```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                      CASE NO. 24-cr-80116-AMC
 3
     UNITED STATES OF AMERICA,           Fort Pierce, Florida
 4
                     Plaintiff,          December 11, 2024
 5
            vs.                          10:33 a.m. - 11:54 a.m.
 6
     RYAN WESLEY ROUTH,
 7
                     Defendant.          Pages 1 to 65
 8    _____
                     TRANSCRIPT OF STATUS CONFERENCE
 9              BEFORE THE HONORABLE AILEEN M. CANNON
                     UNITED STATES DISTRICT JUDGE
10    APPEARANCES:

11    FOR THE GOVERNMENT:
                                 UNITED STATES ATTORNEY'S OFFICE
12                               JOHN SHIPLEY, ESQ.
                                 CHRISTOPHER BROWNE, ESQ.
13                               99 NE 4th Street
                                 Miami, Florida 33132
14
      FOR THE DEFENDANT:
15
                                 FEDERAL PUBLIC DEFENDER'S OFFICE
16                               KRISTY MILITELLO, ESQ.
                                 RENEE SIHVOLA, ESQ. (Via phone)
17                               250 S. Australian Avenue
                                 Suite 400
18                               West Palm Beach, Florida 33401

19
      STENOGRAPHICALLY REPORTED BY:
20
                                 LAURA E. MELTON, RMR, CRR, FPR
21                               Official Court Reporter to the
                                 Honorable Aileen M. Cannon
22                               United States District Court
                                 Fort Pierce, Florida
23

24

25
```

 1          (Call to the Order of the Court.)

 2          THE COURT:  Good morning.  Please be seated unless

 3   you're addressing the Court.

 4          Please call the case.

 5          COURTROOM DEPUTY:  United States of America v. Ryan

 6   Wesley Routh.  Case No. 24-cr-80116.

 7          Will the parties please make your appearance starting

 8   with the United States.

 9          MR. SHIPLEY:  Good morning, Your Honor.  John Shipley

10   for the United States, along with Christopher Browne from the

11   U.S. Attorney's Office.

12          MR. BROWNE:  Good morning.

13          THE COURT:  Good morning to both of you.

14          MS. MILITELLO:  Good morning, Your Honor.

15   Kristy Militello on behalf of Ryan Routh, and also,

16   Renee Sihvola, who is making an appearance by telephone.

17          THE COURT:  Good morning.

18          MS. SIHVOLA:  Good morning, Your Honor.  Renee Sihvola

19   on behalf of Ryan Routh.

20          THE COURT:  Good morning, Ms. Militello, Ms. Sihvola,

21   and good morning, Mr. Routh.

22          All right.  Just as a reminder, we have set up an

23   overflow room on the second floor for any folks who are not in

24   the courtroom and wish to observe from there.  I will again

25   remind folks about the prohibition on electronic equipment in

1   the Fort Pierce courthouse.  So there shall be no possession of

2   those devices and, of course, no electronic transmission during

3   the hearing.

4        This is a status conference to discuss the progress of

5   the case and deadlines as a whole, and also to hear argument on

6   a recently-filed defense motion to continue, which is opposed

7   by expedited response filed by the United States yesterday.

8        I have reviewed the full record to date, including the

9   United States' discovery status report which was filed on

10  November 22nd.  I have also reviewed the full responses to the

11  standard discovery order, the most recent of which was filed on

12  December 4th, plus the associated indices that are attached to

13  those responses showing the particulars of all of the provided

14  material thus far.

15       I also directed the parties in advance of today to be

16  prepared to discuss discovery in detail, including both expert

17  and fact discovery, timelines for production of outstanding

18  discovery, defendant's reciprocal discovery obligations,

19  pretrial motions, any other matters pertinent to trial

20  readiness, and also to address the pending motion to continue.

21       That motion is opposed for various reasons as explained

22  in an expedited response, as I noted, filed yesterday, although

23  the United States indicates it is not opposed to an additional

24  shorter continuance to accommodate the significant discovery in

25  this case.

1           The United States' opposition also calls for

2    specification of additional deadlines, including a deadline for

3    the filing of pretrial motions, for the exchange of defense

4    discovery, and for the defense to file any anticipated notice

5    under Rule 12.2, given, apparently, recent indications by the

6    defense of a possible insanity defense.

7           As general background, trial was initially set in this

8    case for November 18th, following arraignment on an indictment

9    returned on September 24th.  But trial was continued for

10   90 days following the government's unopposed motion to

11   continue, leading to a current trial setting starting on

12   February 10th of next year.  So that is the general lay of the

13   land, as best as I can tell, subject to further clarification

14   and discussion this morning.

15          What I would like to do first is start off with counsel

16   for the United States on the subject of government-produced

17   discovery, both complete and outstanding, so that I can better

18   understand the timelines for remaining productions and just the

19   general volume and scope of discovery in this particular case.

20   Then I would like to hear from defense counsel on the subject

21   of government-produced discovery and any issues associated with

22   those productions.

23          After that, I would like to turn to the miscellaneous

24   additional items, including the parties' views about pretrial

25   motions and related deadlines, notices, reciprocal discovery by

1    the defense, and any other discovery-specific matters.  We will

2    then end with argument on the motion to continue, although

3    there is, of course, significant overlap with the motion and

4    the discovery items.

5         So that's my general plan for this hearing, which I

6    anticipate will last approximately one hour, though I want to

7    make sure each side has enough time to present its views.

8         So, with that, who will be taking the lead for the

9    United States, or is there a division of labor in mind?

10        MR. SHIPLEY:  I think today, Your Honor, it will be

11   mostly me.  So I will be happy to address all of the Court's

12   questions about discovery.  And anticipating where Your Honor

13   would be going, what I have tried to prepare for is to map out,

14   a little more specifically than we have in the status report,

15   what discovery we've produced and what we think will be

16   forthcoming.

17        Obviously, in compliance with Your Honor's order we

18   tried to address that pleading, in a pretty detailed way, what

19   we produced and what the nature of the information is in this

20   case.  So let me try and work off of that since I know the

21   Court is familiar with it.

22        Obviously, what is unusual about this case, at least in

23   terms of the volume of the discovery -- this was a reactive

24   matter.  I mean, there was no pending investigation of this

25   defendant for attempting to assassinate the President-elect

1    prior to September 15th.  By virtue of how serious this conduct

2    was and the gravity of the conduct, there was certainly a

3    wide-ranging investigation that went into a variety of

4    directions.  Some of that was, frankly, a product of the

5    defendant's own history and background which has involved

6    living in multiple places, traveling to multiple places.

7         As we have indicated, I think we have recovered at

8    least 17 cell phones from him, just in terms of what we

9    obtained immediately after the arrest.  So there was a lot of

10   information.

11        THE COURT:  Let me just stop you briefly.

12        Ms. Sihvola, can you hear Mr. Shipley properly?

13        MS. SIHVOLA:  Yes, Your Honor.  Thank you.

14        THE COURT:  All right.  Please continue.

15        MR. SHIPLEY:  And I'm happy to speak differently for

16   your reporter's benefit or for --

17        THE COURT:  We're okay.  I just wanted to ensure the

18   transmission was sound.  Please continue.

19        MR. SHIPLEY:  So that's why we have a lot of

20   information.  These are charges that, maybe on their face, you

21   might wonder why is there so much information out there?  That

22   is a product of this investigation and the gravity of what this

23   defendant attempted to do on the -- on September 15th.

24        The vast majority of what has been produced -- I think

25   we've actually tallied it out to a percentage -- about 65,

1    66 percent are data extractions from the defendant's own

2    devices.  Okay?  So a lot of that material -- that is way more

3    than half.  And again, I think the number is approximately

4    66 percent.  These are from the defendant's own phones,

5    tablets, other items.  So these are things that you would

6    expect him to be familiar with.  But that's the lion's share of

7    what the discovery has been.

8         THE COURT:  Okay.  So on the digital universe, so to

9    speak, can you just itemize for me how many phones, how many

10   devices, et cetera, and how many of that information has -- how

11   much of that information has already produced versus is still

12   waiting to be digitized and transmitted?

13        MR. SHIPLEY:  Sure.

14        My understanding -- again, I believe it's a total of 18

15   phones, 17 of which were the defendant's.  I believe, actually,

16   the list that appears in the status report is still correct in

17   terms of additional -- I think there are three tablets, and

18   some other electronic storage devices.

19        THE COURT:  And these were all seized when?

20        MR. SHIPLEY:  Subsequent to the -- subsequent to the

21   arrest, I believe, pursuant to either -- for example, there

22   were six phones, I believe, in the vehicle that the defendant

23   was driving when he fled the scene, and they were obtained.

24   Others were obtained through search warrants or other searches

25   of locations.

 1           My understanding is that all of that, the digital

 2    extractions from those personal devices, have been produced.

 3    So those are one -- that's off the table.  And I'm going to, in

 4    a moment, with the Court's permission, address what I think is

 5    outstanding and try to give you a timetable on that

 6    information.  But those have been provided.  I don't believe

 7    there is anything that -- that we have in terms of his personal

 8    devices or that data that has not been produced.

 9           THE COURT:  So as of when do you believe this lion's

10    share of digital information was submitted?

11           MR. SHIPLEY:  My understanding -- and my colleagues

12    back there can correct me if I'm wrong -- most, if not all, of

13    that went out in the first SDO response.  Again, we sent two --

14    or would have gone out in the second.  Those went out on

15    November 12th and 13th, immediately after this Court entered

16    the protective order.  Within one or two days of that, we made

17    a fulsome production of all of that information.  So,

18    obviously, we have been working to get those things together,

19    and simply waiting on the Court to enter a protective order.

20    So, I believe that's been out for a matter of weeks.

21           THE COURT:  Okay.

22           MR. SHIPLEY:  The other big chunk of information is --

23    just in terms of data, sort of breaking that down, are the

24    body-worn camera footage and traffic camera footage, just

25    because that consumes an awful lot of data, just as anything

 1    like that would on our phones.

 2            THE COURT:  And that is all from the date in question,

 3    one date?

 4            MR. SHIPLEY:  Not necessarily.  There is some of

 5    that -- the body-worn camera material would have been primarily

 6    from that date obviously; officers responding to -- to the

 7    scene, part of apprehending the defendant after his flight.

 8            I think the traffic camera footage extends over a

 9    longer period of time, simply by virtue of how these things are

10    recorded.  And that may -- that is something that, as I will

11    address in a moment, we are continuing to look at to try to

12    narrow that down as best we can to what may potentially be

13    relevant to a defense.  For example, a traffic cam may have

14    30 days outside of a location, and there may be days where

15    there is absolutely nothing of import to this case, and we're

16    trying to review that to assess what can we pull out of this,

17    as opposed to just giving them the entirety of that footage.

18    But that's a lot of data, as you can imagine, 30 days of

19    traffic cam footage.

20            So, again, the lion's share of that again went out in

21    discovery responses 1 and 2.  I think there was some additional

22    body-worn camera footage that went out in SDO response 3, which

23    came, I think, about a week on the heels of the second

24    response.

25            We are continuing to review some body-worn footage;

1   that will be produced, as I will get to in a moment, I think

2   within the next week in our next discovery production.  So,

3   again, most of that has gone out, other than what we are

4   currently reviewing.  Same with the traffic cam, in an effort

5   to kind of see what we can pull out to -- material that may or

6   may not be relevant.

7           THE COURT:  So by when do you think you will have all

8   of the body-worn camera footage and traffic footage completely

9   done and transmitted to defense?

10          MR. SHIPLEY:  I would think next week.

11          THE COURT:  Okay.  All right.  Please continue.

12          MR. SHIPLEY:  Sure.

13          So that really is -- so you put those two things

14  together, and I think the number is over 90 percent, I think

15  close to 93 percent of the -- of the data we're talking about

16  that we -- have been produced.  Because I know that when you

17  talk about terabytes of data or gigabytes, it sounds like a

18  lot.  That is what it mostly consists of.  Okay?

19          The remaining materials consist of reports of

20  interviews or FBI 302s.  Those have been provided.  Those were

21  provided in our initial discovery responses.  The only items in

22  that set that are outstanding relate to either recent

23  interviews or things that may be ongoing.  I mean, obviously,

24  the investigation has continued.  This only happened less than

25  three months ago, so we're continuing to take investigative

1    steps.  So -- but the reports that have been completed and were

2    ready to go went out, again, in the initial discovery

3    productions.  So that's a -- you know, a small -- certainly, a

4    much smaller percentage of things than the defendant's own

5    devices.

6          So when the defense talks about the need to review

7    materials and go over things they don't know about,

8    60 -- 65 percent of that is the defendant's own to work with.

9    And we're talking about classic things that a defendant may be

10   looking at.  Reports, for example, of witness interviews,

11   that's a really small number in this case.  And, of course,

12   this is not a big fraud case.  This is not a document-heavy

13   case.  So, again, we're not in a situation where those type of

14   materials are out there unknown to the defendant and to defense

15   counsel.  So that is the bulk of the nonexpert discovery.

16         I can tell you within the next week we will be

17   producing, again, body cam footage that we're still reviewing,

18   traffic cam footage, again, trying to work our way through it

19   to just, frankly, winnow it down to what may be relevant to

20   preparing a defense.  We have some reports from recent

21   activity, some ROIs or 302s, and there may be some jail calls

22   as well.  But that's not a lot, and that will be coming out

23   within the next week.

24         So in terms of nonexpert discovery, that's the universe

25   of things.  I think we've worked very hard, given the -- the

1   way this investigation unfolded, in its immediate aftermath,

2   all the leads that had to be tracked down, to try to synthesize

3   this as much as we can.  And again, particularly with the

4   devices, we don't have a choice on that.  They're his devices.

5   We have to produce those things.  That's a lot of data, and

6   they can address them as they see fit in their trial

7   preparation, but that's not an effort by the government to bury

8   them in information.  That's -- those are items we need to

9   produce.

10          THE COURT:  This digital information, has it been

11   produced in a matter -- manner that is searchable in fairly

12   easy ways by the defense?

13          MR. SHIPLEY:  Right.  Well, I mean, the idea -- that's

14   correct, Your Honor.  The idea is to be able to produce and

15   provide it to them in a format that is a searchable.  And that

16   obviously takes some time too on the front end to be able to

17   extract this content and share it in that format.  To the

18   extent we've had any questions from the defense about whether

19   they could access certain materials or some issues, I think

20   we've been able to communicate those to each other and we've

21   worked to address those.

22          If there is something they weren't able to upload and

23   read, then obviously we will continue to do our best to address

24   any concerns on that front.  But, correct, those would have

25   been produced in a format that would have been -- the content

1   could be reviewed and -- and analyzed.  So that's the

2   government's nonexpert discovery.

3          In terms of expert discovery, in compliance with the

4   Court's order, we made a disclosure consistent with the rules

5   as well, on November 17th, I think, was the date.  That

6   consisted of disclosures regarding eight experts, and they

7   really fall into two categories.  There are experts who are

8   really confirming the defendant's presence in certain places or

9   his connection to certain things; fingerprints or handwriting

10  or DNA.  Those are fairly straightforward topics.

11         And then there are some experts on matters that go more

12  to the substantive crimes; for example, a ballistics expert who

13  will be able to testify -- in my words, not the expert's

14  word -- that anybody within range of that rifle would have been

15  dead if he had gotten off a shot, no question about it.  So

16  that's a more substantive piece of expert testimony.

17         The disclosures that we have made, I think of the

18  eight, we may basically complete disclosure, certainly above

19  and beyond what is required initially under the local rules.

20  In terms of synopses, we did a lot more than that.  We gave a

21  detailed explication of what their testimony would be and

22  provided the reporting data.

23         THE COURT:  So -- but you acknowledge that at least

24  that the initial expert disclosures were not of the fully

25  complete variety contemplated by Rule 16?

1          MR. SHIPLEY:  I think the way the -- the Rule 16

2    structures it, and the local rule also, is there are sort of

3    two pieces to an expert disclosure.  One is an initial

4    disclosure of synopses of summaries of the experts, reasons and

5    bases for opinions, and then a more fulsome disclosure under

6    the rules, as required, 21 days before trial subject to the

7    Court's ruling.

8          So we complied with the initial requirement, but for

9    more than half of those eight, we basically provided all of the

10   information that would be their testimony.  In other words,

11   that second phase of expert disclosure has already been done.

12         THE COURT:  So you've identified the actual names of

13   the experts, for example?

14         MR. SHIPLEY:  Correct.  I think in all but one instance

15   we have identified the names, and I can -- happy to walk

16   through that list.  And given, really, the content that we

17   would be -- excuse me -- expected to give closer to trial.  The

18   only thing that would be missing under the rule now is the

19   certification by the expert, the signed document, and

20   identification of any cases they have testified in.

21         But in terms of their --

22         THE COURT:  What about their underlying work, the

23   reports themselves and the analyses?

24         MR. SHIPLEY:  Those have been produced for four of the

25   experts, I believe.  With respect to, for example, the CAST

1   examiner, who would testify about the cell site location data,

2   the reports that that expert would be preparing, Your Honor may

3   be familiar with this, are really more in the manner of trial

4   exhibits.  The underlying data -- the cell site data has

5   already been provided to them.  So that's out of there.

6        We have the handwriting expert.  We've produced two

7   reports and all of the supporting backup for that.  We have a

8   third report that will be forthcoming within the next week.  It

9   just needs approvals.  So that will be coming, and that was

10   just completed.  So as soon as we're getting that, we're

11   turning that around.

12        And my recollection is the only area where we don't

13   have a name yet or, sort of, complementary reports is in the

14   area of the ballistics, and we're in the process, candidly, of

15   identifying who that expert will be.  And then we will be able

16   to develop that -- that content.  But even then, in our expert

17   disclosure we provided a synopsis of what that testimony would

18   be, compliant with the rules.

19        So certainly from our perspective, we've complied fully

20   with Your Honor's order and what the local rules expect in

21   terms of an expert disclosure at this stage.  So as we

22   continue --

23        THE COURT:  What do you view as sort of, like, your

24   drop-dead "all of my expert discovery will be complete"?

25        MR. SHIPLEY:  I think we will be complete with the --

1    again, the handwriting experts disclosures will be complete by

2    next week.  Let me pause and think.  I don't want to make an

3    unrealistic -- the real missing -- some of these materials, for

4    example, the CAST reports, are generally things that would be

5    done closer to trial when we decide how are we going to present

6    this data.  Again, Your Honor, I know, is familiar with it from

7    your trial experience.  We're not going to present every bit of

8    location data.  We're going to focus on where he was, for

9    example, on September 15th, at the golf course and maybe in

10    other locations.  So -- but that data is already available to

11    them.  And this isn't usually a controversial issue.  I mean, I

12    don't find that cell site -- cell site location experts are

13    really a source of a lot of back-and-forth at trial.

14         In terms of the ballistic expert, I can -- what I can

15    do is assure the Court we're having those discussions now.  We

16    want to move that as -- along as quickly as possible.  I'm

17    happy to provide the Court, within a matter of weeks, of where

18    we are with that.  And again, once we identify who that person

19    will be, we will be able to communicate what the reports would

20    be.  But we've already provided the synopsis.

21         There shouldn't be anything that they're in the dark

22    about, about what the gist of that testimony will be; most of

23    which, frankly, may line up with anybody's common sense

24    understanding of where this defendant positioned himself

25    vis-á-vis the golf course and where the President-elect would

```
1   have been and where the Secret Service agent confronted him.
2   So that shouldn't be deeply controversial material anyway.
3            THE COURT:  I --
4            MR. SHIPLEY:  So that's where we are on -- on expert
5   disclosures.  My apologies.  Correct me if I'm mistaken in
6   anything.  Obviously, there are a lot of hands in this.
7            THE COURT:  So there have been four productions to
8   date; is that correct?
9            MR. SHIPLEY:  There have been four SDO productions,
10  that is correct.  Again, the fifth will be coming next week.
11  So -- and really it's -- you know, we could have put the first
12  two together because they went out within a day of each other
13  right after the -- after the Court entered its protective
14  order.  So we sort of turned from one -- as soon as we turned
15  out a production, we've continued to look at other things.  We
16  have individuals working day and night on reviewing these
17  materials to get them ready for production.
18            But, really, it is a fact that the -- of the materials
19  we possess, the vast majority of them have already been
20  provided, and the vast majority of those materials are things
21  of the defendant himself in the form of those electronic
22  devices.  So I'm comfortable with where we are, and we will
23  continue to do what we can on our end to make sure this trial
24  happens as quickly as possible.
25            That's something we want to have happen, and we're
```

1    going to do our best consistent with an ongoing investigation

2    to -- to make materials available to them, and I think we've

3    tried very hard to do that.

4         THE COURT:  When do you believe the defense reciprocal

5    discovery obligation was triggered?

6         MR. SHIPLEY:  Well, I think under the rule, under the

7    same rules that we operate under, that is triggered no later

8    than after we've made our initial discovery responses in terms

9    of nonexpert discovery.  So I think they're already, under the

10   local rules, on the clock for that.  I know that is something

11   that is not often enforced or observed in practice, but they're

12   on that same clock in terms of information that they identify

13   that they may use at trial.  With expert disclosures, that's

14   14 days.  For those initial synopses, under the two-tiered

15   (phonetic) rule, that happened 14 days after -- I guess we made

16   the expert disclosures on October 17th.  So by that count,

17   we're looking at -- I'm sorry -- November 17th.  By that count,

18   we're looking at December 1st.  We sent defense counsel an

19   email then, just closing the loop, making sure there was no

20   confusion about our requests on November 22nd.  So even if you

21   count the 14 days from there, we're already past that date.

22        So they're on the clock for both of those things.  And

23   I'm happy to address it now, or we can turn to it in whatever

24   sequence is helpful to the Court, particularly when it comes to

25   areas of potential mental health experts.  That needs to be out

1    there early.  We cannot be in a position of setting a trial

2    date here, and then have that jettisoned at the last moment

3    because of some disclosures.  Whether they have any merit or

4    not, we're entitled to know about them.

5         So to return to the Court's question, they are on the

6    clock now for those disclosures.  I believe they are in a

7    position to certainly make initial corresponding expert

8    disclosures to us, to the extent they're going to call any

9    experts at all.  But we can't be in a position of them going

10   for months and months and months saying, "We're not sure

11   whether we're calling any experts," and then we're on the eve

12   of trial and we get a slew of disclosures.

13        And the same thing applies, again, with the defense

14   discovery.  They may not be sure at this point what they're

15   actually going to use and what comes within the ambit of the

16   rules, but we have the defense counsel on the record, from the

17   detention hearing, talking about having records supposedly

18   showing this defendant's good character.  We have, obviously, a

19   substantial quantity of communications this defendant is

20   attempting to put out in the public domain, letters or

21   otherwise.

22        So I believe that material is out there, and the most I

23   can ask of this Court in terms of an order is to remind the

24   defendants that they are on the clock with both of these

25   obligations, expert discovery and regular discovery, and to set

1    a deadline once we settle on a -- a trial date, if Your Honor

2    is going to move it, for them, really, to have made those

3    disclosures absent some extraordinary circumstances.  And I

4    think that's what the rules expect on -- on both sides.

5           THE COURT:  All right.  Any other items in the bucket

6    of outstanding discovery?

7           MR. SHIPLEY:  I don't think so, Your Honor.  I think I

8    have addressed it.  We have the traffic cam footage, the body

9    cam footage.  We have the handwriting report.  All that, again,

10   should be going out next week, again, subject to whatever

11   ongoing process of reviewing, particularly the traffic cam

12   footage, to kind of narrow that down.

13          We have some additional reports that will be produced,

14   maybe some additional jail calls.  Again, all of that will be

15   in the next week.  And then, really, the missing pieces are --

16   other than items that we are continuing to acquire, which will

17   be produced as soon as we get them, the ballistics expert

18   information we spoke about, CAST reports, and any more recent

19   investigative materials.

20          Looking back to the galley, I think that's -- that's

21   where we are, Judge.  So we've really endeavored -- our goal in

22   doing this is not only comply with what our obligations are,

23   but to do what we can to keep this on track, mindful of the

24   fact that there was an awful lot of information that was

25   collected in the wake of this, as there should be, given the

 1    seriousness of what happened.

 2         THE COURT:  Okay, then.  Let me turn to Ms. Militello

 3    for any focused discussion on the topics we've covered thus far

 4    related to government-produced discovery.  And then,

 5    Ms. Sihvola, I will be sure to give you an opportunity to chime

 6    in.

 7         Ms. Militello.

 8         MS. MILITELLO:  Thank you, Your Honor.

 9         And I'd like to take the opportunity just to correct a

10    few things in our written filing.  We really tried to make the

11    record clear about when we were receiving and accessing

12    discovery.  Because when the government files their notices in

13    the online docket, of course, we don't receive discovery that

14    day.  They FedEx it to our office, which generally takes a

15    couple of days, and then my support staff has to process that

16    information.

17         When we got Your Honor's order, we tried diligently to

18    finish this motion over the weekend, and as a result, some of

19    our descriptions of the discovery received were inaccurate.

20    That third production, for example, I spoke with my IT

21    Department, it was still uploading on Saturday, Sunday, and did

22    not complete until yesterday.  I asked my IT personnel just for

23    a summary of why that took so long, and he explained that that

24    device, that hard drive was over 1 terabyte of information,

25    which he described as unusual, and then -- or quote, "pretty

1    large in today's standards," unquote, that it contained 41

2    different extraction devices.  So we are talking about more

3    than just 18 devices.  That production had 41 digital

4    extractions.

5         THE COURT:  Do you know how many of those 41 are the

6    defendant's equipment?

7         MS. MILITELLO:  I have not reviewed this production

8    that finished yesterday, but I take the government at their

9    word that it's the 17 or 18.  But I know there is additional

10   tablets, there is additional laptops, there is USBs.  I don't

11   know who those belong to.  And, to be clear, I don't have any

12   reports, at least that I have seen.  It's possible -- again, I

13   haven't reviewed everything.  But to my knowledge, I don't have

14   any reports sort of summarizing the relevance or materiality or

15   lack thereof of these devices.

16        And so, as the Court knows, when we get a device, your

17   ordinary criminal case -- everyone has a cell phone -- maybe we

18   have one or two devices.  And we routinely tell the Court it's

19   going to take us weeks to go through that.  Because we open the

20   Cellebrite program and thousands of pages of material generally

21   populate, so many pages that it often takes hours just to open

22   the program.  Like, I leave it running while I do other work,

23   and then once it's open, we review it.

24        And in this case, we don't have -- and the government's

25   not obligated to do this, right?  But in a lot of big cases,

1    fraud cases, cases for mean justice, they will give us an
2    evidence summary or a PowerPoint telling us where we can find
3    things, right?  We have an index of materials, but we don't
4    have an index of relevant information.  And of course, they're
5    still obligated to give us everything so we can see if there's
6    exculpatory material they've missed.  But having such a map is
7    really helpful in big tax cases, in big fraud cases, because
8    then we know, all right, this was why they gave us this laptop.
9    We need to be looking for, you know, any particular type of
10   evidence about an internet search, or about a photograph, or
11   about location data.

12           You know, them telling us they've given us cell phones
13   with location data -- of course, I'm not a cell site analysis
14   [sic].  I don't have one in-house at my office.  I don't have
15   an in-house investigative agency, right?  It's my investigator
16   who -- here and with me in court.  And so, when us as
17   individuals are trying to go through these things, device by
18   device, it just takes months.  I have never had a case with 17
19   items attributed to a client in my entire career.  So this may
20   not be a case that spans years, but we are talking about an
21   expansive amount of discovery.

22           But I did get off track.  So we did not finish
23   downloading the third production until yesterday; and then,
24   that's why it's not fully outlined.  But I think the
25   government's index about what is contained -- and, you know, I

1   take them at their word in terms of the summary.

2          The fourth production is not even mentioned in our

3   motion.  And that was an oversight, but that was an oversight

4   because, again, our IT department had not begun downloading

5   that because they were still finishing the third.

6          THE COURT:  And that's jail communications, the fourth?

7          MS. MILITELLO:  It appears to be, primarily, jail

8   communications.  The emails downloaded pretty quickly

9   yesterday, but it mentions phone calls, and we don't have those

10  yet.  And I think, again, just because of the size of the

11  files, that we don't have them.

12          I asked my IT person.  And, of course, we have a number

13  of IT persons.  This is an area where my office is

14  well-staffed.  He said he had been working full-time on this

15  for eight hours a day, for over two weeks just to download the

16  third production.

17          So while Ms. Sihvola and I are not working full-time on

18  this case, he was working full-time the last several weeks just

19  to download these materials, and that's how long it's taking us

20  just to obtain them, just to download them on the server, never

21  mind review them.

22          And so, in terms of discovery, that is what we believe

23  is voluminous.  I think the only comparable case, really, is a

24  fraud case.  The only cases I have had comparable in the

25  amounts of discovery are my two January 6th cases, in which the

1    government was able to summarize for the courts how many hours
2    of video there were, how many images, how many reports, right?
3    And we don't have quite the detail of that.  And I understand
4    this is one case versus the thousands there are there.  But the
5    numbers in those cases were really helpful because when they
6    say to the Court, Judge, it would take a lawyer over a year
7    without sleeping or taking vacation to review all the video,
8    therefore, a continuance of more than a year is reasonable,
9    right, we all know what we're dealing with.  Where here, we're
10   sort of in the dark because we're still downloading things,
11   we're still waiting on things.
12         THE COURT:  Do you see any distinction in this case
13   based on the fact that the lion's share of the digital
14   information apparently stems from the defendant himself and,
15   therefore, you could at least have, I would presume,
16   conversations with your client regarding the contents of his
17   own items?
18         MS. MILITELLO:  No.  And I'm glad the Court brought
19   that up.  So, for two reasons, I don't think there is
20   particularly a difference.  One, of course, Mr. Routh is not
21   pro se.  So whether he knows what's on those devices or not
22   doesn't translate to his counsel knowing.  But also, a person
23   often does not know, if they're not in this field, the kind of
24   information that one's phone captures and retains.  And then,
25   of course, you might forget some of that information.

1          But at this time, we don't have much in the way of what

2    materiality, if anything, is on any of these devices.  Are all

3    of the devices coming in at trial?  Does the government think

4    there is relevant information on all of these devices?  I don't

5    know.  That's one of the experts they haven't disclosed yet.

6    And so when they say they've given us the cell site data or the

7    location data, sure, that's on the phone, but I can't read it.

8    I will need to obtain an expert to look at it.  And truly, what

9    the normal course is -- and so the government's right, it's not

10   often litigated -- is they give us the location information.

11   So then we can say to our expert, Does the science support

12   this?  And if the answer is yes, then we don't challenge it.

13         But I don't have that location information yet.  I

14   don't have an expert yet.  And so I don't even know what

15   they're alleging in terms of that location data.  We're still

16   really in the dark.  And, yes, the government's right, some of

17   that information was not due yet.  But that is the kind of

18   information that in, big cases, mean justice often provides, or

19   even in fraud cases in the District, to sort of help us prepare

20   in a timely fashion.

21         THE COURT:  When you say you are in the dark, can you

22   focus?  What exactly do you believe you're in the dark about?

23         MS. MILITELLO:  When I say I'm in the dark, I don't

24   mean it's necessarily because the government hasn't complied.

25   I mean that Ms. Sihvola and I are two people who have just

1   scratched the surface of the discovery.  And I spent all day on

2   this case yesterday.  Candidly, I don't have a lot of days that

3   I can spend all day because I have other cases.  But I,

4   essentially, did spend all day on this case yesterday, and I

5   have still barely scratched the surface.

6           I told the government, with the digital information, I

7   think we've only reviewed close to a couple percents of the

8   case.  If you exclude all of the digital items, maybe we have

9   reviewed about 10 percent of the discovery, but that's

10  excluding a lot of the discovery.  You know, I have one

11  investigator who is wonderful, but he is also not full-time on

12  this case.  I don't have the resources of the FBI, and I don't

13  have in-house experts to catch up in the way that they can.

14  Just because they provide us something, doesn't mean we have

15  analyzed it, we've reviewed it, we have vetted it.  And I know

16  Your Honor knows that.  But -- so when we have nine experts,

17  that is unusual.  Again, I have not had a federal case with

18  nine experts.

19          THE COURT:  So I just want to understand.  We have

20  eight or nine, Mr. Shipley?

21          MR. SHIPLEY:  I think it's eight, Your Honor.

22          THE COURT:  It's eight total?

23          MS. MILITELLO:  I think we were adding one of -- and

24  maybe we miscounted, but there was the unnamed ballistics

25  expert, the cell site expert, and then the handwriting expert.

1    And so maybe it is eight.  I don't --

2          THE COURT:  Okay.  Eight or nine.  Okay.

3          All right.  So you're -- I guess what you -- what you

4    have described to me is the beginning stages of reviewing the

5    great volume of electronic information, most of which derives

6    from items in the defendant's possession.  Would you agree with

7    that characterization?

8          MS. MILITELLO:  Well, it sounds like that, but if there

9    is 41 electronic digital items, which is what my IT personnel

10   just downloaded, I don't yet know where the other 28 came from.

11   So I don't know.

12         THE COURT:  Okay.  I think -- I think they might have

13   been itemized in one of the status reports or in the response

14   to the standing discovery order where it went through tablets,

15   although, perhaps didn't identify exactly who is the custodian

16   of those items.  But in any case, I take your point that there

17   is a lot of device-oriented discovery in this case which you

18   need time to review.

19         So please continue with your presentation of discovery

20   and any responses you may have to Mr. Shipley's statements.

21         MS. MILITELLO:  Yes, of course.

22         There is also hundreds of witness that were

23   interviewed.  Getting us the 302s is helpful, but a number of

24   those witnesses, we need to follow up with as well.  And as we

25   mentioned, we may need to travel to interview or see various

1    locations in person.  It is a little more complicated in that

2    some of these witnesses must -- met with Mr. Routh overseas.

3    We're hoping not, frankly, because of the time needed to travel

4    overseas.  We're hoping to meet with people locally.  But any

5    amount of travel, obviously, is difficult and time-consuming.

6          We have 148 pages, so far, of lab reports; 128 pages of

7    airline records.  Again, I don't really know what those mean,

8    which I should be focusing on.  There are 456 fingerprints.  We

9    have not yet -- I have no problem telling the Court we have not

10   yet consulted with the DNA expert, a fingerprint expert.  Those

11   individuals will need not only these cards, but often, they

12   need to know, well, where did it come from?  What is the

13   discovery that's associated with this, right?  So there is

14   things that we have to put together from the discovery to then

15   have an expert analyze the material, and that doesn't mean

16   we're going to call an expert.  It doesn't mean we're going to

17   challenge the evidence.  But our duty is to validate what the

18   government is presenting to the Court and make sure it meets

19   constitutional and scientific standards in order to be

20   admissible.  And so we're just a long way from doing that.

21         And that's why we haven't listed any defense experts

22   yet because, frankly, we haven't gone through the material to

23   even hire our own experts and tell us, is this material valid?

24         If it's valid, we won't challenge it.  But there may be

25   Daubert motions.  There may be motions related to improper

1    opinion testimony.  We just don't know yet.

2          We will say as to the discussions related to

3    Mr. Routh's mental health, one of the things that we discovered

4    in reviewing the FBI's interview is that one of the last

5    witnesses who talked to Mr. Routh described him as

6    hallucinating, and a number of other witnesses described him as

7    delusional.  And so, I know the government is waiting on us to

8    advise about whether we will seek competency evaluations or

9    move forward with insanity.  And as an officer of the Court, it

10   is my duty to ensure that if I have concerns, we investigate

11   that and then, of course, that I investigate any affirmative

12   defenses.  And we're in the process of doing that.

13         An expert has met with Mr. Routh a couple of times.

14   That expert also needs to review the discovery, at least in

15   terms of a possible insanity defense.  And she will need to

16   meet with Mr. Routh a number of other times.

17         But one of the main pieces of information that we're

18   missing -- and I don't usually like to involve the Court or the

19   government in this, because of work product and attorney-client

20   privilege, and we have the right to a private defense at this

21   stage -- but we've requested records from the Bureau of Prisons

22   regarding Mr. Routh's mental health in terms of his

23   psychological evaluations, logs related to his sleep schedule.

24   And that request was made several weeks ago and has not yet

25   been returned to us.

1           Now, sometimes the BOP returns things in a week,

2     sometimes it's a year.  But our expert will need that

3     information.  And, frankly, I need that information when we're

4     trying to determine Mr. Routh's current state of mind and in

5     terms of how to proceed.

6           We have also requested additional records related to

7     Mr. Routh's status prior to this case.  For example, there were

8     some education records that were at the home in Hawaii.  We

9     believe the FBI seized those records.

10          THE COURT:  Okay.  Let's be a little more precise here.

11          So with respect to the BOP medical records, what

12     exactly are you asking for?

13          MS. MILITELLO:  We requested the entire content of his

14     medical slash -- it's a BEMR file, which should include his

15     mental health records.

16          THE COURT:  Okay.  And you requested that when?

17          MS. MILITELLO:  November 21st.  In that same request we

18     also requested the mandatory 30-minute round logs.  So members

19     of the BOP will do rounds and say, "This person is sleeping,"

20     or, "They're eating," or, "They're awake"; right?  Or they will

21     comment sometimes on their mental status or their physical

22     appearance.  So we have requested those logs.

23          And then we also requested the suicide watch logs as

24     well.  And I know my investigator followed up again this week

25     with FDC Miami, and I -- no response, I believe, was -- that's

1    correct.  They did not respond to his email asking for an

2    update.

3           THE COURT:  So by when do you think you could make a

4    meaningful decision about any 12.2 notices?

5           MS. MILITELLO:  So I talked to my expert yesterday and

6    asked when she thought she could give us an opinion.  And she

7    said she will need several months because she needs to

8    personally interview several witnesses.  She needs these

9    records that we've requested, and she also needs to review some

10   of the pertinent discovery.  Once --

11          THE COURT:  What specific discovery would this mental

12   health evaluator need to review in order to come up with a

13   recommendation?  As you might imagine, this notice issue is

14   pivotal because it may make the difference, substantially, in a

15   schedule to be -- to be formed.

16          And so I think, sort of, the general request for an

17   unidentified number of months is not going to be sufficient at

18   this stage.  So I'm looking for more particularity and a more

19   concrete timeline for this particular notice, which really does

20   affect the calculation of the schedule.

21          MS. MILITELLO:  I completely understand.  I would just

22   say anytime the government needs to investigate, you can

23   probably double that time for what we need, to see if we're

24   going to rely on it; right?  It's almost the reverse of these

25   expert notices; right?  Like, they need our opinion to then see

1   our -- if that's a valid opinion, right, to give to their

2   expert.

3          And what we need to get the opinion are things, for

4   example, from Mr. Routh's house, like his child education

5   records; right?  We have to establish if he has a major mental

6   health diagnosis.  In order to do that, we need records from

7   various sources that we don't yet have.

8          THE COURT:  Okay.  What other requests for records have

9   you submitted at this point beyond the BOP records that you

10  indicated?

11         MS. MILITELLO:  We -- if we're going to go through that

12  in detail, I would prefer to do it in camera, not in front of

13  the government.  But what I will say, and what I'm comfortable

14  saying, is that, like, these records -- as I mentioned about

15  education records, things like that, I imagine the BOP seized

16  from Mr. Routh's house.  And I don't yet have them, I don't

17  think.  If the government has provided them, again, then we

18  just haven't gotten there in the production.

19         THE COURT:  Mr. Shipley, are you aware of any mental

20  health or education-related or -- anything on the subject of

21  potential mental health-related documents seized during any of

22  the searches?

23         MR. SHIPLEY:  I'm not, Your Honor.  We can do

24  follow-up, but I just checked back again with the folks on our

25  team who are looking at the discovery and, no, I'm not familiar

1   with those.

2        THE COURT:  Okay.

3        MS. MILITELLO:  One of the other things, I'm not sure,

4   that would relate to -- directly to insanity, of course, one's

5   ability to make sound decisions, their intent, are all issues

6   that come up with insanity; right?  So to what extent Mr. Routh

7   wrote letters at the time or around the time of this event

8   would be pertinent to the expert, right?  They would be

9   material to the expert's decision.

10       And I don't believe that we have all of Mr. Routh's

11  writings from the government.  Again, I could be wrong if

12  they're in the recent productions I haven't reviewed yet.  But

13  I thought, from their responses, that maybe the handwriting

14  expert has some.  I'm not sure.  But I think if they could

15  clarify that, that would be helpful as well.

16       THE COURT:  Clarify, what?  The scope of writings by

17  Mr. Routh specifically?

18       MS. MILITELLO:  Yes.

19       MR. SHIPLEY:  Judge, my understanding, consistent also

20  with the rules, we've turned over the writings of the defendant

21  that we have, and we will continue to do so to the extent he

22  continues to make those writings, which he is doing.  So I'm

23  not sure what specifically she's referencing in terms of the

24  copies of documents, which I think have already been produced

25  anyway, that the handwriting analysis (phonetic) has been

1   doing, that will be coming next week.  So I don't know that to

2   be an issue here.

3        And I think it's also important to clarify when we come

4   to the insanity -- the 12.2 issue, not to speak over my

5   colleague's time, but there are two things.  Remember, insanity

6   is at the moment of the crime.  That's different from

7   competence.  We emailed about them -- them last week asking

8   them, "Where are you on competence?"  And I appreciate

9   Ms. Militello's candor in response.  She said, "We don't think

10  there is a competency issue at this time, so we're still

11  evaluating a potential insanity defense."

12       That focuses on whether the individual had the mental

13  capacity, or the lack of capacity, due to some demonstrated

14  disease or defect to distinguish right from wrong.  I mean,

15  that's a massive standard to meet, although it certainly seems

16  like one that is popular in cases of this ilk, whether it's

17  founded or not.  And we have no reason to believe it would be

18  here.

19       But the point is that's focused on what the defendant's

20  mental health was and ability to distinguish right and wrong at

21  the time of the offense.  That's not a moving target.  So I

22  understand the need to inquire and investigate, but it's not

23  evolving.  His insanity, such as it may be claimed, that's

24  already baked in from the day he committed these -- these

25  crimes.  So that's one piece of it.

1          The second point is, in terms of expert disclosures,

2    12.2 doesn't just require an insanity defense notice.  It

3    requires disclosure of expert testimony going to any mental

4    health claim.  For example, if the defense were trying to do

5    what is a pretty common exercise, say, "Well, we're not

6    claiming insanity, but we're going to introduce -- we want to

7    introduce this expert evidence about the defendant's diminished

8    capacity," for example.  Again, I'm sure Your Honor has had to

9    decide those issues in the past.  That's a common path.  We're

10   entitled to notice of that because it triggers the obligation

11   of the defendant to submit to examinations at the direction of

12   the Court through BOP.  And inevitably, again, it generates

13   litigation, whether it is well founded or not well founded.

14   And I want to be clear, we have no reason to believe it would

15   be well founded here.

16          THE COURT:  Okay.  But with respect to the statements

17   of Mr. Routh -- and let me make sure I -- the pronunciation of

18   Mr. Routh is "Routh" or "Routh"?

19          MS. MILITELLO:  It's Routh.

20          THE COURT:  Okay.  All right.

21          So with respect to Mr. Routh's statements, drafted and

22   prepared by him, you have -- from what I hear, have received

23   those already in discovery.

24          Do you dispute that?

25          MS. MILITELLO:  If the government tells us that they've

1  given us everything, then I take them at their word.  What I

2  would just remind the Court, though, is likely there are text

3  messages, blog posts, emails, internet searches, all things --

4  of course, I agree with them.  Your Honor knows I do mental

5  health cases -- at or around the time of this case that are

6  likely on these 17 devices.  Which devices?  I don't yet know.

7  I have not opened a single one of these devices yet.  We just

8  haven't gotten there.

9       What I did see from some of the witness interviews is,

10  as I mentioned to the Court, you know, one of the last

11  witnesses describes him as hallucinating.  Why does she say

12  that?  We don't know yet; right?  So we have a lot to follow up

13  in that regard.  And my expert has to interview those people

14  and review his most recent writings, emails, texts, internet

15  searches, things like that in order to formulate an opinion.

16  She also needs to do additional testing with him at FDC Miami.

17       THE COURT:  So thus far, there have been, I think you

18  said, two evaluations or two meetings with this counselor?

19       MS. MILITELLO:  I don't want to misquote how many times

20  he has met with my expert.  It's been at least two.

21       THE COURT:  Okay.

22       MS. MILITELLO:  And -- and then I know that he has met

23  with psychological staff at FDC Miami.  So that's part of what

24  we're trying to obtain because they, frankly, would have been

25  the first to meet with him, I think.  And we'd like to know

 1    what their findings and diagnoses and opinions on Mr. Routh

 2    were.

 3             THE COURT:  Okay.  All right.

 4             Any progress on scheduling a crime scene inspection?

 5             MS. MILITELLO:  So, no.  I will be candid with the

 6    Court.  I, as they said, did not respond to that email yet.  In

 7    order for me to make an intelligent use of a crime scene visit,

 8    I need to know, well, where they are alleging Mr. Routh was;

 9    right?  What are they alleging he possessed at the time?  What

10    are they alleging -- how long are they saying he was here?  And

11    those things require review of the evidence.

12             And so it is my practice --

13             THE COURT:  Wasn't some of this information already the

14    subject of the detention hearing and described both in the

15    complaint as well as -- and, of course, alleged -- I'm

16    just -- I take your point that you want to make this crime

17    scene inspection as useful as possible, but at some point the

18    information has been at least summarized already in the court

19    record; is that incorrect?

20             MS. MILITELLO:  It's not incorrect.  It's just not to

21    the degree that we would see in a case with this kind of

22    volume.  The government really could -- if they chose, and they

23    want this case to go to trial faster, really could help direct

24    us.

25             THE COURT:  In -- by doing what?

1          MS. MILITELLO:  For example, I think the complaint

2    mentions -- or it might be the detention hearing, I don't want

3    to misquote -- that there might have been a prior trip to the

4    golf course.  Well, when?  And how do you know that?  And for

5    how long?

6          Those are the kind of facts that we have not yet

7    developed because we're still reviewing information.

8          THE COURT:  Have the parties engaged in any sort of

9    meaningful conferral in these areas that you're indicating you

10   might need some assistance on?

11         MS. MILITELLO:  I'll be candid.  I have not asked them

12   for this information yet, in part because we were still -- as

13   of yesterday, just still downloading things.  And so from our

14   perspective, we're just still very early on in the case.  It is

15   my practice, of course, to reach out to the government and ask

16   for assistance when we need it.

17         THE COURT:  All right.  Let's shift to the topic of

18   logistical challenges that you expressed in your motion.

19   You've mentioned some challenges with purported delays at FDC,

20   so I want to explore that topic and better understand whether

21   you've conveyed your concerns to anybody at the Marshals

22   Service or at FDC, specifically.

23         MS. MILITELLO:  Today, I did.  Not prior to today.

24   Now, I will say early on, there was an issue with FDC not

25   approving our visits timely.  And even now it takes three to

1    four days, probably, for approval.  And the government did

2    assist in getting us in to visit Mr. Routh when, frankly, FDC

3    was not approving.  So they did help in the past.

4        And the marshals have offered to help in sort of an

5    extraordinary circumstance.  And I was, frankly, waiting until

6    there was an instance where it was an emergency and I needed a

7    same-day visit or a next-day visit.  Like, I don't want to take

8    advantage of that offer.

9        THE COURT:  Right.  But if you're going to use this

10   logistical challenge as a basis, in part, to seek a substantial

11   continuance, then I would have imagined that you would have

12   conveyed these concerns to the appropriate personnel to assist

13   you in facilitating these visits without delay.

14       And so I don't think that, you know, there's room to

15   hold off on -- on invoking that assistance, because it is, of

16   course, imperative that you have that easy access.

17       So I'm trying to get to that place and try to exactly

18   understand when -- when were you required or was co-counsel

19   required to wait up to two hours to visit Mr. Routh?  When did

20   that take place?

21       And, Ms. Sihvola, maybe you can chime in here if -- if

22   you're knowledgeable on this subject.

23       MS. SIHVOLA:  Your Honor, sorry.  I don't have the

24   exact dates in front of me, but it was on two prior occasions

25   when I attempted to meet with him.  I did express my concerns

1    to the staff.  It somewhat fell on deaf ears, but I think the

2    point of including that in our motion was just to express to

3    Your Honor that it's not simply as easy as seeing him

4    immediately at a certain facility.

5         Unfortunately, we don't have video access to be able to

6    see him immediately.  So logistically, each visit could

7    potentially -- and the physical time that it takes from getting

8    from Fort Pierce to Miami in general, there is nothing that can

9    help that.  But just to express to Your Honor that it does take

10   significant time just to see him, I guess, was more of our

11   point.

12        MS. MILITELLO:  I think to compare this case with the

13   normal case, right -- if he was residing at the St. Lucie

14   County Jail, he is 20 minutes from here.  They have video

15   access for registered lawyers.  We are registered lawyers.  So

16   we would be able to show him discovery on a video.  There is

17   private phone calls made, both from that jail, also the Palm

18   Beach County Jail.  These things apply.

19        So here in the Northern District, all of my clients are

20   at the Palm Beach County Jail or the St. Lucie County Jail.

21   And so, we're able to visit the same day or the next day.  We

22   don't need four days of approval.  We don't have these hours of

23   wait time --

24        THE COURT:  Are you suggesting you need four days of

25   approval in this case to make a visit happen at FDC Miami?

1   Because I'm not sure that's accurate.

2           MS. MILITELLO:  Several times my assistant sends the

3   request -- now, I am including an investigator, so one

4   nonlawyer.  But the approvals are taking three to four days --

5           THE COURT:  Okay.

6           MS. MILITELLO:  -- thus far.

7           THE COURT:  Well, we may need to explore that topic.

8   But I'm not entirely sure that these roadblocks you're

9   suggesting exist, at least to the extent you're describing.

10          Can you, I guess, speak to the question of phone access

11  between you and Mr. Routh.  Are you able to have unmonitored

12  calls with your client?

13          MS. MILITELLO:  It's my understanding the answer is no.

14          THE COURT:  Okay.  Why not?

15          MS. MILITELLO:  Well, we cannot call Mr. Routh at FDC

16  Miami; at least that's my understanding, that after COVID, they

17  don't allow attorney legal phone calls.

18          THE COURT:  Can he call you?

19          MS. MILITELLO:  He can call on a call that he is told

20  is recorded, and that call goes to the Miami office.  And then,

21  if they're able to, then, of course, they can transfer to us.

22  But it's not a call that goes direct to us because we're

23  not -- he is in Miami, and those calls are to the Miami office.

24          THE COURT:  Oh, okay.  So you're saying he has a direct

25  line to the Miami FPD's office?

 1          MS. MILITELLO:  I believe so.

 2          THE COURT:  Okay.  So then why can't that call just be

 3     easily transferred to you?

 4          MS. MILITELLO:  So they are trying to do that, I think;

 5     and sometimes there is security issues that prevent that.

 6     Like, I know a lot of the local jails, you can't three-way

 7     call.  You can't transfer for security reasons.  I think he has

 8     been able to transfer on occasion, but my understanding is that

 9     that call is also recorded.  And if that's not true, I

10     would -- that would help if it's not, but --

11          THE COURT:  Okay.  Well, we would need to get to the

12     bottom of this question of whether the calls going direct from

13     Mr. Routh to counsel are recorded.  And certainly, if the call

14     is going to your Miami office, your staff should clearly be

15     able to transfer him without delay, and that certainly

16     shouldn't be a reason to -- to prolong this matter.  So we will

17     work on that subject.

18          As far as video conferencing, have you made any sort of

19     request of FDC to provide that option given the unique

20     circumstances of his placement at FDC for security reasons?

21          MS. MILITELLO:  I have not.  I would be happy to.  I

22     tried, during COVID, to get video visits at FDC, and we were

23     denied that access.  Whether they would make a specific

24     exception with Your Honor's urging, perhaps.  And that would

25     greatly help.  I know that they allow the probation office to

1   Webex.  They have never allowed my office to do so.  But again,

2   we could provide our credentials and, of course, do any

3   security measures they would like.  But that would really aid,

4   particularly the Webex, because then we can share discovery on

5   the screen.

6        THE COURT:  Okay.  All right.  I noticed in your motion

7   some references to pretrial motions, but very, very general in

8   nature, just motion to dismiss, motion to suppress, without

9   anything else.  And so I was hoping you could add a little

10  substance to those references.

11       MS. MILITELLO:  Sure.

12       I mean, those are things we're still investigating.  I

13  think we will likely file a Bruen motion.  Part of that, of

14  course, would depend on -- it would be an as-applied

15  challenge -- so Mr. Routh's prior history.  So that's why we're

16  still evaluating his prior criminal convictions and arrests to

17  see where that falls.

18       THE COURT:  Wouldn't that just be foreclosed by binding

19  precedent?

20       MS. MILITELLO:  I think that the Eleventh Circuit has,

21  of course, issued a ruling on this.  It's still something we

22  should file that the Court should rule on.

23       THE COURT:  Okay.  But that's not the kind of motion

24  that is going to take a lot of time.

25       MS. MILITELLO:  Agreed.

1           THE COURT:  Okay.

2           MS. MILITELLO:  But we --

3           THE COURT:  All right.  Any other motions that I can at

4    least anticipate in the reasonably near future?

5           MS. MILITELLO:  We think there may be a motion to

6    suppress as to at least one identification; that is something

7    where we need to review some of the videos, some of the body

8    cam.  We don't have that footage yet, or if we do, we haven't

9    reviewed it.  But I think they said they haven't given us the

10   body cam yet.  So we're not in a position to write that, but we

11   think there may be a motion in that regard.

12          The charge itself, the primary charge is -- as the

13   Court knows, it's sort of an unusual one.  It's -- so we are

14   looking into the legality of some of the elements.  So where --

15   will there be a legal challenge as to the primary charge?

16   We're not yet sure.  I anticipate, potentially, a Daubert

17   motion, just from the summaries that the government's provided,

18   particularly as to this ballistics expert.  That is something,

19   though, again, that will require us to hire an expert to advise

20   us whether this is within, you know, the realm of the

21   scientific community of what's accepted.  Does the science

22   support this or not?  Because, certainly, I'm not a ballistics

23   expert.

24          But I think some of the expert testimony, it appears,

25   may verge on improper opinion or intent testimony.  So that may

1    be a separate motion to limit -- maybe not a Daubert motion,

2    but just either a motion in limine or a motion to limit expert

3    testimony.  But, again, that's just going to require us to

4    have, sort of, these more detailed -- for four of the experts,

5    we have the more detailed reports; we don't for the other four.

6    And then, we have to consult with our own experts to ask what

7    is valid in the scientific community and, you know, what is

8    acceptable.

9            THE COURT:  At this point, other than the mental health

10   expert, have you identified any defense experts?

11           MS. MILITELLO:  No.

12           THE COURT:  Okay.  All right.

13           Anything else on the subject of pretrial motions,

14   Ms. Militello?

15           And, Ms. Sihvola, I don't want to forget about you.

16           MS. MILITELLO:  I don't believe so, on pretrial

17   motions.  If Ms. Sihvola thinks I have missed something --

18           MS. SIHVOLA:  No.

19           THE COURT:  Okay.  Thank you.

20           All right.  Briefly, let me just turn back to

21   Mr. Shipley.  I noticed a 15-day trial estimate in the

22   certificate attached to the indictment.  Is that still your

23   general understanding?

24           MR. SHIPLEY:  Judge, we talked about this before we

25   came in today.  I think our best guess now, not counting jury

1   selection, which may take some time in this matter, would be 10

2   trial days, 10 full trial days.  That's our estimate as we sit

3   here today before you.

4        THE COURT:  Okay.  Then jury selection was not on the

5   agenda.  But just in very general terms, do you have any

6   preliminary thoughts about the length of jury selection and any

7   unique procedures to be employed in this case for jury

8   selection?

9        MR. SHIPLEY:  Other than the -- to the same extent that

10   I imagine Your Honor and defense counsel have thought about, I

11   can imagine there are some issues we would want to address,

12   given the President-elect being a victim in the case, and the

13   circumstances, and the publicity of the case.  So I imagine it

14   may be a more time-consuming process.

15        I don't know whether Your Honor wants to tackle it now,

16   but a big piece of that -- our concern that we wrote in the

17   motion is, this defendant's very open effort to sway and

18   influence jurors and obtain information through media

19   communications for use in this case.  And I'm referring to

20   the -- just in one instance which we cite.  It was the

21   October 15th jail call, which --

22        THE COURT:  I would like for you to docket that

23   conventionally, here in the clerk's office in Fort Pierce by

24   this Friday.

25        MR. SHIPLEY:  Sure.  We can do that.

1          THE COURT:  All right.

2          MR. SHIPLEY:  Yes.

3          That's been produced in discovery; correct?

4          Yes.  So I don't know how Your Honor wants us to handle

5    that under seal.  Or how would you like us to file that or

6    provide that to the Court?  If you're talking about that

7    October 15th jail call.

8          THE COURT:  Yes.

9          MR. SHIPLEY:  Okay.

10          THE COURT:  Just a conventional filing with a USB drive

11    or whatever electronic format you have, so that I can listen to

12    it.

13          MR. SHIPLEY:  Okay.

14          So, with that additional element of things, I think

15    jury selection may take a little more than -- I know Your Honor

16    moves through jury selection fairly and efficiently, but I

17    would certainly think that is something -- I mean, I would be

18    surprised if that were done in less than a day.  So I think if

19    we're being generous, we're probably into a third week, say, of

20    trial; again, subject to -- I don't know how long the cross are

21    going to be.  We're certainly going to do what we can to make

22    the presentation as tight as possible; that's always in our

23    interest, as well as in the Court's interest.  But I would

24    certainly think we would be going into a third week, taking

25    into account jury selection.  That's the best estimate I can

1     give the Court right now.

2         THE COURT:  Okay.  All right.  Ms. Militello, anything

3     on the subject of defendant statements to the press and how

4     that might interact with the motion to continue?

5         MS. MILITELLO:  Well, by and large, I don't think he is

6     discussing the case.  The letters that have been published were

7     his views on politics.  And, of course, he has a First

8     Amendment right to free speech, and the Court has not entered

9     any gag order as to him.  And I know the government made it

10    very clear early on that they were not seeking a gag order, and

11    in the response to the protective order, acknowledged that

12    Mr. Routh -- that Mr. Routh, excuse me, did have the right to

13    express himself.

14        THE COURT:  I don't think anybody is disputing his

15    right to express himself.  I'm just asking what is -- those

16    decisions to express himself -- and again, I haven't listened

17    to the call or read the press statements -- but does that have

18    any impact on the Court's evaluation of trial setting in this

19    case, given the need to ensure an untainted jury pool as much

20    as possible?

21        MS. MILITELLO:  So, objectively, I think it could, if

22    it rose to that level, but I don't believe we're there yet,

23    with the caveat that I have not listened to the October 15th

24    phone call.  But just from what the government said, although

25    maybe misguided, his attempt for the jury to understand,

1  you know, he is an honorable person -- I mean, at this point,

2  as we mentioned, the government has done so many press

3  releases.  They've described him in far negative fashion.  I

4  can understand, sort of, that response to a family member.

5      But in his letters to the press, he doesn't talk about

6  swaying the jury, and he doesn't talk about his case, and he

7  doesn't talk about the evidence.  Those are the things that I

8  think would concern the Court and should concern the Court.

9      THE COURT:  Have there been press releases filed by the

10  United States?

11      MR. SHIPLEY:  I believe -- I wasn't involved in the

12  matter then, Your Honor.  I believe in connection with the

13  charges, and maybe there was one at the time of indictment, but

14  that is -- obviously, this is a matter of public interest and

15  that's rote.  And of course, we are constrained as lawyers

16  under the local rules about what we can talk about publicly, be

17  it in a press release, be it what Ms. Militello could talk

18  about, to the facts and the matters that are pertinent to the

19  case, and that constraint does not exist over a defendant in

20  his position.

21      And as Your Honor crystallized, our concern is at this

22  point, not a gag order; it is what impact these communications

23  are going to have on jury selection, which does impact timing

24  in that regard.

25      THE COURT:  All right.  Ms. Militello, please continue.

1          MS. MILITELLO:  So, I mean, at this point, if we just

2    have from Mr. Routh a desire that he expressed to his daughter

3    for the jury to view him as honorable, I don't think he has

4    done anything.  In fact, if the government hadn't brought this

5    up, the public wouldn't know about the call.  What has been

6    made public to date, I think, is protected First Amendment

7    speech that has no impact on this case.  So the Court could

8    simply order him not to discuss the case, not to discuss the

9    jury, and we'd have no objection to that.

10         THE COURT:  There is no motion on the table to limit

11   his speech, so I'm not prepared at this point to make such a

12   significant ruling without proper briefing.  So I'm not going

13   to address any sort of court-ordered request to limit his

14   speech, certainly at this juncture, unless you feel that that

15   is truly necessary, in which case a motion would be needed.

16         But I'm trying to understand the statement that was

17   made.  I think part of it was quoted in the government's

18   opposition.

19         Mr. Shipley, do you have that cite?

20         MR. SHIPLEY:  Your Honor, let me -- Mr. Browne has been

21   monitoring the jail calls, so to speak, so I think he can speak

22   to that, with the Court's permission.

23         MR. BROWNE:  Thank you, Your Honor.

24         In short, Judge, it's a -- two snippets of a jail call

25   where he really just states his intent.  We did not quote

1    directly from the jail call, to be clear, in our pleading.  But

2    his intent was very clear.  He wanted to first publish as many

3    of his letters to the media as possible for the purpose of

4    getting out the fact that he is a good guy -- or a nice guy,

5    and he is very explicit about this in his conversations with

6    his daughter.

7         The truth is that he is not simply expressing those

8    desires privately.  He's also written, by his own estimation,

9    more than 40 letters to various media outlets around the

10   country expressing his political views, discussing this case,

11   discussing another assassination attempt on the

12   President-elect.

13        So we don't think it's limited or constrained to

14   private conversations between family members.  This is

15   something that is -- he has stated is his objective.  We have

16   the recording here, if the Court wants to listen to it in open

17   court.  Of course, we will also conventionally file it.  But I

18   can also read a rough transcript of the call, if the Court

19   desires.

20        THE COURT:  Okay.  Please read the transcript.

21        MR. BROWNE:  Yes, Your Honor.  This is from the

22   October 15th call.  There's two excerpts that I just want to

23   turn the Court's attention to.  Mr. Routh is speaking to his

24   daughter.

25        He says, "Yeah, it's just we need to build our case for

1    court.  You know, we need to -- you know, we need to have all

2    this stuff ready for the attorney.  Like, you know, this is

3    where we are.  You know, we -- these people say I'm a nice guy,

4    and these people say I'm a nice guy, and these people say I'm a

5    nice guy.  And, you know, at every turn, we got to build our

6    case to show the attorney -- show, you know, the judge and the

7    jury that Ryan is a good person.  So, you know, we need all of

8    these things printed out, and, you know, be able to hand it to

9    the jury and say, 'Okay.  You know, this is the story on this

10   date,' or, 'This is the media outlet, you know, said that Ryan

11   was, you know' -- I don't know, an honorable person, you know,

12   heart in the right place, whatever they say, you know?"

13       And then he goes on to request that his daughter,

14   quote, "Please monitor all these media outlets and gather as

15   much information as possible."

16       And finally, Your Honor, he states specifically just a

17   minute later in the call, quote, "I need as much coverage as

18   possible to -- you know, to plead our case.  So, you know,

19   nobody has done me any favors except Kim next door, you know,

20   and maybe one person that took a while.  So maybe two people

21   have given two-second blurbs."

22       And then he goes on to discuss what he views as

23   positive comments about him in the media.  But all of this is

24   in the context, Your Honor, of a, frankly, extensive publicity

25   campaign that he has mounted by writing well over 40 letters to

 1    various media outlets around the country.

 2          THE COURT:  Do you have all of those letters in your

 3    possession?

 4          MR. BROWNE:  No.  We do not have all 40, Your Honor.

 5    We have a limited subset that were -- I don't want to use the

 6    word "intercepted," but they were copied by the Bureau of

 7    Prisons upon their transmission.  But we do not have the entire

 8    universe of those letters.  Only Mr. Routh and the BOP knows

 9    the full extent.

10          This is just based on his own estimation in the jail

11    calls of how many letters he has written to various media

12    outlets around the country.  We have approximately a dozen of

13    such letters, Your Honor.

14          THE COURT:  And you've made those available to the

15    defense?

16          MR. BROWNE:  Yes.  Early on, those are part of the

17    items that we recovered -- excuse me -- we received from BOP.

18    Along with his jail calls and emails, we also received a subset

19    of the letters that he wrote to primarily media outlets.

20          THE COURT:  All right.  Thank you.  Okay.

21          MS. MILITELLO:  Your Honor, may I just respond briefly?

22          THE COURT:  Yes, yes.

23          MS. MILITELLO:  Because I know Your Honor wasn't at the

24    detention hearing -- at least at the beginning of this call,

25    based on the government's transcript, it sounds like he's

1    talking about using his daughter to help prepare the case when

2    he mentions, like, "Have the news media ready," for example,

3    there was a media article that we admitted at the detention

4    hearing about him winning the Citizen of the Year award one

5    year in North Carolina for helping to catch a convicted rapist.

6    There is another media outlet that found that he did some

7    nonprofit building of a dock, another one where he built some

8    homeless shelters.

9         So in my mind that's how I interpret "collect the media

10   articles."  I understand, from the very last statement, that

11   the government thinks there might be something else, but when

12   he's talking about building his case, getting these things

13   ready for the case for his lawyers, I think he's talking about

14   collecting that coverage in the event that we would want to

15   introduce good character.  We may or may not do that because,

16   of course, that opens the door to a whole host of other

17   evidentiary items.  But that's how I take that.

18        And just -- if the Court will indulge me for a minute,

19   we weren't asking the Court today to curtail Mr. Routh's speech

20   in any capacity.  What I was suggesting, though, is if there

21   comes a point that rises to that level, I think the correct

22   remedy then would be the Court to issue some sort of warning

23   after a motion and briefing, not changing the trial schedule.

24   Because he does have the right to effective assistance of

25   counsel, and we need to be ready.

1          And then just lastly, on a personal nature, I do have

2     an extended family vacation in the middle of July.  And so I

3     would just ask the Court to avoid setting a trial or a hearing

4     in the middle of July.

5          THE COURT:  Do you have dates for that?  Approximate

6     date, at least?

7          MS. MILITELLO:  If the Court would allow me to gather

8     my phone.

9          THE COURT:  Yes, you may.

10          MS. MILITELLO:  From approximately July 12th through

11     the 20th.

12          THE COURT:  Okay.  All right.

13          I didn't get your thoughts, Ms. Militello -- if you

14     have any, I know it's preliminary -- on jury selection.

15          MS. MILITELLO:  I imagine jury selection would take a

16     couple of days.  If the Court wanted to do a questionnaire,

17     that could help streamline things.  I think there will be a lot

18     of people that would admit, off the bat, why they may or may

19     not be able to be fair.  And so that could -- I'd have no

20     objection to an initial questionnaire.

21          I think the Court or the parties would need to follow

22     up on some of the more sensitive nature and issues related to

23     the case, but I think that could help explain things and we

24     could agree to a questionnaire in advance or specific questions

25     in advance to help eliminate people.

1          A lot of people, of course, as the Court knows, will

2     also just have conflicts regarding the length of the trial.

3     And so if we could exclude those without wasting the Court's

4     time, that could be helpful.

5          THE COURT:  Okay.  All right.

6          Well, I think we've covered a lot of territory, and a

7     lot of this interacts with the motion to continue, so there may

8     not be any need to presents further argument on that subject,

9     but, Mr. Shipley, I want to give you at least one final

10    opportunity to respond or raise any other items.

11         MR. SHIPLEY:  Certainly, Your Honor.

12         On the issue of timing, you know, look, we have -- our

13    view is that postponing this trial until the end of next year

14    is simply not reasonable, and I have heard nothing here today

15    to support such an extension.  I think that would be an abuse

16    of discretion.  I know the Court takes into account a variety

17    of considerations.

18         From our standpoint, I don't know where Your Honor is

19    in terms of scheduling or thinking about that.  Certainly, we

20    have commitments on our end.  Members of the trial team have

21    prepaid vacations.  Otherwise, I think we are generally

22    sensitive -- and I may be just speaking for myself -- to jury

23    selection being a hard task in vacation months, July and

24    August.  I don't know that that usually yields a -- the jury

25    pool that we would be wanting to work off of in a case like

1    this.  So I defer to the Court in terms of what more specific

2    guidance you may want from us, depending upon where you are on

3    the issue, generally.  But I do want to make clear, as outer

4    boundaries on both fronts, we don't oppose a continuance from

5    February.  I think the issue is, at least in terms of the size,

6    are legitimate.  Don't agree on the impact on the case.  But

7    certainly end of next year is -- is wrong on many fronts.  It's

8    wrong to the victim.  It's wrong to the process.

9            THE COURT:  All righty.  Ms. Militello and then

10   Ms. Sihvola.

11           MS. MILITELLO:  We cited a number of cases before the

12   Court where continuances of more than a year were found to be

13   appropriate.  They are not all fraud cases.  Though, as I

14   mentioned to the Court, we typically only see this number of

15   experts or terabytes of discovery in fraud cases.  Other than

16   my January 6th cases and my fraud cases, I've never had

17   discovery this extensive in a federal case.  And so I do think

18   those are the most comparable cases to look at.

19           THE COURT:  Beyond the volume of electronic discovery

20   that is mostly of the defendant's own devices, is there

21   anything legally complex about any of the charges in this

22   indictment?

23           MS. MILITELLO:  Well, I think the fact that none of us

24   have tried a case involving the initial charge makes this more

25   complex.  Of course, Ms. Sihvola and I have both tried

1   attempted murder and murders, but there may be some legal

2   significance as it relates to this charge that we don't see in

3   that charge typically.  And that's something we're still

4   looking at.

5       But I will say with the hundreds of witnesses that have

6   been interviewed, it's a lot of people we need to follow up

7   with; it is a lot of, sort of, traditional investigation that

8   we didn't go into that will be necessary.  Some of the evidence

9   is in Quantico.  And just in your normal gun and drug case,

10  right, my office routinely requests six months or so to prepare

11  for trial.

12      And sort of acknowledging that, I mean, I think our

13  office does an excellent job defending individuals, but we are

14  not private counsel who work full-time on an individual case.

15  We do have a full caseload.  My investigator has a full

16  caseload.  And, you know, Mr. Routh is entitled to effective

17  assistance of counsel with the federal defender for free.  And,

18  you know, I'm sure he'd love to have a trial team that wasn't

19  working on other cases, but that's not our reality.

20      And so it is going to take us more time than the normal

21  six months on a normal gun and drug case.  Where he's facing

22  life in prison, he deserves that time, and he deserves to have

23  counsel that's fully prepared for trial.

24      THE COURT:  All right.  Thank you.

25      Ms. Sihvola, anything further?

1          MS. SIHVOLA:  Your Honor, the only thing I would add

2     is, just to be competent counsel, we have to review all of

3     Mr. Routh's statements.  Whether he made statements or didn't

4     make statements, counsel has to be able to know what they say.

5          And so in this instance, the government is alleging

6     that there are statements on approximately 17 telephones.  And

7     so his statements are in the phone -- in the form of text

8     messages, electronic communications, or blogs or emails.  And

9     so we have to review them for the substance of the trial itself

10    or any type of experts under 12.2.  We have to be able to

11    review his statements that are very, very voluminous

12    surrounding the time of the offense or before to be able to get

13    materials for that information.

14         But we're also making an assumption that the 17 cell

15    phones are his devices, simply because they were found either

16    in a home or a vehicle.  The defense cannot testify to any of

17    that because, unfortunately, we'd have to do an analysis in

18    order to be able to be competent in this matter, as well as the

19    other -- excuse me -- 20 to 30 other devices, whether they're

20    in the form of USB discs or tablets or laptops.

21         But we -- we need to go through all of that

22    information.  As well, the government did not answer

23    Your Honor's question about when they would actually be able to

24    complete discovery in this case.  We don't know when that

25    ballistic analysis expert will come about, or give us the

1    information or their reports on what they will testify to.  And

2    we do have a right to review it, as well as their cell site

3    geolocation expert.  Exactly which cell phone are they going to

4    rely on?  What information?  Simply because you give us all of

5    this discovery, we need to know exactly what -- excuse me --

6    information it is and to rely on it and pinpoint it.  And we

7    simply want to become competent counsel for Mr. Routh in this

8    case.

9         THE COURT:  Of course.

10         Mr. Shipley, there has been some talk of a potential

11    road map or a tool of some kind.  Is anything of that nature in

12    the works?  Can it be prepared?  Do you have any thoughts?

13         MR. SHIPLEY:  So, Your Honor, to be clear, they have a

14    variety of items, including some things that wouldn't

15    ordinarily be produced this early in discovery that have been

16    provided to them exactly along those lines.  There is the

17    criminal complaint.  We've provided them in discovery search

18    warrant affidavits.

19         THE COURT:  Slow down, please.

20         MR. SHIPLEY:  Sorry.

21         We've provided them, obviously, the criminal complaint.

22    They have search warrant affidavits that lay out information.

23    Of course, we had an extremely extensive detention hearing

24    where an unusual amount of cross-examination was allowed.

25         THE COURT:  But I'm talking more in the form of the

1   devices themselves and some sort of road map to say, Look,

2   there are 18 devices; these are the ones that we're sort of

3   focused on because they contain communications about XYZ, and

4   that's kind of where we're zeroing in.

5       Anything along those lines that could maybe provide

6   some sort of path for them to more directly obtain the

7   information that you might deem relevant at this stage?

8       MR. SHIPLEY:  Well, I think the reason I was

9   referencing those sort of road map documents in discovery is

10  they provide some of that.  For example, we know that on the

11  six cell phones that were recovered from his automobile, those

12  were the phones that contained searches about how to go from --

13  how to fly from South Florida to Mexico.

14      So when they suggest that they have no idea where to

15  start looking at information or what information on those

16  phones might be relevant, well, that's one example of what they

17  know.

18      I'm willing to consider -- and we can talk on our

19  end -- if there are things we would be willing to do to

20  facilitate that, but at this stage, and as an argument for this

21  kind of extended continuance, that is simply not persuasive to

22  say they don't know where to look.

23      And, really, you listen to this presentation -- and I

24  don't mean to -- I understand the points that Ms. Militello

25  makes on a personal level and as somebody who has

1    responsibility for other cases, but it really doesn't seem like

2    they've looked at very much in this case.  So I don't know that

3    they're even in a strong position to be coming to this Court

4    and saying, We have no idea, we can't figure out, we're unable

5    to tell.  I think the estimate was they've looked at maybe

6    10 percent of the information.  So --

7          THE COURT:  Well, part of the issue has been getting

8    the information fully downloaded to be prepared and primed for

9    review.

10         MR. SHIPLEY:  Yes.  That may be the explanation on

11   their end, Judge.  What I'm trying to suggest is for them to

12   move things to the point where they're saying, "We've looked at

13   things, and we're not able to identify what is material what is

14   not," we're not even at that point.  But they do have some of

15   that guidance.  And I would direct them, again, to the pretrial

16   detention hearing, to the criminal complaint, and to the search

17   warrant affidavits, again, which are not something that we

18   ordinarily produce right off the bat, but we have in this case.

19         THE COURT:  Okay.  All right.  Thank you.

20         Unless the parties have further argument, then I will

21   adjourn the court.  You all can expect an order in the not too

22   distant future clarifying at least some initial deadlines based

23   on the information I have received.  I think there does need to

24   be more clarification on some of these threshold steps.  And so

25   that is all I will say at the time, but there will be a written

1    order to follow this hearing within the framework of the

2    parties' arguments that allots enough time for defense review,

3    but also fully takes into account the need for just resolution

4    in this matter.  So thank you for being here.  This has been

5    helpful.  The court is in recess.

6         (These proceedings concluded at 11:54 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    I hereby certify that the foregoing is an accurate

 5    transcription of the proceedings in the above-entitled matter.

 6

 7
      DATE:  12-18-2024        /s/Laura Melton
 8                             LAURA E. MELTON, RMR, CRR, FPR
                               Official Court Reporter
 9                             United States District Court
                               Southern District of Florida
10                             Fort Pierce, Florida

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```