## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. <u>24-80116-CR-CANNON/McCabe</u>

**UNITED STATES OF AMERICA**

**vs.**

**RYAN WESLEY ROUTH,**

     **Defendant.**

_____/

### <u>GOVERNMENT'S MOTION TO ADMIT POTENTIAL RULE 404(b) EVIDENCE</u>

Pursuant to this Court's pretrial Order (ECF 29), the United States respectfully moves to admit evidence potentially subject to Federal Rule of Evidence 404(b). To be clear: many items addressed in this motion are <u>not</u> extrinsic evidence, but instead are intrinsic evidence "inextricably intertwined" with the charged offenses, if not direct evidence of Routh's crimes. Evidence of this type is not analyzed under Rule 404(b). Nevertheless, because the defense has not agreed, and in an abundance of caution, we are filing a motion identifying these items and explaining why they are admissible even under the Rule. We also identify items of "extrinsic" evidence that, while subject to Rule 404(b) analysis, are admissible too.

### <u>Part I: Relevant Law, Including Rule 404(b)'s Limited Restriction</u>

Rule 404(b) prohibits evidence about a person's "other crime, wrong or act" when offered <u>solely</u> "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989) (Rule 404(b) "allows extrinsic evidence unless it tends to prove <u>only</u> criminal propensity" (emphasis added)). The Rule lists topics that "other acts" can prove, such as motive, intent, preparation, plan, knowledge, and identity. But the Rule's list of potential uses "is not exhaustive," with "the range of relevancy outside the ban [] almost infinite," *id.* (quotations omitted).

Before a court analyzes a potential "other act" under Rule 404(b), it must first determine whether the Rule applies at all. That decision involves whether the potential "other act" truly lies

outside the scope of the charged crime, which is called "extrinsic" evidence, or instead qualifies as "intrinsic" evidence not subject to Rule 404(b). *See, e.g., United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992) ("[if] evidence is intrinsic, not extrinsic, we do not engage [with] 404(b)").

## A. <u>Intrinsic "Direct" Evidence</u>

"Direct" evidence, as the name implies, covers evidence of a defendant perpetrating the charged crime. "Relevant direct evidence of a crime charged is always admissible unless it falls under a rule of exclusion." *United States v. Troya*, 733 F.3d 1125, 1130 (11th Cir. 2013) (citing *United States v. Rice*, 214 F.3d 1295, 1299 (11th Cir. 2000)); *see also, e.g., United States v. Arney*, 248 F.3d 984, 992 (10th Cir. 2001) ("Evidence is direct or intrinsic to the crime charged if both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." (quotations omitted)). Direct evidence covers a range that's as broad as the ways crime is committed, ranging from text messages plotting a charged offense, *United States v. David*, 2023 WL 7437181 *2 (11th Cir. Nov. 9, 2023), to obtaining items used to commit a charged offense, *see Troya*, 733 F.3d at 1130, to actually using an item (like a firearm) a defendant is charged with possessing, *see United States v. McGill*, 815 F.3d 846, 881-82 (D.C. Cir. 2016).

## B. <u>Intrinsic "Inextricably Intertwined" Evidence</u>

The other form of intrinsic evidence, "inextricably intertwined" evidence, does not directly bear on the charged crime in the way direct evidence does but is still distinct from "other acts" under Rule 404(b). *See United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007). The Eleventh Circuit has recognized three forms of evidence that fall within this broad exception to Rule 404(b). First, acts are inextricably intertwined with the charged offense when they "form[] an integral and natural part of an account of the crime" or that "form[] an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Id*. (quotations omitted). Second, evidence is inextricably intertwined if it is "an uncharged offense which arose out of the same transaction or series of transactions as the charged offense." *Id.* This category includes crimes committed in furtherance of the charged conduct but not charged in the indictment. *See, e.g., United States v. Joseph*, 978 F.3d 1251, 1263 (11th Cir.

2020) (admitting evidence of identity theft that furthered securing a stash house). Third, evidence is inextricably intertwined if it is "necessary to complete the story of the crime." *Edouard*, 485 F.3d at 1344. To this end, evidence that is "not part of the crime charged but [that] pertain[s] to the chain of events explaining the context, motive, and set-up of the crime[] is properly admitted if linked in time and circumstances with the charged crime." *Id.* (quotations omitted).

## C. Extrinsic "Other Acts" 404(b) Evidence Generally

Other acts that are relevant but that lie outside the scope of intrinsic evidence are extrinsic. "Extrinsic" evidence is reviewed under Rule 404(b), but as the Eleventh Circuit has stressed, is often admissible. *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008); *see also United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003). That's so because Rule 404(b)'s prohibition is specific and limited: it prohibits "other acts" evidence <u>solely</u> to show that a defendant acted in accordance with that prior act but permits it to "prov[e] motive, opportunity, intent, preparation, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b)(2). Indeed, "to avoid the strictures of Rule 404(b), all the government need do is suggest a logical hypothesis of the relevance of the evidence for a purpose other than to demonstrate his propensity to act in a particular manner." *United States v. Krout*, 66 F.3d 1420, 1431 (11th Cir. 1995).

Admitting an act under Rule 404(b) requires the moving party to show three things: "(1) it must be relevant to an issue other than defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403." *Edouard*, 485 F.3d at 1344. As to relevance, the evidence must simply have "any tendency to make a fact more or less probable than it would be without the evidence" and be "of consequence to determining the action." FRE 401. When evidence meets that low bar, finding the probative value of the evidence to be outweighed by its prejudicial effect "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility," *United States v. Nerey*, 877 F.3d 956, 975 (11th Cir. 2017) (citation omitted), "maximizing [the evidence's] probative value

and minimizing its undue prejudicial impact" rather than excluding it, *see United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002). Most unfair prejudice concerns can be solved as well by the pattern Rule 404(b) instruction. *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1977).

## Part II: The Key Facts and Resulting Charges

Over the course of months, the Defendant – who possesses a Hawaii driver's license and has no ties to South Florida – intentionally plotted to kill President Trump, and took significant steps toward making that happen, culminating in his attempt to assassinate the President in West Palm Beach at the Trump International Golf Club on September 15, 2024, from a sniper hide he carefully set up, using a military-grade SKS rifle that he possessed illegally.

The indictment alleges five crimes. Count 1 charges Routh with the attempted assassination of a Major Presidential Candidate, contrary to 18 U.S.C. §351(c). Count 2 charges Routh with knowingly possessing and brandishing a firearm in furtherance of that assassination attempt, contrary to 18 U.S.C. §924(c)(1)(A)(ii). Count 3 charges that Routh intentionally assaulted a federal officer (the Secret Service agent), in violation of 18 U.S.C. §§111(a)(1) and (b). Count 4 alleges that Routh, a convicted felon, knowingly and unlawfully possessed a firearm, contrary to 18 U.S.C. §922(g)(1). Count 5 alleges that Routh knowingly possessed a firearm with an obliterated serial number, contrary to 18 U.S.C. §922(k).

We expect the primary issue, certainly on Count 1, will be Routh's intent. It will be our burden to show that Routh intended to kill President Trump and took at least one "substantial step" toward doing so; a substantial step must be some act that strongly corroborates the intent. *See, e.g.*, *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001). Intent is also a key component of Count 2 (which charges Routh's possession of a firearm in the course of the crime identified in Count 1), and of Count 3, which alleges that Routh intentionally assaulted the brave Secret Service agent who confronted him. "A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998)). "The greater the

government's need for evidence of intent, the more likely that the probative value will outweigh any possible prejudice." *United States v. Hicks,* 798 F.2d 446, 451 (11th Cir. 1986). Where, as here, the Government faces not only the need to prove specific intent but also to overcome the effect Routh's flight had on the available evidence, the Government's ability to muster all the relevant facts is paramount. "[A]fter a defendant puts his intent at issue by pleading not guilty, the strength of the government's case on intent must be 'overwhelming' in order to render extrinsic evidence on intent unnecessary." *United States v. Moore*, 535 F. App'x 795, 798 (11th Cir. 2013).

Counts 4 and 5 do not require proof of intent, but do require proof of the Defendant's knowledge of the firearm, his status as a felon, and the presence of an obliterated serial number. Intent or knowledge, in other words, are critically contested issues on every single count. And as noted above, the Eleventh Circuit repeatedly has recognized that extrinsic act evidence should be allowed where a defendant's state of mind is at issue.

All of the charges are linked by Routh's plan to assassinate the President, and his preparation for executing it. Routh's criminal acts on September 15 itself were not impromptu; he had been planning to assassinate the President for six months, at least. The United States will prove that in late March 2024, Routh traveled from his native North Carolina to the West Palm Beach area to conduct reconnaissance on Trump's whereabouts, and immediately upon returning to North Carolina, provided to a friend and former employee (L.P.) a storage box for temporary safekeeping. That box contained (1) copies of a letter authored by Routh announcing the assassination plot to the "World" and envisioning his imprisonment, (2) components of a destructive device, (3) ammunition, and (4) other criminal tools such as "burner" cellular telephones. Then, in July 2024, after the unsuccessful attempt on President Trump's life in Butler, Pennsylvania, Routh decided to follow through on his plan. He unlawfully purchased in early August the military-grade rifle that he ultimately possessed on September 15, and then on August 14, returned to West Palm Beach, where he camped out at an area truck stop while tracking the President's whereabouts and researching weaponry and assassination tactics. Using a burner phone (one of 17 devices attributed to him), Routh researched, among other things, Trump's campaign movements, patterns of life,

the golf course, Trump's airplane, firearms and ammunition, escape routes, local hospitals, police forensic techniques, and items he would need for the attempt. Then, on September 15 itself, Routh set up his sniper hide in the predawn hours, in preparation for the President playing golf that day. After being shot at by the Secret Service shortly before his intended victim would have come into close range of the hide, Routh fled the scene, abandoning the rifle and seeking to escape.

Most, if not all, of this conduct is direct evidence of Routh's intent to kill the President and of the substantial steps he took toward completing the offense charged in Count 1 before he was thwarted. While Routh's statements – in private messages and letters – leading up to the attempt are also direct evidence of Count 1, the acts summarized above are just as important for the Government to meet its burden of proof. Some of these acts are also direct evidence of elements of the remaining charges (Counts 2-5), because each of those counts requires proof that Routh possessed and brandished a firearm – a fact that, significantly, he has not conceded. (Indeed, to date, he has not conceded anything, and has put every element of every single charge at issue.) For example, Routh's acquisition of the rifle in early August is direct evidence that he possessed the same rifle on September 15 – an essential element of the §922(g) charge in Count 4.

**Part III: Evidence We Seek to Admit Today**

This Section identifies eight categories of evidence that we ask this Court to admit at trial. The first six categories (Sections A–F below) are not extrinsic at all; rather, they are either direct evidence or inextricably intertwined evidence necessary to put other admissible evidence into context, to tell the full story of Routh's charged crimes, or as proof of criminal conduct related to Routh's execution of his crimes. The last two (G–H) may be extrinsic acts subject to Rule 404(b) analysis, but in each instance, the evidence will not be offered solely to prove bad character.[1]

**A.  March-April 2024: Routh's Travel to and Activities in West Palm Beach**

---

[1]   This all assumes that Routh does not make his character an issue, or open the door by testifying. If either of those happened, principles of admissibility for the prosecution would be far broader and we may offer additional proof. *See* FRE 404(a), 608, 609, 806.

The United States will introduce evidence that Routh traveled from North Carolina to West Palm Beach—an area he had no connection to—in late March and early April 2024 and spent over a week there engaging in apparent reconnaissance for his assassination attempt. Specifically, on or about March 28, Routh left North Carolina by car for the West Palm Beach area, where he remained between at least March 29 and April 5, when he began driving back to North Carolina. During this time, Routh traveled across the West Palm Beach area, including the areas near Trump International. During this trip, Routh engaged in some of the same conduct as the August-September phase of the assassination plot, including using a stolen license plate to avoid detection, purchasing and using multiple burner phones, and engaging in cash withdrawals, including Western Union transfers at a check casing store just a quarter mile from Trump International. Routh's purpose in traveling to West Palm Beach is evident from what he did immediately upon returning to North Carolina: he gave his friend the box containing several burner phones, ammo, and copies of his "Dear World" letter, in which Routh called for President Trump's assassination and predicted his own imprisonment—a letter that is part-and-parcel of this March and April trip.[2]

This Court should admit this evidence of Routh's intent to assassinate President Trump. Despite occurring months before the charged offense, Routh's driving from North Carolina to Florida and reconnoitering the area around Trump International, as a precursor to his trip in August, is itself a "substantial step" in his attempting to assassinate President Trump; it is direct evidence of the crime. *See United States v. Mehanna*, 735 F.3d 32, 53 (1st Cir. 2013) (substantial step when defendant "flew to Yemen armed with the name of a possible al-Qu'ida liaison"). But the Court need not decide today whether the March trip was a substantial step: Routh's acidity is undeniably necessary context for the jury to understand the significance of Routh's conduct on September 15 at Trump International because it shows his planning for what happened that day and his familiarity with locations he revisited on and leading up to September 15, including the

---

[2]     The evidence described in this Section is based on location records including from Routh's phone(s), financial records, text messages, and other items Routh obtained in the West Palm area on this trip that he kept and were later recovered by investigators.

South Bay area where he camped in the weeks beforehand, and Southern Boulevard, the main road from South Bay to Trump International. Indeed, one of the burner phones he activated in West Palm Beach on this initial trip became his "crime phone," which he essentially did not use again until he returned to execute (literally) his plan. These manifold connections between Routh's March/April and August/September trips show the earlier trip to strike at the heart of Routh's long-standing criminal intent. That probative weight and connection to the crime at issue is also why this Court would have no basis to exercise the extreme remedy of Rule 403 preclusion, as the only prejudice from the conduct at issue lies in Routh's long-running, unyielding commitment to taking President Trump's life—the very thing he is charged with doing.

Yet even were the evidence analyzed under Rule 404(b), it would be relevant to prove Routh's intent to kill President Trump as well as his preparation, plan, and identity. That would leave only the familiar Rule 403 analysis, and this evidence would not be subject to the extreme remedy of Rule 403 exclusion for the reasons already discussed. The temporal gap between this trip and the return trip four months later is not long, and the connections between the two trips (including his presence at the exact same locations) are deep. Any issue can be addressed by a jury instruction. Simply put, the Court should admit this evidence no matter what rubric applies.

**B.  Februrary 2024: Routh Messaging with Contact for Post-Assassination Escape**

Second, this Court should admit Routh's attempts to coordinate his post-assassination escape to Mexico between February and September 2024 as direct and inextricably intertwined evidence necessary to complete the story of his assassination attempt.[3] In February, Routh began an extensive WhatsApp conversation with a person Routh saved in his phone as "Ramiro" who lives in Mexico. Their exchanges that month culminated in Routh seeking Ramiro's help in potentially smuggling an Afghan migrant family into the United States from Mexico, with the two discussing the operation's illegality, the migrants' lack of status, and the potential need to bribe

---

[3]   The evidence described in this Section is based on records secured from one of Routh's phones. Portions of the chat are in Spanish, but other digital search results will show that Routh was familiar with Google Translate. The Government has produced a translation in discovery.

officials before the exchange concluded with Routh objecting to Ramiro's proposed price. While this February chat involved smuggling others, it is necessary context for how that same chat evolved on September 13th and 14th, the two days before Routh set up his sniper hide at Trump International, when he contacted Ramiro for the first time since February 29. On those two days, Routh told Ramiro that he would be in Mexico City in the days immediately after September 15, with Ramiro responding that he would see Routh then and that he was located four hours outside of Mexico City and with Routh replying that he would call Ramiro once he knew for sure whether he'd meet him—something Routh planned through extensive web searches about travel to Mexico.

This Court should find Routh's exchanges with Ramiro to be relevant to Routh's attempt to assassinate President Trump because they show his planning his flight from law enforcement after committing the crime—evidence well-settled to be direct evidence of guilt. *See, e.g., United States v. Williams*, 541 F.3d 1087, 1089 (11th Cir. 2008) ("Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt."). The entire chat between Ramiro and Routh, including the September messages, are direct evidence on that front and are indisputably admissible as such, but the February messages are also admissible intrinsic evidence because they are necessary for the jury to understand the September messages and to appreciate their import. Indeed, without the February messages, Routh could (misleadingly) claim he was spontaneously contacting someone instead of messaging a known contact. Beyond the bare fact of knowing Ramiro, though, the February 2024 messages also show that Routh intentionally sought out a professional smuggler who specialized in clandestine migrant crossings, including the bribery of officials. In these respects, the full chat between Routh and Ramiro is essential evidence to prove Routh's intention to flee after September 15. The evidence is also not unduly prejudicial under Rule 403 because there is no prejudicial effect that substantially outweighs its high probative value in proving Routh's intent. The United States does not plan to elicit other evidence about the legality (or not) of Routh's February request beyond his own words, and there is nothing so inflammatory about Routh attempting to smuggle a migrant family that should lead this Court to take the extreme measure of excluding the evidence.

And even were the evidence analyzed under Rule 404(b), it would be admissible to prove intent anyway. It would be relevant for the same reasons described above and would be readily proven through Routh's phone records. That would leave only Rule 403 analysis, and it would not be subject to the extreme remedy of exclusion for the reasons set forth above. Here again, the Court should hold this evidence admissible no matter what standard it applies.

C. **April 2024: Components of Destructive Device and Ammunition in Box Routh Delivered to L.P. and "I.E.D. Manual" in Nearby Storage Trailer**

Third, this Court should admit evidence of the improvised destructive device components and .50 caliber ammunition that were recovered from the box containing Routh's "Dear World" letter and his burner phones -- all of which proves Routh's intent to kill and to possess a firearm as a convicted felon.[4] On top of the recovery of the box, the United States will be presenting expert testimony that the box's destructive device components—including a barrel, breech, and spring-loaded firing mechanism—and large-caliber ammunition were designed to construct a device that would fire the ammunition with deadly effect. Coupled with this evidence, the United States will present a manual titled "Improvised Explosives: How to Make Your Own," which was recovered from a nearby storage trailer at Routh's former place of business, as well as loose shotgun shells and a Ruger pistol box from the trailer.

This Court should admit this evidence as intrinsic evidence of Routh's intent to assassinate President in at least two respects. *First*, possessing materials and ammunition that could be constructed into the breech and barrel of a lethal device, coupled with an instruction manual demonstrating his interest in "homemade" weapons, accessories, and anti-ballistic armor is at minimum proof of his comfort with causing death to other human beings, as there is no other purpose for such items; this goes directly to his intent to kill. *Second*, this evidence is also quite literally inextricably intertwined with the box containing the "Dear World" letter as well as Routh's prior trip to Florida because it drives home his deadly intent by giving further context to

---

[4]     The evidence described in this Section is based on physical items we will present at trial.

10

those other facts. The .50 caliber ammunition in particular explains Routh's later attempts, in late-August, to obtain a .50 caliber sniper rifle that would have been able to use that ammunition. The ammunition in Routh's storage trailer further explains the box's contents, with the manual showing how to make an improvised deadly device and the other ammunition constituting further circumstantial evidence of the box's contents showing Routh's intent to possess and use bullets to cause harm. This evidence also cannot be deemed unduly prejudicial because it strikes at the heart of the crimes charged here without containing any extraneous inflammatory content. In this respect, all of this evidence is intrinsic to the crime and admissible to those ends.

Beyond those two permissible intrinsic uses of this evidence, Routh's possession of the ammunition would also be relevant and admissible on Rule 404(b) grounds as it relates to his firearm possession charges (one of which, Count 4, also alleges the unlawful possession of ammunition), showing Routh's knowledge and intent as well as an absence of mistake—showings that are particularly significant in cases like this, where Routh abandoned his firearm and ammunition at the scene and the United States must prove his earlier possession. *See United States v. Perpall*, 856 F. App'x 796, 799-800 (11th Cir. 2021).[5] This evidence would be readily provable through the physical evidence from the box and witness testimony from L.P. about Routh bringing the box to L.P.'s home, and it would not be subject to Rule 403 exclusion for the same reasons just discussed. The sum is that this evidence, like all the rest, is admissible no matter which rubric.

**D. <u>August 2024: Attempted Purchase of Anti-Aircraft Weapons</u>**

Fourth, this Court should admit Routh's August 2024 attempt to acquire anti-aircraft weapons as direct evidence of his assassination attempt.[6] That month, Routh sought to purchase the devices online from an associate Routh believed to be a Ukrainian with access to military weapons. The two had discussed the July 2024 attempt to assassinate President Trump that occurred in Pennsylvania, with Routh writing "I wish" via encrypted messaging app, before the

---

[5]    To the extent Rule 404(b) applies, the box's contents would also be admissible for non-character purposes, including to prove planning, motive, and intent to kill President Trump.

[6]    The evidence described here is from encrypted Signal messages on Routh's phone.

two began discussing Routh's purchase of a weapon in August. To that end, Routh told his associate to "send me an rpg [rocket propelled grenade] or stinger and I will see what we can do… [Trump] is not good for Ukraine," which led the two to discuss Routh's purchase options, with Routh asking about the price and whether his associate could "ship it to me????" before then explaining his intent: "I need equipment so that Trump cannot get elected." The two then exchanged messages about price and logistics that included Routh writing, "going to the local store for such an item is impossible – however you are at war so those items lost and destroyed daily – one missing would not be noticed. Do you think Trump will be good for Ukraine?????" The two continued to discuss the possibility of Routh securing a rocket or missile launcher, with Routh sending his associate an image of President Trump's plane and writing "Trump's plane, he gets on and off daily."

This evidence is admissible and intrinsic, and thus outside the scope of Rule 404(b), in two respects. *First*, Routh's attempt to buy either a rocket launcher or an anti-aircraft "stinger" missile is direct evidence of Routh's assassination attempt because it is itself a substantial step taken in furtherance of his plot. *See United States v. Hyde*, 977 F.2d 1436, 1439 (11th Cir. 1992) (holding purchase of drugs to be a substantial step toward distributing them). Attempting to purchase a destructive device to blow up President Trump's airplane lies squarely within the realm of an attempt on his life, and Routh's statements about the purpose of the purchase—that he "need[s] equipment so that Trump cannot get elected"—drives home his intent. While the defense may argue that this evidence isn't direct because it was unlikely that Routh would be able to complete the purchase or because he ultimately used a rifle instead, those arguments misunderstand the law of attempt—where factual impossibility is not a defense, *see United States v. Williams*, 553 U.S. 285, 300 (2008), and where a defendant can attempt to kill someone in a variety of ways even if he makes it furthest with just one. *Second*, Routh's attempt to purchase rockets and missiles is also inextricably intertwined with the many other substantial steps he took to attempt to assassinate President Trump between March and September 2024 while also proving his mental state while taking those steps. For some of those other steps, such as Routh's attempts to purchase more

firearms as discussed in the next section, Routh's request for anti-aircraft weapons shows his destructive intent; for other steps, such as his surveillance at Palm Beach International Airport, his active tracking of President Trump's plane, and his stated intent to destroy that plane in the "Dear World" letter, the jury will not be able to fully appreciate the purpose of the conduct without also knowing about this attempt to purchase a missile launcher. In this way, Routh's attempted purchase gives necessary context to other steps Routh took in furtherance of this plot that might otherwise seem less aggressive or even innocuous—the acts of an obsessive or disturbed mind, but not someone looking to assassinate President Trump. This need to give context to other relevant evidence places this attempted purchase squarely within the realm of the inextricably intertwined, and there is no prejudicial effect this evidence would have that substantially outweighs that high probative value to meet the high bar of proving Routh to have intended to kill President Trump.

Yet even were the evidence analyzed under Rule 404(b), it would be admissible to prove Routh's intent anyway. It would be relevant for the same reasons described above and would be readily proven through Routh's phone records. That would leave only Rule 403, and it would not be subject to the extreme remedy of Rule 403 exclusion for the reasons already discussed. In this way, this Court should hold this evidence to be admissible whether intrinsic or extrinsic.

### E. **August 2024: Attempted Purchase of .50 Caliber Rifle and Other Firearms**

Fifth, this Court should admit Routh's attempt to purchase a .50 caliber rifle and other firearms the same month he was attempting to purchase different military-grade weapons as further evidence of Routh's intent to kill President Trump and to possess firearms as a convicted felon.[7] On August 25, around the same time he was trying to get his hands on rocket and missile launchers from Ukraine, Routh explored another means of killing President Trump by researching and attempting to purchase a .50 caliber sniper rifle from a gun dealer in the Fort Pierce area. This .50 caliber rifle would have been an even more destructive and powerful version of the rifle he already obtained, and Routh sought to purchase one at the supplier's next gun show, with the contact

---

[7]     The evidence described in this Section is from Routh's text messages, a "gun show" flyer discovered in Routh's vehicle, and potential witness testimony.

ultimately not finding a rifle to suit Routh's needs until shortly after the assassination attempt. All the while, Routh searched for and called gun shops in Hawaii where he had resided with a girlfriend, engaged in a series of searches on Craigslist for guns in South Florida, clicking on page after page of online listings, and asked a friend in North Carolina about the price and availability of a .50 caliber sniper rifle there.

This evidence is admissible and intrinsic, and thus outside the scope of Rule 404(b), in two respects. *First*, Routh's attempted purchase of these firearms is direct evidence of his attempt to assassinate President Trump. As with his attempted rocket/missile purchase, Routh's attempts to buy firearms on the eve of the planned attack constitute substantial steps toward assassinating President Trump. *See Hyde*, 977 F.2d at 1439. *Second*, Routh's many attempts to purchase firearms are inextricably intertwined with his actual purchase of the sniper rifle he used because they are necessary context for showing the jury the measures he took to secure the firearm he'd use to kill the President, trying and failing several times before getting the rifle he brought to the sniper hide. This doggedness on his part is relevant to proving his intent to commit the assassination and to securing a firearm for that purpose, and there is no prejudicial aspect of this evidence that can substantially outweigh that probative value for Rule 403 purposes. For those reasons, the Court should admit this evidence as intrinsic.

Yet even were this Court to analyze Routh's attempted purchases under Rule 404(b), it would be admissible anyway. It would be relevant to prove the same things that give it value as direct and inextricably intertwined evidence, and the United States would prove it with Routh's phone records and through other witness testimony. It would also pass the Rule 403 test for the same reasons as stated above: that there is nothing about the evidence so inflammatory that it could lead this Court to take the extreme measure of excluding it. For all these reasons, this Court should admit this evidence just as it should the other evidence described here.

## F.  **August/September 2024: Routh's Use of Aliases, Flight from the Sniper Hide, and Possession of Stolen License Plates**

Sixth, this Court should admit three techniques Routh employed to evade detection and

capture—his use of aliases, his planned flight from law enforcement, and his possession of stolen license plates—because each is admissible direct evidence of Routh's guilt.[8] As to Routh's aliases, the evidence will show that Routh used the alias "Brian Wilson" when staying at the truck stop in South Bay where he camped for weeks while surveilling Palm Beach International Airport and Trump International. During this time, Routh gave this fake name to truck stop employees and wrote it himself on a tag he kept on his Xterra while parked there and on a piece of paper found at the time of his arrest. The evidence will also show that Routh used another alias—"John White," "John," or "J.W."—in August 2024 when purchasing service in North Carolina for a burner phone he brought with him to Florida for the assassination attempt. As to flight and Routh's possessing license plates that were not his own, the evidence from Routh's arrest will show not only that he fled his sniper hide when spotted and shot at by law enforcement but also that he was prepared for flight with a written escape route and variety of license plates belonging to others that would help him evade detection and capture. Specifically, Routh's Xterra bore a stolen license plate (Florida tag 97EEED) when he was captured, and Routh's vehicle also contained other plates not belonging to him—including a long-expired Ohio plate with tag #KDL8415 and a North Carolina plate associated with his daughter Sara. Law enforcement came to know these things only after capturing Routh in Martin County during his flight. Further investigation revealed, as the United States will present at trial, that Routh used a stolen plate during his earlier reconnaissance.

This Court should admit these forms of evidence because they are direct evidence of Routh's guilt. Circuit courts, including the Eleventh Circuit's predecessor Fifth Circuit, have long

---

[8]  This Section groups these three types of evidence because circuit courts and legal scholars have long grouped them together. *See, e.g., Marcoux v. United States*, 405 F.2d 719, 721 (9th Cir. 1968); Wigmore on Evidence, 3d Ed. § 276 ("It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."). The evidence supporting the facts described in this Section will consist of Routh's phone records, witness testimony, and physical evidence collected and photographed at the time.

recognized the use of an alias, flight, and the possession of license plates in others' names[9] to be relevant to consciousness of guilt. The evidence here falls squarely within this basic evidentiary principle: whatever the defense may want to argue about Routh's aliases, license plates, and flight, there is no doubt that a jury should be permitted to consider that evidence in evaluating Routh's guilty state of mind. *See Mesa*, 576 F.2d at 1078 ("While the jury could have found an innocent motive from these actions, the evidence also supports an inference of an attempted concealment."). Indeed, whatever leaps of logic the defense may attempt to explain away this highly unusual conduct, common sense speaks loudly here that Routh's elaborate ruses and ultimate flight—a flight that he had been planning for months—were part of his plan. The fact that Routh planned his flight proves all-the-more that he was executing his plan to assassinate President Trump on September 15 and, in that way, goes beyond the typical flight evidence in its probative value— showing not just a spontaneous decision to evade law enforcement but instead Routh sticking to his plan to assassinate President Trump and that concealment was part of the plan itself. *See United States v. Jorge-Salon*, 734 F.2d 789, 791-92 (11th Cir. 1984) ("the use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendants with the acts charged."); *accord United States v. Hines*, 955 F.2d 1449, 1454 (11th Cir. 1992). This high probative value, and lack of any inflammatory aspects, forms no basis for exclusion under Rule 403 or otherwise.

Yet even were this Court to analyze these attempts by Routh to conceal his identity and escape responsibility for his crimes under Rule 404(b), it would be admissible anyway. It would

---

[9]     On these topics: Alias – *see United States v. James*, 576 F.2d 1121, 1125 (5th Cir. 1978) (holding a defendant's denial of identity and possessing another person's driver's license at time of arrest as "properly introduced to show flight and a guilty mind"); *United States v. Mesa*, 660 F.2d 1070, 1077-78 (5th Cir. 1981) (renting hotel room under alias evidence of consciousness of guilt);[9] *United States v.* Stowell, 947 F.2d 1251, 1255 (5th Cir. 1991) ("Her use of an alias is probative of consciousness of guilt."); *United States v. Glass*, 128 F.3d 1398, 1408 (10th Cir. 1997). Flight – *see* Eleventh Circuit Pattern Special Jury Instruction S19; *Williams*, 541 F.3d at 1089; *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977). Others' license plates – *see United States v. Ramos-Rodriguez*, 809 F.3d 817, 822 (5th Cir. 2016) ("Ramos's changing of his license plate after the traffic stop was an apparent attempt to evade law enforcement, which indicates guilty knowledge."); *Marcoux*, 405 F.2d at 721 (evidence of vehicle with different license plate admissible as knowledge of car being stolen).

be relevant to prove the same things that give it value as direct evidence, proving Routh's intent to kill President Trump and consciousness of his own guilt, and the United States would prove it with the evidence described above. This evidence would also pass the Rule 403 test for the same reasons as stated above: that there is nothing about the evidence so inflammatory that it could lead this Court to take the extreme measure of excluding it. For all these reasons, this Court should admit this evidence just as it should the other evidence described here.

G.  **Routh's Past Felony Convictions**

Routh has multiple prior felony convictions from North Carolina:  a 2002 conviction for possessing a weapon of mass destruction (WMD), and three related 2010 convictions for possessing stolen goods.  These prior felony convictions are direct evidence on Count 4 (the felon-in-possession count), as proof of Routh's status as a felon and his knowledge that he was a felon. *See United States v. Innocent*, 977 F.3d 1077, 1082 (11th Cir. 2020) ("[S]omeone who has been convicted of felonies repeatedly is especially likely to know he is a felon.").  Routh has not yet stipulated on these two issues, so no 404(b) analysis may be needed to admit these past convictions.

Even if Routh stipulates, the Government nonetheless seeks to admit under Rule 404(b) his 2002 WMD conviction and its facts.[10] State authorities charged Routh in April 2002 with this felony violation of North Carolina Statute 14-288.8, in Case Number 02-CRS-083088. According to the indictment, Routh unlawfully possessed a "binary explosive device with a detonation cord and a blasting cap" – essentially, dynamite – on or about April 23, 2002. He pleaded guilty in December 2002 to possessing a "weapon of mass death and destruction," a definition that includes any explosive or incendiary device such as a bomb or grenade or any type of weapon meant to expel a projective by means of an explosion.  Evidence of this conviction is relevant to his intent to kill, is readily provable based on his guilty plea, and is not so unduly prejudicial as to warrant

---

[10]     If Routh stipulates, the parties can address then whether the 2010 convictions may be admissible anyway under Rule 404(b). On March 3, 2010, Routh pleaded guilty in three separate felony cases charging him with violating North Carolina's possession of stolen property statute, North Carolina Statute 14-71.1, Case Numbers 10CRS068059, 10CRS068060, and 10CRS68464.

the extreme remedy of exclusion under Rule 403.

The WMD conviction not only shows Routh's comfort with devices that may cause death or grave injury, but also shows that he was indeed capable of intending to do the extraordinary. Routh stands accused not just of intending to kill *someone*, but of intending to kill a major candidate to be the most powerful leader in the free world. A prior conviction for possessing a weapon of mass death and destruction – as dynamite would – supports the idea that he was perfectly fine with the idea of committing an act of extreme violence in public causing massive public consequences. More generally, as argued above, Routh has put his intent at issue, by pleading guilty and by expressly disputing this element in pretrial proceedings. His tactic allows us latitude to meet its high bar of proving that intent. *See Moore*, 535 F. App'x at 798.

As to proving the underlying acts, the Government will introduce, at minimum, a certified copy of Routh's conviction, including the paperwork related to his guilty plea which he signed. The Government may also elicit testimony from an officer involved in the investigation. Finally, the evidence is not so unfairly prejudicial as to violate Rule 403 for three reasons. *First,* and as already explained, Routh's possession of a WMD is highly probative on Count 1 because it corroborates his intent to engage in an extraordinary and public destructive behavior—an essential aspect of Count 1 that will no doubt be contested by the defense. *Second*, the conviction's age is no barrier to its admission because it is consistent with time passage that the Eleventh Circuit has endorsed previously. *See, e.g., United States v. Patrick*, 536 F. App'x 840, 842 (11th Cir. 2013) (affirming admission of 18-year-old armed robbery conviction in felon-in-possession trial); *United States v. Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995) (finding 15-year span did not render the extrinsic acts too remote for proper consideration). *Third*, any undue prejudice is easily addressed by a limiting instruction or other routine precautions taken when admitting prior convictions. *See Jernigan*, 341 F.3d at 1282; *Calderon*, 127 F.3d at 1333. All of this assumes the conviction is not coming in anyway as direct proof on Count 4; if it is, the prejudice is even more minimal.

### H. Firearms Not the Subject of a Conviction

The Court should next admit evidence of Routh's prior firearm possession that is not the

subject of felony convictions but that show his facility with and affinity for especially dangerous firearms of the kind he ultimately used in trying to kill President Trump on September 15. Specifically, this Court should admit the following to prove Routh's intent and knowledge:

(1) In an April 26, 2022, text message, Routh admitted "I ow[n]ed an ak47 in north Carolina and a tech 9 and a bunch of guns....police ended up with them all." The message does not say when Routh possessed these items, but he did not cabin it in any way, and the evidence will show that he was for many years a North Carolina resident. Routh's admission is especially relevant because it acknowledges that police seized those guns, as well as his capability and experience with the AK-47 assault rifle, which both lay and expert witnesses for the Government will testify is extremely similar to the SKS-type rifle that Routh used in the assassination attempt.

(2) In two text messages from July 2022, Routh displayed his familiarity with the AK-47's effective range of approximately 400 meters; in September 2024, just two weeks before the assassination attempt, Routh discussed procuring scopes for sniper rifles.

(3) Routh possessed a sawed-off shotgun in North Carolina in April 2002, according to contemporaneous law enforcement reports. On April 12, 2002, according to police, Routh possessed a sawed-off shotgun that day and threatened a variety of individuals with it, including Greensboro law enforcement. He was arrested for that activity; the charge was ultimately dismissed as part of Routh's felony guilty plea in the weapon of mass destruction case described below.

(4) In or around December 2002 Routh possessed an Uzi-style submachine gun, according to multiple sources. At least two witnesses (a former employee, S.P., and former police officer, T.F.) told the FBI that Routh possessed an Uzi-style submachine gun at that time. T.F. described a traffic encounter with Routh in December 2002, when she observed Routh reach for a duffel bag and reveal a firearm. T.F. did not recall the exact type of gun but did recall that it was not a long gun and that it may have been an Uzi. T.F. added that Routh subsequently escaped from the car and barricaded himself inside a building until he surrendered and was arrested. S.P., for his part, told the FBI that, in the early 2000s, Routh drove around an Uzi-like firearm, and that Routh claimed he would not surrender to law enforcement. These statements further corroborate, and are themselves corroborated by, Routh's admission that he possessed firearms in the past, including an AK-47, which is nearly identical to the rifle he intended to use to kill the President, and a TEC 9 machine pistol, which closely resembles an Uzi.

While these acts may be extrinsic, none is prohibited by Rule 404(b) because they are relevant, readily provable through eyewitness testimony, and not excludable under Rule 403.

As to relevance, Routh's prior possession and use of firearms tend to prove his mental state as to Count 2 (possessing and brandishing a firearm in furtherance of a crime of violence), Count

4 (possessing a firearm and ammunition as a convicted felon), and Count 5 (possessing a firearm with an obliterated serial number). That's so because "where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged," *Jernigan*, 341 F.3d at 1281 (quotations and citations omitted); *see also United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005), and the Eleventh Circuit has "reiterated that holding multiple times" when it comes to guns. *Perpall*, 856 F. App'x at 799. And these "other acts" do not merely involve Routh possessing guns but also doing so illegally or with exotic firearms where he made threats of violence, just as alleged here—whether a sawed-off shotgun in April 2002 or with a submachine gun that he barricaded himself inside a building while carrying. As with Routh's WMD conviction, these acts directly respond to the Defendant's denial of having the mental state to commit the charged crimes[11] and is thus not only relevant but highly so, and this Court excluding these "other acts" would unfairly hamstring the United States as it answered the defense on this front.

Finally, as to Rule 403, there is nothing about this evidence that causes undue prejudice in light of its clear relevance to Routh's commission of the firearm-related acts charged here. None of these incidents involve any aggravating factors such as wounded victims that might risk inflaming the jury; instead, they are instances of possession that speak directly to the mental state the Government must prove at trial. The extreme remedy of exclusion would be unfair to the jury.

## <u>Conclusion</u>

For all of the foregoing reasons, the United States respectfully requests that the Court permit the Government to introduce the evidence identified in this motion.

---

[11]    Routh's commitment to this line of argument has been apparent since the detention hearing, when counsel asked the agent about Routh's training in firearms and claimed the question went "to intent, it goes to the attempted assassination, if this is an individual who is trained in firearms, who can meet this specific intent versus a person who is less knowledgeable." (Det. Hrg. Tr.: 71).

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

SUE BAI
SUPERVISORY OFFICIAL PERFORMING THE
DUTIES OF THE ASSISTANT ATTORNEY
GENERAL FOR THE NATIONAL SECURITY
DIVISION

By: /s/ John Shipley
    John C. Shipley
    Florida Bar No. 69670
    Christopher B. Browne
    Florida Bar No. 91337
    Maria K. Medetis
    Florida Bar No. 1012329
    Assistant United States Attorneys

    U.S. Attorney's Office
    Southern District of Florida
    99 Northeast 4th Street, 8th Floor
    Miami, Florida 33132-2111
    Telephone: (305) 961-9111
    E-mail: John.Shipley@usdoj.gov

By: /s/ James Donnelly
    James Donnelly, Trial Attorney
    Court ID No. A5503278
    Department of Justice, National Security Division
    950 Pennsylvania Avenue, NW
    Washington, DC 20530
    Telephone: (202) 514-0849

## CERTIFICATE OF CONFERRAL AND SERVICE

As required, counsel for the Government sought the Defendant's position on each of the items of evidence addressed in this motion. Specifically, on April 5 at 2:24 p.m., we sent a detailed email to both defense lawyers identifying each item and also providing a description and/or Bates numbers from the discovery. We asked them to let us know what if any areas could be streamlined for the Court. The next day, April 6, defense counsel replied that they would conference among themselves to see if they could reach agreement on anything. We followed up with defense counsel this morning, April 7, asking again for their position(s) prior to 3 p.m. so we would have time to finalize our motions before today's deadline. On Monday afternoon at 2:30, defense counsel wrote us that, for now, they object to everything and will review our pleading once filed. The Government filed the foregoing document with the Clerk of the Court using CM/ECF on April 7, 2025.

/s/ John C. Shipley
Assistant United States Attorney