## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-80116-CR-CANNON/McCabe

**UNITED STATES OF AMERICA**

**vs.**

**RYAN WESLEY ROUTH,**

**Defendant.**
_____/

### GOVERNMENT'S MOTION IN LIMINE

The United States respectfully moves this Court to issue pre-trial rulings (1) excluding irrelevant and prejudicial evidence we expect the defense may offer; and (2) admitting today certain trial evidence the Government expects to offer.  Pursuant to this Court's Order (ECF No. 29), our motion combines all the Government's requests; they cover a variety of different topics, but each is, in our view, vitally important to keeping trial on track, maintaining jurors' focus on the elements, and preventing violations of the Court's previous orders.

### BACKGROUND

This case arises out of the Defendant's calculated plan to assassinate now-President, then Major Presidential Candidate, Donald J. Trump (hereafter, "President Trump" or "the President") before he could be re-elected.  The Defendant illegally purchased a military-grade SKS rifle, traveled from North Carolina to the West Palm Beach area, and then, on September 15, 2024, in anticipation of the President playing golf there, concealed himself near the 6th green of the Trump International Golf Club.  Routh loaded the weapon's magazine with 20 rounds of ammunition, drew one into the rifle's chamber, and positioned it to fire.  Only the arrival of a Secret Service agent thwarted Routh's plan, prompting his flight.

1

The indictment alleges five crimes.   Count 1 charges Routh with the attempted assassination of a Major Presidential Candidate, contrary to 18 U.S.C. §351(c).   Count 2 charges Routh with knowingly possessing and brandishing a firearm in furtherance of that assassination attempt, contrary to 18 U.S.C. §924(c)(1)(A)(ii).   Count 3 charges that Routh intentionally assaulted a federal officer (the Secret Service agent), in violation of 18 U.S.C. §111(a)(1) and (b). Count 4 alleges that Routh, a convicted felon, knowingly and unlawfully possessed a firearm, contrary to 18 U.S.C. §922(g)(1).   Count 5 alleges that Routh knowingly possessed a firearm with an obliterated serial number, contrary to 18 U.S.C. §922(k).

## LEGAL GROUND RULES FOR MOTIONS IN LIMINE

With an eye toward minimizing disruptions, the Court has ordered the filing of motions in limine two months before trial (ECF No. 109), and we are complying with that Order.   Just like addressing improper defenses and extrinsic evidence (*see* ECF Nos. 181, 182), deciding motions in limine well *before* trial is normal and entirely proper, and serves important purposes set forth by the case law and rules – a defendant's desire to avoid any scrutiny of his possible evidence or defenses, however inadmissible, does not eliminate the Court's responsibility to ensure a fair trial for all sides and spare jurors the burden of a repeatedly interrupted trial proceeding.

Motions in limine streamline trials by settling evidentiary disputes in advance and by minimizing sidebar conferences and other disruptions.   *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002).   In limine rulings also can avoid the futile attempt of "unring[ing] the bell" when jurors have seen or heard inadmissible evidence.   *See Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003); *Carofino v. Forester*, 450 F. Supp. 2d 257, 270 (S.D.N.Y. 2006).   In limine rulings additionally give meaning to a court's broader pre-trial orders, such as this Court's Order foreclosing Routh's impermissible defenses of excuse, justification, and impossibility, among others (ECF No. 181).

Simply put, "[i]f the court determines that the defendant's proffered evidence is irrelevant or otherwise inadmissible, it should issue a ruling in limine precluding the introduction of that

information at trial." *United States v. Baptista-Rodriguez*, 17 F. 3d 1354, 1363 (11th Cir. 1994). Likewise, argument and evidence "based upon an invalid defense should be excluded because [it is] irrelevant as a matter of law to the charges of the indictment." *United States v. Anderson*, 872 F.2d 1508, 1516 n.12 (11th Cir. 1989) (observing "a jury should not be burdened with testimony regarding a defense where that defense has already been determined to be legally insufficient.").

While it is generally true that evidence should not be excluded in limine unless it is clear that the item is not admissible for any proper purpose, a district court may also reject evidence before trial knowing that it always remains free to adjust its ruling during trial. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (citing *Luce*, 469 U.S. at 41-42). It also may impose restrictions, such as barring certain references in opening statement or voir dire, to ensure that, when the time comes during trial for the Court to rule on a topic it deferred, the defense has not already let the cat out of the bag. *See, e.g.*, *Scott v. Dugger*, 686 F. Supp. 1488, 1500-01 (S.D. Fla. 1988) (finding no error in trial court's decision to preclude defense counsel from referring to matters that would only be admissible, if at all, in the defendant's testimony, because "[a] trial court clearly has the power and obligation to ensure that a party's opening statement addresses relevant matters which will come out through the evidence at trial."). And while Federal Rule of Evidence ("FRE") 403 requires a balancing of factors that sometimes cannot be weighed fully prior to trial, on other occasions the issue is clear cut and a motion in limine may be granted based upon that rule alone. *See, e.g., United States v. Kendrick*, 682 F.3d 974, 986 (11th Cir. 2012).

## **ARGUMENT**

### I. **The Court should exclude, at minimum as hearsay, evidence of the Defendant's statements other than statements offered against him by the Government.**

The Government will present evidence at trial about Routh's out-of-court statements relevant to the charged offenses. This evidence will consist primarily of the Defendant's texts and other electronic communications, extracted from the Defendant's devices and accounts, made while plotting his crimes, as well as certain portions of the Defendant's writings bearing on his

intent.[1]  Those statements are "admissions" of a party-opponent and accordingly are not hearsay under FRE 801(d)(2).   Routh cannot avail himself of that rule, however, so his out-of-court statements are inadmissible hearsay.  *See, e.g., United States v. Vernon*, 593 F. App'x 883, 889–90 (11th Cir. 2014) (citing *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999)); *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985).  Simply put, "[w]hen offered by the government, a defendant's out-of-court statements are those of a party opponent and thus not hearsay. When offered by the defense, however, such statements are hearsay." *United States v. Sanjar*, 876 F.3d 725, 739 (5th Cir. 2017).

In *United States v. Bond*, 87 F.3d 695, 699-700 (5th Cir. 1996), the Fifth Circuit illustrated these rules by pointedly rejecting an attempt by a defendant to introduce an audiotaped statement he himself had made:

> The magistrate judge initially admitted into evidence a transcript of the tape Bond made while a fugitive, but later reversed himself and held that the transcript constituted inadmissible hearsay:  We agree with the magistrate's ultimate result. The transcript was not admissible under [FRE] 801(d)(1)(B) [prior consistent statement] because Bond did not testify.  It was not admissible as an admission by a party-opponent because it was not offered against a party within the meaning of [FRE] 801(d)(2); Bond offered the transcript to benefit himself.  The transcript was hearsay, fell within no hearsay exception, and the magistrate judge correctly excluded it from evidence.

*Id*.  The same reasoning applies here.  *See also Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("[T]he district court properly refused to admit those statements because a witness' testimony as

---

[1]     The Government will introduce, for example, Defendant's communications about killing President Trump, such as his request for grenade and missile launchers "so that Trump cannot get elected" (*see* ECF No. 122 at 12), his conversations about other assassination attempts, including WhatsApp messages discussing Lee Harvey Oswald's sniper hide, and, potentially, recorded jail communications in which Routh likens himself to John Hinckley, President Reagan's attempted assassin.  *See* Feb. 3, 2024 WhatsApp Message from Routh to "Z.X." ("I think our president Kennedy was killed from someone buried in the hill facing his caravan in Dallas Texas. It must be something like this, an underground buried space that cannot be seen or detected. It is certainly not an easy task."); Defendant's October 31, 2024, 9:02 PM Call from FDC Miami to "S.R." (discussing Hinckley).

to her own prior out-of-court statement is generally hearsay.").

Routh may contend that some of his statements are not hearsay or come within an exception.  He has not yet done so, however, and the law is strongly against him.  For example, a defendant cannot offer hearsay as proof of his "state of mind" when the statement is nothing more than a self-serving declaration, or a rationale for his conduct.  The Eleventh Circuit, in a crystal-clear series of decisions, has cut back on this type of argument.  As it explained in *United States v. Samaniego*:  "[T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. . . .  [T]he purpose of the exclusion from Rule 803(3) admissibility is to narrowly limit those admissible statements to declarations of condition— 'I'm scared'—and not belief—'I'm scared because [someone] threatened me.'" 345 F.3d 1280, 1282 (11th Cir. 2003). The statement must also be relevant for some purpose other than the supposed truth of the matter asserted.  *See, e.g., United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987) ("Scrima's subjective belief as to his wealth is totally irrelevant. The statement was offered to prove the fact that the defendant actually had the money not that he thought he had it. Consequently, the statement was not admissible under 803(3).").

Some defendants also resort to the "rule of completeness" in FRE 106, which provides that: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  But FRE 106 "does not automatically make the entire document admissible once one portion has been introduced."  Instead, "[it] permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Macrina*, 109 F.4th 1341, 1348 (11th Cir. 2024) (internal citations and quotation marks omitted).  To be admissible notwithstanding the hearsay rules, the defendant's proposed additional statement must be essential to avoid a mischaracterization or distortion of the specific statement offered in isolation by the

Government– the inquiry is *not* whether admitting the defendant's statement would be fair in some holistic sense. *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988); *see also United States v. Santos*, 947 F.3d 711, 729 (11th Cir. 2020) (declining to conclude that the district court abused its discretion in admitting the first inculpatory part of defendant's statement and excluding the rest, which defendant asserted was exculpatory, where the alleged exculpatory part did not explain or clarify the earlier inculpatory part). [2]

For all these reasons, Routh should be barred from seeking to admit, or elicit testimony on direct or cross-examination about his own statements other than those offered by the United States and admitted against him.

## II.    The Court should exclude the Defendant's writings other than those offered against him by the Government.

The same principles apply to Routh's longer writings, which include various letters seized during the investigation, as well as self-published "autobiographies" and non-fiction books. Unless the Government introduces these writings, Routh is prohibited by the hearsay rules from doing so himself. *See also United States v. Marley*, 621 F. App'x 936, 941 (11th Cir. 2015) (district court properly excluded defendant's self-serving written memo explaining his alleged criminal activity (citing *United States v. Groce,* 682 F.2d 1359, 1364 (11th Cir. 1982) and *United States v. Ellisor*, 522 F.3d 1255, 1270–71 (11th Cir. 2008)). The majority of these writings also relate to defenses such as excuse, justification, necessity, or victim-blaming that this Court has foreclosed

---

[2]       Another often-cited avenue is the prior consistent statement exception, FRE 801(d)(1), but this likely would apply only if Routh testified, and even then, a witness cannot be corroborated on direct or redirect examination or rebuttal by proof of prior statements consistent with his in-court testimony. *See, e.g., United States v. Drury*, 396 F.3d 1303, 1316-17 (11th Cir. 2005); *United States v. McCulley*, 178 F.3d 872, 876 (7th Cir. 1999) (no error in refusing to admit testifying defendant's own prior statement and observing that [i]t is, of course, improper to admit a previous statement for the mere purpose of bolstering a statement made at trial); *United States v. Acker*, 52 F.3d 509, 517 (4th Cir. 1995)  (The testimony as to Holly's out of court statement to Rozzi was admitted solely to corroborate what Holly testified to in the courtroom today. A prior consistent out of court statement of a witness is not admissible for this purpose).

(ECF No. 181), so on many fronts Routh cannot seek to introduce them himself.

We do not know all the writings Routh may seek to introduce, but his discovery includes at least two excerpts from his own books. *See* Exhibit 1 (Defendant's discovery index).[3]  Although some content in these books, and Defendant's other writings, is inculpatory, we may or may not introduce those materials ourselves.  Those materials include his self-published book, "Ukraine's Unwinnable War," in which he invites a foreign country to assassinate President Trump, and an apparent "dedication" letter, which Routh left at the crime scene, which provides a list of Defendant's justifications for his attempted murder of the President.  Unless the Government chooses to introduce some or all of these writings, Routh cannot.[4]

### III.    The Court should admit the portion of the "Dear World" letter where Routh confesses that he wanted, and wants, President Trump's assassination.

The Court is familiar already with the "Dear World" letter found among the contents of the box Routh left at L.P.'s North Carolina residence after Routh's trip to West Palm Beach in March and April 2024 (*see* ECF No. 122 (Government's Rule 404(b) motion)).  In that letter,[5] Routh writes at the start: "This was an assassination attempt on Donald Trump but I am so sorry I failed you.  I tried my best and gave it all the gumption I could muster.  It is up to you now to finish the

---

[3]      We have added a column of our own to the Defendant's index, identifying what we assume to be the proposed relevance, as we see it, of the items.  As discussed below, most of them appear to be meant to show the Defendant's supposed good character, as opposed to addressing the merits of the charges.

[4]      The Government will at a minimum introduce the envelope found at the scene in which the "dedication" letter was contained because it matches the handwriting and postage of a near-identical letter and envelope bearing Routh's name, which he mailed to his son in North Carolina one week before the assassination attempt.  Our purpose for doing so would be to further show Routh's presence at the scene, which the defense still has not conceded.  As in all respects, what the Government may ultimately choose to offer at trial will depend in part upon what the defense does or this Court's rulings.

[5]      Page 1 of the letter is attached hereto as Exhibit 2; this page previously appeared in connection with the pretrial detention hearing (*see* ECF No. 14 at 8).  We will have the remainder of the letter available for the Court's inspection at the scheduled July 25 hearing.

job; and I will offer $150,000 to whomever can complete the job." This is the only portion of the letter we ask the Court to admit now. While the letter contains other inculpatory admissions by Routh, most of it is an extended screed about the alleged failings of President Trump and Routh's views on world events ranging from Ukraine to Iran to Taiwan. Indeed, immediately after the passage quoted above, Routh transitions from talking about himself to attacking President Trump's character. *See* Exhibit 2.

As signaled earlier, the Government is entitled to introduce statements in this letter as admissions of a party-opponent. Routh, by contrast, is not entitled under the hearsay rules to introduce other portions himself. Routh also cannot cite "completeness" as a reason to introduce portions not offered by the Government. That is especially so with respect to the passage we are seeking to admit now; a clean break exists, with a shift in focus from soliciting support for a future assassination attempt to besmirching the President's morals. The rule of completeness does not automatically make the entire letter admissible. *See United States v. Ramirez*, 658 F. App'x 949, 953 (11th Cir. 2016) ("Rather, 'the rule permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced.'"); *see also Santos*, 947 F.3d at 730 (noting that Rule 106 is only designed to prevent "misunderstanding or distortion" of a passage in isolation).

Simply put, while events leading up to, or during, trial may require the Government to offer other portions of the letter, the Court should rule now that the Government if it so chooses may introduce the portion quoted above without the defense automatically being able to introduce some other portion.

## IV.  The Court should preclude the defense from offering statements by third parties without a persuasive hearsay exception and a sufficient showing of relevance.

Another defense tactic we anticipate, based upon their discovery disclosure, is an attempt to offer statements by third parties about Routh, about President Trump, about this investigation, or about world affairs supposedly "justifying" this assassination attempt. Just as he cannot

introduce his own self-serving hearsay, Routh cannot offer the out-of-court statements of third parties for their truth.  That restriction applies equally to defense exhibits and defense testimony. *See, e.g., United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) (upholding district court's refusal to admit statements made by co-defendant to a third party); *see also United States v. Arroyo*, 406 F.3d 881, 887-88 (7th Cir. 2005) (rejecting defendant's arguments that conversation between government agent and an informant, which included an exculpatory statement about the defendant, was admissible to show the agent's "state of mind" in pursuing the investigation).  That restriction applies as well to the defendant's cross-examination of Government witnesses, including FBI agents, about other individuals' out-of-court statements.  Routh may, of course, try to impeach a witness on cross-examination with his or her own prior inconsistent statements, but he cannot use a different person's statements for that purpose.  As the Eleventh Circuit explained when it rejected such a tactic in *Gossett*, "[t]he law in this Circuit is settled that impeachment by prior inconsistent statement may not be permitted where it is used as a stratagem to get before the jury otherwise inadmissible evidence."  877 F.2d at 906.[6]

### V. The Court should preclude the defense from offering evidence of Routh's supposed good character or good deeds unrelated to the specific charges against him.

Hearsay aside, many of the third-party statements Routh produced in discovery are plainly irrelevant to the charges, would violate the Court's pretrial order foreclosing his improper defenses, and could be admissible only to prove his supposed good character or good works – the topic we turn to next.

The Eleventh Circuit has cautioned that "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991).

---

[6]     The Government will raise witness-specific objections at the time of trial to prevent improper questioning on cross-examination about certain witnesses' prior statements, immigration status, and arrests for minor offenses which did not result in convictions.

Consequently, a defendant cannot introduce evidence of prior good acts to portray the defendant as having a good character. *Id.; see also Ellisor*, 522 F.3d at 1270-71 (finding that district court properly excluded fraud defendant's evidence of other allegedly legitimate business activities, noting that "[t]hese specific acts of good character were inadmissible under Rules 404(b) and 405(b) to prove [the defendant's] action in conformity therewith"). A defendant may not use general evidence of his supposed good character to prove that he did not commit the charged crimes.

A ruling to that effect is especially vital here. As the Court knows, Routh has been very explicit in his desire to turn this trial into a circus where his supposed good character is weighed against the President's. (*See, e.g.*, ECF No. 119 (GX 119-4 & 119-5)). Routh's desire is reflected by his discovery production – almost none of which relates to any element of the charged offenses, but instead only to persuading the jury that he is a good person. He even has provided us with four-decades-old Eagle Scout applications. *See* Exhibit 1.[7]

This is not a case where a character trait is an essential element of any charge. Pursuant to FRE 404(a) and 405, a defendant cannot introduce evidence of specific acts to support an alleged character trait character unless the character trait is an essential element of a charge, claim, or

---

[7]    The Defendant has also disclosed photographs, documents, and other evidence of his 2022 travels to Ukraine and Taiwan, where he purported (without success) to recruit foreign fighters and other volunteers. *See id.*: 2-3 (documenting recruiting materials titled "Fight for Ukraine" and "Taiwan Foreign Legion"). None of these activities is relevant to the charges in this case. *See, e.g., United States v. Franks*, 76 M.J. 808, 812 (A. Ct. Crim. App. 2017) (finding certain "character" evidence related to defendant's service in French Foreign Legion irrelevant in desertion prosecution). And any attempt to suggest that Routh's views on international relations or his personal sympathies toward Ukrainian or Taiwanese people relate to his alleged "state of mind" or lack of "intent to kill" would run afoul of this Court's prior order (and the parties' own commitments) (*see* ECF No. 150 at 2) ("The defense agrees that it will not make any argument, nor offer any evidence relevant only to, a justification, necessity, duress, or excuse defense"). So these statements are relevant, if at all, only to show the Defendant's supposed good character or past good conduct – impermissible subjects at this stage.

defense.[8]   It is doubtful that Routh could even identify any "good" character trait that would be pertinent to these charges, such that he could offer character evidence via testimony about his "reputation or by testimony in the form of an opinion."  FRE 405(a).  This is not a fraud case, for example, where character traits such as honesty and truthfulness might be pertinent to an allegation of intent to defraud.  *Compare United States v. Ahmed*, 73 F.4th 1363, 1384 (11th Cir. 2023) ("Claud's testimony would have covered specific acts of Ahmed's conduct to establish traits unrelated to the fraud charges. Ahmed would have used this evidence of supposed good conduct "to negate [his] criminal intent," which makes it precisely the kind of evidence that Rules 404(a) and 405(b) prohibit.  *See Ellisor*, 522 F.3d at 1270; FRE 404(a), 405(b). Accordingly, the district court correctly excluded the testimony.").

Routh might argue that his supposed "meekness" or kindness are pertinent character traits, but those arguments, even if sufficient to allow the introduction of opinion or reputation evidence under Rule 404(a), would not support admitting evidence of the specific instances of "good" conduct identified in his discovery.  They would also, obviously, open the door fully to evidence about Routh's violent past and lawlessness, including evidence cited in the Government's Rule 404(b) Motion (ECF No. 122 at 19-20).  As the Supreme Court stated in *Michelson v. United States*, 335 U.S. 469, 479 (1948), the classic case on using character evidence: "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.  Thus, while the law gives the defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof

---

[8]   Rule 404(a)(2)(A) provides: "[a] defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it; . . ." FRE 404(a)(2)(A).  Additionally, Rule 405 provides: "When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."

to tests of credibility designed to prevent him from profiting by a mere parade of partisans." *See also* FRE 405(b) (if a defendant introduces evidence of his good character, the Government may, in cross-examination, rebut the Defendant's good character with relevant specific instances of Defendant's bad character).

At this point, however, Routh has not identified any particular character trait that he thinks may be at issue, so there is no need to speculate. As it stands, none of his supposed good character evidence is admissible. All of it should be excluded now. "[A]n accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

**VI.    The Court should admit non-hearsay statements by the Defendant's agent and employee, Tina Cooper, as they relate to her efforts to obtain firearms on Routh's behalf.**

The Government asks this Court to admit messages authored by the Defendant's agent, employee, and (with respect to acquiring firearms unlawfully) co-conspirator, Tina Cooper, whom the Defendant directed and paid to obtain firearms on his behalf, including the SKS rifle Routh brought to Trump International Golf Club, as well as a .50 caliber sniper rifle. *See* FRE 801(d)(2)(D),(E). Cooper was charged and has now been convicted in North Carolina of conspiring with Routh regarding the firearm.[9]

---

[9]    Cooper was charged by indictment in the Middle District of North Carolina with: conspiring with Routh to purchase a firearm on behalf of a convicted felon, in violation of 18 U.S.C. §932(b)(1) (count 1); attempting and conspiring with Routh to ship, transport, transfer, cause to be transported, and otherwise dispose of a firearm knowing that Routh's use, carrying, or possession of the firearm was a felony, in violation of 18 U.S.C. §933(a)(1), (a)(3), and (b) (count 2); and obstruction of justice, in violation of 18 U.S.C. §1519 (count 3). Case No. 25-CR-97-1 (M.D.N.C.). Cooper entered a guilty plea to Count 2 on July 7, 2025.

Oxendine is charged in the Middle District of North Carolina with possession of an unregistered firearm, in violation of 26 U.S.C. §5861. Case No. 25-CR-108-1 (M.D.N.C.). Oxendine pleaded guilty on June 10, 2025.

By way of background, between July and August 2024, the Defendant enlisted his longtime employee, Cooper, to obtain firearms for him. Cooper agreed and conspired with the Defendant and her current boss, Ronnie Jay Oxendine, to sell and dispose of a firearm to a prohibited person they both knew (Routh). Oxendine sold the SKS firearm to Routh at the request of Cooper. Routh told Oxendine (in Cooper's presence) that he would remove the serial number from the gun so it could not be traced to Oxendine. Routh paid $350 to Oxendine for the rifle. And he paid $100 to Cooper for arranging the deal.

But Cooper's efforts did not end there. The same day he purchased the gun, Routh directed Cooper to ask Oxendine (the seller) questions about one of the rifle's parts, which he photographed and sent to Cooper. Cooper consulted with Oxendine and confirmed that the part Routh had asked about was a "cleaning kit" stored inside the buttstock of the SKS. Routh also asked Cooper to inquire about the location of the rifle's serial numbers, specifically, whether there was more than one serial number on the gun—information Routh needed to ensure that he completely obliterated the gun's identifying marks, as alleged in Count 5 of the indictment.

Thereafter, the Defendant and Cooper continued to correspond about acquiring a .50 caliber sniper rifle for Routh.[10] This prompted Cooper to text Oxendine the following, on August 23: "Ryan said u got a 50caliber for sale". Oxendine responded: "I wish I had a 50 caliber rifle". The next day, Cooper communicated this to the Defendant, stating: "Ronnie says he needed that two [sic] he doesn't have one either." Routh then instructed Cooper: "Go shopping for me". Cooper responded: "I am going to do that". Over the course of the next week, Routh and Cooper discussed

---

[10]     This Court has already ruled, without objection, that evidence of the Defendant's attempts to purchase the .50 caliber rifle is relevant and admissible (ECF No. 182 at 7, 8).

the price of the .50 caliber rifle Routh wanted ($2500 "on the street"), their efforts to find one, and Routh's inability to pass a background check to purchase such a gun.

The Court should admit Cooper's statements to Oxendine (all of which she made at the Defendant's direction or request), as agent/employee/aider-and-abettor statements or, alternatively, as co-conspirator statements under FRE 801(d). Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against an opposing party and "was made by the [opposing] party's coconspirator during and in furtherance of the conspiracy." FRE 801(d)(2)(E). For evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that: "(1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003).

Here, not only did Routh pay Cooper for her participation in the scheme and direct her to continue "shopping" for guns on his behalf, Cooper was also actually charged in North Carolina with conspiring with Routh to illegally obtain a firearm for him. Consequently, her statements during in and furtherance of their conspiracy to acquire firearms for a prohibited person are admissible.

### VII. The Court should preclude the defense from referencing Routh's potential punishment or alternatives to imprisoning him.

In its final instructions, this Court will instruct the jury that it cannot consider the Defendant's punishment upon conviction in any way. 11th Cir. Pattern Jury Instr. B10.2 ("You must never consider punishment in any way to decide whether the Defendant is guilty or not guilty. If you find the Defendant guilty, the punishment is for the Judge alone to decide later."). In this

case, however, we believe the Court must do more.  It should instruct the jury at the start of trial, not merely at the end (as is the norm), that it cannot consider the Defendant's potential punishment. It should also rule in advance that questioning, or evidence, relating to Routh's present or future imprisonment, or any alternative punishment for his crimes, is forbidden.

These extra steps are needed here for at least three reasons.  One, Routh himself has advocated in public communications that, instead of incarcerating him, he should be traded for hostages in Gaza as part of a "prisoner swap." *See, e.g.*, N.Y. POST, Jan. 4, 2025, *Alleged would-be Trump 'assassin' Ryan Routh offers to become Hamas hostage in bizarre letter*, available at https://nypost.com/2025/01/04/us-news/alleged-would-be-trump-assassin-ryan-routh-offers-to-become-hamas-hostage-in-bizzare-letter; Jan. 8, 2025 Letter from FDC Miami, attached hereto as Exhibit 3, at 3 ("Can I please beg of you to please trade me for some hostage around the world, so that I am useful and do not spend a life in prison with no usefulness."). In other communications, he has proposed that instead of serving a term of imprisonment in the United States, he should be permitted to fight on behalf of Ukraine or Taiwan.  *See, e.g.,* Mar. 25, 2025 Letter from FDC Miami, attached hereto as Exhibit 4, at 3 ("Put all of our inmates in the fight for good").  These proposals may be far-fetched, but he cannot be allowed to suggest to a jury that they are a viable alternative to his conviction (*see also* ECF No. 181 ¶¶ 6-7).[11]

Two, the defense may well focus its energy primarily if not exclusively on life-eligible Count 1 (certainly that has been the case in its pleadings to date), suggesting implicitly to the jury that the remaining "lesser" counts, which do not require proof of deadly intent, would provide a

---

[11]     Some of Routh's references to his punishment are tantamount to confessions, including in his recent letter to the federal district judge presiding over his son Oran's upcoming sentencing for violating federal child pornography laws.  We have attached some of those items here and can present others to the Court upon request, or at the July 25 hearing.  The Government does not intend to introduce these admissions in its case-in-chief, but they may become relevant if the Defendant testifies, or if the Court allows him to introduce evidence or argument about his punishment.

sufficient punishment for this defendant. In truth, during recorded discussions of his son's decision to plead guilty to Federal child pornography charges (and the resultant guidelines), the Defendant told his daughter that he is not willing to serve even a thirty-year prison term because of his age: "They came at me with 30 years. They're like, you know, if we can get you 30 years, is that good? I'm like, 'No. That's not good.'" . . . Yeah you know, I'm like, you know, I'll be 90 [expletive] years old. So, you know, . . . No, I don't like 30 years." Defendant's Dec. 26, 2024, 5:23 PM Call from FDC Miami to "S.R." Of course, the jury cannot consider defense evidence or argument about Routh's sentencing exposure or his age because they have no other purpose than eliciting sympathy. *See* 11th Cir. Pattern Jury Instr. B10.2, B2.1.

Three, while defense counsel may be mindful of the rules on this topic, Routh himself – judging by his jailhouse communications – is not, and the Court should not take the risk that Routh will say or do something on the stand to cause a mistrial.

For these reasons among others, the Court should in advance preclude the Defendant from introducing evidence regarding actual or proposed penalties and collateral consequences from a conviction, and preclude counsel from commenting in voir dire or opening statement, let alone closing, about them. "[T]he jury's role is to determine guilt or innocence, and it should reach its verdict without regard to the potential sentence imposed." *United States v. Bergman*, 852 F.3d 1046, 1073 (11th Cir. 2017). "Information as to the severity of the sentence the defendant faces is extrinsic and prejudicial, and the trial court is within its discretion to restrict cross-examination that would reveal such information to the jury." *United States v. Denham*, 437 F. App'x 772, 777 (11th Cir. 2011). "Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579, (1994). *Cf. Scott*, 686 F. Supp. at 1511 (upholding trial court's exclusion, in capital case, of proffered testimony attacking death penalty's deterrent effect). Accordingly, all arguments and evidence regarding the

Defendant's potential penalties, and his proposed alternative punishments including prisoner swaps or joining a foreign legion, should be excluded.

**VIII.   The Court should preclude the defense from arguing abandonment in its opening statement or voir dire.**

The Court has decided to defer until trial whether Routh can argue "abandonment" as a defense, or introduce evidence relating only to that topic. (ECF No. 181 at 3-4 ("[The Court declines at this stage to preclude any defense of abandonment as a matter of law or to exclude proposed evidence or argument relating to a theory of abandonment. Such arguments/objections should be raised via proper motion, consistent with the Court's Scheduling Order, and/or at trial in the context of particularized evidence. Nothing in this Order should be construed as a ruling on the permissibility of an abandonment defense to the charges in this case.")).  We are comfortable with that ruling, especially because the Defendant's discovery does not include any item that would be possibly admissible to show abandonment.  But it remains our position that abandonment is simply not available as a defense to an attempt charge *(see* ECF No. 119) (citing *United States v. Temkin*, 797 F.3d 682, 690 (9th Cir. 2015); *United States v. Young*, 613 F.3d 735, 745 (8th Cir. 2010)).

Absent a jury instruction on the front end of trial telling the jury that abandonment is not available as a defense in this case, it is imperative that the Court preclude the defense from referring to abandonment in opening statement or jury selection.  Without such a ruling, Routh will put into the jury's mind a defense that simply cannot be pursued legally.  This is one of those areas where the bell cannot easily be un-rung, so we ask the Court to rule today that Routh cannot suggest to the jury in opening, voir dire, or witness questioning that a defense of abandonment exists in this trial.

**IX.   The Court should prelude defense from eliciting or introducing evidence into the public record that could compromise the security of the President**

The Government intends to call among its trial witnesses United States Secret Service personnel who were protecting the President at the Trump International Golf Club on the day in

question.  As part of its case in chief, the Government will introduce testimony, in very general terms, about the witnesses' respective titles and roles that day and more generally, as well as what they observed, heard, did, and experienced in the moments before, during, and after Routh was discovered at the golf course.  However, the Government asks this court to preclude the defense from eliciting details about Secret Service's security protocols, policies, and procedures on September 15 because such information (1) is irrelevant and thus inadmissible under FRE 402, (2) would ignore the Court's prior ruling precluding victim-blaming, and (3) could compromise the safety and security of Secret Service protectees including the President of the United States. *See e.g., Watts v. United States*, 394 U.S. 705, 707 (1969) (explaining that "[t]he Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence.").

The areas of inquiry that the Government seeks to exclude by this motion are as follows:[12] the number of personnel involved in the protection of the President on September 15 and/or more generally; duties and responsibilities of personnel (other than those testifying at trial) during a protection detail; areas or zones of responsibility of personnel (other than those testifying at trial) during protection detail; nomenclature used to identify personnel positions vis-à-vis the President (other than those testifying at trial); how communications among protection personnel are distributed among those personnel, Secret Service, and other law enforcement entities participating in the protection of the President at the golf course[13]; the types of assets used in the protection of

---

[12]     The descriptions in this motion are intentionally generally so as to not reveal information that could threaten or compromise the security of the President and other protectees.  Should the Court wish to hear about the enumerated items in more detail, the Government would respectfully request permission to do so in a sealed filing or during a portion of the July 25 hearing that is sealed from the public.

[13]     The Government does not seek to preclude evidence pertaining to the fact that protective personnel communicate via radio and that radio communications occurred among protective personnel on the day in question.  Where appropriate, the Government may introduce such radio communications that occurred at the time of the crimes in question.

the President, generally and on September 15; information regarding the protective perimeter of the golf course; information regarding how the protective perimeter is established; and information regarding the number and type of personnel assigned to the protective perimeter.

Areas of inquiry that touch on the above topics should be excluded for three reasons. First, evidence that relates to the details of how the Secret Service protects the President is utterly irrelevant to the crimes charged, especially as to whether Routh harbored the requisite intent to assassinate the President. Second, such testimony falls within the realm of victim-blaming, in this case, the Secret Service, which is now precluded by Court order (*see* ECF No. 181 at 2-3) ("Defendant shall make no argument about, nor offer any evidence relevant only to, the alleged conduct of any third party, including any alleged victims in this case, to excuse Defendant's otherwise proven criminal conduct. To the extent Defendant seeks to make argument about or offer evidence relevant only to the actions of third parties that are not related to Defendant's alleged criminal acts charged in the indictment, Defendant shall seek leave of Court beforehand."). For what other reason could details of the Secret Service's security and protection protocols be elicited other than to suggest or outright argue that the Secret Service is to blame for the Defendant's crimes or at a minimum his presence at the golf course?

Finally, and perhaps most importantly, if evidence of the kind the Government seeks to exclude was to make it into the public record it could have the unwanted consequence of arming bad actors with sufficient information to circumvent security protocols and create a risk of harm to the President of the United States and other Secret Service protectees. It is indeed paramount to the security of the nation to keep the President safe from foreseeable harm, including the reasonably foreseeable harms created by allowing such details into the public domain and accessible to individuals with bad intentions. *C.f. Buchanan v. Barr*, 71 F.4th 1003, 1009 (D.C. Cir. 2023) (stressing the nation's "overwhelming interest in protecting the safety" of the President) (citing *Watts*, 394 U.S. at 707). For these reasons we seek to limit the details of the President's security as described herein.

## <u>CONCLUSION</u>

Based on the foregoing, the Court should admit now the specific items identified by the Government in this motion, and preclude irrelevant and impermissible evidence and argument from the defense.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:    /s/ John Shipley
John C. Shipley
Florida Bar No. 69670
Christopher B. Browne
Florida Bar No. 91337
Maria K. Medetis Long
Florida Bar No. 1012329
Assistant United States Attorneys

U.S. Attorney's Office
Southern District of Florida
99 Northeast 4th Street, 8th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9111
E-mail: John.Shipley@usdoj.gov

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL FOR THE
NATIONAL SECURITY DIVISION

By:    /s/ James Donnelly
James Donnelly, Trial Attorney
Court ID No. A5503278
Department of Justice, National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-0849

20

<u>**CERTIFICATE OF SERVICE AND CONFERRAL**</u>

The Government filed the foregoing document with the Clerk of the Court using CM/ECF on July 8, 2025.  On July 7, 2025, the Government presented the topics in this motion to defense counsel, and e-mails have been exchanged among the parties, but the parties were unable to reach agreement by the time of filing this motion, except (1) the defense says it is open to language (Section VII, above) prohibiting both sides from referencing punishment, and (2) the defense is open to a more narrowly-worded ruling on the safety issues raised in Section IX, above.

*/s/ John C. Shipley*
Assistant United States Attorney
