UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 24-cr-80116-AMC-1

UNITED STATES OF AMERICA,                    Fort Pierce, Florida

             Plaintiff,                      September 11, 2025

        vs.                                  8:49 a.m. - 3:36 p.m.

RYAN WESLEY ROUTH,

             Defendant.                      Pages 1 to 241
_____

TRANSCRIPT OF JURY TRIAL - DAY 4
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
                              UNITED STATES ATTORNEY'S OFFICE
                              JOHN SHIPLEY, ESQ.
                              MARIA MEDETIS-LONG, ESQ.
                              CHRISTOPHER BROWNE, ESQ.
                              99 NE 4th Street
                              Miami, Florida 33132

                              U.S. DEPARTMENT OF JUSTICE
                              JAMES M. DONNELLY, ESQ.
                              950 Pennsylvania Avenue, NW
                              Washington, DC 20530

FOR THE DEFENDANT:
                              RYAN WESLEY ROUTH, PRO SE

AS STANDBY COUNSEL:
                              FEDERAL PUBLIC DEFENDER'S OFFICE
                              KRISTY MILITELLO, ESQ.
                              RENEE SIHVOLA, ESQ.
                              250 S. Australian Avenue
                              Suite 400
                              West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:

                              LAURA E. MELTON, RMR, CRR, FPR
                              Official Court Reporter to the
                              Honorable Aileen M. Cannon
                              United States District Court
                              Fort Pierce, Florida

E X A M I N A T I O N S

Witness/Proceedings                                        Page

        OPENING STATEMENT BY MR. SHIPLEY              12
        OPENING STATEMENT BY MR. ROUTH                39


SPECIAL AGENT ROBERT FERCANO
        DIRECT EXAMINATION BY MS. MEDETIS-LONG        48
        CROSS-EXAMINATION BY MR. ROUTH               101
TOMMY C. MCGEE
        DIRECT EXAMINATION BY MR. SHIPLEY            114
        CROSS-EXAMINATION BY MR. ROUTH               148
SPECIAL AGENT JASON HARRIS
        DIRECT EXAMINATION BY MS. MEDETIS-LONG       152
        CROSS-EXAMINATION BY MR. ROUTH               173
SPECIAL AGENT DOMINICK HEALEY
        DIRECT EXAMINATION BY MS. MEDETIS-LONG:      175
        CROSS-EXAMINATION BY MR. ROUTH               186
SPECIAL AGENT CHRISTOPHER MAYO
        DIRECT EXAMINATION BY MS. MEDETIS-LONG       188
        CROSS-EXAMINATION BY MR. ROUTH               195

GOVERNMENT ADMITTED EXHIBITS

Exhibit                                                    Page

200-73................................................. 180
200-91 through 200-93................................. 182
439A, B, and C....................................... 130
440.................................................. 129
600-166 through 600-171..............................  73
932.................................................. 141
940.................................................. 182
952.................................................. 146
1002.................................................  74

DEFENDANT ADMITTED EXHIBITS

Exhibit                                                    Page

                    NONE

EXHIBITS ADMITTED DURING SEPTEMBER 8, 2025 CALENDAR CALL
*Page numbers refer to transcript of September 8, 2025

GOVERNMENT ADMITTED EXHIBITS

| Exhibit | Page |
|---|---|
| 1-11 | 43 |
| 25-32 | 43 |
| 33 | 44 |
| 34 | 44 |
| 35 | 44 |
| 39A-D | 45 |
| 41-44 | 45 |
| 46 | 47 |
| 101-105 | 46 |
| 108-110, 112-113, 116-117 | 49 |
| 148A and B | 51 |
| 166 | 50 |
| 167 | 50 |
| 175 | 50 |
| 176, 179, 180 | 51 |
| 185, 186, 187A, 187B, 188A, 188B, 190 | 51 |
| 200-100 | 57 |
| 200-101 | 57 |
| 200-102, 200-104, 200-106A-G, 300-307 | 57 |
| 200-1A, 200-1B, 200-2 | 52 |
| 200-20, 200-21A, 200-21B | 53 |
| 200-23, 200-24, 200-28 | 53 |
| 200-30A and 200-30B | 54 |
| 200-32, 200-33, 200-35, 200-36, 200-38, and 200-41 | 54 |
| 200-44, 200-45, 200-47, 200-50, 200-51, 200-52, 200-53, 200-55, 200-57A through E, 200-63, 200-66, 200-67 | 55 |
| 200-78, 200-80, 200-82 | 56 |
| 200-83, 200-85, 200-86 | 56 |
| 200-87 | 56 |
| 200-88 and 200-90 | 57 |
| 200-9, 200-17, 200-18, 200-19 | 53 |
| 310 | 58 |
| 317, 320, 322A-B, 323-327, 331 | 58 |
| 334A-B, 335, 337, 339, 342, 343, and 347 | 58 |
| 349-351, 352A and 352B, 400, 408, 410 and 414 | 59 |
| 430-432 | 59 |
| 441, 444, 445, and 446 | 60 |
| 523 | 60 |
| 600-1, 600-3 | 60 |
| 600-128 | 64 |
| 600-141 | 64 |

EXHIBITS ADMITTED DURING SEPTEMBER 8, 2025 CALENDAR CALL
*Page numbers refer to transcript of September 8, 2025

GOVERNMENT ADMITTED EXHIBITS

| Exhibit | Page |
|---|---|
| 600-147 | 65 |
| 600-155 | 65 |
| 600-161 | 65 |
| 600-180A-D | 65 |
| 600-183 - 600-193, 600-708 | 66 |
| 600-29 | 61 |
| 600-30, 600-31, 600-32 | 61 |
| 600-34 | 61 |
| 600-48 | 61 |
| 600-49, 600-50, 600-51, 600-52 | 62 |
| 600-72 | 62 |
| 600-80 | 62 |
| 600-81 and 600-82 | 63 |
| 600-84 | 63 |
| 600-86 | 63 |
| 600-88 | 63 |
| 600-95 | 63 |
| 600-96 | 63 |
| 714-720 | 66 |
| 721-728 | 66 |
| 730 | 67 |
| 733 | 67 |
| 739-741, 743 | 67 |
| 745-747 | 68 |
| 753-755 | 68 |
| 900 and 907 | 68 |
| 908, 909, and 911 | 69 |
| 915A and B, 916-918, 920-923, 925-927 | 69 |
| 941-944 | 69 |
| 949-950 | 69 |
| 1100-1106, 1108 | 70 |
| 1109-1121 | 70 |
| 1123-1128 | 70 |
| 1129, 1130, 1132, 1135, 1136, 1138, and 1140 | 71 |

DEFENDANT ADMITTED EXHIBITS

| Exhibit | Page |
|---|---|

NONE

(Call to the Order of the Court.)

THE COURT:  Good morning.  Please have a seat unless you are addressing the Court.

MR. SHIPLEY:  Good morning.

THE COURT:  Everybody is here.  Let's call the case, please.

COURTROOM DEPUTY:  Calling case United States of America v. Ryan Wesley Routh, Case Number 24-cr-80116-Cannon.

Counsel, please state your appearances for the record, starting with the United States.

MR. SHIPLEY:  Good morning, Your Honor.  John Shipley for the United States along with Christopher Browne, Jennifer Luce, Maria Medetis-Long, and Jim Donnelly.

THE COURT:  Good morning.

Mr. Routh.

MR. ROUTH:  Ryan Routh for the defense.

THE COURT:  All right.  Good morning, sir.

MS. MILITELLO:  Good morning, Your Honor.  Kristy Militello and Renee Sihvola as standby counsel.

THE COURT:  Good morning to both of you.

All right.  We will begin momentarily with opening statements.

Ms. Moran, are all of the jurors present?

COURTROOM DEPUTY:  Yes, Judge.

THE COURT:  Thank you.

Okay.  Just a few preliminary items before we get started.  We did pre-admit a number of exhibits during the final pretrial conference.  I want to officially state on the record now that all of those exhibits should be made part of the trial record.

Anything further regarding pre-admitted exhibits, Mr. Browne?

MR. BROWNE:  Your Honor, we have an updated copy of the exhibit list which reflects those pre-admitted exhibits.  If I can approach and provide it to the Court.

THE COURT:  Yes, please.  Thank you.

Okay.  Thank you.

Does either party wish to invoke the rule to exclude from the courtroom witnesses scheduled to testify in the case?

MR. BROWNE:  Yes, Your Honor.  The United States invokes Federal Rule of Evidence 615.

THE COURT:  Okay.  The rule is so invoked.

Are we aware of any such persons in the courtroom at this time?

MR. BROWNE:  No, Your Honor.  Not from the government.

THE COURT:  Okay.  All right.  Mr. Routh, the rule applies to both parties.  If at any point you see any witnesses that you think should not be in the courtroom because they're scheduled to testify later, you should alert me to that fact.

Do you understand?

MR. ROUTH:  I understand.

THE COURT:  Okay.  All right.  Now, we have allotted 40 minutes for opening statements.  I will be keeping time, and I will give each side a 5-minute warning so that you can wrap up your remarks.  I do want to remind all the parties of the Court's orders regarding what opening statements should be and are intended to be and consistent with my prior orders.  So let me do that briefly, referring first to Docket Entry 240, which indicates as follows:

"Pro se Defendant is reminded that statements and arguments of the lawyers, including pro se parties acting in the role of a lawyer, are not evidence.  The purpose of an opening statement is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow and to relate parts of the evidence and testimony to the whole.

"Importantly, the parties must avoid referring to evidence during opening statements that is even of questionable admissibility or that exceeds any court order or the Federal Rules of Evidence.  Failure to comply may result in sanctions, including an order directing the jury to strike all or part of any party's opening statement."

All right.  In addition to this, I, as a general matter, want to remind the parties of Docket Entry 181, which is an order granting in part and denying in part the

government's motion to preclude legally prohibited and factually baseless defenses.  I won't be reading from that.  But, Mr. Routh and the government, you both, of course, must be fully aware of the requirements of that order.

Any other items before we get started with the jury, Mr. Browne or Mr. Shipley?

MR. BROWNE:  Briefly, Your Honor.  With respect to the pre-admitted exhibits, is the Court okay with us going ahead and publishing them when the witness takes the stand?

THE COURT:  I will make just an overall note to the jurors that there have been several exhibits admitted for efficiency as to which neither party has raised an objection.  Once I have said that, then, yes, you can go ahead, of course ensuring that anything you do publish is really on the pre-admitted list, and I will be tracking that as well.

So, Mr. Routh, as you recall, we went through a lengthy exhibit-by-exhibit, pre-admission exercise.  There are many that fall in that category.  If you have any objections to any of the non-pre-admitted exhibits, of course, it's your responsibility to lodge those objections timely.  And if there happens to be an exhibit that is offered for publication as pre-admitted but wasn't in fact pre-admitted, then you should be keeping track of that list as well so you can alert the Court.

Do you have any questions?

MR. ROUTH:  No questions.

THE COURT:  Okay.  All right.  Now, who is going to be delivering opening statement for the United States?

MR. SHIPLEY:  I will be, Your Honor.

THE COURT:  Okay.  All right.  Then anything further, Mr. Routh, before we get started?

MR. ROUTH:  I was just going to mention yesterday when you wouldn't let me speak regarding the striking of jurors, that the marshals had taken some of my paperwork and I think given it to you.  They had given me -- you the first chart of my first 30 people, so I was kind of at a loss.  That's why I was trying to say, Hey, do you have my chart for the first 30?

THE COURT:  Okay.

MR. ROUTH:  I'm sorry.

THE COURT:  To be clear, I don't have any of your paperwork.

MR. ROUTH:  Okay.

THE COURT:  That has been returned to you.  It is important that juror lists do not leave this courthouse.  So my understanding is the marshals did have to retrieve the names of the jurors because they were being taken out of the courthouse. The Court has not in any way reviewed any of your paperwork or, of course, shared it with anyone.  It is in the possession of the marshals.  And you had multiple opportunities yesterday to both consider your strikes and to raise your strikes.

So that will conclude the argument with respect to jury selection, and our jury has been chosen.

All right.  So it is 8:55.  I will step off the bench momentarily so that we can get our jurors, unless they're all ready to go already, Ms. Moran.

MR. BROWNE:  Your Honor, I had just one more item on the opening statement piece.

THE COURT:  Okay.

MR. BROWNE:  We received 100 exhibits from the defendant, none of which were produced in discovery.  We have also reviewed them.  There is not a single exhibit in those 100 that were produced at calendar call that has any basis for admissibility whatsoever.

I have for the Court a chart of that -- those nondisclosed exhibits if the Court wishes to take that up now, but for purposes of the opening, we will absolutely intend to object anytime the defendant refers to any of those exhibits coming into evidence, because they are plainly inadmissible, they are all of the type that the Court already excluded, which are self-serving hearsay statements, newspaper articles, online web pages, things of that nature.

So again, we don't believe there is a basis for the admissibility of any of those things and will object accordingly if the defendant refers to those during his opening.

THE COURT:  Okay.  So, Mr. Routh, just a moment ago, did you hear when I mentioned that opening statements should not contain any references to anything that is even of questionable admissibility or that exceeds the Federal Rules of Evidence or my prior orders?

MR. ROUTH:  I understand.  So if I cross the line, I'm sure you will say, "Stop."  So, yeah.

THE COURT:  Well, but let's see if we can avoid any such crossing the line.

Are you intending during the opening to refer to any exhibits in your stack that we haven't yet admitted?

MR. ROUTH:  No, Your Honor.

THE COURT:  Are you intending to refer or quote from them in any way?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  All right.  Well, at this point there is, I think, no more that can be done anticipatorily, so we will move forward.

Officer Blanford, please call in the jury.

COURT SECURITY OFFICER:  Yes, Your Honor.

(The jury entered the courtroom at 8:58 a.m.)

THE COURT:  Good morning, ladies and gentlemen. Everybody please have a seat.

This is day 4 of trial in this proceeding.  Thank you for your prompt arrival.  We will begin this morning as I

indicated we would yesterday, and that's with opening statements.

Each side has been given the same amount of time.  And the order is the government goes first, and then Mr. Routh, if he chooses to present an opening statement, will do so as well. I will give the parties a warning, a five-minute warning before the time is up, so you can anticipate that, and that is all for now.

So, with that, Mr. Shipley.

MR. SHIPLEY:  Thank you, Your Honor.  May it please the Court.  May I just have a moment to get set up at the lectern?

THE COURT:  Yes.

And also, ladies and gentlemen, if at any point you can't hear Mr. Shipley or me or there is some other interference, please raise your hand or advise Officer Blanford so we can take appropriate measures to make sure everybody is hearing us well.  All right.

MR. SHIPLEY:  Good morning, ladies and gentlemen.

Ms. Luce, do you want to switch -- there we go.  Thank you very much.

May it please the Court.

Last year the defendant (indicating), Ryan Routh, wanted to make sure that the people of this country could not reelect Donald Trump as president of the United States.  "Trump cannot be elected.  He needs to go away.  I need help ensuring

that Trump is not elected."  The defendant's words, you will hear in evidence, not mine.  So the defendant decided to take the choice away from the American voters and planned deliberately and intentionally last year to assassinate, to kill Donald Trump when Donald Trump was a major presidential candidate.

That attempt, as we all know, did not succeed.  But this plot was carefully crafted and deadly serious.  It involved not only a military-grade rifle, loaded with 20 rounds of ammunition, it involved at least ten phones belonging to the defendant, most of which were throwaway burner phones.  It involved the use of at least three aliases over the course of this plot.  It involved stolen license plates so the defendant's movements across the country could not be tracked, and a trail of lies that extended all the way from Honolulu, Hawaii, to West Palm Beach, Florida.

That's the evidence you will hear in this case.  And where did it all come together?  This is adjacent, you will hear in the evidence, to the 6th hole at the Trump International Golf Club in West Palm Beach, Florida.

THE COURT:  One moment.

Ladies and gentlemen, some of the photographs and potentially other exhibits that are presented during opening have been pre-admitted by the Court, and that's because neither party objects to their admission.

Please continue.

MR. SHIPLEY:  Okay.  Thank you.

And you will be seeing this picture and the pictures that I'm showing you in this opening statement in the evidence of the case.

That's where the defendant was for at least ten hours from the pre-dawn hours of September 15th of last year until midday.  Donald Trump, then-presidential candidate, had an off day on his campaign and was playing golf at that course, a local course near his residence in Palm Beach.  The defendant expected Donald Trump to be playing golf that day, perched himself there in that sniper hide.

And what you see in that photograph and what you will hear in the evidence of this case, that is an SKS Chinese-made sniper rifle, loaded.  The two items next to it, you will hear, they look like bags, painted bags, but what's inside them, you will hear, were metal plates of such quality, antiballistic quality, bulletproof plates that would have withstood the firing of any law enforcement agent.

And that little black object you see, that's a camera pointed not at the defendant, pointed at the 6th green of the golf course where the defendant expected his target to die.

This is a wider shot of that area, and we will be talking about this a lot during the trial.  That is the 6th green of the Trump International Golf Club in West Palm Beach.

The defendant, you will hear, was in this area (indicating), in the bushes, hidden away, not visible from the street, but with a relatively clear view to that green where Donald Trump, major presidential candidate at the time, would have been playing.

This is where the defendant spent ten hours. And, to be clear, defendant wasn't homeless. There is no reason for him to be there. The evidence will show that he was living in an oceanside house in Hawaii and traveled all the way from Honolulu to North Carolina, where he had used to live, in order to buy a gun, something he was not allowed to do as a convicted felon. There will be no dispute about the fact that the defendant (indicating) is a convicted felon and knew he was a convicted felon at the time.

The defendant got that gun, traveled down to West Palm Beach, spent a month of planning and tracking and stalking and reconnaissance before, on the evening/early morning of September 15th, he set himself up in that location.

Now, how will you know this? There will be a variety of evidence in this case, some from the scene of the crime, some from the defendant's phones, but most powerfully, it will be from a Secret Service agent, a former Marine named Robert Fercano.

You will see Agent Fercano and hear him later today from the witness stand. And here is what he is going to tell you. Donald Trump was playing golf that morning,

September 15th, and Agent Fercano, Secret Service Agent, was assigned that day to basically be looking at the area a hole ahead of where the President was.  And the President, at this point the current President, was on the 5th hole.  So Agent Fercano, in a golf cart, went ahead in the area of the 6th hole of the golf course, and when he did that, he got literally the shock of his life.

You will hear from Agent Fercano that he saw a face in those bushes in that heavy foliage, and he will tell you how remarkable it is that he even saw that face; it was that hidden.  He made a noise like, hey, and then he heard a grunt back from inside on that side of the fence (indicating).  And if you look at that picture, ladies and gentlemen, that side of the fence where the rifle is, is what could be accessed from the public road.  The 6th green is just to the left.

But Agent Fercano saw something else in that moment. He saw the rifle, the muzzle of that rifle pointed directly at his face.  Agent Fercano, as he had been trained to do, took a step back, trying to process what he had just seen to his surprise.  He will tell you that the muzzle of that rifle swivelled in his direction as he started to move back.  Agent Fercano then, consistent with his training, tried to take cover, took his service weapon and fired in the direction of where he had seen that rifle.

If not for Agent Fercano's actions, ladies and

gentlemen, Donald Trump would not be alive, and the defendant's assassination plot would have been successful, at least in killing Donald Trump.

Agent Fercano did not know this at the time, but that rifle was loaded, 20 rounds of the correct ammunition, 7.62x39mm rounds.  This is a serious weapon.  This was no toy. This was no joke.

Agent Fercano also did not know that a round was already in the chamber of that weapon and the safety switch was off.  Those of you in this jury who are familiar with guns know what that means.  But you will hear in the evidence, for those of you who don't, there is no reason for the safety on a firearm to be off if you're not going to shoot it, none whatsoever.

The defendant had traveled all this way to put himself in that position, hoping to kill Donald Trump.  That's the very serious charge alleged in Count 1 of this indictment.  And it's what I'm going to focus on in my remarks this morning.  At the end, I will talk about what the other charges are in this case. They are equally serious, but I want to lay the groundwork for you about what most of the evidence from the United States will be in this case.

Before I do that, let me just say three things.  First and most importantly, thank you all for taking the time and willingness to be a part of this jury.  It is an inconvenience.

It's a disruption to your lives.  We will do our best to make the case move along as quickly as we can, but I want you to know that we appreciate the time and your willingness to do this service.  It is important.

As Judge Cannon has already told you, the law charged in this case in Count 1, that attempted assassination of a major presidential candidate statutes applies whether you like the candidate or not, whether the candidate is a Republican, a Democrat, or no party at all.  You all attested, when the Court asked you to do so, that keeping public officials and candidates safe is an important consideration.  And that's what this law does.  As the judge told you, this case is not about whether you like Donald Trump or not.  It is about whether this defendant intended to kill that man on September 15th and had been plotting to do so for weeks.

And I also want to touch briefly on the idea of an attempt.  Again, the Court has already talked a little bit about this.  And at the end of the case, Judge Cannon will give you full instructions about what an attempt is under the law.  But as you've already heard, an attempt is an intent to do something, along with what is called in the law a substantial step towards making it happen.  Basically, have you done something to make that intent real?

And we're going to prove that the defendant not only intended to kill Donald Trump but took substantial steps

leading up to September 15th, and then multiple substantial steps on September 15th itself, including up to and including loading a round into the chamber of that rifle and switching off the safety.  That will be the proof from the United States on Count 1.  We will prove through the defendant's words and actions that there is no reasonable doubt about what he intended to do.

THE COURT:  Mr. Shipley, can you move the microphone just a little bit towards you.

MR. SHIPLEY:  Sure.

THE COURT:  Thank you.

MR. SHIPLEY:  So what I want to do now is summarize what the evidence will show you about some of the dates in this case.

This assassination plot actually began long before September 15th in the dark of that spot on the golf course.  In July of 2024, the defendant was living in Honolulu, in that oceanside house, and decided to travel back to Greensboro, North Carolina, where he had lived for years before moving to Hawaii.  As he was getting ready to do so, he reached out to an old friend and a former employee by the name of Tina Cooper, and he told Tina Cooper that he was going to need her help with something when he got back to Greensboro.  And then when he gets to Greensboro, he texts her again to seek her help.  What does he want her help to do?  You will hear, get a gun.  Not

just any gun, that gun you saw, that Norinco SKS sniper military-grade rifle.

The defendant had another former acquaintance by the name of Ronnie Oxendine. So the defendant made contact through Tina Cooper with Ronnie Oxendine, who sold him, on August 2nd of 2024, the firearm that you saw in that exhibit and you will see for yourself here in this courtroom.

The defendant, when he purchased that rifle, paid $350 to Ronnie Oxendine, who you will hear in this courtroom, and paid another hundred dollars to Tina Cooper for her role in brokering the deal. The defendant, when he got the weapon, you will hear from Mr. Oxendine, checked that it would work, racked the action, and also told Mr. Oxendine that this deal was not going to come back to him. An important consideration, obviously, because this sale was illegal. And you will hear evidence in this case, including from an FBI laboratory technician, about how the defendant obliterated the serial number on this rifle.

And, again, for those of you who are not familiar with firearms, you will hear that firearms have serial numbers to track where they are and where they're coming from. Count 5 in this case charges that the defendant knew the serial number on this weapon was obliterated and possessed it anyway. And that was one of the many steps he took to try and make sure nobody would track what he was doing or what he had done if he had

completed his mission.

By this point, the defendant had already made clear in communications that he thought were encrypted and private, but the FBI later recovered, that he wanted Donald Trump dead.  I mentioned a couple of them at the start of my opening statement.  You will hear them from evidence in this case.  You will hear a number of those statements.  "Trump cannot be elected."

You will hear that the defendant said, "I wish I had given the order for a prior assassination attempt on Donald Trump."  And you will see the defendant's own handwritten words calling for the assassination of Donald Trump.  There will be no doubt whatsoever in this case about the defendant's intent.

Now, the defendant, also, you will hear, was familiar with guns.  This was no person who had no idea how to use or operate a gun.  The defendant admitted in text messages, which you will see in evidence, that he had owned an AK-47, which is a rifle similar to an SKS, as well as a TEC 9 and other guns when he used to live in North Carolina.  The defendant knew what this weapon was designed to do.  It was created by the Chinese military, you will hear, to kill.  And that's what the defendant intended to do with it.

Now, by this point, August, Donald Trump was a major presidential candidate.  There will be no dispute about that

fact, okay?

So the defendant on August 14th and August 15th gets the keys to a Nissan Xterra, 2007 Nissan Xterra that his family had kept in North Carolina. The registration is expired, but it's in the name of his daughter, Sara Routh, not in his name. He packs his belongings into that car, as well as the rifle and a whole bunch of cell phones, and drives 800 miles from Greensboro, North Carolina, down to West Palm Beach, Florida.

You see in that image, that's the actual Xterra, that's a photograph you will see in evidence. And that's the SKS rifle that you've already seen a picture of.

The defendant drove those 800 miles, arriving late in the evening of August 14th. The defendant, you will hear, had no reason to be in West Palm Beach. He had no ties down here. There was no purpose for this trip, other than to come down and attempt to kill Donald Trump.

And what did the defendant do when he got to South Florida? Within hours, he goes to the Trump International Golf Club at about 2:30 in the morning. Ladies and gentlemen, he was not there to play golf in the middle of the night. You will see in the evidence maps similar to this one so you can keep track of the defendant's movements. You will see on there the Trump International Golf Course close to downtown West Palm Beach. Mar-a-Lago is Donald Trump's residence and was close to his campaign headquarters. What you see, another mark on that

map, and it's a blue icon all the way on the left.  That's the Marathon Gas Station and truck stop in South Bay.

Don't know whether any of you are familiar with South Bay, Florida, but it's the far western edge of Palm Beach County.  It's a place that's off the grid, and this location in particular, this truck stop, is a location -- nobody asked questions, nobody bothered anyone -- a perfect place to spend your time without anybody checking up on what you're doing or where you're going.

Now, when the defendant parked his car there, in between his trips back and forth to the Golf Club, you will hear that he used an alias.  Brian Wilson is the name that he gave, another example you'll hear in the evidence of how the defendant was concealing his tracks.

But by this point, he had already used a second alias. Remember in North Carolina, before he made the trip down to South Florida, the defendant went to an AT&T store to activate a burner phone that he had acquired months earlier, to reactivate that phone.  You will hear in this courtroom from the witness who actually made that transaction with him, having no idea what that phone was going to be used for.  And you will hear that the defendant gave the name John White, which is not his name, in order to obtain that phone.  That phone is one of the six phones that he took in the car with him, the Xterra, down to Florida and one of at least ten phones that are

associated with the defendant in this plot.

You will also hear evidence at this truck stop the defendant purchased parking in that fake name in cash, the last date of which was September 15th, the date he plopped himself in the bushes intending to kill Donald Trump at the 6th green.

How will we know he drove all this way and did these things?  You will hear evidence in the case from an FBI witness, an expert by the name of Adam Goodrich.  Adam Goodrich specializes in what's called cell phone location data.  You will hear evidence that our cell phone providers keep location data to track where phones might be used at particular times and also to ensure that phones and the towers they connect with are working properly.

The FBI obtained that information pursuant to search warrants obtained from federal judges, and they were able to recreate the defendant's movements with those phones that he possessed during that time leading up to this assassination attempt.

Agent Goodrich will tell you more about how that works, and you will see a whole presentation showing the defendant's movements.  And one of the things you are going to see is the defendant went from that truck stop over to the Trump International Golf Club about 17 times between mid-August and mid-September, most of those in the middle of the night.  Not to play golf, ladies and gentlemen.  This was to conduct

reconnaissance about the best spot to accomplish his mission.

What was the defendant doing or telling people all this time?  He was lying.  The defendant did not tell his friends, his family, anyone.  What he was actually doing instead, he lied to them.  And you will see those messages in the defendant's phones and evidence from them which we will present to you in this trial.

The defendant even sent this selfie to a former romantic partner, making it look like he was just camping.  The thing is, you will see those little sausages.  Some of you may know them as Vienna sausages.  They're actually going to have some significance in this case because when the FBI searched the area of that sniper hide after the defendant fled, they found those sausages.  No question the defendant was the man who was there waiting to kill Donald Trump.  That's the defendant, ladies and gentlemen.

In between these trips back and forth to the golf course, the defendant is doing a couple of things.  He is obsessively researching the movements of Donald Trump online. He is conducting web searches, which you will see proof of in the evidence.  He is communicating with people who he hopes can help him track Donald Trump's movements.  He is doing it on WhatsApp.  He is doing it on Signal.  He is doing it on a whole variety of encrypted platforms, all trying to gather as much information as he can.  And most of his web searches, you will

hear, were done through a Google account created with Alias Number 3, John Smith.  Again, all of these steps to conceal what he is doing.

You will see those web searches in evidence.  You will see these communications.  I just wanted to show you one example of them.

This is one communication you will hear in the evidence from August 27th, and this is a format that you will see, and the agents will be discussing with you, about how these were -- kind of reports about the defendant's communications were generated.

And here he is asking someone who thought, could share with him the daily location on Donald Trump's airplane, from the flight tracking apps.

The defendant was also tracking Donald Trump's movements on the campaign trail, and, as that text message shows you, his airplane which brought him back and forth.

You will hear evidence that Donald Trump as a candidate traveled in a private airplane that would come into and out of the Palm Beach International Airport which has a private airplane area.  It's visible right by Southern Boulevard, for any of you who may be familiar with that location.

The defendant knew this.  You will see evidence that the defendant actually tried to identify tail numbers for the president's plane, but that's a distinctive plane.  It's easy

enough to see.  But on September 7th, you will hear the defendant went further.  He didn't just use flight tracking web searches, which he did, he didn't just try to reach out to people, he actually goes to Palm Beach International Airport at just the moment when Donald Trump's airplane is about to take off for a campaign trip.

He parks his car, he goes into the airport.  He doesn't have a flight.  He doesn't have bags.  He is there for one reason:  to look out towards the private plane area, which you can see from the spot he went to in the airport, and look at that airplane and track it taking off.

How will you know this?  You are going to see the actual security camera footage from inside Palm Beach International Airport.  So there is going to be no question that it was the defendant and no question what he was trying to do.

The defendant also monitored traffic cameras, which you can do on a website, in Palm Beach County, to see where the President's -- the presidential candidate's motorcade might be going.

Now, the defendant did not just track his movements; he also researched alternative weapons and how best to conduct this scheme.  He studied changes in Secret Service protections for Candidate Trump after that earlier assassination attempt in July.  He studied what was the range and the correct type of

ammunition for this SKS rifle he had obtained.  And as I mentioned, he looked for alternative weapons also.

Despite being a convicted felon, not able to obtain or possess any gun, he contacted gun dealers, he reached out about gun shows, he did research on Craigslist into firearms and rifles.  All of these things you will see in the evidence, ladies and gentlemen.

He contacted Tina Cooper again about obtaining a .50 caliber sniper rifle.  He did online research into the cost of rounds for an M15 sniper rifle.  He even tried to find a stinger missile or an RPG.  Again, ladies and gentlemen, there will be no doubt, certainly no reasonable doubt after you have heard the evidence in this case, why the defendant was doing this.

So we come to September 15th, early morning.  The defendant knows that Candidate Trump had no events that day.  He had come to Mar-a-Lago.  He searched specifically for that: Trump event on Sunday, September 15th.  There was nothing.

The defendant had also by this point developed what you might call a pattern of life; knowing where the president was moving, knowing where he would be going, and knowing what he would be doing on his downtime during the campaign.

So the defendant, at 12:50 in the morning -- you can see the timestamp in the lower right of that image -- this is from security camera footage at the Marathon gas station.  And

it shows that man (indicating), the defendant, and that Nissan Xterra -- again, the timestamp and the date is what is significant -- he is about to get in that car and drive, those 50 miles, over to the West Palm Beach Trump International Golf Club to kill Donald Trump.

He has checked the weather.  This is a screenshot you will see from one of his many phones.  You will see the time of that search, 12:44 a.m., in the upper left, at Palm Beach International Airport, which, if I've mentioned, is right next to where the golf club is.  He has checked to see whether it's going to rain.  No rain in the forecast.  Golf is going to go ahead for the President.

And also, you should remember, look at these temperatures and think about your own experiences with South Florida evenings and the heat and humidity.  This is what the defendant would be out in for the next ten hours waiting for his victim.

This is a map you will see in evidence, ladies and gentlemen.  Sort of a broad overview of what that Trump International Golf Course looks like.

The 6th hole is down in that right-hand portion.  The defendant, you will hear, approached the golf course, and you will learn from that cell phone location data, did a couple of drives around, and then parked his car at a dark alley right across from where that 6th green is, on the other side of

Summit Road.

And, again, I have shown you that image earlier. The defendant took his rifle, took his gear, went across the street, and hid himself in those bushes right across from the 6th green.

This is an image you are going to see during the cell phone location data testimony, and you're going to hear that the defendant stayed in this location, where that red icon is, all of that time, between once he settled in, approximately 3:30, 4:00 in the morning, until the moment when Agent Fercano confronted him and the defendant fled. That one spot waiting to get his shot off.

As I mentioned, the defendant came prepared. He had written this item, which you will see in evidence, a gear list, some of the things that he wanted to have with him and planned out to have with him while he sat there for hours and hours in that humid dark spot.

Quiet plastic covering. Cardboard for scope. Scope for the rifle. Tape. Zip ties. You saw how those ballistic plates were put up on the fence facing the 6th green. Spray self with bug spray. Even diapers.

That's where the defendant spent almost ten hours.

As I mentioned, Routh had a round chambered in the rifle, he had the gun's safety off, and was ready to shoot, if it were not for Agent Fercano. Agent Fercano is a hero of this

story.  You will hear him from that witness stand (indicating) later today.

But what Agent Fercano didn't get to see, trying to protect himself in that situation, was what the defendant did after Agent Fercano fired his shots.  The defendant, as I mentioned, fled, trying to get away from there as soon as possible.

The defendant, in fact -- this was the ammunition that the defendant had with him.  You will see all of that in evidence.  The defendant fled and made it 40 miles away on 95, up to the area of that blue icon, before he was apprehended.

Now, how did he even get caught if Agent Fercano didn't know what he did after having seen the rifle pointed at his face?

Another hero:  A man named Tommy McGee.  A civilian, not a law enforcement individual.  You are going to see him in this courtroom also later today or tomorrow.

Mr. McGee, no ties to Donald Trump, no relationship to anything at all about the case, not even a golfer.  Mr. McGee, you will hear, was out furniture shopping for his office and driving in the direction of the golf course along Congress Avenue when he heard shots, the shots fired by Agent Fercano.

Mr. McGee will tell you that he grew up in a neighborhood where that kind of gunfire was common.  So he knew what that sound was.  And he decided to do something I think

very few of us would have done:  to actually do something.  He turned around, interrupted his day, and went back to that corner, where the 6th green was, the corner of Summit and Congress, to see what might have happened.  And as he does so, he sees a man (indicating), the defendant, running out of the bushes, at such a fast pace that he almost hits his car. Mr. McGee will tell you that he had to slow down in order to avoid hitting him.  They made eye contact even.  The defendant then continued running across the street to that dark alley where he had parked his car.

Mr. McGee, even then, didn't walk away from things.  He drove on a little further and turned back to where he had seen that Xterra, hoping to get a picture or a license plate.  You will see he did manage, actually, to get off a picture of that Xterra, which you will see in evidence, pulling out of the dark alley.  He then followed it for a short distance, despite his concern for his own safety, and managed to get the license plate.  97EEED.  You will not be surprised that that license plate was not registered to the Xterra.  One of at least three stolen license plates the defendant used in this scheme.

Agent Fercano, ladies and gentlemen, is the reason the defendant didn't get away with it.  Mr. McGee is the reason the defendant didn't get away.

Shortly before all of this happened, you will hear in the evidence, the defendant sent a series of text messages to

those same family members he had been lying to for weeks, saying, "I love you.  You're the best."  Kind of messages that we might send before a long airplane flight or a journey where we don't know what's going to happen.  No reason for those messages to have been sent at that moment, right before the defendant expected Donald Trump to be within range, other than he knew exactly what he was going to do.

Agents make the arrest up in Martin County, and they search the Xterra.  And what do they find?  Some of this I have already previewed for you.  Six phones, all within arm's reach.  Two of them had already been factory reset, but four of them had information that the FBI was able to recover, text messages, communications, encrypted messages, all of those web searches from those devices.  So you will see those phones, and you will learn what the FBI was able to recover from them.

Also in that car was the defendant's passport.  You see in that photo, too, some of the license plates, and a piece of paper in the console showing flights, in the late afternoon, to a whole variety of places, on Aeroméxico, Avianca, to Bogotá, to Medellín, Colombia.  And a reference down the bottom left, you will see, 95 to 112.  To those of you familiar with the route south from Palm Beach and Earlington Heights, that's access to Miami International Airport, as you will hear in the evidence.

Agents also recovered this piece of paper, which if

nothing else, tells you that the defendant by this point had used so many aliases and so many license plates not registered to that Xterra, he had to actually write them down to keep track of them.

This is the alias Brian Wilson, and you see PKU3131. That's an Ohio license plate number not assigned to that Xterra. It's the license plate you will hear the defendant used to drive down from Greensboro to West Palm Beach in mid-August.

Meanwhile, the defendant's arrest makes the news. Up in North Carolina, where the defendant used to live, the defendant once employed a man named Lazaro Plata. Lazaro Plata is an undocumented immigrant from Mexico who had lived and worked in this country for many years. The defendant had not been in touch with him for a long time, but he reaches out to him in early April of 2024 -- this is about five months before September 15th -- and says, "Hey, I have something I need to leave with you."

Lazaro Plata doesn't know what this is about. But Routh shows up at the house. And you will hear from Lazaro Plata on this witness stand. The man does not speak a lot of English, but he will tell you what he remembers from that day. He even took a video of the defendant coming to his house with that box because it was so unusual. But he did a favor to an old employer and took the box, not thinking about

it again for months, until the news breaks about what the defendant attempted on September 15th.

THE COURT:  4 1/2 minutes.

MR. SHIPLEY:  He contacts law enforcement and law enforcement comes, and what do they find in that box?  This letter, which you will see in evidence, discussing the assassination of Donald Trump.  And this letter, at minimum, will prove to you that the defendant was comfortable with the idea of assassinating Donald Trump and wanted Donald Trump assassinated.

Also in that box was evidence that the defendant had traveled to West Palm Beach in late March and early April of 2024, evidence that will be confirmed by the cell phone location data the FBI later recovered.  He did a reconnaissance trip before going down in August.

And also in that box, you will hear and have discussed by an FBI expert, there were the components of a deadly destructive device, including six rounds of .50 caliber ammunition and a spring-loaded mechanism to fire them.

Ladies and gentlemen, the defendant is not charged in this case with attempting to assassinate Donald Trump in March or April of 2024, but that evidence will show you the defendant was planning this far in advance of September 15th, the defendant knew where to go in West Palm Beach when he came back down here, and was comfortable with the idea of assassinating

Donald Trump.

You will hear some of that information from the FBI cell phone location experts.  You're also going to hear evidence from FBI experts at the laboratory in Quantico, Virginia, where they tested, among other things, this rifle.  They confirmed the rifle worked.  They confirmed the defendant's fingerprint was on it and the defendant's DNA.  You will hear from those experts.

You will also hear from an expert who tested those ballistic plates that the defendant had at the sniper hide -- and will tell you that they would have withstand -- withstood any ordinary law enforcement fire.

So that's Count 1, ladies and gentlemen.  The remaining counts of this indictment, Judge Cannon has already talked about them briefly.  The defendant possessed that SKS in furtherance of this assassination plot.  When he pointed that rifle at Agent Fercano and swivelled it, he violated Count 3 by assaulting, intimidating, and interfering with a law enforcement agent.  I have already discussed the felon was a felon in possession of a firearm illegally, and ammunition, and he possessed that firearm with an obliterated serial number.

The judge has told you about the variety of evidence you can consider in this case.  And we're going to bring you all those types of evidence.  One kind is direct evidence.  Those are the observations of witnesses, like Special Agent

Fercano, like Tommy McGee.  They're going to tell you what they saw, their interactions with the defendant, and what they observed.

Another type of evidence is what are called stipulated facts, undisputed facts.  And these are some of those in this case, and they are significant.  There is no dispute about any of these topics.  And, again, there is no dispute the defendant was a convicted felon and knew he was a convicted felon, and this was a firearm and ammunition he had with him on September 15th.

But there is one more type of evidence that Judge Cannon referred to, if you remember; it's called circumstantial evidence.  And that's important in this case. We all make decisions, every day, based on circumstantial evidence, clues about what people intend to do.  We will bring you the clues in those case -- this case so you will have no doubt of what the defendant intended to do on September 15th.

With my last moments, I want to talk briefly about what this case is not about.  This case is not about your First Amendment right to protest or to vote as you might see fit. Judge Cannon has already read you an instruction on that, and I want you to remember.  I ask you to remember that instruction during this trial.  That's not what this case is about.  There is no defense to the charges in this case if we prove those elements beyond a reasonable doubt.  That is not protected

conduct.

I also want you to know that this case is not about your Second Amendment rights to possess or use a firearm.  The defendant is a convicted felon.  He is not entitled to possess a gun or ammunition, as Judge Cannon has told you and we will prove to you in this case.

This case is also not about whether the defendant matches some idea you may have of a professional sniper or professional assassin.  That's not the requirement.  You will hear evidence, some of which I have discussed, that the defendant did things that are consistent with being a sniper: trying to do this job as professionally as he can; all the operational security; the use of the fake names, the fake license plate; the way he put this ammunition into the round.

But that's not a requirement.  The statute applies to anyone, whether you're skilled, unskilled, who attempts to kill a major presidential candidate.

THE COURT:  Your time is expired.

MR. SHIPLEY:  Okay.

THE COURT:  Mr. Routh, I will add to you one minute to compensate for the overage.

We will now take a break, ladies and gentlemen.

All rise for the jury.

(The jury exited the courtroom at 9:40 a.m.)

THE COURT: Please have a seat. We are going to be in a ten-minute recess until 9:50, at which point, Mr. Routh, you will be given an opportunity to present your opening statement. And then, of course, you should remain standing there while we call the jury in.

So that concludes the government's opening. We will be in a brief break. Thank you.

(A recess was taken from 9:42 a.m. to 9:55 a.m.)

THE COURT: Everybody is here. You may be seated. Let's call in the jury.

COURT SECURITY OFFICER: Yes, Your Honor.

(The jury entered the courtroom at 9:55 a.m.)

THE COURT: Thank you. You may all be seated. You may begin, Mr. Routh.

MR. ROUTH: Thanks for being here. Sorry to take your time and disrupt your lives. So I know it's an inconvenience, so I'm so sorry. So I'm not smart enough to ad-lib, so I have to just read. I'm sorry about that also. So, but anyway.

Modern trials seem to eliminate all that is human, feeling, emotions, thoughts, heart, soul, love, everything that matters --

MR. SHIPLEY: Objection. Improper argument, Judge.

THE COURT: Please continue, Mr. Routh.

MR. ROUTH: -- so much. So how does a jury judge without all of that? It must be offered, as it is everything.

What is in one's heart and mind is everything in the world that matters.  And it is intent.  And intent is the whole of who we are.  It decides our every action and every second of every day.  The overriding question of why we each live revolves around intent.  Why are we here?  What is our intent every day?  Is it not to care for one another?  To help each other?  To be kind?  To love one another?  To hold one another?

Is this so difficult?  How do we get so derailed and filled with hate when 1.52 million years ago, two different human species, Paranthropus boisei and Homo erectus, crossed paths in the mud of Kenya peacefully and civilized.  How can you imagine their meeting?  Would they shaking hands be natural?  Would a smile be rendered?  A nod of the head?  Would they communicate through their eyes and simple gestures of love and cooperation?  All of the gentle caring for one another recorded and preserved there in the mud forever.  How amazing.  And where will the -- and where will the human species be in another 1.5 million years if we cannot learn to get along?

A million and a half years ago there was no intent to harm anyone, yet now, Hitler caused the slaughter of 80 million as America has watched for years.  Putin has slaughtered 1.5 million --

MR. SHIPLEY:  Objection, Your Honor.  Prior rulings. Improper argument.

THE COURT:  All right.  Ladies and gentlemen, as I

instructed you during the preliminary instructions, argument of counsel or parties acting as their counsel are not evidence. An opening statement is supposed to introduce you to admissible evidence to be introduced during the trial.  So you should not consider opening statements from either side as evidence in this case.

Please continue.

MR. ROUTH:  Putin has murdered 1.5 million, and we do nothing.  The Sudanese and Arabs kill 150,000 and rape, and we do nothing.  Netanyahu slaughtered 60,000, and we support his genocide.  What has happened to Homo erectus?  And how did everyone contribute to this madness and hatress [sic]?  How did we allow seven phone calls to Putin, trading a war for reelection?  Did everyone sit silent and allow the budding partnership with Iran be destroyed, an embassy to be moved --

THE COURT:  All right.  One moment, Mr. Routh.  We are going to take another break, ladies and gentlemen.

All rise for the jury.

MR. ROUTH:  I can skip forwards.

(The jury exited the courtroom at 9:59 a.m.)

THE COURT:  Please be seated.

Mr. Routh, we discussed the purpose of opening statement.  And I think you're very well aware that the subject and scope of opening statement must be an introduction to whatever admissible evidence you think will be introduced or

any arguments related to the specific evidence in the case that you think needs to be countered in an objective, nonargumentative way.  What I have heard thus far for the first five minutes is nothing of the sort and clearly goes beyond any relevant evidence in the case.

Are you going to continue to engage in that sort of opening?

MR. ROUTH:  I can move forward and read about the Constitution and other -- other items that are more relevant, I guess.  Certainly.

THE COURT:  All right.  Overall, what is your projection here in terms of reading from the Constitution or, as you just said, "other items that are more relevant"?  Do any of the subjects you plan on touching on actually concern the evidence to be introduced in the case?

MR. ROUTH:  Well, our goal is -- is again, based on your orders, as far as addressing peacefulness, nonviolence, gentleness.  You know, our -- our whole argument is around gentleness and nonviolence and --

THE COURT:  Okay.  As I have indicated in those character-related orders, that sort of evidence potentially may be admissible.  But if it were, it would only be of a general reputational-type nature.  It wouldn't be anything in terms of specific incidents of any purported nonviolence.

Are you familiar with what I'm saying?

MR. ROUTH:  Certainly.

THE COURT:  Okay.

MR. ROUTH:  Certainly.

THE COURT:  So are you planning on touching upon any specific incidents in your past that you believe show your nonviolence?

MR. ROUTH:  Well, I'm speaking generally in this situation, just because it's an opening statement.  So everything is general, so --

THE COURT:  Okay.

MR. ROUTH:  -- I'm not going to get into --

THE COURT:  Well, I'm going to give you another opportunity to stay within the bounds of opening statement.

Do I have your commitment, sir?

MR. ROUTH:  So I will move forward to -- to the Constitution.  So does that sound more realistic?

THE COURT:  It's hard for me to predict where it is that you will go, sir.

MR. ROUTH:  Okay.

THE COURT:  But we have limited patience here.  And you don't have unlimited license to just exceed the Court's orders --

MR. ROUTH:  Okay.

THE COURT:  -- and make a mockery of the dignity of this courtroom.  So we will call back in the jury and we will

try this again --

MR. ROUTH:  Okay.

THE COURT:  -- given all of the admonitions I have just said.

Let's call in the jury, Officer.

COURT SECURITY OFFICER:  Yes, Your Honor.

(The jury entered the courtroom at 10:03 a.m.)

THE COURT:  Please have a seat.

Please continue, Mr. Routh.

MR. ROUTH:  Sorry about that.  So...

This case hangs on intent.  What is in one's heart? What fills one's brain on morals, ethics, and human decency? Of doing the right thing all of the time?  This is what hangs in the scales here:  Intent.

What is in one -- what is a person's intent every second of every day?  What do they hold dear to their heart to guard and protect and cherish and do everything to save?

In the defendant's world, extreme joy is felt in being gifted heart stones that have been worn smooth over hundreds of years of children huddled by the fire and the pleasure of just running one's hand across the smoothness.  To touch a hewn log and run one's fingers across every chaff of the broad axe and wonder what that America was thinking 100 or 200 or 300 years before as he struggled to provide shelter for his family.

For one to stand 15 feet down in a hand-dug well and

marvel at the stacking of stones so that there could be a bucket and a rope and water.

The treasure of finding some old fabric and its feel and texture and warm, soft, that seems magical.  Old boards cut and the markings of the teeth of the saw as it pushed back and forth, that is beauty.

A wooden peg riddled.  A handmade brick.  The laying out board.  The split wood shovel handle worn thin.  The clack of the locust boards as one crosses the old wooden bridge.  The old tractor and the wooden trailer bruised and scarred from decades of hard labor.  The hundred-year-old lathe and drill press saved from the scrapyard, the exact same used by Henry Ford and the Wright Brothers, such wonderment in their function and wear.  The leather belts chugging them along towards fulfilling hopes and dreams and ideas.  That is America.

So no, this case means absolutely nothing.  A life has been lived --

MR. SHIPLEY:  Objection, Your Honor.

MR. ROUTH:  -- to the fullest.

THE COURT:  All right.  Thank you, Mr. Routh.  That will conclude your opening statement.

Let's all rise for the jury.

MR. ROUTH:  Can I finish with the jury not in here?

(The jury exited the courtroom at 10:06 a.m.)

THE COURT:  Thank you.  You may all be seated.

All right.  Mr. Routh, please walk back to counsel table.

Government, please call your first witness.

MR. ROUTH:  My attorney said if I crafted some other -- other questions that started out by saying "the evidence will show," I mean, I could move to another --

THE COURT:  Well, Mr. Routh, I was clear that I would give you one additional opportunity to stay within the bounds of opening.

MR. ROUTH:  Okay.

THE COURT:  I also reinforced the purpose of opening at the very start of today's hearing.  So you obviously have no doubt, yet you continued to use the opening to read what has absolutely nothing to do with the elements in this case or with any of the evidence to be introduced in the case.  And so because of your clear violation of the Court's order, which was done, evidently, in a very knowing fashion, you have relinquished the remainder of your opening statement.

Please return to counsel table, and we will proceed with the first witness.

MR. ROUTH:  All right.  Thank you so much.  I apologize.

MS. MEDETIS-LONG:  Your Honor, the United States calls Special --

THE COURT:  Before you do that, let's make sure the jury is summoned.

All right.  Let's call in the jury.

MS. MEDETIS-LONG:  Your Honor, may I move this back to its original --

THE COURT:  Yes.

(The jury entered the courtroom at 10:08 a.m.)

THE COURT:  Thank you.  You may all be seated.

Ladies and gentlemen, that concludes the opening statements.  The government will now call its first witness.

Ms. Medetis-Long.

MS. MEDETIS-LONG:  Yes, Your Honor.  The United States calls Special Agent Robert Fercano.

THE COURT:  Thank you.

Mr. Fercano, please make your way to the witness stand to be sworn in.

Please remain standing for a moment so that you can be sworn in, and then once you take a seat, please tell us your full name, spelling your last name.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please be seated.

THE COURT:  You may get started.

SPECIAL AGENT ROBERT FERCANO,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.   Sir, can you please state your name, and spell it for the court reporter.

A.   Yes.  Robert Fercano.  F-E-R-C-A-N-O.

Q.   And, sir, where do you work now?

A.   I currently work for Homeland Security Investigations as a special agent.

Q.   And what are your duties and responsibilities as a special agent?

A.   As a special agent, I am on the Violent and Organized Crime Strike Force currently.

Q.   And when did you start with Homeland Security Investigations?

A.   I started with them this Sunday.

Q.   Okay.  And where did you work before Homeland Security Investigations?

A.   Before this, I worked for the United States Secret Service as a special agent.

Q.   And when did you start as a special agent with the United States Secret Service?

A.   I started approximately August of 2023 until September of

2025.

Q.   And as a special agent for the United States Secret Service, if we could focus on that now, what are your duties or were your duties and responsibilities?

A.   So my duties as a special agent with the United States -- United States Secret Service included financial investigations securing our nation's financial infrastructure, and that also included protecting our President, foreign heads of state, and foreign dignitaries.

Q.   So is it fair to say that you have a dual function as a Secret Service special agent?

A.   Yes, ma'am.  The role of a special agent in the Secret Service is a dual function.

Q.   And that is protection and investigating crimes?

A.   Yes, ma'am.

Q.   And when you were a special agent with Secret Service, what office were you assigned to?

A.   As a special agent with Secret Service, I was assigned to the West Palm Beach resident office.

Q.   And what did you do before you were a special agent with Secret Service?

A.   Before I was a special agent with Secret Service, I served the role of a rifleman in the -- in the United States Marine Corps for approximately four years, and then I transferred over to the United States Border Patrol for approximately

4 1/2 years.

Q. And where were you stationed when you were with Border Patrol?

A. When I was in the United States Border Patrol, I was stationed on the southwest border, Big Bend sector, Marfa, Texas, station.

Q. And you mentioned that prior to Secret Service you were with Border Patrol, and prior to Border Patrol you were with the United States Marine Corps?

A. Yes, ma'am. That is correct.

Q. What years were you in the United States Marine Corps?

A. I was in the United States Marine Corps from approximately 2013 to 2017.

Q. And were you honorably discharged?

A. Yes, ma'am, I was honorably discharged.

Q. And what was your rank at the time you separated from the Marine Corps?

A. My rank upon separation from the United States Marine Corps was sergeant.

Q. And were you ever deployed overseas as part of your time with the Marine Corps?

A. Yes, ma'am. I was deployed twice.

Q. And where was that?

A. I deployed to Norway, Romania, Bulgaria, Serbia, the Philippines, South Korea, and Mainland Japan.

Q.   Did you have any specialties or focuses while you were in the Marine Corps?

A.   Yes, ma'am.  While in the Marine Corps, I primarily served as an 0311 rifleman; however, I was also trained as a designated marksman.  And additionally, I also had several certifications to include a Humvee driver.

Q.   Now, when you say you were a designated marksman, did you receive special training for that?

A.   Yes, ma'am.  As a designated marksman in the United States Marine Corps in my unit, I was given certain training with a certain weapon system, which was the M27 IAR, also known as the infantry automatic rifle.

Q.   What other weapons training did you receive?

A.   While serving as a rifleman in the United States Marine Corps, I received training on several weapon systems.  Some of these weapon systems included the M4 Carbine; M16 assault rifle; M249 squad automatic weapon; M240 machine gun; AT4 rocket launcher; LAW, light anti-tank weapon; M67 fragmentation grenade; as well as several foreign weapons while I was deployed.

Q.   What foreign weapons?

A.   Some of the foreign weapons included the PKM machine gun and the AK-47 assault rifle.

Q.   What kind of ammunition does the AK-47 assault rifle hold?

A.   The ammunition chambered in the AK-47 assault rifle is

7.62x39mm.

Q.   Now, I want to go back to your protective role as a special agent with Secret Service, if I may.

Since you were with the Secret Service or during the time you were with Secret Service as a special agent, who did you protect or what types of individuals?

A.   While I was serving in the role of a special agent in the United States Secret Service, I protected any foreign heads of state, dignitaries or presidential candidates or presidents that visited our district, primarily Palm Beach County.  This included anyone from the President of the United States, his spouse, and family members.

Q.   Did you ever protect Donald J. Trump?

A.   Yes, ma'am.  I protected him on several occasions.

Q.   And was he President of the United States at the time that you protected him?

A.   At the time I protected him, he was not.  He was a major candidate, and he was the former President.

Q.   In your time at Secret Service, how many times approximately had you provided protective services for Donald Trump?

A.   During my time as a special agent with Secret Service, I had protected Donald Trump up to in excess of ten times.

Q.   And where or what locations did you protect him?

A.   I protected President Trump at several locations.  Some of

these locations included his resort over at Mar-a-Lago, the golf course which he owned, as well as several off-the-record sites.

Q.   Now, you said the resort at Mar-a-Lago.  Is that also President Trump's private residence in West Palm Beach?

A.   Yes, ma'am.  Mar-a-Lago does serve as President Trump's primary residence.

Q.   And you mentioned President Trump's golf course.  What's the name of that golf course?

A.   The golf course is TIGC, also known as Trump International Golf Course.

Q.   And where is TIGC located?

A.   That is located in Palm Beach County.  Some crossroads around that is Summit and Congress.

Q.   Now, as of September 2024, how many times had you protected President Trump?

A.   From around September 2024, I had protected President Trump in excess of ten times.

Q.   And during those ten times, what role did you serve in protecting him?

A.   During those ten times, my roles varied.  A couple of the times I served as the site agent, which was in charge of facilitating site and site movements for protectees.  At other times I served as the PI agent, also known as a protective intelligence agent, which serves as investigating any threats

against our protectees.  And other times I served as a TS, or transportation agent, in charge of facilitating movements of vehicles and personnel.

Q.   Now, you had mentioned something about an off-the-record protection.  What does that mean?

A.   So an off-the-record movement is any movement done by our protectees that is not official.  This could include anything from sites that they frequent to sites that they do not frequent occasionally, and this is done in order to maintain a security posture.

Q.   Now, when President Trump was a candidate, a major presidential candidate, in September 2024, did he engage in off-the-record movements?

A.   Yes.  On or around September 2024, President Trump frequently visited off-the-record movements.

Q.   What are -- what is an example, or what are examples of where he would go in off-the-record movements?

A.   One example, in particular, would be the golf course, that was previously mentioned.  At any given time on any given day, while President Trump was in our district, he would frequent that golf course.

Q.   And would he go there to play golf?

A.   This depended on the situation and President Trump's schedule.  Some days, he did play golf; however, some days he utilized his facility for his own private matters.

Q.   Now, in protecting President Trump, have you actually been in his physical presence?

A.   Yes, ma'am, I have been in President Trump's physical presence.

Q.   And how tall, approximately, would you say he is?

A.   I would say he is over 6 feet tall.

Q.   Okay.  Now, I want to direct your attention to September 15, 2024, if I might.

What were you assigned to do that day?

A.   September of 2024, I was assigned the site agent for President Trump.

Q.   And, again, remind us what it means to be assigned as the site agent.

A.   So the role of a site agent in the United States Secret Service is, basically, an individual tasked with securing a site a protectee is going to.  For this instant, the TIGC, or Trump Golf Course, was a site of his.  As a site agent, I was tasked with facilitating safe movement of our protectees in shift.  If there is any EA, also known as emergency action, I would be the individual to direct the shift and protectee out of harm's way in order to secure him or her into a safe location.

Q.   Now, we talked about that you protected the President on September 15, 2024.  But when did you learn that you would be protecting President Trump?

A.   I had learned that I was going to be protecting President Trump on September 13, 2024.

Q.   And did you learn that President Trump would be coming to West Palm Beach on that day or shortly thereafter?

A.   Yes, ma'am.  On or around September 2024, I had learned that President Trump would be visiting on or around September 15, 2024.

Q.   Okay.  For that particular visit, where did President Trump arrive when he came to West Palm Beach?

A.   For that visit, he flew into the Palm Beach International Airport on September 15, 2024.

Q.   Was that the early morning hours of September 15th?

A.   Yes, that was the early hours of September 15th.

Q.   So the middle of the night, if you will?

A.   Yes, ma'am, the middle of the night.

Q.   And when did you learn that the president was going to play golf that next day or the day during September 15th?

A.   On September 15, 2024, I had learned that President Trump was scheduled for a potential movement to the golf course. That would have been an OTR movement that was on or around 2:30 a.m.

Q.   And were you present at Palm Beach International Airport when the President arrived?

A.   Yes, ma'am, I was.

Q.   And how did he arrive?

A.    He arrived via private aircraft.

Q.    His private aircraft?

A.    Yes, ma'am; that is correct.

Q.    At some point after President Trump arrived at Palm Beach International Airport, did you go home?

A.    Yes, ma'am.  After a certain point, once President Trump had landed at Palm Beach International Airport, I had returned home.

Q.    And did you then arrive at Trump International Golf Club the next morning?

A.    Yes, that is correct.  I had arrived later that day.

Q.    And that is September -- just to be clear, because we're talking about the middle of the night, early morning hours of September 15th, you arrived at Trump International Golf Club on -- on September 15th?

A.    Correct.  I did arrive at the Golf Club as the site agent on September 15th.

Q.    Do you remember approximately what time of day you arrived?

A.    I do not remember approximate time.

Q.    Was it afternoon?  Evening?  Morning?  Do you remember?

A.    It was on or around the morning.

Q.    Okay.  After your arrival, did President Trump arrive, also, to Trump International Golf Club?

A.    Yes, ma'am; that is correct.  Around the time I had arrived to the Golf Club, President Trump had shortly arrived after.

Q.   Did President Trump start playing golf at any point in time thereafter?

A.   Yes, ma'am.  President Trump did play golf shortly after his arrival.

Q.   Now, as President Trump is playing golf, what is your role or responsibility?

A.   My role on the course that day as the site agent was to facilitate the safe movement of President Trump.  This included scanning one to two holes ahead of the President at any given point.  Based on the President's movement and current location on the golf course, I was constantly scanning ahead for any threats or abnormalities that may present itself.

Q.   What part of the golf course -- well, first of all, how many holes does Trump International Golf Club have?

A.   Trump International Golf Club has approximately 18 holes on the Championship Course, then an additional set of holes on the back, which is often referred to as The Trump Nine.

        THE COURT:  One moment.  Mr. Condon or Ms. Moran, can we adjust the screen so that we're using the preset for the witness that is more zoomed in, please.  I think there is an additional one that is even closer up.  Okay.  All right.  I think our IT person is here, potentially entering to fix the screen here.  Thank you.  Is it set?

        COURTROOM DEPUTY:  Yes.

        THE COURT:  Okay.  Excellent.  All right.  Thank you.

Please continue.

MS. MEDETIS-LONG:  Of course, Your Honor.

BY MS. MEDETIS-LONG:

Q.    What part of the golf course on the day of September 15, 2024, did President Trump play?

A.    On the day of September 15, 2024, excuse me, President Trump played the front nine, which is the first nine holes of his golf course.

Q.    Now, at some point, did President Trump play the 5th hole?

A.    Yes.  At one point during President Trump's arrival at the golf course, he did play on the 5th hole.

Q.    And where were you in relation to President Trump when President Trump was playing the 5th hole?

A.    When President Trump was playing on the 5th hole, I was one hole up ahead -- ahead of him, scanning for any threats or any issues that may arise.

Q.    Where were you scanning in particular?

A.    In particular, I was scanning the fence line which separated the golf course from the main road.

Q.    Did you see anything unusual as you were scanning the tree line?

A.    Yes.  At one point, on September 15, 2024, while scanning the tree line, I had noticed several abnormalities in the fence line on or around the foliage that was present.

Q.    What abnormalities?  Can you explain?

A.   Yes.   I had encountered what appeared to be a face of an individual; a barrel of a weapon system protruding from the fence line; what I had perceived to be bulletproof shielding, which reminded me of bulletproof Humvee plates while I was inside operating Humvees in the Marine Corps.

Q.   Now, where in relation to the golf course did you see these -- this person and these items?

A.   I had encountered and seen the person and items in the vicinity of the 6th hole on the golf course.

Q.   Now I want to take a step back for a moment.

In what direction are you proceeding as you're approaching the 6th hole?

A.   As I'm approaching the 6th hole, I am proceeding towards the hole of -- the 6th hole direction.   Additionally, I am scanning past the 6th hole as well, on a service road that is paralleling the location of the 6th hole.

Q.   Okay.   And are you on foot or a golf cart?

A.   At this time, I am currently in a golf cart.

Q.   And are you on -- you mentioned a service road.   Is that the golf cart path proper, or is that something else?

A.   That service road is not the proper golf cart path.   Next to the path of the golf cart, there is a dirt road that is overgrown with foliage and shrubbery.   That is the path I was scanning on during the time I was on the golf cart.

Q.   Now, you said you saw a partial face.   What did you do

immediately after you noticed the face?

A.   After I had noticed the face and confirmed this was a person on the other side of the fence, I had attempted to initiate contact with the person.

Q.   How did you attempt to initiate contact?

A.   I attempted to initiate contact by being friendly with the individual and saying, "Hey, sir."

Q.   Now, you said you were scanning the tree line.  Do you have experience doing that sort of activity in your training and experience?

A.   Yes, ma'am.  In my training and experience, I have received countless hours in training and real-world experience scanning for abnormalities and establishing a baseline.  I had first been given this training in the United States Marine Corps, during advanced infantry course.  Additionally, I had received this training as part -- as the Border Patrol curriculum which involves what they call for -- cutting for sign.  This basically involves looking at trained features, whether that might be footprints in the sand, turned-over rocks, or any abnormalities in a baseline that is currently present.

Q.   Now, you said you tried to make contact with the individual that you saw in the tree line near the 6th hole.  What happened next?

A.   After I attempted to initiate contact with this individual in the tree line, I had noticed an object to the left of me

beginning to move.

Q.   Did the person in the tree line respond to you in any way when you tried to initiate contact?

A.   Yes, ma'am.  When I had first attempted to initiate contact, I had heard what sounded like a groan and the subject smile at me.

Q.   Just going back, how did you try to initiate contact?  Did you reach out with your hand?  Did you say something?  What was it?

A.   This was all verbal at the time.

Q.   What did you say?

A.   I said, "Hey, sir."

Q.   Okay.  Now you said that the individual grunted and smiled. What did you notice about the smile?

A.   I noticed a particular jawline and facial features within the subject's teeth.

Q.   What was your initial reaction or thought when you saw the individual in the tree line?

A.   My initial thought or reaction upon locating the individual in the tree line was, this was potentially a homeless person camping out.  And at the time, upon initial contact, I did not think that this person was a threat.

Q.   After you had noticed the face, what do you notice next?

A.   After I noticed the face, I begin to see an object to the left of me beginning to move.  This object was black in nature

and protruding from the fence line approximately one to two inches.  Additionally, I had noticed on or around the same time, two plates to the left and right of this black object. These two plates reminded me of my time in the Marine Corps spent utilizing the Humvee vehicles, and these plates reminded me of bulletproof shielding.

Q.   What was the -- did you at any point -- did it, at any point, register what the object protruding from the fence line was?

A.   At first, I had not recognized that this was a barrel of a weapon system.  It was very heavily covered with foliage. However, upon dismounting my golf cart and attempting to reanalyze the scene, at a certain point, I did recognize the weapon and the potential weapon system it was.

Q.   First of all, how far away were you when you first encountered the face and the object protruding from the fence line?

A.   When I first encountered the subject and the object protruding from the fence line, I was approximately 5 feet.

Q.   You said that you recognized this weapon system.  What did you recognize it as?

A.   Upon further scanning this tree line and these objects, I had identified this weapon system to be a Soviet-style weapon.

Q.   What kind of Soviet-style weapon?

A.   It appeared to me it was an AK or AK variant of a weapon.

Q.   When you say, "AK," do you mean AK-47?

A.   That is correct, ma'am, AK-47.

Q.   And how did -- what about it made you think -- what feature made you think that it was an AK-47?

A.   That certain weapon system has a very prominent front sight post.  It is prevalent on various Soviet -- a lot of Soviet bloc weapons.  And as I identified this black object and recognized it was a firearm, I had noticed the front sight post was familiar to me, and that is what gave me an indication it was an AK-47 or similar-type weapon.

Q.   When you encountered the AK-47, where was it pointed?

A.   The barrel of the AK was pointed directly at my face.

Q.   With the barrel of the weapon pointed at your face, what were you thinking?

A.   At that moment in time when I had recognized that this was a barrel of a weapon pointed at my face, I was in fear for my life, I was in fear for the life of the shift on the course, and I was in fear for President Trump's life.

Q.   The person that you saw in the tree line of the golf course, do you see them in the courtroom today?

A.   Yes, ma'am, I do.

Q.   Can you identify them by an article of clothing?

A.   Yes, I can.

Q.   Go ahead, please.

A.   The individual with the gray suit, white shirt, and blue

and striped tie.

MS. MEDETIS-LONG:  Your Honor, I would ask that the record reflect the witness has identified the defendant as the individual in the tree line of Trump International Golf Club.

THE COURT:  The record so reflects.

BY MS. MEDETIS-LONG:

Q.   Your Honor, at this time I would seek permission to publish certain previously admitted evidence.

THE COURT:  All right.  Granted.

Which numbers will you be beginning with?

MS. MEDETIS-LONG:  I will start with Government's Exhibit 200-1A.

THE COURT:  Okay.  Ladies and gentlemen, as I indicated before, to try to make things more efficient, the parties have agreed that certain exhibits can come into evidence without objection.  This is one of those exhibits, and there will be others.

So you may proceed to publish this particular Exhibit 200-1A.

BY MS. MEDETIS-LONG:

Q.   Sir, can you see 200-1A on your screen?

A.   Yes, ma'am.  I have the image in front of me.

Q.   And what is this an image of?

A.   This image appears to be an overhead view of the golf course and surrounding intersection.

Q.   What is the -- what are the roads called of this intersection that we see?

A.   The roads of this intersection are Summit Boulevard and Congress.

Q.   And in what direction is Summit Boulevard running?

THE COURT:   One moment.

Ricardo, do you know if, when the exhibits are displayed, that interferes with the streaming?

Okay.   Please continue.

BY MS. MEDETIS-LONG:

Q.   What direction is Summit Boulevard running?

A.   It would appear that Summit Boulevard is running east to west.

Q.   And is it this Summit Boulevard that I have underlined?

A.   Yes, ma'am.   That is Summit Boulevard.

Q.   And what's the -- what is this street running north/south?

A.   That street running north to south is Congress.

Q.   Okay.   Now, what part of -- first of all, is this an image of Trump International Golf Club golf course?

A.   Yes, ma'am.   This is an image of the golf course.

Q.   What part in particular of the golf course is this?

A.   This appears to be where the thoroughway of Hole 5 and 6 are.

Q.   Okay.   Can you circle where Hole 6 or the 6th green would be on your screen.

A.   It appears to be in this location.

Q.   Okay.  And where -- can you see, on this particular picture, where in relation to that circle President Trump was?

A.   I cannot.  The last I had heard on my service radio, that he was transitioning between holes.

Q.   Okay.  Does this image capture where you were traversing as President Trump was on the 5th hole and you were a hole ahead of him?

A.   Yes, ma'am.  It does.  However, there is also that service path that is on -- on here that is a little hard to see.

Q.   Can you tell us or point or mark with your finger the path that you traversed to the 6th hole?

A.   Yes, ma'am.  If you appear here, where the cement road is, that is the golf cart path.  From here, there is a dirt road that begins and parallels this tree line all the way up to and past the 6th hole.

Q.   And can you stop where you -- stop your pointer and circle where approximately you encountered the defendant.

A.   I encountered him on or around this location (indicating).

        MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-2, previously admitted.

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What is this?

A.   This appears to be an overview map of the golf course with

several holes indicated as well as the direction of movement if you were to play the course.

Q.   Now, can you circle the 6th hole green.

A.   The 6th hole green should be here (indicating).

Q.   Is that where the 6th hole starts?

A.   That's where it starts, ma'am.

Q.   And where does it end?

A.   (Indicating.)  It would end approximately here.

Q.   And what is this arrow here (indicating) that I'm circling in blue?

A.   That -- so that's my mistake.  That's actually where the 6th hole would end.

Q.   Can you circle where the 6th hole would end?

A.   Correct.  Right here (indicating).

Q.   Okay.  And where does the 5th hole end?

A.   The 5th hole would end right here (indicating).

MS. MEDETIS-LONG:  Your Honor, permission to publish 200-47, GX200-47.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, sir?

A.   This appears to be the service path that I was on the day of September 15th.  This is the dirt road in front of us with the hedge and fence line to the left.  To the right on this photo is the actual golf course itself.

Q.   Okay.  Focusing on the left, how would you characterize the tree line?

A.   I would characterize the tree line as heavily wooded and a lot of foliage.

Q.   Now, can you tell from this image approximately where you got off the golf cart?

A.   From this image, I cannot.

Q.   Okay.  But on the left-hand side is the vegetation and what you described as the fence; correct?

A.   Yes, ma'am.

Q.   And on the right-hand side behind this vegetation is the golf course; correct?

A.   Yes, ma'am, that is correct.

Q.   Now, after you got off the golf cart and you're noticing the rifle as an AK-47-style rifle, what do you do next?

A.   At this point, after I had identified that this was an AK-47-type rifle pointed at my face, I had begun to further dismount my golf cart and what I call getting off the X.

Q.   What is getting off the X?

A.   Getting off the X is basically getting out of the danger zone.  You would either move to the left or right, backwards or forwards depending on where the threat is.

Q.   Now, you're saying "threat."  What are the -- the red flags that you are seeing, suggesting to you in your mind that there was a threat here?

A.   There were several things that I had noticed to which I had believed that there was a threat in front of me.  One, there was a subject on the other side of the tree line that had smiled at me after making contact.  Two, I had also noticed that object, which was a barrel of a weapon pointed at my face. And three, I had noticed what I perceived to be bulletproof plates.

Q.   Okay.  And so what is -- what is running through your mind now as you're trying to get off the X?

A.   What is running through my mind is that I need to first positively identify where this exact person or persons may be. Additionally, there is a road behind this person.  This road is occupied by the civilian population.  What was going through my head is if I were to discharge my pistol, I would have to be very cognizant on what was my backdrop in order to not have any unaccounted rounds of ammunition go into the civilian populace.

Q.   And is all of this running through your mind based on your training and experience about what to do if you encounter somebody hidden in a tree line?

A.   Yes, ma'am.  I had received training and experience during countless hours overseas and domestically for ambush-training scenarios.  These ambush-training scenarios basically reflected encountering a threat, what to do during encountering the threat, what to do after encountering the threat.

Q.   Did this appear to be an ambush to you, an ambush scenario

as you call it?

A.   This appeared to be a textbook ambush scenario.

Q.   As you're getting off the X, or trying to get away from the danger zone, what is the rifle doing?

A.   As I am getting off the X, or moving away from the threat, the barrel of the rifle is continually moving in what appeared to be my direction.

Q.   So it's your testimony that the rifle or the barrel of the rifle was following you as you were moving?

A.   Yes, ma'am.   That is correct.

Q.   Now, showing you what's already been published as Government's Exhibit 200-47.   Can you show us in what direction you started moving as you were, quote, "trying to get off the X."

A.   Yes, ma'am.   While I was getting off the X, I had began to dismount my golf cart and move towards the front of my golf cart.   There is a tree that is located in this photo, and from approximately here to here (indicating), I began moving in that direction.

Q.   Are you -- are you walking backwards, or do you turn your back to the ambush scenario?

A.   I am walking backwards while drawing my firearm.

Q.   What do you do next?

A.   Upon drawing my firearm, I had come to the realization that this weapon was still in my direction and in my vicinity.   I

had made the decision to discharge my service weapon in the last known location I had seen the suspect.

Q.   And can you hear anything as this is all unfolding?

A.   As this is all unfolding, I could hear the movement of vehicles on Summit Boulevard.

Q.   And so what did that make you think or do?

A.   That made me think that my shot placement when I discharged my service pistol had to be as accurate as possible in order to not have any ammunition go into the civilian populace.

MS. MEDETIS-LONG:   Your Honor, permission to publish Government's Exhibit 200-33.

THE COURT:   Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This appears to be the service path and the tree line or hedge to the right which separates the golf cart -- golf course from Summit Boulevard, and off to the left is the golf course itself.

Q.   And is this the perspective that you had as you were backing away?

A.   That is correct, ma'am.   That is the perspective I had when backing away.

Q.   Now, as this is all unfolding, were there Secret Service -- U.S. Secret Service radio communications being transmitted?

A.   Yes, ma'am.   That is correct.   At a certain point after

discharging my service pistol, I had got onto the radio and notified the shift and surrounding elements of what had occurred.

Q.   And have you listened to those recordings of the radio communications prior to today?

A.   Yes, ma'am.  I have.

Q.   And do those recordings fairly and accurately capture what was said in those radio transmissions in those moments that you just described?

A.   Yes, ma'am.  The radio transmissions fairly describe what had occurred.

MS. MEDETIS-LONG:  Your Honor, at this time the government would seek to admit Government's Exhibits 600-166 through 600-171.

THE COURT:  One moment.

Mr. Routh, do you have any objection to admission of those exhibits?  We're talking about 600-166 through 600-171.

MR. ROUTH:  No objection.

THE COURT:  All right.  Those exhibits will be admitted without objection.  You may publish.

(Government Exhibits 600-166 through 600-171 were received in evidence.)

BY MS. MEDETIS-LONG:

Q.   Before I get there -- just one moment.

Did you have an opportunity also to review Government's

Exhibit 1002 showing your path as you just described it to where you encountered the defendant?

A.   Yes, ma'am, I did have a chance to review that.

Q.   And did that fairly and accurately depict the path you traversed when you encountered the defendant?

A.   Yes, ma'am.  That accurately described the path I took.

MS. MEDETIS-LONG:  Your Honor, at this time we would seek to -- the government would seek to introduce GX1002.

THE COURT:  Just one moment, going back momentarily to the prior series.

MS. MEDETIS-LONG:  Yes, Judge.

THE COURT:  GX600-166, was that not already pre-admitted?

MS. MEDETIS-LONG:  Your Honor, I don't believe so.

THE COURT:  Okay.  All right.  Well, then the record is clear that GX600-166 through 171 were admitted without objection.  And now we're on to which number?

MS. MEDETIS-LONG:  GX1002.

THE COURT:  Okay.  Any objection to admission, Mr. Routh, of GX1002?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  GX1002 will be admitted without objection.

(Government Exhibit 1002 was received in evidence.)

MS. MEDETIS-LONG:  Your Honor, permission to publish

GX1002?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, Special Agent Fercano?

A.   Ma'am, this appears to be an overhead view of the golf course.

Q.   What part of it?

A.   This appears to be a Hole 5 and the transition to Hole 6 with Congress Avenue as the main road.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   This path right here, what is that?

A.   That path is the main golf cart path.

MS. MEDETIS-LONG:  Can we pause for a second?

BY MS. MEDETIS-LONG:

Q.   Now, you previously described traversing from Hole 5 toward Hole 6 on the golf cart path; correct?

A.   Yes, ma'am, that is correct.

Q.   But at some point, you go onto the service path; is that correct?

A.   Yes.  At a certain moment, I do get off the golf cart path and make my way to the service path.

Q.   Okay.

MS. MEDETIS-LONG:  You can continue.

(A video and/or audio was played.)

MS. MEDETIS-LONG:  Pause for a moment.

BY MS. MEDETIS-LONG:

Q.   Is this the tree line that separates the road from the golf course?

A.   Yes, ma'am.  That is correct.  That is a tree line that separates the golf course from the road.

Q.   And that's Summit Boulevard that it separates; correct?

A.   That is correct.

Q.   And is there a -- behind all the vegetation, is there also, like, a chain-link fence?

A.   That is correct, ma'am.  The foliage and shrubberies is attached in a certain way to the fence.

MS. MEDETIS-LONG:  Continue, please.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Is this the service path you're taking, as you described?

A.   That is correct, ma'am.  This is the service path that I had taken.

MS. MEDETIS-LONG:  Pause, please.

BY MS. MEDETIS-LONG:

Q.   What is to the right on this image?

A.   To the right, there is a hedge and Hole 6.

MS. MEDETIS-LONG:  Please continue.

(A video and/or audio was played.)

///

BY MS. MEDETIS-LONG:

Q. And do we continue to see the service path here?

A. Yes, ma'am. The service path is still visible at this time.

MS. MEDETIS-LONG: Pause for a moment.

BY MS. MEDETIS-LONG:

Q. Is this the approximate location where you encountered the defendant?

A. Yes, ma'am. This is the approximate location.

MS. MEDETIS-LONG: Continue playing.

(A video and/or audio was played.)

MS. MEDETIS-LONG: Pause.

BY MS. MEDETIS-LONG:

Q. What is this pop-up that we see in this video?

A. This image is what I had encountered post-shooting and after I had swept the area. It features the two plates which I had perceived to be ballistic shielding or bulletproof shielding.

Q. Can you circle those two plates, please.

A. Yes, ma'am. (Indicating.)

Q. What else does it show?

A. This image also shows the barrel of the weapon system that I had encountered.

Q. Can you circle the barrel?

A. Yes, ma'am.

Q.   What is the barrel doing?

A.   The barrel appears to be pointing down as if the weapon was moved from where I had first encountered it.

Q.   Is it poking through the fence or not?

A.   Yes.  The weapon is protruding from the fence.

MS. MEDETIS-LONG:  Continue playing, please.

(A video and/or audio was played.)

MS. MEDETIS-LONG:  Can we pause?

BY MS. MEDETIS-LONG:

Q.   What is this object here that I'm circling on the pop-up of the video, toward the right-hand side of that pop-up?

A.   That appears to be a recording device.  I had thought it was a GoPro at the time.

Q.   And in what direction is the lens pointing?

A.   The lens is pointing out towards the golf course in the vicinity of the 6th hole.

MS. MEDETIS-LONG:  Continue playing, please.

BY MS. MEDETIS-LONG:

Q.   As we're watching GX1002, is this the perspective of you backing away, getting off the X?

A.   Yes, ma'am.  That is a perspective of me getting off the X.

MS. MEDETIS-LONG:  You can pause.

Permission to publish 600 -- GX600-166, Your Honor.

THE COURT:  Granted.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Said, "mogul on 5 green."  What is "mogul"?

A.   Mogul is a call sign for President Trump.

Q.   And what is being said about his location?

A.   It sounds if a mogul, or President Trump, is moving from the 5th hole.

Q.   Do you recall approximately what time of day that radio transmission was conveyed?

A.   This was at approximately 1324 hours, also known as 1:24 p.m.

Q.   Okay.

         MS. MEDETIS-LONG:  Permission to publish GX600-167?

         THE COURT:  Granted.

     (A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   What did we just hear there?

A.   That radio transmission was my voice broadcasting to the shift and colleagues on the course to notify them that I had discharged my service pistol.

Q.   What else did you say in that communication?

A.   I had let them know that there was an individual in the tree line with a weapon.

Q.   What kind of weapon?

A.   An AK-style weapon.

         MS. MEDETIS-LONG:  Permission to publish GX600-168,

Your Honor?

THE COURT:  Granted.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Who is speaking there?

A.   That voice on the radio transmission is myself.

Q.   And what are you saying?

A.   I am letting the shift know that it is an AK-style rifle that I had encountered on the fence line.

Q.   Now, between Government's Exhibit 600-166, where it's called out that mogul is on the 5th green, and the moment that you call out, "Shots fired, shots fired, shots fired," how much time passed?

A.   It was approximately 11 seconds.

MS. MEDETIS-LONG:  Permission to publish GX600-169?

THE COURT:  Granted.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Who is that speaking?

A.   The voice on that radio transmission is also myself.

Q.   And what are you saying?

A.   I am giving advance notice to the CS, also known as the countersniper element that was in my vicinity, of the last known location I had seen the individual.

Q.   And when you say, "CS," or countersniper element, are they

also members of the Secret Service?

A.   Yes, ma'am.  Correct.  They are part of the Uniform Division of the United States Secret Service.

Q.   And is their role to also protect the President?

A.   Yes, ma'am.  Their role is also to protect the President.

MS. MEDETIS-LONG:  Permission to publish GX600-170, Your Honor?

THE COURT:  Granted.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Who is speaking there?

A.   The voice in that radio transmission is myself as well.

Q.   And what are you saying in that transmission?

A.   I am further letting the shift know that the individual had not gained access to the golf course, confirming that it was an AK-47-style weapon, and the last known location to where I had seen the individual.

Q.   And when you say "the shift," do you -- are you referring to other Secret Service personnel that are protecting the President?

A.   Yes, ma'am.  That is correct.  When I refer to the shift, I'm referring to the Secret Service personnel directly assigned to the detail of Donald Trump.

MS. MEDETIS-LONG:  Your Honor, permission to publish GX600-171?

THE COURT:  Granted.

(A video and/or audio was played.)

BY MS. MEDETIS-LONG:

Q.   Who is speaking there?

A.   The voice in that radio transmission is also myself.

Q.   And what are you saying there?

A.   I am letting the countersniper element know that the last known individ- -- location I had seen the individual was to the rear of my golf cart.

MS. MEDETIS-LONG:  Can we please publish, again, 200-33, previously admitted.

BY MS. MEDETIS-LONG:

Q.   Based on Government's Exhibit 200-33, approximately where were you when you called out, "Shots fired, shots fired, shots fired"?

A.   Would you like me to circle it on the map?

Q.   Yes, please.

A.   I was on or around this location in the middle of the service path (indicating).

Q.   Immediately after you called this out, "Shots fired," on the radio, what do you do next?

A.   Upon notifying the shift of shots fired, I had noticed that I was standing in the middle of the service path with no cover or concealment, meaning, I had nowhere to obstruct the shooter's vision.  I had nowhere to protect myself from any

incoming fire if that would occur. I had looked around in my vicinity and noticed a tree that was further behind me. Upon inspecting that tree, I had made my way to that area. I had gotten behind the tree. I had performed what is known as a tactical reload, which is removing the magazine that is -- that was current in my pistol, putting it in my magazine pouch located on my waistline. I replenished that magazine with a freshly loaded magazine in case a gunfight followed.

Additionally, I had gotten back on my service radio and notified the countersniper element of my location and the description of clothing I was wearing.

Q. Why did you do that?

A. I did that to ensure a blue on blue, also known as a friendly fire scenario, would not occur.

Q. When you say, "blue on blue," "friendly fire," do you mean you're trying to make sure that fellow law enforcement doesn't discharge their weapon at you?

A. That is correct.

Q. What do you do next after you seek cover?

A. After I seek cover and concealment, I had noticed the countersniper -- one of the countersniper officers to the left of me on the other side of a hedge line. From there, he was within a vicinity of me to where I did not have to utilize my service radio, and I spoke with him verbally.

Q. And what did you communicate?

A.   I further communicated with the countersniper officer of the last known location I had made contact with the individual, and that we would need to go and sweep the tree line.

Q.   What did you do next?

A.   After making contact physically with the countersniper element, me and him moved together in coordination to the tree line.

Q.   And what did you do next?  Or what did you -- let me rephrase that.

What did you see next?

A.   Once we made our way to the tree line, near the vicinity of my golf cart, I had encountered the weapon system still in -- still protruding from the fence.  I had still seen the plates to which I had perceived to be bulletproof plates, as well as the recording device, or what I referred to it as, a GoPro.

Q.   Did you encounter Special Agent Jason Harris at any point in time when you were doing this?

A.   Yes, ma'am.  At a certain point in time, Special Agent Harris did arrive at my location.

Q.   And he is with the United States Secret Service as well?

A.   Yes, ma'am, he is with the United States Secret Service.

Q.   And was he also performing protective function for then-major presidential candidate Donald Trump?

A.   Yes, ma'am, that is correct.

Q.   Okay.  What happened next?

A.   Upon inspecting the fence line, identifying the weapon system, the recording device, and several unidentified items behind the tree line, I had made the conscious decision to get back on my service radio and call for EOD, also known as explosive ordnance disposal, to render the scene safe.

Q.   Okay.  What did Jason Harris do?  Did he stay on the same side of the fence as you?

A.   No.  Once Jason Harris arrived at my location, he ended up moving from that location off to another part of the fence line.

Q.   Okay.  Does Government's Exhibit GX200-33 show the side of the fence line that you were on during this period of time?

A.   Yes, ma'am, it does.

Q.   Okay.  And so as we're looking at this exhibit, what is to the right?

A.   To the right of this exhibit appears to be the fence line and foliage that separates the golf cart -- golf course from Summit Boulevard.

Q.   And what is to the left?

A.   To the left is a small hedge and then the 6th hole.

Q.   Okay.

        MS. MEDETIS-LONG:  Your Honor, permission to publish previously admitted Government's Exhibit 200-57C.

        THE COURT:  Granted.

///

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is an image of the hedge and the fence line and the objects which I had seen on September 15th.

Q.   Can you circle on your screen those objects that you testified you saw?

A.   Yes, ma'am.  They're right here (indicating).

MS. MEDETIS-LONG:  Permission to publish 200-57D previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What is this?

A.   This is an enhanced photo of the previous, depicting the barrel, what I perceived to be bulletproof plates, and the recording device.

MS. MEDETIS-LONG:  Could we zoom into this area here, please.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is the barrel of the weapon system which I had identified as an AK-style weapon with the front sight post.

Q.   Can you circle what you are referring to as the front sight post?

A.   Yes, ma'am.  The front sight post is this object right here (indicating).

Q.   Based on your training and experience, what is the purpose of a front sight post?

A.   The purpose of a front sight post goes in coordination with the rear sight post in order to establish an aperture to aim accurately and fire accurately.

MS.  MEDETIS-LONG:  Could we zoom back out.

BY MS.  MEDETIS-LONG:

Q.   Now, you mentioned something about when you came upon the rifle in this state.  First of all, does this photograph depict what you saw in the state that you saw it when you encountered it?

A.   No, ma'am.

Q.   Well, when you first encountered the individual, what -- what was different?

A.   The location of the weapon in relation to where it was pointed at my face was different.

Q.   How so?

A.   The front sight post, to which I had circled earlier, was facing upwards, which indicated to me that someone or something was manipulating the weapon system.

Q.   If the front sight post is facing upward, then what position is the firearm in?

A.   That would be pointed in the upright direction.

Q.   Now, does this photograph accurately depict after shots fired and you're scanning the tree line what you come upon?

A.   Yes, ma'am.  This photo accurately depicts what I saw after shots fired.

Q.   Now, you mentioned something earlier that this setup with the bags on either side of the rifle and the rifle in the center was reminiscent of something to you, based on your military experience.  Do you recall that?

A.   Yes, ma'am.  That is correct.

Q.   And what is it reminiscent of?

A.   This is reminiscent of my time in the Marine Corps.  I had spent more than a few hours with various Humvee systems to include up-armored and un-armored.  Up-armored Humvee systems typically include a turret with a weapon system.  Typically these turrets are surrounded by bulletproof shielding or ballistic shielding.

This image here reminded me of my time in the Marine Corps while on Humvee systems where a weapon system was fixed between two bulletproof plates.

MS. MEDETIS-LONG:  Your Honor, at this time I would seek to publish as an illustrative aid, pursuant to Rule 107, Government's Exhibit 1142.

THE COURT:  Any objection, Mr. Routh, to use of this exhibit as a demonstrative aid?

MR. ROUTH:  No, no objection.

THE COURT:  Okay.  You may proceed.

///

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   That appears to be the Humvee ballistic shielding that I was discussing earlier.  Off to the right, it appears to be an M240 machine gun with the ballistic shielding surrounding it.

Q.   Can you circle what you are talking about?

A.   Yes, ma'am, (indicating).

Q.   And is this what you are referring to as a firearm between two ballistic shields?

A.   That is correct.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-57E previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   Now, previously we were looking toward the bags and the rifle, the AK-style rifle.  What does this image show?

A.   This image shows a view out towards the golf course.

Q.   How would you characterize the view of the golf course from this perspective?

A.   It appears to be the 6th hole is off to the hedge in front of the image.  And the paved golf cart path is also shown here.

Q.   Is this what you would see if you turned immediately around from where you saw the rifle?

A.   Yes, ma'am, that is correct.  This is what I would have seen if I were to turn around from the hedge line.

MS. MEDETIS-LONG:  Permission to publish previously admitted Government's Exhibit 200-35, Your Honor.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This appears to be similar to the previous photo showcasing the 6th hole and a small hedge that separates the dirt path to the golf cart path.

Q.   So as I'm looking at this hedge line here that I have circled in the center of the photograph, the rifle would be behind us; correct?

A.   That is correct, ma'am.

Q.   And immediately in front of us in this opening in the hedge line would be the 6th hole green; correct?  (Indicating.)

A.   That is correct.  That would be the 6th hole green.

Q.   And that, based on the radio communications that we previously heard, would have been the next hole that President Trump would have played; is that correct?

A.   Correct.  Based on the radio transmissions and prior experience at the course, he would have moved to the 6th hole.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-36 previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, sir?

A.    This appears to be another angle of the 6th hole and the service golf cart path.

Q.    Is this what you would see if you did an about-face from where the rifle was?

A.    That is correct, that is what I would see.

Q.    Circling toward the right side of the photo -- let me try that again.  What do we see here?

A.    That appears to be the 6th green.

Q.    Is that the flag of the -- of the golf hole for the 6th green?

A.    Yes, that is the flag for the hole of the 6th.

        MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-38 previously admitted.

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here in Government's Exhibit 200-38?

A.    This is the 6th hole as well as the paved service cart path.

Q.    Is this fairly and accurately showing the position of the flag on the 6th hole green as you saw it on September 15, 2024?

A.    Yes, ma'am, this accurately depicts what I would have seen on September 15, 2024.

        MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-57A previously admitted.

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see in this exhibit, sir?

A.   This appears to be a view from the 6th hole facing the hedge that separates the golf course from Summit Boulevard.

Q.   Can you see the rifle or the bags of ballistic shielding from this perspective?

A.   From this perspective, no, I cannot.

Q.   Fair to say that that rifle and ballistic shielding were well concealed from this perspective, or not?

A.   Yes, ma'am, very well concealed.

          MS. MEDETIS-LONG:   Permission to publish Government's Exhibit 200-57B.

          THE COURT:   Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This appears to be a view from the service cart path facing the hedge line that separates the golf course from Summit Boulevard.

Q.   Now, I want to be very clear.  You said "the service cart path."  Is it the service path that we see at the bottom of this picture that I have circled here or the golf cart path?

A.   That is the golf cart path.

Q.   Okay.  And what do we see happening in the hedge line here that I have circled in the center of the photograph?

A.   That appears to be a break in foliage to where I had

encountered the subject and the items.

Q.   Now, I want to talk a little bit about the firearm that you saw that day, if you don't mind.  You originally transmitted on the radio communications that this was an AK-47-style rifle.  Do you recall that?

A.   Yes, ma'am, that is true.

Q.   And what made you say that?

A.   So this weapon system, along with very other -- various other Soviet-style weapons, fire the same cartridge of ammunition and also have similar design features on their weapon systems.

Q.   What kind of similarly defined -- or designed features?

A.   Some share similar front sight posts, some share similar ammunition, and other internal features.

Q.   Now, when you got closer after "shots fired" and you were surveying the tree line, did you get a closer look at the firearm that you encountered?

A.   Yes, ma'am.  After scanning the tree line and linking up with the countersniper element, I had noticed the weapon system was actually an SKS-type rifle.

Q.   Are you familiar with the SKS?

A.   Yes, ma'am.  I am also familiar with that weapon system as well.

Q.   Is that also a Soviet-style rifle?

A.   That is correct, that is also a Soviet-style rifle.

Q.   How are you familiar with the SKS?

A.   I am familiar with the SKS because as a kid living in Southern California, I had fired this weapon numerous times over at firing ranges.

Q.   What kind of ammunition does the SKS hold?

A.   Typical ammunition the SKS fires is 7.62x39mm.

Q.   Is that the same ammunition that the AK-47 holds?

A.   That is correct.  That is the same type of ammunition.

Q.   In your training and experience, how would you characterize that ammunition?

A.   That ammunition is designed to fire out of assault-rifle-type weapons.  During my time in Romania and Bulgaria, deployed, I have spent time shooting this weapon system in excess of 300 meters.

Q.   In your experience with these rifles, could that caliber of ammunition pierce a human body?

A.   That is correct.  It can.

MS. MEDETIS-LONG:  Your Honor, at this time I would seek permission to publish previously admitted Government's Exhibit 1.

THE COURT:  Granted.

MS. MEDETIS-LONG:  Your Honor, permission to approach the witness?

THE COURT:  Granted.

Ladies and gentlemen, this firearm is not loaded; it's

fully deactivated.

MS. MEDETIS-LONG:  Your Honor, may I offer the witness gloves if he chooses to use them?

THE COURT:  Yes.

MS. MEDETIS-LONG:  Would you like to use gloves, sir?

THE WITNESS:  Yes, ma'am.

MS. MEDETIS-LONG:  (Tendering item.)

BY MS. MEDETIS-LONG:

Q.   Can you take that.

A.   Yes.

Q.   (Tendering item.)

Sir, if you could remain standing.  What have I just handed you?

A.   You just handed me the SKS rifle that I had encountered on the tree line.

Q.   Okay.  And could you please hold it up so that the jury can see it.

A.   (Complies.)

Q.   And could you point out for the jury the iron sights that you saw.

A.   (Indicating).  There is the front sight post, and here is the rear sight post.

Q.   And what did you see protruding out of the fence?

A.   Protruding out of the fence line that day was approximately this much of the barrel (indicating).

Q.   And when you say, "this much of the barrel," in measurements, approximately how much?

A.   Approximately 1 to 2 inches.

Q.   What were you wearing that day?

A.   That day, I was wearing khaki pants, I was wearing a button-down shirt, a Secret-Service-marked hat, and tennis shoes.

Q.   Were you wearing any protective armor?

A.   I was wearing no protective armor that day.

Q.   Had you been wearing protective armor, would that have protected you from this caliber of ammunition held in the SKS?

A.   No, that would not have.  The soft-body armor Secret Service agents get issued does not protect against this type of caliber.

Q.   What kind of firearm were you holding that day?

A.   That day, I was equipped with the GLOCK 19 service pistol.

        MS.  MEDETIS-LONG:  Your Honor, may I approach the witness again to retrieve the exhibit?

        THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   Before I do that, let me ask you, how was the firearm pointed -- if you can do so in a safe manner -- protruding out of the fence?

A.   When I had first encountered the subject in the fence line, the barrel of the weapon was pointed up, front sight post

pointed towards the sky, indicating that the weapon system was being manipulated by someone.

Q.   Is it fair to say that that is in the firing position?

A.   That is correct.

Q.   And tell us how you encountered the firearm after shots fired was called and you saw it in the fence line.

A.   After I called out, "Shots fired" and linked up with the countersniper element, I had encountered the weapon system approximately like this (indicating), which had indicated the weapon system was not in the same direction.

Q.   And so when you say, "like this," do you mean the front sight was pointed downward?

A.   Correct.  The front sight was pointed more so towards the ground.

           MS. MEDETIS-LONG:  May I approach now, Your Honor?

           THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   Remind us again, what kind of firearm are you holding?

A.   I was holding a pistol; it was a GLOCK 19.

Q.   What type of ammunition does the GLOCK 19 hold?

A.   It fires 9mm.

Q.   Is that caliber of ammunition larger or smaller than the ammunition held by the SKS?

A.   The 9mm, when compared to the 7.62x39, is considerably smaller.

Q.   Now, I want to go back to when you called -- after you called out "Shots fired," you scanned the tree line, you encountered the rifle and the armor.  What happened next?

A.   After encountering the weapon and armor, I had gotten on my service radio and requested EOD, explosive ordnance disposal, to render the scene safe.

Q.   Did they do that?

A.   Yes.  A member of the EOD team did arrive.

Q.   Were there any explosives found?

A.   No, there were no explosives.

Q.   What did you do next?

A.   After the scene was rendered safe by explosive ordnance disposal technicians, I had called my boss at the time and notified him of the incident.  At this time, I was instructed to cordon off the area and preserve the crime scene in order for the Federal Bureau of Investigation to arrive.

Q.   And when you say "cordon off the area and preserve the crime scene," what do you mean by that?

A.   That means to keep the scene as sterile as possible and not manipulate any objects that were present in order 'til -- in order for crime scene technicians to analyze the scene.

Q.   And did you, in fact, do that?

A.   Yes, I did preserve the crime scene.

Q.   How long were you there?

A.   I was there for approximately one to two hours.

Q.   And were you alone?

A.   I was not alone.

Q.   Were there other law enforcement with you?

A.   There was the countersniper element, to include the one I linked up with and others.  There was also another member of the Secret Service present with me.

Q.   Now, for the one to two hours that you were keeping the scene preserved, did anybody disturb the scene?

A.   No, no one had disturbed the scene.

Q.   And when I say, "the scene," I mean the firearm and the ballistic shielding and the camera pointed in the direction of the 6th hole green that you came upon.  Is that correct? Nobody disturbed that?

A.   That is correct.  No one had touched those items.

Q.   Now, when you departed after those one to two hours of keeping the scene secure and sterile, did somebody replace you?

A.   Yes.  The Federal Bureau of Investigation did take over the scene.

          MS. MEDETIS-LONG:  Your Honor, I have nothing further for this witness.

          THE COURT:  All right.  Thank you.

          Ladies and gentlemen, we are going to take our morning break, now, for 15 minutes.  So we will be back in session in 15 minutes.

          Agent, please do not discuss the substance of your

testimony during the break.

All rise for the jury.

(The jury exited the courtroom at 11:26 a.m.)

THE COURT:  Please be seated.  You may be excused for now, sir, from the courtroom.  We will be back in session in 15 minutes.

As far as the lunch, I anticipate breaking around 12:45 for purposes of your planning.  Thank you.

(A recess was taken from 11:27 a.m. to 11:44 a.m.)

THE COURT:  Okay.  Mr. Routh, please make your way to the podium.  And just to confirm, do you wish to cross-examine this witness?

MR. ROUTH:  Oh, yes (indicating).

THE COURT:  Okay.

MR. ROUTH:  Thank you.

THE COURT:  Do you understand that cross-examination must stay within the scope of direct examination?

MR. ROUTH:  Most certainly.

THE COURT:  Okay.  All right.  Let's call the jury in, please.

COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  Okay.  We have a juror still in the restroom.  So you may be seated briefly.

(Pause in proceedings.)

(The jury entered the courtroom at 11:48 a.m.)

THE COURT:  Agent Fercano, you can return to the witness stand.  Thank you.  Please be seated.  Have a seat, sir.  You remain under oath.

Cross-examination.  Mr. Routh, you may begin.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   How are you?  Good to see you.  So I guess the first question is, is it good to be alive?

A.   Yes, it does feel good to be alive.

Q.   Right on.  So I'm sure your family is happy that you are alive as well?

MS. MEDETIS-LONG:  Objection.  Relevance.

THE COURT:  Overruled.

Next question.

MR. ROUTH:  Overruled?  Overruled the objection.

BY MR. ROUTH:

Q.   Okay.  I guess we can start from the beginning.  So in your -- in your work, you were checking the next hole on the golf course.  So you were travelling down the golf -- golf path -- the golf cart path, checking the fence line; is that what you were doing?

A.   Yes.  At certain moments in my time as a sight agent, I was scanning the fence line.

Q.   But on the 15th, that's what -- what you were doing, going from the 5th hole to the 6th hole, traveling on the cart path?

A.   That is correct.

Q.   Checking the fence line?

A.   Yes, that is correct.

Q.   So then, as you approached the service cart path, you decided to deviate from the normal cart path to the service cart path for what reason?

A.   So for that reason, I placed myself in the mindset of a criminal or a combatant, as I was trained to in the military. What is the enemy's most likely and most dangerous course of action?  MLCOA and MDCOA.  For that instance, I made the conscious decision to deviate from the golf cart path, because if I were a bad guy, I would try to conceal myself in an area that is easily obscured by foliage.

Q.   So you went onto the service path which was closer to the fence and proceeded checking from there?

A.   At a certain point in time, that is correct.

Q.   So -- and then you just continued down the path until you noticed an irregularity, I assume?

A.   At a certain point to where I got onto the service path, which was that dirt road, I had noticed yourself in the fence line.

Q.   Okay.  All right.  So was there any obstructions in the service path when you were checking the fence line?

A.   Can you rephrase that?  Obstructions in which way?

Q.   Well, like, was there not like a big tree limb or something

in your -- in your way as you proceeded down the service path?

A.   On September 15, 2024, the service path was unobstructed, at least for a golf cart to drive over whatever may be in place.

Q.   So you were -- you were able to drive over all obstructions?

A.   There was no obstructions that would prevent a golf cart from going down that path.

Q.   In looking at the prior exhibits, it seemed that the defendant was fairly concealed, was he not?

A.   Yes, you were fairly concealed.

Q.   But you just luckily saw someone at the fence?

A.   Is this a question, sir?

Q.   Yeah.  You just happened to see the -- see the individual just -- just driving by, I guess?

A.   Well, there was no individual driving by.  While I was patrolling on my golf cart, cutting for a sign, as I stated earlier, I had noticed an abnormality in the baseline.  The baseline that I had established thus far was foliage.  When I encountered a certain spot in the fence line, I had noticed that the foliage had disappeared.  There was a face, a barrel of a rifle pointed at me, and what appeared to be bulletproof shielding.

Q.   Okay.  And you've shot guns before, certainly, yes?

A.   That is correct.

Q.   As far as being a sniper, what would be the best stance, as far as being a sniper and trying to shoot people?

A.   I was not a sniper.  I was a designated marksman.

Q.   So if you were shooting a gun, would -- what would be the best -- best position?  Standing?  Standing up or crouching or laying down or --

A.   Well, the answer to that question, there are several factors that would determine a shooting position.  For instance, if a subject was located at a far distance, perhaps a prone might be best, which is laying flat on your stomach.  However, maybe you're taking cover behind a vehicle, then maybe prone is not advantageous because it does not provide as much ballistic protection, maybe the crouched position.  Additionally, maybe the standing position may be better if you were firing through maybe a windowsill.  So it all depends on the situation and scenario.

Q.   All right.  If we take this scenario, you've got a fence line and you're going to shoot through it, what would you suggest?

A.   I cannot answer that question because I had never been on the exterior of the fence line.  I do not know the terrain features that are present back there.

Q.   But any fence, any fence in America, if you had to shoot through a fence, what would be the logical choice?

A.   I have never shot through a chain-link fence, sir, so I

cannot tell you.

Q.   All right.  Well, is the prone position not the optimal position?

A.   As I previously stated, it all depends on the situation.

Q.   Okay.  So if you just had an open field, what would be the most stable and most accurate position?

A.   It would depend on the weapon system.

MS. MEDETIS-LONG:  Objection.  Relevance.

THE COURT:  Overruled.

Please answer, sir.

THE WITNESS:  It would depend on the type of weapon system that you were using.

BY MR. ROUTH:

Q.   Well, say you are using a SKS rifle, what would be the -- the optimal, most stable way to fire this weapon?

A.   What are you firing at?

Q.   Really?  A target.

A.   Is there a specific size of the target?

THE COURT:  All right.  Mr. Routh, ask the question that you have next.

MR. ROUTH:  Okay.

BY MR. ROUTH:

Q.   All right.  We will go with the assumption that the prone position is the most optimal position.  So at what height were the plates strapped to the fence?

A.   When I disembarked the golf cart, the plates were about pelvic level.

Q.   So two or three feet?

A.   I could not tell you in feet how far up that was.

Q.   Well, okay.  But not -- not at your eye level?

A.   The plates were -- top of the plates were at or around my sternum.  The weapon system was pointed at my face.

Q.   Okay.  I don't think we have any data on exactly how high the plates were, but anyway...

     So you feel like, with the plates being at a low level, that the defendant could angle the gun in such a manner that they could aim for your face?

A.   Well, when I picture a chain-link fence, I picture several areas that you could possibly put an object through it.  So, yes, that is definitely possible.  Additionally, there is room within a chain-link fence to move an object, such as an AK or a SKS barrel, around in order to move up, down, left, or right.

Q.   So this weapon is roughly how long?

A.   The weapon system itself or what I -- what I found outside of the -- the fence?

Q.   The rifle is roughly how long?

A.   I couldn't tell you based off of the nomenclature of that firearm.

Q.   Can we just approximate three to four feet?

A.   If you would like to approximate that.  I do not know the

actual feet.

Q.   Okay, well -- you know, so if we approximate three to four feet and the plates are off the ground at three to four feet, then, you know, you potentially have to be at a 45-degree angle for the weapon to come near your -- near your face.  Would that make sense, or no?

A.   I don't know about angles, sir.  However, I do know that there was a bullet -- a barrel of a weapon pointed at my face. And as I further examined the weapon and yourself in the tree line, I had noticed this barrel was also moving.

Q.   Okay.  All right.  So...

All right.  Moving on.  Moving on.  So you say that you moved backwards away from the scene to get away from -- from the situation.

A.   I moved back, or getting off the X, from the scene in order to analyze what was occurring in front of me, whether or not this was actually a threat, confirming to myself that this was a barrel of a firearm pointed at my face.  And, additionally, to take into account my backdrop, which included the civilian populace.

Q.   So you exited the golf cart and turned around and walked backwards?

A.   After I had initiated contact with you and after you smiled at me, I began to backpedal while drawing my service pistol.

Q.   Okay.  I find that unusual, but I don't know.

MS. MEDETIS-LONG:  Objection.  Is there a question pending, Your Honor?

THE COURT:  Sustained.

Additional commentary should be limited, sir.  Just ask a question.

MR. ROUTH:  Well, it's just, you know --

THE COURT:  What's your question?

MR. ROUTH:  If the defendant could demonstrate that action, that would be wonderful.  It's not logical.

THE COURT:  All right.  Rephrase your question.

BY MR. ROUTH:

Q.   Okay.  Is that -- is that normal for any human being to step off of a golf cart and turn around and go backwards?  Is that -- is that what happened?

A.   Well, sir, based on my training and experience through various agencies and the United States Marine Corps, and based on the totality of the circumstances on September 15, 2024, and given the proximate distance of approximately 5 feet from myself to you, given that I had disembarked the golf cart and did not have a lot of room to move since there was a golf cart and a fence and a weapon pointed at my face, I had used my training and experience, also known as "shooting and moving," or "drawing your weapon while moving," to my advantage.

Q.   Could the defendant not have taken the weapon out of the fence and raised it up and fired at will?

A.   I don't know your mindset that day.  However, I do know that you pointed the weapon at my face.

Q.   But the question is:  Could the gun, the sight that you were saying, that was sticking out two inches, could that not be pulled out of the fence?

MS. MEDETIS-LONG:  Objection.  Calls for speculation.

THE COURT:  Overruled.

Finish your question and then answer it, sir.

THE WITNESS:  Well, it would depend.  The front sight post of the SKS is pretty prominent.  If you were to, especially under duress, try to pull that from a chain-link fence, it could certainly get caught on the chain-link fence itself.

BY MR. ROUTH:

Q.   But even getting caught on the fence, the defendant could have maneuvered it out of the fence and done whatever necessary to take -- take shots at you; correct?

A.   You could have manipulated the weapon in any shape you wanted to.

Q.   And taken shots?

A.   If that was your mindset, then, yes.

Q.   Maybe it wasn't the mindset.  So exactly.

So how many seconds was this whole interaction?

A.   This occurred roughly five to six seconds.

Q.   So very quick.  So...

Q.   Did you get scratched that day?

A.   Can you rephrase that?  Scratched in what way?

Q.   Did you get scratched or harmed or injured?  Did you get injured in any fashion?

A.   Physically, no.  However, mentally I have to live with the fact that this individual pointed a weapon at my face.

Q.   Okay.  All right.  So do you think the defendant should be charged for harming you in some fashion?

MS. MEDETIS-LONG:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

Next question.

BY MR. ROUTH:

Q.   So you choose not to wear body armor?

A.   Based on my role as a site agent that day, some positions in the service and some positions I am assigned to I find advantageous to wear armor, and some I do not find advantageous.

Q.   So if the defendant wanted to seriously harm you that day, you had no -- no prevention?

A.   I did have prevention.  I had my wits and I had my service pistol.

Q.   But no armor?

A.   I was not wearing body armor that day, as previously stated.

MR. ROUTH: No further questions.

THE COURT: All right. We will take a very brief break, ladies and gentlemen, and then we will see if there is any redirect for this witness. And then we are approaching our lunch hour fairly soon.

All rise for the jury.

(The jury exited the courtroom at 12:04 p.m.)

THE COURT: All right. Everybody have a seat.

Is there any redirect?

MS. MEDETIS-LONG: The government doesn't have any redirect for this witness, Your Honor.

THE COURT: Okay. All right. Then we will call the jury back in, Officer.

COURT SECURITY OFFICER: Yes, Your Honor.

(The jury entered the courtroom at 12:05 p.m.)

THE COURT: Please have a seat. Thank you, Agent.

Any redirect?

MS. MEDETIS-LONG: Your Honor, the United States has no redirect for this witness.

THE COURT: Thank you.

Agent, you may be excused.

Ms. Medetis-Long, what is your next witness -- or who is your next witness?

MS. MEDETIS-LONG: Your Honor, the United States would be calling Tommy McGee.

THE COURT:  Okay.  In general, how long do you expect the direct to take for that witness?

MS. MEDETIS-LONG:  Your Honor, I believe Mr. Shipley will be handling that.  He will be better able to address the Court.

THE COURT:  Mr. Shipley.

MR. SHIPLEY:  I think it would be under an hour, Your Honor.  I can't -- 45 to an hour.  So if the Court wants to break now, we can, or carry through, however you see fit.

THE COURT:  Okay.  Then that's what we will do.  We will break for lunch now so we don't have to sort of interrupt the flow for the examination of the next witness.

Lunch has been ordered for you, ladies and gentlemen, and it has arrived -- or is short to arrive.  So we will be in recess for one hour, until 1:05.

Let's all rise for the jury.

(The jury exited the courtroom at 12:07 p.m.)

THE COURT:  Okay.  We will be in recess for one hour, as I noted.

Are there any legal issues or other items that need to be raised, Mr. Shipley?

MR. SHIPLEY:  No, Your Honor.

THE COURT:  Mr. Routh?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Then we're in a break for one hour.

Thank you.  Enjoy your lunch.

(A recess was taken from 12:08 p.m. to 1:12 p.m.)

THE COURT:  All right.  Thank you.  You may have a seat.  Everybody is here.

Mr. Shipley, do you have your next witness ready?

MR. SHIPLEY:  We do, Your Honor.

THE COURT:  Okay.  Then let's call the jury in, please.

COURT SECURITY OFFICER:  Yes, Your Honor.

(The jury entered the courtroom at 1:12 p.m.)

THE COURT:  Thank you.  Please have a seat.

Mr. Shipley, please call your next witness.

MR. SHIPLEY:  Thank you, Your Honor.  The United States calls Mr. Tommy McGee.

THE COURT:  Thank you.

Mr. McGee, please make your way over here to where the officer is standing.

COURTROOM DEPUTY:  Please raise your right hand.

Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.  Make sure you speak into the mic, and state your first and last name and please spell it for the record.

THE WITNESS:  My name is Tommy McGee.  Last name is

spelled M-C-G-E-E.

THE COURT:  You may begin.

MR. SHIPLEY:  Thank you, Your Honor.

Good afternoon, members of the jury.

TOMMY C. McGEE,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Good afternoon, Mr. McGee.

A.   Good afternoon.

Q.   Where do you live?

A.   I live in Lake Worth.  Lake Worth, Florida.

Q.   And what kind of work do you do?

A.   I am a licensed mental health counselor.

Q.   Okay.  You're not a law enforcement officer; correct?

A.   No, sir, I'm not.

Q.   Okay.  Do you have an office?

A.   I do.  I have an office in Palm Springs, which is just a suburban area of Lake Worth.

Q.   Okay.  Near to West Palm Beach?

A.   Yes, sir.

Q.   Okay.  And is that office on Congress Avenue?

A.   It is.  It's on Congress Avenue between 10th Avenue and Forest Avenue.

Q.   Okay.  And is that close to the Trump International Golf

Club?

A.   Yes, sir.  It is just south.

Q.   Okay.  Tell the jury a little bit more about your life and your background.

A.   So I have been working in the field of mental health for 25 years now.  I'm also a recovering person myself.  So I work with a variety of different clients from different walks of life -- I mean, different demographics.  Either they are looking for some assistance with some substance use issues or psychiatric and mental health issues.  Or I do a lot of work recently with couples and with families.  So I have a nice, wide variety of demographics that I do work with.  And I'm in private practice.

     Previous to that, I worked in various agencies.  And for the last 2 1/2 years, I have been working in my own practice.

Q.   Okay.  Where were you born, Mr. McGee?

A.   I was originally born in Dallas, Texas.

Q.   Okay.  And can you tell the jury a little bit about your childhood community growing up.

A.   Well, I grew up in -- I like to say in an urban area. You know, I grew up in a neighborhood that had, I would say, relatively high crime.  They -- there were times when I would experience law enforcement in my neighborhood on my street.  I had some friends that ended up doing some prison time.  It wasn't uncommon to hear gunshots in my -- my area.  I did -- I

graduated high school.

I was a pretty good athlete myself, so that was one of the ways that I found some refuge from that particular environment because I -- I would say that I was a -- a relatively good athlete.

Q.   Okay.  And did you eventually come to Florida to go to college?

A.   I did.  I did.  In 1997, I came to -- to Florida.  Originally, I came because I had my own substance abuse challenges that I was working through.  I came to Florida for that and decided to stay.  You know, I didn't see any reason to return to Dallas.  Things were working well here in Florida for me.  Initially, I wanted to be a chef, and I was training to be a chef.  And a friend of mine made the recommendation that I apply at a psychiatric facility, and for some reason I fell in love with it, and I have been doing it ever since.

Q.   Okay.  Does your work have any effect on how you observe people or things around you?

A.   I mean, I have done a lot of work with people with some pretty significant and acute psychiatric disorders.  What comes to mind specifically are those that have thought disorders like schizophrenia or schizoaffective disorders, people who have some delusion or paranoia that have the potential to be somewhat aggressive or violent.  What I also know is that they are very intuitive.  They pick up on tells, in other words, any

type of facial or nonverbal affect that I may give off, that -- it can potentially trigger their psychosis. So what I have learned in my years of working in the field is that it's imperative that I be able to maintain some kind of flat affect and remain calm in a variety of situations.

And so that has transitioned or tran- -- it translated into me being able to do that in my day-to-day life. Friends of mine might say that I have the tendency to be extremely calm in some pretty high-intensity situations.

Q. Does your work also tend to make you more vigilant and observant maybe than the average person?

A. I would say hypervigilant. I would say that I have a tendency -- I wouldn't even call it an ability. I have a tendency to pick up on nonverbal cues. I pay close attention to what is -- what is in my surroundings, whether I am out and about in the malls or I am driving down the -- the street or walking. My -- again, my friends and my girlfriend talk about how it appears that my head is always on a swivel. And so, yeah, I would say that I'm hypervigilant.

Q. Okay. Let me take you back to September 15th of last year. Something unusual happen that afternoon?

A. Yes, sir. Yes, sir. I was --

Q. Let me ask you before --

A. Okay.

Q. I will ask you a couple of questions before that.

A.    Okay.

Q.    Around midday on September 15th of last year, what were you doing?

A.    I had just moved into that office on -- in Palm Springs.  I was in the process of transitioning into the office.  Again, I have been in private practice for going on 2 1/2 years now, but up until that point, I was sharing an office with a friend of mine that lives in Delray Beach.  I had acquired this office from a mentor of mine, but I wanted to do some renovations to it.  I wanted to upgrade it.  I would say that her taste was more of what I would consider to be of the '70s, and I wanted to bring it into the -- well, make it more my style.

        And so that particular day, I decided that I wanted to find some furniture.  And I like to furnish my surroundings with antiques, things I can find from the thrift store that can be restored.  And so that particular day, I first stopped by my office to see what would be -- what could fit that space.  And then I was going to go to some thrift stores in the -- the northern region of where I was of North Palm Beach.

Q.    Okay.  And one of the areas where you were shopping, was it in the area of the Trump International Golf Club or in that part of West Palm Beach?

A.    Yes, sir.

Q.    Okay.  And that's near your office; correct?

A.    It is.

Q.    Okay.   In that afternoon, did you come to the intersection of Congress Avenue and Summit Boulevard?

A.    Yes, sir.   That is just north of where my office is located.

Q.    Okay.   And Congress is a north/south road there; correct?

A.    It is.

Q.    And what direction were you traveling?

A.    I was driving north on Congress.

Q.    Okay.   And did you hear something as you approached that intersection that afternoon?

A.    Yes, sir.  Excuse me.  As I was approaching Summit, I heard what I thought to be three gunshots.  It was just as I was reaching the intersection of Congress and Summit that I heard those three gunshots.

Q.    Okay.   I think you told the jury earlier -- do you have firsthand experience hearing gunshots around you?

A.    Yes, sir, both in my upbringing as well as time that I had spent at the range myself, you know.  So I -- I was pretty sure that it was gunshots and not fireworks.

Q.    Okay.   Now, at that time, did you have any idea whether Donald Trump was playing golf?

A.    No, sir.  That wasn't -- no, that was not on my radar at all.

My concern -- what I thought was that -- again, I grew up in an area where drive-by shootings -- there was a potential

for those to happen.  So my thought was that that was what was going on, that there was a possibility that there was some type of drive-by shooting or someone was being shot at.  And my concern was that typically -- again, the way I grew up, typically no one ever shares any information about who may have been involved in that shooting.  So my initial thought was that I would go and see if I could witness what had happened, and, if so, what information I could take down to share with law enforcement.

Q.   Was that about 1:30 in the afternoon?

A.   Yes, sir.  Yes, sir.

Q.   Okay.  All right.  So what did you do?  You have come to the intersection of Summit and Congress.

MR.  SHIPLEY:  And members of the jury, I will have a map up in a few minutes just to help orient you.

BY MR.  SHIPLEY:

Q.   What did you do when you heard those gunshots?

A.   So as I was coming up to the intersection of Congress and Summit, I hear the gunshots, and the left-hand arrow -- the left lane arrow had turned green.  So I made that left and made a left onto Summit.  And when I made that left, I saw a man coming out of the bushes on the right-hand side.

Q.   Okay.  And what was that person doing?

A.   He was running.  He was running.

Q.   Okay.  What did he look like when you first saw him?

A.   I mean, I just knew that he was a relatively tall white man with blond hair.  When I first saw him, you know, it looked like he was in his early 20s.  He looked that he was dishevelled, unkempt, and frantic.

Q.   Okay.  Do you recall what he was wearing?

A.   He was wearing a light-colored top and a darker overgarment.  So I could see that there was a light-colored top on underneath, like a T-shirt or something, and an overgarment, and some darker pants.

Q.   Okay.  Was his overall appearance well-groomed?

A.   No, no.

Q.   Okay.  Did you observe anything about his body language?

A.   Again, he looked frantic.  Because as we -- as I was, you know, driving down Summit, and he ran across -- well, ran near Summit, he ran at a diagonal.  And initially I thought that he would at least pause as I was nearing him on Summit, but he ran right in front of me.  He ran right in front of me.

So the look on his face -- because we looked right at each other.  We looked each other in the eye.  The look on his face was fear, and that's why I refer to it as frantic, you know, because it had looked as if -- though -- just his intent was to get away from whatever it is that he had just done.

Q.   Okay.  And was he carrying anything, this individual?

A.   It looked like he was carrying something in his right hand. It was just a black object.  To be completely honest with you,

I was not focused on his -- what was in his hand, but I did see that object in his hand.  My focus was more on his face. Because, you know, I think what I didn't say is, when I had made the left and I saw him coming out of the bushes, I started to reach for my phone.  And I was fumbling with the phone, with the intent of taking a picture of him as he neared me.  But I could not get my phone onto "photo" as he crossed in front of me.

Q.   Okay.  And tell the jury, how close to your car did this individual come?

A.   As close as where you -- you're standing.

Q.   Okay.

A.   And so I had to slow to keep from hitting him.

Q.   Okay.  Did this individual look carefully across the --

A.   No.

Q.   -- street?

A.   No, no.  And that -- that was my expectation; that, as he was beginning to cross, or about to cross, that he would look and at least see me coming.  But he did not see me until -- at least, in my opinion, he didn't see me until he was in front of my car.

Q.   Okay.  And based on your concerns, what did you do next?

A.   Again, I tried to get my phone up so that I could take a picture, but that's two different things I was thinking.  I wanted to take a picture, but I didn't want him to see me

taking a picture, you know?  So I was trying to get my phone up and on photo so that I could take the picture, but I didn't -- I wasn't able to do that before he crossed over in front of me.  So I tried to take it, like, over my shoulder, but I was trying to drive at the same time.

So there was a driveway just ahead of where the two of us crossed paths, and I made a decision that if I could make a U-turn, that I could go back around, get a photo of his license plate.  And so as I slowed to take a picture, he had already gotten in his -- his vehicle at that point.

Q.    Let me stop you there.

A.    Okay.

Q.    Did you see where -- after the defendant crossed in front of your car, did you see where this individual ran?

A.    I did.  I did.  Because, again, what I was doing is I was trying to see if I could get a photo as he crossed over my shoulder.  So I watched him get into this black Nissan Xterra -- Xterra.  But again, I could not get the photo.

So I made the U-turn, came back around as he was pulling out of his parking spot, and started to take pictures.  But, unfortunately, even then I couldn't get his license plate, because he -- the way he backed out of his parking spot, it shielded the license plate.  So I wasn't able to get the license plate.  So I -- I felt that I still needed more information to share with law enforcement.

Q.   Did you preview things a little bit?  Did you eventually get that license plate --

A.   I did.  I did.

Q.   Okay.

A.   So as I approached --

Q.   Let me -- let me do this, Mr. McGee.

A.   Okay.

Q.   Maybe this is a good moment to pull up the map --

A.   Okay.

Q.   -- so we can talk through more specifically, with the jury, some of these locations.

A.   Okay.

        MR. SHIPLEY:  Your Honor, at this time I would like to publish to the jury Government Exhibit 200-1A.  It's already in evidence and has been shown to the jury earlier.

        THE COURT:  You may.

        MR. SHIPLEY:  Thank you, Judge.

        With the Court's permission, this can be published right to the jury.

        THE COURT:  Yes.

        COURTROOM DEPUTY:  Is it on the overhead?

        MR. SHIPLEY:  I just have gray.  Same thing (indicating).

        COURTROOM DEPUTY:  I mean, is it at counsel's table or --

MR. SHIPLEY:  Okay.  Everyone on the jury have that image?

THE JURY:  (Head nods.)

MR. SHIPLEY:  And, Mr. McGee, do you have it in front of you?

THE WITNESS:  Yes, sir.

BY MR. SHIPLEY:

Q.   All right.  Let's step back for a moment.  You were driving that day in the course of your furniture shopping.  Can you use your finger and indicate on that map roughly where Congress Boulevard is?

A.   This is Congress.

Q.   Congress Avenue.  I'm sorry.

A.   Yeah, this is Congress here.

Q.   And what direction were you heading?

A.   So I was going north on Congress.  I was heading in that direction.

Q.   Okay.  And that junction we see, is that the intersection of Congress with Summit Boulevard going off to the left?

A.   Yes, sir, it is.

Q.   Okay.  Do you mind, with your finger, showing the jury roughly what happened when you're -- as you're heading north, you hear gunfire, and then you turn around.  Could you show the jury with your finger how that unfolded.

A.   Yes, sir.  So I was heading north on Congress.  I hear the

gunfire.  I make the left because the arrow is green, and as I'm driving here on Summit, I see someone coming out of the bushes, along this way (indicating).  And, again, the expectation is as I pass or about to cross -- oops.

Q.  Do you want me to clear it?  Let me --

A.  Okay.  Yes, please.

Q.  Let's try that again.

A.  Sorry about that.

And as I pass or about to cross (indicating), I feel that he will slow and not cross in front of me.  But he does.  He crosses in front of me.

Q.  Okay.

A.  And so I slow enough -- I'm fumbling with the phone to see if I can take a picture, but I couldn't get it to photo.  I couldn't get it to photo.  And so he crosses in front of me, I cross here, and I turn into this drive here.

Q.  Let me just stop you there.  Where you saw the defendant run, was anything parked over there?

A.  There was a -- a black SUV that was parked right here (indicating).

Q.  What kind of car was that?

A.  A Nissan Xterra.

Q.  Okay.  All right.  If we can pick up again, at the risk of making too many lines.  Where did you do your U-turn?

A.  In this drive here (indicating).  I turned in this drive

right here.  It's a drive just before the post office and just past where these 18-wheelers are parked.

Q.   Okay.  And can you show the jury, again pointing with your finger, what you did after you made that U-turn?

A.   So I pulled out of this drive (indicating), and I was driving here, and I started to take photos as he backed out of his parking spot.  And, again, my intent, I just really wanted to get pictures of his license plate.  And I still was not able to get pictures of the license plate.

But at the same time, I'm thinking that -- I mean, I'm -- I just heard gunshots.  I don't know what he had in his hand, so I don't know if this is someone that potentially has a gun.  And here I am, he has already saw me once, in my opinion, and there is a possibility that he could see me again.  And so rather than stop, I just slowly passed as he proceeded out of the parking lot and swung around me.

Q.   Let me stop you there just so we can do it in sequence to the jury.

Let me clear this.

And you mentioned that you took some -- or tried to take some pictures.  Did you actually succeed in taking a photograph?

A.   I did.  I did.  I was able to snap three pictures as he pulled out of his parking spot.

Q.   Okay.

A.   You know, again, there were three pictures of the vehicle, but I still didn't get the license plate.

Q.   Okay.

MR. SHIPLEY:  Your Honor, if I could publish to the witness Government Exhibit 440, not yet in evidence.

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  Mr. McGee, do you see that image?

A.   Yes, sir.

Q.   Okay.  Do you recognize it?

A.   Yes, sir.  It's one of the pictures I took.

Q.   Okay.  And some people in the jury may have iPhones or are familiar.  Do you have something -- is there a feature called Live Photo?

A.   Yes, sir.  Yes, sir.  And I have never changed that feature on my phone, so all of my photos are live photos.

Q.   Okay.

A.   And so they have some motion to them.  Almost looks like a brief video, but it's just a live photo.

Q.   Okay.  And does this image fairly and accurately represent the picture that you took in that moment?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Your Honor, at this time government moves to admit Exhibit 440.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.  No objection.

THE COURT:  Thank you.

Government's 440 will be admitted without objection.

(Government Exhibit 440 was received in evidence.)

MR. SHIPLEY:  Permission to publish to the jury.

THE COURT:  Granted.

MR. SHIPLEY:  Thank you.

(A video and/or audio was played.)

MR. SHIPLEY:  Members of the jury, can you see that picture?

BY MR. SHIPLEY:

Q.   Okay.  So the movement -- this was a picture.  This is what you were describing as a live photo?

A.   Yes, sir.  Yes, sir.

MR. SHIPLEY:  Ms. Luce, can you play that one more time.

(A video and/or audio was played.)

BY MR. SHIPLEY:

Q.   Okay.  Right there, when we come to the end of that live photo, is that the black Nissan Xterra you were seeing?

A.   It is.

Q.   Okay.  Is that the car you eventually followed?

A.   Yes, sir.

Q.   Okay.  Before coming to court, did you also review some

still photographs based on this live photo that you took?

A.   I did, yes, sir.

Q.   Okay.

MR. SHIPLEY:  Your Honor, I can show it to the witness first, but these are still photos of this one live photo in 440.  They're just three individual photos so they don't have to see it with the live feed.

THE COURT:  Are they numbered separately?

MR. SHIPLEY:  They are.  They are 439A, B, and C.  So I would move those into evidence as well, based on 440.

THE COURT:  Okay.  Mr. Routh, any objection to 439A through C?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Those three stills will be admitted without objection.

(Government Exhibits 439A, B, and C were received in evidence.)

MR. SHIPLEY:  Thank you, Your Honor.

Okay.  Ms. Luce, can we pull up Government Exhibit 439A, and publish that to the jury, please.

BY MR. SHIPLEY:

Q.   Okay.  So these are some still pictures based on that live photo.  What are we seeing here?

A.   This is one of the pictures that I was taking as I slowly passed that particular drive.

Q.    Okay.  And, again, do we see the Xterra in that photograph?

A.    Yes, sir.

Q.    And was that where that vehicle was parked?

A.    Yes, sir.  I think at this point it's beginning to pull back.

Q.    Okay.

A.    Yes, sir.

A JUROR:  It's not shown over here.

THE COURT:  Okay.  We will try to reset it and hopefully that will work.  Just give us a couple of minutes. The system can be a little finicky every now and then.

COURTROOM DEPUTY:  Got it.

THE COURT:  Okay.  I'm seeing that the photo is now on display.  Please continue.

MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

Q.    Okay.  Mr. McGee, let me go back and ask the question, now that the jury can actually see the image.

A.    Sure.

Q.    What are we seeing in that picture?

A.    It's one of the photos that I took as I was passing the drive.

Q.    Okay.

A.    Of the Xterra.

Q.    And I will ask you again:  Do we see the Xterra in that

photograph?

A.   Yes, sir.

Q.   Is that where the defendant had run after he crossed in front of your vehicle?

A.   Yes, sir.

Q.   Okay.  And this is a perspective from you inside your car; correct?

A.   It is, yes, sir.

Q.   Okay.

MR.  SHIPLEY:  Ms. Luce, can we pull up 439C.

Everyone in the jury see that?  Okay.

BY MR.  SHIPLEY:

Q.   And is this a moment later, basically, out of that live photograph of the Xterra?

A.   Yes, sir.

Q.   Okay.  Am I right that we see it moving a little bit closer to that light pole which appears in the center of the screen?

A.   Yes, sir, you are correct.

Q.   Okay.

MR.  SHIPLEY:  And, Ms. Luce, can we pull up Government Exhibit 439B, please.

BY MR.  SHIPLEY:

Q.   Okay.  And in this photograph do we see the Xterra actually having moved in front of that light pole?

A.   Yes, sir.

Q.    Okay.  And was that vehicle moving at the time you were taking these pictures?

A.    It was moving and I was also moving.

Q.    Okay.

A.    Yes, sir.

Q.    All right.  So what does -- what did you observe the Xterra do next as it starts to pull away from you?

A.    So I slowly passed the drive where the Xterra was parked and pulling out of that park -- parking spot.  And, again, I slowly passed because, again, I was not -- I was not absolutely sure that he hadn't seen me, and I wanted it to appear that I was just driving.

And so he drove around me.  He passed me on my left-hand side as I passed the drive.  But I still did not feel that I had gotten his license plate, so I continued to follow him towards Congress Avenue.

Q.    Let me interrupt you.  What was the vehicle's rate of speed as it pulled around you?

A.    He was speeding.  He was -- excessive speed.  It was obvious that he was really trying to -- I hate to say get away, but he was trying his best to leave that scene as fast as he possibly could.

Q.    And you mentioned that he actually came around you.  What are you referring to?

A.    I was in the far right lane of travel.  He came around me

into the center lane of travel to pass me and go in front of me.

MR. SHIPLEY:  Why don't I pull up Government Exhibit 200-1A.  Again, this will be the Google map image of the intersection.  200-1A.

Everyone see that?  Okay.

BY MR. SHIPLEY:

Q.   All right.  Can you, Mr. McGee, with your finger, just show roughly where the defendant came out and what he did.

A.   So I'm in the far right lane (indicating).  He comes out of the drive -- he goes around me --

Q.   Okay.

A.   -- where I get behind him.

Q.   And does he eventually make a right turn onto Congress Boulevard?

A.   Yes, sir, he does.

Q.   And starts heading in which direction?

A.   Starts heading south on Congress Avenue.

Q.   Okay.  And what do you do?

A.   So I -- again, I had not gotten his license plate yet, and for some reason, I just knew I needed a license plate number. I mean, I -- I didn't get the photo of his face, only got a picture of the car.  I didn't feel like that was enough information.

So I followed him at a distance as he made the right onto

Congress.  Because, again, my thought is, if this is someone that's dangerous, I don't want him to see me in his rearview mirror.  I want to be far enough back that it can appear that I'm just driving in that general direction.  And at the same time, I want to be close enough to be able to catch the lights as he catches the lights.  So I gave him, you know, four, five car lengths.  And as he drove south on Congress, there were a couple of lights; he made both, I made both.  He did not make the light at Forest Hill and Congress.

Q.   Let me stop you there.

MR. SHIPLEY:  Ms. Luce, can you pull up -- already in evidence, Your Honor -- Government's Exhibit 200-1B.  And if we could publish that.

And members of the jury, I'll assume everything is working fine, but please let the Court know if you're not seeing an image.

Okay.  Oh, I need to clear the screen.  Excuse me. Okay.

BY MR. SHIPLEY:

Q.   Mr. McGee, you have reviewed this Google map image before coming here; correct?

A.   Yes, sir.

Q.   Okay.  What are we -- what are we seeing here?  Do we see Congress -- Congress Avenue marked on here?

A.   We do, yes, sir.

Q.    Okay.  Which is -- which road is that?

A.    This is Congress here (indicating).

Q.    Okay.  And just to reorient ourselves, where was the corner of Summit and Congress?

A.    So that's here (indicating).

Q.    Okay.  So the vehicle, the Xterra you were following was going south?

A.    Yes, sir.

Q.    And eventually, you said you made a couple of lights and did eventually come up to a stoplight where other cars were?

A.    Yes, sir.

Q.    And where was that?

A.    So we made it to Forest Hill and Congress, which is this light (indicating).

Q.    Okay.  And at that point, how close were you to the defendant's vehicle?

A.    I still gave him -- I -- number 1, he was in the left turning lane, heading toward I-95, and I decided to remain in the middle lane.  But I parked in a way that he could be ahead of me but that I could have a gap between cars that were at the light and be able to see his license plate.

So there was enough obstruction with other cars that were along Congress Avenue that he wasn't able to see that I actually followed him to the light.

Q.    Okay.  And were you able to get down that license plate

number?

A.   Yes, sir.  Yes, sir.  I had a pad that I keep in my backpack when I do -- I'm one of those therapists that takes notes during sessions.  And so I had a pad in my backpack that I used to take notes.  I pulled the pad out, and I wrote down his license plate on the pad.

Q.   Okay.  And what did -- what did the Xterra do next?

A.   So the Xterra made the left, going towards I-95.  And I proceeded straight through Congress and Forest Hill.

Q.   Okay.  If we could just show -- this map doesn't show I-95, but can you show the jury what direction that vehicle went on Forest Hill?

A.   So he went that way on Forest (indicating).

Q.   And the on-ramp to I-95 is sort of in the black space on the right of this image; correct?

A.   Yes, sir.

Q.   Okay.  And what did you do?

A.   I proceeded through the light.

Q.   Okay.

     MR. SHIPLEY:  Ms. Luce, could you bring up Government Exhibit 320.

     Your Honor, this is another exhibit, already in evidence, pre-admitted.

     Let me clear the screen.  Okay.

///

BY MR. SHIPLEY:

Q.   Mr. McGee, before coming to court, have you reviewed this photograph?

A.   Yes, sir, I have.

Q.   Okay.  Is that the vehicle you saw?

A.   It is.

Q.   Is that the license plate number you wrote down?

A.   Yes, sir.

Q.   Okay.  So what did you do then?  After you have seen this vehicle and you turn around, where did you go next?

A.   So I drove through the light and -- I mean, I said to myself that if this is really a big deal, then there will probably be some kind of police presence if I go back to Summit and Congress.  You know, that if it was really a shooting that -- I mean, I hate to put it this way -- that really meant anything, then I would expect to see law enforcement at the scene when I returned.

So I went down towards my office, which, again, is just south of Forest Hill, and I made a U-turn.  I went back up to Congress and Summit to see whether or not there was a law enforcement presence.

Q.   Was there?

A.   There was police everywhere.  And so there were -- there were sheriff's deputies that had already gotten out of their vehicles that were walking towards the area where I had seen

the man run out of the bushes.  There were also other law enforcement officers that were in black.  They just had "police" on the back of their vest, so I wasn't absolutely sure what agency they were with.  But there was a large police presence.  They had blocked a portion of Summit, as well as the lane going south on Congress.

Q.   Okay.  And did you talk to any of those law enforcement officers?

A.   Yes, sir.  So --  so what I did was I -- I, again, made the left on Summit.  And I'm smiling because they weren't -- they didn't look too happy for me to turn in there, but anyway.  So I made the left into -- onto Summit, and I navigated my way between a couple of the Suburbans that were parked along Summit Avenue.  And I really -- I just sat there and waited for someone to notice my presence.  And one of the officers that was wearing a black vest with "police" on the back came to my window -- I think I summoned him to my window, and I asked him if he was looking for someone that had been involved in a shooting.  And he didn't answer me.  And I said if you are, I have a license plate and pictures.

Q.   Okay.  Were those officers surprised to see you come back to that location?

A.   Surprised and skeptical.

Q.   Okay.  And you mentioned that you had the license plate information.  Did you give any information about that license

plate to the law enforcement officers?

A.   I did.  I did.  I gave -- I gave him the -- I had actually rewritten the license plate as well as the description of the car, and a vague description of the person that had come.  So I had rewritten that when I made the U-turn, again, just in case the -- the first time I wrote it, I had just wrote the license plate.

Q.   Okay.

A.   And then, again, I rewrote it so that I would have more to hand to law enforcement if I actually saw someone.

Q.   Okay.

       MR. SHIPLEY:  Ms. Luce, could you pull up, and could we publish just to the witness an exhibit not yet in evidence, Government Exhibit 932.

BY MR. SHIPLEY:

Q.   Mr. McGee, is that a photograph of the note we were just talking about?

A.   Yes, sir.

Q.   Is this the note that you provided to law enforcement officers in that moment?

A.   It is, yes, sir.

Q.   Is this a true and accurate image of that note?

A.   It is, yes, sir.

Q.   Okay.

       MR. SHIPLEY:  Your Honor, government moves to admit

932.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  All right.  Government's Exhibit 932 will be admitted without objection.

(Government Exhibit 932 was received in evidence.)

MR. SHIPLEY:  And if we could please publish to the jury.

THE COURT:  Yes, you may.

MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

Q.   So, Mr. McGee, what is -- what is that item, now that we're all able to see?

A.   So that is -- that's really the second one that I wrote, because it's on a clean piece of paper.  The first one I wrote is on a pad that also has some information that is associated with my practice.  And so the second sheet was when I wanted to write both the make and model of the vehicle I saw, the license plate, as well as the person I saw.  So it's a more comprehensive idea of what I saw.

Q.   Okay.  And you provided this note to the law enforcement officers?

A.   Yes, sir.

Q.   Okay.  Did you have a conversation with them about an individual, the individual you had seen?

A.   I did.  I did.

Q.   Okay.  By the way, had anybody told you, anyone in those initial interactions with the law enforcement officers, anybody told you what was going on?

A.   No.  I didn't have a -- any idea what was going on.

Q.   And did you have any firsthand idea what was going on?

A.   No.  I didn't have a clue.

Q.   Okay.  And so what did the law enforcement officers tell you to do?

A.   They just asked me to recount what I saw, you know, and tell them, you know, who I saw, and give them a -- a description of what it was that I saw.

Q.   Okay.  And what did you do next?

A.   And I just recounted, you know, exactly what I saw, just as I had here, and -- and sat and waited as I was interviewed by -- by a detective from the Palm Beach County Sheriff's Office.

Q.   Okay.  Did there come a point where you were asked to -- to travel to a different location?

A.   Yes, sir.  Yes, sir.  We -- I mean, we sat there for -- I'm not sure how long we sat there, as, again, I was being interviewed by the Palm Beach County Sheriff's Office.

    And at one point, he came back to me and said that they felt like they had stopped someone and if I would be available or open to flying up in the helicopter to see whether or not

this was the person that I had seen leave the scene.

Q.   Okay.  This wasn't on your plans for the day, was it?

A.   No.  I was trying to buy some furniture.

Q.   Okay.  And -- but did you agree to do that?

A.   Yes, sir.  Yes, sir.  The -- my intent, you know, was to make sure that anyone who had taken it upon themselves to shoot at someone would be caught.

Q.   And at this point, just to be clear, do you have any idea, any -- in the time between that initial conversation with law enforcement officers and when you're asked to go in the helicopter -- anyone telling you about what's actually going on?

A.   No.  That's -- that's the other part of it, is that -- is that I don't -- I don't really remember how long it took for me to find out, you know, everything that was going on.  And, you know, working in the field, you know, one of the things I think I'm pretty good at is I -- I have the ability to not ask the questions that I don't want the answers to.  And so I -- I never really asked any more than they were willing to volunteer.

You know, my attitude at that time on that scene was that, you know, I respect what they do, and if they feel like there is information that I need to have, then they will volunteer it.  But no, they never -- they didn't tell me at that point.

Q.   Okay.

A.    Uh-uh.

Q.    So do you go up in that helicopter?

A.    Yes, sir.

Q.    Okay.  Did they tell you where you were going, or did you know where it would be landing?

A.    They did say that -- they did say Martin County, you know, that they had stopped someone in Martin County.  And I'm familiar with that area.  I have done some work in that area, so I was familiar with the area.  I wasn't sure exactly where in Martin County, but I was familiar with Martin County.

Q.    So -- so what happens next --

A.    So we took the helicopter ride up to Martin County, and -- we reached a point during the flight where I could see that traffic was backed up.  And so, I mean, I assumed what that meant was that they had stopped traffic up ahead of -- you know, again, where I saw the traffic being backed up.  And so we landed in a clear area on the highway past that traffic jam.

Q.    Okay.  And what happened then?

A.    So they transferred me from the helicopter into a police SUV and drove me, you know, some distance up to where they had stopped an individual, and then asked me whether or not that was the person that I had seen leave the scene of that shooting.

Q.    Okay.  Did you make that identification?

A.   I did.

Q.   Okay.  So you were asked specifically to make an identification of an individual?

A.   Yes, sir.

Q.   Okay.  And do you recognize that person in the courtroom today?

A.   Yes, sir.  The young man -- the man sitting right there.

Q.   Would you describe him by his clothing, please, for the record.

A.   He is wearing a darker gray suit, nice blue striped tie, white shirt, gray hair.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, let the record show that the witness has identified the defendant in the courtroom.

     THE COURT:  It so reflects.

     MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

Q.   And do you recall that conversation with the officers when you made the identification?

A.   I do.  I do.

Q.   Okay.  And was there a recording made of that on the dash cam video of the police car?

A.   Yes, sir.

Q.   Okay.  And did you review that file, that audio and video file, before coming to court?

A.   Yes, sir, I have.

Q.   Is that a true and accurate representation of what your conversation actually was?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Your Honor, at this time I would move into evidence Government's Exhibit 952, and that's pursuant to Rule 801(d)(1)(C) prior identification.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  All right.  Government's 952 will be admitted without objection.

(Government Exhibit 952 was received in evidence.)

MR. SHIPLEY:  And, Your Honor --

THE COURT:  Pursuant to that rule of evidence.

MR. SHIPLEY:  Okay.  And, Your Honor, and members of the jury, this is a short video clip of just a couple of moments.  So with the Court's permission, we will play that for the jury if Ms. Luce has it.

THE COURT:  You may publish.

(A video and/or audio was played.)

BY MR. SHIPLEY:

Q.   Now, Mr. McGee, we don't see an image of the defendant in that video.  Is the person you see in this courtroom the person you identified --

A.    Yes, sir.

Q.    -- in that video clip?

      Okay.  Anything like this ever happen to you before?

A.    No.  No, sir.

Q.    Okay.  Are you in the habit of stopping and taking down license plates?

A.    No.

Q.    Okay.  Fair to say this was unusual?

A.    Yes, sir.  Very much so.

Q.    Okay.  Have you passed by, since your office is close, that corner of Summit and Congress many times?

A.    Yes, sir.  Three or four times a week.

Q.    Ever seen anyone run out of the bushes there?

A.    I have not.

Q.    Ever seen anyone in the bushes there?

A.    No, sir.

Q.    Okay.  And based on your knowledge of that location, any reason for someone to be in those bushes?

A.    No.  No.

      MR. SHIPLEY:  One moment, Your Honor.

      Nothing further, Your Honor.  Thank you, Mr. McGee.

      THE WITNESS:  You are very welcome.

      MR. SHIPLEY:  Thank you, members of the jury.

      THE COURT:  Cross-examination, Mr. Routh.

      MR. ROUTH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. ROUTH:

Q. How are you?

A. Very well.

Q. You're my hero. You're a good man.

So -- how many -- how many cars were in the -- in the vicinity when you were at Congress and Summit that day?

A. No idea. No idea.

Q. But, I mean, going down Congress and Summit, had to be 50, 75?

A. No, sir. Nowhere near that many, no.

Q. But, I mean, 20? 30?

A. No. No.

Q. Well, you know, I'm just saying that you were one of many that -- you were the only one that acted.

A. Yes, sir, I would agree.

Q. Yeah. Yeah. All the other cars --

A. As far as I know.

Q. All the other cars just kept on going?

A. As far as I know, yes, sir.

Q. Shots fired and they just kept on driving. You were the only one that stopped.

You are the man. Good job. Good work.

Are you a Trump supporter?

A. Sir, I prefer not to answer that.

MR. SHIPLEY:  Objection, Your Honor, and move to strike.

THE COURT:  Sustained.

Ladies and gentlemen, you should disregard the question.  The objection has been sustained.

BY MR. ROUTH:

Q.  All right.  Well, you know, I'm sure my next question is going to get objected to.  I'm just -- you think Madea and Beyoncé and Michelle Obama are going to be -- going to be mad?

MR. SHIPLEY:  Your Honor, objection.

THE COURT:  Mr. Routh.

MR. ROUTH:  Yeah.

Right.

THE COURT:  Cease asking those questions.

MR. ROUTH:  Okay.

THE COURT:  Those questions are also stricken, ladies and gentlemen.

Please ask a relevant question, Mr. Routh.

MR. ROUTH:  All right.

BY MR. ROUTH:

Q.  So just trying to be friendly and nice and cordial.  So...

At the stoplight, just out of curiosity -- so when you -- you and the Xterra approached the stoplight at Summit to make a right -- so the light was green, I guess, and you guys both proceeded?

A.   No, actually, the light was red.

Q.   So you just had to wait for it to turn green and then go?

A.   Yes, sir.

Q.   Okay.  Okay.  All right.  All right.  Cool deal.  Cool deal.

     So you're positive of that?

A.   Absolutely positive.

Q.   Absolutely positive.

A.   Yes, sir.

Q.   So the Xterra pulled up to the light and it turned green and it went right?

A.   The Xterra went around the traffic and made a right.  I paused at the light.

Q.   Right.  Right.  Right.  So the Xterra didn't go through the -- through the gas station -- through the gas station?

A.   The Xterra made a right.  Which path it took, I'm not absolutely sure.  It made a right.

Q.   Okay.

A.   Yes, sir.

Q.   So you don't -- you -- you couldn't see it go through the gas station or...

A.   I watched the Xterra made a right -- make a right.  The path that it chose, I wasn't concerned with.  I was concerned with keeping my distance --

Q.   Uh-huh.

A.    -- and keeping my eye on the vehicle.

Q.    But it's a short distance.  I mean, it's 50 feet?  I mean...

It doesn't seem like it's that far, so, you know, but anyway.

But when you were approaching -- initially when you heard the gunshots, your intention was to go straight, yes?

A.    Yes, sir, that was my intention.

Q.    Yeah.  So you haven't given yourself credit for having to deviate from your day.  You had to make a -- an unforeseen left, so you didn't take credit for yourself for having to spend extra time.  So you should have said, Hey, I had to make a left when I had not intended to.  So you missed that -- that bonus point.  So...

But again, good work.  You're an American hero.  So I celebrate you.  You are the only one that stopped out of 50, 60, 70 cars.  So I celebrate your efforts, and we're good now.

THE COURT:  Mr. Routh, do you have a question?

MR. ROUTH:  That's it.  Thank you very much.

THE COURT:  All right.

THE WITNESS:  Thank you.

MR. ROUTH:  Thank you, sir.

THE COURT:  Any redirect?

MR. SHIPLEY:  Not at all, Your Honor.

Thank you, Mr. McGee.  Thank you, Judge.

THE COURT:  Thank you, sir.  You may be excused.

All right.  Government, please call your next witness.

MS. MEDETIS-LONG:  Yes, Your Honor.  We would call Special Agent Harris.

THE COURT:  Good afternoon, sir.  Just remain standing for just one moment to be sworn in.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Jason Harris.  J-A-S-O-N, H-A-R-R-I-S.

MS. MEDETIS-LONG:  Permission to proceed, Your Honor.

THE COURT:  Yes.

MS. MEDETIS-LONG:  Good afternoon, ladies and gentlemen.

SPECIAL AGENT JASON HARRIS, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.  Sir, where do you work?

A.  I work for the U.S. Secret Service.

Q.   And what is your title?

A.   I'm a special agent.

Q.   And what are your duties and responsibilities as a special agent?

A.   I'm currently on the presidential protection detail, and I'm responsible for the operations section, which is protective planning and other protective assignments.

Q.   And what office, in particular, for the U.S. Secret Service do you work at?

A.   Out of the West Palm Beach area office.

Q.   And whom are you working on these operational protection responsibilities?  Whom are you protecting?

A.   So for President Trump, his children, his grandchildren, for the entire family.

Q.   So it's your responsibility to maintain the protection operation when they -- the President or his family comes to the West Palm Beach area; is that correct?

A.   That's correct.

Q.   And how long have you been with Secret Service?

A.   For over 12 years.

Q.   And before you were with Secret Service, where did you work?

A.   I worked as a contractor for Immigration and Customs Enforcement in Miami.

Q.   Okay.  Now, I want to direct your attention to

September 15, 2024, if I may.  Were you working that day?

A.   Yes, I was.

Q.   And what were you assigned to do?

A.   So I was part of the -- President Trump's security team.

Q.   And at the time he was a presidential candidate; correct?

A.   That's correct.

Q.   And where did you respond to in order to be part of the -- President Trump's security team?

A.   I responded to Trump International Golf Course in West Palm Beach.

MS. MEDETIS-LONG:  Can we please show Government's Exhibit 200-2, Your Honor?  It's already in evidence.

THE COURT:  You may.  You said 200-2?

MS. MEDETIS-LONG:  Yes, Your Honor.  Would you like us to take it down?

THE COURT:  No.  You are correct.  It's been previously admitted.  Please proceed.

BY MS. MEDETIS-LONG:

Q.   What do we see here, Special Agent Harris?

A.   It's a diagram of Trump International Golf Course.

Q.   And is this where you were on September 15, 2024?

A.   Yes.

Q.   And what was your role that day as part of the protection of the President?

A.   I was part of the security team.  And my role, in

particular, was to be on the golf course or ahead of wherever President Trump was on that day.

Q.   And did the President play golf that day?

A.   Yes, he did.

Q.   Okay.  And approximately how far ahead of the President were you when he was playing golf?

A.   I leapfrog, typically one hole ahead, ahead of where he was going next.

Q.   Now, have you done this sort of service at Trump International Golf Club before?

A.   Yes, I have.

Q.   Approximately how many times as of September 2024?

A.   Over a dozen times.

Q.   Okay.  So you're fairly familiar, is it fair to say, with the golf course?

A.   Yes, I am.

Q.   What is happening -- or did anything happen as you were approaching the 6th hole?

A.   Yes.  As I was on the -- on the 6th hole on the fairway, I heard rapid-fire gunshots.

Q.   And where was -- well, can you circle on the diagram where you were when you heard the gunshots?

A.   Yes.  I was in this area here (indicating).

Q.   Were you on the cart path or somewhere else?

A.   So I was off of the cart path, in the grass, and trolling

along the fence and brush line so I could see if there was anything ahead that might be a threat.

Q.   And were you on foot, or were you on a golf cart?

A.   I was on the golf cart.

Q.   Okay.  And can you circle or point to the diagram where you understood President Trump was.

A.   So President Trump was, at that time, on the 5th hole, so somewhere in the area of over here (indicating) at that time.

Q.   You heard, you said, rapid fire?

A.   Yes.

Q.   And you believed that to be what?

A.   Gunshots.

Q.   And what were you thinking when you heard those gunshots?

A.   Immediately, I -- I looked at the direction they -- that I heard them coming from to see if I -- I saw anything.  And at that point in time, I immediately jumped out of my golf cart, and I took cover behind a large oak tree that was in the area over there.

          MS. MEDETIS-LONG:  Your Honor, permission to publish 200-1A, Government's Exhibit, which is already in evidence.

          THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What is this?

A.   This is a aerial view of -- of the golf course, of the 6th fairway, 6th green.

Q.   Okay.  And continue, please.  You said you took cover?

A.   So, yes, I took cover behind a large oak tree that was in front of me, after I jumped off the golf cart.  And at that point in time, once the shots stopped and I -- I immediately looked around to see if I could -- if I saw anyone or saw anything.  But I didn't at the time.  The only thing that immediately happened after that is there were two Secret Service countersniper officers behind me that also ran up and joined me in the area where I was behind the oak tree.

Q.   Was there anybody ahead of you from the Secret Service at that time?

A.   Yes, there was.  There was one agent.  Agent Robert Fercano was ahead of me.  It was he and I on the front maneuvering portion.  He had gone around a corner at that point, and I didn't have visual of him at the time when I heard the gunshots, but he was in front of me.

Q.   Could you circle on this diagram of Government's Exhibit 200-1A approximately where you were when you heard the gunshots.

A.   Yes.  I was approximately (indicating) here, in this area.

Q.   And where were the gunshots coming from?  Behind you? Here?  Or ahead of you?

A.   They were ahead of me.

Q.   Would that be toward the 6th green here (indicating)?

A.   Correct, yes.

Q.    In the center of the photograph?

A.    Yes.

Q.    After you positioned yourself behind the oak tree and you made contact with the countersniper team, what did you do next?

A.    So from there -- there were three of us at the time.  We gathered.  We looked at the direction we saw the -- we heard the gunshots coming from and decided that we needed to clear the bushes in the wood line to maneuver towards where we heard the shots coming from to see who and -- and what was going on -- who was over there, and who fired the shots, and what was going on.

So from that point, we began.  The two of them went along the fence line in the corner there and cleared the area along the brush line and the fence line.  And at that point, I covered the rear end -- I covered their six to -- to make sure that no one came up behind them.  And once they began maneuvering, that's when I saw to my right Agent Fercano popped out from behind the bushes --

Q.    And let me ask you, when you heard the shots fired, at that point, did you know who had fired the shots?

A.    No.  Had no idea.  I just -- I knew that Agent Fercano was in the area over there, but I didn't know if it was him firing the shots or someone else, or if he had been or -- or anything, because at that point in time, I couldn't see anyone over there.

Q.    And could you draw on this diagram what route the countersnipers took.

A.    So the countersnipers took the route of coming down this way (indicating).  And that path there, it's a -- you can walk down that path.  And you -- but it's also against the fence line.  So there is heavy brush there against the fence line. And then also on the right side, there is additional bushes. So they had to, essentially, make sure that there was no one inside the fence or outside.

Q.    And when you say you had to make sure there was no one inside the fence, you are talking about this area (indicating) below the red line; correct?

A.    So I'm speaking of the area here (indicating), along there, because at this point, we are inside the fence line.  And it's difficult to see, I guess, on the street side.  So we were on the inside of the fence line at the time.

Q.    Understood.  In the golf course?

A.    Correct.

Q.    In the golf course area?

A.    In the golf course.

Q.    Understood.

      Now, you said that at some point, you saw Special Agent Fercano come out of the bush line or out of behind a tree, you said?

A.    Correct.  So I saw him come out of the bush line and from

the area that he was, closer towards the golf cart path. He came to visual. So at that point in time, I let the other two countersniper officers know that I saw Agent Fercano. They continued to maneuver on, and at that point in time, I moved to the direction of where Agent Fercano was.

Q. And what did you do next?

A. So from there, I -- I went up to him and asked him what happened. And he said that "there is a guy in the bushes with a gun pointing right at me."

Q. And what happened next?

A. So from there, you know, I -- I didn't see anyone at the time. He pointed in the direction of where it was. And then -- so I asked him for, you know, a description, what did he look like? And that's when he told me that it looked like a homeless person with bad teeth.

Q. And then what did you do next?

A. From that point, I told him to -- to put that information out over our radio so that the -- the other agents working would have a description of who to look for in that area.

Q. And after that was transmitted over the radio, what happened next?

A. So from there, we began to -- Agent Fercano and I maneuvered towards the direction of where he fired the shots at and where he last saw the -- the person with the gun.

So we maneuvered over there. Around that same time, the

two countersniper officers also converged in the same area as well, and that's where I saw the area of where the weapons and other things were.

MS. MEDETIS-LONG:  Okay.  Your Honor, I would ask to publish previously admitted Government's Exhibit 200-57C.

THE COURT:  Proceed.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   So this is the fence line on the inside of the golf course view.  And from there is where we saw a rifle barrel sticking out of the fence.  There's a backpack hanging.  There was also, like, tiles hanging from a fence, and a trail cam mounted to the fence.

MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 200-57D, previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   So here, I see the -- the rifle sticking out through the fence.

Q.   Could you circle it, please.

A.   Yes.  (Indicating.)

Q.   What else do you see?

A.   I also see the trail cam.

Q.   Could you circle that?

A.    (Complies.)

Q.    And in what direction is the lens facing?

A.    The lens is facing the golf course.  It was pointing directly at us.

Q.    And what else do you see here?

A.    I also see a backpack and, like, a -- it looked like tiles or some -- some other item hanging from the fence.

Q.    And circle those, please.

A.    (Complies.)

Q.    So those are -- those tiles or those bags are on either side of the rifle that you circled; is that fair to say?

A.    Yes.

        MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 200-57E, previously admitted.

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here?

A.    So this is a view from -- from the fence facing out towards the golf course to the 6th -- 6th green.

Q.    So if you are facing the rifle and the bags and the camera that you just talked about in the previous exhibit --

        MS. MEDETIS-LONG:  If we could do a side-by-side of Government's Exhibit 57D and E.

BY MS. MEDETIS-LONG:

Q.    If you're facing this way and you do an immediate

about-face, is what you see Government's Exhibit 200-57E?

A.   Yes, it is.

Q.   After you came upon these items, what did you do next?

A.   So once we came upon the items, we looked in the area and didn't see anyone at the time.  Looked to see if there was any evidence that someone might have still been in that area, but we did not.

At that point in time, I made the decision to head back the other direction to make sure that there was no one else -- excuse me, no one else in the bushes hiding on the other side of the fence, but also to get to the out -- to the outside of the fence on the street side to -- to get to where the rifle was and to also see if there was anybody else there.

Q.   Now, before we get into that -- showing Government's Exhibit 200-57D alone.  Does this photograph capture the scene as you saw it immediately after you heard the shots fired?

A.   Yes, it does.

Q.   Did you touch or move anything when you came upon this scene?

A.   No, we did not.

Q.   Did anybody that was with you touch or move anything when they came upon this scene with you?

A.   No, we did not.

Q.   Okay.  You said you wanted to get onto the street side, the other side of this fence that we see in Government's

Exhibit 200-57D.  How did you accomplish that?

A.   So the -- in order to get to the other side, I walked down to the -- closer towards Congress Avenue, and I jumped over the fence on that side of -- of the property and immediately began to walk back along the Summit Boulevard side along the bush line and the grass; along the way, clearing the bushes to make sure that there was no one else hiding in the thick brush along the way.

Q.   And when you say "clearing the bushes," do you mean you're scanning for anyone or anything?

A.   Correct.  So I was -- I was basically walking close up to it, squatting down, and looking to see if there was anyone hiding in the thick brush.

        MS. MEDETIS-LONG:  Could you please show us again 200-1A.

BY MS. MEDETIS-LONG:

Q.   Could you mark on this diagram what you did after you came upon the rifle and the bags and the camera, what route you took.

A.   Okay.  So I -- I went from the area of where the rifle was and where Agent Fercano and the two other officers were.  I walked back this way (indicating), and I jumped the fence over here (indicating).  And then I had immediately came across this way and stayed very close to the wood line, to the bushes and the fence line, and cleared this entire area here to make sure

that there was no one else, or that person that we didn't see anymore was still in the bushes, and made my way back to here, to the spot to where they were and -- where I previously was and where they were still currently standing.

Q.   When you say "they," who do you mean?

A.   Agent Fercano and the two countersniper officers.

MS. MEDETIS-LONG:  Okay.  Permission to publish 200-21A, Government's Exhibit previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is a view from the grass on the outside of the fence, looking -- looking into the -- the -- I guess the cutout, the hole of where someone crawled in.

Q.   And you say there was a cutout.  What are you referring to?

A.   When I walked back on that side, I noticed -- which was different than the other areas along the fence, there was a cleared brush path for someone -- that someone could crawl into, basically.

Q.   Could you circle that on the -- on the photograph.

A.   (Complies.)

Q.   And you're saying that this was a break of sorts in the vegetation along the street -- the bush line of the street side of the fence?

A.   Yes.

MS. MEDETIS-LONG: Okay. Permission to publish 200-21B, Government's Exhibit previously admitted.

THE COURT: Granted.

BY MS. MEDETIS-LONG:

Q.   Did you go into that cutaway?

A.   Yes.  I went partially inside, enough to be able to squat down and see everything that was in there.  And on the other side of the fence, I could see Agent Fercano and the two other officers as well as the rifle and other items were still in the -- in the same position.

Q.   Okay.  You said you saw the rifle.  What else did you see?

A.   I saw the backpack, the tiles, the trail cam.  There were also some Vienna sausages on the ground and some other debris as well that made it look like someone had been, you know, sitting back there.

Q.   What was the rifle doing?  How was it positioned?

A.   The rifle was positioned leaning against the fence with the barrel sticking out of the fence.

Q.   So sticking --

A.   Or sticking, I guess, into the golf course side of the fence.

MS. MEDETIS-LONG: Your Honor, permission to publish Government's Exhibit 175 previously admitted.

THE COURT: Granted.

///

BY MS. MEDETIS-LONG:

Q.   What do we see here, sir?

A.   So this is a -- looks like a side view of the rifle, the backpack, the tiles, the trail cam, and the area that was essentially cut out over there on the street side of the fence.

Q.   And so this is a view of what you saw on the golf course side from the other side of the fence; is that fair?

A.   Yes.

        MS. MEDETIS-LONG:   Permission to publish Government's Exhibit 176 previously admitted.

        THE COURT:   Granted.

BY MS. MEDETIS-LONG:

Q.   What does this show?

A.   This shows what I saw when I walked over to the area where the rifle was.  It has the -- the rifle sticking through the fence, the backpack, the tiles, and the trail cam, and other debris on the ground.

Q.   Now, you talked about seeing some Vienna sausages; is that correct?

A.   Yes.

Q.   What did you notice about the branches or the foliage when you were there?

A.   The branches were -- looked like someone broke or bent them to the side so that there was a clear path to be able to go in and out of that crawl space, essentially.

MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 33 previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   Now, do these photographs that I have shown you of the items on this side of the fence, do these photographs fairly and accurately depict how those items were when you first came upon them?

A.   Yes, they do.

Q.   And were you the first to get to these items on this side of the fence?

A.   Yes, I was.

Q.   And right in the center of this Government's Exhibit 33, what do we see there?

A.   Those were the Vienna sausages that I saw on the ground.

Q.   And in the lower left-hand corner of this photograph, what do we see?

A.   A lock on the fence.

MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 200-55 previously admitted.

BY MS. MEDETIS-LONG:

Q.   What is that a close-up of?

A.   It's a close-up of Vienna sausages.

Q.   And what is this item right here (indicating)?

A.   It's a can and a plastic bag.

MS. MEDETIS-LONG: Permission to publish Government's Exhibit 200-53.

THE COURT: Granted.

BY MS. MEDETIS-LONG:

Q. What do we see here?

A. So these are -- this is the image of the broken branches leading up to where the weapon and backpack and everything was against the fence line that cleared the way to be able to walk through.

Q. Can you circle on this photograph where the -- where the weapon and the backpack and the other bag were?

A. (Complies.)

Q. And just for the record, you're circling the background of the photograph in the upper center?

A. Yes.

Q. Did other law enforcement begin to respond after you first came upon this scene?

A. Yes. So I stood in -- once I saw exactly where the area was from that side, I -- I -- at that point in time, the Palm Beach Sheriff's Office had officers responding to the area. I was able to -- to wave -- wave them down to basically let them know exactly where the -- the person was last seen at, and they made their way over to that area there.

MS. MEDETIS-LONG: Permission to publish Government's Exhibit 180 previously admitted.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here?

A.    It's a backpack.

Q.    And what is this (indicating)?

A.    It's -- it looks like an object sticking out of the backpack, out of the side of it.

Q.    Are those the plates you referred to earlier -- or the plate?

A.    Yes.

Q.    Now, after additional law enforcement responded, what did your focus shift to?

A.    So after additional law enforcement responded, my focus shifted to preserving what was now a crime scene.  Part of our responsibilities with the Secret Service is to have interim federal presence if there is ever a crime scene that we're involved in and -- which basically means that we hold the area and make sure that all of the evidence and -- is preserved and the area is secure until the FBI takes over.

Q.    And where did you position yourself to preserve the crime scene?

A.    I positioned myself, at first, directly inside of the crawl space because the -- the bomb squad had to come and make sure that the area was -- was secure and not booby-trapped in any kind of way, because that was an additional concern.

And so I observed them come to the area and make sure everything was clear and untampered with. And then from there, once everyone was clear of the area, I stood immediately outside of that area to make sure that no one disturbed anything in the area.

Q. Did law enforcement find any booby traps or any explosives or anything like that?

A. No.

Q. Okay. Did you -- well, how long did you -- were you posted there preserving the crime scene?

A. So probably from -- so from the time of the incident, which was probably around 1:20 or so, until about 6:15 or 6:20 p.m. that evening.

Q. So over five hours, or about five hours?

A. Correct, about five hours.

Q. And in those five hours, did anybody disturb this crime scene?

A. No. The crime scene wasn't disturbed. I -- I witnessed the evidence being collected, gathered, and processed. But other than the official business that was happening, it was not disturbed.

Q. And were you alone in that -- in that post preserving the crime scene?

A. No. So I was joined later by Palm Beach Sheriff's Office. Once they arrived on the scene, there was an officer that

stayed with me as well.

MS. MEDETIS-LONG:  No further questions, Your Honor.

THE COURT:  Thank you.

Ladies and gentlemen, we're going to take a 15- to 20-minute break at this time.  I will instruct you, as I will do on an ongoing basis, that, of course, you should have no contact or conversations or discussions about this case with anyone, and that includes your fellow jurors.  Obviously, no investigation about the case, no research, no posting of any kind on any social media app or forum, even if I haven't mentioned it.

Again, you must maintain an open mind until the very end of the proceedings.  Premature discussions can lead to premature deliberations, and we want to avoid that at all costs.

So, with that, we're going to take our 15- to 20-minute break.  I would advise you, Agent, not to discuss the substance of your testimony during the break.

Let's rise for the jury.

(The jury exited the courtroom at 2:30 p.m.)

THE COURT:  Thank you.  Please return to the courtroom at, let's see, 2:47, please.  Thank you.

(A recess was taken from 2:31 p.m. to 2:51 p.m.)

THE COURT:  You may all have a seat.  The witness can return to the courtroom, please.  And let's call in the jury,

please.

(The jury entered the courtroom at 2:52 p.m.)

THE COURT:  Thank you.  Please have a seat.  You remain under oath, sir.

Mr. Routh, cross-examination.

MR. ROUTH:  Sure.  Just one question.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   So you're saying that you have scaled a 6-foot fence?

A.   In -- in which -- which -- I guess what are you pertaining to that -- what do you mean by that?

Q.   You were testifying earlier that you had -- you were in the vicinity of Hole 6 there, and you jumped the fence towards Congress?

A.   Correct.

Q.   And I just was verifying the fact that you jumped a 6-foot fence.

A.   Yes.

Q.   You did?

A.   Yes.  The exact height I'm not sure of, but, yes, I did jump the fence.

Q.   Okay.  So that was -- all right.  So that's something that you can do?

A.   Yes.

Q.   Right on.  Awesome.  So just another item maybe.

I realize I'm the dumbest guy in the room, but --

MS. MEDETIS-LONG:  Objection, Your Honor, to the superfluous commentary.

MR. ROUTH:  Okay.  I'm sorry.  I'm sorry, but --

THE COURT:  Stricken, ladies and gentlemen.

This is your opportunity to conduct cross-examination.

MR. ROUTH:  Right.

THE COURT:  If you have questions that are relevant and permissible, you may ask them now.

MR. ROUTH:  Well, I was just going to say, there is a standing order that -- protecting Trump.  So they don't -- they don't need to discuss the workings of the security on the golf course.  They can skip that part of the testimony, if they -- if they wish.  So I just -- maybe they --

THE COURT:  I don't know to what you are referring, sir.  Do you have any other questions for this witness?

MR. ROUTH:  No, I do not.  Thank you.

THE COURT:  Okay.  Any redirect?

MS. MEDETIS-LONG:  No redirect, Your Honor.

THE COURT:  Okay.  Thank you very much, Agent.  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  Next witness, please.

MS. MEDETIS-LONG:  Yes, Your Honor.  The United States calls Dominick Healey.

COURTROOM DEPUTY:  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  My first name is Dominick, D-O-M-I-N-I-C-K.  Last name Healy, H-E-A-L-E-Y.

MS. MEDETIS-LONG:  Permission to proceed, Your Honor.

THE COURT:  Granted.

SPECIAL AGENT DOMINICK HEALEY, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Where do you work?

A.   I work at the FBI.

Q.   And is that the Federal Bureau of Investigation?

A.   It is.

Q.   And what is your title?

A.   I'm a special agent.

Q.   And what are your duties and responsibilities as a special agent?

A.   I am on the Violent Crimes squad of the West Palm Beach resident agency.

Q.   And is it your responsibility, among other things, to investigate crimes?

A.   It is.

Q.   And how long have you been an FBI Special Agent?

A.   Since January 6, 2019.

Q.   And do you have other duties and responsibilities in addition to investigating crimes at the FBI?

A.   I do.

Q.   What are those?

A.   I am a practical applications instructor.  It's just a fancy term for a tactical instructor.

Q.   And what does that entail?

A.   That entails instructing agents in a number of topics, close-quarter battle, traffic stops, how to set up their gear, just a wide array of tactical topics.

Q.   And what did you do before you joined the FBI?

A.   Immediately prior to joining the FBI, for about 10 months I was a collision appraiser with the Government Employees Insurance Company, also known as GEICO.  And prior to that, I was an officer in the United States Army for almost five years.

Q.   And were you honorably discharged?

A.   Yes.

Q.   And what was your rank at the time that you separated?

A.   First lieutenant.

Q.   I want to direct your attention to September 15, 2024.

A.   (Nods head.)

Q.   Did you work that day?

A.   Yes.

Q.   And where were you dispatched?

A.   I was dispatched to the -- Summit Boulevard, to the post office that is there that is adjacent to President Trump's golf course in West Palm Beach.

Q.   And is that the Trump International Golf Club that you are referring to?

A.   Yes.

Q.   Were you advised at any point -- well, at what time did you -- did you dispatch to -- to that area?  Do you recall?

A.   Approximately noon.  It was midday.

Q.   Okay.  Did there come a time when you were told that somebody had been detained in this -- in this attempted assassination?

A.   Yes.

Q.   And what were you directed to do at that point?

A.   I was directed to go to the Palm Beach County Sheriff's Office headquarters located at 3228 Gun Club Road and respond to the Violent Crime Division to assist in the booking and processing of the defendant, Mr. Routh.

Q.   And what did you do when you got to the Palm Beach County

jail?

A.   I met with Special Agent Hull and Moore.  I produced the paperwork that I needed to fill out.  I filled it out the best that I could with the information that they knew.  And then I set to conversing with Mr. Routh to fill out the rest of the paperwork.

Q.   What kind of paperwork were you -- are you referring to?

A.   It's administrative paperwork.  Name, date of birth, emergency contact, that sort of thing.

Q.   And where was Mr. Routh at this time?

A.   He was in a holding cell in the Violent Crime Division.

Q.   And after you filled out the paperwork, what did you do next?

A.   After that, I set about to finding a jumpsuit for Mr. Routh so that we could transport him over to the prison.  As soon as we found that jumpsuit, we secured the clothing that was on his person.  And from there, we took him from the Violent Crime Division.  He was transported to the jail, and we checked him in at the jail.

Q.   What did you do with his personal items?

A.   His personal items were bagged in an evidence bag.  And from the jail, we took those items back to the command post that was in the area of the post office near the golf course, and we turned those items over to a Evidence Response Team technician.

MS. MEDETIS-LONG:  One moment, Your Honor.

Your Honor, at this time, I would ask to show only the witness Government's Exhibit 200-73.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, sir?  Or is it on your screen?

A.   It is not, no.

Q.   Okay.  Is there anything on your screen now?

A.   Just the camera feeds.

Q.   Do you see anything now?

A.   Yes.

Q.   Okay.  Do you recognize that?

A.   Yes.

Q.   Does that fairly and accurately depict what you saw at the Palm Beach County jail on September 15, 2024, when you responded?

A.   It does.

Q.   And what does it generally depict?

A.   It's Mr. Routh wearing a long-sleeved pink shirt, some kind of gray pants, and black socks.

MS. MEDETIS-LONG:  At this time, Your Honor, the government would seek to admit Government's Exhibit 200-73 into evidence.

THE COURT:  Mr. Routh, do you have any objection to introduction of this exhibit?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  This exhibit will then be admitted, 200-73, without objection.

(Government Exhibit 200-73 was received in evidence.)

MS. MEDETIS-LONG:  Permission to publish to the jury, Your Honor.

THE COURT:  Granted.

MS. MEDETIS-LONG:  Ladies and gentlemen, can you see on your screen Government's Exhibit 200-73?

THE JURY:  (Head nods.)

MS. MEDETIS-LONG:  Yes.

BY MS. MEDETIS-LONG:

Q.  Now, you started to describe this.  What do we see here?

A.  We see Mr. Routh in a long-sleeved salmon or pink-colored T-shirt.  He is wearing gray pants.  Underneath those pants are another pair of camo-colored legging pants and then socks that are black and gray in color.

Q.  Now, did you retrieve these items from the defendant?

A.  I did.

MS. MEDETIS-LONG:  Permission to approach the witness, Your Honor?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.  I'm going to approach you with Government's Exhibit 940, 200-91, 200-92, and 200-93.

Would you like gloves, sir?

A.    No.

Q.    (Tendering items.)

Do you recognize those items?

A.    Yes.

Q.    How do you recognize them?

A.    This was the shirt that Mr. Routh was wearing when I spoke with him.  These are the pants.  These were the pants that were under the pants.  And this is the blue Venmo card that was on his person.

MS. MEDETIS-LONG:  May I approach again, Your Honor?

THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.    Now, you saw those items.  Are those in the same or similar condition as when you seized them from the defendant on September 15, 2024?

A.    Yes.

MS. MEDETIS-LONG:  Your Honor, at this time I would seek to move these items into exhibit [sic].  Once again, they are Government's Exhibit 200-91, Government's Exhibit 200-92, Government's Exhibit 200-93, and Government's Exhibit 940.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  All right.  Then those four exhibits will be admitted without objection.

(Government Exhibits 200-91 through 200-93 were received in evidence.)

(Government Exhibit 940 was received in evidence.)

MS. MEDETIS-LONG:  Permission to publish, Your Honor.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   I'm showing you what's been admitted now as Government's Exhibit 200-91.  What do we see here?

A.   That's the pink long-sleeved T-shirt.

MS. MEDETIS-LONG:  And if we could put up 200-73, please.

BY MS. MEDETIS-LONG:

Q.   Is this the same T-shirt that the defendant was wearing when you did the booking paperwork?

A.   Yes.

MS. MEDETIS-LONG:  Publishing what's been admitted as 200-92.

BY MS. MEDETIS-LONG:

Q.   What are these again?

A.   Those are the gray pants that he was wearing.

MS. MEDETIS-LONG:  Your Honor, may I have use of the ELMO?

THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   Special Agent Healey, I'm showing you the left-side pant

leg.  What do we see on there?

A.    Some kind of stain.

Q.    What color is it?

A.    Red.

Q.    That stain right there (indicating)?  It's sort of blurry?

A.    Yeah, it's a little blurry, but it looks like that, yeah.

        MS. MEDETIS-LONG:  May I approach, Your Honor?

        THE COURT:  Yes.

        MS. MEDETIS-LONG:  (Tendering item.)

BY MS. MEDETIS-LONG:

Q.    Do you see what I'm referring to on Government's Exhibit 200-91?

A.    I do.

Q.    And what is that?

A.    It's a red stain.

Q.    Showing you what's been admitted now as Government's Exhibit 200-93.  What are these?

A.    Those are the pants that he was wearing underneath the gray pants.

Q.    What is -- what is the color or the style of the pattern?

A.    It's a -- I believe it's called M81 camouflage in a tire-stripe color.

Q.    Showing you now on the ELMO what's been admitted as Government's Exhibit 940.  Showing you the front of it.  What is this?

A.   That's the Venmo card that was on his person.

Q.   What is that word right here (indicating)?

A.   "Debit."

Q.   So this is a debit card?

A.   Presumably.

Q.   What is the account number?

A.   The account number is 5143 7723 7150 2288.

Q.   And in whose name is this debit card?

A.   Ryan Routh.

Q.   And what is this that we see here (indicating)?

A.   Some sort of hole.

Q.   Did you do that?

A.   No.

Q.   Was that hole there when you retrieved this item from the defendant?

A.   I don't recall.

Q.   Now, did this -- after you brought all of these items back to the command post by the post office, did that conclude your work in retrieving the items, these items from the defendant?

A.   Yes.

        MS. MEDETIS-LONG:  One moment, Your Honor.

        Your Honor, permission to approach the witness.

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   Special Agent Healey, I'm showing you what's been marked

for identification purposes as Government's Exhibit 200-96 and 200-97.  (Tendering items.)

Q.    Did you look at those items?

A.    Yes.

Q.    Do you recognize those items?

A.    Yes.

Q.    How do you recognize them?

A.    These were the sunglasses that I retrieved from the Palm Beach County Sheriff's Office as well as the shoes.

Q.    And when you say "the Palm Beach County Sheriff's Office," to whom did those glasses and shoes belong to?

A.    Mr. Routh.

Q.    And how do you know that?

A.    Because they were seized incident to arrest from his person.

Q.    Are those in the same or substantially the same condition as when you seized them from the defendant?

A.    Yes.

        MS. MEDETIS-LONG:  Your Honor, at this time I would seek to introduce Government's Exhibit 200-96 and 200-97 into evidence.

        THE COURT:  Any objection, Mr. Routh?

        MR. ROUTH:  No objection.

        THE COURT:  Okay.  Those exhibits will be admitted without objection.

MS. MEDETIS-LONG:  Permission to reapproach the witness, Your Honor.

THE COURT:  Yes.

MS. MEDETIS-LONG:  Permission to publish these items to the jury.

THE COURT:  Granted.

MS. MEDETIS-LONG:  First, showing the jury 200-96.  Now showing the jury 200-97.

I have no further questions, Your Honor.

THE COURT:  Thank you.

Any cross-examination, Mr. Routh?

MR. ROUTH:  Sure.  Why not?

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Could someone that loses things possibly just drill holes in their bank cards to put them on a key ring?

A.   I'm sorry.  Could you say the question again.

Q.   Could someone that possibly loses everything possibly just drill holes in their bank cards and put them on a key ring?

A.   Yes.

Q.   Would you possibly know of an SKS rifle as semiautomatic?

A.   I wouldn't, no.

Q.   You wouldn't know.

MR. ROUTH:  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MS. MEDETIS-LONG:  Nothing from the government, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may be excused.

Is the government ready for its next witness?

MS. MEDETIS-LONG:  May we have just one moment, Your Honor?

THE COURT:  Yes.

MS. MEDETIS-LONG:  Yes, Your Honor, at this time the government would call Special Agent Christopher Mayo.

THE COURT:  Good afternoon, Mr. Mayo -- or Special Agent Mayo.  This is our witness stand, please.

COURTROOM DEPUTY:  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

Now state your first and last name, and please spell it for the record.

THE WITNESS:  Christopher Mayo.  C-H-R-I-S-T-O-P-H-E-R, M-A-Y-O.

MS. MEDETIS-LONG:  Permission to proceed, Your Honor.

THE COURT:  Yes.

SPECIAL AGENT CHRISTOPHER MAYO, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Sir, where do you work?

A.    For the Federal Bureau of Investigation.

Q.    Is that "FBI," for short?

A.    Yes, ma'am.

Q.    And what is your role or title?

A.    I'm a special agent.

Q.    And what are your duties and responsibilities as a special agent?

A.    I'm currently assigned to the Fort Pierce resident agency. I work criminal matters, mostly violent crime and crimes against children.

Q.    And how long have you worked as a special agent for the FBI?

A.    Just over 15 years.

Q.    And do you have any other collateral duties other than investigating criminal activity?

A.    Yes, ma'am.  I'm a firearms instructor, and I'm also a team leader for the SWAT team.

Q.    What does "SWAT" stand for?

A.    Special Weapons and Tactics.

Q.    What does SWAT do?

A.   We serve high-risk warrants, hostage rescue incidents, but mainly high-risk warrants service.

Q.   And do you receive specialized training to be in SWAT?

A.   Yes, ma'am.  We train one day a week.

Q.   And prior to joining the FBI, what did you do?

A.   I was a police officer in North Carolina.

Q.   How long were you a police officer?

A.   Approximately 9 1/2 years.

Q.   And what did you do before that?

A.   I was a firefighter for two years.

Q.   Now, I want to direct your attention to September 15th, 2024.  Were you on duty that day?

A.   No, ma'am.

Q.   And were you at any point called in to work that day?

A.   Yes, ma'am, I was.

Q.   And where were you called to?

A.   We initially received a call out to Mar-a-Lago, the residence of the -- at the time Candidate Trump, his residence in West Palm Beach.

Q.   Do you know why you received a call out there?

A.   Yes.  Because there was an assassination attempt.

Q.   On who?

A.   The former president at the time, Donald Trump.

Q.   Current President Trump?

A.   Current President Trump, yes, ma'am.

Q.   And what did you do in response to that call?

A.   I got into my work vehicle and I started to leave my house. I live in Martin County. And I started to travel to go to head south to Palm Beach County to -- towards Mar-a-Lago.

Q.   What route did you take?

A.   I was going to go towards I-95. I live right by I-95. Take I-95 south --

     (Court Reporter requested clarification.)

BY MS. MEDETIS-LONG:

Q.   And did you make it to Mar-a-Lago?

A.   No, ma'am.

Q.   Why?

A.   I was on a Teams call with the SWAT team leaders, and we were discussing the callout. And as soon as I was getting onto I-95 southbound, one of the team leaders stated that law enforcement had a possible suspect stopped at Mile Marker, approximately, 112, on I-95 north.

Q.   And so what did you do when you heard that?

A.   I was approximately at Mile Marker 102, so about ten miles south, so I turned around through the median and I responded to the potential suspect that they stopped.

Q.   And did you get to Mile Marker 112 approximately?

A.   Yes, ma'am, I did.

Q.   And what did you see when you got there?

A.   Martin County Sheriff's Office had already conducted a

vehicle stop.  And at that point in time, all lanes of I-95 northbound were shut down.

Q.   And what happened next?

A.   I got out at the scene, I made contact with members of the Martin County Sheriff's Office, and I asked them if they, in fact, had the correct suspects in custody.

Q.   And what did you do next?

A.   They asked me -- they said that he did not have ID.  I told them I have a mobile biometric application system, which is like a mobile fingerprint system, and asked them if they wanted me to fingerprint him to confirm his identity.

Q.   And did you fingerprint him on scene?

A.   Yes, ma'am, I did.

Q.   And what was the result of who you fingerprinted?  What was the identity of who you fingerprinted?

A.   Ryan Wesley Routh.

Q.   And what else did you see other than the defendant on scene?

A.   His vehicle.

Q.   What kind of vehicle was it?

A.   It was a SUV, like Nissan Xterra.

Q.   What color?

A.   Black.

Q.   Okay.  Did you approach the vehicle?

A.   No, ma'am, initially we did not approach the vehicle.  He

had been removed from the vehicle, and they were actually awaiting on a bomb dog to get to the scene to conduct a K-9 sniff to make sure there were no explosives in the vehicle.

Q.   And was the vehicle ultimately cleared of explosives?

A.   Yes, ma'am, it was.

Q.   Meaning, there were no explosives found in the vehicle?

A.   Correct.  The dog did not alert on the vehicle.

Q.   Did you get close enough to observe the car?

A.   Yes, ma'am, I did.

Q.   And did you get close enough to the car to observe inside through the window?

A.   Yes, ma'am, I did.

Q.   What did you observe?

A.   In the backseat area of the SUV, it appeared to me that somebody -- the person had been, like, living in there.  Like a bed was kind of, like, in the backseat.  There was a box that contained food products, like packs of crackers.  Saw a couple cans of Vienna sausages.  And, like, sunglasses were hanging up on the handle, like if you were laying down in there, you would hang your sunglasses or your reading glasses on the handle.

Q.   And so what did it appear to you that the user of that car was doing with his car?

A.   Living out of it.

Q.   Now, did you open any of the doors to the SUV at any point in time?

A.   No, ma'am, I did not.

Q.   Did you see any other law enforcement officers do that at any point in time?

A.   I did not, no, ma'am.

Q.   What did the police do next with the SUV?

A.   Members of the Palm Beach Sheriff's Office actually sealed the vehicle with evidence tape.  So they sealed the door seams of all the doors to show that it had been sealed for evidentiary purposes.

Q.   What's the reason for sealing the doors that way?

A.   To show that nobody had gone into the vehicle and tampered with anything inside the vehicle.

Q.   Because if somebody had, after it was taped, entered the vehicle, the tape would have broken.  Is that why?

A.   Correct.  The seal of the tape would break, and you -- it would be very noticeable.

Q.   What happened to the SUV next?  What did you observe?

A.   They wanted the SUV to be towed back to secure storage at the Palm Beach Sheriff's Office.  Martin County Sheriff's Office owns their own tow truck, so Martin County Sheriff's Office utilized their tow truck to -- it's a flatbed tow truck -- to put the suspect vehicle on the tow truck, and they towed it down to Gun Club Road in West Palm Beach.

Q.   What's Gun Club Road?

A.   A street in West Palm Beach near the sheriff's office.

Q.    Okay.  And did you observe the loading of the Xterra onto the flatbed?

A.    Yes, ma'am, I did.

Q.    And what did you do next?

A.    For custody purposes, I followed the vehicle from Mile Marker 112 on I-95 all the way down to West Palm until it was secured in secure storage.

Q.    Were you the only one who followed that vehicle?

A.    No, ma'am.

Q.    Who else did?

A.    There was another deputy from the Palm Beach Sheriff's Office.

Q.    And did you, at any point in time from Martin County Mile Marker 112 to Gun Club Road, Palm Beach Sheriff's Office, lose sight of the Xterra?

A.    No, ma'am, I did not.

Q.    And what happened to the truck when it got to Palm Beach Sheriff's Office?

A.    It was placed inside of a building that is secure storage. And after it was placed there, I -- I left.

        MS. MEDETIS-LONG:  Your Honor, at this time I would seek to publish to the ladies and gentlemen of the jury previously admitted Government's Exhibit 342.

        THE COURT:  Granted.

///

BY MS. MEDETIS-LONG:

Q.   What is this a photograph of?

A.   The subject vehicle.

Q.   Do we see what it says there?

A.   Yes, ma'am.  "Xterra."

Q.   What am I circling to the -- on the right side of the photograph, the center of the photograph, and the left?

A.   That's the evidence tape over the seams of the doors that I was speaking about.

Q.   Do these appear to be intact?

A.   Yes, they do.

Q.   After you followed the tow truck with the Nissan Xterra to Gun Club Road, Palm Beach Sheriff's Office secure evidence facility, did that conclude your participation in the custody of the Xterra?

A.   Yes, ma'am, it did.

        MS. MEDETIS-LONG:  I have nothing further for this witness, Your Honor.

        THE COURT:  Thank you.  Any cross-examination?

                        CROSS-EXAMINATION

BY MR. ROUTH:

Q.   So the defendant's passport was not on-site on the highway?

A.   Not that I'm aware of, no, sir.

Q.   The defendant wasn't holding his passport out the car window when he was stopped?

A.    Sir, I thought -- testified when I got there, the subject was already in custody --

Q.    Okay.

A.    -- in the back of a Martin County --

Q.    Okay.

A.    -- Sheriff's Office vehicle.

Q.    All right.  Cool, cool, cool.

      Is an AK-47 an automatic weapon?

      MS. MEDETIS-LONG:  Your Honor, I'm going to object as to beyond the scope of direct examination.

      MR. ROUTH:  It's just a question.  He is a gun specialist.

      THE COURT:  Overruled.  Answer the question, sir.

      THE WITNESS:  I'm not aware, sir.  It can be, yes, sir.

BY MR. ROUTH:

Q.    An AK-47 can be a fully automatic weapon?

A.    Uh-uh, yes, sir.

Q.    With modification or something?

A.    Depends on which lever it has.  There's a switch.  Yes, sir.

Q.    What's that?

A.    Semi-auto or auto, depending on where -- the make and model.

Q.    Of an AK-47?

A.    It's my belief, yes, sir.

Q.   I'm unaware of that, so we will take your word for it.

MS. MEDETIS-LONG:  Objection as to the superfluous commentary, Your Honor.

THE COURT:  Sustained.

Do you have any other questions, Mr. Routh?

MR. ROUTH:  No.

Thank you very much, sir.

THE COURT:  All right.  Ladies and gentlemen, you should strike the last comment by Mr. Routh:  "I'm unaware of that, so we will take your word for it."

Okay.  Any redirect?

MS. MEDETIS-LONG:  Nothing from the government, Your Honor.

THE COURT:  Okay.  Thank you, sir.

THE WITNESS:  Thank you, ma'am.

THE COURT:  Ladies and gentlemen, we're going to take a 15-minute break now.  We are moving at a pretty fast clip.  So we have a little bit of extra time today.

With that, let's rise for the jury.  All my continued rules continue to apply.  Thank you.

(The jury exited the courtroom at 3:25 p.m.)

THE COURT:  Please have a seat.  Mr. Shipley, or Ms. Medetis, or Mr. Browne, I would just like an update on the remainder of the day in terms of additional witnesses.

MR. SHIPLEY:  Your Honor, as the Court indicated, we

have moved at a very rapid clip.  We are trying to get one additional witness ready.  We've gone through five today, plus opening statements.  Certainly, the cross-examinations, even with our best crystal ball, given the circumstances, have not taken as much time as we expected.  So in good faith, Your Honor, I think we've moved this along much further than we expected to be at, 3:30 on day 1.  So obviously, we will follow the Court's lead.

We would request to dismiss the jury and resume tomorrow.  We will have witnesses available.  We're trying to move people up in the sequence of things.  I think the upshot of all of this will be, if we continue on this pace, certainly a shorter trial, to the benefit of the jury.  But we would ask that we break today, if possible.

THE COURT:  Okay.  Now, you said there was one other witness that you were trying to get accommodated today.  Is that in the works?  Is that realistic?  Is he or she here?

MR. SHIPLEY:  She is here, Your Honor.  So we can make it happen.  I haven't had a chance to speak to Mr. Browne about where that is.  This was, again, trying to move her up to work with the jury and the Court.  So, again, we will follow your lead.  We will do whatever the Court wants.  But I may just need a minute to coordinate with Mr. Browne about what the status of that witness is.

THE COURT:  Okay.  All right.  If we were to break

today, then who would be your witnesses for tomorrow?

MR. BROWNE:  We would begin with Erin Casey from the FBI.  Kathryn Rose with the FBI.  William Gale from Palm Beach Sheriff's Office.  David Gilbert with the FBI.  And Jose Loureiro with the FBI.

THE COURT:  Okay.

Okay.  Mr. Routh, do you have any objection to breaking early today?  Your cross-examinations have been shorter than anticipated, and so we are now well ahead of schedule, which has caused some difficulty in arranging witnesses last minute.

MR. ROUTH:  Yeah, yeah.  No objections.

THE COURT:  Okay.  Well, then I will grant the request to break early today at 3:25, rather than the usual time of 5:30.  Please do, though, make efforts to get witnesses ready for tomorrow.

Mr. Routh, in general, do you anticipate the length of your cross-examinations to be as brief as they have been so far?

MR. ROUTH:  Yes.  I'm -- I'm very simpleminded.  Yes.

THE COURT:  Well, that's not what I'm suggesting.  I'm just asking a pure length-of-examination question.

MR. ROUTH:  Yes.  That's it, yeah.

THE COURT:  Okay.

MR. ROUTH:  Yeah.

THE COURT:  All right, then.  Let's call in the jury so

I can wish them a pleasant evening.

(The jury entered the courtroom at 3:30 p.m.)

THE COURT:  All right.  Thank you.  Everybody may be seated.

Ladies and gentlemen, as I indicated, we are moving at a more efficient rate than anticipated, and so we are going to break early today at 3:30, rather than the usual time of 5:30. Please know, though, that we remain on track as far as the schedule of the trial.  So you shouldn't perceive this early -- earlier day, I should say, as an indication that we will exceed the anticipated schedule that I indicated at the outset.

I'm going to read to you again the standard instructions, as I will do each day before we break.  So please listen carefully.

You are reminded that you are not to discuss this case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply aren't to talk about this case.

Also, remember that you aren't to read or listen to anything touching on this case in any way.  If anyone should try to talk to you about it, please bring it to my attention promptly.  Keep in mind that you must not do any research or make any investigation about the case on your own.  The only evidence is the testimony of the witnesses that you hear in

court and the evidence that is introduced during the official proceedings in the courtroom.

Also remember that you cannot have any contact with the attorneys, parties, or witnesses in the case.  If you happen to see them, please realize they're not being disrespectful or rude.  They are simply required to avoid all contact with you, as you are required to avoid all contact with them.

And finally, remember that you must not form any opinion about this case until all of the evidence has been presented.  You must keep an open mind until you start your deliberations at the end of the case.  So, with that, have a pleasant evening.  We will resume tomorrow at 9:00 a.m.

Let's rise for the jury.

(The jury exited the courtroom at 3:32 p.m.)

THE COURT:  Please have a seat.  Okay.  Before we close for the day, I just want to give each side an opportunity to alert the Court to any evidentiary issues or legal matters that I should address.

Anything from the United States?

MR. SHIPLEY:  No, Your Honor.  Thank you.

THE COURT:  Anything from Mr. Routh?

MR. ROUTH:  Not really.  I just -- if they could turn my light off at the jail so I could sleep, that would be a benefit.  But...

THE COURT:  Okay.  Thank you, Mr. Routh.

We will be concluding today's proceeding.  Now that you know who will be testifying tomorrow, I trust you will be prepared for those examinations.

And if there are, I guess, any exhibits -- does the government know in advance any of the exhibits connected to any of the witnesses for tomorrow?

MR. BROWNE:  Yes, Your Honor.  Tomorrow's witness is a summary witness insofar as we intend to introduce several of the fly-through-type videos.  We presented one of those through Special Agent Fercano that was pre-admitted.  There was another such video, as well as some other graphic summary charts that this witness intends to introduce.

So just as a mechanical matter, it's our plan to present a thumb drive with the voluminous data from which those exhibits are derived to the witness, have her confirm that it's voluminous, and then present the summary charts from that data.  So we will actually be seeking to, as a formal matter, admit the voluminous data in the form of a thumb drive.

I can give the Court those exhibit numbers now that will be contained on the thumb drive.  And those are just the underlying data for the summary charts.

THE COURT:  Okay.  What are the numbers?

MR. BROWNE:  The voluminous data includes Government's Exhibit 1114, 1115, and 1116.  That is drone footage, satellite footage, and laser scanner data.

The thumb drive will also include, Your Honor, Government's Exhibits, pre-admitted already, 1010, 1011, 1012, and 1013.  Those exhibits were admitted by agreement of the parties.  But as a practical matter, because they are also voluminous, we are including them on the same thumb drive so the jury doesn't have to contend with two different portable devices.

THE COURT:  Okay.  And there are no other items on that thumb drive other than the exhibits you have numbered?

MR. BROWNE:  No.  We will confirm that and double-check it, Your Honor, and make sure that those are the only exhibits on this thumb drive.

THE COURT:  Okay.  All right.  Then that is all for today.  Have a good evening.  We will resume tomorrow at 8:45.  Thank you.

MR. SHIPLEY:  8:45, Your Honor?

THE COURT:  Yes, 8:45 in the courtroom for the parties, and then 9:00 with the jury.

(These proceedings concluded at 3:36 p.m.)

C E R T I F I C A T E


I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled matter.


DATE:   09-11-2025          /s/Laura Melton
                            LAURA E. MELTON, RMR, CRR, FPR
                            Official Court Reporter
                            United States District Court
                            Southern District of Florida
                            Fort Pierce, Florida

**$**

**$350** [1]_ - 20:8

**'**

**'70s** [1]_ - 118:11

**0**

**0311** [1]_ - 51:4

**1**

**1** [8]_ - 17:17_, 18:6_, 19:5_, 36:13_, 94:20_, 96:3_, 136:17, 198:7
**1.5** [3]_ - 40:18_, 40:22_, 41:8
**1.52** [1]_ - 40:9
**1/2** [5]_ - 35:3_, 50:1_, 115:15_, 118:6_, 189:8
**10** [1]_ - 176:19
**100** [3]_ - 10:9_, 10:11_, 44:23
**1002** [2]_ - 74:1_, 74:24
**1010** [1]_ - 203:2
**1011** [1]_ - 203:2
**1012** [1]_ - 203:2
**1013** [1]_ - 203:3
**102** [1]_ - 190:19
**107** [1]_ - 88:19
**10:03** [1]_ - 44:7
**10:06** [1]_ - 45:25
**10:08** [1]_ - 47:7
**10th** [1]_ - 114:23
**11** [1]_ - 80:14
**1114** [1]_ - 202:24
**1115** [1]_ - 202:24
**1116** [1]_ - 202:24
**112** [5]_ - 33:21_, 190:17_, 190:22_, 194:6_, 194:14
**1142** [1]_ - 88:20
**11:26** [1]_ - 100:3
**11:27** [1]_ - 100:9
**11:44** [1]_ - 100:9
**11:48** [1]_ - 100:25
**12** [1]_ - 153:20
**12:04** [1]_ - 111:7

**12:05** [1]_ - 111:15
**12:07** [1]_ - 112:17
**12:08** [1]_ - 113:2
**12:44** [1]_ - 29:8
**12:45** [1]_ - 100:7
**12:50** [1]_ - 28:23
**13** [1]_ - 56:2
**1324** [1]_ - 79:9
**14th** [2]_ - 22:2_, 22:13
**15** [24]_ - 44:25_, 55:8_, 55:24_, 56:7_, 56:11_, 56:18_, 59:5_, 59:6_, 59:22_, 91:20_, 91:22_, 99:23_, 99:24_, 100:6_, 103:2_, 108:17_, 154:1_, 154:21_, 172:4_, 172:16_, 177:2_, 179:15_, 181:16_, 188:18
**15-minute** [1]_ - 197:17
**150,000** [1]_ - 41:9
**15th** [28]_ - 14:7_, 15:17_, 16:1_, 18:14_, 19:1_, 19:2_, 19:16_, 22:2_, 24:4_, 28:15_, 28:18_, 34:17_, 35:2_, 35:23_, 37:10_, 37:17_, 56:12_, 56:13_, 56:17_, 57:14_, 57:15_, 57:17_, 68:23_, 86:4_, 101:24_, 117:20_, 118:2_, 189:11
**17** [1]_ - 24:23
**171** [1]_ - 74:16
**175** [1]_ - 166:23
**176** [1]_ - 167:10
**18** [1]_ - 58:15
**18-wheelers** [1]_ - 127:2
**180** [1]_ - 169:25
**181** [1]_ - 7:24
**19** [3]_ - 96:16_, 97:19_, 97:20
**1997** [1]_ - 116:8
**1:05** [1]_ - 112:15
**1:12** [2]_ - 113:2_, 113:9
**1:20** [1]_ - 171:12
**1:24** [1]_ - 79:10
**1:30** [1]_ - 120:10

**2**

**2** [3]_ - 96:3_, 115:15_, 118:6

**20** [3]_ - 13:9_, 17:5_, 148:12
**20-minute** [2]_ - 172:5_, 172:16
**200** [1]_ - 44:23
**200-1A** [9]_ - 65:12_, 65:19_, 65:21_, 124:14_, 134:4_, 134:5_, 156:20_, 157:18_, 164:15
**200-1B** [1]_ - 135:12
**200-2** [3]_ - 67:21_, 154:12_, 154:13
**200-21A** [1]_ - 165:8
**200-21B** [1]_ - 166:2
**200-33** [3]_ - 72:11_, 82:11_, 82:13
**200-35** [1]_ - 90:2
**200-36** [1]_ - 90:22
**200-38** [2]_ - 91:13_, 91:16
**200-47** [2]_ - 68:18_, 71:12
**200-53** [1]_ - 169:2
**200-55** [1]_ - 168:20
**200-57A** [1]_ - 91:24
**200-57B** [1]_ - 92:12
**200-57C** [2]_ - 85:23_, 161:5
**200-57D** [4]_ - 86:8_, 161:15_, 163:15_, 164:1
**200-57E** [3]_ - 89:12_, 162:14_, 163:1
**200-73** [6]_ - 179:3_, 179:22_, 180:3_, 180:4_, 180:9_, 182:10
**200-91** [5]_ - 180:25_, 181:20_, 182:1_, 182:8_, 183:12
**200-92** [3]_ - 180:25_, 181:20_, 182:17
**200-93** [4]_ - 180:25_, 181:21_, 182:1_, 183:17
**200-96** [3]_ - 185:1_, 185:20_, 186:7
**200-97** [3]_ - 185:2_, 185:20_, 186:8
**2007** [1]_ - 22:3
**2013** [1]_ - 50:13
**2017** [1]_ - 50:13
**2019** [1]_ - 176:7
**2023** [1]_ - 48:25
**2024** [31]_ - 19:17_, 20:6_,

34:16_, 35:13_, 35:22_, 53:15_, 53:17_, 54:12_, 54:14_, 55:8_, 55:10_, 55:24_, 56:2_, 56:5_, 56:7_, 56:11_, 56:18_, 59:5_, 59:6_, 59:22_, 91:20_, 91:22_, 103:2_, 108:17_, 154:1_, 154:21_, 155:12_, 177:2_, 179:15_, 181:16_, 189:12
**2025** [1]_ - 49:1
**20s** [1]_ - 121:3
**2288** [1]_ - 184:7
**24-cr-80116-Cannon** [1]_ - 5:8
**240** [1]_ - 7:8
**25** [1]_ - 115:6
**27th** [1]_ - 26:8
**2:30** [3]_ - 22:19_, 56:21_, 172:20
**2:31** [1]_ - 172:23
**2:47** [1]_ - 172:22
**2:51** [1]_ - 172:23
**2:52** [1]_ - 173:2
**2nd** [1]_ - 20:5

**3**

**3** [2]_ - 26:2_, 36:17
**30** [3]_ - 9:11_, 9:12_, 148:12
**300** [2]_ - 44:23_, 94:14
**320** [1]_ - 137:21
**3228** [1]_ - 177:22
**33** [2]_ - 168:2_, 168:13
**342** [1]_ - 194:23
**3:25** [2]_ - 197:21_, 199:13
**3:30** [4]_ - 30:10_, 198:7_, 200:2_, 200:7
**3:32** [1]_ - 201:14
**3:36** [1]_ - 203:19

**4**

**4** [3]_ - 11:24_, 35:3_, 50:1
**40** [2]_ - 7:3_, 31:10
**439A** [4]_ - 130:9_, 130:11_, 130:16_, 130:20
**439B** [1]_ - 132:21
**439C** [1]_ - 132:10
**440** [6]_ - 128:5_, 128:25_,

129:4_, 129:5_, 130:6_, 130:10

**45** [1]_ - 112:8

**45-degree** [1]_ - 107:4

**4:00** [1]_ - 30:10

### 5

**5** [7]_ - 20:21_, 63:19_, 66:22_, 75:8_, 75:16_, 79:2_, 108:18

**5-minute** [1]_ - 7:4

**50** [6]_ - 28:9_, 29:4_, 35:18_, 148:9_, 151:2_, 151:16

**5143** [1]_ - 184:7

**57D** [1]_ - 162:23

**5:30** [2]_ - 199:14_, 200:7

**5th** [12]_ - 16:4_, 59:9_, 59:11_, 59:13_, 59:14_, 67:7_, 68:15_, 68:16_, 79:6_, 80:11_, 101:25_, 156:7

### 6

**6** [8]_ - 55:6_, 66:22_, 66:24_, 75:8_, 75:17_, 76:22_, 173:13_, 176:7

**6-foot** [2]_ - 173:9_, 173:16

**60** [1]_ - 151:17

**60,000** [1]_ - 41:10

**600** [1]_ - 78:23

**600-166** [4]_ - 73:13_, 73:17, 73:21_, 80:10

**600-171** [3]_ - 73:14_, 73:17, 73:21

**615** [1]_ - 6:16

**6:15** [1]_ - 171:12

**6:20** [1]_ - 171:12

**6th** [49]_ - 13:19_, 14:21_, 14:24_, 16:6_, 16:15_, 24:5_, 29:21_, 29:25_, 30:5_, 30:20_, 32:3_, 60:9_, 60:12_, 60:13_, 60:14_, 60:15_, 60:16_, 61:22_, 66:24_, 67:12_, 67:16_, 68:3_, 68:4_, 68:5_, 68:12_, 68:13_, 78:16_, 85:20_, 89:20_, 90:7_, 90:14_, 90:15_, 90:20_, 91:1_, 91:8_, 91:9_, 91:11_,

91:17_, 91:20_, 92:3_, 99:12_, 101:25_, 155:18_, 155:19_, 156:24_, 156:25_, 157:24_, 162:19

### 7

**7.62x39** [1]_ - 97:24

**7.62x39mm** [3]_ - 17:6_, 52:1_, 94:6

**70** [1]_ - 151:17

**7150** [1]_ - 184:7

**75** [1]_ - 148:10

**7723** [1]_ - 184:7

**7th** [1]_ - 27:1

### 8

**80** [1]_ - 40:20

**800** [2]_ - 22:7_, 22:12

**801(d)(1)(C** [1]_ - 146:8

**8:45** [3]_ - 203:14_, 203:16_, 203:17

**8:55** [1]_ - 10:3

**8:58** [1]_ - 11:21

### 9

**9** [2]_ - 21:19_, 189:8

**932** [4]_ - 140:14_, 141:1_, 141:4_, 141:6

**940** [4]_ - 180:24_, 181:21_, 182:3_, 183:24

**95** [2]_ - 31:10_, 33:21

**952** [3]_ - 146:7_, 146:11_, 146:13

**97EEED** [1]_ - 32:18

**9:00** [2]_ - 201:12_, 203:18

**9:40** [1]_ - 38:25

**9:42** [1]_ - 39:8

**9:50** [1]_ - 39:2

**9:55** [2]_ - 39:8_, 39:12

**9:59** [1]_ - 41:20

**9mm** [2]_ - 97:21_, 97:24

### A

**a.m** [16]_ - 11:21_, 29:8_, 38:25_, 39:8_, 39:12_, 41:20_, 44:7_, 45:25_,

47:7_, 56:21_, 100:3_, 100:9_, 100:25_, 201:12

**ability** [2]_ - 117:13_, 143:17

**able** [21]_ - 24:15_, 28:3_, 33:12_, 33:15_, 103:5_, 112:4_, 117:4_, 117:7_, 123:3_, 123:23_, 127:8_, 127:23_, 135:5_, 136:21_, 136:23_, 136:25_, 141:13_, 166:6_, 167:24_, 169:8_, 169:21

**abnormalities** [5]_ - 58:12_, 59:23_, 59:25_, 61:13_, 61:20

**abnormality** [1]_ - 103:18

**about-face** [2]_ - 91:3_, 163:1

**absolutely** [8]_ - 10:16_, 45:17_, 46:15_, 133:10_, 139:3_, 150:7_, 150:8_, 150:17

**abuse** [1]_ - 116:9

**access** [2]_ - 33:23_, 81:15

**accessed** [1]_ - 16:14

**accommodated** [1]_ - 198:16

**accomplish** [2]_ - 25:1_, 164:1

**accordingly** [1]_ - 10:24

**account** [4]_ - 26:1_, 107:19_, 184:6_, 184:7

**accurate** [4]_ - 72:8_, 105:6_, 140:22_, 146:2

**accurately** [12]_ - 73:7_, 74:4_, 74:6_, 87:5_, 87:24_, 88:1_, 91:19_, 91:21_, 128:20_, 168:7_, 179:14

**acquaintance** [1]_ - 20:3

**acquired** [2]_ - 23:18_, 118:8

**acted** [1]_ - 148:15

**acting** [2]_ - 7:11_, 41:2

**action** [5]_ - 20:13_, 40:3_, 55:19_, 102:10_, 108:9

**actions** [2]_ - 16:25_, 19:6

**activate** [1]_ - 23:17

**activity** [2]_ - 61:9_, 188:20

**actual** [4]_ - 22:9_, 27:13

_, 68:25_, 107:1

**acute** [1]_ - 116:20

**ad** [1]_ - 39:17

**ad-lib** [1]_ - 39:17

**Adam** [2]_ - 24:8

**add** [1]_ - 38:20

**addition** [2]_ - 7:23_, 176:9

**additional** [10]_ - 46:9_, 58:16_, 58:21_, 108:4_, 159:7_, 170:11_, 170:13_, 170:25_, 197:24_, 198:2

**additionally** [9]_ - 51:5_, 60:14_, 61:15_, 63:2_, 70:12_, 83:9_, 104:14_, 106:15_, 107:18

**address** [2]_ - 112:4_, 201:18

**addressing** [2]_ - 5:3_, 42:17

**adjacent** [2]_ - 13:18_, 177:8

**adjust** [1]_ - 58:19

**administrative** [1]_ - 178:8

**admissibility** [4]_ - 7:19_, 10:13_, 10:23_, 11:4

**admissible** [3]_ - 41:3_, 41:25_, 42:22

**admission** [4]_ - 8:17_, 13:25_, 73:16_, 74:19

**admit** [6]_ - 6:2_, 73:13_, 128:25_, 140:25_, 179:22_, 202:17

**admitted** [53]_ - 6:6_, 6:9_, 8:8_, 8:11_, 8:15_, 8:19_, 8:22_, 11:11_, 13:24_, 21:17_, 65:8_, 67:21_, 73:19_, 74:13_, 74:16_, 74:22_, 82:11_, 85:23_, 86:9_, 89:12_, 90:2_, 90:22_, 91:13_, 91:24_, 94:19_, 129:4_, 130:14_, 137:23_, 141:5_, 146:12_, 154:17_, 161:5_, 161:15_, 162:14_, 165:8_, 166:2_, 166:23_, 167:10_, 168:2_, 168:20_, 169:25_, 180:2_, 181:25_, 182:7_, 182:16_, 183:16_, 183:23_, 185:24_, 194:23_, 202:10_, 203:2_, 203:3

**admonitions** [1]_ - 44:3

**advance** [3]_ - 35:23_, 80:22_, 202:5

**advanced** [1] - 61:15
**advantage** [1] - 108:23
**advantageous** [3] - 104:12, 110:17, 110:18
**advise** [2] - 12:15, 172:17
**advised** [1] - 177:13
**aerial** [1] - 156:24
**Aeroméxico** [1] - 33:19
**affect** [2] - 117:1, 117:4
**affirm** [5] - 47:21, 113:18, 152:8, 175:1, 187:13
**afternoon** [16] - 33:18, 57:20, 114:4, 114:9, 114:10, 117:21, 119:1, 119:10, 120:10, 152:5, 152:18, 175:16, 175:17, 187:11, 188:3, 188:4
**agencies** [2] - 108:16, 115:14
**agency** [3] - 139:4, 176:2, 188:13
**agent** [43] - 14:19, 15:21, 24:19, 36:19, 48:11, 48:13, 48:14, 48:22, 48:23, 49:2, 49:5, 49:11, 49:12, 49:16, 49:18, 49:20, 49:22, 52:3, 52:5, 52:7, 52:22, 53:22, 53:24, 53:25, 54:2, 55:10, 55:13, 55:14, 55:17, 57:16, 58:7, 99:25, 101:22, 110:15, 111:16, 153:2, 153:4, 157:12, 175:23, 175:25, 188:10, 188:12, 188:16
**AGENT** [4] - 48:2, 152:20, 175:12, 187:24
**Agent** [48] - 15:23, 16:1, 16:5, 16:8, 16:16, 16:18, 16:21, 16:25, 17:4, 17:8, 30:10, 30:25, 31:3, 31:5, 31:12, 31:22, 32:21, 36:17, 36:25, 47:13, 75:4, 84:16, 84:18, 101:1, 111:21, 152:4, 154:19, 157:12, 158:17, 158:21, 159:23, 160:3, 160:5, 160:22, 164:21, 165:6, 166:8, 172:17, 174:20, 176:6, 178:2, 182:25, 184:25, 187:10, 187:12, 202:10

**agents** [6] - 26:9, 33:8, 33:25, 96:13, 160:18, 176:15
**aggressive** [1] - 116:24
**ago** [3] - 11:1, 40:9, 40:19
**agree** [2] - 143:4, 148:16
**agreed** [1] - 65:15
**agreement** [1] - 203:3
**ahead** [24] - 8:8, 8:13, 16:3, 16:5, 29:12, 58:9, 58:11, 59:15, 64:24, 67:7, 123:6, 136:19, 144:15, 155:1, 155:5, 155:7, 156:2, 157:10, 157:13, 157:22, 157:23, 199:9
**aid** [2] - 88:19, 88:22
**aim** [2] - 87:4, 106:12
**aircraft** [2] - 57:1, 57:2
**airplane** [7] - 26:13, 26:17, 26:19, 26:21, 27:5, 27:11, 33:3
**Airport** [9] - 26:20, 27:4, 27:14, 29:9, 33:23, 56:11, 56:22, 57:5, 57:7
**airport** [2] - 27:7, 27:10
**AK** [9] - 63:25, 64:1, 64:12, 79:24, 80:8, 86:21, 89:16, 106:16
**AK-47** [13] - 21:18, 51:23, 51:24, 51:25, 64:1, 64:2, 64:4, 64:10, 64:11, 94:7, 196:8, 196:16, 196:24
**AK-47-style** [3] - 69:15, 81:16, 93:4
**AK-47-type** [1] - 69:17
**AK-style** [4] - 79:24, 80:8, 86:21, 89:16
**alert** [4] - 6:24, 8:23, 192:7, 201:17
**alias** [4] - 23:12, 23:15, 26:1, 34:5
**aliases** [2] - 13:12, 34:2
**alive** [4] - 17:1, 101:8, 101:9, 101:11
**alleged** [1] - 17:17
**alley** [3] - 29:24, 32:9, 32:16
**allotted** [1] - 7:2

**allow** [2] - 41:13, 41:14
**allowed** [1] - 15:10
**almost** [4] - 30:22, 32:6, 128:18, 176:22
**alone** [4] - 99:1, 99:2, 163:15, 171:22
**alternative** [2] - 27:22, 28:2
**amazing** [1] - 40:16
**ambush** [6] - 70:21, 70:22, 70:25, 71:2, 71:21
**ambush-training** [2] - 70:21, 70:22
**Amendment** [2] - 37:20, 38:3
**America** [5] - 5:8, 40:21, 44:23, 45:16, 104:23
**American** [2] - 13:3, 151:15
**ammunition** [26] - 13:10, 17:5, 28:1, 31:8, 35:19, 36:20, 37:9, 38:5, 38:14, 51:24, 51:25, 70:16, 72:9, 93:10, 93:14, 94:5, 94:6, 94:7, 94:8, 94:10, 94:11, 94:16, 96:11, 97:20, 97:22, 97:23
**amount** [1] - 12:3
**analyze** [2] - 98:21, 107:16
**angle** [3] - 91:1, 106:11, 107:4
**angles** [1] - 107:7
**answer** [7] - 104:7, 104:20, 105:10, 109:8, 139:19, 148:25, 196:13
**answers** [1] - 143:18
**anti** [1] - 51:18
**anti-tank** [1] - 51:18
**antiballistic** [1] - 14:17
**anticipate** [3] - 12:7, 100:7, 199:16
**anticipated** [3] - 199:9, 200:6, 200:11
**anticipatorily** [1] - 11:17
**antiques** [1] - 118:15
**anytime** [1] - 10:17
**anyway** [4] - 20:23, 39:18, 139:11, 151:5
**anyway..** [1] - 106:9

**aperture** [1] - 87:4
**apologize** [1] - 46:23
**app** [1] - 172:10
**appear** [7] - 66:12, 67:13, 70:25, 133:11, 135:3, 192:21, 195:10
**appearance** [1] - 121:10
**appearances** [1] - 5:9
**appeared** [6] - 60:1, 63:25, 71:2, 71:6, 103:22, 192:14
**application** [1] - 191:9
**applications** [1] - 176:12
**applies** [3] - 6:22, 18:7, 38:15
**apply** [2] - 116:15, 197:20
**appraiser** [1] - 176:20
**appreciate** [1] - 18:3
**apprehended** [1] - 31:11
**approach** [11] - 6:10, 94:22, 96:17, 97:15, 180:20, 180:24, 181:11, 183:7, 184:22, 191:24, 191:25
**approached** [5] - 29:22, 102:4, 119:9, 124:5, 149:23
**approaching** [6] - 60:11, 60:13, 111:4, 119:11, 151:6, 155:18
**appropriate** [1] - 12:16
**approximate** [6] - 57:19, 77:7, 77:9, 106:24, 106:25, 107:2
**apps** [1] - 26:14
**April** [3] - 34:16, 35:12, 35:22
**Arabs** [1] - 41:9
**area** [59] - 14:23, 15:1, 16:2, 16:5, 25:13, 26:21, 27:9, 31:11, 77:16, 83:3, 86:16, 98:15, 98:17, 102:12, 114:19, 115:20, 115:25, 118:21, 119:25, 138:25, 144:8, 144:9, 144:17, 153:10, 153:17, 155:23, 156:8, 156:17, 157:9, 157:20, 158:13, 158:22, 159:11

_, 159:13_, 159:19_, 160:1_, 160:19_, 161:1_, 161:2_, 163:4_, 163:6_, 164:20_, 164:25_, 167:4_, 167:14_, 169:18_, 169:20_, 169:23_, 170:17_, 170:19_, 170:24_, 171:1_, 171:3_, 171:4_, 171:5_, 177:14_, 178:23_, 192:14

**areas** [3]_ - 106:14_, 118:20_, 165:17

**argument** [5]_ - 10:1_, 39:22_, 40:24_, 41:1_, 42:18

**arguments** [2]_ - 7:11_, 42:1

**arise** [1]_ - 59:16

**arm's** [1]_ - 33:10

**armor** [10]_ - 96:8_, 96:9_, 96:10_, 96:12_, 98:3_, 98:4_, 110:14_, 110:17_, 110:23_, 110:24

**armored** [3]_ - 88:11

**Army** [1]_ - 176:22

**arranging** [1]_ - 199:10

**array** [1]_ - 176:17

**arrest** [3]_ - 33:8_, 34:10_, 185:14

**arrival** [4]_ - 11:25_, 57:22_, 58:4_, 59:10

**arrive** [9]_ - 56:9_, 56:25_, 57:9_, 57:16_, 57:22_, 84:19_, 98:8_, 98:16_, 112:14

**arrived** [11]_ - 56:23_, 57:1_, 57:4_, 57:11_, 57:14_, 57:18_, 57:24_, 57:25_, 85:8_, 112:14_, 171:25

**arriving** [1]_ - 22:12

**arrow** [4]_ - 68:9_, 120:19_, 120:20_, 126:1

**article** [1]_ - 64:22

**articles** [1]_ - 10:20

**assassin** [1]_ - 38:9

**assassinate** [2]_ - 13:4_, 35:21

**assassinated** [1]_ - 35:10

**assassinating** [2]_ - 35:9_, 35:25

**assassination** [11]_ - 17:2_, 18:6_, 19:15_, 21:10_, 21:12_, 24:17_,

27:24_, 35:7_, 36:16_, 177:18_, 189:21

**assault** [5]_ - 51:16_, 51:23_, 51:24_, 51:25_, 94:12

**assault-rifle-type** [1]_ - 94:12

**assaulting** [1]_ - 36:18

**assigned** [11]_ - 16:2_, 34:6_, 49:17_, 49:18_, 55:9_, 55:10_, 55:12_, 81:22_, 110:16_, 154:3_, 188:13

**assignments** [1]_ - 153:7

**assist** [1]_ - 177:23

**assistance** [1]_ - 115:9

**associated** [2]_ - 24:1_, 141:16

**assume** [2]_ - 102:18_, 135:14

**assumed** [1]_ - 144:14

**assumption** [1]_ - 105:23

**AT&T** [1]_ - 23:17

**AT4** [1]_ - 51:17

**athlete** [2]_ - 116:2_, 116:5

**attached** [1]_ - 76:12

**attempt** [10]_ - 13:7_, 18:17_, 18:19_, 18:20_, 21:10_, 22:16_, 24:18_, 27:24_, 61:5_, 189:21

**attempted** [7]_ - 18:6_, 35:2_, 61:3_, 61:6_, 61:24_, 62:4_, 177:17

**attempting** [2]_ - 35:21_, 63:12

**attempts** [1]_ - 38:16

**attention** [6]_ - 55:7_, 117:14_, 153:25_, 177:2_, 189:11_, 200:22

**attested** [1]_ - 18:9

**attitude** [1]_ - 143:21

**attorney** [1]_ - 46:5

**attorneys** [1]_ - 201:4

**audio** [16]_ - 75:10_, 75:25_, 76:14_, 76:24_, 77:11_, 78:7_, 78:25_, 79:14_, 80:3_, 80:17_, 81:9_, 82:2_, 129:9_, 129:18_, 145:24_, 146:21

**August** [10]_ - 20:5_,

21:24_, 22:2_, 22:13_, 24:23_, 26:8_, 34:9_, 35:15_, 48:25

**auto** [2]_ - 196:22

**automatic** [4]_ - 51:12_, 51:17_, 196:8_, 196:16

**available** [2]_ - 142:24_, 198:10

**Avenue** [14]_ - 31:22_, 75:9_, 114:22_, 114:23_, 114:24_, 119:2_, 125:13_, 133:16_, 134:18_, 135:24_, 136:23_, 139:14_, 164:3

**average** [1]_ - 117:11

**Avianca** [1]_ - 33:19

**avoid** [6]_ - 7:17_, 11:8_, 32:8_, 172:14_, 201:6_, 201:7

**awaiting** [1]_ - 192:2

**aware** [5]_ - 6:18_, 8:4_, 41:23_, 195:23_, 196:14

**awesome** [1]_ - 173:25

**axe** [1]_ - 44:22

### B

**backdrop** [2]_ - 70:15_, 107:19

**backed** [4]_ - 123:22_, 127:6_, 144:14_, 144:16

**background** [2]_ - 115:4_, 169:13

**backing** [3]_ - 72:20_, 72:22_, 78:20

**backpack** [11]_ - 137:3_, 137:4_, 161:11_, 162:6_, 166:12_, 167:4_, 167:16_, 169:7_, 169:11_, 170:4_, 170:7

**backpedal** [1]_ - 107:24

**backseat** [2]_ - 192:14_, 192:16

**backwards** [6]_ - 69:21_, 71:20_, 71:22_, 107:13_, 107:22_, 108:13

**bad** [2]_ - 102:12_, 160:15

**bag** [3]_ - 168:25_, 169:11_, 178:21

**bagged** [1]_ - 178:21

**bags** [9]_ - 14:16_, 27:8_, 88:4_, 89:15_, 92:5_, 162:10_, 162:20_, 164:18

**ball** [1]_ - 198:4

**ballistic** [11]_ - 30:19_, 36:10_, 77:17_, 88:14_, 89:3_, 89:5_, 89:9_, 92:5_, 92:8_, 99:11_, 104:13

**bank** [2]_ - 186:16_, 186:19

**barrel** [24]_ - 60:2_, 63:10_, 64:12_, 64:13_, 64:16_, 70:5_, 71:6_, 71:8_, 77:22_, 77:24_, 78:1_, 78:2_, 86:14_, 86:20_, 95:25_, 96:1_, 96:25_, 103:21_, 106:17_, 107:8_, 107:10_, 107:18_, 161:10_, 166:18

**based** [18]_ - 37:14_, 42:16_, 58:10_, 70:17_, 82:13_, 87:1_, 88:5_, 90:16_, 90:19_, 106:22_, 108:15_, 108:16_, 110:15_, 122:22_, 130:1_, 130:10_, 130:22_, 147:17

**baseless** [1]_ - 8:2

**baseline** [4]_ - 61:13_, 61:20_, 103:18_, 103:19

**basis** [3]_ - 10:12_, 10:22_, 172:6

**battle** [1]_ - 176:16

**Bay** [2]_ - 23:2_, 23:4

**Beach** [58]_ - 13:16_, 13:20_, 14:10_, 14:25_, 15:15_, 22:8_, 22:14_, 22:24_, 23:4_, 26:20_, 27:4_, 27:13_, 27:18_, 29:4_, 29:8_, 33:22_, 34:8_, 35:12_, 35:24_, 49:19_, 52:10_, 53:5_, 53:13_, 56:4_, 56:9_, 56:10_, 56:22_, 57:4_, 57:7_, 114:20_, 118:8_, 118:19_, 118:22_, 142:16_, 142:22_, 153:10_, 153:17_, 154:10_, 169:20_, 171:24_, 176:1_, 177:9_, 177:21_, 177:25_, 179:15_, 185:9_, 185:10_, 189:19_, 190:4_, 193:6_, 193:19_, 193:23_, 193:25_, 194:11_, 194:14_, 194:17_, 195:13_, 199:3

**beauty** [1]_ - 45:6

**bed** [1]_ - 192:16

**began** [8]_ - 19:15_, 71:15_, 71:18_, 107:24_, 158:12_, 158:16_, 160:22_, 164:4

**begin** [8]_ - 5:21_, 11:25_, 39:14_, 62:24_, 101:4_, 114:2_, 169:16_, 199:2

**beginning** [6]_ - 62:1_, 62:25_, 65:10_, 101:17_, 122:18_, 131:4

**begins** [1]_ - 67:15

**begun** [1]_ - 69:17

**behind** [18]_ - 69:11_, 70:12_, 76:9_, 83:2_, 83:4_, 85:3_, 90:11_, 104:11_, 134:13_, 156:17_, 157:2_, 157:8_, 157:9_, 157:21_, 158:3_, 158:16_, 158:18_, 159:23

**belief** [1]_ - 196:25

**belong** [1]_ - 185:11

**belonging** [1]_ - 13:10

**belongings** [1]_ - 22:6

**below** [1]_ - 159:12

**belts** [1]_ - 45:14

**bench** [1]_ - 10:3

**Bend** [1]_ - 50:5

**benefit** [2]_ - 198:13_, 201:24

**bent** [1]_ - 167:23

**best** [11]_ - 18:1_, 25:1_, 27:22_, 33:2_, 104:1_, 104:5_, 104:10_, 133:21_, 178:3_, 198:4

**better** [2]_ - 104:14_, 112:4

**between** [12]_ - 23:11_, 24:23_, 25:17_, 30:9_, 67:5_, 80:10_, 88:16_, 89:8_, 114:23_, 136:20_, 139:13_, 143:9

**Beyoncé** [1]_ - 149:9

**beyond** [3]_ - 37:25_, 42:4_, 196:10

**big** [3]_ - 50:5_, 102:25_, 138:12

**biometric** [1]_ - 191:9

**birth** [1]_ - 178:8

**bit** [8]_ - 18:17_, 19:9_, 93:2_, 115:3_, 115:18_, 124:1_, 132:16_, 197:18

**black** [14]_ - 14:20_, 62:25_, 63:3_, 64:7_, 121:25_, 123:17_, 126:19_, 129:21_, 137:14_, 139:2_, 139:16_, 179:20_, 180:17_, 191:23

**Blanford** [2]_ - 11:19_, 12:15

**bloc** [1]_ - 64:7

**blocked** [1]_ - 139:5

**blond** [1]_ - 121:2

**blue** [10]_ - 23:1_, 31:11_, 64:25_, 68:10_, 83:13_, 83:15_, 145:10_, 181:9

**blurry** [2]_ - 183:5_, 183:6

**board** [1]_ - 45:8

**boards** [2]_ - 45:4_, 45:9

**body** [5]_ - 94:16_, 96:12_, 110:14_, 110:24_, 121:12

**Bogotá** [1]_ - 33:19

**boisei** [1]_ - 40:10

**bomb** [2]_ - 170:23_, 192:2

**bonus** [1]_ - 151:14

**booby** [2]_ - 170:24_, 171:6

**booby-trapped** [1]_ - 170:24

**booking** [2]_ - 177:23_, 182:14

**Border** [5]_ - 49:25_, 50:2_, 50:8_, 61:16

**border** [2]_ - 50:4_, 50:5

**born** [2]_ - 115:16_, 115:17

**boss** [1]_ - 98:13

**bothered** [1]_ - 23:7

**bottom** [2]_ - 33:20_, 92:20

**Boulevard** [19]_ - 26:21_, 66:3_, 66:5_, 66:11_, 66:12_, 66:14_, 66:15_, 72:5_, 72:17_, 76:7_, 85:18_, 92:4_, 92:18_, 119:2_, 125:11_, 125:19_, 134:15_, 164:5_, 177:7

**bounds** [2]_ - 43:13_, 46:9

**box** [6]_ - 34:24_, 34:25_, 35:5_, 35:11_, 35:16_, 192:16

**brain** [1]_ - 44:12

**branches** [3]_ - 167:21_, 167:23_, 169:6

**break** [21]_ - 38:22_, 39:7_, 41:17_, 92:25_, 99:23_, 100:1_, 111:3_, 112:9_, 112:11_, 112:25_, 165:22_, 172:5_, 172:17_,

172:18_, 193:15_, 197:17_, 198:14_, 198:25_, 199:13_, 200:7_, 200:14

**breaking** [2]_ - 100:7_, 199:7

**breaks** [1]_ - 35:1

**Brian** [2]_ - 23:12_, 34:5

**brick** [1]_ - 45:7

**bridge** [1]_ - 45:9

**brief** [4]_ - 39:7_, 111:2_, 128:19_, 199:17

**briefly** [6]_ - 7:8_, 8:7_, 18:16_, 36:15_, 37:18_, 100:23

**bring** [5]_ - 36:23_, 37:15_, 118:12_, 137:20_, 200:22

**broad** [2]_ - 29:19_, 44:22

**broadcasting** [1]_ - 79:17

**broke** [1]_ - 167:23

**broken** [2]_ - 169:6_, 193:14

**brokering** [1]_ - 20:11

**brothers** [1]_ - 45:13

**brought** [2]_ - 26:17_, 184:17

**BROWNE** [10]_ - 6:8_, 6:15_, 6:20_, 8:7_, 10:6_, 10:9_, 199:2_, 202:7_, 202:23_, 203:10

**Browne** [6]_ - 5:12_, 6:7_, 8:6_, 197:23_, 198:19_, 198:23

**bruised** [1]_ - 45:10

**brush** [6]_ - 156:1_, 158:14_, 159:6_, 164:7_, 164:13_, 165:18

**bucket** [1]_ - 45:2

**budding** [1]_ - 41:14

**bug** [1]_ - 30:21

**building** [1]_ - 194:19

**Bulgaria** [2]_ - 50:24_, 94:13

**bullet** [1]_ - 107:8

**bulletproof** [11]_ - 14:18_, 60:3_, 60:4_, 63:6_, 70:6_, 77:17_, 84:14_, 86:14_, 88:13_, 88:17_, 103:22

**bunch** [1]_ - 22:7

**Bureau** [4]_ - 98:16_, 99:17_, 175:20_, 188:6

**burner** [2]_ - 13:11_, 23:18

**bush** [4]_ - 159:23_, 159:25_, 164:5_, 165:23

**bushes** [21]_ - 15:2_, 16:9_, 24:5_, 30:4_, 32:6_, 120:22_, 122:4_, 126:3_, 139:1_, 147:13_, 147:15_, 147:18_, 158:8_, 158:18_, 159:7_, 160:8_, 163:10_, 164:6_, 164:9_, 164:24_, 165:2

**business** [1]_ - 171:20

**but..** [1]_ - 201:24

**button** [1]_ - 96:6

**button-down** [1]_ - 96:6

**buy** [2]_ - 15:10_, 143:3

**BY** [102]_ - 48:5_, 59:3_, 65:6_, 65:20_, 66:10_, 67:23_, 68:20_, 72:13_, 73:23_, 75:3_, 75:11_, 75:15_, 76:2_, 76:15_, 76:20_, 77:1_, 77:6_, 77:13_, 78:9, 78:18_, 79:1_, 79:15_, 80:4_, 80:18_, 81:10_, 82:3, 82:12_, 86:1_, 86:11, 86:18_, 87:7_, 89:1_, 89:14_, 90:4_, 90:24_, 91:15_, 92:1_, 92:14_, 95:8_, 96:20_, 97:17_, 101:6, 101:16_, 105:13, 105:22, 108:11_, 109:14, 110:13_, 114:8, 120:16, 125:7, 128:7_, 129:12, 129:19_, 130:21_, 131:16, 132:12, 132:22, 134:7, 135:19, 138:1_, 140:15, 141:11, 145:17, 146:22_, 148:2, 149:6, 149:20_, 152:23_, 154:18_, 156:22_, 161:7_, 161:17, 162:16, 162:24, 164:16, 165:10_, 166:4_, 167:1_, 167:12, 168:4_, 168:21_, 169:4_, 170:2_, 173:8_, 175:15_, 179:5_, 180:12, 180:23_, 181:13_, 182:6, 182:12, 182:18_, 182:24_, 183:10_, 184:24_, 186:14_, 188:2_, 190:9_, 195:1_, 195:21_, 196:15

---

C

---

**calendar** [1]_ - 10:12

**caliber** [6]_ - 28:9_, 35:18

_, 94:15_, 96:11_, 96:14_, 97:22

**California** [1]_ - 94:3

**callout** [1]_ - 190:14

**calm** [2]_ - 117:5_, 117:8

**cam** [6]_ - 145:22_, 161:12 _, 161:24_, 166:12_, 167:4_, 167:16

**camera** [7]_ - 14:20_, 27:13_, 28:25_, 99:11_, 162:20_, 164:18_, 179:9

**cameras** [1]_ - 27:17

**camo** [1]_ - 180:16

**camo-colored** [1]_ - 180:16

**camouflage** [1]_ - 183:21

**campaign** [5]_ - 14:9_, 22:25_, 26:16_, 27:6_, 28:22

**camping** [2]_ - 25:9_, 62:21

**Candidate** [3]_ - 27:24_, 28:16_, 189:18

**candidate** [14]_ - 13:6_, 14:8_, 15:4_, 18:7_, 18:8 _, 21:25_, 26:18_, 38:17_, 52:18_, 54:11_, 54:12_, 84:23_, 154:5

**candidate's** [1]_ - 27:19

**candidates** [2]_ - 18:11_, 52:9

**Cannon** [6]_ - 18:5_, 18:18_, 36:14_, 37:12_, 37:21_, 38:5

**cannot** [9]_ - 12:25_, 21:7 _, 40:18_, 67:4_, 69:7_, 92:7_, 104:20_, 105:1_, 201:3

**cans** [1]_ - 192:18

**capture** [3]_ - 67:6_, 73:7 _, 163:15

**car** [24]_ - 22:6_, 23:10_, 23:24_, 27:7_, 29:3_, 29:24_, 32:6_, 32:10_, 33:16_, 122:9_, 122:21_, 123:14_, 126:21_, 129:23 _, 132:6_, 134:23_, 135:7 _, 140:4_, 145:22_, 192:8 _, 192:10_, 192:21_, 192:22_, 195:24

**Carbine** [1]_ - 51:16

**card** [4]_ - 181:9_, 184:1_, 184:4_, 184:8

**cardboard** [1]_ - 30:18

**cards** [2]_ - 186:16_, 186:19

**care** [1]_ - 40:6

**carefully** [3]_ - 13:8_, 122:14_, 200:15

**caring** [1]_ - 40:15

**Carolina** [8]_ - 15:9_, 19:19_, 21:20_, 22:4_, 22:8_, 23:16_, 34:11_, 189:6

**carry** [1]_ - 112:9

**carrying** [2]_ - 121:23_, 121:24

**cars** [7]_ - 136:10_, 136:20 _, 136:22_, 148:6_, 148:17_, 148:19_, 151:17

**cart** [50]_ - 16:5_, 60:17_, 60:18_, 60:20_, 60:21_, 60:22_, 60:24_, 63:12_, 67:14_, 69:6_, 69:14_, 69:18_, 71:16_, 71:17_, 72:16_, 75:13_, 75:17_, 75:21_, 82:9_, 84:12_, 85:17_, 89:21_, 90:8_, 91:2_, 91:17_, 92:16_, 92:19_, 92:21_, 92:22_, 101:20_, 101:25_, 102:4_, 102:5_, 102:6_, 102:11_, 103:3_, 103:7_, 103:17_, 106:1_, 107:21_, 108:13_, 108:19_, 108:20_, 155:24 _, 155:25_, 156:3_, 156:4 _, 156:16_, 157:3_, 160:1

**cartridge** [1]_ - 93:9

**case** [55]_ - 5:5_, 5:7_, 6:14_, 13:17_, 14:5_, 14:14_, 15:19_, 17:19_, 17:22_, 18:2_, 18:6_, 18:12_, 18:18_, 19:14_, 20:16_, 20:22_, 21:6_, 21:13_, 24:7_, 25:12_, 28:13_, 31:19_, 35:21_, 36:23_, 37:6_, 37:13_, 37:16_, 37:19_, 37:23_, 37:24_, 38:2_, 38:6_, 38:7 _, 41:6_, 42:1_, 42:5_, 42:15_, 44:11_, 45:17_, 46:15_, 46:16_, 83:8_, 140:5_, 172:7_, 172:9_, 200:16_, 200:18_, 200:19 _, 200:21_, 200:24_, 201:4_, 201:9_, 201:11

**Case** [1]_ - 5:8

**Casey** [1]_ - 199:2

**cash** [1]_ - 24:3

**catch** [1]_ - 135:5

**catches** [1]_ - 135:6

**category** [1]_ - 8:18

**caught** [4]_ - 31:12_, 109:12_, 109:15_, 143:7

**caused** [2]_ - 40:20_, 199:10

**cease** [1]_ - 149:14

**celebrate** [2]_ - 151:16_, 151:17

**cell** [8]_ - 22:7_, 24:9_, 24:10_, 29:23_, 30:6_, 35:13_, 36:3_, 178:11

**cement** [1]_ - 67:13

**center** [9]_ - 88:5_, 90:10 _, 92:24_, 132:17_, 134:1 _, 158:1_, 168:13_, 169:14_, 195:7

**certain** [15]_ - 51:10_, 51:11_, 57:6_, 63:13_, 64:5_, 65:8_, 65:15_, 72:25_, 75:21_, 76:12_, 84:18_, 101:22_, 102:16_, 102:19_, 103:20

**certainly** [9]_ - 28:12_, 42:10_, 43:1_, 43:3_, 100:18_, 103:24_, 109:12 _, 198:3_, 198:12

**certifications** [1]_ - 51:6

**chaff** [1]_ - 44:22

**chain** [6]_ - 76:10_, 104:25_, 106:13_, 106:16 _, 109:11_, 109:12

**chain-link** [6]_ - 76:10_, 104:25_, 106:13_, 106:16 _, 109:11_, 109:12

**challenges** [1]_ - 116:10

**chamber** [2]_ - 17:9_, 19:3

**chambered** [2]_ - 30:23 _, 51:25

**Championship** [1]_ - 58:16

**chance** [2]_ - 74:3_, 198:19

**changed** [1]_ - 128:15

**changes** [1]_ - 27:23

**character** [1]_ - 42:21

**character-related** [1]_ - 42:21

**characterize** [4]_ - 69:1 _, 69:3_, 89:18_, 94:9

**charge** [3]_ - 17:17_,

53:22_, 54:2

**charged** [3]_ - 18:5_, 35:20_, 110:8

**charges** [3]_ - 17:19_, 20:22_, 37:24

**chart** [3]_ - 9:10_, 9:12_, 10:14

**charts** [3]_ - 202:11_, 202:16_, 202:21

**check** [1]_ - 203:10

**checked** [4]_ - 20:12_, 29:6_, 29:10_, 178:18

**checking** [6]_ - 23:8_, 101:18_, 101:20_, 102:2_, 102:15_, 102:23

**chef** [2]_ - 116:13_, 116:14

**cherish** [1]_ - 44:17

**childhood** [1]_ - 115:19

**children** [3]_ - 44:20_, 153:13_, 188:15

**Chinese** [2]_ - 14:14_, 21:22

**Chinese-made** [1]_ - 14:14

**choice** [2]_ - 13:3_, 104:24

**choose** [1]_ - 110:14

**chooses** [2]_ - 12:5_, 95:3

**chose** [1]_ - 150:23

**chosen** [1]_ - 10:2

**CHRISTOPHER** [2]_ - 187:20_, 187:24

**Christopher** [3]_ - 5:12_, 187:10_, 187:20

**chugging** [1]_ - 45:14

**circle** [19]_ - 66:24_, 67:3 _, 67:17_, 68:3_, 68:13_, 77:19_, 77:24_, 82:16_, 86:5_, 86:22_, 89:6_, 155:21_, 156:5_, 157:17_, 161:21_, 161:25_, 162:8_, 165:20_, 169:10

**circled** [5]_ - 87:18_, 90:10_, 92:21_, 92:24_, 162:11

**circling** [5]_ - 68:9_, 78:10_, 91:6_, 169:13_, 195:6

**circumstances** [2]_ - 108:17_, 198:4

**circumstantial** [2]_ - 37:13_, 37:14

**civilian** [5] - 31:15, 70:13, 70:16, 72:9, 107:19

**civilized** [1] - 40:11

**clack** [1] - 45:8

**clarification** [1] - 190:8

**clean** [1] - 141:15

**clear** [19] - 9:15, 15:3, 15:6, 21:2, 46:8, 46:17, 57:12, 74:16, 92:19, 126:5, 127:19, 135:17, 137:24, 143:8, 144:17, 158:7, 167:24, 171:2, 171:3

**cleared** [5] - 158:13, 164:25, 165:18, 169:8, 192:4

**clearing** [2] - 164:6, 164:9

**clearly** [1] - 42:4

**clients** [1] - 115:7

**clip** [4] - 146:17, 147:2, 197:17, 198:1

**close** [17] - 22:23, 22:24, 114:25, 117:14, 122:9, 122:11, 135:5, 136:15, 147:10, 164:11, 164:24, 168:22, 168:23, 176:16, 192:8, 192:10, 201:15

**close-quarter** [1] - 176:16

**close-up** [2] - 168:22, 168:23

**closer** [7] - 58:21, 93:15, 93:16, 102:14, 132:16, 160:1, 164:3

**clothing** [4] - 64:22, 83:11, 145:8, 178:16

**club** [1] - 29:10

**Club** [24] - 13:20, 14:25, 22:19, 23:11, 24:23, 29:5, 57:9, 57:14, 57:16, 57:23, 57:25, 58:14, 58:15, 65:4, 66:19, 115:1, 118:21, 155:10, 177:10, 177:22, 193:23, 193:24, 194:14, 195:13

**clue** [1] - 142:7

**clues** [2] - 37:15, 37:16

**cognizant** [1] - 70:15

**collateral** [1] - 188:19

**colleagues** [1] - 79:18

**collected** [1] - 171:19

**college** [1] - 116:7

**collision** [1] - 176:20

**Colombia** [1] - 33:20

**color** [5] - 180:17, 183:3, 183:20, 183:22, 191:22

**colored** [4] - 121:6, 121:7, 180:14, 180:16

**combatant** [1] - 102:8

**comfortable** [2] - 35:8, 35:25

**coming** [18] - 10:18, 20:21, 34:23, 56:3, 120:18, 120:22, 122:4, 122:19, 126:2, 129:25, 135:21, 138:2, 145:25, 156:15, 157:21, 158:7, 158:9, 159:3

**command** [2] - 178:22, 184:18

**comment** [1] - 197:9

**commentary** [3] - 108:4, 174:3, 197:3

**commitment** [1] - 43:14

**common** [1] - 31:24

**communicate** [2] - 40:14, 83:25

**communicated** [1] - 84:1

**communicating** [1] - 25:21

**communication** [2] - 26:7, 79:20

**communications** [8] - 21:3, 26:5, 26:10, 33:13, 72:24, 73:5, 90:16, 93:4

**community** [1] - 115:19

**Company** [1] - 176:21

**compared** [1] - 97:24

**compensate** [1] - 38:21

**completed** [1] - 21:1

**completely** [1] - 121:25

**Complies** [5] - 95:18, 162:1, 162:9, 165:21, 169:12

**comply** [1] - 7:20

**components** [1] - 35:17

**comprehensive** [1] -

141:20

**conceal** [2] - 26:2, 102:12

**concealed** [4] - 92:9, 92:10, 103:10, 103:11

**concealing** [1] - 23:14

**concealment** [2] - 82:24, 83:20

**concern** [5] - 32:17, 42:14, 119:24, 120:4, 170:25

**concerned** [2] - 150:23

**concerns** [1] - 122:22

**conclude** [4] - 10:1, 45:22, 184:18, 195:14

**concluded** [1] - 203:19

**concludes** [2] - 39:6, 47:9

**concluding** [1] - 202:1

**conclusion** [1] - 110:10

**condition** [2] - 181:15, 185:16

**Condon** [1] - 58:18

**conduct** [5] - 24:25, 27:22, 38:1, 174:6, 192:2

**conducted** [1] - 190:25

**conducting** [1] - 25:20

**conference** [1] - 6:3

**confirm** [4] - 100:11, 191:11, 202:15, 203:10

**confirmed** [4] - 35:13, 36:6, 61:2

**confirming** [2] - 81:15, 107:17

**confronted** [1] - 30:11

**Congress** [42] - 31:21, 32:4, 53:14, 66:4, 66:17, 75:9, 114:22, 114:23, 119:2, 119:5, 119:8, 119:13, 120:13, 120:18, 125:10, 125:12, 125:13, 125:14, 125:16, 125:19, 125:25, 133:16, 134:14, 134:18, 135:1, 135:7, 135:9, 135:24, 136:2, 136:4, 136:13, 136:23, 137:9, 138:14, 138:20, 139:6, 147:11, 148:7, 148:9, 164:3, 173:14

**connect** [1] - 24:12

**connected** [1] - 202:5

**conscious** [2] - 85:3, 102:11

**consider** [4] - 9:25, 36:23, 41:5, 118:11

**considerably** [1] - 97:24

**consideration** [2] - 18:11, 20:14

**consistent** [3] - 7:7, 16:22, 38:11

**console** [1] - 33:18

**constantly** [1] - 58:11

**Constitution** [3] - 42:9, 42:12, 43:16

**contact** [22] - 20:4, 32:8, 61:4, 61:5, 61:6, 61:21, 61:24, 62:3, 62:5, 62:7, 62:21, 70:4, 84:2, 84:5, 107:23, 158:4, 172:7, 178:9, 191:4, 201:3, 201:6, 201:7

**contacted** [2] - 28:4, 28:8

**contacts** [1] - 35:4

**contain** [1] - 11:3

**contained** [2] - 192:17, 202:20

**contend** [1] - 203:6

**continually** [1] - 71:6

**continue** [18] - 14:1, 39:23, 41:7, 42:6, 44:9, 59:1, 66:9, 75:24, 76:13, 76:23, 77:2, 77:10, 78:6, 78:17, 131:14, 157:1, 197:20, 198:12

**continued** [6] - 32:9, 46:14, 102:17, 133:15, 160:4, 197:19

**contractor** [1] - 153:23

**contribute** [1] - 41:12

**converged** [1] - 161:1

**conversation** [4] - 141:24, 143:9, 145:18, 146:3

**conversations** [1] - 172:7

**conversing** [1] - 178:5

**conveyed** [1] - 79:8

**convicted** [7] - 15:10, 15:12, 15:13, 28:3, 37:8, 38:4

**cool** [5]- - 150:4_, 196:7
**Cooper** [5]- - 19:21_, 19:22_, 20:5_, 20:10_, 28:8
**cooperation** [1]- - 40:15
**coordinate** [1]- - 198:23
**coordination** [2]- - 84:6_, 87:3
**copy** [1]- - 6:8
**cordial** [1]- - 149:21
**cordon** [2]- - 98:15_, 98:17
**corner** [7]- - 32:3_, 136:3_, 147:11_, 157:14_, 158:13_, 168:16
**Corps** [17]- - 49:24_, 50:9_, 50:11_, 50:12_, 50:17_, 50:18_, 50:21_, 51:2_, 51:3_, 51:10_, 51:15_, 60:5_, 61:14_, 63:4_, 88:9_, 88:15_, 108:16
**correct** [72]- - 17:5_, 27:25_, 50:10_, 57:3_, 57:11_, 57:16_, 57:24_, 64:2_, 68:14_, 69:9_, 69:12_, 69:13_, 71:10_, 72:21_, 72:25_, 75:17_, 75:18_, 75:20_, 76:5_, 76:7_, 76:8_, 76:11_, 76:17_, 81:2_, 81:21_, 83:18_, 84:24_, 88:7_, 89:10_, 89:24_, 90:11_, 90:12_, 90:14_, 90:15_, 90:18_, 90:19_, 91:5_, 93:25_, 94:8_, 94:17_, 97:4_, 97:13_, 99:12_, 99:14_, 102:1_, 102:3_, 102:16_, 103:25_, 109:17_, 114:15_, 118:24_, 119:5_, 132:7_, 132:18_, 135:21_, 137:15_, 153:17_, 153:18_, 154:5_, 154:6_, 154:16_, 157:25_, 159:12_, 159:18_, 159:25_, 164:11_, 167:19_, 171:15_, 173:15_, 191:6_, 192:7_, 193:15
**cost** [1]- - 28:9
**costs** [1]- - 172:15
**Counsel** [1]- - 5:9
**counsel** [5]- - 5:19_, 41:2_, 46:2_, 46:20
**counsel's** [1]- - 124:24
**counselor** [1]- - 114:14
**Count** [6]- - 17:17_, 18:6_, 19:5_, 20:21_, 36:13_,

36:17
**countered** [1]- - 42:2
**countersniper** [16]- - 80:23_, 80:25_, 82:7_, 83:10_, 83:21_, 84:1_, 84:5_, 93:19_, 97:8_, 99:4_, 157:8_, 158:4_, 160:3_, 161:1_, 165:6
**countersnipers** [2]- - 159:2_, 159:3
**countless** [2]- - 61:12_, 70:21
**country** [3]- - 12:23_, 13:14_, 34:14
**counts** [1]- - 36:14
**County** [25]- - 23:5_, 27:18_, 33:8_, 52:10_, 53:13_, 142:16_, 142:22_, 144:6_, 144:7_, 144:10_, 144:12_, 177:21_, 177:25_, 179:15_, 185:9_, 185:10_, 190:3_, 190:4_, 190:25_, 191:5_, 193:19_, 193:20_, 194:13_, 196:4
**couple** [11]- - 21:5_, 25:18_, 29:23_, 53:21_, 117:25_, 131:10_, 135:8_, 136:9_, 139:13_, 146:17_, 192:17
**couples** [1]- - 115:11
**Course** [6]- - 22:23_, 29:20_, 53:11_, 55:17_, 58:16_, 154:20
**course** [75]- - 8:3_, 8:13_, 8:19_, 9:23_, 13:12_, 14:9_, 14:10_, 14:22_, 16:6_, 19:16_, 25:18_, 29:22_, 31:21_, 39:4_, 53:2_, 53:8_, 53:9_, 53:10_, 54:18_, 54:21_, 56:19_, 58:7_, 58:11_, 58:13_, 59:2_, 59:4_, 59:8_, 59:11_, 59:19_, 60:6_, 60:9_, 61:15_, 64:17_, 64:20_, 65:25_, 66:19_, 66:20_, 66:21_, 67:25_, 68:2_, 68:25_, 69:12_, 72:16_, 72:17_, 75:6_, 76:4_, 76:6_, 78:15_, 79:18_, 81:15_, 85:17_, 89:17_, 89:18_, 90:20_, 92:4_, 92:17_, 101:19_, 102:9_, 125:9_, 154:9_, 155:1_, 155:15_, 156:24_, 159:17_, 159:19_, 159:20_, 161:9_, 162:3_, 162:19_, 166:20_, 167:6_, 172:6_, 174:13_, 177:9_, 178:23

**Court** [22]- - 5:1_, 5:3_, 6:10_, 8:8_, 8:24_, 9:22_, 10:14_, 10:15_, 10:19_, 12:11_, 12:21_, 13:24_, 18:9_, 18:17_, 112:5_, 135:15_, 190:8_, 197:25_, 198:21_, 198:22_, 201:17_, 202:19
**court** [7]- - 7:19_, 48:7_, 112:8_, 129:25_, 138:2_, 145:25_, 201:1
**COURT** [231]- - 5:2_, 5:5_, 5:14_, 5:17_, 5:20_, 5:25_, 6:11_, 6:17_, 6:21_, 7:2_, 8:10_, 9:2_, 9:5_, 9:13_, 9:15_, 9:18_, 10:8_, 11:1_, 11:8_, 11:13_, 11:16_, 11:20_, 11:22_, 12:12_, 13:21_, 19:8, 19:11_, 35:3_, 38:18_, 38:20_, 39:1_, 39:9_, 39:11_, 39:13_, 39:23_, 40:25_, 41:16_, 41:21_, 42:11_, 42:20_, 43:2_, 43:4_, 43:10_, 43:12_, 43:17_, 43:20_, 43:24_, 44:3_, 44:6_, 44:8_, 45:21_, 46:1_, 46:8_, 46:12_, 47:1_, 47:6_, 47:8_, 47:14_, 48:1_, 58:18_, 58:25_, 65:5_, 65:9_, 65:13_, 66:6_, 67:22_, 68:19_, 72:12_, 73:15_, 73:19_, 74:9_, 74:12_, 74:15_, 74:19_, 74:22_, 75:2_, 78:24_, 79:13_, 80:2_, 80:16_, 81:8_, 82:1_, 85:24_, 86:10_, 88:21_, 88:24_, 89:13_, 90:3_, 90:23_, 91:14_, 91:25_, 92:13_, 94:21_, 94:24_, 95:4_, 96:19_, 97:16_, 99:21_, 100:4_, 100:10_, 100:14_, 100:16_, 100:19_, 100:21_, 100:22_, 101:1_, 101:13_, 105:9_, 105:19_, 108:3_, 108:7_, 108:10_, 109:7_, 110:11_, 111:2_, 111:8_, 111:12_, 111:14_, 111:16_, 111:20_, 112:1_, 112:6_, 112:10_, 112:18_, 112:23_, 112:25_, 113:3_, 113:7_, 113:8_, 113:10_, 113:14_, 114:2_, 124:16_, 124:20_, 128:6_, 129:1_, 129:3_, 129:7_, 130:8_, 130:11_, 130:14_, 131:9_, 131:13_, 141:2_, 141:4_, 141:9_, 145:15_, 146:9_, 146:11_, 146:15_, 146:20_

147:24_, 149:3_, 149:11_, 149:14_, 149:16_, 151:18_, 151:20_, 151:23_, 152:1_, 152:5, 152:17_, 154:13_, 154:16_, 156:21_, 161:6_, 161:16_, 162:15_, 165:9_, 166:3_, 166:24_, 167:11_, 168:3_, 169:3_, 170:1_, 172:3_, 172:21_, 172:24_, 173:3_, 174:5_, 174:8_, 174:15_, 174:18_, 174:20_, 174:23_, 175:11_, 179:4_, 179:24_, 180:2_, 180:7_, 180:22_, 181:12_, 181:22_, 181:24_, 182:5_, 182:23_, 183:8_, 184:23_, 185:22_, 185:24_, 186:3_, 186:6_, 186:10_, 187:1_, 187:4_, 187:8_, 187:11_, 187:23_, 194:24_, 195:19_, 196:13_, 197:4_, 197:8_, 197:14_, 197:16_, 197:22_, 198:15_, 198:25_, 199:6_, 199:12_, 199:20_, 199:23_, 199:25_, 200:3_, 201:15_, 201:21_, 201:25_, 202:22_, 203:8_, 203:13_, 203:17
**Court's** [6]- - 7:6_, 43:21_, 46:17_, 124:18_, 146:18_, 198:8
**courthouse** [2]- - 9:19_, 9:21
**COURTROOM** [16]- - 5:7_, 5:24_, 47:20_, 47:25_, 58:24_, 113:17_, 113:22_, 124:21_, 124:24_, 131:12_, 152:7_, 152:12_, 175:1_, 175:5_, 187:13_, 187:17
**courtroom** [35]- - 6:14_, 6:18_, 6:23_, 11:21_, 20:7_, 20:9_, 23:19_, 31:17_, 38:25_, 39:12_, 41:20_, 43:25_, 44:7_, 45:25_, 47:7_, 64:20_, 100:3_, 100:5_, 100:25_, 111:7_, 111:15_, 112:17_, 113:9_, 145:5_, 145:14_, 146:24_, 172:20_, 172:21_, 172:25_, 173:2_, 197:21_, 200:2_, 201:2_, 201:14_, 203:17
**cover** [8]- - 16:23_, 82:23_, 83:19_, 83:20_, 104:11_, 156:17_, 157:1_, 157:2
**covered** [3]- - 63:11_,

158:15

**covering** [1]_ - 30:18
**crackers** [1]_ - 192:17
**crafted** [2]_ - 13:8_, 46:5
**Craigslist** [1]_ - 28:5
**crawl** [3]_ - 165:18_, 167:25, 170:22
**crawled** [1]_ - 165:14
**created** [2]_ - 21:21_, 26:1
**credit** [2]_ - 151:9_, 151:11
**crime** [14]_ - 15:19, 98:15_, 98:18_, 98:21, 98:23_, 115:22, 170:14_, 170:16_, 170:20_, 171:10_, 171:16_, 171:18, 171:23_, 188:14
**Crime** [4]_ - 48:14_, 177:23, 178:11, 178:17
**Crimes** [1]_ - 176:1
**crimes** [4]_ - 49:14_, 176:4_, 176:9, 188:14
**criminal** [3]_ - 102:8_, 188:14_, 188:20
**cross** [18]_ - 11:6_, 100:11_, 100:16_, 101:4_, 122:18_, 126:4_, 126:9_, 126:10, 126:16, 147:24_, 173:5_, 174:6_, 186:11_, 195:19, 198:3_, 199:8_, 199:17
**CROSS** [5]_ - 101:5_, 148:1_, 173:7_, 186:13_, 195:20
**cross-examination** [7]_ - 100:16_, 101:4_, 147:24_, 173:5_, 174:6_, 186:11_, 195:19
**CROSS-EXAMINATION** [5]_ - 101:5_, 148:1_, 173:7_, 186:13_, 195:20
**cross-examinations** [3]_ - 198:3_, 199:8_, 199:17
**cross-examine** [1]_ - 100:11
**crossed** [7]_ - 40:10_, 122:7_, 123:3_, 123:7_, 123:13_, 123:16, 132:3
**crosses** [3]_ - 45:9_, 126:11_, 126:15
**crossing** [1]_ - 11:9

**crossroads** [1]_ - 53:13
**crouched** [1]_ - 104:13
**crouching** [1]_ - 104:5
**crystal** [1]_ - 198:4
**CS** [2]_ - 80:22_, 80:25
**cues** [1]_ - 117:14
**curiosity** [1]_ - 149:22
**current** [5]_ - 16:4_, 58:10_, 83:6_, 189:24_, 189:25
**curriculum** [1]_ - 61:16
**custody** [4]_ - 191:6_, 194:5_, 195:14_, 196:2
**Customs** [1]_ - 153:23
**cut** [2]_ - 45:4_, 167:5
**cutaway** [1]_ - 166:5
**cutout** [2]_ - 165:13_, 165:15
**cutting** [2]_ - 61:17_, 103:17

### D

**D-O-M-I-N-I-C-K** [1]_ - 175:9
**daily** [1]_ - 26:13
**Dallas** [2]_ - 115:17_, 116:12
**danger** [2]_ - 69:20_, 71:4
**dangerous** [2]_ - 102:9_, 135:2
**dark** [5]_ - 19:16_, 29:24_, 30:17_, 32:9_, 32:15
**darker** [3]_ - 121:6_, 121:9_, 145:10
**dash** [1]_ - 145:21
**data** [12]_ - 24:9_, 24:11_, 29:23_, 30:7_, 35:14_, 106:8_, 202:14_, 202:16_, 202:18_, 202:21_, 202:23_, 202:25
**date** [4]_ - 24:4_, 29:2_, 178:8
**dates** [1]_ - 19:13
**daughter** [1]_ - 22:5
**David** [1]_ - 199:4
**dawn** [1]_ - 14:7
**day-to-day** [1]_ - 117:7
**days** [2]_ - 54:24
**deactivated** [1]_ - 95:1
**dead** [1]_ - 21:4

**deadly** [2]_ - 13:8_, 35:17
**deal** [5]_ - 20:11_, 20:13_, 138:12_, 150:4_, 150:5
**dealers** [1]_ - 28:4
**dear** [1]_ - 44:16
**debit** [3]_ - 184:3_, 184:4_, 184:8
**debris** [2]_ - 166:13_, 167:17
**decades** [1]_ - 45:11
**decency** [1]_ - 44:12
**decided** [8]_ - 13:2_, 19:18, 31:25_, 102:5_, 116:11_, 118:13_, 136:18_, 158:7
**decides** [1]_ - 40:3
**decision** [5]_ - 72:1_, 85:3_, 102:11_, 123:7_, 163:8
**decisions** [1]_ - 37:14
**defendant** [128]_ - 7:10_, 10:10_, 10:17_, 10:24_, 12:22_, 13:2_, 13:11_, 14:6_, 14:10_, 14:21_, 14:22_, 15:1_, 15:5_, 15:6_, 15:12_, 15:14_, 17:15_, 18:14_, 18:24_, 19:17_, 20:3_, 20:4_, 20:8_, 20:11_, 20:17_, 20:22_, 21:2_, 21:9_, 21:15_, 21:17_, 21:20_, 21:23_, 22:2_, 22:12_, 22:13_, 22:17_, 23:10_, 23:14_, 23:17_, 23:22_, 24:1_, 24:3_, 24:22_, 25:2_, 25:3_, 25:8_, 25:13_, 25:14_, 25:16_, 25:18_, 26:15_, 26:23_, 26:24_, 27:2_, 27:15_, 27:17_, 27:21_, 28:13_, 28:16_, 28:19_, 28:23_, 29:1_, 29:16_, 29:22_, 30:3_, 30:8_, 30:11_, 30:13_, 30:22_, 31:4_, 31:5_, 31:8_, 31:9_, 31:10_, 32:5_, 32:8_, 32:20_, 32:22_, 32:23_, 32:25_, 33:6_, 34:1_, 34:7_, 34:11_, 34:12_, 34:14_, 34:23_, 35:2_, 35:8_, 35:11_, 35:20_, 35:22_, 35:24_, 36:10_, 36:15_, 37:2_, 37:7_, 37:17_, 38:4_, 38:7_, 38:11_, 65:3_, 67:18_, 74:2_, 74:5_, 77:8_, 103:10_, 106:11_, 108:8_, 108:24_, 109:15_, 110:7_, 110:19_, 123:13_, 126:17_, 132:3_, 134:9_, 145:14_, 146:23_, 177:24_, 180:18_, 181:15_, 182:13_, 184:15_, 184:19_, 185:17_, 191:17_, 195:24
**defendant's** [19]_ - 13:1_, 13:14_, 15:20_, 17:1_, 19:5_, 21:11_, 21:14_, 22:22_, 24:16_, 24:20_, 25:6_, 26:10_, 33:16_, 34:10_, 36:7_, 44:18_, 136:16_, 195:22
**defense** [2]_ - 5:16_, 37:24
**defenses** [1]_ - 8:2
**defined** [1]_ - 93:12
**definitely** [1]_ - 106:15
**deliberate** [1]_ - 200:18
**deliberately** [1]_ - 13:4
**deliberations** [2]_ - 172:14_, 201:11
**delivering** [1]_ - 9:3
**Delray** [1]_ - 118:8
**delusion** [1]_ - 116:23
**Democrat** [1]_ - 18:9
**demographics** [2]_ - 115:8_, 115:12
**demonstrate** [1]_ - 108:8
**demonstrative** [1]_ - 88:22
**denying** [1]_ - 7:25
**departed** [1]_ - 99:15
**depended** [1]_ - 54:23
**depict** [6]_ - 74:4_, 87:9_, 87:24_, 168:7_, 179:14_, 179:18
**depicting** [1]_ - 86:13
**depicts** [2]_ - 88:1_, 91:21
**deployed** [5]_ - 50:20_, 50:22_, 50:24_, 51:20_, 94:13
**deputies** [1]_ - 138:24
**deputy** [1]_ - 194:11
**DEPUTY** [16]_ - 5:7_, 5:24_, 47:20_, 47:25_, 58:24_, 113:17_, 113:22_, 124:21_, 124:24_, 131:12_, 152:7_, 152:12_, 175:1_, 175:5_, 187:13_, 187:17
**derailed** [1]_ - 40:8
**derived** [1]_ - 202:15

214

describe [3] - 73:10,
145:8, 180:13
described [6] - 69:9,
73:9, 74:1, 74:6, 75:16
, 76:16
describing [1] - 129:14
description [6] - 83:11
, 140:3, 140:4, 142:12
, 160:13, 160:19
design [1] - 93:10
designated [4] - 51:5,
51:7, 51:9, 104:3
designed [3] - 21:21,
93:12, 94:11
despite [2] - 28:3,
32:16
destroyed [1] - 41:15
destructive [1] - 35:18
detail [2] - 81:23, 153:5
detained [1] - 177:17
detective [1] - 142:16
determine [1] - 104:8
developed [1] - 28:19
deviate [3] - 102:5,
102:11, 151:10
device [5] - 35:18,
78:12, 84:15, 85:2,
86:15
devices [2] - 33:14,
203:7
diagonal [1] - 121:15
diagram [6] - 154:20,
155:21, 156:5, 157:17,
159:1, 164:17
diapers [1] - 30:21
die [1] - 14:22
different [10] - 40:9,
87:14, 87:16, 115:7,
115:8, 122:24, 142:19,
165:17, 203:6
difficult [2] - 40:8,
159:15
difficulty [1] - 199:10
dignitaries [2] - 49:9,
52:9
dignity [1] - 43:24
direct [9] - 36:24, 55:7,
55:20, 100:17, 112:2,
153:25, 177:2, 189:11,
196:10
DIRECT [5] - 48:4,
114:7, 152:22, 175:14,

188:1
directed [2] - 177:20,
177:21
directing [1] - 7:21
direction [29] - 16:21,
16:23, 31:21, 60:11,
60:14, 66:5, 66:11,
68:1, 71:7, 71:12,
71:19, 71:25, 78:14,
87:23, 97:10, 99:11,
119:7, 125:15, 125:17,
134:17, 135:4, 137:11,
156:14, 158:6, 160:5,
160:12, 160:23, 162:2,
163:9
directly [5] - 16:17,
64:12, 81:22, 162:4,
170:22
dirt [5] - 60:22, 67:14,
68:23, 90:7, 102:20
disappeared [1] -
103:21
discharge [3] - 70:14,
72:1, 83:17
discharged [5] - 50:14
, 50:15, 72:7, 79:19,
176:23
discharging [1] - 73:1
discovery [1] - 10:10
discuss [5] - 99:25,
172:17, 174:12, 200:16
, 200:17
discussed [4] - 35:16,
36:19, 38:10, 41:22
discussing [4] - 26:9,
35:6, 89:4, 190:14
discussions [2] - 172:7
, 172:13
disembarked [2] -
106:1, 108:19
dishevelled [1] - 121:4
dismiss [1] - 198:9
dismount [2] - 69:18,
71:16
dismounting [1] -
63:12
disorders [3] - 116:20,
116:21, 116:22
dispatch [1] - 177:14
dispatched [2] - 177:6
, 177:7
display [1] - 131:14
displayed [1] - 66:8
disposal [3] - 85:5,

98:5, 98:13
dispute [4] - 15:11,
21:25, 37:6, 37:7
disregard [1] - 149:4
disrespectful [1] -
201:5
disrupt [1] - 39:16
disruption [1] - 18:1
distance [7] - 32:16,
104:9, 108:18, 134:25,
144:21, 150:24, 151:2
distinctive [1] - 26:25
district [2] - 52:10,
54:20
disturb [2] - 99:8,
171:16
disturbed [5] - 99:9,
99:13, 171:4, 171:18,
171:21
Division [4] - 81:3,
177:23, 178:11, 178:18
DNA [1] - 36:7
docket [2] - 7:8, 7:24
dog [2] - 192:2, 192:7
dollars [1] - 20:10
domestically [1] -
70:21
Dominick [2] - 174:25,
175:8
DOMINICK [1] - 175:12
Donald [41] - 12:24,
13:5, 14:8, 14:11, 15:3
, 15:25, 17:1, 17:3,
17:16, 18:13, 18:25,
21:4, 21:11, 21:13,
21:24, 22:16, 22:24,
24:5, 25:15, 25:19,
25:22, 26:13, 26:15,
26:18, 27:5, 29:5,
31:18, 33:6, 35:7, 35:9
, 35:21, 36:1, 52:13,
52:21, 52:23, 81:23,
84:23, 119:21, 189:23
done [13] - 11:17, 18:22
, 20:25, 26:1, 32:1,
46:18, 54:6, 54:9,
109:16, 116:19, 121:22
, 144:8, 155:9
Donnelly [1] - 5:13
door [1] - 193:7
doors [4] - 192:24,
193:8, 193:10, 195:8
double [1] - 203:10
double-check [1] -

203:10
doubt [7] - 19:6, 21:13,
28:12, 37:17, 37:25,
46:14
down [42] - 15:14, 22:8
, 22:14, 22:15, 23:16,
23:25, 29:21, 32:7,
33:20, 34:3, 34:8,
35:15, 35:25, 44:25,
78:2, 96:6, 101:19,
102:17, 103:1, 103:8,
104:6, 106:17, 117:16,
120:8, 121:14, 136:25,
137:5, 138:7, 138:18,
147:5, 148:9, 154:15,
159:3, 159:5, 164:2,
164:12, 166:7, 169:21,
191:2, 192:19, 193:23,
194:6
downtime [1] - 28:22
downtown [1] - 22:23
downward [1] - 97:12
dozen [1] - 155:13
draw [1] - 159:1
drawing [4] - 71:22,
71:24, 107:24, 108:23
dreams [1] - 45:15
drill [3] - 45:11, 186:15,
186:19
drive [24] - 29:3, 34:8,
103:3, 103:5, 119:25,
120:3, 123:5, 126:16,
126:25, 127:1, 127:5,
130:25, 131:22, 133:8,
133:14, 134:11, 202:14
, 202:18, 202:20,
203:1, 203:5, 203:9,
203:12
drive-by [2] - 119:25,
120:3
driver [1] - 51:6
drives [2] - 22:7, 29:24
driveway [1] - 123:6
driving [12] - 31:21,
103:15, 103:16, 117:16
, 119:8, 121:14, 125:8
, 126:2, 127:6, 133:12
, 135:4, 148:21
drone [1] - 202:24
drove [7] - 22:12, 24:6,
32:12, 133:13, 135:7,
138:11, 144:21
dual [2] - 49:10, 49:13
dug [1] - 44:25
dumbest [1] - 174:1

**duress** [1] - 109:11
**during** [29] - 6:2, 7:18, 10:24, 11:10, 13:23, 14:24, 24:17, 28:22, 30:6, 37:23, 41:1, 41:4, 52:4, 52:22, 53:19, 53:21, 56:17, 59:10, 60:24, 61:15, 70:20, 70:23, 85:12, 94:12, 100:1, 137:4, 144:13, 172:18, 201:1
**duties** [9] - 48:12, 49:3, 49:4, 49:5, 153:3, 175:24, 176:8, 188:11, 188:19
**duty** [1] - 189:12

E

**EA** [1] - 55:19
**Earlington** [1] - 33:22
**early** [11] - 28:15, 34:16, 35:12, 56:12, 56:13, 57:13, 121:3, 199:8, 199:13, 200:7, 200:10
**easier** [1] - 7:14
**easily** [1] - 102:13
**east** [1] - 66:12
**easy** [1] - 26:25
**edge** [1] - 23:4
**effect** [1] - 116:17
**efficiency** [1] - 8:12
**efficient** [2] - 65:14, 200:6
**efforts** [2] - 151:17, 199:14
**either** [6] - 6:13, 41:5, 69:21, 88:4, 115:8, 162:10
**elected** [3] - 12:25, 13:1, 21:8
**element** [8] - 80:23, 80:25, 82:7, 83:10, 84:6, 93:19, 97:8, 99:4
**elements** [3] - 37:25, 46:15, 73:2
**eliminate** [1] - 39:19
**ELMO** [2] - 182:22, 183:23
**embassy** [1] - 41:15
**emergency** [2] - 55:19, 178:9
**emotions** [1] - 39:20

**employed** [1] - 34:12
**employee** [1] - 19:21
**Employees** [1] - 176:20
**employer** [1] - 34:25
**encounter** [2] - 70:18, 84:16
**encountered** [25] - 60:1, 60:8, 63:16, 63:18, 64:11, 67:18, 67:19, 74:2, 74:5, 77:7, 77:15, 77:23, 78:3, 80:9, 84:12, 87:10, 87:13, 93:1, 93:17, 95:14, 96:24, 97:5, 97:8, 98:3, 103:20
**encountering** [4] - 70:23, 70:24, 98:4
**encrypted** [3] - 21:3, 25:24, 33:13
**end** [13] - 17:19, 18:18, 68:7, 68:8, 68:12, 68:13, 68:15, 68:16, 129:20, 158:15, 172:13, 200:18, 201:11
**ended** [2] - 85:8, 115:24
**enemy's** [1] - 102:9
**Enforcement** [1] - 153:24
**enforcement** [29] - 14:19, 31:16, 35:4, 35:5, 36:12, 36:19, 83:16, 99:3, 114:15, 115:23, 120:9, 123:25, 138:16, 138:21, 139:2, 139:7, 140:1, 140:10, 140:19, 141:21, 142:3, 142:8, 143:10, 169:16, 170:11, 170:13, 171:6, 190:16, 193:2
**engage** [2] - 42:6, 54:12
**English** [1] - 34:22
**enhanced** [1] - 86:13
**enjoy** [1] - 113:1
**ensure** [2] - 24:12, 83:13
**ensuring** [2] - 8:14, 12:25
**entail** [1] - 176:14
**entails** [1] - 176:15
**entered** [10] - 11:21, 39:12, 44:7, 47:7, 100:25, 111:15, 113:9, 173:2, 193:13, 200:2

**entering** [1] - 58:22
**entire** [2] - 153:14, 164:25
**entitled** [1] - 38:4
**entry** [2] - 7:8, 7:24
**environment** [1] - 116:3
**EOD** [3] - 85:4, 98:5, 98:8
**equally** [1] - 17:20
**equipped** [1] - 96:16
**erectus** [2] - 40:10, 41:11
**Erin** [1] - 199:2
**especially** [1] - 109:11
**essentially** [3] - 159:8, 167:5, 167:25
**establish** [1] - 87:4
**established** [1] - 103:19
**establishing** [1] - 61:13
**ethics** [1] - 44:12
**evening** [6] - 22:13, 57:20, 171:13, 200:1, 201:12, 203:14
**evening/early** [1] - 15:16
**evenings** [1] - 29:15
**event** [1] - 28:18
**events** [1] - 28:16
**eventually** [6] - 116:6, 124:1, 129:23, 134:14, 136:9, 136:10
**everywhere** [1] - 138:23
**evidence** [95] - 7:12, 7:13, 7:15, 7:18, 10:18, 11:5, 13:2, 13:17, 13:19, 14:4, 14:14, 15:7, 15:19, 17:11, 17:21, 19:13, 20:16, 21:6, 21:18, 22:10, 22:21, 23:13, 24:2, 24:7, 24:10, 25:6, 25:21, 26:4, 26:7, 26:18, 26:23, 28:6, 28:13, 29:18, 30:14, 31:10, 32:15, 32:25, 33:24, 35:6, 35:11, 35:13, 35:22, 36:4, 36:22, 36:24, 37:4, 37:11, 37:13, 37:15, 38:10, 41:2, 41:4, 41:5, 41:25, 42:1, 42:5,

42:15, 42:21, 46:7, 46:16, 65:8, 65:15, 73:22, 74:24, 124:15, 128:5, 129:5, 130:10, 130:17, 135:12, 137:23, 140:13, 141:6, 146:7, 146:13, 146:15, 154:12, 156:20, 163:6, 170:18, 171:19, 178:21, 179:23, 180:4, 182:2, 182:3, 185:21, 193:7, 195:8, 195:13, 200:25, 201:1, 201:9
**Evidence** [3] - 6:16, 7:20, 178:24
**evidentiary** [2] - 193:9, 201:17
**evidently** [1] - 46:18
**exact** [3] - 45:12, 70:11, 173:20
**exactly** [7] - 33:7, 106:8, 109:22, 142:14, 144:9, 169:18, 169:22
**examination** [11] - 100:16, 100:17, 101:4, 112:12, 147:24, 173:5, 174:6, 186:11, 195:19, 196:10, 199:21
**EXAMINATION** [10] - 48:4, 101:5, 114:7, 148:1, 152:22, 173:7, 175:14, 186:13, 188:1, 195:20
**examinations** [4] - 198:3, 199:8, 199:17, 202:3
**examine** [1] - 100:11
**examined** [1] - 107:9
**example** [4] - 23:13, 26:6, 54:16, 54:18
**examples** [1] - 54:16
**exceed** [2] - 43:21, 200:11
**exceeds** [2] - 7:19, 11:4
**excellent** [1] - 58:25
**excess** [3] - 52:23, 53:18, 94:14
**excessive** [1] - 133:19
**exclude** [1] - 6:13
**excluded** [1] - 10:19
**excuse** [4] - 59:6, 119:11, 135:17, 163:10
**excused** [5] - 100:4, 111:21, 152:1, 174:21,

187:4

**exercise** [1]– 8:17

**Exhibit** [71]– 65:12–, 65:19–, 67:21–, 71:12–, 72:11–, 74:1–, 74:24–, 80:10–, 82:13–, 85:11–, 85:23–, 88:20–, 89:12–, 90:2–, 90:22–, 91:13–, 91:16–, 91:24–, 92:12–, 94:20–, 124:14–, 128:5–, 128:25–, 129:5–, 130:20–, 132:21–, 134:4–, 135:12–, 137:21–, 140:14–, 141:4–, 141:6–, 146:7–, 146:13–, 154:12–, 156:20–, 157:18–, 161:5–, 161:15–, 162:14–, 162:23–, 163:1–, 163:15–, 164:1–, 165:8–, 166:2–, 166:23–, 167:10–, 168:2–, 168:13–, 168:20–, 169:2–, 169:25–, 179:3–, 179:22–, 180:4–, 180:9–, 180:24–, 181:20–, 181:21–, 182:3–, 182:8–, 183:12–, 183:17–, 183:24–, 185:1–, 185:20–, 194:23–, 202:24

**exhibit** [18]– 6:9–, 8:17–, 8:21–, 10:11–, 20:6–, 85:14–, 85:16–, 88:22–, 92:2–, 96:18–, 137:22–, 140:13–, 162:21–, 179:25–, 180:2–, 181:19–, 202:19

**exhibit-by-exhibit** [1]– 8:17

**Exhibits** [5]– 73:13, 73:21–, 130:16–, 182:1–, 203:2

**exhibits** [26]– 6:2–, 6:4–, 6:6–, 6:9–, 8:8–, 8:11–, 8:19–, 10:9–, 10:15–, 10:17–, 11:11–, 13:23–, 65:15–, 65:16–, 66:7–, 73:17–, 73:19–, 103:9–, 181:24–, 185:24–, 202:4–, 202:5–, 202:15–, 203:3–, 203:9–, 203:11

**exited** [10]– 38:25–, 41:20–, 45:25–, 100:3–, 107:21–, 111:7–, 112:17–, 172:20–, 197:21–, 201:14

**expect** [2]– 112:1–, 138:16

**expectation** [2]– 122:17–, 126:4

**expected** [5]– 14:11–, 14:22–, 33:6–, 198:5–,

198:7

**experience** [15]– 61:9–, 61:10–, 61:11–, 61:12–, 70:18–, 70:20–, 87:1–, 88:6–, 90:20–, 94:9–, 94:15–, 108:15–, 108:22–, 115:23–, 119:16

**experiences** [1]– 29:14

**expert** [3]– 24:8–, 35:17–, 36:9

**experts** [3]– 36:3–, 36:4–, 36:8

**expired** [2]– 22:4–, 38:18

**explain** [1]– 59:25

**explosive** [3]– 85:5–, 98:5–, 98:12

**explosives** [6]– 98:9–, 98:10–, 171:6–, 192:3–, 192:4–, 192:6

**extended** [1]– 13:15

**exterior** [1]– 104:21

**extra** [2]– 151:12–, 197:18

**extreme** [1]– 44:18

**extremely** [1]– 117:8

**eye** [4]– 32:8–, 106:5–, 121:19–, 151:1

**eyes** [1]– 40:14

F

**F-E-R-C-A-N-O** [1]– 48:8

**fabric** [1]– 45:3

**face** [32]– 16:8–, 16:10–, 16:18–, 31:14–, 60:1–, 60:25–, 61:1–, 61:2–, 62:23–, 62:24–, 63:16–, 64:12–, 64:13–, 64:16–, 69:17–, 70:5–, 87:16–, 91:3–, 103:21–, 106:7–, 106:12–, 107:5–, 107:8–, 107:18–, 108:21–, 109:2–, 110:6–, 121:18–, 121:19–, 122:2–, 134:22–, 163:1

**facial** [2]– 62:15–, 117:1

**facilitate** [1]– 58:8

**facilitating** [3]– 53:23–, 54:2–, 55:18

**facility** [3]– 54:25–, 116:15–, 195:14

**facing** [10]– 30:20–,

87:19–, 87:21–, 92:3–, 92:16–, 162:2–, 162:3–, 162:18–, 162:20–, 162:25

**fact** [9]– 6:24–, 8:22–, 15:11–, 22:1–, 31:8–, 98:22–, 110:6–, 173:16–, 191:6

**factors** [1]– 104:8

**factory** [1]– 33:11

**facts** [2]– 37:5

**factually** [1]– 8:2

**failure** [1]– 7:20

**fair** [7]– 49:10–, 92:8–, 97:3–, 147:8–, 155:14–, 162:11–, 167:7

**fairly** [11]– 73:7–, 73:10–, 74:4–, 91:19–, 103:10–, 103:11–, 111:5–, 128:20–, 155:14–, 168:6–, 179:14

**fairway** [2]– 155:19–, 156:25

**faith** [1]– 198:5

**fake** [3]– 24:3–, 38:13

**fall** [1]– 8:18

**familiar** [17]– 17:10–, 20:19–, 21:15–, 23:3–, 26:22–, 33:21–, 42:25–, 64:9–, 93:21–, 93:22–, 94:1–, 94:2–, 128:13–, 144:8–, 144:9–, 144:10–, 155:14

**families** [1]– 115:11

**family** [8]– 22:3–, 25:4–, 33:1–, 44:24–, 52:12–, 101:10–, 153:14–, 153:16

**fancy** [1]– 176:13

**far** [20]– 23:4–, 35:23–, 42:3–, 42:17–, 63:15–, 100:7–, 103:19–, 104:1–, 104:2–, 104:9–, 106:4–, 133:25–, 134:10–, 135:3–, 148:18–, 148:20–, 151:4–, 155:5–, 199:18–, 200:8

**fashion** [3]– 46:18–, 110:4–, 110:8

**fast** [3]– 32:6–, 133:21–, 197:17

**favor** [1]– 34:25

**FBI** [24]– 20:16–, 21:4–, 24:7–, 24:14–, 25:12–, 33:12–, 33:15–, 35:14–, 35:17–, 36:2–, 36:4–, 170:19–, 175:19–, 176:6–, 176:9–, 176:18–, 176:19–, 188:7–, 188:17–, 189:5–,

199:3–, 199:4–, 199:5

**fear** [4]– 64:16–, 64:17–, 64:18–, 121:20

**feature** [3]– 64:3–, 128:13–, 128:15

**features** [7]– 61:18–, 62:15–, 77:16–, 93:10–, 93:12–, 93:14–, 104:22

**federal** [2]– 24:15–, 170:16

**Federal** [7]– 6:16–, 7:19–, 11:4–, 98:16–, 99:17–, 175:20–, 188:6

**feed** [1]– 130:7

**feeds** [1]– 179:9

**feet** [11]– 44:25–, 55:6–, 63:19–, 106:3–, 106:4–, 106:24–, 107:1–, 107:3–, 108:18–, 151:2

**fell** [1]– 116:15

**fellow** [2]– 83:16–, 172:8

**felon** [9]– 15:11–, 15:12–, 15:13–, 28:3–, 36:19–, 36:20–, 37:8–, 38:4

**felt** [3]– 44:18–, 123:24–, 142:24

**fence** [95]– 16:12–, 16:14–, 30:20–, 59:18–, 59:23–, 60:3–, 61:3–, 63:1–, 63:8–, 63:16–, 63:19–, 68:24–, 69:9–, 76:10–, 76:12–, 78:4–, 78:5–, 80:9–, 84:13–, 85:1–, 85:7–, 85:9–, 85:12–, 85:16–, 86:3–, 95:23–, 95:24–, 96:23–, 96:24–, 97:6–, 101:20–, 101:23–, 102:2–, 102:15–, 102:20–, 102:23–, 103:12–, 103:20–, 104:17–, 104:21–, 104:23–, 104:24–, 104:25–, 105:25–, 106:13–, 106:16–, 106:20–, 108:21–, 108:25–, 109:5–, 109:12–, 109:15–, 109:16–, 156:1–, 158:13–, 158:14–, 159:5–, 159:6–, 159:9–, 159:11–, 159:14–, 159:16–, 161:9–, 161:11–, 161:12–, 161:13–, 161:20–, 162:7–, 162:18–, 163:11–, 163:12–, 163:25–, 164:4–, 164:22–, 164:25–, 165:12–, 165:17–, 165:24–, 166:8–, 166:17–, 166:18–, 166:21–, 167:5–, 167:7–, 167:16–, 168:6–, 168:11–,

168:18_, 169:8_, 173:9_, 173:13_, 173:17_, 173:21

**FERCANO** [1]_ - 48:2

**Fercano** [36]_ - 15:22_, 15:23_, 16:1_, 16:5_, 16:8_, 16:16_, 16:18_, 16:22_, 17:4_, 17:8_, 30:10_, 30:25_, 31:3_, 31:5_, 31:12_, 31:22_, 32:21_, 36:17_, 37:1_, 47:13_, 47:15_, 48:8_, 75:4_, 101:1_, 157:12_, 158:17_, 158:21_, 159:23_, 160:3_, 160:5_, 160:22_, 164:21_, 165:6_, 166:8_, 202:10

**Fercano's** [1]_ - 16:25

**few** [4]_ - 6:1_, 32:1_, 88:10_, 120:15

**field** [4]_ - 105:5_, 115:5_, 117:3_, 143:16

**file** [2]_ - 145:24_, 145:25

**fill** [2]_ - 178:3_, 178:5

**filled** [3]_ - 40:9_, 178:3_, 178:12

**fills** [1]_ - 44:12

**final** [1]_ - 6:3

**finally** [1]_ - 201:8

**financial** [2]_ - 49:7

**fine** [1]_ - 135:15

**finger** [6]_ - 67:11_, 125:10_, 125:21_, 125:24_, 127:4_, 134:8

**fingerprint** [4]_ - 36:7_, 191:10_, 191:11_, 191:12

**fingerprinted** [2]_ - 191:14_, 191:15

**fingers** [1]_ - 44:22

**finicky** [1]_ - 131:11

**finish** [2]_ - 45:24_, 109:8

**fire** [12]_ - 35:19_, 36:12_, 44:20_, 83:1_, 83:14_, 83:15_, 87:5_, 93:9_, 94:11_, 105:15_, 155:20_, 156:9

**firearm** [21]_ - 17:13_, 20:6_, 36:20_, 36:21_, 37:9_, 38:3_, 64:8_, 71:22_, 71:24_, 87:22_, 89:8_, 93:2_, 93:17_, 94:25_, 96:15_, 96:21_, 97:5_, 97:18_, 99:10_, 106:23_, 107:18

**firearms** [4]_ - 20:20_, 28:5_, 188:21

**fired** [25]_ - 16:23_, 31:5_, 31:22_, 80:12_, 82:14_, 82:15_, 82:20_, 82:22_, 87:25_, 88:2_, 93:15_, 94:3_, 97:6_, 97:7_, 98:2_, 108:25_, 148:21_, 158:10_, 158:19_, 158:20_, 160:23_, 163:16

**firefighter** [1]_ - 189:10

**fires** [2]_ - 94:6_, 97:21

**fireworks** [1]_ - 119:19

**firing** [6]_ - 14:19_, 94:4_, 97:3_, 104:15_, 105:16_, 158:22

**first** [42]_ - 7:8_, 9:10_, 9:11_, 9:12_, 12:4_, 17:23_, 42:3_, 46:4_, 46:21_, 47:10_, 58:13_, 59:7_, 61:13_, 62:4_, 63:10_, 63:15_, 63:18_, 66:18_, 70:10_, 78:3_, 87:9_, 87:13_, 96:24_, 101:7_, 113:23_, 118:16_, 120:25_, 121:2_, 130:5_, 140:6_, 141:15_, 152:13_, 168:7_, 168:10_, 169:16_, 170:22_, 175:6_, 175:8_, 177:1_, 186:7_, 187:18

**First** [1]_ - 37:19

**firsthand** [2]_ - 119:16_, 142:6

**fit** [3]_ - 37:20_, 112:9_, 118:17

**five** [11]_ - 12:6_, 34:16_, 42:4_, 109:24_, 135:7_, 171:14_, 171:15_, 171:16_, 176:22_, 198:2

**five-minute** [1]_ - 12:6

**fix** [1]_ - 58:22

**fixed** [1]_ - 88:16

**flag** [3]_ - 91:9_, 91:11_, 91:20

**flags** [1]_ - 69:23

**flat** [2]_ - 104:10_, 117:4

**flatbed** [2]_ - 193:21_, 194:2

**fled** [4]_ - 25:13_, 30:11_, 31:6_, 31:10

**flew** [1]_ - 56:10

**flight** [5]_ - 26:14_, 27:2_, 27:8_, 33:3_, 144:13

**flights** [1]_ - 33:18

**Florida** [13]_ - 13:16_, 13:20_, 22:8_, 22:18_, 23:4_, 23:17_, 23:25_, 29:15_, 114:12_, 116:6_, 116:8_, 116:10_, 116:12

**flow** [1]_ - 112:12

**fly** [1]_ - 202:9

**fly-through-type** [1]_ - 202:9

**flying** [1]_ - 142:25

**focus** [5]_ - 17:18_, 49:3_, 122:2_, 170:12_, 170:13

**focused** [1]_ - 122:1

**focuses** [1]_ - 51:1

**focusing** [1]_ - 69:1

**foliage** [12]_ - 16:9_, 59:24_, 60:23_, 63:11_, 69:4_, 76:11_, 85:17_, 92:25_, 102:13_, 103:19_, 103:21_, 167:21

**follow** [4]_ - 7:15_, 133:15_, 198:7_, 198:21

**followed** [8]_ - 32:16_, 83:8_, 129:23_, 134:25_, 136:24_, 194:5_, 194:8_, 195:12

**following** [2]_ - 71:9_, 136:6

**follows** [6]_ - 7:9, 48:3, 114:6, 152:21, 175:13, 187:25

**food** [1]_ - 192:17

**foot** [2]_ - 60:17_, 156:3

**footage** [4]_ - 27:13_, 28:25_, 202:24_, 202:25

**footprints** [1]_ - 61:19

**Force** [1]_ - 48:15

**Ford** [1]_ - 45:13

**forecast** [1]_ - 29:11

**foreign** [6]_ - 49:9_, 51:19_, 51:21_, 51:22_, 52:8

**Forest** [7]_ - 114:24_, 135:9_, 136:13_, 137:9_, 137:12_, 137:13_, 138:19

**forever** [1]_ - 40:16

**form** [2]_ - 201:8_, 202:18

**formal** [1]_ - 202:17

**format** [1]_ - 26:8

**former** [6]_ - 15:21_, 19:21_, 20:3_, 25:8_, 52:18_, 189:23

**Fort** [1]_ - 188:13

**forth** [4]_ - 23:11_, 25:17_, 26:17_, 45:6

**forum** [1]_ - 172:10

**forward** [3]_ - 11:18_, 42:8_, 43:15

**forwards** [2]_ - 41:19_, 69:22

**four** [8]_ - 33:11_, 49:24_, 106:24_, 107:2_, 107:3_, 135:6_, 147:12_, 181:24

**fragmentation** [1]_ - 51:18

**frantic** [3]_ - 121:4_, 121:13_, 121:20

**frequent** [3]_ - 54:8_, 54:9_, 54:20

**frequently** [1]_ - 54:15

**freshly** [1]_ - 83:8

**friend** [3]_ - 19:21_, 116:14_, 118:7

**friendly** [4]_ - 61:6_, 83:14_, 83:15_, 149:21

**friends** [4]_ - 25:3_, 115:24_, 117:7_, 117:17

**front** [40]_ - 59:7_, 64:5_, 64:8_, 65:22_, 68:23_, 70:2_, 71:16_, 86:21_, 86:22_, 86:24_, 87:2_, 87:3_, 87:18_, 87:21_, 89:20_, 90:13_, 93:13_, 95:21_, 96:25_, 97:11_, 97:13_, 107:16_, 109:9_, 121:17_, 122:7_, 122:20_, 123:4_, 123:13_, 125:4_, 126:10_, 126:11_, 126:15_, 132:4_, 132:24_, 134:1_, 157:3_, 157:13_, 157:16_, 183:24

**fulfilling** [1]_ - 45:15

**full** [2]_ - 18:19_, 47:19

**fullest** [1]_ - 45:20

**fully** [3]_ - 8:4_, 95:1_, 196:16

**fumbling** [2]_ - 122:5_, 126:13

**function** [4]_ - 45:14_, 49:10_, 49:13_, 84:22

**furnish** [1]_ - 118:14

**furniture** [4]_ - 31:20_, 118:14_, 125:9_, 143:3

**furtherance** [1]_ - 36:16

**G**

**gained** [1]_ - 81:15

**Gale** [1]_ - 199:3

**gap** [1]_ - 136:20

**gas** [4]_ - 28:25_, 150:15_, 150:21

**Gas** [1]_ - 23:2

**gather** [1]_ - 25:24

**gathered** [2]_ - 158:6_, 171:19

**gear** [3]_ - 30:3_, 30:14_, 176:16

**GEICO** [1]_ - 176:21

**general** [6]_ - 7:23_, 42:22_, 43:9_, 112:1_, 135:4_, 199:16

**generally** [2]_ - 43:7_, 179:18

**generated** [1]_ - 26:11

**genocide** [1]_ - 41:11

**gentle** [1]_ - 40:15

**gentlemen** [34]_ - 11:22 _, 12:13_, 12:18_, 13:22_, 16:13_, 17:1_, 22:19_, 24:25_, 25:16_, 28:7_, 28:11_, 29:19_, 32:21_, 35:20_, 36:13_, 38:22_, 40:25_, 41:17_, 47:9_, 65:13_, 94:25_, 99:22_, 111:3_, 112:13_, 149:4_, 149:17_, 152:19_, 172:4_, 174:5_, 180:8_, 194:22_, 197:8_, 197:16_, 200:5

**gentleness** [2]_ - 42:18_, 42:19

**gestures** [1]_ - 40:14

**gifted** [1]_ - 44:19

**Gilbert** [1]_ - 199:4

**girlfriend** [1]_ - 117:17

**given** [15]_ - 9:10_, 12:3_, 21:10_, 39:3_, 44:3_, 51:10_, 54:19_, 58:9_, 61:14_, 108:18_, 108:19_, 151:9_, 198:4

**glasses** [2]_ - 185:11_, 192:20

**GLOCK** [3]_ - 96:16_, 97:19_, 97:20

**gloves** [3]_ - 95:3_, 95:5_, 181:1

**goal** [1]_ - 42:16

**God** [5]_ - 47:23_, 113:20 _, 152:10_, 175:3_, 187:15

**Golf** [25]_ - 13:20_, 14:25_,

22:18_, 22:23_, 23:11_, 24:23_, 29:4_, 29:20_, 53:11_, 55:17_, 57:9_, 57:14_, 57:16_, 57:23_, 57:25_, 58:14_, 58:15_, 65:4_, 66:19_, 114:25_, 118:21_, 154:9_, 154:20_, 155:10_, 177:10

**golf** [116]_ - 14:9_, 14:11_, 14:22_, 15:25_, 16:5_, 16:6_, 19:16_, 22:20_, 24:25_, 25:17_, 29:10_, 29:11_, 29:22_, 31:21_, 53:2_, 53:8_, 53:9_, 53:10 _, 54:18_, 54:21_, 54:22_, 54:24_, 56:17_, 56:19_, 58:1_, 58:3_, 58:5_, 58:11 _, 58:13_, 59:4_, 59:8_, 59:11_, 59:19_, 60:6_, 60:9_, 60:17_, 60:18_, 60:20_, 60:21_, 60:22_, 60:24_, 63:12_, 64:19_, 65:24_, 66:19_, 66:20_, 66:21_, 67:14_, 67:25_, 68:25_, 69:6_, 69:12_, 69:14_, 69:18_, 71:16_, 72:16_, 72:17_, 75:5_, 75:13_, 75:17_, 75:21_, 76:3_, 76:6_, 78:15_, 81:15_, 82:9_, 84:12_, 85:17_, 89:17_, 89:18_, 89:21_, 90:8_, 91:2_, 91:9 _, 92:4_, 92:17_, 92:21_, 92:22_, 101:19_, 101:20_, 102:11_, 103:3_, 103:7_, 103:17_, 106:1_, 107:21_, 108:13_, 108:19_, 108:20 _, 119:21_, 155:1_, 155:3 _, 155:6_, 155:15_, 156:3 _, 156:4_, 156:16_, 156:24_, 157:3_, 159:17_, 159:19_, 159:20_, 160:1_, 161:9_, 162:3_, 162:19_, 166:20_, 167:6_, 174:12_, 177:8_, 178:23

**golfer** [1]_ - 31:19

**Goodrich** [3]_ - 24:8_, 24:19

**Google** [3]_ - 26:1_, 134:4 _, 135:20

**GoPro** [2]_ - 78:13_, 84:15

**government** [17]_ - 6:20 _, 8:3_, 12:4_, 46:4_, 47:10_, 73:13_, 74:8_, 111:10_, 128:24_, 140:25 _, 152:2_, 179:22_, 187:2 _, 187:5_, 187:10_, 197:12_, 202:5

**Government** [17] - 73:21 _, 74:24_, 124:14_, 128:5 _, 129:5_, 130:16_, 130:19_, 132:20_, 134:3_, 137:20_, 140:14_, 141:6_, 146:13_, 176:20_, 180:4_, 182:1_, 182:3

**Government's** [60]_ - 65:11_, 67:21_, 71:12_, 72:11_, 73:13_, 73:25_, 80:10_, 82:13_, 85:11_, 85:23_, 88:20_, 89:12_, 90:2_, 90:22_, 91:13_, 91:16_, 91:24_, 92:11_, 94:19_, 129:4_, 135:12_, 141:4_, 146:7_, 146:11_, 154:11_, 156:20_, 157:17 _, 161:5_, 161:14_, 162:13_, 162:23_, 163:1_, 163:14_, 163:25_, 165:8_, 166:2_, 166:23_, 167:9_, 168:1_, 168:13_, 168:19_, 169:1_, 169:24_, 179:3_, 179:22_, 180:9_, 180:24_, 181:20_, 181:21_, 182:7_, 183:11_, 183:16_, 183:24 _, 185:1_, 185:20_, 194:23_, 202:23_, 203:2

**government's** [2]_ - 8:1 _, 39:6

**grade** [2]_ - 13:9_, 20:2

**graduated** [1]_ - 116:1

**grandchildren** [1]_ - 153:13

**grant** [1]_ - 199:12

**granted** [40]_ - 65:9_, 67:22_, 68:19_, 72:12_, 75:2_, 78:24_, 79:13_, 80:2_, 80:16_, 81:8_, 82:1 _, 85:24_, 86:10_, 89:13_, 90:3_, 90:23_, 91:14_, 91:25_, 92:13_, 94:21_, 94:24_, 129:7_, 156:21_, 161:16_, 162:15_, 165:9_, 166:3_, 166:24_, 167:11_, 168:3_, 169:3_, 170:1_, 175:11_, 179:4_, 180:7_, 180:22_, 182:5_, 184:23_, 186:6_, 194:24

**granting** [1]_ - 7:25

**graphic** [1]_ - 202:11

**grass** [3]_ - 155:25_, 164:6_, 165:12

**gray** [9]_ - 64:25_, 124:22 _, 145:10_, 145:11_, 179:20_, 180:15_, 180:17 _, 182:20_, 183:18

**green** [28]_ - 14:21_, 14:25_, 15:3_, 16:15_, 24:5_, 29:25_, 30:5_, 30:20_, 32:3_, 66:24_, 68:3_, 68:4_, 79:2_, 80:11 _, 90:14_, 90:15_, 91:8_, 91:10_, 91:20_, 99:12_, 120:20_, 126:1_, 149:24_, 150:2_, 150:10_, 156:25_, 157:24_, 162:19

**Greensboro** [5]_ - 19:18 _, 19:23_, 19:24_, 22:8_, 34:8

**grenade** [1]_ - 51:19

**grew** [5]_ - 31:23_, 115:20 _, 115:21_, 119:24_, 120:4

**grid** [1]_ - 23:5

**groan** [1]_ - 62:5

**groomed** [1]_ - 121:10

**ground** [5]_ - 97:14_, 107:3_, 166:13_, 167:17_, 168:15

**groundwork** [1]_ - 17:20

**growing** [1]_ - 115:19

**grunt** [1]_ - 16:11

**grunted** [1]_ - 62:13

**guard** [1]_ - 44:17

**guess** [10]_ - 42:10_, 101:7_, 101:17_, 103:15_, 149:24_, 159:15_, 165:13 _, 166:20_, 173:10_, 202:4

**gun** [20]_ - 15:10_, 15:14_, 19:25_, 20:1_, 21:17_, 28:4_, 28:5_, 38:5_, 51:17 _, 51:22_, 89:5_, 104:4_, 106:11_, 109:3_, 127:12_, 160:9_, 160:24_, 196:11

**Gun** [5]_ - 177:22_, 193:23 _, 193:24_, 194:14_, 195:13

**gun's** [1]_ - 30:24

**gunfight** [1]_ - 83:8

**gunfire** [3]_ - 31:24_, 125:23_, 126:1

**guns** [4]_ - 17:10_, 21:16_, 21:19_, 103:24

**gunshots** [17]_ - 115:25 _, 119:12_, 119:14_, 119:16_, 119:19_, 120:17 _, 120:19_, 127:11_, 151:7_, 155:20_, 155:22_, 156:12_, 156:13_, 157:16 _, 157:19_, 157:21_,

158:7

**guy** [3]_ - 102:12_, 160:8_, 174:1

**guys** [1]_ - 149:24

**GX1002** [6]_ - 74:8_, 74:18_, 74:20_, 74:22_, 75:1_, 78:19

**GX200-33** [1]_ - 85:11

**GX200-47** [1]_ - 68:18

**GX600-166** [3]_ - 74:12_, 74:16_, 78:23

**GX600-167** [1]_ - 79:12

**GX600-168** [1]_ - 79:25

**GX600-169** [1]_ - 80:15

**GX600-170** [1]_ - 81:6

**GX600-171** [1]_ - 81:25

### H

**H-A-R-R-I-S** [1]_ - 152:15

**H-E-A-L-E-Y** [1]_ - 175:9

**habit** [1]_ - 147:5

**hair** [2]_ - 121:2_, 145:11

**half** [1]_ - 40:19

**hand** [20]_ - 12:15_, 29:21_, 44:21_, 44:25_, 47:20_, 62:8_, 69:8_, 69:11_, 78:11_, 113:17_, 120:19_, 120:22_, 121:24_, 122:1_, 122:2_, 127:11_, 133:13_, 140:10_, 152:7_, 168:16

**hand-dug** [1]_ - 44:25

**handed** [2]_ - 95:12_, 95:14

**handle** [3]_ - 45:8_, 192:19_, 192:20

**handling** [1]_ - 112:4

**handmade** [1]_ - 45:7

**hands** [1]_ - 40:12

**handwritten** [1]_ - 21:12

**hang** [1]_ - 192:20

**hanging** [4]_ - 161:11_, 161:12_, 162:7_, 192:18

**hangs** [2]_ - 44:11_, 44:13

**happy** [2]_ - 101:10_, 139:11

**hard** [3]_ - 43:17_, 45:11_, 67:10

**harm** [2]_ - 40:20_, 110:19

**harm's** [1]_ - 55:21

**harmed** [1]_ - 110:3

**harming** [1]_ - 110:8

**HARRIS** [1]_ - 152:20

**Harris** [7]_ - 84:16_, 84:19_, 85:6_, 85:8_, 152:4_, 152:15_, 154:19

**hat** [1]_ - 96:6

**hate** [3]_ - 40:9_, 133:20_, 138:15

**hatress** [1]_ - 41:12

**Hawaii** [3]_ - 13:16_, 15:8_, 19:20

**Head** [1]_ - 180:10

**head** [7]_ - 40:13_, 70:14_, 117:18_, 125:3_, 163:8_, 177:3_, 190:3

**heading** [7]_ - 125:15_, 125:16_, 125:22_, 125:25_, 134:17_, 134:18_, 136:18

**headquarters** [2]_ - 22:25_, 177:22

**heads** [2]_ - 49:9_, 52:8

**Healey** [3]_ - 174:25_, 182:25_, 184:25

**HEALEY** [1]_ - 175:12

**health** [3]_ - 114:14_, 115:5_, 115:10

**Healy** [1]_ - 175:9

**hear** [57]_ - 11:2_, 12:14_, 13:2_, 13:17_, 13:19_, 14:14_, 14:15_, 14:17_, 15:1_, 15:23_, 16:8_, 17:11_, 19:25_, 20:9_, 20:12_, 20:15_, 20:20_, 21:6_, 21:7_, 21:9_, 21:15_, 21:22_, 22:13_, 23:12_, 23:13_, 23:19_, 23:22_, 24:2_, 24:7_, 24:10_, 26:1_, 26:7_, 26:18_, 27:1_, 29:22_, 30:7_, 31:1_, 31:20_, 32:24_, 33:23_, 34:7_, 34:20_, 35:16_, 36:2_, 36:3_, 36:8_, 36:9_, 38:10_, 72:3_, 72:4_, 79:16_, 115:25_, 119:9_, 120:19_, 125:23_, 125:25_, 200:25

**heard** [25]_ - 16:11_, 18:20_, 28:13_, 31:22_, 42:3_, 62:5_, 67:4_, 90:17_, 119:11_, 119:13_, 120:17_, 127:11_, 151:6_, 155:20_, 155:22_, 156:9_, 156:13_, 156:15_, 157:15_, 157:18_, 158:6_, 158:8_, 158:19_, 163:16_, 190:18

**hearing** [3]_ - 12:17_, 46:13_, 119:16

**hearsay** [1]_ - 10:20

**heart** [5]_ - 39:20_, 40:1_, 44:11_, 44:16_, 44:19

**heat** [1]_ - 29:15

**heavily** [2]_ - 63:11_, 69:3

**heavy** [2]_ - 16:9_, 159:6

**hedge** [14]_ - 68:24_, 72:16_, 76:22_, 83:22_, 85:20_, 86:3_, 89:20_, 89:25_, 90:7_, 90:9_, 90:13_, 92:4_, 92:17_, 92:23

**height** [2]_ - 105:24_, 173:20

**Heights** [1]_ - 33:22

**held** [2]_ - 96:11_, 97:23

**helicopter** [5]_ - 142:25_, 143:11_, 144:2_, 144:12_, 144:20

**help** [12]_ - 12:25_, 19:22_, 19:24_, 19:25_, 25:22_, 40:6_, 47:23_, 113:20_, 120:15_, 152:10_, 175:3_, 187:15

**Henry** [1]_ - 45:13

**hero** [4]_ - 30:25_, 31:15_, 148:5_, 151:15

**hewn** [1]_ - 44:21

**hid** [1]_ - 30:4

**hidden** [3]_ - 15:2_, 16:11_, 70:19

**hide** [3]_ - 14:12_, 25:13_, 36:10

**hiding** [3]_ - 163:10_, 164:7_, 164:13

**high** [6]_ - 106:8_, 115:22_, 116:1_, 117:9_, 189:1_, 189:2

**high-intensity** [1]_ - 117:9

**high-risk** [2]_ - 189:1_, 189:2

**highway** [2]_ - 144:17_, 195:22

**Hill** [5]_ - 135:9_, 136:13_, 137:9_, 137:12_, 138:19

**himself** [6]_ - 14:12_, 15:17_, 17:15_, 24:4_, 30:4_, 31:4

**Hitler** [1]_ - 40:20

**hits** [1]_ - 32:6

**hitting** [2]_ - 32:8_, 122:13

**hold** [7]_ - 40:7_, 44:16_, 51:24_, 94:5_, 95:16_, 97:20_, 170:17

**holding** [5]_ - 96:15_, 97:18_, 97:19_, 178:11_, 195:24

**holds** [1]_ - 94:7

**Hole** [7]_ - 66:24_, 75:8_, 75:16_, 75:17_, 76:22_, 173:13

**hole** [56]_ - 13:19_, 16:2_, 16:4_, 16:6_, 29:21_, 59:9_, 59:11_, 59:13_, 59:14_, 59:15_, 60:9_, 60:12_, 60:13_, 60:14_, 60:15_, 60:16_, 61:22_, 66:22_, 67:7_, 67:12_, 67:16_, 68:3_, 68:4_, 68:5_, 68:12_, 68:13_, 68:15_, 68:16_, 78:16_, 79:6_, 85:20_, 89:20_, 90:7_, 90:14_, 90:15_, 90:17_, 90:20_, 91:1_, 91:9_, 91:11_, 91:17_, 91:20_, 92:3_, 99:12_, 101:18_, 101:25_, 155:7_, 155:18_, 155:19_, 156:7_, 165:14_, 184:11_, 184:14

**holes** [9]_ - 58:9_, 58:14_, 58:15_, 58:16_, 59:8_, 67:5_, 68:1_, 186:15_, 186:19

**home** [2]_ - 57:5_, 57:8

**Homeland** [3]_ - 48:10_, 48:16_, 48:19

**homeless** [3]_ - 15:6_, 62:20_, 160:15

**Homo** [2]_ - 40:10_, 41:11

**honest** [1]_ - 121:25

**Honolulu** [3]_ - 13:15_, 15:9_, 19:17

**Honor** [125]_ - 5:11_, 5:18_, 6:8_, 6:15_, 6:20_, 8:7_, 9:4_, 10:6_, 11:12_, 11:15_, 11:20_, 12:10_, 39:11_, 40:23_, 44:6_, 45:19_, 46:24_, 47:4_, 47:12_, 59:2_, 65:2_, 65:7_, 67:20_, 68:17_, 72:10_, 73:12_, 74:7_, 74:14_, 74:21_, 74:25_, 78:23_, 80:1_, 81:7_, 81:24_, 85:22_,

88:18_, 89:11_, 90:2_, 90:21_, 91:12_, 91:23_, 94:18_, 94:22_, 95:2_, 96:17_, 97:15_, 99:19_, 100:21_, 108:2_, 111:11_, 111:14_, 111:18_, 111:24_, 112:3_, 112:8_, 112:22_, 112:24_, 113:6_, 113:8_, 113:12_, 114:3_, 124:13_, 128:4_, 128:24_, 130:4_, 130:13_, 130:18_, 135:12_, 137:22_, 140:25_, 145:13_, 146:6_, 146:14_, 146:16_, 147:20_, 147:21_, 147:25_, 149:1_, 149:10_, 151:24_, 152:3, 152:16_, 154:12_, 154:14_, 156:19_, 161:4_, 166:22_, 172:2_, 174:2_, 174:19_, 174:24_, 175:10_, 179:1_, 179:2_, 179:21_, 180:1_, 180:6_, 180:21_, 181:11_, 181:18_, 182:4_, 182:21_, 183:7_, 184:21_, 184:22_, 185:19_, 186:2_, 186:9_, 187:3_, 187:7_, 187:9, 187:22_, 194:21_, 195:18_, 196:9_, 197:3_, 197:13_, 197:25_, 198:6_, 198:18_, 201:20_, 202:7_, 203:1_, 203:11_, 203:16

**honorably** [3]_ - 50:14_, 50:15_, 176:23

**hopefully** [1]_ - 131:10

**hopes** [2]_ - 25:21_, 45:15

**hoping** [2]_ - 17:16_, 32:13

**hostage** [1]_ - 189:1

**hour** [6]_ - 111:5_, 112:7_, 112:8_, 112:15_, 112:18_, 112:25

**hours** [22]_ - 14:6_, 14:7_, 15:5_, 22:18_, 29:16_, 30:16_, 30:22_, 56:12_, 56:13_, 57:13_, 61:12_, 70:21_, 79:9_, 88:10_, 98:25_, 99:7_, 99:15_, 171:14_, 171:15_, 171:16

**house** [5]_ - 15:8_, 19:18_, 34:20_, 34:24_, 190:2

**huddled** [1]_ - 44:20

**Hull** [1]_ - 178:2

**human** [6]_ - 39:19_, 40:10_, 40:17_, 44:12_, 94:16_, 108:12

**humid** [1]_ - 30:17

**humidity** [1]_ - 29:15

**Humvee** [7]_ - 51:6_, 60:4_, 63:5_, 88:10_, 88:11_, 88:16_, 89:3

**Humvees** [1]_ - 60:5

**hundred** [2]_ - 20:10_, 45:11

**hundred-year-old** [1]_ - 45:11

**hundreds** [1]_ - 44:19

**hypervigilant** [2]_ - 117:12_, 117:19

## I

**I-95** [11]_ - 136:18_, 137:8_, 137:10_, 137:14_, 190:6_, 190:7_, 190:15_, 190:17_, 191:1_, 194:6

**IAR** [1]_ - 51:11

**icon** [3]_ - 23:1_, 30:8_, 31:11

**ID** [1]_ - 191:8

**idea** [14]_ - 18:16_, 21:16_, 23:21_, 35:9_, 35:25_, 38:8_, 119:20_, 141:20_, 142:5_, 142:6_, 143:8_, 148:8_, 158:21

**ideas** [1]_ - 45:15

**identification** [5]_ - 144:25_, 145:3_, 145:19_, 146:8_, 185:1

**identified** [7]_ - 63:23_, 64:7_, 65:3_, 69:16_, 86:21_, 145:14_, 146:25

**identify** [3]_ - 26:24_, 64:22_, 70:11

**identifying** [1]_ - 85:1

**identity** [2]_ - 191:11_, 191:15

**illegal** [1]_ - 20:15

**illegally** [1]_ - 36:20

**illustrative** [1]_ - 88:19

**image** [31]_ - 22:9_, 28:24_, 30:2_, 30:6_, 65:22_, 65:23_, 65:24_, 66:18_, 66:20_, 67:6_, 69:5_, 69:7_, 76:21_, 77:15_, 77:22_, 86:3_, 88:15_, 89:16_, 89:17_, 89:21_, 125:2_, 128:8_, 128:20_, 131:18_, 134:4_, 135:16_, 135:20_, 137:15_, 140:22_, 146:23_, 169:6

**imagine** [1]_ - 40:12

**immediate** [1]_ - 162:25

**immediately** [13]_ - 61:1_, 82:20_, 89:22_, 90:13_, 156:14_, 156:16_, 157:4_, 157:7_, 163:16_, 164:4_, 164:23_, 171:3_, 176:19

**immigrant** [1]_ - 34:13

**immigration** [1]_ - 153:23

**imperative** [1]_ - 117:4

**important** [5]_ - 9:19_, 18:4_, 18:11_, 20:14_, 37:13

**importantly** [2]_ - 7:17_, 17:24

**improper** [2]_ - 39:22_, 40:24

**inadmissible** [1]_ - 10:18

**inches** [3]_ - 63:2_, 96:3_, 109:4

**incident** [3]_ - 98:14_, 171:11_, 185:14

**incidents** [3]_ - 42:24_, 43:5_, 189:1

**include** [6]_ - 51:6_, 54:7_, 88:11_, 88:12_, 99:4_, 203:1

**included** [8]_ - 49:6_, 49:8_, 51:16_, 51:22_, 52:11_, 53:1_, 58:8_, 107:19

**includes** [2]_ - 172:8_, 202:23

**including** [7]_ - 7:11_, 7:21_, 19:2_, 20:16_, 35:18_, 203:5

**incoming** [1]_ - 83:1

**inconvenience** [2]_ - 17:25_, 39:16

**indicate** [1]_ - 125:10

**indicated** [9]_ - 12:1_, 42:20_, 65:13_, 68:1_, 87:19_, 97:9_, 197:25_, 200:5_, 200:11

**indicates** [1]_ - 7:9

**indicating** [27]_ - 12:22_, 15:1_, 15:12_, 29:1_, 31:1_, 32:5_, 68:8_, 68:9_, 71:18_, 77:20_, 90:14_, 97:1_, 97:9_, 126:9_, 127:5_, 156:8_, 157:20_, 157:24_, 159:11_, 159:13_, 161:22_, 164:22_, 168:24_, 170:5_, 183:5_, 184:2_, 184:10

**indicating)** [24]_ - 16:12_, 67:19_, 68:4_, 68:14_, 68:16_, 82:19_, 86:7_, 86:25_, 89:7_, 95:21_, 95:25_, 100:13_, 124:23_, 126:3_, 126:20_, 126:25_, 134:10_, 136:2_, 136:5_, 136:14_, 137:13_, 155:23_, 159:4_, 164:23

**indication** [2]_ - 64:9_, 200:10

**indictment** [2]_ - 17:17_, 36:14

**individ** [1]_ - 82:8

**individual** [31]_ - 31:16_, 55:15_, 55:20_, 60:2_, 61:7_, 61:21_, 61:24_, 62:13_, 62:18_, 62:19_, 64:25_, 65:4_, 79:21_, 80:24_, 81:14_, 81:17_, 82:8_, 84:2_, 87:13_, 103:14_, 103:16_, 110:6_, 121:23_, 122:10_, 122:14_, 123:14_, 130:6_, 141:25_, 144:22_, 145:3

**individuals** [1]_ - 52:6

**infantry** [2]_ - 51:12_, 61:15

**information** [14]_ - 24:14_, 25:25_, 33:12_, 36:2_, 120:5_, 120:8_, 123:25_, 134:24_, 139:25_, 141:16_, 143:23_, 160:17_, 178:4

**infrastructure** [1]_ - 49:8

**initial** [6]_ - 62:17_, 62:19_, 62:21_, 120:6_, 142:3_, 143:9

**initiate** [7]_ - 61:4_, 61:5_, 61:6_, 61:24_, 62:3_, 62:4_, 62:7

**initiated** [1]_ - 107:23

**injured** [2]_ - 110:3_, 110:4

**inside** [15]_ - 14:16_, 16:12_, 27:13_, 60:5_, 132:6_, 159:9_, 159:11_, 159:14_, 159:16_, 161:9_, 166:6_, 170:22_, 192:10_, 193:12_, 194:19

**insofar** [1]_ - 202:8

**inspecting** [2]_ - 83:3_,

85:1

instance [2] - 102:10, 104:9

instant [1] - 55:16

instead [1] - 25:4

instruct [1] - 172:5

instructed [2] - 41:1, 98:14

instructing [1] - 176:15

instruction [2] - 37:21, 37:22

instructions [3] - 18:19, 41:1, 200:14

instructor [3] - 176:12, 176:13, 188:21

Insurance [1] - 176:21

intact [1] - 195:10

intelligence [1] - 53:25

intend [3] - 10:16, 37:15, 202:8

intended [7] - 7:7, 18:14, 18:25, 19:7, 21:23, 37:17, 151:13

intending [3] - 11:10, 11:13, 24:5

intends [1] - 202:12

intensity [1] - 117:9

intent [15] - 18:20, 18:23, 21:14, 40:2, 40:5, 40:19, 44:11, 44:14, 44:15, 121:21, 122:6, 127:7, 143:5

intention [2] - 151:7, 151:8

intentionally [1] - 13:4

interaction [1] - 109:23

interactions [2] - 37:2, 142:3

interference [1] - 12:15

interferes [1] - 66:8

interfering [1] - 36:18

interim [1] - 170:15

internal [1] - 93:14

International [30] - 13:20, 14:25, 22:18, 22:23, 24:23, 26:20, 27:4, 27:14, 29:4, 29:9, 29:20, 33:23, 53:10, 56:10, 56:22, 57:5, 57:7, 57:9, 57:14, 57:23, 58:14, 58:15, 65:4, 66:19, 114:25, 118:21, 154:9, 154:20,

155:10, 177:10

interrupt [2] - 112:11, 133:17

interrupted [1] - 32:2

intersection [10] - 65:25, 66:2, 66:3, 119:1, 119:10, 119:13, 120:13, 120:18, 125:18, 134:5

interviewed [2] - 142:15, 142:22

intimidating [1] - 36:18

introduce [5] - 41:3, 74:8, 185:20, 202:8, 202:12

introduced [5] - 41:4, 41:25, 42:15, 46:16, 201:1

introduction [2] - 41:24, 179:25

intuitive [1] - 116:25

investigate [1] - 176:4

investigating [4] - 49:14, 53:25, 176:9, 188:20

Investigation [4] - 98:16, 99:17, 175:20, 188:6

investigation [2] - 172:9, 200:24

Investigations [3] - 48:10, 48:17, 48:20

investigations [1] - 49:7

invoke [1] - 6:13

invoked [1] - 6:17

invokes [1] - 6:16

involved [7] - 13:9, 13:10, 13:12, 13:13, 120:6, 139:18, 170:17

involves [2] - 61:17, 61:18

iPhones [1] - 128:12

Iran [1] - 41:15

iron [1] - 95:19

irregularity [1] - 102:18

issued [1] - 96:13

issues [5] - 59:16, 112:20, 115:9, 115:10, 201:17

IT [1] - 58:22

item [10] - 10:6, 30:14, 95:7, 95:11, 141:12,

162:7, 168:24, 173:25, 183:9, 184:14

items [34] - 6:1, 8:5, 14:15, 42:9, 42:13, 60:7, 60:8, 85:2, 93:1, 99:14, 112:20, 163:3, 163:4, 166:9, 168:6, 168:7, 168:10, 178:20, 178:21, 178:22, 178:24, 180:18, 181:3, 181:4, 181:14, 181:19, 184:17, 184:19, 185:2, 185:3, 185:5, 186:4, 203:8

itself [6] - 19:2, 58:12, 68:25, 72:18, 106:19, 109:13

## J

jail [6] - 178:1, 178:18, 178:19, 178:22, 179:15, 201:23

jam [1] - 144:18

January [1] - 176:7

Japan [1] - 50:25

JASON [2] - 152:15, 152:20

Jason [4] - 84:16, 85:6, 85:8, 152:15

jawline [1] - 62:15

Jennifer [1] - 5:12

Jim [1] - 5:13

job [2] - 38:12, 148:23

John [3] - 5:11, 23:22, 26:2

joined [3] - 157:9, 171:24, 176:18

joining [2] - 176:19, 189:5

joke [1] - 17:7

Jose [1] - 199:4

journey [1] - 33:3

joy [1] - 44:18

judge [3] - 18:12, 36:22, 39:24

Judge [11] - 5:24, 18:5, 18:18, 36:14, 37:12, 37:21, 38:5, 39:22, 74:11, 124:17, 151:25

judges [1] - 24:15

July [2] - 19:17, 27:25

jump [1] - 173:21

jumped [6] - 156:16, 157:3, 164:3, 164:22, 173:13, 173:16

jumpsuit [2] - 178:14, 178:16

junction [1] - 125:18

juror [2] - 9:19, 100:22

JUROR [1] - 131:8

jurors [7] - 5:23, 7:14, 8:11, 9:8, 9:21, 10:4, 172:8

JURY [2] - 125:3, 180:10

jury [87] - 7:21, 8:5, 10:1, 10:2, 11:19, 11:21, 17:10, 17:25, 38:24, 38:25, 39:5, 39:10, 39:12, 39:24, 41:18, 41:20, 43:25, 44:5, 44:7, 45:23, 45:24, 45:25, 47:2, 47:3, 47:7, 95:16, 95:19, 100:2, 100:3, 100:19, 100:25, 111:6, 111:7, 111:13, 111:15, 112:16, 112:17, 113:7, 113:9, 114:4, 115:3, 115:18, 119:15, 120:14, 122:9, 124:10, 124:14, 124:15, 124:19, 125:1, 125:21, 125:24, 127:3, 127:18, 128:12, 129:6, 129:10, 130:20, 131:18, 132:11, 135:14, 137:11, 141:8, 146:17, 146:19, 147:23, 172:19, 172:20, 172:25, 173:2, 180:5, 186:5, 186:7, 186:8, 194:22, 197:19, 197:21, 198:9, 198:13, 198:21, 199:25, 200:2, 200:18, 201:13, 201:14, 203:6, 203:18

## K

K-9 [1] - 192:2

Kathryn [1] - 199:3

keep [8] - 22:22, 24:10, 34:3, 98:19, 122:13, 137:2, 200:23, 201:10

keeping [7] - 7:3, 8:23, 18:10, 99:7, 99:16, 150:24, 151:1

Kenya [1] - 40:11

**kept** [3] - 22:4, 148:19, 148:21

**key** [2] - 186:16, 186:19

**keys** [1] - 22:3

**khaki** [1] - 96:5

**kid** [1] - 94:2

**kill** [11] - 13:5, 17:16, 18:14, 18:25, 21:22, 22:16, 24:5, 25:15, 29:5, 38:16, 41:9

**killing** [1] - 17:3

**kind** [24] - 9:11, 26:10, 31:24, 33:2, 36:24, 40:7, 51:24, 63:24, 79:23, 93:12, 94:5, 96:15, 97:18, 114:13, 117:4, 126:21, 138:13, 170:25, 172:10, 178:7, 179:19, 183:2, 191:20, 192:16

**knowing** [4] - 28:20, 28:21, 46:18

**knowledge** [1] - 147:17

**known** [16] - 51:11, 53:10, 53:24, 55:19, 72:2, 79:9, 80:22, 80:24, 81:16, 82:8, 83:4, 83:13, 84:2, 85:4, 108:22, 176:21

**knows** [1] - 28:16

**Korea** [1] - 50:25

**Kristy** [1] - 5:18

## L

**labor** [1] - 45:11

**laboratory** [2] - 20:16, 36:4

**ladies** [34] - 11:22, 12:13, 12:18, 13:22, 16:13, 16:25, 22:19, 24:25, 25:16, 28:7, 28:11, 29:18, 32:21, 35:20, 36:13, 38:22, 40:25, 41:17, 47:9, 65:13, 94:25, 99:22, 111:3, 112:13, 149:4, 149:16, 152:18, 172:4, 174:5, 180:8, 194:22, 197:8, 197:16, 200:5

**Lago** [8] - 22:24, 28:17, 53:1, 53:4, 53:6, 189:17, 190:4, 190:10

**Lake** [3] - 114:12, 114:19

**landed** [2] - 57:7, 144:17

**landing** [1] - 144:5

**lane** [7] - 120:20, 133:25, 134:1, 134:10, 136:18, 136:19, 139:6

**lanes** [1] - 191:1

**language** [1] - 121:12

**large** [3] - 139:4, 156:17, 157:2

**larger** [1] - 97:22

**laser** [1] - 202:25

**last** [25] - 12:22, 13:4, 14:7, 24:3, 37:18, 47:19, 67:4, 72:2, 80:23, 81:16, 82:7, 84:2, 113:23, 113:25, 115:15, 117:20, 118:2, 152:13, 160:24, 169:22, 175:6, 175:9, 187:18, 197:9, 199:10

**late** [3] - 22:12, 33:18, 35:12

**lathe** [1] - 45:11

**launcher** [1] - 51:18

**law** [33] - 14:19, 18:5, 18:12, 18:19, 18:21, 31:16, 35:4, 36:12, 36:18, 83:16, 99:3, 114:15, 115:23, 120:8, 123:25, 138:16, 138:20, 139:1, 139:7, 140:1, 140:10, 140:19, 141:21, 142:3, 142:8, 143:9, 169:16, 170:11, 170:13, 171:6, 190:15, 193:2

**LAW** [1] - 51:18

**lawyer** [1] - 7:12

**lawyers** [1] - 7:11

**lay** [1] - 17:20

**laying** [4] - 45:7, 104:6, 104:10, 192:19

**Lazaro** [4] - 34:12, 34:19, 34:21

**lead** [3] - 172:13, 198:8, 198:22

**leader** [1] - 188:22

**leaders** [2] - 190:13, 190:15

**leading** [3] - 19:1, 24:17, 169:7

**leaning** [1] - 166:17

**leapfrog** [1] - 155:7

**learn** [6] - 29:23, 33:15, 40:18, 55:24, 56:3, 56:16

**learned** [4] - 56:1, 56:5, 56:18, 117:3

**least** [10] - 13:10, 13:12, 14:6, 17:2, 23:25, 32:19, 103:3, 121:16, 122:19, 122:20

**leather** [1] - 45:14

**leave** [6] - 9:19, 34:18, 133:21, 143:1, 144:23, 190:2

**lectern** [1] - 12:11

**left** [35] - 16:15, 23:1, 29:8, 33:20, 61:25, 62:25, 63:3, 68:24, 69:1, 69:8, 69:21, 72:17, 83:21, 85:19, 85:20, 106:17, 120:19, 120:20, 120:21, 122:4, 125:19, 126:1, 133:13, 136:17, 137:8, 139:10, 139:12, 151:11, 151:13, 168:16, 182:25, 194:20, 195:7

**left-hand** [4] - 69:8, 120:19, 133:13, 168:16

**left-side** [1] - 182:25

**leg** [1] - 183:1

**legal** [3] - 110:9, 112:20, 201:17

**legally** [1] - 8:1

**legging** [1] - 180:16

**length** [2] - 199:16, 199:21

**length-of-examination** [1] - 199:21

**lengths** [1] - 135:7

**lengthy** [1] - 8:16

**lens** [4] - 78:14, 78:15, 162:2, 162:3

**letter** [2] - 35:6, 35:7

**letting** [3] - 80:8, 81:14, 82:7

**level** [3] - 106:2, 106:5, 106:10

**lever** [1] - 196:19

**lib** [1] - 39:17

**license** [33] - 13:13, 32:13, 32:17, 32:18, 32:20, 33:17, 34:2, 34:6, 34:7, 38:14, 43:21, 123:8, 123:21, 123:23, 123:24, 124:2, 127:8, 127:9, 128:2, 133:15, 134:20, 134:21, 136:21, 136:25, 137:6, 138:7, 139:20, 139:24, 139:25, 140:3, 140:6, 141:18, 147:6

**licensed** [1] - 114:14

**lied** [1] - 25:5

**lies** [1] - 13:15

**lieutenant** [1] - 177:1

**life** [9] - 16:7, 28:20, 45:17, 64:17, 64:18, 115:3, 115:8, 117:7

**light** [16] - 51:18, 121:6, 121:7, 132:17, 132:24, 135:9, 136:14, 136:21, 136:24, 137:18, 138:11, 149:24, 150:1, 150:10, 150:13, 201:23

**light-colored** [2] - 121:6, 121:7

**lights** [4] - 135:5, 135:6, 135:8, 136:9

**likely** [1] - 102:9

**limb** [1] - 102:25

**limited** [2] - 43:20, 108:4

**line** [81] - 11:6, 11:9, 59:18, 59:21, 59:23, 59:24, 60:3, 61:8, 61:22, 61:25, 62:2, 62:18, 62:20, 63:1, 63:8, 63:17, 63:19, 63:22, 64:19, 65:4, 67:15, 68:24, 69:2, 69:3, 70:3, 70:19, 72:15, 76:3, 76:5, 79:22, 80:9, 83:22, 84:3, 84:7, 84:11, 85:1, 85:3, 85:10, 85:12, 85:16, 86:3, 87:25, 89:25, 90:9, 90:14, 92:17, 92:23, 93:16, 93:18, 95:15, 95:24, 96:24, 97:6, 98:2, 101:20, 101:23, 102:2, 102:21, 102:23, 103:20, 104:18, 104:21, 107:10, 156:1, 158:8, 158:13, 158:14, 159:6, 159:12, 159:14, 159:16, 159:23, 159:25, 161:9, 164:6, 164:24, 164:25, 165:23, 169:8

**lines** [1] - 126:24

**link** [6] - 76:10, 104:25, 106:13, 106:16, 109:11, 109:12

**linked** [2] - 97:7, 99:5

**linking** [1] - 93:18

**list** [4] - 6:9, 8:15, 8:23, 30:14

**listen** [2] - 200:15, 200:20

**listened** [1] - 73:4

**lists** [1] - 9:19

**literally** [1] - 16:7

**live** [19] - 15:9, 21:20, 34:11, 40:4, 110:5, 114:11, 114:12, 128:14, 128:16, 128:19, 129:14, 129:20, 130:1, 130:5, 130:7, 130:22, 132:13, 190:3, 190:6

**lived** [3] - 19:19, 34:13, 45:18

**lives** [3] - 18:1, 39:16, 118:8

**living** [5] - 15:7, 19:17, 94:2, 192:15, 192:23

**loaded** [6] - 13:9, 14:15, 17:5, 35:19, 83:8, 94:25

**loading** [2] - 19:3, 194:1

**local** [1] - 14:10

**located** [7] - 53:12, 53:13, 71:17, 83:7, 104:9, 119:4, 177:22

**locating** [1] - 62:19

**location** [34] - 15:17, 23:5, 23:6, 24:9, 24:10, 26:13, 26:22, 29:23, 30:7, 30:8, 35:14, 36:3, 55:22, 58:10, 60:16, 67:1, 67:19, 72:2, 77:7, 77:9, 79:4, 80:24, 81:16, 82:8, 82:18, 83:10, 84:2, 84:19, 85:8, 85:9, 87:15, 139:22, 142:19, 147:17

**locations** [4] - 52:24, 52:25, 53:1, 124:11

**lock** [1] - 168:18

**locust** [1] - 45:9

**lodge** [1] - 8:20

**log** [1] - 44:21

**logical** [2] - 104:24,

108:9

**LONG** [185] - 46:24, 47:4, 47:12, 48:5, 59:2, 59:3, 65:2, 65:6, 65:11, 65:20, 66:10, 67:20, 67:23, 68:17, 68:20, 72:10, 72:13, 73:12, 73:23, 74:7, 74:11, 74:14, 74:18, 74:25, 75:3, 75:11, 75:14, 75:15, 75:24, 76:1, 76:2, 76:13, 76:15, 76:19, 76:20, 76:23, 77:1, 77:5, 77:6, 77:10, 77:12, 77:13, 78:6, 78:8, 78:9, 78:17, 78:18, 78:22, 79:1, 79:12, 79:15, 79:25, 80:4, 80:15, 80:18, 81:6, 81:10, 81:24, 82:3, 82:10, 82:12, 85:22, 86:1, 86:8, 86:11, 86:16, 86:18, 87:6, 87:7, 88:18, 89:1, 89:11, 89:14, 90:1, 90:4, 90:21, 90:24, 91:12, 91:15, 91:23, 92:1, 92:11, 92:14, 94:18, 94:22, 95:2, 95:5, 95:7, 95:8, 96:17, 96:20, 97:15, 97:17, 99:19, 101:12, 105:8, 108:1, 109:6, 110:9, 111:10, 111:18, 111:24, 112:3, 152:3, 152:16, 152:18, 152:23, 154:11, 154:14, 154:18, 156:19, 156:22, 161:4, 161:7, 161:14, 161:17, 162:13, 162:16, 162:22, 162:24, 164:14, 164:16, 165:7, 165:10, 166:1, 166:4, 166:22, 167:1, 167:9, 167:12, 168:1, 168:4, 168:19, 168:21, 169:1, 169:4, 169:24, 170:2, 172:2, 174:2, 174:19, 174:24, 175:10, 175:15, 179:1, 179:5, 179:21, 180:5, 180:8, 180:11, 180:12, 180:20, 180:23, 181:11, 181:13, 181:18, 182:4, 182:6, 182:10, 182:12, 182:16, 182:18, 182:21, 182:24, 183:7, 183:9, 183:10, 184:21, 184:24, 185:19, 186:1, 186:4, 186:7, 187:2, 187:6,

187:9, 187:22, 188:2, 190:9, 194:21, 195:1, 195:17, 196:9, 197:2, 197:12

**long-sleeved** [3] - 179:19, 180:14, 182:9

**look** [17] - 14:16, 16:13, 25:9, 27:9, 27:10, 29:13, 93:16, 120:25, 121:18, 121:19, 122:14, 122:18, 139:11, 160:14, 160:19, 166:14, 185:3

**looked** [17] - 28:2, 83:1, 121:2, 121:3, 121:13, 121:18, 121:19, 121:21, 121:24, 156:14, 157:5, 158:6, 160:14, 162:6, 163:4, 163:5, 167:23

**looking** [11] - 16:2, 61:18, 85:14, 89:15, 90:9, 103:9, 115:9, 139:18, 164:12, 165:13

**looks** [5] - 29:20, 128:18, 167:3, 170:6, 183:6

**lose** [1] - 194:14

**loses** [2] - 186:15, 186:18

**loss** [1] - 9:11

**Loureiro** [1] - 199:5

**love** [5] - 33:2, 39:20, 40:7, 40:14, 116:16

**low** [1] - 106:10

**lower** [2] - 28:24, 168:16

**Luce** [10] - 5:13, 12:19, 129:16, 130:19, 132:10, 132:20, 135:11, 137:20, 140:12, 146:19

**luckily** [1] - 103:12

**lunch** [5] - 100:7, 111:5, 112:11, 112:13, 113:1

**lying** [2] - 25:3, 33:1

**M**

**M-A-Y-O** [1] - 187:21

**M-C-G-E-E** [1] - 114:1

**M15** [1] - 28:10

**M16** [1] - 51:16

**M240** [2] - 51:17, 89:5

**M249** [1] - 51:17

**M27** [1] - 51:11

**M4** [1] - 51:16

**M67** [1] - 51:18

**M81** [1] - 183:21

**ma'am** [91] - 47:24, 49:12, 49:15, 50:10, 50:15, 50:22, 51:3, 51:9, 52:14, 53:6, 55:3, 56:5, 56:15, 56:24, 57:3, 57:6, 57:24, 58:3, 61:11, 62:4, 64:2, 64:21, 65:22, 66:15, 66:20, 67:9, 67:13, 68:6, 69:10, 69:13, 70:20, 71:10, 71:15, 72:21, 72:25, 73:6, 73:10, 74:3, 74:6, 75:5, 75:18, 76:5, 76:11, 76:17, 77:3, 77:9, 77:20, 77:25, 78:21, 81:2, 81:5, 81:21, 84:18, 84:21, 84:24, 85:13, 86:7, 86:24, 87:12, 88:1, 88:7, 89:7, 89:24, 90:12, 91:21, 92:10, 93:6, 93:18, 93:22, 95:6, 188:8, 188:21, 189:4, 189:13, 189:15, 189:25, 190:11, 190:23, 191:13, 191:25, 192:5, 192:9, 192:12, 193:1, 193:4, 194:3, 194:9, 194:16, 195:5, 195:16, 197:15

**machine** [3] - 51:17, 51:22, 89:5

**mad** [1] - 149:9

**Madea** [1] - 149:8

**madness** [1] - 41:12

**magazine** [4] - 83:5, 83:6, 83:7, 83:8

**magical** [1] - 45:4

**main** [3] - 59:19, 75:9, 75:13

**mainland** [1] - 50:25

**maintain** [4] - 54:9, 117:4, 153:15, 172:12

**major** [8] - 13:5, 15:3, 18:7, 21:24, 38:17, 52:17, 54:11, 84:23

**malls** [1] - 117:16

**man** [14] - 18:14, 25:14, 29:1, 31:15, 32:5, 34:12, 34:21, 120:21, 121:1, 139:1, 145:7,

148:5_, 148:23

**manage** [1]_ - 32:14

**managed** [1]_ - 32:17

**maneuver** [2]_ - 158:8_, 160:4

**maneuvered** [3]_ - 109:16_, 160:23, 160:25

**maneuvering** [2]_ - 157:13_, 158:17

**manipulate** [1]_ - 98:20

**manipulated** [2]_ - 97:2 _, 109:18

**manipulating** [1]_ - 87:20

**manner** [2]_ - 96:22_, 106:11

**map** [10]_ - 23:1_, 29:18_, 67:25_, 82:16_, 120:15_, 124:8_, 125:10_, 134:4_, 135:20_, 137:10

**maps** [1]_ - 22:21

**Mar** [8]_ - 22:24_, 28:17_, 53:1_, 53:4_, 53:6_, 189:17_, 190:4_, 190:10

**Mar-a-Lago** [8]_ - 22:24 _, 28:17_, 53:1_, 53:4_, 53:6_, 189:17_, 190:4_, 190:10

**Marathon** [2]_ - 23:2_, 28:25

**March** [2]_ - 35:12_, 35:21

**Marfa** [1]_ - 50:5

**Maria** [1]_ - 5:13

**marine** [1]_ - 15:21

**Marine** [17]_ - 49:23_, 50:9_, 50:11_, 50:12_, 50:17_, 50:18_, 50:21_, 51:2_, 51:3_, 51:10_, 51:14_, 60:5_, 61:14_, 63:4_, 88:9_, 88:15_, 108:16

**mark** [3]_ - 22:25_, 67:11_, 164:17

**marked** [3]_ - 96:6_, 135:24_, 184:25

**Marker** [5]_ - 190:16_, 190:19_, 190:22_, 194:6_, 194:14

**markings** [1]_ - 45:5

**marksman** [4]_ - 51:5_, 51:7_, 51:9_, 104:3

**marshals** [3]_ - 9:9_, 9:20_, 9:24

**Martin** [13]_ - 33:8_, 144:6 _, 144:7_, 144:10_, 144:12_, 190:3_, 190:25_, 191:5_, 193:19_, 193:20_, 194:13_, 196:4

**marvel** [1]_ - 45:1

**matches** [1]_ - 38:8

**matter** [4]_ - 7:24_, 202:13_, 202:17_, 203:4

**matters** [5]_ - 39:21_, 40:2_, 54:25_, 188:14_, 201:17

**Mayo** [4]_ - 187:10_, 187:11_, 187:12_, 187:20

**MAYO** [1]_ - 187:24

**McGee** [27]_ - 31:15_, 31:18_, 31:19_, 31:23_, 32:7_, 32:11_, 32:22_, 37:1_, 111:25_, 113:13_, 113:15_, 113:25_, 114:5_, 114:9_, 115:16_, 124:6_, 125:4_, 128:8_, 131:17_, 134:8_, 135:20_, 138:2_, 140:16_, 141:12_, 146:23 _, 147:21_, 151:25

**MDCOA** [1]_ - 102:10

**mean** [23]_ - 46:7_, 54:5_, 64:1_, 83:15_, 97:11_, 98:18_, 99:10_, 115:8_, 116:19_, 121:1_, 124:24_, 127:10_, 134:22_, 138:11 _, 138:15_, 142:20_, 144:14_, 148:9_, 148:12_, 151:2_, 164:9_, 165:5_, 173:11

**mean..** [1]_ - 151:3

**meaning** [2]_ - 82:24_, 192:6

**means** [5]_ - 17:11_, 45:17_, 55:12_, 98:19_, 170:17

**meant** [2]_ - 138:15_, 144:15

**meanwhile** [1]_ - 34:10

**measurements** [1]_ - 96:2

**measures** [1]_ - 12:16

**mechanical** [1]_ - 202:13

**mechanism** [1]_ - 35:19

**Medellín** [1]_ - 33:20

**MEDETIS** [185]_ - 46:24_, 47:4_, 47:12_, 48:5_, 59:2 _, 59:3_, 65:2_, 65:6_, 65:11_, 65:20_, 66:10_,

67:20_, 67:23_, 68:17_, 68:20_, 72:10_, 72:13_, 73:12_, 73:23_, 74:7_, 74:11_, 74:14_, 74:18_, 74:25_, 75:3_, 75:11_, 75:14_, 75:15_, 75:24_, 76:1_, 76:2_, 76:13_, 76:15_, 76:19_, 76:20_, 76:23_, 77:1_, 77:5_, 77:6 _, 77:10_, 77:12_, 77:13_, 78:6_, 78:8_, 78:9_, 78:17, 78:18_, 78:22_, 79:1_, 79:12_, 79:15_, 79:25_, 80:4_, 80:15_, 80:18_, 81:6_, 81:10_, 81:24_, 82:3_, 82:10, 82:12_, 85:22_, 86:1_, 86:8_, 86:11_, 86:16, 86:18_, 87:6_, 87:7_, 88:18_, 89:1_, 89:11_, 89:14_, 90:1_, 90:4_, 90:21_, 90:24_, 91:12_, 91:15_, 91:23_, 92:1_, 92:11_, 92:14_, 94:18_, 94:22_, 95:2_, 95:5_, 95:7 _, 95:8_, 96:17_, 96:20_, 97:15_, 97:17_, 99:19_, 101:12_, 105:8_, 108:1_, 109:6_, 110:9_, 111:10_, 111:18_, 111:24_, 112:3_, 152:3, 152:16, 152:18_, 152:23_, 154:11_, 154:14 _, 154:18_, 156:19_, 156:22_, 161:4_, 161:7_, 161:14_, 161:17_, 162:13 _, 162:16_, 162:22, 162:24, 164:14, 164:16_, 165:7_, 165:10_, 166:1_, 166:4_, 166:22_, 167:1_, 167:9_, 167:12_, 168:1_, 168:4_, 168:19_, 168:21_, 169:1_, 169:4_, 169:24_, 170:2_, 172:2_, 174:2_, 174:19_, 174:24_, 175:10 _, 175:15_, 179:1_, 179:5 _, 179:21_, 180:5_, 180:8 _, 180:11_, 180:12_, 180:20, 180:23_, 181:11_, 181:13_, 181:18_, 182:4_, 182:6_, 182:10, 182:12_, 182:16, 182:18_, 182:21_, 182:24_, 183:7_, 183:9_, 183:10_, 184:21_, 184:24 _, 185:19_, 186:1_, 186:4 _, 186:7_, 187:2_, 187:6_, 187:9, 187:22_, 188:2_, 190:9_, 194:21_, 195:1_, 195:17_, 196:9_, 197:2_, 197:12

**Medetis** [4]_ - 5:13_,

47:11_, 111:22_, 197:23

**MEDETIS-LONG** [185]_ - 46:24_, 47:4_, 47:12_, 48:5_, 59:2_, 59:3_, 65:2 _, 65:6_, 65:11_, 65:20_, 66:10_, 67:20_, 67:23_, 68:17_, 68:20_, 72:10_, 72:13_, 73:12_, 73:23_, 74:7_, 74:11_, 74:14_, 74:18_, 74:25_, 75:3_, 75:11_, 75:14_, 75:15_, 75:24_, 76:1_, 76:2_, 76:13_, 76:15_, 76:19_, 76:20_, 76:23_, 77:1_, 77:5_, 77:6_, 77:10_, 77:12_, 77:13_, 78:6_, 78:8_, 78:9_, 78:17, 78:18 _, 78:22_, 79:1_, 79:12_, 79:15_, 79:25_, 80:4_, 80:15_, 80:18_, 81:6_, 81:10_, 81:24_, 82:3_, 82:10, 82:12_, 85:22_, 86:1_, 86:8_, 86:11_, 86:16, 86:18_, 87:6_, 87:7 _, 88:18_, 89:1_, 89:11_, 89:14_, 90:1_, 90:4_, 90:21_, 90:24_, 91:12_, 91:15_, 91:23_, 92:1_, 92:11_, 92:14_, 94:18_, 94:22_, 95:2_, 95:5_, 95:7 _, 95:8_, 96:17_, 96:20_, 97:15_, 97:17_, 99:19_, 101:12_, 105:8_, 108:1_, 109:6_, 110:9_, 111:10_, 111:18_, 111:24_, 112:3_, 152:3, 152:16, 152:18_, 152:23_, 154:11_, 154:14 _, 154:18_, 156:19_, 156:22_, 161:4_, 161:7_, 161:14_, 161:17_, 162:13 _, 162:16_, 162:22, 162:24, 164:14, 164:16_, 165:7_, 165:10_, 166:1_, 166:4_, 166:22_, 167:1_, 167:9_, 167:12_, 168:1_, 168:4_, 168:19_, 168:21_, 169:1_, 169:4_, 169:24_, 170:2_, 172:2_, 174:2_, 174:19_, 174:24_, 175:10 _, 175:15_, 179:1_, 179:5 _, 179:21_, 180:5_, 180:8 _, 180:11_, 180:12_, 180:20, 180:23_, 181:11_, 181:13_, 181:18_, 182:4_, 182:6_, 182:10, 182:12_, 182:16, 182:18_, 182:21_, 182:24_, 183:7_, 183:9_, 183:10_, 184:21_, 184:24 _, 185:19_, 186:1_, 186:4 _, 186:7_, 187:2_, 187:6_,

187:9, 187:22, 188:2, 190:9, 194:21, 195:1, 195:17, 196:9, 197:2, 197:12

**Medetis-Long** [3] - 5:13, 47:11, 111:22

**media** [1] - 172:10

**median** [1] - 190:20

**meeting** [1] - 40:12

**member** [2] - 98:8, 99:5

**members** [11] - 33:1, 52:12, 81:1, 114:4, 120:14, 129:10, 135:14, 146:16, 147:23, 191:4, 193:6

**mental** [3] - 114:14, 115:5, 115:10

**mentally** [1] - 110:5

**mention** [1] - 9:7

**mentioned** [18] - 11:2, 21:5, 28:2, 29:9, 30:13, 30:23, 31:6, 50:7, 53:8, 54:4, 54:19, 60:19, 87:8, 88:3, 127:20, 133:23, 139:24, 172:11

**mentor** [1] - 118:9

**message** [1] - 26:16

**messages** [7] - 21:17, 25:5, 32:25, 33:2, 33:5, 33:13

**met** [1] - 178:2

**metal** [1] - 14:17

**meters** [1] - 94:14

**Mexico** [1] - 34:13

**Miami** [2] - 33:23, 153:24

**mic** [1] - 113:23

**Michelle** [1] - 149:9

**microphone** [1] - 19:8

**mid** [3] - 24:23, 24:24, 34:9

**mid-August** [2] - 24:23, 34:9

**mid-September** [1] - 24:24

**midday** [3] - 14:8, 118:2, 177:15

**middle** [8] - 22:20, 24:24, 56:14, 56:15, 57:13, 82:18, 82:23, 136:19

**might** [12] - 24:11,

27:19, 28:20, 32:4, 33:3, 37:20, 55:8, 61:19, 104:10, 117:8, 156:2, 163:6

**Mile** [5] - 190:16, 190:19, 190:22, 194:5, 194:13

**miles** [5] - 22:7, 22:12, 29:4, 31:10, 190:19

**military** [5] - 13:9, 20:2, 21:22, 88:6, 102:8

**military-grade** [2] - 13:9, 20:2

**MILITELLO** [1] - 5:18

**Militello** [1] - 5:19

**million** [6] - 40:9, 40:18, 40:19, 40:20, 40:22, 41:8

**mind** [11] - 40:1, 69:24, 70:8, 70:10, 70:17, 93:3, 116:21, 125:21, 172:12, 200:23, 201:10

**mindset** [4] - 102:7, 109:1, 109:21, 109:22

**mine** [5] - 13:2, 116:14, 117:8, 118:8, 118:9

**minimum** [1] - 35:7

**minute** [5] - 12:6, 38:20, 39:2, 198:23, 199:10

**minutes** [8] - 7:3, 35:3, 42:4, 99:23, 99:24, 100:6, 120:15, 131:10

**mirror** [1] - 135:3

**missed** [1] - 151:13

**missile** [1] - 28:11

**mission** [2] - 21:1, 25:1

**mistake** [1] - 68:11

**MLCOA** [1] - 102:10

**mobile** [2] - 191:9, 191:10

**mockery** [1] - 43:24

**model** [2] - 141:18, 196:23

**modern** [1] - 39:19

**modification** [1] - 196:18

**mogul** [5] - 79:2, 79:3, 79:5, 80:11

**moment** [30] - 11:1, 12:11, 13:21, 16:16, 27:5, 30:10, 33:5, 41:16, 47:17, 58:18, 60:10, 64:15, 66:6,

73:15, 73:24, 74:9, 75:21, 76:1, 77:5, 80:11, 124:8, 125:8, 128:21, 132:13, 140:20, 147:20, 152:6, 179:1, 184:21, 187:6

**momentarily** [3] - 5:21, 10:4, 74:9

**moments** [4] - 37:18, 73:8, 101:22, 146:18

**monitored** [1] - 27:17

**month** [1] - 15:15

**months** [4] - 23:18, 34:16, 35:1, 176:19

**Moore** [1] - 178:2

**morals** [1] - 44:12

**Moran** [3] - 5:23, 10:5, 58:18

**morning** [23] - 5:2, 5:4, 5:11, 5:14, 5:17, 5:18, 5:20, 11:22, 11:25, 12:18, 15:16, 15:25, 17:18, 22:19, 28:15, 28:23, 30:10, 56:12, 57:10, 57:13, 57:20, 57:21, 99:22

**most** [13] - 13:11, 15:20, 17:21, 17:24, 24:24, 25:25, 100:18, 102:9, 105:6, 105:15, 105:24

**mostly** [1] - 188:14

**motion** [2] - 8:1, 128:18

**motorcade** [1] - 27:19

**mounted** [1] - 161:12

**move** [23] - 11:18, 16:21, 18:2, 19:8, 42:8, 43:15, 46:7, 47:4, 62:1, 62:25, 69:21, 71:16, 106:16, 106:17, 108:20, 130:10, 146:6, 149:1, 163:18, 163:21, 181:19, 198:11, 198:20

**moved** [11] - 41:15, 78:3, 84:6, 90:20, 107:13, 107:15, 118:4, 132:24, 160:4, 198:1, 198:6

**movement** [10] - 54:6, 55:18, 56:19, 56:20, 58:8, 58:10, 68:1, 72:4, 129:13

**movements** [13] - 13:14, 22:22, 24:16, 24:21, 25:19, 25:22, 26:16, 27:21, 53:23, 54:2, 54:13, 54:15,

54:17

**moves** [2] - 128:24, 140:25

**moving** [20] - 19:19, 28:21, 71:5, 71:6, 71:9, 71:13, 71:18, 79:5, 85:9, 107:10, 107:12, 108:22, 108:23, 132:16, 133:1, 133:3, 197:17, 200:5

**MR** [166] - 5:4, 5:11, 5:16, 6:8, 6:15, 6:20, 7:1, 8:7, 9:1, 9:4, 9:7, 9:14, 9:17, 10:6, 10:9, 11:6, 11:12, 11:15, 12:10, 12:18, 14:2, 19:10, 19:12, 35:4, 38:19, 39:15, 39:22, 39:24, 40:23, 41:8, 41:19, 42:8, 42:16, 43:1, 43:3, 43:7, 43:11, 43:15, 43:19, 43:23, 44:2, 44:10, 45:19, 45:20, 45:24, 46:5, 46:11, 46:22, 73:18, 74:21, 88:23, 100:13, 100:15, 100:18, 101:6, 101:15, 101:16, 105:13, 105:21, 105:22, 108:6, 108:8, 108:11, 109:14, 110:13, 111:1, 112:7, 112:22, 112:24, 113:6, 113:12, 114:3, 114:8, 120:14, 120:16, 124:13, 124:17, 124:22, 125:1, 125:4, 125:7, 128:4, 128:7, 128:24, 129:2, 129:6, 129:8, 129:10, 129:12, 129:16, 129:19, 130:4, 130:9, 130:13, 130:18, 130:21, 131:15, 131:16, 132:10, 132:12, 132:20, 132:22, 134:3, 134:7, 135:11, 135:19, 137:20, 138:1, 140:12, 140:15, 140:25, 141:3, 141:7, 141:10, 141:11, 145:13, 145:16, 145:17, 146:6, 146:10, 146:14, 146:16, 146:22, 147:20, 147:23, 147:25, 148:2, 149:1, 149:6, 149:10, 149:12, 149:15, 149:19, 149:20, 151:19, 151:22, 151:24, 173:6, 173:8, 174:4, 174:7, 174:10, 174:17, 180:1, 181:23, 185:23, 186:12, 186:14, 186:24, 195:21, 196:11,

196:15_, 197:6_, 197:25_, 198:18_, 199:2_, 199:11_, 199:19_, 199:22_, 199:24_, 201:20_, 201:22_, 202:7_, 202:23_, 203:10_, 203:16

**MS** [186]_ - 5:18_, 46:24_, 47:4_, 47:12_, 48:5_, 59:2_, 59:3_, 65:2_, 65:6_, 65:11_, 65:20_, 66:10_, 67:20_, 67:23_, 68:17_, 68:20_, 72:10_, 72:13_, 73:12_, 73:23_, 74:7_, 74:11_, 74:14_, 74:18_, 74:25_, 75:3_, 75:11_, 75:14_, 75:15_, 75:24_, 76:1_, 76:2_, 76:13_, 76:15_, 76:19_, 76:20_, 76:23_, 77:1_, 77:5_, 77:6_, 77:10_, 77:12_, 77:13_, 78:6_, 78:8_, 78:9_, 78:17, 78:18_, 78:22_, 79:1_, 79:12_, 79:15_, 79:25_, 80:4_, 80:15_, 80:18_, 81:6_, 81:10_, 81:24_, 82:3_, 82:10, 82:12_, 85:22_, 86:1_, 86:8_, 86:11_, 86:16, 86:18_, 87:6_, 87:7_, 88:18_, 89:1_, 89:11_, 89:14_, 90:1_, 90:4_, 90:21_, 90:24_, 91:12_, 91:15_, 91:23_, 92:1_, 92:11_, 92:14_, 94:18_, 94:22_, 95:2_, 95:5_, 95:7_, 95:8_, 96:17_, 96:20_, 97:15_, 97:17_, 99:19_, 101:12_, 105:8_, 108:1_, 109:6_, 110:9_, 111:10_, 111:18_, 111:24_, 112:3_, 152:3, 152:16, 152:18_, 152:23_, 154:11_, 154:14_, 154:18_, 156:19_, 156:22_, 161:4_, 161:7_, 161:14_, 161:17_, 162:13_, 162:16_, 162:22, 162:24_, 164:14, 164:16_, 165:7_, 165:10_, 166:1_, 166:4_, 166:22_, 167:1_, 167:9_, 167:12_, 168:1_, 168:4_, 168:19_, 168:21_, 169:1_, 169:4_, 169:24_, 170:2_, 172:2_, 174:2_, 174:19_, 174:24_, 175:10_, 175:15_, 179:1_, 179:5_, 179:21_, 180:5_, 180:8_, 180:11_, 180:12_, 180:20, 180:23_, 181:11_, 181:13_, 181:18_, 182:4_, 182:6_, 182:10, 182:12_,

182:16, 182:18_, 182:21_, 182:24_, 183:7_, 183:9_, 183:10_, 184:21_, 184:24_, 185:19_, 186:1_, 186:4_, 186:7_, 187:2_, 187:6_, 187:9, 187:22_, 188:2_, 190:9_, 194:21_, 195:1_, 195:17_, 196:9_, 197:2_, 197:12

**mud** [2]_ - 40:11_, 40:16

**multiple** [2]_ - 9:24_, 19:1

**murdered** [1]_ - 41:8

**must** [9]_ - 7:17_, 8:3_, 39:25_, 41:24_, 100:17_, 172:12_, 200:23_, 201:8_, 201:10

**muzzle** [2]_ - 16:17_, 16:20

## N

**name** [23]_ - 19:21_, 20:4_, 22:5_, 23:12_, 23:22_, 23:23_, 24:3_, 24:8_, 47:19_, 48:6_, 53:9_, 113:23_, 113:25_, 152:13_, 175:6_, 175:8_, 175:9_, 178:8_, 184:8_, 187:18

**named** [3]_ - 15:21_, 31:15_, 34:12

**names** [2]_ - 9:20_, 38:13

**nation's** [1]_ - 49:7

**natural** [1]_ - 40:13

**nature** [3]_ - 10:21_, 42:23_, 62:25

**navigated** [1]_ - 139:12

**near** [11]_ - 14:10_, 61:22_, 84:11_, 107:5_, 114:20_, 118:24_, 121:15_, 148:11_, 178:23_, 193:25

**neared** [1]_ - 122:6

**nearing** [1]_ - 121:16

**necessary** [1]_ - 109:16

**need** [10]_ - 12:25_, 19:22_, 34:17_, 70:10_, 84:3_, 112:20_, 135:17_, 143:23_, 174:12_, 198:23

**needed** [4]_ - 123:24_, 134:21_, 158:7_, 178:3

**needs** [2]_ - 12:25_, 42:2

**neighborhood** [3]_ - 31:24_, 115:21_, 115:23

**Netanyahu** [1]_ - 41:10

**never** [5]_ - 104:20_,

104:25_, 128:15_, 143:19_, 143:24

**news** [2]_ - 34:10_, 35:1

**newspaper** [1]_ - 10:20

**next** [51]_ - 14:15_, 29:9_, 29:16_, 56:17_, 57:10_, 60:21_, 61:23_, 62:23_, 69:15_, 71:23_, 82:21_, 83:19_, 84:4_, 84:8_, 84:10_, 84:25_, 90:17_, 98:3_, 98:11_, 101:14_, 101:18_, 105:20_, 110:12_, 111:22_, 111:23_, 112:12_, 113:5_, 113:11_, 122:22_, 133:7_, 137:7_, 138:10_, 142:13_, 144:11_, 149:7_, 152:2_, 155:8_, 158:4_, 160:6_, 160:10_, 160:16_, 160:21_, 163:3_, 174:23_, 178:13_, 187:5_, 191:3_, 191:7_, 193:5_, 193:17_, 194:4

**nice** [3]_ - 115:11_, 145:10_, 149:21

**night** [5]_ - 22:20_, 24:24_, 56:14_, 56:15_, 57:13

**Nine** [1]_ - 58:17

**nine** [2]_ - 59:7

**Nissan** [8]_ - 22:3_, 29:1_, 123:17_, 126:22_, 129:21_, 191:21_, 195:12

**nobody** [5]_ - 20:24_, 23:6_, 23:7_, 99:13_, 193:11

**noise** [1]_ - 16:11

**nomenclature** [1]_ - 106:22

**non** [1]_ - 8:19

**non-pre-admitted** [1]_ - 8:19

**nonargumentative** [1]_ - 42:3

**nondisclosed** [1]_ - 10:15

**none** [2]_ - 10:10_, 17:13

**nonverbal** [2]_ - 117:1_, 117:14

**nonviolence** [4]_ - 42:17_, 42:19_, 42:24_, 43:6

**noon** [1]_ - 177:15

**Norinco** [1]_ - 20:1

**normal** [2]_ - 102:5_, 108:12

**North** [9]_ - 15:9_, 19:19_,

21:20_, 22:4_, 22:8_, 23:16_, 34:11_, 118:19_, 189:6

**north** [7]_ - 66:17_, 119:3_, 119:8_, 125:16_, 125:22_, 125:25_, 190:17

**north/south** [2]_ - 66:16_, 119:5

**northbound** [1]_ - 191:2

**northern** [1]_ - 118:19

**Norway** [1]_ - 50:24

**note** [5]_ - 8:10_, 140:16_, 140:19_, 140:22_, 141:21

**noted** [1]_ - 112:19

**notes** [2]_ - 137:4_, 137:5

**nothing** [17]_ - 28:18_, 34:1_, 41:9_, 41:10_, 42:4_, 45:17_, 46:15_, 47:23_, 99:19, 113:19_, 147:21_, 152:10_, 175:3_, 187:2_, 187:15_, 195:17_, 197:12

**notice** [5]_ - 62:14_, 62:23_, 80:22_, 139:15_, 167:21

**noticeable** [1]_ - 193:16

**noticed** [22]_ - 59:23_, 61:1_, 61:2_, 61:25_, 62:15_, 62:23_, 62:24_, 63:2_, 64:8_, 70:1_, 70:4_, 70:6_, 82:22_, 83:2_, 83:20_, 93:19_, 102:18_, 102:20_, 103:18_, 103:20_, 107:10_, 165:16

**noticing** [1]_ - 69:14

**notified** [3]_ - 73:2_, 83:10_, 98:14

**notify** [1]_ - 79:18

**notifying** [1]_ - 82:22

**nowhere** [3]_ - 82:24_, 82:25_, 148:11

**number** [15]_ - 6:2_, 20:18_, 20:22_, 21:7_, 26:2_, 34:6_, 36:21_, 74:17_, 134:21_, 136:17_, 137:1_, 138:7_, 176:15_, 184:6_, 184:7

**Number** [1]_ - 5:8

**numbered** [2]_ - 130:8_, 203:9

**numbers** [5]_ - 20:20_, 26:24_, 65:10_, 202:19_, 202:22

**numerous** [1]_ - 94:3

# O

**oak** [4] - 156:17, 157:2, 157:9, 158:3
**oath** [2] - 101:3, 173:4
**Obama** [1] - 149:9
**object** [20] - 10:17, 10:23, 14:20, 61:25, 62:24, 62:25, 63:3, 63:8, 63:16, 63:18, 64:7, 70:5, 78:10, 86:24, 106:14, 106:16, 121:25, 122:2, 170:6, 196:9
**objected** [1] - 149:8
**objection** [45] - 8:12, 39:22, 40:23, 45:19, 65:16, 73:16, 73:18, 73:20, 74:17, 74:19, 74:23, 88:21, 88:23, 101:12, 101:15, 105:8, 108:1, 109:6, 110:9, 129:1, 129:2, 129:4, 130:11, 130:15, 141:2, 141:3, 141:5, 146:9, 146:10, 146:12, 149:1, 149:5, 149:10, 174:2, 179:24, 180:3, 181:22, 181:23, 181:25, 185:22, 185:23, 185:25, 197:2, 199:7
**objections** [3] - 8:18, 8:20, 199:11
**objective** [1] - 42:2
**objects** [5] - 13:25, 63:22, 86:4, 86:5, 98:20
**obliterated** [3] - 20:17, 20:23, 36:21
**obscured** [1] - 102:13
**observant** [1] - 117:11
**observations** [1] - 36:25
**observe** [8] - 116:17, 121:12, 133:6, 192:8, 192:10, 192:13, 193:17, 194:1
**observed** [2] - 37:3, 171:1
**obsessively** [1] - 25:19
**obstruct** [1] - 82:24
**obstruction** [1] - 136:22
**obstructions** [4] -

102:22, 102:24, 103:6, 103:7
**obtain** [2] - 23:23, 28:3
**obtained** [3] - 24:14, 24:15, 28:1
**obtaining** [1] - 28:8
**obvious** [1] - 133:20
**obviously** [4] - 20:15, 46:13, 172:8, 198:7
**occasionally** [1] - 54:9
**occasions** [1] - 52:14
**occupied** [1] - 70:13
**occur** [2] - 83:1, 83:14
**occurred** [3] - 73:3, 73:11, 109:24
**occurring** [1] - 107:16
**oceanside** [2] - 15:8, 19:18
**off-the-record** [6] - 53:2, 54:4, 54:6, 54:13, 54:15, 54:17
**offer** [1] - 95:2
**offered** [2] - 8:21, 39:25
**office** [22] - 31:20, 49:17, 49:19, 114:17, 114:18, 114:22, 118:4, 118:5, 118:7, 118:8, 118:17, 118:24, 119:3, 127:1, 138:18, 147:10, 153:8, 153:10, 177:8, 178:23, 184:18, 193:25
**Office** [19] - 142:17, 142:22, 169:20, 171:24, 177:22, 185:9, 185:10, 190:25, 191:5, 193:6, 193:19, 193:20, 193:21, 194:12, 194:14, 194:18, 195:13, 196:6, 199:4
**Officer** [4] - 11:19, 12:15, 44:5, 111:13
**officer** [7] - 84:1, 113:16, 114:15, 171:25, 176:22, 189:6, 189:7
**OFFICER** [6] - 11:20, 39:11, 44:6, 100:21, 111:14, 113:8
**officers** [20] - 83:21, 139:2, 139:8, 139:15, 139:21, 140:1, 140:20, 141:22, 142:3, 142:8, 143:10, 145:18, 157:8, 160:3, 161:1, 164:21, 165:6, 166:9, 169:20, 193:2

**official** [3] - 54:7, 171:20, 201:1
**officially** [1] - 6:3
**officials** [1] - 18:10
**often** [1] - 58:17
**Ohio** [1] - 34:6
**old** [7] - 19:21, 34:25, 45:3, 45:4, 45:9, 45:10, 45:11
**on-ramp** [1] - 137:14
**on-site** [1] - 195:22
**once** [15] - 8:13, 30:9, 34:12, 47:18, 57:6, 84:11, 85:8, 127:13, 157:4, 158:16, 163:4, 169:18, 171:3, 171:25, 181:19
**one** [89] - 10:6, 13:21, 20:24, 22:21, 23:23, 23:25, 24:21, 26:5, 26:7, 27:8, 29:7, 30:11, 32:19, 36:24, 37:11, 38:20, 40:6, 40:7, 40:15, 41:16, 44:15, 44:25, 45:9, 46:9, 54:18, 58:9, 58:18, 58:21, 59:10, 59:14, 59:22, 63:1, 65:16, 66:6, 70:2, 73:15, 73:24, 74:9, 83:21, 98:25, 99:4, 99:7, 99:9, 99:14, 99:15, 112:15, 112:18, 112:25, 116:2, 118:20, 120:5, 128:11, 129:16, 130:5, 130:24, 131:21, 137:3, 139:15, 141:14, 141:15, 142:23, 143:16, 147:20, 148:14, 148:15, 148:22, 151:16, 152:6, 155:7, 157:12, 158:16, 159:8, 159:10, 163:9, 163:10, 164:7, 165:1, 171:4, 173:6, 179:1, 184:21, 187:6, 189:4, 190:15, 194:8, 198:1, 198:15, 202:9
**one's** [5] - 40:1, 44:11, 44:12, 44:21, 44:22
**ongoing** [1] - 172:6
**online** [3] - 10:20, 25:19, 28:9
**oops** [1] - 126:4
**open** [5] - 105:5, 142:25, 172:12, 192:24, 201:10

**official** [3] - 54:7, 171:20, 201:1

**opening** [34] - 5:21, 7:3, 7:6, 7:13, 7:18, 7:22, 9:3, 10:7, 10:16, 10:25, 11:2, 11:10, 12:1, 12:5, 13:23, 14:4, 21:5, 39:3, 39:6, 41:3, 41:5, 41:22, 41:24, 42:7, 43:8, 43:13, 45:22, 46:10, 46:12, 46:14, 46:19, 47:9, 90:13, 198:3
**operate** [1] - 21:17
**operating** [1] - 60:5
**operation** [1] - 153:16
**operational** [2] - 38:13, 153:11
**operations** [1] - 153:6
**opinion** [3] - 122:20, 127:13, 201:9
**opportunities** [1] - 9:24
**opportunity** [6] - 39:3, 43:13, 46:9, 73:25, 174:6, 201:16
**optimal** [3] - 105:2, 105:15, 105:24
**or..** [1] - 150:21
**order** [23] - 7:19, 7:21, 7:25, 8:4, 12:4, 15:9, 21:10, 23:23, 32:7, 46:17, 54:9, 55:21, 70:15, 72:8, 87:4, 98:15, 98:20, 98:21, 106:17, 107:15, 154:7, 164:2, 174:11
**Order** [1] - 5:1
**ordered** [1] - 112:13
**orders** [6] - 7:6, 7:7, 11:5, 42:17, 42:21, 43:22
**ordinary** [1] - 36:12
**ordnance** [3] - 85:5, 98:5, 98:12
**Organized** [1] - 48:14
**orient** [1] - 120:15
**original** [1] - 47:5
**originally** [3] - 93:3, 115:17, 116:9
**OTR** [1] - 56:20
**ourselves** [1] - 136:3
**outset** [1] - 200:12
**outside** [5] - 106:19, 159:9, 163:11, 165:12, 171:4

**overage** [1]_ - 38:21
**overall** [3]_ - 8:10_, 42:11_, 121:10
**overgarment** [2]_ - 121:7_, 121:8
**overgrown** [1]_ - 60:23
**overhead** [3]_ - 65:24_, 75:5_, 124:21
**overriding** [1]_ - 40:4
**overruled** [5]_ - 101:13_, 101:15, 105:9_, 109:7_, 196:13
**Overruled** [1]_ - 101:15
**overseas** [2]_ - 50:20_, 70:21
**overview** [2]_ - 29:19_, 67:25
**own** [8]_ - 21:11_, 29:14_, 32:17_, 54:25_, 115:15_, 116:9_, 193:20_, 200:24
**owned** [2]_ - 21:18_, 53:2
**owns** [1]_ - 193:20
**Oxendine** [5]_ - 20:4_, 20:5_, 20:9_, 20:12_, 20:13

**P**

**p.m** [16]_ - 79:10_, 111:7_, 111:15_, 112:17_, 113:2_, 113:9_, 171:12_, 172:20_, 172:23_, 173:2_, 197:21_, 200:2_, 201:14_, 203:19
**pace** [2]_ - 32:6_, 198:12
**packs** [2]_ - 22:6_, 192:17
**pad** [5]_ - 137:2_, 137:4_, 137:5_, 137:6_, 141:16
**pages** [1]_ - 10:21
**paid** [2]_ - 20:8_, 20:10
**painted** [1]_ - 14:16
**pair** [1]_ - 180:16
**Palm** [60]_ - 13:16_, 13:20_, 14:10_, 14:25_, 15:14_, 22:8_, 22:14_, 22:23_, 23:4_, 26:20_, 27:4_, 27:13_, 27:18_, 29:4_, 29:8_, 33:22_, 34:8_, 35:12_, 35:24_, 49:19_, 52:10_, 53:5_, 53:13_, 56:4_, 56:9_, 56:10_, 56:22_, 57:4_, 57:7_, 114:18_, 114:20_, 118:4_, 118:19_, 118:22_, 142:16

_, 142:22_, 153:10_, 153:17_, 154:9_, 169:19_, 171:24_, 176:1_, 177:9_, 177:21_, 177:25_, 179:15_, 185:8_, 185:10_, 189:19_, 190:4_, 193:6_, 193:19_, 193:23_, 193:25_, 194:6_, 194:11_, 194:14_, 194:17_, 195:13_, 199:3
**pant** [1]_ - 182:25
**pants** [12]_ - 96:5_, 121:9_, 179:20_, 180:15_, 180:16_, 181:8_, 181:9_, 182:20_, 183:18_, 183:19
**paper** [3]_ - 33:18_, 33:25_, 141:15
**paperwork** [9]_ - 9:9_, 9:16_, 9:22_, 178:3_, 178:6_, 178:7_, 178:8_, 178:12_, 182:14
**paralleling** [1]_ - 60:16
**parallels** [1]_ - 67:15
**paranoia** [1]_ - 116:23
**Paranthropus** [1]_ - 40:10
**park** [1]_ - 133:9
**parked** [10]_ - 23:10_, 29:24_, 32:10_, 126:18_, 126:19_, 127:2_, 131:3_, 133:8_, 136:19_, 139:13
**parking** [7]_ - 24:3_, 123:20_, 123:22_, 127:7_, 127:16_, 127:24_, 133:9
**parks** [1]_ - 27:7
**part** [22]_ - 6:4_, 7:21_, 7:25_, 17:25_, 50:20_, 58:13_, 59:4_, 61:16_, 66:18_, 66:21_, 75:7_, 81:2_, 85:9_, 118:22_, 143:13_, 154:4_, 154:7_, 154:23_, 154:25_, 170:14_, 174:13
**partial** [1]_ - 60:25
**partially** [1]_ - 166:6
**participation** [1]_ - 195:14
**particular** [16]_ - 23:6_, 24:11_, 54:18_, 56:8_, 59:17_, 59:18_, 62:15_, 65:18_, 66:21_, 67:2_, 116:3_, 118:13_, 118:16_, 130:25_, 153:8_, 155:1
**parties** [11]_ - 6:22_, 7:5_, 7:11_, 7:17_, 7:24_, 12:6_, 41:2_, 65:14_, 201:4_,

203:4_, 203:17
**partner** [1]_ - 25:9
**partnership** [1]_ - 41:15
**parts** [1]_ - 7:15
**party** [4]_ - 6:13_, 8:12_, 13:25_, 18:9
**party's** [1]_ - 7:22
**pass** [3]_ - 126:4_, 126:9_, 134:1
**passed** [8]_ - 80:13_, 127:15_, 130:25_, 133:8_, 133:10_, 133:13_, 133:14_, 147:10
**passing** [1]_ - 131:21
**passport** [3]_ - 33:16_, 195:22_, 195:24
**past** [5]_ - 43:5_, 60:15_, 67:16_, 127:2_, 144:17
**path** [58]_ - 60:20_, 60:21_, 60:22_, 60:23_, 67:10_, 67:11_, 67:14_, 68:22_, 72:15_, 74:1_, 74:4_, 74:6_, 75:12_, 75:13_, 75:17_, 75:19_, 75:21_, 75:22_, 76:16_, 76:17_, 77:2_, 77:3_, 82:19_, 82:23_, 89:21_, 90:7_, 90:8_, 91:2_, 91:18_, 92:16_, 92:20_, 92:21_, 92:22_, 101:20_, 101:25_, 102:4_, 102:5_, 102:6_, 102:11_, 102:14_, 102:17_, 102:19_, 102:23_, 103:1_, 103:2_, 103:8_, 150:16_, 150:23_, 155:24_, 155:25_, 159:4_, 159:5_, 160:1_, 165:18_, 167:24
**paths** [2]_ - 40:11_, 123:7
**patience** [1]_ - 43:20
**Patrol** [6]_ - 49:25_, 50:3_, 50:4_, 50:8_, 61:16
**patrolling** [1]_ - 103:17
**pattern** [2]_ - 28:20_, 183:20
**pause** [8]_ - 75:14_, 76:1_, 76:19_, 77:5_, 77:12_, 78:8_, 78:22_, 121:16
**Pause** [1]_ - 100:24
**paused** [1]_ - 150:13
**paved** [2]_ - 89:21_, 91:17
**pay** [1]_ - 117:14
**peacefully** [1]_ - 40:11
**peacefulness** [1]_ - 42:17

**peg** [1]_ - 45:7
**pelvic** [1]_ - 106:2
**pending** [1]_ - 108:2
**people** [12]_ - 9:11_, 12:23_, 25:2_, 25:21_, 27:4_, 37:15_, 104:2_, 116:18_, 116:19_, 116:22_, 128:12_, 198:11
**perceive** [1]_ - 200:9
**perceived** [5]_ - 60:3_, 70:6_, 77:17_, 84:14_, 86:14
**perched** [1]_ - 14:11
**perfect** [1]_ - 23:7
**performed** [1]_ - 83:4
**performing** [1]_ - 84:22
**perhaps** [1]_ - 104:9
**period** [1]_ - 85:12
**permissible** [1]_ - 174:9
**permission** [44]_ - 65:7_, 67:20_, 68:17_, 72:10_, 74:25_, 78:23_, 79:12_, 79:25_, 80:15_, 81:6_, 81:24_, 85:22_, 86:8_, 89:11_, 90:1_, 90:21_, 91:12_, 91:23_, 92:11_, 94:19_, 94:22_, 124:18_, 129:6_, 146:18_, 152:16_, 156:19_, 161:14_, 162:13_, 165:7_, 166:1_, 166:22_, 167:9_, 168:1_, 168:19_, 169:1_, 169:24_, 175:10_, 180:5_, 180:20_, 182:4_, 184:22_, 186:1_, 186:4_, 187:22
**permit** [1]_ - 200:17
**person** [31]_ - 21:16_, 58:22_, 60:7_, 60:8_, 61:3_, 61:4_, 62:2_, 62:20_, 62:22_, 64:19_, 70:11_, 70:12_, 115:6_, 117:11_, 120:23_, 140:4_, 141:19_, 143:1_, 144:23_, 145:5_, 146:24_, 160:15_, 160:24_, 165:1_, 169:22_, 178:17_, 181:10_, 184:1_, 185:15_, 192:15
**person's** [1]_ - 44:15
**personal** [2]_ - 178:20_, 178:21
**personnel** [3]_ - 54:3_, 81:19_, 81:22
**persons** [2]_ - 6:18_, 70:11
**perspective** [9]_ - 72:19

_, 72:21_, 78:19_, 78:21_, 89:19_, 92:6_, 92:7_, 92:9_, 132:6

**pertaining** [1]_ - 173:10

**Philippines** [1]_ - 50:25

**phone** [19]_ - 23:18_, 23:19_, 23:21_, 23:23_, 24:9_, 24:10_, 29:23_, 30:7_, 35:13_, 36:3_, 41:13_, 122:5_, 122:7_, 122:23_, 123:1_, 126:13_, 128:16

**phones** [13]_ - 13:10_, 13:11_, 15:20_, 22:7_, 23:24_, 23:25_, 24:11_, 24:12_, 24:16_, 25:6_, 29:7_, 33:10_, 33:14

**photo** [23]_ - 33:17_, 68:25_, 71:17_, 86:13_, 88:1_, 90:6_, 91:6_, 122:7_, 123:2_, 123:8_, 123:16_, 123:18_, 126:14_, 126:15_, 128:14_, 128:19_, 129:14_, 129:21_, 130:1_, 130:5_, 130:23_, 131:13_, 134:22

**photograph** [22]_ - 14:13_, 22:10_, 87:9_, 87:24_, 90:10_, 92:24_, 127:22_, 131:1_, 132:1_, 132:14_, 132:23_, 138:3_, 140:16_, 158:1_, 163:15_, 165:20_, 168:16_, 169:10_, 169:14_, 195:2_, 195:7

**photographs** [4]_ - 13:22_, 130:1_, 168:5_, 168:6

**photos** [6]_ - 127:6_, 128:16_, 130:5_, 130:6_, 131:21

**physical** [2]_ - 55:2_, 55:3

**physically** [2]_ - 84:5_, 110:5

**PI** [1]_ - 53:24

**pick** [3]_ - 116:25_, 117:14_, 126:23

**picture** [21]_ - 14:3_, 16:13_, 22:11_, 32:13_, 32:14_, 67:3_, 92:21_, 106:13_, 122:6_, 122:24_, 122:25_, 123:1_, 123:2_, 123:9_, 126:14_, 128:21_, 129:11_, 129:13_, 131:20_, 134:23

**pictures** [12]_ - 14:3_, 123:20_, 127:8_, 127:9_,

127:21_, 127:23_, 128:1_, 128:11_, 130:22_, 130:24_, 133:2_, 139:20

**piece** [4]_ - 10:7_, 33:17_, 33:25_, 141:15

**pierce** [1]_ - 94:16

**Pierce** [1]_ - 188:13

**pink** [3]_ - 179:19_, 180:14_, 182:9

**pink-colored** [1]_ - 180:14

**pistol** [9]_ - 70:14_, 72:8_, 73:1_, 79:19_, 83:6_, 96:16_, 97:19_, 107:24_, 110:22

**PKM** [1]_ - 51:22

**PKU3131** [1]_ - 34:5

**place** [3]_ - 23:5_, 23:7_, 103:4

**placed** [3]_ - 102:7_, 194:19_, 194:20

**placement** [1]_ - 72:7

**places** [1]_ - 33:19

**plainly** [1]_ - 10:18

**plan** [2]_ - 42:14_, 202:13

**plane** [3]_ - 26:25_, 27:9

**planned** [2]_ - 13:3_, 30:15

**planning** [5]_ - 15:15_, 35:23_, 43:4_, 100:8_, 153:7

**plans** [1]_ - 143:2

**plastic** [2]_ - 30:18_, 168:25

**Plata** [4]_ - 34:12_, 34:19_, 34:21

**plate** [28]_ - 32:13_, 32:18_, 32:19_, 34:6_, 34:7_, 38:14_, 123:9_, 123:21_, 123:23_, 123:24_, 124:2_, 127:8_, 127:9_, 128:2_, 133:15_, 134:20_, 134:21_, 136:21_, 136:25_, 137:6_, 138:7_, 139:20_, 139:24_, 140:1_, 140:3_, 140:7_, 141:19_, 170:9

**plates** [28]_ - 13:13_, 14:17_, 14:18_, 30:20_, 32:20_, 33:17_, 34:2_, 36:10_, 60:4_, 63:3_, 63:4_, 63:5_, 70:7_, 77:16_, 77:19_, 84:13_, 84:14_, 86:14_, 88:17_, 105:25_, 106:1_, 106:6_, 106:9_,

106:10_, 107:3_, 147:6_, 170:8

**platforms** [1]_ - 25:24

**play** [13]_ - 22:20_, 24:25_, 54:22_, 54:24_, 56:16_, 58:3_, 59:5_, 59:9_, 59:11_, 68:2_, 129:16_, 146:18_, 155:3

**played** [17]_ - 59:7_, 75:10_, 75:25_, 76:14_, 76:24_, 77:11_, 78:7_, 78:25_, 79:14_, 80:3_, 80:17_, 81:9_, 82:2_, 90:18_, 129:9_, 129:18_, 146:21

**playing** [13]_ - 14:9_, 14:11_, 15:4_, 15:25_, 58:1_, 58:5_, 59:13_, 59:14_, 77:10_, 78:6_, 78:17_, 119:21_, 155:6

**pleasant** [2]_ - 200:1_, 201:12

**pleasure** [1]_ - 44:20

**plopped** [1]_ - 24:4

**plot** [6]_ - 13:8_, 13:13_, 17:2_, 19:15_, 24:1_, 36:16

**plotting** [1]_ - 18:15

**plus** [1]_ - 198:2

**podium** [1]_ - 100:11

**point** [61]_ - 6:22_, 11:16_, 12:13_, 16:4_, 21:2_, 21:24_, 23:15_, 28:19_, 34:1_, 39:2_, 57:4_, 57:6_, 58:1_, 58:10_, 59:9_, 59:10_, 59:22_, 63:7_, 63:8_, 63:13_, 67:11_, 69:16_, 72:25_, 75:19_, 84:16_, 84:18_, 95:19_, 102:16_, 102:19_, 118:7_, 123:10_, 131:4_, 136:15_, 142:18_, 142:23_, 143:8_, 143:24_, 144:13_, 151:14_, 156:5_, 156:16_, 157:4_, 157:14_, 158:12_, 158:14_, 158:20_, 158:24_, 159:14_, 159:22_, 160:2_, 160:4_, 160:17_, 163:8_, 169:19_, 177:13_, 177:20_, 189:14_, 191:1_, 192:24_, 193:3_, 194:13

**pointed** [27]_ - 14:21_, 16:17_, 31:13_, 36:16_, 64:11_, 64:12_, 64:13_, 64:16_, 69:17_, 70:5_, 87:16_, 87:23_, 96:22_, 96:25_, 97:1_, 97:12_,

97:13_, 99:11_, 103:22_, 106:7_, 107:8_, 107:18_, 108:21_, 109:2_, 110:6_, 160:12

**pointer** [1]_ - 67:17

**pointing** [6]_ - 78:2_, 78:14_, 78:15_, 127:3_, 160:9_, 162:3

**poking** [1]_ - 78:4

**pole** [2]_ - 132:17_, 132:24

**police** [10]_ - 138:13_, 138:23_, 139:3_, 139:4_, 139:16_, 144:20_, 145:22_, 189:6_, 189:7_, 193:5

**pop** [3]_ - 77:14_, 78:10_, 78:11

**pop-up** [3]_ - 77:14_, 78:10_, 78:11

**popped** [1]_ - 158:17

**populace** [3]_ - 70:16_, 72:9_, 107:20

**population** [1]_ - 70:13

**portable** [1]_ - 203:6

**portion** [3]_ - 29:21_, 139:5_, 157:14

**position** [15]_ - 17:16_, 87:22_, 91:19_, 97:3_, 104:5_, 104:8_, 104:13_, 104:14_, 105:2_, 105:3_, 105:6_, 105:24_, 166:10_, 170:20

**positioned** [4]_ - 158:3_, 166:16_, 166:17_, 170:22

**positions** [2]_ - 110:15_, 110:16

**positive** [3]_ - 150:6_, 150:7_, 150:8

**positively** [1]_ - 70:11

**possess** [3]_ - 28:4_, 38:3_, 38:4

**possessed** [4]_ - 20:23_, 24:17_, 36:15_, 36:21

**possession** [2]_ - 9:23_, 36:20

**possibility** [2]_ - 120:2_, 127:14

**possible** [6]_ - 31:7_, 72:8_, 98:19_, 106:15_, 190:16_, 198:14

**possibly** [6]_ - 106:14_, 133:22_, 186:15_, 186:18_, 186:21

**post** [22]_ - 64:6_, 64:8_, 77:15_, 86:21_, 86:23_,

86:24_, 87:2_, 87:3_, 87:4_, 87:18_, 87:21_, 95:21_, 95:22_, 96:25_, 109:10_, 127:1_, 171:22_, 177:7_, 178:22_, 178:23_, 184:18

**post-shooting** [1]_ - 77:15

**posted** [1]_ - 171:9

**posting** [1]_ - 172:9

**posts** [1]_ - 93:13

**posture** [1]_ - 54:10

**potential** [5]_ - 56:19_, 63:14_, 116:23_, 119:25_, 190:21

**potentially** [7]_ - 13:23_, 42:21_, 58:22_, 62:20_, 107:4_, 117:2_, 127:12

**pouch** [1]_ - 83:6

**powerfully** [1]_ - 15:20

**practical** [2]_ - 176:12_, 203:4

**practice** [4]_ - 115:13_, 115:15_, 118:6_, 141:17

**pre** [15]_ - 6:2_, 6:6_, 6:9_, 8:8_, 8:15_, 8:17_, 8:19_, 8:22_, 13:24_, 14:7_, 74:13_, 137:23_, 202:10_, 203:2

**pre-admission** [1]_ - 8:17

**pre-admit** [1]_ - 6:2

**pre-admitted** [11]_ - 6:6_, 6:9_, 8:8_, 8:15_, 8:22_, 13:24_, 74:13_, 137:23_, 202:10_, 203:2

**pre-dawn** [1]_ - 14:7

**preclude** [1]_ - 8:1

**predict** [1]_ - 43:17

**prefer** [1]_ - 148:25

**preliminary** [2]_ - 6:1_, 41:1

**premature** [2]_ - 172:13_, 172:14

**prepared** [2]_ - 30:13_, 202:3

**presence** [7]_ - 55:2_, 55:4_, 138:13_, 138:21_, 139:5_, 139:15_, 170:16

**present** [13]_ - 5:23_, 12:5_, 25:6_, 39:3_, 56:22_, 58:12_, 59:24_, 61:20_, 98:20_, 99:6_, 104:22_, 202:14_, 202:16

**presentation** [1]_ -

24:20

**presented** [4]_ - 7:13_, 13:23_, 201:10_, 202:9

**preserve** [4]_ - 98:15_, 98:17_, 98:23_, 170:20

**preserved** [3]_ - 40:16_, 99:8_, 170:18

**preserving** [3]_ - 170:14_, 171:10_, 171:22

**preset** [1]_ - 58:19

**president** [10]_ - 12:24_, 28:20_, 29:12_, 49:9_, 52:11_, 52:15_, 52:18_, 56:16_, 153:16_, 189:23

**President** [61]_ - 16:3_, 16:4_, 52:25_, 53:5_, 53:6_, 53:8_, 53:16_, 53:17_, 54:11_, 54:14_, 54:20_, 54:23_, 55:1_, 55:3_, 55:11_, 55:23_, 55:25_, 56:2_, 56:3_, 56:6_, 56:8_, 56:18_, 56:23_, 57:4_, 57:6_, 57:22_, 57:25_, 58:1_, 58:3_, 58:5_, 58:8_, 58:9_, 59:5_, 59:7_, 59:9_, 59:10_, 59:12_, 59:13_, 59:14_, 64:18_, 67:3_, 67:7_, 79:3_, 79:5_, 81:4_, 81:5_, 81:20_, 90:18_, 153:13_, 154:4_, 154:8_, 154:24_, 155:2_, 155:3_, 155:5_, 156:6_, 156:7_, 177:8_, 189:24_, 189:25

**President's** [1]_ - 58:10

**president's** [2]_ - 26:25_, 27:19

**presidential** [12]_ - 13:5_, 14:8_, 15:4_, 18:7_, 21:25_, 27:19_, 38:17_, 52:9_, 54:12_, 84:23_, 153:5_, 154:5

**presidents** [1]_ - 52:9

**press** [1]_ - 45:12

**presumably** [1]_ - 184:5

**pretrial** [1]_ - 6:3

**pretty** [7]_ - 109:10_, 116:2_, 116:20_, 117:9_, 119:18_, 143:17_, 197:17

**prevalent** [1]_ - 64:6

**prevent** [1]_ - 103:7

**prevention** [2]_ - 110:20_, 110:21

**preview** [1]_ - 124:1

**previewed** [1]_ - 33:10

**previous** [4]_ - 86:13_, 90:6_, 115:14_, 162:21

**previously** [30]_ - 54:19_, 65:8_, 67:21_, 75:16_, 82:11_, 85:23_, 86:9_, 89:12_, 89:15_, 90:1_, 90:17_, 90:22_, 91:13_, 91:24_, 94:19_, 105:4_, 110:24_, 154:16_, 161:5_, 161:15_, 162:14_, 165:3_, 165:8_, 166:2_, 166:23_, 167:10_, 168:2_, 168:20_, 169:25_, 194:23

**primarily** [2]_ - 51:3_, 52:10

**primary** [1]_ - 53:7

**prison** [2]_ - 115:24_, 178:15

**private** [10]_ - 21:3_, 26:19_, 26:20_, 27:9_, 53:5_, 54:25_, 57:1_, 57:2_, 115:13_, 118:6

**pro** [2]_ - 7:10_, 7:11

**proceed** [8]_ - 46:20_, 65:18_, 88:24_, 152:16_, 154:17_, 161:6_, 175:10, 187:22

**proceeded** [6]_ - 102:15_, 103:1_, 127:15_, 137:9_, 137:18_, 149:25

**proceeding** [4]_ - 11:24_, 60:11_, 60:13_, 202:1

**proceedings** [4]_ - 100:24_, 172:13_, 201:2_, 203:19

**process** [2]_ - 16:19_, 118:5

**processed** [1]_ - 171:19

**processing** [1]_ - 177:24

**produced** [3]_ - 10:10_, 10:12_, 178:2

**products** [1]_ - 192:17

**professional** [2]_ - 38:8_, 38:9

**professionally** [1]_ - 38:12

**prohibited** [1]_ - 8:1

**projection** [1]_ - 42:12

**prominent** [2]_ - 64:5_, 109:10

**prompt** [1]_ - 11:25

**promptly** [1]_ - 200:23

**prone** [4]_ - 104:10_, 104:12_, 105:2_, 105:23

**proof** [2]_ - 19:4_, 25:20

**proper** [2]_ - 60:20_, 60:21

**properly** [1]_ - 24:13

**property** [1]_ - 164:4

**protect** [9]_ - 31:4_, 44:17_, 52:6_, 52:13_, 52:24_, 81:4_, 81:5_, 82:25_, 96:13

**protected** [11]_ - 37:25_, 52:8_, 52:14_, 52:16_, 52:17_, 52:23_, 52:25_, 53:15_, 53:17_, 55:23_, 96:11

**protectee** [2]_ - 55:16_, 55:20

**protectees** [4]_ - 53:23_, 54:1_, 54:7_, 55:18

**protecting** [8]_ - 49:8_, 53:20_, 55:1_, 55:25_, 56:1_, 81:19_, 153:12_, 174:11

**protection** [7]_ - 49:14_, 54:5_, 104:13_, 153:5_, 153:11_, 153:15_, 154:23

**protections** [1]_ - 27:23

**protective** [9]_ - 52:2_, 52:20_, 53:24_, 84:22_, 96:8_, 96:9_, 96:10_, 153:6_, 153:7

**protest** [1]_ - 37:20

**protruding** [10]_ - 60:2_, 63:1_, 63:8_, 63:16_, 63:19_, 78:5_, 84:13_, 95:23_, 95:24_, 96:22

**prove** [5]_ - 18:24_, 19:5_, 35:8_, 37:24_, 38:6

**provide** [3]_ - 6:10_, 44:24_, 104:12

**provided** [3]_ - 52:20_, 140:19_, 141:21

**providers** [1]_ - 24:10

**proximate** [1]_ - 108:18

**psychiatric** [3]_ - 115:10_, 116:15_, 116:20

**psychosis** [1]_ - 117:2

**public** [2]_ - 16:15_, 18:10

**publication** [1]_ - 8:21

**publish** [49]_ - 8:14_, 65:7_, 65:18_, 67:20_, 68:17_, 72:10_, 73:20_, 74:25_, 78:23_, 79:12_, 79:25_, 80:15_, 81:6_, 81:24_, 82:10_, 85:22_, 86:8_,

88:19_, 89:11_, 90:1_, 90:21_, 91:12_, 91:23_, 92:11_, 94:19_, 124:14_, 128:4_, 129:6_, 130:20_, 135:13_, 140:13_, 141:7_, 146:20_, 156:19_, 161:5_, 161:14_, 162:13_, 165:7_, 166:1_, 166:22_, 167:9_, 168:1_, 168:19_, 169:1_, 169:24_, 180:5_, 182:4_, 186:4_, 194:22

**published** [2]_ - 71:11_, 124:18

**publishing** [2]_ - 8:9_, 182:16

**pull** [10]_ - 109:11_, 124:8_, 130:19_, 131:4_, 132:10_, 132:20_, 133:7_, 134:3_, 135:11_, 140:12

**pulled** [6]_ - 109:5_, 127:5_, 127:24_, 133:18_, 137:5_, 150:10

**pulling** [3]_ - 32:15_, 123:19_, 133:9

**purchased** [2]_ - 20:8_, 24:3

**pure** [1]_ - 199:21

**purported** [1]_ - 42:24

**purpose** [6]_ - 7:12_, 22:15_, 41:22_, 46:12_, 87:1_, 87:3

**purposes** [5]_ - 10:16_, 100:8_, 185:1_, 193:9_, 194:5

**pursuant** [4]_ - 24:14_, 88:19_, 146:7_, 146:15

**pushed** [1]_ - 45:5

**put** [10]_ - 17:15_, 30:20_, 38:14_, 106:14_, 138:15_, 160:17_, 182:10_, 186:16_, 186:19_, 193:22

**Putin** [3]_ - 40:21_, 41:8_, 41:13

**putting** [1]_ - 83:6

## Q

**quality** [2]_ - 14:17_, 14:18

**Quantico** [1]_ - 36:4

**quarter** [1]_ - 176:16

**questionable** [2]_ - 7:18_, 11:4

**questions** [14]_ - 8:25_,

9:1_, 23:7_, 46:6_, 111:1_, 117:25_, 143:18_, 149:14_, 149:16_, 172:2_, 174:8_, 174:16_, 186:9_, 197:5

**quick** [1]_ - 109:25

**quickly** [1]_ - 18:2

**quiet** [1]_ - 30:18

**quote** [2]_ - 11:13_, 71:13

## R

**racked** [1]_ - 20:12

**radar** [1]_ - 119:22

**radio** [22]_ - 67:4_, 72:24_, 73:1_, 73:4_, 73:8_, 73:10_, 79:7_, 79:17_, 80:6_, 80:20_, 81:12_, 82:5_, 82:21_, 83:9_, 83:24_, 85:4_, 90:16_, 90:19_, 93:4_, 98:5_, 160:18_, 160:20

**rain** [2]_ - 29:11

**raise** [5]_ - 9:25_, 12:15_, 47:20_, 113:17_, 152:7

**raised** [3]_ - 8:12_, 108:25_, 112:21

**ramp** [1]_ - 137:14

**ran** [7]_ - 121:14_, 121:15_, 121:17_, 123:14_, 157:8

**range** [3]_ - 27:25_, 33:6_, 119:18

**ranges** [1]_ - 94:4

**rank** [3]_ - 50:16_, 50:18_, 176:25

**rape** [1]_ - 41:9

**rapid** [3]_ - 155:20_, 156:9_, 198:1

**rapid-fire** [1]_ - 155:20

**rate** [2]_ - 133:17_, 200:6

**rather** [3]_ - 127:15_, 199:13_, 200:7

**reach** [4]_ - 27:3_, 33:10_, 62:8_, 122:5

**reached** [3]_ - 19:20_, 28:4_, 144:13

**reaches** [1]_ - 34:15

**reaching** [1]_ - 119:13

**reaction** [2]_ - 62:17_, 62:19

**reactivate** [1]_ - 23:19

**read** [6]_ - 37:21_, 39:18_, 42:8_, 46:14_, 200:13_, 200:20

**reading** [3]_ - 8:2_, 42:12_, 192:20

**ready** [7]_ - 10:5_, 19:20_, 30:24_, 113:5_, 187:5_, 198:2_, 199:14

**real** [2]_ - 18:23_, 61:12

**real-world** [1]_ - 61:12

**realistic** [2]_ - 43:16_, 198:17

**realization** [1]_ - 71:24

**realize** [2]_ - 174:1_, 201:5

**really** [12]_ - 8:14_, 105:17_, 127:7_, 133:20_, 138:12_, 138:14_, 138:15_, 139:14_, 141:14_, 143:14_, 143:19_, 201:22

**reanalyze** [1]_ - 63:13

**reapproach** [1]_ - 186:1

**rear** [4]_ - 82:9_, 87:4_, 95:22_, 158:15

**rearview** [1]_ - 135:2

**reason** [14]_ - 15:6_, 17:12_, 22:14_, 27:9_, 32:21_, 32:22_, 33:4_, 102:6_, 102:7_, 116:11_, 116:15_, 134:21_, 147:18_, 193:10

**reasonable** [3]_ - 19:6_, 28:12_, 37:25

**receive** [3]_ - 51:8_, 51:13_, 189:3

**received** [16]_ - 10:9_, 51:15_, 61:11_, 61:15_, 70:20_, 73:22_, 74:24_, 129:5_, 130:16_, 141:6_, 146:13_, 180:4_, 182:1_, 182:3_, 189:17_, 189:20

**recently** [1]_ - 115:11

**recess** [7]_ - 39:2_, 39:8_, 100:9_, 112:15_, 112:18_, 113:2_, 172:23

**recognize** [9]_ - 63:13_, 63:21_, 128:10_, 145:5_, 179:12_, 181:4_, 181:6_, 185:5_, 185:7

**recognized** [4]_ - 63:10_, 63:20_, 64:8_, 64:15

**recommendation** [1]_ - 116:14

**reconnaissance** [3]_ -

15:16_, 25:1_, 35:14

**record** [19]_ - 5:9_, 6:4_, 6:5_, 53:2_, 54:4_, 54:6_, 54:13_, 54:15_, 54:17_, 65:3_, 65:5_, 74:15_, 113:24_, 145:9_, 145:13_, 152:14_, 169:13_, 175:7_, 187:19

**recorded** [1]_ - 40:16

**recording** [5]_ - 78:12_, 84:15_, 85:2_, 86:15_, 145:21

**recordings** [2]_ - 73:4_, 73:7

**recount** [1]_ - 142:10

**recounted** [1]_ - 142:14

**recover** [2]_ - 33:12_, 33:15

**recovered** [3]_ - 21:4_, 33:25_, 35:14

**recovering** [1]_ - 115:6

**recreate** [1]_ - 24:16

**red** [6]_ - 30:8_, 69:23_, 150:1_, 159:12_, 183:4_, 183:15

**redirect** [10]_ - 111:4_, 111:9_, 111:11_, 111:17_, 111:19_, 151:23_, 174:18_, 174:19_, 187:1_, 197:11

**reelect** [1]_ - 12:24

**reelection** [1]_ - 41:14

**refer** [4]_ - 11:10_, 11:13_, 81:21_, 121:20

**reference** [1]_ - 33:20

**references** [1]_ - 11:3

**referred** [4]_ - 37:12_, 58:17_, 84:15_, 170:8

**referring** [12]_ - 7:8_, 7:17_, 81:18_, 81:22_, 86:22_, 89:8_, 133:24_, 165:15_, 174:15_, 177:11_, 178:7_, 183:11

**refers** [2]_ - 10:17_, 10:24

**reflect** [1]_ - 65:3

**reflected** [1]_ - 70:22

**reflects** [3]_ - 6:9_, 65:5_, 145:15

**refuge** [1]_ - 116:3

**regarding** [3]_ - 6:6_, 7:6_, 9:8

**region** [1]_ - 118:19

**register** [1]_ - 63:8

**registered** [2] – 32:19, 34:2

**registration** [1] – 22:4

**reinforced** [1] – 46:12

**relate** [1] – 7:15

**related** [2] – 42:1, 42:21

**relation** [4] – 59:12, 60:6, 67:3, 87:15

**relationship** [1] – 31:18

**relatively** [4] – 15:3, 115:22, 116:4, 121:1

**relevance** [1] – 105:8

**Relevance** [1] – 101:12

**relevant** [5] – 42:5, 42:9, 42:13, 149:18, 174:8

**relinquished** [1] – 46:19

**reload** [1] – 83:5

**remain** [9] – 39:4, 47:17, 95:12, 101:3, 117:5, 136:18, 152:5, 173:3, 200:8

**remainder** [2] – 46:19, 197:24

**remaining** [1] – 36:13

**remarkable** [1] – 16:10

**remarks** [2] – 7:5, 17:18

**remember** [12] – 23:16, 29:13, 37:12, 37:22, 57:18, 57:19, 57:20, 143:14, 200:20, 201:3, 201:8

**remembers** [1] – 34:22

**remind** [4] – 7:5, 7:24, 55:12, 97:18

**reminded** [6] – 7:10, 60:4, 63:4, 63:5, 88:15, 200:16

**reminiscent** [3] – 88:5, 88:8, 88:9

**removed** [1] – 192:1

**removing** [1] – 83:5

**render** [2] – 85:5, 98:6

**rendered** [2] – 40:13, 98:12

**Renee** [1] – 5:19

**renovations** [1] – 118:9

**reorient** [1] – 136:3

**rephrase** [4] – 84:9, 102:24, 108:10, 110:2

**replace** [1] – 99:16

**replenished** [1] – 83:7

**reporter** [1] – 48:7

**Reporter** [1] – 190:8

**reports** [1] – 26:10

**represent** [1] – 128:20

**representation** [1] – 146:2

**Republican** [1] – 18:8

**reputational** [1] – 42:23

**reputational-type** [1] – 42:23

**request** [2] – 198:9, 199:12

**requested** [2] – 98:5, 190:8

**required** [2] – 201:6, 201:7

**requirement** [2] – 38:9, 38:15

**requirements** [1] – 8:4

**rescue** [1] – 189:1

**research** [4] – 28:5, 28:9, 172:9, 200:23

**researched** [1] – 27:22

**researching** [1] – 25:19

**reset** [2] – 33:11, 131:9

**residence** [6] – 14:10, 22:24, 53:5, 53:7, 189:18

**resident** [3] – 49:19, 176:2, 188:13

**resort** [2] – 53:1, 53:4

**respect** [3] – 8:7, 10:1, 143:22

**respond** [4] – 62:2, 154:7, 169:16, 177:22

**responded** [5] – 154:9, 170:11, 170:13, 179:16, 190:20

**responding** [1] – 169:20

**response** [1] – 190:1

**Response** [1] – 178:24

**responsibilities** [8] – 48:12, 49:4, 153:3, 153:12, 170:15, 175:24, 176:8, 188:11

**responsibility** [4] – 8:20, 58:6, 153:15, 176:3

**responsible** [1] – 153:6

**rest** [1] – 178:5

**restored** [1] – 118:16

**restroom** [1] – 100:23

**result** [2] – 7:20, 191:14

**resume** [3] – 198:9, 201:12, 203:14

**retire** [1] – 200:18

**retrieve** [3] – 9:20, 96:18, 180:18

**retrieved** [2] – 184:14, 185:8

**retrieving** [1] – 184:19

**return** [5] – 46:20, 101:1, 116:12, 172:21, 172:25

**returned** [3] – 9:18, 57:7, 138:17

**review** [4] – 73:25, 74:3, 129:25, 145:24

**reviewed** [4] – 9:22, 10:11, 135:20, 138:2

**revolves** [1] – 40:4

**rewritten** [2] – 140:3, 140:5

**rewrote** [1] – 140:9

**Ricardo** [1] – 66:7

**riddled** [1] – 45:7

**ride** [1] – 144:12

**rifle** [73] – 13:9, 14:15, 16:14, 16:17, 16:20, 16:24, 17:5, 19:3, 20:2, 20:8, 20:18, 21:19, 22:6, 22:11, 28:1, 28:9, 28:10, 30:3, 30:19, 30:24, 31:13, 36:5, 36:6, 36:17, 51:12, 51:17, 51:23, 51:24, 51:25, 69:15, 69:17, 71:4, 71:6, 71:8, 71:9, 80:8, 87:9, 88:4, 89:16, 89:23, 90:10, 91:4, 92:5, 92:8, 93:4, 93:20, 93:24, 93:25, 94:12, 95:14, 98:3, 103:22, 105:14, 106:21, 161:10, 161:19, 162:11, 162:20, 163:12, 164:18, 164:20, 166:9, 166:11, 166:16, 166:17, 167:3, 167:15, 186:21

**rifleman** [3] – 49:23, 51:4, 51:14

**rifles** [2] – 28:6, 94:15

**right-hand** [4] – 29:21,

69:11, 78:11, 120:22

**rights** [1] – 38:3

**ring** [2] – 186:16, 186:19

**rise** [9] – 38:24, 41:18, 45:23, 100:2, 111:6, 112:16, 172:19, 197:19, 201:13

**risk** [3] – 126:23, 189:1, 189:2

**road** [17] – 16:15, 59:19, 60:15, 60:19, 60:21, 60:22, 67:13, 67:14, 68:23, 70:12, 75:9, 76:3, 76:6, 102:20, 119:5, 136:1

**Road** [6] – 30:1, 177:22, 193:23, 193:24, 194:14, 195:13

**roads** [2] – 66:1, 66:3

**ROBERT** [1] – 48:2

**Robert** [4] – 15:22, 47:13, 48:8, 157:12

**rocket** [1] – 51:18

**rocks** [1] – 61:19

**role** [16] – 7:12, 20:10, 49:12, 49:23, 52:2, 52:7, 53:19, 55:14, 58:5, 58:7, 81:4, 81:5, 110:15, 154:23, 154:25, 188:9

**roles** [1] – 53:21

**Romania** [2] – 50:24, 94:12

**romantic** [1] – 25:9

**Ronnie** [3] – 20:4, 20:5, 20:9

**room** [4] – 106:15, 108:20, 174:1, 200:18

**rope** [1] – 45:2

**Rose** [1] – 199:3

**roughly** [6] – 106:18, 106:21, 109:24, 125:10, 125:22, 134:9

**round** [4] – 17:8, 19:3, 30:23, 38:14

**rounds** [6] – 13:9, 17:5, 17:6, 28:10, 35:18, 70:16

**route** [5] – 33:22, 159:1, 159:3, 164:18, 190:5

**Routh** [59] – 5:8, 5:15, 5:16, 6:21, 8:3, 8:16, 9:6, 11:1, 12:4, 12:22, 22:5, 30:23, 34:20,

38:20_, 39:2_, 39:14_, 39:23_, 41:16_, 41:22_, 44:9_, 45:21_, 46:2_, 46:8_, 73:16_, 74:20_, 88:21_, 100:10_, 101:4_, 105:19_, 112:23_, 129:1_, 130:11_, 141:2_, 146:9_, 147:24_, 149:11_, 149:18_, 151:18_, 173:5_, 177:24_, 178:5_, 178:10_, 178:14_, 179:19_, 179:24_, 180:14_, 181:7_, 181:22_, 184:9_, 185:12_, 185:22_, 186:11_, 191:16_, 197:5_, 197:9_, 199:7_, 199:16_, 201:21_, 201:25

**ROUTH** [82]_ - 5:16_, 7:1_, 9:1_, 9:7_, 9:14_, 9:17_, 11:6_, 11:12_, 11:15_, 39:15_, 39:24_, 41:8_, 41:19_, 42:8_, 42:16_, 43:1_, 43:3_, 43:7_, 43:11_, 43:15_, 43:19, 43:23_, 44:2_, 44:10_, 45:20_, 45:24_, 46:5_, 46:11_, 46:22_, 73:18_, 74:21_, 88:23_, 100:13_, 100:15_, 100:18_, 101:6_, 101:15, 101:16_, 105:13_, 105:21, 105:22_, 108:6_, 108:8, 108:11_, 109:14, 110:13_, 111:1_, 112:24_, 129:2_, 130:13_, 141:3_, 146:10_, 147:25_, 148:2, 149:6_, 149:12_, 149:15, 149:19, 149:20_, 151:19_, 151:22_, 173:6_, 173:8_, 174:4, 174:7_, 174:10_, 174:17_, 180:1_, 181:23_, 185:23_, 186:12_, 186:14_, 186:24_, 195:21_, 196:11_, 196:15_, 197:6_, 199:11_, 199:19_, 199:22_, 199:24_, 201:22

**RPG** [1]_ - 28:11

**rude** [1]_ - 201:6

**rule** [4]_ - 6:13_, 6:17_, 6:21_, 146:15

**Rule** [3]_ - 6:16_, 88:19_, 146:8

**rules** [2]_ - 11:4_, 197:20

**Rules** [1]_ - 7:20

**rulings** [1]_ - 40:23

**run** [5]_ - 44:22_, 126:18_, 132:3_, 139:1_, 147:13

**running** [13]_ - 32:5_, 32:9_, 44:21_, 66:5_, 66:11_, 66:12_, 66:16_,

66:17_, 70:8_, 70:10_, 70:17_, 120:24

**Ryan** [5]_ - 5:8_, 5:16_, 12:22_, 184:9_, 191:16

## S

**safe** [8]_ - 18:11_, 55:18_, 55:21_, 58:8_, 85:5_, 96:22_, 98:6_, 98:12

**safety** [5]_ - 17:9_, 17:12_, 19:4_, 30:24_, 32:17

**sale** [1]_ - 20:15

**salmon** [1]_ - 180:14

**sanctions** [1]_ - 7:20

**sand** [1]_ - 61:19

**Sara** [1]_ - 22:5

**sat** [5]_ - 30:16_, 139:14_, 142:15_, 142:20_, 142:21

**satellite** [1]_ - 202:24

**sausages** [8]_ - 25:10_, 25:11_, 25:14_, 166:13_, 167:18_, 168:15_, 168:23_, 192:18

**save** [1]_ - 44:17

**saved** [1]_ - 45:12

**saw** [60]_ - 16:8_, 16:10_, 16:16_, 16:17_, 20:1_, 20:6_, 30:19_, 37:2_, 45:5_, 60:25_, 61:22_, 62:17_, 64:19_, 86:6_, 87:10_, 88:1_, 89:23_, 91:20_, 93:3_, 95:20_, 97:6_, 103:12_, 120:21_, 120:25_, 121:2_, 122:4_, 126:17_, 127:13_, 138:5_, 140:10_, 141:18_, 141:19_, 141:20_, 142:10_, 142:11_, 142:12_, 142:14_, 144:16_, 156:15_, 157:5_, 158:6_, 158:17_, 159:22_, 159:25_, 160:3_, 160:24_, 161:2_, 161:10_, 163:16_, 166:11_, 166:12_, 167:6_, 167:14_, 168:15_, 169:18_, 179:14_, 181:14_, 192:17

**scaled** [1]_ - 173:9

**scales** [1]_ - 44:14

**scanned** [1]_ - 98:2

**scanner** [1]_ - 202:25

**scanning** [16]_ - 58:9_, 58:11_, 59:15_, 59:17_, 59:18_, 59:20_, 59:22_, 60:15_, 60:24_, 61:8_,

61:12_, 63:22_, 87:25_, 93:18_, 101:23_, 164:10

**scarred** [1]_ - 45:10

**scenario** [6]_ - 70:25_, 71:2_, 71:21_, 83:14_, 104:16_, 104:17

**scenarios** [2]_ - 70:22

**scene** [40]_ - 15:19_, 63:13_, 85:5_, 98:6_, 98:12_, 98:15_, 98:18_, 98:19_, 98:21_, 98:23_, 99:8_, 99:9_, 99:10_, 99:16_, 99:18_, 107:13_, 107:15_, 133:21_, 138:17_, 143:1_, 143:21_, 144:23_, 163:15_, 163:19_, 163:22_, 169:17_, 170:14_, 170:16_, 170:21_, 171:10_, 171:17_, 171:18_, 171:23_, 171:25_, 191:4_, 191:12_, 191:18_, 192:2

**schedule** [4]_ - 54:24_, 199:9_, 200:9_, 200:11

**scheduled** [3]_ - 6:14_, 6:24_, 56:19

**scheme** [2]_ - 27:23_, 32:20

**schizoaffective** [1]_ - 116:22

**schizophrenia** [1]_ - 116:22

**school** [1]_ - 116:1

**scope** [5]_ - 30:18_, 41:24_, 100:17_, 196:10

**scrapyard** [1]_ - 45:12

**scratched** [3]_ - 110:1_, 110:2_, 110:3

**screen** [11]_ - 58:19_, 58:23_, 65:21_, 66:25_, 86:5_, 132:17_, 135:17_, 137:24_, 179:6_, 179:8_, 180:9

**screenshot** [1]_ - 29:6

**se** [2]_ - 7:10_, 7:11

**seal** [1]_ - 193:15

**sealed** [3]_ - 193:6_, 193:7_, 193:8

**sealing** [1]_ - 193:10

**seams** [2]_ - 193:7_, 195:8

**search** [3]_ - 24:14_, 29:8_, 33:9

**searched** [2]_ - 25:12_,

28:17

**searches** [5]_ - 25:20_, 25:25_, 26:4_, 27:3_, 33:14

**seat** [14]_ - 5:2_, 11:23_, 39:1_, 44:8_, 47:18_, 101:2_, 111:8_, 111:16_, 113:4_, 113:10_, 172:24_, 173:3_, 197:22_, 201:15

**seated** [14]_ - 39:9_, 39:13_, 41:21_, 46:1_, 47:8_, 47:25_, 100:4_, 100:23_, 101:2_, 113:22_, 152:12_, 175:5_, 187:17_, 200:4

**second** [6]_ - 23:15_, 40:3_, 44:16_, 75:14_, 141:14_, 141:17

**Second** [1]_ - 38:3

**seconds** [3]_ - 80:14_, 109:23_, 109:24

**Secret** [39]_ - 15:21_, 16:1_, 27:23_, 48:21_, 48:24_, 49:2_, 49:6_, 49:11_, 49:12_, 49:16_, 49:18_, 49:21_, 49:22_, 50:7_, 52:3_, 52:4_, 52:5_, 52:8_, 52:19_, 52:22_, 55:14_, 72:23_, 72:24_, 81:1_, 81:3_, 81:19_, 81:22_, 84:20_, 84:21_, 96:6_, 96:12_, 99:6_, 152:25_, 153:8_, 153:19_, 153:21_, 157:7_, 157:10_, 170:15

**Secret-Service-marked** [1]_ - 96:6

**section** [1]_ - 153:6

**sector** [1]_ - 50:5

**secure** [8]_ - 55:21_, 99:16_, 170:19_, 170:24_, 193:18_, 194:7_, 194:19_, 195:13

**secured** [2]_ - 178:16_, 194:7

**securing** [2]_ - 49:7_, 55:15

**security** [8]_ - 27:13_, 28:25_, 38:13_, 54:10_, 154:4_, 154:8_, 154:25_, 174:12

**SECURITY** [6]_ - 11:20_, 39:11_, 44:6_, 100:21_, 111:14_, 113:8

**Security** [3]_ - 48:10_, 48:16_, 48:19

**see** [168]_ - 6:22_, 11:8_,

14:13_, 14:20_, 15:23_, 20:7_, 21:11_, 21:18_, 22:9_, 22:10_, 22:21_, 22:22_, 22:25_, 24:20_, 24:21_, 25:5_, 25:10_, 25:20_, 26:4_, 26:5_, 26:8_, 26:23_, 27:1_, 27:10_, 27:12_, 27:18_, 28:6_, 28:24_, 29:7_, 29:10_, 29:18_, 30:6_, 30:14_, 31:3_, 31:9_, 31:16_, 32:4_, 32:14_, 32:15_, 33:14_, 33:16_, 33:21_, 34:5_, 35:6_, 37:20_, 59:20_, 60:6_, 62:24_, 64:20_, 65:21_, 66:2_, 67:2_, 67:10_, 68:21_, 72:14_, 75:4_, 77:2_, 77:14_, 84:10_, 86:2_, 86:19_, 89:2_, 89:22_, 90:5_, 90:25_, 91:3_, 91:5_, 91:7_, 91:16_, 92:2_, 92:5_, 92:15_, 92:20_, 92:23_, 95:17_, 95:23_, 101:7_, 103:14_, 111:3_, 112:9_, 116:11_, 118:17_, 120:7_, 121:7_, 122:1_, 122:19_, 122:20_, 122:25_, 123:13_, 123:14_, 123:16_, 125:18_, 126:2_, 126:13_, 127:14_, 128:8_, 129:10_, 130:7_, 131:1_, 131:18_, 131:25_, 132:11_, 132:16_, 132:23_, 134:6_, 135:2_, 135:23_, 136:21_, 136:23_, 138:16_, 138:20_, 139:21_, 141:13_, 142:25_, 144:13_, 146:23_, 146:24_, 150:20_, 154:19_, 156:1_, 156:15_, 157:5_, 158:9_, 158:24_, 159:15_, 160:11_, 161:8_, 161:18_, 161:19_, 161:23_, 161:24_, 162:5_, 162:6_, 162:17_, 163:1_, 163:5_, 163:13_, 163:25_, 164:12_, 165:1_, 165:11_, 166:7_, 166:8_, 166:11_, 167:2_, 168:14_, 168:17_, 169:5_, 170:3_, 172:22_, 179:6_, 179:10_, 180:8_, 180:13_, 180:14_, 182:8_, 183:1_, 183:11_, 184:10_, 190:24_, 191:17_, 193:2_, 195:4_, 201:5

**seeing** [9]_ - 14:3_, 69:24_, 129:21_, 130:23_, 131:13_, 131:20_, 135:16_, 135:23_, 167:18

**seek** [13]_ - 19:24_, 65:7_,

73:13_, 74:8_, 83:19_, 83:20_, 88:19_, 94:19_, 179:22_, 181:19_, 185:20_, 194:22

**seeking** [1]_ - 202:17
**seem** [2]_ - 39:19_, 151:4
**sees** [1]_ - 32:5
**seized** [3]_ - 181:15_, 185:14_, 185:17
**selection** [1]_ - 10:2
**self** [2]_ - 10:20_, 30:21
**self-serving** [1]_ - 10:20
**selfie** [1]_ - 25:8
**semi** [1]_ - 196:22
**semi-auto** [1]_ - 196:22
**semiautomatic** [1]_ - 186:21
**send** [1]_ - 33:3
**sense** [1]_ - 107:6
**sent** [3]_ - 25:8_, 32:25_, 33:5
**separated** [3]_ - 50:16_, 59:19_, 176:25
**separately** [1]_ - 130:8
**separates** [8]_ - 72:16_, 76:3_, 76:6_, 76:7_, 85:17_, 90:7_, 92:4_, 92:17
**separation** [1]_ - 50:18
**September** [55]_ - 14:7_, 15:17_, 16:1_, 18:14_, 19:1_, 19:2_, 19:16_, 24:4_, 24:24_, 27:1_, 28:15_, 28:18_, 34:17_, 35:2_, 35:23_, 37:10_, 37:17_, 48:25_, 53:15_, 53:17_, 54:12_, 54:14_, 55:8_, 55:10_, 55:24_, 56:2_, 56:5_, 56:7_, 56:11_, 56:12_, 56:13_, 56:17_, 56:18_, 57:12_, 57:14_, 57:15_, 57:17_, 59:5_, 59:6_, 59:22_, 68:23_, 86:4_, 91:20_, 91:22_, 103:2_, 108:17_, 117:20_, 118:2_, 154:1_, 154:21_, 155:12_, 177:2_, 179:15_, 181:16_, 189:11
**sequence** [2]_ - 127:17_, 198:11
**Serbia** [1]_ - 50:24
**sergeant** [1]_ - 50:19
**serial** [4]_ - 20:17_, 20:20_, 20:22_, 36:21
**series** [2]_ - 32:25_, 74:10

**serious** [4]_ - 13:8_, 17:6_, 17:17_, 17:20
**seriously** [1]_ - 110:19
**serve** [3]_ - 53:6_, 53:19_, 189:1
**served** [5]_ - 49:22_, 51:3_, 53:22_, 53:24_, 54:1
**serves** [1]_ - 53:25
**service** [43]_ - 16:23_, 18:4_, 60:15_, 60:19_, 60:21_, 67:4_, 67:9_, 68:22_, 72:1_, 72:8_, 72:15_, 73:1_, 75:19_, 75:22_, 76:16_, 76:17_, 77:2_, 77:3_, 79:19_, 82:19_, 82:23_, 83:9_, 83:24_, 85:4_, 91:2_, 91:17_, 92:16_, 92:19_, 92:20_, 96:16_, 98:5_, 102:4_, 102:5_, 102:14_, 102:19_, 102:23_, 103:1_, 103:2_, 107:24_, 110:16_, 110:21_, 155:9_, 189:2
**Service** [39]_ - 15:21_, 16:1_, 27:23_, 48:21_, 48:24_, 49:3_, 49:6_, 49:11_, 49:13_, 49:16_, 49:18_, 49:21_, 49:22_, 50:7_, 52:3_, 52:4_, 52:5_, 52:8_, 52:19_, 52:22_, 55:15_, 72:23_, 72:24_, 81:1_, 81:3_, 81:19_, 81:22_, 84:20_, 84:21_, 96:6_, 96:13_, 99:6_, 152:25_, 153:8_, 153:19_, 153:21_, 157:8_, 157:10_, 170:15
**services** [1]_ - 52:20
**serving** [3]_ - 10:20_, 51:14_, 52:7
**session** [2]_ - 99:23_, 100:5
**sessions** [1]_ - 137:4
**set** [7]_ - 12:11_, 15:17_, 58:16_, 58:23_, 176:16_, 178:5_, 178:14
**settled** [1]_ - 30:9
**setup** [1]_ - 88:3
**seven** [1]_ - 41:13
**several** [14]_ - 8:11_, 51:5_, 51:15_, 51:19_, 52:14_, 52:25_, 53:2_, 59:23_, 68:1_, 70:1_, 85:2_, 104:7_, 106:13_, 202:8
**shaking** [1]_ - 40:12
**shape** [1]_ - 109:18

**share** [5]_ - 26:12_, 93:13_, 120:8_, 123:25
**shared** [1]_ - 9:23
**shares** [1]_ - 120:5
**sharing** [1]_ - 118:7
**sheet** [1]_ - 141:17
**shelter** [1]_ - 44:24
**sheriff's** [2]_ - 138:24_, 193:25
**Sheriff's** [19]_ - 142:16_, 142:22_, 169:20_, 171:24_, 177:21_, 185:9_, 185:10_, 190:25_, 191:5_, 193:6_, 193:19_, 193:20_, 194:11_, 194:14_, 194:18_, 195:13_, 196:6_, 199:4
**shielded** [1]_ - 123:23
**shielding** [12]_ - 60:3_, 63:6_, 77:17_, 77:18_, 88:13_, 88:14_, 89:3_, 89:5_, 92:5_, 92:8_, 99:11_, 103:23
**shields** [1]_ - 89:9
**shift** [11]_ - 55:19_, 55:20_, 64:17_, 73:2_, 79:18_, 80:8_, 81:14_, 81:18_, 81:21_, 82:22_, 170:12
**shifted** [1]_ - 170:14
**SHIPLEY** [74]_ - 5:4_, 5:11_, 9:4_, 12:10_, 12:18_, 14:2_, 19:10_, 19:12_, 35:4_, 38:19_, 39:22_, 40:23_, 45:19_, 112:7_, 112:22_, 113:6_, 113:12_, 114:3_, 114:8_, 120:14_, 120:16_, 124:13_, 124:17_, 124:22_, 125:1_, 125:4_, 125:7_, 128:4_, 128:7_, 128:24_, 129:6_, 129:8_, 129:10_, 129:12_, 129:16_, 129:19_, 130:4_, 130:9_, 130:18_, 130:21_, 131:15_, 131:16_, 132:10_, 132:12_, 132:20_, 132:22_, 134:3_, 134:7_, 135:11_, 135:19_, 137:20_, 138:1_, 140:12_, 140:15_, 140:25_, 141:7_, 141:10_, 141:11_, 145:13_, 145:16_, 145:17_, 146:6_, 146:14_, 146:16_, 146:22_, 147:20_, 147:23_, 149:1_, 149:10_, 151:24_, 197:25_, 198:18_, 201:20_, 203:16
**Shipley** [11]_ - 5:11_, 8:6_, 12:9_, 12:14_, 19:8_,

112:3_, 112:6_, 112:21_, 113:5_, 113:11_, 197:22

**shirt** [9]_ - 64:25_, 96:6_, 121:8_, 145:11_, 179:19_, 180:15_, 181:7_, 182:9_, 182:13

**shock** [1]_ - 16:7

**shoes** [3]_ - 96:7_, 185:9_, 185:11

**shoot** [6]_ - 17:13_, 30:24_, 104:2_, 104:18_, 104:23_, 143:6

**shooter's** [1]_ - 82:25

**shooting** [10]_ - 77:15_, 94:13_, 104:4_, 104:8_, 108:22_, 120:3_, 120:6_, 138:14_, 139:19_, 144:24

**shootings** [1]_ - 119:25

**shopping** [3]_ - 31:20_, 118:20_, 125:9

**short** [5]_ - 32:16_, 112:14_, 146:17_, 151:2_, 188:7

**shorter** [2]_ - 198:13_, 199:8

**shortly** [4]_ - 32:24_, 56:4_, 57:25_, 58:3

**shot** [6]_ - 14:23_, 30:12_, 72:7_, 103:24_, 104:25_, 120:3

**Shots** [5]_ - 80:12_, 82:14_, 82:20_, 97:7_, 98:2

**shots** [23]_ - 31:5_, 31:22_, 80:12_, 82:14_, 82:22_, 87:24_, 88:2_, 93:15_, 97:5_, 109:17_, 109:20_, 148:21_, 157:4_, 158:9_, 158:10_, 158:19_, 158:20_, 158:23_, 160:23_, 163:16

**shoulder** [2]_ - 123:4_, 123:17

**shovel** [1]_ - 45:8

**show** [24]_ - 15:7_, 19:13_, 26:5_, 35:22_, 43:5_, 46:7_, 71:12_, 77:21_, 85:11_, 89:16_, 125:23_, 127:3_, 130:4_, 134:8_, 137:10_, 137:11_, 145:13_, 154:11_, 164:14_, 167:13_, 179:2_, 193:8_, 193:11

**showcasing** [1]_ - 90:6

**showing** [16]_ - 14:4_, 24:20_, 33:18_, 71:11_, 74:1_, 91:19_, 125:21_,

163:14_, 182:7_, 182:25_, 183:16_, 183:23_, 183:24_, 184:25_, 186:7_, 186:8

**shown** [5]_ - 30:2_, 89:21_, 124:15_, 131:8_, 168:5

**shows** [7]_ - 26:17_, 28:5_, 29:1_, 34:20_, 77:22_, 89:17_, 167:14

**shrubberies** [1]_ - 76:11

**shrubbery** [1]_ - 60:23

**shut** [1]_ - 191:2

**sic** [1]_ - 41:12

**sic]** [1]_ - 181:19

**side** [46]_ - 7:4_, 12:3_, 16:12_, 16:13_, 29:25_, 41:5_, 61:3_, 69:8_, 69:11_, 70:3_, 78:11_, 83:22_, 85:7_, 85:11_, 88:4_, 91:6_, 120:22_, 133:14_, 159:7_, 159:15_, 162:11_, 162:22_, 163:10_, 163:12_, 163:24_, 163:25_, 164:2_, 164:4_, 164:5_, 165:16_, 165:23_, 166:8_, 166:20_, 167:3_, 167:5_, 167:7_, 167:24_, 168:6_, 168:10_, 169:19_, 170:7_, 182:25_, 195:6_, 201:16

**side-by-side** [1]_ - 162:22

**sight** [20]_ - 64:5_, 64:8_, 86:21_, 86:22_, 86:24_, 87:2_, 87:3_, 87:4_, 87:18_, 87:21_, 93:13_, 95:21_, 95:22_, 96:25_, 97:12_, 97:13_, 101:22_, 109:3_, 109:9_, 194:15

**sights** [1]_ - 95:19

**sign** [3]_ - 61:17_, 79:3_, 103:17

**Signal** [1]_ - 25:23

**significance** [1]_ - 25:12

**significant** [3]_ - 29:3_, 37:6_, 116:20

**Sihvola** [1]_ - 5:19

**silent** [1]_ - 41:14

**similar** [8]_ - 21:19_, 22:21_, 64:10_, 90:6_, 93:10_, 93:13_, 181:14

**similar-type** [1]_ - 64:10

**similarly** [1]_ - 93:12

**simple** [1]_ - 40:14

**simpleminded** [1]_ - 199:19

**simply** [2]_ - 200:19_, 201:6

**single** [1]_ - 10:11

**sit** [1]_ - 41:14

**site** [13]_ - 53:22_, 53:23_, 55:10_, 55:13_, 55:14_, 55:16_, 55:17_, 57:16_, 58:7_, 110:15_, 195:22

**sites** [3]_ - 53:3_, 54:8

**sitting** [2]_ - 145:7_, 166:15

**situation** [6]_ - 31:4_, 43:8_, 54:23_, 104:16_, 105:4_, 107:14

**situations** [2]_ - 117:5_, 117:9

**six** [5]_ - 23:24_, 33:10_, 35:18_, 109:24_, 158:15

**size** [1]_ - 105:18

**skeptical** [1]_ - 139:23

**skilled** [1]_ - 38:16

**skip** [2]_ - 41:19_, 174:13

**SKS** [19]_ - 14:14_, 20:1_, 21:19_, 22:10_, 28:1_, 36:15_, 93:20_, 93:21_, 94:1_, 94:2_, 94:5_, 94:6_, 95:14_, 96:11_, 97:23_, 105:14_, 106:17_, 109:10_, 186:21

**SKS-type** [1]_ - 93:20

**sky** [1]_ - 97:1

**slaughter** [1]_ - 40:20

**slaughtered** [2]_ - 40:21_, 41:10

**sleep** [1]_ - 201:23

**sleeved** [3]_ - 179:19_, 180:14_, 182:9

**slow** [4]_ - 32:7_, 122:13_, 126:10_, 126:13

**slowed** [1]_ - 123:9

**slowly** [4]_ - 127:15_, 130:24_, 133:8_, 133:10

**small** [2]_ - 85:20_, 90:7

**smaller** [2]_ - 97:22_, 97:25

**smart** [1]_ - 39:17

**smile** [3]_ - 40:13_, 62:6_, 62:14

**smiled** [3]_ - 62:13_, 70:4_, 107:23

**smiling** [1]_ - 139:10

**Smith** [1]_ - 26:2

**smooth** [1]_ - 44:19

**smoothness** [1]_ - 44:21

**snap** [1]_ - 127:23

**sniff** [1]_ - 192:3

**sniper** [12]_ - 14:12_, 14:15_, 20:1_, 25:13_, 28:9_, 28:10_, 36:10_, 38:8_, 38:11_, 104:1_, 104:2_, 104:3

**so..** [5]_ - 44:10_, 107:11_, 109:25_, 149:21_, 151:14

**social** [1]_ - 172:10

**socks** [2]_ - 179:20_, 180:16

**soft** [2]_ - 45:4_, 96:12

**soft-body** [1]_ - 96:12

**sold** [1]_ - 20:5

**solemnly** [4]_ - 47:21_, 152:8_, 175:1_, 187:13

**someone** [24]_ - 26:12_, 87:19_, 97:2_, 103:12_, 120:3_, 126:2_, 127:12_, 135:1_, 139:15_, 139:18_, 140:10_, 142:24_, 143:7_, 144:7_, 147:18_, 158:23_, 163:6_, 165:14_, 165:18_, 166:14_, 167:23_, 186:15_, 186:18

**somewhat** [1]_ - 116:24

**somewhere** [2]_ - 155:24_, 156:8

**soon** [4]_ - 31:6_, 111:5_, 178:15_, 190:14

**sorry** [10]_ - 9:14_, 39:15_, 39:17_, 39:18_, 44:10_, 125:13_, 126:8_, 174:4_, 186:17

**sort** [11]_ - 29:19_, 42:4_, 42:6_, 42:21_, 61:9_, 112:11_, 137:14_, 155:9_, 178:9_, 183:5_, 184:11

**sorts** [1]_ - 165:22

**soul** [1]_ - 39:20

**sound** [2]_ - 31:25_, 43:16

**sounded** [1]_ - 62:5

**sounds** [1]_ - 79:5

**South** [6]_ - 22:17_, 23:2_, 23:3_, 23:17_, 29:14_, 50:25

**south** [11]_ - 33:22_, 66:17_, 115:2_, 134:18_, 135:7_, 136:7_, 138:19_, 139:6_, 190:4_, 190:7_,

190:20

**southbound** [1]_ - 190:15

**Southern** [1]_ - 26:21

**southern** [1]_ - 94:3

**southwest** [1]_ - 50:5

**Soviet** [7]_ - 63:23_, 63:24_, 64:6_, 93:9_, 93:24_, 93:25

**Soviet-style** [5]_ - 63:23_, 63:24_, 93:9_, 93:24_, 93:25

**space** [4]_ - 118:17_, 137:14_, 167:25_, 170:23

**speaking** [7]_ - 43:7_, 80:5_, 80:19_, 81:11_, 82:4_, 159:13_, 195:9

**SPECIAL** [4] - 48:2_, 152:20_, 175:12_, 187:24

**Special** [16]_ - 36:25_, 46:25_, 47:13_, 75:4_, 84:16_, 84:18_, 152:4_, 154:19_, 159:22_, 176:6_, 178:2_, 182:25_, 184:25_, 187:10_, 187:11_, 202:10

**special** [26]_ - 48:11_, 48:12_, 48:14_, 48:22_, 48:23_, 49:2_, 49:5_, 49:11_, 49:12_, 49:16_, 49:18_, 49:20_, 49:22_, 51:8_, 52:2_, 52:5_, 52:7_, 52:22_, 153:2_, 153:3_, 175:23_, 175:24_, 188:10_, 188:11_, 188:16_, 188:24

**specialist** [1]_ - 196:12

**specialized** [1]_ - 189:3

**specializes** [1]_ - 24:9

**specialties** [1]_ - 51:1

**species** [2]_ - 40:10_, 40:17

**specific** [4]_ - 42:1_, 42:24_, 43:5_, 105:18

**specifically** [4]_ - 28:17_, 116:21_, 124:10_, 145:2

**speculation** [1]_ - 109:6

**speed** [2]_ - 133:17_, 133:19

**speeding** [1]_ - 133:19

**spell** [5]_ - 48:6_, 113:24_, 152:13_, 175:6_, 187:18

**spelled** [1]_ - 114:1

**spelling** [1]_ - 47:19

**spend** [2]_ - 23:7_, 151:12

**spent** [7]_ - 15:5_, 15:15_, 30:22_, 63:5_, 88:10_, 94:13_, 119:18

**split** [1]_ - 45:8

**spot** [12]_ - 19:16_, 25:1_, 27:10_, 30:11_, 30:17_, 103:20_, 123:20_, 123:22_, 127:7_, 127:24_, 133:9_, 165:3

**spouse** [1]_ - 52:12

**spray** [2]_ - 30:20_, 30:21

**spring** [1]_ - 35:19

**spring-loaded** [1]_ - 35:19

**Springs** [2]_ - 114:18_, 118:4

**squad** [3]_ - 51:17_, 170:23_, 176:1

**squat** [1]_ - 166:6

**squatting** [1]_ - 164:12

**stable** [2]_ - 105:6_, 105:15

**stack** [1]_ - 11:11

**stacking** [1]_ - 45:1

**stain** [3]_ - 183:2_, 183:5_, 183:15

**stalking** [1]_ - 15:15

**stance** [1]_ - 104:1

**stand** [9]_ - 8:9_, 15:24_, 31:1_, 34:21_, 44:25_, 47:15_, 101:2_, 187:12_, 188:23

**standard** [1]_ - 200:13

**standby** [1]_ - 5:19

**standing** [12]_ - 39:4_, 47:17_, 82:23_, 95:12_, 104:5_, 104:14_, 113:16_, 122:11_, 152:5_, 165:4_, 174:11

**start** [8]_ - 21:5_, 46:13_, 48:16_, 48:23_, 58:1_, 65:11_, 101:17_, 201:10

**started** [15]_ - 6:2_, 8:5_, 9:6_, 16:21_, 46:6_, 48:1_, 48:18_, 48:25_, 71:13_, 122:4_, 123:20_, 127:6_, 180:13_, 190:2_, 190:3

**starting** [1]_ - 5:10

**starts** [5]_ - 68:5_, 68:6_, 133:7_, 134:17_, 134:18

**state** [12]_ - 5:9_, 6:3_, 7:13_, 48:6_, 49:9_, 52:9_

_, 87:9_, 87:10_, 113:23_, 152:13_, 175:6_, 187:18

**statement** [15]_ - 7:13_, 7:22_, 9:3_, 10:7_, 12:5_, 14:4_, 21:6_, 39:3_, 41:3_, 41:23_, 41:24_, 43:8_, 43:13_, 45:22_, 46:19

**statements** [12]_ - 5:22_, 7:3_, 7:6_, 7:10_, 7:18_, 10:20_, 11:2_, 12:2_, 21:7_, 41:5_, 47:10_, 198:3

**States** [39]_ - 5:7_, 5:10_, 5:12_, 6:15_, 9:3_, 12:24_, 17:21_, 19:4_, 46:24_, 47:12_, 48:21_, 48:24_, 49:2_, 49:6_, 49:23_, 49:25_, 50:4_, 50:9_, 50:11_, 50:12_, 50:18_, 51:9_, 51:14_, 52:8_, 52:11_, 52:15_, 55:14_, 61:14_, 81:3_, 84:20_, 84:21_, 108:16_, 111:18_, 111:24_, 113:12_, 174:24_, 176:22_, 201:19

**station** [5]_ - 28:25_, 50:6_, 150:15_, 150:21

**Station** [1]_ - 23:2

**stationed** [2]_ - 50:2_, 50:5

**status** [1]_ - 198:24

**statute** [1]_ - 38:15

**statutes** [1]_ - 18:7

**stay** [5]_ - 43:13_, 46:9_, 85:6_, 100:17_, 116:11

**stayed** [3]_ - 30:8_, 164:24_, 172:1

**step** [6]_ - 10:3_, 16:19_, 18:22_, 60:10_, 108:13_, 125:8

**steps** [4]_ - 18:25_, 19:2_, 20:24_, 26:2

**sterile** [2]_ - 98:19_, 99:16

**sternum** [1]_ - 106:7

**sticking** [8]_ - 109:4_, 161:10_, 161:19_, 166:18_, 166:19_, 166:20_, 167:15_, 170:6

**still** [18]_ - 71:25_, 77:3_, 84:12_, 84:13_, 100:22_, 123:24_, 127:8_, 128:2_, 130:1_, 130:5_, 130:22_, 133:14_, 136:17_, 163:6_, 165:2_, 165:4_, 166:9

**stills** [1]_ - 130:14

**stinger** [1]_ - 28:11

**stipulated** [1]_ - 37:4

**stolen** [2]_ - 13:13_, 32:20

**stomach** [1]_ - 104:10

**stones** [2]_ - 44:19_, 45:1

**stood** [2]_ - 169:18_, 171:3

**stop** [12]_ - 23:2_, 23:6_, 24:2_, 24:22_, 67:17_, 123:11_, 126:17_, 127:15_, 127:17_, 135:10_, 191:1

**Stop** [1]_ - 11:7

**stoplight** [3]_ - 136:10_, 149:22_, 149:23

**stopped** [11]_ - 118:16_, 142:24_, 144:7_, 144:15_, 144:22_, 148:22_, 151:16_, 157:4_, 190:16_, 190:21_, 195:25

**stopping** [1]_ - 147:5

**stops** [1]_ - 176:16

**storage** [3]_ - 193:18_, 194:7_, 194:19

**store** [2]_ - 23:17_, 118:15

**stores** [1]_ - 118:18

**story** [1]_ - 31:1

**straight** [2]_ - 137:9_, 151:7

**strapped** [1]_ - 105:25

**streaming** [1]_ - 66:8

**street** [15]_ - 15:2_, 30:4_, 32:9_, 66:16_, 66:17_, 115:23_, 117:16_, 122:16_, 159:15_, 163:12_, 163:24_, 165:23_, 167:5_, 193:25

**stricken** [2]_ - 149:16_, 174:5

**Strike** [1]_ - 48:15

**strike** [3]_ - 7:21_, 149:2_, 197:9

**strikes** [2]_ - 9:25

**striking** [1]_ - 9:8

**stripe** [1]_ - 183:22

**striped** [2]_ - 65:1_, 145:10

**struggled** [1]_ - 44:24

**studied** [2]_ - 27:23_, 27:25

**style** [11]_ - 63:23_, 63:24_, 79:24_, 80:8_, 86:21_, 89:16_, 93:9_, 93:24_,

93:25_, 118:12_, 183:20
**subject** [9]_ - 41:23_, 62:5_, 63:18_, 70:3_, 93:1_, 96:24_, 104:9_, 195:3_, 196:1
**subject's** [1]_ - 62:16
**subjects** [1]_ - 42:14
**substance** [4]_ - 99:25_, 115:9_, 116:9_, 172:17
**substantial** [3]_ - 18:21_, 18:25_, 19:1
**substantially** [1]_ - 185:16
**suburban** [1]_ - 114:19
**Suburbans** [1]_ - 139:13
**succeed** [2]_ - 13:7_, 127:21
**successful** [1]_ - 17:2
**Sudanese** [1]_ - 41:9
**suggest** [1]_ - 104:19
**suggesting** [2]_ - 69:24_, 199:20
**suit** [2]_ - 64:25_, 145:10
**summarize** [1]_ - 19:12
**summary** [4]_ - 202:8_, 202:11_, 202:16_, 202:21
**Summit** [39]_ - 30:1_, 32:3_, 53:14_, 66:3_, 66:5_, 66:11_, 66:12_, 66:14_, 66:15_, 72:5_, 72:17_, 76:7_, 85:18_, 92:4_, 92:17_, 119:2_, 119:11_, 119:13_, 120:13_, 120:19_, 120:21_, 121:14_, 121:15_, 121:16_, 125:19_, 126:2_, 136:4_, 138:13_, 138:20_, 139:5_, 139:10_, 139:12_, 139:13_, 147:11_, 148:7_, 148:9_, 149:23_, 164:5_, 177:7
**summoned** [2]_ - 47:2_, 139:17
**Sunday** [2]_ - 28:18_, 48:18
**sunglasses** [3]_ - 185:8_, 192:18_, 192:20
**superfluous** [2]_ - 174:3_, 197:2
**support** [1]_ - 41:10
**supporter** [1]_ - 148:24
**supposed** [1]_ - 41:3
**surprise** [1]_ - 16:20
**surprised** [3]_ - 32:18_,

139:21_, 139:23
**surrounded** [1]_ - 88:13
**surrounding** [3]_ - 65:25_, 73:2_, 89:5
**surroundings** [2]_ - 117:15_, 118:14
**surveying** [1]_ - 93:16
**suspect** [4]_ - 72:2_, 190:16_, 190:21_, 193:22
**suspects** [1]_ - 191:6
**sustained** [5]_ - 108:3_, 110:11_, 149:3_, 149:5_, 197:4
**SUV** [8]_ - 126:19_, 144:21_, 191:21_, 192:14_, 192:24_, 193:5_, 193:17_, 193:18
**SWAT** [5]_ - 188:22_, 188:23_, 188:25_, 189:3_, 190:13
**swear** [5]_ - 47:21_, 113:18_, 152:8_, 175:1_, 187:13
**sweep** [1]_ - 84:3
**swept** [1]_ - 77:16
**switch** [3]_ - 12:19_, 17:9_, 196:19
**switching** [1]_ - 19:3
**swivel** [1]_ - 117:18
**swivelled** [2]_ - 16:21_, 36:17
**sworn** [8]_ - 47:16_, 47:18, 48:3, 114:6_, 152:6, 152:21, 175:13, 187:25
**swung** [1]_ - 127:16
**system** [28]_ - 51:11_, 60:2_, 63:11_, 63:14_, 63:20_, 63:23_, 64:5_, 77:22_, 84:12_, 85:2_, 86:20_, 87:20_, 88:12_, 88:16_, 93:8_, 93:19_, 93:22_, 94:14_, 97:1_, 97:8_, 97:10_, 105:7_, 105:12_, 106:7_, 106:19_, 131:11_, 191:9_, 191:10
**systems** [6]_ - 51:15_, 51:16_, 88:10_, 88:11_, 88:16_, 93:11

T

**T-shirt** [4]_ - 121:8_, 180:15_, 182:9_, 182:13

**table** [3]_ - 46:3_, 46:20_, 124:24
**tactical** [3]_ - 83:5_, 176:13_, 176:17
**tactics** [1]_ - 188:24
**tail** [1]_ - 26:24
**tall** [3]_ - 55:5_, 55:6_, 121:1
**tampered** [1]_ - 193:11
**tank** [1]_ - 51:18
**tape** [5]_ - 30:19_, 193:7_, 193:14_, 193:15_, 195:8
**taped** [1]_ - 193:13
**target** [3]_ - 14:22_, 105:17_, 105:18
**tasked** [2]_ - 55:15_, 55:18
**taste** [1]_ - 118:10
**Team** [1]_ - 178:24
**team** [9]_ - 98:8_, 154:4_, 154:8_, 154:25_, 158:4_, 188:21_, 188:22_, 190:13_, 190:15
**teams** [1]_ - 190:13
**TEC** [1]_ - 21:19
**technician** [2]_ - 20:17_, 178:25
**technicians** [2]_ - 98:13_, 98:21
**teeth** [3]_ - 45:5_, 62:16_, 160:15
**temperatures** [1]_ - 29:14
**ten** [12]_ - 13:10_, 14:6_, 15:5_, 23:25_, 29:16_, 30:22_, 39:2_, 52:23_, 53:18_, 53:19_, 53:21_, 190:19
**ten-minute** [1]_ - 39:2
**tend** [1]_ - 117:10
**tendency** [3]_ - 117:8_, 117:13_, 117:14
**Tendering** [5]_ - 95:7_, 95:11_, 181:3_, 183:9_, 185:2
**tennis** [1]_ - 96:6
**term** [1]_ - 176:13
**terms** [3]_ - 42:12_, 42:23_, 197:24
**terrain** [1]_ - 104:21
**tested** [2]_ - 36:5_, 36:9
**testified** [7] - 48:3_, 86:6,

114:6, 152:21, 175:13, 187:25_, 196:1
**testify** [2]_ - 6:14_, 6:24
**testifying** [2]_ - 173:12_, 202:2
**testimony** [12]_ - 7:15_, 30:7_, 47:21_, 71:8_, 100:1_, 113:18_, 152:8_, 172:18_, 174:13, 175:2, 187:14_, 200:25
**Texas** [2]_ - 50:6_, 115:17
**text** [4]_ - 21:17_, 26:16_, 32:25_, 33:12
**textbook** [1]_ - 71:2
**texts** [1]_ - 19:24
**texture** [1]_ - 45:4
**THE** [246]_ - 5:2_, 5:5_, 5:14_, 5:17_, 5:20_, 5:25_, 6:11_, 6:17_, 6:21_, 7:2_, 8:10_, 9:2_, 9:5, 9:13_, 9:15_, 9:18_, 10:8_, 11:1_, 11:8_, 11:13_, 11:16_, 11:22_, 12:12_, 13:21_, 19:8, 19:11_, 35:3_, 38:18_, 38:20_, 39:1_, 39:9_, 39:13_, 39:23_, 40:25_, 41:16_, 41:21_, 42:11_, 42:20_, 43:2_, 43:4_, 43:10_, 43:12_, 43:17_, 43:20_, 43:24_, 44:3_, 44:8_, 45:21_, 46:1_, 46:8_, 46:12_, 47:1_, 47:6_, 47:8_, 47:14_, 47:24_, 48:1_, 58:18_, 58:25_, 65:5_, 65:9_, 65:13_, 66:6_, 67:22_, 68:19_, 72:12_, 73:15_, 73:19_, 74:9_, 74:12_, 74:15_, 74:19_, 74:22_, 75:2_, 78:24_, 79:13_, 80:2_, 80:16_, 81:8_, 82:1_, 85:24_, 86:10_, 88:21_, 88:24_, 89:13_, 90:3_, 90:23_, 91:14_, 91:25_, 92:13_, 94:21_, 94:24_, 95:4_, 95:6_, 96:19_, 97:16_, 99:21_, 100:4_, 100:10_, 100:14_, 100:16_, 100:19_, 100:22_, 101:1_, 101:13_, 105:9_, 105:11_, 105:19_, 108:3_, 108:7_, 108:10_, 109:7_, 109:9_, 110:11_, 111:2_, 111:8_, 111:12_, 111:16_, 111:20_, 112:1_, 112:6_, 112:10_, 112:18_, 112:23_, 112:25_, 113:3_, 113:7_, 113:10_, 113:14_, 113:21_

_, 113:25_, 114:2_, 124:16_, 124:20_, 125:3_, 125:6_, 128:6_, 129:1_, 129:3_, 129:7_, 130:8_, 130:11_, 130:14_, 131:9_, 131:13_, 141:2_, 141:4_, 141:9_, 145:15_, 146:9_, 146:11_, 146:15_, 146:20_, 147:22_, 147:24_, 149:3_, 149:11_, 149:14_, 149:16_, 151:18_, 151:20_, 151:21_, 151:23_, 152:1_, 152:5_, 152:11_, 152:15, 152:17_, 154:13_, 154:16_, 156:21_, 161:6_, 161:16_, 162:15_, 165:9_, 166:3_, 166:24_, 167:11_, 168:3_, 169:3_, 170:1_, 172:3_, 172:21_, 172:24_, 173:3_, 174:5_, 174:8_, 174:15_, 174:18_, 174:20_, 174:22_, 174:23_, 175:4_, 175:8_, 175:11_, 179:4_, 179:24_, 180:2_, 180:7_, 180:10_, 180:22_, 181:12_, 181:22_, 181:24_, 182:5_, 182:23_, 183:8_, 184:23_, 185:22_, 185:24_, 186:3_, 186:6_, 186:10_, 186:25_, 187:1_, 187:4_, 187:8_, 187:11_, 187:16_, 187:20_, 187:23_, 194:24_, 195:19_, 196:13_, 196:14_, 197:4_, 197:8_, 197:14_, 197:15_, 197:16_, 197:22_, 198:15_, 198:25_, 199:6_, 199:12_, 199:20_, 199:23_, 199:25_, 200:3_, 201:15_, 201:21_, 201:25_, 202:22_, 203:8_, 203:13_, 203:17

**themselves** [1]_ - 143:6

**then-major** [1]_ - 84:23

**then-presidential** [1]_ - 14:8

**therapists** [1]_ - 137:3

**thereafter** [2]_ - 56:4_, 58:2

**thick** [2]_ - 164:7_, 164:13

**thin** [1]_ - 45:8

**thinking** [6]_ - 34:25_, 44:23_, 64:14_, 122:24_, 127:10_, 156:13

**thoroughway** [1]_ - 66:22

**thoughts** [1]_ - 39:20

**threat** [11]_ - 62:22_,

69:22_, 69:23_, 69:25_, 70:2_, 70:23_, 70:24_, 71:5_, 107:17_, 156:2

**threats** [3]_ - 53:25_, 58:12, 59:15

**three** [16]_ - 13:12_, 17:23_, 32:19_, 70:6_, 106:3_, 106:24_, 107:2_, 107:3_, 119:12_, 119:14_, 127:23_, 128:1_, 130:6_, 130:14_, 147:12_, 158:5

**thrift** [2]_ - 118:15_, 118:18

**throwaway** [1]_ - 13:11

**thumb** [7]_ - 202:14_, 202:18_, 202:20_, 203:1_, 203:5_, 203:9_, 203:12

**tie** [2]_ - 65:1_, 145:10

**ties** [3]_ - 22:14_, 30:19_, 31:18

**TIGC** [3]_ - 53:10_, 53:12_, 55:16

**tiles** [6]_ - 161:12_, 162:6_, 162:10_, 166:12_, 167:4_, 167:16

**timely** [1]_ - 8:20

**timestamp** [2]_ - 28:24_, 29:2

**Tina** [5]_ - 19:21_, 19:22_, 20:5_, 20:10_, 28:8

**tire** [1]_ - 183:22

**tire-stripe** [1]_ - 183:22

**title** [3]_ - 153:1_, 175:22_, 188:9

**today** [15]_ - 15:23_, 31:2_, 31:17_, 64:20_, 73:5_, 145:6_, 197:18_, 198:2_, 198:14_, 198:16_, 199:1_, 199:8_, 199:13_, 200:7_, 203:14

**today's** [2]_ - 46:13_, 202:1

**together** [2]_ - 13:18_, 84:6

**TOMMY** [1]_ - 114:5

**Tommy** [5]_ - 31:15_, 37:1_, 111:25_, 113:13_, 113:25

**tomorrow** [8]_ - 31:17_, 198:10_, 199:1_, 199:15_, 201:12_, 202:2_, 202:6_, 203:14

**tomorrow's** [1]_ - 202:7

**took** [26]_ - 16:18_, 16:23

_, 18:25_, 20:24_, 23:24_, 30:3_, 34:23_, 34:25_, 74:6_, 127:20_, 128:11_, 128:21_, 130:1_, 131:21_, 143:14_, 144:12_, 150:16_, 156:17_, 157:1_, 157:2_, 159:2_, 159:3_, 164:19_, 178:17_, 178:22

**top** [3]_ - 106:6_, 121:6_, 121:7

**topics** [3]_ - 37:7_, 176:15_, 176:17

**totality** [1]_ - 108:17

**touch** [5]_ - 18:16_, 34:15_, 44:21_, 163:18_, 163:21

**touched** [1]_ - 99:14

**touching** [3]_ - 42:14_, 43:4_, 200:21

**tow** [5]_ - 193:20_, 193:21_, 193:22_, 195:12

**toward** [6]_ - 75:16_, 78:11_, 89:15_, 91:6_, 136:18_, 157:24

**towards** [22]_ - 18:22_, 19:9_, 27:9_, 45:15_, 60:13_, 71:16_, 78:15_, 89:17_, 97:1_, 97:13_, 133:16_, 137:8_, 138:18_, 138:25_, 158:8_, 160:1_, 160:23_, 162:18_, 164:3_, 173:13_, 190:4_, 190:6

**towed** [2]_ - 193:18_, 193:23

**towers** [1]_ - 24:12

**toy** [1]_ - 17:6

**track** [10]_ - 8:23_, 20:21_, 20:25_, 22:22_, 24:11_, 25:22_, 27:11_, 27:21_, 34:4_, 200:8

**tracked** [1]_ - 13:14

**tracking** [5]_ - 8:15_, 15:15_, 26:14_, 26:15_, 27:2

**tracks** [1]_ - 23:14

**tractor** [1]_ - 45:10

**trading** [1]_ - 41:13

**traffic** [7]_ - 27:17_, 144:14_, 144:15_, 144:16_, 144:17_, 150:12_, 176:16

**trail** [7]_ - 13:15_, 26:16_, 161:12_, 161:24_, 166:12_, 167:4_, 167:16

**trailer** [1]_ - 45:10

**train** [1]_ - 189:4

**trained** [4]_ - 16:18_, 51:4_, 61:18_, 102:8

**training** [20]_ - 16:22_, 51:8_, 51:10_, 51:13_, 51:15_, 61:9_, 61:11_, 61:12_, 61:14_, 61:16_, 70:18_, 70:20_, 70:21_, 70:22_, 87:1_, 94:9_, 108:15_, 108:22_, 116:13_, 189:3

**tran** [1]_ - 117:6

**transaction** [1]_ - 23:20

**transferred** [2]_ - 49:24_, 144:20

**transition** [1]_ - 75:8

**transitioned** [1]_ - 117:6

**transitioning** [2]_ - 67:5_, 118:5

**translated** [1]_ - 117:6

**transmission** [7]_ - 79:8_, 79:17_, 80:6_, 80:20_, 81:12_, 81:13_, 82:5

**transmissions** [3]_ - 73:8_, 73:10_, 90:19

**transmitted** [3]_ - 72:24_, 93:3_, 160:20

**transport** [1]_ - 178:15

**transportation** [1]_ - 54:2

**transported** [1]_ - 178:18

**trapped** [1]_ - 170:24

**traps** [1]_ - 171:6

**travel** [5]_ - 19:18_, 133:25_, 134:1_, 142:19_, 190:3

**traveled** [5]_ - 15:8_, 15:14_, 17:15_, 26:19_, 35:12

**traveling** [2]_ - 101:25_, 119:7

**travelling** [1]_ - 101:19

**traversed** [2]_ - 67:12_, 74:5

**traversing** [2]_ - 67:6_, 75:16

**treasure** [1]_ - 45:3

**tree** [40]_ - 59:20_, 59:23_, 61:8_, 61:22_, 61:25_, 62:2_, 62:18_, 62:20_, 63:22_, 64:19_, 65:4_, 67:15_, 69:2_, 69:3_, 70:3

_, 70:19_, 71:17_, 72:15_, 76:3_, 76:5_, 79:22_, 83:2_, 83:3_, 83:4_, 84:3_, 84:6_, 84:11_, 85:3_, 87:25_, 93:16_, 93:18_, 95:15_, 98:2_, 102:25_, 107:9_, 156:17_, 157:2_, 157:9_, 158:3_, 159:24

**trial** [8]_ - 6:5_, 11:24_, 14:24_, 25:7_, 37:23_, 41:4_, 198:13_, 200:9

**trials** [1]_ - 39:19

**tried** [8]_ - 16:22_, 26:24_, 28:10_, 61:21_, 62:3_, 122:23_, 123:4_, 127:20

**trigger** [1]_ - 117:2

**trip** [4]_ - 22:15_, 23:16_, 27:6_, 35:15

**trips** [2]_ - 23:11_, 25:17

**trolling** [1]_ - 155:25

**truck** [10]_ - 23:2_, 23:6_, 24:2_, 24:22_, 193:20_, 193:21_, 193:22_, 194:17_, 195:12

**true** [3]_ - 93:6_, 140:22_, 146:2

**Trump** [107]_ - 12:24_, 13:1_, 13:5_, 13:19_, 14:8_, 14:11_, 14:25_, 15:3_, 15:25_, 17:1_, 17:3_, 17:16_, 18:13_, 18:25_, 21:4_, 21:7_, 21:11_, 21:13_, 21:24_, 22:16_, 22:18_, 22:23_, 24:5_, 24:22_, 25:15_, 25:19_, 26:18_, 27:24_, 28:16_, 28:18_, 29:4_, 29:5_, 29:19_, 31:18_, 33:6_, 35:7_, 35:9_, 35:21_, 36:1_, 52:13_, 52:21_, 52:23_, 52:25_, 53:10_, 53:16_, 53:17_, 54:11_, 54:14_, 54:20_, 55:1_, 55:11_, 55:17_, 55:25_, 56:2_, 56:3_, 56:6_, 56:8_, 56:18_, 57:4_, 57:6_, 57:9_, 57:14_, 57:22_, 57:23_, 57:25_, 58:1_, 58:3_, 58:5_, 58:8_, 58:14_, 58:15_, 58:17_, 59:5_, 59:7_, 59:9_, 59:12_, 59:13_, 59:14_, 65:4_, 66:19_, 67:3_, 67:7_, 79:3_, 79:5_, 81:23_, 84:23_, 90:18_, 114:25_, 118:21_, 119:21_, 148:24_, 153:13_, 154:9_, 154:20_, 155:2_, 155:9_, 156:6_, 156:7_, 174:11_,

177:10_, 189:18_, 189:23_, 189:24_, 189:25

**Trump's** [15]_ - 22:24_, 25:22, 26:13_, 26:15_, 27:5_, 53:5_, 53:6_, 53:8_, 54:23_, 55:3_, 59:10_, 64:18_, 154:4_, 154:8_, 177:8

**trust** [1]_ - 202:2

**truth** [15]_ - 47:22_, 47:23, 113:19_, 113:20_, 152:9_, 152:10, 175:2_, 175:3, 187:14_, 187:15

**try** [11]_ - 20:24_, 27:3_, 44:1_, 62:7_, 65:14_, 91:6_, 102:12_, 109:11_, 126:7_, 131:9_, 200:22

**trying** [23]_ - 9:12_, 16:19_, 25:24_, 27:15_, 31:3_, 31:6_, 38:12_, 70:9_, 71:3_, 71:13_, 83:16_, 104:2_, 123:1_, 123:5_, 123:16_, 133:20_, 133:21_, 143:3_, 149:21_, 198:1_, 198:10_, 198:16_, 198:20

**TS** [1]_ - 54:1

**turn** [16]_ - 71:20_, 89:25_, 108:13_, 123:8_, 123:19_, 125:23_, 126:16_, 126:24_, 127:4_, 134:14_, 138:10_, 138:19_, 139:11_, 140:5_, 150:2_, 201:22

**turned** [10]_ - 32:2_, 32:12_, 61:19_, 89:22_, 107:21_, 120:20_, 126:25_, 150:10_, 178:24_, 190:20

**turned-over** [1]_ - 61:19

**turning** [1]_ - 136:18

**turret** [1]_ - 88:12

**turrets** [1]_ - 88:13

**twice** [1]_ - 50:22

**two** [28]_ - 14:15_, 33:11_, 40:9_, 58:9_, 63:1_, 63:3_, 63:4_, 70:4_, 77:16_, 77:19_, 88:17_, 89:9_, 98:25_, 99:7_, 99:15_, 106:3_, 109:4_, 122:24_, 123:6_, 157:7_, 158:12_, 160:2_, 161:1_, 164:21_, 165:6_, 166:8_, 189:10_, 203:6

**type** [15]_ - 10:19_, 27:25_, 37:4_, 37:11_, 42:23_, 64:10_, 93:20_, 94:8_, 94:12_, 96:13_, 97:20_, 105:11_, 117:1_, 120:2_,

202:9

**types** [2]_ - 36:24_, 52:6

**typical** [1]_ - 94:6

**typically** [5]_ - 88:12_, 120:4_, 120:5_, 155:7

---

U

---

**U-turn** [6]_ - 123:8_, 123:19_, 126:24_, 127:4_, 138:19_, 140:5

**U.S** [3]_ - 72:24_, 152:25_, 153:8

**ultimately** [1]_ - 192:4

**un-armored** [1]_ - 88:11

**unaccounted** [1]_ - 70:16

**unaware** [2]_ - 197:1_, 197:9

**uncommon** [1]_ - 115:25

**under** [6]_ - 18:19_, 101:3_, 109:11_, 112:7_, 173:4_, 181:9

**underlined** [1]_ - 66:14

**underlying** [1]_ - 202:21

**underneath** [3]_ - 121:8_, 180:15_, 183:18

**understood** [3]_ - 156:6_, 159:17_, 159:21

**undisputed** [1]_ - 37:5

**undocumented** [1]_ - 34:13

**unfolded** [1]_ - 125:24

**unfolding** [3]_ - 72:3_, 72:4_, 72:23

**unforeseen** [1]_ - 151:10

**unfortunately** [1]_ - 123:21

**unidentified** [1]_ - 85:2

**Uniform** [1]_ - 81:2

**unit** [1]_ - 51:10

**United** [39]_ - 5:7_, 5:10_, 5:12_, 6:15_, 9:3_, 12:24_, 17:21_, 19:4_, 46:24_, 47:12_, 48:21_, 48:24_, 49:2_, 49:6_, 49:23_, 49:25_, 50:4_, 50:9_, 50:11_, 50:12_, 50:18_, 51:9_, 51:14_, 52:8_, 52:11_, 52:15_, 55:14_, 61:14_, 81:3_, 84:20_, 84:21_, 108:16_, 111:18_, 111:24_, 113:12_, 174:24_

_, 176:22_, 201:19

**unkempt** [1]_ - 121:4

**unless** [2]_ - 5:2_, 10:4

**unlimited** [1]_ - 43:21

**unobstructed** [1]_ - 103:2

**unskilled** [1]_ - 38:16

**untampered** [1]_ - 171:2

**unusual** [5]_ - 34:24_, 59:20_, 107:25_, 117:21_, 147:8

**up** [78]_ - 7:5_, 10:15_, 12:7_, 12:11_, 15:17_, 19:1_, 19:2_, 23:8_, 24:17_, 30:20_, 31:11_, 31:23_, 33:8_, 34:10_, 34:20_, 52:23_, 58:21_, 59:15_, 67:15_, 77:14_, 78:10_, 78:11_, 85:8_, 88:11_, 93:18_, 95:16_, 96:25_, 97:7_, 99:5_, 104:5_, 106:4_, 106:17_, 108:25_, 115:19_, 115:20_, 115:21_, 115:24_, 116:25_, 117:14_, 118:7_, 119:24_, 120:4_, 120:15_, 120:18_, 122:23_, 123:1_, 124:8_, 126:23_, 130:19_, 132:10_, 132:20_, 134:3_, 135:11_, 136:10_, 137:20_, 138:19_, 140:12_, 142:25_, 144:2_, 144:12_, 144:14_, 144:15_, 144:16_, 144:21_, 150:10_, 157:8_, 158:16_, 160:7_, 164:11_, 168:22_, 168:23_, 169:7_, 176:16_, 182:10_, 192:18_, 198:11_, 198:20

**up-armored** [2]_ - 88:11

**upbringing** [1]_ - 119:17

**update** [1]_ - 197:23

**updated** [1]_ - 6:8

**upgrade** [1]_ - 118:10

**upper** [2]_ - 29:8_, 169:14

**upright** [1]_ - 87:23

**upshot** [1]_ - 198:11

**upward** [1]_ - 87:21

**upwards** [1]_ - 87:19

**urban** [1]_ - 115:20

**user** [1]_ - 192:21

**usual** [2]_ - 199:13_, 200:7

**utilize** [1]_ - 83:23

**utilized** [2] - 54:25, 193:21
**utilizing** [1] - 63:5

**V**

**vague** [1] - 140:4
**variant** [1] - 63:25
**varied** [1] - 53:21
**variety** [7] - 15:18, 25:24, 33:19, 36:22, 115:7, 115:12, 117:5
**various** [5] - 64:6, 88:10, 93:8, 108:16, 115:14
**vegetation** [4] - 69:8, 69:11, 76:9, 165:23
**vehicle** [33] - 104:11, 123:10, 128:1, 131:3, 132:4, 133:1, 136:6, 136:16, 137:11, 138:5, 138:10, 141:18, 151:1, 190:2, 191:1, 191:19, 191:20, 191:24, 191:25, 192:1, 192:3, 192:4, 192:6, 192:7, 193:7, 193:11, 193:12, 193:14, 193:22, 194:5, 194:8, 195:3, 196:6
**vehicle's** [1] - 133:17
**vehicles** [4] - 54:3, 63:5, 72:5, 138:25
**Venmo** [2] - 181:9, 184:1
**verbal** [1] - 62:10
**verbally** [1] - 83:24
**verdict** [1] - 200:19
**verifying** [1] - 173:16
**vest** [2] - 139:3, 139:16
**via** [1] - 57:1
**vicinity** [9] - 60:9, 71:25, 78:16, 80:23, 83:2, 83:23, 84:11, 148:7, 173:13
**victim** [1] - 29:17
**video** [25] - 34:23, 75:10, 75:25, 76:14, 76:24, 77:11, 77:14, 78:7, 78:11, 78:25, 79:14, 80:3, 80:17, 81:9, 82:2, 128:19, 129:9, 129:18, 145:22, 145:24, 146:17, 146:21, 146:24, 147:2, 202:11

**videos** [1] - 202:9
**Vienna** [6] - 25:11, 166:13, 167:18, 168:15, 168:23, 192:18
**view** [13] - 15:3, 65:24, 75:5, 89:17, 89:18, 92:3, 92:16, 156:24, 161:10, 162:18, 165:12, 167:3, 167:6
**vigilant** [1] - 117:10
**violated** [1] - 36:17
**violation** [1] - 46:17
**Violent** [5] - 48:14, 176:1, 177:23, 178:11, 178:17
**violent** [2] - 116:24, 188:14
**Virginia** [1] - 36:5
**visible** [3] - 15:2, 26:21, 77:3
**vision** [1] - 82:25
**visit** [2] - 56:8, 56:10
**visited** [2] - 52:10, 54:15
**visiting** [1] - 56:6
**visual** [2] - 157:15, 160:2
**voice** [5] - 79:17, 80:6, 80:20, 81:12, 82:5
**voluminous** [5] - 202:14, 202:16, 202:18, 202:23, 203:5
**volunteer** [2] - 143:20, 143:23
**vote** [1] - 37:20
**voters** [1] - 13:3

**W**

**waistline** [1] - 83:7
**wait** [1] - 150:2
**waited** [2] - 139:14, 142:15
**waiting** [3] - 25:15, 29:16, 30:11
**walk** [5] - 32:11, 46:2, 159:4, 164:5, 169:8
**walked** [5] - 107:21, 164:2, 164:22, 165:16, 167:14
**walking** [5] - 71:20, 71:22, 117:17, 138:25,

164:11
**walks** [1] - 115:7
**wants** [2] - 112:8, 198:22
**war** [1] - 41:13
**warm** [1] - 45:4
**warning** [3] - 7:4, 12:6
**warrants** [3] - 24:15, 189:1, 189:2
**watched** [3] - 40:21, 123:17, 150:22
**watching** [1] - 78:19
**water** [1] - 45:2
**wave** [2] - 169:21
**ways** [1] - 116:3
**weapon** [73] - 16:23, 17:6, 17:9, 20:11, 20:23, 21:21, 51:11, 51:15, 51:16, 51:17, 51:18, 60:2, 63:11, 63:14, 63:20, 63:23, 63:24, 63:25, 64:5, 64:10, 64:13, 64:16, 70:5, 71:25, 72:1, 77:22, 78:2, 78:5, 79:22, 79:23, 79:24, 81:16, 83:17, 84:12, 85:1, 86:20, 86:21, 87:15, 87:20, 88:12, 88:16, 93:8, 93:11, 93:19, 93:22, 94:3, 94:13, 96:25, 97:1, 97:8, 97:10, 98:4, 105:7, 105:11, 105:15, 106:7, 106:18, 106:19, 107:5, 107:8, 107:9, 108:21, 108:23, 108:24, 109:2, 109:18, 110:6, 169:7, 169:11, 196:8, 196:16
**weapons** [11] - 27:22, 28:2, 51:13, 51:19, 51:21, 51:22, 64:7, 93:9, 94:12, 161:2, 188:24
**wear** [3] - 45:14, 110:14, 110:17
**wearing** [18] - 83:11, 96:4, 96:5, 96:8, 96:9, 96:10, 110:24, 121:5, 121:6, 139:16, 145:10, 179:19, 180:15, 181:7, 182:13, 182:20, 183:18
**weather** [1] - 29:6
**web** [6] - 10:21, 25:20,

25:25, 26:4, 27:2, 33:13
**website** [1] - 27:18
**week** [2] - 147:12, 189:4
**weeks** [2] - 18:15, 33:1
**welcome** [1] - 147:22
**well-groomed** [1] - 121:10
**Wesley** [2] - 5:8, 191:16
**west** [1] - 66:13
**West** [26] - 13:16, 13:20, 14:25, 15:14, 22:8, 22:14, 22:23, 29:4, 34:8, 35:12, 35:24, 49:19, 53:5, 56:4, 56:9, 114:20, 118:22, 153:10, 153:17, 154:9, 176:1, 177:9, 189:19, 193:23, 193:25, 194:6
**western** [1] - 23:4
**WhatsApp** [1] - 25:23
**whatsoever** [3] - 10:13, 17:14, 21:13
**White** [1] - 23:22
**white** [3] - 64:25, 121:1, 145:11
**whole** [13] - 7:16, 22:7, 24:20, 25:23, 33:19, 40:2, 42:18, 47:22, 109:23, 113:19, 152:9, 175:3, 187:15
**wide** [2] - 115:12, 176:17
**wider** [1] - 14:23
**William** [1] - 199:3
**willing** [1] - 143:19
**willingness** [2] - 17:25, 18:3
**Wilson** [2] - 23:12, 34:5
**window** [4] - 139:17, 192:11, 195:25
**windowsill** [1] - 104:15
**wish** [5] - 6:13, 21:9, 100:11, 174:14, 200:1
**wishes** [1] - 10:15
**withstand** [1] - 36:11
**withstood** [2] - 14:18, 36:11
**WITNESS** [19] - 47:24, 95:6, 105:11, 109:9, 113:21, 113:25, 125:6, 147:22, 151:21, 152:11, 152:15, 174:22,

175:4_, 175:8_, 186:25_, 187:16_, 187:20_, 196:14_, 197:15

**witness** [50]_ - 8:9_, 15:24_, 23:20_, 24:8_, 31:1_, 34:21_, 46:4_, 46:21_, 47:10_, 47:15_, 58:20_, 65:3_, 94:23_, 95:2_, 96:18_, 99:20_, 100:12_, 101:2_, 111:4_, 111:11_, 111:19_, 111:22_, 111:23_, 112:2_, 112:12_, 113:5_, 113:11_, 120:7_, 128:5_, 130:4_, 140:13_, 145:14_, 152:2_, 172:24_, 174:16_, 174:23_, 179:3_, 180:20_, 184:22_, 186:2_, 187:5_, 187:12_, 195:18_, 198:2_, 198:16_, 198:24_, 202:7_, 202:8_, 202:12_, 202:15

**witnessed** [1]_ - 171:18

**witnesses** [11]_ - 6:14_, 6:22_, 36:25_, 197:24_, 198:10_, 199:1_, 199:10_, 199:14_, 200:25_, 201:4_, 202:6

**wits** [1]_ - 110:21

**wonder** [1]_ - 44:23

**wonderful** [1]_ - 108:9

**wonderment** [1]_ - 45:13

**wood** [3]_ - 45:8_, 158:8_, 164:24

**wooded** [1]_ - 69:3

**wooden** [3]_ - 45:7_, 45:9_, 45:10

**word** [3]_ - 184:2_, 197:1_, 197:10

**words** [4]_ - 13:1_, 19:5_, 21:12_, 116:25

**workings** [1]_ - 174:12

**works** [2]_ - 24:19_, 198:17

**world** [3]_ - 40:1_, 44:18_, 61:12

**worn** [2]_ - 44:19_, 45:8

**Worth** [3]_ - 114:12_, 114:19

**wrap** [1]_ - 7:4

**Wright** [1]_ - 45:13

**write** [2]_ - 34:3_, 141:18

**written** [1]_ - 30:14

**wrote** [6]_ - 137:5_, 138:7_

_, 140:6_, 141:14_, 141:15

## X

**Xterra** [37]_ - 22:3_, 22:9_, 23:24_, 29:2_, 32:13_, 32:15_, 32:19_, 33:9_, 34:3_, 34:7_, 123:18_, 126:22_, 129:21_, 131:1_, 131:24_, 131:25_, 132:14_, 132:23_, 133:6_, 133:8_, 136:6_, 137:7_, 137:8_, 149:23_, 150:10_, 150:12_, 150:14_, 150:16_, 150:22_, 191:21_, 194:1_, 194:15_, 195:5_, 195:12_, 195:15

## Y

**year** [6]_ - 12:22_, 13:4_, 14:7_, 45:11_, 117:20_, 118:2

**years** [20]_ - 19:19_, 34:14_, 40:9_, 40:18_, 40:19_, 40:21_, 44:20_, 44:23_, 49:24_, 50:1_, 50:11_, 115:6_, 115:15_, 117:3_, 118:6_, 153:20_, 176:22_, 188:18_, 189:8_, 189:10

**yesterday** [3]_ - 9:7_, 9:24_, 12:1

**young** [1]_ - 145:7

**yourself** [7]_ - 20:7_, 102:20_, 107:9_, 151:9_, 151:11_, 158:3_, 170:20

## Z

**zip** [1]_ - 30:19

**zone** [2]_ - 69:21_, 71:4

**zoom** [2]_ - 86:16_, 87:6

**zoomed** [1]_ - 58:20