UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 24-cr-80116-AMC-1

UNITED STATES OF AMERICA,                    Fort Pierce, Florida

            Plaintiff,                       September 12, 2025

       vs.                                   8:51 a.m. - 3:27 p.m.

RYAN WESLEY ROUTH,

            Defendant.                       Pages 1 to 234
_____
                 TRANSCRIPT OF JURY TRIAL – DAY 5
           BEFORE THE HONORABLE AILEEN M. CANNON
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
                          UNITED STATES ATTORNEY'S OFFICE
                          JOHN SHIPLEY, ESQ.
                          MARIA MEDETIS-LONG, ESQ.
                          CHRISTOPHER BROWNE, ESQ.
                          JENNIFER LUCE, ESQ.
                          99 NE 4th Street
                          Miami, Florida 33132

                          U.S. DEPARTMENT OF JUSTICE
                          JAMES M. DONNELLY, ESQ.
                          950 Pennsylvania Avenue, NW
                          Washington, DC 20530
FOR THE DEFENDANT:
                          RYAN WESLEY ROUTH, PRO SE
AS STANDBY COUNSEL:
                          FEDERAL PUBLIC DEFENDER'S OFFICE
                          KRISTY MILITELLO, ESQ.
                          RENEE SIHVOLA, ESQ.
                          250 S. Australian Avenue
                          Suite 400
                          West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:
                          LAURA E. MELTON, RMR, CRR, FPR
                          Official Court Reporter to the
                          Honorable Aileen M. Cannon
                          United States District Court
                          Fort Pierce, Florida

E X A M I N A T I O N S

Witness/Proceedings                                              Page

ERIN CASEY
        DIRECT EXAMINATION BY MR. BROWNE                           6
        CROSS-EXAMINATION BY MR. ROUTH                            29
SERGEANT KENNETH MAYS
        DIRECT EXAMINATION BY MR. DONNELLY                        32
        CROSS-EXAMINATION BY MR. ROUTH                            52
LIEUTENANT WILLIAM GALE
        DIRECT EXAMINATION BY MR. SHIPLEY                         55
SPECIAL AGENT KATHRYN ROSE
        DIRECT EXAMINATION BY MS. MEDETIS-LONG                    74
        CROSS-EXAMINATION BY MR. ROUTH                           135
SPECIAL AGENT JOSE LOUREIRO
        DIRECT EXAMINATION BY MS. MEDETIS-LONG                   138
        CROSS-EXAMINATION BY MR. ROUTH                           159
ELIZABETH RIDDELL
        DIRECT EXAMINATION BY MR. BROWNE                         161
SPECIAL AGENT KRISTIN BAILEY
        DIRECT EXAMINATION BY MR. DONNELLY:                      171
        CROSS-EXAMINATION BY MR. ROUTH                           187
SPECIAL AGENT DAVID GILBERT
        DIRECT EXAMINATION BY MS. MEDETIS-LONG:                  189
        CROSS-EXAMINATION BY MR. ROUTH                           194

E X H I B I T S

GOVERNMENT ADMITTED EXHIBITS

Exhibit                                                          Page
200-106A through 200-106G............................   166
200-39..............................................   142
200-46..............................................   143
200-60..............................................   143
200-74, 200-75A, 200-75B, and 200-77................   153
200-98..............................................   129
948-C and 948-D.....................................   187
1003................................................    16
1004A and 1004B.....................................    26
1005A through 1005C.................................    22
1010 through 1013...................................    11

DEFENDANT ADMITTED EXHIBITS
Exhibit                                                          Page

NONE

(Call to the Order of the Court.)

THE COURT:  Good morning.  Let's call the case.  You may all be seated unless you are addressing the Court.

COURTROOM DEPUTY:  Calling case United States of America v. Ryan Wesley Routh, Case Number 24-cr-80116-Cannon.

Counsel, please state your appearances for the record, starting with the United States.

MR. SHIPLEY:  Good morning, Your Honor.  John Shipley, Christopher Browne, Maria Medetis-Long, Jim Donnelly, and Jennifer Luce for the United States.

THE COURT:  Good morning to all of you.

MS. MEDETIS-LONG:  Good morning, Your Honor.

THE COURT:  Mr. Routh.

MR. ROUTH:  Ryan Routh for the defense.

THE COURT:  Good morning.

Standby counsel.

MS. MILITELLO:  Good morning, Your Honor.  Kristy Militello and Renee Sihvola, standby counsel.

THE COURT:  Good morning to both of you.

All right.  We are on our fifth day of trial, second day of evidentiary presentation.  Are all of your witnesses ready to go, Mr. Browne, Mr. Shipley?

MR. BROWNE:  Yes, Your Honor.

THE COURT:  Okay.  So first up today would be who?

MR. BROWNE:  Erin Casey, Your Honor.

THE COURT:  All right, then.  Any items to address before we summon the jury, Mr. Browne?

MR. BROWNE:  Just one correction from yesterday.  When I was mentioning the voluminous data that was previously admitted, I misspoke.  The data that was previously admitted was Government's Exhibits 1114, 1115, and 1116.  They were admitted at the calendar call.  This thumb drive contains those previously admitted exhibits as well as Government's Exhibits 1010 through 1013, sequential, which I intend to introduce through Ms. Casey this morning.

THE COURT:  Okay.  All right.  That's consistent with the numbers I had jotted down yesterday.  Okay.

Any changes to the lineup in terms of witnesses that you had predicted yesterday?

MR. BROWNE:  I think there was one minor change.  I would defer to Ms. Medetis-Long on the exact order.

MS. MEDETIS-LONG:  Yes, Your Honor.  It would be Erin Casey, Deputy Mays, Lieutenant Gale, Special Agent Kathryn Rose, and potentially Jose Loureiro and David Gilbert.

THE COURT:  Okay.  Mr. Routh, do you have those names?

MR. ROUTH:  Yes, Your Honor.

THE COURT:  Okay.  Any items to raise from the defense side?

MR. ROUTH:  Just wanted to -- when you were fussing at me about my counsel being too involved, apparently, my response

was not proper and not -- not correct.  So I would like to retract that.  I, apparently, was not appreciative and grateful for the help that they give me.  And they are wonderful and do a wonderful job.  And so whatever I said that was offensive, I would like to retract and recall.  And they -- they do a wonderful job.  And whatever I said, I apologize.

THE COURT:  Very well.

All right.  Ms. Moran, do you know if the jurors are all here?

COURTROOM DEPUTY:  Yes.

THE COURT:  Okay.  Excellent.  Well, if they're all here, then I think we can get started.

Please have your first witness ready to go.

MR. BROWNE:  Yes, Your Honor.

THE COURT:  All rise for the jury.

(The jury entered the courtroom at 8:55 a.m.)

THE COURT:  Please have a seat.  Good morning, ladies and gentlemen.

THE JURY:  Good morning.

THE COURT:  Thank you for your punctuality.  We will resume trial today.

So I will now ask the government to call its next witness.  Mr. Browne.

MR. BROWNE:  Thank you, Your Honor.  The United States calls Erin Casey.

THE COURT:  Excellent.  Mr. Casey, please make your way to the witness stand -- or excuse me -- Ms. Casey.

COURTROOM DEPUTY:  Please raise your right hand.  Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Erin Casey.  E-R-I-N, C-A-S-E-Y.

MR. BROWNE:  May I inquire, Your Honor?

THE COURT:  Yes, you may.

ERIN CASEY,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWNE:

Q.   Good morning, Ms. Casey.

A.   Good morning.

Q.   Tell the jury, who do you work for?

A.   I work for the Federal Bureau of Investigation at the FBI laboratory.

Q.   And what do you do there?

A.   I am a operational media specialist, forensics.

Q.   What do you do in your role as an operational media

specialist?

A.   I am part of the Laboratory Shooting Reconstruction Team, and I deploy to document complex crime scenes, like shootings, bombings, and other types of complex scenes.

Q.   Do you have any other jobs?

A.   Yes.  I am a sergeant, first class, in the Virginia Army National Guard.

Q.   So getting back to the complex crime scenes, do you ever actually physically travel to those crime scenes as part of your job?

A.   Yes.  I maintain a 24/7 on-call posture, and I have responded both countrywide and internationally to support complex crime scenes.

Q.   Let's talk about this case.  Did you respond to the scene at Trump International Golf Club?

A.   Yes, I did.  I was on the conference call, and I did respond shortly after.

Q.   And when did you actually arrive to the Trump International Golf Club?

A.   I arrived the day after, on September 16th.

Q.   What was your role in the FBI's investigation at Trump International Golf Club?

A.   My role was lead for all measurement documentation of the crime scene, which included drone footage, photography, and laser scanner data and hand measurements.

Q.   And why are these measurements important at a complex crime scene like this one?

A.   Measurements allow us to see events and objects within the crime scene in relation to each other in space after we have departed the scene, and tell us where they are located within the world.

Q.   I want to talk briefly about the kinds of tools that you use to take these measurements.  Can you give us an overview of those tools and how they work.

A.   Yes.  So starting in the air, we had drone, which is taking a flight path of a grid of photographs that I'm then able to turn into a measurable product.  We have both still photography and 360-degree photography, like a realty tour you would see online, of the crime scene.  Laser scan data is using a laser pulse to take millions of measurements in space, like a very advanced tape measure.  And anything I'm not able to capture with those laser measurements, I'm taking with hand measurements with a traditional tape measure.

Q.   I'm going to show you a portable thumb drive containing exhibits marked Government's Exhibits 1010 through 1013, sequential, as well as Government's Exhibits 1114 through 1116.

MR. BROWNE:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. BROWNE:

Q.   (Tendering item.)

Ms. Casey, do you recognize that thumb drive?

A.   Yes.  I reviewed this thumb drive yesterday and signed it with yesterday's date.

Q.   And can you confirm that it contains the exhibits I just named?

A.   Yes, I can.

Q.   All right.  Let's just briefly go through those exhibits one by one, beginning with Government's Exhibit 1010.  What kind of a file is that?

A.   1010 is license plate reader data from Motorola Solutions.

Q.   And what about Government's Exhibit 1011?

A.   That contains drone data of drone products.

Q.   And what about 1012?

A.   1012 contains the raw data from the laser scanner photography and drone.

Q.   And what about Government's Exhibit 1013?

A.   1013 contains the 360-degree spherical photography data.

MR. BROWNE:  And just for the record, Your Honor, the remaining exhibits on that thumb drive, 1114, 1115, 1116 have been previously admitted into evidence.

THE COURT:  All right.  So the -- in this set, the only items that have not yet been admitted are, I think you said, 1010, 1011, 1012, and 1013.

MR. BROWNE:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

BY MR. BROWNE:

Q. All right. And approximately how large are the data in Government's Exhibits 1010 through 1013?

A. The data package as a whole is over 60 gigabytes' worth of data. To put that into perspective, it takes between five-plus hours just to transfer a copy onto a thumb drive.

Q. And how long did it take you, in terms of how long it took you to capture and process all that data?

A. The on-scene capturing across all these technologies took about three days to capture all the raw data. I was the collector of all the data in the end to then bring it back to the office. Once I process all of this data in the office, it is hundreds of hours of processing across multiple computers, and months' worth of work to then create the products that we have today.

Q. And is that data voluminous, in your view?

A. Yes. It's very large amounts of data to work with on a daily basis.

MR. BROWNE: Your Honor, at this time I would ask that Government's Exhibits 1010, 1011, 1012, and 1013 be admitted into evidence.

THE COURT: Any objection, Mr. Routh?

MR. ROUTH: No objection.

THE COURT: All right. 1010, 1011, 1012, and 1013 will be admitted without objection.

(Government Exhibits 1010 through 1013 were received in evidence.)

MR. BROWNE:  Your Honor, may I retrieve the exhibits from the witness stand?

THE COURT:  Yes, you may.  And to confirm, Mr. Browne, these items have been -- the underlying material was supplied in discovery?

MR. BROWNE:  It was, Your Honor.

THE COURT:  Okay.  All right.  Thank you.

Please continue.

BY MR. BROWNE:

Q.   Now, Ms. Casey, I want to bring up something that we looked at yesterday, and that is Government's Exhibit 1002, which was previously admitted.

May we have the government PC, please, on the screen.

MR. BROWNE:  Would you play that, Ms. Luce.

(A video and/or audio was played.)

BY MR. BROWNE:

Q.   All right.  As we're looking at this, I want to ask you, what did you ultimately do with all of this drone, laser, and photography data that we just talked about?

A.   All of this data was combined into multiple summary exhibits.  So here we are looking at one of two fly-through exhibits that I ended up creating from this dataset.  I also created three exhibit diagrams and two three-dimensional

cutaway diagrams from this data.

Q.   All right.  Beginning with this, is this one of the fly-through products that you just mentioned?

A.   Yes.

Q.   Can you explain how you made this?

A.   Yes.  So right now we are looking at both satellite aerial imagery and drone mesh imagery, and think of this like an animated camera in a Pixar movie.  I'm able to use software to write a camera path through the data that was collected on scene.  As we get closer, you're going to see points.  So on the screen you see dots and grains.  Those are the millions of measurable points from the scanner data.

        MR.  BROWNE:  Can we resume?

     (A video and/or audio was played.)

BY MR.  BROWNE:

Q.   And does this fly-through video fairly and accurately depict the scene at Trump International Golf Club as you recall it from last September?

A.   Yes.

Q.   Now, why did the FBI in this case create these fly-through videos?

A.   We see products like a fly-through as our tool to bring you back to the scene as close to the time of the event as possible.  So this is a 3D immersible environment that I'm able to bring you back to that location and show you the data that

was captured in real time within hours of the event.

Q.   And in order to create these images that we're seeing on the screen, did you physically have to walk this path yourself?

A.   Yes.  I walked this path on both Summit Boulevard, the service path, and the cart path multiple times throughout those days.

Q.   So we see, for example, text on the bottom portion of the scene in Government's Exhibit 1002 that says "service path." We looked at another text that said "Hole 6."  How is it that text appears in this fly-through video?

A.   During my standard daily walks of the scene, I'm taking notes of where things are located, and I am making those notes to then be able to incorporate into diagrams later.  So I notated where holes were, where different paths were, where different roadways were, and what the names of those items were.

Q.   And in terms of the overhead view, how are you involved in the process of, for example, the drone video?  Are you involved in that as well?

A.   Yes.  So I worked hand in hand with the drone operator to ensure that we were as thorough as possible to capture the area around both Summit Boulevard and across the golf club.

Q.   So is it fair to say that if it's on this video, it was captured either by a laser scanner or a camera?

A.   Yes.

Q.   All right.  What we're looking at here is text that says "fence post" in the middle of the screen, as well as what appears to be a photograph.  Can you explain first the significance of the fence post?

A.   So when I arrived on scene, I knew that this site might involve hand measurements.  As part of my traditional training, we are taught to find an anchor point to take hand measurements from.  So the fence post was a very good anchor point in close proximity to our area of interest that I could use to take hands measurements from, and it became a continuous anchor point throughout the rest of the exhibits.

So here, you are able to see side by side a still photograph where you have that fence post on the right-hand side, and you also have the fence post notated in the laser scan data so that you can see how it's captured in both data types.

Q.   And can you indicate on the monitor with a vertical line to show the jury where the fence post is, your anchor point, in the photograph?

A.   Uh-huh (indicating).

Q.   Thank you.

MR.  BROWNE:   You can play the video.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Now, there are a number of items depicted in the photograph

on the left, including what appears to be a camera and two bags.  Did you personally observe those items when you were actually at the crime scene?

A.   I was present for those items being collected at the scene.

Q.   And were you also there when the items of evidence were being collected by other members of the FBI?

A.   Yes.

MR. BROWNE:  All right.  Ms. Luce, we can take that down.

BY MR. BROWNE:

Q.   And now I want to show you something different, what's been previously marked as Government's Exhibit 1003, which is not yet in evidence.

MR. BROWNE:  Your Honor, would it be possible to broadcast Government's 1003 from the government PC to the witness monitor only?

THE COURT:  Yes.

MR. BROWNE:  You can go ahead and play it, Ms. Luce.

(A video and/or audio was played.)

BY MR. BROWNE:

Q.   All right.  Ms. Casey, do you recognize Government's Exhibit 1003 on your monitor?

A.   Yes.  This is the second fly-through that I created.

Q.   And was it created in the same way as Government's Exhibit 1002 which we just showed to the jury?

A.   Yes.

Q.   And does Government's Exhibit 1003 also fairly and accurately depict the Trump International Golf Club as you remember it last September?

A.   Yes.  It is using the same dataset.

MR.  BROWNE:   Your Honor, at this time I would ask that Government's Exhibit 1003 be admitted into evidence.

THE COURT:   Any objection?

MR.  ROUTH:   No objection.

THE COURT:   1003 will be admitted without objection.

(Government Exhibit 1003 was received in evidence.)

MR.  BROWNE:   And if we could publish that to the jury, please.

THE COURT:   Granted.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Ms. Casey, tell us about this fly-through video.  How does it differ from the one we just looked at?

A.   So here we're starting towards the south side of the club from a bird's-eye view.  We can see satellite imagery on the outer edges and a drone mesh around the central area, along with text marking the locations of the holes.

Q.   And is there anything about this fly-through that tells you that it was taken while you were physically present at the crime scene at Trump International Golf Club?

A.   Yes.  So in the lower left corner, you can see our kind of command post setup.  So all of those vehicles and tents, that's where we were staging equipment, packaging evidence, et cetera.

Q.   And would you just mark that general area with an X, please.

A.   (Complies.)

MR.  BROWNE:   And for the record, the witness has marked in the lower left-hand corner of Government's Exhibit 1003.

We can continue playing, please, Ms. Luce.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   And, again, the basis for titling that part of the golf course "Hole 6," was that your personal observation?

A.   Yes.

Q.   And what just flashed on the screen called "the area of interest," tell us how you chose that rectangular area as the area of interest for purposes of this exhibit.

A.   It aligns with the boundary that was set of the red crime scene tape that we can see on the screen, and it helps focus our eyes to where we are going to be going next within the camera view.

Q.   And where are we going next in terms of the camera?

A.   We are heading into the bushes that are between Summit Boulevard and the golf club just south of Hole 6.

Q.   Now, have you personally been inside that hole and the

hedge line that we just passed through?  Have you done that yourself?

A.   Yes.  I crawled in and out of there many times.

Q.   What's it like in there?

A.   It's very close quarters.  You have to crawl hands and knees, and you have very short depth perception, so as you're approaching the bush line, you need to kind of call out to teammates to see if there is someone on the other side before you start crawling in and bumping into one another.

Q.   Fair to say it's not very comfortable?

A.   No.

Q.   About how far from the outside of the hedge to the chain-link fence was it in terms of feet?

A.   It was between 10 and 12 feet to get from the Summit Boulevard hedge all the way through to the fence.

Q.   And do you recall seeing yourself, what appears at the center of the screen in Government's Exhibit 1003, that appears to be a broken branch?

A.   Yes.

Q.   And can you mark it with an X, please, for the jurors' reference.

A.   (Complies.)

Q.   Thank you, Ms. Casey.

        MR. BROWNE:  We can keep playing.

///

BY MR. BROWNE:

Q.    And what are we seeing on the screen now?

A.    Here is one of the still photographs that was captured on scene.  That is in relation to the direction that the camera is pointing, looking at the scan data.

Q.    And what do the two purple circles represent?

A.    They represent the location of the camera that you can see on the left and the approximate location of the muzzle of the firearm leaning within the chain-link fence.

Q.    Can you circle on your monitor the two items that you just described in the photograph?

A.    (Complies.)

Q.    And can you tell us where the camera is going to go from here?

A.    The camera path I chose for this fly-through, we are going to fly through the approximate location of the camera that was mounted on the chain-link fence.

Q.    And just one more time, can you show us where that fence post was, your anchor point?

A.    It is right back here (indicating).  And as the camera continues, you are going to see it marked with text.

Q.    Can you also see it in the photograph in the bottom right-hand corner?

A.    Yes.  (Indicating.)

Q.    Thank you Ms. Casey.

MR. BROWNE: We can keep playing.

(A video and/or audio was played.)

BY MR. BROWNE:

Q. Now, what is that photograph that just popped up on the screen with the text "Hole 6" in the middle?

A. This is one of the spherical photography photographs, and helps orient between a photograph and the scan data of where we are looking towards Hole 6.

Q. And did you personally observe the foliage that is yellow and green in color at the center of the screen?

A. Yes.

Q. And were you able to see the flag at Hole 6 through that foliage from the fence line?

A. Yes.

Q. Was there a clearing that allowed you to see that?

A. Yes.

MR. BROWNE: Can we pause it right there?

BY MR. BROWNE:

Q. And, Ms. Casey, is that the approximate location of the Hole 6 flag as it was located at the time you reported to the crime scene?

A. Yes. All of these measurements were taken within hours of the event, and that was the exact location of the Hole 6 flag.

Q. And that's a water hazard right behind it?

A. Yes.

MR. BROWNE:   And we can take that down, please.

BY MR. BROWNE:

Q.   I would like to show you now what has not yet been admitted, Government's Exhibits 1005A, B, and C.

MR. BROWNE:   Your Honor, if we could show the witness those images on just the juror -- the witness monitor, excuse me.

THE COURT:   Yes.

BY MR. BROWNE:

Q.   Ms. Casey, I'm showing you Government's Exhibit 1005A, 1005B, and 1005C.  Do you recognize those?

A.   Yes.

Q.   What are you looking at on your screen?

A.   I am looking at three pages of exhibit diagrams that are technical scale diagrams.

Q.   And what is a technical scale diagram?

A.   It means that it is to a precise scale that can be measured similar to a construction diagram that you would use for a building.

Q.   And is it generated using the same types of data that we've talked about already?

A.   Yes.  This is using both drone and scanner data.

Q.   And do these three diagrams represent a fair and accurate depiction of the Trump International Golf Club as you saw it?

A.   Yes.

MR. BROWNE:  Your Honor, at this time I would like that Government's Exhibit 1005A through C be admitted into evidence, please.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  Those exhibits are admitted without objection.

(Government Exhibits 1005A through 1005C were received in evidence.)

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  Can everybody see?

BY MR. BROWNE:

Q.   Great.  All right.  Ms. Casey, tell us what we are looking at now.

A.   Here we are looking at an overall top-down map view of the golf club.

Q.   Let's start with the key in the lower right-hand corner. There is a magenta-color broken line box called "area of interest."  Where is that on the actual map?

A.   Would you like me to mark it with my finger?

Q.   Yes, please.

A.   Okay.  (Indicating.)

Q.   And can you also show the jury the other elements identified in the key, starting with the cart path.

A.   Yes.  So the cart path is notated by two solid black lines, which is annotated here, and you can follow it through (indicating).  And the service path is a dirt path that's annotated by white dashed lines (indicating) that is highlighted here.  We also have annotations marking the locations of Hole 6 flags and tees.

Q.   And you can also see the intersection of Congress Avenue and Summit Boulevard.  Again, how were those images generated for purpose of this exhibit?

A.   So the outermost portions of the image are satellite aerial image that you can access just like Google Maps.  And as we work our way towards the area of interest, you can see a change in color here (indicating); that's where we start to transition from satellite to drone.  And a change in color here (indicating); that's where we start to transition into laser scan data.

Q.   Now, I want to talk briefly about some points of interest just on the golf course itself.  Can you tell us where Hole 6 actually begins?

A.   So Hole 6, the entire swath of the hole would start at the tee, so in the upper (indicating) right corner, and if you follow the path south -- and turns towards the west, then we end at the green, where we have the marking for the Hole 6 flag.

Q.   Thank you.

And there is some measurements on this diagram; is that correct?

A.   Yes.

Q.   And, again, how did you obtain those measurements?

A.   These measurements are taken directly from the scanner data, and they originate -- if we go back to our fence post, our zero anchor point, that's at the face of the chain-link fence, and those measurements then go out to the hole flag location.  So out to Hole 6 flag and out to Hole 7 flag.

Q.   I'm going to show you now what's been admitted as Government's Exhibit 1005B.  Can you tell us what this diagram is.

A.   This is a zoomed-in view.  We are still looking from a birds-eye view, down.  We are just closer to the area of interest near Summit Boulevard, and we have that repeat of the same symbols for the cart path, the service path, and the magenta area of interest.

Q.   I'm going to switch over to Government's Exhibit 1005C, also admitted.

All right.  Can you explain how this diagram differs from the last two we just looked at.

A.   This diagram now incorporates still photography and measurements to exhibit numbers.  These measurements are a combination of measurements extracted from the scan data and hand measurements.

Q.   And these exhibit numbers, do they correspond with pieces of evidence that were collected at the crime scene when you arrived?

A.   Yes.

Q.   Okay.  We can take that down.  I'm going to show you now on --

MR.  BROWNE:   If possible, Your Honor, the witness monitor only, Government's Exhibits 1004A through B?

THE COURT:  Yes.

MR.  BROWNE:   Thank you, Your Honor.

BY MR.  BROWNE:

Q.   All right, Ms. Casey, what's on your screen now?

A.   This is a three-dimensional cutaway of the data.

Q.   Okay.  And can you just explain in your own words what a cutaway is.

A.   Yes.  This is specifically an isometric view, so it is still scaled and measurable.  We are taking a slice of that data we were looking at, at a three-dimensional perspective.

Q.   And Government's Exhibit 1004B, what is that?

A.   This is a section slice, so the same area of interest.  We are now looking at it directly from the side.

Q.   All right.  And do those also fairly and accurately depict the scene at Trump International Golf Club?

A.   Yes.

Q.   Your Honor, I would ask that Government's Exhibits 1004A

and B be admitted into evidence at this time.

THE COURT:  And that's pursuant to which rule of evidence?

MR. BROWNE:  1004A and B are also summaries under Rule 1006 of the previously admitted data in Government's Exhibits 1011 through 1013.

THE COURT:  Okay.  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  All right.  Government's 1004A and B will be admitted without objection.

(Government Exhibits 1004A and 1004B were received in evidence.)

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  Can everybody see?

BY MR. BROWNE:

Q.   All right, Ms. Casey.  What are we looking at?

A.   So the gray-scale portion is a mesh that was processed from the scan data.  And then in the center, we have just a colored slice of the scan data.  So I'm able to clip it in so we can see just a slice of that data around our area of interest.  We have Summit Boulevard to the upper right area and Hole 6 green and flag to the lower left.

Q.   And does the area of interest also appear in photographic form on Government's Exhibit 1004A?

A.    Yes.  It's reiterating our fence post location in the area of interest adjacent to it.

Q.    And that's basically the starting point for all the measurements that you took?

A.    Yes, sir.

Q.    And is it just the laser scanner measurements that you relied on in creating this diagram?

A.    This is primarily laser scan measurements with some hand measurements to verify as a secondary form of backup.

Q.    Okay.

        MR. BROWNE:   And can we transition now to Government's Exhibit 1004B.

BY MR. BROWNE:

Q.    Ms. Casey, is this a drawing?

A.    No.  This is direct laser scan data.

Q.    Okay.  And so the images that appear here are as they were captured by the laser scanner; is that fair?

A.    Yes.

Q.    All right.  Let's start from the right side of the diagram where it says "Summit Boulevard."

        Can you explain, going from right to left, the measurements that you took using the laser scanner.

A.    Yes.  So this section view shows the terrain very well.  So on the right, we can see the flat road of Summit Boulevard.  It comes up the curb, and there is a flat area of sidewalk before

we reach the very large palm tree.

Q.   Can you mark where the sidewalk is located in this diagram.

A.   (Complies.)

Q.   All right.  Please continue.

A.   We have some text that shows up.  So the fence post, if we follow that arrow, the point of that arrow leads us then to the fence post that we have been referring to in other exhibits. But we can see that between the fence post and the palm tree are large bushes between the sidewalk and the fence.  That fence area, we have the magenta box annotating the area of interest.

Q.   Let me stop you there.  Does the fence post more or less align in terms of distance with where the camera was located on the fence?

A.   In terms of depth distance, yes.

Q.   And in terms of depth distance, does the fence post align with where the rifle muzzle was located on the fence?

A.   In the chain-link fence, yes.

Q.   Okay.  Please continue.

A.   As we move to the left, the first notated path is the service path; this was a dirt path and it varied in width.  So above, we have text.  The approximate width was steadily 8 feet throughout the width of the service path.  And the center point of that service path to the chain-link fence post area of interest was 7 feet, 10 inches.  As we move to the

left, there is a tree with other decorative shrubbery, some maroon shrubs and green shrubs. And we reach the cart path which was a paved path. That one was also approximately 8 feet in width with slight variance throughout the golf club. The center point of that golf cart path to the fence post and chain-link fence was 33 feet, 5 inches.

Then we end up on the golf course itself. So you can see the terrain slopes down, but we do reach a very flat area where the green itself is with the Hole 6 flag. The measurement point is at the ground where the flag inserts into the hole to our area of interest, and that was 126 feet and 10 inches.

Q. And so the distance from the rifle position on the fence to the center of the cart path would have been approximately what?

A. 33 feet and 5 inches.

Q. And the distance from the rifle in the fence to the flag on the 6th hole would have been what?

A. 126 feet and 10 inches.

MR. BROWNE: Just a moment, Your Honor. Tender the witness.

THE COURT: Thank you. Cross-examination.

MR. ROUTH: Sure.

CROSS-EXAMINATION

BY MR. ROUTH:

Q. Good morning.

A. Good morning.

Q.   I thought he was going to take longer.

So it's my understanding that Donald Trump was playing on the 5th green.  So what is the dimension from the fence to the 5th green?

A.   I do not know that off the top of my head.

Q.   So you didn't take a measurement?

A.   I did.  I would have to access the data to take the measurement.

Q.   Okay.  Okay.  All right.  All right.

As far as -- do you have a dimension as far as the barrel, from the -- from the barrel to the ground?

A.   I would need to access the data to take that measurement.

Q.   And the metal plates to the ground?

A.   I would need to access the data to take that measurement.

Q.   Why was a -- the measurement taken from the 7th green to the fence?

A.   It was within a line of sight from the fence area, so it was a measurement I extracted to help understand the distances across the course.

Q.   But the 5th green didn't make it onto the diagram, where the -- for -- President Trump was playing?

A.   I did not add that text, but it's a measurement I could take.

Q.   Okay.  Okay.  All right.

Was the SKS rifle ever fired?

A.   That is not within my area of expertise.

Q.   I thought you were gunfire reconstruction.

A.   My specialty is measurements.  My specialty is not firearms.

Q.   Okay.  I thought it was reconstructing -- reconstructing evidence.  Okay.

All right.  No further questions.

THE COURT:  Thank you.  Any redirect?

MR. BROWNE:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you very much, Agent, you may be excused.

THE WITNESS:  Thank you.

THE COURT:  All right.  Please call your next witness.

MR. DONNELLY:  Yes, Your Honor.  The government calls Sergeant Kenneth Mays.

THE COURT:  All right.  Let's invite him in, please.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.  I do.

COURTROOM DEPUTY:  Thank you.  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Kenneth Mays.  K-A -- Ken --

K-E-N-N-E-T-H, M-A-Y-S.

MR. DONNELLY:  Permission to examine the witness, Your Honor?

THE COURT:  Granted.

MR. DONNELLY:  Thank you very much.

SERGEANT KENNETH MAYS,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DONNELLY:

Q.   Sergeant, good morning.

A.   Good morning.

Q.   Sergeant, by whom are you employed?

A.   Palm Beach County Sheriff's Office.

Q.   And do you have a rank within the Palm Beach Sheriff's Office?

A.   Yes.  I'm a sergeant.

Q.   And how long have you been employed by the Palm Beach County Sheriff's Office?

A.   Just under 17 years.

Q.   And when you -- prior to your joining the Palm Beach Sheriff's Office, did you have any military experience?

A.   I did.  I joined the military 2002.

Q.   And are you currently still a member of the military?

A.   No.  I retired with 22 years.

Q.   And what branch of the military were you in?

A.    Army.

Q.    Okay.  And were you in the reserves for some period of time?

A.    I was.

Q.    And for the full period of time?  Or were you active duty at some point?

A.    I was Guard Reserve the whole time.

Q.    Okay.  And during your time with the Palm Beach County Sheriff's Office, can you tell the members of the jury the various positions that you've held within the sheriff's office?

A.    Sure.  Started out with road patrol, then I did street crimes.  Went to the training division.  Got promoted from the training division, did road patrol again.  And now I'm a sergeant in the tactical unit.  We do fugitive recovery, and I'm a SWAT sergeant as well.

Q.    And as part of your training with the Palm Beach County Sheriff's Office, as well as your time in the military, have you become familiar with various firearms?

A.    Yes, I have.

Q.    And does that include some rifles and handguns as well?

A.    Yes.

Q.    And are you roughly familiar with different types of rifles, including SKS and AK-47-type rifles?

A.    Yes, I am.

Q.    Are you an expert in those -- with those weapons?

A.    Not -- I wouldn't say an expert, but well-versed.

Q.    Okay.  And as part of your current duties with the SWAT team and with the tactical unit with the Palm Beach County Sheriff's Office, I think you mentioned that you do some warrant work and so forth with them?

A.    Yes, correct.

Q.    And what does SWAT stand for?

A.    Special Weapons and Tactics.

Q.    And as part of your daily SWAT duties, what is it that you do?

A.    We do warrant execution.  We do, obviously, emergency callouts in the event that it warrants us coming out if it's raised to a level where SWAT is needed.  We do overwatch for both drug transactions as well as overwatch for presidential or political details.

Q.    And I think you probably anticipated my next question.  As part of your duties, do you have some protection duties to go along with the Secret Service in the West Palm Beach and Palm Beach areas?

A.    Yes.

Q.    And can you describe for the members of the jury how that meshes with your daily duties with the Palm Beach County Sheriff's Office.

A.    Sure.  So my daily duties are with the tactical unit.  We do dignitary protection for most politicians, anybody that is

considered a protectee.  Most often we do motorcade support, where we assist Secret Service with motorcade security to and from wherever that motorcade needs to go.

Q.    And as part of your duties, now focusing on the dignitary protection and working alongside the Secret Service, are you still with the Palm Beach County Sheriff's Office when you do that work?

A.    Yes.

Q.    And so when you're working in connection with the Secret Service, you talk with the Secret Service officers about what it is that you're going to do; correct?

A.    Yes, that's correct.

Q.    But do you have your own Palm Beach County communications and radios and so forth?

A.    We do.

Q.    Do you have access to the United States Secret Service radios and their communications platforms?

A.    No, I do not.

Q.    I'm going to direct your attention to September 20th -- September 15th, 2024.  Were you called in to duty that day?

A.    I was.

Q.    And what -- where did you go when you were called in that day?

A.    So generally the first thing we do is we get our vehicle

swept by EOD, at -- where -- at the place where we get that done, right?  So we get our vehicle swept, make sure everything is safe, and then we went to the golf course.

Q.    And can you tell us what EOD stands for?

A.    Yeah.  Explosive ordnance disposal.  They basically check your car and make sure you have got no explosives on the car because you're going to be inside the motorcade.

Q.    And is that a Secret Service EOD?

A.    Yes.

Q.    Okay.  And at some point after your car was swept -- or your vehicle was swept by EOD, did you make your way over towards Trump International Golf Club?

A.    I did.

Q.    Were you with other members of the Palm Beach Sheriff's Office?

A.    Yes.

Q.    And when you arrived at the golf club, can you tell the members of the jury where exactly it is that you went.

A.    So generally we stage -- when you go past the main gates of the golf course, we stage to the left side.  It's -- it's generally an open parking lot there.  That way, we can -- we're right by the entrance so we can provide security there, but also, we're ready for the motorcade when it's ready to leave.

Q.    When you arrived at the golf club that day, were you familiar with whether or not the former President Donald Trump

was going to play golf that day and was at the golf club?

A.   Yes.

Q.   Had he already arrived at the golf club by the time that you had gotten there?

A.   He had.

Q.   And as part of your duties that day, did you have any specific security detail while at the golf club itself?

A.   Because he was already there when I arrived, like I said, we park in that certain area just to provide extra security at the gate, and then we can respond to anything throughout the course if we need to.

Q.   Okay.  But you don't have any specific role with protecting any of the dignitaries or the President or former president while he is on the golf course?

A.   That's correct.  Once we are there, we just -- we wait.

Q.   And then your primary role while -- after it's over is to be part of the motorcade that would escort him or any of the other dignitaries wherever it is that they wanted to go?

A.   Correct.

Q.   On this particular day while you were at the club, did anything happen while you were there?

A.   Yes.

Q.   And before we begin and get into that, I would like to direct your attention to --

MR. DONNELLY:  Your Honor, if we could publish what's

already been marked into evidence as Government Exhibit 200-2.

THE COURT:  You may.

MR. DONNELLY:  And if we could just bring that up on the screen.

BY MR. DONNELLY:

Q.   And, Sergeant, you can see, I believe on your screen in front of you, what's already been marked into evidence as Government Exhibit 200-2.  Can you see it on the screen there?

A.   I can.

Q.   And can you tell the members of the jury what you recognize that to be?

A.   That is Trump International Golf Course.

Q.   Are you familiar with the grounds from your duties as part of that dignitary protection detail with the sheriff's department?

A.   Yes, I am.

Q.   And are you familiar with the grounds enough to be able to kind of identify certain areas of the golf course and the roads surrounding it?

A.   Yes.

Q.   And are you also familiar with the roads surrounding it because the sheriff's office and various government buildings for Palm Beach County are in that area as well?

A.   Yes.

Q.   I'm going to ask you if you could --

(Court Reporter requested clarification.)

THE WITNESS:  Yes.

THE COURT:  Just slow down a little bit if you can in between questions.

MR. DONNELLY:  Sorry, Your Honor.

BY MR. DONNELLY:

Q.   If I could ask you, with your finger, if you can mark the approximate location where you were parked when you arrived at the golf club that day.

A.   Yes.  So we were -- this is the entrance here.  We were parked here (indicating).

Q.   And when you say "we," were you parked there with other members of the Secret Service or other members of the sheriff's department?  Who were you parked with?

A.   Other members of the sheriff's office that are also in the motorcade.

Q.   Okay.  The vehicle that you were in that particular day, is it a police vehicle?

A.   It is.  It's an unmarked vehicle.

Q.   Does it have a lights package that goes along with it?

A.   It does.

Q.   So lights in the grill and maybe lights along the dashboard?

A.   That's correct.

Q.   And does it have a siren package as well?

A.   It does.

Q.   Okay.  I think I mentioned before I broke to show you this, I asked you whether or not anything happened of note while you were in the clubhouse parking lot.  Can you describe what it is that happened while you were at the clubhouse parking lot?

A.   Yes.  As you mentioned earlier, so we have our own radios, so we're not on the Secret Service channel.  Somebody came across our radio channel and said "shots fired."  That's all I heard.  I started asking for more information and wasn't really getting any information across our radio.

Q.   Did you start to see any activity in the clubhouse parking lot from other members of the Secret Service?

A.   Yes.  I started seeing vehicles moving around.  One of the vehicles left out of the main gate.

Q.   Did that vehicle leave in a hurry?

A.   It did.

Q.   And based upon what you heard from the transmission over the Palm Beach radio and seeing the activity in the parking lot, did you -- did you decide to do something at that point?

A.   Yes.

Q.   What did you do?

A.   So without much information, we tried -- I tried to figure out what was going on and where it was going on.  The vehicle that had left, I want to say it turned right, so I thought maybe they know where they're going.  So I tried to follow it

out and go to the right; realized there was nothing going on that way.

Q.   And I should ask you, did you hear any gunshots yourself while you were in the clubhouse parking lot?

A.   No.

Q.   You mentioned that you had turned right.  Was that onto Summit Road?

A.   That's correct.

Q.   And after you found that there was nothing in that area, what did you do?

A.   I turned around, went back to the clubhouse, hoping that there would be somebody there from Secret Service I could speak with to try to get more information.

Q.   Were you able to get any information when you went back to the clubhouse?

A.   No.  When I arrived, there was one person there, and they didn't have any information.

Q.   When you drove out of the clubhouse -- I should also ask you, did you activate your lights and sirens?

A.   Yes.

Q.   Did you consider this to be an emergency situation?

A.   Yes.

Q.   And when you made your way out, did you actually proceed at a pretty rapid pace?

A.   I did.

Q.   When you went back to the clubhouse and couldn't get any more information, what did you do next?

A.   I went back out the main gate, and this time I went to the left, which is east, on Summit Boulevard, towards Congress.

Q.   And again with your finger, if you could just trace the route that you took going east on Summit towards Congress.

A.   Sure.  So from the clubhouse, out the entrance, down Summit, eastbound.

MR. DONNELLEY:  Okay.  And for the record, Your Honor, the witness has made a red line with -- on the screen, going from the clubhouse, the area marked "clubhouse" on the exhibit, and then going from roughly the center of the page towards the right-hand edge of the page; that is in 200-2.

Sergeant, when you reached the area where you stopped, the mark there, is that the area where you stopped your vehicle?

A.   Yeah, around that -- around that area.

BY MR. DONNELLY:

Q.   And, again, when you left the clubhouse, did you -- were you traveling at a pretty high rate of speed?

A.   I was.

Q.   And did you have your lights and sirens activated at that time?

A.   Yes.

MR. DONNELLY:  Your Honor, with your permission, if we

could publish what's been previously marked as Government Exhibit 200-1A for the witness and for the jury.

THE COURT:  Yes, we may publish that.

BY MR. DONNELLY:

Q.   Sergeant, I'm showing you what's been marked as -- and admitted into evidence as Government Exhibit 200-1A.  Do you recognize what you are seeing on the screen in front of you?

A.   I do.

Q.   Can you tell the members of the jury what it is that you recognize that to be.

A.   So that is the intersection there to the far right of Summit and Congress.  To the top of the page is Trump International Golf course.

Q.   And do you see the area in that photograph?  Does that depict the area where you stopped your vehicle on that day?

A.   It does.

Q.   And can you mark that with an X, please.

A.   Sure.  Probably right around here (indicating).

MR. DONNELLEY:  And, again, for the record, Your Honor, the witness has made an X that appears to be right near the center of the page in the area of a sidewalk next to Summit Boulevard.

BY MR. DONNELLEY:

Q.   Sergeant, when you parked your car, what did you do?

A.   I got out.  What alerted me kind of to that area was, there

was a Secret Service agent walking on the sidewalk, going westbound on the sidewalk bordering Summit.  That's what kind of told me that something -- probably something -- this is probably the area.

Q.   And just to orient us, which way is westbound on that -- if you could point it -- if you could draw an arrow-ish or --

A.   So this is west (indicating).

Q.   Okay.  And when you got out in that area, are you familiar with that area from having patrolled it before and being in that area as part of that protective detail?

A.   Yes.

Q.   Can you describe what that area looks like from the street.

A.   So from the street, if you're looking at the golf course, you can basically just only see bushes.  So there is -- you can see kind of along here (indicating), you have a row of palm trees that are pretty consistent, and then behind that is a row of hedges.

Q.   And you -- I think you mentioned that you saw one Secret Service agent, in that area where you made the X, walking from right to left on that page.  Did you have a chance, as you recall, to talk to that agent?

A.   I don't remember what I said to him at this point.  I was just trying to get more information.

Q.   And as part of your effort to get more information, did you actually go into the bushes?

A.    I did.

Q.    And why did you go into the bushes at that point in time?

A.    I could hear a Secret Service agent on the inside of the property.  And there was, at this point, some other people there.  And I'm saying, "Where -- where did this happen?"  And they're saying, "It was in the bushes there."  So I went into the bushes to see what we were dealing with.

Q.    And when you went into the bushes, did you just pick a random spot, or did you see somewhere that you thought might be useful?

A.    Yeah.  The bushes are pretty thick, but there was some disturbance to it.  So that, and the fact that there was -- I could hear voices on the other side of the fence, led me to believe that that's probably the section.

Q.    And so the voices that you're communicating with, to be clear, they're through the bushes and kind of towards the golf course then?

A.    That's correct.

Q.    When you went into the bushes, did you do anything to announce your presence?

A.    I would have said, to try to deconflict with the Secret Service on that side so they know who is coming in the bushes -- so "sheriff's office" or "blue, blue" basically, to say, "This is a friendly."

Q.    And when you went into that bush line, can you estimate --

did you eventually come to an area that was marked off by a chain-link fence?

A.   Yes.

Q.   And can you estimate, if you could, the distance from when you first went into the bushes to where that chain-link fence is at the end of that.

A.   Yes.  So from -- from the -- the edge of the bushes to the fence is probably 8 to 10 feet.

Q.   As you made your way through the bushes, did you come upon an area that was of some note to you?

A.   Yes.

Q.   And can you describe for the members of the jury what you saw when you came through the bushes towards that fence.

A.   Sure.  So, like I said before, the bushes were kind of thick.  Once I kind of pushed through those and I could see that it opened up -- so I could see the fence in front of me, and it -- it opened up quite a bit to where it looked like somebody had been in there.

Q.   And did you see anything that you took note of in that area where you believed somebody had been?

A.   Yes.

Q.   And could you tell the members of the jury what it is that you saw in that area?

A.   So I saw a rifle leaned up against the fence.  I also saw two bags, looked like they were clipped or tied to the fence.

Q. Did you see anything else? You said, I think, you -- you saw something that led you to believe that there was a person or had -- somebody had been in that area?

A. Yes.

Q. Was there something other than the rifle that you described and the -- and the bags?

A. Yeah. The reason I thought somebody had been in there is because the bushes did open up, but to the right and left the bushes weren't disturbed. So they were still basically intact. So it looked like somebody had been in that area kind of pushing things down. There was some trash or debris on the ground as well.

Q. And at that point in time, is there anybody else -- was there anybody else from law enforcement inside that bush line with you at that point in -- in that area?

A. No.

Q. When you got in there --

MR. DONNELLY: I'm going to ask Your Honor if we could publish for both the witness and members of the jury previously admitted Government Exhibit 176.

THE COURT: Yes, that may be published.

BY MR. DONNELLY:

Q. And, Sergeant, what you're looking at on the screen there with Government Exhibit 176, can you describe for the members of the jury what you see in that photograph.

A.   So that is the -- a couple bags, two bags that are -- that are tied to the fence, and then a rifle leaning against the fence.

Q.   And does that fairly and accurately depict the way that scene looked when you came through that bush line towards the fence on that day?

A.   Yes.

Q.   Did you do anything?  Did you touch anything in there?  Did you move anything while you were in that fence line or in that bush line?

A.   No.

MR.  DONNELLY:   Your Honor, ask permission to show the witness and the jury Government Exhibit 180, previously marked and admitted into evidence?

THE COURT:  Granted.

BY MR.  DONNELLY:

Q.   And, Sergeant, is that just a different angle of that same scene that you described for the members of the jury?

A.   Yes.

Q.   And, again, it fairly and accurately depicts the way that scene looked to you on that day?

A.   Yes.

MR.  DONNELLY:   And, finally, Your Honor, with your permission, if we could publish for the jury and for the witness, Government Exhibit 175 that was previously admitted?

A.    Granted.

BY MR. DONNELLY:

Q.    And is that yet another view, Sergeant, of that rifle against the fence with the two bags as you saw them?

A.    Yes.

Q.    And does it also include some of that trash, I think, that you had described along the -- kind of the base or along the ground there?

A.    It does.

Q.    At some point, did you back out of the bushes and go back towards the street?

A.    Yes.

Q.    And was there anything about the bags that caused you any concern?

A.    Yes.

Q.    And what was your concern with the bags?

A.    So not knowing what's in them, first, was my major concern. Obviously, I didn't know if there was any explosives or anything hazardous inside of those bags.

Q.    And did you go back and report that to somebody else within the Palm Beach County Sheriff's Office --

A.    Yes.

Q.    -- that you had seen some bags?

A.    Yes.

Q.    Did you also radio out your findings with regard to what

was located by the fence, to other members of the Palm Beach County Sheriff's Office?

A.    Yes.

Q.    And why did you do that?

A.    For situational awareness for everybody.  Obviously, I wanted to try to get a better description of what we were dealing with.  And then put out what I found so we knew -- obviously, there is always the potential that the suspect could have more firearms, but at least we know that this one is not in his possession.

Q.    And when you first arrived at that scene, I think you mentioned that you had seen one Secret Service agent walking, again, westbound, you know, in that area.  Were there other law enforcement from Palm Beach County Sheriff's in that area at that time?

A.    Yes.

Q.    And did you go back out and report back to them what you had seen?

A.    Yes.

Q.    And did you speak to at least one lieutenant to inform him about your observations about the bags and so forth?

A.    Yes.

Q.    And was that Lieutenant William Gale?

A.    It was.

Q.    Okay.  At -- after you backed out and you spoke with

Lieutenant Gale about what you had seen inside the fence line, did you help maintain, along with other members of the sheriff's office, a perimeter to kind of secure that area?

A.   Yes, we did.

Q.   Was the primary duty for securing the inner core of that crime scene -- did that belong to the Secret Service, though?

THE COURT:  One moment.  You're leading the witness.

MR. DONNELLY:  Sorry, Your Honor.

THE COURT:  Rephrase.

BY MR. DONNELLY:

Q.   Did you do anything in terms of securing the area?

A.   Yes.  I mean, we didn't have a lot of foot traffic or anything around that area.  But we were -- we were locking that area down so nobody could walk in.

Q.   And was the Secret Service also there?

A.   Yes.

Q.   And what were they doing?

A.   The same thing.  We were -- we were also at this time still searching.  We didn't know if there was an outstanding suspect in the area.  So we were, you know, obviously still looking for somebody.  But also kind of cordoning that area off so nobody could enter.

MR. DONNELLY:  Thank you very much.

Your Honor, I have no further questions for the witness.

THE COURT:  All right.  Thank you.

Any cross-examination?

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   You had said you were very familiar with weapons.  Is AK-47 off the shelf -- is that just a single-fire bolt-action rifle?

A.   There is a lot of variance of AK-47s.  If you just walked into a gun store, it would probably be a semi-auto.

Q.   A semi-auto?

A.   Correct.

Q.   But it'd still have the bolt-action on top of it?

A.   It wouldn't have a bolt, no.  It would have a -- it would have a charging handle.  It wouldn't have a bolt in the terms of like a bolt-action rifle.

Q.   So if a rifle has that bolt on it, then it's pretty much single-fire?

A.   Not necessarily.

Q.   Right.  An SKS is basically the same thing as an AK-47?

A.   Similar, but not the same.

Q.   So -- but it's not -- not a Chinese knockoff of an AK-47?

A.   There is -- there is -- there is so many variants of AK-47s built in so many countries, it would be hard to tell, especially just checking the bushes for a couple seconds and seeing --

Q.   Yeah, right, right, right.  But all -- all of them are

derivations of an AK-47?

A.    Right.  They're similar, yes.

Q.    Right, right, right.  And most of them are just bolt-action where the -- where the carriage just goes back and forth?

A.    In terms of how you operate the action, it's not a bolt-action rifle in terms of being -- where you have to work a bolt each time you fire.  It's -- an AK-47-style is a semi-auto, meaning you pull the trigger and it reloads on its own.

Q.    All AK-47s?

A.    I -- all -- not all.  There is -- again, there is --

Q.    Right, right, right.

A.    There is more than --

Q.    Yeah.

A.    There is tons of them, so I can't say for each one.

Q.    Okay.  So just different ones.  Okay.  It's just gun-specific, then.  All right.

A.    Sure.

        MR. ROUTH:  All right.  Thank you very much.

        THE COURT:  Any redirect?

        MR. DONNELLY:  No, Your Honor.  Thank you.

        THE COURT:  Okay.  Thank you very much, sir.  You may be excused.

        Ladies and gentlemen, we are going to take our morning break now.  This will be until 10:20.

Please make sure that you do not discuss this case with anyone or permit anyone to discuss it with you.  Of course, no investigation or research of any kind.  You must keep an open mind until all of the evidence has been presented.

All rise for the jury.

(The jury exited the courtroom at 9:58 a.m.)

THE COURT:  Please have a seat.

All right.  We're in recess until 10:20.  Thank you.

(A recess was taken from 9:58 a.m. to 10:26 a.m.)

THE COURT:  Please have a seat.

All right.  Officer, are the jurors ready?

COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  One moment.

Any items to address with the Court?

MR. SHIPLEY:  No, Your Honor.

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Let's call them in, please.

(The jury entered the courtroom at 10:26 a.m.)

THE COURT:  All right.  Please have a seat.

Government, please call your next witness.

MR. SHIPLEY:  Thank you, Your Honor.  The United States calls Lieutenant William Gale.

THE COURT:  Good morning, Lieutenant.  Please walk over here.

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  First name is William.  Last name is Gale, G-A-L-E.

THE COURT:  You may begin.

MR. SHIPLEY:  Thank you, Your Honor.

Good morning, Lieutenant Gale.  Good morning, members of the jury.

LIEUTENANT WILLIAM GALE,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Who do you work for?

A.   I'm a lieutenant with the Palm Beach County Sheriff's Office, and I run the hazardous devices unit, which is also known as the bomb squad.

Q.   Okay.  How long have you been with Palm Beach Sheriff's Office?

A.   26 years, 10 months.

Q.   Okay.  Getting close to retirement?

THE COURT:  One moment.  Officer.

All right.  I have been told the audio is not working for the streaming.

Any updates?  Is it working now?

Test.

MS. MEDETIS-LONG:  Your Honor, it shows muted on the screen, the microphone, so I don't think it's working.

THE COURT:  Oh, okay.  I'm not sure how that happened.

Ms. Moran, can you reach out to IT, please.

COURTROOM DEPUTY:  Yes, Judge.

COURT SECURITY OFFICER:  Pardon me, Your Honor.  I was told it's still not working.

THE COURT:  All right.  Then we will take a brief break, unfortunately, ladies and gentlemen.  I want to make sure this is all working.

All rise for the jury.

(The jury exited the courtroom at 10:29 a.m.)

THE COURT:  All right.  We will be in a brief recess, sir.  Please do not discuss the substance of your testimony with anybody during the break.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  We will get started as soon as possible.  Please stand by.

(A recess was taken from 10:30 a.m. to 10:33 a.m.)

THE COURT:  All right.  Officer, jurors in, please.
Thank you.

(The jury entered the courtroom at 10:33 a.m.)

THE COURT:  Please be seated.  And let's invite the
lieutenant back.  Thank you.

You remain under oath, sir.  Thank you.  Have a seat.

You may begin.

MR. SHIPLEY:  Okay.  Thank you, Your Honor.

BY MR. SHIPLEY:

Q.   Okay.  Lieutenant Gale, I think you said you have been
27 years with Palm Beach Sheriff's Office?

A.   Correct.

Q.   Tell the jury a little bit about what you have done before
your current responsibilities.

A.   Twenty -- almost 27 years with the sheriff's office.  Prior
to that, 4 years with the City of Greenacres as a police
officer.  And then 1 year as a corrections deputy with Martin
County Sheriff's Office.  That's where I started my public
safety career.

So in the -- in my career I have worked road patrol as a
deputy, as a detective.  I worked as a field training officer,
a road patrol sergeant, a sergeant in the bomb squad.  And
since 2017, a lieutenant of the bomb squad.

Q.   Okay.  And you mentioned before Palm Beach Sheriff's Office
you were with City of Greenacres?

A.    Correct.

Q.    Were you a beat cop, or what did you do?

A.    Yes.  I was a road patrol officer and a field training officer, yes.

Q.    Right now, are you in charge of any special units within the Palm Beach Sheriff's Office?

A.    Yes.  I'm in charge of the bomb squad.  I have two environmental crimes detectives and eight fire investigators under my charge as well.

Q.    Generally, what are you responsible for with the bomb squad?

A.    From soup to nuts, I'm also a certified bomb technician. So if need be, I will respond to the calls and work the calls with the detectives.  Typically, I'm in an administrative role, ordering new parts and equipment, working on budgets, doing annual reports, training, mentoring and monitoring the, you know, members of the bomb squad.  Liaisoning with our counterparts, state, local, and federal, to include fire rescue.  And responding to calls with the guys, working with our SWAT team.  We support our SWAT team, and we also support our dive team.  We have a dive element within the bomb squad.

Q.    Okay.  Where is your office?  Is there an office space that you work out of?

A.    Yes.  We have a compound at 3228 Gun Club Road, which is our headquarters of PBSO.  And we are off to the side -- out of

sight, out of mind, but we have a really nice place to work.

Q.   Okay.  And is that adjacent to the Trump International Golf Club?

A.   It is.  So our headquarters for the Palm Beach County Sheriff's Office is surrounded by the golf course on two or three sides, and my shop is on the north side of the golf course.

Q.   Okay.  By virtue of your work and coming to your office, are you familiar with the golf club and the streets and area around it?

A.   Yes.  So prior to being in the bomb squad, I was actually a road patrol sergeant in that area.  That is considered District 1, which is our headquarters area.  And I worked that area for 3 1/2 years; and then having been in the bomb squad for a total of 18 years in that facility, I was pretty familiar with that area.  And I grew up in Palm Beach County.

Q.   Okay.  Can you tell the jury a little bit about your experience as a road patrol officer in the vicinity of the golf club.

A.   Yeah.  District 1, or the headquarters district, was one of the busiest districts in the agency, and we had a high call volume.  It was pretty high pace.  But I was very fortunate.  I had great leadership, and I had great support from the troops that I had on my squad.  We've worked numerous critical incidents, incidents from, you know, lost children to

shootings.  So a very good representation of what a road patrol deputy would handle, you would see that and handle it in District 1.  And being in District 1, a lot of people think that you get, you know, more than your fair share of experience in a short amount of time.

Q.  Okay.

MR. SHIPLEY:  Your Honor, with the Court's permission, I would like to publish to the jury, already in evidence, Government Exhibit 200-1A.

THE COURT:  You may proceed.

MR. SHIPLEY:  Ms. Luce, could you pull it up.

BY MR. SHIPLEY:

Q.  Okay.  Lieutenant Gale, this is an image our jury has seen a few times already in this case.  Can you tell the jury what we're seeing on this map --

A.  Yes, sir.

Q.  -- this image.

A.  This is a photo -- aerial photograph of the intersection of Congress Avenue and Summit Boulevard.  And the -- obviously the golf course is on the top portion of the photo, and then there is some businesses and buildings on the south side of Summit.

Q.  Okay.  Was this part of the area that you became familiar with when you were doing road patrol in District 1?

A.  Yes.

Q.  Okay.  Let me focus you particularly on to the southeast

corner of the golf course where the trees are at the corner between Summit and Congress.

In your time as a road patrol officer, did you ever see anybody coming out of those bushes?

A.   No.

Q.   Okay.  Did you ever see people going into those bushes?

A.   No.

Q.   Okay.  If we could take a look on Summit Boulevard and this area in here (indicating), are you familiar with what is at that location?

A.   Yes.

Q.   Can you tell the jury what's over there.

A.   That is a dirt road or driveway area that typically truckers park their rigs.  As you can see in the photo there, dump trucks, semitrucks.  They park there.  If their trucks are not there, typically their personal car could be there in its place, so they use that as a parking location.

Q.   Is that area at night very well lit or is it dark?

A.   I mean, the roadway is lit.  That particular dirt area, I'm not sure.

Q.   Okay.  And is that an area you're personally familiar with?

A.   Yes.

Q.   Okay.  And that's in -- that's essentially across from what is the 6th green of the golf course.  Okay.

Let me take you back to September 15th of last year.  Did

you respond to an incident at the Trump International Golf Club about 1:30 in the afternoon?

A.   Yes, I did.

Q.   Okay.

A.   That particular day I was working.  I had bomb squad detectives working at two different locations, one location being Mar-a-Lago, the second location being the golf course, Trump International Golf Course.

Q.   Okay.  And Mar-a-Lago was the residence of then-Candidate Trump; correct?

A.   Yes.

Q.   Okay.  And where were you physically?

A.   So on those days, I would typically travel between the two different locations.  I had just left Mar-a-Lago.  I did stop by the office before reaching the golf course.

And during my travels, I monitored two different radios; they are both Palm Beach County Sheriff's Office radios.  One channel would be for Mar-a-Lago location.  The other channel would be for the golf course location.

Once I was at the office, I heard someone say on the radio, the golf course channel radio, that shots were fired.

Q.   Okay.  I was just going to ask you that.

A.   Sorry.

Q.   When you were back in the office -- that's fine -- what did you hear?

A.   Someone got on the radio, and I couldn't tell you who it was, just a high-pitched voice saying, "Shots fired, shots fired."   And I knew that was the golf course channel.   So I exited the building, jumped into my assigned vehicle, and drove over to that location that we're looking at right now.

Q.   Okay.   I was going to ask you, where -- where did you go? When you left the office space, you heard the "shots fired" call, where did you go?   To this area?

A.   Right.   Eastbound on -- I left the compound eastbound on Gun Club, southbound on Congress Avenue, and then I approached Summit Boulevard and I turned right, which would be going westbound.   And in the area where that car is and where Summit Boulevard is written on the picture is in close proximity. Probably a little bit ahead of that is where I stopped.

Q.   Okay.  Let me do this.   Let me make sure I have this right. Essentially, your office would have been up here (indicating)?

A.   Yes.

Q.   It's not depicted on this image.

A.   Yes.

Q.   You come out.   You come down Congress?

A.   Yes.

Q.   And then you pull into about right there (indicating)?

A.   Somewhere in that area.

Q.   Okay.   Okay.   And when you got to the scene, what did you do?

A.   So the reason why I stopped, I saw a Secret Service agent whose car was in the roadway.  He was standing outside of the vehicle, and he was looking at the hedge line.

Q.   Okay.

A.   I knew this agent from the West Palm Beach office.  I stopped next to his car, blocking the next lane of traffic, using my emergency lights on my vehicle, got out, and asked what he had.  At this point, we weren't sure what we had.

Q.   Okay.  Once you got settled at that location, did a member of the public speak to you?

A.   Yeah, absolutely.  So a citizen drove up behind us.  I walked over to his car.  His driver's side window was down.  He said that he had some information regarding this incident.  Being curious, I asked him what information did he have.  He said that he saw someone running from the hedge line across from his -- in front of his car, across all the lanes of traffic into that dirt lot.

Q.   Okay.

A.   He said that the person got into the driver's seat and drove away.  He mentioned that the car was a black Nissan Xterra.  I asked him if he knew what an Xterra was.

Q.   Why did you ask him that?

A.   That was the only thing I could really verify.  You know, I didn't want to put out a diff- -- a vehicle with the wrong description.  You know, I know what a Nissan Xterra is; I just

wanted to make sure that he knew.

Q.   Did he know?

A.   He did.  And he produced a photo on his phone -- he showed me his phone -- in that dirt lot.  I was familiar with the area.  So I actually took a photo of his phone with my phone to capture that.

He said that he then followed -- the vehicle left eastbound on Summit Boulevard, continued to go southbound on Congress.  He made a U-turn to follow the vehicle.

So I asked him if he took a photograph of the tag.  He said he did not.  But he did catch up to the car at Forest Hill and Congress, at which point he was able to write down the tag number on a piece of paper.

Q.   Did he provide that to you?

A.   He did.  He handed me the piece of paper.  So, with that, I asked him if he would stay, you know, on scene, if he could stay there.  I asked the Secret Service agent next to me to talk to him while I stepped away.  At that point, I used the police radio, put the information over the radio, the tag and the vehicle description, and the last location that it was seen.

Q.   Okay.  Do you know, now, that individual -- or I guess you knew at the time what his name was?

A.   At that time, no.

Q.   Do you know now him as Tommy McGee?

A.   Oh, yes, yes.  I'm sorry.  I --

Q.   You didn't know him before you had that discussion?

A.   No, no, absolutely not.

Q.   Total stranger to you?

A.   Correct.

Q.   Okay.  And tell the jury again, what did you do with the information that he gave you about the person he saw and the license tag?  What did you do with that?

A.   Right.  So I -- I had the police radio.  I put the information over the radio to broadcast it, obviously, but for our communication division to pick it up.  And they did.  So that information was put out.  I also asked for a tactical agent or a strategic intelligence agent to come to the scene, and so they could, you know, talk to Mr. McGee further.

Q.   And did you provide that information on down the line so that other law enforcement officers could identify the vehicle on the road somewhere?

A.   Yes.  Anybody that was on that channel heard me broadcast it, but then our communication division picked it up.

Q.   Okay.  All right.  Did you have any other involvement in the events of that day, September 15th?

A.   Yes.

Q.   Okay.  Well, let me ask you this.  What happened after your conversations with Mr. McGee and you send the information over the radio?  What do you do next?

A.   I pretty much stayed right there at the scene, at that location.  You know -- you know, at this point, we're thinking this is potentially a crime scene.  We didn't have a lot of resources there at that point, so I just stayed right there with the Secret Service agent.

Q.   Okay.  Were you asked to assist with something by another law enforcement officer?

A.   Yes.  Sergeant Mays from our tactical division was checking the perimeter, that hedge line, and called me and asked me to come check out two backpacks that he had found hanging on the fence.

Q.   Okay.  At that point, you had not been inside any of that wooded area of the golf course; correct?

A.   No.  I -- I was on the roadway.

Q.   Okay.  And why would you have been the person he would have asked to go check out those items?  Sergeant Mays.

A.   Right.  Being the bomb squad, we -- we investigate suspicious package or suspicious items.  We have X-ray equipment and different tools that we can use to look into items without physically touching or going into them.

Q.   Okay.  So what did you do when Sergeant Mays asked you to assist with that part of the investigation?  What did you do next?

A.   I reached out to the detectives that I had at the golf course, asked them to meet me at this location.  We readied our

equipment, our X-ray equipment.  And we wore some protective gear.  And then we made entry into the hedge line.  We -- that hedge line, if you're not familiar, is very tall and very wide, and there is very thick branches that go in all different directions.  So we were -- literally had to crawl in the hedge line.

Q.   Let me stop you there, put up an image for the jury.

MR. SHIPLEY:  Your Honor, may I publish Government's Exhibit 200-21A that's already in evidence?

THE COURT:  Yes, you may.

MR. SHIPLEY:  Ms. Luce, can we pull that.  Thank you.

BY MR. SHIPLEY:

Q.   Lieutenant Gale, I pulled up on the screen, for you and for the jury, an image that's in evidence in this case.  Have you seen that location before?

A.   Yes.

Q.   Okay.  And what are we seeing in this picture?

A.   Well, that's a ficus hedge -- pretty familiar with the hedge.  But it's a ficus hedge that surrounds the Trump International Golf Course.

Q.   Okay.  And we see those orange cones in the center of it. Are those roughly marking the path that you would have followed to get into the wooded area from the roadway?

A.   I don't believe we went right through that spot. We -- when we were directed to that location to check out the

backpacks, I don't believe it was pinpointed --

Q.   Uh-huh.

A.   -- exactly where it was.  So we had to crawl in the hedges to see where it was.

Q.   Okay.  And could you describe that for the -- for the jury, when you talk about crawling under these type of bushes and ficus.

A.   Correct.  That hedge is very thick and very tall, and as such, the branches are going to be thicker and stronger.  And as everyone knows, with a hedge, the branches grow in different directions.  It's not all straight up and down like a tree trunk.  So it was very difficult to maneuver in there, especially wearing protective gear and a helmet, and then carrying extra equipment with us.

Q.   Okay.  So you -- so that opening -- you didn't walk through an opening into that space.  You had to actually crawl under these --

A.   Correct.

Q.   -- bushes --

A.   Correct.

Q.   -- in order to get into the location?

A.   Correct.

Q.   Describe it as a comfortable location to spend ten hours?

A.   It was not.  It was not comfortable.  It was very uncomfortable because we couldn't stand.  We had to crouch the

whole time and try to maneuver over and around the branches.

Q.   Okay.  And once you got into that area, what did you see?

A.   We saw what looked like two backpacks hanging on the fence, on the chain-link fence, and there was a rifle leaning up on the chain-link fence between the two backpacks.

Q.   Okay.

A.   And then off to -- and then off to the left of that, there was what I will describe as a GoPro-type camera.  I don't know exactly what brand it was, but it was some type of a camera. It looked to be zip-tied to the fence.

MR. SHIPLEY:  Okay.  Your Honor, with the Court's permission, may I republish Government Exhibit 180 in evidence?

Ms. Luce.

THE COURT:  Yes, you may.

BY MR. SHIPLEY:

Q.   Lieutenant Gale, have you seen this picture before coming to court today?

A.   Yes.

Q.   Okay.  And what are we seeing in this picture?

A.   As I just described it, the two backpacks hanging off of the fence.  We have the camera off to the left, that black item.  And then the rifle leaning on the chain-link fence between the two backpacks.

Q.   Okay.  Now, remind the jury, what was your -- what was your reason for going in that space?  What were you tasked with

doing?

A.   Right.  Sergeant Mays, in his travels along that fence line, happened upon the backpacks.  He was concerned that there could be something dangerous in the backpacks.

Q.   Okay.  So what did you do when you got into that hidden space?

A.   It was myself and another bomb technician.  I asked him to take some photographs with his issued cell phone.  And I reminded him that we were not going to touch anything.  That was not our purpose.  The purpose was to X-ray the two backpacks.  So we -- luckily, there was an agent on the other side of the fence holding that crime scene.  He helped us with putting the X-ray panel on the other side, on the inside of the fence.

If you're not familiar with X-ray equipment, there is several pieces, one of which is a panel that captures the image.  You put that on the back side of the item.  And then you have an X-ray generator that you put on the front side of the item.  It shoots pulses through the item.  The pulses are captured in that panel.  And we have a tablet, a wireless tablet that controls all these pieces.  And we get the image within 30 seconds on that tablet of those -- whatever we X-rayed.

And in this particular case, we hung the panel on the inside of the fence without touching the items, X-rayed each

backpack. Did not see anything that we were concerned about, so that crime scene could actually do their job at a future time. We -- you know, we didn't see anything at that point that we, you know, needed to go any further.

Q. All right.

A. Typically, if we were to go to a call like this, and there was something else in there, then we would take different action. We may go in hand entry if we feel that it's safe or we could use some type of disruption tool to disable the item.

Q. Okay. And when you say you didn't identify anything of concern, you're talking about from an explosives perspective?

A. Absolutely. I'm sorry, yes. No explosive components that we saw that would lead us to believe that it couldn't be handled by crime scene personnel.

Q. Okay. And, to be clear, you didn't -- in this process of taking the X-rays, you didn't touch the bags or any of the other items in that area?

A. No. Never. We did not touch anything. I made it very clear to the other bomb technician with me that we were not there to touch anything.

Q. Okay.

A. Typically we would, to verify. It's always good to use the human eye to verify, but we were confident with the X-rays that we took that there was no explosive hazard.

Q. Okay. And do you remember anything -- did you look at the

ground area as well in that space?

A.   Yes.

Q.   Do you remember anything?

A.   Well, I was on the ground most of the time, but, yes.   So what we noticed on the ground, and I'll -- I will use a generic term, they looked like Vienna sausages.   And if you look on the bottom towards the left center of the photo, that might be them.

Q.   Could you circle -- oh, there we go.

A.   Yes.   Yeah, I saw --

Q.   Do you remember seeing that at the location?

A.   Yes.

Q.   Okay.   After you completed your inspection for explosives, what did you do next, if anything?

A.   We exited.   We exited the hedge line back to the street where our truck was.   And that was -- that was it for that task.

Q.   Did you have to crawl back out?

A.   Yes.

Q.   Okay.   Was that difficult to do with your equipment?

A.   It was.   But that's just part of the job.   That's what we do.

Q.   Okay.

        MR.  SHIPLEY:   Thank you, Your Honor.   No further questions.

Thank you, Lieutenant Gale.

THE COURT:  Any cross-examination, Mr. Routh?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Thank you, Lieutenant.  That is all.

All right.  Next witness, please.

MS. MEDETIS-LONG:  Yes, Your Honor.  At this time the United States would call Special Agent Kathryn Rose.

THE COURT:  All right.

COURTROOM DEPUTY:  Please remain standing, and raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Kathryn A. Rose, R-O-S-E.

SPECIAL AGENT KATHRYN ROSE,
having been sworn, testified as follows:

DIRECT EXAMINATION
BY MS. MEDETIS-LONG:

Q.   Good morning, ma'am.

A.   Good morning.

Q.   Where do you work?

A.    I work for the Federal Bureau of Investigation, Miami Division.

Q.    And that's the FBI?

A.    Yes.

Q.    And what is your title?

A.    I'm a special agent.

Q.    And how long have you been a special agent?

A.    I have been a special agent since 2017.  I started with the Bureau in 2012.

Q.    Okay.  When you started at the Bureau in 2012, what was your title?

A.    I was an operational support technician, an OST.

Q.    And what does an OST do?

A.    It's an administrative role.  It covers -- anything that the squads may need, an OST will help with that.

Q.    And when you became a special agent in 2017, what were your duties and responsibilities, or what are your duties and responsibilities?

A.    Duties and responsibilities include investigating violations of federal crime.

Q.    And have you since 2012 investigated a variety of federal crimes?

A.    I have, yes.

Q.    And what squad are you currently assigned to?

A.    I'm assigned to a counterterrorism squad.  The squad name

is T1.

Q.   Do you have -- in addition to being a special agent who investigates criminal activity or federal violations of law, do you have other duties at the FBI?

A.   I do.  I'm a member of our Evidence Response Team.

Q.   And do you hold any titles as a member of the Evidence Response Team?

A.   I do.  I'm a team leader.

Q.   First of all, what is the Evidence Response Team?

A.   The Evidence Response Team is responsible for the collection and documentation of evidence at a crime scene.

Q.   Okay.  And can we call it ERT for short?  Is that what you refer to it as?

A.   Yes, ERT.

Q.   How long have you been a member of ERT?

A.   I have been a member since approximately 2018.

Q.   And how long have you been a team leader?

A.   For approximately two years.

Q.   Can you elaborate a little bit more on what the responsibilities are for -- of ERT?

A.   Yes.  So ERT will receive a callout for a crime that has occurred.  And we will respond to the crime scene, conduct a preliminary survey of the crime scene, and begin processing the crime scene.

Q.   And when you say "processing the crime scene," what do you

mean?

A.   Processing the crime scene can include anything from collection of the evidence, assessment of the evidence, packaging of the evidence, documentation of the evidence. Overall, basically control of the crime scene during the entire evidence collection process.

Q.   Okay.  I'm just going to ask you to slow down a little bit so that the court reporter can get everything you are saying. Okay?

And did you receive specialized training to become a member of ERT?

A.   I did.  The training takes approximately two weeks.  It's a very intensive training.  That is in addition to the two to three days of training we receive at the academy as special agents.

Q.   You receive two to three days of training?

A.   Correct.

Q.   For ERT?

A.   For special agent training.

Q.   Okay.

A.   When we become members of ERT, we go through a very intensive additional two weeks' training.

Q.   Okay.  And how much time did you spend at Quantico to become a special agent?

A.   I was there for 21 weeks.

Q.   Okay.  And in your 21 weeks of training at Quantico and your 2 weeks of specialized training for ERT, did you train in how to handle and process evidence at a crime scene?

A.   Yes, I did.

Q.   Do you have other certifications as part of ERT?

A.   I do.  I'm a certified FARO scanner.

Q.   What is a FARO scanner?

A.   A FARO scanner is responsible for scanning a crime scene and putting together a product at the end that shows the totality of the crime scene, and it's used as a measurement tool.

Q.   Now, the reasons that bring us here today, did you participate in this investigation as -- in your capacity as ERT?

A.   Yes, I did.

Q.   Did you do any FARO scanning?

A.   No, I did not.

Q.   I want to direct your attention to September 15, 2024, if I may.  Were you working that day?

A.   Yes, I was.

Q.   And where did you respond to?

A.   I responded to the Trump International Golf Club.

Q.   And why did you respond there?

A.   We received notification that an incident had occurred and Evidence Response Team was being called out.

Q.   What incident had occurred?

A.   There was an attempted assassination and attempted shooting of the President.

Q.   Then-former President Trump --

A.   Correct.

Q.   -- is that what you are referring to?

A.   Correct.  Former President Trump.

Q.   Okay.  What did you do when you responded to the Trump International Golf Club?  What did you do next?

A.   When I arrived, I made contact with the individuals that had control of the scene at the time, and then proceeded to conduct a preliminary investigation -- a preliminary -- a preliminary walk-through of the scene with the Palm Beach Sheriff's Office crime scene investigators who were already on scene.

Q.   Okay.  To your knowledge, by the time you had arrived -- well, first of all, let me back up a second.

    What time of day did you arrive?

A.   I arrived around approximately 3:28 p.m.

Q.   Was it still daylight out?

A.   Yes, it was.

Q.   And as far as you know, had anything at the crime scene been disturbed or touched by the time you got there?

A.   Yes.  It was already in the process of being -- the scene itself was already in the process of being processed by PBSO

crime technicians.

Q. What do you mean by "processed"?

A. They had begun photographing the scene and evidence-marking some of the items of interest.

Q. Had they moved any of the items of interest by that point?

A. No, I don't believe so.

MS. MEDETIS-LONG: Your Honor, may we publish Government's Exhibit 200-1A, already in evidence?

THE COURT: Yes.

BY MS. MEDETIS-LONG:

Q. Now, the jury has seen this before, but what do we see here?

A. This would be the area in the vicinity of the crime scene, and it would be Summit Boulevard and Congress Avenue.

Q. And what is this general area (indicating) at the top of the photo?

A. This would be area in the proximity and at Hole 6 of the golf club.

Q. And where in particular, if you could circle on your screen, did you respond?

A. I would say that we responded around here (indicating).

Q. Okay.

MS. MEDETIS-LONG: Your Honor, may we publish Government's Exhibit 1005A in evidence?

THE COURT: You may.

And I do want to pause here momentarily, ladies and gentlemen.

You have heard certain witnesses reference a term "attempted assassination."  As you know, the defendant is charged in Count 1 with attempted assassination.  You should not construe any of the statements by the witnesses in this case as a final determination of whether the government has met its burden of proof on Count 1.

Please publish the exhibit.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is a rendering of the crime scene.

Q.   And can you circle again where approximately you responded.

A.   Yes.  (Indicating.)

MS. MEDETIS-LONG:  Your Honor, permission to publish what's been previously admitted as Government's Exhibit 1005B?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, Special Agent Rose?

A.   This is a closer version of the crime scene.

Q.   And can you please circle the area where you responded to.

A.   Yes.  (Indicating.)

Q.   Showing you what's been --

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-18?

THE COURT:  Is this in evidence?

MS. MEDETIS-LONG:  Let me just double-check, Your Honor.  I believe it is.

THE COURT:  Okay.

MS. MEDETIS-LONG:  It is, Your Honor.

THE COURT:  Mr. Routh, do you agree?

MR. ROUTH:  I agree.

THE COURT:  Okay.  Then 200-18 pre-admitted can be shown now.

BY MS. MEDETIS-LONG:

Q.  What do we see in Government's Exhibit 200-18?

A.  This would be a gravel lot that, if were you facing south, that -- that you would see the gravel lot directly to your left if were you facing south.

MS. MEDETIS-LONG:  Ms. Luce, can we do a side by side of 200-1A and 200-18.

BY MS. MEDETIS-LONG:

Q.  On 200-1A, which is on the right side of the screen, can you circle what we're looking at here.

A.  Yes.  (Complies.)

It would be this area here (indicating).

Q.  So if you're facing the golf course where you responded to, and you immediately turn around, would you see what's on the left side of the screen at Government's Exhibit 200-18?

A.  Yes, you would.

MS. MEDETIS-LONG:  Your Honor, permission to publish previously admitted Exhibit, GX200-17?

THE COURT:  Proceed.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be a view of the crime scene from across the street.

Q.   And what have I circled on the left side of the photograph?

A.   That would be the area in -- which is the outside, the entryway to the crime scene.

Q.   Okay.  And what is located there?  What are those?

A.   That would be law enforcement vehicles and Evidence Response Team vehicles.

Q.   Now, this particular area you said is the area you responded to, the area that I'm circling sort of in the center of this photograph; is that correct?

A.   Yes.

Q.   Did you -- in addition to the palm trees, what do we see behind the palm trees?

A.   That would be a bush line.

Q.   And did you enter the bush line?

A.   Yes, I did.

Q.   Okay.  Can you describe what it was like entering the bush line.

A.   It was very thick foliage with very thick and extensive

branches and leaves.

Q.   And what was the temperature?  And I'm not asking for a number.  Was it cold?  Was it hot?  What was it like?

A.   It was hot.

Q.   And how would you describe your ability to enter that area?

A.   I would say it is not an area you could easily walk into. You needed to bend down and make your way through the branches.

Q.   Okay.

      MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-19, already in evidence?

      THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the entryway to the crime scene.

      MS. MEDETIS-LONG:  Permission to publish previously admitted Government's Exhibit 200-20?

      THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   And what do we see here?

A.   This would be a closer version -- a closer-up photograph of the entryway to the crime scene.

Q.   Can you circle the entryway on this photograph.

A.   Sure.  (Complies.)

Q.   And what in particular -- and for the record, the witness has circled the center of the photograph.

What in particular made you think this was the entryway?

A.   It is a much more open space, indicating it's -- it was an area in -- which had been trans- -- transported through previously.

Q.   Okay.

MS. MEDETIS-LONG:   Permission to publish 200-21A and B, already admitted into evidence?

THE COURT:   Granted.

BY MS. MEDETIS-LONG:

Q.   This is 200-21A.   What do we see here?

A.   This is a closer-up photograph of the entryway to the crime scene.

Q.   And is this the entry path that you took?

A.   Yes, it is.

Q.   From 200-19 to 200-21A, that shows the path you took?

A.   Yes.

MS. MEDETIS-LONG:   If we could please show, Ms. Luce, the witness and the jury, Government's Exhibit 200-21B.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be -- once you are further inside the bush line, this would be a closer-up photograph of the area in which you accessed the crime scene.

Q.   Now, I'm circling the center of the photograph here (indicating) for the record.   What did I just circle?

A.   You circled an area where there is a broken branch --

Q.   Okay.  And --

A.   -- in evidence.

Q.   And what is behind the broken branch, those objects?

A.   That would be items of interest in the crime scene area.

Q.   And are there orange cones depicted in this photograph?

A.   Yes, there are.

Q.   And who put those there?

A.   Those were there prior to my arrival.  They were placed there by PBSO.

Q.   And why, based on your training and experience, would orange cones be placed inside the crime scene?

A.   Orange cones would be placed inside of the crime scene to mark evidence items of interest.

Q.   So it's like a -- is it --  is it fair to say those cones are like a placeholder for where certain things are found within a crime scene?

A.   Yes, it would.

Q.   Okay.  So you entered the bush line, you said with some difficulty.  What did you see next?

A.   When you enter the bush line and you proceed toward the fence line, I saw several items of interest that had already been marked, areas in which it looks as if the branches and foliage had been pushed aside.  And then you arrive at the fence line.

Q.    And what do you see at the fence line?

A.    At the fence line, there were several items of interest, and you are able to look through the fence line onto the golf course.

Q.    What part of the golf course can you see through the fence line?

A.    You can see the area at and in proximity to Hole 6.

Q.    Okay.  Now, you said there were certain items of interest. Can you specify what those are.

A.    Sure.  Leaned up the against the fence, there was a rifle. Attached to the fence line, there were two bags.  To the left of the rifle, on the ground was a black plastic bag with food items and a can.  And attached to the fence line were -- was a GoPro-style camera.  And to the left of that were two locks.

Q.    Okay.  The GoPro-style camera you're referring to, in what direction, based on what you saw, was it -- was the lens pointing?

A.    The lens would have been pointing toward Hole 6.

        MS. MEDETIS-LONG:  Your Honor, permission to publish previously admitted Government's Exhibit 175?

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    Special Agent Rose, what do we see here?

A.    Here you see the rifle leaning up against the fence line. You see the two noted bags, the GoPro-style camera, the ways in

which they were affixed to the fence line, and some items of -- of garbage, random items on the -- on the ground.

Q.   Okay.  I want to talk about the bags and the -- well, let's talk first about the bags.  How were the bags secured to the fence?

A.   The bags were secured to the fence with zip ties and bungee cords.

Q.   Could you circle those bungee cords --

A.   Sure.

Q.   -- and zip ties for me on the -- on the image.

A.   Sure.  (Complies.)

Q.   So just for the record, there are -- well, why don't you tell us where the bungee cords are in relation to each of the bags.  Let's start with the leftmost bag.

A.   Sure.  There is a large blue bungee cord affixed to the fence line and the bags holding it against the fence line.  And that goes across both bags.  And then attached at the top are -- are zip ties with red bungee cords --

Q.   Okay.

A.   -- red, in color, bungee cords.

Q.   And how is the camera affixed to the fence?

A.   The camera is affixed with zip ties.

Q.   Okay.

        MS. MEDETIS-LONG:  And if we can zoom in, slightly, to the firearm in this picture, Ms. Luce.

BY MS. MEDETIS-LONG:

Q.   How is the firearm positioned as you found it?

A.   The firearm is leaning against the fence line with the end of the rifle sticking through the fence line.

Q.   Okay.  When you say, "the end the rifle," do you mean -- what part of the rifle?

A.   The barrel.

Q.   The barrel.

And does this photograph fairly and accurately depict what you saw, how you saw it, and how it was positioned when you responded to the crime scene on September 15, 2024?

A.   Yes, it does.

Q.   And in what direction -- I'm going to circle this -- what part of the firearm is that (indicating)?

A.   That would be the magazine.

Q.   And in what direction is it pointing?

A.   Upward.

Q.   And circling the bottom (indicating) of the photograph, what did I just circle there?

A.   That would be a scope.

Q.   And in what direction is that pointing?

A.   Downward.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 34, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q. What do we see here?

A. This would be the same rifle with a scope, and a label of some sort affixed to the end of the scope.

MS. MEDETIS-LONG: Could we, Ms. Luce, focus in or zoom in on the label.

BY MS. MEDETIS-LONG:

Q. What does that say, if you can make it out?

A. It says, "Dollar General."

MS. MEDETIS-LONG: Can we go back to exhibit -- Your Honor, permission to publish Exhibit 176, already in evidence?

THE COURT: Granted.

BY MS. MEDETIS-LONG:

Q. What do we see here?

A. This would be the rifle, the two bags, and the GoPro-style camera affixed to the fence line.

Q. Now, starting with the leftmost bag, or the bag that is on the left side of the rifle in this Exhibit 176, what color is that?

A. I would describe that as a reddish-brown color.

Q. Okay. What other color do you see that appears on that bag?

A. I see a blue color and areas in which appear to be black.

Q. Okay. And regarding the bag on the right side of the

rifle, what color is that?

A.   That appears to be a bluish-black in color.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 179, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   Here you see the same rifle, and the two bags affixed to the fence line.

Q.   And is this -- what I'm circling, sort of near the top by the bags, the blue bungee cord that was securing the bags that you referred to earlier?

A.   Yes, it is.

MS. MEDETIS-LONG:  Permission to publish, Your Honor, Government's Exhibit 180, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   And I want to direct your attention to cone -- well, first of all, what do we see here?

A.   Here you see the -- we will begin with the bottom left -- the black bag with food items and a metal can.

Q.   Can you circle that, please.

A.   Yes.  (Complies.)

To the left of that, we see Master Locks on the fence line.

Q.   Did you examine the Master Locks?

A.    Yes.

Q.    What did they appear to be doing?

A.    There is an opening in the fence line.  They appear to have been used to close that opening in the fence line.

      Would you like me to continue with the evidence items?

Q.    Yes.  If you could -- if I could direct your attention to the bluish-black bag on the right side of the rifle.  What do we see protruding out of it to the -- to the right side of that bag?

A.    To the right side of the bag protruding out of it would be a black metal plate.

Q.    And how do you know that?  Did you inspect the contents of these bags when you removed them from the fence?

A.    Yes.  Once they were removed from the fence, I was able to inspect the items.

Q.    And was there, in fact, a metal plate in the dark blue-black bag?

A.    Yes, there was.

Q.    And what about the reddish-brown bag, as you described it, what was in there?

A.    Also a plate.

Q.    What kind of plate?

A.    I don't recall.

Q.    Was it plastic?

A.    I don't believe so.

Q.   Okay.  Was it metal?

A.   It was -- yes.  It was either metal or ceramic of some sort.  It was a hard material.

Q.   Okay.

MS. MEDETIS-LONG:  Your Honor, may I have permission to publish Government's Exhibit 200-55, already in evidence?

THE COURT:  Yes, you may.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   Here we see the black bag, metal can, and food items to the left of where the rifle and bags are affixed to the fence line.

MS. MEDETIS-LONG:  And permission to publish Government's Exhibit 200-24, Your Honor, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see to the left of Government's Exhibit 200-24?  The area that I'm circling here.

A.   Thank you.  That would be the two locks I referenced previously.

Q.   And, again, what was each lock doing?  Because before in the previous exhibit that showed the lock, we only saw one lock, but you're saying there are two locks?

A.   Correct.  Yes.  The locks were placed in a way in which they would be holding the opening closed.

Q.   An opening in the chain-link fence?

A.   Correct.

Q.   Okay.

MS. MEDETIS-LONG:  Your Honor, permission to publish previously admitted Government's Exhibit 1005C?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   Here we see a topo- -- the primary section, we see a topographical view of the crime scene.  To the right of the exhibit, we see photographs of the evidence items at the crime scene.

Q.   So is it fair to say that the two photographs that I have underlined (indicating) are images taken from this magenta-colored area of interest?

A.   Yes.

Q.   And if we could run through what those items are.  For example, looking at the rightmost photograph, what's been marked as 187A to B, what is that?

A.   187A to B would be the two bags that are affixed to the fence line.

Q.   Okay.  And what about 1?

A.   1 would be the rifle leaning against the fence line.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 33, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   And, again, what do we see in this photograph?

A.   We see the rifle; the two totes being held against the fence line with the bungee cord; the camera, the GoPro-style camera affixed to the fence line; one of the locks; and the items on the ground, the black bag food items and can.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-53, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the broken branch proceeding to the crime scene.

Q.   Was that branch broken by you?

A.   No, it was not.

Q.   Was that already broken when you got to the crime scene?

A.   Yes, it was.

Q.   Now, after you photographed the items of interest or the evidence as it was found, what did you do next?

A.   I assisted the PBSO crime scene investigators in beginning to remove the items of interest there to begin processing them for packaging.

Q.   Okay.  And what protocols or precautions do you take when you are gathering the evidence and collecting it?

A.   We wear gloves.

Q.   Why do you wear gloves?

A.   To -- to -- I apologize.  I'm finding a hard time finding my words.  We wear gloves to limit the amount of cross contamination and putting our -- our DNA onto evidence.

Q.   Okay.  Was everyone who was handling the evidence in your presence wearing gloves?

A.   Yes, they were.

Q.   Now, did you at some point with your team and PBSO's team collect the firearm that was on scene?

A.   Yes, we did.

Q.   By the way, generally speaking, what -- what category of firearm was it?

A.   It is a rifle.

Q.   Okay.  And what did you do with the firearm before you collected it?  Or what was done with the firearm before it was collected?

A.   The firearm was rendered safe by a firearms expert.

Q.   Okay.  And what does "rendered safe" mean?

A.   Rendered safe means that you remove the magazine and clear the weapon of any chambered ammunition so that it is safe for transport.

Q.   Did you make it safe yourself?

A.   No, I did not.

Q.   Did somebody else from the FBI make it safe?

A.   Yes.

Q.   And do you recall who that was?

A.   Yes.  That would have been Special Agent David Gilbert.

Q.   Okay.  Did you bring Special Agent David Gilbert into the -- this wooded area where the crime scene was to make it safe?

A.   No.  The rifle was transported from the fence line to the grass line on the outside of the bushes where it was rendered safe.

Q.   And did you watch that process?

A.   I did.

Q.   And what did you observe?

A.   I observed the magazine being removed and a one single round ammunition being removed from the chamber.

Q.   What did you do with that round of ammunition that was removed from the chamber?

A.   That round of ammunition was packaged as an -- as an item, along with the rifle, but separately.

Q.   And you said that the magazine was removed.  What did you do with the magazine?

A.   The magazine was also packaged along with the rifle but separately.

Q.   Could you tell if there was ammunition in the magazine?

A.   Yes.  There was ammunition in the magazine.

Q.   How do you know that?

A.   I could visually see the ammunition with my eyes.

Q.   And did you remove the ammunition from the magazine?

A.   No, I did not.

Q.   Why not?

A.   We leave the ammunition within the magazine for the lab to be able to process any DNA or trace evidence.

Q.   And -- what is trace evidence?

A.   It would be any hairs or fibers that would be left behind.

Q.   And when you say "the lab," do you mean the FBI lab?

A.   Yes.

Q.   And where is the FBI lab?

A.   The FBI lab is at Quantico in Virginia.

Q.   Now, as you start to collect the evidence and the items of evidence, what do you do with it physically?

A.   Once the items are removed from their original location, they are then transported to a -- an area that is controlled in which they are then photographed up close --

Q.   Okay.

A.   -- prior to packaging.

Q.   Okay.  Now, let me backtrack for a second.

Before you remove the items of evidence from their original location, is there someone documenting where each of the items of evidence are found?

A.   Yes.  So as an item is transported to the packaging area, that information is -- comes along with the items so that it is documented at the evidence control area.

Q.   And before the item is removed from its original location and undisturbed, is anybody photographing the items as they're found?

A.   Yes.

Q.   In the way that they're found?

A.   Yes.

Q.   Before they're touched by anybody from ERT or PBSO crime scene?

A.   Yes.  They should ideally be photographed in place, but the photography had begun prior to my arrival.

Q.   Okay.  But there was photography that was done in this case?

A.   Correct.  Yes.

Q.   Okay.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 25, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the rifle from the scene and the magazine that was seated within the rifle.

Q.   Now, is the magazine in this photograph -- well, where is the magazine in relation to the rifle in this photograph?

A.   It is to the left of the photograph.

Q.   So is it attached to the rifle or not?

A.   No, it is not attached.

Q.   Aside from the magazine not being attached to the rifle, is this the same condition that you saw the rifle in the wooded area?

A.   Yes, it is.

MS. MEDETIS-LONG:  And if we could close-up zoom, Ms. Luce, on that particular area.

BY MS. MEDETIS-LONG:

Q.   What do we see written there?

A.   That would be Dollar General.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 26, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   And what are we looking at here?

A.   Here is a closer-up photograph of the scope area of the rifle.

Q.   And I'm circling the center of the photograph.  What am I circling there?

A.   That would be black tape.

Q.   And what am I circling here (indicating) to the right of the photograph?

A.   That would be the Dollar General label and black tape and items used to affix the scope to the rifle.

Q.   Showing you Government's Exhibit 27.

MS. MEDETIS-LONG:  Oh, Your Honor, permission to publish Government's Exhibit 27, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be manufacturer markings on the rifle that have been scratched out.

Q.   Okay.  Now, by the way, with respect to Government's Exhibit 25, 26, and 27, which are, as you described them, photographs of the rifle, where were these photographs taken?

A.   The closer-up photographs, after being removed from the fence line, were taken in the evidence control area of -- outside of the direct crime scene.

Q.   So on the street part of the sidewalk area?

A.   Yes.  So there -- the evidence response team's vehicles were off to the left, down the road, and that is where we had our evidence control area.

Q.   Okay.  So it was nearby the crime scene?

A.   Yes.

Q.   Okay.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 28, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   Here we see more manufacturer markings and what appear to be intentionally removed, scratched off.

Q.   And is this a photograph of the rifle that was seized from the crime scene at the Trump International Golf Club?

A.   Yes.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 29, already admitted into evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the rifle from the crime scene, a photograph of the rifle from the crime scene taken up close with scale.

Q.   And when you say, "scale," what do you mean?

A.   The L scale to the top left of the photograph.

Q.   Okay.  Is that like a ruler?

A.   Yes.  It's meant for measurements.

Q.   Okay.  And there is something labeled 5A.  What is that?

A.   5A would be the magazine that was seated within the rifle.

Q.   And -- but in this photograph, it's removed from the rifle; correct?

A.   Correct.

Q.   And what is 5B?

A.   5B would be the one single round of ammunition that was chambered within the rifle.

Q.   Okay.

MS. MEDETIS-LONG:  If we could close-up, Ms. Luce, on this area (indicating).

BY MS. MEDETIS-LONG:

Q.   What have I zoomed in on here?

A.   This would be the magazine from the rifle, showing ammunition within it.

Q.   And can you circle where you see the ammunition within it.

A.   Yes.  (Complies.)

MS. MEDETIS-LONG:  Can we have permission, Your Honor, to publish Government's Exhibit 30, already in evidence?

THE COURT:  Yes, you may.

BY MS. MEDETIS-LONG:

Q.   And can we compare, Ms. Luce, Government's Exhibit 29 to Government's Exhibit 30.

BY MS. MEDETIS-LONG:

Q.   What does Government's Exhibit 30 show?

A.   30 shows the rifle and the magazine, as well as the single round of ammunition.

Q.   Is it the same perspective as Government's Exhibit 29 or a different perspective?

A.   It's a different perspective.  The rifle is flipped the other way.

Q.   Okay.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit GX31, already in evidence?

THE COURT:  Yes, you may proceed.

BY MS. MEDETIS-LONG:

Q.   And what do we see here?

A.   Here would be a photograph of the magazine from the rifle with the ammunition inside of the magazine, with scale.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 32, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see in Government's Exhibit 32?

A.   This would be the single round of ammunition from the rifle, chambered within the rifle, up close with scale.

MS. MEDETIS-LONG:  Your Honor, permission to publish what's been previously admitted as Government's Exhibit 200-32?

THE COURT:  Granted.

MS. MEDETIS-LONG:  Your Honor, one moment.  I'm sorry.

Your Honor, permission to publish Government's Exhibit 200-23?  I apologize.  Previously admitted.

THE COURT:  Yes.  You may proceed.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be an up-close photograph of the GoPro-style camera, the zip tie, and the bungee cord that were used to affix it to the fence line, with scale.

Q.   Okay.  And this is a photograph of that camera that -- as

it has now been removed from the fence; is that correct?

A.   Yes.

Q.   Now, you mentioned this earlier, but after you photographed the items, what did you do next?

A.   Once the items were photographed up close with scale, the items then are placed into packaging.

Q.   What kind of packaging?

A.   The kind of packaging depends on the type of the evidence, but it can range anywhere from a plastic -- a plastic bag to a cardboard box or a paper bag.

Q.   And what do you do next with the evidence?

A.   The evidence is then included in our evidence item log and documented in that way.  And they are then packaged and taped up and initialed.

Q.   Did you initial the items of evidence in this case?

A.   On the tape, not necessarily.  On the evidence item labels, yes.  The packager of the evidence will often tape the evidence closed and sign it themselves.

Q.   And they will sign it on the tape?

A.   Correct.  Across the tape line.

Q.   But where do you sign it as the person collecting the evidence?

A.   I would sign on the label that is affixed to the packaging.

Q.   Okay.

        MS.  MEDETIS-LONG:  Your Honor, at this time I'm going

to show some physical items of evidence that have been previously admitted.  And I would ask the Court's permission to approach the witness to do that?

THE COURT:  Yes.  Granted.

MS. MEDETIS-LONG:  May I seek Mr. Browne's assistance to carry this to the witness?

THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   What I have just handed you, do you recognize that item?

A.   Yes, I do.

Q.   And how do you recognize it?

A.   I recognize it with my initials on the label.

Q.   And what is that item?

A.   This item would be the rifle that was collected from the scene.

Q.   And I'm going to ask you to remove that item from the box so that we can publish it again to the jury.  Would you like some gloves for that?

A.   Yes, I would, please.

MS. MEDETIS-LONG:  May I approach, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Thank you.  Remove it?

MS. MEDETIS-LONG:  (Nods head.)

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the rifle recovered from the scene.

Q.   And when it was photographed on scene, in what direction was -- where would -- where the scope would be pointing?

A.   It was flipped upside down, leaning against the fence line (indicating), and the scope would have been here (indicating).

Q.   And when you say, "here," can you describe where you're -- when you say, "here," can you describe where you're pointing for the jury.

A.   Yes.  So I'm pointing to the top of the rifle.  I will rest it here.  The scope would have been affixed in this location (indicating).

Q.   Sort of toward the middle --

A.   Yes.  Right along here (indicating).

Q.   -- of the firearm -- of the rifle?

A.   Yes.

        MS. MEDETIS-LONG:  I'm now going to show you Government's Exhibit 2, already in evidence.

        Permission to publish, Your Honor?

        THE COURT:  Granted.

        MS. MEDETIS-LONG:  May I approach, Your Honor?

        THE COURT:  Yes.

        MS. MEDETIS-LONG:  (Tendering item.)

        THE WITNESS:  Thank you.  May I remove the item?

        THE COURT:  Yes.

        THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   What have I just handed you, Special Agent Rose?

A.   This would be the magazine that was seated within the rifle.

Q.   And can you hold that up so the jury can see it.

A.   (Complies.)

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.  May I remove the items?

THE COURT:  Yes.

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   I have just handed you Government's Exhibit 4, what's been previously admitted into evidence.  What is that?

A.   This would be a single round of ammunition.

Q.   And where did that round of ammunition come from?

A.   This round would have been the round that was chambered within the rifle.

Q.   Can you hold it up so that the jury can see it, please.

A.   Yes.  (Complies.)  Would you like me to remove the ammunition?

MS. MEDETIS-LONG:  If -- if Your Honor would permit.

THE COURT:  Yes.  Any item of physical evidence that you're presenting here can be removed and displayed to the

jury.

MS. MEDETIS-LONG:  Thank you, Your Honor.

THE WITNESS:  (Indicating.)

MS. MEDETIS-LONG:  Again, permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been marked as Government's Exhibit 5, and already admitted into evidence.  What is that?

A.   This would be the scope that was affixed to the top of the rifle.

Q.   And could you hold that up so that the jury can see it, please.

A.   (Complies.)  That would have been affixed in this manner (indicating).

Q.   So just for the record, that's running lengthwise?

A.   Yes.

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been marked and previously admitted as

Government's Exhibit GX6.  There are several items there.  Can you describe what those items are.

A.   Yes.  So initially, here I see what would be the label, the Dollar General label that was used on the scope, along with metal items that are used -- that were used to affix the scope to the top of the rifle.  And this item here (indicating) would be the tape, the black tape that was used to affix the scope to the top of the rifle.

Q.   Can you hold those items up for the jury to see.

A.   Yes.

Q.   First, hold up --

THE COURT:  If you wish to -- excuse me.  If you wish to stand up --

THE WITNESS:  Sure.

THE COURT:  -- Agent, you may do so; however you would prefer to display the physical evidence.

BY MS. MEDETIS-LONG:

Q.   What are you holding up now?

A.   This would be the label, the Dollar General label that was used around the outside of the scope.

This item here would be the metal material, the metal items that were used to affix the scope to the rifle.

And this here would be the black tape that was used to affix the scope to the top of the rifle.

MS. MEDETIS-LONG:  May I approach, Your Honor?

THE COURT:  You may.

Do any of the jurors need to see anything more up close?  No.  Okay.

MS. MEDETIS-LONG:  (Indicating.)

Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Special Agent Rose, I have just handed you what's been previously admitted as Government's Exhibit 187A.  What is that?

A.   Just a moment.  Here we have the bluish-black backpack that was affixed to the fence line.

Q.   And what color is the backpack?

A.   The backpack appears to have been blue, but intentionally spray-painted with black.

Q.   Okay.

MS. MEDETIS-LONG:  Could we publish previously admitted Government's Exhibit 176, please.

BY MS. MEDETIS-LONG:

Q.   Can you circle the bag that you just held up as it's depicted in this Government's Exhibit 176.

A.   Yes.  (Complies.)

Q.   What else is in that exhibit?

A.   Also present within the exhibit is the red-in-color bungee cord that was used to affix the backpack to the fence line, along with the white zip tie that was used to affix the backpack to the fence line (indicating), and a set of keys that were within the backpack (indicating).

Q.   What else was inside the backpack?

A.   The item that was inside the backpack was the metal plate.

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering items.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's Exhibit 187B.  What is that?

A.   This would be the metal plate that was within the backpack.

Q.   And could you please remove it from its plastic covering and show it to the jury.

A.   Yes.  (Complies.)

Q.   Would you describe that as heavy or light?

A.   Very heavy.

Q.   Could you flip it around, please.

A.   (Complies.)

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's 88A.  What do you see there?

A.   This would be the bluish -- I apologize.  This would be the reddish-brown tote that was affixed to the left of the backpack.

Q.   Can you circle it on the monitor at Government's Exhibit 176.

A.   Yes.  (Complies.)  It would be this item (indicating).

Q.   Now, based on your observations of that tote, is the reddish-brown its original color?

A.   No, it is not.

Q.   What -- what does it appear has been done or happened to this tote bag?

A.   I apologize.

It appears as if the blue tote, originally blue-in-color tote, has been spray-painted with a reddish-brown paint.

Q.   And what else is part of that exhibit?

A.   Also within the exhibit is the red-in-color bungee cord.

Q.   And what was the red-in-color bungee cord doing at the crime scene?

A.   The bungee cord was used to affix and hold the tote to the fence line.

Q.   Can you circle that in Government's Exhibit 176.

A.   Yes.  It would be this item here (indicating).

Q.   What else is in there?

A.   Along with three other zip ties, two white clear-in-color and one orange zip tie.

Q.   Was there anything else inside this reddish-brown tote?

A.   Yes.  There was a plate.

Q.   Another plate?

A.   Yes.

        MS. MEDETIS-LONG:  Permission to approach, Your Honor?

        THE COURT:  Granted.

        MS. MEDETIS-LONG:  (Tendering item.)

        THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's Exhibit 188B.  What is that?

A.   This would be the plate that was within the reddish-brown spray-painted tote.

Q.   And would you characterize that as light or heavy?

A.   I would characterize it as heavy.

        MS. MEDETIS-LONG:  Permission to approach, Your Honor?

        THE COURT:  Granted.

        MS. MEDETIS-LONG:  (Tendering item.)

        THE WITNESS:  Thank you.

        MS. MEDETIS-LONG:  (Indicating.)

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's

Exhibit 200-101.  What is that?

A.   This is the GoPro-style camera that was affixed to the fence line, the outside casing of the camera, along with a micro-SD card.

Q.   Okay.  And can you circle on Government's Exhibit 176 where that camera was at the crime scene.

A.   Yes.  It would be this item here (indicating).

Q.   And just for the record, we're looking at the top left of the photograph at Government's Exhibit 176.

A.   Yes, correct.

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's Exhibit 200-100.  What is that?

A.   This would be the bungee cord and the clear white zip tie that was used to affix the GoPro-style camera to the fence line.

Q.   Okay.  Could you hold that up so that the jury can see it.

A.   (Complies.)

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

///

BY MS. MEDETIS-LONG:

Q.   I'm showing you again the GoPro-style camera, Government's Exhibit 200-101.  I apologize.  I don't know that I asked you to hold it up for the jury to see it.  Could you do that?

A.   Sure.

Q.   And I have also handed you what's been previously admitted as Government's Exhibit 200-102.  What is that?

A.   This would be the metal can and lid that were to the left of the rifle on the ground, sitting alongside the food items, on the black bag.

Q.   Could you tell what kind of food items those were?

A.   Yes, I could.

     MS. MEDETIS-LONG:  Could we publish previously admitted Government's Exhibit 200-55.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   Here we would see the metal can, present within this exhibit, the black bag, and the food items.

Q.   What are the food items?

A.   They appear to be Vienna-style sausages.

Q.   Okay.

     MS. MEDETIS-LONG:  Permission to approach the witness, Your Honor?

     THE COURT:  Granted.

///

BY MS. MEDETIS-LONG:

Q.   Now, you said that you had responded to the golf course at approximately 3:00 or 3:30 on September 15th, 2024.  Do you recall that?

A.   Yes.

Q.   Okay.  How long were you there?

A.   Over the course of three days, I was there from September 15th to September 17th.  And I believe on the first day, September 15th, we cleared the golf course area around 9:00-ish in the evening, approximately.

Q.   Was it dark out?

A.   Yes, it was.

Q.   Were photographs of the scene, meaning the golf course and the surrounding area, taken during the nighttime hours?

A.   Yes, there were photographs taken in the nighttime hours.

THE COURT:  I would like to start preparing for lunch, so please wrap up this line of questioning and find a natural stopping point around noon, which is in five minutes.

MS. MEDETIS-LONG:  Yes, Your Honor.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's Exhibit 200-28.

MS. MEDETIS-LONG:  Permission to publish, Your Honor?

THE COURT:  Granted.

///

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the area in the vicinity of the crime scene, looking downward, sideways.

Q.   Okay.  Are you looking toward the golf course in this perspective?

A.   Allow me a moment to examine the photograph.

Q.   Let me ask it a different way.  Is this sort of the entryway into the bush line?

A.   Yes, it is.

Q.   And how would you characterize the lighting at night in this area?

A.   There was very little light.  The only light present is the light from the camera.

Q.   You mean the flash from the camera?

A.   Yes.  Correct.

Q.   Okay.

     MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-30A?

     THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the area to the south of the bush and fence line across the street, looking toward the crime scene.

Q.   And how would you characterize the lighting in the

nighttime hours of this area?

A.   It was very dark.

Q.   And what is the light source that we see here?

A.   This is either a light source from the camera, the flash, or it could be spotlights that were brought in so that the team could see.

Q.   Who brought in the spotlights?

A.   I don't recall.  I believe it was a local partner.

Q.   Okay.  Law enforcement?

A.   Yes.

Q.   Okay.

        MS. MEDETIS-LONG:  Government's Exhibit 200-30B, already in evidence, permission to publish, Your Honor?

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This would be the area between the tree line and the bush line, looking south, across the street.

Q.   And how would you characterize the lighting?

A.   Very dark, with the exception of a few streetlights across the street and the light being provided by the flash.

        MS. MEDETIS-LONG:  Your Honor, permission to approach the witness?

        THE COURT:  Granted.

        MS. MEDETIS-LONG:  (Tendering item.)

BY MS. MEDETIS-LONG:

Q.   Special Agent Rose, please don't hold that up.  If you could just look at that, and look up when you are done.

I have handed you what's been marked for identification purposes, not-yet-admitted Government's Exhibit 200-98.

Have you reviewed that item?

A.   Yes, I have.

Q.   Do you recognize that item?

A.   I recognize it as a black clamp.

Q.   Well, don't tell us what it is yet.  How do you recognize it?

A.   Oh, I apologize.  My initials on the -- on the label.

Q.   Okay.  And is this an item that was seized from the crime scene on September 15, 2024?

A.   It was seized on September 16th, the very next day, but, yes, from the crime scene over the course of the three days.

Q.   Over the course of the three days while you were there conducting your ERT function?

A.   Yes.

Q.   Okay.  Is it in substantially the same condition as when you seized it on that day?

A.   Yes.

MS. MEDETIS-LONG:  Your Honor, at this time the government would seek to admit Government's Exhibit 200-98.

THE COURT:  Any objection?

MR. ROUTH:  I don't know what it is, but no objection.

THE COURT:  Well, no.

Ladies and gentlemen, this would be a good time to break so I can discuss this issue further with the parties. Lunch has been ordered for you, as we did yesterday, so that will allow you to stay in the courthouse.

Again, please continue to abide by all of the instructions regarding no discussion, no investigation, and no reaching of any conclusions certainly.

I also wish to supplement some instructions that I gave you earlier today.

As I indicated, you have heard witnesses refer to the term "attempted assassination," and as I said, the defendant is charged in Count 1 with that offense.  You, as the jurors, are, of course, here to determine whether the government has met its burden of proof on Count 1 or on any of the other specific counts that are alleged in the indictment.  And so the fact that a question or an answer might have referenced or used the term "attempted assassination" should in no way be taken by you as a conclusion or a finding on any count alleged in the indictment.

Again, whether the government has met its burden of proof on any specific count in the indictment is your duty as jurors as the judges of the facts to decide.

Now, similarly, ladies and gentlemen, to the extent any

questions or answers have used the term "crime" or "crime scene," the same rule applies.  You should not construe those references and -- as in any way taking from you the factual decision whether the government has met its burden of proof on any specific alleged offense.

Again, you are the judges of the facts based on the law that I will present to you at the conclusion of this case.

So with all of that, let's rise for the jury.  We will be in lunch for one hour -- one more thing, sorry -- for one hour and 15 minutes today, which means that we will resume at 1:15.

All rise for the jury.

And, ma'am, please do not discuss the substance of your testimony over the break.

THE WITNESS:  Uh-huh.

(The jury exited the courtroom at 12:04 p.m.)

THE COURT:  Please have a seat.  And return to the courtroom at 1:10.  1:10.  That will give us just a couple of minutes in case any issues have arisen over the break.

I do want to say, because of the pace of the witnesses, I assume the government is making efforts to bring witnesses for the duration of the trial day, Ms. Medetis-Long?

MS. MEDETIS-LONG:  We are, Your Honor.

THE COURT:  Okay.

MS. MEDETIS-LONG:  We are making our best efforts,

absolutely.

THE COURT:  Okay.  Excellent.  Thank you.  Enjoy your lunch.

(A recess was taken from 12:06 p.m. to 1:17 p.m.)

THE COURT:  All right.  Thank you.  You may all be seated.  Okay.  We should address that last exhibit that wasn't finalized before lunch.  That is 200-98.  I think the witness described it as a clamp of sorts.

What is it, Ms. Medetis-Long?

MS. MEDETIS-LONG:  Your Honor, it's a black clamp that was found in the wooded area where the other items of evidence were found on September 16, 2024.

THE COURT:  Okay.  So the question to you, Mr. Routh, is, do you have an objection to admission of this exhibit?

MR. ROUTH:  Yes.  This is the first that I have ever seen of it.  I have never been provided a photo until just a little while ago.  It was not in the evidence, so -- so yes, I don't know where this was located or anything about this item.  So I do object.

THE COURT:  Well, hold on one moment.  Do you have a copy of the exhibit list that was provided to you --

MR. ROUTH:  Yes, there is a list.

THE COURT:  -- with all -- okay.  So if you go to the spot where it would say 200-98, what does it say?

MR. ROUTH:  Well, I'm just saying I don't --

THE COURT:  No.  Let's just -- one at a time.

What does the description say on the exhibit list?

MR. ROUTH:  I go to page 33.  Apparently, it's on page 34?

THE COURT:  This is -- this is -- just look for 200-98.

MR. ROUTH:  I'm saying I don't have it.  I don't have that, ma'am.

THE COURT:  Well, you have a copy of the exhibit list because that has been given to you.  So I'm just looking at the exhibit list.

MR. ROUTH:  Exactly.  I'm saying I go through page 33, which ends at 241.

THE COURT:  All right.  Ms. Militello, if you could please show Mr. Routh the excerpt from the exhibit list that I'm referring to.

MS. MILITELLO:  I'm sorry.  Could the Court -- it's 200- --

THE COURT:  98.

MR. ROUTH:  98.

MS. SIHVOLA:  Your Honor, may I approach?

THE COURT:  You may.

MS. SIHVOLA:  Thank you.

THE COURT:  All of these items were provided to you, Mr. Routh, and perhaps you've moved them around.  But this is the government's exhibit list, and it has been made available

to you now for some time.  And I'm just asking you to draw your attention to 200-98.

MR. ROUTH:  Right.  It says -- it says "black clamp found in hide."

THE COURT:  Okay.  So this item was disclosed as an exhibit.

MR. ROUTH:  Right.

THE COURT:  And what the government has represented is that this is one of many pieces of physical evidence that were recovered in this case and that were available for review and inspection by your attorneys and by you as an overall matter when you elected to proceed pro se.  So I'm not sure what the basis of your current objection is, which is that -- I think you're saying you've -- you've never been advised of this item.

MR. ROUTH:  Well, I was never provided a picture of this item.  So there was not a picture of this item.  There were many files that were missing from the box that they provided.  So I have never -- until today was able to see actually what the item entailed.  So -- but you can proceed.  I don't -- I don't care.

THE COURT:  Well, no.  Let's handle this appropriately.

Ms. Medetis-Long, what is the government's position on this exhibit and its availability for review by Mr. Routh?

MS. MEDETIS-LONG:  Yes, Your Honor.  I would note that while Ms. Militello and Ms. Sihvola were on this case, they

went to FBI in Miami and reviewed all of the physical evidence in this case.  I don't know, in particular, what they reviewed, but all of it was made available.  I would also note that at the break that we just took at around noon, Ms. Sihvola asked me if she could show the item of evidence at 200-98 so that Mr. Routh could inspect it.  We accommodated that request.  And my understanding is that he did inspect it.

THE COURT:  Okay.  Are there any photographs of this particular exhibit?

MS. MEDETIS-LONG:  Your Honor, with respect to the box of printed items that we provided both to the Court, Mr. Routh, and standby counsel, those were only paper copy exhibits.  If it was a physical item of exhibit, there was not a photograph provided.

THE COURT:  Of course.  But some of the physical exhibits are reflected in photos.  And my question is, is there a photograph that shows the clamp?

MS. MEDETIS-LONG:  Your Honor, I would have to go back and check the discovery to confirm.  I know that ERT and PBSO photographed every single piece of evidence that was recovered and that those photographs in total were provided during discovery.  But to pinpoint that particular photo, I would have to go back into our discovery responses to confirm the Bates number.

THE COURT:  Okay.  All right.

All right.  Based on all of this, Mr. Routh, if you have a legal objection to make to this exhibit, then now would be the time to make it.  Ultimately, I have to make a ruling.  And if you want to cross-examine this witness about the source of the exhibit or anything else related to her observations or knowledge about it, you're welcome to do that.  But I just need to determine, do you have a valid objection to admission of Government's 200-98?

MR. ROUTH:  I thought I had already made my valid objection, but...

THE COURT:  Which is?

MR. ROUTH:  It -- it doesn't -- I -- I don't object.  I don't object.  I don't object.

THE COURT:  I want to make sure, sir, that you don't just abandon any objection that you might have because you just get tired of presenting your position.  I am here to hear you out.  So do you have an objection and, if so, what is it?

MR. ROUTH:  Well, we -- we had a whole hearing one day where we went through all of these items, and this item was not one of those items, where we all discussed every item, and -- and you asked me which ones I wanted to exclude, and we talked about four or five or six, and this was not any part of that discussion.  So this is like something out of left field, so...

THE COURT:  Okay.  I think you may be referring to the calendar call when we did a pre-admission of a lot of exhibits.

Those were exhibits that the government had marked as suitable for pre-admission.  But certainly there were many other exhibits that didn't get moved into evidence at that time, and this is one of those.  So the fact that it didn't get discussed at calendar call doesn't make this a new exhibit, because, again, it's been on the exhibit list.

Ms. Militello, can you speak to whether this item was made available to you and Ms. Sihvola during the discovery stages of this proceeding.

MS. MILITELLO:  I believe that it was and that there is photos of broad collections with a number of the cones where the item was.  I don't recall off the top of my head if -- as Ms. Medetis-Long said, if there is an individual photo of just this item.  But there are photos of this item in conjunction with other items.

THE COURT:  But as far as the physical items, when they were made available for inspection, do you have any reason to believe that the clamp was not among all of those items?

MS. MILITELLO:  The FBI made available all of the items that we requested to view.  I don't know that the clamp was an item we requested to view.  But they did accommodate us, and we spent all day at the FBI office reviewing everything requested.

THE COURT:  Okay.  And you would -- you would acknowledge that this is listed on the exhibit list; correct?

MS. MILITELLO:  Yes.

THE COURT:  Okay.  All right.  Well, I see no basis to -- to grant the defendant's objection, which appears to be something in the order of he isn't aware of this item, based on everything that's been discussed.

But, again, Mr. Routh, if you want to cross-examine this witness about this item, or where it was found or anything associated with it, then you're welcome to do that.  But for admission purposes alone, I do believe 200-98 should be admitted over the defendant's unclear objection.  So that's the Court's ruling.

(Government Exhibit 200-98 was received in evidence.)

MS. MEDETIS-LONG:  Your Honor, if I may supplement the record on this point.  On the September 2nd calendar call, this particular item of evidence was specifically raised, and Mr. Routh did specifically object to it.  So this is not a surprise to him.

THE COURT:  Okay.  Well, that's, okay, another -- another data point.

All right.  I did want to raise one other thing before we invite the jury in.  Because of the pace of the trial, I just want to see if we can talk about timing for any defense witnesses.  I had marked the date of September 23rd, thinking that would be early enough.

Does the government have any sense, with this current pace that we're keeping, how long it might need to finish its

case in chief?

MR. SHIPLEY:  At this point, Your Honor, we tried at lunch to go through in a responsible and good faith way.  I think we're looking at the 18th or the 19th to rest.  That would be next Thursday or Friday.

THE COURT:  Okay.  All right.  Ms. Militello, for Mr. McClay, could you make arrangements to have him available starting on the 19th, or at the very least, the 22nd.

MS. MILITELLO:  Yes.  We will have to, of course, issue a new subpoena.  And I -- I think there is time for his work to accommodate that.  But we will do our best.  We did bring blank subpoenas so we could have them available with whatever date the Court instructs.

THE COURT:  Okay.  All right.  I think it would be prudent to go ahead and direct you to reissue a subpoena to Mr. McClay with a date of -- Mr. Shipley, do you have a view as between the 19th and the 22nd?

MR. SHIPLEY:  I -- I -- there's a lot of unpredictability, Judge.  So with that -- with that caveat, my guess would be we will finish on Thursday the 18th, but there is a lot of unpredictability.  So --

THE COURT:  Okay.

MR. SHIPLEY:  -- I'm not trying to be coy.  I'm just thinking ahead realistically, given the cross-examinations, given the way, I think, we're adjusting our case based on the

circumstances, and to accommodate the jury, I think any defense witness should be ready on the 19th.

THE COURT:  Okay.  All right.  So, Ms. Militello, please readjust that for Mr. McClay on the 19th.  I do believe Mr. Oran Routh is in the district or very close to being in the district.  So he would be another defense witness to be available for the 19th if necessary.  And then for the additional witnesses, Mr. Zuniga and Hinshaw, I believe, I'll request that, Ms. Militello, you adjust those subpoenas and make them available to the marshals with a date of September 22nd.  Any questions about that, Ms. Militello?

MS. MILITELLO:  Your Honor, if it's acceptable, since Mr. Routh may choose to call them in a different order, we would suggest we just have subpoenas for everyone on the 19th. That way they are under subpoena and under court order to be here, and then Mr. Routh can make any decisions --

THE COURT:  Okay.  That's -- that's reasonable.

Then the new date is the 19th, and we will go with that date.

And, Mr. Routh, whatever order you decide to call your witnesses in, we will go with that, but at least this way, there is a higher likelihood that they will be in the district for you to call them.

Okay.  All right, then.  Anything further before we call in the jury?

MS. MEDETIS-LONG:  Not from the government, Your Honor.

THE COURT:  Mr. Routh.

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Then let's call in the jury.  Thank you, Officer.

(The jury entered the courtroom at 1:30 p.m.)

THE COURT:  Please be seated.  Thank you.  Everybody is present.  I hope you had a nice lunch, ladies and gentlemen.

We will continue with the examination of the last witness.  So please -- please bring Agent Rose in.

MS. MEDETIS-LONG:  Yes, Your Honor.

THE COURT:  Good afternoon.  You remain under oath.

THE WITNESS:  Thank you.

MS. MEDETIS-LONG:  May I proceed?

THE COURT:  Yes.

MS. MEDETIS-LONG:  Thank you, Your Honor.

BY MS. MEDETIS-LONG:

Q.  Good afternoon, Agent Rose.

A.  Good afternoon.

Q.  We left off with Government's Exhibit 200-98.  Do you recall inspecting that?

A.  Yes, I do.

MS. MEDETIS-LONG:  Your Honor, permission -- we would move at this time to admit that into evidence.

THE COURT:  Granted.  200-98 is admitted over the

defendant's objection.

(Government Exhibit 200-98 was received in evidence, jury present.)

MS. MEDETIS-LONG: Your Honor, permission to approach the witness?

THE COURT: Granted.

MS. MEDETIS-LONG: (Tendering item.)

THE WITNESS: Thank you.

BY MS. MEDETIS-LONG:

Q. Special Agent Rose, what is that item that I have handed you as Government's 200-98?

A. It is a black clamp.

Q. And where was that seized from?

A. It was seized from the location of the crime scene.

Q. Okay. Now, you are talking about the scene where you found the rifle and the metal plates and the bags and the AKASO camera?

A. Yes. Generally described as the crime scene in general. More specific, I would need to refresh my memory.

Q. So was that in the wooded area that you went into?

A. Yes.

Q. Okay.

A. Yes.

Q. And you mentioned that there is something that would refresh your recollection?

A.   Yes.  Our Evidence Response Team report.

MS. MEDETIS-LONG:  Your Honor, may I approach the witness?

THE COURT:  Yes.

MS. MEDETIS-LONG:  (Tendering item.)

THE WITNESS:  Thank you.

BY MS. MEDETIS-LONG:

Q.   Special Agent Rose, please read that to yourself and look up when you are done.

A.   Okay.  Thank you.

Q.   I see that you have looked up.  Are you done reviewing that report?

A.   Yes, I am.

Q.   And is your memory refreshed?

A.   Yes, it is.

Q.   And where did you find that black clamp?

A.   It would be within the tree line -- I'm sorry, within the bush line where the other evidence was around the area specific to the rifle, the totes, the additional items on the ground.

Q.   And could you hold that item up so that the jury can see it?

A.   Yes.  I will stand.  (Complies.)

MS. MEDETIS-LONG:  Permission to approach, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  Your Honor, at this time the

government would tender the witness.

THE COURT:  Thank you.

Cross-examination.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Just in general terms, the way the scope was attached, is that like the normal way a scope is attached to a weapon?

A.   I would not have any knowledge of how to attach a scope to a weapon.

Q.   No knowledge at all?

A.   No.

Q.   With the FBI?

A.   No.

Q.   Okay.  All righty, then.  So who took off the scope?

A.   I don't know.

Q.   So in the photos it looks like there's a mass of black tape hanging from the scope.  Is that -- am I viewing that properly?

A.   May I review the photo in particular?

Q.   Possibly -- I don't have it.  So...

A.   Okay.

Q.   If you're asking me, I don't have a copy of it.  But, you know --

THE COURT:  Ladies and gentlemen, the items of exhibits

that have been presented to you have been made available.

Ms. Medetis-Long, do you know the exhibit number that might reflect the tape or other items being referenced by Mr. Routh?

MS. MEDETIS-LONG:  If I may have just one moment, Your Honor.

THE COURT:  Yes.

MS. MEDETIS-LONG:  That would be Government's Exhibit 26, I believe.

THE COURT:  Okay.

MS. MEDETIS-LONG:  Would you like us to pull it up?

THE COURT:  Yes.

Okay.  There is the photograph, Mr. Routh.  You see it there --

MR. ROUTH:  Certainly.

THE COURT:  -- on the screen?

Okay.  Please proceed, Mr. Routh.

BY MR. ROUTH:

Q.   But in my perception, that doesn't look normal to me as far as the fastening of a scope to a firearm.  Does that look normal to you?

A.   I'm not a firearms expert, so I would not be in a position to make a comment on that.

Q.   But dangling tape from a firearm is not normal?

A.   Again, I'm not a firearms expert, so I wouldn't be in a

position to make a comment on that.

Q.   Okay.  All right.  Seems like we get nowhere.

MR. ROUTH:  All right.  Thank you for your useful testimony.

THE WITNESS:  Thank you, sir.

THE COURT:  Any redirect?

MS. MEDETIS-LONG:  Nothing, Your Honor.

THE COURT:  All right.  Thank you, Agent.

THE WITNESS:  Thank you.

THE COURT:  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Please call your next witness.

MS. MEDETIS-LONG:  Your Honor, at this time the United States would call Special Agent Jose Loureiro.

THE COURT:  Good afternoon, sir.  Please walk over here.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  First name is Jose, J-O-S-E.  Last name

is Loureiro, L-O-U-R-E-I-R-O.

                    SPECIAL AGENT JOSE LOUREIRO,

having been sworn, testified as follows:

                    DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Where do you work?

A.    Federal Bureau of Investigation, Miami field office.

Q.    What's your title?

A.    Special agent.

Q.    And what are your duties and responsibilities as a special agent?

A.    To investigate violations of federal law, collect evidence, and serve -- and other -- many other duties --

Q.    And --

A.    -- including, well, the collection of evidence.

Q.    And how long have you been a special agent?  When did you start?

A.    I started in May 2004, so a little over 21 years.

Q.    Now, let's talk about some of your other duties other than investigating crimes.  What do those include?

A.    Well, it includes -- I'm also part of the Evidence Response Team.

Q.    Is that ERT for short?

A.    Yes, it is.

Q.    And when did you start with the Evidence Response Team?

A.    In or around 2009.

Q.    And did you receive training to become part of the Evidence Response Team?

A.    Yes, I did.

Q.    And as part of the Evidence Response Team, do you have any other additional functions or duties and responsibilities outside of collecting evidence?

A.    In relation or outside of ERT?

Q.    In relation to ERT.

A.    I am also a certified adjunct faculty instructor for ERT.

Q.    And where do you teach?

A.    I have taught here domestically to some partners in the military, and outside of the United States internationally to the law enforcement partners or equivalence outside of the United States.

Q.    Okay.  I want to direct your attention to September 15th, 2024.

A.    Yes.

Q.    Did you respond to the Trump International Golf Course that day?

A.    Yes, I did.

Q.    What time of day was it?

A.    It was early afternoon.  Early to midafternoon.

Q.   Okay.  And did you respond in your capacity as ERT?

A.   Yes, I did.

Q.   And was there anybody from FBI's ERT that was already there when you -- when you arrived?

A.   I know Kate Rose -- or Captain Rose, special agent, was there.  And by the time I arrived, I think there was a few others as well.

Q.   Okay.  And when you responded to the golf club, did you go to the golf course?

A.   Yeah.  Yes, I did.

Q.   And what part of the golf course did you respond to?

A.   On Summit Boulevard.  So it would have been the south end of -- or the south side of the golf course.

Q.   And then did you ever make it to -- on the golf course proper?

A.   Not on that day.

Q.   Okay.  On what day did you make it to --

A.   Well, actually, I stand corrected.  I did, but not to the area of the fence.

Q.   Okay.

A.   On the north side, at least.

Q.   Okay.

        MS. MEDETIS-LONG:  Your Honor, may we --

BY MS. MEDETIS-LONG:

Q.   Well, did there come a time where you came upon any

evidence or items of interest on the golf course?

A. Yes.

Q. And when was that?

A. That would have been the following day, on the 16th, when we started processing the north side of the -- of the -- formally processing the north side of the fence.

Q. Okay. And when you say "the north side of the fence," are you referring to the perimeter fence along Summit Boulevard?

A. Yeah. So the location of the -- of where the shooting would have happened -- or where the shooting happened was in close proximity to the southeast portion of the golf course, that perimeter fence along Summit Boulevard where it runs west and east at that point, close to and west of South Congress Avenue.

Q. Okay.

MS. MEDETIS-LONG: At this time, Your Honor, I would ask that the witness only be shown Government's Exhibit 200-39.

THE COURT: Yes. That's permissible. Just the witness.

BY MS. MEDETIS-LONG:

Q. Do you see 200-39 on your monitor?

A. No, I do not.

COURTROOM DEPUTY: Do you see anything?

THE WITNESS: No, nothing yet.

///

BY MS. MEDETIS-LONG:

Q.   Do you recognize that?

A.   Yes, I do.

Q.   Does that photograph fairly and accurately depict what you saw on September 16th, 2024, when you processed the north side of the golf course?

A.   Yes.

MS. MEDETIS-LONG:  Your Honor, at this time, I would seek to admit into evidence 200-39.

THE COURT:  Any objection?

MR. ROUTH:  No objection.

THE COURT:  200-39 will be admitted without objection.

(Government Exhibit 200-39 was received in evidence.)

MS. MEDETIS-LONG:  If I could show the witness only Government's Exhibit 200-46.

THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   Do you see that, Special Agent Loureiro?

A.   Yes, I do.

Q.   And do you recognize that?

A.   Yes.

Q.   And does that fairly and accurately depict what you saw on the north side of the golf course that day?

A.   Yes.

MS. MEDETIS-LONG:  Your Honor, at this time the

United States would seek to admit Government's Exhibit 200-46.

THE COURT: Any objection, Mr. Routh? Mr. Routh.

MR. ROUTH: No objection.

THE COURT: All right. Government's 200-46 will be admitted without objection.

(Government Exhibit 200-46 was received in evidence.)

MS. MEDETIS-LONG: If we could show the witness only Government's Exhibit 200-60.

THE COURT: Yes.

BY MS. MEDETIS-LONG:

Q. Sir, do you see 200-60 on your screen?

A. Yes, I do.

Q. And does that fairly and accurately depict the subject matter as you saw it on the north side of the fence at the Trump International Golf Club on September 16, 2024?

A. Yes.

MS. MEDETIS-LONG: At this time, Your Honor, we would seek to admit or move to admit Government's Exhibit 200-60.

THE COURT: Any objection, Mr. Routh?

MR. ROUTH: No objection.

THE COURT: Okay. 200-60 will be admitted without objection.

(Government Exhibit 200-60 was received in evidence.)

MS. MEDETIS-LONG: And if we could show the witness 200-63.

THE COURT:  My records show that that was already pre-admitted, but I could be mistaken.

MS. MEDETIS-LONG:  Your Honor, let me double-check that.  I apologize.  I do have that as previously admitted.  Thank you, Your Honor.  My apologies.

THE COURT:  Okay.  That's fine.

MS. MEDETIS-LONG:  Now, if we could publish Government's Exhibit 200-1A, previously admitted, to both the witness and the jury.

BY MS. MEDETIS-LONG:

Q.   Showing you what's been previously admitted as Government's Exhibit 200-1A.  What does this show you?

A.   This shows the golf course.  The area of the golf course is the southeastern portion of it, which shows Summit Boulevard and south Congress Avenue to -- to the far right of my screen.

Q.   And is this the area that you responded to, or the general vicinity of where you responded to on September 15th and 16th?

A.   Yes.

Q.   Okay.  Now, I'm circling the center of the photograph. Which hole of the golf course is that?

A.   That is Hole 6.

MS. MEDETIS-LONG:  If we could publish what's been now admitted as Government's Exhibit 200-63 to the jury and to the witness.

///

BY MS. MEDETIS-LONG:

Q.   What do we see there?

A.   That is a photo taken from the service trail area, if you will, on the north side of the fence facing the area where other items of evidence were found.

Q.   Okay.  And is this what your perspective was when you were on the north side of the fence?

A.   Correct.

Q.   And is there anything particular about the vegetation that stands out to you in this particular photograph?

A.   There is like a clearing in that vegetation, if you can see, just like in the center.  I'm not sure if I'm able to draw on this.

Q.   You can.

        MS. MEDETIS-LONG:  And for the record, the witness --

        THE WITNESS:  There is kind of an opening in that general area, but in there (indicating).

        MS. MEDETIS-LONG:  If I may, the witness, for the record, has circled the center of the photograph.

BY MS. MEDETIS-LONG:

Q.   And what did you circle there, sir?  What does that show?

A.   Kind of just like an opening there within the vegetation.

        MS. MEDETIS-LONG:  If we could publish, Your Honor, Government's Exhibit 200-57D, previously admitted.

        THE COURT:  Yes.

BY MS. MEDETIS-LONG:

Q.   What do we see there?

A.   We see -- this is a perspective from the north side of the fence facing towards the south side of the fence; obviously, the fence there in the middle.  And then we have -- I believe that was the AKASO camera and two bags that were -- that I later learned were -- around the time I learned contained some plates or some sorts of similar items.

Q.   What is this item that I'm circling here?

A.   That is the muzzle of a firearm --

Q.   Okay.

A.   -- of a rifle.

        MS. MEDETIS-LONG:  And, Ms. Luce, if we could zoom into this area here (indicating).

        THE WITNESS:  That is a camera.

BY MS. MEDETIS-LONG:

Q.   And what is behind the camera?

A.   Trees.

Q.   And behind that?

A.   Vegetation.

Q.   This right here (indicating), can you tell?

A.   Yes.  It's a vehicle.

Q.   Okay.  Showing you what's been previously admitted as Government's Exhibit 200-47.

        MS. MEDETIS-LONG:  Permission to publish, Your Honor.

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here?

A.    This is along the north side of the fence.  Looking to the right where you see the heavy green vegetation is where the fence is posted, if you will.  This is a service area or the service trail that goes from -- from the position of the -- where the photograph was taken, that is facing west.  So going from east to west.  And on the right side out of the -- of the image is where Hole 6 -- or the putting green of Hole 6 was located.

MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 200-33, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here?

A.    This is a perspective from the other side, from the west end or the western part, facing east towards Congress Avenue.

Q.    And so what would be on the right side of this photograph?

A.    The fence.

Q.    And what would be on the left side of the photograph?

A.    Hole 6.

Q.    Okay.  And what do we see here with these orange cones that I have circled on the right side of the photograph, lower right side?

A.   Well, aside from the orange cones is basically that open area that I showed earlier from a different perspective.

MS. MEDETIS-LONG:  Permission to publish Government's Exhibit 200-35, already admitted into evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is a perspective shot, if you will, from the fence, from that open area in the fence facing towards Hole 6, and some of the vegetation in between the service trail area and Hole 6.

Q.   And did you -- did you get to witness this perspective firsthand?

A.   Yes.

Q.   And is this a fair and accurate depiction of what you saw firsthand on September 16th?

A.   Yes.

MS. MEDETIS-LONG:  Your Honor, permission to publish Government's Exhibit 200-36, already in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here?

A.   This is also facing from south to north.  It's a -- basically, an opening in that vegetation facing Hole 6. So beyond the -- beyond the vegetation there and that red tape,

you see Hole 6 and the flag for the Hole 6.  And that is the putting green there in that area.

Q.   And could you circle where you said we saw the flag on this photograph.

A.   Yes.  (Complies.)

Q.   Okay.

MS. MEDETIS-LONG:  And that is toward the right side of the photograph, for the record.

If we could show just the witness Government's Exhibit 200-60.

Your Honor, permission to publish what's now been admitted as 200-60?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see in this photograph, sir?

A.   A -- so at the bottom, or more towards the bottom of the photograph is the blue flashlight.  And then the open -- pretty much directly above is that open space again.

Q.   Can you circle what you're calling the blue flashlight.

A.   Actually, I -- I stand corrected.  It's the blue flashlight, and just around that area is the hole.  But I don't believe that's the hole itself there --

Q.   Okay.

A.   -- or that area.

Q.   So when you say "the hole," you mean the area where other

items of evidence were found?

A.   Yes.   The opening.   Excuse me.

Q.   Okay.   Can you circle the flashlight.

A.   Yes.   (Complies.)

Q.   And what side of the fence is this on?   The north side, on the golf course side?   Or on the other side where the other items of evidence were found?

A.   This is on the north side.   And if I were taking -- me taking this photograph or whatever, just giving you that perspective -- you're facing the south towards the fence.   And behind this photograph or in the eyesight of the person who took the photograph is -- is the putting green, or the Hole 6.

MS. MEDETIS-LONG:   Your Honor, permission to publish what's been admitted as 200-39, Government's Exhibit?

THE COURT:   Granted.

BY MS. MEDETIS-LONG:

Q.   What do we see here, sir?

A.   Again, the flashlight.

Q.   Could you circle it for us.

A.   Yes.   (Complies.)

Q.   And what is that "26" next to it?

A.   That was an evidence item number that we designated for that flashlight when we initially spotted it.

MS. MEDETIS-LONG:   Your Honor, permission to publish Government's Exhibit 200-46, now in evidence?

THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.    What do we see here, sir?

A.    It's the flashlight.  Again, "harborfreight.com" -- or bearing "harborfreight.com" with the -- with the designated Evidence Item Number 26.

Q.    And what color is that again?

A.    Blue.

Q.    Now, in addition to performing functions on the golf course, did you perform other functions as part of the investigation on September 15th and 16th?

A.    Yes.  On September 15th, I did a few other things.  I was tasked to collecting the firearm from United States Secret Service Special Agent Robert Fercano, and the ammunition that was on his person.  I was also tasked to go photograph the defendant's person and his clothing while he was in custody at the Palm Beach Sheriff's Office facility located adjacent to and north of the golf course, and --

Q.    And --

A.    -- eventually, the vehicle.

Q.    Okay.  We will get to those in a second.  Let's take this step by step.

      Let's start with your -- it's September 15, 2024, and you respond to the Palm Beach County jail which is near the golf course, you said?

A.   Yes.

Q.   Okay.

     MS. MEDETIS-LONG:  If we could show the witness only Government's Exhibit 200-73, Government's Exhibit 200-74.

BY MS. MEDETIS-LONG:

Q.   Did you see 200-73 and -74?

A.   Yes, I did.

Q.   200-75A, 200-75B --

A.   Yes.

Q.   -- and 200-77.

A.   Yes.

Q.   Now, those photographs, are they a fair and accurate depiction of what you saw and photographed when you went on September 15, 2024, to the Palm Beach County jail?

A.   Yes.  With the exception of 277, I didn't take that photograph.

Q.   You did not take this photograph?

A.   Right.

Q.   Okay.  But is it a fair and accurate depiction of what you saw when you encountered the defendant that day?

A.   Yes.

Q.   Okay.

     MS. MEDETIS-LONG:  Your Honor, at this time we would move to admit Government's Exhibit 200-73, 200-74, 200-75A, 200-75B, and 200-77 into evidence.

THE COURT:  Okay.  I believe 200-73 was already admitted yesterday.  Please --

MS. MEDETIS-LONG:  Yes, Your Honor, that is correct.

THE COURT:  Okay.  So 200-73 is already in evidence without objection.  Let me inquire of Mr. Routh.

Do you have any objection, sir, to admission of Government's 200-74, 200-75A and B, and 200-77?

MR. ROUTH:  No objection.

THE COURT:  Okay.  Those exhibits will be admitted without objection.

(Government Exhibits 200-74, 200-75A, 200-75B, and 200-77 were received in evidence.)

MS. MEDETIS-LONG:  Permission to publish those exhibits, Your Honor?

THE COURT:  Granted.

MS. MEDETIS-LONG:  Can we start, Ms. Luce, with Government's Exhibit 200-73.

BY MS. MEDETIS-LONG:

Q.   What do we see there?

A.   That was a photograph I took of Mr. Routh, the defendant.

Q.   And what is he wearing?

A.   He is wearing a -- kind of semi-long-sleeve shirt, or long-sleeve shirt, dark green pants, some camouflage leggings or something underneath the pants, and the black socks.

MS. MEDETIS-LONG:  Could we look at 200-74, Ms. Luce.

BY MS. MEDETIS-LONG:

Q.   What do we see there?

A.   A close-up of some of the clothing that I have already discussed.  But the pants, the leggings, and the socks.

Q.   Is this the defendant's ankle area?

A.   Yes.

Q.   Showing you 200-75A, please.  What do we see there?

A.   A different perspective on the side.  And also on the pants, you see a red stain, if you will.

Q.   And Government's Exhibit --

A.   A reddish stain.

Q.   I'm sorry?

A.   A reddish stain.

Q.   A reddish stain.

     And showing you Government's Exhibit 200-75B.

A.   That is the close-up of the reddish stain.

Q.   And what side of the pant leg -- which pant leg is it, the right or the left?

A.   Left.

Q.   And this color stain, is that reminiscent of anything?

A.   It's consistent with the same type of reddish paint or substance that was on some of the articles of what became evidence from the area of the hole, if you will, at the fence.

          MS. MEDETIS-LONG:  Ms. Luce, if we could publish what's been already admitted as Government's Exhibit 180.

BY MS. MEDETIS-LONG:

Q.   What item are you referring to?

A.   I would say mostly the item -- if I could circle it --

Q.   Of course.

A.   -- it would be easier.

     (Indicating.)  This item right here that is mostly red.

Q.   Is that item a bag that you circled?

A.   Yes, it appears to be one.

Q.   And is it to the left or to the right of the -- of the firearm that's depicted in that exhibit?

A.   It's to the left of the firearm.

Q.   Okay.

     MS. MEDETIS-LONG:  Could we do a side by side with 180 and 200-75B.

BY MS. MEDETIS-LONG:

Q.   Now, you said also on that day you met with Special Agent of the United States Secret Service Robert Fercano; correct?

A.   Yes, I did.

Q.   And what did you do when you met with him?

A.   When I met with him, I photographed his person, and I photographed the weapon and ammunitions that he used that day, which was a Glock 19.

Q.   And what did you do with those items after you took custody of them?

A.   Once we took custody of them, we took it over to our

command post, the ERT command post.

Q.   Okay.

A.   That was in the vicinity of Summit Boulevard.

Q.   Okay.  Now, you mentioned something about you did something with the -- with a vehicle on September 15, 2024.  Can you detail what you did with a vehicle.  What vehicle was it?

A.   It was a Nissan Xterra, dark-colored.  I believe it was black.

Q.   And who did the vehicle belong to?

A.   It was my understanding that the vehicle belonged to the defendant, Ryan Routh.

Q.   Okay.  And was that vehicle seized by the FBI as part of the investigation?

A.   Yes.

Q.   Okay.  And what did you do in relation to that vehicle?

A.   I was part of a few others from ERT that we went and just accepted custody of the vehicle from the CSI unit of Palm Beach Sheriff's Office, and then we transported that vehicle via tow truck to our facility at the Miami main office.

Q.   Did you inspect the vehicle before you took custody of it?

A.   Not -- we didn't do a search of the vehicle, but --

Q.   The outside of it.  Did you inspect the outside of it?

A.   Yes, we did.

Q.   Did it contain evidence tape anywhere?

A.   Yes.  Basically anything that could open -- the doors, the

back hatch, and the hood -- were all sealed with red evidence tape.

Q. And did it appear that any of those seals were broken when you inspected it?

A. No, they were not.

Q. Okay. You said you took custody of the vehicle. How did you do that?

A. Once we arrived there to -- to the facility for Palm Beach Sheriff's, we called a tow truck. The tow truck loaded it on. We photographed the vehicle to show the state it was in when we accepted custody of it, and then we transported it over via the tow truck to our main office in Miramar.

Q. And when you say "our main office," do you mean FBI?

A. Yes.

Q. And where were you while the Nissan Xterra was being towed by the tow truck?

A. We were in a bureau vehicle and we were following it, me and some others. We followed it, and we maintained eye -- constant eye on it.

Q. Did you lose -- did you lose track of the vehicle or sight of the vehicle at any time between West Palm Beach PBSO evidence facility to when you got to FBI in Miramar?

A. No, we did not.

Q. And --

A. There was no route deviations, nothing -- went -- went

straight to the office.

Q.   No route deviations you said?

A.   Yeah, nothing -- we just went directly to -- to the office.

Q.   And no stops were made?

A.   No.

Q.   Okay.  And what happened with the vehicle when it got to the FBI office in Miramar?

A.   We placed it in our -- over at our office.  In our ERT facility, we have basically a -- a garage, if you will, where we process vehicles, which we can actually just close up and seal.  And you need like a keypad and everything to get in or a code to get in.  And we left it there as evidence to be processed by another team within ERT.

        MS. MEDETIS-LONG:  Permission to publish previously admitted Government's Exhibit 342?

        THE COURT:  Granted.

BY MS. MEDETIS-LONG:

Q.   What is this a photograph of?

A.   That is the Nissan Xterra that was transported from PBSO over to Miami main.  And that is inside our garage at ERT bay, what we call it.

Q.   And can you see from the photo the evidence tape?

A.   Yes.

Q.   And does it appear to be tampered with in any way?

A.   No.

MS. MEDETIS-LONG:  Your Honor, at this time the government would tender the witness.

THE COURT:  Okay.  Mr. Routh, cross-examination.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Is it not fortuitous that the blue flashlight landed face up with the name of the flashlight on it?

A.   I couldn't tell you.

MR. ROUTH:  All right.  Thank you very much.

THE WITNESS:  You are welcome.

MS. MEDETIS-LONG:  No redirect, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  We will take another brief break, ladies and gentlemen, for 10 to 15 minutes until approximately 2:12.

All rise.

(The jury exited the courtroom at 2:05 p.m.)

THE COURT:  All right.  We are in recess for ten minutes.  Please return then.  Thank you.

(A recess was taken from 2:06 p.m. to 2:18 p.m.)

THE COURT:  All right.  Everybody is present.  Please have a seat.

Who will be your next witness?

MR. BROWNE:   The United States will be calling Elizabeth Riddell.

THE COURT:   Okay.   Let's bring the next witness, please, into the courtroom.   And let's call in the jury, Officer.

(The jury entered the courtroom at 2:19 p.m.)

THE COURT:   Please have a seat.

All right.   Let's call the next witness, please.

MR. BROWNE:   Yes, Your Honor.   The United States calls Elizabeth Riddell.

COURTROOM DEPUTY:   Hello.   Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:   I swear.

COURTROOM DEPUTY:   Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:   My name is Elizabeth Riddell. E-L-I-Z-A-B-E-T-H.   Last name is spelled R-I-D-D-E-L-L.

MR. BROWNE:   May I inquire, your Honor?

THE COURT:   Yes.

ELIZABETH RIDDELL,
having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWNE:

Q.   Good afternoon.  Can you tell us what you do for a living.

A.   Yes.  I'm an information technology specialist, senior digital forensic examiner.

Q.   And what do you do as an information -- information technology specialist, senior digital examiner -- forensic examiner?

A.   I preserve, examine, and analyze digital evidence.

Q.   And what do you mean when you say "digital evidence"?

A.   Digital evidence is anything that can store data such as cell phones, laptops, USBs.

Q.   And who do you work for?

A.   I work for the Federal Bureau of Investigation.

Q.   Are you in a specialized unit at the FBI?

A.   Yes, I am.  I am part of the Computer Analysis Response Team, also known as CART.

Q.   And what does the CART team do?

A.   We are the collection of the FBI's digital forensic examiners.

Q.   Did you perform any function as a digital forensic examiner in this case?

A.   Yes, I did.

Q.   What specifically did you do?

A.   I conducted examinations, and I processed digital evidence.

Q.   I'm going to show you what's been previously admitted as Government's Exhibit 200-101.

MR.  BROWNE:  May I approach, Your Honor?

THE COURT:  Yes, you may.

MR.  BROWNE:  (Tendering item.)

BY MR.  BROWNE:

Q.   Ms. Riddell, do you recognize Government's Exhibit 200-101?

A.   Yes, I do.

Q.   How do you recognize that?

A.   I recognize this as the device I performed an extraction on, and I also recognize my handwritten label that I put on this device.

Q.   Now, when you say you performed an extraction on that device, what do you mean by that?

A.   I have removed the SD card, and then I forensically imaged the contents of this SD card.

Q.   Okay.  And what type of device is Government's Exhibit 200-101?

A.   This is an AKASO action camera.

Q.   And AKASO is the brand, ma'am?

A.   Yes, that's the maker.

Q.   Okay.  Are there other terms for that type of device that you have heard?

A.   Sure.  A trail camera or, similarly, a GoPro is a similar looking model.

MR. BROWNE:  Your Honor, may I retrieve the exhibit and publish and pass it to the members of the jury?

THE COURT:  Yes.

MR. BROWNE:  Can you pass this around.

A JUROR:  Sure.

THE COURT:  And ladies and gentlemen, I should make a note here that all of the admitted exhibits will ultimately be given to you for your review, however you wish to review them, during deliberations, with the exception of some physical items that can't be provided without supervision.  But the overwhelming majority of the exhibits, including all of the images you have seen on the screens, will be given to you should you wish to review them further during deliberations.

Please continue.

MR. BROWNE:  Thank you, Your Honor.

BY MR. BROWNE:

Q.   All right.  So let's go back to the extraction process.

Tell us what procedure you followed in extracting evidence from that device.

A.   Before performing any sort of extraction, first I had to wait for a judge-issued search warrant which would allow me to search that device.  After reviewing this signed search warrant, then I was able to perform a forensic extraction and collect the data off that SD card.

Q.   And how did you go about collecting data off the SD card in

that device?

A.   I removed the SD card from the camera, and then I got a forensic image or a digital copy of all of the data off the device.  Then I'm able to take that data, run it through some forensic processing software, export the videos, and provide everything to our investigative team.

Q.   And did you, in fact, find videos on that device's SD card?

A.   Yes, I did.

Q.   And this was all authorized by the search warrant you just mentioned to the jury; correct?

A.   Yes, sir.

Q.   I'm going to show you now what has been previously marked but not yet admitted as Government's Exhibits 200-106A through 200-106G.

MR. BROWNE:  If it's possible to have the government PC broadcast to the witness monitor?

(A video and/or audio was played.)

BY MR. BROWNE:

Q.   All right.  This is Government's 200-106A.  Do you recognize that image?

A.   Yes, I recognize this video.

MR. BROWNE:  Can we switch to 200-106B.

(A video and/or audio was played.)

BY MR. BROWNE:

Q.   Do you recognize that?

A.   Yes, I do.

Q.   Government's 200-106C.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Do you recognize that?

A.   Yes.

Q.   Government's 200-106D.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Do you recognize that?

A.   Yes.

THE COURT:  That was 200-106D, Mr. Browne?

MR.  BROWNE:  200-106D, Your Honor.

THE COURT:  Okay.  Thank you.

BY MR.  BROWNE:

Q.   Now I'm now going to show, Ms. Riddell, 200-106E.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Do you recognize that?

A.   Yes.

Q.   I'm going to show you now Government's 200-106F.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   Do you recognize that?

A.   Yes.

Q.   And 200-106G.

     (A video and/or audio was played.)

BY MR. BROWNE:

Q.   Do you recognize that?

A.   Yes, I do.

Q.   Okay.  How do you recognize the exhibits that you were just shown on the witness monitor?

A.   I recognize these as the videos that were exported from this SD card.

Q.   And those are true and accurate copies of the videos that you managed to extract from the SD card?

A.   They appear to be.

Q.   Okay.

     MR. BROWNE:  Your Honor, at this time I would ask to move Government's Exhibit 200-106A through 200-106G into evidence.

     THE COURT:  Any objection?

     MR. ROUTH:  No objection.

     THE COURT:  Okay.  Those exhibits will be admitted without objection.

     (Government Exhibits 200-106A through 200-106G were received in evidence.)

     MR. BROWNE:  Permission to publish, Your Honor?

     THE COURT:  Granted.

     MR. BROWNE:  Ms. Luce, can we have

Government's 200-106D to start, please.

(A video and/or audio was played.)

BY MR. BROWNE:

Q.   Ms. Riddell, what are we looking at here?

A.   What appears to be leaves, maybe part of a fence.

Q.   Okay.  And this is one of the videos you just described as having been extracted from the SD card on that action camera; correct?

A.   Yes.

MR.  BROWNE:  And can we look at 200-106A, Ms. Luce?

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   What is this?

A.   It appears to be the ground with leaves and dirt.

Q.   Okay.  And let's look at 200-106B.

(A video and/or audio was played.)

BY MR.  BROWNE:

Q.   What is that?

A.   It appears to be some sort of tarp with ground and part of a hand.

Q.   And is this a camouflage pattern, as best you can tell?

A.   Yes, it appears to be.

Q.   Okay.  And 200-106E.

(A video and/or audio was played.)

///

BY MR. BROWNE:

Q.   What do you see there?

A.   Part of a fence, some type of camouflage material, and leaves, the ground, and trees.

Q.   Is it a different pattern of camouflage than the tarp that we looked at previously?

A.   Yes.  It looks different.

        MR. BROWNE:  Okay.  Let's look at Government's Exhibit 200-106F.

        (A video and/or audio was played.)

        MR. BROWNE:  And finally, let's look at Government's Exhibit 200-106G.

        (A video and/or audio was played.)

BY MR. BROWNE:

Q.   What's the date on that last exhibit we just played, Government's 200-106G?

A.   The date timestamp here is 12/14/2023.

Q.   Okay.  And then if we go back one exhibit, to 200-106E, what is the date and timestamp there?

A.   The date and timestamp is 8/31/2024, at 22:14:43.

Q.   As part of your forensic evaluation of the device and its SD card, were you able to determine if these timestamps were accurate?

A.   I was able to determine that these timestamps could not be accurate.

Q.   How were you able to surmise that?

A.   First, I -- after performing an extraction of this SD card, I then powered on the original camera to check the date and time settings for the camera, which is when I discovered that the date was off from the current date and time by about 42 hours and 44 minutes.  So it was behind a bit.

Additionally, when you watch the video, including the one shown on the screen, you will see that the timestamp would place the video at 10:00 p.m. at night, but it appears to be daylight.  So that is an additional clue that the timestamp that is written on the video cannot be accurate.

Q.   So with the exception of the previous video where we saw that skin-toned item that was from 2023, would you agree with me that the rest of the videos on this camera are from in or around August of 2024?

A.   Yes.  So it would be August, September 2024.

Q.   And you would agree with me that, at least this particular video, appears to depict something that looks like a chain-link fence?

A.   Yes, it does.

Q.   And, again, Ms. Riddell, all of the videos we just watched were extracted from that AKASO action camera?

A.   Yes, sir.

Q.   Okay.  Just a moment.

MR.  BROWNE:   May I retrieve the exhibit from the jury?

THE COURT:  Yes.

MR. BROWNE:  Nothing further.  Thank you.

THE COURT:  Thank you.

Mr. Routh.

MR. ROUTH:  I have no questions.

THE COURT:  Okay.  That concludes your testimony.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  I will ask the United States to call its next witness, please.

MR. DONNELLY:  Yes, Your Honor.  The government calls Special Agent Kristin Bailey.

THE COURT:  Good afternoon.  Special Agent, please walk over here to the witness stand.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

THE WITNESS:  Thank you.

COURTROOM DEPUTY:  State your first and last name, and please spell it for the record.

THE WITNESS:  Kristin, K-R-I-S-T-I-N.  Bailey, B-A-I-L-E-Y.

MR. DONNELLY:  With Your Honor's permission?

THE COURT:  Yes.

MR. DONNELLY:  Thank you, Judge.

SPECIAL AGENT KRISTIN BAILEY,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DONNELLY:

Q.   Ma'am, good afternoon.

A.   Good afternoon.

Q.   Ma'am, by whom are you employed?

A.   The Federal Bureau of Investigation.

Q.   And what do you do for the FBI?

A.   I am a special agent with the FBI.  And as my collateral duty, I am also a team leader of one of our evidence response teams.

Q.   And is that commonly known as ERT?

A.   Yes, it is.

Q.   How long have you been with the FBI?

A.   I have been with the FBI a little over 4 1/2 years -- or 14 1/2 years.  Sorry.

Q.   If we could all run back the hands of time; right?

Ma'am, did you receive any specialized training during your time with the FBI in the field of evidence and evidence collection?

A.   I have.

Q.   And --

A.   In addition to what we receive just in our basic training to become special agents, I have also been to our evidence response basic training as well as a number of advanced courses, including anywhere from latent print collection, mass disaster, various trajectory, things of that nature.

Q.   And can you just briefly describe what your day-to-day duties are with the ERT teams with the FBI.

A.   Absolutely.  As I said, it's a collateral team, so it's in addition to our regular duties.  But we have on-call periods. And during that on-call period, if a request comes in for the Evidence Response Team to execute a search warrant or for some other matter for processing, that would come through the senior team leader to me as the team leader, and then what I would do is prepare the resources that we would need to execute that search warrant, make sure that I have the team members necessary to do that, and then we would execute the search warrant or whatever that other matter might be if it was processing.

Q.   Now, you mentioned that you're a team leader.  That would suggest that there is other members of your team; correct?

A.   Correct.

Q.   And if you're called in to provide support and respond for evidence collection purposes, do you divide up duties amongst the different team members?

A.    Yes, we do.

Q.    And if you go to a particularly complex or large scene, do various members of the team get assigned to different duties?

A.    Yes, they do.

Q.    And so, for instance, might there be a time where you would be in the field actually collecting evidence from a physical scene, for instance, an outdoor scene with pieces of evidence strewn about?

A.    Yes, absolutely.

Q.    Are there other times -- I think you mentioned a search warrant, at -- where -- a collection of evidence from a search warrant.  What would that entail?

A.    So it would be specific to the search warrant, and if there is a search warrant, it will lay out what is to be searched, whether it's a residence, whether it's a specific area, maybe a business.  It would also lay out what we are allowed to search for and collect in that matter.  And so depending on what that search warrant -- depending on the location on that search warrant as well as the items to be seized on that search warrant would depend on what resources we would bring to that search.

Q.    Could you execute a search warrant on a person?

A.    Absolutely.

Q.    And are there times when you have done that?

A.    Yes.

Q.   And did you do that in this particular case?

A.   I did.

Q.   Did you obtain -- was there a search warrant obtained in -- in this case -- in this investigation pertaining to an incident that occurred at the Trump International Golf Club?

A.   Yes.

Q.   Now, on September 15th, 2024, were you on duty?

A.   I was not.  I had somebody covering for me.

Q.   Were you eventually called back in --

A.   Yes.

Q.   -- to assist?

A.   Yes, I was.

Q.   And at some point during -- did you respond out to the golf club?

A.   I did.

Q.   And did you also perform other functions in the ERT realm during the course of this investigation?

A.   I did.

Q.   At some point in time was there a search warrant obtained for the person of the defendant in this case?

A.   Yes, there was.

Q.   And as part of your training with the FBI and your day-to-day duties, are you familiar with the manner in which you would collect DNA evidence?

A.   Yes.

Q.   Are you also familiar with the manner in which you would collect fingerprints?

A.   Yes.

Q.   And is that based, again, on your training?

A.   Yes, it is.

Q.   And have you had experience before this case in collecting those various pieces of evidence in a case?

A.   Yes, I have.

Q.   And in this particular case, were you called upon to do so?

A.   I was.

MR. DONNELLY:  Your Honor, with your permission -- there are several pieces of physical evidence that have not been premarked -- or pre-admitted that I intend to show the witness.  I just need to be able to go back to the table with Your Honor's permission?

THE COURT:  Yes.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Ma'am, before I show you these pieces of evidence, I think -- have you had a chance to review some of the evidence in this case?

A.   I have.

Q.   Have you reviewed Government Exhibits 948A, B, C, and D?

A.   Yes.

Q.   And before you look at them today, would you like to

wear -- are you asking to have gloves so that you can --

A.   I would like gloves, yes, sir.

MR. DONNELLY:   With Your Honor's permission, if I can approach with a set of gloves?

THE COURT:   Yes.

MR. DONNELLY:   (Tendering item.)

THE WITNESS:   Thank you.

BY MR. DONNELLY:

Q.   Ma'am, before I show you these pieces of evidence, I'm going to direct your attention actually to September 19th, 2024.   Did you become aware at that point in time that there had been a search warrant issued by a judge in the district -- the Southern District of Florida for Mr. Routh's person?

A.   Yes.

Q.   And did you have a chance to review that search warrant to make sure that you were authorized to collect certain pieces of evidence from him?

A.   Yes, I did.

Q.   And you did that, you actually reviewed the document itself?

A.   I did.

Q.   And at some point did you respond to a secure location in order to execute that search warrant?

A.   I did.

Q.   Did you go with other members of the FBI ERT?

A.   Yes, I did.

Q.   And who were the people that you went with?

A.   So I went with my assistant team leader, Natasha Petriolo (phonetic).

Q.   And did you meet -- did you see Mr. Routh actually at that location?

A.   We did, yes.

Q.   Were there other individuals at that location as well that were not part of the FBI investigative team?

A.   Yes.

Q.   Were there investigators from that -- from various places but including his representatives?

A.   Correct.  There was an investigator from the defense team that was present during the collection.

Q.   Ma'am, I'm going to ask you about the collection of these items.  When -- I'm going to first focus on the DNA portion of it.

A.   Yes, sir.

Q.   And without getting into what DNA is or anything else, are you familiar with the manner in which you would collect a DNA sample from an individual?

A.   Yes, I am.  And for the DNA, what we do is we take -- it's a wooden stick with almost a Q-tip at the end.  And then for a person's DNA, we can rub that Q-tip on the inside of the cheek,

usually just circle a couple of times, usually seven, and then we go to the other side of the cheek.  And so we collected from the inside of the cheeks on that -- almost a Q-tip is the best way to describe it.

Q.   The Q-tip that you described, prior to actually rubbing it inside the cheek, is that kept in any particular fashion before you actually do that examination?

A.   Yes.  So those Q-tips are in a sealed container, and they stay sealed until we have put on clean gloves and we're going to go ahead and take the sample.  Once the sample is taken, they go into a box that was also in a package.  And so it goes into that box into a manner to keep it from rubbing into anything else.

Q.   And what's --

A.   It's securely packaged.

Q.   What's the purpose, then, I guess, having the Q-tip-type device in a -- in a package, a sealed package, wearing gloves, and then securing it in that box?

A.   Just to make sure that the DNA sample that you take comes into contact with a person you want it to come into contact with, and try to eliminate any other contact.

Q.   In this particular case, when you went to execute the search warrant and rubbed that Q-tip inside his cheek, was there any problem with the packaging with the Q-tip that you were going to use?

A.   With one of the Q-tips, the -- as always happens, the holes that we put it in, they're not -- this one was not fully predone, and so one of the Q-tips snapped a little bit, but it didn't prevent it from going into the thing and packaging, and we took another swab as well.

Q.   Okay.  So in this particular case, you took two swabs -- or you took multiple swab samples from Mr. Routh?

A.   Yes.

Q.   And, again, that was in the presence of these other individuals that you listed before?

A.   Yes, correct.

Q.   Okay.

     MR. DONNELLY:  Your Honor, with your permission, if I could approach the witness first with Government Exhibit 948A?

     THE COURT:  Yes.

     Can you please repeat the number.

     MR. DONNELLY:  948A.

     THE COURT:  Thank you.

BY MR. DONNELLY:

Q.   Ma'am, have you been able to look -- I handed you an envelope, and then there were contents within that envelope; is that right?

A.   That's correct.

Q.   And can you tell the members of the jury what you are actually handling right now?

A.   So this is the box that I mentioned that the Q-tips with the DNA swabs would go into, and they're held inside there. And then we seal boxes, as you can tell.

Q.   And so at some point in time, did you actually use the Q-tip and then take a swab from within the mouth of Mr. Routh to get that DNA sample?

A.   Yes, I did.

Q.   Did you then place that Q-tip inside that secured box, the one that you're handling there, for further processing?

A.   Yes, that's correct.

Q.   And did you have it sealed up?

A.   Yes.  We sealed this as well as the bag that we put it in.

Q.   And did you actually document the outside of that box in some way to make sure that it was, in fact, the box that was containing this sample for Mr. Routh?

A.   Yes.

Q.   Can you tell the members of the jury how you did that.

A.   So in addition to labeling the outside of the box, we put the details on.  And then initialing and dating the tape on the box, we also label it here (indicating), and so I have the DNA swabs and where they came from.

          MR. DONNELLY:  With Your Honor's permission if I could --

          THE COURT:  Yes.

          MR. DONNELLY:  -- take the evidence back.

BY MR. DONNELLY:

Q.   And just to be clear, that -- there are -- there are a number of tags on the -- on the bag here; right?

A.   There are.

Q.   Do they include, among other things, the case number for this particular case that's assigned by the FBI?

A.   Yes, they do.

Q.   Along with the other identifiers for this case to make sure that it's being tracked properly in the evidence systems that the FBI maintains?

A.   That's correct.

MR. DONNELLY:  And with Your Honor's permission again, if I could approach with Government Exhibit 948B?

THE COURT:  Yes, you may.

MR. DONNELLY:  (Tendering item.)

BY MR. DONNELLY:

Q.   And, Special Agent, if I could ask you to just take a look at the contents of 948B.

A.   Yes.  This is the same.  It's another DNA swab just like before with the box sealed, and my initials on the outside label indicating where and when it came -- it was taken, and the case number.

Q.   And do both of these boxes appear to be in the same condition as when you actually sealed them up after the execution of the search warrant on September 19th, 2024?

A.   I mean, our original seal is there.   It's -- it looks like it's had another seal since, probably at the lab, but, yes, I'm -- I can still see my seal there.

Q.   Okay.   And in this particular case, after you took these pieces of -- these Q-tips with the swabs from Mr. Routh, what did you do with these particular swabs?

A.   So the evidence I collected was released to the seizing agent there at the location, and the seizing agent would then take custody of those items.

Q.   Did you do anything else with these in terms of testing or anything else?

A.   No.   I was strictly the collection of these items.

Q.   And then you turned them over to the seizing agent that was part of your team?

A.   Was not part of my team, was a FBI agent assigned to the case team.

Q.   And then further decisions about the process that they would undergo was done after you had handed them over?

A.   That's correct.

Q.   Okay.   You did not open these boxes; correct?

A.   That's correct.

Q.   And is it to maintain them in a -- in a state for further examination during this trial?

A.   Correct.   I would not want to open that without the lab's permission.

MR. DONNELLY:  And, Judge, just to be clear, we're not going to ask for these to be admitted at this particular point in time.  There is going to be further testimony down the road about these two items.

THE COURT:  Okay.  Thank you.

MR. DONNELLY:  Thank you, Judge.  And if I could approach to get that particular exhibit back.

THE COURT:  Yes, you may.

MR. DONNELLY:  Thank you.

BY MR. DONNELLY:

Q.   Now, Special Agent, along with the collection of the DNA evidence from inside Mr. Routh's mouth on the 19th, were you also authorized to obtain other pieces of evidence from his person?

A.   Yes.

Q.   And what other kinds of evidence were you authorized to collect at that time?

A.   Fingerprints as well.

Q.   And did you do that?

A.   We did.

Q.   And, again, do you have training in the -- in the manner in which fingerprints would be collected and then sent along for further examination?

A.   Yes, I do.

MR. DONNELLY:  Your Honor, with your permission, I will

approach the witness with 948C and D?

THE COURT: Yes, you may.

MR. DONNELLY: (Tendering item.)

BY MR. DONNELLY:

Q. Ma'am, have you had a chance to look inside the envelope that I handed you that's been marked as 948C and D?

A. Yes.

Q. And are there two documents that are contained within that envelope?

A. Yes, there is.

Q. And are they two different types of fingerprints that were obtained by you that day or --

A. Yes.

Q. -- fingerprint cards?

A. Yes, sir.

Q. And can you -- first, with regard to -- there appears to be like a larger card there. What is the specific evidence number for that particular card? It's on the back portion there.

A. That looks like Exhibit 948C.

Q. Okay. And with regard to 948C that's in your hands there, can you describe for the members of the jury what it is that you're looking at.

A. So this is a fingerprint card, and what this card captures is not only the front part of the finger there on the -- but also the sides of each finger, as well as the tip of the

finger.

Q.   And when you say that this shows the fingerprints for this -- in this case, did you -- how did you go about obtaining the fingerprints that are obtained -- that are located on 948C?

A.   So in the same process.  We utilized ink and -- to take the prints of the defendant -- of Mr. Routh.  And so, Mr. Routh would then put his fingerprint down, and then we would rotate the finger to the side, place it down, rotate it to the other side, place it down, and then the same with the tip.

Q.   And is that done for each of the ten fingers on Mr. Routh's hand?

A.   For each ten fingers, both hands.  And there is a space for each one of them to go on the card.

Q.   And is there a place on that card where you are able to memorialize the fact that you performed this on September 19th?

A.   Yes.  On the back of the card there is an area to place my information as well as for the individual whose prints were taken to sign.  And Mr. Routh did sign that that day.

Q.   And with regard to the other card that's contained in there, 948D, can you describe for the members of the jury what that card is.

A.   This is a similar card; however, it's only for the main part of the finger.  It doesn't do the sides or the tips.  But it's a little bit more of a roll.  And it's just on the five fingers on each hand, and then there is a place to put four

fingers together and then the thumb separately.

Q.   And are both of these on FBI forms that you would use, typically, during the course of your duties with the FBI ERT?

A.   Yes.  These are both on standard fingerprint cards.

Q.   And, again, with regard to 948D, is there an area where you memorialized the fact that this occurred on -- on or about -- well, on September 19, 2024?

A.   Yes.  And then there is a place for the individual having their fingerprints to sign.

Q.   And did Mr. Routh sign those?

A.   He did.

Q.   Did you force him in any way to sign either of these cards?

A.   No.

Q.   Was there an -- was he forced in any way to provide the DNA sample that we discussed before?

A.   No.

Q.   And similar to the DNA sample, what did you do with these prints after you collected them from Mr. Routh?

A.   Once they were collected and we filled out the paperwork, they went into this envelope, and then we sealed the envelope, initialed, and dated that.

        MR. DONNELLY:  Your Honor, I would ask at this time that 948C and D be admitted into evidence.

        THE COURT:  All right.  The particular numbers?  Can you repeat those, please.

MR. DONNELLY:  Yes, Your Honor.  It's Government Exhibit 948C and D.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  948-C and 948-D will be admitted without objection.

(Government Exhibits 948-C and 948-D were received in evidence.)

MR. DONNELLY:  Thank you very much, Your Honor.

Your Honor, I have no further questions for the witness.

THE COURT:  All right.  Thank you.

Any cross-examination?

MR. ROUTH:  Sure.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.  You left out the hair.  You pulled all my hair out, and it's not even in evidence?

A.  I -- it is in evidence.  I was not asked about the hair. But, yes, we did also take hair samples.

Q.  Okay.  Well, I can attest that we did a good job.  So thank you very much.

A.  Thank you.

THE COURT:  Okay.  Any redirect?

MR. DONNELLY:  No.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much, Special Agent. You may be excused.

Okay.  Is the government ready for the next witness or is a break necessary?

MS. MEDETIS-LONG:  At the Court's discretion, Your Honor, but we are ready.

THE COURT:  Okay.  Then let's move forward.

MS. MEDETIS-LONG:  At this time, the United States would call Special Agent David Gilbert.

THE COURT:  Good afternoon, sir.

THE WITNESS:  Hello.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  David Gilbert.  D-A-V-I-D. G-I-L-B-E-R-T.

THE COURT:  You may begin.

MS. MEDETIS-LONG:  Thank you, Your Honor.

SPECIAL AGENT DAVID GILBERT,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MEDETIS-LONG:

Q.   Good afternoon, sir.

A.   Hello.

Q.   Where do you work?

A.   At the Miami field office, ma'am.

Q.   For what agency?

A.   The FBI.

Q.   Okay.  And what is your title?

A.   I'm a special agent, and I'm the assistant principal tactical instructor for our field office.

Q.   And how long have you been with the FBI?

A.   Eight years now, ma'am.

Q.   Okay.  And when you say you're a tactical instructor, what do you mean by that?

A.   Full-time I teach tactics, so warrant service and firearms, to our agents.

Q.   Are you a SWAT member as well?

A.   Yes, ma'am.

Q.   And what does SWAT stand for?

A.   Special Weapons and Tactics.

Q.   Okay.  And what did you do before you joined the FBI?

A.   I was a Coast Guard officer.  So I served in the Coast Guard as a commissioned officer for ten years.

Q.   And before those ten years, what did you do in the Coast Guard?

A.   I was a Coast Guard Academy graduate.  So I was in the Coast Guard for a total of 14 years with those four years included.

Q.   Now, I want to direct your attention to September 15, 2024, if I may.  Did you respond to the area near the Trump International Golf Club?

A.   Yes, ma'am.

Q.   And that was in West Palm Beach, Florida?

A.   Yes, ma'am.

Q.   What area, in particular, did you respond to?

A.   I responded to where we were staging, in the general area where the post office was.  I don't recall the exact address offhand.

Q.   Was that on Summit Boulevard?

A.   I -- I believe so, ma'am.

Q.   And what, if anything, did ERT ask you to do that day?

A.   That day I was asked to clear out the firearm that was allegedly used in this event.

Q.   Okay.  And when you say "clear out the firearm," what do you mean by that?

A.   Render it safe so that evidence could -- Evidence Response Team could handle it for further purposes.

Q.   And when you say "render it safe," what do you mean?

A.   Remove any ammunition that may be present from the firearm.

Q.   Okay.  And did you do that, in fact?

A.   Yes, ma'am.

Q.   And where did you do that?

A.   So I was directed to an area in the bushes.  I went into that location.  The firearm was sitting there, and I was directed that that was the firearm that was being requested to make safe.  At that point, I --

Q.   Well, let me -- let me stop you right there.

Where was the firearm situated?

A.   It was in -- so, like I said, in the bushes, kind of leaning against, I think, a fence or something.

Q.   Okay.  And what kind or -- I'm not asking you for make and model.  What category of firearm was it?

A.   It was a rifle.

Q.   Okay.  Do you know what the make and model was?

A.   At the time, I did not.  I didn't -- I did not know the make and model at the time.

Q.   Okay.  And after you --

MS. MEDETIS-LONG:  Well, if we could show what's been previously admitted as Government's Exhibit 176, Your Honor?

THE COURT:  Yes, you may proceed to publish that.

BY MS. MEDETIS-LONG:

Q.   Do you see that, sir, on your screen?

A.   Yes.

Q.   And is that what you saw when you entered the bush line?

A.   That's correct, yes.

Q.   Okay.  And was there a scope affixed to this rifle when you saw it?

A.   Yes, there was.

Q.   Okay.  What did you do next after you saw the rifle?

A.   So again, being asked to make the -- render the weapon safe, I pointed it in a safe direction, I removed the source of ammunition, which was a magazine, and then I pulled the bolt to the rear and a round came out of it.

Q.   I'm sorry.  You pulled what to the rear?

A.   The bolt of the weapon.

Q.   Okay.

A.   At that point a round came out of it that was captured as well, and I placed everything with the box that was there provided by Evidence Response Team.

Q.   Now, you said a round came out of it.

A.   Yes, ma'am.

Q.   When you say "a round," do you mean a round of ammunition?

A.   Yes, ma'am.  The round.  The bullet.

Q.   And where from the firearm did it come from?

A.   From the chamber area, ma'am.

Q.   Was there any obstruction or interference when you pulled the -- the rifle back to discharge or release the ammunition?

A.   Do you mean the bolt?

Q.   The bolt, yes.  I apologize.

A.   No, ma'am.  There was no -- nothing appeared to obstruct it when I did that.

Q.   So you pulled the bolt to the rear with ease?

A.   Yes, ma'am.

Q.   What happened to the round that was released from the chamber?

A.   It was captured there.  I know we recovered it, and it was right there with the box that was provided to put this gun into.

Q.   Were you wearing gloves when you did all of this?

A.   Yes, ma'am.

Q.   Is that standard practice?

A.   Yes, ma'am.

Q.   Have you rendered firearms safe before?

A.   Many times.

     MS. MEDETIS-LONG:  Can we show, Your Honor, what's been previously admitted as Government's Exhibit 29 and 30?

     THE COURT:  Yes.

     MS. MEDETIS-LONG:  At the same time, please, Ms. Luce.

BY MS. MEDETIS-LONG:

Q.   Now, what do we see here?

A.   That looks like the firearm, the magazine, and the round that I observed that day, ma'am.

Q.   This is the firearm that you rendered safe?

A.   Yes, ma'am.

Q.   And can you circle -- this is a touchscreen, so if you touch your screen, can you circle the magazine?

A.   (Complies.)

Q.   And was that attached to the firearm when you first came upon it?

A.   Yes, ma'am.

Q.   And can you circle the area of the firearm to which the magazine was attached?

A.   It goes into this location here (indicating).  On this angle, it would be here (indicating).

Q.   And can you circle the chambered round that you removed from the chamber of this rifle?

A.   (Complies.)

        MS. MEDETIS-LONG:  Your Honor, no further questions.

        THE COURT:  Thank you.

        Any cross-examination, Mr. Routh?

                    CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.

     When you say the bolts on the -- on the rifle, is that required to -- to put in another round to take a second shot?  Or what is the purpose of the bolt (indicating)?

A.   The bolt in clearing it this time, sir?

Q.   Yeah, what does that -- what does that do?

A.   So in order to make sure that weapon was safe, I had to release the magazine, which would be the source of ammunition, and then extract whatever round may have been in there with -- by pulling back the bolt.

Q.   So normally you pull the bolt back and the -- the -- the spent shell comes out, and then you push it forwards, and it pushes another shell in?

A.   My understanding of that firearm, sir, is that when a round is fired, it will do that itself.  But in this case I had to manually do it because obviously we weren't firing off a round to clear it.

Q.   All right.  But you never fired the weapon, so you're not -- you never fired the weapon?

A.   I have not fired that weapon, no, sir.

Q.   All right.  As far as an AK-47 or an SKS, what type of scope normally goes on those type of weapons?

A.   That's not something that I'm familiar with, sir.

Q.   You're not familiar with those.  Okay.  I don't -- I thought you said that you did firearms training.

A.   Yes, sir, I do.

Q.   But not -- not familiar with the most popular weapon in the world?

A.   I'm not sure how to answer that, sir.

Q.   The AK-47 is the most popular weapon in the world.  So you're not --

MS. MEDETIS-LONG:  Your Honor, objection.  Move to strike.  No question pending.

BY MR. ROUTH:

Q.   You're not familiar with AK-47s?

THE COURT:  One second.  Let me just make a ruling, sir.

MR. ROUTH:  Okay.

THE COURT:  I will grant the motion.

Ladies and gentlemen, you should strike the question.  But, Mr. Routh, please re-ask a question if you wish.

BY MR. ROUTH:

Q.   You're not familiar with AK-47s?

A.   I have some familiarity with an AK-47, yes, sir.

Q.   But you are not familiar with how a scope is attached to an AK-47?

A.   The AK-47s I have conducted familiarity training with have not had scopes on them, no, sir.

Q.   Okay.  All right.

MR. ROUTH:  No further questions.  Thank you.

THE COURT:  Any redirect?

MS. MEDETIS-LONG:  Nothing further from the government, Your Honor.

THE COURT:  Okay.  Thank you.

Thank you.  That concludes your testimony, sir.

All right.  We're going to be taking a 15-minute break

at this time, and we will resume at 3:20 to make it easy, so a little bit more than 15 minutes.

Let's rise for the jury.

(The jury exited the courtroom at 3:05 p.m.)

THE COURT:  Please return at 3:20.  Thank you.

MR.  SHIPLEY:  Your Honor?

THE COURT:  Yes?

MR.  SHIPLEY:  I just wanted to address now what we have ahead of us and what we don't have ahead of us.  We can do it when we come back, but just thinking ahead about the jury.

We have gone through eight witnesses today.  We don't have any more witnesses today.  We have other things we could propose to the Court that we could do with the time in terms of defense exhibits.  But given the lack of cross-examination, we have brought people who were not supposed to be here until Monday or Tuesday of next week.  So just wanted to give the Court a heads-up about that.

THE COURT:  Let me ask you something.  Did -- there have been a lot of witnesses.  Did Mr. Gilbert testify?

MR.  SHIPLEY:  That was --

THE COURT:  Yes, that was Mr. Gilbert.

MR.  SHIPLEY:  Yes.

THE COURT:  Okay.

Okay.  So as far as the names that were given to me yesterday towards the end, you ran through all of those, and

then there were, I believe, one or two additional folks from the list provided yesterday?  I had Casey, Mays, Rose, Gale, Gilbert, and Loureiro.

MR. BROWNE:  Yes.  We also called additional witnesses, at least one, Your Honor, I can think of, Ms. Riddell.

THE COURT:  That's true.  Okay.

MR. SHIPLEY:  And Ms. Bailey.

THE COURT:  Okay.  So what would you propose we do with the time?

Everybody else may be seated.

MR. SHIPLEY:  Your Honor, we can address the defense exhibits at this time in anticipation, especially since we're moving at a faster pace, but we don't have any more witnesses for the jury.  We have been in touch with individuals, again, who we didn't expect to have until the middle of next week. They will be here on Monday.  Those are mostly individuals from Quantico, Virginia.  So...

THE COURT:  Okay.  Well, I -- now that we know that there is little cross-examination, at least so far -- and, Mr. Routh, certainly you are welcome to cross-examine witnesses permissibly for as long as you think is necessary for your defense -- the government needs to now ensure that we don't close early.  So this is now going to be the second day, and I don't want this to happen again.  So I will make that accommodation today because of the unexpected nature of the

pace, but at this point starting Monday, you should have witnesses to complete the entire trial day.

MR. SHIPLEY:  Absolutely, Judge.

THE COURT:  Okay.  So we will now take our break, and then I will determine whether to stay later with the parties for purposes of any evidentiary discussion, but then I will release the jury until 9:00 a.m. on Monday.

So please have a nice break.  We will resume in 15 minutes.

MR. SHIPLEY:  Thank you, Judge.

(A recess was taken from 3:08 p.m. to 3:23 p.m.)

THE COURT:  Okay.  Everybody is present.  You may be seated.

After I release the jury, we're going to be adjourning for the day.

Let's call in the jury.

(The jury entered the courtroom at 3:24 p.m.)

THE COURT:  Thank you.  Please be seated.

Ladies and gentlemen, like we did yesterday, we are moving at a very efficient rate, and so for that reason, also because it's a Friday, I have elected to adjourn for the day and call you back tomorrow -- excuse me, Monday at 9:00 a.m., to -- no.  Sorry.  Call you back at 9:00 a.m. Monday to resume trial.  So we will be adjourning early today, and I hope you have a wonderful weekend.

I will again repeat to you that you shall have no contact with anybody about this case, no discussion of any kind, no research or investigation or posting or visiting any places related to the case, and certainly no contact with any of the parties, attorneys, or witnesses in the case.  You must keep an open mind until the end of the proceeding.

And that concludes my instructions for this evening.  So thank you for your continued patience and diligence, and we will see you Monday at 9:00 a.m.

All rise for the jury.

(The jury exited the courtroom at 3:26 p.m.)

THE COURT:  Please have a seat.  All right.

Unless there are any emergent issues, we would be adjourning now.  I will hear first from the government, and then, Mr. Routh, if you have anything to raise.

MR. SHIPLEY:  Not for the United States, Your Honor.  Thank you.

THE COURT:  Okay.  Well, have a good weekend.

Mr. Routh, anything from the defense?

MR. ROUTH:  No, Your Honor.  I guess turning my light off is not a possibility, huh?

THE COURT:  I will be entering an order, sir, that endeavors to address your registered complaints, I should say, over the last few days, and that should be entered in due course.

But that concludes our hearing.  Have a good weekend. We will see everybody again at 8:45 on Monday.  Thank you.

(These proceedings concluded at 3:27 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled matter.

DATE:   09-13-2025          /s/Laura Melton
                            LAURA E. MELTON, RMR, CRR, FPR
                            Official Court Reporter
                            United States District Court
                            Southern District of Florida
                            Fort Pierce, Florida

## 1

**1** [12]_ - 57:17_, 59:13_, 59:20_, 60:3_, 60:23_, 81:5_, 81:8_, 94:21_, 94:22_, 121:14_, 121:16
**1/2** [3]_ - 59:14_, 171:19_, 171:20
**10** [7]_ - 18:14_, 28:25_, 29:11_, 29:17_, 46:8_, 55:25_, 159:17
**1002** [3]_ - 11:13_, 13:8_, 15:25
**1003** [9]_ - 15:12_, 15:15_, 15:22_, 16:2_, 16:7_, 16:10_, 16:11_, 17:8_, 18:17
**1004A** [6]_ - 25:8_, 25:25_, 26:4_, 26:9, 26:11_, 26:25
**1004B** [3]_ - 25:19, 26:11_, 27:12
**1005A** [5]_ - 21:4_, 21:10_, 22:2, 22:8_, 80:24
**1005B** [3]_ - 21:11_, 24:11_, 81:16
**1005C** [4]_ - 21:11, 22:8_, 24:18_, 94:4
**1006** [1]_ - 26:5
**1010** [9]_ - 4:9_, 8:20_, 9:8_, 9:10_, 9:23_, 10:3_, 10:20_, 10:24, 11:1
**1011** [5]_ - 9:11_, 9:23_, 10:20_, 10:24_, 26:6
**1012** [5]_ - 9:13_, 9:14_, 9:23_, 10:20_, 10:24
**1013** [10]_ - 4:9_, 8:20_, 9:16_, 9:17_, 9:23_, 10:3_, 10:20_, 10:24, 11:1_, 26:6
**10:00** [1]_ - 169:9
**10:20** [2]_ - 53:25_, 54:8
**10:26** [2]_ - 54:9_, 54:18
**10:29** [1]_ - 56:18
**10:30** [1]_ - 56:25
**10:33** [2]_ - 56:25_, 57:3
**1114** [3]_ - 4:6_, 8:21_, 9:19
**1115** [2]_ - 4:6_, 9:19
**1116** [3]_ - 4:6_, 8:21_, 9:19
**12** [1]_ - 18:14

**12/14/2023** [1]_ - 168:17
**126** [2]_ - 29:11_, 29:17
**12:04** [1]_ - 122:16
**12:06** [1]_ - 123:4
**14** [2]_ - 171:20_, 190:4
**15** [11]_ - 78:18_, 89:11_, 120:14_, 122:10_, 151:23_, 152:14_, 156:5_, 159:17_, 190:6_, 197:2_, 199:9
**15-minute** [1]_ - 196:25
**15th** [11]_ - 35:20_, 61:25_, 66:21_, 117:3_, 117:8_, 117:9_, 139:18_, 144:17_, 151:11_, 151:12_, 174:7
**16** [2]_ - 123:12_, 143:15
**16th** [7]_ - 7:20_, 120:15_, 141:4_, 142:5_, 144:17_, 148:16_, 151:11
**17** [1]_ - 32:19
**175** [2]_ - 48:25_, 87:20
**176** [11]_ - 47:20_, 47:24_, 90:11_, 90:19_, 111:20_, 111:23_, 113:8_, 113:24_, 115:5_, 115:9_, 191:21
**179** [1]_ - 91:4
**17th** [1]_ - 117:8
**18** [1]_ - 59:15
**180** [5]_ - 48:13_, 70:12_, 91:15_, 154:25_, 155:13
**187A** [3]_ - 94:18_, 94:19_, 111:11
**187B** [1]_ - 112:14
**188B** [1]_ - 114:14
**18th** [2]_ - 130:4_, 130:20
**19** [2]_ - 155:22_, 186:7
**19th** [12]_ - 130:4_, 130:8_, 130:17_, 131:2_, 131:4_, 131:7_, 131:14_, 131:18_, 176:10_, 181:25_, 183:12_, 185:15
**1:10** [2]_ - 122:18
**1:15** [1]_ - 122:11
**1:17** [1]_ - 123:4
**1:30** [2]_ - 62:2_, 132:6

## 2

**2** [2]_ - 78:2_, 107:17
**200** [1]_ - 124:17
**200-100** [1]_ - 115:17

**200-101** [5]_ - 115:1_, 116:3_, 162:2_, 162:7_, 162:18
**200-102** [1]_ - 116:7
**200-106A** [5]_ - 164:13_, 164:19_, 166:15, 166:21_, 167:10
**200-106B** [2]_ - 164:22_, 167:15
**200-106C** [1]_ - 165:2
**200-106D** [4]_ - 165:7_, 165:12_, 165:13_, 167:1
**200-106E** [3]_ - 165:16_, 167:23_, 168:18
**200-106F** [2]_ - 165:21_, 168:9
**200-106G** [6]_ - 164:14_, 166:1_, 166:15, 166:21_, 168:12_, 168:16
**200-18** [5]_ - 81:25_, 82:8_, 82:11_, 82:16_, 82:24
**200-19** [2]_ - 84:10_, 85:15
**200-1A** [8]_ - 43:2_, 43:6_, 60:9_, 80:8_, 82:16_, 82:18_, 144:8_, 144:12
**200-2** [3]_ - 38:1_, 38:8_, 42:13
**200-20** [1]_ - 84:16
**200-21A** [4]_ - 68:9_, 85:6_, 85:10_, 85:15
**200-21B** [1]_ - 85:18
**200-23** [1]_ - 104:18
**200-24** [2]_ - 93:13_, 93:16
**200-28** [1]_ - 117:22
**200-30A** [1]_ - 118:19
**200-30B** [1]_ - 119:12
**200-32** [1]_ - 104:14
**200-33** [1]_ - 147:13
**200-35** [1]_ - 148:4
**200-36** [1]_ - 148:19
**200-39** [6]_ - 141:17_, 141:21_, 142:9_, 142:12_, 142:13_, 150:14
**200-46** [5]_ - 142:15_, 143:1_, 143:4_, 143:6_, 150:25
**200-47** [1]_ - 146:24
**200-53** [1]_ - 95:8
**200-55** [2]_ - 93:6_, 116:14

**200-57D** [1]_ - 145:24
**200-60** [7]_ - 143:8_, 143:11_, 143:18_, 143:21_, 143:23_, 149:10_, 149:12
**200-63** [2]_ - 143:25_, 144:23
**200-73** [6]_ - 152:4_, 152:6_, 152:24, 153:1_, 153:4_, 153:17
**200-74** [5]_ - 152:4_, 152:24, 153:7, 153:11_, 153:25
**200-75A** [5]_ - 152:8_, 152:24, 153:7, 153:11_, 154:7
**200-75B** [5]_ - 152:8_, 152:25, 153:11_, 154:15_, 155:14
**200-77** [4]_ - 152:10_, 152:25, 153:7, 153:11
**200-98** [14]_ - 120:5_, 120:24, 123:7_, 123:24_, 124:5_, 125:2_, 126:5_, 127:8_, 129:8_, 129:11_, 132:20_, 132:25, 133:2_, 133:11
**2002** [1]_ - 32:22
**2004** [1]_ - 138:20
**2009** [1]_ - 139:3
**2012** [3]_ - 75:9_, 75:10_, 75:21
**2017** [3]_ - 57:23_, 75:8_, 75:16
**2018** [1]_ - 76:16
**2023** [1]_ - 169:13
**2024** [19]_ - 35:20_, 78:18_, 89:11_, 117:3_, 120:14_, 123:12_, 139:19_, 142:5_, 143:15_, 151:23_, 152:14_, 156:5_, 169:15_, 169:16_, 174:7_, 176:11_, 181:25_, 186:7_, 190:6
**20th** [1]_ - 35:20
**21** [3]_ - 77:25_, 78:1_, 138:20
**22** [1]_ - 32:24
**22:14:43** [1]_ - 168:20
**22nd** [3]_ - 130:8_, 130:17_, 131:11
**23rd** [1]_ - 129:22
**24-cr-80116-Cannon** [1]_ - 3:5
**24/7** [1]_ - 7:11

**241** [1]_ - 124:12
**25** [2]_ - 99:16_, 101:9
**26** [6]_ - 55:25_, 100:12_, 101:9_, 136:9_, 150:21_, 151:6
**27** [5]_ - 57:11_, 57:15_, 100:25_, 101:2_, 101:9
**277** [1]_ - 152:15
**28** [1]_ - 101:22
**29** [4]_ - 102:7_, 103:13_, 103:19_, 193:18
**2:05** [1]_ - 159:19
**2:06** [1]_ - 159:22
**2:12** [1]_ - 159:17
**2:18** [1]_ - 159:22
**2:19** [1]_ - 160:6
**2nd** [1]_ - 129:13

### 3

**3** [1]_ - 59:14
**30** [6]_ - 71:22_, 103:10_, 103:14_, 103:16_, 103:17_, 193:18
**32** [2]_ - 104:7_, 104:10
**3228** [1]_ - 58:24
**33** [5]_ - 29:6_, 29:14_, 94:24_, 124:3_, 124:11
**34** [2]_ - 89:24_, 124:4
**342** [1]_ - 158:15
**360-degree** [2]_ - 8:13_, 9:17
**3:00** [1]_ - 117:3
**3:05** [1]_ - 197:4
**3:08** [1]_ - 199:11
**3:20** [2]_ - 197:1_, 197:5
**3:23** [1]_ - 199:11
**3:24** [1]_ - 199:17
**3:26** [1]_ - 200:11
**3:27** [1]_ - 201:3
**3:28** [1]_ - 79:19
**3:30** [1]_ - 117:3
**3D** [1]_ - 12:24

### 4

**4** [3]_ - 57:16_, 108:14_, 171:19
**42** [1]_ - 169:6

**44** [1]_ - 169:6

### 5

**5** [3]_ - 29:6_, 29:14_, 109:10
**5A** [2]_ - 102:17_, 102:18
**5B** [2]_ - 102:22_, 102:23
**5th** [3]_ - 30:3_, 30:4_, 30:20

### 6

**6** [28]_ - 13:9_, 17:13_, 17:24_, 20:5_, 20:8_, 20:12_, 20:20_, 20:23_, 23:6_, 23:18_, 23:20_, 23:23_, 24:9_, 26:22_, 29:9_, 80:17_, 87:7_, 87:18_, 144:21_, 147:10_, 147:11_, 147:22_, 148:9_, 148:11_, 148:24_, 149:1_, 150:12
**60** [1]_ - 10:4
**6th** [2]_ - 29:16_, 61:24

### 7

**7** [2]_ - 24:9_, 28:25
**74** [1]_ - 152:6
**7th** [1]_ - 30:15

### 8

**8** [3]_ - 28:23_, 29:4_, 46:8
**8/31/2024** [1]_ - 168:20
**88A** [1]_ - 113:3
**8:45** [1]_ - 201:2
**8:55** [1]_ - 5:16

### 9

**948-C** [2]_ - 187:5, 187:7
**948-D** [2]_ - 187:5, 187:7
**948A** [3]_ - 175:23_, 179:14_, 179:17
**948B** [2]_ - 181:13_, 181:18
**948C** [7]_ - 184:1_, 184:6_, 184:19_, 184:20_, 185:4_, 186:23_, 187:2

**948D** [2]_ - 185:20_, 186:5
**98** [2]_ - 124:18_, 124:19
**9:00** [4]_ - 199:7_, 199:22_, 199:23_, 200:9
**9:00-ish** [1]_ - 117:10
**9:58** [2]_ - 54:6_, 54:9

### A

**a.m** [13]_ - 5:16_, 54:6_, 54:9_, 54:18_, 56:18_, 56:25_, 57:3_, 199:7_, 199:22_, 199:23_, 200:9
**abandon** [1]_ - 127:15
**abide** [1]_ - 121:7
**ability** [1]_ - 84:5
**able** [24]_ - 8:11_, 8:16_, 12:8_, 12:24_, 13:13_, 14:12_, 20:12_, 26:20_, 38:17_, 41:14_, 65:12_, 87:3_, 92:14_, 98:5_, 125:18_, 145:12_, 163:23_, 164:4_, 168:22_, 168:24_, 169:1_, 175:14_, 179:20_, 185:14
**absolutely** [8]_ - 64:11_, 66:3_, 72:12_, 123:1_, 172:9_, 173:9_, 173:23_, 199:3
**Academy** [1]_ - 190:3
**academy** [1]_ - 77:14
**acceptable** [1]_ - 131:12
**accepted** [2]_ - 156:17_, 157:11
**access** [5]_ - 23:11_, 30:7_, 30:12_, 30:14_, 35:16
**accessed** [1]_ - 85:23
**accommodate** [3]_ - 128:21_, 130:11_, 131:1
**accommodated** [1]_ - 126:6
**accommodation** [1]_ - 198:25
**accurate** [8]_ - 21:23_, 148:15_, 152:12_, 152:19_, 166:10_, 168:23_, 168:25_, 169:11
**accurately** [9]_ - 12:16_, 16:3_, 25:22_, 48:4_, 48:20_, 89:9_, 142:4_, 142:22_, 143:13
**acknowledge** [1]_ - 128:24

**action** [10]_ - 52:6_, 52:11_, 52:14_, 53:3_, 53:5_, 53:6_, 72:8_, 162:19_, 167:7_, 169:22
**activate** [1]_ - 41:19
**activated** [1]_ - 42:22
**active** [1]_ - 33:5
**activity** [3]_ - 40:11_, 40:18_, 76:3
**actual** [1]_ - 22:20
**add** [1]_ - 30:22
**addition** [7]_ - 76:2_, 77:13_, 83:18_, 151:9_, 172:2_, 172:10_, 180:18
**additional** [7]_ - 77:22_, 131:8_, 134:19_, 139:8_, 169:10_, 198:1_, 198:4
**additionally** [1]_ - 169:7
**address** [7]_ - 4:1_, 54:14_, 123:6_, 190:14_, 197:8_, 198:11_, 200:23
**addressing** [1]_ - 3:3
**adjacent** [3]_ - 27:2_, 59:2_, 151:17
**adjourn** [1]_ - 199:21
**adjourning** [3]_ - 199:14_, 199:24_, 200:14
**adjunct** [1]_ - 139:12
**adjust** [1]_ - 131:9
**adjusting** [1]_ - 130:25
**administrative** [2]_ - 58:14_, 75:14
**admission** [6]_ - 123:14_, 127:7_, 127:25_, 128:2_, 129:8_, 153:6
**admit** [7]_ - 120:24_, 132:24_, 142:9_, 143:1_, 143:18_, 152:24
**admitted** [77]_ - 4:5_, 4:7_, 4:8_, 9:20_, 9:22_, 10:20_, 10:25_, 11:14_, 16:7_, 16:10_, 21:4_, 22:2_, 22:6_, 24:10_, 24:19_, 26:1_, 26:5_, 26:10_, 43:6_, 47:20_, 48:14_, 48:25_, 81:16_, 82:8_, 83:2_, 84:16_, 85:7_, 87:20_, 94:4_, 102:7_, 104:14_, 104:18_, 106:2_, 108:15_, 109:11_, 109:25_, 111:11_, 111:19_, 112:13_, 113:2_, 114:13_, 114:25_, 115:16_, 116:6_, 116:13_, 117:21_, 120:5_, 129:9_,

132:25_, 142:12_, 143:5_, 143:21_, 144:2_, 144:4_, 144:8_, 144:11_, 144:23_, 145:24_, 146:23_, 148:4_, 149:12_, 150:14_, 153:2_, 153:9_, 154:25_, 158:15_, 162:1_, 163:7_, 164:13_, 166:19_, 175:13_, 183:2_, 186:23_, 187:5_, 191:21_, 193:18

**advanced** [2]_ - 8:16_, 172:4

**advised** [1]_ - 125:14

**aerial** [3]_ - 12:6_, 23:10_, 60:18

**affirm** [8] - 6:4_, 31:18_, 55:2_, 74:11, 137:18_, 160:13_, 170:16_, 188:14

**affix** [10]_ - 100:24_, 104:24_, 110:5_, 110:7_, 110:22_, 110:24_, 112:2_, 112:3_, 113:22_, 115:19

**affixed** [18]_ - 88:1_, 88:15_, 88:21_, 88:22_, 90:4_, 90:17_, 91:8_, 93:11_, 94:19_, 95:5_, 105:23_, 107:10_, 109:12_, 109:16_, 111:14_, 113:5_, 115:2_, 192:3

**afternoon** [19]_ - 62:2_, 132:12_, 132:18_, 132:19_, 135:6_, 135:7_, 137:15_, 138:6_, 138:7_, 139:25_, 159:6_, 159:7_, 161:3_, 170:13_, 171:8_, 171:9_, 188:11_, 189:4_, 194:20

**agency** [2]_ - 59:21_, 189:8

**Agent** [26]_ - 4:18_, 31:10_, 74:7_, 81:19_, 87:23_, 97:2_, 97:3_, 108:2_, 110:15_, 111:10_, 120:2_, 132:10_, 132:18_, 133:10_, 134:8_, 137:8_, 137:14_, 142:18_, 151:14_, 155:16_, 170:12_, 170:13_, 181:17_, 183:11_, 188:2_, 188:10

**agent** [29]_ - 44:1_, 44:19_, 44:21_, 45:3_, 50:12_, 64:1_, 64:5_, 65:17_, 66:13_, 67:5_, 71:11_, 75:6_, 75:7_, 75:8_, 75:16_, 76:2_, 77:19_, 77:24_, 138:11_, 138:13_, 138:18_, 140:5_, 171:13_, 182:8_, 182:13_, 182:15_, 189:11

**AGENT** [4] - 74:19, 138:2, 171:4_, 188:25

**agents** [3]_ - 77:15_, 172:3_, 189:18

**ago** [1]_ - 123:17

**agree** [4]_ - 82:6_, 82:7_, 169:13_, 169:17

**ahead** [8]_ - 15:18_, 63:14_, 130:15_, 130:24_, 178:10_, 197:9_, 197:10

**air** [1]_ - 8:10

**AK-47** [8]_ - 52:5_, 52:18_, 52:20_, 53:1_, 195:15_, 195:24_, 196:13_, 196:15

**AK-47-style** [1]_ - 53:7

**AK-47-type** [1]_ - 33:23

**AK-47s** [6]_ - 52:7_, 52:21_, 53:10_, 196:4_, 196:12_, 196:16

**AKASO** [5]_ - 133:16_, 146:6_, 162:19_, 162:20_, 169:22

**alerted** [1]_ - 43:25

**align** [2]_ - 28:13_, 28:16

**aligns** [1]_ - 17:18

**alleged** [3]_ - 121:17_, 121:20_, 122:5

**allegedly** [1]_ - 190:20

**allow** [4]_ - 8:3_, 118:7_, 121:6_, 163:21

**allowed** [2]_ - 20:15_, 173:16

**almost** [3]_ - 57:15_, 177:24_, 178:3

**alone** [1]_ - 129:8

**alongside** [2]_ - 35:5_, 116:9

**America** [1]_ - 3:5

**ammunition** [24]_ - 96:20_, 97:13_, 97:14_, 97:16_, 97:22_, 97:23_, 97:25_, 98:1_, 98:4_, 102:23_, 103:6_, 103:7_, 103:18_, 104:5_, 104:11_, 108:16_, 108:17_, 108:22_, 151:14_, 191:1_, 192:9_, 192:19_, 192:24_, 195:2

**ammunitions** [1]_ - 155:21

**amount** [2]_ - 60:5_, 96:3

**amounts** [1]_ - 10:17

**Analysis** [1]_ - 161:16

**analyze** [1]_ - 161:9

**anchor** [6]_ - 14:7_, 14:8_, 14:10_, 14:18_, 19:19_, 24:7

**angle** [2]_ - 48:17_, 194:11

**animated** [1]_ - 12:8

**ankle** [1]_ - 154:5

**annotated** [2]_ - 23:2_, 23:4

**annotating** [1]_ - 28:10

**annotations** [1]_ - 23:5

**announce** [1]_ - 45:20

**annual** [1]_ - 58:16

**answer** [2]_ - 121:18_, 195:23

**answers** [1]_ - 122:1

**anticipated** [1]_ - 34:16

**anticipation** [1]_ - 198:12

**apologies** [1]_ - 144:5

**apologize** [9]_ - 5:6_, 96:2_, 104:18_, 113:4_, 113:15_, 116:3_, 120:12_, 144:4_, 193:1

**appear** [12]_ - 26:24_, 27:16_, 90:24_, 92:2_, 92:3_, 102:1_, 113:13_, 116:20_, 157:3_, 158:24_, 166:12_, 181:23

**appearances** [1]_ - 3:6

**appeared** [1]_ - 193:2

**applies** [1]_ - 122:2

**appreciative** [1]_ - 5:2

**approach** [26]_ - 8:22_, 106:3_, 106:20_, 107:20_, 108:7_, 109:4_, 109:20_, 110:25_, 111:5_, 112:8_, 112:23_, 114:8_, 114:19_, 115:11_, 116:22_, 119:22_, 124:20_, 133:4_, 134:2_, 134:23_, 162:3_, 176:4_, 179:14_, 181:13_, 183:7_, 184:1

**approached** [1]_ - 63:10

**approaching** [1]_ - 18:7

**appropriately** [1]_ - 125:21

**approximate** [5]_ - 19:8_, 19:16_, 20:19_, 28:22_, 39:8

**area** [141]_ - 13:21_, 14:9_, 16:21_, 17:4_, 17:15_,

17:16_, 17:17_, 22:19_, 23:12_, 24:14_, 24:17_, 25:20_, 26:21_, 26:22_, 26:24_, 27:1_, 27:25_, 28:10_, 28:25_, 29:8_, 29:11_, 30:17_, 31:1_, 37:9_, 38:23_, 41:9_, 42:11_, 42:14_, 42:15_, 42:17_, 43:14_, 43:15_, 43:21_, 43:25_, 44:4_, 44:8_, 44:9_, 44:10_, 44:12_, 44:19_, 46:1_, 46:10_, 46:19_, 46:23_, 47:3_, 47:10_, 47:15_, 50:13_, 50:14_, 51:3_, 51:11_, 51:13_, 51:14_, 51:20_, 51:21_, 59:9_, 59:12_, 59:13_, 59:14_, 59:16_, 60:22_, 61:9_, 61:13_, 61:18_, 61:19_, 61:21_, 63:8_, 63:12_, 63:23_, 65:5_, 67:13_, 68:23_, 70:2_, 72:17_, 73:1_, 80:13_, 80:15_, 80:17_, 81:21_, 82:21_, 83:9_, 83:14_, 83:15_, 84:5_, 84:6_, 85:3_, 85:22_, 86:1_, 86:5_, 87:7_, 93:17_, 94:14_, 97:4_, 98:15_, 98:23_, 98:25_, 100:4_, 100:7_, 100:16_, 101:12_, 101:14_, 101:17_, 103:2_, 117:9_, 117:14_, 118:3_, 118:12_, 118:23_, 119:1_, 119:17_, 123:11_, 133:20_, 134:18_, 140:19_, 144:13_, 144:16_, 145:3_, 145:4_, 145:17_, 146:14_, 147:6_, 148:2_, 148:9_, 148:10_, 149:2_, 149:21_, 149:24_, 149:25_, 154:5_, 154:23_, 173:15_, 185:16_, 186:5_, 190:7_, 190:12_, 190:13_, 191:5_, 192:22_, 194:8

**areas** [4]_ - 34:19_, 38:18_, 86:23_, 90:24

**arisen** [1]_ - 122:19

**Army** [2]_ - 7:6_, 33:1

**arrangements** [1]_ - 130:7

**arrival** [2]_ - 86:9_, 99:10

**arrive** [3]_ - 7:18_, 79:18_, 86:24

**arrived** [16]_ - 7:20_, 14:5_, 25:3_, 36:17_, 36:24_, 37:3_, 37:8_, 39:8_, 41:16_, 50:11_, 79:10_, 79:16_, 79:19_, 140:4_, 140:6_,

157:8

**arrow** [3]_ - 28:6_, 44:6

**arrow-ish** [1]_ - 44:6

**articles** [1]_ - 154:22

**aside** [3]_ - 86:24_, 100:2_, 148:1

**assassination** [5]_ - 79:2_, 81:4_, 81:5_, 121:13_, 121:19

**assessment** [1]_ - 77:3

**assigned** [6]_ - 63:4_, 75:24_, 75:25_, 173:3_, 181:6_, 182:15

**assist** [4]_ - 35:2_, 67:6_, 67:22_, 174:11

**assistance** [1]_ - 106:5

**assistant** [2]_ - 177:4_, 189:11

**assisted** [1]_ - 95:20

**associated** [1]_ - 129:7

**assume** [1]_ - 122:21

**attach** [1]_ - 135:10

**attached** [11]_ - 87:11_, 87:13_, 88:17_, 99:25_, 100:1_, 100:2_, 135:8_, 135:9_, 194:5_, 194:9_, 196:14

**attempted** [6]_ - 79:2_, 81:4_, 81:5_, 121:13_, 121:19

**attention** [9]_ - 35:19_, 37:24_, 78:18_, 91:18_, 92:6_, 125:2_, 139:18_, 176:10_, 190:6

**attest** [1]_ - 187:22

**attorneys** [2]_ - 125:11_, 200:5

**audio** [21]_ - 11:17_, 12:14_, 14:23_, 15:19_, 16:15_, 17:10_, 20:2_, 56:3, 164:17_, 164:23_, 165:3_, 165:8_, 165:17_, 165:22_, 166:2_, 167:2_, 167:11_, 167:16_, 167:24_, 168:10_, 168:13

**August** [2]_ - 169:15_, 169:16

**authorized** [4]_ - 164:9_, 176:17_, 183:13_, 183:16

**auto** [3]_ - 52:8_, 52:9_, 53:8

**availability** [1]_ - 125:23

**available** [11]_ - 124:25_, 125:10_, 126:3_, 128:8_,

128:17_, 128:19_, 130:7_, 130:12_, 131:7_, 131:10_, 136:1

**Avenue** [7]_ - 23:7_, 60:19_, 63:10_, 80:14_, 141:14_, 144:15_, 147:18

**aware** [2]_ - 129:3_, 176:11

**awareness** [1]_ - 50:5

B

**B-A-I-L-E-Y** [1]_ - 170:25

**backed** [1]_ - 50:25

**backpack** [11]_ - 72:1_, 111:13_, 111:15_, 111:16_, 112:2_, 112:4_, 112:5_, 112:6_, 112:7_, 112:15_, 113:6

**backpacks** [9]_ - 67:10_, 69:1_, 70:3_, 70:5_, 70:20_, 70:23_, 71:3_, 71:4_, 71:11

**backtrack** [1]_ - 98:19

**backup** [1]_ - 27:9

**bag** [23]_ - 87:12_, 88:14_, 90:18_, 90:23_, 90:25_, 91:21_, 92:7_, 92:9_, 92:10_, 92:17_, 92:19_, 93:10_, 95:6_, 105:9_, 105:10_, 111:22_, 113:14_, 116:10_, 116:18_, 155:7_, 180:12_, 181:3

**bags** [30]_ - 15:2_, 46:25_, 47:6_, 48:1_, 49:4_, 49:13_, 49:16_, 49:19_, 49:23_, 50:21_, 72:16_, 87:11_, 87:25_, 88:3_, 88:4_, 88:6_, 88:14_, 88:16_, 88:17_, 90:16_, 91:8_, 91:11_, 92:13_, 93:11_, 94:19_, 133:16_, 146:6

**Bailey** [3]_ - 170:12_, 170:24_, 198:7

**BAILEY** [1] - 171:4

**barrel** [4]_ - 30:10_, 30:11_, 89:7_, 89:8

**base** [1]_ - 49:7

**based** [9]_ - 40:17_, 86:11_, 87:16_, 113:10_, 122:6_, 127:1_, 129:3_, 130:25_, 175:4

**basic** [2]_ - 172:2_, 172:4

**basis** [4]_ - 10:18_, 17:12_, 125:13_, 129:1

**Bates** [1]_ - 126:23

**bay** [1]_ - 158:20

**Beach** [35]_ - 32:13_, 32:14_, 32:17_, 32:20_, 33:8_, 33:16_, 34:3_, 34:18_, 34:19_, 34:22_, 35:6_, 35:13_, 36:14_, 38:23_, 40:18_, 49:21_, 50:1_, 50:14_, 55:20_, 55:23_, 57:11_, 57:24_, 58:6_, 59:4_, 59:16_, 62:17_, 64:5_, 79:13_, 151:17_, 151:24_, 152:14_, 156:17_, 157:8_, 157:21_, 190:10

**bearing** [1]_ - 151:5

**beat** [1]_ - 58:2

**became** [4]_ - 14:10_, 60:22_, 75:16_, 154:22

**become** [7]_ - 33:18_, 77:10_, 77:21_, 77:24_, 139:4_, 172:3_, 176:11

**begin** [7]_ - 37:23_, 55:11_, 57:7_, 76:23_, 91:20_, 95:21, 188:23

**beginning** [3]_ - 9:8_, 12:2_, 95:20

**begins** [1]_ - 23:19

**begun** [2]_ - 80:3_, 99:10

**behind** [10]_ - 20:24_, 44:16_, 64:11_, 83:19_, 86:4_, 98:7_, 146:17_, 146:19_, 150:11_, 169:6

**belong** [2]_ - 51:6_, 156:9

**belonged** [1]_ - 156:10

**bend** [1]_ - 84:7

**best** [4]_ - 122:25_, 130:11_, 167:21_, 178:3

**better** [1]_ - 50:6

**between** [15]_ - 10:5_, 17:23_, 18:14_, 20:7_, 28:8_, 28:9_, 39:4_, 61:2_, 62:13_, 70:5_, 70:23_, 119:17_, 130:17_, 148:10_, 157:21

**beyond** [2]_ - 148:25

**bird's** [1]_ - 16:20

**bird's-eye** [1]_ - 16:20

**birds** [1]_ - 24:14

**birds-eye** [1]_ - 24:14

**bit** [11]_ - 39:3_, 46:17_, 57:13_, 59:17_, 63:14_, 76:19_, 77:7_, 169:6_, 179:3_, 185:24_, 197:2

**black** [28]_ - 23:1_, 64:20_, 70:21_, 87:12_, 90:24_, 91:2_, 91:21_, 92:7_, 92:11_, 92:17_, 93:10_, 95:6_, 100:20_, 100:23_, 110:7_, 110:23_, 111:13_, 111:17_, 116:10_, 116:18_, 120:9_, 123:10_, 125:3_, 133:12_, 134:16_, 135:18_, 153:24_, 156:8

**blank** [1]_ - 130:11

**blocking** [1]_ - 64:6

**blue** [14]_ - 45:23_, 88:15_, 90:24_, 91:11_, 92:17_, 111:16_, 113:16_, 149:17_, 149:19_, 149:20_, 151:8_, 159:8

**blue-black** [1]_ - 92:17

**blue-in-color** [1]_ - 113:16

**bluish** [4]_ - 91:2_, 92:7_, 111:13_, 113:4

**bluish-black** [3]_ - 91:2_, 92:7_, 111:13

**bolt** [18]_ - 52:6_, 52:11_, 52:12_, 52:13_, 52:14_, 52:15_, 53:3_, 53:6_, 53:7_, 192:9_, 192:12_, 192:25_, 193:1_, 193:4_, 194:23_, 194:24_, 195:4_, 195:5

**bolt-action** [5]_ - 52:6_, 52:11_, 52:14_, 53:3_, 53:6

**bolts** [1]_ - 194:21

**bomb** [14]_ - 55:22_, 57:22_, 57:23_, 58:7_, 58:10_, 58:12_, 58:17_, 58:21_, 59:11_, 59:14_, 62:5_, 67:17_, 71:7_, 72:19

**bombings** [1]_ - 7:4

**bordering** [1]_ - 44:2

**bottom** [7]_ - 13:7_, 19:22_, 73:7_, 89:18_, 91:20_, 149:16

**Boulevard** [23]_ - 13:4_, 13:22_, 17:24_, 18:15_, 23:8_, 24:15_, 26:22_, 27:20_, 27:24_, 42:4_, 43:22_, 60:19_, 61:8_, 63:11_, 63:13_, 65:8_, 80:14_, 140:12_, 141:8_, 141:12_, 144:14_, 156:3_, 190:16

**boundary** [1]_ - 17:18

**box** [18]_ - 22:19_, 28:10_, 105:10_, 106:16_, 125:17_, 126:10_, 178:11_, 178:12_, 178:18_, 180:1_, 180:8_, 180:13_, 180:14_, 180:18_, 180:20_, 181:20_, 192:15_, 193:9

**boxes** [3]_ - 180:3_, 181:23_, 182:20

**branch** [6]_ - 18:18_, 32:25_, 86:1_, 86:4_, 95:12_, 95:14

**branches** [7]_ - 68:4_, 69:9_, 69:10_, 70:1_, 84:1_, 84:7_, 86:23

**brand** [2]_ - 70:9_, 162:20

**break** [12] - 53:25_, 56:15_, 56:21_, 121:4_, 122:14_, 122:19_, 126:4_, 159:16_, 188:5_, 196:25_, 199:4_, 199:8

**brief** [3]_ - 56:14_, 56:19_, 159:16

**briefly** [4]_ - 8:7_, 9:7_, 23:17_, 172:7

**bring** [12]_ - 10:11_, 11:12_, 12:22_, 12:25_, 38:3_, 78:12_, 97:3_, 122:21_, 130:11_, 132:10_, 160:3_, 173:20

**broad** [1]_ - 128:11

**broadcast** [4]_ - 15:15_, 66:10_, 66:18_, 164:16

**broke** [1]_ - 40:2

**broken** [8]_ - 18:18_, 22:19_, 86:1_, 86:4_, 95:12_, 95:14_, 95:16_, 157:3

**brought** [3]_ - 119:5_, 119:7_, 197:15

**brown** [7]_ - 90:21_, 92:19_, 113:5_, 113:11_, 113:17_, 114:4_, 114:15

**Browne** [6]_ - 3:9_, 3:22_, 4:2_, 5:23_, 11:5_, 165:12

**BROWNE** [94]_ - 3:23_, 3:25_, 4:3_, 4:15_, 5:14_, 5:24_, 6:12_, 6:17_, 8:22_, 8:24_, 9:18_, 9:24_, 10:1_, 10:19_, 11:3_, 11:8_, 11:11_, 11:16_, 11:18_, 12:13_, 12:15_, 14:22_, 14:24_, 15:8_, 15:10_, 15:14_, 15:18_, 15:20_, 16:6_, 16:12_, 16:16_, 17:7_, 17:11_, 18:24_,

19:1_, 20:1_, 20:3_, 20:17_, 20:18_, 21:1_, 21:2_, 21:5_, 21:9_, 22:1_, 22:10_, 22:12_, 22:13_, 25:7_, 25:10_, 25:11_, 26:4_, 26:13_, 26:15_, 26:16_, 27:11_, 27:13_, 29:18_, 31:9_, 160:1_, 160:9, 160:22_, 161:2_, 162:3_, 162:5_, 162:6_, 163:1_, 163:4_, 163:15_, 163:16_, 164:15_, 164:18_, 164:22_, 164:24_, 165:4_, 165:9_, 165:13_, 165:15_, 165:18_, 165:23_, 166:3_, 166:14_, 166:23_, 166:25_, 167:3_, 167:10_, 167:12_, 167:17_, 168:1_, 168:8_, 168:11_, 168:14_, 169:25_, 170:2_, 198:4

**Browne's** [1]_ - 106:5

**budgets** [1]_ - 58:15

**building** [2]_ - 21:19_, 63:4

**buildings** [2]_ - 38:22_, 60:21

**built** [1]_ - 52:22

**bullet** [1]_ - 192:20

**bumping** [1]_ - 18:9

**bungee** [14]_ - 88:6_, 88:8_, 88:13_, 88:15_, 88:18_, 88:20_, 91:11_, 95:4_, 104:23_, 112:1_, 113:19_, 113:20_, 113:22_, 115:18

**burden** [4]_ - 81:8_, 121:16_, 121:22_, 122:4

**Bureau** [5]_ - 6:21_, 75:1_, 138:9_, 161:14_, 171:11

**bureau** [3]_ - 75:9_, 75:10_, 157:17

**bush** [16]_ - 18:7_, 45:25_, 47:14_, 48:5_, 48:10_, 83:20_, 83:21_, 83:23_, 85:21_, 86:19_, 86:21_, 118:9_, 118:23_, 119:17_, 134:18_, 192:1

**bushes** [28]_ - 17:23_, 28:9_, 44:14_, 44:25_, 45:2_, 45:6_, 45:7_, 45:8_, 45:11_, 45:16_, 45:19_, 45:23_, 46:5_, 46:7_, 46:9_, 46:13_, 46:14_, 47:8_, 47:9_, 49:10_, 52:23_, 61:4_, 61:6_, 69:6_, 69:19_, 97:7_, 191:5_, 191:11

**busiest** [1]_ - 59:21

**business** [1]_ - 173:16

**businesses** [1]_ - 60:21

**but..** [1]_ - 127:10

**BY** [155]_ - 6:17_, 8:24_, 10:1_, 11:11_, 11:18_, 12:15_, 14:24_, 15:10_, 15:20_, 16:16_, 17:11_, 19:1_, 20:3_, 20:18_, 21:2_, 21:9_, 22:13_, 25:11_, 26:16_, 27:13_, 29:23_, 32:9_, 38:5_, 39:6_, 42:18_, 43:4_, 43:23_, 47:22_, 48:16_, 49:2_, 51:10_, 52:4, 55:18, 57:9, 60:12, 68:12_, 70:15_, 74:22_, 80:10_, 81:10_, 81:18_, 82:10_, 82:17_, 83:4_, 84:12_, 84:18_, 85:9, 85:19_, 87:22_, 89:1_, 90:1_, 90:7_, 90:14_, 91:6_, 91:17_, 93:8_, 93:15_, 94:6_, 95:1_, 95:10_, 99:18_, 100:8_, 100:14_, 101:4_, 101:24_, 102:9_, 103:3_, 103:12_, 103:15_, 104:2_, 104:9_, 104:20_, 106:8_, 106:24_, 108:1_, 108:13_, 109:9_, 109:24_, 110:17_, 111:9_, 111:21_, 112:12_, 113:1_, 114:12_, 114:24_, 115:15_, 116:1, 116:15_, 117:1_, 117:20_, 118:1_, 118:21_, 119:15_, 120:1_, 132:17_, 133:9_, 134:7_, 135:5, 136:18_, 138:5, 140:24_, 141:20_, 142:1_, 142:17_, 143:10_, 144:10_, 145:1, 145:20_, 146:1_, 146:16_, 147:2_, 147:15_, 148:6_, 148:21_, 149:14_, 150:16_, 151:2_, 152:5_, 153:18, 154:1_, 155:1_, 155:15_, 158:17_, 159:5, 161:2_, 162:6_, 163:16_, 164:18_, 164:24_, 165:4_, 165:9_, 165:15_, 165:18_, 165:23_, 166:3_, 167:3_, 167:12_, 167:17_, 168:1_, 168:14_, 171:7_, 175:18_, 176:8_, 179:19_, 181:1_, 181:16_, 183:10_, 184:4_, 187:17_, 189:3_, 191:23_, 193:21_, 194:19, 196:3_, 196:11

C

**C-A-S-E-Y** [1]_ - 6:11

**calendar** [4]_ - 4:7_, 127:25_, 128:5_, 129:13

**callout** [1]_ - 76:21

**callouts** [1]_ - 34:12

**camera** [46]_ - 12:8_, 12:9_, 13:24_, 15:1_, 17:21_, 17:22_, 19:4_, 19:7_, 19:13_, 19:15_, 19:16_, 19:20_, 28:13_, 70:8_, 70:9_, 70:21_, 87:14_, 87:15_, 87:25_, 88:21_, 88:22_, 90:17_, 95:4_, 95:5_, 104:23_, 104:25_, 115:2_, 115:3_, 115:6_, 115:19_, 116:2_, 118:14_, 118:15_, 119:4_, 133:17_, 146:6_, 146:15_, 146:17_, 162:19_, 162:24_, 164:2_, 167:7_, 169:3_, 169:4_, 169:14_, 169:22

**camouflage** [4]_ - 153:23_, 167:21_, 168:3_, 168:5

**Candidate** [1]_ - 62:9

**cannot** [1]_ - 169:11

**capacity** [2]_ - 78:13_, 140:1

**Captain** [1]_ - 140:5

**capture** [5]_ - 8:16_, 10:8_, 10:10_, 13:21_, 65:6

**captured** [8]_ - 13:1_, 13:24_, 14:15_, 19:3_, 27:17_, 71:20_, 192:14_, 193:8

**captures** [2]_ - 71:16_, 184:23

**capturing** [1]_ - 10:9

**car** [12]_ - 36:6_, 36:10_, 43:24_, 61:16_, 63:12_, 64:2_, 64:6_, 64:12_, 64:16_, 64:20_, 65:11

**card** [22]_ - 115:4_, 162:15_, 162:16_, 163:24_, 163:25_, 164:2_, 164:7_, 166:9_, 166:11_, 167:7_, 168:22_, 169:2_, 184:17_, 184:18_, 184:23_, 185:13_, 185:14_, 185:16_, 185:19_, 185:21_, 185:22

**cardboard** [1]_ - 105:10

**cards** [3]_ - 184:14_, 186:4_, 186:12

**care** [1]_ - 125:20

**career** [2]_ - 57:19_, 57:20

**carriage** [1]_ - 53:4

**carry** [1]₋ - 106:6

**carrying** [1]₋ - 69:14

**CART** [2]₋ - 161:17₋, 161:18

**cart** [7]₋ - 13:5₋, 22:25₋, 23:1₋, 24:16₋, 29:2₋, 29:5₋, 29:13

**case** [39]₋ - 3:2₋, 3:4₋, 7:14₋, 12:20₋, 54:1₋, 60:14₋, 68:14₋, 71:24₋, 81:7₋, 99:12₋, 105:15₋, 122:7₋, 122:19₋, 125:10₋, 125:25₋, 126:2₋, 130:1₋, 130:25₋, 161:22₋, 174:1₋, 174:4₋, 174:20₋, 175:6₋, 175:7₋, 175:9₋, 175:21₋, 178:22₋, 179:6₋, 181:5₋, 181:6₋, 181:8₋, 181:22₋, 182:4₋, 182:16₋, 185:3₋, 195:9₋, 200:2₋, 200:4₋, 200:5

**Case** [1]₋ - 3:5

**Casey** [21]₋ - 3:25₋, 4:10₋, 4:18₋, 5:25₋, 6:1₋, 6:2₋, 6:11₋, 6:18₋, 9:1₋, 11:12₋, 15:21₋, 16:17₋, 18:23₋, 19:25₋, 20:19₋, 21:10₋, 22:14₋, 25:12₋, 26:17₋, 27:14₋, 198:2

**CASEY** [1] - 6:14

**casing** [1]₋ - 115:3

**catch** [1]₋ - 65:11

**category** [2]₋ - 96:11₋, 191:14

**caused** [1]₋ - 49:13

**caveat** [1]₋ - 130:19

**cell** [2]₋ - 71:8₋, 161:12

**center** [17]₋ - 18:17₋, 20:10₋, 26:19₋, 28:24₋, 29:5₋, 29:13₋, 42:12₋, 43:21₋, 68:21₋, 73:7₋, 83:15₋, 84:25₋, 85:24₋, 100:18₋, 144:19₋, 145:12₋, 145:19

**central** [1]₋ - 16:21

**ceramic** [1]₋ - 93:2

**certain** [6]₋ - 37:9₋, 38:18₋, 81:3₋, 86:16₋, 87:8₋, 176:17

**certainly** [5]₋ - 121:9₋, 128:2₋, 136:15₋, 198:20₋, 200:4

**certifications** [1]₋ - 78:5

**certified** [3]₋ - 58:12₋, 78:6₋, 139:12

**cetera** [1]₋ - 17:3

**chain** [14]₋ - 18:13₋, 19:9₋, 19:17₋, 24:7₋, 28:18₋, 28:24₋, 29:6₋, 46:2₋, 46:5₋, 70:4₋, 70:5₋, 70:22₋, 93:25₋, 169:18

**chain-link** [14]₋ - 18:13₋, 19:9₋, 19:17₋, 24:7₋, 28:18₋, 28:24₋, 29:6₋, 46:2₋, 46:5₋, 70:4₋, 70:5₋, 70:22₋, 93:25₋, 169:18

**chamber** [5]₋ - 97:13₋, 97:15₋, 192:22₋, 193:7₋, 194:13

**chambered** [5]₋ - 96:20₋, 102:24₋, 104:12₋, 108:18₋, 194:12

**chance** [4]₋ - 44:20₋, 175:20₋, 176:16₋, 184:5

**change** [3]₋ - 4:15₋, 23:12₋, 23:14

**changes** [1]₋ - 4:13

**channel** [7]₋ - 40:7₋, 40:8₋, 62:18₋, 62:21₋, 63:3₋, 66:18

**characterize** [5]₋ - 114:17₋, 114:18₋, 118:11₋, 118:25₋, 119:19

**charge** [3]₋ - 58:5₋, 58:7₋, 58:9

**charged** [2]₋ - 81:5₋, 121:14

**charging** [1]₋ - 52:13

**check** [8]₋ - 36:5₋, 67:10₋, 67:16₋, 68:25₋, 82:2₋, 126:19₋, 144:3₋, 169:3

**checking** [2]₋ - 52:23₋, 67:8

**cheek** [4]₋ - 177:25₋, 178:2₋, 178:6₋, 178:23

**cheeks** [1]₋ - 178:3

**chief** [1]₋ - 130:1

**children** [1]₋ - 59:25

**Chinese** [1]₋ - 52:20

**choose** [1]₋ - 131:13

**chose** [2]₋ - 17:16₋, 19:15

**Christopher** [1]₋ - 3:9

**circle** [28]₋ - 19:10₋, 73:9₋, 80:19₋, 81:13₋, 81:21₋, 82:19₋, 84:22₋, 85:25₋, 88:8₋, 89:13₋, 89:19₋, 91:22₋, 103:7₋, 111:22₋, 113:7₋, 113:24₋, 115:5₋, 145:21₋, 149:3₋, 149:19₋,

150:3₋, 150:19₋, 155:3₋, 178:1₋, 194:2₋, 194:3₋, 194:8₋, 194:12

**circled** [6]₋ - 83:8₋, 84:25₋, 86:1₋, 145:19₋, 147:24₋, 155:7

**circles** [1]₋ - 19:6

**circling** [10]₋ - 83:15₋, 85:24₋, 89:18₋, 91:10₋, 93:17₋, 100:18₋, 100:19₋, 100:21₋, 144:19₋, 146:9

**circumstances** [1]₋ - 131:1

**citizen** [1]₋ - 64:11

**City** [2]₋ - 57:16₋, 57:25

**clamp** [9]₋ - 120:9₋, 123:8₋, 123:10₋, 125:3₋, 126:17₋, 128:18₋, 128:20₋, 133:12₋, 134:16

**clarification** [1] - 39:1

**class** [1]₋ - 7:6

**clean** [1]₋ - 178:9

**clear** [11]₋ - 45:16₋, 72:15₋, 72:19₋, 96:19₋, 114:2₋, 115:18₋, 181:2₋, 183:1₋, 190:19₋, 190:21₋, 195:11

**clear-in-color** [1]₋ - 114:2

**cleared** [1]₋ - 117:9

**clearing** [3]₋ - 20:15₋, 145:11₋, 194:24

**clip** [1]₋ - 26:20

**clipped** [1]₋ - 46:25

**close** [21]₋ - 12:23₋, 14:8₋, 18:5₋, 56:1₋, 63:13₋, 92:4₋, 98:16₋, 100:6₋, 102:12₋, 103:1₋, 104:12₋, 104:22₋, 105:5₋, 111:3₋, 131:5₋, 141:11₋, 141:13₋, 154:3₋, 154:16₋, 158:10₋, 198:23

**close-up** [4]₋ - 100:6₋, 103:1₋, 154:3₋, 154:16

**closed** [2]₋ - 93:24₋, 105:18

**closer** [9]₋ - 12:10₋, 24:14₋, 81:20₋, 84:20₋, 85:11₋, 85:22₋, 100:16₋, 101:11

**closer-up** [5]₋ - 84:20₋, 85:11₋, 85:22₋, 100:16₋, 101:11

**clothing** [2]₋ - 151:16₋, 154:3

**club** [17]₋ - 13:22₋, 16:19₋,

17:24₋, 22:17₋, 29:4₋, 36:17₋, 36:24₋, 37:1₋, 37:3₋, 37:7₋, 37:20₋, 39:9₋, 59:9₋, 59:19₋, 80:18₋, 140:8₋, 174:14

**Club** [19]₋ - 7:15₋, 7:19₋, 7:22₋, 12:17₋, 16:3₋, 16:25₋, 21:24₋, 25:23₋, 36:12₋, 58:24₋, 59:3₋, 62:1₋, 63:10₋, 78:22₋, 79:9₋, 102:4₋, 143:15₋, 174:5₋, 190:8

**clubhouse** [12]₋ - 40:4₋, 40:5₋, 40:11₋, 41:4₋, 41:11₋, 41:15₋, 41:18₋, 42:1₋, 42:7₋, 42:11₋, 42:19

**clue** [1]₋ - 169:10

**Coast** [5]₋ - 189:24₋, 189:25₋, 190:2₋, 190:3₋, 190:4

**code** [1]₋ - 158:12

**cold** [1]₋ - 84:3

**collateral** [2]₋ - 171:13₋, 172:9

**collect** [10]₋ - 96:9₋, 98:12₋, 138:14₋, 163:24₋, 173:17₋, 174:24₋, 175:2₋, 176:17₋, 177:21₋, 183:17

**collected** [12]₋ - 12:9₋, 15:4₋, 15:6₋, 25:2₋, 96:15₋, 96:16₋, 106:14₋, 178:2₋, 182:7₋, 183:22₋, 186:18₋, 186:19

**collecting** [7]₋ - 95:24₋, 105:21₋, 139:9₋, 151:13₋, 163:25₋, 173:6₋, 175:6

**collection** [13]₋ - 76:11₋, 77:3₋, 77:6₋, 138:17₋, 161:19₋, 171:24₋, 172:5₋, 172:24₋, 173:11₋, 177:15₋, 177:16₋, 182:12₋, 183:11

**collections** [1]₋ - 128:11

**collector** [1]₋ - 10:11

**color** [20]₋ - 20:10₋, 22:19₋, 23:13₋, 23:14₋, 88:20₋, 90:19₋, 90:21₋, 90:22₋, 90:24₋, 91:1₋, 91:2₋, 111:15₋, 112:1₋, 113:11₋, 113:16₋, 113:19₋, 113:20₋, 114:2₋, 151:7₋, 154:20

**colored** [3]₋ - 26:19₋, 94:14₋, 156:7

**combination** [1]₋ - 24:24

**combined** [1] - 11:22
**comfortable** [3] - 18:10, 69:23, 69:24
**coming** [5] - 34:12, 45:22, 59:8, 61:4, 70:16
**command** [3] - 17:2, 156:1
**comment** [2] - 136:23, 137:1
**commissioned** [1] - 189:25
**commonly** [1] - 171:16
**communicating** [1] - 45:15
**communication** [2] - 66:11, 66:19
**communications** [2] - 35:13, 35:17
**compare** [1] - 103:13
**complaints** [1] - 200:23
**complete** [1] - 199:2
**completed** [1] - 73:13
**complex** [6] - 7:3, 7:4, 7:8, 7:13, 8:1, 173:2
**Complies** [23] - 17:6, 18:22, 19:12, 28:3, 82:20, 84:23, 88:11, 91:23, 103:8, 108:6, 108:21, 109:16, 111:24, 112:18, 112:22, 113:9, 115:22, 134:22, 149:5, 150:4, 150:20, 194:4, 194:14
**components** [1] - 72:12
**compound** [2] - 58:24, 63:9
**Computer** [1] - 161:16
**computers** [1] - 10:13
**concern** [4] - 49:14, 49:16, 49:17, 72:11
**concerned** [2] - 71:3, 72:1
**concluded** [1] - 201:3
**concludes** [4] - 170:6, 196:24, 200:7, 201:1
**conclusion** [2] - 121:20, 122:7
**conclusions** [1] - 121:9
**condition** [3] - 100:3, 120:20, 181:24
**conduct** [2] - 76:22,

79:12
**conducted** [2] - 161:25, 196:16
**conducting** [1] - 120:18
**cone** [1] - 91:18
**cones** [8] - 68:21, 86:6, 86:12, 86:13, 86:15, 128:11, 147:23, 148:1
**conference** [1] - 7:16
**confident** [1] - 72:23
**confirm** [4] - 9:4, 11:5, 126:19, 126:23
**Congress** [14] - 23:7, 42:4, 42:6, 43:12, 60:19, 61:2, 63:10, 63:20, 65:8, 65:12, 80:14, 141:13, 144:15, 147:18
**conjunction** [1] - 128:14
**connection** [1] - 35:9
**consider** [1] - 41:21
**considered** [2] - 35:1, 59:12
**consistent** [3] - 4:11, 44:16, 154:21
**constant** [1] - 157:19
**construction** [1] - 21:18
**construe** [2] - 81:6, 122:2
**contact** [6] - 79:10, 178:20, 178:21, 200:2, 200:4
**contain** [1] - 156:24
**contained** [3] - 146:7, 184:8, 185:19
**container** [1] - 178:8
**containing** [2] - 8:19, 180:15
**contains** [5] - 4:7, 9:4, 9:12, 9:14, 9:17
**contamination** [1] - 96:4
**contents** [4] - 92:12, 162:16, 179:21, 181:18
**continue** [8] - 11:10, 17:9, 28:4, 28:19, 92:5, 121:7, 132:9, 163:14
**continued** [2] - 65:8, 200:8
**continues** [1] - 19:21
**continuous** [1] - 14:10

**control** [5] - 77:5, 79:11, 98:25, 101:12, 101:17
**controlled** [1] - 98:15
**controls** [1] - 71:21
**conversations** [1] - 66:24
**cop** [1] - 58:2
**copies** [1] - 166:10
**copy** [6] - 10:6, 123:21, 124:8, 126:12, 135:23, 164:3
**cord** [9] - 88:15, 91:11, 95:4, 104:23, 112:2, 113:19, 113:20, 113:22, 115:18
**cordoning** [1] - 51:21
**cords** [5] - 88:7, 88:8, 88:13, 88:18, 88:20
**core** [1] - 51:5
**corner** [7] - 17:1, 17:8, 19:23, 22:18, 23:21, 61:1
**correct** [51] - 5:1, 24:2, 34:6, 35:11, 35:12, 37:15, 37:19, 39:24, 41:8, 45:18, 52:10, 57:12, 58:1, 62:10, 66:5, 67:13, 69:8, 69:18, 69:20, 69:22, 77:17, 79:5, 79:7, 83:16, 93:23, 94:1, 99:13, 102:20, 102:21, 105:1, 105:20, 115:10, 118:16, 128:24, 145:8, 153:3, 155:17, 164:10, 167:8, 172:21, 172:22, 177:14, 179:11, 179:23, 180:10, 181:11, 182:19, 182:20, 182:21, 182:24, 192:2
**corrected** [2] - 140:18, 149:20
**correction** [1] - 4:3
**corrections** [1] - 57:17
**correspond** [1] - 25:1
**Counsel** [1] - 3:6
**counsel** [4] - 3:16, 3:18, 4:25, 126:12
**Count** [4] - 81:5, 81:8, 121:14, 121:16
**count** [2] - 121:20, 121:23
**counterparts** [1] -

58:18
**counterterrorism** [1] - 75:25
**countries** [1] - 52:22
**countrywide** [1] - 7:12
**counts** [1] - 121:17
**County** [19] - 32:13, 32:18, 33:8, 33:16, 34:3, 34:22, 35:6, 35:13, 38:23, 49:21, 50:2, 50:14, 55:20, 57:18, 59:4, 59:16, 62:17, 151:24, 152:14
**couple** [4] - 48:1, 52:23, 122:18, 178:1
**Course** [3] - 38:12, 68:20, 139:21
**course** [58] - 17:13, 23:18, 29:7, 30:19, 36:3, 36:20, 37:11, 37:14, 38:18, 43:13, 44:13, 45:17, 54:2, 59:5, 59:7, 60:20, 61:1, 61:24, 62:7, 62:8, 62:15, 62:19, 62:21, 63:3, 67:13, 67:25, 82:22, 87:4, 87:5, 117:2, 117:7, 117:9, 117:13, 118:5, 120:16, 120:17, 121:15, 126:15, 130:9, 140:9, 140:11, 140:13, 140:14, 141:1, 141:11, 142:6, 142:23, 144:13, 144:20, 150:6, 151:10, 151:18, 151:25, 155:4, 174:17, 186:3, 200:25
**courses** [1] - 172:5
**court** [3] - 70:17, 77:8, 131:15
**Court** [9] - 3:1, 3:3, 39:1, 54:14, 124:16, 126:11, 130:13, 197:13, 197:17
**COURT** [272] - 3:2, 3:11, 3:13, 3:15, 3:19, 3:24, 4:1, 4:11, 4:20, 4:22, 5:7, 5:11, 5:15, 5:17, 5:20, 6:1, 6:13, 8:23, 9:21, 9:25, 10:22, 10:24, 11:5, 11:9, 15:17, 16:8, 16:10, 16:14, 21:8, 22:4, 22:6, 22:11, 25:9, 26:2, 26:7, 26:9, 26:14, 29:20, 31:8, 31:10, 31:13, 31:16, 32:4, 38:2

_, 39:3_, 43:3_, 47:21_, 48:15_, 51:7_, 51:9_, 52:1_, 53:20_, 53:22_, 54:7_, 54:10_, 54:12_, 54:13_, 54:17_, 54:19_, 54:23, 55:11_, 56:2_, 56:9_, 56:12_, 56:14_, 56:19_, 56:23_, 57:1_, 57:4_, 60:10_, 68:10_, 70:14_, 74:2_, 74:4_, 74:8_, 80:9_, 80:25_, 81:17_, 82:1_, 82:4_, 82:6_, 82:8_, 83:3_, 84:11_, 84:17_, 85:8_, 87:21_, 89:25_, 90:13_, 91:5_, 91:16_, 93:7_, 93:14_, 94:5_, 94:25_, 95:9_, 99:17_, 100:13_, 101:3_, 101:23_, 102:8_, 103:11_, 104:1_, 104:8_, 104:15_, 104:19_, 106:4_, 106:7_, 106:21_, 107:19_, 107:21_, 107:24_, 108:8_, 108:11_, 108:24_, 109:6_, 109:21_, 110:12_, 110:15_, 111:1_, 111:6_, 112:9_, 112:24_, 114:9_, 114:20_, 115:12_, 116:24_, 117:16_, 117:24_, 118:20_, 119:14_, 119:24_, 120:25_, 121:2_, 122:17, 122:24_, 123:2_, 123:5_, 123:13_, 123:20_, 123:23_, 124:1_, 124:5_, 124:8_, 124:13_, 124:18_, 124:21_, 124:23_, 125:5_, 125:8_, 125:21_, 126:8_, 126:15_, 126:25_, 127:11_, 127:14_, 127:24_, 128:16_, 128:23_, 129:1_, 129:17_, 130:6_, 130:14_, 130:22_, 131:3_, 131:17_, 132:2_, 132:4_, 132:7_, 132:12_, 132:15_, 132:25_, 133:6_, 134:4_, 134:24_, 135:2_, 135:25_, 136:7_, 136:10_, 136:12_, 136:16_, 137:6_, 137:8_, 137:10_, 137:12_, 137:15_, 141:18_, 142:10_, 142:12_, 142:16_, 143:2_, 143:4_, 143:9_, 143:19_, 143:21_, 144:1_, 144:6_, 145:25_, 147:1_, 147:14_, 148:5_, 148:20_, 149:13_, 150:15_, 151:1_, 153:1_, 153:4_, 153:9_, 153:15_, 158:16_, 159:3_, 159:14_, 159:16_, 159:20_, 159:23_, 160:3_, 160:7, 160:23_, 162:4_, 163:3_, 163:6_, 165:12_, 165:14_, 166:17_

_, 166:19_, 166:24_, 170:1_, 170:3_, 170:6_, 170:9_, 170:13, 171:2_, 175:16_, 176:5_, 179:15_, 179:18_, 180:24_, 181:14_, 183:5_, 183:8_, 184:2_, 186:24_, 187:3_, 187:5_, 187:12_, 187:15_, 187:25_, 188:2_, 188:8_, 188:11, 188:23_, 191:22_, 193:19_, 194:16_, 196:5_, 196:8_, 196:20_, 196:23_, 197:5_, 197:7_, 197:18_, 197:21_, 197:23_, 198:6_, 198:8_, 198:18_, 199:4_, 199:12_, 199:18_, 200:12_, 200:18_, 200:22

**Court's** [5]_ - 60:7_, 70:11_, 106:2_, 129:10_, 188:6

**courthouse** [1]_ - 121:6

**courtroom** [14]_ - 5:16_, 54:6_, 54:18_, 56:18_, 57:3_, 122:16_, 122:18_, 132:6_, 159:19_, 160:4_, 160:6_, 197:4_, 199:17_, 200:11

**COURTROOM** [21]_ - 3:4_, 5:10_, 6:3_, 6:8_, 31:17_, 31:22_, 55:1_, 55:6_, 56:11_, 74:9_, 74:15_, 137:17_, 137:22_, 141:23_, 160:11_, 160:17_, 170:15_, 170:20_, 170:22_, 188:13_, 188:18

**covering** [2]_ - 112:16_, 174:8

**covers** [1]_ - 75:14

**coy** [1]_ - 130:23

**crawl** [5]_ - 18:5_, 68:5_, 69:3_, 69:16_, 73:18

**crawled** [1]_ - 18:3

**crawling** [2]_ - 18:9_, 69:6

**create** [3]_ - 10:14_, 12:20_, 13:2

**created** [3]_ - 11:25_, 15:23_, 15:24

**creating** [2]_ - 11:24_, 27:7

**crime** [69]_ - 7:3_, 7:8_, 7:9_, 7:13_, 7:24_, 8:1_, 8:4_, 8:14_, 15:3_, 16:25_, 17:18_, 20:21_, 25:2_, 51:6_, 67:3_, 71:12_, 72:2_, 72:14_, 75:20_, 76:11_, 76:21_, 76:22_, 76:23_, 76:24_, 76:25_, 77:2_,

77:5_, 78:3_, 78:8_, 78:10_, 79:14_, 79:22_, 80:1_, 80:13_, 81:12_, 81:20_, 83:6_, 83:10_, 84:14_, 84:21_, 85:11_, 85:23_, 86:5_, 86:12_, 86:13_, 86:17_, 89:11_, 94:9_, 94:10_, 95:12_, 95:16_, 95:20_, 97:4_, 99:7_, 101:13_, 101:18_, 102:4_, 102:11_, 102:12_, 113:21_, 115:6_, 118:3_, 118:24_, 120:13_, 120:16_, 122:1_, 133:14_, 133:18

**crimes** [4]_ - 33:12_, 58:8_, 75:22_, 138:22

**criminal** [1]_ - 76:3

**critical** [1]_ - 59:24

**cross** [14]_ - 29:20_, 52:2_, 74:2_, 96:3_, 127:4_, 129:5_, 130:24_, 135:3_, 159:3_, 187:13_, 194:17_, 197:14_, 198:19_, 198:20

**CROSS** [6]_ - 29:22_, 52:3_, 135:4_, 159:4_, 187:16_, 194:18

**cross-examination** [9]_ - 29:20_, 52:2_, 74:2_, 135:3_, 159:3_, 187:13_, 194:17_, 197:14_, 198:19

**CROSS-EXAMINATION** [6]_ - 29:22_, 52:3_, 135:4_, 159:4_, 187:16_, 194:18

**cross-examinations** [1]_ - 130:24

**cross-examine** [3]_ - 127:4_, 129:5_, 198:20

**crouch** [1]_ - 69:25

**CSI** [1]_ - 156:17

**curb** [1]_ - 27:25

**curious** [1]_ - 64:14

**current** [5]_ - 34:2_, 57:14_, 125:13_, 129:24_, 169:5

**custody** [8]_ - 151:16_, 155:23_, 155:25_, 156:17_, 156:20_, 157:6_, 157:11_, 182:9

**cutaway** [3]_ - 12:1_, 25:13_, 25:15

### D

**D-A-V-I-D** [1]_ - 188:21

**daily** [5]_ - 10:18_, 13:11_, 34:9_, 34:22_, 34:24

**dangerous** [1]_ - 71:4

**dangling** [1]_ - 136:24

**dark** [7]_ - 61:18_, 92:16_, 117:11_, 119:2_, 119:20_, 153:23_, 156:7

**dark-colored** [1]_ - 156:7

**dashboard** [1]_ - 39:23

**dashed** [1]_ - 23:4

**data** [48]_ - 4:4_, 4:5_, 7:25_, 8:14_, 9:10_, 9:12_, 9:14_, 9:17_, 10:2_, 10:4_, 10:5_, 10:8_, 10:10_, 10:11_, 10:12_, 10:16_, 10:17_, 11:21_, 11:22_, 12:1_, 12:9_, 12:12_, 12:25_, 14:15_, 19:5_, 20:7_, 21:20_, 21:22_, 23:16_, 24:6_, 24:24_, 25:13_, 25:18_, 26:5_, 26:19_, 26:20_, 26:21_, 27:15_, 30:7_, 30:12_, 30:14_, 129:18_, 161:11_, 163:24_, 163:25_, 164:3_, 164:4

**dataset** [2]_ - 11:24_, 16:5

**date** [14]_ - 9:3_, 129:22_, 130:12_, 130:16_, 131:10_, 131:18_, 131:19_, 168:15_, 168:17_, 168:19_, 168:20_, 169:3_, 169:5

**dated** [1]_ - 186:21

**dating** [1]_ - 180:19

**David** [5]_ - 4:19_, 97:2_, 97:3_, 188:10_, 188:21

**DAVID** [1]_ - 188:25

**day-to-day** [2]_ - 172:7_, 174:23

**daylight** [2]_ - 79:20_, 169:10

**days** [9]_ - 10:10_, 13:6_, 62:13_, 77:14_, 77:16_, 117:7_, 120:16_, 120:17_, 200:24

**dealing** [2]_ - 45:7_, 50:7

**debris** [1]_ - 47:11

**decide** [3]_ - 40:19_, 121:24_, 131:20

**decision** [1]_ - 122:4

**decisions** [2]_ - 131:16_, 182:17

deconflict [1] - 45:21

decorative [1] - 29:1

defendant [7] - 81:4, 121:13, 152:20, 153:20, 156:11, 174:20, 185:6

defendant's [5] - 129:2, 129:9, 133:1, 151:16, 154:5

defense [10] - 3:14, 4:22, 129:21, 131:1, 131:6, 177:14, 197:14, 198:11, 198:22, 200:19

defer [1] - 4:16

deliberations [2] - 163:9, 163:13

departed [1] - 8:5

department [2] - 38:15, 39:14

depict [10] - 12:17, 16:3, 25:22, 43:15, 48:4, 89:9, 142:4, 142:22, 143:13, 169:18

depicted [5] - 14:25, 63:18, 86:6, 111:23, 155:10

depiction [4] - 21:24, 148:15, 152:13, 152:19

depicts [1] - 48:20

deploy [1] - 7:3

depth [3] - 18:6, 28:15, 28:16

Deputy [1] - 4:18

DEPUTY [21] - 3:4, 5:10, 6:3, 6:8, 31:17, 31:22, 55:1, 55:6, 56:11, 74:9, 74:15, 137:17, 137:22, 141:23, 160:11, 160:17, 170:15, 170:20, 170:22, 188:13, 188:18

deputy [3] - 57:17, 57:21, 60:2

derivations [1] - 53:1

describe [19] - 34:21, 40:4, 44:12, 46:12, 47:24, 69:5, 69:23, 70:8, 83:23, 84:5, 90:21, 107:6, 107:7, 110:2, 112:19, 172:7, 178:4, 184:21, 185:20

described [11] - 19:11, 47:5, 48:18, 49:7, 70:20, 92:19, 101:9, 123:8, 133:18, 167:6,

178:5

description [4] - 50:6, 64:25, 65:20, 124:2

designated [2] - 150:22, 151:5

detail [4] - 37:7, 38:14, 44:10, 156:6

details [2] - 34:15, 180:19

detective [1] - 57:21

detectives [4] - 58:8, 58:14, 62:6, 67:24

determination [1] - 81:7

determine [5] - 121:15, 127:7, 168:22, 168:24, 199:5

deviations [2] - 157:25, 158:2

device [11] - 162:10, 162:12, 162:14, 162:17, 162:22, 163:19, 163:22, 164:1, 164:4, 168:21, 178:17

device's [1] - 164:7

devices [1] - 55:21

diagram [10] - 21:16, 21:18, 24:1, 24:11, 24:20, 24:22, 27:7, 27:19, 28:2, 30:20

diagrams [6] - 11:25, 12:1, 13:13, 21:14, 21:15, 21:23

diff [1] - 64:24

differ [1] - 16:18

different [24] - 13:14, 13:15, 15:11, 33:22, 48:17, 53:16, 62:6, 62:14, 62:16, 67:19, 68:4, 69:10, 72:7, 103:20, 103:21, 118:8, 131:13, 148:2, 154:8, 168:5, 168:7, 172:25, 173:3, 184:11

differs [1] - 24:20

difficult [2] - 69:12, 73:20

difficulty [1] - 86:20

digital [9] - 161:5, 161:7, 161:9, 161:10, 161:11, 161:19, 161:21, 161:25, 164:3

dignitaries [2] - 37:13, 37:18

dignitary [3] - 34:25, 35:4, 38:14

diligence [1] - 200:8

dimension [2] - 30:3, 30:10

dimensional [3] - 11:25, 25:13, 25:18

DIRECT [8] - 6:16, 32:8, 55:17, 74:21, 138:4, 161:1, 171:6, 189:2

direct [11] - 27:15, 35:19, 37:24, 78:18, 91:18, 92:6, 101:13, 130:15, 139:18, 176:10, 190:6

directed [3] - 68:25, 191:5, 191:7

direction [7] - 19:4, 87:16, 89:13, 89:16, 89:21, 107:2, 192:8

directions [2] - 68:5, 69:11

directly [5] - 24:5, 25:21, 82:13, 149:18, 158:3

dirt [7] - 23:3, 28:21, 61:13, 61:19, 64:17, 65:4, 167:14

disable [1] - 72:9

disaster [1] - 172:6

discharge [1] - 192:24

disclosed [1] - 125:5

discovered [1] - 169:4

discovery [5] - 11:7, 126:19, 126:22, 126:23, 128:8

discretion [1] - 188:6

discuss [5] - 54:1, 54:2, 56:20, 121:4, 122:13

discussed [5] - 127:20, 128:4, 129:4, 154:4, 186:15

discussion [5] - 66:2, 121:8, 127:23, 199:6, 200:2

display [1] - 110:16

displayed [1] - 108:25

disposal [1] - 36:5

disruption [1] - 72:9

distance [6] - 28:13, 28:15, 28:16, 29:12, 29:15, 46:4

distances [1] - 30:18

district [6] - 59:13, 59:20, 131:5, 131:6, 131:22, 176:13

District [5] - 59:20, 60:3, 60:23, 176:13

districts [1] - 59:21

disturbance [1] - 45:12

disturbed [2] - 47:9, 79:23

dive [2] - 58:21

divide [1] - 172:24

Division [1] - 75:2

division [5] - 33:12, 33:13, 66:11, 66:19, 67:8

DNA [16] - 96:4, 98:5, 174:24, 177:17, 177:20, 177:21, 177:23, 177:25, 178:19, 180:2, 180:6, 180:20, 181:19, 183:11, 186:14, 186:17

document [3] - 7:3, 176:20, 180:13

documentation [3] - 7:23, 76:11, 77:4

documented [2] - 98:25, 105:13

documenting [1] - 98:21

documents [1] - 184:8

Dollar [5] - 90:9, 100:10, 100:23, 110:4, 110:19

domestically [1] - 139:14

Donald [2] - 30:2, 36:25

done [12] - 18:1, 36:2, 57:13, 96:15, 99:11, 113:13, 120:3, 134:9, 134:11, 173:24, 182:18, 185:10

DONNELLEY [3] - 42:9, 43:19, 43:23

DONNELLY [52] - 31:14, 32:2, 32:5, 32:9, 37:25, 38:3, 38:5, 39:5, 39:6, 42:18, 42:25, 43:4, 47:18, 47:22, 48:12, 48:16, 48:23, 49:2, 51:8, 51:10, 51:23, 53:21, 170:11, 171:1, 171:3, 171:7, 175:11, 175:17, 175:18, 176:3, 176:6, 176:8, 179:13, 179:17, 179:19

_, 180:22_, 180:25_, 181:1_, 181:12_, 181:15_, 181:16_, 183:1_, 183:6_, 183:9_, 183:10_, 183:25_, 184:3_, 184:4_, 186:22_, 187:1_, 187:9_, 188:1

**Donnelly** [1]_ - 3:9

**doors** [1]_ - 156:25

**dots** [1]_ - 12:11

**double** [2]_ - 82:2_, 144:3

**double-check** [2]_ - 82:2_, 144:3

**down** [24]_ - 4:12_, 15:9_, 21:1_, 22:16_, 24:14_, 25:5_, 29:8_, 39:3_, 42:7_, 47:11_, 51:14_, 63:20_, 64:12_, 65:12_, 66:15_, 69:11_, 77:7_, 84:7_, 101:16_, 107:4_, 183:3_, 185:7_, 185:8_, 185:9

**downward** [2]_ - 89:22_, 118:4

**draw** [3]_ - 44:6_, 125:1_, 145:12

**drawing** [1]_ - 27:14

**drive** [6]_ - 4:7_, 8:19_, 9:1_, 9:2_, 9:19_, 10:6

**driver's** [2]_ - 64:12_, 64:19

**driveway** [1]_ - 61:13

**drone** [12]_ - 7:24_, 8:10_, 9:12_, 9:15_, 11:20_, 12:7_, 13:18_, 13:20_, 16:21_, 21:22_, 23:14

**drove** [4]_ - 41:18_, 63:4_, 64:11_, 64:20

**drug** [1]_ - 34:14

**due** [1]_ - 200:24

**dump** [1]_ - 61:15

**duration** [1]_ - 122:22

**during** [17]_ - 13:11_, 33:8_, 56:21_, 62:16_, 77:5_, 117:14_, 126:21_, 128:8_, 163:9_, 163:13_, 171:22_, 172:11_, 174:13_, 174:17_, 177:15_, 182:23_, 186:3

**duties** [23]_ - 34:2_, 34:9_, 34:17_, 34:22_, 34:24_, 35:4_, 37:6_, 38:13_, 75:17_, 75:19_, 76:4_, 138:12_, 138:15_, 138:21_, 139:8_, 172:8_, 172:10_, 172:24_, 173:3_, 174:23_, 186:3

**duty** [6]_ - 33:5_, 35:21_, 51:5_, 121:23_, 171:14_, 174:7

## E

**E-L-I-Z-A-B-E-T-H** [1]_ - 160:21

**early** [5]_ - 129:23_, 139:25_, 198:23_, 199:24

**ease** [1]_ - 193:4

**easier** [1]_ - 155:5

**easily** [1]_ - 84:6

**east** [5]_ - 42:4_, 42:6_, 141:13_, 147:9_, 147:18

**eastbound** [4]_ - 42:8_, 63:9_, 65:7

**easy** [1]_ - 197:1

**edge** [2]_ - 42:13_, 46:7

**edges** [1]_ - 16:21

**efficient** [1]_ - 199:20

**effort** [1]_ - 44:24

**efforts** [2]_ - 122:21_, 122:25

**eight** [3]_ - 58:8_, 189:14_, 197:11

**either** [4]_ - 13:24_, 93:2_, 119:4_, 186:12

**elaborate** [1]_ - 76:19

**elected** [2]_ - 125:12_, 199:21

**element** [1]_ - 58:21

**elements** [1]_ - 22:24

**eliminate** [1]_ - 178:21

**ELIZABETH** [1] - 160:24

**Elizabeth** [3]_ - 160:2_, 160:10_, 160:20

**emergency** [3]_ - 34:11_, 41:21_, 64:7

**emergent** [1]_ - 200:13

**employed** [3]_ - 32:12_, 32:17_, 171:10

**encountered** [1]_ - 152:20

**end** [13]_ - 10:11_, 23:23_, 29:7_, 46:6_, 78:9_, 89:3_, 89:5_, 90:4_, 140:12_, 147:18_, 177:24_, 197:25_, 200:6

**endeavors** [1]_ - 200:23

**ended** [1]_ - 11:24

**ends** [1]_ - 124:12

**enforcement** [7]_ - 47:14_, 50:14_, 66:16_, 67:7_, 83:12_, 119:9_, 139:16

**enjoy** [1]_ - 123:2

**ensure** [2]_ - 13:21_, 198:22

**entail** [1]_ - 173:12

**entailed** [1]_ - 125:19

**enter** [4]_ - 51:22_, 83:21_, 84:5_, 86:21

**entered** [9]_ - 5:16_, 54:18_, 57:3_, 86:19_, 132:6_, 160:6_, 192:1_, 199:17_, 200:24

**entering** [2]_ - 83:23_, 200:22

**entire** [3]_ - 23:20_, 77:5_, 199:2

**entrance** [3]_ - 36:22_, 39:10_, 42:7

**entry** [3]_ - 68:2_, 72:8_, 85:13

**entryway** [7]_ - 83:10_, 84:14_, 84:21_, 84:22_, 85:1_, 85:11_, 118:9

**envelope** [6]_ - 179:21_, 184:5_, 184:9_, 186:20

**environment** [1]_ - 12:24

**environmental** [1]_ - 58:8

**EOD** [4]_ - 36:1_, 36:4_, 36:8_, 36:11

**equipment** [8]_ - 17:3_, 58:15_, 67:19_, 68:1_, 69:14_, 71:15_, 73:20

**equivalence** [1]_ - 139:16

**Erin** [4]_ - 3:25_, 4:18_, 5:25_, 6:11

**ERIN** [2]_ - 6:11, 6:14

**ERT** [31]_ - 76:12_, 76:14_, 76:15_, 76:20_, 76:21_, 77:11_, 77:18_, 77:21_, 78:2_, 78:5_, 78:14_, 99:7_, 120:18_, 126:19_, 138:25_, 139:10_, 139:11_, 139:12_, 140:1_, 140:3_, 156:1_, 156:16_, 158:8_, 158:13_, 158:20_, 171:16_, 172:8_, 174:16_, 177:1_, 186:3_, 190:18

**escort** [1]_ - 37:17

**especially** [3]_ - 52:23_, 69:13_, 198:12

**essentially** [2]_ - 61:23_, 63:16

**estimate** [2]_ - 45:25_, 46:4

**et** [1]_ - 17:3

**evaluation** [1]_ - 168:21

**evening** [2]_ - 117:10_, 200:7

**event** [5]_ - 12:23_, 13:1_, 20:23_, 34:12_, 190:20

**events** [2]_ - 8:3_, 66:21

**eventually** [3]_ - 46:1_, 151:20_, 174:9

**evidence** [158]_ - 9:20_, 10:21_, 11:2_, 15:5_, 15:13_, 16:7_, 16:11_, 17:3_, 22:2_, 22:9_, 25:2_, 26:1_, 26:3_, 26:12_, 31:6_, 38:1_, 38:7_, 43:6_, 48:14_, 54:4_, 60:8_, 68:9_, 68:14_, 70:12_, 76:11_, 77:3_, 77:4_, 77:6_, 78:3_, 80:3_, 80:8_, 80:24_, 82:1_, 84:10_, 85:7_, 86:3_, 86:14_, 89:24_, 90:12_, 91:4_, 91:15_, 92:5_, 93:6_, 93:13_, 94:10_, 94:24_, 95:8_, 95:19_, 95:24_, 96:4_, 96:5_, 98:5_, 98:6_, 98:12_, 98:13_, 98:20_, 98:22_, 98:25_, 99:16_, 100:12_, 101:2_, 101:12_, 101:15_, 101:17_, 101:22_, 102:7_, 103:10_, 103:25_, 104:7_, 105:8_, 105:11_, 105:12_, 105:15_, 105:16_, 105:17_, 105:22_, 106:1_, 107:17_, 108:15_, 108:24_, 109:11_, 110:16_, 119:13_, 123:11_, 123:17_, 125:9_, 126:1_, 126:5_, 126:20_, 128:3_, 129:11_, 129:14_, 132:24_, 133:2_, 134:18_, 138:14_, 138:17_, 139:9_, 141:1_, 142:9_, 142:13_, 143:6_, 143:23_, 145:5_, 147:13_, 148:4_, 148:19_, 150:1_, 150:7_, 150:22_, 150:25_, 152:25_, 153:4_, 153:12_, 154:23_, 156:24_, 157:1_, 157:22_, 158:12_, 158:22_, 161:9_, 161:10_, 161:11_, 161:25

_, 163:18_, 166:16, 166:22_, 171:14_, 171:23_, 172:3_, 172:24_, 173:6_, 173:7_, 173:11_, 174:24_, 175:7_, 175:12_, 175:19_, 175:20_, 176:9_, 176:18_, 180:25_, 181:9_, 182:7_, 183:12_, 183:13_, 183:16_, 184:17_, 186:23_, 187:8_, 187:19_, 187:20_, 190:23

**Evidence** [15]_ - 76:5_, 76:6_, 76:9_, 76:10_, 78:25_, 83:12_, 134:1_, 138:23_, 139:2_, 139:4_, 139:7_, 151:6_, 172:12_, 190:23_, 192:16

**evidence-marking** [1]_ - 80:3

**evidentiary** [2]_ - 3:21_, 199:6

**exact** [3]_ - 4:16_, 20:23_, 190:14

**exactly** [4]_ - 36:18_, 69:3_, 70:9_, 124:11

**examination** [13]_ - 29:20_, 52:2_, 74:2_, 132:9_, 135:3_, 159:3_, 178:7_, 182:23_, 183:23_, 187:13_, 194:17_, 197:14_, 198:19

**EXAMINATION** [14]_ - 6:16_, 29:22_, 32:8_, 52:3_, 55:17_, 74:21_, 135:4_, 138:4_, 159:4_, 161:1_, 171:6_, 187:16_, 189:2_, 194:18

**examinations** [2]_ - 130:24_, 161:25

**examine** [7]_ - 32:2_, 91:25_, 118:7_, 127:4_, 129:5_, 161:9_, 198:20

**examiner** [4]_ - 161:5_, 161:7_, 161:8_, 161:21

**examiners** [1]_ - 161:20

**example** [3]_ - 13:7_, 13:18_, 94:17

**excellent** [3]_ - 5:11_, 6:1_, 123:2

**exception** [4]_ - 119:20_, 152:15_, 163:9_, 169:12

**excerpt** [1]_ - 124:14

**exclude** [1]_ - 127:21

**excuse** [5]_ - 6:2_, 21:6_, 110:12_, 150:2_, 199:22

**excused** [5]_ - 31:11_,

53:23_, 137:10_, 159:14_, 188:3

**execute** [6]_ - 172:12_, 172:15_, 172:17_, 173:22_, 176:24_, 178:22

**execution** [2]_ - 34:11_, 181:25

**Exhibit** [136]_ - 9:8_, 9:11_, 9:16_, 11:13_, 13:8_, 15:12_, 15:22_, 15:25_, 16:2_, 16:7_, 16:11_, 17:8_, 18:17_, 21:10_, 22:2_, 24:11_, 24:18_, 25:19_, 26:25_, 27:12_, 38:1_, 38:8_, 43:2_, 43:6_, 47:20_, 47:24_, 48:13_, 48:25_, 60:9_, 68:9_, 70:12_, 80:8_, 80:24_, 81:16_, 81:25_, 82:11_, 82:24_, 83:2_, 84:10_, 84:16_, 85:18_, 87:20_, 89:24_, 90:11_, 90:19_, 91:4_, 91:15_, 93:6_, 93:13_, 93:16_, 94:4_, 94:24_, 95:8_, 99:16_, 100:12_, 100:25_, 101:2_, 101:9_, 101:22_, 102:7_, 103:10_, 103:13_, 103:14_, 103:16_, 103:19_, 103:25_, 104:7_, 104:10_, 104:14_, 104:18_, 107:17_, 108:14_, 109:10_, 110:1_, 111:11_, 111:20_, 111:23_, 112:14_, 113:8_, 113:24_, 114:14_, 115:1_, 115:5_, 115:9_, 115:17_, 116:3_, 116:7_, 116:14_, 117:22_, 118:19_, 119:12_, 120:5_, 120:24_, 129:11_, 132:20_, 133:2_, 136:9_, 141:17_, 142:13_, 142:15_, 143:1_, 143:6_, 143:8_, 143:18_, 143:23_, 144:8_, 144:12_, 144:23_, 145:24_, 146:24_, 147:13_, 148:4_, 148:19_, 149:10_, 150:14_, 150:25_, 152:4_, 152:24_, 153:17_, 154:10_, 154:15_, 154:25_, 158:15_, 162:2_, 162:7_, 162:18_, 166:15_, 168:9_, 168:12_, 179:14_, 181:13_, 184:19_, 187:2_, 191:21_, 193:18

**exhibit** [40]_ - 11:25_, 17:17_, 21:14_, 23:9_, 24:23_, 25:1_, 42:11_, 81:9_, 90:10_, 93:21_, 94:10_, 111:25_, 112:1_, 113:18_, 113:19_, 116:18

_, 123:6_, 123:14_, 123:21_, 124:2_, 124:8_, 124:10_, 124:14_, 124:25_, 125:6_, 125:23_, 126:9_, 126:13_, 127:2_, 127:5_, 128:5_, 128:6_, 128:24_, 136:2_, 155:10_, 163:1_, 168:15_, 168:18_, 169:25_, 183:7

**Exhibits** [18]_ - 4:6_, 4:9_, 8:20_, 8:21_, 10:3_, 10:20_, 11:1_, 21:4_, 22:8_, 25:8_, 25:25_, 26:6_, 26:11_, 153:11_, 164:13_, 166:21_, 175:23_, 187:7

**exhibits** [25]_ - 4:8_, 8:20_, 9:4_, 9:7_, 9:19_, 11:3_, 11:23_, 11:24_, 14:11_, 22:6_, 28:7_, 126:12_, 126:16_, 127:25_, 128:1_, 128:3_, 135:25_, 153:9_, 153:14_, 163:7_, 163:11_, 166:6_, 166:19_, 197:14_, 198:12

**exited** [9]_ - 54:6_, 56:18_, 63:4_, 73:15_, 122:16_, 159:19_, 197:4_, 200:11

**expect** [1]_ - 198:15

**experience** [5]_ - 32:21_, 59:18_, 60:4_, 86:11_, 175:6

**expert** [5]_ - 33:25_, 34:1_, 96:17_, 136:22_, 136:25

**expertise** [1]_ - 31:1

**explain** [5]_ - 12:5_, 14:3_, 24:20_, 25:14_, 27:21

**explosive** [3]_ - 36:5_, 72:12_, 72:24

**explosives** [4]_ - 36:6_, 49:18_, 72:11_, 73:13

**export** [1]_ - 164:5

**exported** [1]_ - 166:8

**extensive** [1]_ - 83:25

**extent** [1]_ - 121:25

**extra** [2]_ - 37:9_, 69:14

**extract** [2]_ - 166:11_, 195:3

**extracted** [4]_ - 24:24_, 30:18_, 167:7_, 169:22

**extracting** [1]_ - 163:18

**extraction** [6]_ - 162:10_, 162:13_, 163:17_, 163:20_, 163:23_, 169:2

**eye** [5]_ - 16:20_, 24:14_,

72:23_, 157:19

**eyes** [2]_ - 17:20_, 97:25

**eyesight** [1]_ - 150:11

**F**

**face** [2]_ - 24:7_, 159:8

**facility** [6]_ - 59:15_, 151:17_, 156:19_, 157:8_, 157:22_, 158:9

**facing** [11]_ - 82:12_, 82:14_, 82:22_, 145:4_, 146:4_, 147:8_, 147:18_, 148:9_, 148:23_, 148:24_, 150:10

**fact** [9]_ - 45:12_, 92:16_, 121:17_, 128:4_, 164:7_, 180:14_, 185:15_, 186:6_, 191:2

**facts** [2]_ - 121:24_, 122:6

**factual** [1]_ - 122:3

**faculty** [1]_ - 139:12

**fair** [10]_ - 13:23_, 18:10_, 21:23_, 27:17_, 60:4_, 86:15_, 94:12_, 148:15_, 152:12_, 152:19

**fairly** [9]_ - 12:16_, 16:2_, 25:22_, 48:4_, 48:20_, 89:9_, 142:4_, 142:22_, 143:13

**faith** [1]_ - 130:3

**familiar** [26]_ - 33:18_, 33:22_, 36:25_, 38:13_, 38:17_, 38:21_, 44:8_, 52:5_, 59:9_, 59:15_, 60:22_, 61:9_, 61:21_, 65:4_, 68:3_, 68:18_, 71:15_, 174:23_, 175:1_, 177:21_, 195:17_, 195:18_, 195:21_, 196:4_, 196:12_, 196:14

**familiarity** [2]_ - 196:13_, 196:16

**far** [11]_ - 18:12_, 30:10_, 43:11_, 79:22_, 128:16_, 136:19_, 144:15_, 195:15_, 197:24_, 198:19

**FARO** [4]_ - 78:6_, 78:7_, 78:8_, 78:16

**fashion** [1]_ - 178:6

**fastening** [1]_ - 136:20

**faster** [1]_ - 198:13

**FBI** [35]_ - 6:21_, 12:20_, 15:6_, 75:3_, 76:4_, 96:24

_, 98:8_, 98:10_, 98:11_, 126:1_, 128:19_, 128:22_, 135:14_, 156:12_, 157:13 _, 157:22_, 158:7_, 161:15_, 171:12_, 171:13 _, 171:18_, 171:19_, 171:23_, 172:8_, 174:22_, 177:1_, 177:10_, 181:6_, 181:10_, 182:15_, 186:2_, 186:3_, 189:9_, 189:13_, 189:23

**FBI's** [3]_ - 7:21_, 140:3_, 161:19

**federal** [5]_ - 58:18_, 75:20_, 75:21_, 76:3_, 138:14

**Federal** [5]_ - 6:21_, 75:1 _, 138:9_, 161:14_, 171:11

**feet** [10]_ - 18:13_, 18:14_, 28:23_, 28:25_, 29:4_, 29:6_, 29:11_, 29:14_, 29:17_, 46:8

**fence** [125]_ - 14:2_, 14:4_, 14:8_, 14:13_, 14:14_, 14:18_, 18:13_, 18:15_, 19:9_, 19:17_, 19:18_, 20:13_, 24:6_, 24:8_, 27:1 _, 28:5_, 28:7_, 28:8_, 28:9_, 28:10_, 28:12_, 28:14_, 28:16_, 28:17_, 28:18_, 28:24_, 29:5_, 29:6_, 29:12_, 29:15_, 30:3_, 30:16_, 30:17_, 45:13_, 46:2_, 46:5_, 46:8 _, 46:13_, 46:16_, 46:24_, 46:25_, 48:2_, 48:3_, 48:6 _, 48:9_, 49:4_, 50:1_, 51:1_, 67:11_, 70:3_, 70:4 _, 70:5_, 70:10_, 70:21_, 70:22_, 71:2_, 71:12_, 71:14_, 71:25_, 86:22_, 86:25_, 87:1_, 87:2_, 87:3 _, 87:5_, 87:10_, 87:11_, 87:13_, 87:24_, 88:1_, 88:5_, 88:6_, 88:16_, 88:21_, 89:3_, 89:4_, 90:17_, 91:9_, 91:24_, 92:3_, 92:4_, 92:13_, 92:14_, 93:11_, 93:25_, 94:20_, 94:22_, 95:4_, 95:5_, 97:6_, 101:12_, 104:24_, 105:1_, 107:4_, 111:14_, 112:2_, 112:4_, 113:23_, 115:3_, 115:19_, 118:23_, 140:19_, 141:6_, 141:7_, 141:8_, 141:12_, 143:14_, 145:4_, 145:7_, 146:4_, 146:5_, 147:4_,

147:6_, 147:20_, 148:8_, 148:9_, 150:5_, 150:10_, 154:23_, 167:5_, 168:3_, 169:19_, 191:12

**Fercano** [2]_ - 151:14_, 155:17

**few** [6]_ - 60:14_, 119:20_, 140:6_, 151:12_, 156:16_, 200:24

**fibers** [1]_ - 98:7

**ficus** [3]_ - 68:18_, 68:19_, 69:7

**field** [8]_ - 57:21_, 58:3_, 127:23_, 138:9_, 171:23_, 173:6_, 189:7_, 189:12

**fifth** [1]_ - 3:20

**figure** [1]_ - 40:22

**file** [1]_ - 9:9

**files** [1]_ - 125:17

**filled** [1]_ - 186:19

**final** [1]_ - 81:7

**finalized** [1]_ - 123:7

**finally** [2]_ - 48:23_, 168:11

**findings** [1]_ - 49:25

**fine** [2]_ - 62:24_, 144:6

**finger** [8]_ - 22:21_, 39:7_, 42:5_, 184:24_, 184:25_, 185:1_, 185:8_, 185:23

**fingerprint** [4]_ - 184:14 _, 184:23_, 185:7_, 186:4

**fingerprints** [7]_ - 175:2 _, 183:18_, 183:22_, 184:11_, 185:2_, 185:4_, 186:9

**fingers** [4]_ - 185:10_, 185:12_, 185:25_, 186:1

**finish** [2]_ - 129:25_, 130:20

**fire** [5]_ - 52:6_, 52:16_, 53:7_, 58:8_, 58:18

**firearm** [30]_ - 19:9_, 88:25_, 89:2_, 89:3_, 89:14_, 96:9_, 96:12_, 96:14_, 96:15_, 96:17_, 107:14_, 136:20_, 136:24 _, 146:10_, 151:13_, 155:10_, 155:11_, 190:19 _, 190:21_, 191:1_, 191:6 _, 191:7_, 191:10_, 191:14_, 192:21_, 193:23 _, 193:25_, 194:5_, 194:8 _, 195:8

**firearms** [9]_ - 31:4_,

33:18_, 50:9_, 96:17_, 136:22_, 136:25_, 189:17 _, 193:15_, 195:19

**fired** [10]_ - 30:25_, 40:8_, 62:21_, 63:2_, 63:3_, 63:7 _, 195:9_, 195:12_, 195:13_, 195:14

**firing** [1]_ - 195:10

**first** [33]_ - 3:24_, 5:13_, 6:9_, 7:6_, 14:3_, 28:20_, 31:23_, 35:25_, 46:5_, 49:17_, 50:11_, 55:7_, 55:9_, 74:16_, 76:9_, 79:17_, 88:4_, 91:18_, 110:11_, 117:8_, 123:15_, 137:23_, 137:25_, 160:18 _, 163:20_, 169:2_, 170:22_, 177:17_, 179:14 _, 184:16_, 188:19_, 194:5_, 200:14

**firsthand** [2]_ - 148:13_, 148:16

**five** [4]_ - 10:5_, 117:18_, 127:22_, 185:24

**five-plus** [1]_ - 10:5

**flag** [13]_ - 20:12_, 20:20_, 20:23_, 23:24_, 24:8_, 24:9_, 26:23_, 29:9_, 29:10_, 29:15_, 149:1_, 149:3

**flags** [1]_ - 23:6

**flash** [3]_ - 118:15_, 119:4 _, 119:21

**flashed** [1]_ - 17:15

**flashlight** [9]_ - 149:17_, 149:19_, 149:21_, 150:3_, 150:18_, 150:23_, 151:4_, 159:8_, 159:9

**flat** [3]_ - 27:24_, 27:25_, 29:8

**flight** [1]_ - 8:11

**flip** [1]_ - 112:21

**flipped** [2]_ - 103:21_, 107:4

**Florida** [2]_ - 176:13_, 190:10

**fly** [11]_ - 11:23_, 12:3_, 12:16_, 12:20_, 12:22_, 13:10_, 15:23_, 16:17_, 16:23_, 19:15_, 19:16

**fly-through** [10]_ - 11:23 _, 12:3_, 12:16_, 12:20_, 12:22_, 13:10_, 15:23_, 16:17_, 16:23_, 19:15

**focus** [4]_ - 17:19_, 60:25

_, 90:5_, 177:17

**focusing** [1]_ - 35:4

**foliage** [4]_ - 20:9_, 20:13 _, 83:25_, 86:24

**folks** [1]_ - 198:1

**follow** [5]_ - 23:2_, 23:22 _, 28:6_, 40:25_, 65:9

**followed** [4]_ - 65:7_, 68:22_, 157:18_, 163:18

**following** [2]_ - 141:4_, 157:17

**follows** [8]_ - 6:15, 32:7, 55:16, 74:20, 138:3, 160:25, 171:5, 189:1

**food** [8]_ - 87:12_, 91:21_, 93:10_, 95:6_, 116:9_, 116:11_, 116:18_, 116:19

**foot** [1]_ - 51:12

**footage** [1]_ - 7:24

**force** [1]_ - 186:12

**forced** [1]_ - 186:14

**forensic** [8]_ - 161:5_, 161:7_, 161:19_, 161:21_, 163:23_, 164:3_, 164:5_, 168:21

**forensically** [1]_ - 162:15

**forensics** [1]_ - 6:24

**Forest** [1]_ - 65:11

**form** [2]_ - 26:25_, 27:9

**formally** [1]_ - 141:6

**former** [4]_ - 36:25_, 37:13_, 79:4_, 79:7

**forms** [1]_ - 186:2

**forth** [4]_ - 34:5_, 35:14_, 50:21_, 53:4

**fortuitous** [1]_ - 159:8

**fortunate** [1]_ - 59:22

**forward** [1]_ - 188:8

**forwards** [1]_ - 195:6

**four** [3]_ - 127:22_, 185:25 _, 190:4

**Friday** [2]_ - 130:5_, 199:21

**friendly** [1]_ - 45:24

**front** [6]_ - 38:7_, 43:7_, 46:16_, 64:16_, 71:18_, 184:24

**fugitive** [1]_ - 33:14

**full** [2]_ - 33:5_, 189:17

**full-time** [1]_ - 189:17

**fully** [1]_ - 179:2
**function** [2]_ - 120:18_, 161:21
**functions** [4]_ - 139:8_, 151:9_, 151:10_, 174:16
**fussing** [1]_ - 4:24
**future** [1]_ - 72:2

G

**G-A-L-E** [1]_ - 55:10
**G-I-L-B-E-R-T** [1]_ - 188:22
**GALE** [1] - 55:15
**Gale** [12]_ - 4:18_, 50:23_, 51:1_, 54:22_, 55:10_, 55:13_, 57:10_, 60:13_, 68:13_, 70:16_, 74:1_, 198:2
**garage** [2]_ - 158:9_, 158:20
**garbage** [1]_ - 88:2
**gate** [3]_ - 37:10_, 40:14_, 42:3
**gates** [1]_ - 36:19
**gathering** [1]_ - 95:24
**gear** [2]_ - 68:2_, 69:13
**general** [7]_ - 17:4_, 80:15_, 133:18_, 135:8_, 144:16_, 145:17_, 190:13
**General** [5]_ - 90:9_, 100:10_, 100:23_, 110:4_, 110:19
**generally** [6]_ - 35:25_, 36:19_, 36:21_, 58:10_, 96:11_, 133:18
**generated** [2]_ - 21:20_, 23:8
**generator** [1]_ - 71:18
**generic** [1]_ - 73:5
**gentlemen** [12]_ - 5:18_, 53:24_, 56:15_, 81:2_, 121:3_, 121:25_, 132:8_, 135:25_, 159:17_, 163:6_, 196:9_, 199:19
**gigabytes'** [1]_ - 10:4
**Gilbert** [8]_ - 4:19_, 97:2_, 97:3_, 188:10_, 188:21_, 197:19_, 197:21_, 198:3
**GILBERT** [1]_ - 188:25
**given** [7]_ - 124:9_, 130:24_, 130:25_, 163:8_, 163:12_, 197:14_, 197:24

**Glock** [1]_ - 155:22
**gloves** [11]_ - 95:25_, 96:1_, 96:3_, 96:6_, 106:18_, 176:1_, 176:2_, 176:4_, 178:9_, 178:17_, 193:11
**God** [8]_ - 6:6_, 31:20_, 55:4_, 74:13_, 137:20_, 160:15_, 170:18_, 188:16
**Golf** [22]_ - 7:15_, 7:19_, 7:22_, 12:17_, 16:3_, 16:25_, 21:24_, 25:23_, 36:12_, 38:12_, 43:13_, 59:2_, 62:1_, 62:8_, 68:20_, 78:22_, 79:9_, 102:4_, 139:21_, 143:15_, 174:5_, 190:8
**golf** [60]_ - 13:22_, 17:12_, 17:24_, 22:17_, 23:18_, 29:4_, 29:5_, 29:7_, 36:3_, 36:17_, 36:20_, 36:24_, 37:1_, 37:3_, 37:7_, 37:14_, 38:18_, 39:9_, 44:13_, 45:16_, 59:5_, 59:6_, 59:9_, 59:18_, 60:20_, 61:1_, 61:24_, 62:7_, 62:15_, 62:19_, 62:21_, 63:3_, 67:13_, 67:24_, 80:18_, 82:22_, 87:3_, 87:5_, 117:2_, 117:9_, 117:13_, 118:5_, 140:8_, 140:9_, 140:11_, 140:13_, 140:14_, 141:1_, 141:11_, 142:6_, 142:23_, 144:13_, 144:20_, 150:6_, 151:9_, 151:18_, 151:24_, 174:13
**Google** [1]_ - 23:11
**GoPro** [11]_ - 70:8_, 87:14_, 87:15_, 87:25_, 90:16_, 95:4_, 104:22_, 115:2_, 115:19_, 116:2_, 162:24
**GoPro-style** [9]_ - 87:14_, 87:15_, 87:25_, 90:16_, 95:4_, 104:22_, 115:2_, 115:19_, 116:2
**GoPro-type** [1]_ - 70:8
**government** [24]_ - 5:22_, 11:15_, 15:15_, 31:14_, 38:22_, 54:20_, 81:7_, 120:24_, 121:15_, 121:22_, 122:4_, 122:21_, 125:8_, 128:1_, 129:24_, 132:1_, 135:1_, 159:2_, 164:15_, 170:11_, 188:4_, 196:21_, 198:22_, 200:14
**Government** [26] - 11:1_, 16:11_, 22:8_, 26:11_, 38:1_, 38:8_, 43:1_, 43:6_

_, 47:20_, 47:24_, 48:13_, 48:25_, 60:9_, 70:12_, 129:11_, 133:2_, 142:13_, 143:6_, 143:23_, 153:11_, 166:21_, 175:23_, 179:14_, 181:13_, 187:1_, 187:7
**government's** [2]_ - 124:25_, 125:22
**Government's** [137]_ - 4:6_, 4:8_, 8:20_, 8:21_, 9:8_, 9:11_, 9:16_, 10:3_, 10:20_, 11:13_, 13:8_, 15:12_, 15:15_, 15:21_, 15:24_, 16:2_, 16:7_, 17:8_, 18:17_, 21:4_, 21:10_, 22:2_, 24:11_, 24:18_, 25:8_, 25:19_, 25:25_, 26:5_, 26:9_, 26:25_, 27:11_, 68:8_, 80:8_, 80:24_, 81:16_, 81:25_, 82:11_, 82:24_, 84:10_, 84:16_, 85:18_, 87:20_, 89:24_, 91:4_, 91:15_, 93:6_, 93:13_, 93:16_, 94:4_, 94:24_, 95:8_, 99:16_, 100:12_, 100:25_, 101:2_, 101:8_, 101:22_, 102:7_, 103:10_, 103:13_, 103:14_, 103:16_, 103:19_, 103:25_, 104:7_, 104:10_, 104:14_, 104:17_, 107:17_, 108:14_, 109:10_, 110:1_, 111:11_, 111:20_, 111:23_, 112:13_, 113:3_, 113:7_, 113:24_, 114:13_, 114:25_, 115:5_, 115:9_, 115:16_, 116:2_, 116:7_, 116:14_, 117:21_, 118:19_, 119:12_, 120:5_, 120:24_, 127:8_, 132:20_, 133:11_, 136:8_, 141:17_, 142:15_, 143:1_, 143:4_, 143:8_, 143:18_, 144:8_, 144:11_, 144:23_, 145:24_, 146:24_, 147:12_, 148:3_, 148:19_, 149:9_, 150:14_, 150:25_, 152:4_, 152:24_, 153:7_, 153:17_, 154:10_, 154:15_, 154:25_, 158:15_, 162:2_, 162:7_, 162:17_, 164:13_, 164:19_, 165:2_, 165:7_, 165:21_, 166:15_, 167:1_, 168:8_, 168:11_, 168:16_, 191:21_, 193:18
**graduate** [1]_ - 190:3
**grains** [1]_ - 12:11
**grant** [2]_ - 129:2_, 196:8

**granted** [55]_ - 16:14_, 22:11_, 26:14_, 32:4_, 48:15_, 49:1_, 81:17_, 84:11_, 84:17_, 85:8_, 87:21_, 89:25_, 90:13_, 91:5_, 91:16_, 93:14_, 94:5_, 94:25_, 95:9_, 99:17_, 100:13_, 101:3_, 101:23_, 102:8_, 104:8_, 104:15_, 106:4_, 107:19_, 108:8_, 109:6_, 109:21_, 111:6_, 112:9_, 112:24_, 114:9_, 114:20_, 115:12_, 116:24_, 117:24_, 118:20_, 119:14_, 119:24_, 132:25_, 133:6_, 134:24_, 147:1_, 147:14_, 148:5_, 148:20_, 149:13_, 150:15_, 151:1_, 153:15_, 158:16_, 166:24
**grass** [1]_ - 97:7
**grateful** [1]_ - 5:2
**gravel** [2]_ - 82:12_, 82:13
**gray** [1]_ - 26:18
**gray-scale** [1]_ - 26:18
**great** [3]_ - 22:14_, 59:23
**green** [15]_ - 20:10_, 23:23_, 26:22_, 29:2_, 29:9_, 30:3_, 30:4_, 30:15_, 30:20_, 61:24_, 147:5_, 147:10_, 149:2_, 150:12_, 153:23
**Greenacres** [2]_ - 57:16_, 57:25
**grew** [1]_ - 59:16
**grid** [1]_ - 8:11
**grill** [1]_ - 39:22
**ground** [16]_ - 29:10_, 30:11_, 30:13_, 47:12_, 49:8_, 73:1_, 73:4_, 73:5_, 87:12_, 88:2_, 95:6_, 116:9_, 134:19_, 167:14_, 167:19_, 168:4
**grounds** [2]_ - 38:13_, 38:17
**grow** [1]_ - 69:10
**Guard** [6]_ - 7:7_, 189:24_, 189:25_, 190:2_, 190:3_, 190:4
**guard** [1]_ - 33:7
**guess** [4]_ - 65:22_, 130:20_, 178:16_, 200:20
**Gun** [2]_ - 58:24_, 63:10
**gun** [3]_ - 52:8_, 53:17_, 193:9

**gun-specific** [1] - 53:17

**gunfire** [1] - 31:2

**gunshots** [1] - 41:3

**guys** [1] - 58:19

**GX200-17** [1] - 83:2

**GX31** [1] - 103:25

**GX6** [1] - 110:1

## H

**hair** [4] - 187:18, 187:20, 187:21

**hairs** [1] - 98:7

**hand** [25] - 6:3, 7:25, 8:17, 13:20, 14:6, 14:7, 14:13, 17:8, 19:23, 22:18, 24:25, 27:8, 31:17, 42:13, 55:1, 72:8, 74:10, 137:17, 160:12, 167:20, 170:15, 185:11, 185:25, 188:13

**handed** [11] - 65:15, 106:9, 108:2, 108:14, 111:10, 116:6, 120:4, 133:10, 179:20, 182:18, 184:6

**handguns** [1] - 33:20

**handle** [6] - 52:13, 60:2, 78:3, 125:21, 190:24

**handled** [1] - 72:14

**handling** [3] - 96:5, 179:25, 180:9

**hands** [5] - 14:10, 18:5, 171:21, 184:20, 185:12

**handwritten** [1] - 162:11

**hanging** [4] - 67:10, 70:3, 70:20, 135:19

**harborfreight.com** [2] - 151:4, 151:5

**hard** [3] - 52:22, 93:3, 96:2

**hatch** [1] - 157:1

**hazard** [2] - 20:24, 72:24

**hazardous** [2] - 49:19, 55:21

**head** [3] - 30:5, 106:23, 128:12

**heading** [1] - 17:23

**headquarters** [4] - 58:25, 59:4, 59:13, 59:20

**heads** [1] - 197:17

**heads-up** [1] - 197:17

**hear** [6] - 41:3, 45:3, 45:13, 62:25, 127:16, 200:14

**heard** [8] - 40:9, 40:17, 62:20, 63:7, 66:18, 81:3, 121:12, 162:23

**hearing** [2] - 127:18, 201:1

**heavy** [5] - 112:19, 112:20, 114:17, 114:18, 147:5

**hedge** [15] - 18:1, 18:12, 18:15, 64:3, 64:15, 67:9, 68:2, 68:3, 68:5, 68:18, 68:19, 69:8, 69:10, 73:15

**hedges** [2] - 44:17, 69:3

**held** [4] - 33:10, 95:3, 111:22, 180:2

**hello** [3] - 160:11, 188:12, 189:5

**helmet** [1] - 69:13

**help** [12] - 5:3, 6:6, 30:18, 31:20, 51:2, 55:4, 74:13, 75:15, 137:20, 160:15, 170:18, 188:16

**helped** [1] - 71:12

**helps** [2] - 17:19, 20:7

**hidden** [1] - 71:5

**hide** [1] - 125:4

**high** [4] - 42:20, 59:21, 59:22, 63:2

**high-pitched** [1] - 63:2

**higher** [1] - 131:22

**highlighted** [1] - 23:5

**Hill** [1] - 65:11

**Hinshaw** [1] - 131:8

**hold** [12] - 76:6, 108:5, 108:20, 109:14, 110:9, 110:11, 113:22, 115:21, 116:4, 120:2, 123:20, 134:20

**holding** [4] - 71:12, 88:16, 93:24, 110:18

**hole** [10] - 17:25, 23:20, 24:8, 29:10, 29:16, 144:20, 149:21, 149:22, 149:25, 154:23

**Hole** [29] - 13:9, 17:13, 17:24, 20:5, 20:8, 20:12, 20:20, 20:23, 23:6, 23:18, 23:20, 23:23, 24:9, 26:22, 29:9, 80:17, 87:7, 87:18, 144:21, 147:10, 147:11, 147:22, 148:9, 148:11, 148:24, 149:1, 150:12

**holes** [3] - 13:14, 16:22, 179:1

**Honor** [176] - 3:8, 3:12, 3:17, 3:23, 3:25, 4:17, 4:21, 5:14, 5:24, 6:12, 8:22, 9:18, 9:24, 10:19, 11:3, 11:8, 15:14, 16:6, 21:5, 22:1, 22:10, 25:7, 25:10, 25:25, 26:13, 29:18, 31:9, 31:14, 32:3, 37:25, 39:5, 42:9, 42:25, 43:19, 47:18, 48:12, 48:23, 51:8, 51:24, 53:21, 54:12, 54:15, 54:16, 54:21, 55:12, 56:7, 56:12, 56:22, 57:8, 60:7, 68:8, 70:11, 73:24, 74:3, 74:6, 80:7, 80:23, 81:15, 81:24, 82:3, 82:5, 83:1, 84:9, 87:19, 89:23, 90:11, 91:3, 91:14, 93:5, 93:13, 94:3, 94:23, 95:7, 99:15, 100:11, 101:1, 101:21, 102:6, 103:9, 103:24, 104:6, 104:13, 104:16, 104:17, 105:25, 106:20, 107:18, 107:20, 108:7, 108:23, 109:2, 109:5, 109:20, 110:25, 111:5, 112:8, 112:23, 114:8, 114:19, 115:11, 116:23, 117:19, 117:23, 118:18, 119:13, 119:22, 120:23, 122:23, 123:10, 124:20, 125:24, 126:10, 126:18, 129:12, 130:2, 131:12, 132:1, 132:3, 132:11, 132:16, 132:23, 133:4, 134:2, 134:23, 134:25, 136:6, 137:7, 137:13, 140:23, 141:16, 142:8, 142:25, 143:17, 144:3, 144:5, 145:23, 146:25, 148:18, 149:11, 150:13, 150:24, 152:23, 153:3, 153:14, 159:1, 159:13, 160:9, 160:22, 162:3, 163:1, 163:15, 165:13, 166:14, 166:23, 170:8, 170:11, 175:11, 179:13, 183:25, 186:22, 187:1, 187:9, 187:10, 188:1, 188:7, 188:24, 191:21, 193:17, 194:15, 196:1, 196:22, 197:6, 198:5, 198:11, 200:16, 200:20

**Honor's** [5] - 171:1, 175:15, 176:3, 180:22, 181:12

**hood** [1] - 157:1

**hope** [2] - 132:8, 199:24

**hoping** [1] - 41:11

**hot** [2] - 84:3, 84:4

**hour** [2] - 122:9, 122:10

**hours** [9] - 10:6, 10:13, 13:1, 20:22, 69:23, 117:14, 117:15, 119:1, 169:6

**human** [1] - 72:23

**hundreds** [1] - 10:13

**hung** [1] - 71:24

**hurry** [1] - 40:15

## I

**ideally** [1] - 99:9

**identification** [1] - 120:4

**identified** [1] - 22:25

**identifiers** [1] - 181:8

**identify** [3] - 38:18, 66:16, 72:10

**image** [13] - 23:10, 23:11, 60:13, 60:17, 63:18, 68:7, 68:14, 71:17, 71:21, 88:10, 147:10, 164:3, 164:20

**imaged** [1] - 162:15

**imagery** [3] - 12:7, 16:20

**images** [6] - 13:2, 21:6, 23:8, 27:16, 94:13, 163:12

**immediately** [1] - 82:23

**immersible** [1] - 12:24

**important** [1] - 8:1

**inches** [5] - 28:25, 29:6, 29:11, 29:14, 29:17

**incident** [5] - 62:1, 64:13, 78:24, 79:1, 174:5

**incidents** [2] - 59:25

**include** [7] - 33:20, 49:6, 58:18, 75:19, 77:2, 138:22, 181:5

**included** [3] - 7:24, 105:12, 190:5

**includes** [1] - 138:23

**including** [7] - 15:1, 33:23, 138:17, 163:11, 169:7, 172:5, 177:13

**incorporate** [1] - 13:13

**incorporates** [1] - 24:22

**indicate** [1] - 14:17

**indicated** [1] - 121:12

**indicating** [30] - 19:24, 22:23, 23:4, 23:13, 23:15, 23:21, 44:15, 61:9, 63:16, 63:22, 80:15, 81:14, 81:22, 85:2, 85:25, 89:14, 89:18, 94:13, 100:21, 107:5, 109:3, 110:6, 111:4, 112:4, 114:23, 146:21, 155:6, 180:20, 181:21, 194:23

**indicating)** [21] - 14:20, 19:20, 23:3, 39:11, 43:18, 44:7, 80:21, 82:21, 103:2, 107:5, 107:11, 107:13, 109:17, 112:5, 113:9, 113:25, 115:7, 145:17, 146:14, 194:10, 194:11

**indictment** [3] - 121:17, 121:21, 121:23

**individual** [5] - 65:22, 128:13, 177:22, 185:17, 186:8

**individuals** [5] - 79:10, 177:9, 179:10, 198:14, 198:16

**inform** [1] - 50:20

**information** [22] - 40:9, 40:10, 40:22, 41:13, 41:14, 41:17, 42:2, 44:23, 44:24, 64:13, 64:14, 65:19, 66:7, 66:10, 66:12, 66:15,

66:24, 98:24, 161:4, 161:6, 185:17

**initial** [1] - 105:15

**initialed** [2] - 105:14, 186:21

**initialing** [1] - 180:19

**initials** [3] - 106:12, 120:12, 181:20

**ink** [1] - 185:5

**inner** [1] - 51:5

**inquire** [3] - 6:12, 153:5, 160:22

**inserts** [1] - 29:10

**inside** [25] - 17:25, 36:7, 45:3, 47:14, 49:19, 51:1, 67:12, 71:13, 71:25, 85:21, 86:12, 86:13, 104:5, 112:6, 112:7, 114:4, 158:20, 177:25, 178:3, 178:6, 178:23, 180:2, 180:8, 183:12, 184:5

**inspect** [6] - 92:12, 92:15, 126:6, 126:7, 156:20, 156:22

**inspected** [1] - 157:4

**inspecting** [1] - 132:21

**inspection** [3] - 73:13, 125:11, 128:17

**instance** [2] - 173:5, 173:7

**instructions** [3] - 121:8, 121:10, 200:7

**instructor** [3] - 139:12, 189:12, 189:15

**instructs** [1] - 130:13

**intact** [1] - 47:9

**intelligence** [1] - 66:13

**intend** [2] - 4:9, 175:13

**intensive** [2] - 77:13, 77:22

**intentionally** [2] - 102:2, 111:16

**interest** [26] - 14:9, 17:16, 17:17, 22:20, 23:12, 23:17, 24:15, 24:17, 25:20, 26:21, 26:24, 27:2, 28:11, 28:25, 29:11, 80:4, 80:5, 86:5, 86:14, 86:22, 87:2, 87:8, 94:14, 95:18, 95:21, 141:1

**interference** [1] -

192:23

**International** [22] - 7:15, 7:18, 7:22, 12:17, 16:3, 16:25, 21:24, 25:23, 36:12, 38:12, 43:13, 59:2, 62:1, 62:8, 68:20, 78:22, 79:9, 102:4, 139:21, 143:15, 174:5, 190:8

**internationally** [2] - 7:12, 139:15

**intersection** [3] - 23:7, 43:11, 60:18

**introduce** [1] - 4:10

**investigate** [2] - 67:17, 138:14

**investigated** [1] - 75:21

**investigates** [1] - 76:3

**investigating** [2] - 75:19, 138:22

**investigation** [11] - 7:21, 54:3, 67:22, 78:13, 79:12, 121:8, 151:11, 156:13, 174:4, 174:17, 200:3

**Investigation** [5] - 6:21, 75:1, 138:9, 161:14, 171:11

**investigative** [2] - 164:6, 177:10

**investigator** [1] - 177:14

**investigators** [4] - 58:8, 79:14, 95:20, 177:12

**invite** [3] - 31:16, 57:4, 129:20

**involve** [1] - 14:6

**involved** [3] - 4:25, 13:17, 13:18

**involvement** [1] - 66:20

**ish** [1] - 44:6

**isometric** [1] - 25:16

**issue** [2] - 121:4, 130:9

**issued** [3] - 71:8, 163:21, 176:12

**issues** [2] - 122:19, 200:13

**IT** [1] - 56:10

**it'd** [1] - 52:11

**Item** [1] - 151:6

**item** [70] - 8:25, 70:22, 71:17, 71:19, 72:9, 97:16, 98:23, 99:1,

105:12, 105:16, 106:9, 106:13, 106:14, 106:16, 107:22, 107:23, 108:9, 108:24, 109:7, 109:22, 110:6, 110:21, 111:7, 112:7, 112:25, 113:9, 113:25, 114:10, 114:21, 115:7, 115:13, 115:23, 119:25, 120:6, 120:8, 120:13, 123:18, 125:5, 125:14, 125:16, 125:19, 126:5, 126:13, 127:19, 127:20, 128:7, 128:12, 128:14, 128:21, 129:3, 129:6, 129:14, 133:7, 133:10, 134:5, 134:20, 146:9, 150:22, 155:2, 155:3, 155:6, 155:7, 162:5, 169:13, 176:6, 181:15, 184:3

**items** [83] - 4:1, 4:22, 9:22, 11:6, 13:15, 14:25, 15:2, 15:4, 15:5, 19:10, 54:14, 67:16, 67:18, 67:20, 71:25, 72:17, 80:4, 80:5, 86:5, 86:14, 86:22, 87:2, 87:8, 87:13, 88:1, 88:2, 91:21, 92:5, 92:15, 93:10, 94:10, 94:16, 95:6, 95:18, 95:21, 98:12, 98:14, 98:20, 98:21, 98:24, 99:2, 100:24, 105:4, 105:5, 105:6, 105:15, 106:1, 108:10, 110:1, 110:2, 110:5, 110:9, 110:21, 112:10, 116:9, 116:11, 116:18, 116:19, 123:11, 124:23, 126:11, 127:19, 127:20, 128:15, 128:16, 128:18, 128:19, 134:19, 135:25, 136:3, 141:1, 145:5, 146:8, 150:1, 150:7, 155:23, 163:9, 173:19, 177:17, 182:9, 182:12, 183:4

**itself** [8] - 23:18, 29:7, 29:9, 37:7, 79:25, 149:22, 176:21, 195:9

**J**

**J-O-S-E** [1] - 137:25

**jail** [2] - 151:24, 152:14

**Jennifer** [1] - 3:10

**Jim** [1]₋ - 3:9

**job** [6]₋ - 5:4₋, 5:6₋, 7:10₋, 72:2₋, 73:21₋, 187:22

**jobs** [1]₋ - 7:5

**John** [1]₋ - 3:8

**joined** [2]₋ - 32:22₋, 189:23

**joining** [1]₋ - 32:20

**Jose** [3]₋ - 4:19₋, 137:14₋, 137:25

**JOSE** [1] - 138:2

**jotted** [1]₋ - 4:12

**judge** [2]₋ - 163:21₋, 176:12

**Judge** [8]₋ - 56:11₋, 130:19, 171:3₋, 175:17₋, 183:1₋, 183:6₋, 199:3₋, 199:10

**judge-issued** [1]₋ - 163:21

**judges** [2]₋ - 121:24₋, 122:6

**jumped** [1]₋ - 63:4

**JUROR** [1]₋ - 163:5

**juror** [1]₋ - 21:6

**jurors** [6]₋ - 5:8₋, 54:11₋, 57:1₋, 111:2₋, 121:14₋, 121:24

**jurors'** [1]₋ - 18:20

**jury** [83]₋ - 4:2₋, 5:15₋, 5:16₋, 6:20₋, 14:18₋, 15:25₋, 16:12₋, 22:24₋, 33:9₋, 34:21₋, 36:18₋, 38:10₋, 43:2₋, 43:9₋, 46:12₋, 46:22₋, 47:19₋, 47:25₋, 48:13₋, 48:18₋, 48:24₋, 54:5₋, 54:6₋, 54:18, 55:14₋, 56:17₋, 56:18₋, 57:3₋, 57:13₋, 59:17₋, 60:8₋, 60:13₋, 60:14₋, 61:12₋, 66:6₋, 68:7₋, 68:14₋, 69:5₋, 70:24₋, 80:11₋, 85:18₋, 106:17₋, 107:8₋, 108:5₋, 108:20₋, 109:1₋, 109:14₋, 110:9₋, 112:17₋, 115:21₋, 116:4₋, 122:8₋, 122:12₋, 122:16₋, 129:20₋, 131:1₋, 131:25₋, 132:4₋, 132:6₋, 133:3₋, 134:20₋, 144:9₋, 144:23₋, 159:19₋, 160:4₋, 160:6₋, 163:2₋, 164:10₋, 169:25₋, 179:24₋, 180:17₋, 184:21₋, 185:20₋, 197:3₋, 197:4₋, 197:10₋,

198:14₋, 199:7₋, 199:14₋, 199:16₋, 199:17₋, 200:10₋, 200:11

**JURY** [1]₋ - 5:19

**K**

**K-R-I-S-T-I-N** [1]₋ - 170:24

**KA** [1]₋ - 31:25

**Kate** [1]₋ - 140:5

**KATHRYN** [1] - 74:19

**Kathryn** [3]₋ - 4:19₋, 74:7₋, 74:18

**keep** [5]₋ - 18:24₋, 20:1₋, 54:3₋, 178:12₋, 200:6

**keeping** [1]₋ - 129:25

**Ken** [1]₋ - 31:25

**Kenneth** [2]₋ - 31:15₋, 31:25

**KENNETH** [2]₋ - 32:1, 32:6

**kept** [1]₋ - 178:6

**key** [2]₋ - 22:18₋, 22:25

**keypad** [1]₋ - 158:11

**keys** [1]₋ - 112:4

**kind** [25]₋ - 9:9₋, 17:1₋, 18:7₋, 38:18₋, 43:25₋, 44:2₋, 44:15₋, 45:16₋, 46:14₋, 46:15₋, 47:10₋, 49:7₋, 51:3₋, 51:21₋, 54:3₋, 92:22₋, 105:7₋, 105:8₋, 116:11₋, 145:16₋, 145:22₋, 153:22₋, 191:11₋, 191:13₋, 200:3

**kinds** [2]₋ - 8:7₋, 183:16

**knees** [1]₋ - 18:6

**knockoff** [1]₋ - 52:20

**knowing** [1]₋ - 49:17

**knowledge** [4]₋ - 79:16₋, 127:6₋, 135:10₋, 135:12

**known** [3]₋ - 55:22₋, 161:17₋, 171:16

**knows** [1]₋ - 69:10

**Kristin** [2]₋ - 170:12₋, 170:24

**KRISTIN** [1] - 171:4

**Kristy** [1]₋ - 3:17

**L**

**L-O-U-R-E-I-R-O** [1]₋ -

138:1

**lab** [6]₋ - 98:4₋, 98:8₋, 98:10₋, 98:11₋, 182:2

**lab's** [1]₋ - 182:24

**label** [13]₋ - 90:3₋, 90:6₋, 100:23₋, 105:23₋, 106:12₋, 110:3₋, 110:4₋, 110:19₋, 120:12₋, 162:11₋, 180:20₋, 181:21

**labeled** [1]₋ - 102:17

**labeling** [1]₋ - 180:18

**labels** [1]₋ - 105:16

**laboratory** [1]₋ - 6:22

**Laboratory** [1]₋ - 7:2

**lack** [1]₋ - 197:14

**ladies** [12]₋ - 5:17₋, 53:24₋, 56:15₋, 81:1₋, 121:3₋, 121:25₋, 132:8₋, 135:25₋, 159:16₋, 163:6₋, 196:9₋, 199:19

**Lago** [4]₋ - 62:7₋, 62:9₋, 62:14₋, 62:18

**landed** [1]₋ - 159:8

**lane** [1]₋ - 64:6

**lanes** [1]₋ - 64:16

**laptops** [1]₋ - 161:12

**large** [6]₋ - 10:2₋, 10:17₋, 28:1₋, 28:9₋, 88:15₋, 173:2

**larger** [1]₋ - 184:17

**laser** [14]₋ - 7:25₋, 8:14₋, 8:17₋, 9:14₋, 11:20₋, 13:24₋, 14:14₋, 23:15₋, 27:6₋, 27:8₋, 27:15₋, 27:17₋, 27:22

**last** [20]₋ - 6:9₋, 12:18₋, 16:4₋, 24:21₋, 31:23₋, 55:7₋, 55:9₋, 61:25₋, 65:20₋, 74:16₋, 123:6₋, 132:9₋, 137:23₋, 137:25₋, 160:18₋, 160:21₋, 168:15₋, 170:22₋, 188:19₋, 200:24

**latent** [1]₋ - 172:5

**law** [10]₋ - 47:14₋, 50:13₋, 66:16₋, 67:7₋, 76:3₋, 83:12₋, 119:9₋, 122:6₋, 138:14₋, 139:16

**lay** [2]₋ - 173:14₋, 173:16

**lead** [2]₋ - 7:23₋, 72:13

**leader** [7]₋ - 76:8₋, 76:17₋, 171:14₋, 172:14₋, 172:20₋, 177:4

**leadership** [1]₋ - 59:23

**leading** [1]₋ - 51:7

**leads** [1]₋ - 28:6

**leaned** [2]₋ - 46:24₋, 87:10

**leaning** [9]₋ - 19:9₋, 48:2₋, 70:4₋, 70:22₋, 87:24₋, 89:3₋, 94:22₋, 107:4₋, 191:12

**learned** [2]₋ - 146:7

**least** [8]₋ - 50:9₋, 50:20₋, 130:8₋, 131:21₋, 140:21₋, 169:17₋, 198:5₋, 198:19

**leave** [3]₋ - 36:23₋, 40:15₋, 98:4

**leaves** [4]₋ - 84:1₋, 167:5₋, 167:14₋, 168:4

**led** [2]₋ - 45:13₋, 47:2

**left** [48]₋ - 15:1₋, 17:1₋, 17:8₋, 19:8₋, 26:23₋, 27:21₋, 28:20₋, 29:1₋, 36:20₋, 40:14₋, 40:24₋, 42:4₋, 42:19₋, 44:20₋, 47:8₋, 62:14₋, 63:7₋, 63:9₋, 65:7₋, 70:7₋, 70:21₋, 73:7₋, 82:13₋, 82:24₋, 83:8₋, 87:11₋, 87:14₋, 90:19₋, 91:20₋, 91:24₋, 93:11₋, 93:16₋, 98:7₋, 99:24₋, 101:16₋, 102:14₋, 113:5₋, 115:8₋, 116:8₋, 127:23₋, 132:20₋, 147:21₋, 154:18₋, 154:19₋, 155:9₋, 155:11₋, 158:12₋, 187:18

**left-hand** [1]₋ - 17:8

**leftmost** [2]₋ - 88:14₋, 90:18

**leg** [2]₋ - 154:17

**legal** [1]₋ - 127:2

**leggings** [2]₋ - 153:23₋, 154:4

**lengthwise** [1]₋ - 109:18

**lens** [2]₋ - 87:16₋, 87:18

**less** [1]₋ - 28:12

**level** [1]₋ - 34:13

**liaisoning** [1]₋ - 58:17

**license** [2]₋ - 9:10₋, 66:8

**lid** [1]₋ - 116:8

**lieutenant** [12]₋ - 50:20₋, 54:22₋, 54:23₋, 55:20₋, 57:5₋, 57:10₋, 57:23₋, 60:13₋, 68:13₋, 70:16₋, 74:1₋, 74:4

**Lieutenant** [4]₋ - 4:18₋,

50:23_, 51:1, 55:13

**LIEUTENANT** [1] - 55:15

**light** [9]_ - 112:19_, 114:17_, 118:13_, 118:14_, 119:3_, 119:4_, 119:21_, 200:20

**lighting** [3]_ - 118:11_, 118:25_, 119:19

**lights** [6]_ - 39:20_, 39:22_, 41:19_, 42:22_, 64:7

**likelihood** [1]_ - 131:22

**limit** [1]_ - 96:3

**line** [72]_ - 14:17_, 18:1_, 18:7_, 20:13_, 22:19_, 30:17_, 42:10_, 45:25_, 47:14_, 48:5_, 48:9_, 48:10_, 51:1_, 64:3_, 64:15_, 66:15_, 67:9_, 68:2_, 68:3_, 68:6_, 71:3_, 73:15_, 83:20_, 83:21_, 83:24_, 85:21_, 86:19_, 86:21_, 86:22_, 86:25_, 87:1_, 87:2_, 87:3_, 87:6_, 87:11_, 87:13_, 87:24_, 88:1_, 88:16_, 89:3_, 89:4_, 90:17_, 91:9_, 91:24_, 92:3_, 92:4_, 93:11_, 94:20_, 94:22_, 95:4_, 95:5_, 97:6_, 97:7_, 101:12_, 104:24_, 105:20_, 107:4_, 111:14_, 112:2_, 112:4_, 113:23_, 115:3_, 115:20_, 117:17_, 118:9_, 118:24_, 119:17_, 119:18_, 134:17_, 134:18_, 192:1

**lines** [2]_ - 23:1_, 23:4

**lineup** [1]_ - 4:13

**link** [14]_ - 18:13_, 19:9_, 19:17_, 24:7_, 28:18_, 28:24_, 29:6_, 46:2_, 46:5_, 70:4_, 70:5_, 70:22_, 93:25_, 169:18

**list** [10]_ - 123:21_, 123:22_, 124:2_, 124:8_, 124:10_, 124:14_, 124:25_, 128:6_, 128:24_, 198:2

**listed** [2]_ - 128:24_, 179:10

**lit** [2]_ - 61:18_, 61:19

**literally** [1]_ - 68:5

**living** [1]_ - 161:3

**loaded** [1]_ - 157:9

**local** [2]_ - 58:18_, 119:8

**located** [12]_ - 8:5_, 13:12

_, 20:20_, 28:2_, 28:13_, 28:17_, 50:1_, 83:11_, 123:18_, 147:11_, 151:17_, 185:4

**location** [38]_ - 12:25_, 19:7_, 19:8_, 19:16_, 20:19_, 20:23_, 24:9_, 27:1_, 39:8_, 61:10_, 61:17_, 62:6_, 62:7_, 62:18_, 62:19_, 63:5_, 64:9_, 65:20_, 67:2_, 67:25_, 68:15_, 68:25_, 69:21_, 69:23_, 73:11_, 98:14_, 98:21_, 99:1_, 107:10_, 133:14_, 141:9_, 173:18_, 176:23_, 177:7_, 177:9_, 182:8_, 191:6_, 194:10

**locations** [4]_ - 16:22_, 23:6_, 62:6_, 62:14

**lock** [3]_ - 93:20_, 93:21_, 93:22

**locking** [1]_ - 51:13

**Locks** [2]_ - 91:24_, 91:25

**locks** [5]_ - 87:14_, 93:18_, 93:22_, 93:23_, 95:5

**log** [1]_ - 105:12

**LONG** [232]_ - 3:12_, 4:17_, 56:7_, 74:6_, 74:22_, 80:7_, 80:10_, 80:23_, 81:10_, 81:15_, 81:18_, 81:24_, 82:2_, 82:5_, 82:10_, 82:15_, 82:17_, 83:1_, 83:4_, 84:9_, 84:12_, 84:15_, 84:18_, 85:6_, 85:9_, 85:17_, 85:19_, 87:19_, 87:22_, 88:24_, 89:1_, 89:23_, 90:1_, 90:5_, 90:7_, 90:10_, 90:14_, 91:3_, 91:6_, 91:14_, 91:17_, 93:5_, 93:8_, 93:12_, 93:15_, 94:3_, 94:6_, 94:23_, 95:1_, 95:7_, 95:10_, 99:15_, 99:18_, 100:6_, 100:8_, 100:11_, 100:14_, 101:1_, 101:4_, 101:21_, 101:24_, 102:6_, 102:9_, 103:1_, 103:3_, 103:9_, 103:12_, 103:15_, 103:24_, 104:2_, 104:6_, 104:9_, 104:13_, 104:16_, 104:20_, 105:25_, 106:5_, 106:8_, 106:20_, 106:23_, 106:24_, 107:16_, 107:20_, 107:22_, 108:1_, 108:7_, 108:9_, 108:13_, 108:23_, 109:2_, 109:4_, 109:7_, 109:9_, 109:20_, 109:22_,

109:24_, 110:17_, 110:25_, 111:4_, 111:7_, 111:9_, 111:19_, 111:21_, 112:8_, 112:10_, 112:12_, 112:23_, 112:25_, 113:1_, 114:8_, 114:10_, 114:12_, 114:19_, 114:21_, 114:23_, 114:24_, 115:11_, 115:13_, 115:15_, 115:23_, 116:1_, 116:13, 116:15_, 116:22_, 117:1_, 117:19_, 117:20_, 117:23_, 118:1_, 118:18_, 118:21_, 119:12_, 119:15_, 119:22_, 119:25_, 120:1_, 120:23_, 122:23_, 122:25_, 123:10_, 125:24_, 126:10_, 126:18_, 129:12_, 132:1_, 132:11_, 132:14_, 132:16_, 132:17_, 132:23_, 133:4_, 133:7_, 133:9_, 134:2_, 134:5_, 134:7_, 134:23_, 134:25_, 136:5_, 136:8_, 136:11_, 137:7_, 137:13_, 138:5_, 140:23, 140:24_, 141:16_, 141:20_, 142:1_, 142:8_, 142:14_, 142:17_, 142:25_, 143:7_, 143:10_, 143:17_, 143:24_, 144:3_, 144:7_, 144:10_, 144:22_, 145:1_, 145:15_, 145:18, 145:20_, 145:23_, 146:1_, 146:13_, 146:16_, 146:25_, 147:2_, 147:12_, 147:15_, 148:3_, 148:6_, 148:18_, 148:21_, 149:7_, 149:14_, 150:13_, 150:16_, 150:24_, 151:2_, 152:3_, 152:5_, 152:23_, 153:3_, 153:13_, 153:16_, 153:18_, 153:25, 154:1_, 154:24_, 155:1_, 155:13_, 155:15_, 158:14_, 158:17_, 159:1_, 159:13_, 188:6_, 188:9_, 188:24_, 189:3_, 191:20_, 191:23_, 193:17_, 193:20_, 193:21_, 194:15_, 196:1_, 196:21

**long-sleeve** [1]_ - 153:23

**look** [20]_ - 61:8_, 67:19_, 72:25_, 73:6_, 87:3_, 120:3_, 124:5_, 134:8_, 136:19_, 136:20_, 153:25_, 167:10_, 167:15_, 168:8_, 168:11_, 175:25_, 179:20_, 181:17_, 184:5

**looked** [14]_ - 11:12_,

13:9_, 16:18_, 24:21_, 46:17_, 46:25_, 47:10_, 48:5_, 48:21_, 70:3_, 70:10_, 73:6_, 134:11_, 168:6

**looking** [33]_ - 11:19_, 11:23_, 12:6_, 14:1_, 19:5_, 20:8_, 21:13_, 21:14_, 22:14_, 22:16_, 24:13_, 25:18_, 25:21_, 26:17_, 44:13_, 47:23_, 51:20_, 63:5_, 64:3_, 82:19_, 94:17_, 100:15_, 115:8_, 118:4_, 118:5_, 118:24_, 119:18_, 124:9_, 130:4_, 147:4_, 162:25_, 167:4_, 184:22

**looks** [8]_ - 44:12_, 86:23_, 135:18_, 168:7_, 169:18_, 182:1_, 184:19_, 193:23

**lose** [2]_ - 157:20

**lost** [1]_ - 59:25

**Loureiro** [5]_ - 4:19_, 137:14_, 138:1_, 142:18_, 198:3

**LOUREIRO** [1] - 138:2

**lower** [5]_ - 17:1_, 17:8_, 22:18_, 26:23_, 147:24

**Luce** [22]_ - 3:10_, 11:16_, 15:8_, 15:18_, 17:9_, 60:11_, 68:11_, 70:13_, 82:15_, 85:17_, 88:25_, 90:5_, 100:7_, 103:1_, 103:13_, 146:13_, 153:16_, 153:25_, 154:24_, 166:25_, 167:10_, 193:20

**luckily** [1]_ - 71:11

**lunch** [7]_ - 117:16_, 121:5_, 122:9_, 123:3_, 123:7_, 130:3_, 132:8

## M

**M-A-Y-S** [1]_ - 32:1

**ma'am** [30]_ - 54:25_, 74:23_, 122:13_, 124:7_, 162:20_, 171:8_, 171:10_, 171:22_, 175:19_, 176:9_, 177:16_, 179:20_, 184:5_, 189:7_, 189:14_, 189:20_, 190:9_, 190:11_, 190:17_, 191:3_, 192:18_, 192:20_, 192:22_, 193:2_, 193:5_, 193:12_, 193:14_, 193:24_, 194:1_, 194:7

**magazine** [25]_ - 89:15_, 96:19_, 97:12_, 97:18_, 97:19_, 97:20_, 97:22_, 97:23_, 98:1_, 98:4_, 99:20_, 99:22_, 99:23_, 100:2_, 102:18_, 103:5_, 103:17_, 104:4_, 104:5_, 108:3_, 192:9_, 193:23_, 194:3_, 194:9_, 195:2

**magenta** [4]_ - 22:19_, 24:17_, 28:10_, 94:14

**magenta-color** [1]_ - 22:19

**magenta-colored** [1]_ - 94:14

**main** [8]_ - 36:19_, 40:14_, 42:3_, 156:19_, 157:12_, 157:13_, 158:20_, 185:22

**maintain** [3]_ - 7:11_, 51:2_, 182:22

**maintained** [1]_ - 157:18

**maintains** [1]_ - 181:10

**major** [1]_ - 49:17

**majority** [1]_ - 163:11

**maker** [1]_ - 162:21

**managed** [1]_ - 166:11

**maneuver** [2]_ - 69:12_, 70:1

**manner** [6]_ - 109:16_, 174:23_, 175:1_, 177:21_, 178:12_, 183:21

**manually** [1]_ - 195:10

**manufacturer** [2]_ - 101:6_, 102:1

**map** [3]_ - 22:16_, 22:20_, 60:15

**Maps** [1]_ - 23:11

**Mar** [4]_ - 62:7_, 62:9_, 62:14_, 62:18

**Mar-a-Lago** [4]_ - 62:7_, 62:9_, 62:14_, 62:18

**Maria** [1]_ - 3:9

**mark** [8]_ - 17:4_, 18:20_, 22:21_, 28:2_, 39:7_, 42:15_, 43:17_, 86:14

**marked** [20]_ - 8:20_, 15:12_, 17:7_, 19:21_, 38:1_, 38:7_, 42:11_, 43:1_, _, 43:5_, 46:1_, 48:13_, 86:23_, 94:18_, 109:10_, 109:25_, 120:4_, 128:1_, 129:22_, 164:12_, 184:6

**marking** [5]_ - 16:22_, 23:5_, 23:23_, 68:22_,

80:3

**markings** [2]_ - 101:6_, 102:1

**maroon** [1]_ - 29:2

**marshals** [1]_ - 131:10

**Martin** [1]_ - 57:17

**mass** [2]_ - 135:18_, 172:5

**Master** [2]_ - 91:24_, 91:25

**material** [4]_ - 11:6_, 93:3_, _, 110:21_, 168:3

**matter** [5]_ - 125:11_, 143:14_, 172:13_, 172:18_, _, 173:17

**MAYS** [1] - 32:6

**Mays** [8]_ - 4:18_, 31:15_, 31:25_, 67:8_, 67:16_, 67:21_, 71:2_, 198:2

**McClay** [3]_ - 130:7_, 130:16_, 131:4

**McGee** [3]_ - 65:25_, 66:14_, 66:24

**mean** [19]_ - 51:12_, 61:19_ _, 77:1_, 80:2_, 89:6_, 96:18_, 98:8_, 102:13_, 118:15_, 149:25_, 157:13_ _, 161:10_, 162:14_, 182:1_, 189:16_, 190:22_, 190:25_, 192:19_, 192:25

**meaning** [2]_ - 53:8_, 117:13

**means** [3]_ - 21:17_, 96:19_, 122:10

**meant** [1]_ - 102:16

**measurable** [3]_ - 8:12_, 12:12_, 25:17

**measure** [2]_ - 8:16_, 8:18

**measured** [1]_ - 21:17

**measurement** [10]_ - 7:23_, 29:9_, 30:6_, 30:8_ _, 30:12_, 30:14_, 30:15_, 30:18_, 30:22_, 78:10

**measurements** [26]_ - 7:25_, 8:1_, 8:3_, 8:8_, 8:15_, 8:17_, 8:18_, 14:6_ _, 14:7_, 14:10_, 20:22_, 24:1_, 24:4_, 24:5_, 24:8_ _, 24:23_, 24:24_, 24:25_, 27:4_, 27:6_, 27:8_, 27:9_ _, 27:21_, 31:3_, 102:16

**Medetis** [7]_ - 3:9_, 4:16_, 122:22_, 123:9_, 125:22_, 128:13_, 136:2

**MEDETIS** [232]_ - 3:12_, 4:17_, 56:7_, 74:6_, 74:22_ _, 80:7_, 80:10_, 80:23_, 81:10_, 81:15_, 81:18_, 81:24_, 82:2_, 82:5_, 82:10_, 82:15_, 82:17_, 83:1_, 83:4_, 84:9_, 84:12_ _, 84:15_, 84:18_, 85:6_, 85:9_, 85:17, 85:19_, 87:19_, 87:22_, 88:24_, 89:1_, 89:23_, 90:1_, 90:5_ _, 90:7_, 90:10_, 90:14_, 91:3_, 91:6_, 91:14_, 91:17_, 93:5_, 93:8_, 93:12_, 93:15_, 94:3_, 94:6_, 94:23_, 95:1_, 95:7_ _, 95:10_, 99:15_, 99:18_, 100:6_, 100:8_, 100:11_, 100:14_, 101:1_, 101:4_, 101:21_, 101:24_, 102:6_, 102:9_, 103:1_, 103:3_, 103:9_, 103:12_, 103:15_, 103:24_, 104:2_, 104:6_, 104:9_, 104:13_, 104:16_, 104:20_, 105:25_, 106:5_, 106:8_, 106:20_, 106:23_, 106:24_, 107:16_, 107:20_ _, 107:22_, 108:1_, 108:7, 108:9_, 108:13_, 108:23_, 109:2_, 109:4_, 109:7_, 109:9_, 109:20_, 109:22_, 109:24_, 110:17_, 110:25_ _, 111:4_, 111:7_, 111:9_, 111:19_, 111:21_, 112:8_, 112:10_, 112:12_, 112:23_ _, 112:25_, 113:1_, 114:8_ _, 114:10_, 114:12_, 114:19_, 114:21_, 114:23_ _, 114:24_, 115:11_, 115:13_, 115:15_, 115:23_ _, 116:1_, 116:13, 116:15_ _, 116:22_, 117:1_, 117:19_, 117:20_, 117:23_ _, 118:1_, 118:18_, 118:21_, 119:12_, 119:15_ _, 119:22_, 119:25_, 120:1_, 120:23_, 122:23_, 122:25_, 123:10_, 125:24_ _, 126:10_, 126:18_, 129:12_, 132:1_, 132:11_, 132:14_, 132:16_, 132:17_ _, 132:23_, 133:4_, 133:7_ _, 133:9_, 134:2_, 134:5_, 134:7_, 134:23_, 134:25_, 136:5_, 136:8_, 136:11_, 137:7_, 137:13_, 138:5_, 140:23, 140:24_, 141:16_, 141:20_, 142:1_, 142:8_, 142:14_, 142:17_, 142:25_ _, 143:7_, 143:10_,

143:17_, 143:24_, 144:3_, 144:7_, 144:10_, 144:22_, 145:1_, 145:15_, 145:18, 145:20_, 145:23_, 146:1_, 146:13_, 146:16_, 146:25_ _, 147:2_, 147:12_, 147:15_, 148:3_, 148:6_, 148:18_, 148:21_, 149:7_, 149:14_, 150:13_, 150:16_ _, 150:24_, 151:2_, 152:3_ _, 152:5_, 152:23_, 153:3_ _, 153:13_, 153:16_, 153:18_, 153:25_, 154:1_, 154:24_, 155:1_, 155:13_, 155:15_, 158:14_, 158:17_ _, 159:1_, 159:13_, 188:6_ _, 188:9_, 188:24_, 189:3_ _, 191:20_, 191:23_, 193:17_, 193:20_, 193:21_ _, 194:15_, 196:1_, 196:21

**Medetis-Long** [7]_ - 3:9_ _, 4:16_, 122:22_, 123:9_, 125:22_, 128:13_, 136:2

**MEDETIS-LONG** [232]_ - 3:12_, 4:17_, 56:7_, 74:6_ _, 74:22_, 80:7_, 80:10_, 80:23_, 81:10_, 81:15_, 81:18_, 81:24_, 82:2_, 82:5_, 82:10_, 82:15_, 82:17_, 83:1_, 83:4_, 84:9_ _, 84:12_, 84:15_, 84:18_, 85:6_, 85:9_, 85:17, 85:19_ _, 87:19_, 87:22_, 88:24_, 89:1_, 89:23_, 90:1_, 90:5_ _, 90:7_, 90:10_, 90:14_, 91:3_, 91:6_, 91:14_, 91:17_, 93:5_, 93:8_, 93:12_, 93:15_, 94:3_, 94:6_, 94:23_, 95:1_, 95:7_ _, 95:10_, 99:15_, 99:18_, 100:6_, 100:8_, 100:11_, 100:14_, 101:1_, 101:4_, 101:21_, 101:24_, 102:6_, 102:9_, 103:1_, 103:3_, 103:9_, 103:12_, 103:15_, 103:24_, 104:2_, 104:6_, 104:9_, 104:13_, 104:16_, 104:20_, 105:25_, 106:5_, 106:8_, 106:20_, 106:23_, 106:24_, 107:16_, 107:20_ _, 107:22_, 108:1_, 108:7, 108:9_, 108:13_, 108:23_, 109:2_, 109:4_, 109:7_, 109:9_, 109:20_, 109:22_, 109:24_, 110:17_, 110:25_ _, 111:4_, 111:7_, 111:9_, 111:19_, 111:21_, 112:8_, 112:10_, 112:12_, 112:23_ _, 112:25_, 113:1_, 114:8_

_, 114:10_, 114:12_, 114:19_, 114:21_, 114:23_, 114:24_, 115:11_, 115:13_, 115:15_, 115:23_, 116:1_, 116:13, 116:15_, 116:22_, 117:1_, 117:19_, 117:20_, 117:23_, 118:1_, 118:18_, 118:21_, 119:12_, 119:15_, 119:22_, 119:25_, 120:1_, 120:23_, 122:23_, 122:25_, 123:10_, 125:24_, 126:10_, 126:18_, 129:12_, 132:1_, 132:11_, 132:14_, 132:16_, 132:17_, 132:23_, 133:4_, 133:7_, 133:9_, 134:2_, 134:5_, 134:7_, 134:23_, 134:25_, 136:5_, 136:8_, 136:11_, 137:7_, 137:13_, 138:5_, 140:23, 140:24_, 141:16_, 141:20_, 142:1_, 142:8_, 142:14_, 142:17_, 142:25_, 143:7_, 143:10_, 143:17_, 143:24_, 144:3_, 144:7_, 144:10_, 144:22_, 145:1_, 145:15_, 145:18_, 145:20_, 145:23_, 146:1_, 146:13_, 146:16_, 146:25_, 147:2_, 147:12_, 147:15_, 148:3_, 148:6_, 148:18_, 148:21_, 149:7_, 149:14_, 150:13_, 150:16_, 150:24_, 151:2_, 152:3_, 152:5_, 152:23_, 153:3_, 153:13_, 153:16_, 153:18_, 153:25, 154:1_, 154:24_, 155:1_, 155:13_, 155:15_, 158:14_, 158:17_, 159:1_, 159:13_, 188:6_, 188:9_, 188:24_, 189:3_, 191:20_, 191:23_, 193:17_, 193:20_, 193:21_, 194:15_, 196:1_, 196:21

**media** [2]_ - 6:24_, 6:25

**meet** [2]_ - 67:25_, 177:6

**member** [8]_ - 32:23_, 64:9_, 76:5_, 76:6_, 76:15_, 76:16_, 77:10_, 189:19

**members** [31]_ - 15:6_, 33:9_, 34:21_, 36:14_, 36:18_, 38:10_, 39:13_, 39:15_, 40:12_, 43:9_, 46:12_, 46:22_, 47:19_, 47:24_, 48:18_, 50:1_, 51:2, 55:13_, 58:17_, 77:21_, 163:2_, 172:16_, 172:21_, 172:25_, 173:3_, 177:1_, 179:24_, 180:17_,

184:21_, 185:20

**memorialize** [1]_ - 185:15

**memorialized** [1]_ - 186:6

**memory** [2]_ - 133:19_, 134:14

**mentioned** [16]_ - 12:3_, 34:4_, 40:2_, 40:6_, 41:6_, 44:18_, 50:12_, 57:24_, 64:20_, 105:3_, 133:24_, 156:4_, 164:10_, 172:20_, 173:10_, 180:1

**mentioning** [1]_ - 4:4

**mentoring** [1]_ - 58:16

**mesh** [3]_ - 12:7_, 16:21_, 26:18

**meshes** [1]_ - 34:22

**met** [7]_ - 81:7_, 121:15_, 121:22_, 122:4_, 155:16_, 155:19_, 155:20

**metal** [15]_ - 30:13_, 91:21_, 92:11_, 92:16_, 93:1_, 93:2_, 93:10_, 110:5_, 110:21_, 112:7_, 112:15_, 116:8_, 116:17_, 133:16

**Miami** [6]_ - 75:1_, 126:1_, 138:9_, 156:19_, 158:20_, 189:7

**micro** [1]_ - 115:4

**micro-SD** [1]_ - 115:4

**microphone** [1]_ - 56:8

**midafternoon** [1]_ - 139:25

**middle** [5]_ - 14:2_, 20:5_, 107:12_, 146:5_, 198:15

**might** [9]_ - 14:5_, 45:9_, 73:7_, 121:18_, 127:15_, 129:25_, 136:3_, 172:18_, 173:5

**military** [6]_ - 32:21_, 32:22_, 32:23_, 32:25_, 33:17_, 139:15

**MILITELLO** [7]_ - 3:17_, 124:16_, 128:10_, 128:19_, 128:25_, 130:9_, 131:12

**Militello** [8]_ - 3:18_, 124:13_, 125:25_, 128:7_, 130:6_, 131:3_, 131:9_, 131:11

**millions** [2]_ - 8:15_, 12:11

**mind** [3]_ - 54:4_, 59:1_,

200:6

**minor** [1]_ - 4:15

**minutes** [8]_ - 117:18_, 122:10_, 122:19_, 159:17_, 159:21_, 169:6_, 197:2_, 199:9

**Miramar** [3]_ - 157:12_, 157:22_, 158:7

**missing** [1]_ - 125:17

**misspoke** [1]_ - 4:5

**mistaken** [1]_ - 144:2

**model** [4]_ - 162:25_, 191:14_, 191:16_, 191:18

**moment** [10]_ - 29:18_, 51:7_, 54:13_, 56:2_, 104:16_, 111:13_, 118:7_, 123:20_, 136:5_, 169:24

**momentarily** [1]_ - 81:1

**Monday** [8]_ - 197:16_, 198:16_, 199:1_, 199:7_, 199:22_, 199:23_, 200:9_, 201:2

**monitor** [10]_ - 14:17_, 15:16_, 15:22_, 19:10_, 21:6_, 25:8_, 113:7_, 141:21_, 164:16_, 166:7

**monitored** [1]_ - 62:16

**monitoring** [1]_ - 58:16

**months** [1]_ - 55:25

**months'** [1]_ - 10:14

**Moran** [2]_ - 5:8_, 56:10

**morning** [22]_ - 3:2_, 3:8_, 3:11_, 3:12_, 3:15_, 3:17_, 3:19_, 4:10_, 5:17_, 5:19_, 6:18_, 6:19_, 29:24_, 29:25_, 32:10_, 32:11_, 53:24_, 54:23_, 55:13_, 74:23_, 74:24

**most** [6]_ - 34:25_, 35:1_, 53:3_, 73:4_, 195:21_, 195:24

**mostly** [3]_ - 155:3_, 155:6_, 198:16

**motion** [1]_ - 196:8

**motorcade** [7]_ - 35:1_, 35:2_, 35:3_, 36:7_, 36:23_, 37:17_, 39:16

**Motorola** [1]_ - 9:10

**mounted** [1]_ - 19:17

**mouth** [2]_ - 180:5_, 183:12

**move** [9]_ - 28:20_, 28:25_, 48:9_, 132:24_, 143:18_, 152:24_, 166:15_,

188:8_, 196:1

**moved** [3]_ - 80:5_, 124:24_, 128:3

**movie** [1]_ - 12:8

**moving** [3]_ - 40:13_, 198:13_, 199:20

**MR** [227]_ - 3:8_, 3:14_, 3:23_, 3:25_, 4:3_, 4:15_, 4:21_, 4:24_, 5:14_, 5:24, 6:12_, 6:17_, 8:22_, 8:24_, 9:18_, 9:24_, 10:1_, 10:19_, 10:23_, 11:3_, 11:8_, 11:11_, 11:16_, 11:18_, 12:13_, 12:15_, 14:22_, 14:24_, 15:8_, 15:10_, 15:14_, 15:18_, 15:20_, 16:6_, 16:9_, 16:12_, 16:16_, 17:7_, 17:11_, 18:24_, 19:1_, 20:1_, 20:3_, 20:17_, 20:18_, 21:1_, 21:2_, 21:5_, 21:9_, 22:1_, 22:5_, 22:10_, 22:12_, 22:13_, 25:7_, 25:10_, 25:11_, 26:4_, 26:8_, 26:13_, 26:15_, 26:16_, 27:11, 27:13_, 29:18_, 29:21_, 29:23_, 31:9_, 31:14_, 32:2, 32:5_, 32:9_, 37:25_, 38:3_, 38:5_, 39:5, 39:6_, 42:9_, 42:18_, 42:25_, 43:4_, 43:19_, 43:23_, 47:18_, 47:22_, 48:12_, 48:16_, 48:23_, 49:2_, 51:8_, 51:10_, 51:23_, 52:4_, 53:19_, 53:21_, 54:15_, 54:16_, 54:21, 55:12, 55:18_, 57:8, 57:9_, 60:7_, 60:11, 60:12_, 68:8_, 68:11, 68:12_, 70:11, 70:15_, 73:24_, 74:3_, 82:7_, 121:1_, 123:15_, 123:22_, 123:25_, 124:3_, 124:6_, 124:11_, 124:19_, 125:3_, 125:7_, 125:15_, 127:9_, 127:12_, 127:18_, 130:2_, 130:18_, 130:23_, 132:3_, 135:5_, 136:15_, 136:18_, 137:3_, 142:11_, 143:3_, 143:20_, 153:8_, 159:5_, 159:11_, 160:1_, 160:9, 160:22_, 161:2_, 162:3_, 162:5_, 162:6_, 163:1_, 163:4_, 163:15_, 163:16_, 164:15_, 164:18_, 164:22_, 164:24_, 165:4_, 165:9_, 165:13_, 165:15_, 165:18_, 165:23_, 166:3_, 166:14_, 166:18_, 166:23

_, 166:25_, 167:3_, 167:10_, 167:12_, 167:17 _, 168:1_, 168:8_, 168:11 _, 168:14_, 169:25_, 170:2_, 170:5_, 170:11_, 171:1, 171:3_, 171:7_, 175:11_, 175:17_, 175:18 _, 176:3_, 176:6_, 176:8_, 179:13_, 179:17_, 179:19 _, 180:22_, 180:25_, 181:1_, 181:12_, 181:15_, 181:16_, 183:1_, 183:6_, 183:9_, 183:10_, 183:25_, 184:3_, 184:4_, 186:22_, 187:1_, 187:4_, 187:9_, 187:14_, 187:17_, 188:1_, 194:19, 196:3_, 196:7_, 196:11_, 196:19_, 197:6_, 197:8, 197:20_, 197:22_, 198:4_, 198:7_, 198:11_, 199:3_, 199:10_, 200:16_, 200:20

**MS** [241]_ - 3:12_, 3:17_, 4:17_, 56:7_, 74:6_, 74:22 _, 80:7_, 80:10_, 80:23_, 81:10_, 81:15_, 81:18_, 81:24_, 82:2_, 82:5_, 82:10_, 82:15_, 82:17_, 83:1_, 83:4_, 84:9_, 84:12 _, 84:15_, 84:18_, 85:6_, 85:9_, 85:17, 85:19_, 87:19_, 87:22_, 88:24_, 89:1_, 89:23_, 90:1_, 90:5 _, 90:7_, 90:10_, 90:14_, 91:3_, 91:6_, 91:14_, 91:17_, 93:5_, 93:8_, 93:12_, 93:15_, 94:3_, 94:6_, 94:23_, 95:1_, 95:7 _, 95:10_, 99:15_, 99:18_, 100:6_, 100:8_, 100:11_, 100:14_, 101:1_, 101:4_, 101:21_, 101:24_, 102:6_, 102:9_, 103:1_, 103:3_, 103:9_, 103:12_, 103:15_, 103:24_, 104:2_, 104:6_, 104:9_, 104:13_, 104:16_, 104:20_, 105:25_, 106:5_, 106:8_, 106:20_, 106:23_, 106:24_, 107:16_, 107:20 _, 107:22_, 108:1_, 108:7, 108:9_, 108:13_, 108:23_, 109:2_, 109:4_, 109:7_, 109:9_, 109:20_, 109:22_, 109:24_, 110:17_, 110:25 _, 111:4_, 111:7_, 111:9_, 111:19_, 111:21_, 112:8_, 112:10_, 112:12_, 112:23 _, 112:25_, 113:1_, 114:8 _, 114:10_, 114:12_, 114:19_, 114:21_, 114:23

_, 114:24_, 115:11_, 115:13_, 115:15_, 115:23 _, 116:1_, 116:13, 116:15 _, 116:22_, 117:1_, 117:19_, 117:20_, 117:23 _, 118:1_, 118:18_, 118:21_, 119:12_, 119:15 _, 119:22_, 119:25_, 120:1_, 120:23_, 122:23_, 122:25_, 123:10_, 124:16 _, 124:20_, 124:22_, 125:24_, 126:10_, 126:18 _, 128:10_, 128:19_, 128:25_, 129:12_, 130:9_, 131:12_, 132:1_, 132:11_, 132:14_, 132:16_, 132:17 _, 132:23_, 133:4_, 133:7 _, 133:9_, 134:2_, 134:5_, 134:7_, 134:23_, 134:25_, 136:5_, 136:8_, 136:11_, 137:7_, 137:13_, 138:5_, 140:23, 140:24_, 141:16_, 141:20_, 142:1_, 142:8_, 142:14_, 142:17_, 142:25 _, 143:7_, 143:10_, 143:17_, 143:24_, 144:3_, 144:7_, 144:10_, 144:22_, 145:1_, 145:15_, 145:18, 145:20_, 145:23_, 146:1_, 146:13_, 146:16_, 146:25 _, 147:2_, 147:12_, 147:15_, 148:3_, 148:6_, 148:18_, 148:21_, 149:7_, 149:14_, 150:13_, 150:16 _, 150:24_, 151:2_, 152:3 _, 152:5_, 152:23_, 153:3 _, 153:13_, 153:16_, 153:18_, 153:25, 154:1_, 154:24_, 155:1_, 155:13_, 155:15_, 158:14_, 158:17 _, 159:1_, 159:13_, 188:6 _, 188:9_, 188:24_, 189:3 _, 191:20_, 191:23_, 193:17_, 193:20_, 193:21 _, 194:15_, 196:1_, 196:21

**multiple** [4]_ - 10:13_, 11:22_, 13:5_, 179:7

**must** [2]_ - 54:3_, 200:5

**muted** [1]_ - 56:7

**muzzle** [3]_ - 19:8_, 28:17 _, 146:10

**N**

**name** [17]_ - 6:9_, 31:23_, 55:7_, 55:9_, 65:23_, 74:16_, 75:25_, 137:23_, 137:25_, 159:9_, 160:18_,

160:20_, 160:21_, 170:22 _, 188:19

**named** [1]_ - 9:5

**names** [3]_ - 4:20_, 13:15 _, 197:24

**Natasha** [1]_ - 177:4

**National** [1]_ - 7:7

**natural** [1]_ - 117:17

**nature** [2]_ - 172:6_, 198:25

**near** [5]_ - 24:15_, 43:20_, 91:10_, 151:24_, 190:7

**nearby** [1]_ - 101:18

**necessarily** [2]_ - 52:17 _, 105:16

**necessary** [4]_ - 131:7_, 172:17_, 188:5_, 198:21

**need** [13]_ - 18:7_, 30:12_, 30:14_, 37:11_, 58:13_, 75:15_, 111:2_, 127:6_, 129:25_, 133:19_, 158:11 _, 172:15_, 175:14

**needed** [3]_ - 34:13_, 72:4_, 84:7

**needs** [2]_ - 35:3_, 198:22

**never** [7]_ - 72:18_, 123:16_, 125:14_, 125:15 _, 125:18_, 195:12_, 195:13

**new** [4]_ - 58:15_, 128:5_, 130:10_, 131:18

**next** [32]_ - 5:22_, 17:20_, 17:22_, 31:13_, 34:16_, 42:2_, 43:21_, 54:20_, 64:6_, 65:17_, 66:25_, 67:23_, 73:14_, 74:5_, 79:9_, 86:20_, 95:19_, 105:4_, 105:11_, 120:15_, 130:5_, 137:12_, 150:21_, 159:25_, 160:3_, 160:8_, 170:10_, 188:4_, 192:6_, 197:16_, 198:15

**nice** [3]_ - 59:1_, 132:8_, 199:8

**night** [3]_ - 61:18_, 118:11 _, 169:9

**nighttime** [3]_ - 117:14_, 117:15_, 119:1

**Nissan** [5]_ - 64:20_, 64:25_, 156:7_, 157:15_, 158:19

**nobody** [2]_ - 51:14_, 51:21

**noon** [2]_ - 117:18_, 126:4

**normal** [4]_ - 135:9_, 136:19_, 136:21_, 136:24

**normally** [2]_ - 195:5_, 195:16

**north** [16]_ - 59:6_, 140:21 _, 141:5_, 141:6_, 141:7_, 142:5_, 142:23_, 143:14_, 145:4_, 145:7_, 146:3_, 147:4_, 148:23_, 150:5_, 150:8_, 151:18

**not-yet-admitted** [1]_ - 120:5

**notated** [4]_ - 13:14_, 14:14_, 23:1_, 28:20

**note** [6]_ - 40:3_, 46:10_, 46:19_, 125:24_, 126:3_, 163:7

**noted** [1]_ - 87:25

**notes** [2]_ - 13:12

**nothing** [17] - 6:5_, 31:20 _, 41:1_, 41:9_, 55:4_, 74:13_, 137:7_, 137:20_, 141:24_, 157:25_, 158:3_, 160:15_, 170:2_, 170:18_, 188:16_, 193:2_, 196:21

**noticed** [1]_ - 73:5

**notification** [1]_ - 78:24

**nowhere** [1]_ - 137:2

**Number** [2]_ - 3:5_, 151:6

**number** [13]_ - 14:25_, 65:13_, 84:3_, 126:24_, 128:11_, 136:2_, 150:22_, 172:4_, 179:16_, 181:3_, 181:5_, 181:22_, 184:17

**numbers** [4]_ - 4:12_, 24:23_, 25:1_, 186:24

**numerous** [1]_ - 59:24

**nuts** [1]_ - 58:12

**O**

**oath** [2]_ - 57:6_, 132:12

**object** [5]_ - 123:19_, 127:12_, 127:13_, 129:15

**objection** [44]_ - 10:22_, 10:23_, 10:25_, 16:8_, 16:9_, 16:10_, 22:4_, 22:5 _, 22:7_, 26:7_, 26:8_, 26:10_, 120:25_, 121:1_, 123:14_, 125:13_, 127:2_, 127:7_, 127:10_, 127:15_, 127:17_, 129:2_, 129:9_, 133:1_, 142:10_, 142:11_, 142:12_, 143:2_, 143:3_,

143:5_, 143:19_, 143:20_, 143:22_, 153:5_, 153:6_, 153:8_, 153:10_, 166:17_, 166:18_, 166:20_, 187:3_, 187:4_, 187:6_, 196:1

**objects** [2]_ - 8:3_, 86:4

**observation** [1]_ - 17:13

**observations** [3]_ - 50:21_, 113:10_, 127:5

**observe** [3]_ - 15:2_, 20:9_, 97:11

**observed** [2]_ - 97:12_, 193:24

**obstruct** [1]_ - 193:2

**obstruction** [1]_ - 192:23

**obtain** [3]_ - 24:4_, 174:3_, 183:13

**obtained** [4]_ - 174:3_, 174:19_, 184:12_, 185:4

**obtaining** [1]_ - 185:3

**obviously** [9]_ - 34:11_, 49:18_, 50:5_, 50:8_, 51:20_, 60:19_, 66:10_, 146:4_, 195:10

**occurred** [5]_ - 76:22_, 78:24_, 79:1_, 174:5_, 186:6

**offense** [2]_ - 121:14_, 122:5

**offensive** [1]_ - 5:4

**offhand** [1]_ - 190:15

**office** [30]_ - 10:12_, 32:13_, 33:10_, 38:22_, 39:15_, 45:23_, 51:3_, 57:15_, 58:22_, 59:8_, 62:15_, 62:20_, 62:24_, 63:7_, 63:16_, 64:5_, 128:22_, 138:9_, 156:19_, 157:12_, 157:13_, 158:1_, 158:3_, 158:7_, 158:8_, 189:7_, 189:12_, 190:14

**Office** [22]_ - 32:15_, 32:18_, 32:21_, 33:9_, 33:17_, 34:4_, 34:23_, 35:6_, 36:15_, 49:21_, 50:2_, 55:21_, 55:24_, 57:11_, 57:18_, 57:24_, 58:6_, 59:5_, 62:17_, 79:14_, 151:17_, 156:18

**Officer** [5]_ - 54:11_, 56:2_, 57:1_, 132:5_, 160:5

**officer** [9]_ - 57:17_, 57:21_, 58:3_, 58:4_, 59:18_, 61:3_, 67:7_,

189:24_, 189:25

**OFFICER** [2]_ - 54:12_, 56:12

**officers** [2]_ - 35:10_, 66:16

**often** [2]_ - 35:1_, 105:17

**on-call** [3]_ - 7:11_, 172:10_, 172:11

**on-scene** [1]_ - 10:9

**once** [14]_ - 10:12_, 37:15_, 46:15_, 62:20_, 64:9_, 70:2_, 85:21_, 92:14_, 98:14_, 105:5_, 155:25_, 157:8_, 178:10_, 186:19

**one** [57]_ - 4:3_, 4:15_, 8:2_, 9:8_, 11:23_, 12:2_, 16:18_, 18:9_, 19:3_, 19:18_, 20:6_, 29:3_, 40:13_, 41:16_, 44:18_, 50:9_, 50:12_, 50:20_, 51:7_, 53:15_, 54:13_, 56:2_, 59:20_, 62:6_, 62:17_, 71:16_, 93:21_, 95:5_, 97:12_, 102:23_, 104:16_, 114:3_, 122:9_, 123:20_, 124:1_, 125:9_, 127:18_, 127:20_, 128:4_, 129:19_, 136:5_, 155:8_, 167:6_, 168:18_, 169:7_, 171:14_, 179:1_, 179:2_, 179:3_, 180:9_, 185:13_, 196:5_, 198:1_, 198:5

**ones** [2]_ - 53:16_, 127:21

**online** [1]_ - 8:14

**open** [12]_ - 36:21_, 47:8_, 54:3_, 85:2_, 148:1_, 148:9_, 149:17_, 149:18_, 156:25_, 182:20_, 182:24_, 200:6

**opened** [2]_ - 46:16_, 46:17

**opening** [10]_ - 69:15_, 69:16_, 92:3_, 92:4_, 93:24_, 93:25_, 145:16_, 145:22_, 148:24_, 150:2

**operate** [1]_ - 53:5

**operational** [3]_ - 6:24_, 6:25_, 75:12

**operator** [1]_ - 13:20

**Oran** [1]_ - 131:5

**orange** [7]_ - 68:21_, 86:6_, 86:12_, 86:13_, 114:3_, 147:23_, 148:1

**order** [10]_ - 4:16_, 13:2_, 69:21_, 129:3_, 131:13_, 131:15_, 131:20_, 176:24_,

_, 195:1_, 200:22

**Order** [1]_ - 3:1

**ordered** [1]_ - 121:5

**ordering** [1]_ - 58:15

**ordnance** [1]_ - 36:5

**orient** [2]_ - 20:7_, 44:5

**original** [6]_ - 98:14_, 98:20_, 99:1_, 113:11_, 169:3_, 182:1

**originally** [1]_ - 113:16

**originate** [1]_ - 24:6

**OST** [3]_ - 75:12_, 75:13_, 75:15

**outdoor** [1]_ - 173:7

**outer** [1]_ - 16:21

**outermost** [1]_ - 23:10

**outside** [16]_ - 18:12_, 64:2_, 83:9_, 97:7_, 101:13_, 110:20_, 115:3_, 139:9_, 139:10_, 139:15_, 139:16_, 156:22_, 180:13_, 180:18_, 181:20

**outstanding** [1]_ - 51:19

**overall** [3]_ - 22:16_, 77:5_, 125:11

**overhead** [1]_ - 13:17

**overview** [1]_ - 8:8

**overwatch** [2]_ - 34:13_, 34:14

**overwhelming** [1]_ - 163:11

**own** [4]_ - 25:14_, 35:13_, 40:6_, 53:9

**P**

**p.m** [16]_ - 79:19_, 122:16_, 123:4_, 132:6_, 159:19_, 159:22_, 160:6_, 169:9_, 197:4_, 199:11_, 199:17_, 200:11_, 201:3

**pace** [7]_ - 41:24_, 59:22_, 122:20_, 129:20_, 129:25_, 198:13_, 199:1

**package** [7]_ - 10:4_, 39:20_, 39:25_, 67:18_, 178:11_, 178:17

**packaged** [4]_ - 97:16_, 97:20_, 105:13_, 178:15

**packager** [1]_ - 105:17

**packaging** [11]_ - 17:3_, 77:4_, 95:22_, 98:18_, 98:23_, 105:6_, 105:7_,

105:8_, 105:23_, 178:24_, 179:4

**page** [8]_ - 42:12_, 42:13_, 43:12_, 43:21_, 44:20_, 124:3_, 124:4_, 124:11

**pages** [1]_ - 21:14

**paint** [2]_ - 113:17_, 154:21

**painted** [3]_ - 111:17_, 113:17_, 114:16

**Palm** [35]_ - 32:13_, 32:14_, 32:17_, 32:20_, 33:8_, 33:16_, 34:3_, 34:18_, 34:22_, 35:6_, 35:13_, 36:14_, 38:23_, 40:18_, 49:21_, 50:1_, 50:14_, 55:20_, 55:23_, 57:11_, 57:24_, 58:6_, 59:4_, 59:16_, 62:17_, 64:5_, 79:13_, 151:17_, 151:24_, 152:14_, 156:17_, 157:8_, 157:21_, 190:10

**palm** [5]_ - 28:1_, 28:8_, 44:15_, 83:18_, 83:19

**panel** [4]_ - 71:13_, 71:16_, 71:20_, 71:24

**pant** [2]_ - 154:17

**pants** [4]_ - 153:23_, 153:24_, 154:4_, 154:9

**paper** [4]_ - 65:13_, 65:15_, 105:10_, 126:12

**paperwork** [1]_ - 186:19

**pardon** [1]_ - 56:12

**park** [3]_ - 37:9_, 61:14_, 61:15

**parked** [5]_ - 39:8_, 39:11_, 39:12_, 39:14_, 43:24

**parking** [7]_ - 36:21_, 40:4_, 40:5_, 40:11_, 40:18_, 41:4_, 61:17

**part** [43]_ - 7:2_, 7:9_, 14:6_, 17:12_, 33:16_, 34:2_, 34:9_, 34:17_, 35:4_, 37:6_, 37:17_, 38:13_, 44:10_, 44:24_, 60:22_, 67:22_, 73:21_, 78:5_, 87:5_, 89:6_, 89:14_, 101:14_, 113:18_, 127:22_, 138:23_, 139:4_, 139:7_, 140:11_, 147:18_, 151:10_, 156:12_, 156:16_, 161:16_, 167:5_, 167:19_, 168:3_, 168:21_, 174:22_, 177:10_, 182:14_, 182:15_, 184:24_, 185:23

**participate** [1]_ - 78:13

**particular** [31]_ - 37:20_, 39:17_, 61:19_, 62:5_, 71:24_, 80:19_, 83:14_, 84:24_, 85:1_, 100:7_, 126:2_, 126:9_, 126:22_, 129:14_, 135:20_, 145:9_, 145:10_, 169:17_, 174:1_, 175:9_, 178:6_, 178:22_, 179:6_, 181:6_, 182:4_, 182:6_, 183:2_, 183:7_, 184:18_, 186:24_, 190:12

**particularly** [2]_ - 60:25 _, 173:2

**parties** [3]_ - 121:4_, 199:5_, 200:5

**partner** [1]_ - 119:8

**partners** [2]_ - 139:14_, 139:16

**parts** [1]_ - 58:15

**pass** [2]_ - 163:2_, 163:4

**passed** [1]_ - 18:1

**past** [1]_ - 36:19

**path** [27]_ - 8:11_, 12:9_, 13:3_, 13:4_, 13:5_, 13:8 _, 19:15_, 22:25_, 23:1_, 23:3_, 23:22_, 24:16_, 28:20_, 28:21_, 28:23_, 28:24_, 29:2_, 29:3_, 29:5 _, 29:13_, 68:22_, 85:13_, 85:15

**paths** [1]_ - 13:14

**patience** [1]_ - 200:8

**patrol** [10]_ - 33:11_, 33:13_, 57:20_, 57:22_, 58:3_, 59:12_, 59:18_, 60:1_, 60:23_, 61:3

**patrolled** [1]_ - 44:9

**pattern** [2]_ - 167:21_, 168:5

**pause** [2]_ - 20:17_, 81:1

**paved** [1]_ - 29:3

**PBSO** [8]_ - 58:25_, 79:25 _, 86:10_, 95:20_, 99:7_, 126:19_, 157:21_, 158:19

**PBSO's** [1]_ - 96:8

**PC** [3]_ - 11:15_, 15:15_, 164:15

**pending** [1]_ - 196:2

**people** [5]_ - 45:4_, 60:3_, 61:6_, 177:3_, 197:15

**perception** [2]_ - 18:6_, 136:19

**perform** [4]_ - 151:10_, 161:21_, 163:23_, 174:16

**performed** [3]_ - 162:10 _, 162:13_, 185:15

**performing** [3]_ - 151:9 _, 163:20_, 169:2

**perhaps** [1]_ - 124:24

**perimeter** [4]_ - 51:3_, 67:9_, 141:8_, 141:12

**period** [3]_ - 33:2_, 33:5_, 172:11

**periods** [1]_ - 172:10

**permissible** [1]_ - 141:18

**permissibly** [1]_ - 198:21

**permission** [72]_ - 22:10 _, 26:13_, 32:2_, 42:25_, 48:12_, 48:24_, 60:7_, 70:12_, 81:15_, 81:24_, 83:1_, 84:9_, 84:15_, 85:6 _, 87:19_, 89:23_, 90:11_, 91:3_, 91:14_, 93:5_, 93:12_, 94:3_, 94:23_, 95:7_, 99:15_, 100:11_, 101:1_, 101:21_, 102:6_, 103:9_, 103:24_, 104:6_, 104:13_, 104:17_, 106:2_, 107:18_, 108:7_, 109:4_, 109:20_, 111:5_, 112:8_, 112:23_, 114:8_, 114:19_, 115:11_, 116:22_, 117:23 _, 118:18_, 119:13_, 119:22_, 132:23_, 133:4_, 134:23_, 146:25_, 147:12 _, 148:3_, 148:18_, 149:11_, 150:13_, 150:24 _, 153:13_, 158:14_, 166:23_, 171:1_, 175:11_, 175:15_, 176:3_, 179:13_, 180:22_, 181:12_, 182:25 _, 183:25

**permit** [2]_ - 54:2_, 108:23

**person** [15]_ - 41:16_, 47:2_, 64:19_, 66:7_, 67:15_, 105:21_, 150:11_, 151:15_, 151:16_, 155:20 _, 173:22_, 174:20_, 176:14_, 178:20_, 183:14

**person's** [1]_ - 177:25

**personal** [2]_ - 17:13_, 61:16

**personally** [4]_ - 15:2_, 17:25_, 20:9_, 61:21

**personnel** [1]_ - 72:14

**perspective** [15]_ - 10:5 _, 25:18_, 72:11_, 103:19

_, 103:20_, 103:21_, 118:6_, 145:6_, 146:3_, 147:17_, 148:2_, 148:8_, 148:12_, 150:10_, 154:8

**pertaining** [1]_ - 174:4

**Petriolo** [1]_ - 177:4

**phone** [5]_ - 65:3_, 65:4_, 65:5_, 71:8

**phones** [1]_ - 161:12

**phonetic)** [1]_ - 177:5

**photo** [13]_ - 60:18_, 60:20_, 61:14_, 65:3_, 65:5_, 73:7_, 80:16_, 123:16_, 126:22_, 128:13 _, 135:20_, 145:3_, 158:22

**photograph** [63]_ - 14:3 _, 14:13_, 14:19_, 14:25_, 19:11_, 19:22_, 20:4_, 20:7_, 43:14_, 47:25_, 60:18_, 65:10_, 83:8_, 83:16_, 84:20_, 84:22_, 84:25_, 85:11_, 85:22_, 85:24_, 86:6_, 89:9_, 89:18_, 94:17_, 95:2_, 99:22_, 99:23_, 99:24_, 100:16_, 100:18_, 100:22 _, 102:3_, 102:11_, 102:14_, 102:19_, 104:4_, 104:22_, 104:25_, 115:9_, 118:7_, 126:13_, 126:17_, 136:13_, 142:4_, 144:19_, 145:10_, 145:19_, 147:8_, 147:19_, 147:21_, 147:24 _, 149:4_, 149:8_, 149:15 _, 149:17_, 150:9_, 150:11_, 150:12_, 151:15 _, 152:16_, 152:17_, 153:20_, 158:18

**photographed** [11]_ - 95:18_, 98:16_, 99:9_, 105:3_, 105:5_, 107:2_, 126:20_, 152:13_, 155:20 _, 155:21_, 157:10

**photographic** [1]_ - 26:24

**photographing** [2]_ - 80:3_, 99:2

**photographs** [14]_ - 8:11_, 19:3_, 20:6_, 71:8 _, 94:10_, 94:12_, 101:10 _, 101:11_, 117:13_, 117:15_, 126:8_, 126:21_, 152:12

**photography** [10]_ - 7:24_, 8:12_, 8:13_, 9:15 _, 9:17_, 11:21_, 20:6_,

24:22_, 99:10_, 99:11

**photos** [4]_ - 126:16_, 128:11_, 128:14_, 135:18

**physical** [11]_ - 106:1_, 108:24_, 110:16_, 125:9_, 126:1_, 126:13_, 126:15_, 128:16_, 163:9_, 173:6_, 175:12

**physically** [6]_ - 7:9_, 13:3_, 16:24_, 62:12_, 67:20_, 98:13

**pick** [2]_ - 45:8_, 66:11

**picked** [1]_ - 66:19

**picture** [7]_ - 63:13_, 68:17_, 70:16_, 70:19_, 88:25_, 125:15_, 125:16

**piece** [3]_ - 65:13_, 65:15 _, 126:20

**pieces** [12]_ - 25:1_, 71:16 _, 71:21_, 125:9_, 173:7_, 175:7_, 175:12_, 175:19_, 176:9_, 176:17_, 182:5_, 183:13

**pinpoint** [1]_ - 126:22

**pinpointed** [1]_ - 69:1

**pitched** [1]_ - 63:2

**Pixar** [1]_ - 12:8

**place** [12]_ - 36:1_, 59:1_, 61:17_, 99:9_, 169:9_, 180:8_, 185:8_, 185:9_, 185:14_, 185:16_, 185:25 _, 186:8

**placed** [7]_ - 86:9_, 86:12 _, 86:13_, 93:23_, 105:6_, 158:8_, 192:15

**placeholder** [1]_ - 86:16

**places** [2]_ - 177:12_, 200:4

**plastic** [5]_ - 87:12_, 92:24_, 105:9_, 112:16

**plate** [10]_ - 9:10_, 92:11_, 92:16_, 92:21_, 92:22_, 112:7_, 112:15_, 114:5_, 114:6_, 114:15

**plates** [3]_ - 30:13_, 133:16_, 146:8

**platforms** [1]_ - 35:17

**play** [4]_ - 11:16_, 14:22_, 15:18_, 37:1

**played** [21]_ - 11:17_, 12:14_, 14:23_, 15:19_, 16:15_, 17:10_, 20:2, 164:17_, 164:23_, 165:3_, 165:8_, 165:17_, 165:22_,

166:2_, 167:2_, 167:11_, 167:16_, 167:24, 168:10_, 168:13_, 168:15

**playing** [5]_ - 17:9_, 18:24_, 20:1_, 30:2_, 30:21

**plus** [1]_ - 10:5

**point** [44]_ - 14:7_, 14:8_, 14:11_, 14:18_, 19:19_, 24:7_, 27:3_, 28:6_, 28:24_, 29:5_, 29:10_, 33:6_, 36:10_, 40:19_, 44:6_, 44:22_, 45:2_, 45:4_, 47:13_, 47:15_, 49:10_, 64:8_, 65:12_, 65:18_, 67:2_, 67:4_, 67:12_, 72:3_, 80:5_, 96:8_, 117:18_, 129:13_, 129:18_, 130:2_, 141:13_, 174:13_, 174:19_, 176:11_, 176:23_, 180:4_, 183:2_, 191:8_, 192:14_, 199:1

**pointed** [1]_ - 192:8

**pointing** [8]_ - 19:5_, 87:17_, 87:18_, 89:16_, 89:21_, 107:3_, 107:8_, 107:9

**points** [3]_ - 12:10_, 12:12_, 23:17

**police** [4]_ - 39:18_, 57:16_, 65:19_, 66:9

**political** [1]_ - 34:15

**politicians** [1]_ - 34:25

**popped** [1]_ - 20:4

**popular** [2]_ - 195:21_, 195:24

**portable** [1]_ - 8:19

**portion** [7]_ - 13:7_, 26:18_, 60:20_, 141:11_, 144:14_, 177:17_, 184:18

**portions** [1]_ - 23:10

**position** [6]_ - 29:12_, 125:22_, 127:16_, 136:22_, 137:1_, 147:7

**positioned** [2]_ - 89:2_, 89:10

**positions** [1]_ - 33:10

**possession** [1]_ - 50:10

**possibility** [1]_ - 200:21

**possible** [6]_ - 12:24_, 13:21_, 15:14_, 25:7_, 56:24_, 164:15

**possibly** [1]_ - 135:21

**post** [20]_ - 14:2_, 14:4_,

14:8_, 14:13_, 14:14_, 14:18_, 17:2_, 19:19_, 24:6_, 27:1_, 28:5_, 28:7_, 28:8_, 28:12_, 28:16_, 28:24_, 29:5_, 156:1_, 190:14

**posted** [1]_ - 147:6

**posting** [1]_ - 200:3

**posture** [1]_ - 7:11

**potential** [1]_ - 50:8

**potentially** [2]_ - 4:19_, 67:3

**powered** [1]_ - 169:3

**practice** [1]_ - 193:13

**pre** [5]_ - 82:8_, 127:25_, 128:2_, 144:2_, 175:13

**pre-admission** [2]_ - 127:25_, 128:2

**pre-admitted** [3]_ - 82:8_, 144:2_, 175:13

**precautions** [1]_ - 95:23

**precise** [1]_ - 21:17

**predicted** [1]_ - 4:14

**predone** [1]_ - 179:3

**prefer** [1]_ - 110:16

**preliminary** [4]_ - 76:23_, 79:12_, 79:13

**premarked** [1]_ - 175:13

**prepare** [1]_ - 172:15

**preparing** [1]_ - 117:16

**presence** [3]_ - 45:20_, 96:6_, 179:9

**present** [12]_ - 15:4_, 16:24_, 112:1_, 116:17_, 118:13_, 122:7_, 132:8_, 133:3_, 159:23_, 177:15_, 191:1_, 199:12

**presentation** [1]_ - 3:21

**presented** [2]_ - 54:4_, 136:1

**presenting** [2]_ - 108:25_, 127:16

**preserve** [1]_ - 161:9

**President** [4]_ - 30:21_, 36:25_, 79:4_, 79:7

**president** [3]_ - 37:13_, 79:3

**presidential** [1]_ - 34:14

**pretty** [10]_ - 41:24_, 42:20_, 44:16_, 45:11_, 52:15_, 59:15_, 59:22_, 67:1_, 68:18_, 149:17

**prevent** [1]_ - 179:4

**previous** [2]_ - 93:21_, 169:12

**previously** [44]_ - 4:4_, 4:5_, 4:8_, 9:20_, 11:14_, 15:12_, 26:5_, 43:1_, 47:19_, 48:13_, 48:25_, 81:16_, 83:2_, 84:15_, 85:4_, 87:20_, 93:19_, 94:4_, 104:14_, 104:18_, 106:2_, 108:15_, 109:25_, 111:11_, 111:19_, 112:13_, 113:2_, 114:13_, 114:25_, 115:16_, 116:6_, 116:13_, 117:21_, 144:4_, 144:8_, 144:11_, 145:24_, 146:23_, 158:14_, 162:1_, 164:12_, 168:6_, 191:21_, 193:18

**primarily** [1]_ - 27:8

**primary** [3]_ - 37:16_, 51:5_, 94:8

**principal** [1]_ - 189:11

**print** [1]_ - 172:5

**printed** [1]_ - 126:11

**prints** [3]_ - 185:6_, 185:17_, 186:18

**pro** [1]_ - 125:12

**problem** [1]_ - 178:24

**procedure** [1]_ - 163:18

**proceed** [11]_ - 41:23_, 60:10_, 83:3_, 86:21_, 104:1_, 104:19_, 125:12_, 125:19_, 132:14_, 136:17_, 191:22

**proceeded** [1]_ - 79:11

**proceeding** [3]_ - 95:12_, 128:9_, 200:6

**proceedings** [1]_ - 201:3

**process** [14]_ - 10:8_, 10:12_, 13:18_, 72:15_, 77:6_, 78:3_, 79:24_, 79:25_, 97:9_, 98:5_, 158:10_, 163:17_, 182:17_, 185:5

**processed** [6]_ - 26:18_, 79:25_, 80:2_, 142:5_, 158:13_, 161:25

**processing** [11]_ - 10:13_, 76:23_, 76:25_, 77:2_, 95:21_, 141:5_, 141:6_, 164:5_, 172:13_, 172:19_, 180:9

**produced** [1]_ - 65:3

**product** [2]_ - 8:12_, 78:9

**products** [4]_ - 9:12_, 10:14_, 12:3_, 12:22

**promoted** [1]_ - 33:12

**proof** [4]_ - 81:8_, 121:16_, 121:23_, 122:4

**proper** [2]_ - 5:1_, 140:15

**properly** [2]_ - 135:19_, 181:9

**property** [1]_ - 45:4

**propose** [2]_ - 197:13_, 198:8

**protectee** [1]_ - 35:1

**protecting** [1]_ - 37:12

**protection** [4]_ - 34:17_, 34:25_, 35:5_, 38:14

**protective** [3]_ - 44:10_, 68:1_, 69:13

**protocols** [1]_ - 95:23

**protruding** [2]_ - 92:8_, 92:10

**provide** [7]_ - 36:22_, 37:9_, 65:14_, 66:15_, 164:5_, 172:23_, 186:14

**provided** [13]_ - 119:21_, 123:16_, 123:21_, 124:23_, 125:15_, 125:18_, 126:11_, 126:14_, 126:21_, 163:10_, 192:16_, 193:9_, 198:2

**proximity** [5]_ - 14:9_, 63:13_, 80:17_, 87:7_, 141:11

**prudent** [1]_ - 130:15

**public** [2]_ - 57:18_, 64:10

**publish** [62]_ - 16:12_, 22:10_, 26:13_, 37:25_, 43:1_, 43:3_, 47:19_, 48:24_, 60:8_, 68:8_, 80:7_, 80:23_, 81:9_, 81:15_, 81:24_, 83:1_, 84:9_, 84:15_, 85:6_, 87:19_, 89:23_, 90:11_, 91:3_, 91:14_, 93:6_, 93:12_, 94:3_, 94:23_, 95:7_, 99:15_, 100:11_, 101:2_, 101:21_, 102:6_, 103:10_, 103:24_, 104:6_, 104:13_, 104:17_, 106:17_, 107:18_, 111:19_, 116:13_, 117:23_, 118:18_, 119:13_, 144:7_, 144:22_, 145:23_, 146:25_, 147:12_, 148:3_, 148:18_, 149:11_, 150:13_, 150:24

_, 153:13_, 154:24_, 158:14_, 163:2_, 166:23_, 191:22

**published** [1]_ - 47:21

**pull** [6]_ - 53:8_, 60:11_, 63:22_, 68:11_, 136:11_, 195:5

**pulled** [6]_ - 68:13_, 187:18_, 192:9_, 192:11_, 192:23_, 193:4

**pulling** [1]_ - 195:4

**pulse** [1]_ - 8:15

**pulses** [2]_ - 71:19

**punctuality** [1]_ - 5:20

**purple** [1]_ - 19:6

**purpose** [5]_ - 23:9_, 71:10_, 178:16_, 194:23

**purposes** [6]_ - 17:17_, 120:5_, 129:8_, 172:24_, 190:24_, 199:6

**pursuant** [1]_ - 26:2

**push** [1]_ - 195:6

**pushed** [2]_ - 46:15_, 86:24

**pushes** [1]_ - 195:7

**pushing** [1]_ - 47:11

**put** [19]_ - 10:5_, 50:7_, 64:24_, 65:19_, 66:9_, 66:12_, 68:7_, 71:17_, 71:18_, 86:8_, 162:11_, 178:9_, 179:2_, 180:12_, 180:18_, 185:7_, 185:25_, 193:9_, 194:22

**putting** [6]_ - 71:13_, 78:9_, 96:4_, 147:10_, 149:2_, 150:12

## Q

**Q-tip** [8]_ - 177:24_, 177:25_, 178:3_, 178:5_, 178:23_, 178:24_, 180:5_, 180:8

**Q-tip-type** [1]_ - 178:16

**Q-tips** [5]_ - 178:8_, 179:1_, 179:3_, 180:1_, 182:5

**Quantico** [4]_ - 77:23_, 78:1_, 98:11_, 198:17

**quarters** [1]_ - 18:5

**questioning** [1]_ - 117:17

**questions** [10]_ - 31:7_, 39:4_, 51:24_, 73:25_,

122:1_, 131:11_, 170:5_, 187:10_, 194:15_, 196:19

**quite** [1]_ - 46:17

## R

**R-I-D-D-E-L-L** [1]_ - 160:21

**R-O-S-E** [1]_ - 74:18

**radio** [12]_ - 40:8_, 40:10_, 40:18_, 49:25_, 62:20_, 62:21_, 63:1_, 65:19_, 66:9_, 66:10_, 66:25

**radios** [5]_ - 35:14_, 35:17_, 40:6_, 62:16_, 62:17

**raise** [11]_ - 4:22_, 6:3_, 31:17_, 55:1_, 74:9_, 129:19_, 137:17_, 160:11_, 170:15_, 188:13_, 200:15

**raised** [2]_ - 34:13_, 129:14

**ran** [1]_ - 197:25

**random** [2]_ - 45:9_, 88:2

**range** [1]_ - 105:9

**rank** [1]_ - 32:14

**rapid** [1]_ - 41:24

**rate** [2]_ - 42:20_, 199:20

**raw** [2]_ - 9:14_, 10:10

**ray** [6]_ - 67:18_, 68:1_, 71:10_, 71:13_, 71:15_, 71:18

**rayed** [2]_ - 71:23_, 71:25

**rays** [2]_ - 72:16_, 72:23

**re** [1]_ - 196:10

**re-ask** [1]_ - 196:10

**reach** [4]_ - 28:1_, 29:2_, 29:8_, 56:10

**reached** [2]_ - 42:14_, 67:24

**reaching** [2]_ - 62:15_, 121:9

**read** [1]_ - 134:8

**reader** [1]_ - 9:10

**readied** [1]_ - 67:25

**readjust** [1]_ - 131:4

**ready** [8]_ - 3:22_, 5:13_, 36:23_, 54:11_, 131:2_, 188:4_, 188:7

**real** [1]_ - 13:1

**realistically** [1]_ - 130:24

**realized** [1]_ - 41:1

**really** [3]_ - 40:9_, 59:1_, 64:23

**realm** [1]_ - 174:16

**realty** [1]_ - 8:13

**rear** [3]_ - 192:10_, 192:11_, 193:4

**reason** [5]_ - 47:7_, 64:1_, 70:25_, 128:17_, 199:20

**reasonable** [1]_ - 131:17

**reasons** [1]_ - 78:12

**receive** [7]_ - 76:21_, 77:10_, 77:14_, 77:16_, 139:4_, 171:22_, 172:2

**received** [13]_ - 11:1_, 16:11, 22:8, 26:11_, 78:24_, 129:11, 133:2_, 142:13_, 143:6_, 143:23_, 153:12, 166:22, 187:7

**recess** [8]_ - 54:8_, 54:9_, 56:19_, 56:25_, 123:4_, 159:20_, 159:22_, 199:11

**recognize** [28]_ - 9:1_, 15:21_, 21:11_, 38:10_, 43:7_, 43:10_, 106:9_, 106:11_, 106:12_, 120:8_, 120:9_, 120:10_, 142:2_, 142:20_, 162:7_, 162:9_, 162:10_, 162:11_, 164:20_, 164:21_, 164:25_, 165:5_, 165:10_, 165:19_, 165:24_, 166:4_, 166:6_, 166:8

**recollection** [1]_ - 133:25

**reconstructing** [2]_ - 31:5

**Reconstruction** [1]_ - 7:2

**reconstruction** [1]_ - 31:2

**record** [22]_ - 3:6_, 6:10_, 9:18_, 17:7_, 31:24_, 42:9_, 43:19_, 55:8_, 74:17_, 84:24_, 85:25_, 88:12_, 109:18_, 115:8_, 129:13_, 137:24_, 145:15_, 145:19_, 149:8_, 160:19_, 170:23_, 188:20

**records** [1]_ - 144:1

**recovered** [4]_ - 107:1_, 125:10_, 126:20_, 193:8

**recovery** [1]_ - 33:14

**rectangular** [1]_ - 17:16

**red** [11]_ - 17:18_, 42:10_, 88:18_, 88:20_, 112:1_, 113:19_, 113:20_, 148:25_, 154:9_, 155:6_, 157:1

**red-in-color** [3]_ - 112:1_, 113:19_, 113:20

**reddish** [12]_ - 90:21_, 92:19_, 113:5_, 113:11_, 113:17_, 114:4_, 114:15_, 154:11_, 154:13_, 154:14_, 154:16_, 154:21

**reddish-brown** [7]_ - 90:21_, 92:19_, 113:5_, 113:11_, 113:17_, 114:4_, 114:15

**redirect** [6]_ - 31:8_, 53:20_, 137:6_, 159:13_, 187:25_, 196:20

**refer** [2]_ - 76:13_, 121:12

**reference** [2]_ - 18:21_, 81:3

**referenced** [3]_ - 93:18_, 121:18_, 136:3

**references** [1]_ - 122:3

**referred** [1]_ - 91:12

**referring** [7]_ - 28:7_, 79:6_, 87:15_, 124:15_, 127:24_, 141:8_, 155:2

**reflect** [1]_ - 136:3

**reflected** [1]_ - 126:16

**refresh** [2]_ - 133:19_, 133:25

**refreshed** [1]_ - 134:14

**regard** [5]_ - 49:25_, 184:16_, 184:20_, 185:19_, 186:5

**regarding** [3]_ - 64:13_, 90:25_, 121:8

**registered** [1]_ - 200:23

**regular** [1]_ - 172:10

**reissue** [1]_ - 130:15

**reiterating** [1]_ - 27:1

**related** [2]_ - 127:5_, 200:4

**relation** [7]_ - 8:4_, 19:4_, 88:13_, 99:23_, 139:10_, 139:11_, 156:15

**release** [4]_ - 192:24_, 195:2_, 199:7_, 199:14

**released** [2]_ - 182:7_, 193:6

**relied** [1]_ - 27:7

**reloads** [1]_ - 53:8

**remain** [3] - 57:6, 74:9, 132:12
**remaining** [1] - 9:19
**remember** [5] - 16:4, 44:22, 72:25, 73:3, 73:11
**remind** [1] - 70:24
**reminded** [1] - 71:9
**reminiscent** [1] - 154:20
**remove** [11] - 95:21, 96:19, 98:1, 98:20, 106:16, 106:22, 107:23, 108:10, 108:21, 112:16, 191:1
**removed** [17] - 92:13, 92:14, 97:12, 97:13, 97:15, 97:18, 98:14, 99:1, 101:11, 102:2, 102:19, 105:1, 108:25, 162:15, 164:2, 192:8, 194:12
**render** [3] - 190:23, 190:25, 192:7
**rendered** [6] - 96:17, 96:18, 96:19, 97:7, 193:15, 193:25
**rendering** [1] - 81:12
**Renee** [1] - 3:18
**repeat** [4] - 24:15, 179:16, 186:25, 200:1
**rephrase** [1] - 51:9
**report** [4] - 49:20, 50:17, 134:1, 134:12
**reported** [1] - 20:20
**Reporter** [1] - 39:1
**reporter** [1] - 77:8
**reports** [1] - 58:16
**represent** [3] - 19:6, 19:7, 21:23
**representation** [1] - 60:1
**representatives** [1] - 177:13
**represented** [1] - 125:8
**republish** [1] - 70:12
**request** [3] - 126:6, 131:9, 172:11
**requested** [5] - 39:1, 128:20, 128:21, 128:22, 191:7
**required** [1] - 194:22
**rescue** [1] - 58:19

**research** [2] - 54:3, 200:3
**reserve** [1] - 33:7
**reserves** [1] - 33:2
**residence** [2] - 62:9, 173:15
**resources** [3] - 67:4, 172:15, 173:20
**respect** [2] - 101:8, 126:10
**respond** [18] - 7:14, 7:17, 37:10, 58:13, 62:1, 76:22, 78:21, 78:23, 80:20, 139:21, 140:1, 140:11, 151:24, 172:23, 174:13, 176:23, 190:7, 190:12
**responded** [14] - 7:12, 78:22, 79:8, 80:21, 81:13, 81:21, 82:22, 83:15, 89:11, 117:2, 140:8, 144:16, 144:17, 190:13
**responding** [1] - 58:19
**response** [4] - 4:25, 101:15, 171:14, 172:4
**Response** [15] - 76:5, 76:7, 76:9, 76:10, 78:25, 83:13, 134:1, 138:23, 139:2, 139:5, 139:7, 161:16, 172:12, 190:23, 192:16
**responses** [1] - 126:23
**responsibilities** [7] - 57:14, 75:17, 75:18, 75:19, 76:20, 138:12, 139:8
**responsible** [4] - 58:10, 76:10, 78:8, 130:3
**rest** [4] - 14:11, 107:9, 130:4, 169:14
**resume** [6] - 5:21, 12:13, 122:10, 197:1, 199:8, 199:23
**retired** [1] - 32:24
**retirement** [1] - 56:1
**retract** [2] - 5:2, 5:5
**retrieve** [3] - 11:3, 163:1, 169:25
**return** [3] - 122:17, 159:21, 197:5
**review** [8] - 125:10, 125:23, 135:20, 163:8, 163:13, 175:20, 176:16

**reviewed** [6] - 9:2, 120:6, 126:1, 126:2, 175:23, 176:20
**reviewing** [3] - 128:22, 134:11, 163:22
**Riddell** [8] - 160:2, 160:10, 160:20, 162:7, 165:16, 167:4, 169:21, 198:5
**RIDDELL** [1] - 160:24
**rifle** [76] - 28:17, 29:12, 29:15, 30:25, 46:24, 47:5, 48:2, 49:3, 52:6, 52:14, 52:15, 53:6, 70:4, 70:22, 87:10, 87:12, 87:24, 89:4, 89:5, 89:6, 90:3, 90:16, 90:19, 91:1, 91:8, 92:7, 93:11, 94:22, 95:3, 96:13, 97:6, 97:17, 97:20, 99:20, 99:21, 99:23, 99:25, 100:2, 100:3, 100:17, 100:24, 101:6, 101:10, 102:3, 102:11, 102:12, 102:18, 102:19, 102:24, 103:5, 103:17, 103:21, 104:4, 104:12, 106:14, 107:1, 107:9, 107:14, 108:4, 108:19, 109:13, 110:6, 110:8, 110:22, 110:24, 116:9, 133:16, 134:19, 146:12, 191:15, 192:3, 192:6, 192:24, 194:13, 194:21
**rifles** [3] - 33:20, 33:23
**right-hand** [4] - 14:13, 19:23, 22:18, 42:13
**rightmost** [1] - 94:17
**righty** [1] - 135:16
**rigs** [1] - 61:14
**rise** [8] - 5:15, 54:5, 56:17, 122:8, 122:12, 159:18, 197:3, 200:10
**Road** [2] - 41:7, 58:24
**road** [15] - 27:24, 33:11, 33:13, 57:20, 57:22, 58:3, 59:12, 59:18, 60:1, 60:23, 61:3, 61:13, 66:17, 101:16, 183:3
**roads** [2] - 38:18, 38:21
**roadway** [4] - 61:19, 64:2, 67:14, 68:23
**roadways** [1] - 13:15

**Robert** [2] - 151:14, 155:17
**role** [7] - 6:25, 7:21, 7:23, 37:12, 37:16, 58:14, 75:14
**roll** [1] - 185:24
**rose** [5] - 74:18, 81:19, 120:2, 140:5, 198:2
**Rose** [10] - 4:19, 74:7, 87:23, 108:2, 111:10, 132:10, 132:18, 133:10, 134:8, 140:5
**ROSE** [1] - 74:19
**rotate** [2] - 185:7, 185:8
**roughly** [3] - 33:22, 42:12, 68:22
**round** [23] - 97:13, 97:14, 97:16, 102:23, 103:18, 104:11, 108:16, 108:17, 108:18, 192:10, 192:14, 192:17, 192:19, 192:20, 193:6, 193:23, 194:12, 194:22, 195:3, 195:8, 195:10
**route** [3] - 42:6, 157:25, 158:2
**Routh** [50] - 3:5, 3:13, 3:14, 4:20, 10:22, 22:4, 26:7, 74:2, 82:6, 123:13, 124:14, 124:24, 125:23, 126:6, 126:11, 127:1, 129:5, 129:15, 131:5, 131:13, 131:16, 131:20, 132:2, 136:4, 136:13, 136:17, 143:2, 143:19, 153:5, 153:20, 156:11, 159:3, 170:4, 177:6, 179:7, 180:5, 180:15, 182:5, 185:6, 185:18, 186:10, 186:18, 187:3, 194:17, 196:10, 198:20, 200:15, 200:19
**ROUTH** [50] - 3:14, 4:21, 4:24, 10:23, 16:9, 22:5, 26:8, 29:21, 29:23, 52:4, 53:19, 54:16, 74:3, 82:7, 121:1, 123:15, 123:22, 123:25, 124:3, 124:6, 124:11, 124:19, 125:3, 125:7, 125:15, 127:9, 127:12, 127:18, 132:3, 135:5, 136:15, 136:18, 137:3, 142:11, 143:3, 143:20, 153:8, 159:5,

159:11, 166:18, 170:5, 187:4, 187:14, 187:17, 194:19, 196:3, 196:7, 196:11, 196:19, 200:20

**Routh's** [3] - 176:13, 183:12, 185:10

**row** [2] - 44:15, 44:16

**rub** [1] - 177:25

**rubbed** [1] - 178:23

**rubbing** [2] - 178:5, 178:12

**rule** [2] - 26:2, 122:2

**Rule** [1] - 26:5

**ruler** [1] - 102:15

**ruling** [3] - 127:3, 129:10, 196:5

**run** [4] - 55:21, 94:16, 164:4, 171:21

**running** [2] - 64:15, 109:18

**runs** [1] - 141:12

**Ryan** [3] - 3:5, 3:14, 156:11

## S

**safe** [18] - 36:3, 72:8, 96:17, 96:18, 96:19, 96:20, 96:22, 96:24, 97:5, 97:8, 190:23, 190:25, 191:8, 192:8, 193:15, 193:25, 195:1

**safety** [1] - 57:19

**sample** [8] - 177:22, 178:10, 178:19, 180:6, 180:15, 186:15, 186:17

**samples** [2] - 179:7, 187:21

**satellite** [4] - 12:6, 16:20, 23:10, 23:14

**sausages** [2] - 73:6, 116:20

**saw** [31] - 21:24, 44:18, 46:13, 46:23, 46:24, 47:2, 49:4, 64:1, 64:15, 66:7, 70:3, 72:13, 73:10, 86:22, 87:16, 89:10, 93:21, 100:3, 142:5, 142:22, 143:14, 148:15, 149:3, 152:13, 152:20, 169:12, 192:1, 192:4, 192:6

**scale** [11] - 21:15, 21:16, 21:17, 26:18, 102:12

, 102:13, 102:14, 104:5, 104:12, 104:24, 105:5

**scaled** [1] - 25:17

**scan** [10] - 8:14, 14:15, 19:5, 20:7, 23:16, 24:24, 26:19, 26:20, 27:8, 27:15

**scanner** [12] - 7:25, 9:14, 12:12, 13:24, 21:22, 24:5, 27:6, 27:17, 27:22, 78:6, 78:7, 78:8

**scanning** [2] - 78:8, 78:16

**scene** [96] - 7:14, 7:24, 8:2, 8:4, 8:5, 8:14, 10:9, 12:10, 12:17, 12:23, 13:8, 13:11, 14:5, 15:3, 15:4, 16:25, 17:19, 19:4, 20:21, 25:2, 25:23, 48:5, 48:18, 48:21, 50:11, 51:6, 63:24, 65:16, 66:13, 67:1, 67:3, 71:12, 72:2, 72:14, 76:11, 76:22, 76:23, 76:24, 76:25, 77:2, 77:5, 78:3, 78:8, 78:10, 79:11, 79:13, 79:14, 79:15, 79:22, 79:24, 80:3, 80:13, 81:12, 81:20, 83:6, 83:10, 84:14, 84:21, 85:12, 85:23, 86:5, 86:12, 86:13, 86:17, 89:11, 94:9, 94:11, 95:13, 95:16, 95:20, 96:9, 97:4, 99:8, 99:20, 101:13, 101:18, 102:4, 102:11, 102:12, 106:15, 107:1, 107:2, 113:21, 115:6, 117:13, 118:3, 118:24, 120:14, 120:16, 122:2, 133:14, 133:15, 133:18, 173:2, 173:7

**scenes** [5] - 7:3, 7:4, 7:8, 7:9, 7:13

**scope** [24] - 89:20, 90:3, 90:4, 100:16, 100:24, 107:3, 107:5, 107:10, 109:12, 110:4, 110:6, 110:8, 110:20, 110:22, 110:24, 135:8, 135:9, 135:10, 135:16, 135:19, 136:20, 192:3, 195:16, 196:14

**scopes** [1] - 196:17

**scratched** [2] - 101:7, 102:2

**screen** [29] - 11:15, 12:11, 13:3, 14:2, 17:15, 17:19, 18:17, 19:2, 20:5, 20:10, 21:13, 25:12, 38:4, 38:6, 38:8, 42:10, 43:7, 47:23, 56:8, 68:13, 80:20, 82:18, 82:24, 136:16, 143:11, 144:15, 169:8, 191:24, 194:3

**screens** [1] - 163:12

**SD** [12] - 115:4, 162:15, 162:16, 163:24, 163:25, 164:2, 164:7, 166:9, 166:11, 167:7, 168:22, 169:2

**se** [1] - 125:12

**seal** [5] - 158:11, 180:3, 182:1, 182:2, 182:3

**sealed** [9] - 157:1, 178:8, 178:9, 178:17, 180:11, 180:12, 181:20, 181:24, 186:20

**seals** [1] - 157:3

**search** [25] - 156:21, 163:21, 163:22, 164:9, 172:12, 172:16, 172:17, 173:10, 173:11, 173:13, 173:14, 173:16, 173:18, 173:19, 173:21, 173:22, 174:3, 174:19, 176:12, 176:16, 176:24, 178:23, 181:25

**searched** [1] - 173:14

**searching** [1] - 51:19

**seat** [10] - 5:17, 54:7, 54:10, 54:19, 57:6, 64:19, 122:17, 159:24, 160:7, 200:12

**seated** [18] - 3:3, 6:8, 31:22, 55:6, 57:4, 74:15, 99:21, 102:18, 108:3, 123:6, 132:7, 137:22, 160:17, 170:20, 188:18, 198:10, 199:13, 199:18

**second** [9] - 3:20, 15:23, 62:7, 79:17, 98:19, 151:21, 194:22, 196:5, 198:23

**secondary** [1] - 27:9

**seconds** [2] - 52:23,

71:22

**Secret** [23] - 34:18, 35:2, 35:5, 35:9, 35:10, 35:16, 36:8, 39:13, 40:7, 40:12, 41:12, 44:1, 44:18, 45:3, 45:21, 50:12, 51:6, 51:15, 64:1, 65:17, 67:5, 151:13, 155:17

**section** [4] - 25:20, 27:23, 45:14, 94:8

**secure** [2] - 51:3, 176:23

**secured** [3] - 88:4, 88:6, 180:8

**securely** [1] - 178:15

**securing** [4] - 51:5, 51:11, 91:11, 178:18

**SECURITY** [2] - 54:12, 56:12

**security** [4] - 35:2, 36:22, 37:7, 37:9

**see** [152] - 8:3, 8:13, 12:10, 12:11, 12:22, 13:7, 14:12, 14:15, 16:20, 17:1, 17:19, 18:8, 19:7, 19:21, 19:22, 20:12, 20:15, 22:12, 23:7, 23:12, 26:15, 26:21, 27:24, 28:8, 29:7, 38:6, 38:8, 40:11, 43:14, 44:14, 44:15, 45:7, 45:9, 46:15, 46:16, 46:19, 47:1, 47:25, 60:2, 61:3, 61:6, 61:14, 68:21, 69:4, 70:2, 72:1, 72:3, 80:11, 81:11, 81:19, 82:11, 82:13, 82:23, 83:5, 83:18, 84:13, 84:19, 85:10, 85:20, 86:20, 87:1, 87:5, 87:7, 87:23, 87:24, 87:25, 90:2, 90:15, 90:22, 90:24, 91:7, 91:8, 91:19, 91:20, 91:24, 92:8, 93:9, 93:10, 93:16, 94:7, 94:8, 94:10, 95:2, 95:3, 95:11, 97:25, 99:19, 100:9, 101:5, 101:25, 102:1, 102:10, 103:7, 104:3, 104:10, 104:21, 106:25, 108:5, 108:20, 109:14, 110:3, 110:9, 111:2, 113:3, 115:21, 116:4, 116:16, 116:17, 118:2, 118:22, 119:3,

119:6, 119:16, 125:18, 129:1, 129:21, 134:11, 134:20, 136:13, 141:21, 141:23, 142:18, 143:11, 145:2, 145:12, 146:2, 146:3, 147:3, 147:5, 147:16, 147:23, 148:7, 148:22, 149:1, 149:15, 150:17, 151:3, 152:6, 153:19, 154:2, 154:7, 154:9, 158:22, 168:2, 169:8, 177:6, 182:3, 191:24, 193:22, 200:9, 201:2

**seeing** [11] - 13:2, 18:16, 19:2, 40:13, 40:18, 43:7, 52:24, 60:15, 68:17, 70:19, 73:11

**seek** [5] - 106:5, 120:24, 142:9, 143:1, 143:18

**seized** [8] - 102:3, 120:13, 120:15, 120:21, 133:13, 133:14, 156:12, 173:19

**seizing** [3] - 182:7, 182:8, 182:13

**semi** [4] - 52:8, 52:9, 53:8, 153:22

**semi-auto** [3] - 52:8, 52:9, 53:8

**semi-long-sleeve** [1] - 153:22

**semitrucks** [1] - 61:15

**send** [1] - 66:24

**senior** [3] - 161:4, 161:7, 172:13

**sense** [1] - 129:24

**sent** [1] - 183:22

**separately** [3] - 97:17, 97:21, 186:1

**September** [36] - 7:20, 12:18, 16:4, 35:20, 61:25, 66:21, 78:18, 89:11, 117:3, 117:8, 117:9, 120:14, 120:15, 123:12, 129:13, 129:22, 131:11, 139:18, 142:5, 143:15, 144:17, 148:16, 151:11, 151:12, 151:23, 152:14, 156:5, 169:16, 174:7, 176:10, 181:25, 185:15, 186:7, 190:6

**sequential** [2] - 4:9, 8:21

**sergeant** [14] - 7:6, 32:10, 32:16, 33:14, 33:15, 38:6, 42:14, 43:5, 43:24, 57:22, 59:12, 67:8, 71:2

**Sergeant** [7] - 31:15, 32:12, 47:23, 48:17, 49:3, 67:16, 67:21

**SERGEANT** [1] - 32:6

**serve** [1] - 138:15

**served** [1] - 189:24

**Service** [23] - 34:18, 35:2, 35:5, 35:10, 35:16, 36:8, 39:13, 40:7, 40:12, 41:12, 44:1, 44:19, 45:3, 45:22, 50:12, 51:6, 51:15, 64:1, 65:17, 67:5, 151:14, 155:17

**service** [12] - 13:5, 13:8, 23:3, 24:16, 28:21, 28:23, 28:24, 145:3, 147:6, 147:7, 148:10, 189:17

**set** [4] - 9:21, 17:18, 112:4, 176:4

**settings** [1] - 169:4

**settled** [1] - 64:9

**setup** [1] - 17:2

**seven** [1] - 178:1

**several** [5] - 71:16, 86:22, 87:2, 110:1, 175:12

**shall** [1] - 200:1

**share** [1] - 60:4

**shelf** [1] - 52:6

**shell** [2] - 195:6, 195:7

**sheriff's** [9] - 32:13, 33:10, 38:14, 38:22, 39:13, 39:15, 45:23, 51:3, 57:15

**Sheriff's** [24] - 32:14, 32:18, 32:21, 33:9, 33:17, 34:4, 34:23, 35:6, 36:14, 49:21, 50:2, 50:14, 55:20, 55:23, 57:11, 57:18, 57:24, 58:6, 59:5, 62:17, 79:14, 151:17, 156:18, 157:9

**SHIPLEY** [28] - 3:8, 54:15, 54:21, 55:12, 55:18, 57:8, 57:9, 60:7, 60:11, 60:12, 68:8, 68:11, 68:12, 70:11,

70:15, 73:24, 130:2, 130:18, 130:23, 197:6, 197:8, 197:20, 197:22, 198:7, 198:11, 199:3, 199:10, 200:16

**Shipley** [3] - 3:8, 3:22, 130:16

**shirt** [2] - 153:22, 153:23

**Shooting** [1] - 7:2

**shooting** [3] - 79:2, 141:9, 141:10

**shootings** [2] - 7:3, 60:1

**shoots** [1] - 71:19

**shop** [1] - 59:6

**short** [4] - 18:6, 60:5, 76:12, 138:25

**shortly** [1] - 7:17

**shot** [2] - 148:8, 194:22

**shots** [4] - 40:8, 62:21, 63:2, 63:7

**Shots** [1] - 63:2

**show** [37] - 8:19, 12:25, 14:18, 15:11, 19:18, 21:3, 21:5, 22:24, 24:10, 25:5, 40:2, 48:12, 85:17, 103:16, 106:1, 107:16, 112:17, 124:14, 126:5, 142:14, 143:7, 143:24, 144:1, 144:12, 145:21, 149:9, 152:3, 157:10, 162:1, 164:12, 165:16, 165:21, 175:13, 175:19, 176:9, 191:20, 193:17

**showed** [4] - 15:25, 65:3, 93:21, 148:2

**showing** [18] - 21:10, 43:5, 81:23, 100:25, 103:5, 109:10, 109:25, 112:13, 113:2, 114:13, 114:25, 115:16, 116:2, 117:21, 144:11, 146:23, 154:7, 154:15

**shown** [4] - 82:9, 141:17, 166:7, 169:8

**shows** [10] - 27:23, 28:5, 56:7, 78:9, 85:15, 103:17, 126:17, 144:13, 144:14, 185:2

**shrubbery** [1] - 29:1

**shrubs** [2] - 29:2

**side** [61] - 4:23, 14:12, 14:14, 16:19, 18:8,

25:21, 27:19, 36:20, 45:13, 45:22, 58:25, 59:6, 60:21, 64:12, 71:12, 71:13, 71:17, 71:18, 82:15, 82:18, 82:24, 83:8, 90:19, 90:25, 92:7, 92:8, 92:10, 140:13, 140:21, 141:5, 141:6, 141:7, 142:5, 142:23, 143:14, 145:4, 145:7, 146:3, 146:4, 147:4, 147:9, 147:17, 147:19, 147:21, 147:24, 147:25, 149:7, 150:5, 150:6, 150:8, 154:8, 154:17, 155:13, 178:2, 185:8, 185:9

**sides** [3] - 59:6, 184:25, 185:23

**sidewalk** [7] - 27:25, 28:2, 28:9, 43:21, 44:1, 44:2, 101:14

**sideways** [1] - 118:4

**sight** [3] - 30:17, 59:1, 157:20

**sign** [9] - 105:18, 105:19, 105:21, 105:23, 185:18, 186:9, 186:10, 186:12

**signed** [2] - 9:2, 163:22

**significance** [1] - 14:4

**Sihvola** [4] - 3:18, 125:25, 126:4, 128:8

**SIHVOLA** [2] - 124:20, 124:22

**similar** [7] - 21:18, 52:19, 53:2, 146:8, 162:24, 185:22, 186:17

**similarly** [2] - 121:25, 162:24

**single** [8] - 52:6, 52:16, 97:12, 102:23, 103:17, 104:11, 108:16, 126:20

**single-fire** [2] - 52:6, 52:16

**siren** [1] - 39:25

**sirens** [2] - 41:19, 42:22

**site** [1] - 14:5

**sitting** [2] - 116:9, 191:6

**situated** [1] - 191:10

**situation** [1] - 41:21

**situational** [1] - 50:5

**six** [1] - 127:22

**skin** [1]₋ - 169:13
**skin-toned** [1]₋ - 169:13
**SKS** [4]₋ - 30:25₋, 33:23₋, 52:18₋, 195:15
**sleeve** [2]₋ - 153:22₋, 153:23
**slice** [4]₋ - 25:17₋, 25:20₋, 26:20₋, 26:21
**slight** [1]₋ - 29:4
**slightly** [1]₋ - 88:24
**slopes** [1]₋ - 29:8
**slow** [2]₋ - 39:3₋, 77:7
**snapped** [1]₋ - 179:3
**so..** [3]₋ - 127:23₋, 135:21₋, 198:17
**socks** [2]₋ - 153:24₋, 154:4
**software** [2]₋ - 12:8₋, 164:5
**solemnly** [7]₋ - 31:18₋, 55:2₋, 74:11₋, 137:18₋, 160:13₋, 170:16₋, 188:14
**solid** [1]₋ - 23:1
**Solutions** [1]₋ - 9:10
**someone** [5]₋ - 18:8₋, 62:20₋, 63:1₋, 64:15₋, 98:21
**somewhere** [3]₋ - 45:9₋, 63:23₋, 66:17
**soon** [1]₋ - 56:23
**sorry** [13]₋ - 39:5₋, 51:8₋, 62:23₋, 66:1₋, 72:12₋, 104:16₋, 122:9₋, 124:16₋, 134:17₋, 154:12₋, 171:20₋, 192:11₋, 199:23
**sort** [8]₋ - 83:15₋, 90:4₋, 91:10₋, 93:3₋, 107:12₋, 118:8₋, 163:20₋, 167:19
**sorts** [2]₋ - 123:8₋, 146:8
**soup** [1]₋ - 58:12
**source** [5]₋ - 119:3₋, 119:4₋, 127:4₋, 192:8₋, 195:2
**south** [15]₋ - 16:19₋, 17:24₋, 23:22₋, 60:21₋, 82:12₋, 82:14₋, 118:23₋, 119:18₋, 140:12₋, 140:13₋, 141:13₋, 144:15₋, 146:4₋, 148:23₋, 150:10
**southbound** [2]₋ - 63:10₋, 65:8
**southeast** [2]₋ - 60:25₋, 141:11

**southeastern** [1]₋ - 144:14
**Southern** [1]₋ - 176:13
**space** [11]₋ - 8:4₋, 8:15₋, 58:22₋, 63:7₋, 69:16₋, 70:25₋, 71:6₋, 73:1₋, 85:2₋, 149:18₋, 185:12
**speaking** [1]₋ - 96:11
**special** [17]₋ - 58:5₋, 75:6₋, 75:7₋, 75:8₋, 75:16₋, 76:2₋, 77:14₋, 77:19₋, 77:24₋, 138:11₋, 138:12₋, 138:18₋, 140:5₋, 171:13₋, 172:3₋, 189:11₋, 189:22
**SPECIAL** [4] - 74:19, 138:2, 171:4₋, 188:25
**Special** [22]₋ - 4:18₋, 34:8₋, 74:7₋, 81:19₋, 87:23₋, 97:2₋, 97:3₋, 108:2₋, 111:10₋, 120:2₋, 133:10₋, 134:8₋, 137:14₋, 142:18₋, 151:14₋, 155:16₋, 170:12₋, 170:13₋, 181:17₋, 183:11₋, 188:2₋, 188:10
**specialist** [4]₋ - 6:24₋, 7:1₋, 161:4₋, 161:7
**specialized** [4]₋ - 77:10₋, 78:2₋, 161:15₋, 171:22
**specialty** [2]₋ - 31:3
**specific** [11]₋ - 37:7₋, 37:12₋, 53:17₋, 121:16₋, 121:23₋, 122:5₋, 133:19₋, 134:18₋, 173:13₋, 173:15₋, 184:17
**specifically** [4]₋ - 25:16₋, 129:14₋, 129:15₋, 161:24
**specify** [1]₋ - 87:9
**speed** [1]₋ - 42:20
**spell** [8]₋ - 6:9₋, 31:23₋, 55:7₋, 74:16₋, 137:23₋, 160:18₋, 170:23₋, 188:19
**spelled** [1]₋ - 160:21
**spend** [2]₋ - 69:23₋, 77:23
**spent** [2]₋ - 128:22₋, 195:6
**spherical** [2]₋ - 9:17₋, 20:6
**spot** [3]₋ - 45:9₋, 68:24₋, 123:24
**spotlights** [2]₋ - 119:5₋, 119:7
**spotted** [1]₋ - 150:23
**spray** [3]₋ - 111:17₋,

113:17₋, 114:16
**spray-painted** [3]₋ - 111:17₋, 113:17₋, 114:16
**squad** [15]₋ - 55:22₋, 57:22₋, 57:23₋, 58:7₋, 58:11₋, 58:17₋, 58:21₋, 59:11₋, 59:14₋, 59:24₋, 62:5₋, 67:17₋, 75:24₋, 75:25
**squads** [1]₋ - 75:15
**stage** [2]₋ - 36:19₋, 36:20
**stages** [1]₋ - 128:9
**staging** [2]₋ - 17:3₋, 190:13
**stain** [6]₋ - 154:9₋, 154:11₋, 154:13₋, 154:14₋, 154:16₋, 154:20
**stand** [11]₋ - 6:2₋, 11:4₋, 34:7₋, 56:24₋, 69:25₋, 110:13₋, 134:22₋, 140:18₋, 149:20₋, 170:14₋, 189:21
**standard** [3]₋ - 13:11₋, 186:4₋, 193:13
**standby** [3]₋ - 3:16₋, 3:18₋, 126:12
**standing** [2]₋ - 64:2₋, 74:9
**stands** [2]₋ - 36:4₋, 145:10
**start** [15]₋ - 18:9₋, 22:18₋, 23:13₋, 23:15₋, 23:20₋, 27:19₋, 40:11₋, 88:14₋, 98:12₋, 117:16₋, 138:19₋, 139:2₋, 151:23₋, 153:16₋, 167:1
**started** [10]₋ - 5:12₋, 33:11₋, 40:9₋, 40:13₋, 56:23₋, 57:18₋, 75:8₋, 75:10₋, 138:20₋, 141:5
**starting** [8]₋ - 3:7₋, 8:10₋, 16:19₋, 22:25₋, 27:3₋, 90:18₋, 130:8₋, 199:1
**state** [12]₋ - 3:6₋, 6:9₋, 31:23₋, 55:7₋, 58:18₋, 74:16₋, 137:23₋, 157:10₋, 160:18₋, 170:22₋, 182:22₋, 188:19
**statements** [1]₋ - 81:6
**States** [18]₋ - 3:4₋, 3:7₋, 3:10₋, 5:24₋, 35:16₋, 54:21₋, 74:7₋, 137:14₋, 139:15₋, 139:17₋, 143:1₋, 151:13₋, 155:17₋, 160:1₋, 160:9₋, 170:9₋, 188:9₋, 200:16

**stay** [5]₋ - 65:16₋, 65:17₋, 121:6₋, 178:9₋, 199:5
**stayed** [2]₋ - 67:1₋, 67:4
**steadily** [1]₋ - 28:22
**step** [2]₋ - 151:22
**stepped** [1]₋ - 65:18
**stick** [1]₋ - 177:24
**sticking** [1]₋ - 89:4
**still** [15]₋ - 8:12₋, 14:12₋, 19:3₋, 24:13₋, 24:22₋, 25:17₋, 32:23₋, 35:6₋, 47:9₋, 51:18₋, 51:20₋, 52:11₋, 56:13₋, 79:20₋, 182:3
**stop** [4]₋ - 28:12₋, 62:14₋, 68:7₋, 191:9
**stopped** [6]₋ - 42:14₋, 42:15₋, 43:15₋, 63:14₋, 64:1₋, 64:6
**stopping** [1]₋ - 117:18
**stops** [1]₋ - 158:4
**store** [2]₋ - 52:8₋, 161:11
**straight** [2]₋ - 69:11₋, 158:1
**stranger** [1]₋ - 66:4
**strategic** [1]₋ - 66:13
**streaming** [1]₋ - 56:4
**street** [10]₋ - 33:11₋, 44:12₋, 44:13₋, 49:11₋, 73:15₋, 83:7₋, 101:14₋, 118:24₋, 119:18₋, 119:21
**streetlights** [1]₋ - 119:20
**streets** [1]₋ - 59:9
**strewn** [1]₋ - 173:8
**strictly** [1]₋ - 182:12
**strike** [2]₋ - 196:2₋, 196:9
**stronger** [1]₋ - 69:9
**style** [10]₋ - 87:14₋, 87:15₋, 87:25₋, 90:16₋, 95:4₋, 104:22₋, 115:2₋, 115:19₋, 116:2₋, 116:20
**subject** [1]₋ - 143:13
**subpoena** [3]₋ - 130:10₋, 130:15₋, 131:15
**subpoenas** [3]₋ - 130:12₋, 131:9₋, 131:14
**substance** [3]₋ - 56:20₋, 122:13₋, 154:22
**substantially** [1]₋ - 120:20
**suggest** [2]₋ - 131:14₋, 172:21

**suitable** [1] - 128:1
**summaries** [1] - 26:4
**summary** [1] - 11:22
**Summit** [30] - 13:4, 13:22, 17:23, 18:14, 23:8, 24:15, 26:22, 27:20, 27:24, 41:7, 42:4, 42:6, 42:8, 43:12, 43:21, 44:2, 60:19, 60:21, 61:2, 61:8, 63:11, 63:12, 65:8, 80:14, 140:12, 141:8, 141:12, 144:14, 156:3, 190:16
**summon** [1] - 4:2
**supervision** [1] - 163:10
**supplement** [2] - 121:10, 129:12
**supplied** [1] - 11:6
**support** [7] - 7:12, 35:1, 58:20, 59:23, 75:12, 172:23
**supposed** [1] - 197:15
**surmise** [1] - 169:1
**surprise** [1] - 129:16
**surrounded** [1] - 59:5
**surrounding** [3] - 38:19, 38:21, 117:14
**surrounds** [1] - 68:19
**survey** [1] - 76:23
**suspect** [2] - 50:8, 51:19
**suspicious** [2] - 67:18
**swab** [4] - 179:5, 179:7, 180:5, 181:19
**swabs** [5] - 179:6, 180:2, 180:21, 182:5, 182:6
**SWAT** [9] - 33:15, 34:2, 34:7, 34:9, 34:13, 58:20, 189:19, 189:21
**swath** [1] - 23:20
**swear** [9] - 6:4, 31:18, 55:2, 74:11, 137:18, 160:13, 160:16, 170:16, 188:14
**swept** [4] - 36:1, 36:2, 36:10, 36:11
**switch** [2] - 24:18, 164:22
**sworn** [8] - 6:15, 32:7, 55:16, 74:20, 138:3,

160:25, 171:5, 189:1
**symbols** [1] - 24:16
**systems** [1] - 181:9

T

**T1** [1] - 76:1
**table** [1] - 175:14
**tablet** [3] - 71:20, 71:21, 71:22
**tactical** [7] - 33:14, 34:3, 34:24, 66:12, 67:8, 189:12, 189:15
**tactics** [1] - 189:17
**Tactics** [2] - 34:8, 189:22
**tag** [4] - 65:10, 65:12, 65:19, 66:8
**tags** [1] - 181:3
**tall** [2] - 68:3, 69:8
**tampered** [1] - 158:24
**tape** [20] - 8:16, 8:18, 17:19, 100:20, 100:23, 105:16, 105:17, 105:19, 105:20, 110:7, 110:23, 135:18, 136:3, 136:24, 148:25, 156:24, 157:2, 158:22, 180:19
**taped** [1] - 105:13
**tarp** [2] - 167:19, 168:5
**task** [1] - 73:17
**tasked** [3] - 70:25, 151:13, 151:15
**taught** [2] - 14:7, 139:14
**teach** [2] - 139:13, 189:17
**Team** [16] - 7:2, 76:5, 76:7, 76:9, 76:10, 78:25, 83:13, 134:1, 138:24, 139:2, 139:5, 139:7, 161:17, 172:12, 190:24, 192:16
**team** [27] - 34:3, 58:20, 58:21, 76:8, 76:17, 96:8, 119:5, 158:13, 161:18, 164:6, 171:14, 172:9, 172:14, 172:16, 172:20, 172:21, 172:25, 173:3, 177:4, 177:10, 177:14, 182:14, 182:15, 182:16
**team's** [1] - 101:15

**teammates** [1] - 18:8
**teams** [2] - 171:15, 172:8
**technical** [2] - 21:15, 21:16
**technician** [4] - 58:12, 71:7, 72:19, 75:12
**technicians** [1] - 80:1
**technologies** [1] - 10:9
**technology** [2] - 161:4, 161:7
**tee** [1] - 23:21
**tees** [1] - 23:6
**temperature** [1] - 84:2
**ten** [6] - 69:23, 159:21, 185:10, 185:12, 189:25, 190:1
**tender** [3] - 29:18, 135:1, 159:2
**Tendering** [19] - 8:25, 107:22, 108:9, 109:7, 109:22, 111:7, 112:10, 112:25, 114:10, 114:21, 115:13, 115:23, 119:25, 133:7, 134:5, 162:5, 176:6, 181:15, 184:3
**tents** [1] - 17:2
**term** [5] - 73:6, 81:3, 121:13, 121:19, 122:1
**terms** [16] - 4:13, 10:7, 13:17, 17:22, 18:13, 28:13, 28:15, 28:16, 51:11, 52:13, 53:5, 53:6, 135:8, 162:22, 182:10, 197:13
**terrain** [2] - 27:23, 29:8
**test** [1] - 56:6
**testified** [8] - 6:15, 32:7, 55:16, 74:20, 138:3, 160:25, 171:5, 189:1
**testify** [1] - 197:19
**testimony** [14] - 6:4, 31:18, 55:2, 56:20, 74:11, 122:14, 137:4, 137:18, 160:13, 170:6, 170:16, 183:3, 188:14, 196:24
**testing** [1] - 182:10
**text** [10] - 13:7, 13:9, 13:10, 14:1, 16:22, 19:21, 20:5, 28:5, 28:22, 30:22
**THE** [322] - 3:2, 3:11,

3:13, 3:15, 3:19, 3:24, 4:1, 4:11, 4:20, 4:22, 5:7, 5:11, 5:15, 5:17, 5:19, 5:20, 6:1, 6:7, 6:11, 6:13, 8:23, 9:21, 9:25, 10:22, 10:24, 11:5, 11:9, 15:17, 16:8, 16:10, 16:14, 21:8, 22:4, 22:6, 22:11, 25:9, 26:2, 26:7, 26:9, 26:14, 29:20, 31:8, 31:10, 31:12, 31:13, 31:16, 31:21, 31:25, 32:4, 38:2, 39:2, 39:3, 43:3, 47:21, 48:15, 51:7, 51:9, 52:1, 53:20, 53:22, 54:7, 54:10, 54:13, 54:17, 54:19, 54:23, 54:25, 55:5, 55:9, 55:11, 56:2, 56:9, 56:14, 56:19, 56:22, 56:23, 57:1, 57:4, 60:10, 68:10, 70:14, 74:2, 74:4, 74:8, 74:14, 74:18, 80:9, 80:25, 81:17, 82:1, 82:4, 82:6, 82:8, 83:3, 84:11, 84:17, 85:8, 87:21, 89:25, 90:13, 91:5, 91:16, 93:7, 93:14, 94:5, 94:25, 95:9, 99:17, 100:13, 101:3, 101:23, 102:8, 103:11, 104:1, 104:8, 104:15, 104:19, 106:4, 106:7, 106:21, 106:22, 107:19, 107:21, 107:23, 107:24, 107:25, 108:8, 108:10, 108:11, 108:12, 108:24, 109:3, 109:6, 109:8, 109:21, 109:23, 110:12, 110:14, 110:15, 111:1, 111:6, 111:8, 112:9, 112:11, 112:24, 114:9, 114:11, 114:20, 114:22, 115:12, 115:14, 115:24, 116:24, 117:16, 117:24, 118:20, 119:14, 119:24, 120:25, 121:2, 122:15, 122:17, 122:24, 123:2, 123:5, 123:13, 123:20, 123:23, 124:1, 124:5, 124:8, 124:13, 124:18, 124:21, 124:23, 125:5, 125:8, 125:21, 126:8, 126:15, 126:25, 127:11, 127:14, 127:24, 128:16, 128:23, 129:1, 129:17, 130:6, 130:14,

130:22_, 131:3_, 131:17_, 132:2_, 132:4_, 132:7_, 132:12_, 132:13_, 132:15 _, 132:25_, 133:6_, 133:8 _, 134:4_, 134:6_, 134:24 _, 135:2_, 135:25_, 136:7 _, 136:10_, 136:12_, 136:16_, 137:5_, 137:6_, 137:8_, 137:9_, 137:10_, 137:11_, 137:12_, 137:15 _, 137:21_, 137:25_, 141:18_, 141:24_, 142:10 _, 142:12_, 142:16_, 143:2_, 143:4_, 143:9_, 143:19_, 143:21_, 144:1_, 144:6_, 145:16_, 145:25_, 146:15_, 147:1_, 147:14_, 148:5_, 148:20_, 149:13_, 150:15_, 151:1_, 153:1_, 153:4_, 153:9_, 153:15_, 158:16_, 159:3_, 159:12_, 159:14_, 159:15_, 159:16 _, 159:20_, 159:23_, 160:3_, 160:7_, 160:16_, 160:20, 160:23_, 162:4_, 163:3_, 163:6_, 165:12_, 165:14_, 166:17_, 166:19 _, 166:24_, 170:1_, 170:3 _, 170:6_, 170:8_, 170:9_, 170:13_, 170:19_, 170:21 _, 170:24, 171:2_, 175:16 _, 176:5_, 176:7_, 179:15 _, 179:18_, 180:24_, 181:14_, 183:5_, 183:8_, 184:2_, 186:24_, 187:3_, 187:5_, 187:12_, 187:15_, 187:25_, 188:2_, 188:8_, 188:11_, 188:12_, 188:17 _, 188:21, 188:23_, 191:22_, 193:19_, 194:16 _, 196:5_, 196:8_, 196:20 _, 196:23_, 197:5_, 197:7 _, 197:18_, 197:21_, 197:23_, 198:6_, 198:8_, 198:18_, 199:4_, 199:12_, 199:18_, 200:12_, 200:18 _, 200:22

**themselves** [1]_ - 105:18

**then-Candidate** [1]_ - 62:9

**then-former** [1]_ - 79:4

**thick** [6]_ - 45:11_, 46:15_, 68:4_, 69:8_, 83:25

**thicker** [1]_ - 69:9

**thinking** [4]_ - 67:2_, 129:22_, 130:24_, 197:10

**thorough** [1]_ - 13:21

**three** [14]_ - 10:10_, 11:25

_, 21:14_, 21:23_, 25:13_, 25:18_, 59:6_, 77:14_, 77:16_, 114:2_, 117:7_, 120:16_, 120:17

**three-dimensional** [3] _ - 11:25_, 25:13_, 25:18

**throughout** [5]_ - 13:5_, 14:11_, 28:23_, 29:4_, 37:10

**thumb** [7]_ - 4:7_, 8:19_, 9:1_, 9:2_, 9:19_, 10:6_, 186:1

**Thursday** [2]_ - 130:5_, 130:20

**tie** [4]_ - 104:23_, 112:3_, 114:3_, 115:18

**tied** [3]_ - 46:25_, 48:2_, 70:10

**ties** [5]_ - 88:6_, 88:10_, 88:18_, 88:22_, 114:2

**timestamp** [5]_ - 168:17 _, 168:19_, 168:20_, 169:8_, 169:10

**timestamps** [2]_ - 168:22_, 168:24

**timing** [1]_ - 129:21

**tip** [11]_ - 177:24_, 177:25 _, 178:3_, 178:5_, 178:16 _, 178:23_, 178:24_, 180:5_, 180:8_, 184:25_, 185:9

**tips** [6]_ - 178:8_, 179:1_, 179:3_, 180:1_, 182:5_, 185:23

**tired** [1]_ - 127:16

**title** [4]_ - 75:5_, 75:11_, 138:10_, 189:10

**titles** [1]_ - 76:6

**titling** [1]_ - 17:12

**today** [13]_ - 3:24_, 5:21_, 10:15_, 70:17_, 78:12_, 121:11_, 122:10_, 125:18 _, 175:25_, 197:11_, 197:12_, 198:25_, 199:24

**together** [2]_ - 78:9_, 186:1

**Tommy** [1]_ - 65:25

**tomorrow** [1]_ - 199:22

**toned** [1]_ - 169:13

**tons** [1]_ - 53:15

**took** [24]_ - 10:7_, 10:9_, 27:4_, 27:22_, 42:6_, 46:19_, 65:5_, 65:10_, 72:24_, 85:13_, 85:15_,

126:4_, 135:16_, 150:12_, 153:20_, 155:23_, 155:25 _, 156:20_, 157:6_, 179:5 _, 179:6_, 179:7_, 182:4

**tool** [3]_ - 12:22_, 72:9_, 78:11

**tools** [3]_ - 8:7_, 8:9_, 67:19

**top** [16]_ - 22:16_, 30:5_, 43:12_, 52:11_, 60:20_, 80:15_, 88:17_, 91:10_, 102:14_, 107:9_, 109:12_, 110:6_, 110:8_, 110:24_, 115:8_, 128:12

**top-down** [1]_ - 22:16

**topo** [1]_ - 94:8

**topographical** [1]_ - 94:9

**total** [4]_ - 59:15_, 66:4_, 126:21_, 190:4

**totality** [1]_ - 78:10

**tote** [8]_ - 113:5_, 113:10_, 113:14_, 113:16_, 113:17 _, 113:22_, 114:4_, 114:16

**totes** [2]_ - 95:3_, 134:19

**touch** [7]_ - 48:8_, 71:9_, 72:16_, 72:18_, 72:20_, 194:3_, 198:14

**touched** [2]_ - 79:23_, 99:7

**touching** [2]_ - 67:20_, 71:25

**touchscreen** [1]_ - 194:2

**tour** [1]_ - 8:13

**tow** [5]_ - 156:18_, 157:9_, 157:12_, 157:16

**toward** [6]_ - 86:21_, 87:18_, 107:12_, 118:5_, 118:24_, 149:7

**towards** [19]_ - 16:19_, 20:8_, 23:12_, 23:22_, 36:12_, 42:4_, 42:6_, 42:12_, 45:16_, 46:13_, 48:5_, 49:11_, 73:7_, 146:4_, 147:18_, 148:9_, 149:16_, 150:10_, 197:25

**towed** [1]_ - 157:15

**trace** [3]_ - 42:5_, 98:5_, 98:6

**track** [1]_ - 157:20

**tracked** [1]_ - 181:9

**traditional** [2]_ - 8:18_,

14:6

**traffic** [3]_ - 51:12_, 64:6_, 64:17

**trail** [4]_ - 145:3_, 147:7_, 148:10_, 162:24

**train** [1]_ - 78:2

**training** [26]_ - 14:6_, 33:12_, 33:13_, 33:16_, 57:21_, 58:3_, 58:16_, 77:10_, 77:12_, 77:13_, 77:14_, 77:16_, 77:19_, 77:22_, 78:1_, 78:2_, 86:11_, 139:4_, 171:22_, 172:2_, 172:4_, 174:22_, 175:4_, 183:21_, 195:19_, 196:16

**trajectory** [1]_ - 172:6

**trans** [1]_ - 85:3

**transactions** [1]_ - 34:14

**transfer** [1]_ - 10:6

**transition** [3]_ - 23:13_, 23:15_, 27:11

**transmission** [1]_ - 40:17

**transport** [1]_ - 96:21

**transported** [7]_ - 85:3_, 97:6_, 98:15_, 98:23_, 156:18_, 157:11_, 158:19

**trash** [2]_ - 47:11_, 49:6

**travel** [2]_ - 7:9_, 62:13

**traveling** [1]_ - 42:20

**travels** [2]_ - 62:16_, 71:2

**tree** [6]_ - 28:1_, 28:8_, 29:1_, 69:11_, 119:17_, 134:17

**trees** [6]_ - 44:16_, 61:1_, 83:18_, 83:19_, 146:18_, 168:4

**trial** [7]_ - 3:20_, 5:21_, 122:22_, 129:20_, 182:23 _, 199:2_, 199:24

**tried** [4]_ - 40:22_, 40:25_, 130:2

**trigger** [1]_ - 53:8

**troops** [1]_ - 59:23

**truck** [6]_ - 73:16_, 156:19 _, 157:9_, 157:12_, 157:16

**truckers** [1]_ - 61:14

**trucks** [2]_ - 61:15

**true** [2]_ - 166:10_, 198:6

**Trump** [28]_ - 7:15_, 7:18

_, 7:21_, 12:17_, 16:3_, 16:25_, 21:24_, 25:23_, 30:2_, 30:21_, 36:12_, 36:25_, 38:12_, 43:12_, 59:2_, 62:1_, 62:8_, 62:10_, 68:19_, 78:22_, 79:4_, 79:7_, 79:8_, 102:4_, 139:21_, 143:15_, 174:5_, 190:7

**trunk** [1]_ - 69:12

**truth** [24] - 6:5, 31:19_, 31:20, 55:3_, 55:4, 74:12_, 74:13, 137:19, 137:20, 160:14, 160:15, 170:17_, 170:18, 188:15_, 188:16

**try** [5]_ - 41:13_, 45:21_, 50:6_, 70:1_, 178:21

**trying** [2]_ - 44:23_, 130:23

**Tuesday** [1]_ - 197:16

**turn** [3]_ - 8:12_, 65:9_, 82:23

**turned** [5]_ - 40:24_, 41:6_, 41:11_, 63:11_, 182:13

**turning** [1]_ - 200:20

**turns** [1]_ - 23:22

**twenty** [1]_ - 57:15

**two** [43]_ - 11:23_, 11:25_, 15:1_, 19:6_, 19:10_, 23:1_, 24:21_, 46:25_, 48:1_, 49:4_, 58:7_, 59:5_, 62:6_, 62:13_, 62:16_, 67:10_, 70:3_, 70:5_, 70:20_, 70:23_, 71:10_, 76:18_, 77:12_, 77:13_, 77:16_, 77:22_, 87:11_, 87:14_, 87:25_, 90:16_, 91:8_, 93:18_, 93:22_, 94:12_, 94:19_, 95:3_, 114:2_, 146:6_, 179:6_, 183:4_, 184:8_, 184:11_, 198:1

**type** [12]_ - 69:6_, 70:8_, 70:9_, 72:9_, 105:8_, 154:21_, 162:17_, 162:22_, 168:3_, 178:16_, 195:15_, 195:16

**types** [5]_ - 7:4_, 14:16_, 21:20_, 33:22_, 184:11

**typically** [7]_ - 58:14_, 61:13_, 61:16_, 62:13_, 72:6_, 72:22_, 186:3

**U**

**U-turn** [1]_ - 65:9

**ultimately** [3]_ - 11:20_, 127:3_, 163:7

**unclear** [1]_ - 129:9

**uncomfortable** [1]_ - 69:25

**under** [9]_ - 26:4_, 32:19_, 57:6_, 58:9_, 69:6_, 69:16_, 131:15_, 132:12

**undergo** [1]_ - 182:18

**underlined** [1]_ - 94:13

**underlying** [1]_ - 11:6

**underneath** [1]_ - 153:24

**undisturbed** [1]_ - 99:2

**unexpected** [1]_ - 198:25

**unfortunately** [1]_ - 56:15

**unit** [6]_ - 33:14_, 34:3_, 34:24_, 55:21_, 156:17_, 161:15

**United** [18]_ - 3:4_, 3:7_, 3:10_, 5:24_, 35:16_, 54:21_, 74:7_, 137:14_, 139:15_, 139:17_, 143:1_, 151:13_, 155:17_, 160:1_, 160:9_, 170:9_, 188:9_, 200:16

**units** [1]_ - 58:5

**unless** [2]_ - 3:3_, 200:13

**unmarked** [1]_ - 39:19

**unpredictability** [2]_ - 130:19_, 130:21

**up** [65]_ - 3:24_, 11:12_, 11:24_, 20:4_, 27:25_, 28:5_, 29:7_, 38:3_, 46:16_, 46:17_, 46:24_, 47:8_, 59:16_, 60:11_, 63:16_, 64:11_, 65:11_, 66:11_, 66:19_, 68:7_, 68:13_, 69:11_, 70:4_, 79:17_, 84:20_, 85:11_, 85:22_, 87:10_, 87:24_, 98:16_, 100:6_, 100:16_, 101:11_, 102:12_, 103:1_, 104:12_, 104:22_, 105:5_, 105:14_, 108:5_, 108:20_, 109:14_, 110:9_, 110:11_, 110:13_, 110:18_, 111:2_, 111:22_, 115:21_, 116:4_, 117:17_, 120:2_, 120:3_, 134:9_, 134:11_, 134:20_, 136:11_, 154:3_, 154:16_, 158:10_, 159:9_, 172:24_, 180:11_, 181:24_, 197:17

**up-close** [1]_ - 104:22

**updates** [1]_ - 56:5

**upper** [2]_ - 23:21_, 26:22

**upside** [1]_ - 107:4

**upward** [1]_ - 89:17

**USBs** [1]_ - 161:12

**useful** [2]_ - 45:10_, 137:3

**utilized** [1]_ - 185:5

**V**

**valid** [2]_ - 127:7_, 127:9

**variance** [2]_ - 29:4_, 52:7

**variants** [1]_ - 52:21

**varied** [1]_ - 28:21

**variety** [1]_ - 75:21

**various** [7]_ - 33:10_, 33:18_, 38:22_, 172:6_, 173:3_, 175:7_, 177:12

**vegetation** [8]_ - 145:9_, 145:11_, 145:22_, 146:20_, 147:5_, 148:10_, 148:24_, 148:25

**vehicle** [37]_ - 35:25_, 36:2_, 36:11_, 39:17_, 39:18_, 39:19_, 40:15_, 40:23_, 42:16_, 43:15_, 63:4_, 64:3_, 64:7_, 64:24_, 65:7_, 65:9_, 65:20_, 66:16_, 146:22_, 151:20_, 156:5_, 156:6_, 156:9_, 156:10_, 156:12_, 156:15_, 156:17_, 156:18_, 156:20_, 156:21_, 157:6_, 157:10_, 157:17_, 157:20_, 157:21_, 158:6

**vehicles** [7]_ - 17:2_, 40:13_, 40:14_, 83:12_, 83:13_, 101:15_, 158:10

**verify** [4]_ - 27:9_, 64:23_, 72:22_, 72:23

**versed** [1]_ - 34:1

**version** [2]_ - 81:20_, 84:20

**vertical** [1]_ - 14:17

**via** [2]_ - 156:18_, 157:11

**vicinity** [5]_ - 59:18_, 80:13_, 118:3_, 144:17_, 156:3

**video** [32]_ - 11:17_, 12:14_, 12:16_, 13:10_, 13:18_, 13:23_, 14:22_, 14:23_, 15:19_, 16:15_, 16:17_, 17:10_, 20:2, 164:17_, 164:21, 164:23, 165:3_, 165:8, 165:17, 165:22_, 166:2, 167:2, 167:11_, 167:16, 167:24, 168:10_, 168:13, 169:7, 169:9_, 169:11, 169:12, 169:18

**videos** [8]_ - 12:21_, 164:5, 164:7_, 166:8_, 166:10_, 167:6_, 169:14_, 169:21

**Vienna** [2]_ - 73:6_, 116:20

**Vienna-style** [1]_ - 116:20

**view** [15]_ - 10:16_, 13:17_, 16:20_, 17:21_, 22:16_, 24:13_, 24:14_, 25:16_, 27:23_, 49:3_, 83:6_, 94:9_, 128:20_, 128:21_, 130:16

**viewing** [1]_ - 135:19

**violations** [3]_ - 75:20_, 76:3_, 138:14

**Virginia** [3]_ - 7:6_, 98:11_, 198:17

**virtue** [1]_ - 59:8

**visiting** [1]_ - 200:3

**visually** [1]_ - 97:25

**voice** [1]_ - 63:2

**voices** [2]_ - 45:13_, 45:15

**volume** [1]_ - 59:22

**voluminous** [2]_ - 4:4_, 10:16

**W**

**wait** [2]_ - 37:15_, 163:21

**walk** [8]_ - 13:3_, 51:14_, 54:23_, 69:15_, 79:13_, 84:6_, 137:15_, 170:13

**walk-through** [1]_ - 79:13

**walked** [3]_ - 13:4_, 52:7_, 64:12

**walking** [3]_ - 44:1_, 44:19_, 50:12

**walks** [1]_ - 13:11

**warrant** [24]_ - 34:5_, 34:11_, 163:21_, 163:23_, 164:9_, 172:12_, 172:16_, 172:18_, 173:11_, 173:12

_, 173:13_, 173:14_, 173:18_, 173:19_, 173:20_, 173:22_, 174:3_, 174:19_, 176:12_, 176:16_, 176:24_, 178:23_, 181:25_, 189:17

**warrants** [1]_ - 34:12

**watch** [2]_ - 97:9_, 169:7

**watched** [1]_ - 169:21

**water** [1]_ - 20:24

**ways** [1]_ - 87:25

**weapon** [12]_ - 96:20_, 135:9_, 135:11_, 155:21_, 192:7_, 192:12_, 195:1_, 195:12_, 195:13_, 195:14_, 195:21_, 195:24

**weapons** [3]_ - 33:25_, 52:5_, 195:16

**Weapons** [2]_ - 34:8_, 189:22

**wear** [4]_ - 95:25_, 96:1_, 96:3_, 176:1

**wearing** [6]_ - 69:13_, 96:6_, 153:21_, 153:22_, 178:17_, 193:11

**week** [2]_ - 197:16_, 198:15

**weekend** [3]_ - 199:25_, 200:18_, 201:1

**weeks** [4]_ - 77:12_, 77:25_, 78:1_, 78:2

**weeks'** [1]_ - 77:22

**welcome** [4]_ - 127:6_, 129:7_, 159:12_, 198:20

**well-versed** [1]_ - 34:1

**Wesley** [1]_ - 3:5

**West** [4]_ - 34:18_, 64:5_, 157:21_, 190:10

**west** [7]_ - 23:22_, 44:7_, 141:12_, 141:13_, 147:8_, 147:9_, 147:17

**westbound** [4]_ - 44:2_, 44:5_, 50:13_, 63:12

**western** [1]_ - 147:18

**white** [4]_ - 23:4_, 112:3_, 114:2_, 115:18

**whole** [12] - 6:5_, 10:4_, 31:19_, 33:7, 55:3_, 70:1, 74:12, 127:18, 137:19, 160:14, 170:17, 188:15

**wide** [1]_ - 68:3

**width** [4]_ - 28:21_, 28:22_, 28:23_, 29:4

**William** [3]_ - 50:23_, 54:22_, 55:9

**WILLIAM** [1] - 55:15

**window** [1]_ - 64:12

**wireless** [1]_ - 71:20

**wish** [6]_ - 110:12_, 121:10_, 163:8_, 163:13_, 196:10

**witness** [63]_ - 5:13_, 5:23_, 6:2_, 11:4_, 15:16_, 17:7_, 21:5_, 21:6_, 25:7_, 29:19_, 31:13_, 32:2_, 42:10_, 43:2_, 43:20_, 47:19_, 48:13_, 48:25_, 51:7_, 51:25_, 54:20_, 74:5_, 84:24_, 85:18_, 106:3_, 106:6_, 116:22_, 119:23_, 123:7_, 127:4_, 129:6_, 131:2_, 131:6_, 132:10_, 133:5_, 134:3_, 135:1_, 137:12_, 141:17_, 141:19_, 142:14_, 143:7_, 143:24_, 144:9_, 144:24_, 145:15_, 145:18_, 148:12_, 149:9_, 152:3_, 159:2_, 159:25_, 160:3_, 160:8_, 164:16_, 166:7_, 170:10_, 170:14_, 175:14_, 179:14_, 184:1_, 187:11_, 188:4

**WITNESS** [51]_ - 6:7_, 6:11_, 31:12_, 31:21_, 31:25_, 39:2_, 54:25_, 55:5_, 55:9_, 56:22_, 74:14_, 74:18_, 106:22_, 107:23_, 107:25_, 108:10_, 108:12_, 109:3_, 109:8_, 109:23_, 110:14_, 111:8_, 112:11_, 114:11_, 114:22_, 115:14_, 115:24_, 122:15_, 132:13_, 133:8_, 134:6_, 137:5_, 137:9_, 137:11_, 137:21_, 137:25_, 141:24_, 145:16_, 146:15_, 159:12_, 159:15_, 160:16_, 160:20_, 170:8_, 170:19_, 170:21_, 170:24_, 176:7_, 188:12_, 188:17_, 188:21

**witnesses** [18]_ - 3:21_, 4:13_, 81:3_, 81:6_, 121:12_, 122:20_, 122:21_, 129:22_, 131:8_, 131:21_, 197:11_, 197:12_, 197:19_, 198:4_, 198:13_, 198:20_, 199:2_, 200:5

**wonderful** [4]_ - 5:3_, 5:4

_, 5:6_, 199:25

**wooded** [6]_ - 67:13_, 68:23_, 97:4_, 100:3_, 123:11_, 133:20

**wooden** [1]_ - 177:24

**words** [2]_ - 25:14_, 96:3

**wore** [1]_ - 68:1

**world** [3]_ - 8:6_, 195:22_, 195:24

**worth** [2]_ - 10:4_, 10:14

**wrap** [1]_ - 117:17

**write** [2]_ - 12:9_, 65:12

**written** [3]_ - 63:13_, 100:9_, 169:11

## X

**X-ray** [6]_ - 67:18_, 68:1_, 71:10_, 71:13_, 71:15_, 71:18

**X-rayed** [2]_ - 71:23_, 71:25

**X-rays** [2]_ - 72:16_, 72:23

**Xterra** [6]_ - 64:21_, 64:25_, 156:7_, 157:15_, 158:19

## Y

**year** [2]_ - 57:17_, 61:25

**years** [17]_ - 32:19_, 32:24_, 55:25_, 57:11_, 57:15_, 57:16_, 59:14_, 59:15_, 76:18_, 138:20_, 171:19_, 171:20_, 189:14_, 189:25_, 190:1_, 190:4

**yellow** [1]_ - 20:9

**yesterday** [10]_ - 4:3_, 4:12_, 4:14_, 9:2_, 11:13_, 121:5_, 153:2_, 197:25_, 198:2_, 199:19

**yesterday's** [1]_ - 9:3

**yourself** [6]_ - 13:3_, 18:2_, 18:16_, 41:3_, 96:22_, 134:8

## Z

**zero** [1]_ - 24:7

**zip** [10]_ - 70:10_, 88:6_, 88:10_, 88:18_, 88:22_, 104:23_, 112:3_, 114:2_, 114:3_, 115:18

**zip-tied** [1]_ - 70:10

**zoom** [4]_ - 88:24_, 90:5_, 100:6_, 146:13

**zoomed** [2]_ - 24:13_, 103:4

**zoomed-in** [1]_ - 24:13

**Zuniga** [1]_ - 131:8