UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 24-cr-80116-AMC-1

UNITED STATES OF AMERICA,                    Fort Pierce, Florida

          Plaintiff,                    September 15, 2025

    vs.                                8:52 a.m. - 5:06 p.m.

RYAN WESLEY ROUTH,

       Defendant.                    Pages 1 to 326
_____

TRANSCRIPT OF JURY TRIAL - DAY 6
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
                  UNITED STATES ATTORNEY'S OFFICE
                  JOHN SHIPLEY, ESQ.
                  MARIA MEDETIS-LONG, ESQ.
                  CHRISTOPHER BROWNE, ESQ.
                  JENNIFER LUCE, ESQ.
                  99 NE 4th Street
                  Miami, Florida 33132

                  U.S. DEPARTMENT OF JUSTICE
                  JAMES M. DONNELLY, ESQ.
                  950 Pennsylvania Avenue, NW
                  Washington, DC 20530

FOR THE DEFENDANT:
                  RYAN WESLEY ROUTH, PRO SE

AS STANDBY COUNSEL:
                  FEDERAL PUBLIC DEFENDER'S OFFICE
                  KRISTY MILITELLO, ESQ.
                  RENEE SIHVOLA, ESQ.
                  250 S. Australian Avenue
                  Suite 400
                  West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:
                  LAURA E. MELTON, RMR, CRR, FPR
                  Official Court Reporter to the
                  Honorable Aileen M. Cannon
                  United States District Court
                  Fort Pierce, Florida

E X A M I N A T I O N S

Witness/Proceedings                                          Page

CINDY BARROIS
          DIRECT EXAMINATION BY MR. SHIPLEY                     8
          CROSS-EXAMINATION BY MR. ROUTH                       96
          REDIRECT EXAMINATION BY MR. SHIPLEY                 105
ERIN FARAIS
          DIRECT EXAMINATION BY MR. BROWNE                    108
          CROSS-EXAMINATION BY MR. ROUTH                      123
ERICH SMITH
          DIRECT EXAMINATION BY MR. SHIPLEY                   131
          CROSS-EXAMINATION BY MR. ROUTH                      190
          REDIRECT EXAMINATION BY MR. SHIPLEY                 194
STEPHANIE STEWART
          DIRECT EXAMINATION BY MR. DONNELLY                  195
          CROSS-EXAMINATION BY MR. ROUTH                      244
CURTIS GAUL
          DIRECT EXAMINATION BY MR. DONNELLY                  246
          CROSS-EXAMINATION BY MR. ROUTH                      277
          REDIRECT EXAMINATION BY MR. DONNELLY                279

GOVERNMENT ADMITTED EXHIBITS

Exhibit                                                      Page

23F, 23K, 23L, 23M, 23N, 23R, 23S, 23T............... 166
23W, 23O, 23B, 23H, 23A, 23Z, 23X, and 23Y........... 166
36................................................... 106
38...................................................  37
45...................................................  36
200-72...............................................  67
729..................................................  79
912A................................................. 227
948A and 948B........................................ 277

DEFENDANT ADMITTED EXHIBITS

Exhibit                                                      Page

NONE

(Call to the Order of the Court.)

THE COURT:  Good morning.  You may all have a seat unless you're addressing the Court.  Let's call the case.

COURTROOM DEPUTY:  Calling case United States of America v. Ryan Wesley Routh, Case Number 24-cr-80116-Cannon.

Counsel, please state your appearances for the record, starting with the United States.

MR. SHIPLEY:  Good morning, Your Honor.  John Shipley for the United States, along with Christopher Browne, Maria Medetis-Long, James Donnelly, and Jennifer Luce.  Good morning.

THE COURT:  Good morning to all of you.

MS. MEDETIS-LONG:  Good morning, Judge.

THE COURT:  Mr. Routh, good morning.

MR. ROUTH:  Ryan Routh for the defense.

THE COURT:  Good morning, Mr. Routh.

MS. MILITELLO:  Good morning, Your Honor.  Kristy Militello and Renee Sihvola, standby counsel.

THE COURT:  Good morning to both of you.

All right.  I was handed an updated copy of a government exhibit.  Just want to make sure the record is clear on what has been updated.

Mr. Browne.

MR. BROWNE:  Yes, Your Honor.  Government's Exhibit 400, which was previously admitted at the calendar call, we have just added a translation to that exhibit.  Some

of the text messages in the communications that comprise Government's Exhibit 400 are in Spanish.  We previously provided that translation months ago during the 404(b) litigation stage, and it's the same certified translation that we previously provided to the defense.

THE COURT:  Okay.  And you have given the defense an updated copy of Government's 400?

MR. BROWNE:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Very well, then.  I will receive that updated exhibit and replace it in my files.  All right.

Any items that have arisen over the weekend, legal issues, evidentiary questions that need to be addressed at this time?  I will start first with the United States.

MR. BROWNE:  Not from the United States, Your Honor.

THE COURT:  Okay.  So everything is all set.

Anything from the defense?

MR. ROUTH:  We are researching whether or not to exclude my son Oran.  As you know, he is doing a seven-year prison sentence because of this case already, so we are -- we are researching the request for some imaginary documents.  So it may take us a day or two to find out, but we are -- we're going to -- he may end up being excluded, but we are working on that situation.

THE COURT:  When you say "excluded," do you mean the

defense will make a decision not to call him as a defense witness?

MR. ROUTH:  Yes, Your Honor.

THE COURT:  Okay.  And when you say he is serving a seven-year prison sentence because of this case, was he convicted of any crime in this case, Mr. Routh?

MR. ROUTH:  Just in relation to this case.  So as, you know -- as a sidebar to this case, because of this case, rolled into a seven-year sentence, yes.

THE COURT:  Okay.  My understanding is that whatever sentence he is serving is in connection with separate criminal offenses that don't relate factually to anything in this case. Is that correct?

MR. ROUTH:  Yeah, it doesn't relate factually, but it was a -- you know, it was tied -- tied to the situation.  So...

THE COURT:  Okay.  When will you know whether, Mr. Routh, your -- whether you'll continue to call your son as a witness or not?

MR. ROUTH:  Probably tomorrow.

THE COURT:  Okay.  And then when you said "imaginary documents," does that relate to the -- to the Jencks motion that was filed, or what does that concern?

MR. ROUTH:  I have not seen the paperwork, but apparently they were requesting some -- some imaginary documents from my son.  I don't know.  So I haven't seen the

paperwork, but I'm just...

THE COURT:  Who is requesting imaginary documents?

MR. ROUTH:  Something in the subpoena suggested that he needed to present some documents.  I'm not sure.  So I -- again, I don't have all the facts, so that's why possibly tomorrow I will have more information.

THE COURT:  Okay.  Ms. Militello, do you know perhaps what Mr. Routh might be referring to in the form of imaginary documents?

MS. MILITELLO:  My understanding is that in the fall of last year, Oran Routh was issued a grand jury subpoena.  I don't have a copy of that subpoena, but I believe it included correspondence with Mr. Routh.

There may be some concerns about possible obstruction or evidence-tampering charges here in this district related to that; I don't know.  I just approached the government this morning to ask if they had given any thought to whether they intended to cross-examine Oran Routh on that subject, and, if so, I might think ethically they would need to ask the Court to appoint counsel to represent him.  Obviously, my office has a conflict; we can't speak to him about this issue at all.  I think that's what Mr. Routh is discussing.

THE COURT:  Okay.  Any commentary from the United States regarding a potential questioning related to some unidentified allegations?  My only concern is whether this will

impact his appearance, and again, it depends ultimately on whether Mr. Routh elects to call him as a witness.

Anything to be said about this now, Mr. Shipley?

MR. SHIPLEY:  Nothing right now, Your Honor.

THE COURT:  Okay.  All right.  Mr. Routh, please make sure that you advise the Court by tomorrow.  A lot of work has gone into transporting your son to this district on the assumption that you wanted and felt that he was necessary and important to your defense.  So before the government continues to outlay additional funds for his transportation and stay here, we should know whether you indeed intend to call him.  So we will revisit this matter tomorrow.

Any other items to bring to the Court's attention, Mr. Routh, relevant to this case?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Are our jurors here?

COURTROOM DEPUTY:  Yes, Judge.

THE COURT:  Okay.  Then let's call them in, please.

COURT SECURITY OFFICER:  Yes, Judge.

(The jury entered the courtroom at 8:59 a.m.)

THE COURT:  Please be seated.  Good morning, ladies and gentlemen.  I hope you had a very nice weekend.  We will resume as promised with the trial today.

Government, please call your next witness.

MR. SHIPLEY:  Good morning, Your Honor.  Good morning,

members of the jury.

The United States calls Special Agent Cindy Barrois.

THE COURT:  Excellent.

COURTROOM DEPUTY:  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

THE WITNESS:  Thank you.

COURTROOM DEPUTY:  State your first and last name, and please spell it for the record.

THE WITNESS:  Sure.  Cindy Barrois.  C-I-N-D-Y, B as in Bravo, A-R-R-O-I-S.

THE COURT:  You may begin.

MR. SHIPLEY:  Thank you, Your Honor.

CINDY BARROIS,
having been sworn, testified as follows:

DIRECT EXAMINATION
BY MR. SHIPLEY:

Q.   Good morning, Ms. Barrois.

A.   Good morning.

Q.   Okay.  Who do you work for?

A.   I work for the Federal Bureau of Investigation.

Q.   And how long have you worked for the FBI?

A.   11 years.

Q.   Okay.  And where are you based?

A.   I am in the Miami field office.

Q.   Okay.  And what's your background?  Before you came to FBI, what did you do?

A.   I was an attorney -- a civilian attorney for the Army, and also a judge advocate attorney in the Army Reserves.

Q.   Okay.  So you are also a lawyer; correct?

A.   I am.

Q.   Okay.  Do you do any legal work for the FBI?

A.   I do not.

Q.   Okay.  What are your duties and responsibilities with the FBI?

A.   So I am currently assigned to the Violent Crimes Against Children squad.  In addition to that, I have a collateral duty, which is the Evidence Response Team.  And I serve as a team leader for that.

Q.   Okay.  The jury has heard a little bit about ERT, so could you just give the jury a quick summary about what the Evidence Response Team is and what you do in that role?

A.   Sure.  I think the easiest way to explain it is kind of like CSI lite.  Generally the ERT, Miami ERT is called out for searches that require forensic examinations.  So, for example, if there is collection of DNA that's needed, or latent prints that would need to be lifted or complex search scenes, that's when ERT would be called out.

Q.   Okay.  And what are your responsibilities as a team leader?

A.   So as a team leader, I'm the one that takes control of the scene.  So I have to -- I assign roles to everybody that is on the team.  I ensure that everybody understands and reads the search warrant, understands what we are searching for and what we're allowed to collect.

In consultation with the case agent and sometimes the prosecutor, I will determine what is collected as evidence as well.  And then I'm responsible for all of the documentation of that search.

Q.   Okay.  So in the course of a search, do you also perform roles as a supervisor?

A.   I do.

Q.   Okay.  And do you participate as well in the actual recovery of evidence?

A.   I do.  I oversee that, yes.

Q.   Okay.  Are you familiar with FBI colleague Kate Rose, Kathryn Rose?

A.   Yes.  She is a team leader as well.

Q.   Okay.  And Jose Loureiro?

A.   Yes.

Q.   Okay.  Okay.  They perform similar ERT duties?

A.   Correct.  Yes.

Q.   Okay.  Ever participate in the search of a vehicle for evidence recovery?

A.   Yes.

Q.   Okay.  How many times over the course of your career?

A.   Between -- for ERT, probably at least 20 searches I have participated in.  And then as a -- just an FBI agent on vehicle searches, probably another 20.

Q.   Okay.  Talking in general terms, how do you do a vehicle search?  How do you do inventory evidence from a vehicle?  Is there a standard protocol?

A.   Yes.  So in any search, we have what's like a 12-step process.  So initially obviously we assess the scene, so in this case a vehicle.  The first thing that is done is photographs.  So we will take what we consider -- what we call entry photographs.  So we will take photographs of the vehicle as is, of the exterior, and then one by one, we will open the doors of each section and then take photographs of the interior as is.  So that way, we are documenting the vehicle as we receive it.

Q.   Do you also, in the course of a vehicle search, remove items and log them separately?

A.   Yes.  So once all the photographs are completed, the entry photographs are completed, we will then conduct a search of the vehicle.  Items are taken out of the vehicle, and then depending on certain items, if they are found in place and determined at that moment to be of evidence, they will be photographed in place inside the vehicle.

After that, they will also be placed generally on a -- let's say a piece of paper and then photographed more closely, so that way -- with the placard, so that you know exactly which number -- evidence number corresponds to which item that's being collected.

Q. Okay. Did you participate in a vehicle search in connection with this case?

A. I did.

Q. Okay. And was that your only role in connection with this case?

A. Yes.

Q. Okay. Do you recall how your involvement started?

A. Yes. So on September 15th, in the evening, we were -- the Evidence Response Team senior team leader notified us that there was a critical incident and that there would potentially be a vehicle that would need to be searched. And on September 16th, we received a copy of the search warrant to search the vehicle.

Q. Okay. Today is September 15th, 2025.

A. 2024. I am so sorry. I am so sorry.

Q. We're talking about 2024, not today?

A. Sorry. Yes, 2024.

Q. Okay.

A. Yeah, exactly one year ago.

Q. Okay. Do you recall the make and model of that vehicle?

A.   It was a Nissan Xterra.

Q.   Okay.  Color?

A.   Black.

Q.   Okay.  And did you have an understanding as to who had been driving that vehicle before it came into FBI custody?

A.   I did.  Yes.

Q.   And who was that?

A.   Mr. Ryan Routh.

Q.   Okay.  When you first saw that vehicle, where was it?

A.   It was in -- so in the Miami field office, we -- the Evidence Response Team has a bay or, like, almost like a big garage, and the vehicle was stored in there, which is a secure space.

Q.   Okay.  So were you present when the vehicle was actually stopped or seized up in Martin County?

A.   I was not.

Q.   Okay.  Is it correct the first time you saw the vehicle was in the evidence bay or garage?

A.   Yes.

Q.   Okay.

A.   That's correct.

Q.   Okay.  And did you conduct a series of searches for items in that vehicle?

A.   I did.

Q.   And were there search warrants obtained from a federal

judge to authorize those searches?

A.    Yes.

Q.    Okay.  During the time that you conducted these searches, or once the vehicle came into FBI custody, was it ever out of FBI custody and control?

A.    It was not.

Q.    Okay.  Where has the vehicle been kept since it came into FBI custody last year?

A.    It has been kept in the FBI Miami secure parking lot.

Q.    Okay.  Has it ever been out of the FBI's custody or control since it came into the evidence bay on September 16th?

A.    No.

Q.    Okay.  Of last year.

       And in this search, were you the team leader?

A.    I was.

Q.    Okay.  And remind the jury again, what does the team leader do, or more specifically, what did you do as the team leader for this search of the Xterra?

A.    So I arrived on September 16th of 2024.  I arrived at the ERT bay where I said the vehicle was located.  I -- around 9:30, I -- as I was waiting for a search warrant, we just kind of observed everything -- anything that would have been seen in plain view.  And then just coordinating with my members to -- to come forward once we had the search warrant to start executing the search warrant.  So I coordinated with my team,

assigned their roles, made sure that everybody reviewed the search warrant, reviewed what we can collect, and then began the actual execution of the search.

Q.   Okay.

MR. SHIPLEY:   Your Honor, I would like to publish to the jury and to the witness Government Exhibit 320, already in evidence?

And, Ms. Luce, if you --

THE COURT:   You may publish.

BY MR. SHIPLEY:

Q.   Okay.  Do you see that on your screen, Ms. Barrois?

A.   I do.

Q.   Okay.

MR. SHIPLEY:   And members of the jury.  Okay.

BY MR. SHIPLEY:

Q.   All right.  What are we seeing in this picture?

A.   That is the vehicle that I searched pursuant to a search warrant, the Nissan Xterra.

Q.   Okay.  And does this show the ERT evidence bay or garage where the searches were conducted?

A.   Yes.  That's correct.

Q.   Okay.  And do you see a license plate on that Xterra?

A.   I do.

Q.   And what does that say?

A.   It's 97E EED.  So 9-7, Echo, Echo, Echo, Delta.

Q.    Okay.  Is that for the state of Florida?

A.    And that's a Florida license plate.

Q.    Okay.  All right.  Let me show you and the jury a couple of other images of the vehicle, also already in evidence.

MR. SHIPLEY:  Can we publish Government's Exhibit 916, please.  Okay.

And, Your Honor, for the record, other than a couple of instances that I will identify for the Court, all of the photographs and items that I will be showing this witness are already pre-admitted in evidence, except for a few instances which, obviously, I will handle differently.

THE COURT:  Okay.  Nevertheless, you should note the pre-admitted nature of each exhibit before you reference it.

MR. SHIPLEY:  Happy to do so.

THE COURT:  Okay.  Thank you.

BY MR. SHIPLEY:

Q.    Okay.  All right.  I'm showing you, Ms. Barrois, Government Exhibit 916.  This is an image already in evidence.  What are we seeing here?

A.    That is the front of the Nissan Xterra that I -- that we searched.

Q.    Okay.  And this is the vehicle.  Did you actually -- you supervised the search of this vehicle?

A.    I did.

Q.    And did you also recover items from inside the vehicle

yourself?

A.   I did.

Q.   Okay.

MR. SHIPLEY:  Your Honor, I would like to show the jury and the witness Government Exhibits 322A and B, already in evidence.

THE COURT:  Proceed.

BY MR. SHIPLEY:

Q.   Okay.  And what is this?

A.   This is the photo of -- on the driver's side of the Nissan Xterra that I was responsible for the search.

Q.   Okay.  Do you see if -- if you look sort of just to the right of the center of that photograph, do you see some evidence tape?

A.   Yes.

Q.   Okay.  What -- we have had some testimony about that.  What is the purpose of that tape on the vehicle?

A.   So when the vehicle was transported and brought into FBI custody, it's our -- our norm to put evidence tape and then sign it and initial and date so that we ensure that that vehicle was seized upon us taking custody of the vehicle, "us" meaning the FBI taking custody of the vehicle.

Q.   Okay.

MR. SHIPLEY:  I would like to show the witness Government Exhibit 322B, in evidence.  If we could publish

that, please.

BY MR. SHIPLEY:

Q.   So is this a closer-up view of what we were just talking about?

A.   Correct.

Q.   Okay.  Now, if you look just to the left -- and I'm going to circle it on my screen (indicating).  Do you see what appears to be a blackened circle there?

A.   Yes.

Q.   Okay.  What was that?

A.   So there were multiple stickers on the vehicle, all that had seemed to have been blacked out with, potentially, spray paint or something of that nature.

Q.   Did that, a similar type of blacked-out sticker, did that appear in multiple places on the outside of the Xterra?

A.   It did.

Q.   Okay.  And tell the jury, what -- what was -- based on your training and experience, what had been done to those stickers?

A.   It appeared that it had been -- the stickers had been covered up with spray paint, because you can see, like, drip marks from -- in some areas, so why I would think that it would be some kind of spray paint that would have been used to cover it --

Q.   Okay.

A.   -- and the other stickers as well.

Q.    Okay.

A.    And you can see some of those there as well.

Q.    Okay.  Could you point those out to the jury, Ms. Barrois.  Just circle them with your finger on the screen, if you can.

A.    (Complies.)

Q.    And those are a couple -- are those a couple of the other examples of what appear to be blacked-out stickers --

A.    Yes.

Q.    -- on the vehicle?

      Okay.

          MR.  SHIPLEY:  Okay.  Your Honor, may I publish for the jury Government Exhibit 444, already in evidence?

          THE COURT:  You may.

BY MR.  SHIPLEY:

Q.    What do we see here?

A.    That is the top of the vehicle, and then it's like a roof storage rack on -- on the top of the vehicle.

Q.    Okay.

A.    On the roof.

Q.    Just want to identify a couple of other things for the jury.  We see over here (indicating) on the left, a number of items with what appear to be little yellow placards.  What are those?

A.    So those would have been the evidence items that we collected from the vehicle at the time.

Q.   And the yellow placards, what do they show?

A.   So we mark each evidence item with a number so that we know, corresponding, once we document the evidence, like, evidence Item 1 with a description.  And then you will be able to go to the photos and see exactly what that photo is of that Item 1.  So it's a way for us to ensure that we understand which item is collected from the vehicle, and then corresponds to the correct evidence item.  So in here, those are -- those are the items, the number of items that we would have collected.

Q.   Okay.  Let me ask you about one other thing.  We see a towel here (indicating) on what appears to be the driver's side window.  What's that?

A.   When we -- when FBI took custody of the vehicle, that was already there.  As you can see, the window is partially open, so to preserve and ensure that nothing comes inside the vehicle, such as weather conditions, rain, et cetera, it's to protect that --

Q.   Okay.

A.   -- and preserve the evidence.

Q.   Okay.  All right.

     MR. SHIPLEY:  Your Honor, I would like to publish for the witness, already in evidence, Government Exhibit 917.

     THE COURT:  You may proceed.

///

BY MR. SHIPLEY:

Q.   Okay.  Is this a -- is this the passenger's side -- front passenger's side view of the Xterra?

A.   Yes, it is.

Q.   Okay.  And what -- what is here or what is not here (indicating) in this area of the vehicle, based on your observations?

A.   The side-view mirror is not there.

Q.   Okay.  Okay.  In the course of your search as one of the first things you did, did you identify a VIN number for this car?

A.   I did, yes.

Q.   Okay.

MR. SHIPLEY:  Your Honor, if I may publish Government Exhibit 922, already in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   What are we seeing here, Agent Barrois?

A.   That's the photo of the VIN number that was taken on the -- the windshield of the vehicle --

Q.   Okay.

A.   -- at the time of the search.

Q.   Okay.  I won't have you read that for the jury.  These are long numbers.  But everyone can see it, I'm sure.

All right.  Let me talk about what you have found or what

you found inside the car in the course of your search.

And we're going to -- I'm going to show you some physical items as well as some photographs.  Before coming to court today, did you have an opportunity to review those physical items of evidence --

A.   I did.

Q.   -- and also review the photographs that I will be showing you?

A.   Yes, I did.

Q.   Okay.  All right.  And let me -- let me start with this. Other than the VIN number we've just talked about, did you find any forms of identification in that vehicle?

A.   Yes, I did.

Q.   Okay.  Did you find a driver's license?

A.   I did.

Q.   Okay.

MR. SHIPLEY:  Permission to approach, Your Honor?

THE COURT:  Granted.

MR. SHIPLEY:  Okay.  May I have standing permission to approach the witness with exhibits in this examination?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.   (Tendering item.)

MR. SHIPLEY:  Your Honor, I'm showing the witness what has been pre-admitted as Government Exhibit 949.

BY MR. SHIPLEY:

Q.   Ms. Barrois, do you recognize that item?

A.   Yes, I do.

Q.   And what is that?

A.   It's a driver's license issued by the State of Hawaii for Mr. Ryan Routh that was collected from the Nissan Xterra on September 16th, 2024, during the execution of the search.

Q.   Okay.  Members of the jury will have an opportunity to review these items yourselves later, but could you just hold it up for the jury.  I don't know whether anybody is going to be able to see it that well, but just so they can see what the license looks like.

A.   Yes, of course.  (Complies.)

Q.   Okay.  Is there an expiry date, an expiration date on that license?

A.   Yes.  It expired on February 5th, 2024.

Q.   That was six or seven months before your search?

A.   Yes.

Q.   Okay.

     MR. SHIPLEY:  All right.  Your Honor, if I may show the witness Government Exhibit 923, in evidence already.  It's a photograph.

     THE COURT:  You may.

     MR. SHIPLEY:  Oh.  Okay.

///

BY MR. SHIPLEY:

Q.   Do you recognize this photograph, Agent Barrois?

A.   Yes, I do.

Q.   And what do we see in this photograph?

A.   So in this photograph, as you can see, there is a placard, number 11.  That's the number that was assigned to the evidence -- to the driver's license as an evidence item.  And as you can see, it's inside the glove box located on the passenger's side of the vehicle.

Q.   Okay.  Is this where that item was found?

A.   Yes, that's where it was found.

Q.   What are the -- what are the white items that appear sort of below it and next to it?

A.   Dental floss picks.

Q.   Okay.  Were there a number of them in that glove compartment area?

A.   Yes, there were.

Q.   Okay.  Were there any other forms of identification that you found in that vehicle?

A.   Yes.

Q.   Okay.

        MR. SHIPLEY:  Approaching the witness with what has been admitted as Government Exhibit 950.

        THE COURT:  Okay.

///

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Ms. --

MR. SHIPLEY:  You can take that off the screen, Ms. Luce.  Thank you.

BY MR. SHIPLEY:

Q.   Do you recognize that item?

A.   I do.

Q.   Okay.  And what is that?

A.   It's a United States passport issued to Ryan Routh and which was recovered on September 16, 2024, during the execution of the search warrant.

Q.   Okay.  If you take a look at the expiration date of that passport, was that passport still valid on September 15, 2024?

A.   Yes.  The expiration is January 12, 2031.

Q.   Okay.  And, again, could you hold that up for the jury just so that they know what to look for when they examine it.

A.   (Complies.)  Of course.

Q.   Okay.

MR. SHIPLEY:  Ms. Luce, could you bring up Government Exhibit -- and, Your Honor, can I publish to the witness Government Exhibit 918, already in evidence?

THE COURT:  You may.

///

BY MR. SHIPLEY:

Q.   Do you see that?

A.   I do.

Q.   Okay.  What are we seeing in this image?

A.   We are seeing a -- the driver's side, the interior of the driver's side, which includes -- on the floorboard there is a -- the U.S. passport that was recovered as this item right here (indicating).

Q.   Would you just circle that item, please?

A.   Of course.  (Indicating.)

     MR. SHIPLEY:  Okay.  Let me publish for the jury now, Your Honor, Government Exhibit 323.

     THE COURT:  Okay.  Please proceed.

BY MR. SHIPLEY:

Q.   Is this a closer-up or a zoomed-in image of the passport we're talking about?

A.   Yes, it is.

Q.   What are some of the other items we see in this image of the front driver's side seat area?

A.   You can see superglue, and then tucked under the driver's side, you can see two license plates as well as pens and then some tools.

Q.   Okay.  And let me ask you:  The photographs we're going to see of items in the Xterra, do they reflect where those items were when you started your search on the morning of

September 16th?

A.   Yes, they -- yes.  That's correct.

Q.   Okay.  All right.  Did you find any type of bank card with the defendant's name on it?

A.   Yes, we did.

Q.   Okay.

MR. SHIPLEY:  Approaching the witness, Your Honor, with what's been introduced already and admitted as Government Exhibit 943.

THE COURT:  Okay.

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Do you recognize that item, Agent?

A.   I do.

Q.   Okay.  And what is that?

A.   It is a Bank of Hawaii business debit card issued to Ryan Routh.

Q.   Okay.  And, again, could you just hold it up for the jury so they know what to look for.

A.   (Complies.)

Q.   Okay.  Thank you.

Did you also find any pieces of paper with handwriting on them in your search?

A.   Yes, we did -- I did.

Q.   Okay.   Let me start with Government Exhibit 445, already in evidence.

(Tendering item.)

A.   Thank you.

Q.   Do you recognize that item?

A.   I do.

Q.   And just can you describe generally what that is?

A.   Sure.   So on one side is a typed form from Rent-a-Home, and then on the back are handwritten notes.

Q.   Okay.   Could you show it up to the -- show it to the jury, first the printed side.

A.   I'm sorry.   (Complies.)   Yes.

Q.   And that just appears to be a standard printed form?

A.   Looks like a standard form from that company, yes.

Q.   Okay.

A.   With no handwriting on there.

Q.   Okay.   And then could you show the jury the other side.

A.   Sure.   (Complies.)

I will look both ways because it's -- (indicating).

Q.   Okay.   I want to call the jury's attention to a few lines in that now -- and have you read them for the jury.

MR. SHIPLEY:   Your Honor, and for the jury's benefit, we will have another witness later in the case who will be talking more about the substance of a lot of these items, but at this point let me pull up already in evidence Government

Exhibit 600-180C.  It's a photograph.

BY MR. SHIPLEY:

Q.   Okay.  And does this image accurately reflect what's on the physical copy of that note which was Government Exhibit 445? Or is that the different --

A.   That's a different --

Q.   You know what?  I have jumped ahead an item.  Let me do this.  Why don't we put that down, and let me approach the witness with Government Exhibit 446, already in evidence.

     (Tendering item.)

A.   Thank you.

Q.   And do recognize that item?

A.   I do.

Q.   And what is that item?

A.   It's a piece of paper containing handwritten notes.

Q.   Okay.  And, again, can you hold it up for the jury?

A.   (Complies.)

Q.   Is there handwriting on both sides of that piece of paper?

A.   There is.

Q.   If we could return to Government -- what are some of the handwritten entries on that?

A.   There is the word "pipe."  Looks like "C clamp."  And then on the other side, there is "bag for blanket," "pillow," "how to fasten tape," "paint," "green poncho," what appears to be phone numbers as well.

MR. SHIPLEY: Okay. Let me -- let me pull up -- can I pull up Government Exhibit 184A, please.

BY MR. SHIPLEY:

Q. Okay. What are we seeing in this picture?

MR. SHIPLEY: Already in evidence, Your Honor.

THE WITNESS: That's the Evidence Number 18 that was recovered which corresponds to this handwritten note.

BY MR. SHIPLEY:

Q. Okay. Is that an image of the back part of the Xterra?

A. Yes, it is.

Q. Okay. And was this the condition -- was the seat in this condition when you first observed it, the seat --

A. Yes.

Q. -- folded down?

A. The seats were folded down when we recovered the vehicle, yes.

Q. Okay.

MR. SHIPLEY: Could I see Government Exhibit 184B, please.

BY MR. SHIPLEY:

Q. And is that a zoomed-in image -- image of the note that we just talked about?

A. Yes, it is.

Q. Okay.

A. As you can see, the pipe clamp, which is what I was -- I

had read earlier.

Q.    Let me return, then, to Government Exhibit 445P in front of you.

MR. SHIPLEY:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.    (Tendering item.)

Agent Barrois, could you read to the jury some of the contents of that letter, please, of that note.

A.    Sure.

Q.    Is there a name on there?

A.    Brian Wilson, and then with a phone number.  There -- and then the letters PKU 3131 underneath that, numbers 96730 beneath that.  And then on the other side, there appears to be what are flight times.  For example, 6:35 to 8:00, American 480.  6:02, Delta 720, Avianca to Bogotá, 1 hour 15 minutes.

Q.    Could you read a couple -- is there an entry there for Medellín, Columbia, as well?  Medellín.

A.    7:00 p.m., Avianca 31.  Medellín, 9:25.  Avianca 234.

Q.    Okay.  And are there also references to flights to Mexico?

A.    Yes.  So 6:35 to 8:00 p.m., American 480.  60 -- I think it's 6:02, 7:45, Aeroméxico 480.  2:22, Delta 480.  6:02, Delta.  Again, the Avianca which I mentioned.

There is also a flight -- a Frontier Airline -- two Frontier Airlines flights.  There is a 5:41, Aero.  5:42,

Delta.  6:35, Delta.  And 5:00 Volario.

Q.   Okay.

MR.  SHIPLEY:  Your Honor, I don't have a good zoomed-in photograph of that evidence item handy.  With the Court's permission, may I provide it for the jury to take a look at at the moment?

THE COURT:  Yes.

MR.  SHIPLEY:  May I approach?

THE COURT:  Yes.

MR.  SHIPLEY:  And for the record, Your Honor, I'm showing the jury Government Exhibit 445.  And I will let the jury pass that on, and I will continue with the examination.

BY MR.  SHIPLEY:

Q.   Okay.  So we're talking about pieces of paper with handwriting you found in the car.  Let me show you another exhibit.

MR.  SHIPLEY:  Showing the witness Government Exhibit 941, already in evidence.

BY MR.  SHIPLEY:

Q.   (Tendering item.)

And do you recognize that item?

A.   I do.

Q.   Okay.  Is this another piece of paper with handwriting on both sides of it?

A.   Yes, there is handwriting on both sides.

Q.    Okay.  Why don't you tell the jury what's on each side of that handwritten piece of paper.

A.    Sure.  On one side, it says, "If you need this car moved, text 1 (808) 379-9411.  If no response, 1 (808) 379-9411" -- 1 -- sorry -- "11.  Sara Oran, or 1-336-337-933" -- looks like a 9 -- "or 1-336-254-1981.  Kathleen."

And then if I turn it over to the other side, it says, "Working at the car dealership, part of the construction, text me if in the way, 808-379-9411 or 808-379-9411 or 336-337-33" -- I'm sorry -- "-9339.  Thanks.  Sorry.  Short on parking, just for a few days during day."

MR. SHIPLEY:  Okay.  Ms. Luce, could you publish Government Exhibit -- with the Court's permission, Government Exhibit 926.  And I think that's a zoomed-in image of part of that item.

Already in evidence, Your Honor.

BY MR. SHIPLEY:

Q.    And is this -- is this, in fact, a zoomed-in image of what you have in front of you?

A.    Yes.  Yes, it is.

Q.    Okay.  That is Government Exhibit 941?

A.    That is correct.

Q.    Okay.

THE COURT:  Let's take a brief minute so the jurors can finish reviewing the other physical exhibit.

MR. SHIPLEY:  Of course.

THE COURT:  One of the jurors has a question.

A JUROR:  Yeah.  I'm just wondering, what is the significance of all of the dates?  Because I am noticing there is like a date and a date and a date.

THE COURT:  Thank you, sir.  We're not going to entertain juror questions.  We will just wait a moment so that the last juror can review this exhibit, and then we will resume the examination.

All right.  Let's get started.

MR. SHIPLEY:  Okay.  And, Your Honor, for the jury's reference, this item will be addressed by another witness later in the case.  Okay.  Thank you, Your Honor.  All right.

May I approach with Government Exhibit 186, already in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   (Tendering item.)

MR. SHIPLEY:  You can take that off the screen, Ms. Luce.  Thank you.

BY MR. SHIPLEY:

Q.   Okay.  Do you recognize that item?

A.   I do.

Q.   And is that another item with handwriting on it that was seized from the Xterra?

A.   Yes.

Q.   Okay.   And what does it -- is there printed content on there as well?

A.   Yes.   It's a -- from -- issued from the Bank of Hawaii and addressed to Ryan Routh.   Looks like correspondence from the Bank of Hawaii.

Q.   Okay.   And is there handwriting as well on that item?

A.   Yes, there is.

Q.   And what does that say?

A.   "Make tourniquet."

Q.   Can you hold that up for the jury.

A.   (Complies.)

Q.   And could you just point to where the handwriting, "make tourniquet" is.

A.   Sure.   Right there (indicating).

Q.   Okay.   Thank you.

        MR. SHIPLEY:   Your Honor, I'm going to approach the witness with Government Exhibit 45.   This is an item not yet in evidence.   May I approach?

        THE COURT:   You may.

BY MR. SHIPLEY:

Q.   (Tendering item.)

     Agent Barrois, do you recognize that item?

A.   I do.

Q.   Okay.   Is that an item that was seized during the search of

the Xterra?

A.   Yes, it was.

Q.   And this item was found in the Xterra along with other documents that we've reviewed this morning identifying the defendant, Ryan Routh; correct?

A.   That's correct.

Q.   Is this item in the same condition or substantially the same condition as when it was removed from the Xterra during the search?

A.   Yes.

Q.   Okay.

MR. SHIPLEY:   Your Honor, I move to admit Government Exhibit 45.

THE COURT:   Any objection to admission, Mr. Routh, of Government's 45?

MR. ROUTH:   No.

THE COURT:   Government's 45 will be admitted without objection.

(Government Exhibit 45 was received in evidence.)

BY MR. SHIPLEY:

Q.   With that item in evidence now, Miss -- Agent Barrois, what is that?

A.   It is a cartridge casing for a .45 caliber --

Q.   Okay.  Could you --

A.   -- bullet.

Q.   -- hold that up for the jury.

A.   Of course.  (Complies.)

Q.   And do you remember where that was found in the vehicle?

A.   It was found inside the glove box of the Nissan Xterra.

Q.   And if I'm remembering your earlier testimony correctly, is that also where the driver's license was, for example?

A.   Yes.

Q.   Okay.

MR.  SHIPLEY:  Ms. Luce, could you pull up and publish government exhibit -- actually, publish just to the witness since that's not in evidence yet -- Government Exhibit 38. This will be published just to the witness.

BY MR.  SHIPLEY:

Q.   Is that a zoomed-in photograph of the item that is now in evidence as Government Exhibit 45?

A.   Yes, it is.

Q.   Okay.

MR.  SHIPLEY:  Your Honor, the United States would move to admit Government Exhibit 38.

THE COURT:  Any objection, Mr. Routh, to Government Exhibit 38?

MR.  ROUTH:  No objection.

THE COURT:  Government's 38 will be admitted without objection.

(Government Exhibit 38 was received in evidence.)

MR. SHIPLEY:  Okay.  And when we are ready, could the Court publish that to the jury, please.

THE COURT:  You may activate the juror screens.  Okay.

BY MR. SHIPLEY:

Q.   Is that a closer image of the physical item you had a moment ago as Government Exhibit 45, the cartridge casing?

A.   Yes, it's a close-up of the top of the casing.

Q.   Okay.  And this was in the glove compartment of the vehicle?

A.   That is correct.

Q.   Okay.  Okay.  All right.

MR. SHIPLEY:  Your Honor, I'm approaching the witness with what is in evidence as Government Exhibit 185, and I will retrieve the cartridge casing and bring that back.

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Okay.  And do you recognize that item?

A.   I do.

Q.   Okay.  And what is that?

A.   It's a coupon or a flier for the Great American Florida Gun Shows.  It's the big weekend event in LaBelle, Florida, scheduled for July 13th through 14th of 2024.

Q.   Okay.  Is there also a phone number associated with that gun show on that flier?

A.   Yes.  It states, "For more info, call (772) 577-9647."

Q.   Okay.  And was this an item found in the Xterra also?

A.   Yes, it was.

Q.   Okay.  Talking about phone numbers, did you find any telephones in the course of your search?

A.   Yes.  We found six telephones.

Q.   Okay.  Six.

All right.  Let's -- let's start with Government Exhibit 300, already in evidence.

(Tendering item.)

A.   Thank you.

Q.   Agent Barrois, would you hold that item up for the jury.

A.   (Complies.)

Q.   Okay.  Is that one of the cell phones that was found in the Xterra?

A.   Yes.  This one was found under the driver's seat.

Q.   Okay.

MR. SHIPLEY:  Actually here, let me show the jury, with the Court's permission, already in evidence, an image, Government Exhibit 339.  Ms. Luce.  Okay.

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   And what are we seeing in this photograph?

A.   You're seeing the phone that I have right here in my hand; that's the -- a photo of the phone when it was found and where

it was found.

Q.   And where is that in the car?

A.   In the -- underneath the driver's side seat, underneath -- sorry, underneath the seat of the driver's side.

Q.   Okay.  All right.

MR. SHIPLEY:  Your Honor, approaching the witness with Government Exhibit 301, already in evidence.

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   (Tendering item.)

And do you recognize that item?

A.   I do.

Q.   And what is that?

A.   It's a Samsung cellular phone that was recovered from the center console of the Nissan Xterra.

Q.   Okay.

MR. SHIPLEY:  Your Honor, may I publish to the jury, already in evidence, Government Exhibit 325?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   And what do we see in this image?

A.   You can see the Placard Number 1, and that's the -- the evidence item number that it was issued, and you can see just to the right of it the phone that's plugged in.

Q.   Okay.  Is this -- would you circle that for the jury, just

in case.

A.   (Complies.)  Of course.

Q.   Okay.

MR. SHIPLEY:  And, Your Honor, can I also publish to the jury, already in evidence, Government Exhibit Number 920? It's an image.

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   And is this another view of that center console area?

A.   Yes, it is.

Q.   Okay.  And is the phone in that area?

A.   It is.

Q.   Government Exhibit 301.

MR. SHIPLEY:  Approaching the witness, Your Honor, with Government Exhibit 302, already in evidence.

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Do you recognize that item?

A.   I do.

Q.   Is this another one of the phones from the Xterra?

A.   Yes, it is.

Q.   Okay.  Could you just hold the bag up for the jury.

A.   Of course (Complies.)

Q.   Okay.  Is that an AT&T phone?

A.   It's -- yes.  AT&T-issued phone.

MR. SHIPLEY:  Your Honor, permission to publish Government Exhibit 326, an image already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   Now what do we see here?

A.   Again, you see the placard number -- with number 2 on it, and that's the evidence number that we assigned the AT&T phone. It was found on the -- in the driver -- the passenger seat side pocket, as you can see.

Q.   So just so everyone understands the perspective, would this be to the driver's right if he or she were reaching out into that pocket?

A.   Correct.  The way the photo is taken, it's taken from the driver's angle.  So if you're sitting in the driver's seat, the phone would be right here (indicating) to the right.

Q.   Would that have been within reach of the driver?

A.   Yes.

Q.   Okay.  Did you find any receipts in the course of your search relating to an AT&T phone?

A.   I did.

Q.   Okay.

MR. SHIPLEY:  Your Honor, may I publish Government Exhibit 334B, already in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  And does this photograph reflect that receipt that you recovered from the Xterra?

A.   Yes, it does.

Q.   Okay.  There is an entry in the middle that says "Customer."  Can you circle that for the jury.

A.   (Complies.)

Q.   What is the name that is listed there?

A.   John W.

Q.   And what is the phone number?

A.   (743) 251-7269.

Q.   Okay.

MR. SHIPLEY:  And, Ms. Luce, with the Court's permission, could we now publish Government Exhibit 334A, already in evidence?

THE COURT:  You may.

MR. SHIPLEY:  Let me clear the screen.

And could we zoom in on that, Ms. Luce?

BY MR. SHIPLEY:

Q.   And this is another shot, another image of that receipt, if we look down the bottom of it?

A.   Yes.

Q.   Or if you see -- do we see a date?

A.   Yes.

Q.   Can you circle that date for the jury.

A.   Of course.  (Complies.)

Q.   And is that August -- 8/4/24, August 4, 2024?

A.   That's correct.

Q.   Okay.  All right.

MR. SHIPLEY:  Your Honor, with the Court's permission, approaching the witness with the next phone.  This is Government Exhibit 303, already in evidence.  Permission to approach?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Okay.  What is that item?

A.   It's an Orbic cellular phone.

Q.   And was this another one of the phones recovered from the Xterra?

A.   Yes.  This one was recovered from inside the glove box of the Nissan Xterra.

Q.   Okay.

MR. SHIPLEY:  Your Honor, approaching the witness with Government Exhibit 304, already in evidence.

Could you just hold that up so the jury can see it.

THE WITNESS:  (Complies.)

MR. SHIPLEY:  Okay.  And that was 303.  I'm now approaching with 304.  And could you do the same thing.

THE WITNESS: Of course.

BY MR. SHIPLEY:

Q. (Tendering item.)

A. Thank you. (Indicating.)

Q. Do you recognize that item?

A. Yes. This is another phone that was recovered from inside the Nissan Xterra, in the glove box.

Q. Okay. So both of the two phones that you have in front of you -- maybe hold them both up for the jury, if you don't mind -- 303 and 304, both of those were inside the glove compartment?

A. That's correct.

Q. Okay. All right.

MR. SHIPLEY: Your Honor, permission to approach the witness with Government Exhibit 305, already in evidence?

THE COURT: Granted.

BY MR. SHIPLEY:

Q. (Tendering item.)

A. Thank you.

Q. Do you recognize that item?

A. I do.

Q. Okay. And what is that?

A. It's a flip phone that was also recovered inside the glove box of the Nissan Xterra.

Q. Is it fair to say that all three of the phones we've just

spoken about, 303, 304, and 305, were in the glove compartment?

A.   That's correct.

Q.   Could you hold all three of those up for the jury.

A.   Yes.  (Complies.)

Q.   Okay.

MR. SHIPLEY:  Your Honor, with the Court's permission, may I publish already in evidence Government 327, an image?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   And what are we seeing in this photograph?

A.   You can see the placard for evidence Item Number 3, which would have been for the flip phone.  You can see it right to the left.  It's just a little hard to see.

Q.   Can you circle it, if you can see it.

A.   Of course.  (Complies.)

Q.   Okay.  And this is where those other phones were found as well?

A.   Yes.  They were found in the same glove box, glove compartment.

Q.   Okay.  Okay.  Let's talk about some other contents of the car.

What was the general condition of the contents of that vehicle?  Was it well organized?  Was it messy?  What were your observations?

A.   Not organized.  It -- the contents looked like somebody had

lived in it. There was food, there was a lot of clothing. As I said earlier, the seats were put down and in kind of like a mattress on top as though somebody would be sleeping inside the vehicle.

Q. Okay. Did you take any photographs of the general appearance of that vehicle?

A. Yes. When we take the entry photographs, you will see the appearance of the vehicle as is.

Q. Okay.

MR. SHIPLEY: Let me show the jury a couple of those, Your Honor. With the Court's permission, I would like to publish Government Exhibit 324, an image already in evidence.

THE COURT: Granted.

BY MR. SHIPLEY:

Q. And what are we seeing in this picture?

A. The general condition of the -- more so the passenger's side, a little bit of the driver's side.

Q. Okay. And in this picture, do we see a couple of the phones that we were just talking about?

A. Yes. You see the one that was recovered from the center console.

Q. Could you circle that for the jury, please.

A. Of course. (Complies.) It's hard to see Item 1 there (indicating).

The phone that we spoke of earlier that was recovered from

the side pocket of the passenger seat, and then the flip phone -- sorry -- the flip phone that would have been recovered here (indicating).

Q. There would have been three -- so we can reorient ourselves, we have a phone where the marker number 1 is.

A. Correct. Another one where marker 2 is, and again, number 3, where that phone was inside the glove box.

Q. And there were other phones in that glove box as well?

A. There were two other phones in the glove box as well.

Q. And we don't see it in this picture, but this is from the driver's seat?

A. It's from the driver's side, correct.

Q. The perspective of --

A. Correct. Correct.

Q. And under that driver's seat, was that another phone?

A. Yes. There was one more phone underneath, which I think we had already -- which, obviously, you can't see from here but...

Q. Correct.

MR. SHIPLEY: Your Honor, permission to publish Government Exhibit 1127, already in evidence?

THE COURT: Granted.

BY MR. SHIPLEY:

Q. What do we see here?

A. So this would have been a photo of the vehicle from the trunk. As you can see, there is bins. There is also what

looks -- what appears to be a mattress, and clothing as well. And this is the general condition in which we found the vehicle.

Q.   Okay.   In the course of your search and inspection of the vehicle, did you remove some of those items of clothing from the Xterra and mark them separately?

A.   Yes.   In order to conduct a thorough search of the vehicle, items from the vehicle need to be removed.

MR. SHIPLEY:   Okay.   I'm going to briefly show the jury some pictures of those items.   Again, Your Honor, all of these will already be in evidence.   Let's start with Government Exhibit 4 -- I'm sorry, Government Exhibit 39A, an image.

BY MR. SHIPLEY:

Q.   What are we seeing in this image?

A.   This would have been items taken out of the vehicle, and then just an overall photo of those items.

Q.   Okay.

MR. SHIPLEY:   Let me go to Government Exhibit 39B, in evidence.

BY MR. SHIPLEY:

Q.   Is this another perspective on some of those items?

A.   This is a closer look of the items that were in the previous photograph.

Q.   Okay.   And do we see also in that image -- maybe you can circle it for the jury -- some receipts?

A.    Yes.  So you have one here (indicating).  Another one here (indicating).  And there is like one underneath.  And then here (indicating).  As can you see, there is one right there (indicating).

Q.    And do you also see one of the handwritten notes that we were just talking about that -- the one that reads:  "If you want this car moved"?

A.    Yes.  It's -- and I will circle it just to -- for ease of reference (indicating).

Q.    Okay.  All right.

       MR. SHIPLEY:  Ms. Luce, could you pull up Government Exhibit 39C, already in evidence.

BY MR. SHIPLEY:

Q.    This is just another perspective on those items?

A.    Correct.

       MR. SHIPLEY:  And can we now show Government Exhibit 39D, already in evidence.

BY MR. SHIPLEY:

Q.    And, just to be clear, Agent, these are just some of the items that were removed from the Xterra in the course of your search?

A.    That -- that's correct.  This is not all the items.

Q.    Okay.  Would there be a lot of items if we brought everything in?

A.    There were -- yes.  As I said earlier, it appeared that the

vehicle was lived in.  So there were a lot of items, more so than we would find typical in someone just driving their vehicle.

Q.  Okay.  All right.

MR. SHIPLEY:  Let me just show the jury, with the Court's permission, three more images of kind of -- give the picture of how many items were seized.  Can we pull up Government Exhibit 1126, already in evidence.

BY MR. SHIPLEY:

Q.  And what are we seeing generally in this picture?

A.  Again, you will see a blanket, sheets, a backpack, a SunnyD bottle that has been mostly drank or at least emptied.  A plastic bin which contained a lot of these items as well.  All collected and removed from the Nissan Xterra at the time of the search.

Q.  Okay.

MR. SHIPLEY:  Can we publish Government Exhibit 1128, already in evidence.

BY MR. SHIPLEY:

Q.  And are these more of the items that were seized from the vehicle?

A.  Yes.  And, again, you can see some personal hygiene, such as the razor, utensils to eat, like a spoon, as well.

MR. SHIPLEY:  And can we publish Government Exhibit 1130, also already in evidence.

BY MR. SHIPLEY:

Q.   What are some of the things we see in this picture?

A.   You can see glasses, sunglasses, a yellow almost like an electric tape.  You can see pliers, gloves, a flashlight, a backpack.  All of these were -- these items would have been inside the backpack.  And then you can see again the dental floss picks.

Q.   Can you circle those for the jury.

A.   Of course.  (Complies.)

Q.   Okay.  All right.  And, again, just to be clear, what we're seeing in these images, some but not all of the things that were taken from that vehicle?

A.   Yeah.  And you can even see a roll of toilet paper in a Ziploc bag as well.

Q.   That's to the left of the backpack?

A.   That's correct.  I can circle it if --

Q.   Sure.

A.   (Complies.)

Q.   Okay.

A.   You can also see gauze pads, masks, black face masks.

Q.   Could you circle the gauze pads, please.

A.   Of course.  (Complies.)

Q.   Okay.  All right.  The pictures have probably let the cat out the bag for this, but did you find any items of clothing?

A.   Yes.

Q.    Okay.  I want to talk about just a few of those.

MR. SHIPLEY:  Your Honor, may I approach with gloves for the agent?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.    (Tendering item.)

Agent, I don't know that I'm going to need you to remove these items from the bag, but I want to make sure you have the gloves there --

A.    Okay.  Thank you.

Q.    -- as a precaution.

MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 44, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.    (Tendering item.)

A.    Thank you.

Q.    Okay.  Agent, do you recognize those?

A.    Yes, I do.

Q.    Okay.  And can you describe those generally for the jury.

A.    Yes.  They are Vans sneakers, I would say, mustard in color.  These were the sneakers that were recovered from the Nissan Xterra from the front passenger side.  They're also documented, some of the photos we saw earlier.

Q.    Okay.  Please don't remove them from the bag.  Could you

hold them up, though, for the jury to see.

A.   Of course.  (Complies.)

Q.   Okay.  As you mentioned, have we seen these sneakers in some of the photographs that have already been published to the jury?

A.   Yes, we have.

Q.   Okay.

MR. SHIPLEY:  Let me bring up something else.  Your Honor, permission to approach with Government Exhibit 200-78, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Okay.  Do you recognize that item?

A.   Yes.

Q.   Okay.  And what are those?

A.   It's a button-down shirt.  Let me see if I can see the brand.  I don't think I can see the brand exactly.

Q.   Okay.  I don't need you to take that --

A.   Okay.

Q.   -- out right now.  But what generally is the color?  And could you hold it up for the jury so they can see.

A.   Sure.  It's like an olive drab green.

Q.   Okay.  All right.  Your Honor, permission to approach the witness with Government Exhibit 942, already in evidence?

THE COURT: Granted.

BY MR. SHIPLEY:

Q. (Tendering item.)

What is that?

A. These are a pair of shorts that were recovered from the Nissan Xterra.

Q. Okay. Is that sort of a madras style of shorts?

A. Yes.

Q. Okay. Could you hold that up so the jury can see.

A. Of course. (Complies.)

Q. And you recovered those during your search of the Nissan Xterra; correct?

A. Yes.

Q. Okay. All right. Let me show you one more item of clothing.

MR. SHIPLEY: Your Honor, permission to approach the witness with Government Exhibit 942, already in evidence?

THE COURT: I think you just did 942.

MR. SHIPLEY: I'm sorry. 42. 42. My apologies.

THE COURT: Yes, you may.

MR. SHIPLEY: Okay.

BY MR. SHIPLEY:

Q. (Tendering item.)

Okay. And do you recognize that item?

A. I do.

Q.   Okay.  And what is that?

A.   It is a pair of jeans with visible torn marks that was recovered from the Nissan Xterra during the execution of the search.

Q.   Okay.  Are those the Old Navy brand?

A.   Yes, they're Old Navy.

Q.   Okay.  Could you just hold it up again so the jury --

A.   (Complies.)  Of course.

Q.   Okay.  Did you find other jeans as well in the vehicle?

A.   I did.

Q.   Okay.  Let me -- for that one, let me pull up a photograph, Government Exhibit 1129, already in evidence.

         MR. SHIPLEY:  Your Honor, permission to publish?

         THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   And what we see in Government Exhibit 1129, is that a different pair of jeans that were recovered from the vehicle?

A.   Yes, that's correct.

Q.   Okay.  Also find some other shirts and other types of clothes?

A.   Yes, that's correct.

         MR. SHIPLEY:  Okay.  Your Honor, permission to publish Government Exhibit 1132, already in evidence?

         THE COURT:  Granted.

///

BY MR. SHIPLEY:

Q.   Does that photograph depict some of the shirts that were obtained from the vehicle?

A.   Yes, it does.

MR. SHIPLEY:  And permission to publish Government Exhibit 343, in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   And do we see more of those items of clothing here?

A.   You do, including the madras short that we just displayed.

Q.   Okay.  All right.  Did you also find -- and I think we have seen this in pictures already -- any gloves?

A.   Yes.

Q.   Okay.  Do you need water or anything?

A.   No.  Sorry.  I just have something in my eye.

Q.   Okay.  All right.  Let me show you --

MR. SHIPLEY:  One moment, Your Honor.

Okay.  Your Honor, permission to approach the witness with Government Exhibits 1136 and 1138, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering items.)

Okay.  Agent Barrois, I would ask you to put on your gloves and just confirm what's in those bags.  And if you could just show them to the jury, please.

A.   Sure.   Is there any particular order you would like me to start?

Q.   On your left, that is Government Exhibit 1136.   And I think one of the bags has already been removed from the plastic evidence bag.  So if you start with that one, I think...

A.   You would like me to take every item or --

BY MR.  SHIPLEY:

Q.   I would just like you to show the jury --

A.   Sure.

Q.   Or you know what?  What we can do is this.  Why don't you tell the jury what is in that bag and just show them one example of it.

A.   Sure.   There is multiple pairs of black gloves, like kind of like utility gloves (indicating).  As you can see...

Q.   Okay.  I don't need you to take every one of those out.

A.   Okay.

Q.   If you could, though, do the same exercise for the remaining contents of Government Exhibit 1136 in the plastic bag.

MR.  SHIPLEY:  Is that open now?

BY MR.  SHIPLEY:

Q.   Okay.  That item is not -- let me ask it this way, rather than open it now.  Before coming to court, are you familiar with what is inside that bag?

A.   Yes.  It's more gloves.

Q.   Okay.  That's fine.

A.   Yeah.  It's more gloves.

Q.   Okay.  And can you --

MR. SHIPLEY:  Your Honor, permission to approach?

THE COURT:  Granted.

THE WITNESS:  It's actually open.

BY MR. SHIPLEY:

Q.   You can show to the jury.

A.   Yes.  It's another -- it's a work glove (indicating).  A TrueFit work glove.

Q.   (Tendering item.)

Agent Barrois, I have handed you Government's Exhibit 1138.  And could you again tell the jury what is in there, and maybe show them an example, please.

A.   It's two Hardy gloves, like, again work gloves (indicating).  It's one pair in here.

Q.   Okay.  Thank you very much.  You can take your gloves off if...

Okay.  We've talked about work gloves.  Did you also find tools in the search of the vehicle?

A.   Yes.

Q.   Okay.

MR. SHIPLEY:  Let me, with the Court's permission, publish Government Exhibit 1125, already in evidence.

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   And what are we seeing in this picture?

A.   You can see a tire iron.  You can see some metal rods.  You can see adjustable pliers, a screwdriver, tie-down straps, work utility gloves --

Q.   Let me --

A.   -- an umbrella.  And then, like, a caulking utensil, like, to -- to help with the caulking or paint.

Q.   Okay.  And were these some of the tools and related items that were seized from the vehicle?

A.   Yup, these are all recovered from the vehicle.

Q.   What you call tie-down straps, are you talking about these items (indicating)?

A.   That's correct.

Q.   Okay.  And do we also see some of the gloves that you were just identifying for the jury as physical exhibits?

A.   Yes.  (Indicating.)

Q.   All right.

     MR. SHIPLEY:  Your Honor, with the Court's permission, may I publish Government Exhibit 41, already in evidence?

     THE COURT:  You may.

BY MR. SHIPLEY:

Q.   What's this?

A.   It's a case containing drill bits.

Q.   And this was also found in the Xterra; correct?

A.   Yes, that's correct.

Q.   And is this the condition the drill bit set would have been in when you removed it from the Xterra?

A.   Yes, it is.

Q.   Okay.  So the arrangement of the bits and the heads and everything, that's how it would have looked at the time?

A.   Correct.  It wouldn't have been altered.

Q.   Okay.  Okay.  Okay.  Thank you.

Let me show you a few more items of physical evidence, as well, that were obtained from the vehicle.

MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 200-182, [sic] already in evidence?

THE COURT:  Which number is that?

MR. SHIPLEY:  It's 200-82.

THE COURT:  You may proceed.  200-82.

MR. SHIPLEY:  Yes.  May I approach?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Okay.  What is -- do you recognize that item?

A.   I do.

Q.   Okay.  And can you describe that item generally for the jury, please.

A.   Sure.  It's a Ziploc bag containing a black mask, a poncho,

and then a zip tie.

Q.   Okay.  Could you hold that up for the jury as best --

A.   Of course.  (Complies.)

MR. SHIPLEY:  Okay.  Your Honor, permission to approach the witness with Government Exhibit 200-86, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Are you familiar with that item from your search, Agent Barrois?

A.   I am.

Q.   Okay.  And can you describe for the jury what that is.  And maybe hold it up again at the same time.

A.   Of course.  It's a black plastic, like, throwaway tablecloth.

Q.   And, to be clear, the plastic bag that it's in now, was it like that when you recovered it from the vehicle?

A.   No, it was not.

Q.   Okay.  That's an evidence bag?

A.   That's an evidence bag, yeah.  It was just the actual tablecloth that was recovered.

Q.   Okay.  Is that expensive material or cheap material?

A.   No, it's one of those cheap, like, throwaway tablecloths that you would buy at like a Dollar Store, for example.

Q.   Okay.  All right.

MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibits 200-83 and 200-87?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering items.)

Agent, are those items that you recovered in your search of the defendant's Xterra?

A.   Yes, they are.

Q.   And could you hold them up for the jury --

A.   Of course.

Q.   -- and tell the jury what those are.

A.   They're little bungee cords, so they kind of have an elastic feel to them.  They can stretch.

Q.   Can you hold it up just to make sure --

A.   Of course.  I'm sorry.

Q.   -- that the members of the jury can see also.

A.   (Complies.)

Q.   Okay.

MR. SHIPLEY:  Your Honor, permission to approach and publish Government Exhibit 200-188, already in evidence?

THE COURT:  Which number is that?

MR. SHIPLEY:  200- -- I'm sorry, 200-88, not 188.  I misspoke.  200-88.

THE COURT:  Granted.  200-88.

BY MR. SHIPLEY:

Q.   (Tendering item.)

     Okay.  Do you recognize that item from your search?

A.   I do.

Q.   And, again, can you hold it up for the jury, and just tell them generally what that is.

A.   Sure.  It's an AKASO brand -- and I don't know if I'm saying the brand right, but it's an AKASO rechargeable ion battery.

Q.   And AKASO makes cameras?

A.   AKASO makes action cameras.

Q.   Like GoPro-type cameras?

A.   Exactly.

Q.   And does this appear to be the battery that would go with such a camera?

A.   Yes.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 200-41, already in evidence?

     THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

     Okay.  Is that another item you recovered in the course of your search?

A.   Yes.  It's a red Harbor Freight flashlight.

Q.   Okay.  Did you find any receipts relating to the purchase of flashlights in the course of your search?

A.   Yes, I did.

MR. SHIPLEY:  Okay.  Your Honor, permission to approach the witness with Government Exhibit 200-44 in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Agent, can you generally describe what that item is.

A.   Sure.  It's a receipt from Harbor Freight.

Q.   Okay.  And is -- what's the condition of that receipt now?  Is it faded?

A.   It is faded, yes.

Q.   Okay.  Was that true for a number of the receipts that you have reviewed before coming into court today over the course of the past year?

A.   Yes.

MR. SHIPLEY:  Okay.  Your Honor, permission to publish Government Exhibit 200-45?  That's an image of this item already in evidence.

THE COURT:  Yes.  Granted.

BY MR. SHIPLEY:

Q.   Okay.  And, Agent, is this a zoomed-in image of the receipt you have in front of you?

A.   Yes, it is.

Q.   Okay.  And what do we -- what things do we see on there?
Or, more specifically, do we see an entry for the purchase of a
two-piece flashlight?

A.   Yes.  And I can circle it, if you would like.

Q.   Please do, yes.

        MR. SHIPLEY:  And maybe -- can we zoom in at all,
Ms. Luce?

BY MR. SHIPLEY:

Q.   Agent Barrois, could you circle -- there you go.

A.   (Complies.)

Q.   And can you read --

A.   Sure.  It's a 3.5-inch LED mini flashlight, two-piece,
which is the same size as (indicating) this flashlight.

Q.   Okay.

        THE COURT:  In about five minutes, I would like to take
our morning break.

        MR. SHIPLEY:  That's fine, Your Honor.

        Okay.  Your Honor, if I may publish to the witness at
this time as well Government Exhibit 523, already in evidence?
It's an image.

        THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   I just want to show the jury.  Is this another -- is this
an image showing another Harbor Freight receipt that you
recovered from the vehicle?

A.   Yes, it is.

Q.   Okay.  And if you look down -- or maybe I will circle.  Is there a date on this receipt?

A.   Yes.  It's dated March 5th of 2024.

Q.   Okay.  Okay.

        MR. SHIPLEY:  Okay, Your Honor, permission to approach the witness with Government Exhibit 200-72, not yet in evidence?

        THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

        Agent Barrois, do you recognize that item?

A.   I do.

Q.   Okay.  Was this an item that was seized from the defendant's Xterra?

A.   Yes, it was.

Q.   Does it appear to be in substantially the same condition as when it was recovered during the search of that vehicle?

A.   Yes, it is.

        MR. SHIPLEY:  Your Honor, at this time the United States moves Exhibit 200-72 into evidence.

        THE COURT:  Any objection, Mr. Routh?

        MR. ROUTH:  No objection.

        THE COURT:  200-72 will be admitted without objection.

      (Government Exhibit 200-72 was received in evidence.)

BY MR. SHIPLEY:

Q.   Okay.  And, Agent, could you hold that up for the jury, and tell the jury what that appears to be.

A.   It's a metal rod similar in nature to what you would find on a chain-link fence, sorry.  Black in color (indicating).

Q.   Okay.  Did you also find your -- so I'm sorry.  Could you tell the jury again, what is that?  What does that appear to be, based on your training and experience?

A.   It's a -- so it's a metal rod, and it has like a -- as you can see here, it's curved, so it -- and then the color resembles what you would find like on a chain-link fence, like a fencing.

Q.   Okay.

MR. SHIPLEY:  Your Honor, permission to publish Government Exhibit 730, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   Okay.  What do we see in this picture from the Xterra?

A.   You can see orange earplugs.

Q.   Did you find a large quantity of those in the vehicle?

A.   I did.

MR. SHIPLEY:  Okay.  Your Honor, I am about to transition to some more physical items, so this may be the good moment to break, but I can carry on at the Court's pleasure.

THE COURT:  Okay.  Ladies and gentlemen, we are going

to take our morning break now for 15 minutes.

Agent, please do not discuss the substance of your testimony over the break.

All rise for the jury.

(The jury exited the courtroom at 10:26 a.m.)

THE COURT: We will resume at 10:40. Thank you.

(A recess was taken from 10:27 a.m. to 10:47 a.m.)

THE COURT: All right. Let's call in the jury, please. And you can have your witness enter the courtroom, please.

We are apparently having audio issues on the second floor. Can you please advise IT as soon as possible.

COURTROOM DEPUTY: Yes.

(The jury entered the courtroom at 10:48 a.m.)

THE COURT: Please have a seat. Agent, you may return to the witness stand. We will wait until we have confirmation from IT that the audio is streaming.

You remain under oath. And we are just waiting momentarily to ensure that the folks in the streaming room can hear.

It's all good. Okay. Excellent. You may begin, or resume.

MR. SHIPLEY: Okay. Thank you, Your Honor, members of the jury.

BY MR. SHIPLEY:

Q. Okay. Agent, let me, before we move on to the next topic,

return to an area we talked about earlier.  Do you remember testifying about some of the handwritten notes that were found in the vehicle?

A.   Yes, I did.

Q.   Okay.

MR.  SHIPLEY:  And, Your Honor, may I publish to the witness Government Exhibit 180C, already in evidence?  It's an Image.  600-180C in evidence.

THE COURT:  You may.

BY MR.  SHIPLEY:

Q.   Okay.  Okay.  Do you recognize this photograph, Agent?

A.   Yes, I do.

Q.   Okay.  Was at least one of those handwritten notes basically illegible -- basically faded and not able to be brought to court?

THE COURT:  One moment.  You're leading.

MR.  SHIPLEY:  I am.

BY MR.  SHIPLEY:

Q.   Are you familiar with this note?

A.   Yes.

Q.   Okay.  And is this an image of one of the notes that was found in the vehicle?

A.   Yes.  This is an image that was taken at the time of the search.

Q.   Okay.  And are you familiar with the condition of the

physical item, the physical note of this?

A.   Yes.   Recently I viewed this particular evidence item at the Miami field office.

Q.   Okay.   And what was its condition now?

A.   It was torn into pieces.

Q.   Okay.

A.   And, therefore, not legible.

Q.   Okay.   And can you read for the jury, what does this say on it, Government Exhibit 600-180C?

A.   Sure.   On the top right it says "Wilson," underneath "Brian Wilson," and then a phone number (614) 646-4283.   And underneath that PKU 3131.

Q.   Now, we previously published for the jury, and I think the jury had an opportunity to examine in the jury box, Government Exhibit 445.

MR. SHIPLEY:   Your Honor, may I approach with this?

THE COURT:   Yes.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Just for clarity, are these, the image on the screen, Government Exhibit 600-180C and that item you have in your hands, those are different; correct?

A.   That's correct.

Q.   Okay.   Does that demonstrate that there are at least two handwritten documents with the name Brian Wilson?

A.   Yes, that's correct.

Q.   Okay.   Thank you.

Okay.   Maybe after the break that the jury had for some food, let's talk about some of the food items in the car.

MR. SHIPLEY:   Government Exhibit 200-80, Your Honor, 200-80 in evidence.   May I approach the witness with that physical item?

THE COURT:   You may.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Okay.   Agent Barrois, what is that item?

A.   It's a 56-ounce bottle of SunnyD, Sunny Delight.

Q.   Is it --

A.   And it's leaking.   If -- I don't know if anybody can see. But it still contains some liquid, just the -- not -- it's not fully -- it's not full.

Q.   Okay.   Is that an item that was seized out of the Xterra during your search?

A.   Yes.   Yes.   It was recovered from the vehicle.

Q.   And have we seen pictures of the Xterra showing that item in the vehicle?

A.   Yes.

MR. SHIPLEY:   Let me take -- Your Honor, let me approach the witness, with the Court's permission, Government Exhibit 200-85?

THE COURT:  Granted.

MR. SHIPLEY:  And this item is in evidence.

BY MR. SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Okay.  Would you hold that up for the jury, please.

A.   Sure.

Q.   And are those items that you obtained during your search?

A.   Yes.  These are Armour -- unopened Armour brand Vienna Sausage, two cans.

Q.   Okay.  Could you hold it up so that everyone on the jury can see them.

A.   (Complies.)

Q.   Okay.

MR. SHIPLEY:  Your Honor, may I publish for the jury Government Exhibit 921, already in evidence?  It's an image.

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Does this image reflect some of the food items that were recovered from the Xterra?

A.   Yes.  And if you want me to circle, I can show you where the Vienna Sausages --

Q.   Sure.

A.   -- cans are.

Q.   Please do that.

A.   So you have one right here (indicating) and another one right here (indicating).

Q.   Okay.  Do those appear to be the two items in the exhibit that you have in front of you?

A.   Yes.

Q.   Okay.  That's Government Exhibit 200-85.

Okay.  All right.  We've talked a little bit about some of the receipts that you found in the vehicle.  What was the overall physical condition of a number of those receipts?

A.   Some of them were fairly worn and hard to -- hard to read.

Q.   Okay.  And of those type of receipts, were there photographs taken of them at the time of the search?

A.   Yes.

Q.   Okay.  Have you inspected those receipts before you came to court today?

A.   I did, yes.

Q.   Are they more faded now than they were at that time?

A.   Yes.

Q.   Okay.  Do the pictures we're going to be showing of those receipts, though, fairly and accurately represent what's on the physical receipt itself?

A.   Yes.  The photographs are -- were taken at the time of the search.  So they would accurately reflect that.

Q.   Okay.  All right.

MR. SHIPLEY:  Let's start with Government Exhibit 723,

already in evidence, Your Honor.  It's an image.

BY MR. SHIPLEY:

Q.   Okay.  And is this one of the receipts that was obtained from the vehicle during your search?

A.   Yes.  This is a McDonald's receipt that was recovered from the vehicle.

Q.   Okay.  Can you circle and read for the jury the address of that McDonald's.

A.   Sure.  It's 828 South Military Trail in West Palm Beach, Florida 33406 (indicating).

Q.   And do we see -- if you see the words "locater," do you see a date faded under that?

A.   Yes.  It's --

Q.   Circle it.

A.   -- August 26th of 2024 (indicating).

Q.   Okay.  Did you also find a number of receipts from some stores, Family Dollar, Dollar Tree, and Dollar General family of stores?

A.   Yes, I found multiple receipts.

Q.   Okay.  Let's take a look at a couple of those.

     MR. SHIPLEY:  Your Honor, may I publish Government Exhibit 200-67, already in evidence?

     THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  And what does this appear to be?

A.   This is a receipt from Family Dollar, from the Family Dollar located at 533 Southwest 16th Street in Belle Glade, Florida.

Q.   Okay.

A.   And I can circle for ease as well.

Q.   Yes.  Can you circle the address.

A.   Yes.  (Complies.)

Q.   Okay.  Do you happen to know, is that location, Belle Glade, is that near to South Bay, Florida?

A.   Yes.

Q.   And do you see a date on this receipt?

A.   Yes.  It's dated September 10, 2024.  And I will just for ease of reference (indicating).

Q.   Okay.  All right.

     MR.  SHIPLEY:  Your Honor, permission to publish Government Exhibit 727, already in evidence 200-727?  Let's try that again.  200-727.  Oh, my fault.  My apologies, Your Honor. It's 727.

     THE COURT:  You may publish that.  This is 727.

     MR.  SHIPLEY:  Yes.  I apologize for the confusion.

BY MR.  SHIPLEY:

Q.   And what do we see here, Agent?

A.   Another receipt, and this one is from Dollar Tree.

Q.   Okay.  And on the lower right, do you see a date?

A.   Yes.  It's August 28, 2024.

Q.   And the address in the upper left?  The address is faded or blurred, but do you see the word "west"?

A.   Yes.

Q.   Okay.  And does that appear to correspond to West Palm Beach, Florida?

A.   Yeah.  I mean, I can -- I can read, West Palm Beach, Florida, and then 33411.

Q.   Okay.  Okay.

     MR. SHIPLEY:  Your Honor, may I publish to the jury already in evidence, Government Exhibit 728, 728?

     THE COURT:  You may.

BY MR. SHIPLEY:

Q.   And we see two -- two receipts, actually, on this image.

A.   Yes.  The one on the left is for McDonald's; the one on the right is Dollar Tree.

Q.   Okay.  Let's take a look at the receipt on the left for McDonald's.  What is the date on that?

A.   It's August 21, 2024, and I will circle for ease of reference (indicating).

Q.   And the address of that restaurant, can you circle that as well?

A.   Of course.  It's 828 South Military Trail in West Palm Beach, Florida 33406 (indicating).

Q.   Do you remember, is that the same address as the McDonald's receipt we saw a few moments ago?

A.   Yes, it is.

Q.   Okay.  All right.  Let's look at the Dollar Tree receipt on the right.  Are you able to identify an address on there?

A.   Yes.  Sorry.  It's 2601 South Military Trail in West Palm Beach, and -- (indicating).  And there is also a date at the bottom.

Q.   Okay.

A.   August 26, 2024 (indicating).

Q.   Okay.  And what are the -- what are the items you see purchased as shown on that receipt?

A.   Tijuana Mama Hot Sausage, dry roasted peanuts.  Let's see.

Q.   I guess --

A.   Looks like coffee drinks, food, pretzels, Sunny Delight.  And you can see -- and I can --

Q.   Can you circle the Sunny Delight?

A.   Of course.  There is two (indicating) Sunny Delight.

Q.   Okay.  All right.

A.   And both 56 fluid ounces.

Q.   Okay.  Is that the same size as the physical item we reviewed a few moments ago?

A.   Yes, it is.

     MR. SHIPLEY:  Okay.  Your Honor, may I publish just to the witness, because it is not yet in evidence, Government Exhibit 729?

     THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  Agent, do you recognize this item?

A.   Yes.

Q.   Is -- does this image reflect another of the receipts from the Xterra?

A.   Yes.  This is a --

Q.   Don't describe it yet --

A.   I'm so sorry.  I apologize.

Q.   -- for the jury until the Court admits it into evidence.

    Does this image -- this image, was this taken at or around the time of the search?

A.   Yes, this would have been taken on the day of the search.

Q.   Okay.  And does this image fairly and accurately reflect what that photograph at the time would have looked like?

A.   Yes, this accurately reflects the condition of the receipt at the time.

Q.   Okay.

    MR. SHIPLEY:  Your Honor, at this time I would move to admit Government Exhibit 729.

    THE COURT:  Any objection, Mr. Routh?

    MR. ROUTH:  No objection.

    THE COURT:  Government's 729 will be admitted without objection.

    (Government Exhibit 729 was received in evidence.)

///

BY MR. SHIPLEY:

Q.   Okay.  Now we can talk about it, Agent.

MR. SHIPLEY:  Ms. Luce, can you zoom in on it a little bit, the top part.

BY MR. SHIPLEY:

Q.   Okay.  Where does this receipt appear to be from?

A.   It's from the -- a Dollar General store located in South Bay, Florida.

Q.   Okay.  And what is the first --

MR. SHIPLEY:  Okay.  So, oh, I'm sorry.  My -- my fault.  Can we publish that image for the jury, please.  I don't think we switched back.

THE COURT:  All right.  It's now displayed.

MR. SHIPLEY:  Everybody see the image now?  I apologize.

BY MR. SHIPLEY:

Q.   Okay.  Agent, why don't you circle the address and read that as best you can for the jury.

A.   Sure.  You can't really see the numbers, but you can see "South Bay, Florida."  Right here (indicating).

Q.   Okay.  And a little bit below that, what's the entry for that first item purchased?

A.   That's for dental floss picks.

Q.   Can you circle that for the jury, please.

A.   Of course.  (Complies.)

Q.   Okay.  The stores we have been talking about, Dollar General, Dollar Tree, did we also find -- did you also find plastic bags relating to purchases from those locations?

A.   Yes, we did find bags issued by Dollar General and Dollar Tree.

Q.   Okay.

MR. SHIPLEY:  Your Honor, may I publish Government Exhibit 200-86 -- sorry, 200-66 in evidence?  200-66?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Are these the bags we were just discussing?

A.   Yes, that's some of the bags, correct.

Q.   Okay.  And these bags were all in the vehicle itself?

A.   Yes, these would have been recovered from the vehicle at the time of the search.

Q.   And what does this photograph depict?  Where is this?

A.   This is in our ERT bay.  We will put brown paper to lay at -- to lay items that we recover and/or evidence that we recover.

Q.   Got it.

Okay.  All right.

A.   So that's the floor of our bay.

Q.   Okay.  All right.  I want to ask you -- I think you mentioned at the start of your testimony -- did you recover any license plates from inside the Xterra?

A.   Yes, we did.

Q.   I think we saw Government Exhibit 920.  Was there a license plate on the exterior of the Xterra?

A.   Yes.

Q.   That was the Florida plate?

A.   That's correct.

Q.   Okay.  Even before I ask about license plates, did you find a registration for the car during your search?

A.   Yes, I did.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, at this time, may I publish Government Exhibit 925, already in evidence?

     THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  Agent, is this a photograph of that registration?

A.   Yes, it is.

Q.   Okay.  Let's start on the left-hand -- what state is this from?

A.   This is from the state of -- issued by the State of North Carolina.

Q.   Okay.  And if we look on the left-hand side, do we see a name there?

A.   Yes.  Sara Ellen Routh.  There is also an address.

Q.   Can you circle that.

A.   (Complies.)

Q.   And if we look on the right-hand side (indicating), there is a date there.  What is that date?

A.   The date of issue.

Q.   Do we know whether -- was there a more recent registration card in that vehicle that you found?

A.   No.

Q.   Okay.  The Florida plate that was on the vehicle at the time it came into the evidence bay, was it from North Carolina?

A.   It was not.

Q.   Okay.  Did this registration card correspond to the plate that was on the outside of the vehicle?

A.   It did not.

Q.   Did you find any proof of insurance in the vehicle?

A.   I did.

Q.   Okay.  And do you recall the dates on that?

A.   I -- not off the top of my head.

Q.   Okay.  So let me show you --

MR. SHIPLEY:  Your Honor, may I approach with Government Exhibit -- actually, can we pull up Government Exhibit 320, previously shown to the witness and already in evidence.

BY MR. SHIPLEY:

Q.   And could you circle the license plate that was on the Xterra when you first encountered it.

A.   Of course.  (Complies.)

Q.   And what state is that?

A.   State of Florida.

Q.   Did you find a State of Florida registration for this vehicle during your search?

A.   Did not.

MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 351, already in evidence? Physical item.

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Are you familiar with that item?

A.   Yes, I am.

Q.   And what is that?

A.   It's a license plate that was recovered from the defendant's vehicle during the execution of the search.

Q.   Could you hold that up so the jury is able to see it.

A.   (Complies.)

MR. SHIPLEY:  Are the jurors on this end able to see it?

JURORS:  (Head nods.)

BY MR. SHIPLEY:

Q.   Why don't you just read what's on the outside of that plate, if you can.

A.   Sure.

Q.   Hold it up to the jury, if you're able to.

A.   Of course.  It's a Ohio, sorry, issued plate for a truck, and the license plate number is PKU 3131, with an expiration registration of October of 2020.  Over here (indicating).

Q.   Did you find any receipts associated with that tag number, PKU 3131?

A.   Receipts?

Q.   Parking receipts.

A.   Oh, yes, I'm sorry.  Yes.

Q.   Sure.  And we've seen -- have we seen that PKU 3131 on other documents reviewed during your testimony today?

A.   Yes.  In two of the documents that I reviewed, one on the -- one is a photo and one as a physical evidence.

Q.   Are you referring to the handwritten documents?

A.   The two handwritten notes, yes.

        MR.  SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 347, already in evidence?

        THE COURT:  Granted.

BY MR.  SHIPLEY:

Q.   (Tendering item.)

A.   Thank you.

Q.   Do you recognize that item from your search?

A.   I do.

Q.   And what is that?

A.   It's a parking receipt for Lake Worth Beach, dated -- for

parking expiring on August 22nd -- or 22, sorry, 2024, at 7:38 a.m. for license plate PKU 3131.

Q.   Okay.  Does it say that on the receipt itself, that license plate?

A.   It does (indicating).

Q.   Okay.  And Lake Worth Beach is where?  Is that --

A.   It's in Florida.

Q.   Okay.

A.   Not too far from West Palm.

Q.   Okay.  Did you also find in your search any overnight parking receipts?

A.   Yes, I did.

Q.   Okay.  And let me show you -- were those receipts in their present condition?  Are they -- what is their condition now today?

A.   Faded.

Q.   Okay.  Were photographs of those receipts taken at the time of your search?

A.   Yes, they were.

Q.   And have you reviewed both those photographs and the actual receipts before coming to court?

A.   I have looked at both.

Q.   Okay.  And do those photos fairly and accurately represent what the receipts looked like at the time of your search?

A.   Yes, they do.

Q.    All right.  Oh, before I do that, I have one more license plate to show you.

MR. SHIPLEY:  Your Honor, may I approach with Government Exhibit 350, already in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.    (Tendering item.)

Do you recognize that item?

A.    I do.

Q.    And what is that?  Can you describe it for the jury, and hold it up, please?

A.    Of course.  It's a North Carolina-issued license plate with license plate number HKY4343.

Q.    Okay.  Where was that found in the vehicle?

A.    This is -- this was found underneath the driver's seat, in the Nissan Xterra.

Q.    This was -- was it on the outside of the Xterra?

A.    No, no, no.  Underneath the driver's seat, correct.

Q.    Okay.  And was it next to that Ohio license plate that we just spoke about?

A.    Yes.  They were together.

Q.    Okay.  All right.  Let me go back to the overnight parking receipts.

MR. SHIPLEY:  And, Your Honor, permission to publish Government Exhibit 720, an image, already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   Okay.  Let's -- are you familiar with this item?

A.   Yes.

Q.   Okay.  Let's look at the top.  What's the location?

A.   The location is 890 North U.S. Highway -- sorry, U.S. Highway 27, in South Bay, Florida 33493.  And I can circle it, if that's helpful.

Q.   Okay.

A.   It's located in two different -- so it's here (indicating), and then also here (indicating).

Q.   Okay.  Right above the portion you just circled --

MR. SHIPLEY:  Oh, we need to publish that to the jury.

A JUROR:  It's cutting in and out.  Flashing.

THE COURT:  Is it still flickering?

A JUROR:  Yes.

THE COURT:  Okay.  Perhaps we can reset it.  Still no?

A JUROR:  Much better.

THE COURT:  Okay.  It's up.  Please continue.

MR. SHIPLEY:  Okay.

BY MR. SHIPLEY:

Q.   All right.  One just step back.  Agent, the address we see on there, you have circled both of the addresses?

A.   It's the same address, yeah.  890 North U.S. Highway 27, South Bay, Florida 33493.

Q. Okay. Of the lower of the two circles, do you see -- and I will circle it here -- what does that say?

A. It's for Marathon gas station.

Q. And is another name on the receipt (indicating) up on the top?

A. Yes. Long Island Food Market.

Q. Okay. All right. What's the date of this receipt?

A. It's August 14th, 2024, and I will show it right here (indicating).

Q. And maybe I better clear that. Can you see the time? I think you may have circled over it.

A. I'm sorry. Yep.

Q. That's all right.

A. Let me see if I can clear it.

Q. I will clear it.

A. Okay. It's -- so it's dated 8 -- August 14th, 2024, 9:29:09 p.m.

Q. That's the time?

A. That is correct.

Q. Okay. And do you see where it says "Parking Overnight" right below that?

A. Yeah. So it's for eight nights at $10. And I can circle that as well (indicating).

Q. Okay. And then if you look in the bottom left of that receipt, does it indicate whether the person paid cash or

charged?

A.   Yeah, it shows the form of payment as cash.

Q.   Could you circle that.

A.   (Complies.)

Q.   Thank you.  All right.

MR. SHIPLEY:  Your Honor, may I publish for the jury Government Exhibit 726, already in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  Now, this one is -- is this one pretty faded?

A.   This one is somewhat faded, yes.

Q.   And this is how it appeared at the time that the search was conducted; correct?

A.   That's correct.

Q.   Okay.  All right.  Where is the -- do we see the same address that we saw on the earlier receipt?

A.   Yes.  You can see it more clearly on the (indicating) top center portion right here, 890 North U.S. Highway 27, South Bay, Florida.  And then it's a little bit more faded, but you can still make it out here (indicating) as well.

Q.   And do you see on there the same references to Long Island Food Market and Marathon?

A.   That's correct.

Q.   Okay.  All right.  And looking at the -- the dates reflected on this receipt, and your own visual inspection of

this item, what does it say about a date?  Can you make out a date?

A.   It's August 21st, 2024.  It's right here (indicating).

Q.   And then a little below that, what does it say was purchased?

A.   It's, again, parking overnight.  This time for six -- six nights (indicating).  Again, at $10 a night.

Q.   Okay.  All right.

MR. SHIPLEY:  Your Honor, may I publish Government Exhibit 724, in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Okay.  What do we have here?

A.   Similar receipt.  It's, again, for overnight parking at, whether you call it Marathon or Long Island Food Market, located at 890 North U.S. Highway 27, in South Bay, Florida.

Q.   Okay.  And what is the date on this receipt?

A.   The date on this one is August 29th, 2024, at 1:46 and 38 seconds p.m.  And I can highlight that.  Circle that as well for ease (indicating).

Q.   Okay.  And what do we see purchased?

A.   It's for, again, parking overnight for six nights at $10 a night (indicating).

Q.   Okay.  And can you tell from that receipt whether the individual paid cash or credit?

A.   Yes.   Again, form of payment is shown as cash. (Indicating.)

Q.   And do we see a third name down at the bottom of that receipt for what is at that location?

A.   Yes.   You also see for Dos Amigos restaurant.

Q.   On the same receipt as Long Island Food Market and Marathon gas?

A.   That is correct.

Q.   Okay.   All right.

MR. SHIPLEY:   If I could publish for the witness, already in evidence, Government Exhibit 725?

THE COURT:   You may.

BY MR. SHIPLEY:

Q.   Okay.   And do we see those same three locations, three names of the same physical address on this receipt?

A.   Yes.

Q.   And why don't you tell the jury again and for the record, what are those?

A.   Of course.   So on the top is for Long Island Food Market; the address is 890 North U.S. Highway 27, in South Bay, Florida.   And then below that to the left, you have listed as Marathon.   And then on the bottom in the center, it's listed as Dos Amigos Mexican Restaurant.

Q.   Okay.   And looking in the middle, are you able to make out the date of this transaction?

A.   Yes.  This one is for September 5, 2024, at 10:32:37 a.m.

Q.   Okay.  Could you circle that for the jury, please.

A.   Of course.  (Complies.)

A JUROR:  I'm sorry.

MR. BROWNE:  That's not on the screen.

MR. SHIPLEY:  Huh?  Oh, can we publish that for the jury, please.

THE COURT:  Okay.  It's showing.

BY MR. SHIPLEY:

Q.   Okay.  All right.  Let me -- let me just do that again.

What -- what are the three locations we see on that receipt?

A.   Sure.  Long Island Food Market (indicating) with the address of 890 North U.S. Highway 27, South Bay, Florida 33493. And then to the left, bottom -- I'm sorry -- right below that is for Marathon, same address; and then on the bottom, it's listed Dos Amigos Mexican Restaurant.

Q.   Is that the same as the other receipts we've just looked at?

A.   Yes, it is.

Q.   Okay.  And is this also a receipt for overnight parking?

A.   It is.  It's for six nights of overnight parking.

Q.   And can you tell the jury again, what's the date on this receipt?

A.   Sure.  The date is September 5, 2024, 10:32:37 a.m., and

it's right here (indicating).

Q.   Okay.  And do you know that on the image that we may see in the courtroom, looks like there is a white blur over the date. Have you reviewed this image up close yourself?

A.   I have.

Q.   And that's the basis for you saying this is the 5th of September?

A.   Yes, and I can -- I can see it as well through here.

Q.   Okay.  And did the individual pay cash for this?

A.   Yes.  Again, form of payment is listed as cash.

Q.   And okay, there we go, ah (indicating).  Is that September 5th of 2024?

A.   Yes.

Q.   Okay.  And for how many nights of parking?

A.   It's for six nights at $10 a night.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, permission to publish what is already in evidence as Government Exhibit 721, and if we could display that for the jury, please?

     THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   And what is this?

A.   This is another receipt from Long Island Food Market/Marathon/Dos Amigos Mexican Restaurant for overnight parking for four nights.

Q.   And what is the date on this item?

A.   The date is September 12, 2024, 3:12:54 p.m.

Q.   And so, four nights.  If I'm doing this right, would that be September 12th, 13th, 14th, 15th?

A.   It would be the 12th into the 13th.  Correct.

Q.   Okay.  To the 13th, or onto the 14th and 15th?

A.   Well, it would be -- yeah, it would be four nights.  So September 12th going into 13, 13 going into 14.

Q.   Okay.  And let me -- do we also have an actual parking pass that corresponds to this receipt in evidence?  Or parking permit?

MR. SHIPLEY:  Let me do this.  Your Honor, may I approach the witness with Government Exhibit 753, already in evidence?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Do you recognize that item?

A.   Yes, I do.

Q.   Okay.  And what is that?

A.   It's a parking permit that was recovered from the defendant's vehicle at the time of the search.

Q.   Okay.  Could you hold that up for the jury and read what that says.

A.   (Complies.)

The -- so it's a -- it says, "Parking permit, 091224, expires 091524."  And then has a number "0257."

Q.   Okay.  And what's the expiration date?

A.   091524, or September 15, 2024.

Q.   Okay.

MR. SHIPLEY:  No further questions, Your Honor.

Thank you, Agent.

THE COURT:  All right.  Any cross-examination?

MR. ROUTH:  Sure.  Yes.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   How are you?

A.   Good.  How are you?

Q.   All right.  Sorry this is so exciting.

So I guess of all the items in the car, how long could the items have been in the car?  A year, five years, ten years?

A.   The items that were recovered from the vehicle?

Q.   Yes.  Yes.

A.   Well, those that have dates would have been from those dates.

Q.   But everything else could be from any time period?

A.   I -- yeah, I couldn't be able to attest to that.  But the items that have dates would have been, at the earliest, for those dates.

Q.   Correct, correct, obviously.  Right.

As far as the tourniquet note, did you know I was in Ukraine twice for eight months?  So we had tourniquets every day.  So is it possible that --

MR. SHIPLEY:  Objection, Your Honor.  Prior ruling.

THE COURT:  Overruled.

BY MR. ROUTH:

Q.   Is it possible that that note pertained to working in Ukraine and needing a tourniquet for Ukraine?

A.   I -- I wouldn't be able to say.  I can say that that note was recovered from the vehicle at the time of the search.

Q.   Right.  Thank you so much.

Do you have a list of how many jackets and ties and shirts and dress pants and dress shoes were in the -- in the vehicle?

A.   There is not a full inventory of all of the items that were in the vehicle; there is an inventory of the items that were collected as evidence.

Q.   But do you recall maybe how many jackets and ties there were, or you don't?

A.   I don't recall ties.  There were quite a number of shirts. Same thing with pants and/or shirt -- shorts.

Q.   Dress shoes, do you remember the number of dress shoes or --

A.   I don't recall.  I remember sneakers.

Q.   I was unable to print the items, so I don't know.

THE COURT:  Ladies and gentlemen, you should strike

that comment.  The Court has made arrangements for printing for Mr. Routh.

Next question.

BY MR. ROUTH:

Q.   But is it safe to say there was two jackets in the vehicle?

A.   I would have to double-check the images.

Q.   Is it safe to say there was three or four ties in the vehicle?

A.   I would, again, have to check the photos.

Q.   But granted, we have photos of five or six shirts; correct?

A.   There are photos of multiple shirts; that's correct.

MR. ROUTH:  Is there any chance we can show this, this one photo --

THE COURT:  Yes.  Certainly.

MR. ROUTH:  It's --

THE COURT:  Which number is that, Mr. Routh?

MR. ROUTH:  GX343.

THE COURT:  Okay.  Let's activate the ELMO, please.

Mr. Routh, if you want to zoom out, there is a little scroll thing on the top.

BY MR. ROUTH:

Q.   But this is one photo that we do have which shows -- is it not some dress pants in the upper right and some dress shirts on the left and some dress pants on the bottom right and --

A.   There are, yes, button-down shirts, shorts.  There was a

lot of clothing recovered from the vehicle, and this is a few of them.

MR. ROUTH:  Can we show GX1127?

THE COURT:  Yes.  Are those in evidence, Mr. Routh?

MR. ROUTH:  They're Government Exhibits, so I --

THE COURT:  Right.  But we have a procedure by which only admitted exhibits can be displayed.  So before you display that, please pull it back, provide the number, and I will confirm whether it's been admitted.

MR. ROUTH:  GX1127.  I think we looked at this earlier.

THE COURT:  One moment.

This is in evidence.  So you can display it, Government's 1127.

BY MR. ROUTH:

Q.  As far as, you know, from looking at the picture, it looks like this -- this is a tie that matches the one that I have on today; does it not?

A.  I'm sorry.  Do you mind just rotating it?

Q.  Okay.

A.  It would just be a little bit easier.  Perfect.  I appreciate that.

Q.  Certainly.

A.  Thank you.  There is a little bit of a glare on the photo, but -- like I said, there was a lot of clothing that was found inside the vehicle.  I wouldn't be able to tell you how many,

exactly how many of each item was found inside.

Q.   Right.  Right.  Right.

MR. ROUTH:  And this -- this -- this is a GX1132.  I think we looked at this earlier also.

THE COURT:  You may display this, which is in evidence.

BY MR. ROUTH:

Q.   Just the shirts also?

A.   Yes.  These are button-down white shirts.

MR. ROUTH:  And I don't know if the government -- can the government display GX322B?

THE COURT:  One moment.

Mr. Routh, you have -- you have paper copies of all of the exhibits.  Do you have your version or your copy of 322?

MR. ROUTH:  No, ma'am.

THE COURT:  All right.  Well --

MR. ROUTH:  It's okay.

THE COURT:  As a --

MR. ROUTH:  It's okay.

THE COURT:  As a courtesy, let's go ahead, and if the government can display this one exhibit, that would be helpful.

This is 322B.

BY MR. ROUTH:

Q.   But, again, you see the shirts that are hanging in the window?

A.   Yes.  Those are the shirts that we just see -- just saw in

the previous photo.

Q.   So if someone needed to go to a funeral or be in a funeral, how many outfits might one need?

A.   To go to a funeral?

Q.   Or be in a funeral?

A.   For a day?

Q.   Yeah.

A.   I mean, I'm going to assume you would just need -- would -- one --

Q.   Right.

A.   -- one shirt.

Q.   So if someone needed to go to court for several weeks, how many outfits -- outfits might one need?

A.   I wouldn't be able to tell you.  Everybody dresses differently.

Q.   Certainly.  All right.

     If someone purchased a two-pack of red flashlights, what color might both flashlights be?

          MR. SHIPLEY:  Objection, Your Honor.

          THE COURT:  No basis provided.  Overruled.

          MR. SHIPLEY:  Speculation.

          MR ROUTH:  If someone purchased --

          THE COURT:  Overruled.

BY MR. ROUTH:

Q.   -- purchased a two-pack of flashlights, would they not

assumingly be -- be both the same color?

A.   I wouldn't know.  That's not -- that's outside my purview.

Q.   Okay.

A.   Some can be multicolored.  I don't know.

Q.   The flashlight that was encountered in the vehicle was -- was red; was it not?

A.   That is correct.

Q.   Okay.  Right.  Thank you so much.

The piece of metal that people claim is chain-link fencing, is that not a brand-new item?

A.   I don't understand what you mean by "brand-new item."

Q.   Is it used, is it old, or is it brand-new?

A.   It looks like it was cut off.  So it is -- looks used. It's -- it was -- it's part -- looks like it's part of something, a bigger fence.  Looks like a piece of it only.

Q.   But it's perfectly straight, is it not?

A.   It -- it's cut on the edge.  And I don't know if it's perfectly straight.  It has that -- the curve on the --

I'm not sure what your question is.  I'm sorry.

Q.   Well, I'm just trying to determine if this is old -- an old piece of fence or a new piece of fencing that is purchased at the store that would be a brand-new item.

MR. ROUTH:  So, I mean, is it possible, Your Honor, that we could retrieve the actual item and look at it once again?

THE COURT:  What's the exhibit that you wish to use?

MR. ROUTH:  GX200-72.

THE COURT:  Let's see here.  Can the government please make this exhibit available to Mr. Routh.  It's 200-72.

MR. ROUTH:  If you can.

THE COURT:  Would you like to give this to the witness, Mr. Routh, or display it on the ELMO?

MR. ROUTH:  If you can -- if you can show it to her, that would be great.

AGENT:  Your Honor, may I?

THE COURT:  Yes, Deputy, thank you.

AGENT:  (Tendering item.)

THE WITNESS:  Thank you.

BY MR. ROUTH:

Q.   Would one not assume that once you have bent something, it's hard to straighten it back out?

A.   It's not fully straight.

Q.   Okay.  All right.  So -- all right.  All right.

MR. ROUTH:  I have nothing further, Your Honor.  Oh, I do have one other item.  Is there any possibility we can pull back up GX923?

THE COURT:  One moment.

Ms. Luce, can you display Government's 923.  It is in evidence.  Thank you.

BY MR. ROUTH:

Q.   Do you see a -- a bullet casing in that picture?

A.   Not in this picture.

Q.   Are you aware of another picture of this exact same shot where there is a bullet shell?

A.   Yes.

Q.   How can there be two pictures of the exact same angle, one without and one with?

A.   When the casing was found, a photograph was taken of it in place.

Q.   But the photo that I saw placed it right there in the corner.  And it's not there with this photo.

A.   Correct.  There is a photo with the casing in the corner (indicating) over here that was taken at the time when the casing was found.

Q.   So which photo are we to take as the original photo, as the real?

A.   They're both original photos.

Q.   So we're to assume that maybe the casing was removed prior or added later or...

A.   The casing was not added.

Q.   Okay.

A.   The casing was -- was located inside the glove box.

Q.   Okay.  All right.  So you're saying that this photo was taken after the bullet was removed?

A.   I would have to look at the two photos.  As you can see,

there were other items also inside the glove box.  So items are -- have to be removed in order to take photos.  I would just have to see as to the sequence of the photos.  But both photos accurately show what was found inside the glove box.

Q.   So the photos are time-stamped?

A.   Yes.

Q.   Okay.  So that's helpful.  All right.  All right.  I guess we will need to look at that when the time comes.

MR. ROUTH:  All right.  No further questions.  Thank you so much.  Appreciate your time.

THE COURT:  Thank you.  Any redirect?

MR. SHIPLEY:  Very brief, Your Honor.

REDIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Agent, on the topic we were just discussing, you mentioned there was a photograph taken that reflects the cartridge casing in the glove compartment?

A.   Yes, there is.

Q.   Okay.  And you are familiar with that photograph?

A.   I am.

MR. SHIPLEY:  Your Honor, can we publish just to the witness Government Exhibit 36, not yet in evidence?

THE COURT:  You may.

BY MR. SHIPLEY:

Q.   Is that the photograph you're thinking of?

A.   Yup.  Yes, it is.  It's -- so the -- again --

Q.   Before you describe it --

A.   Oh, so sorry.

Q.   That's okay.

A.   Yes.

Q.   Does this fairly and accurately depict what was observed during the search at the time?

A.   Yes.

Q.   Okay.

MR. SHIPLEY:  Your Honor, I would move to admit Government Exhibit 36.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  It's admitted now.  No objection.

THE COURT:  All right.  Government's 36 will be admitted without objection.

(Government Exhibit 36 was received in evidence.)

MR. SHIPLEY:  Permission to publish to the jury?

THE COURT:  Granted.

MR. SHIPLEY:  Does the jury have it yet?

JURORS:  (Head shakes.)

THE COURT:  Is it showing up on your screens, ladies and gentlemen?

JURORS:  No.

THE COURT:  How about now?

Okay.  Thank you.

Case 9:24-cr-80116-AMC   Document 330   Entered on FLSD Docket 09/29/2025   Page 107 of 326

107

BY MR. SHIPLEY:

Q.   Do you see that cartridge casing, Government Exhibit 45, in this image?

A.   Yes.  It's -- I can circle it for ease of reference?

Q.   Please do.

A.   It's right here (indicating).  And then the placard that you can see nice and big, Placard 10, corresponds to the evidence number that was issued for the casing.

MR. SHIPLEY:  No further questions, Your Honor.

THE COURT:  All right.  Thank you, Agent.  You may be excused.

We are going to go until about 12:15 or 12:20, so please call your next witness.

MR. BROWNE:  Thank you, Your Honor.  The United States calls Erin Farais.

THE COURT:  Good morning.  Please walk over here.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Yes, ma'am.  My first name is Erin,

E-R-I-N.  And my last name is Farais, F-A-R-A-I-S.

THE COURT:  Ma'am, if you could please bring that microphone base closer to you so we can hear you properly.

THE WITNESS:  Yes, ma'am.

MR. BROWNE:  May I inquire, Your Honor?

THE COURT:  You may.

ERIN FARAIS,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWNE:

Q.   Good morning, Ms. Farais.  What do you do for a living?

A.   Good morning.  I am an evidence analyst request coordinator at the FBI laboratory in Quantico.

Q.   What is your official job title?

A.   Sure.  Evidence analyst request coordinator.

Q.   And you talked about the FBI laboratory in Quantico.  Where is Quantico?

A.   Quantico is in Virginia.

Q.   And do you work on a specific team at the FBI laboratory in Quantico?

A.   I do.  So I am a part of the evidence management unit within our laboratory.

Q.   What does the evidence management unit do?

A.   Absolutely.  So our evidence management unit is responsible for kind of cradle-to-grave of the evidence once it's received

at the laboratory.  So we're responsible for intake of that initial evidence.  We call it "receipt."  And then we perform an initial inventory of the evidence where it's assigned an evidence item number at our lab, as well as how the packaging was originally received.  We capture all of that for documentation.

Then we're also responsible for routing the evidence throughout our laboratory while it's there for examination, and ultimately giving it back to our law enforcement agency partner once it's done at our lab.

Q.   And is that who typically submits items of evidence to the FBI laboratory in Quantico?

A.   Yes, sir.  Law enforcement partners.

Q.   Is it just FBI agents?

A.   No, sir.

Q.   Who else submits evidence to the FBI laboratory?

A.   Absolutely.  So we receive evidence from all over, all of our law enforcement agency partners, whether it be state, local, or other federal agencies.

Q.   Can you talk a little bit about the lab itself.  Is that a secure facility?

A.   Yes, sir.

Q.   What is the layout like?

A.   Sure.  So just like most government buildings, we have our security folks at the front.  Badge access.  We have to make

sure we're badged in, code in.  Depending on where we're going in the lab, sometimes it requires dual-access entry, so any of our safes or anything like that require multiple individuals to get in and out of.

Q.   All right.  And just, generally speaking, what kind of government personnel actually work within the laboratory?

A.   Sure.  So the majority of the folks that work in the laboratory building in Quantico are scientists of some sort. Most of us are physical scientists, or depending on the discipline, it may be a biologist or a chemist or a forensic examiner, but all of us mainly have scientific backgrounds.

Q.   And what is your own background?

A.   Sure.  So I have two bachelor's degrees.  My first degree is a bachelor's of science in biology, and my second is a bachelor's of criminal justice in forensic science.

Q.   You mentioned the term "disciplines."  What do you mean by that?

A.   Sure.  So disciplines within our building, we have several different caseworking units, and within those units we have specialized personnel that perform specific exams.  So a discipline may be something like within our latent print operations unit, where our fingerprint folks are located.  So they would be looking for, like, fingerprints, palm prints, things like that.

Or our DNA Casework Unit, where they may be doing something

with serology, so looking for blood or semen evidence or DNA evidence to do comparisons for.

Our firearms and toolmarks folks as well.  They will be doing anything as far as functions testing, right, to see -- or comparisons from one scene to another scene and things like that.  So just because it's one unit in our building, there may be several specialties or several disciplines within that particular unit.

Q.   Changing gears.  Can you tell us what an examination plan is in the context of the work that you do?

A.   Sure.  So an examination plan is one of the main documents that a request coordinator like myself generates within our job.  So not only are we responsible for receiving the evidence, inventorying it, and dispositioning it, as a request coordinator we're also kind of in charge of managing the submissions while they're at the laboratory.  So in order to kind of do that, we form an examination plan, which is basically an outline for how the evidence is going to move throughout the building.

As a request coordinator, we're responsible for kind of knowing the different capabilities that the disciplines have within the units, as well as the case acceptance policies for the laboratory.  And we're kind of like the point of contact, the go-between between our contributors, the law enforcement agencies, and our internal folks, the scientists that work

within the building.

So when we get a case in, we kind of evaluate that case, look at the case scenario, look at the evidence that was submitted and the individuals that may have been involved.  And we have conversations with our contributors to kind of discuss what the evidence might be best suited for as far as scientifically for forensic exploitation, and then we will route those accordingly, working with our internal folks, the scientists within the building, to make sure that all of those items are evaluated.

So on our examination plan, it's kind of like our little cheat sheet outline that shows us what items are slated to go where, to which discipline.  And then it will tell us when they were received, when they were received back to us.  Because we're kind of like a hub and spoke.  So everything comes into the laboratory with us and starts with us, and then we kind of parse it out to the units, and they will give it back to us, and it keeps going until the exams are complete.

So for us at the laboratory, we route everything from least destructive to most destructive.  So we start out with exam units such as our trace hair and fiber folks or our DNA folks to kind of preserve any evidence that may be more susceptible to loss or contamination.  And then we ultimately end our examination plans with disciplines such as, like, our latent print unit who may be performing some chemical processors or

really strong UV lights or things like that that may hurt potential DNA evidence or something of that nature. And then we usually round out with our firearms and toolmarks folks when that is appropriate because of how they have to handle the evidence to test-fire those things. We want to make sure that we can exploit everything to its fullest before it gets to the back end of the process.

So that examination plan is kind of like the lab's outline for how we're going to move the evidence, what evidence is going to move, and in what order it's going to go in. It will also tell us if there was any evidence that was added in a unit, whether it be their secondary evidence.

So some of our disciplines do generate evidence throughout their examination process. DNA Casework Unit, our DNA folks are a very good example of that. They have these little tubes; they're called their secondary extracts a lot of the times, and that's a work product that they get from testing their evidence. That's all retained. So we will get that back from them and provide it back to our law enforcement contributors when we are done with it.

So the examination plan will capture things like that. Or if an item is sub-itemized throughout the laboratory, a lot of the times, we find things throughout the exam process. Say you receive a pair of pants or something like that, there may be something in the pockets.

At initial intake, we try not to go into evidence that may be trace hair fibery (phonetic), things like that, so that we can preserve that evidence to the best of our ability.  So when that examiner or technician may receive it, they may locate items, we will sub-itemize those items so that we can keep track of them as to when they were located and maintain the chain of custody for it as it routes through the laboratory. So things --

THE COURT:  Next question.

THE WITNESS:  Sorry.

BY MR. BROWNE:

Q.   All right.  What was your involvement, ma'am, in designing the actual exam plan in this case?

A.   Sure.  So this case was assigned to me as the request coordinator.  So for me, it was a matter of reviewing the evidence that was received in the case scenario at hand, and realizing what exams may be appropriate for the evidence, discussing with our contributor, the case agents, about what exams they would like performed, and then working directly with all of the units at hand to make sure we could evaluate all of that evidence.  So I was the one that designed it in this particular case.

Q.   So on the Quantico side of things at the laboratory, about how many people were involved in doing these examinations?

A.   Sure.  So we had a decent amount of individuals that were

involved in this particular case, mainly because we were running at a 24/7 priority for about four days on this case, and then it followed into routine -- or priority during normal business hours.  So because of that -- because of the 24 hours, we had a lot of folks working in shifts to cover down and make sure everything was moving as quickly as it possibly could.

Q.   I'm going to show you what has been previously admitted as Government's Exhibit 6.

        MR. BROWNE:  Your Honor, may I approach the witness?

        THE COURT:  You may.

BY MR. BROWNE:

Q.   (Tendering item.)

     Ms. Farais, take a moment to open that Redweld and examine the items inside.  All right.  Can you tell us what items are contained within Government's Exhibit 6.

A.   Sure.  So it looks like we have our FBI laboratory Numbers 1- -- 1-1, 1-1-1, 1-3, 1-4, and 1-5.

Q.   So five items that were numbered by your laboratory?

A.   Yes, sir.

Q.   All right.  And can you explain while showing them to the jury what each of those items is.

A.   Absolutely.  So to start at the beginning, we have Items 1-1 and Items 1-1-1, which was tape.  The item identifiers 1-1 and 1-1-1 relate to our FBI laboratory numbers, stating to me that it was originally taken off of Item 1.  So we refer to

that as, like, the parent item.

So this was 1-1, removed from Item 1; and then 1-1-1, which was removed from this individual dash tape.

And then we have 1-3, which are pieces of metal.  Again, based on the item identifier I know to be also have removed from our parent Item 1.

And then same with Item 1-4 and 1-5, which appear to be a plastic bag and some pieces of paper that were also removed from their parent Item 1.

Q.   And in this case, the parent item, your Item Number 1, is also Government's Exhibit 1; correct?

A.   Yes.

Q.   And that is the SKS rifle?

A.   The rifle, correct.

Q.   All right.  So explain again the distinction between Items 1-1 and Item 1-1-1.  Why are they numbered that way?

A.   Sure.  So when these items were originally removed from the rifle, they received a sub-item, so the dash 1 part.  So 1-1 was the tape that was removed from Item 1, the rifle.  And it's a practice within our laboratory, when anything is removed from the whole or from its parent, again, we sub-itemize that item to keep track of it for chain-of-custody purposes and to delineate that.

So when we have Item 1-1-1, that signifies that it was removed from the tape Item 1-1, that was removed from the

rifle.  And a lot of times, that is to further delineate out a specific subset of the whole, whether it be for probative results or reporting results and things of that nature.

Q.   And can you explain why that happened in this particular case.

A.   Sure.  So in this particular case, we had our tape that was removed from our rifle, so 1-1.  And during the examination process, probative results were identified on a particular piece of this tape.  So it was further delineated as Item 1-1-1.

Q.   And for context, I would like to show you what's been admitted previously as Government's Exhibit 30.

MR. BROWNE:  Your Honor, can I make use of the ELMO, please?

THE COURT:  You can.

MR. BROWNE:  May I publish Government's Exhibit 30, Your Honor?

THE COURT:  Yes.

BY MR. BROWNE:

Q.   Okay.  Ms. Farais, do you recognize what is depicted in Government's Exhibit 30?

A.   Yes, sir.

Q.   How do you recognize that item?

A.   This item was originally received at our laboratory.  I was the individual that received it from our Evidence Response unit

that brought it to the lab.  And I conducted the initial inventory this item.

Q.   And is that in substantially the same condition as when you received it at the FBI lab in Quantico?

A.   Yes, sir.

Q.   Okay.  And was there a scope attached to Item 1 at the time you received it at the laboratory?

A.   Yes, sir.

Q.   And are you also able to see tape affixed to the rifle that is Government's Exhibit 1?

A.   Yes, sir.

Q.   Using an X, can you touch the monitor and indicate one of the places where there was tape on the rifle.

A.   (Complies.)

Q.   Thank you, Ms. Farais.

A.   Uh-huh.

        MR. BROWNE:  We can take the ELMO down, please.

BY MR. BROWNE:

Q.   I'm now going to show you what's been previously admitted as Government's Exhibit 5.

        MR. BROWNE:  Your Honor, may I approach the witness?

        THE COURT:  You may.

        MR. BROWNE:  (Tendering item.)

        THE WITNESS:  Thank you.

        MR. BROWNE:  Just for the record, I'm retrieving the

other physical exhibits that were on the witness stand.

BY MR. BROWNE:

Q.   All right.  Ms. Farais, what is Government's Exhibit 5?

A.   Sure.  So this was a scope that was removed from our Item 1 rifle.

Q.   And can you show that to the jury, please.

A.   Yes.  (Complies.)

Q.   And how do you know that that item was the same scope that we just saw on top of the rifle as depicted in the photograph in Government's Exhibit 30?

A.   Absolutely.  So this item bears our laboratory number and item number (indicating).  If you can see it here, it's lab number 2024-0202, and this was Item 1-2.

Q.   And is that numbering system consistent with what we just talked about with the parent item being number 1?

A.   Yes, sir; that is correct.

Q.   So this would have been 1-2, as numbered by the FBI lab?

A.   Correct.

        MR. BROWNE:  Your Honor, may I approach to retrieve the exhibit?

        THE COURT:  Yes.

        MR. BROWNE:  And may I have the ELMO, please?

        THE COURT:  Yes.

BY MR. BROWNE:

Q.   Ms. Farais, I'm going to try to show the jury the lab

number that you previously indicated.  Is that it?

THE COURT:  If you hold up -- oh, there it is.

BY MR. BROWNE:

Q.   Are you able to read that, ma'am?

A.   Yes, sir.

Q.   And what is the number beginning with 2024?

A.   The lab number right there, 2024-0202, is our FBI laboratory number.

Q.   And the item number is to the right of that?

A.   Correct?  "I1-2" is significant for Item 1-2.

Q.   So is it fair to say that this was another item that was sub-itemized by laboratory personnel?

A.   Yes, sir; that's correct.

Q.   All right.  Let's talk about how that happened.

A.   Sure.  So as I mentioned previously, we wrote everything from least destructive to most destructive at the laboratory. So for this particular item, especially any item with tape on it, a lot of the times, the folks that get it first, which would -- in this case, was our trace hair and fiber group -- they will take a look at it to evaluate it.  If they see tape and they see that it is wrapped in any fashion, we will bring in -- they will call in for our latent print group, so the fingerprint folks to come take a look at it.  Reason being, if we go to remove it, which is very normal in most of our cases, because we're trying to evaluate what is present -- so what is

on top that we can see, as well as underneath, what is potentially unexposed.  So if we have anything that is in a state other than how it was originally manufactured, originally purchased -- so if tape is added by a potential person of interest, we want to make sure we can look at the underside of that tape to look for possible hairs or fibers or latent prints.

So when tape, it's going to go to our trace group first. If they see that it's wrapped, they're going to call in the latent print individual on call in this particular case, to take a look at it to provide an initial evaluation, is what we refer to it as, meaning, they're going to take a look at it to see if there may be any prints present on that exterior surface before we remove the tape, because we don't want to potentially disrupt a latent print while removing that tape.

So in this particular case, the individual in our trace hair and fiber group that received the evidence after I was done inventorying it saw this, notified our latent group to come take a look at it.  We transferred the evidence over.  I transferred the evidence over to latents.  Latents took a look at it, did a visual.  We call it, again, an initial only.  And then, from that point, they capture and do what they need to do, and then it will go back to our trace and hair and fiber folks for removal of that tape.  So that's what happened in this particular instance.

MR. BROWNE:  So if I may, Your Honor, I would ask for permission to distribute Government's Exhibit 5 to the jury?

THE COURT:  Granted.

I will ask the jurors to be fairly swift in their review so that we can proceed.  Again, exhibits will be made available to you should you wish to view them during deliberations.

BY MR. BROWNE:

Q.   And, Ms. Farais, what you just described, is that consistent with the FBI lab's policy of going from least destructive to most destructive?

A.   Yes, sir.  That's correct.

Q.   And so who at the laboratory, I don't need a name, but which discipline or department physically removed that scope, Government's Exhibit 5, from Government's Exhibit 1?

A.   Sure.  So the physical scientist within our trace evidence unit within the hair and fiber group is the one that took the tape off.

Q.   And do you know if the FBI personnel that inspected that tape initially was, in fact, able to get a latent fingerprint off that tape?

A.   Based on results, yes.  But that was -- is not part of my scope.

THE COURT:  All right.  Let's let the jurors to pass the item around for a minute or two, and then we will resume

questioning.

MR. BROWNE:  Thank you, Your Honor.

Tender this witness, Your Honor.

THE COURT:  Thank you.  Any cross-examination?

MR. ROUTH:  Sure.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   How are you?

A.   Good morning.

Q.   So you say that hair and fiber removed the scope?

A.   They removed the tape that was affixing the scope, correct.

Q.   So they just removed the tape and not the scope itself?

A.   I wasn't present when it did come off.  But it's my understanding that once the tape was removed, there were several portions that were then present.

Q.   So the other items that were holding the scope on held the scope to the rifle still after the tape was removed?

A.   No, sir.

Q.   So when the tape was removed, the scope came off?

A.   That is my understanding.

Q.   Right, right, right.  Was the ballistic testing done prior to the removal of the scope?

A.   No, sir.

Q.   So there was no -- no firing of the weapon prior to the scope being removed?

A.   No, sir.  Based on the process from which the disciplines we route through -- again, from least destructive to most destructive -- we save all of the aggressive manhandling and things like that for the end, so that's where our firearms folks come in.

Q.   Right on.  Right on.  But in the chain of command, as far as testing for accuracy is not one of the things that you all do?

A.   That is outside of my scope.

Q.   But, I mean, at Quantico you don't test for accuracy when you receive an item?

A.   We perform functions evaluations, and what that entails would be better suited for our firearms examiner.

Q.   Okay. All right.  But obviously, if you remove the scope, you can't do testing?

A.   We were trying to preserve the evidence that was there for hair and fiber, that's our process at the laboratory, and latent prints.

Q.   Okay.  So there is no accuracy testing?

A.   Again, that --

MR. BROWNE:  Asked and answered.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  That would be a better question suited for our firearms examiner as they are the subject matter

experts in that discipline.

BY MR. ROUTH:

Q.   But you said you were the central hub, so you were the coordinator that coordinates everything.  So but... I think we all understand.

MR. ROUTH:  Thank you very much.

THE COURT:  All right.  Any further cross-examination?

MR. ROUTH:  No.

THE COURT:  Okay.  All right.  Any redirect?

MR. BROWNE:  No, Your Honor.

THE COURT:  Okay.  Thank you very much.  You may be excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, we are going to break now for lunch so as not to start and stop a witness in the middle.  It's 12:02.  We will be in recess for 1 hour and 15 minutes.

Please make sure that you continue to abide by all of my instructions regarding no discussion of this case with anyone, and that includes your fellow jurors.  No investigation or research about this case in any way.  No posting of any information whatsoever on any forum.  And, of course, no contact with any of the attorneys, the parties, or witnesses in the case.

Your lunch has been ordered and should be arriving

hopefully within the next ten minutes or so.

All rise for the jury.

(The jury exited the courtroom at 12:06 p.m.)

THE COURT: Please be seated.

All right. Before we break for lunch, I just wanted to see what the overview for the day is in terms of witnesses.

Mr. Browne or Ms. Medetis-Long, who are the next witnesses you plan to call?

MR. SHIPLEY: Your Honor, the next witness will be Erich Smith from the Quantico laboratory. And he will be followed today by Stephanie Stewart, also from the Quantico laboratory. Curtis Gaul, who is a brief fact witness. Kara Gregor from the Quantico laboratory. And Scott Patterson from the FBI ballistics facility related to Quantico. And then if we have time, Jerry Llanes, who is an FBI digital extraction witness.

THE COURT: Okay. All right. Thank you.

Any issues to raise before lunch, Mr. Shipley?

MR. SHIPLEY: Yeah. Only, Your Honor, the next witness is going to be Mr. Smith. He is the FBI individual who did the toolmark examination of the obliterated serial numbers, did the test-fire. Given the questioning that just came from the defendant, I would ask the Court to apply its prior rulings on what is permissible and relevant in this proceeding. I don't think that question should even be asked. I understand that a

question that isn't answered isn't evidence, but a -- any litigant has to be able to have a good-faith basis that the question they're asking comports with the law and the Court's rulings.  So --

THE COURT:  So what's the particular question or questions that you're concerned about?

MR. SHIPLEY:  Well, asking Mr. Smith, who did not perform any accuracy analysis, whether he did perform any, and then leaping on from there in the manner that was just suggested by the defendant, that isn't this something that should have been done, couldn't this have been done, you couldn't have done it because these things were done to the rifle beforehand.

All of that topic is inappropriate, it's within the bounds of the Court's impossibility ruling, and also the extensive rulings the Court has already made on these topics.

And, again, I am mindful that an asked question that is not answered is not evidence, but again, he has to have a basis to ask a question that aligns with the Court's rulings.  And I think we have had a number of instances of questions that are being asked plainly in violation of things the Court has ruled.

THE COURT:  All right.  Focused now on this one issue, Mr. Routh, do you plan on asking Mr. Smith any questions regarding testing for accuracy of the firearm?

MR. ROUTH:  I don't foresee a need.  I think we

clarified that that did not happen.  So I think we're fairly clear on that fact.

THE COURT:  So as far as your projected cross for Mr. Smith, would it involve any questions regarding accuracy testing?

MR. ROUTH:  I honestly don't see the problem with asking that question.  I mean, really?  I mean, a gun's accuracy, is that not relevant to everything?  I mean, am I missing -- missing something here?

THE COURT:  All right.  I will go back over lunch and just restate the Court's rulings related to accuracy.  That topic was clearly not allowed, from my recollection, during the motion to compel litigation, which was concerned solely with the operability of the firearm and not how good it shoots or well it shoots, because the -- that particular question and issue isn't legally relevant to the elements of the offense. But if you wish to prepare any further argument on that, you may over lunch, and we will address it briefly.  Although, like Mr. Shipley said, this issue has been raised and litigated previously.  So we must abide by those rulings, unless there is a clear basis to deviate from them, and I don't see any at this time.

So, with that, enjoy your lunch.  We will be in recess until 1:15.  Thank you.

(A recess was taken from 12:10 p.m. to 1:24 p.m.)

THE COURT:  Please be seated.  Okay.  All right.  Is Mr. Smith still the next witness?

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  Okay.  I had an opportunity to go back and review the Court's prior orders just for purposes of precision, and I will briefly go over those.

The first was Docket Entry 128, Mr. Routh.  This granted in part the motion to compel live-fire testing, and it was limited strictly to an operability test only.  In that order I explicitly rejected any tests beyond operability, explaining that such a demand, likely unprecedented, would be premised on a legally improper theory of factual impossibility; that it relied on speculative and conclusory claims about the mere possibility of developing additional evidence and insights into the accuracy of the rifle; and that it would go beyond verifying or refuting the findings of the government's expert who conducted the live-fire test for operability.

This matter then resurfaced again at Docket Entry 181. That order memorialized the parties' agreement that, quote, "The defendant shall make no argument, nor offer any evidence, relevant only to a defense of factual impossibility, of facts unknown to the defendant."

And then finally, in the Daubert order, which is Docket Entry 224, I noted the related principle that a conviction for attempt does not require that a defendant

actually commit the final act required for conviction for the underlying crime, citing cases.

And so with that background, I just want to revisit with Mr. Routh:  Is it still your intention, sir, or your request to ask questions regarding the accuracy of the -- of the rifle or any accuracy-related testing?

MR. ROUTH:  No, Your Honor.  Kristy verified the fact that there was a standing order, so she also noted the fact that the rifle was disassembled prior to those orders being issued.  So, you know, there is a -- you know, the FBI --

THE COURT:  All right.  So I'm hearing that you do not wish to ask those questions.  Is that still the case, sir?

MR. ROUTH:  Yeah, I will refrain from discussing accuracy.

THE COURT:  Okay.  Well, then, with that, I see no need for a further ruling.  This is all in line with the Court's order, along with the Eleventh Circuit's case law, that factual impossibility is an invalid defense.  And so we will get started with the next witness, unless there are any other items to address.

MR. SHIPLEY:  No.  We're all set.

THE COURT:  Okay.  Are the jurors ready, Officer?

COURT SECURITY OFFICER:  Yes.  Yes, Your Honor.

THE COURT:  Then let's call them in, please.

(The jury entered the courtroom at 1:27 p.m.)

THE COURT: Please be seated. All right. I hope you enjoyed your lunch, ladies and gentlemen. We will resume with the witnesses.

Please call your next witness.

MR. SHIPLEY: Your Honor, the United States calls Erich Smith.

THE COURT: Excellent.

Mr. Smith, please make your way to the witness stand. Remain standing to be sworn in.

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

COURTROOM DEPUTY: Please be seated.

State your first and last name and please spell it for the record.

THE WITNESS: All right. My first name is Erich, and it's spelled E-R-I-C-H. Last name is Smith, S-M-I-T-H.

THE COURT: You may begin.

MR. SHIPLEY: Thank you, Your Honor.

Good afternoon, members of the jury.

ERICH SMITH,
having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Good afternoon, Mr. Smith.

Who do you work for, sir?

A.   I work at the FBI laboratory in Quantico, Virginia.

Q.   How long have you been with the FBI?

A.   I started working at the FBI laboratory in 2000.  Excuse me, in 1998.

Q.   Okay.  And what is your current position with the FBI?

A.   I am a firearms and toolmark examiner.

Q.   And were you recently given an additional title and responsibility?

A.   Yes.  I was originally a firearms and toolmarks examiner and I was the technical leader of our discipline, but I have recently taken on a new job where I'm a senior-level scientist.

Q.   And what do you do in that new role as senior-level scientist?

A.   My primary duties will be looking at comparative sciences, which the firearms and toolmark discipline is, and admissibility challenges in court.

Q.   All right.  Before this promotion, you mentioned you were a firearms and toolmark examiner; correct?

A.   That is correct.

Q.   And how long were you in that unit?

A.   So I started in the firearms and toolmarks unit in 1998 as a technician.  So I was assisting other firearms and toolmark

examiners taking notes.  And then in 2000, I took on the responsibility of being a trainee to become a firearms and toolmark examiner, and I was qualified in 2002.

Q.   Okay.  So that's basically about been your entire career with the FBI?

A.   No.

Q.   Okay.

A.   Prior to that, I worked for the Virginia division of forensic science in their firearms and toolmarks unit helping the examiners.

Q.   Okay.  I was going to ask that.  Before you joined the FBI, were you also working in these fields?

A.   Yes.

Q.   Okay.  Before that, did you go to college?

A.   I did.

Q.   Okay.  Where did you go, and what degrees have you obtained in your education?

A.   So I went to the Virginia Commonwealth University which is in Richmond, Virginia.  So I got a bachelor's in science in biology.  And then I also got a master's in forensic science from Virginia Commonwealth.

Q.   Okay.  All right.  Let's talk about some of the things you do and have done in the firearms and toolmarks unit.

First of all, toolmarks, what are those in reference to firearms?

A.   All right.  So you have to think about the tool.  So a tool is a harder object.  So just think about a screwdriver.  It's a tool.  But if I took that screwdriver and I slammed it into the desk here, it would leave a mark.  That is the toolmark that the tool made.  The toolmark is usually in the softer substrate from the tool.

Q.   Okay.  And what does that mean in terms of firearms and ammunition?

A.   So a firearm is just a specialized tool to fire bullets.  So when a cartridge is fired in a firearm, the toolmarks that are inside the firearm are imparted onto the cartridge case as well as the bullet.

Q.   Okay.  And is another part of your job and your experience identifying serial numbers on firearms?

A.   Yes, it is.

Q.   Okay.  And is a component of that identifying serial numbers that have been altered or obliterated?

A.   That is correct.

Q.   Okay.  We're going to talk about that for a while today, but can you tell the jury in summary, what is that?  What is a serial number, and what is an obliterated serial number?

A.   Well, firearms, when they're sold, they have a serial number on them.  And oftentimes they will be submitted to the lab where they have been obliterated, and we're asked to restore that number to try to determine what the number

originally was.

Q.   Okay.  Is another -- what's another word for obliterated?

A.   Erased.

Q.   Wiped out?

A.   Right.

Q.   Okay.  Is evaluating gunshot residue another part of your job and your training?

A.   It is.

Q.   Okay.  What is gunshot residue?

A.   Well, there are two types of exams for gunshot residue. The one that I'm qualified in, I'm looking at gunshot residue for muzzle to target distance.  How far away was this gun that left residue on this garment?  The other one is more of a chemistry exam where someone is being checked on their hands with swabs to find out if there is any analytical material there that would suggest gunshot residue.

Q.   How is gunshot residue created?

A.   All right.  So we have to think about the cartridge.  So the cartridge is a self-unit of ammunition.  It's got the cartridge case, it has the bullet in the top, and then there is powder put inside the cartridge case.  And at the very bottom is a primer.  It looks like a little disc and it is shock sensitive.  So when the firing pin from the firearm hits that, it ignites the powder inside.  Not all the powder is consumed when it leaves the gun.  So at the muzzle end, the bullet

leaves, and unburned powder leaves as well.  But that little primer at the base also shoots residue out the muzzle end too.  So there are two things that we're looking for, primer residue and well as unburned gun powder.

Q.   Okay.  And is that created when a gun is fired?

A.   That is correct.

Q.   Okay.  All right.  Let me ask you a little more about your background.  Do you have any professional affiliations?

A.   I do.

Q.   Okay.  Can you summarize those for the jury, please.

A.   So the professional organization that I'm a member of is the Association of Firearms and Toolmarks Examiners.  I'm also a member of the European Network of Forensic Science Institutes.  Those are the two principal ones that I'm a member of.

Q.   Excuse me.  Have you published any articles related to forensic firearms analysis?

A.   I have.

Q.   Okay.  Have you given presentations related to forensic firearms analysis?

A.   I have.

Q.   Okay.  Many?

A.   Quite a few.

Q.   Have you received specialized trainings in this field, forensic firearms analysis?

A.   I have.

Q.   Okay.  And have you given those trainings yourself?

A.   I have, yes.

Q.   Okay.  Inside the FBI or also outside the FBI?

A.   It depends on the type of training, but I have trained other qualified examiners as well as provided training to other law enforcement officials.

Q.   Okay.  Have you ever testified in court as an expert witness relating to forensic firearms analysis?

A.   I have.

Q.   Okay.  Many times?

A.   Yes.

Q.   Okay.  Have those been all over the country?

A.   Primarily, yes.

Q.   Okay.  And have you specifically testified as an expert with regard to obliterated or altered serial numbers?

A.   I have.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, at this time I would tender Mr. Smith as an expert in forensic firearms analysis.

     THE COURT:  Any objection, Mr. Routh, to the qualification of this witness as an expert in the stated field, which is forensic firearms analysis?

     MR. ROUTH:  He seems like an expert.

     THE COURT:  All right.  No objection.  The witness is

so qualified.

Ladies and gentlemen, when scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.  But that doesn't mean that you must accept the witness's opinion.  As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

Please proceed.

MR. SHIPLEY:  Thank you, Your Honor.

BY MR. SHIPLEY:

Q.   Okay.  Mr. Smith, were you asked to examine certain pieces of evidence in this case?

A.   I was.

Q.   Okay.  And did you conduct examinations on them?

A.   I did.

Q.   And did you make findings from your review of them and those examinations that you conducted?

A.   I did.

Q.   Okay.  Now, before coming to Court, have you had an opportunity to review those same items?

A.   I have.

Q.   And have you reviewed those items marked with court exhibit numbers as well?

A.   I have.

Q.   Okay.  All right.  I'm going to go through some of them with you.

MR. SHIPLEY:  Your Honor, for the record, I'm -- with the Court's permission, I'm going to have the witness -- bring up to the witness Government Exhibit 1, which is the firearm.

Just to confirm again for the jury and for the Court, the firearm has been confirmed rendered safe, and we will be keeping the rifle separate from the ammunition and the magazine which will be back on counsel table.

THE COURT:  Okay.  Thank you.  You may show the witness Government's 1 with the clarifications.

MR. SHIPLEY:  Okay.  May I approach the witness with the item?

THE COURT:  Yes.

MR. SHIPLEY:  (Tendering item.)

Your Honor, this item is already in evidence, of course.

BY MR. SHIPLEY:

Q.   Are you familiar with this item, Mr. Smith?

A.   I am.

Q.   Okay.  And what is that?

A.   Well, this box I received at the FBI laboratory.  It has our laboratory number on it and the item designated -- designation.  I also see my initials on the box as well.

Q.   Okay.  And did you examine or conduct tests of the item inside that box?

A.   I did.

Q.   Okay.  With the Court's permission, would you open that box and remove the item to display it to the jury, please.

THE COURT:  If you need to stand up, sir, to do this, you may.

MR. SHIPLEY:  With the Court's permission, I was going to ask, is it permissible for the witness -- so he's going to be demonstrating some of the smaller parts of the rifle -- is it acceptable to the Court if the witness stands down here as long as I make sure he is within range of the microphone?

THE COURT:  That's fine.

Sir, we have some handheld microphones here.  They can clip onto your suit to make it easier for you to be heard.  Obviously, point the firearm down in a non-menacing way.  I know it's disabled, in any event.

THE WITNESS:  Yes, ma'am.  Does this work?

THE COURT:  That should.  That should be okay.

Ladies and gentlemen, if you don't hear the witness when he is mobile, please raise your hand so we can get him a better microphone.

All right.  You may begin.

BY MR. SHIPLEY:

Q.   Okay.  So, Mr. Smith, if you would kindly remove the weapon

from the box.  The zip ties should already be detached.

THE WITNESS:  Right, Your Honor, it is sealed and secured.

THE COURT:  Thank you.

MR. SHIPLEY:  And for the record, Your Honor -- Mr. Smith, if you would step down into the well in front of the jury and just, again, positioning the rifle in a way that is not obviously directed towards anyone.

Is everyone on the jury able to see it close enough?

THE JURORS:  (Head nods.)

MR. SHIPLEY:  I'm going to ask some questions and ask Mr. Smith to identify parts of the weapon.  Okay?

THE COURT:  Okay.  Go ahead.

BY MR. SHIPLEY:

Q.   All right.  Now, Mr. Smith, you have seen this item before; correct?

A.   I have.

Q.   And this is what you have analyzed in this case, one of the items?

A.   That is correct.

Q.   Okay.  What is this?

A.   This is a Norinco.  And Norinco stands for North China Industries, SKS rifle.

Q.   And can you tell us more.  Are you familiar with this type of rifle, the SKS?

A.    I am.

Q.    Okay.  Can you tell the jury more about the origins of this rifle and the development of it in general, an SKS.

A.    You have to think about the history of rifles, the evolution.  So this time period, we're looking at World War II when this is starting to come about.  This is a Russian-designed rifle, so the Soviet Union.  They were looking for a firearm to replace the Mosin-Nagant.  It was a larger infantry rifle.  So this one is smaller, and it's designed around the 7.62x79mm cartridge.

Q.    And has this weapon been produced in decades since in other countries as well?

A.    It has.

Q.    Okay.  What country primarily?

A.    China, North Korea, Egypt.  A host of different countries got ahold of the designs and started producing them in their manufacturing.

Q.    Okay.  Is this a weapon designed for military purposes?

A.    It is.  It's an infantry weapon.

Q.    Okay.  And was it designed to be a -- when you say it's a military-type weapon, what are you referring to?  What is that based on?

A.    Well, the whole premise of this was to get a type of firearm within the Army, the Soviet Union, the infantrymen that was a little more compact, kind of the evolution of the rifle

as far as military-wise.

Q.   Was this rifle designed to be rugged in conditions of a battlefield?

A.   That is correct.

Q.   Okay.  And what -- what is an example of that?

A.   As far as its robustness?

Q.   Yes.

A.   Well, it's got a steel receiver -- well, we really should kind of point out some things on this firearm for you guys.

Q.   Why don't we do that, Mr. Smith, first.  Why don't we go through -- I know some members of the jury are familiar with firearms, but let's assume that individuals are not.

     Can you go through the main components of this rifle, and maybe start with the receiver, and then we will go from there.

A.   All right.  So the receiver on a firearm is that portion that holds the bolt and the barrel.  So this portion right here (indicating) -- it's steel -- is the receiver.

Q.   Mr. Smith, could you turn it just so everyone, including the jurors --

     THE COURT:  Mr. Shipley, you need a microphone.

     MR. SHIPLEY:  Just asking the witness to turn the weapon so Mr. Smith can demonstrate the exact parts he is looking at.

     THE WITNESS:  All right.  So this is the barrel (indicating).  This is the bolt.  And this is the receiver

(indicating) that holds those two components.

BY MR. SHIPLEY:

Q.   What is the lighter-colored part that is protruding from the bolt?

A.   I'm not sure exactly what you are --

Q.   The part that has the clamps on it.

A.   Okay.  So this bolt is under spring tension.  And this is the charging handle (indicating).  So in order to open the bolt, this allows you to get leverage to pull down on it, to open it up.

Q.   And where is the trigger on that rifle?

A.   So this is the trigger guard, and within it is the trigger right here (indicating).

Q.   Are you familiar with something called a safety on a rifle like this?

A.   Yes.

Q.   Okay.  What does the safety do?

A.   So the safety on this firearm is located right here next to the trigger guard (indicating).  It's actually folded up against the black portion here.  It's actually in the safe position right now.  It won't fire.  It's designed to block the trigger from actuating to prevent it from firing.

Q.   Okay.  And are you able to -- is that safety switch able to be moved to a different position in order to fire the weapon?

A.   Sure.  If I move it down (indicating) so it's in line with

the trigger guard, it's ready to fire.

Q.   Okay.  And is that something that is necessary for this weapon to fire?

A.   It is.

Q.   Okay.  Any reason for the safety to be off if the weapon is not going to be fired?

A.   Well, if the safety is off and it's loaded, you can fire the gun.

Q.   Okay. All right.  Let me -- let me ask you about one other feature at the tip of that rifle, the muzzle.  What do we see up there on both sides, the top side and then the bottom side?

A.   All right.  So at the end, this is the muzzle of the barrel.  This is where the bullet comes out.  This is the sight, the front sight.  And this little lug here, this is for a bayonet.

Q.   Okay.  And what is a bayonet, and why would that have been in addition to this rifle?

A.   So this is an infantry rifle.  A bayonet would have been here (indicating); so in the situation where there was close fighting between soldiers, the bayonet could be deployed and now you can spear your opponent.

Q.   And is that because this was designed as a military weapon?

          THE COURT:  Leading.

          Rephrase.

BY MR. SHIPLEY:

Q.   How does that --

MR.  SHIPLEY:  Sure, Your Honor.

BY MR.  SHIPLEY:

Q.   How does that relate to the design of this weapon and its intended purpose?

A.   Well, it's allowing the soldier that's using this rifle another device to defend themselves.

Q.   Okay.  Can you tell the jury, what do the sights do on this rifle?

A.   Well, there are two.  So we talked about the front sight. And then folded down here is the rear sight.  So these are the two implements that you would use to try to basically find your target, to acquire it, and shoot at it.

Q.   Okay.  So how would -- could you demonstrate for the jury how somebody would fire this rifle.  Not actually doing it, but simulating it as best you can for the jury --

A.   Okay.

Q.   -- in order.

A.   We're missing a piece, a critical piece.  And that's the magazine.  The magazine holds the cartridges, which I told you about earlier.  It's a self-contained unit of ammunition.

Q.   Let me stop you there, Mr. Smith.

MR.  SHIPLEY:  Your Honor, with the Court's permission, may I just hold up the magazine, Government's Exhibit 2, for the jury?

THE COURT:  You may.

At which point will the demonstration be concluded so that the witness can return to the witness box?

MR. SHIPLEY:  Within moments --

THE COURT:  Okay.

MR. SHIPLEY:  -- after this.

THE COURT:  Okay.

BY MR. SHIPLEY:

Q.   Okay.  Mr. Smith, we want to keep them apart, but is this the magazine that you are talking about?

A.   Right.  So that magazine is designed for this rifle.

Q.   And what goes in the magazine?

A.   The cartridges, the live rounds of ammunition would go into that magazine.

Q.   Okay.  If you could -- if you could continue, please, just simulate for the jury how -- once the magazine has been put in, what would you do next in order to fire this rifle?

A.   All right.  So this black portion (indicating) is called the stock.  And there is a hole here, right here (indicating). The magazine is inserted like this (indicating), and it locks into place, okay?

The bolt, which is this portion here (indicating) that has these attachments, would be closed.  It wouldn't be open like this.  Okay.

At this point the operator has to pull back on this lever,

actuating the bolt, and when you let the bolt go, it takes that first cartridge out of the magazine and puts it into the chamber. Okay. So at that point the gun is ready to be fired as long as the safety is off. If the safety is on, it won't fire. But you have to pull the safety off.

If I were going to fire this, what would happen is -- this is a semiautomatic rifle. It means one pull of the trigger is only going to fire one cartridge. So let's pretend that magazine has ten cartridges in it. I pull the trigger. It's only going to fire one cartridge. But what will happen is this bolt will come back, it will grab the next cartridge and put it into the chamber so it's ready to be fired again. But it takes another pull of the trigger. So that's semiautomatic.

Q. Okay. And one last question on that. What's the difference between semiautomatic and automatic?

A. All right. So automatic, let's again pretend there are ten cartridges in that magazine. I pull the bolt back. It loads the first cartridge. The minute I pull the trigger, it will continue to fire all the cartridges, either until I take my finger off or it runs out of ammunition.

Q. Okay. And one last term which you can demonstrate for the jury. What is self-loading, and how does that describe this rifle?

A. So I kind of described self-loading. So in a semiautomatic situation, it self-loads the cartridge into the chamber for

you.  I don't have to physically put the cartridge into the chamber.

Q.  Okay.  So is it fair to say, based on the testimony you've just given, in order to fire this weapon multiple rounds, you would be pulling the trigger multiple times, but you're not pulling in different ammunition.  That happens automatically.  Is that a fair summary?

A.  That is correct.

Q.  Okay.  All right.  With that, Mr. Smith, if you could return the rifle --

MR. SHIPLEY:  Your Honor, the witness will reapproach the witness stand.

THE COURT:  That's fine.  Do you intend for the witness to put it back in its box?

MR. SHIPLEY:  I think -- why don't we do this, Mr. Smith.  Could you put it back in the box, please, securely, but don't close the box up yet.

And I think I may have some other questions that might require him just to show it, but I don't need the witness to stand down again, Your Honor.

THE COURT:  Okay.  Thank you.

BY MR. SHIPLEY:

Q.  Okay.  All right.  Let's talk about what you did with this item in your lab in Quantico.  When you first received this rifle, was it at the lab?

A.    It was, yes.

Q.    Was that the first time you saw this particular rifle?

A.    That is correct.

Q.    And how did you receive it?

A.    In this box (indicating).

Q.    Okay.  Was there a scope affixed to it when you received it?

A.    There was not.

Q.    Did you also receive the magazine that is Government Exhibit 2?

A.    I did.

Q.    Was the magazine in the -- in the rifle, or was it separate?

A.    It was separate.

Q.    Okay.  Now, in all respects in terms of how you handled this rifle and the examinations you conducted, were you following normal protocols?

A.    I was.

Q.    And normal safety procedures?

A.    Yes, sir.

Q.    Okay.  So what did you do first in your examination?

A.    The very first thing is safety.  I don't know the history of any particular firearm that I encounter.  So the first thing I'm going to do is inspect it, that it's functioning properly. It's the only time I look down the muzzle of a gun to make sure

there is no obstruction.  If there is something lodged in the barrel and I go to pull the trigger, it's a bad day.  So it's all centered around safety first in evaluating the gun.

After that point, there is classification.  What is this gun?  What caliber is it?  All just general features about the classification of the gun.

Q.   Okay.  Let me break that down a little bit.  So when you received this gun, did you actually look down the muzzle of it?

A.   I did.

Q.   Did you see any obstructions?

A.   No.

Q.   Okay.  And did you then visually inspect the physical item?

A.   I did.

Q.   Okay.  And after you -- after you did that, did you attempt to learn more information about the item?

A.   I did.  But that's not the steps in which I examined it.

Q.   Okay.

A.   The next thing I would have been doing is function testing it.

Q.   Okay.  What is that?  What is a function test?

A.   So I can -- just like I demonstrated to you in front of you, I can do things and understand this gun should fire if I put a cartridge in it.  But to truly understand that it does shoot a cartridge, I actually fire it.  I test-fire it.

Q.   And is there another reason why you do that beyond just

testing its operability or functionality?

A.   There is.  So if you were with me in my laboratory, we have a room that has a water tank.  It stands about 4-feet tall.  It's about 10-feet long.  It's about 4-feet wide.  And it's full of water.  And it has a big hole in it.  And that allows me to test-fire the gun safely, but it also lets me catch the bullets, because I want to capture the bullets.  And so when they hit the water, they slow down very rapidly and it protects the toolmarks that are on the bullet.

In addition, I collect cartridge cases, the little container that had the powder.  They're ejected from the gun as well.  I'm also going to use those to analyze the class characteristics as well as the class characteristics on the bullets.

Q.   So, fair to say this -- is this test-firing an important part of developing information about where this gun may have been or where the ammunition may have been?

A.   That is correct.

Q.   Okay.  What -- is this standard protocol to test a firearm in this way?

A.   It is.

Q.   Okay.  And, in fact, is it FBI policy?

A.   Well, the function testing is not a FBI policy per se.  There is another analysis that is policy.

Q.   Okay.  What is -- what is NIBIN?  Have you heard that

term --

A.    I have.

Q.    -- or that abbreviation?  Could you tell the jury about NIBIN.

A.    So NIBIN stands for the National Integrated Ballistic Information Network.  It is a repository of digital images of cartridge cases and/or guns that have been collected at a crime scene.

So you imagine there is a database for all this information.  I took a test-fire from this gun, and I pinged it against that database to see if this gun was involved in any unsolved shooting crime.

Q.    And is that another reason why you perform this function test?

A.    It is.

Q.    Okay.  All right.  How -- before you do a function test, is there anything you do, even before that, to determine whether the rifle is suitable for test-firing?  Do you conduct any visual inspection of it or examination to make sure that it's suitable for that test?

A.    Right.  So as I was explaining earlier, I'm going to run through the firearm's functionality.  Kind of crudely did it in front of you.  But I want to understand how the mechanism's working inside.  Is this going to go full auto on me, or is it truly semiautomatic?  So I'm testing that before I actually put

a cartridge into it to fire it.

Q.   How do you select the ammunition for a function test?

A.   This cartridge is -- the bullet is going to go very fast, and so we have cartridges set aside where we know that the bullet is going to slow down enough so it's not distorted in the tank.  When that bullet hits the water, sometimes the bullet will flatten like a pancake, and so we're trying to make that bullet stay intact.  So we have ammunition that we have set aside for these types of rifles that we know are going to give us nice pristine artifacts when we're done.

Q.   What was the size and caliber of the ammunition you used in this function test?

A.   This is a 7.62x39mm.

Q.   Okay.  Is that an appropriate type of ammunition for this firearm?

A.   It is.

Q.   Okay.  And so what -- you have given the jury a preview of this.  Did you perform a function test, and what exactly did you do with this particular rifle?

A.   I did perform a function test on this rifle.

Q.   Okay.  And did you have to chamber a round to do that?

A.   Yes, I did.

Q.   Okay.  And what happened in your test-fire?

A.   So I actually used the magazine that was presented over there (indicating).

Q.   That's Government Exhibit 2?

A.   That's correct.

Q.   Okay.

A.   So I loaded the magazine first, and then I inserted the magazine into the magazine opening, pulled the bolt back, charging the gun, let it go, and put a cartridge into the chamber.

Q.   Okay.  And did you repeat that a second time?

A.   Well, it loaded itself automatically after I fired the first one.  It took the second cartridge and put it in the chamber.

Q.   Okay.

A.   And I fired that one as well.

Q.   Okay.  Why did you do that two times?

A.   Well, we like to have more than one sample.  I don't know if there is going to be evidence that comes later that I have to compare to this gun.  So if I had more than one sample, I have a couple of samples, and then later on I receive cartridge cases or bullets that came from this gun, I have more than one sample to look at as my known.

Q.   So based on that function test, that test-fire, did this weapon fire?

A.   It did.

Q.   Twice?

A.   Yes, it did.

Q.   Okay.   Now, you mentioned NIBIN searches.   Do NIBIN searches always identify entries that were coming from a firearm?

A.   It does not.

Q.   Okay.   And is the NIBIN database inclusive of every bullet fired by every firearm?

A.   It's for cartridge cases only, not bullets.

Q.   Okay.

A.   So, no, it's not all-inclusive for all gun crime.

Q.   And were you able to make any identification through the NIBIN database with regards to this firearm?

A.   I was not.

Q.   Okay. All right.   After testing for functionality, what do you do next?

A.   Well, there is another request.   The serial number was obliterated.   So I did a serial number restoration exam.

Q.   Okay.   Now, let me ask you, you previewed this again. What -- what is the purpose of a serial number, and what are the requirements for serial numbers for firearms that are distributed in the United States?

A.   So I pointed out the receiver portion of the firearm.   By law, that is where the serial number has to be affixed to the firearm.   And so having this serial number on the firearm tracks purchasing, who sold it, who bought it.   It gives you the whole history on that firearm.   So that's the reason why

the serial number is required to be on the firearm.

Q. Can law enforcement use the serial number on a firearm to trace where that firearm may have been and how it might have been used?

THE COURT: Rephrase.

BY MR. SHIPLEY:

Q. How does law enforcement use the serial number on a firearm, assuming it's not obliterated?

A. So they will do an electronic trace on the serial number to understand point of sales along the way for the history of that firearm.

Q. Okay. And if there is a match, what can law enforcement do with that information?

A. Well, I assume that they would use it for lead information to develop their investigation.

Q. Okay. Is that -- that task possible if the serial number is obliterated?

A. It is not.

Q. Okay. Now, do serial numbers only appear on one place on a firearm?

A. It depends on the manufacturer. They are only required to put one on the receiver, but some manufacturers put them on the barrel as well as the receiver or the slide.

Q. Okay. And are there instances where a partial serial number might appear, partial in its original form, as put in by

the manufacturer or distributor?

A.   That is correct.

Q.   Okay.  Is that serial number required to be put on the receiver and in other locations in a -- in a permanent way?

THE COURT:  Leading.  Rephrase.

BY MR. SHIPLEY:

Q.   What is the manner in which that serial number is supposed to be put on the rifle?

A.   It is supposed to be permanent, and it has to appear on the receiver.

Q.   Okay.  And by "permanent," what do you mean?

A.   Well, it's not readily removable.

Q.   Okay.  But in the course of your experience, have you seen firearms where the serial number has indeed been obliterated or removed?

A.   I have.

Q.   And that's part of your specialty, is looking at those situations?

A.   That is correct.

Q.   Okay.  Why would somebody do that, in your experience?

A.   They're trying to conceal the information behind that gun.

Q.   In your experience, is there any lawful purpose for somebody to be obliterating the serial number on a rifle?

A.   Not necessarily, no.

Q.   Okay.  What are the ways, based on your experience and your

training, that an individual could obliterate the serial number on a rifle?

A.   Most often we see grinding, someone tries to grind the marks off.  There's -- also be drilling.  They will take a drill right to it.  It's very crude.  They just attack it in some manner.  You start to see that they're chipping away at the metal, actually defacing the number, trying to remove it.

Q.   Okay.  Can you tell the jury more about grinding.  How would you grind the serial number off of a rifle?

A.   You need to have something that's going to be -- what would work best is some sort of grinding wheel, something that is spinning with some force that you can actually bite into the metal to remove the metal.  So a little grinding wheel works well.  I used Dremel drills.  If you are familiar with that, that is a small drill that I used, actually, in the restoration work.

Q.   Okay.  Could you do that with a file, for example?

A.   You could.  A metal file.  You could do that as well.

Q.   And how would one drill through the serial -- the serial numbers on a firearm?

A.   You just need a drill with a proper drill bit, and you just actually drill right through the numbers.  If the number's completely gone, you put a hole in it.  The number is gone.

Q.   Okay.  Is one of your areas of expertise trying to recover serial numbers after these kinds of things have been done to

them?

A. It is.

Q. Okay. And, again, tell the jury, why is that important, and what do you do with the information if you're able to restore the serial number?

A. So if I'm able to restore the serial number, I'm going to provide the contributor an eTrace. I'm actually going to do it myself, get the information about the serial number as far as point of sales, and direct that to the contributor.

Q. Is it an easy process to restore the serial number or try to restore the serial number to a firearm?

A. Each one brings its own challenges. They're not all the same as far as restoration.

Q. Okay. Is that a destructive or damaging process to the weapon?

A. It is. It is going to destroy the material that I'm actually working on. It also can be deleterious to the firearm as well.

Q. Okay. Would it also affect, potentially, the future functionality of the rifle?

A. It can.

Q. Okay. All right. Let me talk about this rifle and its serial numbers. Did you start your inspection on this area by looking for the serial numbers on this rifle, this SKS?

A. I did.

Q.   Okay.  And did you see any on the receiver?

A.   I did.

Q.   Okay.  And what did you observe about that serial number or where that serial number would have been when you first inspected it?

A.   It was ground as well as drilled.

Q.   In your opinion, had that number on the receiver been obliterated?

A.   It was.

Q.   Okay.  Did you look to see if either an entire or partial serial number appeared anywhere else on that rifle?

A.   I did.

Q.   Okay.  Did you visually identify a partial serial number?  Why don't you tell the jury.  What other parts of the rifle did you visually identify a partial serial number?

A.   I know, because this is an SKS, that it's going to have more than one serial number -- or partial serial numbers throughout.  I actually took this firearm completely apart, inspecting it, trying to find these other types of numbers that build this serial number.  So I found one on the bolt carrier, the portion that carries the bolt.  The receiver cover also has a number.  The trigger guard has a partial number on it as well.

     MR. SHIPLEY:  Okay.  Your Honor, I'm not going to ask the witness to stand down.  But with the Court's permission,

may Mr. Smith stand up and just, holding the rifle, identify the areas where the serial numbers would be?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.  So, Mr. Smith, if you don't mind doing that from the witness stand still.

MR. SHIPLEY:  Your Honor, actually, for the benefit of the jurors on -- closer to me, is it permissible for Mr. Smith just to stand down again briefly simply to point out where the serial numbers were?

THE COURT:  Yes, you may stand briefly, and then come back to the witness stand.

THE WITNESS:  Thank you.

BY MR. SHIPLEY:

Q.  So, Mr. Smith, let's start with the serial number on the receiver.  Could you hold that up and show the jury where that would have been.

A.  Right here (indicating) is where the serial number is affixed.  You can see, it might be hard, but the patina has changed a bit here.  This should be black, but all the acids that I threw at it have actually changed the patina.

Additionally, the bolt carrier, this device here is carrying the bolt.  Right there (indicating) is another serial number.  It's part of the whole serial number right here (indicating) that's been erased.

It's also stamped on the base of the trigger guard, a portion of it.  That's been drilled as well as grounded.

Q.   Would those have been visible to -- certainly, let me ask first about the receiver, the serial number on the receiver. Would that have been visible to anyone handling this gun?

A.   The obliteration or the serial number?

Q.   The obliteration.

A.   Yes.

Q.   Okay.  All right.  After your visual inspection of those obliterated serial numbers, did you start to try to restore them?

A.   I did, yes.

Q.   Okay.  I think you made a reference to this a moment ago about the acids and the patina.  Can you describe generally what you did and the process of going about recovering the serial numbers that have been obliterated on a firearm like this.

A.   There is a lot of artistry here in this exam, and we start off at the least destructive method.  And it -- it seems counterintuitive, but we use magnets on the steel to try to bring back the number.  The magnets don't interfere with the metal; they just create a magnetic field.  And we try to visualize the number through some methods.  If I'm not successful that way, I have to go into acid restoration where I'm actually peeling metal away.

But you have to understand:  If you think about the number, it's a stamp, okay?  And the stamp hit the metal and you visually see the number there.  But the metal below it is still being bound tightly, okay?  It's still trying to hold that compressed area.  So even though you obliterate it, we try to peel back the obliteration and the number comes up.  That's what we do.

Q.   Okay.  All right.  And do you use chemicals or acids in doing this?

A.   We do, yes.

Q.   Is that customary in your field?

A.   It depends on the type of metal.  There are different chemicals based on if it's a metal alloy versus steel.

Q.   And why is that necessary?

A.   Their performance on how they actually bring the number back.

Q.   Okay.

MR. SHIPLEY:  All right.  Your Honor, at this time I would like to publish, just initially to the witness, a series of photographs that the witness took during his examination. For the moment -- these are not yet in evidence, so I will publish them first, with the Court's permission, to the witness.

THE COURT:  Okay.

MR. SHIPLEY:  And, Ms. Luce, would you publish for the

witness Government Exhibits 23F, 23K, 23L, 23M, 23N, 23R, 23S, 23T, 23W, 23O, 23B, 23H, 23A, 23Z, 23X, and 23Y.  You can scroll through these.  Ms. Luce, can we scroll through these.

BY MR. SHIPLEY:

Q.   Have you seen these images before, Mr. Smith?

A.   Yeah, these are pictures I took from my notes.

Q.   And you are familiar with these images?

A.   I am, yes.

Q.   Okay.  And did you, in fact, take these photographs?

A.   I did.

Q.   Okay.  And do they show the -- at least the first set of them show the rifle, Government Exhibit 1, during various stages of the serial number recovery process?

A.   They do.

Q.   And do the pictures at the very end also show the ammunition that we will be discussing later, Government Exhibits 3 and 4?

A.   It does.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, I would move to admit these items into evidence.  And I will be happy to read them back in alphabetical order, although that's not the order I will show them to the witness.

     THE COURT:  Any objection, Mr. Routh, to these various exhibits?

They're all from 23, is that correct, Mr. Shipley?

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  And the letters are F as in frank, K, L, M as in Mary, N as in Nancy, R, S as in Sam, T, W, O, B as in boy, H, A, Z, X, and Y; is that correct?

MR. SHIPLEY:  That's correct, Your Honor.  Thank you.

THE COURT:  Mr. Routh, any objection?

MR. ROUTH:  In the interest of ascertaining the truth, no objection.

THE COURT:  Okay.  Then these exhibits will be admitted without objection.

(Government Exhibits 23F, 23K, 23L, 23M, 23N, 23R, 23S, 23T were received in evidence.)

(Government Exhibits 23W, 23O, 23B, 23H, 23A, 23Z, 23X, and 23Y were received in evidence.)

THE COURT:  Let me just mark my list.  One moment.

All right.  Those exhibits will be admitted without objection.

MR. SHIPLEY:  Okay.  Thank you, Your Honor.

Okay.  Ms. Luce, would you publish for the jury, and if the Court could publish for the jury as well, Government Exhibit 23F.

Do the members of the jury have that one up?  Okay. Thank you.

///

BY MR. SHIPLEY:

Q.   All right.  And do you have it, Mr. Smith, most importantly?

A.   I do.

Q.   Okay.  What is that top -- we see two images on this page.  What is that top image?

A.   That image is isolating the serial number on the receiver.

Q.   And below that, the second image, what do we see there?

A.   That's the serial number on the -- or the partial serial number on the bolt carrier.

Q.   Okay.  And do these reflect the appearance of those items when you originally received the rifle?

A.   That is correct.

Q.   Okay.

MR. SHIPLEY:  Ms. Luce, could we zoom in on the receiver, please.  The top picture.

BY MR. SHIPLEY:

Q.   Okay. All right.  What are we seeing here, Mr. Smith?

A.   We can see toolmarks.  We can see the grinding, the bright, shiny finish going across from left to right.  And then you see a multitude of drill marks that follow along with it.  That's what we see here.

Q.   Let me ask you more precisely.  Could you -- and, Mr. Smith, you are able to use your finger on this screen.  The sort of whited-out area, what are we seeing there?  Can you

circle -- or why don't I do it this way.

A.   So those are the grinding toolmarks.

Q.   Okay.  And then you reference as well what appear to be drilled toolmarks.  Can you circle some of those?

A.   So these are the drill marks (indicating).

Q.   And that's where the serial number of the rifle would have been visible, if not for these steps?

A.   That is correct.

Q.   What is this on the far left-hand side (indicating)?

A.   That's the factory emblem in China where this firearm was produced.

Q.   Okay.  All right.

MR.  SHIPLEY:  Can we go to Government Exhibit 23K.

BY MR.  SHIPLEY:

Q.   What do we see here?

A.   So what I wanted to do is I actually took the rifle to my comparison microscope.  I wanted a closer image of the obliteration.  So from -- reading from left to right, this is the first portion.  So the figure here (indicating), that's the code for the factory in China that this rifle was made, and these are also factory emblems as well (indicating).

I didn't know what was going to occur with this case, so we have toolmarks, the drill marks.  I casted them.  So in case a drill bit was sent to me later to compare, I could compare it to the cast.

Q.   Is this a highly magnified image?

A.   Yeah, this is around 6X.

Q.   Okay.  Okay.

     MR. SHIPLEY:  Let's look at 23L.

BY MR. SHIPLEY:

Q.   And, Mr. Smith, are we moving to the right now across the serial number on the receiver?

A.   Right.  So now we're starting to look at the serial number. So we have this drill mark here (indicating), this one here, this one here, and this one here (indicating).  These are four characters that have been obliterated.

     MR. SHIPLEY:  Okay.  Can we pull up 23M, please.

BY MR. SHIPLEY:

Q.   More of the same heading from left to right?

A.   Can you clear the screen of the --

Q.   Oh, sure.  (Complies.)

A.   Again, so I have moved over to the right.  Here is another character that's been obliterated (indicating).  Another one, another one, and another one (indicating).

Q.   And again, the white scratches, for want of a better word, on top of those, what is that from?

A.   That is a grinding mark.

Q.   Okay.

     MR. SHIPLEY:  Ms. Luce, could we see 23N.

     THE WITNESS:  I will clear the screen.

BY MR. SHIPLEY:

Q.   And what do we see here?

A.   This is the last character in the serial number.

Q.   Okay.  All right.

MR. SHIPLEY:  Ms. Luce, can we see Government Exhibit 23R, please.

BY MR. SHIPLEY:

Q.   Okay.  What are we seeing in these pictures?

A.   I took the firearm apart.  So this is the actual -- in the top photo, it is the receiver minus the stock.

MR. SHIPLEY:  And, Ms. Luce, can you zoom in on that top picture.

BY MR. SHIPLEY:

Q.   And the -- what we see here (indicating), are those the obliterated serial numbers that we were just speaking about?

THE COURT:  Leading.

BY MR. SHIPLEY:

Q.   What do we see there, Mr. Smith?

A.   So let me explain this photograph.  The red thing at the top (indicating), that's the magnet.  Remember I talked briefly about the magnet.  So I took the magnet, and it is creating an electric field basically around where counsel has made the blue mark around the number, okay?  But there is some black -- within this bright silver area, there is some black material.  This is a good example right here (indicating).

There is a -- there is a material called Magnaflux, which is basically mineral oil with fine metal shavings in it.  And basically, at this time, I'm basically dripping it out over top of the number.  And you can see that the metal filings are trying to go to the number, actually outline the number.  You're starting to see the number come through.  Like this was the first number (indicating), that's a 2.  I can see that one.  But I can't see all of them.  And some of them are confusing.

Let me give you an example.  If we looked --

Q.   Would you like me to clear the screen?

A.   Yeah, that would be fine.

When you saw the first image, you probably were thinking, "I can't understand this number.  What is this number?"

Well, the problem is I don't know what the font is.  What font did they use to make the number?

So you could have a number 1 that's just a straight stick, but it could be a number 1 with a base.  Or is that number 1 with a base really a 4 with a base?

So this is where we have to go through our collection and try to understand what was the font.  What does this number -- what is this supposed to look like?  And so that's what we're working through here gradually, trying to work with the Magnaflux to visualize the number to give us some sort of indication of what it might be.

Q.   Did you also use a technique called sandpapering and

polishing at this stage?

A.   Right.   Actually, can we see the picture that was below this one.

Q.   Sure.

MR. SHIPLEY:  Can we zoom -- zoom out.

THE WITNESS:  One of the worst things to have when you are using Magnaflux is grinding.  Because you have all of these peaks and valleys that are grabbing at the magnetic -- grabbing at the filings.  They're impeding their ability to go to the number.  So one of the first things that I did is I actually polished this.  I actually had my Dremel drill, and I'm actually taking a tip, a grinding tip, going into the drill mark to reduce those lines, trying to polish it.  Because it's a smooth surface, and when I put the magnetic field on there, the metal filings are going to want to go to that number.  The more grinding that still remains inhibits the number coming back.

MR. SHIPLEY:  Okay.  Your Honor -- or Ms. Luce, can you pull up Government Exhibit 23T next, please.

BY MR. SHIPLEY:

Q.   Okay.  What was the next stage in the restoration process, Mr. Smith?

A.   I was having some success with the Magnaflux but wasn't getting the complete number.  So I elected to go to the acid restoration where now I'm going to attack the metal harder,

trying to get rid of more of that -- grinding features, and hopefully bring the number back completely.

Q.   And could you describe for the jury how you do that.

A.   I used a series of three chemicals.  They're all acids, but they're in different configurations as far as acidic.  And so I used a swab, a large swab, and I have a electrical current that I apply to the swab.  I dip the swab into the chemical, and then I lay out the portion that I want to restore and just lay the chemical over it, applying electricity.  The electricity makes the acid cook the metal faster, peeling off steel as you go.

Q.   And what do we see in these pictures as it relates to the acid restoration process?

A.   This is more of an illustration of a combination of both the Magnaflux and acid restoration.  So I kept moving back and forth.  I would do Magnaflux.  Go to acid, do a little bit of the acid.  Go back to Magnaflux.  Just back and forth.

Q.   All right.

     MR. SHIPLEY:  Ms. Luce, could we pull up Government Exhibit 23W, please.

BY MR. SHIPLEY:

Q.   All right.  Mr. Smith, what are we seeing here?  And what stage of the process is shown?

A.   We're getting towards the end.  So I'm going back between acid and Magnaflux.  You can see right here (indicating), all

through here, the acid has just eaten away at the steel.  It's now almost a silver color.  But then I'm still throwing Magnaflux on there to try to highlight the number below.

Q.   Remind the jury.  What part of the rifle is this?

A.   This is the receiver.

Q.   And what does the receiver do?

A.   The receiver supports the barrel and the breech.

Q.   Okay.  What does it do with regard to the ammunition in a rifle?

A.   So that's the portion that holds the magazine that allows you to deliver a cartridge into the chamber.

Q.   Okay.

MR. SHIPLEY:  If we could zoom in on the bottom of the two images, Ms. Luce, on 23W.

BY MR. SHIPLEY:

Q.   Tell the jury again, what are we seeing here?

A.   So you can kind of start to make out the number almost in totality.  So we have a 2 here (indicating).  Here is a 3 (indicating).  A 0, a 0 (indicating).  We go from 1, 1, 4, 9 (indicating).

Q.   Okay.  And the character on the far right?

A.   This one right here (indicating)?

Q.   Yes.  Were you ever able to recover that fully?

A.   I was not.

Q.   Okay.  What did you do to try and identify that number more

precisely, or letter?

A.   We get to a point where -- the point of diminishing return -- I'm destroying the firearm completely.  The number is going to be completely gone at some point because I will take enough acid to it.  So at that point -- well, along the way, we're creating a catalog of possible characters that it could be.  I understand the structure of this serial number should be eight numbers, and there should be an alpha at the end.  This should be a letter (indicating).  I know that much.  But if I can't figure that letter out, I will give a series of possible candidates that it can be.  Could it be an A, B, C, and so on?

Q.   Were you ever able to identify what that last letter was?

A.   I was not.

Q.   And were you ever able, then, as a result, to identify a complete serial number for this rifle?

A.   I was unable to get it completely restored.

Q.   Okay. All right.  Let me look at -- let's look at a different part of the rifle that you mentioned earlier.

        MR.  SHIPLEY:  Can we pull up Government Exhibit 230, please.  I will clear the screen.

BY MR.  SHIPLEY:

Q.   What are we looking at here, Mr. Smith?

A.   This is the trigger guard.  So this is where another number, a portion of the serial number is stamped.

Q.   Okay.  And does this reflect that area in its original

condition?

A.   It does.

Q.   Okay.  And how would you describe the condition of that serial number originally when you saw it?

A.   It's in poor condition.  We've got both grinding, drilling, and now we also have corrosion.  There is rust on it as well.

Q.   Do you have an opinion as to whether this serial number has been obliterated?

A.   It has been obliterated.

Q.   Okay.  Did you attempt to restore this portion of the serial number?

A.   I did.

Q.   Okay.  Could you tell the jury how you did that.

A.   Same methodology that I explained earlier.  This is a steel component.  Somebody used the same methodology.  The first thing is we need to clean it up.  We need to get rid of the rust as well as the grinding marks.  So it's going to be a polishing.

Q.   And what -- could you make any observations as to what had been done to obliterate this partial serial number here?  What methods have been used?

A.   There is both grinding and drilling.  So the grinding marks, you can still see here.  This is a drill; this is a drill; and that's a drill (indicating).

Q.   Okay.  And were you able to successfully restore this

partial serial number?

A.   I was.

Q.   Okay.

MR. SHIPLEY:  Ms. Luce, could we bring up Government Exhibit 23B, please.

BY MR. SHIPLEY:

Q.   What do we see here?

A.   All right.  So you can see I have polished it quite a bit, and now we're using Magnaflux to highlight the number.  So we have a 0, 0, 4, 1, 1, 9.

Q.   To be clear, in its original form, was this the entire serial number, or was this a partial serial number?

A.   This was a portion of the serial number.

Q.   Okay.

MR. SHIPLEY:  If we could pull up, Your Honor, Government Exhibit 23H?

BY MR. SHIPLEY:

Q.   What are we seeing here?

A.   This is the number on the bolt carrier that I pointed out to you that was ground off.

Q.   Okay.  And did we see that image at the bottom earlier of Government Exhibit -- I think it was 23F at the start?

A.   We did.

Q.   Okay.  Could you observe what methods were used to obliterate the serial number here?

A.   This one is just a grinding, straight grinding.  There are no drill marks here.

Q.   Okay.  And what processes did you use to try and restore this number?

A.   Same methodology.  Started out with polishing it, Magnaflux, and then acid restoration.

MR. SHIPLEY:  Can we see 23A, Ms. Luce.

BY MR. SHIPLEY:

Q.   Is that the effect of your hard work?

A.   Right.  So here you can see the Magnaflux.  And actually, you can see a good example of how the -- the grinding marks are kind of impeding the Magnaflux.  They actually -- they were creating their own lines, but you could still see the number, the 004119.

Q.   By grinding marks, could you show the jury with your finger what you're referring to.

A.   These, now they appear as deep, dark lines running through the number right here (indicating).

Q.   And that -- would that have been part of the obliteration of that number originally?

A.   Yes.

Q.   Okay.  And, again, to be clear, the serial number that appears in this portion, is this the entire serial number, or would this only ever have been a partial serial number?

A.   It's just a portion.

Q.    Okay.  All right.

Mr. Smith, so to summarize, do you have an opinion as to whether the serial number of this rifle had been obliterated in multiple places?

A.    It was.

Q.    Were you able to ever restore it completely, that serial number?

A.    I was not.

Q.    As a result, were you able to use the limited information you did obtain to trace this rifle at all?

A.    We did.

Q.    Was -- and I think you mentioned in the beginning -- were you able to identify any alterations or obliteration of a manufacturer logo on this rifle?

A.    Back in the beginning when we were showing you the receiver, there is some drill marks on some Chinese characters that have been taken out.

Q.    Okay.  I touched on this a little bit earlier.  During your testing, does this have any effect on the overall -- at the end of that process, what is the effect on the condition of the rifle after your process of testing and restoration?

A.    It's pretty rough on the metal.  These acids, I'm working in a hood that has metal components in it that are rusting just because they're exposed in the air to these chemicals.  So anytime I'm putting the acid onto any metal surface, it causes

it to rust.  What I did at the end to protect that serial number that I partially restored is I sprayed clear lacquer on it to reduce the rusting in that area.  But you can see inside of it -- I have looked at it -- rust has grown inside the chamber where the cartridge would go.

Q.   Okay.  This testing process, would it affect the future functioning of that rifle if you tried to fire it again?

A.   It can.

Q.   Could it have other destructive effects on the rifle?

A.   It can.  So the individual characteristics -- let's say I had something to compare to this later on, bullets and cartridge cases, they're going to be affected because those acids are going to eat away at the surfaces, those toolmarks, that we would use for identification.

Q.   Given that, why do you -- why does the FBI do this serial number restoration process?  Why is that important?

A.   Well, it's done very last.  It's the most destructive thing, so it's done last.  So we collect all the information upfront, but we're still trying to find out lead information.  Can this serial number provide some investigative lead in the case?

          MR. SHIPLEY:  All right.  Your Honor, at this point I would like to retrieve Government Exhibit 1.

          THE COURT:  You may.

          MR. SHIPLEY:  Just one moment, Your Honor.

May I approach, Your Honor?

THE COURT:  Yes.

MR. SHIPLEY:  Okay.  Your Honor, permission to approach the witness with Government Exhibit 2 already in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.  (Tendering item.)

For the record, Mr. Smith, showing you what we've already identified as Government Exhibit Number 2, and that's already in evidence.  Have you seen this item before?

A.  I have.  I wrote the laboratory number right here and my initials (indicating).

Q.  Okay.  And what is that item?

A.  This is a magazine designed for an SKS rifle.

Q.  Were you able to determine how many rounds of ammunition that magazine would hold?

A.  I didn't specifically measure it, but it's consistent with a 30-round magazine.

Q.  And when you say it's consistent with that, is that based on your training and experience?

A.  Yes.

Q.  Okay.  What is the significance -- I'm sorry.  We asked this earlier.  I won't repeat that.

Well, let me do it.  What is the significance of a round being loaded into the chamber from the magazine?

A.   You are preparing the firearm if you want to shoot it.

Q.   Okay.  On this firearm -- on the SKS, does that require some action by the user to make that happen?

A.   Yes, it does.

Q.   Okay.  Does it happen just by attaching the magazine?

THE COURT:  Leading.

BY MR. SHIPLEY:

Q.   How does it happen?

A.   Yeah.  I kind of walked you through it with the rifle.  But if I loaded this with cartridges and I put it inside the magazine well, and the bolt was closed, nothing would happen because there is no way a cartridge can get into the chamber. I have to reciprocate the bolt to strip a cartridge off the top of the magazine, or I reciprocate the bolt first, put the magazine in, let the bolt go, and it takes a cartridge off the magazine.

Q.   Do you have an opinion as to whether intentional thinking is required to fire this gun with that magazine?

A.   Yes.  You have to have some plan on what you're going to do.

Q.   Okay.

MR. SHIPLEY:  Your Honor, permission to retrieve Government Exhibit 2?

THE COURT:  Granted.

MR. SHIPLEY:  Your Honor, permission to approach the

witness with already-in-evidence Government Exhibits 3 and 4?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering items.)

Mr. Smith, would you take a moment and take a look at those items.

A.   (Complies.)

Q.   All right.  Okay.  Did you examine those items at the Quantico laboratory?

A.   Yes.  This is the ammunition that I received in this case.

Q.   Okay.  Can you describe how they are packaged at the moment?

A.   There is a series of cartridges that are individually wrapped.  Each one is in its own little vessel, plastic vessel in this container (indicating).  And there is one cartridge in this container (indicating).

Q.   Okay.  Do you understand what -- do you have an understanding as to why that one cartridge is separate?

A.   I do.

Q.   Okay.  And what is that?

A.   This one, I have been told, was removed from the chamber (indicating).

Q.   Now, by the time you got these items, were they separated already from the magazine?

A.   That is correct.

Q.   Okay.  And were they placed in the bags as we see them now?

A.   These are not the original bags, these exhibit bags, but the inner bag is the bag that I received them in.

Q.   Did you try to determine what type of ammunition this was?

A.   I did.

Q.   Okay.  And what did you determine?

A.   So just like the firearm, the first thing that we do with ammunition is classify it.  So on the base of the cartridge case -- or the headstamp area -- will tell you about the caliber as well as the manufacturer.

Q.   Did you determine both of those things for these items?

A.   I did.

Q.   And what were they?

A.   So these are 7.62x39mm cartridges, and they're manufactured by Tula, Tula Ammo.

Q.   Let me skip ahead.

     MR. SHIPLEY:  Ms. Luce, can you publish Government Exhibit 23Z in evidence, please.

     I'm sorry.  23X, please.  23Z is already in evidence -- but 23X is in evidence.  If you can pull that one up.  Thank you.

BY MR. SHIPLEY:

Q.   What are we seeing in this image, Mr. Smith?

A.   All right.  So at the top you see all the cartridges laid out side by side.  At the bottom is a picture of the headstamp.

So the caliber is at the 6:00 position, and then the manufacturer is at the top.  And there is a manufacturer logo at 9:00.

Q.   Okay.  What is the -- the top part of the ammunition appears to be a different color.  What's that?

A.   Yeah, so this is often -- these are called cartridges.  We talked about self-contained unit of ammunition.  People wrongly call them bullets.  That is not a bullet.

The copper devices at the top are the bullets.  They're inserted into the cartridge case.  The greenish color portion is the cartridge case.

Q.   And did you reach any conclusions about what type of ammunition these were?

A.   So Tula Ammo is a Russian-made ammunition.

Q.   Are you familiar with the term "a full metal jacket"?

A.   Yes.

Q.   Okay.  And what is that, and how did that play into your analysis of this ammunition?

A.   So the cartridges at the top have what are called full metal jacket bullets.  A bullet has a lead core, and then a jacket is wrapped around it.  Full metal jacket means there is no opening at the nose portion.  The base may be open.  If we were to pull the bullet out, we might see the lead exposed at the base portion of it.

Q.   Okay.  What does -- are there different designs for the top

part of ammunition like this?

A.   Sure.  Yes.

Q.   Okay.  What is this designed to do, a full metal jacket?

A.   The primary purpose of a full metal jacket is penetration.

Q.   Does it also have an effect on flight?

A.   It does.  Well, not so much the jacket but the design of the bullet.

So if you look at this bullet here (indicating) -- I'm going to try to crudely draw this for you guys.  The nose portion is very long.  You can see that.  This portion here is long.  That's called the ogive.  It has better aerodynamic characteristics as opposed to a bullet that might be very round, flat.  Okay.  So the bullet's design is to be better flight characteristics as opposed to like a handgun ammunition.

Q.   Okay.  Ever heard of the term "overpenetration" with reference to ammunition?

A.   Yes.

Q.   What does that refer to?

A.   With bullets, they're trying to determine how far it can penetrate, so overpenetration might go beyond the target that you intended.  With this type of bullet is there a greater or lesser risk of overpenetration.

This bullet is moving quite fast, and it will definitely penetrate.  Its purpose is for penetration.

          MR.  SHIPLEY:  Ms. Luce, can we pull up Government

Exhibit 23Y, please.

BY MR. SHIPLEY:

Q.   And what are we seeing here?

A.   This is the other cartridge that was submitted.  And so, again, this is -- at the bottom we can see the headstamp, Tula Ammo, the caliber, 7.62x39mm, and then that's the overall dimensions of the cartridge.

Q.   Okay.  In your inspection, did you form any conclusions about whether this ammunition in Government Exhibit 3 and 4 was consistent with functional ammunition?

A.   It is.

        MR. SHIPLEY:  Permission to approach, Your Honor?

        THE COURT:  Granted.

        MR. SHIPLEY:  Your Honor, request permission to approach the witness with Government Exhibit 45, already in evidence?

        THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

     Have you seen that item before, Mr. Smith?

A.   I have.

Q.   Okay.  And did you conduct an inspection of that item?

A.   I did, yes.

Q.   What is it?  Can you hold that up and describe it for the jury, please.

A.   This is just a cartridge case.  So it's been a fired cartridge, and all that remains now is the cartridge case.

MR. SHIPLEY:  Your Honor, if I could have Ms. Luce go back now to Government Exhibit 23Z.

THE COURT:  Yes, you may.

BY MR. SHIPLEY:

Q.   Is this -- are these photographs that you took of the item that you have now in front of you, Government Exhibit 45?

A.   It is.

Q.   Okay.  And what do we see here?

A.   So we can see the profile image of the cartridge case here (indicating).  This is a little different than the ammunition that we talked about earlier.  The 7.62x39mm is designed for a semiautomatic or automatic weapon.  This is a .45 Colt.  That's the caliber.  This is more of a revolver-type ammunition.  And Hornady is the manufacturer of the cartridge case.

Q.   You mentioned this is a casing.  What part of ammunition is the casing?  And how is that separated from the rest of the ammunition?

A.   So it is a cartridge case.  You remember the self-containing unit of ammunition.  You have to have the cartridge case and a bullet.  The bullet is missing.  And this silver portion down here, that's the primer.  That's that detonation area on the cartridge (indicating).

Q.   Okay.  And how does that casing get separated from the rest

of the ammunition?

A.   Well, in this situation, it appears that this one has been fired.

Q.   And did you make any observations about the configuration or how this firing had happened?

A.   I did.

Q.   What are those?

A.   All right.  Let's focus on that silver portion, the primer.  It stands out as being unusual.  It's not what I would typically see with a firing pin impression.  The firing pin impression is typically a nice smooth -- almost kind of like the drill marks that we were looking at earlier, nice little dimple.

This appears extremely irregular, and it's covering the whole surface.  This does not look like something that was commercially made.  It almost looks like it was handmade.

Q.   Okay.  All right.

MR. SHIPLEY:  And finally, Ms. Luce, could we go back to 23Y.

Mr. Smith, you can put that item down, Government Exhibit 45.

BY MR. SHIPLEY:

Q.   Let me ask you -- remind the jury, Mr. Smith:  How long have you been studying the forensics of firearms?

A.   I have been involved since 1998.

Q.   And have you studied ammunition like this?

A.   I have used this quite often, yes.

Q.   And have you inspected ammunition like this, including in this case?

A.   Yes.

Q.   Okay.  Do you have an opinion as to what ammunition like this would do to a target if it were fired in that direction?

A.   Well, bullets are designed to put holes in things.  So it would put a hole if it hit a target.

        MR. SHIPLEY:  No further questions, Your Honor.  Thank you.

        THE COURT:  Cross-examination.

        MR. ROUTH:  Sure.

                    CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.

A.   How are you doing, sir?

Q.   Great.  Good to see you.

     Just a few questions, if you don't mind.

     So are all AK-47s semiautomatic?

A.   All right.  So an AK-47 is a different type of firearm.  That's not what we're talking about.

Q.   Okay.  Are the AK-47s semiautomatic?

A.   They can be semiautomatic, yes.

Q.   They can be?

A.    Yeah.

Q.    Okay.  So would -- all SKS rifles are semiautomatic?

A.    That's their original design configuration to be semiautomatic.

Q.    Can they break in some fashion so they become no longer semiautomatic?

A.    It's unlikely.  Could it be altered?  Sure.  Someone could alter the firearm to fire full auto, but that's not how they're designed.

Q.    So if I were to have a kid Google a Norinco SKS rifle, on Google it would say that they're all semiautomatic?

A.    The firearm was built to be semiautomatic.

Q.    It's built to be semiautomatic.

     When you tested the rifle in your lab, did you videotape that -- that firing?

A.    No.  We don't videotape.

Q.    You don't videotape?

A.    It's an exam that can be repeated, so there is no reason to videotape it.

Q.    So we just have to take you at your word that it -- that it reloaded itself for the second bullet?

A.    It did.

Q.    So I'm just saying, we have to take your word for it?

A.    That's my opinion.  That's what happened.

Q.    That's what happened.  Okay.  All right.  So -- all right.

What is the range of that bullet in that rifle as far as the distance?

A.   All right.  So that's an expertise outside of my discipline.  I'm not -- I don't do ballistics as far as range. So that's not my expertise.

Q.   Okay.  All right.  You know a semiautomatic, but you don't know its range.

Okay.  All right.  I guess, what, are there 26 letters in the alphabet?  Is that correct?  I mean, so I'm assuming there were 26 names that popped on your list of possible owners of this -- of this rifle?

A.   So I didn't get a successful eTrace out of it because I didn't have the numbers -- I didn't have the last character.

Q.   Well, you should be able to get 26; right?

A.   Right.  But that's not my responsibility.  That would be up to the case agent.

Q.   So that's somebody else?

A.   Correct.

Q.   That would be someone else that we'd talk to?

A.   That is correct.

Q.   Okay.  Okay.  Okay.  Okay.  All right.  So I guess they will be able to give us the physical serial number of the gentleman that they purport sold the gun, I guess?

A.   It's possible.

Q.   It's possible.  Okay.  There was a gun show in early

September on Southern Avenue.  Is it not feasible that a gun might have been traded?

MR. SHIPLEY:  Objection, Your Honor.  Foundation. Scope.

BY MR. ROUTH:

Q.  Well, can people trade guns --

THE COURT:  Hold on one moment.

Sustained on scope grounds because it exceeds the scope of direct examination.

Next question.

MR. ROUTH:  Did my rephrase not correct any problems?

Can guns not be traded?

THE COURT:  Is that your new question, "Can guns not be traded"?

MR. ROUTH:  Yeah, Can guns not be traded?

THE COURT:  Okay.  Answer that question, sir.

THE WITNESS:  Guns are sold personally amongst people.

BY MR. ROUTH:

Q.  So theoretically, an SKS could be traded for another SKS at a gun show?

A.  That's possible.

Q.  Right.  Right.  Right.  Okay.  All right.  So it seems like we didn't arrive at an ultimate solution, so -- but it seems like -- that your science is not -- not 99 percent.  I mean, it's more of a art, it seems to me; is that correct?

A.   Well, I don't know of any science that's 100 percent accurate.

MR. ROUTH:  Uh-huh.  So all right.  All righty.  I think that's all that I have.  Thank you for your time.

THE WITNESS:  Thank you.

MR. ROUTH:  Appreciate your work.

THE COURT:  Any redirect?

MR. SHIPLEY:  Just one question, Your Honor.

REDIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Mr. Smith, just to clarify.  Were you ever able to obtain a full serial number through your restoration process for this rifle?

A.   I wasn't.

MR. SHIPLEY:  Okay.  No further questions, Your Honor.

THE COURT:  Thank you.  Thank you, Mr. Smith.

Please call your next witness.

And, ladies and gentlemen, we will be breaking at around 3:10 for our afternoon break.

MR. DONNELLY:  Yes, Your Honor.  The government calls Stephanie Stewart.

Your Honor, can I approach quickly?  I think there is one item of evidence that was left up there.

THE COURT:  Yes.

MR. DONNELLY:  Thank you, Your Honor.

THE COURT:  Good afternoon, ma'am.  Please walk up here to the witness stand and remain standing briefly to be sworn in.

COURTROOM DEPUTY:  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Sure.  Stephanie Stewart. S-T-E-P-H-A-N-I-E, last name, S-T-E-W-A-R-T.

MR. DONNELLY:  Judge, with your permission.

THE COURT:  Yes.

MR. DONNELLY:  Thank you very much, Your Honor.

STEPHANIE STEWART, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DONNELLY:

Q.   Ms. Stewart, good afternoon.

A.   Good afternoon.

Q.   Ms. Stewart, by whom are you employed?

A.   The Federal Bureau of Investigation.

Q.   And for how long have you been with the FBI?

A.   Approximately 16 years.

Q.    And what do you do for the FBI?

A.    I am a physical scientist, forensic examiner assigned to the Latent Print Operations Unit.

Q.    And have you been assigned to that unit in that position for each of your 16 years with the FBI?

A.    Yes.  All 16 years have been in that unit.

Q.    Can you please give the members of the jury your educational background.

A.    Yes.  I have a bachelor of science in forensic and investigative science from West Virginia University.

Q.    And after your graduation from West Virginia, did you have any other positions before you joined the FBI?

A.    Yes.  Prior to joining the FBI, I was employed as a latent print examiner at the Alexandria Police Department in Alexandria, Virginia.

Q.    And for how long were you with the Alexandria Police Department?

A.    Approximately two years.

Q.    During the time at the Alexandria Police Department, were you trained in the latent fingerprints and friction ridge analysis?

A.    I was.

Q.    And where did you receive that training from?

A.    Mostly on-the-job training while at Alexandria, and I attended a couple of external conferences and classes as well.

Q.   And during your time with the Alexandria Police Department, was it part of your day-to-day duties to examine latent fingerprints and what is known as friction ridge or finger -- typical fingerprints?

A.   Yes.  I was a fingerprint examiner, and I conducted comparisons manually and using an automated database.

Q.   And after you left the Alexandria Police Department and joined the FBI, did you receive additional training from the FBI for that field?

A.   Yes, I did.

Q.   And can you describe for the members of the jury what training you received when you went to the FBI.

A.   I received an approximate 14-month training program.  That included classroom lectures.  I learned how to process evidence and detect latent prints on items of evidence utilizing a variety of different processing techniques.  I learned to conduct comparisons.  I learned how -- we conducted moot courts and oral boards as well, and we did multiple comparison exams and comparison tests to include a comprehensive examination at the end of the training.

Q.   And, ma'am, when you -- in your day-to-day duties with the latent print operations unit, do you examine what are known as latent fingerprints?

A.   Yes, I do.

Q.   And can you just briefly -- we are going to go into this in

a little bit more detail later on, but can you briefly describe for the members of the jury what we mean when we talk about latent fingerprints.

A.   Yes.  On the palms of your hand, there is a specialized skin known as friction ridge skin.  It's -- the raised portions are called ridges, and the areas in between are called furrows.

So these -- in your day-to-day life, these friction ridges become coated in things such as sweat, oil, or grease, and when an item is handled, an impression of those friction ridges can be transferred to that item.

Q.   And, ma'am, do you work on a daily basis to make identifications based upon those -- the friction ridges leaving marks on certain items?

A.   My day-to-day work includes processing items to detect these latent prints.  And then if latent prints are detected, then I would compare those latent prints.

Q.   Do you do any trainings outside the FBI?  Or do you work with other law enforcement agencies in this field?

A.   Yes, I do.

Q.   And can you describe just briefly for the members of the jury what it is that you do in that regard.

A.   I work -- as part of my duties, I also work on the development of postmortem prints or prints to be taken off of deceased individuals.  And I have worked with several different law enforcement agencies in that capacity to help identify

unknown deceased individuals.

Q.   As part of your -- as part of your work with the FBI, do you keep yourself current with the latest trends in the field?

A.   Yes, I do.  In fact, we are required to have eight hours of continuing -- continuing education that is friction-ridge-discipline-specific each year.

Q.   Have you been a member of any professional organizations related to your field?

A.   Yes.  When I worked at the Alexandria Police Department, I was a member of an external professional organization.

Q.   And the work that you do now with the FBI lab, is that work -- does it undergo any analysis from any outside agencies or bodies?

A.   The FBI laboratory is accredited by an external agency.

Q.   And the -- and what is that external agency?

A.   It is -- the abbreviation is ANAB, A-N-A-B.  And it is escaping at this moment what it stands for, but it is an accreditation body that comes in and reviews our work on a regular basis and makes sure on-site that we are following the procedures we have put in place and that they're up to their standards.

Q.   Now, does ANAB come in and evaluate the work that you do as an examiner in the FBI?

A.   ANAB will come in and conduct on-site observations and will ask questions of examiners that are there as well as review all

of our documentation.  They will follow me while I process, and they will shadow me to make sure I'm following my procedures, as well as they'll shadow me while I'm conducting my comparison examinations as well.

Q.    And so, as part of their work in the lab, does ANAB assess the work that you do?

A.    ANAB does assess not just me, but the laboratory as a whole.

Q.    And is the laboratory at the FBI, especially with regard to the latent prints unit that you work in, is it accredited currently by ANAB?

A.    Yes, the laboratory is currently accredited.

Q.    With regard to your personal career with the FBI, have you received any honors or rewards from the FBI?

A.    Yes, I have.  In 2022, I received the FBI director's director award for excellence in the field of outstanding scientific achievement.

Q.    And, ma'am, during the course of your duties with both Alexandria Police Department and with the FBI, have you been previously qualified in various courts as an expert in the field?

A.    Yes, I have.

Q.    And on about how many occasions have you been qualified as an expert?

A.    Approximately 15.

MR. DONNELLY:  Your Honor, at this time, pursuant to Rule 702, I would proffer Ms. Stewart as an expert in the field of latent fingerprints and friction ridge identification.

THE COURT:  Any objection to qualification of the witness as an expert in the stated field, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  The witness is so qualified.

And, ladies and gentlemen, that same expert witness instruction that I read to you earlier continues to apply.

Please resume.

MR. DONNELLY:  Thank you very much, Judge.

BY MR. DONNELLY:

Q.  Ms. Stewart, I'm going to ask you a few more questions to kind of lay out exactly what it is that we're talking about here when we talk about latent fingerprints, if we could.

You began and you described, I think, briefly for the members of the jury what you mean by latent fingerprints and friction ridge.  Can you go into a little bit more detail about what it is that we're talking about here.

A.  Yes.  So we discussed on a latent print being when the transfer of your friction ridges are transferred to an item based on the coating of oils and grease or sweat, whatever might be coating those ridges.  So these latent prints are not readily visible, typically, and need additional processing techniques to render them visible.

Q.   And is that part of your duty, is to render those visible so that you can do further examination on those?

A.   Yes.  There is a variety of processing techniques I utilize when trying to detect latent prints on items of evidence.

Q.   And we will go back into that momentarily.  But in terms of fingerprints themselves and the friction ridge that you described, based on your training and your education and your experience in the field, are they unique?

A.   The friction ridge skin is unique in that it is developed in the uterus.  Around the 17- to 24-week mark, your friction ridge arrangement is actually set, and this is due to the DNA that you inherit from your parents as well as the womb environment and those factors and influences on the friction ridge skin in the womb.

Q.   And are you aware -- and, again, based upon your training and your education and your experience -- of any testing that has been done to examine the uniqueness of fingerprints?

A.   Yes.  To examine the uniqueness of the friction ridge skin, researchers have looked at individuals that are most likely to have the same fingerprints.  They looked at identical twins because identical twins share the same DNA and they share the same womb environment, and multiple studies have been conducted comparing the fingerprints of identical twins and found that no two identical twins had the same fingerprints.

Q.   And are there massive databases that have collected

fingerprints for any variety of reasons from individuals across the country?

A.    Yes.   At the FBI we have a substantially large fingerprint database.

Q.    And are you aware yet of any time when there has been a fingerprint that's been identified as an identical fingerprint from two different people?

A.    I have not been aware of that.

Q.    Are you familiar with the term "persistence"?

A.    I am.

Q.    And what does the term "persistence" mean when we're talking about friction ridge prints?

A.    So the friction ridge arrangement that is set in utero is persistent in that it will persist in that same arrangement throughout life until death and decomposition, barring any permanent scarring.

Q.    And we will talk a little bit more about those patterns in a moment.   But aside from being persistent, I guess my question would be:   Are the latent -- or rather, are the friction ridge -- ridges on each finger, are they unique to each finger, or does -- do you have the same friction ridge marks on each -- on -- are they the same for each finger, or are they different on fingers on the same person?

A.    Each finger will have a different friction ridge arrangement on the end joint or the fingertip of each finger.

Q.   Are the friction ridges that you're looking at and describing here, can there be substantial similarities between different people and the friction ridges that they have on their fingers?

A.   Yes, there can be similarities in friction ridge arrangements between different fingers or different individuals.

Q.   And are there things that set them apart?

A.   Yes, there are.

Q.   And what are the things that set apart those friction ridge details?

A.   So looking at fingerprints, first off, we will look at the overall ridge flow, which the overall ridge flow is the way the ridges flow on the end joint of the finger, and they're usually categorized in three pattern types known as an arch, loop, and a whirl.

After looking at this initial overall ridge flow, we would look at the individual ridge path and how the ridges either divide or end or the combinations of these features.  When two ridges that divide meet, they might make something that looks like an enclosure, for example.  Then we would look at the even finer detail of the ridge itself, so the ridge edges, the ridge shapes, and the pores along that ridge.  Using all of this information is how we conduct our fingerprint comparisons and examinations.

Q.    And when you're doing your comparisons and when you are doing these examinations, do you refer to different levels?

A.    Yes.  So the layout I just provided, the first or the overall ridge flow would be Level 1 detail, and that is the most broad.  The next would be Level 2; that is the individual ridge events.  And Level 3 is that finer detail of the ridge edges and shapes.

Q.    And can you make an identification of a fingerprint using the characteristics that are located in each one of those three levels as you do an examination?

A.    Each time I do an analysis of a fingerprint, or a latent print, I'm looking at all of those levels of detail, and I'm documenting what I find when I'm analyzing that print.  And then I use that information that I have documented when I move on to a comparison.

Q.    And we've talked a little bit -- now, we've talked about friction ridges, but I would like to move into latent fingerprints.  What is the difference between the latent fingerprint and the friction ridges that you have described for us?

A.    So the friction ridges are the actual skin on your hands.  And this friction ridge arrangement, once it's coated and that impression is transferred, that's the latent print, the print that is on the item of evidence or that's been transferred to another -- something off of your hand or off of the friction

ridge skin.

Q.   And we have gotten into this a little bit, but can you describe in a little bit more detail how latent fingerprints are left on an object or on a surface by an individual.

A.   Sure.  So when that item is handled, that impression is then transferred depending on what is coating those friction ridges.  Additionally, other factors that might impact how a latent print is left is the surface of the item that is being handled, how it is being handled, whether the item is curved or textured, whether it's smooth.  Also, depending on how much substance is coating those friction ridges, that can impact how much transfer there is between the friction ridge skin and that item.

Q.   Just to -- to take one step back, you mentioned the different nature of the surfaces that would -- could affect the ability to leave a latent fingerprint.  In general terms or, you know, can you describe what types of surfaces would be better for being able to observe a latent fingerprint that was left by somebody?

A.   Typically in the laboratory, we receive porous items and non-porous items and then a combination known as semiporous. So typically a porous item would count -- would mean a -- like a piece of paper.  When the latent print is left on that piece of paper, the latent print is absorbed into that item; whereas, a nonporous item is something like this table or a glass.  And

when the print is left on that item, it's left on that surface, not absorbed into it.  So by nature, it's a little more fragile.

Q.   And with regard to -- you mentioned some of the different personal characteristics, I think, that would lead to leaving behind a latent fingerprint.  What are some of the different things that would come out of the body that would affect or impact the -- whether or not a latent fingerprint is left behind on a surface?

A.   So latent fingerprints can be left behind in sweat or oils that coat the friction ridges.  It can also be left behind if something on the item, like blood, for example -- a latent print could be left if an item was bloody.  The friction ridges might be left in that.  That might be visible, but it might also require additional processing techniques to render it visible.

Q.   And are latent fingerprints subject to being smudged or destroyed in any way?

A.   Yes.  So those porous items I told you about, the latent print is absorbed in it so it's slightly more protected.  However, if the item is continuously handled, then there might be additional latent prints, and that original latent print may not -- no longer be detected when processed for latent prints.

     Also, if the item is a nonporous item, how it's excessively handled, that print might be more fragile on the surface, so if

it's handled again, that might destroy that latent print.

Q.   Are there environmental factors that could affect that?

A.   Yes.  If it is super-humid or if there is a lot of moisture or if it rains, that could impact the presence of a latent print.

Q.   If an object -- and based upon your training, your education and experience, if an object with a latent fingerprint is left out in a hostile environment, whether it's extremely humid or raining, would -- is it your experience that that would impact the likelihood of being able -- being able to identify a latent fingerprint on an object?

A.   The environmental factors can impact the presence and detection of latent prints.

Q.   As part of your duties with the FBI lab, you mentioned that it's your job to find these latent fingerprints from -- from different items that are submitted.  Is that fair to say?

A.   Correct.  I process items of evidence for the detection of latent prints.

Q.   Is that the most frequent way in which you become engaged in a case?  Or are there other manners in which you are looking for fingerprints or doing fingerprint identifications?

A.   Typically, I receive items of evidence or images of potential latent prints, and then I conduct comparisons on any latent prints that I have detected or deemed suitable to move on to the comparison.

Q.   And then before we get into the nuts and bolts of this case, can you describe the -- for the members of the jury the examination process that you conduct when you get an item of evidence in and where you are looking -- going to look for a latent fingerprint.

A.   Yes.  So depending on the type of item I receive, that will help guide what processing sequence I utilize.  Any item of evidence I receive, I initially will do a visual exam where I simply look at the item of evidence to see if there are any prints that are on that item.  That's followed by a forensic light source exam where I utilize different light sources at different wavelengths to look for any inherent fluorescent prints that might be present.

Then if it is a porous item, I would follow it with a chemical process.  And if it is a nonporous item, I would follow it with a superglue fuming process in which the items are placed in a superglue fuming chamber.  The superglue is heated up and the vapors of the superglue adhere to the moisture left behind in that latent print.

Superglue prints sometimes are visible and sometimes require a light source to visualize, or I can also follow up a superglue fuming process with a forensic dye stain process that would highlight the latent prints that were detected by the superglue fuming.

Q.   With all of this testing that you do, are you always

successful in finding a latent fingerprint on an item of evidence that's been submitted for your examination?

A.   No.

Q.   If you have been successful and you have located a latent fingerprint, what's the next step in your analysis in your examination that you conduct?

A.   If I detect a latent print on an item of evidence, I then will try to preserve that item -- or preserve that latent print, usually through photography.  So either I can take a picture of the latent print myself, or I will send it to our photography unit and they will take a picture of the latent print.

Q.   And what is the purpose of taking that photograph?

A.   So then once I have taken the photograph, I can then visualize that print in our digital image retention system, and then I can conduct my comparisons on screen.

Lifting is another technique for preserving a latent print. So if a latent print is detected specifically -- more specifically in the field, usually lift -- the lifting processes are used, and then you can powder and then use tape to lift that latent print and put it on a card to preserve that latent print.

Q.   In your -- in your lab setting, though, is photography the most commonly used way to preserve any latent print so that they can later be compared?

A.    In-house we almost exclusively do the photography or would scan the item if it was a piece of paper.  And to protect the latent prints, we could scan that item in, which would be similar to photography, and upload it into our digital imaging retention system.

Lifts are usually submitted to us because they're typically taken in the field when the items are -- cannot be submitted to us for processing.

Q.    And do you take the photographs yourself?

A.    Sometimes.

Q.    Do you also have other people that are trained in photography at the FBI lab that can take photographs for you with -- at your direction?

A.    Yes.  We have a photography unit that has photographers that are trained specifically in latent print photography.

Q.    And after there has been this preservation of -- of the latent fingerprint -- you mentioned the term "comparison." What do you mean by a comparison?

A.    So after I have processed an item of evidence and indicated a latent print and had that latent print captured through photography, I can go to that digital imaging retention system and pull up an image of that latent print, and then I can start my comparison examination.

Q.    And what are you comparing that latent fingerprint to? What is the comparison that you're doing?

A.   So first I would start with an analysis of the latent print where I'm looking for all of those levels of details we discussed earlier.  And then I'm indicating that by utilizing Photoshop and indicating each ridge event that I see with a dot to indicate that a ridge event is happening.

I also, through my analysis, will determine if I can see a pattern type, and I will try to determine if the print is from a finger or a palm in the orientation and the upright position of that latent print.

If I have determined there is enough information, I will then move to comparison where I do a side-by-side comparison of the latent print and the known print.  And then I go back and forth using the information I marked in analysis, and I look to see agreement or disagreement in that known print.

Q.   Now, we've talked about latent fingerprints, but you just used the term "known" -- "a known print," rather.  Can you describe for the members of the jury what you mean when you talk about a known print.

A.   A known print or a known fingerprint card is a standard recording starting with the right thumb.  There are 10 blocks, 5 for the right hand, 5 for the left.  And underneath those 10 blocks are an area known as the planes where the -- all the fingers are taken at once, and the two thumbs are taken together.  And then in the top portion of this fingerprint card is typically biographical information.

Q.   And are those known prints kept on file in one of those FBI databases that we talked about before?

A.   Yes.  We have an FBI database that has in excess of 150 million, probably, records of known individuals.

Q.   And that database, does it ingest fingerprints for individuals for a variety of reasons that could be military applications or job applications or license applications?

A.   Yes, that's correct.

Q.   Okay.  Once you begin that process, once you're now looking at the latent print and the known print that you have described, do you go through a process called evaluation at that point?

A.   After I have conducted my comparison and I have looked at all of the information I have marked in my latent print and compared it against that known print, I would move to evaluation where I can come to one of three conclusions: Identification, exclusion, or inconclusive.

Q.   And identification means what?

A.   Identification is when I have come to the conclusion that there is sufficient agreement between the latent print and the known print such that I would not expect to see that latent print -- or that much agreement in a known print from a different source.  Exclusion is where I have sufficient disagreement between the latent print and the known print.  And inconclusive is when there is lacking comparable area between

the latent print and known print and I cannot render a conclusive comparison.  Typically, additional known prints are requested to then conduct that full -- or to then come to that conclusive comparison.

Q.    And after you've reached, for instance, an identification, and you've concluded that you have enough of the points that are in agreement to be able to conclude that there is an identification, is there another step in the FBI lab process that -- that -- that that identification procedure would undergo?

A.    So if I could -- if I could come to an identification decision, the next step would be verification where another examiner is provided my latent print and my known print, and they are to conduct their own analysis, comparison, and evaluation.

Q.    And are they done -- are there blind verifications, or does the person doing the verification have information about the process or about the case itself?

A.    At the FBI, we have both verification where the examiner will know my conclusion and be provided my documentation, and we have blind verification where the examiner is handed an image of the latent print with no markings on it and an image of the full known print, ten-print card, and no markings on it, and they need to conduct their own analysis, comparison, and evaluation.

Q.    And why -- why the difference?  What's the distinction?  When would those two things be used?

A.    At the FBI, all identifications are subjected to the verification process.  And all single conclusions, whether it's a single identification, single exclusion, or single inconclusive are subjected to a blind verification.

MR. DONNELLY:  Your Honor, I know you indicated 3:10 was going to be the break point.  And we are going to move into a new area of the examination, so this might be a good time if it's Your Honor's pleasure.

THE COURT:  All right.  Thank you.

We will take our afternoon break now until 3:25.

All rise for the jury.

And, ma'am, please do not discuss the substance of your testimony during the break.

(The jury exited the courtroom at 3:14 p.m.)

THE COURT:  All right.  Thank you.  We are in recess until 3:25.

(A recess was taken from 3:14 p.m. to 3:29 p.m.)

THE COURT:  Okay.  Everybody is here.  Let's call in the jury, please.  And the witness should reenter the courtroom.

(The jury entered the courtroom at 3:30 p.m.)

THE COURT:  Thank you.  Please be seated.

Agent, you may return to the witness stand, and you

remain under oath.

Please resume.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Ms. Stewart, when we broke, we were talking about -- we were finishing talking about identifications and the identification procedure that is done with the FBI.  Do you recall those questions?

A.   I do.

Q.   And I would like to now shift our attention to this particular case.  Beginning on or about September 15, 2024, did you become aware of a critical incident that had occurred in Miami -- or in -- out of the Miami field office involving an incident in West Palm Beach?

A.   I did.

Q.   And were you -- along with other members of the lab that you work with, were you called in to work on a rotating basis to be able to process some evidence that was going to be given to you by the agents in that case?

A.   Yes.

Q.   And did you do that?

A.   I did.

Q.   And at some point on or about September 16th, did you receive a piece of evidence in the case that was submitted for your examination?

A.    Yes.

Q.    And can you tell the members of the jury what that piece of evidence was that was submitted to you for your -- for this process?

A.    I received a few different items to include -- one was a gun, a rifle with tape on it.

Q.    Okay.  And that's the one we're going to discuss now.  How did you come into possession of that rifle?

A.    I believe the request coordinator hand-to-hand transferred it to me.

Q.    And the request coordinator, do you recall her name or his name?

A.    Erin.  Her name, Erin Farais.

Q.    And do you know whether that firearm that was given to you, had it been somewhere else in the laboratory, to your knowledge --

A.    I believe.

Q.    -- before it came to you?

A.    I believe it had been.

Q.    And do you know what part of the laboratory it had been in before it came to you?

A.    I -- well, it was definitely in the evidence management unit first.  They did the intake of it.  And then I believe it went to the trace evidence unit, but I would have to refer back to the chain of custody to know exactly where

it went throughout the laboratory.

Q.   Okay.  It's not that -- it's not a big issue.

Is it -- is it uncommon for you to receive pieces of evidence that have maybe been forwarded as part of that exam plan to receive them back so that you can conduct some testing before the initial unit that was supposed to do it could conduct their work?

A.   There are some times when we work in cooperation with other units -- "we" being the latent print unit -- and we will do, not our full processing sequence, to preserve their examinations as well.  And they will give it to us first to conduct a brief examination, an initial examination to preserve our exams.  So we work -- this is -- the request coordinator will make this examination plan that works best for each unit and minimizes the opportunity for disruptions in the exam processes of each unit in the laboratory.

Q.   And can you give the members of the jury an example of where you might just be asked to do sort of a more surface-type examination to be able to preserve other types of evidence that might be subject to degradation or corruption in some way?

A.   This is typically most seen in items that have tape overlapping.  So if an item of evidence like a knife, for example, has tape overlapping over and over again.  We might get the item to do an initial exam.  So we wouldn't do our full processing sequence.  And then provide it back to other units

for them to do their examinations.  And then once that tape is removed, we would then receive it again to continue our examinations.

Q.   Are there times in which your unit would do some work but be conscious of the fact that that object had to be passed on to another unit like the DNA Casework Unit?

A.   Yes.  If an item is going to DNA after us -- typically, items would go before -- but if it is going after us, we would make sure to do certain things, or not do certain things to protect the DNA exams.

Q.   And in this particular case, when you got this rifle, do you know whether it had been to the DNA Casework Unit yet?

A.   Based on my notes, I don't think it had.  Because I did the initial examination processing sequence that is to preserve DNA, meaning that I did a visual examination, a laser-only examination, because we are not to do ultraviolet light on it because that can impact the DNA.  And then I did a superglue fuming process, but I did not follow it up with any UV lights. And then I returned that item to -- I believe to Erin.  But I returned it to go to other units for other processing.

Q.   And when you -- when you say Erin, you are talking about Ms. Farais?

A.   Yes.

Q.   Okay.

           MR. DONNELLY:  Your Honor, with your permission, I'm

going to approach the witness -- what's been already admitted into evidence as G1, GX1.

THE COURT:  You may.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   And, ma'am, I'm going to show you that.  It's -- I'm just going to ask you to take a look at it, but would you like to wear gloves --

A.   Yes.

Q.   -- while you just take a look at it?

MR. DONNELLY:  And, Your Honor, with your permission to approach with the set of gloves, and I will come back with the weapon?

THE COURT:  Yes.

MR. DONNELLY:  Thank you, Judge.  (Tendering item.)

THE WITNESS:  Thank you.

BY MR. DONNELLY:

Q.   Ms. Stewart, I'm going to ask you to take a look at what's been marked as GX1 in this case and has been placed in front of you.  Do you recognize that box that's been placed in front of you?

THE WITNESS:  Your Honor, do you mind if I stand up to look at it?

THE COURT:  Yes, you may.

THE WITNESS:  Thank you.

Yes.

BY MR. DONNELLY:

Q.   And can you tell the members of the jury, when you received this firearm, was it in a box like that one?

A.   Yes.

Q.   And does that box actually have markings from the FBI laboratory with a bar code and with the Case Number that's assigned to this case?

A.   Yes.  There are labels with the laboratory number, the item number.  And in the corner, I see my initials where I sealed it up when I returned it to Erin Farais.

Q.   And what is the lab number that was assigned to this case?

A.   It is 2024-02020.

Q.   And what is the lab number for that particular item?

A.   The item number for the -- this item is Item 1.

Q.   Okay.  If I could ask you --

      MR. DONNELLY:   With Your Honor's permission --

BY MR. DONNELLY:

Q.   Could we just open the top of the box?  If you could just look at that without taking it out.

A.   (Complies.)  Okay.

Q.   Ma'am, having had a chance to look at the -- what's contained within the box, is that -- does that appear to be the same firearm that you conducted an analysis of back in September of 2024?

A.   The firearm I did an analysis on was, I believe, a rifle, but it had additional tape and other items attached to it at the time when I received it.

Q.   What were some of the items that you're talking about?

A.   I believe there was the black tape, a scope, and what I believe was a plastic bag taped to the end of the -- I think either the scope or the back end of the gun.

Q.   Okay.

MR. DONNELLY:  All right.  With Your Honor's permission, I'm going to take the firearm back from the stand.

THE COURT:  Okay.

MR. DONNELLY:  Thank you, Judge.

And with Your Honor's permission, could we please publish what has been previously admitted into evidence, photograph GX30?  Your Honor, may I proceed with regard to GX30?

THE COURT:  Yes.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Ms. Stewart, I'm asking you to take a look at the screen that is in front of you there.  Do you -- I'm showing you what's been marked as GX30 in evidence in this case.  Do you recognize what I'm showing you there?

A.   Yes, I do.

Q.   And can you tell the members of the jury what it is that

you see in that photograph.

A.   I see what appears to be a rifle with some tape holding a scope, and the blue and orange areas, the plastic bag or piece of plastic that is attached to it.

Q.   And is that -- does that appear to be the firearm in the same condition in which you received it to do your examination on September 16, 2024?

A.   Yes.  This looks like the gun I processed then.

Q.   And when you say -- you began to process it.  What do you mean -- what did you do to begin the process?

A.   So this item was sent to me with the note to do an initial exam only.  So I did a visual exam, a laser exam, which is that alternate light source I talked about.  And then I did the superglue fuming, and then I -- or I looked at the gun after superglue fuming, visually only, with no UV that would impact the DNA exams.

Q.   And in this particular instance with this weapon, did you locate a latent fingerprint on that firearm?

A.   After the superglue fuming process, I detected a potential latent print on the tape on the firearm.

Q.   And with your finger, if you could -- on the screen in front of you, can you indicate for the members of the jury the area on that scope and the tape that you described, where you located the potential latent print?

A.   I don't recall exactly, but my best guess is somewhere in

this area (indicating).

Q.   Okay.  So in terms of like precision marking on the actual scope itself, you don't recall exactly where on the tape, but that is the general vicinity on the gun in which you -- or the scope that you saw this latent print?

A.   Right.  It was detected where there is an area of overlapping tape like that and near that black funnel shape on the scope.

Q.   And after you located this, after the superglue procedure had been completed, once you located that potential latent fingerprint, what did you do?

A.   I took the item down to our photography unit, and I sat with the photographer while they captured the latent print that I had indicated.

Q.   And when you say you took the item, did you take the full firearm with the scope and all of the other attachments with it to the photography unit?

A.   Yes.  Everything was attached to the gun, so I took the whole entire item in its entirety down to the photography unit in a box similar to the one you had up here earlier.

Q.   And when you went down to the photography unit, what happened at the photography unit?

A.   The photographer took some images of the latent print I had indicated.

Q.   And was that done on his own, or did you help supervise

that photography process in this case?

A.   I had indicated with -- using a Post-It note flag where I would like him to capture or where to take pictures of, and I sat in the room with him while he did it.

MR. DONNELLY:  If we -- we could take down GX30 at this point.  Thank you.

BY MR. DONNELLY:

Q.   Ms. Stewart, after the photograph was taken, did you get access to that photograph to be able to continue your examination?

A.   Yes.  After the photographer took pictures of that item, he uploaded it into our digital image retention system.

Q.   And how long did that take?  Was it a process that took some time, or was it almost immediate?

A.   It's basically immediately.

Q.   And so at that point, were you able to kind of continue your examination process using the photograph that had been obtained by the photographer?

A.   At that point I had completed the initial portion of the processing sequence on that item, and I packaged it and returned it so it could go on to the other units.  And then I took that time to go to my desk and pull up an image from the digital imaging retention system of that latent print that had just been captured.

Q.   And did you begin to examine that latent print?

A.    Yes, I did.  I started what we had discussed earlier, my ACE-V process, the analysis, comparison, evaluation, and verification, if necessary.

Q.    And so ACE-V is sort of the terminology that you use with the A for analysis, C for comparison, E for evaluation, and V for verification?

A.    Yes.

Q.    Okay.  And what stage are we at now that you're describing?

A.    So at this stage, this would be the analysis stage where I first initially brought up the image that was captured.  And I looked at the print in its entirety and I gathered all the information, indicating those ridge events we discussed, determining if there is a pattern-type present, determining the orientation of the print, if it was from a finger, from a palm. And after I did my complete analysis indicating all of these different ridge events and documenting them, I then moved on to the comparison stage.

        MR.  DONNELLY:  And, Your Honor, if we could publish for the witness only what has been marked as GX912A, which is not yet in evidence.

        THE COURT:  Yes, you may.

        MR.  DONNELLY:  Thank you, Your Honor.

BY MR.  DONNELLY:

Q.    Ms. Stewart, I'm showing you -- or what's being shown to you on the screen right now has been marked as GX912A in this

case.  Do you recognize what you're looking at there?

A.   I do.

Q.   Can you describe in general terms -- well, first of all, let me ask you this:  Do you recognize that photograph from your work that day?

A.   Yes.  This is a -- an image from my case file.

Q.   And in terms of what we're -- what is contained within that photograph, does it contain a photographic image of the latent fingerprint that you described as -- that was being brought about before by that superglue process?

A.   Right.  This is a print that I indicated to capture after the superglue fuming process, and then this image also has my markings that demonstrate my ACE process on here.

Q.   Does it fairly and accurately depict the way that this latent fingerprint looked back on September 16th, 2014?

A.   Yes.

MR. DONNELLY:  Your Honor, with your permission, if we could admit into evidence GX912A for publication to the jury?

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  912A is admitted without objection.

(Government Exhibit 912A was received in evidence.)

MR. DONNELLY:  And if we could publish it to the jury, please, Your Honor.

THE COURT:  Granted.

MR. DONNELLY:   Thank you, Your Honor.

BY MR. DONNELLY:

Q.   Now, Ms. Stewart, you briefly described what it is that we're looking at here, but can you please just walk the jurors through what they're looking at here in GX912A?

A.   Sure.   So this area here (indicating) is the latent print that I indicated for the photography unit to capture.

How do I erase?

Q.   I can do it.

A.   Oh.   Oh.

This (indicating) tag here indicates the date, the item number, what the item was, the processing technique, which is superglue fuming (indicating), and the date it was captured on.

And then the pink lines and numbers you see are -- that is my documentation when I was conducting my ACE process.

This horseshoe that you see going like this (indicating) indicates tip up.   So we're actually looking at -- the image we're looking at, the fingerprint is actually upside down. It's kind of like this (indicating), and the horseshoe indicates upright.   So if you flipped it upside down, you would see the fingerprint in its upright position.

Q.   And is this photograph a very close-up view of that area of the firearm that you described before?

A.   Yes.   This fingerprint behind the fingerprint is the overlapping black tape.

Q.   And were you able to take this photograph and conduct your analysis to determine whether there were those levels of identification in detail contained within that latent fingerprint?

A.   Yes, I was.

Q.   And can you tell the members of the jury how you went about that process.

A.   So I did my analysis where I put pink dots and lines to indicate different areas to document the information I saw.  I used the pink line that I traced, that I'm tracing again here (indicating), that was indicating that, yes, I do think this print is suitable to move to the comparison process.  And right here (indicating) -- it's upside down, but it's a P1 to indicate that it is a latent print on Item 1.

        MR. DONNELLY:  And if we could take that down momentarily, Ms. Luce.

BY MR. DONNELLY:

Q.   When you worked through this process and you began to look at that latent fingerprint and identify different points, did you -- I think you mentioned that you use a tool in order to kind of identify those points and record where they are.  Is that correct?

A.   I use -- in Photoshop, I use like a paint tool to mark the different dots, and sometimes I use that same tool to trace the ridge lines or the flow of the ridges.

Q.   And have you reviewed a document that's been marked as GX1143 in this case where you traced the -- your -- basically your identification of these points through that photograph?

A.   I'm not sure what that item is.

Q.   Okay.  Are you familiar with a series of four or five photographs that were put together, along with what's known as a ten-print card?

A.   Yes, a demonstrative aid that was made to demonstrate how the ACE process is conducted.

Q.   And have you had a chance to review that -- that aid?

A.   I did.

        MR. DONNELLY:  And, Your Honor, with Your Honor's permission, pursuant to Rule 107, we would ask that GX1143 be shown to the witness so she can identify it and then later just to the jury for -- for the aid purposes and not to be admitted into evidence.

        THE COURT:  Yes.  You may proceed.

        MR. DONNELLY:  Thank you very much, Judge.

        Just first for the witness, if we could, Ms. Luce, and Madam Deputy, GX1143.

BY MR. DONNELLY:

Q.   And I'm showing you what's been marked now as GX1143.  Do you see what's being placed on the screen in front of you?

A.   Yes, I do.

Q.   Is that the aid document that you used in conjunction with

this case?

A.   It is.

Q.   Okay.

MR. DONNELLY:  And, Your Honor, if we could publish page 1 of that to the jury.

THE COURT:  Granted.

Ladies and gentlemen, as with all illustrative aids, sometimes we call them "demonstrative aids," they're there to help you comprehend evidence, but they're not itself evidence. So this exhibit won't be coming in like the various other exhibits that you have seen coming into evidence as formal exhibits.

So, with that, let's publish this first page.

BY MR. DONNELLY:

Q.   And, ma'am, can you describe for the members of the jury what's depicted on the first page of 1143 here.

A.   So the image on the left that says "reverse color," that is just a close-up of that same latent print we saw in the previous -- on the previous item of evidence that has none of my markings on it, minus this green line, which I will explain in a moment.

The image on the right is the original color, so that is the capture after the superglue fuming process, that is what the latent print looked like.  That is what I indicated to the photography unit what I wanted them to capture.

And then I inverted the image; that's the reverse color.

Now, this green line denotes a change in the color where the ridges in the original color image above the green line, the ridges appear dark and the furrows appear white. And below the line, the ridges appear white and the furrows appear dark.

Now, this phenomenon does happen. It's not an uncommon situation that we encounter in analysis. And during my analysis of this latent print, I noted that this print was experiencing reverse color. And I have both images next to each other so you can see what they look like when the ridges are in the correct color, when the ridges look black, and when the furrows look black.

MR. DONNELLY: And, Ms. Luce, if we could go to page 2 of the aid, 1143.

BY MR. DONNELLY:

Q. Ms. Stewart, can you describe for the members of the jury what it is that is depicted on page 2 of the aid here and what we're looking at.

A. So on the left you can see little blue dots throughout the entirety of the print. Those are the different ridge events that I located during my analysis. And this is an example of how I would mark those different ridge events during my analysis.

I also marked some of the same ones in the right image so you could see how the reverse color impacts the ridge

appearance. And even though the color is inverted, there is still a ridge event happening there.

And when I'm looking at these ridge events, I'm looking not only at their ridge event type, but their location in the print, their direction, and the spatial relation to the other points that I have marked within the print.

Q. And, ma'am, based upon what we're looking at here, in your analysis procedure, did you think that there was enough of these points to be able to pursue a possible identification for this latent fingerprint?

A. After I completed my analysis, I determined that this print was suitable to move on to comparison.

Q. And when you say that you're moving on to comparison, what did you compare it to initially?

A. In this specific case, I was provided an individual's name and biographical information, and did a search in our database and found a record, and I used that record to conduct a side-by-side comparison.

Q. And if we could proceed to page 3.

Is this the ten-print -- or this is the card that you referred to before that you pulled from the -- from the database?

A. Yes. This is the ten-print card I located using the biographical information I was provided. And there is a blue box around the left middle finger because that is the finger we

will be using in the next slide.

Q.    And does this card actually reflect both -- the name Ryan Routh?

A.    It is on the card to the right.

Q.    And does it have the date down the bottom there of 9/16/2024?

A.    That is when I retrieved this known card.

Q.    Okay.  And this known card was already in -- you said the database; correct?

A.    Yes.

Q.    At some point -- and we will discuss this momentarily -- did you get additional fingerprints in this case for comparison purposes?

A.    In the next submission, I was submitted known -- known prints that were determined -- deemed to be Item 226.

Q.    And those known prints, were they taken by an agent down in Florida?

A.    I'm not exactly sure, but I believe it appears on the back of the known print.

Q.    Okay.  And did you compare those, quote -- those known prints with the prints that are shown here to confirm that the -- the person, Ryan Routh, in this particular page, was the same person who provided those known prints that came later?

A.    Whenever known prints are submitted to the laboratory, we are required to check our system to see if there is a known

print already in the system.  And then conduct what's known as a "ten-print to ten-print" comparison, meaning, I take the ten-print that we had in our database and the ten-print that was submitted, and compare each of the fingers in the different blocks to verify that it is one and the same person.

Q.   Okay.  And we will come back to that in just a moment.  But if I could -- if we could go to page 4 of your demonstrative aid.  Can you tell the members of the jury what we're looking at here in page -- I will clear that off --

A.   Thank you.

Q.   -- in page 4 of your aid.

A.   Yes.  This slide is going to help us demonstrate the comparison process and how I go about it.  So starting in the latent print, which is the print on the left, I'm going to start in this area (indicating).  There are two blue dots; those are both ending ridges.  They're ridge events known as ending ridges in that they flow and then come to a end, and the ridges around them kind of follow along and close that gap.

So there are two of them here, pointing to the left.

Q.   And if I could just stop you for a second.  You've made an arrow pointing in the left-hand portion of this -- in the left photograph here, pointing up at the two dots that are closest to the center of the page; is that right?

A.   That is correct.

Q.   Okay.  If you could continue.

A.   Okay.  And then I would look in the known print to see if in the same area that -- if the same ridge events were present, which I have indicated now with this arrow pointing here (indicating).  Using this, these two ending ridges as my anchor point, we can then work our way through the print.

So back to the latent print.  If we follow the ending ridge, the ridge portion of it back to the right, this way, you see that between them is another ending ridge that I have marked with a blue dot (indicating).  If we move up one purple line, that's a ridge tracing.  There is another blue-dot-ending ridge right here.  And then moving up another purple line, which is representative of another continuous ridge, there is an ending ridge down here.  And if you follow that ending ridge up and to the right, and you continue to -- whoops -- continue to follow it up and around, you see that it actually comes to an end as well, and the ridges on either side of it fill in and close that gap.

Can you erase that last line I did, please.

Q.   I probably would need to erase the whole thing.

A.   That's okay.

Q.   Okay.  It's now been cleared.  But is it fair to say that you made markings that kind of followed the purple lines in the left-hand portion of that page?

A.   Yes.  To follow along to give you an idea of what I am doing when I'm conducting my comparison.

Q.   And did they correspond to the blue dots as well that are located on the left-hand portion of that page?

A.   Yes.  If you look on the -- the known print, you will see the blue dots and the purple lines, and you can go back and forth and see how they're the same ridge event in the same location, and the same spatial relationship within those other blue dots that I have indicated in this print.

Q.   Can you mark those for the jury with that line that you were able to draw in the different points.

A.   Sure.  So our anchor point was here (indicating) on the known.  And we have our two blue dot representing ending ridges.  And we flow to the right, follow that -- those purple lines to the right (indicating), and we have our ending ridge here.  That splits -- that blue dot, that splits the two initial blue dot ending ridges.  We move up this one ridge to the next blue dot, another ending ridge.  This one is pointing down and to the left (indicating).  We move up one more purple line to represent that continuous ridge to our ending ridge pointing down and to the left, and this is that ending ridge that we can continue up and around.  And we see that it ends, and the two ridges on either side of it continue and start to close the gap where that ending ridge ended.

There is also the one short ridge which I did not discuss in the latent print.  So I will highlight that now (indicating).  That is a short ridge, meaning it's like a

combination of two ending ridges. They end on either side. And it's between those two continuous ridges on either side. And if we look back in our known print, we see that same combination of ridge events is located with the two continuous ridges on either side of it.

Q. And did that complete your examination at this point?

A. This is just a small sample to help demonstrate how I conduct a comparison. I would have continued the same process through all of those ridge events I had marked on a previous slide. I would have continued to conduct -- looking back and forth between the latent and the known print, looking to see if the ridge events were in agreement in their type, location, direction, and spatial relationship.

Q. Okay. And if we can proceed to the last page of this demonstrative aid, 1146.

THE COURT: I thought this was 1143.

MR. DONNELLY: I'm sorry, Your Honor. 1143. I apologize. Sorry. I apologize. I think I skipped a page there, but I apologize.

BY MR. DONNELLY:

Q. You mentioned that you would have continued this process throughout. And so you would have looked at both the latent print and those points that are popping up on the latent print as well as the -- the known print; is that right?

A. Yeah. And from what I recall, I don't think we skipped a

page.  I think this is the next page.  This one demonstrates the agreement between the latent print and the known print with the -- represented by the blue dots.  Those indicate ridge events that I found in agreement between the latent print and the known print.

This is just a representative sample to give the jury an idea of what I look for and what I find when I'm conducting my ACE process.

Q.   And you're correct.  I got -- I got thrown off by the similar marking on the bottom of the page and the right.

Can you again walk us through what you're doing here and describe for us what you see in these side-by-side photographs.

A.   This is just a representation of the conclusion of my comparison where I'm demonstrating the previous slide showing the back and forth.  This is what I found as a result of all of that back and forth.  This is to represent some of the agreement I found between the latent print and the known print.

Q.   And it's a little difficult to see the blue on either side.  Can you just, like, tip each one of those blue dots on both sides to show those areas of agreement that you've described.

A.   Yes.  I think the known is a little harder to see.  So I will highlight that in that -- there is the dots; there is a few here; there's some here (indicating).  There's our short ridge that we discussed.  Here is some of the ones from our tracing.  And then we have some down and to the left over here

(indicating).  My dots are just kind of to give -- to draw your eye to roughly the area that that blue dot is indicated in.

Q.   And do those blue dots that you've indicated on the right side of the page agree with the dots that you have -- that you made on the left side of the page which is the latent fingerprint from GX1?

A.   Yes.  All of the dots indicated on this demonstrative aid are in agreement between the latent print and the known print.

Q.   As you went through the entirety of this process, did you find any areas of disagreement that would have -- that would have been of any note?

A.   I did not.

Q.   Did you find any disagreement whatsoever?

A.   I did not.

Q.   Based upon your analysis where you went through point by point as you have described, were you able to reach any conclusions in this case?

A.   Yes, I was.

Q.   And what was the conclusion that you reached in this case?

A.   I -- after conducting my analysis and comparison, I moved to the evaluation phase where I determined that the latent print detected on the tape on Item 1 was identified to the known print recorded in the left middle finger block of that known card we saw earlier bearing the name "Ryan Routh."

Q.   Okay.  And I'm going to show you another item of evidence

here.

MR. DONNELLY:  If we could take down the 1143, please.

BY MR. DONNELLY:

Q.   I think you mentioned that you had done most of this work on September 16th; is that correct?

A.   Yes.

Q.   Was evidence continuing to come in on a rolling basis in this case over the course of the next several days?

A.   It was.  There -- I received a few different submissions in this case that had varying amounts of evidence to process.

Q.   And the -- the known print that you used initially to make that identification, where it had the card with the prints on it, where you had -- you had made the square around that middle finger, did you have a chance to look and compare that card that had the little square around it that the jury just looked at with another ten-print card that has -- that was produced in this investigation?

A.   Yes, I was.

MR. DONNELLY:  And with Your Honor's permission, if I could approach with an item that has been marked for identification but is not yet in evidence, I believe.

THE COURT:  Yes, you may.

MR. DONNELLY:  Actually, Your Honor, I stand corrected. I believe that it's 948D.  And I believe it has been actually admitted into evidence through a previous witness.

THE COURT:  948D?

MR. DONNELLY:  Yes, Your Honor.

THE COURT:  Yes, it has been admitted already.

MR. DONNELLY:  Thank you, Judge.  I apologize.

BY MR. DONNELLY:

Q.  Have you had a chance to look at 948D?

A.  Yes, I have.

Q.  And do you recognize what that is?

A.  I do.

Q.  Can you tell the members of the jury what it is that you're looking at.

A.  Yes.  This is a known card, like we discussed earlier, with the 10 blocks and the biographical information up top and the simultaneous impressions below.  And it is bearing the name "Ryan Wesley Routh."

Q.  And does it have a date at -- on which those prints were obtained by the FBI?

A.  I don't see a date.  I have my indication that it -- the item number and the laboratory number and my initials, but I don't see a date stating when these prints were taken.

Q.  Okay.  I'm going to show you an item --

MR. DONNELLY:  Your Honor, with your permission.  I'm sorry.

BY MR. DONNELLY:

Q.  If I could ask you to take a look at what I'm presenting

you there.  Is -- is that an evidence envelope?

A.   Yes, this is the envelope that I received the known prints in.

Q.   And on the outside of that, is there a marking with regard to the case number from the Florida agents?

A.   Yes.  There is an evidence property tag on here.

Q.   And does it reflect the date on which that evidence was obtained from Mr. Routh?

A.   The date on the evidence property tag is 9/19/24.

Q.   And does it have the name of an agent in the -- in Florida that was the person who obtained those prints?

A.   It has a collected-by name and an observed-by name.

Q.   And the collected-by name, is that Kristin Bailey?

A.   It is.

Q.   Okay.  Did you take the ten-print card, 948D, and compare that with the card that we have already discussed that was in the demonstrative that had the name Ryan Routh on it, to ensure that those prints were from the same person?

A.   Yes.  When I received this known print, I scanned it into our digital imaging retention system and then did an on-screen ten-print to ten-print comparison of Item 226, as we have designated it in the laboratory, to the known print I used in the previous demonstration.

Q.   And did you reach any conclusions based upon that examination?

A.   Yes.  I identified the ten-print to the other ten-print.

Q.   Okay.  So they're from the same person?

A.   Yes.

Q.   After you made the identification of that print that is preserved in -- from GX1, that is preserved in 912A, did you submit that for the final stages of the process at the FBI lab?

A.   Yes.  This print was a single conclusion, a single identification decision, and it was -- I submitted that for a blind verification.

Q.   And did you have to do any follow-up after the blind verification?

A.   I did not.

Q.   Okay.

MR. DONNELLY:  Your Honor, I have no further questions for the witness.  I can take the items of evidence back, if it's -- with your permission.

THE COURT:  Yes.  Please retrieve the evidence.

MR. DONNELLY:  (Complies.)

THE COURT:  All right.  Thank you.

MR. DONNELLY:  Thank you, Judge.

THE COURT:  Mr. Routh, cross-examination.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.

A.   Hello.

Q.    Just a couple of quick questions.

When you were working with the scope, was it fixed to the rifle fairly securely?

A.    Yes, it was.

Q.    So do you know who removed the scope?

A.    I -- when I had it, it -- the scope was fixed to the gun. And then it went to other units.  And when it came back to my unit, the rifle and the other parts of that -- that were associated with it had been separated.

Q.    Okay.  So someone else?

A.    Yes.

Q.    But you're sure that it was -- it was tied to the gun, it wasn't moving about?

A.    When I had it, the whole item stayed together through all of my processing.

MR. ROUTH:  All right.  Thank you very much.

THE WITNESS:  You are welcome.

THE COURT:  Redirect?

MR. DONNELLY:  No, Your Honor.  Thank you.

THE COURT:  Thank you, ma'am.  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  All right.  Please call your next witness.

MR. DONNELLY:  Your Honor, the government calls Curtis Gaul.

THE COURT:  Good afternoon, sir.  Please stay standing

to be sworn in.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Curtis Gaul, C-U-R-T-I-S, G-A-U-L.

THE COURT:  You may begin.

MR. DONNELLY:  Thank you, Judge.

CURTIS GAUL,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DONNELLY:

Q.   Mr. Gaul, good afternoon.

A.   Good afternoon.

Q.   Mr. Gaul, by whom are you employed?

A.   The FBI laboratory.

Q.   And what do you do for the FBI laboratory?

A.   I am a biologist for the DNA Casework Unit.

Q.   And how long have you been working for the DNA Casework Unit at the FBI lab?

A.   Approximately 3 1/2 years, since 2022.

Q.   And before that, where did you work prior to coming to the FBI?

A.   I worked in a vaccine production lab.

Q.   And prior to that, did you get a college education?

A.   Yes, I did.

Q.   And where did you get that education from?

A.   I received a bachelor of science in biology from Minnesota State University, Mankato.

Q.   And what year did you graduate?

A.   2018.

Q.   In the -- in the FBI DNA lab, what is your exact job in terms of what -- what do you do for the DNA Casework Unit?

A.   I perform collection, serology, and extraction.

Q.   And can you just -- when -- and you're talking about serology.  Can you just tell us a little bit about what you mean by serology?

A.   The testing of bodily fluids; namely, in this case, the potential presence of blood.

Q.   And when you're talking about collection and extraction, what are you talking about when you talk about collection and extraction?

A.   I collect samples to potentially get DNA from items of evidence, and the extraction is to extract potential DNA from those samples.

Q.   And in terms of the DNA lab itself, there are other

individuals that work within the DNA lab that have different jobs; is that fair to say?

A.   Yes.

Q.   And your job is kind of focused on the collection and the extraction as well as the serology?

A.   Yes.

Q.   Have you received training from the FBI in connection with your job duties?

A.   Yes.

Q.   And what kind of training did you receive since you've become a member of the FBI DNA Casework Unit?

A.   For each role that I perform, I receive a training in a training program, including observation, practical training, qualification, and proficiency testing regularly.

Q.   Okay.  And have you -- when you say that you've been observed, is that by senior members of the staff?

A.   During training, I began with observation of more senior members of the staff, and then they observed me, and I performed testing to qualify.

Q.   Do you go through any formal classroom training while you're there?

A.   An amount, yes.

Q.   Okay.  How -- about how long, if you could?

A.   It depends on the specific process.  Approximately a month or two.

Q.   And when you are doing your day-to-day operations at the lab, are they reviewed by other members of the lab, peer-review, for instance?  Do they look at the work that you've done to assess the quality of the work that you've done?

A.   My examiner will look over the case notes that I produce.

Q.   Are you familiar with what we -- with the term "known sample"?

A.   Yes.

Q.   And what -- when we talk about a known sample, what are we talking about when we say "known sample"?

A.   A known sample is a sample intended to be from one person for a comparison.

Q.   And are you familiar with the term "questioned samples"?

A.   Yes.

Q.   And what is it -- when you use the term "questioned samples," what do you mean by "questioned samples"?

A.   That would be all other samples that are not known samples.

Q.   And when you're talking about the questioned samples, do you receive items of evidence from law enforcement agencies during the course of their investigations?

A.   Yes.

Q.   And do they ask the lab to do examinations of those for potential DNA that might be found on those items?

A.   Yes.

Q.   And are they -- do they generally fall into the category of

questioned samples or questioned items?

A.   Yes.

Q.   Can you describe a little bit -- you mentioned that you do largely collection and extraction as well as your serology. Can you describe for the members of the jury what it is that happens, broadly speaking, during the course of the collection process at the DNA lab.

A.   During the collection process, I begin by donning personal protective equipment, including my lab coat, a mask, and gloves.  I will clean my workstation by application of a bleach solution to my air hood, my workbench, and my instruments.  The instruments receive a wipe down with an alcohol solution, and then the hood receives an ultraviolet exposure of a minimum of five minutes.

Q.   And what's the purpose in all of that?

A.   That is to sanitize the station and prevent contamination.

Q.   And contamination.  What do you mean by "contamination"?

A.   So that I am not moving DNA from another item of evidence or another case into my own samples.

Q.   And when you talk about wearing, you know, coat and gloves and so forth, is that also to avoid contamination?

A.   It protects me as well as the evidence from contamination by me.

Q.   And I think you also mentioned that you UV the hood that you work on -- or under.  What's the purpose of the UV for

five minutes on the hood?

A.   The ultraviolet light is damaging to DNA and prevents contamination.

Q.   Do you do collections and extractions at the same time, or are they done separately?

A.   They are done separately.

Q.   And what's the purpose in doing the collections and the extractions separately?

A.   Prevent contamination.

Q.   When you are presented with an item -- and we're talking just generally now, and we will move into specifics later -- but, generally speaking, are you familiar with the selection of areas that might be able to produce DNA samples that would be useful for an investigation?

A.   Yes.  For routines items, we have an item processing guide that will guide the typical areas to collect.

Q.   And do you refer to that processing guide for items such as firearms?

A.   Yes.

Q.   And are you -- items of clothing, for instance, would they also be common items that would be covered by that guide?

A.   Yes.

Q.   Bags.  Would that be another common item?

A.   Yes.

Q.   Zip ties.  Are they common or uncommon?

A.   Common.

Q.   And when you have areas that you're not certain about that are not covered by the guide, what do you do?

A.   I defer to my examiner.

Q.   And did you work with a particular examiner in this case that we've come here for?

A.   Yes.

Q.   And what was her name?

A.   Kara Gregor.

Q.   And did you have to consult with Ms. Gregor at some points about the selection of different areas, or other examiners, about selection of areas to be tested for some of the items that were presented to you in this case?

A.   Yes.

Q.   After you have gone through the process of, like, selecting an area to be examined, can you tell the members of the jury what it is that you do to actually get the collection done.

A.   To collect from an item, I will moisten a sterile swab individually wrapped with reagent grade water.  I will apply the swab to the area of interest.  After swabbing the area of interest, I will cut the swab and place it into a barcoded tube.  Then I will write the sample information on that tube as well.  The barcode is scanned to track in our computer system.

Q.   And you mentioned a swab.  A couple of questions.  First of all, the swab that you're using to do the collection process,

is that a swab that's kept in sort of a pristine state?

A.   Yes.

Q.   Is it sealed?

A.   Yes.

Q.   If you got a swab that was not sealed, would you use it?

A.   No.

Q.   And, again, is that to prevent any contamination?

A.   Yes.

Q.   Okay.  And then when it is -- when you've completed the collection and you snip the swab, is it put into another item that is then used to make sure that there is no further contamination as it is sent out for other examination?

A.   Yes.  The labeled and barcoded tube.

Q.   And does this process change from whether it is a known sample as opposed to an unknown sample?

A.   Not depending on whether it is known or unknown.

Q.   Okay.  Are you familiar with what a buccal swab is?

A.   Yes.

Q.   And what is a buccal swab?

A.   It is a swab of the inside of a cheek to provide a known.

Q.   Are you familiar with the method that is used to collect DNA from a known sample from a buccal swab?

A.   Yes.

Q.   And have you done that regularly over the course of your years with the FBI?

A.   Yes.

Q.   Have you also done the other collections that we discussed on questioned items on a daily basis with the FBI?

A.   Yes.

Q.   The buccal swab, the known sample, once that is collected, is that processed in the same manner as those unknown -- or those questioned samples?

A.   If the item of evidence is itself a swab, I will cut that swab rather than using an additional swab.

Q.   So you would just simply snip that swab and then insert that into the protective device to make sure that there is no contamination of that swab?

A.   Correct.

Q.   Once the collection process is complete, I believe that you mentioned that you're also a person that is charged with extracting DNA.  Can you describe for the members of the jury what extraction is.

A.   The process of extraction is to lyse open cells and remove potential DNA into a solution.

Q.   And do you, again, do that on a daily basis as part of your job functions with the FBI?

A.   Yes.

Q.   And are there computers and machines that are involved with that particular process of extraction?

A.   Yes.

Q.   Are you familiar with the use of those computers and machines to do the -- to do the extraction process?

A.   Yes.

Q.   And at the conclusion of the extraction process, after those items have been placed into those various machines and computers, do you do anything to check to make sure that the process -- at least appeared to work as it should have?

A.   Yes.  Following the samples coming off of the machine at the end of extraction, I perform a visual examination of the tubes to make sure that the final tubes have an appropriate volume, which indicates that the process worked correctly.

Q.   And a volume.  What are you talking about when you say "volume."  A volume of what?

A.   The volume of liquid at the end is approximately 50 microliters.

Q.   And if you see something that's off -- and if it's either too much or too little, what do you do?

A.   I would consult my lead and my examiner.

Q.   Once the extraction of the DNA is complete, does that complete your role in the process of examination of an item for a DNA?

A.   Yes.

Q.   What do you do with the items from which -- or from the extractions that you've gotten as part of this process?  What do you do with those things?

A.   Those samples are either given hand-to-hand directly to another biologist for downstream processing or placed in a refrigerator for later downstream processing.

Q.   And are there other steps that are taken in the process known as amplification and quantification?

A.   Yes.

Q.   Are you familiar, at least generally, even though you don't -- that's not your job title, but are -- you're familiar with the methods that are used to amplify and quantify DNA samples?

A.   I am generally familiar, but not specifically.

Q.   Are the forensic examiners in your office familiar with that?

A.   Yes.

Q.   And are there profiles generated from those extracted samples on -- on some occasions that are used for further comparison purposes?

A.   Yes.

Q.   Okay.  I'm going to direct your attention, actually, to this particular case now.

Were you working about -- on or about September 16th in 2024?

A.   Yes.

Q.   And were you working along with other members of the DNA Casework Unit on a rotating basis on a 24/7 basis?

A.    Yes.

Q.    And at some point during the course of this case, did you become aware that there had been a lab number that was assigned to this matter?

A.    Yes.

Q.    And do you recall what that lab number was off the top of your head?

A.    2024-02020.

Q.    And were you asked to take part in the examination of certain items that came into FBI lab custody as part of this investigation?

A.    Yes.

Q.    Did they include some questioned samples or questioned items?

A.    Yes.

Q.    And did they also include what were perceived to be known samples?

A.    Yes.

Q.    Okay.  Is it fair to say that in the course of your duties in this particular case, that there were a fairly large number of items that had been submitted for examination?

A.    Yes.

Q.    And did you take part in the collection and extraction for all of those items or a certain number of those items?

A.    Only certain items.

Q.   And included in that list of items, were you involved in the collection and extraction from a rifle?

A.   Yes.

Q.   Okay.

MR. DONNELLY:   Your Honor, with your permission, if I could approach the witness with GX1?

THE COURT:   You may.

MR. DONNELLY:   Thank you, Your Honor.

(Tendering item.)

With Your Honor's permission, if Mr. Gaul -- if I could ask him to actually just open the box and take a look -- examine the outside of the box first, and then examine the inside of the box as well?

THE COURT:   Yes, you may do so, sir.

BY MR. DONNELLY:

Q.   Mr. Gaul, if you would just look at the outside of the box first and then the interior of the box.

A.   (Complies.)

Q.   You've had a chance to look at it?  The box that you've just looked at, are you familiar with that box?

A.   Yes.

Q.   And can you tell the members of the jury, have you seen that box before?

A.   Yes.

Q.   And where did you see that box before?

A.   During my exams in this case.

Q.   And is it marked with the lab number that you referred to before?

A.   Yes.

Q.   And does it have any -- is there anywhere on that box that it has your handwriting or some initials from you?

A.   Yes.  My initials are by the laboratory number sticker.

Q.   And the interior of the box, have you had a chance to look at that?

A.   Yes.

Q.   And can you tell the members what is contained inside the box itself?

A.   One black rifle.

Q.   The black rifle that you just described, did you have a chance to do both the collection and extraction process with regard to that rifle?

A.   Yes.

MR.  DONNELLY:   Your Honor, if I could take the weapon back at this point?

THE COURT:  Yes.

MR.  DONNELLY:   Thank you, Judge.

THE COURT:  How much longer on this witness direct?

MR.  DONNELLY:   Maybe 10 minutes, Your Honor.

THE COURT:  Okay.  Thank you.

MR.  DONNELLY:   Although I confess my time estimations

are sometimes off, but I think that's where we are.

And if I could ask, Ms. Luce, if you could please for the witness and for the jury, GX30, which has already been marked into evidence.

THE COURT:  Yes, please publish.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Mr. Gaul, I'm asking you to take a look at the screen in front of you at a photograph that's been marked in this case as GX30 in evidence.  Do you recognize what you're looking at there?

A.   Yes.

Q.   And can you tell the members of the jury what you see.

A.   That is the rifle that is Item 1 with accessories.

Q.   Okay.  The item that you just looked at is different from --

THE COURT:  One moment.  Let's publish this to the juror monitors.

A JUROR:  It's blinking.  It's flashing, blinking.

THE COURT:  Any luck now, jurors?

JURORS:  (Head nods.)

THE COURT:  Okay.

BY MR. DONNELLY:

Q.   Does this -- the rifle that you see in GX30, it's in a little bit different condition than the rifle that you just

looked at; correct?

A.   Yes.

Q.   The rifle you just looked at doesn't have the scope or some of the other items that are depicted in GX30?

A.   Correct.

Q.   But, however, the rifle itself, when you first examined it on -- in September 2024, did it have the scope attached to it?

A.   It did not.

Q.   It did not.

The scope had already been removed?

A.   Yes.

Q.   Okay.  Do you see -- you mentioned before that you do a swabbing with a -- basically a Q-tip; is that right?

A.   Yes.

Q.   And the reagent that you described before, did you do that process on this weapon?

A.   Yes.

Q.   And did you swab any particular areas of the firearm to attempt to obtain DNA as part of the collection process?

A.   Yes.

Q.   And can you tell the members of the jury where it is that you swabbed.  And you can use your finger on the screen in front of you to indicate the areas of the weapon that you swabbed for the DNA collection process.

A.   The swabbing of the weapon was at the textured areas of the

grip and the foregrip (indicating).

Q.   And so if you're looking at the rifle, as you described it, you made sort of a broad circle around two different areas, and you mentioned that there are textured areas.  In the photograph, is -- if you look carefully at it, can you see, are there darker areas of those -- of parts of the rifle that appear in that picture?

A.   Yes.

Q.   Are those the textured areas that you're referring to?

A.   Yes.

Q.   So the swabbing actually went into a much smaller area.  It was the -- the smaller darkened areas that run along the stock of the weapon, and then behind the trigger guard, and then down towards the muzzle; is that correct?

THE COURT:  Rephrase in a more direct, simple way.

MR. DONNELLY:  Yes, Your Honor.

BY MR. DONNELLY:

Q.   The grip area that you described, is it ahead of or behind the trigger area?

A.   The grip is behind the trigger.

Q.   And when you swabbed that area, can you describe the nature of the area that you swabbed?

A.   It is the area with the diamond pattern.

Q.   Are they bumpy?

A.   Yes.

Q.   Okay.  And then the other area that you described, can you -- is that -- would you describe it the same way, that it's that diamond pattern?

A.   Yes.

Q.   Okay.  After you did the swabbing of those areas, what did you do with the swabs that you used to do the collection process on the rifle?

A.   That swab was cut, placed into a barcoded and labeled tube.

Q.   And the -- was it sent -- did you actually do another process on that particular swab?

A.   I performed extraction at a later time.

Q.   Okay.  I'm just going to go ahead and go to another item that you did a collection on.

        MR. DONNELLY:  Your Honor, with your permission, if I can approach the witness?

        THE COURT:  Yes.

BY MR. DONNELLY:

Q.   (Tendering item.)

    Mr. Gaul, do you recognize what I'm showing you there?

A.   Yes.

Q.   And can you tell the members of the jury what the large item is inside of GX188A in evidence?

A.   It is laboratory item 5.  It is a thermal-type food bag.

Q.   And can you describe for the members of the jury what Item Number 5 that was assigned by the lab, what color is it?

A.   It is maroon, white, and blue.

Q.   And what's the -- the normal color, or what appears to be the normal color or the natural color of that bag?

A.   White and blue.

Q.   What about the reddish color or the maroon color that you described?  Does it appear to be something that was added to that bag?

A.   Yes, it does.

Q.   Did you test that bag for serological purposes for the presence of human blood?

A.   Yes.

Q.   Were you able to reach any conclusions as to whether or not there was any human blood on that bag?

A.   The test had a negative result, which means that it did not detect the presence of blood.

Q.   And why did you test that bag for blood?

A.   From my training in serology, it seemed that it may be appropriate, and in consulting with my examiner, they thought that it may be probative.

Q.   Was it based on the coloring?

A.   Yes.

Q.   Okay.  Did you also collect or attempt to collect DNA from the bag itself?

A.   Yes.

Q.   Can you tell the members of the jury what you did to

perform the collection process on that bag.

A.   I moistened a sterile swab with reagent grade water, and I applied the swab to the handle region of the bag.

Q.   And did you go on through the collection process and then, after it was completed, actually secure that in another tube to make sure that it wasn't contaminated?

A.   Yes, I did.

Q.   Also, within that bag, is there another item that is marked as Evidence Item 188A but Lab Number 8?  Do you see that item inside that bag?

A.   Yes.

Q.   Can you describe for the members of the jury what that item is.

A.   The item is an orange zip tie.

Q.   And does it indicate that that was taken alongside the bag from the scene in this case?

A.   I cannot tell exactly where it is taken from.

Q.   Did it come as -- a part of one package, though?  Did it come with the bag itself?

A.   I do not recall.  I would have to consult my notes.

Q.   Okay.  In this case, though, did you test the zip tie?

A.   Yes, I did.

Q.   And what area did you test on the zip tie?

A.   The textured backside of the zip tie.

Q.   And when you say the textured zip -- area of the backside,

is that -- were there teeth on the zip tie?

A.   Yes.

Q.   And is that -- again, that's a common item that would normally come into your possession for testing?

THE COURT:   Leading.

BY MR. DONNELLY:

Q.   Is that one of the items that's contained in the guide?

A.   Yes.

Q.   And did you perform the same collection process on that zip tie?

A.   Yes.

MR. DONNELLY:   Your Honor, if I could retrieve 188A from the witness.

THE COURT:   Yes.

MR. DONNELLY:   Thank you.

BY MR. DONNELLY:

Q.   Did you test any further items in this case?

A.   Yes.

Q.   Okay.   Did you also test Lab Items 14 and 11 in this case?

A.   Yes.

MR. DONNELLY:   Your Honor, if I could approach the witness with items marked as GX187A in evidence?

THE COURT:   You may.

MR. DONNELLY:   Thank you, Judge.

///

BY MR. DONNELLY:

Q.   Mr. Gaul, first with regard to the larger package that's been marked as 187A, do you recognize what that is?

A.   Yes.

Q.   And can you tell the members of the jury what's contained in that bag?

A.   One blue and black backpack.

Q.   And did you actually perform the collection process that you described earlier on that backpack?

A.   Yes.

Q.   What areas did you swab on that backpack?

A.   I swabbed the zipper pulls, the grip region, and the inside of the shoulder straps.

Q.   Is that one of the areas -- one of the items that's contained within the guide that you discussed before?

A.   Yes.

Q.   I'm going to ask you to take a look at the other item that I handed you, which is also marked with 187A as a government exhibit but with Lab Number 14.  Do you recognize what's in that bag?

A.   Yes.

Q.   Can you tell the members of the jury what that is?

A.   One bungee cord.

Q.   And what color is it?

A.   Red.

Q.   Did you perform the collection process on the bungee cord as well?

A.   Yes, I did.

Q.   Is that one of those common items that's listed in the guide?

A.   No, it is not.

Q.   Did you decide -- how did you decide where to test and what -- what test to do on that bungee cord?

A.   I consulted with my forensic examiner.

Q.   And what areas on the bungee cord did you examine and do a collection process on?

A.   I collected from the coiled metal regions as well as the end of the bungee itself on the ends.

Q.   And at -- with regard to both of those items, did you go through the same process after the collection was concluded in order to preserve it for further examination?

A.   Yes.

MR. DONNELLY:  Your Honor, with your permission, to approach to take those items back?

THE COURT:  Yes.

BY MR. DONNELLY:

Q.   Mr. Gaul, did you also conduct a collection on an item that was marked as Lab Exhibit Number 61?

A.   Yes.

MR. DONNELLY:  Your Honor, with your permission?

THE COURT:  Yes.

MR. DONNELLY:  I'm going to approach with Government Exhibit 1136, I believe, already in evidence.

THE COURT:  Okay.  Please do so.

MR. DONNELLY:  Thank you very much.

BY MR. DONNELLY:

Q.   (Tendering item.)

Mr. Gaul, the paper bag contains a number of different items, but I have pulled one to the side with a tag on it.

Do you see the -- the FBI lab number on that tag?

A.   Yes.

Q.   And does it have that 2024-02020 number on it?

A.   Yes.

Q.   Does it also have the Lab Number 61?

A.   Yes.

Q.   Can you describe for the members of the jury what that item is.

A.   One right glove.

Q.   And did you perform the collection process for the DNA on that glove?

A.   Yes.

Q.   And what areas did you swab on that glove in an effort to obtain a DNA sample?

A.   The inside surfaces.

Q.   And after that collection process was done, did you again

go through the same process to secure what you had collected for downstream examination?

A.   Yes.

MR. DONNELLY:   Judge, with your permission to take that item back?

THE COURT:  Yes.

MR. DONNELLY:  Thank you.

THE COURT:  I would like to take a brief final break, so if you are close to wrapping up, please do so.

MR. DONNELLY:  One more item in this particular section.

THE COURT:  Okay.

MR. DONNELLY:  Thank you.

And, Your Honor, with regard to these items, they have not yet been marked into evidence.  They have been discussed before.  They are --

THE COURT:  What are the numbers?

MR. DONNELLY:  948A and 948B.

THE COURT:  Okay.  Proceed.

MR. DONNELLY:  Thank you very much, Judge.

BY MR. DONNELLY:

Q.   (Tendering items.)

Mr. Gaul, with regard to what has been marked in this case for identification as 948B and 948A, I have handed you two items.  Do you recognize what's contained within those items?

A.    I do not personally recognize the items.

Q.    Do you recognize the packaging contained there?

A.    I recognize the identification from the laboratory on the markings.

Q.    Did you do the extraction process for those items?

A.    Yes, I did.

Q.    And which -- which one of those items in particular did you perform the extraction process on?

A.    Item 220.

Q.    And Item 220, there is two envelopes in front of you.  Can you identify which one of those envelopes it is that contains Item 220?

A.    Item 220 is the smaller bag.

Q.    Okay.  And on that, does it contain an FBI laboratory -- or rather, an FBI evidence marking?

A.    Yes.

Q.    Does it contain the case number from Florida that was associated with this case?

A.    Yes.

Q.    Does it contain the marking that it was obtained by an agent in this case from --

        THE COURT:  All right.  All your questions are leading, so we're going to take a break at this time for ten minutes.

        All rise for the jury.

      (The jury exited the courtroom at 4:42 p.m.)

THE COURT:  All right.  We will be in recess for ten minutes.  Sir, don't discuss the substance of your testimony over the break.

And, Counselor, please stop leading the witness.  Thank you.

MR. DONNELLY:  Yes, Your Honor.  I apologize.

(A recess was taken from 4:42 p.m. to 4:53 p.m.)

THE COURT:  All right.  Everybody is present.  Let's call the jury in, Officer.

(The jury entered the courtroom at 4:54 p.m.)

THE COURT:  Please be seated.  And invite your witness back in, please.  Mr. Gaul.

MR. DONNELLY:  Thank you, Judge.

THE COURT:  You remain under oath, sir.

Go ahead.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Mr. Gaul, before we broke, we were asking -- we were talking about the two packages that you have in front of you.  Do you recall the questions I was asking you about those packages?

A.   Yes.

Q.   Okay.  And I think you referenced the smaller package, the smaller of the two packages before; is that correct?

A.   Yes.

Q.   Did you examine what -- the contents of that package?

A.   Not of the smaller package, no.

Q.   Did you -- did you perform an extraction on either of those two packages?

A.   I did, yes.

Q.   And can you tell the members of the jury which of the two packages you performed the extraction on?

A.   The smaller package.

Q.   Okay.  And the marking on that package, the government exhibit on that package is -- is what?

THE WITNESS:  Could I get additional gloves, please.

MR. DONNELLY:  Oh, sure.  Sorry.  (Tendering item.)

THE WITNESS:  Thank you.

The marking on the package is GX948A.

BY MR. DONNELLY:

Q.   Okay.  And for GX948A -- and we will -- I will ask you these questions with regard to some of the other items as well. You said that you performed the extraction process on that. What do you mean by you performed the extraction process?

A.   The extraction process consists of applying a solution to each of the sample tubes, performing an hour incubation period, centrifuging the samples to separate the cotton swab substrate from the liquid solution now holding the potential DNA, and then placing the samples into the machine to perform the semiautomated extraction.

Q.   And you did that for this particular item?

A.   Yes.

Q.   Can you look at the item and check and look at the box that's contained within 948A, please.

A.   (Complies.)

Q.   Does 948A have any markings on it?

A.   Yes.

Q.   And can you tell the members of the jury what markings you see on 948A?

A.   The markings include the lab markings indicating the case number and the item number as well as who it was collected by and who it is from.

Q.   And does it appear to be in substantially the same condition as when you did the extraction process back in September 2024?

A.   I did not directly view this item of evidence.

Q.   And did you -- did you view the -- well, when you say you didn't directly view it, was it -- did the material inside that box come into your possession at some point?

A.   Yes.  I received a sample tube.

Q.   Okay.  And did it come from the -- the box that's contained within 948A?

A.   Yes.

Q.   And are you -- you are familiar with all the markings on that particular package?

A.   Yes.

Q.   And they are consistent -- are they consistent with the work that you did on that package?

A.   Yes.

Q.   And does it have your -- does it have your initials anywhere on there?

A.   This package does not.

Q.   Okay.  With regard to the other items that we've already discussed that you performed the collection on, did you -- or that you -- that -- sorry -- that you performed the collection on, did you also perform an extraction that you described earlier?  Did you provide that -- did you perform that on those other items?

A.   Yes.

Q.   Did you perform that extraction process on the rifle?

A.   Yes.

Q.   Did you perform an extraction process on GX188A, Lab Number 5?

A.   Yes.

Q.   Were -- did you perform an extraction on 188A, Lab Number 8?

A.   Yes.

Q.   Did you perform an extraction process on 187A, Lab Number 11?

A.   Yes.

Q.   And did you perform an extraction process on 187A, Lab Number 14?

A.   Yes.

Q.   And did you perform the same -- the process in essentially the same way that you described earlier with regard to 948A?

A.   Yes.

Q.   Did you check the results for each one of those to make sure that they appeared to be consistent with the machinery working correctly?

A.   Yes.

Q.   Did it appear to you to be working correctly?

A.   Yes.

Q.   Did you get appropriate volumes for each one of those tests?

A.   Yes.

Q.   Does that include the test that was performed on 948A?

A.   Yes.

Q.   Okay.   And with regard to those different items, what did you do once the extraction process was completed?

A.   Once the extraction process was completed, the samples were moved on, either hand-to-hand, directly to another biologist or to a refrigerator for downstream processing.

MR. DONNELLY:   Judge, I would ask that 948A be moved into evidence at this point.   And with that, I would have no further questions for the witness.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  I don't even know what 948A is.  Did he ever take it out of the bag?

THE COURT:  All right.  It's listed on your exhibit --

MR. ROUTH:  No objection.

THE COURT:  Well, do you have your exhibit list?  I know it's been provided to you.

MR. ROUTH:  Certainly, yeah, no objection.  It's good.  Yeah.

THE COURT:  Okay.  All right.  Am I correct, Mr. Routh, you have no objection to admission of Government's 948A or 948B?

MR. ROUTH:  No objection.

THE COURT:  All right.  Those exhibits will be admitted without defense objection.

(Government Exhibits 948A and 948B were received in evidence.)

THE COURT:  Okay.  Hearing no further questions, any cross-examination for this witness, Mr. Routh?

MR. ROUTH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Sorry to hold you up.  Well, were there other items that

you tested?

A.   Yes.

Q.   Did you test a blue flashlight?

A.   I do not recall.

Q.   Did you test a .45 Colt bullet shell?

A.   No.

Q.   No?  Okay.

But you say you did test other items -- other items?

A.   Yes.

Q.   So they just haven't introduced those yet?

A.   Correct.

Q.   Okay.  Okay.  All right.  Interesting.

MR. ROUTH:  Your Honor, is it okay if I ask where the right glove came from, if he might know?

THE COURT:  Ask your questions and we will see if there is an objection.

BY MR. ROUTH:

Q.   Do you, by chance, know where the right glove that you tested came from on the scene?

A.   I do not recall.

Q.   Okay.  Because I'm unaware.

Do you, by chance, know who took off the scope off the gun?

A.   I do not.

Q.   Do not.  Okay.

MR. ROUTH:  I have no other questions.

THE COURT:  Thank you.

Redirect?

MR. DONNELLY:  Just one, Your Honor.

REDIRECT EXAMINATION

BY MR. DONNELLY:

Q.   Mr. Gaul, with regard to the right glove that was referred to by the defendant, did you also perform the extraction process on that glove, which is item number -- Lab Number 61?

A.   Yes.

Q.   Same process as was done with the other items?

A.   Yes.

MR. DONNELLY:  No further questions, Judge.

THE COURT:  Okay.  Thank you, Mr. Gaul.  You may be excused.

As far as the next witness is concerned, is this examination expected to last more than 20 minutes, Counselor?

MR. DONNELLY:  Yes, Your Honor.

THE COURT:  Okay.  Well, then, ladies and gentlemen, we are going to break for the day, again so as not to interrupt the flow of the witness examination.

I will again instruct you to make sure that you are not discussing this case with anyone, including your fellow jurors. There shall be no discussion, no investigation, no research, no communication, no posting.  I think you get the idea.  And, of course, no -- no communication or interaction with the parties,

the lawyers, or the witnesses in the case.  You must maintain an open mind until you start your deliberations at the end of the case, and you must not form any opinion about this case until all of the evidence has been presented.

So, with that, I wish you a pleasant evening.  We will begin at the same time tomorrow, 9:00 a.m.

All rise for the jury.

(The jury exited the courtroom at 5:04 p.m.)

THE COURT:  All right.  Please have a seat.  Okay.  As far as the witnesses that were covered today, it was Mr. Erich Smith, Ms. Stephanie Stewart, and Mr. Curtis Gaul. So is tomorrow's next witness still Kara Gregor?

MR. SHIPLEY:  Yes, Your Honor.  That will be Ms. Gregor first, followed by Mr. Patterson, and followed by, I believe, Mr. Goodrich after that.

THE COURT:  What about Mr. Llanes?

MR. SHIPLEY:  Oh, Llanes, I guess.  Yes, Mr. Llanes and then Mr. Goodrich after that.  That will certainly take us through the morning and for the afternoon probably.

THE COURT:  Okay.  All right.  Any evidentiary issues to raise at this time from either side?

MR. SHIPLEY:  Nothing for United States, Your Honor. Thank you.

THE COURT:  Okay.  Mr. Routh, anything from your end?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Well, then we will begin fresh tomorrow at 9:00 a.m.  That's all for today.  Have a nice evening.  Thank you.

MR. SHIPLEY:  Have a nice evening.  Thank you.

(These proceedings adjourned at 5:06 p.m.)

C E R T I F I C A T E


I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled matter.


DATE:   09-15-2025          /s/Laura Melton
                            LAURA E. MELTON, RMR, CRR, FPR
                            Official Court Reporter
                            United States District Court
                            Southern District of Florida
                            Fort Pierce, Florida

## $

**$10** [4]_ - 89:22_, 91:7_, 91:22_, 94:15

## ()

**0** [4]_ - 174:19_, 177:10
**004119** [1]_ - 178:14
**0257** [1]_ - 96:2
**091224** [1]_ - 96:1
**091524** [2]_ - 96:2_, 96:4

## 1

**1** [41]_ - 20:4_, 20:6_, 31:16 _, 33:4_, 33:5_, 40:22_, 47:23_, 48:5_, 115:17_, 115:25_, 116:2_, 116:6_, 116:9_, 116:10_, 116:11_, 116:18_, 116:19_, 118:6_, 118:10_, 119:4_, 119:15_, 122:15_, 125:16_, 139:5_, 139:11_, 165:12_, 171:16 _, 171:17_, 174:19_, 177:10_, 180:23_, 205:4_, 221:15_, 229:14_, 231:5_, 240:22_, 260:14
**1-1** [8]_ - 115:17_, 115:23_, 116:2_, 116:16_, 116:18_, 116:25_, 117:7
**1-1-1** [7]_ - 115:17_, 115:23_, 115:24_, 116:2_, 116:16_, 116:24_, 117:10
**1-2** [3]_ - 119:13_, 119:17_, 120:10
**1-3** [2]_ - 115:17_, 116:4
**1-336-254-1981** [1]_ - 33:6
**1-336-337-933** [1]_ - 33:5
**1-4** [2]_ - 115:17_, 116:7
**1-5** [2]_ - 115:17_, 116:7
**1/2** [1]_ - 246:25
**10** [6]_ - 76:12_, 107:7_, 212:20_, 212:21_, 242:13 _, 259:23
**10-feet** [1]_ - 152:4
**100** [1]_ - 194:1
**107** [1]_ - 230:13
**10:26** [1]_ - 69:5
**10:27** [1]_ - 69:7

**10:32:37** [2]_ - 93:1_, 93:25
**10:40** [1]_ - 69:6
**10:47** [1]_ - 69:7
**10:48** [1]_ - 69:13
**11** [5]_ - 8:25_, 24:6_, 33:5 _, 266:19_, 275:24
**1125** [1]_ - 59:24
**1126** [1]_ - 51:8
**1127** [2]_ - 48:20_, 99:13
**1128** [1]_ - 51:17
**1129** [2]_ - 56:12_, 56:16
**1130** [1]_ - 51:25
**1132** [1]_ - 56:23
**1136** [4]_ - 57:19_, 58:3_, 58:18_, 269:3
**1138** [2]_ - 57:19_, 59:12
**1143** [5]_ - 231:16_, 232:14_, 238:16_, 238:17 _, 241:2
**1146** [1]_ - 238:15
**12** [2]_ - 25:16_, 95:2
**12-step** [1]_ - 11:9
**128** [1]_ - 129:7
**12:02** [1]_ - 125:16
**12:06** [1]_ - 126:3
**12:10** [1]_ - 128:25
**12:15** [1]_ - 107:12
**12:20** [1]_ - 107:12
**12th** [3]_ - 95:4_, 95:5_, 95:8
**13** [2]_ - 95:8
**13th** [4]_ - 38:23_, 95:4_, 95:5_, 95:6
**14** [4]_ - 95:8_, 266:19_, 267:19_, 276:2
**14-month** [1]_ - 197:13
**14th** [5]_ - 38:23_, 89:8_, 89:16_, 95:4_, 95:6
**15** [7]_ - 25:15_, 31:16_, 69:1_, 96:4_, 125:17_, 200:25_, 216:11
**150** [1]_ - 213:4
**15th** [4]_ - 12:13_, 12:19_, 95:4_, 95:6
**16** [5]_ - 25:12_, 195:25_, 196:5_, 196:6_, 223:7
**16th** [10]_ - 12:17_, 14:11_, 14:19_, 23:7_, 27:1_, 76:2 _, 216:23_, 227:15_, 241:5_, 256:21

**17** [1]_ - 202:10
**18** [1]_ - 30:6
**180C** [1]_ - 70:7
**181** [1]_ - 129:18
**184A** [1]_ - 30:2
**184B** [1]_ - 30:18
**185** [1]_ - 38:13
**186** [1]_ - 34:14
**187A** [4]_ - 267:3_, 267:18 _, 275:23_, 276:1
**188** [1]_ - 63:23
**188A** [3]_ - 265:9_, 266:12 _, 275:20
**1998** [3]_ - 132:7_, 132:24 _, 189:25
**1:15** [1]_ - 128:24
**1:24** [1]_ - 128:25
**1:27** [1]_ - 130:25
**1:46** [1]_ - 91:18

## 2

**2** [13]_ - 42:7_, 48:6_, 146:24_, 150:10_, 155:1_, 171:7_, 174:18_, 181:4_, 181:9_, 182:23_, 205:5_, 232:13_, 232:17
**20** [3]_ - 11:3_, 11:5_, 279:16
**200** [1]_ - 63:23
**200-182** [1]_ - 61:12
**200-188** [1]_ - 63:21
**200-41** [1]_ - 64:19
**200-44** [1]_ - 65:5
**200-45** [1]_ - 65:19
**200-66** [2]_ - 81:8
**200-67** [1]_ - 75:22
**200-72** [5]_ - 67:7_, 67:21 _, 67:24_, 67:25_, 103:4
**200-727** [2]_ - 76:16_, 76:17
**200-78** [1]_ - 54:10
**200-80** [2]_ - 72:5_, 72:6
**200-82** [2]_ - 61:15_, 61:16
**200-83** [1]_ - 63:3
**200-85** [2]_ - 72:25_, 74:6
**200-86** [2]_ - 62:5_, 81:8
**200-87** [1]_ - 63:3
**200-88** [3]_ - 63:23_,

63:24_, 63:25
**2000** [2]_ - 132:6_, 133:1
**2002** [1]_ - 133:3
**2014** [1]_ - 227:15
**2018** [1]_ - 247:10
**2020** [1]_ - 85:4
**2022** [2]_ - 200:15_, 246:25
**2024** [33]_ - 12:20, 12:21, 12:22_, 14:19_, 23:7_, 23:16_, 25:12_, 25:15_, 38:23_, 44:2_, 67:4_, 75:15_, 76:12_, 76:25_, 77:18_, 78:8_, 86:1_, 89:8 _, 89:16_, 91:3_, 91:18_, 93:1_, 93:25_, 94:12_, 95:2_, 96:4_, 120:6_, 216:11_, 221:25_, 223:7_, 256:22_, 261:7_, 274:15
**2024-0202** [2]_ - 119:13_, 120:7
**2024-02020** [3]_ - 221:13 _, 257:8_, 269:12
**2025** [1]_ - 12:19
**2031** [1]_ - 25:16
**21** [1]_ - 77:18
**21st** [1]_ - 91:3
**22** [1]_ - 86:1
**220** [4]_ - 271:9_, 271:10_, 271:12_, 271:13
**224** [1]_ - 129:24
**226** [2]_ - 234:15_, 243:21
**22nd** [1]_ - 86:1
**23** [1]_ - 166:1
**234** [1]_ - 31:19
**23A** [3]_ - 165:2, 166:14_, 178:7
**23B** [3]_ - 165:2, 166:14_, 177:5
**23F** [4]_ - 165:1, 166:12_, 166:22_, 177:22
**23H** [3]_ - 165:2, 166:14_, 177:16
**23K** [3]_ - 165:1, 166:12_, 168:13
**23L** [3]_ - 165:1, 166:12_, 169:4
**23M** [3]_ - 165:1, 166:12_, 169:12
**23N** [3]_ - 165:1, 166:12_, 169:24
**23O** [3]_ - 165:2, 166:14_,

175:19

**23R** [3]_ - 165:1, 166:12_, 170:6

**23S** [2]_ - 165:1, 166:12

**23T** [3]_ - 165:2, 166:13_, 172:19

**23W** [4]_ - 165:2, 166:14_, 173:20, 174:14

**23X** [4]_ - 165:2, 166:14_, 184:19, 184:20

**23Y** [4]_ - 165:2, 166:15_, 187:1, 189:19

**23Z** [5]_ - 165:2, 166:14_, 184:18, 184:19, 188:4

**24** [1]_ - 115:4

**24-cr-80116-Cannon** [1]_ - 3:5

**24-week** [1]_ - 202:10

**24/7** [2]_ - 115:2_, 256:25

**251-7269** [1]_ - 43:11

**26** [4]_ - 78:8_, 192:8_, 192:10_, 192:14

**2601** [1]_ - 78:4

**26th** [1]_ - 75:15

**27** [6]_ - 88:7_, 88:24_, 90:18_, 91:16_, 92:20_, 93:14

**28** [1]_ - 76:25

**29th** [1]_ - 91:18

**2:22** [1]_ - 31:22

---

*3*

**3** [9]_ - 46:11_, 48:7_, 165:17_, 174:18_, 183:1_, 187:9_, 205:6_, 233:19_, 246:25

**3.5-inch** [1]_ - 66:12

**30** [4]_ - 117:12_, 117:16_, 117:21_, 119:10

**30-round** [1]_ - 181:18

**300** [1]_ - 39:9

**301** [2]_ - 40:7_, 41:13

**302** [1]_ - 41:15

**303** [4]_ - 44:7_, 44:24_, 45:10_, 46:1

**304** [4]_ - 44:21_, 44:25_, 45:10_, 46:1

**305** [2]_ - 45:15_, 46:1

**31** [1]_ - 31:19

**3131** [6]_ - 31:13_, 71:12_,

85:3_, 85:6_, 85:10_, 86:2

**320** [2]_ - 15:6_, 83:20

**322** [1]_ - 100:13

**322A** [1]_ - 17:5

**322B** [2]_ - 17:25_, 100:21

**323** [1]_ - 26:12

**324** [1]_ - 47:12

**325** [1]_ - 40:18

**326** [1]_ - 42:3

**327** [1]_ - 46:7

**33406** [2]_ - 75:10_, 77:23

**33411** [1]_ - 77:7

**33493** [3]_ - 88:7_, 88:25_, 93:14

**334A** [1]_ - 43:14

**334B** [1]_ - 42:24

**336-337-33** [1]_ - 33:10

**339** [1]_ - 39:20

**343** [1]_ - 57:6

**347** [1]_ - 85:17

**350** [1]_ - 87:4

**351** [1]_ - 84:7

**36** [4]_ - 105:22_, 106:11_, 106:14_, 106:16

**379-9411** [2]_ - 33:4

**38** [6]_ - 37:11_, 37:19_, 37:21_, 37:23, 37:25_, 91:19

**39A** [1]_ - 49:12

**39B** [1]_ - 49:18

**39C** [1]_ - 50:12

**39D** [1]_ - 50:17

**3:10** [2]_ - 194:19_, 215:7

**3:12:54** [1]_ - 95:2

**3:14** [2]_ - 215:16_, 215:19

**3:25** [2]_ - 215:12_, 215:18

**3:29** [1]_ - 215:19

**3:30** [1]_ - 215:23

---

*4*

**4** [10]_ - 44:2_, 49:12_, 165:17_, 171:18_, 174:19_, 177:10_, 183:1_, 187:9_, 235:7_, 235:11

**4-feet** [2]_ - 152:3_, 152:4

**400** [3]_ - 3:24_, 4:2_, 4:7

**404(b** [1]_ - 4:3

**41** [1]_ - 60:20

**42** [2]_ - 55:19

**44** [1]_ - 53:13

**444** [1]_ - 19:12

**445** [4]_ - 28:1_, 29:4_, 32:11_, 71:15

**445P** [1]_ - 31:2

**446** [1]_ - 29:9

**45** [14]_ - 35:18_, 36:13_, 36:15_, 36:17_, 36:19_, 36:23_, 37:15_, 38:6_, 107:2_, 187:15_, 188:8_, 188:14_, 189:21_, 278:5

**480** [4]_ - 31:16_, 31:21_, 31:22

**4:42** [2]_ - 271:25_, 272:7

**4:53** [1]_ - 272:7

**4:54** [1]_ - 272:10

---

*5*

**5** [11]_ - 93:1_, 93:25_, 118:20_, 119:3_, 122:2_, 122:15_, 212:21_, 263:23_, 263:25_, 275:18

**50** [1]_ - 255:15

**523** [1]_ - 66:19

**533** [1]_ - 76:2

**56** [1]_ - 78:18

**56-ounce** [1]_ - 72:12

**577-9647** [1]_ - 39:1

**5:00** [1]_ - 32:1

**5:04** [1]_ - 280:8

**5:06** [1]_ - 281:5

**5:41** [1]_ - 31:25

**5:42** [1]_ - 31:25

**5th** [4]_ - 23:16_, 67:4_, 94:6_, 94:12

---

*6*

**6** [2]_ - 115:8_, 115:15

**60** [1]_ - 31:21

**600-180C** [4]_ - 29:1_, 70:8_, 71:9_, 71:21

**61** [3]_ - 268:23_, 269:14_, 279:8

**614** [1]_ - 71:11

**646-4283** [1]_ - 71:11

**6:00** [1]_ - 185:1

**6:02** [3]_ - 31:16_, 31:22

**6:35** [3]_ - 31:15_, 31:21_, 32:1

**6X** [1]_ - 169:2

---

*7*

**7.62x39mm** [4]_ - 154:13_, 184:14_, 187:6_, 188:13

**7.62x79mm** [1]_ - 142:10

**702** [1]_ - 201:2

**720** [2]_ - 31:16_, 87:25

**721** [1]_ - 94:18

**723** [1]_ - 74:25

**724** [1]_ - 91:10

**725** [1]_ - 92:11

**726** [1]_ - 90:7

**727** [3]_ - 76:16_, 76:18_, 76:19

**728** [2]_ - 77:10

**729** [4]_ - 78:24_, 79:19_, 79:22_, 79:24

**730** [1]_ - 68:15

**743** [1]_ - 43:11

**753** [1]_ - 95:13

**772** [1]_ - 39:1

**7:00** [1]_ - 31:19

**7:38** [1]_ - 86:2

**7:45** [1]_ - 31:22

---

*8*

**8** [3]_ - 89:16_, 265:9_, 275:21

**8/4/24** [1]_ - 44:2

**808** [2]_ - 33:4

**808-379-9411** [2]_ - 33:9

**828** [2]_ - 75:9_, 77:22

**890** [6]_ - 88:6_, 88:24_, 90:18_, 91:16_, 92:20_, 93:14

**8:00** [2]_ - 31:15_, 31:21

**8:59** [1]_ - 7:20

---

*9*

**9** [3]_ - 33:6_, 174:19_, 177:10

**9-7** [1]_ - 15:25

**9/16/2024** [1]_ - 234:6
**9/19/24** [1]_ - 243:9
**912A** [3]_ - 227:21_, 227:22_, 244:5
**916** [2]_ - 16:5_, 16:18
**917** [1]_ - 20:23
**918** [1]_ - 25:23
**920** [2]_ - 41:5_, 82:2
**921** [1]_ - 73:16
**922** [1]_ - 21:15
**923** [2]_ - 23:21_, 103:23
**925** [1]_ - 82:12
**926** [1]_ - 33:14
**9339** [1]_ - 33:10
**941** [2]_ - 32:18_, 33:21
**942** [3]_ - 54:25_, 55:17_, 55:18
**943** [1]_ - 27:9
**948A** [12]_ - 270:18_, 270:24_, 274:4_, 274:6_, 274:9_, 274:22_, 276:5_, 276:16_, 276:23_, 277:2_, 277:11, 277:16
**948B** [4]_ - 270:18_, 270:24_, 277:12, 277:16
**948D** [4]_ - 241:24_, 242:1_, 242:6_, 243:15
**949** [1]_ - 22:25
**950** [1]_ - 24:23
**96730** [1]_ - 31:13
**97E** [1]_ - 15:25
**99** [1]_ - 193:24
**9:00** [3]_ - 185:3_, 280:6_, 281:2
**9:25** [1]_ - 31:19
**9:29:09** [1]_ - 89:17
**9:30** [1]_ - 14:21

## A

**A-N-A-B** [1]_ - 199:16
**A-R-R-O-I-S** [1]_ - 8:13
**a.m** [10]_ - 7:20_, 69:5_, 69:7_, 69:13_, 86:2_, 93:1_, 93:25_, 280:6_, 281:2
**abbreviation** [2]_ - 153:3_, 199:16
**abide** [2]_ - 125:18_, 128:20
**ability** [3]_ - 114:3_, 172:9

_, 206:16
**able** [48]_ - 20:4_, 23:11_, 70:14_, 78:3_, 84:17_, 84:19_, 85:1_, 92:24_, 96:22_, 97:9_, 99:25_, 101:14_, 118:9_, 120:4_, 122:20_, 127:2_, 141:9_, 144:23_, 156:10_, 160:4_, 160:6_, 167:24_, 174:23_, 175:12_, 175:14_, 176:25_, 179:6_, 179:9_, 179:13_, 181:15_, 192:14_, 192:22_, 194:11_, 206:18_, 208:10_, 214:7_, 216:18_, 218:19_, 225:9_, 225:16_, 229:1_, 233:9_, 237:9_, 240:16_, 251:13_, 264:12
**absolutely** [4]_ - 108:24_, 109:17_, 115:22_, 119:11
**absorbed** [3]_ - 206:24_, 207:2, 207:20
**accept** [1]_ - 138:6
**acceptable** [1]_ - 140:11
**acceptance** [1]_ - 111:22
**access** [3]_ - 109:25_, 110:2, 225:9
**accessories** [1]_ - 260:14
**accordingly** [1]_ - 112:8
**accreditation** [1]_ - 199:18
**accredited** [3]_ - 199:14_, 200:10_, 200:12
**accuracy** [12]_ - 124:7_, 124:10, 124:19_, 127:8_, 127:24_, 128:4_, 128:8_, 128:11_, 129:15_, 130:5_, 130:6_, 130:14
**accuracy-related** [1]_ - 130:6
**accurate** [1]_ - 194:2
**accurately** [9]_ - 29:3_, 74:20_, 74:23_, 79:13_, 79:15_, 86:23_, 105:4_, 106:6_, 227:14
**ACE** [6]_ - 226:2_, 226:4_, 227:13_, 228:15_, 230:9_, 239:8
**ACE-V** [2]_ - 226:2_, 226:4
**achievement** [1]_ - 200:17

**acid** [12]_ - 163:24_, 172:24_, 173:10_, 173:13_, 173:15_, 173:16_, 173:17_, 173:25_, 174:1_, 175:5_, 178:6_, 179:25
**acidic** [1]_ - 173:5
**acids** [6]_ - 162:20_, 163:14_, 164:8_, 173:4_, 179:22_, 180:13
**acquire** [1]_ - 146:13
**act** [1]_ - 130:1
**action** [2]_ - 64:11_, 182:3
**activate** [2]_ - 38:3_, 98:18
**actual** [10]_ - 10:14_, 15:3_, 62:21_, 86:20_, 95:9_, 102:24_, 114:13_, 170:9_, 205:21_, 224:2
**actuating** [2]_ - 144:22_, 148:1
**added** [6]_ - 3:25_, 104:19_, 104:20_, 113:11_, 121:4_, 264:6
**addition** [3]_ - 9:14_, 145:17_, 152:10
**additional** [12]_ - 7:10_, 129:14_, 132:10_, 197:8_, 201:24_, 207:15_, 207:22_, 214:2_, 222:2_, 234:12_, 254:9_, 273:11
**additionally** [2]_ - 162:22_, 206:7
**address** [18]_ - 75:7_, 76:6_, 77:1_, 77:20_, 77:24_, 78:3_, 80:17_, 82:23_, 88:22_, 88:24_, 90:16_, 92:15_, 92:20_, 93:14_, 93:16_, 128:18_, 130:20
**addressed** [3]_ - 4:13_, 34:12_, 35:5
**addresses** [1]_ - 88:23
**addressing** [1]_ - 3:3
**adhere** [1]_ - 209:18
**adjourned** [1]_ - 281:5
**adjustable** [1]_ - 60:4
**admissibility** [1]_ - 132:19
**admission** [2]_ - 36:14_, 277:11
**admit** [6]_ - 36:12_, 37:19_, 79:19_, 106:10_, 165:20_, 227:18
**admits** [1]_ - 79:9

**admitted** [26]_ - 3:24_, 16:10_, 16:13_, 22:25_, 24:23_, 27:8_, 36:17_, 37:23_, 67:24_, 79:22_, 99:7_, 99:9_, 106:13_, 106:15_, 115:7_, 117:12_, 118:19_, 166:10_, 166:17_, 220:1_, 222:14_, 227:21_, 230:15_, 241:25_, 242:3_, 277:14
**advise** [2]_ - 7:6_, 69:11
**advocate** [1]_ - 9:6
**Aero** [1]_ - 31:25
**aerodynamic** [1]_ - 186:11
**Aeroméxico** [1]_ - 31:22
**affect** [5]_ - 160:19_, 180:6_, 206:15_, 207:7_, 208:2
**affected** [1]_ - 180:12
**affiliations** [1]_ - 136:8
**affirm** [5]_ - 8:4_, 107:18_, 131:11_, 195:4_, 246:3
**affixed** [4]_ - 118:9_, 150:6_, 156:22_, 162:19
**affixing** [1]_ - 123:11
**afternoon** [15] - 131:22_, 132:2_, 190:16_, 194:19_, 195:1_, 195:20_, 195:21_, 215:12_, 244:24_, 245:25_, 246:17_, 246:18_, 277:23_, 277:24_, 280:19
**agencies** [6]_ - 109:19_, 111:25_, 198:18_, 198:25_, 199:12_, 249:19
**agency** [4]_ - 109:9_, 109:18_, 199:14_, 199:15
**AGENT** [2]_ - 103:10_, 103:12
**Agent** [33]_ - 8:2_, 21:18_, 24:2_, 27:14_, 31:8_, 35:23_, 36:21_, 39:12_, 50:19_, 53:7_, 53:18_, 57:23_, 59:12_, 62:11_, 63:7_, 65:9_, 65:23_, 66:9_, 67:12_, 68:2_, 69:14_, 69:25_, 70:11_, 72:11_, 76:22_, 79:2_, 80:2_, 82:15_, 88:22_, 96:7_, 105:15_, 107:10_, 215:25
**agent** [9]_ - 10:7_, 11:4_, 53:3_, 69:2_, 80:17_, 192:16_, 234:16_, 243:10_, 271:21
**agents** [4]_ - 109:14_,

114:18_, 216:19_, 243:5

**aggressive** [1]_ - 124:3

**ago** [6]_ - 4:3_, 12:24_, 38:6_, 77:25_, 78:20_, 163:13

**agree** [1]_ - 240:4

**agreement** [11]_ - 129:19 _, 212:14_, 213:20_, 213:22_, 214:7_, 238:12_, 239:2_, 239:4_, 239:17_, 239:20_, 240:8

**ahead** [7]_ - 29:7_, 100:19 _, 141:13_, 184:16_, 262:18_, 263:12_, 272:15

**ahold** [1]_ - 142:16

**aid** [10]_ - 230:8_, 230:10_, 230:15_, 230:25_, 232:14 _, 232:17_, 235:8_, 235:11_, 238:15_, 240:7

**aids** [2]_ - 231:7_, 231:8

**air** [2]_ - 179:24_, 250:11

**airline** [1]_ - 31:24

**Airlines** [1]_ - 31:25

**AK-47** [1]_ - 190:21

**AK-47s** [2]_ - 190:20_, 190:23

**AKASO** [4]_ - 64:7_, 64:8 _, 64:10_, 64:11

**alcohol** [1]_ - 250:12

**Alexandria** [9]_ - 196:14 _, 196:15_, 196:16_, 196:19_, 196:24_, 197:1_, 197:7_, 199:9_, 200:19

**aligns** [1]_ - 127:19

**all-inclusive** [1]_ - 156:9

**allegations** [1]_ - 6:25

**allowed** [3]_ - 10:6_, 128:12_, 138:4

**allowing** [1]_ - 146:6

**allows** [3]_ - 144:9_, 152:5_, 174:10

**alloy** [1]_ - 164:13

**almost** [8]_ - 13:11_, 52:3 _, 174:2_, 174:17_, 189:11_, 189:16_, 211:1_, 225:14

**alongside** [1]_ - 265:15

**alpha** [1]_ - 175:8

**alphabet** [1]_ - 192:9

**alphabetical** [1]_ - 165:22

**already-in-evidence**

[1]_ - 183:1

**alter** [1]_ - 191:8

**alterations** [1]_ - 179:13

**altered** [4]_ - 61:7_, 134:17_, 137:16_, 191:7

**alternate** [1]_ - 223:13

**America** [1]_ - 3:5

**American** [3]_ - 31:15_, 31:21_, 38:21

**amigos** [1]_ - 92:5

**Amigos** [3]_ - 92:23_, 93:17_, 94:24

**ammo** [2]_ - 184:15_, 185:14

**Ammo** [1]_ - 187:6

**ammunition** [37]_ - 134:8_, 135:19_, 139:8_, 146:21_, 147:13_, 148:20 _, 149:6_, 152:17_, 154:2 _, 154:8_, 154:11_, 154:14_, 165:16_, 174:8_, 181:15_, 183:10_, 184:4_, 184:8_, 185:4_, 185:7_, 185:13_, 185:14_, 185:18 _, 186:1_, 186:14_, 186:16_, 187:9_, 187:10_, 188:12_, 188:15_, 188:17 _, 188:19_, 188:21_, 189:1_, 190:1_, 190:3_, 190:6

**amount** [2]_ - 114:25_, 248:22

**amounts** [1]_ - 241:10

**amplification** [1]_ - 256:5

**amplify** [1]_ - 256:9

**ANAB** [6]_ - 199:16_, 199:22_, 199:24_, 200:5_, 200:7_, 200:11

**analysis** [34]_ - 127:8_, 136:17_, 136:20_, 136:25 _, 137:9_, 137:20_, 137:23_, 152:24_, 185:18 _, 196:21_, 199:12_, 205:11_, 210:5_, 212:1_, 212:6_, 212:13_, 214:14_, 214:24_, 221:24_, 222:1_, 226:2_, 226:5_, 226:9_, 226:15_, 229:2_, 229:8_, 232:7_, 232:8_, 232:21_, 232:23_, 233:8_, 233:11_, 240:15_, 240:20

**analyst** [2]_ - 108:12_, 108:15

**analytical** [1]_ - 135:15

**analyze** [1]_ - 152:12

**analyzed** [1]_ - 141:18

**analyzing** [1]_ - 205:13

**anchor** [2]_ - 236:4_, 237:10

**angle** [2]_ - 42:15_, 104:6

**answer** [2]_ - 124:23_, 193:16

**answered** [3]_ - 124:21_, 127:1_, 127:18

**anytime** [1]_ - 179:25

**apart** [5]_ - 147:9_, 161:18 _, 170:9_, 204:8_, 204:10

**apologies** [2]_ - 55:19_, 76:17

**apologize** [8]_ - 76:20_, 79:8_, 80:15_, 238:18_, 238:19_, 242:4_, 272:6

**appear** [27]_ - 18:15_, 19:7_, 19:22_, 24:12_, 64:14_, 67:17_, 68:7_, 74:3_, 75:25_, 77:4_, 80:6 _, 116:7_, 157:19_, 157:25_, 158:9_, 168:3_, 178:17_, 221:23_, 223:5_, 232:4_, 232:5_, 262:7_, 264:6_, 274:13_, 276:11

**appearance** [5]_ - 7:1_, 47:6_, 47:8_, 167:11_, 233:1

**appearances** [1]_ - 3:6

**appeared** [6]_ - 18:19_, 50:25_, 90:12_, 161:11_, 255:7_, 276:8

**application** [1]_ - 250:10

**applications** [3]_ - 213:7

**applied** [1]_ - 265:3

**apply** [4]_ - 126:23_, 173:7_, 201:9_, 252:19

**applying** [2]_ - 173:9_, 273:20

**appoint** [1]_ - 6:20

**appreciate** [3]_ - 99:21_, 105:10_, 194:6

**approach** [51]_ - 22:17_, 22:20_, 29:8_, 31:4_, 32:8 _, 34:14_, 35:17_, 35:19_, 44:8_, 45:14_, 53:2_, 53:12_, 54:9_, 54:24_, 55:16_, 57:18_, 59:4_, 61:11_, 61:17_, 62:4_, 63:2_, 63:20_, 64:18_, 65:4_, 67:6_, 71:16_, 72:6 _, 72:24_, 83:18_, 84:6_,

85:16_, 87:3_, 95:13_, 115:9_, 118:21_, 119:19_, 139:12_, 181:1_, 181:3_, 182:25_, 187:12_, 187:15 _, 194:22_, 220:1_, 220:12_, 241:20_, 258:6_, 263:15_, 266:21_, 268:19 _, 269:2

**approached** [1]_ - 6:16

**approaching** [8]_ - 24:22_, 27:7_, 38:12_, 40:6_, 41:14_, 44:6_, 44:20_, 44:25

**appropriate** [6]_ - 113:4 _, 114:17_, 154:14_, 255:10_, 264:18_, 276:13

**approximate** [1]_ - 197:13

**arch** [1]_ - 204:15

**area** [37]_ - 21:6_, 24:16_, 26:19_, 41:9_, 41:11_, 70:1_, 160:23_, 164:5_, 167:25_, 170:24_, 175:25 _, 180:3_, 184:9_, 188:24 _, 212:22_, 213:25_, 215:9_, 223:23_, 224:1_, 224:6_, 228:6_, 228:22_, 235:15_, 236:2_, 240:2_, 252:16_, 252:20_, 262:11 _, 262:18_, 262:19_, 262:21_, 262:22_, 262:23 _, 263:1_, 265:23_, 265:25

**areas** [26]_ - 18:21_, 159:24_, 162:2_, 198:6_, 223:3_, 229:9_, 239:20_, 240:10_, 251:13_, 251:16 _, 252:2_, 252:11_, 252:12_, 261:18_, 261:23 _, 261:25_, 262:3_, 262:4 _, 262:6_, 262:9_, 262:12 _, 263:5_, 267:11_, 267:14_, 268:10_, 269:22

**argument** [2]_ - 128:17_, 129:20

**arisen** [1]_ - 4:12

**Armour** [2]_ - 73:9

**Army** [3]_ - 9:5_, 9:6_, 142:24

**arrangement** [6]_ - 61:5 _, 202:11_, 203:13_, 203:14_, 203:25_, 205:22

**arrangements** [2]_ - 98:1_, 204:6

**arrive** [1]_ - 193:23

**arrived** [2]_ - 14:19

**arriving** [1] - 125:25
**arrow** [2] - 235:21, 236:3
**art** [1] - 193:25
**articles** [1] - 136:16
**artifacts** [1] - 154:10
**artistry** [1] - 163:18
**ascertaining** [1] - 166:8
**aside** [3] - 154:4, 154:9, 203:18
**assess** [4] - 11:10, 200:5, 200:7, 249:4
**assign** [1] - 10:3
**assigned** [12] - 9:13, 15:1, 24:6, 42:8, 109:3, 114:14, 196:2, 196:4, 221:8, 221:12, 257:3, 263:25
**assisting** [1] - 132:25
**associated** [4] - 38:24, 85:5, 245:9, 271:18
**Association** [1] - 136:12
**assume** [5] - 101:8, 103:15, 104:18, 143:12, 157:14
**assuming** [2] - 157:8, 192:9
**assumingly** [1] - 102:1
**assumption** [1] - 7:8
**AT&T** [4] - 41:25, 42:1, 42:8, 42:20
**AT&T-issued** [1] - 42:1
**attached** [5] - 118:6, 222:2, 223:4, 224:18, 261:7
**attaching** [1] - 182:5
**attachments** [2] - 147:23, 224:16
**attack** [2] - 159:5, 172:25
**attempt** [5] - 129:25, 151:14, 176:10, 261:19, 264:22
**attended** [1] - 196:25
**attention** [4] - 7:13, 28:20, 216:10, 256:19
**attest** [1] - 96:22
**attorney** [3] - 9:5, 9:6
**attorneys** [1] - 125:23
**audio** [2] - 69:10, 69:16

**August** [11] - 44:2, 75:15, 76:25, 77:18, 78:8, 86:1, 89:8, 89:16, 91:3, 91:18
**authorize** [1] - 14:1
**auto** [2] - 153:24, 191:8
**automated** [1] - 197:6
**automatic** [3] - 148:15, 148:16, 188:14
**automatically** [2] - 149:6, 155:9
**available** [2] - 103:4, 122:6
**Avenue** [1] - 193:1
**Avianca** [4] - 31:16, 31:19, 31:23
**avoid** [1] - 250:21
**award** [1] - 200:16
**aware** [6] - 104:3, 202:15, 203:5, 203:8, 216:12, 257:3

B

**bachelor** [2] - 196:9, 247:7
**bachelor's** [4] - 110:13, 110:14, 110:15, 133:19
**background** [5] - 9:3, 110:12, 130:3, 136:8, 196:8
**backgrounds** [1] - 110:11
**backpack** [7] - 51:11, 52:5, 52:6, 52:15, 267:7, 267:9, 267:11
**backside** [2] - 265:24, 265:25
**bad** [1] - 151:2
**badge** [1] - 109:25
**badged** [1] - 110:1
**bag** [37] - 29:23, 41:23, 52:14, 52:24, 53:8, 53:25, 58:5, 58:11, 58:19, 58:24, 61:25, 62:17, 62:20, 62:21, 116:8, 184:3, 222:6, 223:3, 263:23, 264:3, 264:7, 264:9, 264:13, 264:16, 264:23, 265:1, 265:3, 265:8, 265:10, 265:15, 265:19, 267:6, 267:20, 269:8, 271:13,

277:3
**bags** [11] - 57:24, 58:4, 81:3, 81:4, 81:11, 81:12, 81:13, 184:1, 184:2, 251:23
**Bailey** [1] - 243:13
**ballistic** [1] - 123:21
**Ballistic** [1] - 153:5
**ballistics** [2] - 126:14, 192:4
**bank** [1] - 27:3
**Bank** [3] - 27:17, 35:4, 35:6
**bar** [1] - 221:7
**barcode** [1] - 252:23
**barcoded** [3] - 252:21, 253:13, 263:8
**barrel** [6] - 143:16, 143:24, 145:13, 151:2, 157:23, 174:7
**barring** [1] - 203:15
**Barrois** [19] - 8:2, 8:12, 8:20, 15:11, 16:17, 19:3, 21:18, 23:2, 24:2, 31:8, 35:23, 36:21, 39:12, 57:23, 59:12, 62:11, 66:9, 67:12, 72:11
**BARROIS** [1] - 8:16
**base** [9] - 108:3, 136:2, 163:1, 171:17, 171:18, 184:8, 185:22, 185:24
**based** [23] - 9:1, 18:17, 21:6, 68:8, 116:5, 122:22, 124:1, 142:22, 149:3, 155:21, 158:25, 164:13, 181:19, 198:12, 201:22, 202:7, 202:15, 208:6, 219:13, 233:7, 240:15, 243:24, 264:20
**basis** [13] - 94:6, 101:20, 127:2, 127:18, 128:21, 198:11, 199:19, 216:17, 241:7, 254:3, 254:20, 256:25
**battery** [2] - 64:9, 64:14
**battlefield** [1] - 143:3
**Bay** [9] - 76:9, 80:8, 80:20, 88:7, 88:25, 90:19, 91:16, 92:20, 93:14
**bay** [8] - 13:11, 13:18, 14:11, 14:20, 15:19, 81:17, 81:22, 83:8

**bayonet** [4] - 145:15, 145:16, 145:18, 145:20
**Beach** [8] - 75:9, 77:5, 77:6, 77:23, 78:5, 85:25, 86:6, 216:14
**bearing** [2] - 240:24, 242:14
**bears** [1] - 119:11
**become** [7] - 133:2, 191:5, 198:8, 208:19, 216:12, 248:11, 257:3
**beforehand** [1] - 127:13
**began** [5] - 15:2, 201:16, 223:9, 229:18, 248:17
**begin** [11] - 8:14, 69:20, 131:20, 140:23, 213:9, 223:10, 225:25, 246:11, 250:8, 280:6, 281:1
**beginning** [5] - 115:22, 120:6, 179:12, 179:15, 216:11
**behind** [10] - 158:21, 207:6, 207:9, 207:10, 207:11, 209:19, 228:24, 262:13, 262:18, 262:20
**Belle** [2] - 76:2, 76:9
**below** [12] - 24:13, 80:21, 89:21, 91:4, 92:21, 93:15, 164:3, 167:8, 172:2, 174:3, 232:4, 242:14
**beneath** [1] - 31:14
**benefit** [2] - 28:22, 162:7
**bent** [1] - 103:15
**best** [8] - 62:2, 80:18, 112:6, 114:3, 146:16, 159:11, 218:14, 223:25
**better** [9] - 88:18, 89:10, 124:13, 124:24, 140:22, 169:20, 186:11, 186:13, 206:18
**between** [22] - 11:3, 111:24, 116:15, 145:20, 148:15, 173:24, 198:6, 204:2, 204:6, 205:18, 206:12, 213:20, 213:24, 213:25, 236:8, 238:2, 238:11, 239:2, 239:4, 239:17, 240:8
**beyond** [4] - 129:10,

129:15_, 151:25_, 186:20

**big** [5]_ - 13:11_, 38:22_, 107:7_, 152:5_, 218:2

**bigger** [1]_ - 102:15

**bin** [1]_ - 51:13

**bins** [1]_ - 48:25

**biographical** [4]_ - 212:25_, 233:16_, 233:24_, 242:13

**biologist** [4]_ - 110:10_, 246:22_, 256:2_, 276:21

**biology** [3]_ - 110:14_, 133:20_, 247:7

**bit** [26]_ - 9:17_, 47:17_, 61:2_, 74:7_, 80:4_, 80:21_, 90:19_, 99:20_, 99:23_, 109:20_, 151:7_, 159:21_, 162:20_, 168:24_, 173:16_, 177:8_, 179:18_, 198:1_, 201:18_, 203:17_, 205:16_, 206:2_, 206:3_, 247:15_, 250:3_, 260:25

**bite** [1]_ - 159:12

**bits** [2]_ - 60:24_, 61:5

**black** [19]_ - 13:3_, 52:20_, 58:13_, 61:25_, 62:15_, 68:5_, 144:20_, 147:18_, 162:20_, 170:24_, 222:5_, 224:7_, 228:25_, 232:11_, 232:12_, 259:13_, 259:14_, 267:7

**blacked** [3]_ - 18:12_, 18:14_, 19:7

**blacked-out** [2]_ - 18:14_, 19:7

**blackened** [1]_ - 18:8

**blanket** [2]_ - 29:23_, 51:11

**bleach** [1]_ - 250:10

**blind** [5]_ - 214:16_, 214:21_, 215:6_, 244:9_, 244:10

**blinking** [2]_ - 260:19

**block** [2]_ - 144:21_, 240:23

**blocks** [4]_ - 212:20_, 212:22_, 235:5_, 242:13

**blood** [7]_ - 111:1_, 207:12_, 247:18_, 264:10_, 264:13_, 264:15_, 264:16

**bloody** [1]_ - 207:13

**blue** [23]_ - 170:22_, 223:3_, 232:19_, 233:24_,

235:15_, 236:9_, 236:10_, 237:1_, 237:4_, 237:7_, 237:11_, 237:14_, 237:15_, 237:16_, 239:3_, 239:18_, 239:19_, 240:2_, 240:3_, 264:1_, 264:4_, 267:7_, 278:3

**blue-dot-ending** [1]_ - 236:10

**blur** [1]_ - 94:3

**blurred** [1]_ - 77:2

**boards** [1]_ - 197:18

**bodies** [1]_ - 199:13

**bodily** [1]_ - 247:17

**body** [2]_ - 199:18_, 207:7

**Bogotá** [1]_ - 31:16

**bolt** [21]_ - 143:16_, 143:25_, 144:4_, 144:7_, 144:9_, 147:22_, 148:1_, 148:11_, 148:17_, 155:5_, 161:20_, 161:21_, 162:22_, 162:23_, 167:10_, 177:19_, 182:11_, 182:13_, 182:14_, 182:15

**bolts** [1]_ - 209:1

**bottle** [2]_ - 51:12_, 72:12

**bottom** [16]_ - 43:21_, 78:6_, 89:24_, 92:3_, 92:22_, 93:15_, 93:16_, 98:24_, 135:21_, 145:11_, 174:13_, 177:21_, 184:25_, 187:5_, 234:5_, 239:10

**bought** [1]_ - 156:24

**bound** [1]_ - 164:4

**bounds** [1]_ - 127:15

**box** [45]_ - 24:8_, 37:4_, 44:17_, 45:7_, 45:24_, 46:18_, 48:7_, 48:8_, 48:9_, 71:14_, 104:22_, 105:1_, 105:4_, 139:22_, 139:24_, 140:2_, 140:4_, 141:1_, 147:3_, 149:14_, 149:16_, 149:17_, 150:5_, 220:20_, 221:4_, 221:6_, 221:19_, 221:23_, 224:20_, 233:25_, 258:11_, 258:12_, 258:13_, 258:16_, 258:17_, 258:19_, 258:20_, 258:23_, 258:25_, 259:5_, 259:8_, 259:12_, 274:3_, 274:19_, 274:21

**boy** [1]_ - 166:5

**brand** [10]_ - 54:18_, 56:5_, 64:7_, 64:8_, 73:9_, 102:10_, 102:11_, 102:12

_, 102:22

**brand-new** [4]_ - 102:10_, 102:11_, 102:12_, 102:22

**bravo** [1]_ - 8:13

**break** [17]_ - 66:16_, 68:24_, 69:1_, 69:3_, 72:3_, 125:14_, 126:5_, 151:7_, 191:5_, 194:19_, 215:8_, 215:12_, 215:15_, 270:8_, 271:23_, 272:3_, 279:19

**breaking** [1]_ - 194:18

**breech** [1]_ - 174:7

**Brian** [3]_ - 31:12_, 71:10_, 71:25

**brief** [5]_ - 33:24_, 105:12_, 126:12_, 218:12_, 270:8

**briefly** [12]_ - 49:9_, 128:18_, 129:6_, 162:9_, 162:11_, 170:20_, 195:2_, 197:25_, 198:1_, 198:20_, 201:16_, 228:3

**bright** [2]_ - 167:19_, 170:24

**bring** [11]_ - 7:13_, 25:21_, 38:14_, 54:8_, 108:2_, 120:21_, 139:4_, 163:21_, 164:15_, 173:2_, 177:4

**brings** [1]_ - 160:12

**broad** [2]_ - 205:5_, 262:3

**broadly** [1]_ - 250:6

**broke** [2]_ - 216:5_, 272:18

**brought** [6]_ - 17:18_, 50:23_, 70:15_, 118:1_, 226:10_, 227:9

**brown** [1]_ - 81:17

**Browne** [3]_ - 3:9_, 3:22_, 126:7

**BROWNE** [28]_ - 3:23_, 4:8_, 4:15_, 93:5_, 107:14_, 108:5_, 108:10_, 114:11_, 115:9_, 115:11_, 117:13_, 117:16_, 117:19_, 118:17_, 118:18_, 118:21_, 118:23_, 118:25_, 119:2_, 119:19_, 119:22_, 119:24_, 120:3_, 122:1_, 122:8_, 123:2_, 124:21_, 125:10

**buccal** [4]_ - 253:17_, 253:19_, 253:22_, 254:5

**build** [1]_ - 161:20

**building** [6]_ - 110:8_,

110:18_, 111:6_, 111:19_, 112:1_, 112:9

**buildings** [1]_ - 109:24

**built** [2]_ - 191:12_, 191:13

**bullet** [28]_ - 36:25_, 104:1_, 104:4_, 104:24_, 134:12_, 135:20_, 135:25_, 145:13_, 152:9_, 154:3_, 154:5_, 154:6_, 154:7_, 154:8_, 156:5_, 185:8_, 185:20_, 185:23_, 186:7_, 186:8_, 186:12_, 186:21_, 186:23_, 188:22_, 191:21_, 192:1_, 278:5

**bullet's** [1]_ - 186:13

**bullets** [12]_ - 134:9_, 152:7_, 152:14_, 155:19_, 156:7_, 180:11_, 185:8_, 185:9_, 185:20_, 186:19_, 190:8

**bumpy** [1]_ - 262:24

**bungee** [6]_ - 63:13_, 267:23_, 268:1_, 268:8_, 268:10_, 268:13

**Bureau** [2]_ - 8:23_, 195:23

**business** [2]_ - 27:17_, 115:4

**but..** [2]_ - 48:17_, 125:4

**button** [3]_ - 54:17_, 98:25_, 100:8

**button-down** [3]_ - 54:17_, 98:25_, 100:8

**buy** [1]_ - 62:25

**BY** [213]_ - 8:19, 15:10, 15:15, 16:16, 17:8, 18:2, 19:14, 21:1, 21:17, 22:22, 23:1, 24:1, 25:1, 25:7, 26:1, 26:14, 27:11, 29:2, 30:3, 30:8, 30:20, 31:6, 32:13, 32:19_, 33:17, 34:17, 34:21, 35:21, 36:20, 37:13, 38:4, 38:15, 39:22, 40:9, 40:20, 41:8, 41:16, 42:5, 43:1, 43:19, 44:10_, 45:2, 45:17, 46:9, 47:14_, 48:22, 49:13, 49:20, 50:13, 50:18, 51:9, 51:19, 52:1, 53:5, 53:15, 54:12, 55:2_, 55:22, 56:15, 57:1, 57:8, 57:21_, 58:7, 58:21_, 59:7, 60:1, 60:22_, 61:19, 62:8_, 63:5_, 64:1, 64:21, 65:7, 65:22, 66:8, 66:22, 67:10, 68:1, 68:17, 69:24, 70:10, 70:18, 71:18, 72:9, 73:3,

73:18, 75:2, 75:24, 76:21, 77:12, 79:1, 80:1, 80:5, 80:16, 81:10, 82:14, 83:22, 84:10_, 84:22, 85:19, 87:6, 88:2, 88:21, 90:9, 91:12, 92:13, 93:9, 94:21_, 95:16_, 96:11_, 97:6, 98:4, 98:21, 99:14, 100:6, 100:22, 101:24, 103:14, 103:25_, 105:14, 105:24_, 107:1_, 108:10_, 114:11_, 115:11_, 117:19 _, 118:18_, 119:2_, 119:24_, 120:3_, 122:8_, 123:7, 125:2, 132:1, 138:11, 139:18, 140:24, 141:14_, 144:2, 145:25_, 146:3, 147:8, 149:22_, 157:6, 158:6_, 162:4_, 162:14_, 165:4, 167:1, 167:17, 168:14, 169:5, 169:13_, 170:1, 170:7, 170:13_, 170:17, 172:20_, 173:21, 174:15_, 175:21, 177:6, 177:17, 178:8, 181:6, 182:7_, 183:3, 184:22, 187:2, 187:18, 188:6, 189:22_, 190:15, 193:5_, 193:18_, 194:10_, 195:19_, 201:12_, 216:4_, 220:5_, 220:17_, 221:2, 221:18_, 222:19, 225:7_, 226:23_, 228:2_, 229:17_, 230:21_, 231:14_, 232:15 _, 238:20, 241:3_, 242:5_, 242:24_, 244:23_, 246:16 _, 258:15_, 260:7_, 260:23_, 262:17_, 263:17 _, 266:6_, 266:16_, 267:1 _, 268:21_, 269:6_, 270:21_, 272:17_, 273:15 _, 277:22_, 278:17_, 279:5

**C**

**calendar** [1]_ - 3:24
**caliber** [7]_ - 36:23_, 151:5_, 154:11_, 184:10_, 185:1_, 187:6_, 188:15
**camera** [1]_ - 64:15
**cameras** [3]_ - 64:10_, 64:11_, 64:12
**candidates** [1]_ - 175:11
**cannot** [3]_ - 211:7_, 214:1_, 265:17
**cans** [2]_ - 73:10, 73:24
**capabilities** [1]_ -

111:21
**capacity** [1]_ - 198:25
**capture** [9]_ - 109:5_, 113:21_, 121:22_, 152:7_, 225:3_, 227:11_, 228:7_, 231:23_, 231:25
**captured** [5]_ - 211:20_, 224:13_, 225:24_, 226:10 _, 228:13
**car** [12]_ - 21:11_, 22:1_, 32:15_, 33:3_, 33:8_, 40:2 _, 46:21_, 50:7_, 72:4_, 82:8_, 96:15_, 96:16
**card** [22]_ - 27:3_, 27:17_, 83:5_, 83:10_, 210:21_, 212:19_, 212:24_, 214:23 _, 230:7_, 233:20_, 233:23_, 234:2_, 234:4_, 234:7_, 234:8_, 240:24_, 241:12_, 241:14_, 241:16 _, 242:12_, 243:15_, 243:16
**career** [3]_ - 11:2_, 133:4 _, 200:13
**carefully** [1]_ - 262:5
**Carolina** [3]_ - 82:20_, 83:8_, 87:12
**Carolina-issued** [1]_ - 87:12
**carrier** [4]_ - 161:20_, 162:22_, 167:10_, 177:19
**carries** [1]_ - 161:21
**carry** [1]_ - 68:24
**carrying** [1]_ - 162:23
**cartridge** [50]_ - 36:23_, 38:6_, 38:14_, 105:16_, 107:2_, 134:10_, 134:11_, 135:18_, 135:19_, 135:20 _, 135:21_, 142:10_, 148:2_, 148:8_, 148:10_, 148:11_, 148:18_, 148:25 _, 149:1_, 151:23_, 151:24_, 152:10_, 153:7_, 154:1_, 154:3_, 155:6_, 155:10_, 155:18_, 156:7_, 174:11_, 180:5_, 180:12_, 182:12_, 182:13_, 182:15 _, 183:15_, 183:18_, 184:8_, 185:10_, 185:11_, 187:4_, 187:7_, 188:1_, 188:2_, 188:11_, 188:16_, 188:20_, 188:22_, 188:24
**cartridges** [12]_ - 146:20 _, 147:13_, 148:9_, 148:17_, 148:19_, 154:4_, 182:10_, 183:13_, 184:14

_, 184:24_, 185:6_, 185:19
**case** [106]_ - 3:3_, 3:4_, 4:20_, 5:5_, 5:6_, 5:7_, 5:8_, 5:12_, 7:14_, 10:7_, 11:11_, 12:7_, 12:10_, 28:23_, 34:13_, 41:1_, 60:24_, 111:22_, 112:2_, 112:3_, 114:13_, 114:14_, 114:16_, 114:18_, 114:22 _, 115:1_, 115:2_, 116:10 _, 117:5_, 117:6_, 120:19 _, 121:10_, 121:16_, 125:19_, 125:21_, 125:24 _, 130:12_, 130:17_, 134:11_, 135:20_, 135:21 _, 138:13_, 141:18_, 168:22_, 168:23_, 180:21 _, 183:10_, 184:9_, 185:10_, 185:11_, 188:1_, 188:2_, 188:11_, 188:16_, 188:20_, 188:22_, 190:4_, 192:16_, 208:20_, 209:2_, 214:18_, 216:11_, 216:19 _, 216:24_, 219:11_, 220:19_, 221:8_, 221:12_, 222:22_, 225:1_, 227:1_, 227:6_, 230:2_, 231:1_, 233:15_, 234:12_, 240:17 _, 240:19_, 241:8_, 241:10_, 243:5_, 247:17_, 249:5_, 250:19_, 252:5_, 252:13_, 256:20_, 257:2_, 257:20_, 259:1_, 260:9_, 265:16_, 265:21_, 266:17 _, 266:19_, 270:23_, 271:17_, 271:18_, 271:21 _, 274:10_, 279:22_, 280:1_, 280:3
**Case** [2]_ - 3:5_, 221:7
**cases** [7]_ - 120:24_, 130:2_, 152:10_, 153:7_, 155:19_, 156:7_, 180:12
**Casework** [9]_ - 110:25_, 113:14_, 219:6_, 219:12_, 246:22_, 246:23_, 247:12 _, 248:11_, 256:25
**caseworking** [1]_ - 110:19
**cash** [6]_ - 89:25_, 90:2_, 91:25_, 92:1_, 94:9_, 94:10
**casing** [17]_ - 36:23_, 38:6_, 38:7_, 38:14_, 104:1_, 104:8_, 104:12_, 104:14_, 104:18_, 104:20 _, 104:22_, 105:16_, 107:2_, 107:8_, 188:17_, 188:18_, 188:25

**cast** [1]_ - 168:25
**casted** [1]_ - 168:23
**cat** [1]_ - 52:23
**catalog** [1]_ - 175:6
**catch** [1]_ - 152:6
**categorized** [1]_ - 204:15
**category** [1]_ - 249:25
**caulking** [2]_ - 60:7_, 60:8
**causes** [1]_ - 179:25
**cell** [1]_ - 39:14
**cells** [1]_ - 254:18
**cellular** [2]_ - 40:14_, 44:14
**center** [7]_ - 17:13_, 40:15 _, 41:9_, 47:20_, 90:18_, 92:22_, 235:23
**centered** [1]_ - 151:3
**central** [1]_ - 125:3
**centrifuging** [1]_ - 273:22
**certain** [9]_ - 11:23_, 138:12_, 198:13_, 219:9_, 252:2_, 257:10_, 257:24_, 257:25
**certainly** [6]_ - 98:14_, 99:22_, 101:16_, 163:3_, 277:8_, 280:18
**certified** [1]_ - 4:4
**cetera** [1]_ - 20:17
**chain** [7]_ - 68:5_, 68:11_, 102:9_, 114:7_, 116:22_, 124:6_, 217:25
**chain-link** [3]_ - 68:5_, 68:11_, 102:9
**chain-of-custody** [1]_ - 116:22
**challenges** [2]_ - 132:19 _, 160:12
**chamber** [13]_ - 148:3_, 148:12_, 148:25_, 149:2_, 154:21_, 155:7_, 155:11_, 174:11_, 180:5_, 181:25_, 182:12_, 183:21_, 209:17
**chance** [10]_ - 98:12_, 221:22_, 230:10_, 241:14 _, 242:6_, 258:19_, 259:8 _, 259:15_, 278:18_, 278:22
**change** [2]_ - 232:2_, 253:14
**changed** [2]_ - 162:20_,

162:21

**changing** [1] - 111:9

**character** [4] - 169:18, 170:3, 174:21, 192:13

**characteristics** [7] - 152:13, 180:10, 186:12, 186:14, 205:9, 207:5

**characters** [3] - 169:11, 175:6, 179:16

**charge** [1] - 111:15

**charged** [2] - 90:1, 254:15

**charges** [1] - 6:15

**charging** [2] - 144:8, 155:6

**cheap** [2] - 62:23, 62:24

**cheat** [1] - 112:12

**check** [6] - 98:6, 98:9, 234:25, 255:6, 274:3, 276:7

**checked** [1] - 135:14

**cheek** [1] - 253:20

**chemical** [4] - 112:25, 173:7, 173:9, 209:15

**chemicals** [4] - 164:8, 164:13, 173:4, 179:24

**chemist** [1] - 110:10

**chemistry** [1] - 135:14

**children** [1] - 9:14

**China** [4] - 141:22, 142:15, 168:10, 168:20

**Chinese** [1] - 179:16

**chipping** [1] - 159:6

**Christopher** [1] - 3:9

**Cindy** [2] - 8:2, 8:12

**CINDY** [2] - 8:12, 8:16

**circle** [39] - 18:7, 18:8, 19:4, 26:9, 40:25, 43:6, 43:25, 46:14, 47:22, 49:25, 50:8, 52:8, 52:16, 52:21, 66:4, 66:9, 67:2, 73:21, 75:7, 75:14, 76:5, 76:6, 77:18, 77:20, 78:15, 80:17, 80:24, 82:24, 83:23, 88:7, 89:2, 89:22, 90:3, 91:19, 93:2, 107:4, 168:1, 168:4, 262:3

**circled** [3] - 88:12, 88:23, 89:11

**circles** [1] - 89:1

**Circuit's** [1] - 130:17

**citing** [1] - 130:2

**civilian** [1] - 9:5

**claim** [1] - 102:9

**claims** [1] - 129:13

**clamp** [2] - 29:22, 30:25

**clamps** [1] - 144:6

**clarifications** [1] - 139:11

**clarified** [1] - 128:1

**clarify** [1] - 194:11

**clarity** [1] - 71:20

**class** [2] - 152:12, 152:13

**classes** [1] - 196:25

**classification** [2] - 151:4, 151:6

**classify** [1] - 184:8

**classroom** [2] - 197:14, 248:20

**clean** [2] - 176:16, 250:10

**clear** [18] - 3:20, 43:17, 50:19, 52:10, 62:17, 89:10, 89:14, 89:15, 128:2, 128:21, 169:15, 169:25, 171:10, 175:20, 177:11, 178:22, 180:2, 235:9

**cleared** [1] - 236:21

**clearly** [2] - 90:17, 128:12

**clip** [1] - 140:15

**close** [11] - 38:7, 94:4, 141:9, 145:19, 149:17, 228:22, 231:18, 235:18, 236:17, 237:22, 270:9

**close-up** [3] - 38:7, 228:22, 231:18

**closed** [2] - 147:23, 182:11

**closely** [1] - 12:3

**closer** [7] - 18:3, 26:15, 38:5, 49:22, 108:3, 162:8, 168:17

**closer-up** [2] - 18:3, 26:15

**closest** [1] - 235:22

**clothes** [1] - 56:20

**clothing** [9] - 47:1, 49:1, 49:5, 52:24, 55:15, 57:9, 99:1, 99:24,

251:20

**coat** [3] - 207:11, 250:9, 250:20

**coated** [2] - 198:8, 205:22

**coating** [4] - 201:22, 201:23, 206:6, 206:11

**code** [3] - 110:1, 168:20, 221:7

**coffee** [1] - 78:13

**coiled** [1] - 268:12

**collateral** [1] - 9:14

**colleague** [1] - 10:17

**collect** [10] - 10:6, 15:2, 152:10, 180:18, 247:22, 251:16, 252:18, 253:21, 264:22

**collected** [16] - 10:8, 12:5, 19:25, 20:7, 20:10, 23:6, 51:14, 97:16, 153:7, 202:25, 243:12, 243:13, 254:5, 268:12, 270:1, 274:11

**collected-by** [2] - 243:12, 243:13

**collection** [32] - 9:23, 171:19, 247:13, 247:19, 247:20, 248:4, 250:4, 250:6, 250:8, 252:17, 252:25, 253:10, 254:14, 257:23, 258:2, 259:15, 261:19, 261:24, 263:6, 263:13, 265:1, 265:4, 266:9, 267:8, 268:1, 268:11, 268:15, 268:22, 269:19, 269:25, 275:9, 275:10

**collections** [3] - 251:4, 251:7, 254:2

**college** [2] - 133:14, 247:4

**color** [26] - 13:2, 53:22, 54:21, 68:5, 68:10, 101:18, 102:1, 174:2, 185:5, 185:10, 231:17, 231:22, 232:1, 232:2, 232:3, 232:9, 232:11, 232:25, 233:1, 263:25, 264:2, 264:3, 264:5, 267:24

**colored** [1] - 144:3

**coloring** [1] - 264:20

**Colt** [2] - 188:14, 278:5

**Columbia** [1] - 31:18

**combination** [4] -

173:14, 206:21, 238:1, 238:4

**combinations** [1] - 204:19

**coming** [11] - 22:3, 58:23, 65:15, 86:21, 138:20, 156:2, 172:16, 231:10, 231:11, 247:1, 255:8

**command** [1] - 124:6

**comment** [1] - 98:1

**commentary** [1] - 6:23

**commercially** [1] - 189:16

**commit** [1] - 130:1

**common** [6] - 251:21, 251:23, 251:25, 252:1, 266:3, 268:4

**commonly** [1] - 210:24

**Commonwealth** [2] - 133:18, 133:21

**communication** [2] - 279:24, 279:25

**communications** [1] - 4:1

**compact** [1] - 142:25

**company** [1] - 28:14

**comparable** [1] - 213:25

**comparative** [1] - 132:17

**compare** [10] - 155:17, 168:24, 180:11, 198:16, 233:14, 234:20, 235:4, 241:14, 243:15

**compared** [2] - 210:25, 213:15

**comparing** [2] - 202:23, 211:24

**comparison** [34] - 168:17, 197:18, 197:19, 200:3, 205:15, 208:25, 211:17, 211:18, 211:23, 211:25, 212:11, 213:13, 214:2, 214:4, 214:14, 214:24, 226:2, 226:5, 226:17, 229:12, 233:12, 233:13, 233:18, 234:13, 235:2, 235:13, 236:25, 238:8, 239:14, 240:20, 243:21, 249:12, 256:17

**comparisons** [8] - 111:2, 111:5, 197:6, 197:17, 204:24, 205:1,

208:23_, 210:16

**compartment** [6]_ - 24:16_, 38:8_, 45:11_, 46:1, 46:19_, 105:17

**compel** [2]_ - 128:13_, 129:8

**complete** [8]_ - 112:18_, 172:24_, 175:15_, 226:15 _, 238:6_, 254:14_, 255:19_, 255:20

**completed** [9]_ - 11:20_, 11:21_, 224:10_, 225:19_, 233:11_, 253:9_, 265:5_, 276:19_, 276:20

**completely** [7]_ - 159:23 _, 161:18_, 173:2_, 175:3 _, 175:4_, 175:16_, 179:6

**complex** [1]_ - 9:24

**Complies** [43]_ - 19:5_, 23:13_, 25:19_, 27:21_, 28:12_, 28:18_, 29:17_, 35:12_, 37:2_, 39:13_, 41:2_, 41:24_, 43:7_, 44:1 _, 44:23_, 46:4_, 46:15_, 47:23_, 52:9_, 52:18_, 52:22_, 54:2_, 55:10_, 56:8_, 62:3_, 63:18_, 66:10_, 73:13_, 76:7_, 80:25_, 82:25_, 83:25_, 84:18_, 90:4_, 93:3_, 95:25_, 118:14_, 119:7_, 169:16_, 183:7_, 221:21_, 244:18_, 274:5

**complies** [1] - 258:18

**component** [2]_ - 134:16 _, 176:15

**components** [3]_ - 143:13_, 144:1_, 179:23

**comports** [1]_ - 127:3

**comprehend** [1]_ - 231:9

**comprehensive** [1]_ - 197:19

**compressed** [1]_ - 164:5

**comprise** [1]_ - 4:1

**computer** [1]_ - 252:23

**computers** [3]_ - 254:23 _, 255:1_, 255:6

**conceal** [1]_ - 158:21

**concern** [2]_ - 5:22_, 6:25

**concerned** [3]_ - 127:6_, 128:13_, 279:15

**concerns** [1]_ - 6:14

**conclude** [1]_ - 214:7

**concluded** [3]_ - 147:2_, 214:6_, 268:15

**conclusion** [6]_ - 213:19 _, 214:20_, 239:13_, 240:19_, 244:7_, 255:4

**conclusions** [7]_ - 185:12_, 187:8_, 213:16_, 215:4_, 240:17_, 243:24_, 264:12

**conclusive** [2]_ - 214:2_, 214:4

**conclusory** [1]_ - 129:13

**condition** [24]_ - 30:11_, 30:12_, 36:7_, 36:8_, 46:22_, 47:16_, 49:2_, 61:2_, 65:11_, 67:17_, 70:25_, 71:4_, 74:9_, 79:15_, 86:14_, 118:3_, 176:1_, 176:3_, 176:5_, 179:20_, 223:6_, 260:25_, 274:14

**conditions** [2]_ - 20:17_, 143:2

**conduct** [26]_ - 11:21_, 13:22_, 49:7_, 138:15_, 140:1_, 153:18_, 187:22_, 197:17_, 199:24_, 204:24 _, 208:23_, 209:3_, 210:6 _, 210:16_, 214:3_, 214:14_, 214:24_, 218:5_, 218:7_, 218:12_, 229:1_, 233:17_, 235:1_, 238:8_, 238:10_, 268:22

**conducted** [13]_ - 14:3_, 15:20_, 90:13_, 118:1_, 129:17_, 138:18_, 150:16 _, 197:5_, 197:17_, 202:22_, 213:13_, 221:24 _, 230:9

**conducting** [5]_ - 200:3 _, 228:15_, 236:25_, 239:7_, 240:20

**conferences** [1]_ - 196:25

**confess** [1]_ - 259:25

**configuration** [2]_ - 189:4_, 191:3

**configurations** [1]_ - 173:5

**confirm** [4]_ - 57:24_, 99:9_, 139:6_, 234:21

**confirmation** [1]_ - 69:15

**confirmed** [1]_ - 139:7

**conflict** [1]_ - 6:21

**confusing** [1]_ - 171:8

**confusion** [1]_ - 76:20

**conjunction** [1]_ - 230:25

**connection** [4]_ - 5:11_, 12:7_, 12:9_, 248:7

**conscious** [1]_ - 219:5

**consider** [1]_ - 11:12

**consistent** [8]_ - 119:14 _, 122:10_, 181:17_, 181:19_, 187:10_, 275:2_, 276:8

**consists** [1]_ - 273:20

**console** [3]_ - 40:15_, 41:9_, 47:21

**construction** [1]_ - 33:8

**consult** [3]_ - 252:10_, 255:18_, 265:20

**consultation** [1]_ - 10:7

**consulted** [1]_ - 268:9

**consulting** [1]_ - 264:18

**consumed** [1]_ - 135:24

**contact** [2]_ - 111:23_, 125:23

**contain** [4]_ - 227:8_, 271:14_, 271:17_, 271:20

**contained** [15]_ - 51:13_, 115:15_, 146:21_, 185:7_, 221:23_, 227:7_, 229:3_, 259:11_, 266:7_, 267:5_, 267:15_, 270:25_, 271:2_, 274:4_, 274:21

**container** [3]_ - 152:11_, 183:15_, 183:16

**containing** [4]_ - 29:15_, 60:24_, 61:25_, 188:21

**contains** [3]_ - 72:15_, 269:8_, 271:11

**contaminated** [1]_ - 265:6

**contamination** [11]_ - 112:23_, 250:16_, 250:17 _, 250:21_, 250:22_, 251:3_, 251:9_, 253:7_, 253:12_, 254:12

**content** [1]_ - 35:2

**contents** [6]_ - 31:9_, 46:20_, 46:22_, 46:25_, 58:18_, 273:1

**context** [2]_ - 111:10_, 117:11

**continue** [14]_ - 5:17_,

32:12_, 88:19_, 125:18_, 147:15_, 148:19_, 219:2_, 225:9_, 225:16_, 235:25_, 236:14_, 237:20_, 237:21

**continued** [3]_ - 238:8_, 238:10_, 238:21

**continues** [2]_ - 7:9_, 201:9

**continuing** [3]_ - 199:5_, 241:7

**continuous** [4]_ - 236:12 _, 237:18_, 238:2_, 238:4

**continuously** [1]_ - 207:21

**contributor** [3]_ - 114:18 _, 160:7_, 160:9

**contributors** [3]_ - 111:24_, 112:5_, 113:19

**control** [3]_ - 10:2_, 14:5 _, 14:10

**conversations** [1]_ - 112:5

**convicted** [1]_ - 5:6

**conviction** [2]_ - 129:25 _, 130:1

**cook** [1]_ - 173:10

**cooperation** [1]_ - 218:8

**coordinated** [1]_ - 14:25

**coordinates** [1]_ - 125:4

**coordinating** [1]_ - 14:23

**coordinator** [10]_ - 108:12_, 108:15_, 111:12 _, 111:15_, 111:20_, 114:15_, 125:4_, 217:9_, 217:11_, 218:13

**copies** [1]_ - 100:12

**copper** [1]_ - 185:9

**copy** [6]_ - 3:19_, 4:7_, 6:12_, 12:17_, 29:4_, 100:13

**cord** [4]_ - 267:23_, 268:1 _, 268:8_, 268:10

**cords** [1]_ - 63:13

**core** [1]_ - 185:20

**corner** [3]_ - 104:11_, 104:12_, 221:10

**correct** [97]_ - 5:13_, 9:7_, 10:23_, 13:17_, 13:21_, 15:21_, 18:5_, 20:8_, 27:2 _, 33:22_, 36:5_, 36:6_, 38:10_, 42:14_, 44:3_, 45:12_, 46:2_, 48:6_, 48:12_, 48:14_, 48:18_,

50:15, 50:22, 52:16, 55:12, 56:18, 56:21, 60:14, 60:25, 61:1, 61:7, 71:22, 71:23, 72:1, 81:12, 82:6, 87:18, 89:19, 90:13, 90:14, 90:23, 92:8, 95:5, 96:25, 98:10, 98:11, 102:7, 104:12, 116:11, 116:14, 119:16, 119:18, 120:10, 120:13, 122:12, 123:11, 132:21, 132:22, 134:18, 136:6, 141:16, 141:20, 143:4, 149:8, 150:3, 152:18, 155:2, 158:2, 158:19, 166:1, 166:5, 166:6, 167:13, 168:8, 183:25, 192:9, 192:18, 192:20, 193:11, 193:25, 208:17, 213:8, 229:22, 232:11, 234:9, 235:24, 239:9, 241:5, 254:13, 261:1, 261:5, 262:14, 272:24, 277:10, 278:11

**corrected** [1] - 241:23

**correctly** [4] - 37:5, 255:11, 276:9, 276:11

**correspond** [3] - 77:4, 83:10, 237:1

**correspondence** [2] - 6:13, 35:5

**corresponding** [1] - 20:3

**corresponds** [5] - 12:4, 20:7, 30:7, 95:10, 107:7

**corrosion** [1] - 176:6

**corruption** [1] - 218:20

**cotton** [1] - 273:22

**Counsel** [1] - 3:6

**counsel** [4] - 3:17, 6:20, 139:9, 170:22

**Counselor** [2] - 272:4, 279:16

**count** [1] - 206:22

**counterintuitive** [1] - 163:20

**countries** [2] - 142:12, 142:15

**country** [3] - 137:13, 142:14, 203:2

**County** [1] - 13:15

**couple** [13] - 16:3, 16:7, 19:6, 19:20, 31:17,

47:10, 47:18, 75:20, 155:18, 196:25, 245:1, 252:24

**coupon** [1] - 38:21

**course** [51] - 10:11, 11:2, 11:18, 21:9, 22:1, 23:13, 25:19, 26:10, 34:1, 37:2, 39:5, 41:2, 41:24, 42:19, 44:1, 45:1, 46:15, 47:23, 49:4, 50:20, 52:9, 52:22, 54:2, 55:10, 56:8, 62:3, 62:15, 63:11, 63:16, 64:23, 65:2, 65:15, 77:22, 78:16, 80:25, 83:25, 85:2, 87:12, 92:19, 93:3, 125:22, 139:17, 158:13, 200:18, 241:8, 249:20, 250:6, 253:24, 257:2, 257:19, 279:25

**court** [10] - 22:3, 58:23, 65:15, 70:15, 74:15, 86:21, 101:12, 132:19, 137:8, 138:23

**Court** [15] - 3:1, 3:3, 6:19, 7:6, 16:8, 38:2, 79:9, 98:1, 126:23, 127:16, 127:21, 138:20, 139:6, 140:11, 166:21

**COURT** [303] - 3:2, 3:11, 3:13, 3:15, 3:18, 4:6, 4:9, 4:16, 4:25, 5:4, 5:10, 5:16, 5:20, 6:2, 6:7, 6:23, 7:5, 7:16, 7:18, 7:19, 7:21, 8:3, 8:14, 15:9, 16:12, 16:15, 17:7, 19:13, 20:24, 21:16, 22:18, 22:21, 23:23, 24:24, 25:24, 26:13, 27:10, 31:5, 32:7, 32:9, 33:24, 34:2, 34:6, 34:16, 35:20, 36:14, 36:17, 37:20, 37:23, 38:3, 39:21, 40:8, 40:19, 41:7, 42:4, 42:25, 43:16, 44:9, 45:16, 46:8, 47:13, 48:21, 53:4, 53:14, 54:11, 55:1, 55:18, 55:20, 56:14, 56:24, 57:7, 57:20, 59:5, 59:25, 60:21, 61:14, 61:16, 61:18, 62:7, 63:4, 63:22, 63:25, 64:20, 65:6, 65:21, 66:15, 66:21, 67:9, 67:22,

67:24, 68:16, 68:25, 69:6, 69:8, 69:14, 70:9, 70:16, 71:17, 72:8, 73:1, 73:17, 75:23, 76:19, 77:11, 78:25, 79:20, 79:22, 80:13, 81:9, 82:13, 84:9, 85:18, 87:5, 88:1, 88:15, 88:17, 88:19, 90:8, 91:11, 92:12, 93:8, 94:20, 95:15, 96:8, 97:5, 97:25, 98:14, 98:16, 98:18, 99:4, 99:6, 99:11, 100:5, 100:11, 100:15, 100:17, 100:19, 101:20, 101:23, 103:1, 103:3, 103:6, 103:11, 103:22, 105:11, 105:23, 106:12, 106:14, 106:18, 106:21, 106:24, 107:10, 107:16, 108:2, 108:6, 114:9, 115:10, 117:15, 117:18, 118:22, 119:21, 119:23, 120:2, 122:3, 122:24, 123:4, 124:22, 125:7, 125:9, 125:11, 125:14, 126:4, 126:17, 127:5, 127:22, 128:3, 128:10, 129:1, 129:4, 130:11, 130:15, 130:22, 130:23, 130:24, 131:1, 131:7, 131:20, 137:21, 137:25, 139:10, 139:14, 140:6, 140:13, 140:19, 141:4, 141:13, 143:20, 145:23, 147:1, 147:5, 147:7, 149:13, 149:21, 157:5, 158:5, 162:3, 162:11, 164:24, 165:24, 166:3, 166:7, 166:10, 166:16, 170:16, 180:24, 181:2, 181:5, 182:6, 182:24, 183:2, 187:13, 187:17, 188:5, 190:12, 193:7, 193:13, 193:16, 194:7, 194:16, 194:24, 195:1, 195:14, 201:4, 201:7, 215:11, 215:17, 215:20, 215:24, 220:3, 220:14, 220:24, 222:11, 222:17, 226:21, 227:19, 227:21, 227:25, 230:17, 231:6, 238:16, 241:22, 242:1, 242:3, 244:17, 244:19, 244:21, 245:18, 245:20, 245:22, 245:25, 246:11, 258:7, 258:14,

259:20, 259:22, 259:24, 260:5, 260:17, 260:20, 260:22, 262:15, 263:16, 266:5, 266:14, 266:23, 268:20, 269:1, 269:4, 270:6, 270:8, 270:12, 270:17, 270:19, 271:22, 272:1, 272:8, 272:11, 272:14, 277:1, 277:4, 277:6, 277:10, 277:14, 277:18, 278:15, 279:1, 279:13, 279:18, 280:9, 280:16, 280:20, 280:24, 281:1

**Court's** [25] - 7:13, 32:4, 33:13, 39:19, 43:13, 44:5, 46:6, 47:11, 51:6, 59:23, 60:19, 68:24, 72:24, 127:3, 127:15, 127:19, 128:11, 129:5, 130:16, 139:4, 140:4, 140:8, 146:23, 161:25, 164:22

**courtesy** [1] - 100:19

**COURTROOM** [14] - 3:4, 7:17, 8:4, 8:8, 8:10, 69:12, 107:17, 107:22, 131:10, 131:15, 195:4, 195:8, 246:2, 246:7

**courtroom** [13] - 7:20, 69:5, 69:9, 69:13, 94:3, 126:3, 130:25, 215:16, 215:22, 215:23, 271:25, 272:10, 280:8

**courts** [2] - 197:17, 200:20

**cover** [3] - 18:22, 115:5, 161:21

**covered** [4] - 18:20, 251:21, 252:3, 280:10

**covering** [1] - 189:14

**cradle** [1] - 108:25

**cradle-to-grave** [1] - 108:25

**create** [1] - 163:22

**created** [2] - 135:17, 136:5

**creating** [3] - 170:21, 175:6, 178:13

**credit** [1] - 91:25

**crime** [5] - 5:6, 130:2, 153:7, 153:12, 156:9

**crimes** [1] - 9:13

**criminal** [2]‗ - 5:11‗, 110:15

**critical** [3]‗ - 12:15‗, 146:19, 216:12

**CROSS** [5]‗ - 96:10‗, 123:6‗, 190:14, 244:22‗, 277:21

**cross** [8]‗ - 6:18‗, 96:8‗, 123:4‗, 125:7, 128:3‗, 190:12, 244:21, 277:19

**cross-examination** [6]‗ - 96:8‗, 123:4‗, 125:7, 190:12, 244:21, 277:19

**CROSS-EXAMINATION** [5]‗ - 96:10‗, 123:6‗, 190:14, 244:22‗, 277:21

**cross-examine** [1]‗ - 6:18

**crude** [1]‗ - 159:5

**crudely** [2]‗ - 153:22‗, 186:9

**CSI** [1]‗ - 9:21

**current** [3]‗ - 132:8‗, 173:6, 199:3

**Curtis** [4]‗ - 126:12‗, 245:23, 246:10, 280:11

**CURTIS** [2]‗ - 246:10, 246:13

**curve** [1]‗ - 102:18

**curved** [2]‗ - 68:10‗, 206:9

**custody** [13]‗ - 13:5‗, 14:4, 14:5, 14:8, 14:10‗, 17:19, 17:21, 17:22‗, 20:14, 114:7, 116:22‗, 217:25, 257:10

**customary** [1]‗ - 164:11

**customer** [1]‗ - 43:6

**cut** [5]‗ - 102:13, 102:17‗, 252:21, 254:8, 263:8

**cutting** [1]‗ - 88:14

### D

**daily** [3]‗ - 198:11‗, 254:3‗, 254:20

**damaging** [2]‗ - 160:14‗, 251:2

**dark** [3]‗ - 178:17‗, 232:4‗, 232:5

**darkened** [1]‗ - 262:12

**darker** [1]‗ - 262:6

**dash** [2]‗ - 116:3‗, 116:18

**database** [12]‗ - 153:9‗, 153:11‗, 156:5‗, 156:11‗, 197:6‗, 203:4‗, 213:3‗, 213:5‗, 233:16‗, 233:22‗, 234:9‗, 235:3

**databases** [2]‗ - 202:25‗, 213:2

**date** [38]‗ - 17:20‗, 23:14‗, 25:14, 34:5‗, 43:23‗, 43:25‗, 67:3‗, 75:12‗, 76:11, 76:24‗, 77:17‗, 78:5‗, 83:2‗, 83:3‗, 89:7‗, 91:1, 91:2, 91:17‗, 91:18, 92:25, 93:23‗, 93:25, 94:3‗, 95:1‗, 95:2‗, 96:3‗, 228:11‗, 228:13‗, 234:5‗, 242:16‗, 242:18, 242:20, 243:7‗, 243:9

**dated** [4]‗ - 67:4‗, 76:12‗, 85:25, 89:16

**dates** [7]‗ - 34:4‗, 83:15‗, 90:24, 96:19, 96:20‗, 96:23, 96:24

**Daubert** [1]‗ - 129:23

**day-to-day** [5]‗ - 197:2‗, 197:21, 198:7, 198:14‗, 249:1

**days** [3]‗ - 33:11‗, 115:2‗, 241:8

**dealership** [1]‗ - 33:8

**death** [1]‗ - 203:15

**debit** [1]‗ - 27:17

**decades** [1]‗ - 142:11

**deceased** [2]‗ - 198:24‗, 199:1

**decent** [1]‗ - 114:25

**decide** [3]‗ - 138:7‗, 268:7

**decision** [3]‗ - 5:1‗, 214:12, 244:8

**decomposition** [1]‗ - 203:15

**deemed** [2]‗ - 208:24‗, 234:15

**deep** [1]‗ - 178:17

**defacing** [1]‗ - 159:7

**defend** [1]‗ - 146:7

**defendant** [7]‗ - 36:5‗, 126:23, 127:10, 129:20‗, 129:22, 129:25‗, 279:7

**defendant's** [5]‗ - 27:4‗,

63:8‗, 67:15‗, 84:16‗, 95:22

**defense** [10]‗ - 3:14‗, 4:5‗, 4:6, 4:17‗, 5:1‗, 7:9‗, 129:21, 130:18‗, 277:15

**defer** [1]‗ - 252:4

**definitely** [2]‗ - 186:23‗, 217:22

**degradation** [1]‗ - 218:20

**degree** [1]‗ - 110:13

**degrees** [2]‗ - 110:13‗, 133:16

**deleterious** [1]‗ - 160:17

**deliberations** [2]‗ - 122:7‗, 280:2

**Delight** [4]‗ - 72:12‗, 78:13, 78:15, 78:16

**delineate** [2]‗ - 116:23‗, 117:1

**delineated** [1]‗ - 117:9

**deliver** [1]‗ - 174:11

**delta** [5]‗ - 31:16‗, 31:22‗, 31:23‗, 32:1

**Delta** [1]‗ - 15:25

**demand** [1]‗ - 129:11

**demonstrate** [8]‗ - 71:24‗, 143:22, 146:14‗, 148:21, 227:13‗, 230:8‗, 235:12‗, 238:7

**demonstrated** [1]‗ - 151:21

**demonstrates** [1]‗ - 239:1

**demonstrating** [2]‗ - 140:10‗, 239:14

**demonstration** [2]‗ - 147:2‗, 243:23

**demonstrative** [6]‗ - 230:8‗, 231:8‗, 235:7‗, 238:15‗, 240:7‗, 243:17

**denotes** [1]‗ - 232:2

**dental** [3]‗ - 24:14‗, 52:6‗, 80:23

**department** [1]‗ - 122:14

**Department** [7]‗ - 196:14‗, 196:17‗, 196:19‗, 197:1‗, 197:7‗, 199:9‗, 200:19

**depict** [4]‗ - 57:2‗, 81:16‗, 106:6‗, 227:14

**depicted** [5]‗ - 117:20‗,

119:9‗, 231:16‗, 232:17‗, 261:4

**deployed** [1]‗ - 145:20

**DEPUTY** [14]‗ - 3:4‗, 7:17‗, 8:4, 8:8, 8:10, 69:12‗, 107:17, 107:22‗, 131:10, 131:15, 195:4‗, 195:8, 246:2, 246:7

**Deputy** [1]‗ - 230:20

**deputy** [1]‗ - 103:11

**describe** [33]‗ - 28:7‗, 53:20, 61:23, 62:13‗, 65:9, 79:7, 87:10‗, 106:2, 148:22, 163:14‗, 173:3, 176:3, 183:11‗, 187:24, 197:11, 198:1‗, 198:20, 206:3, 206:17‗, 209:2, 212:17, 227:3‗, 231:15, 232:16, 239:12‗, 250:3, 250:5, 254:16‗, 262:21, 263:2‗, 263:24, 265:12, 269:16

**described** [21]‗ - 122:9‗, 148:24, 201:16, 202:7‗, 205:19, 213:11, 223:23‗, 227:9, 228:3, 228:23‗, 239:20, 240:16‗, 259:14, 261:15, 262:2‗, 262:18, 263:1, 264:6‗, 267:9, 275:11, 276:5

**describing** [2]‗ - 204:2‗, 226:8

**description** [1]‗ - 20:4

**design** [4]‗ - 146:4‗, 186:6, 186:13, 191:3

**designated** [2]‗ - 139:24‗, 243:22

**designation** [1]‗ - 139:24

**designed** [14]‗ - 114:21‗, 142:7, 142:9, 142:18‗, 142:20, 143:2, 144:21‗, 145:22, 147:11, 181:14‗, 186:3, 188:13, 190:8‗, 191:9

**designing** [1]‗ - 114:12

**designs** [2]‗ - 142:16‗, 185:25

**desk** [2]‗ - 134:4‗, 225:22

**destroy** [2]‗ - 160:16‗, 208:1

**destroyed** [1]‗ - 207:18

**destroying** [1]‗ - 175:3

**destructive** [12]‗ - 112:20‗, 120:16‗, 122:11

_, 124:2_, 124:3_, 160:14_, 163:19_, 180:9_, 180:17

**detached** [1]_ - 141:1

**detail** [8]_ - 198:1_, 201:18_, 204:22_, 205:4_, 205:6_, 205:12_, 206:3_, 229:3

**details** [2]_ - 204:11_, 212:2

**detect** [5]_ - 197:15_, 198:14_, 202:4_, 210:7_, 264:15

**detected** [8]_ - 198:15_, 207:23_, 208:24_, 209:23_, 210:18_, 223:19_, 224:6_, 240:22

**detection** [2]_ - 208:13_, 208:17

**determine** [12]_ - 10:8_, 102:20_, 134:25_, 153:17_, 181:15_, 184:4_, 184:6_, 184:11_, 186:19_, 212:6_, 212:7_, 229:2

**determined** [5]_ - 11:24_, 212:10_, 233:11_, 234:15_, 240:21

**determining** [2]_ - 226:13

**detonation** [1]_ - 188:24

**develop** [1]_ - 157:15

**developed** [1]_ - 202:9

**developing** [2]_ - 129:14_, 152:16

**development** [2]_ - 142:3_, 198:23

**deviate** [1]_ - 128:21

**device** [3]_ - 146:7_, 162:22_, 254:11

**devices** [1]_ - 185:9

**diamond** [2]_ - 262:23_, 263:3

**difference** [3]_ - 148:15_, 205:18_, 215:1

**different** [50]_ - 29:5_, 29:6_, 56:17_, 71:22_, 88:10_, 110:19_, 111:21_, 142:15_, 144:24_, 149:6_, 164:12_, 173:5_, 175:18_, 185:5_, 185:25_, 188:12_, 190:21_, 197:16_, 198:24_, 203:7_, 203:23_, 203:24_, 204:3_, 204:6_, 205:2_, 206:15_, 207:4_, 207:6_, 208:16_, 209:11_,

209:12_, 213:23_, 217:5_, 226:16_, 229:9_, 229:19_, 229:24_, 232:20_, 232:22_, 235:4_, 237:9_, 241:9_, 248:1_, 252:11_, 260:15_, 260:25_, 262:3_, 269:8_, 276:18

**differently** [2]_ - 16:11_, 101:15

**difficult** [1]_ - 239:18

**digital** [8]_ - 126:15_, 153:6_, 210:15_, 211:4_, 211:21_, 225:12_, 225:23_, 243:20

**dimensions** [1]_ - 187:7

**diminishing** [1]_ - 175:2

**dimple** [1]_ - 189:13

**dip** [1]_ - 173:7

**direct** [5]_ - 160:9_, 193:9_, 256:19_, 259:22_, 262:15

**DIRECT** [5]_ - 8:18_, 108:9_, 131:25_, 195:18_, 246:15

**directed** [1]_ - 141:8

**direction** [4]_ - 190:7_, 211:13_, 233:5_, 238:13

**directly** [5]_ - 114:19_, 256:1_, 274:16_, 274:18_, 276:21

**director** [1]_ - 200:16

**director's** [1]_ - 200:15

**disabled** [1]_ - 140:17

**disagreement** [4]_ - 212:14_, 213:24_, 240:10_, 240:13

**disassembled** [1]_ - 130:9

**disc** [1]_ - 135:22

**discipline** [9]_ - 110:10_, 110:21_, 112:13_, 122:14_, 125:1_, 132:13_, 132:18_, 192:4_, 199:6

**disciplines** [7]_ - 110:16_, 110:18_, 111:7_, 111:21_, 112:24_, 113:13_, 124:1

**discuss** [7]_ - 69:2_, 112:5_, 215:14_, 217:7_, 234:11_, 237:23_, 272:2

**discussed** [11]_ - 201:20_, 212:3_, 226:1_, 226:12_, 239:24_, 242:12_, 243:16_, 254:2_, 267:15_,

270:15_, 275:9

**discussing** [7]_ - 6:22_, 81:11_, 105:15_, 114:18_, 130:13_, 165:16_, 279:22

**discussion** [2]_ - 125:19_, 279:23

**display** [9]_ - 94:19_, 99:7_, 99:12_, 100:5_, 100:10_, 100:20_, 103:7_, 103:23_, 140:5

**displayed** [3]_ - 57:10_, 80:13_, 99:7

**dispositioning** [1]_ - 111:14

**disrupt** [1]_ - 121:15

**disruptions** [1]_ - 218:15

**distance** [2]_ - 135:12_, 192:2

**distinction** [2]_ - 116:15_, 215:1

**distorted** [1]_ - 154:5

**distribute** [1]_ - 122:2

**distributed** [1]_ - 156:20

**distributor** [1]_ - 158:1

**district** [2]_ - 6:15_, 7:7

**divide** [2]_ - 204:19_, 204:20

**division** [1]_ - 133:8

**DNA** [43]_ - 9:23_, 110:25_, 111:1_, 112:21_, 113:2_, 113:14_, 202:11_, 202:21_, 219:6_, 219:7_, 219:10_, 219:12_, 219:15_, 219:17_, 223:16_, 246:22_, 246:23_, 247:11_, 247:12_, 247:22_, 247:23_, 247:25_, 248:1_, 248:11_, 249:23_, 250:7_, 250:18_, 251:2_, 251:13_, 253:22_, 254:16_, 254:19_, 255:19_, 255:21_, 256:9_, 256:24_, 261:19_, 261:24_, 264:22_, 269:19_, 269:23_, 273:23

**docket** [3]_ - 129:7_, 129:18_, 129:24

**document** [4]_ - 20:3_, 229:9_, 230:1_, 230:25

**documentation** [5]_ - 10:9_, 109:6_, 200:1_, 214:20_, 228:15

**documented** [2]_ - 53:24_, 205:14

**documenting** [3]_ - 11:16_, 205:13_, 226:16

**documents** [12]_ - 4:21_, 5:21_, 5:25_, 6:2_, 6:4_, 6:9_, 36:4_, 71:25_, 85:11_, 85:12_, 85:14_, 111:11

**dollar** [1]_ - 62:25

**Dollar** [13]_ - 75:17_, 76:1_, 76:2_, 76:23_, 77:15_, 78:2_, 80:7_, 81:1_, 81:2_, 81:4

**done** [30]_ - 11:11_, 18:18_, 109:10_, 113:20_, 121:18_, 123:21_, 127:11_, 127:12_, 133:23_, 154:10_, 159:25_, 176:20_, 180:17_, 180:18_, 202:17_, 214:16_, 216:7_, 224:25_, 241:4_, 249:4_, 251:5_, 251:6_, 252:17_, 253:24_, 254:2_, 269:25_, 279:10

**DONNELLY** [105]_ - 194:20_, 194:25, 195:13, 195:15_, 195:19_, 201:1_, 201:11_, 201:12_, 215:7_, 216:3_, 216:4_, 219:25_, 220:4_, 220:5_, 220:11_, 220:15_, 220:17_, 221:2_, 221:17, 221:18_, 222:9_, 222:12_, 222:18_, 222:19_, 225:5_, 225:7_, 226:18_, 226:22_, 226:23_, 227:17_, 227:23_, 228:1_, 228:2_, 229:15_, 229:17_, 230:12_, 230:18_, 230:21_, 231:4_, 231:14_, 232:13_, 232:15_, 238:17_, 238:20_, 241:2, 241:3_, 241:19_, 241:23_, 242:2_, 242:4_, 242:5_, 242:22_, 242:24_, 244:14_, 244:18_, 244:20_, 245:19_, 245:23_, 246:12_, 246:16_, 258:5_, 258:8_, 258:15_, 259:18_, 259:21_, 259:23_, 259:25_, 260:6_, 260:7_, 260:23_, 262:16_, 262:17_, 263:14_, 263:17_, 266:6_, 266:12_, 266:15_, 266:16_, 266:21_, 266:24_, 267:1_, 268:18_, 268:21_, 268:25_, 269:2_, 269:5_, 269:6_, 270:4, 270:7_, 270:10_, 270:13_, 270:18_, 270:20_, 270:21_, 272:6_, 272:13_, 272:16_, 272:17_, 273:12_, 273:15_,

276:23_, 279:3_, 279:5_, 279:12_, 279:17

**Donnelly** [1]_ - 3:10

**donning** [1]_ - 250:8

**doors** [1]_ - 11:15

**Dos** [3]_ - 92:5_, 92:23_, 93:17

**dot** [8]_ - 212:4_, 236:9_, 236:10_, 237:11_, 237:14_, 237:15_, 237:16_, 240:2

**dots** [15]_ - 229:8_, 229:24_, 232:19_, 235:15_, 235:22_, 237:1_, 237:4_, 237:7_, 239:3_, 239:19_, 239:22_, 240:1_, 240:3_, 240:4_, 240:7

**double** [1]_ - 98:6

**double-check** [1]_ - 98:6

**down** [47]_ - 29:8_, 30:14_, 30:15_, 43:21_, 47:2_, 54:17_, 60:4_, 60:12_, 67:2_, 92:3_, 98:25_, 100:8_, 115:5_, 118:17_, 140:11_, 140:16_, 141:6_, 144:9_, 144:25_, 146:11_, 149:20_, 150:25_, 151:7_, 151:8_, 152:8_, 154:5_, 161:25_, 162:9_, 188:23_, 189:20_, 224:12_, 224:19_, 224:21_, 225:5_, 228:18_, 228:20_, 229:13_, 229:15_, 234:5_, 234:16_, 236:13_, 237:17_, 237:19_, 239:25_, 241:2_, 250:12_, 262:13

**downstream** [4]_ - 256:2_, 256:3_, 270:2_, 276:22

**drab** [1]_ - 54:23

**drank** [1]_ - 51:12

**draw** [3]_ - 186:9_, 237:9_, 240:1

**Dremel** [2]_ - 159:14_, 172:11

**dress** [7]_ - 97:13_, 97:21_, 98:23_, 98:24

**dresses** [1]_ - 101:14

**drill** [21]_ - 60:24_, 61:2_, 159:5_, 159:15_, 159:19_, 159:21_, 159:22_, 167:21_, 168:5_, 168:23_, 168:24_, 169:9_, 172:11_, 172:12_, 176:23_, 176:24_, 178:2_, 179:16_,

189:12

**drilled** [3]_ - 161:6_, 163:2_, 168:4

**drilling** [3]_ - 159:4_, 176:5_, 176:22

**drills** [1]_ - 159:14

**drinks** [1]_ - 78:13

**drip** [1]_ - 18:20

**dripping** [1]_ - 171:3

**driver** [2]_ - 42:9_, 42:17

**driver's** [22]_ - 17:10_, 20:12_, 22:14_, 23:5_, 24:7_, 26:5_, 26:6_, 26:19_, 26:20_, 37:6_, 39:16_, 40:3_, 40:4_, 42:12_, 42:15_, 47:17_, 48:11_, 48:12_, 48:15_, 87:15_, 87:18

**driving** [2]_ - 13:5_, 51:2

**dry** [1]_ - 78:11

**dual** [1]_ - 110:2

**dual-access** [1]_ - 110:2

**due** [1]_ - 202:11

**during** [38]_ - 4:3_, 14:3_, 23:7_, 25:12_, 33:11_, 35:25_, 36:8_, 55:11_, 56:3_, 67:18_, 72:18_, 73:8_, 75:4_, 82:8_, 84:4_, 84:16_, 85:11_, 106:7_, 115:3_, 117:7_, 122:6_, 128:12_, 164:20_, 165:12_, 179:18_, 196:19_, 197:1_, 200:18_, 215:15_, 232:7_, 232:21_, 232:22_, 248:17_, 249:20_, 250:6_, 250:8_, 257:2_, 259:1

**duties** [10]_ - 9:11_, 10:22_, 132:17_, 197:2_, 197:21_, 198:22_, 200:18_, 208:14_, 248:8_, 257:19

**duty** [2]_ - 9:14_, 202:1

**dye** [1]_ - 209:22

### E

**E-R-I-C-H** [1]_ - 131:19

**E-R-I-N** [1]_ - 108:1

**earliest** [1]_ - 96:23

**early** [1]_ - 192:25

**earplugs** [1]_ - 68:19

**ease** [6]_ - 50:8_, 76:5_, 76:13_, 77:18_, 91:20_,

107:4

**easier** [2]_ - 99:20_, 140:15

**easiest** [1]_ - 9:20

**easy** [1]_ - 160:10

**eat** [2]_ - 51:23_, 180:13

**eaten** [1]_ - 174:1

**Echo** [3]_ - 15:25

**edge** [1]_ - 102:17

**edges** [2]_ - 204:22_, 205:7

**education** [7]_ - 133:17_, 199:5_, 202:7_, 202:16_, 208:7_, 247:4_, 247:6

**educational** [1]_ - 196:8

**EED** [1]_ - 15:25

**effect** [4]_ - 178:9_, 179:19_, 179:20_, 186:5

**effects** [1]_ - 180:9

**effort** [1]_ - 269:22

**Egypt** [1]_ - 142:15

**eight** [4]_ - 89:22_, 97:2_, 175:8_, 199:4

**either** [16]_ - 148:19_, 161:10_, 204:18_, 210:9_, 222:7_, 236:16_, 237:21_, 238:1_, 238:2_, 238:5_, 239:18_, 255:16_, 256:1_, 273:3_, 276:21_, 280:21

**ejected** [1]_ - 152:11

**elastic** [1]_ - 63:14

**elected** [1]_ - 172:24

**electric** [2]_ - 52:4_, 170:22

**electrical** [1]_ - 173:6

**electricity** [2]_ - 173:9

**electronic** [1]_ - 157:9

**elects** [1]_ - 7:2

**elements** [1]_ - 128:16

**Eleventh** [1]_ - 130:17

**Ellen** [1]_ - 82:23

**ELMO** [5]_ - 98:18_, 103:7_, 117:13_, 118:17_, 119:22

**emblem** [1]_ - 168:10

**emblems** [1]_ - 168:21

**employed** [3]_ - 195:22_, 196:13_, 246:19

**emptied** [1]_ - 51:12

**enclosure** [1]_ - 204:21

**encounter** [2]_ - 150:23

_, 232:7

**encountered** [2]_ - 83:24_, 102:5

**end** [27]_ - 4:23_, 84:19_, 112:23_, 113:7_, 124:4_, 135:25_, 136:2_, 145:12_, 165:15_, 173:24_, 175:8_, 179:19_, 180:1_, 197:20_, 203:25_, 204:14_, 204:19_, 222:6_, 222:7_, 235:17_, 236:16_, 238:1_, 255:9_, 255:14_, 268:13_, 280:2_, 280:24

**ended** [1]_ - 237:22

**ending** [16]_ - 235:16_, 235:17_, 236:4_, 236:6_, 236:8_, 236:10_, 236:13_, 237:11_, 237:13_, 237:15_, 237:16_, 237:18_, 237:19_, 237:22_, 238:1

**ends** [2]_ - 237:20_, 268:13

**enforcement** [12]_ - 109:9_, 109:13_, 109:18_, 111:24_, 113:19_, 137:7_, 157:2_, 157:7_, 157:12_, 198:18_, 198:25_, 249:19

**engaged** [1]_ - 208:19

**enjoy** [1]_ - 128:23

**enjoyed** [1]_ - 131:2

**ensure** [6]_ - 10:4_, 17:20_, 20:6_, 20:16_, 69:18_, 243:17

**entails** [1]_ - 124:12

**enter** [1]_ - 69:9

**entered** [5]_ - 7:20_, 69:13_, 130:25_, 215:23_, 272:10

**entertain** [1]_ - 34:7

**entire** [5]_ - 133:4_, 161:10_, 177:11_, 178:23_, 224:19

**entirety** [4]_ - 224:19_, 226:11_, 232:20_, 240:9

**entries** [2]_ - 29:21_, 156:2

**entry** [11]_ - 11:13_, 11:20_, 31:17_, 43:5_, 47:7_, 66:2_, 80:21_, 110:2_, 129:7_, 129:18_, 129:24

**envelope** [2]_ - 243:1_, 243:2

**envelopes** [2]_ - 271:10_, 271:11

**environment** [3]_ -

202:13_, 202:22_, 208:8

**environmental** [2]_ - 208:2_, 208:12

**equipment** [1]_ - 250:9

**erase** [3]_ - 228:8_, 236:18_, 236:19

**erased** [2]_ - 135:3_, 162:25

**Erich** [4]_ - 126:10_, 131:5_, 131:18_, 280:11

**ERICH** [1] - 131:23

**Erin** [7]_ - 107:15_, 107:25_, 217:13_, 219:19_, 219:21_, 221:11

**ERIN** [1] - 108:7

**ERT** [9]_ - 9:17_, 9:21_, 9:25_, 10:22_, 11:3_, 14:20_, 15:19_, 81:17

**escaping** [1]_ - 199:17

**especially** [2]_ - 120:17_, 200:9

**essentially** [1]_ - 276:4

**estimations** [1]_ - 259:25

**et** [1]_ - 20:17

**ethically** [1]_ - 6:19

**eTrace** [2]_ - 160:7_, 192:12

**European** [1]_ - 136:13

**evaluate** [5]_ - 112:2_, 114:20_, 120:20_, 120:25_, 199:22

**evaluated** [1]_ - 112:10

**evaluating** [2]_ - 135:6_, 151:3

**evaluation** [8]_ - 121:11_, 213:11_, 213:16_, 214:15_, 214:25_, 226:2_, 226:5_, 240:21

**evaluations** [1]_ - 124:12

**evening** [4]_ - 12:13_, 280:5_, 281:3_, 281:4

**event** [7]_ - 38:22_, 140:17_, 212:4_, 212:5_, 233:2_, 233:4_, 237:5

**events** [12]_ - 205:6_, 226:12_, 226:16_, 232:20_, 232:22_, 233:3_, 235:16_, 236:2_, 238:4_, 238:9_, 238:12_, 239:4

**Evidence** [5]_ - 9:15_, 9:18_, 12:14_, 13:11_,

30:6

**evidence** [251]_ - 6:15_, 10:8_, 10:15_, 10:25_, 11:7_, 11:24_, 12:4_, 13:18_, 14:11_, 15:7_, 15:19_, 16:4_, 16:10_, 16:18_, 17:6_, 17:14_, 17:19_, 17:25_, 19:12_, 19:24_, 20:2_, 20:3_, 20:4_, 20:8_, 20:20_, 20:23_, 21:15_, 22:5_, 23:21_, 24:7_, 25:23_, 28:2_, 28:25_, 29:9_, 30:5_, 32:4_, 32:18_, 33:16_, 34:15_, 35:19_, 36:19_, 36:21_, 37:11_, 37:15_, 37:25_, 38:13_, 39:9_, 39:19_, 40:7_, 40:18_, 40:23_, 41:5_, 41:15_, 42:3_, 42:8_, 42:24_, 43:15_, 44:7_, 44:21_, 45:15_, 46:7_, 46:11_, 47:12_, 48:20_, 49:11_, 49:19_, 50:12_, 50:17_, 51:8_, 51:18_, 51:25_, 53:13_, 54:10_, 54:25_, 55:17_, 56:12_, 56:23_, 57:6_, 57:19_, 58:5_, 59:24_, 60:20_, 61:9_, 61:13_, 62:6_, 62:20_, 62:21_, 63:21_, 64:19_, 65:5_, 65:20_, 66:19_, 67:8_, 67:21_, 67:25_, 68:15_, 70:7_, 70:8_, 71:2_, 72:6_, 73:2_, 73:16_, 75:1_, 75:22_, 76:16_, 77:10_, 78:23_, 79:9_, 79:24_, 81:8_, 81:18_, 82:12_, 83:8_, 83:21_, 84:7_, 85:13_, 85:17_, 87:4_, 87:25_, 90:7_, 91:10_, 92:11_, 94:18_, 95:10_, 95:14_, 97:16_, 99:4_, 99:12_, 100:5_, 103:24_, 105:22_, 106:16_, 107:8_, 108:12_, 108:15_, 108:21_, 108:23_, 108:24_, 108:25_, 109:2_, 109:3_, 109:4_, 109:7_, 109:11_, 109:16_, 109:17_, 111:1_, 111:2_, 111:14_, 111:18_, 112:3_, 112:6_, 112:22_, 113:2_, 113:5_, 113:9_, 113:11_, 113:12_, 113:13_, 113:18_, 114:1_, 114:3_, 114:16_, 114:17_, 114:21_, 117:25_, 121:17_, 121:19_, 121:20_, 122:16_, 124:16_, 127:1_, 127:18_, 129:14_, 129:20_, 138:13

_, 139:16_, 155:16_, 164:21_, 165:21, 166:13_, 166:15_, 181:4_, 181:10_, 183:1_, 184:18_, 184:19_, 184:20_, 187:16_, 194:23_, 197:14_, 197:15_, 202:4_, 205:24_, 208:17_, 208:22_, 209:4_, 209:8_, 209:9_, 210:2_, 210:7_, 211:19_, 216:18_, 216:24_, 217:3_, 217:22_, 217:24_, 218:4_, 218:19_, 218:22_, 220:2_, 222:14_, 222:22_, 226:20_, 227:18_, 227:22_, 230:16_, 231:9_, 231:11_, 231:19_, 240:25_, 241:7_, 241:10_, 241:21_, 241:25_, 243:1_, 243:6_, 243:7_, 243:9_, 244:15_, 244:17_, 247:23_, 249:19_, 250:18_, 250:22_, 254:8_, 260:4_, 260:10_, 263:22_, 265:9_, 266:22_, 269:3_, 270:15_, 271:15_, 274:16_, 276:24_, 277:17_, 280:4

**evidence-tampering** [1]_ - 6:15

**evidentiary** [2]_ - 4:13_, 280:20

**evolution** [2]_ - 142:5_, 142:25

**exact** [4]_ - 104:3_, 104:6_, 143:22_, 247:11

**exactly** [14]_ - 12:4_, 12:24_, 20:5_, 54:18_, 64:13_, 100:1_, 144:5_, 154:18_, 201:14_, 217:25_, 223:25_, 224:3_, 234:18_, 265:17

**exam** [15]_ - 112:20_, 113:23_, 114:13_, 135:14_, 156:16_, 163:18_, 191:18_, 209:8_, 209:11_, 218:4_, 218:15_, 218:24_, 223:12

**examination** [54]_ - 22:20_, 32:12_, 34:9_, 96:8_, 109:8_, 111:9_, 111:11_, 111:17_, 112:11_, 112:24_, 113:8_, 113:14_, 113:21_, 117:7_, 123:4_, 125:7_, 126:21_, 150:21_, 153:19_, 164:20_, 190:12_, 193:9_, 197:19_, 202:2_, 205:10_, 209:3_, 210:2_, 210:6_, 211:23_, 215:9_, 216:25_, 218:12_, 218:14_, 218:19

_, 219:14_, 219:15_, 219:16_, 223:6_, 225:10_, 225:17_, 238:6_, 243:25_, 244:21_, 253:12_, 255:9_, 255:20_, 257:9_, 257:21_, 268:16_, 270:2_, 277:19_, 279:16_, 279:20

**EXAMINATION** [13]_ - 8:18_, 96:10_, 105:13_, 108:9_, 123:6_, 131:25_, 190:14_, 194:9_, 195:18_, 244:22_, 246:15_, 277:21_, 279:4

**examinations** [12]_ - 9:22_, 114:24_, 138:15_, 138:18_, 150:16_, 200:4_, 204:25_, 205:2_, 218:11_, 219:1_, 219:3_, 249:22

**examine** [16]_ - 6:18_, 25:18_, 71:14_, 115:13_, 138:12_, 140:1_, 183:8_, 197:2_, 197:22_, 202:17_, 202:18_, 225:25_, 258:12_, 268:10_, 273:1

**examined** [3]_ - 151:16_, 252:16_, 261:6

**examiner** [21]_ - 110:11_, 114:4_, 124:13_, 124:25_, 132:9_, 132:12_, 132:21_, 133:3_, 196:2_, 196:14_, 197:5_, 199:23_, 214:13_, 214:19_, 214:21_, 249:5_, 252:4_, 252:5_, 255:18_, 264:18_, 268:9

**Examiners** [1]_ - 136:12

**examiners** [6]_ - 133:1_, 133:10_, 137:6_, 199:25_, 252:11_, 256:12

**example** [17]_ - 9:22_, 31:15_, 37:6_, 58:12_, 59:14_, 62:25_, 113:15_, 143:5_, 159:17_, 170:25_, 171:9_, 178:11_, 204:21_, 207:12_, 218:17_, 218:23_, 232:21

**examples** [1]_ - 19:7

**exams** [10]_ - 110:20_, 112:18_, 114:17_, 114:19_, 135:10_, 197:18_, 218:13_, 219:10_, 223:16_, 259:1

**exceeds** [1]_ - 193:8

**excellence** [1]_ - 200:16

**excellent** [3]_ - 8:3_, 69:20_, 131:7

**except** [1]_ - 16:10

**excess** [1] - 213:3
**excessively** [1] - 207:24
**exciting** [1] - 96:14
**exclude** [1] - 4:19
**excluded** [2] - 4:23, 4:25
**exclusion** [3] - 213:17, 213:23, 215:5
**exclusively** [1] - 211:1
**excuse** [2] - 132:6, 136:16
**excused** [4] - 107:11, 125:12, 245:20, 279:14
**executing** [1] - 14:25
**execution** [5] - 15:3, 23:7, 25:12, 56:3, 84:16
**exercise** [1] - 58:17
**exhibit** [23] - 3:20, 3:25, 4:10, 16:13, 25:22, 32:16, 33:13, 33:25, 34:8, 37:10, 74:3, 83:19, 100:20, 103:1, 103:4, 119:20, 138:23, 184:2, 231:10, 267:19, 273:10, 277:4, 277:6
**Exhibit** [157] - 3:24, 4:2, 15:6, 16:5, 16:18, 17:25, 19:12, 20:23, 21:15, 22:25, 23:21, 24:23, 25:23, 26:12, 27:9, 28:1, 29:1, 29:4, 29:9, 30:2, 30:18, 31:2, 32:11, 32:18, 33:14, 33:21, 34:14, 35:18, 36:13, 36:19, 37:11, 37:15, 37:19, 37:21, 37:25, 38:6, 38:13, 39:9, 39:20, 40:7, 40:18, 41:5, 41:13, 41:15, 42:3, 42:24, 43:14, 44:7, 44:21, 45:15, 47:12, 48:20, 49:12, 49:18, 50:12, 50:17, 51:8, 51:17, 51:25, 53:13, 54:10, 54:25, 55:17, 56:12, 56:16, 56:23, 57:6, 58:3, 58:18, 59:12, 59:24, 60:20, 61:12, 62:5, 63:21, 64:19, 65:5, 65:19, 66:19, 67:7, 67:21, 67:25, 68:15, 70:7, 71:9, 71:15, 71:21, 72:5, 72:25, 73:16,

74:6, 74:25, 75:22, 76:16, 77:10, 78:24, 79:19, 79:24, 81:8, 82:2, 82:12, 83:20, 84:7, 85:17, 87:4, 87:25, 90:7, 91:10, 92:11, 94:18, 95:13, 105:22, 106:11, 106:16, 107:2, 115:8, 115:15, 116:11, 117:12, 117:16, 117:21, 118:10, 118:20, 119:3, 119:10, 122:2, 122:15, 139:5, 146:24, 150:10, 155:1, 165:12, 166:22, 168:13, 170:6, 172:19, 173:20, 175:19, 177:5, 177:16, 177:22, 180:23, 181:4, 181:9, 182:23, 184:18, 187:1, 187:9, 187:15, 188:4, 188:8, 189:21, 227:22, 268:23, 269:3
**exhibits** [12] - 22:20, 60:16, 99:7, 100:13, 119:1, 122:5, 165:25, 166:10, 166:17, 231:11, 231:12, 277:14
**Exhibits** [10] - 17:5, 57:19, 63:3, 99:5, 165:1, 165:17, 166:12, 166:14, 183:1, 277:16
**exited** [5] - 69:5, 126:3, 215:16, 271:25, 280:8
**expect** [1] - 213:21
**expected** [1] - 279:16
**expensive** [1] - 62:23
**experience** [13] - 18:18, 68:8, 134:13, 138:4, 158:13, 158:20, 158:22, 158:25, 181:20, 202:8, 202:16, 208:7, 208:9
**experiencing** [1] - 232:9
**expert** [11] - 129:16, 137:8, 137:15, 137:20, 137:22, 137:24, 200:20, 200:24, 201:2, 201:5, 201:8
**expertise** [3] - 159:24, 192:3, 192:5
**experts** [1] - 125:1
**expiration** [5] - 23:14, 25:14, 25:16, 85:3, 96:3

**expired** [1] - 23:16
**expires** [1] - 96:2
**expiring** [1] - 86:1
**expiry** [1] - 23:14
**explain** [6] - 9:20, 115:20, 116:15, 117:4, 170:19, 231:20
**explained** [1] - 176:14
**explaining** [2] - 129:11, 153:21
**explicitly** [1] - 129:10
**exploit** [1] - 113:6
**exploitation** [1] - 112:7
**exposed** [2] - 179:24, 185:23
**exposure** [1] - 250:13
**extensive** [1] - 127:16
**exterior** [3] - 11:14, 82:3, 121:13
**external** [4] - 196:25, 199:10, 199:14, 199:15
**extract** [1] - 247:23
**extracted** [1] - 256:15
**extracting** [1] - 254:16
**extraction** [36] - 126:15, 247:13, 247:19, 247:21, 247:23, 248:5, 250:4, 254:17, 254:18, 254:24, 255:2, 255:4, 255:9, 255:19, 257:23, 258:2, 259:15, 263:11, 271:5, 271:8, 273:3, 273:7, 273:18, 273:19, 273:20, 273:25, 274:14, 275:11, 275:15, 275:17, 275:20, 275:23, 276:1, 276:19, 276:20, 279:7
**extractions** [3] - 251:4, 251:8, 255:24
**extracts** [1] - 113:16
**extremely** [2] - 189:14, 208:9
**eye** [2] - 57:15, 240:2

F

**F-A-R-A-I-S** [1] - 108:1
**face** [1] - 52:20
**facility** [2] - 109:21, 126:14
**fact** [10] - 33:18, 122:20,

126:12, 128:2, 130:7, 130:8, 152:22, 165:9, 199:4, 219:5
**factors** [4] - 202:13, 206:7, 208:2, 208:12
**factory** [3] - 168:10, 168:20, 168:21
**facts** [2] - 6:5, 129:21
**factual** [3] - 129:12, 129:21, 130:17
**factually** [2] - 5:12, 5:14
**faded** [10] - 65:12, 65:13, 70:14, 74:17, 75:12, 77:1, 86:16, 90:10, 90:11, 90:19
**fair** [9] - 45:25, 120:11, 149:3, 149:7, 152:15, 208:16, 236:21, 248:2, 257:19
**fairly** [10] - 74:10, 74:20, 79:13, 86:23, 106:6, 122:4, 128:1, 227:14, 245:3, 257:20
**faith** [1] - 127:2
**fall** [2] - 6:10, 249:25
**familiar** [29] - 10:17, 58:23, 62:10, 70:19, 70:25, 84:12, 88:3, 105:19, 139:19, 141:24, 143:11, 144:14, 159:14, 165:7, 185:15, 203:9, 230:5, 249:6, 249:13, 251:12, 253:17, 253:21, 255:1, 256:7, 256:8, 256:11, 256:12, 258:20, 274:24
**Family** [3] - 75:17, 76:1
**family** [1] - 75:17
**far** [20] - 86:9, 97:1, 99:15, 111:4, 112:6, 124:6, 128:3, 135:12, 143:1, 143:6, 160:8, 160:13, 168:9, 173:5, 174:21, 186:19, 192:1, 192:4, 279:15, 280:10
**Farais** [12] - 107:15, 108:1, 108:11, 115:13, 117:20, 118:15, 119:3, 119:25, 122:9, 217:13, 219:22, 221:11
**FARAIS** [1] - 108:7
**fashion** [2] - 120:21, 191:5
**fast** [2] - 154:3, 186:23

**fasten** [1] - 29:24

**faster** [1] - 173:10

**fault** [2] - 76:17, 80:11

**FBI** [87] - 8:24, 9:3, 9:9, 9:12, 10:17, 11:4, 13:5, 14:4, 14:5, 14:8, 14:9, 17:18, 17:22, 20:14, 108:13, 108:16, 108:19, 109:12, 109:14, 109:16, 115:16, 115:24, 118:4, 119:17, 120:7, 122:10, 122:19, 126:14, 126:15, 126:20, 130:10, 132:4, 132:5, 132:6, 132:8, 133:5, 133:11, 137:4, 139:22, 152:22, 152:23, 180:15, 195:24, 196:1, 196:5, 196:12, 196:13, 197:8, 197:9, 197:12, 198:17, 199:2, 199:11, 199:14, 199:23, 200:9, 200:13, 200:14, 200:15, 200:19, 203:3, 208:14, 211:12, 213:1, 213:3, 214:8, 214:19, 215:3, 216:7, 221:6, 242:17, 244:6, 246:20, 246:21, 246:24, 247:2, 247:11, 248:7, 248:11, 253:25, 254:3, 254:21, 257:10, 269:10, 271:14, 271:15

**FBI's** [1] - 14:10

**feasible** [1] - 193:1

**feature** [1] - 145:10

**features** [3] - 151:5, 173:1, 204:19

**February** [1] - 23:16

**Federal** [2] - 8:23, 195:23

**federal** [2] - 13:25, 109:19

**fellow** [2] - 125:20, 279:22

**felt** [1] - 7:8

**fence** [4] - 68:5, 68:11, 102:15, 102:21

**fencing** [3] - 68:12, 102:9, 102:21

**few** [14] - 16:10, 28:20, 33:11, 53:1, 61:9, 77:25, 78:20, 99:1, 136:23, 190:19, 201:13, 217:5, 239:23, 241:9

**fiber** [7] - 112:21,

120:19, 121:17, 121:23, 122:17, 123:10, 124:17

**fibers** [1] - 121:6

**fibery** [1] - 114:2

**field** [22] - 9:2, 13:10, 71:3, 136:24, 137:22, 138:4, 163:22, 164:11, 170:22, 172:14, 197:9, 198:18, 199:3, 199:8, 200:16, 200:21, 201:2, 201:5, 202:8, 210:19, 211:7, 216:13

**fields** [1] - 133:12

**fighting** [1] - 145:20

**figure** [2] - 168:19, 175:10

**file** [4] - 159:17, 159:18, 213:1, 227:6

**filed** [1] - 5:22

**files** [1] - 4:10

**filings** [3] - 171:4, 172:9, 172:15

**fill** [1] - 236:16

**final** [4] - 130:1, 244:6, 255:10, 270:8

**finally** [2] - 129:23, 189:18

**findings** [2] - 129:16, 138:17

**fine** [6] - 59:1, 66:17, 140:13, 149:13, 171:2, 171:11

**finer** [2] - 204:22, 205:6

**finger** [19] - 19:4, 148:20, 167:24, 178:15, 197:3, 203:20, 203:22, 203:24, 203:25, 204:14, 212:8, 223:21, 226:14, 233:25, 240:23, 241:14, 261:22

**fingerprint** [37] - 110:22, 120:23, 122:20, 197:5, 203:3, 203:6, 204:24, 205:8, 205:11, 205:19, 206:16, 206:18, 207:6, 207:8, 208:8, 208:11, 208:21, 209:5, 210:1, 210:5, 211:17, 211:24, 212:19, 212:24, 223:18, 224:11, 227:9, 227:15, 228:18, 228:21, 228:24, 229:4, 229:19, 233:10, 240:6

**fingerprints** [25] - 110:23, 196:20, 197:3, 197:4, 197:23, 198:3, 201:3, 201:15, 201:17, 202:6, 202:17, 202:20, 202:23, 202:24, 203:1, 204:12, 205:18, 206:3, 207:10, 207:17, 208:15, 208:21, 212:15, 213:5, 234:12

**fingers** [5] - 203:23, 204:4, 204:6, 212:23, 235:4

**fingertip** [1] - 203:25

**finish** [2] - 33:25, 167:20

**finishing** [1] - 216:6

**fire** [30] - 113:5, 126:22, 129:8, 129:17, 134:9, 144:21, 144:24, 145:1, 145:3, 145:7, 146:15, 147:17, 148:5, 148:6, 148:8, 148:10, 148:19, 149:4, 151:22, 151:24, 152:6, 153:10, 154:1, 154:23, 155:21, 155:22, 180:7, 182:18, 191:8

**firearm** [55] - 127:24, 128:14, 134:9, 134:10, 134:11, 135:23, 139:5, 139:7, 140:16, 142:8, 142:24, 143:9, 143:15, 144:18, 150:23, 152:19, 154:15, 156:3, 156:6, 156:11, 156:21, 156:23, 156:25, 157:1, 157:2, 157:3, 157:8, 157:11, 157:20, 159:20, 160:11, 160:17, 161:18, 163:16, 168:10, 170:9, 175:3, 182:1, 182:2, 184:7, 190:21, 191:8, 191:12, 217:14, 221:4, 221:24, 222:1, 222:10, 223:5, 223:18, 223:20, 224:16, 228:23, 261:18

**firearm's** [1] - 153:22

**firearms** [29] - 111:3, 113:3, 124:4, 124:13, 124:25, 132:9, 132:12, 132:18, 132:21, 132:24, 132:25, 133:2, 133:9, 133:23, 133:25, 134:7, 134:14, 134:22, 136:17, 136:20, 136:25, 137:9, 137:20, 137:23, 143:12, 156:19,

158:14, 189:24, 251:18

**Firearms** [1] - 136:12

**fired** [11] - 134:10, 136:5, 145:6, 148:3, 148:12, 155:9, 155:13, 156:6, 188:1, 189:3, 190:7

**firing** [9] - 123:24, 135:23, 144:22, 152:15, 153:18, 189:5, 189:10, 191:15

**first** [60] - 4:14, 8:10, 11:11, 13:9, 13:17, 21:10, 28:11, 30:12, 80:9, 80:22, 83:24, 107:23, 107:25, 110:13, 120:18, 121:8, 129:7, 131:16, 131:18, 133:24, 143:10, 148:2, 148:18, 149:24, 150:2, 150:21, 150:22, 150:23, 151:3, 155:4, 155:10, 161:4, 163:4, 164:22, 165:11, 168:19, 171:7, 171:12, 172:10, 176:15, 182:14, 184:7, 195:9, 204:12, 205:3, 212:1, 217:23, 218:11, 226:10, 227:3, 230:19, 231:13, 231:16, 246:8, 252:24, 258:12, 258:17, 261:6, 267:2, 280:14

**five** [7] - 66:15, 96:16, 98:10, 115:18, 230:5, 250:14, 251:1

**fixed** [2] - 245:2, 245:6

**flag** [1] - 225:2

**flashing** [2] - 88:14, 260:19

**flashlight** [7] - 52:4, 64:25, 66:3, 66:12, 66:13, 102:5, 278:3

**flashlights** [4] - 65:2, 101:17, 101:18, 101:25

**flat** [1] - 186:13

**flatten** [1] - 154:7

**flickering** [1] - 88:15

**flier** [2] - 38:21, 38:25

**flight** [4] - 31:15, 31:24, 186:5, 186:14

**flights** [2] - 31:20, 31:25

**flip** [4] - 45:23, 46:12, 48:1, 48:2

**flipped** [1] - 228:20

**floor** [2] - 69:11, 81:22

**floorboard** [1] - 26:6

**Florida** [27] - 16:1, 16:2, 38:21, 38:22, 75:10, 76:3, 76:9, 77:5, 77:7, 77:23, 80:8, 80:20, 82:5, 83:7, 84:2, 84:3, 86:7, 88:7, 88:25, 90:19, 91:16, 92:21, 93:14, 234:17, 243:5, 243:10, 271:17

**floss** [3] - 24:14, 52:7, 80:23

**flow** [9] - 204:13, 204:14, 204:17, 205:4, 229:25, 235:17, 237:12, 279:20

**fluid** [1] - 78:18

**fluids** [1] - 247:17

**fluorescent** [1] - 209:12

**focus** [1] - 189:8

**focused** [2] - 127:22, 248:4

**folded** [4] - 30:14, 30:15, 144:19, 146:11

**folks** [16] - 69:18, 109:25, 110:7, 110:22, 111:3, 111:25, 112:8, 112:21, 113:3, 113:14, 115:5, 120:18, 120:23, 121:24, 124:5

**follow** [13] - 167:21, 200:1, 209:14, 209:16, 209:21, 219:18, 235:18, 236:6, 236:13, 236:15, 236:24, 237:12, 244:10

**follow-up** [1] - 244:10

**followed** [6] - 115:3, 126:11, 209:10, 236:22, 280:14

**following** [4] - 150:17, 199:19, 200:2, 255:8

**follows** [5] - 8:17, 108:8, 131:24, 195:17, 246:14

**font** [3] - 171:14, 171:15, 171:20

**Food** [7] - 89:6, 90:22, 91:15, 92:6, 92:19, 93:13, 94:23

**food** [6] - 47:1, 72:4, 73:19, 78:13, 263:23

**force** [1] - 159:12

**foregrip** [1] - 262:1

**forensic** [18] - 9:22,

110:10, 110:15, 112:7, 133:9, 133:20, 136:17, 136:19, 136:25, 137:9, 137:20, 137:23, 196:2, 196:9, 209:10, 209:22, 256:12, 268:9

**Forensic** [1] - 136:13

**forensics** [1] - 189:24

**foresee** [1] - 127:25

**form** [12] - 6:8, 28:8, 28:13, 28:14, 90:2, 92:1, 94:10, 111:17, 157:25, 177:11, 187:8, 280:3

**formal** [2] - 231:11, 248:20

**forms** [2] - 22:12, 24:18

**forth** [8] - 173:16, 173:17, 212:13, 237:5, 238:11, 239:15, 239:16, 250:21

**forum** [1] - 125:22

**forward** [1] - 14:24

**forwarded** [1] - 218:4

**foundation** [1] - 193:3

**four** [7] - 94:25, 95:3, 95:7, 98:7, 115:2, 169:10, 230:5

**fragile** [2] - 207:3, 207:25

**frank** [1] - 166:3

**Freight** [3] - 64:25, 65:10, 66:24

**frequent** [1] - 208:19

**fresh** [1] - 281:1

**friction** [34] - 196:20, 197:3, 198:5, 198:7, 198:9, 198:12, 199:6, 201:3, 201:18, 201:21, 202:6, 202:9, 202:10, 202:13, 202:18, 203:12, 203:13, 203:19, 203:21, 203:24, 204:1, 204:3, 204:5, 204:10, 205:17, 205:19, 205:21, 205:22, 205:25, 206:6, 206:11, 206:12, 207:11, 207:13

**friction-ridge-discipline-specific** [1] - 199:6

**front** [25] - 16:20, 21:2, 26:19, 31:2, 33:19, 45:8, 53:23, 65:24, 74:4, 109:25, 141:6,

145:14, 146:10, 151:21, 153:23, 188:8, 220:19, 220:20, 222:21, 223:22, 230:23, 260:9, 261:23, 271:10, 272:19

**frontier** [1] - 31:24

**Frontier** [1] - 31:25

**full** [16] - 72:16, 97:14, 152:5, 153:24, 185:15, 185:19, 185:21, 186:3, 186:4, 191:8, 194:12, 214:3, 214:23, 218:10, 218:24, 224:15

**fullest** [1] - 113:6

**fully** [3] - 72:16, 103:17, 174:23

**fuming** [11] - 209:16, 209:17, 209:22, 209:24, 219:18, 223:14, 223:15, 223:19, 227:12, 228:13, 231:23

**function** [10] - 151:18, 151:20, 152:23, 153:13, 153:16, 154:2, 154:12, 154:18, 154:20, 155:21

**functional** [1] - 187:10

**functionality** [4] - 152:1, 153:22, 156:13, 160:20

**functioning** [2] - 150:24, 180:7

**functions** [3] - 111:4, 124:12, 254:21

**funds** [1] - 7:10

**funeral** [4] - 101:2, 101:4, 101:5

**funnel** [1] - 224:7

**furrows** [4] - 198:6, 232:4, 232:5, 232:12

**future** [2] - 160:19, 180:6

---

**G**

---

**G-A-U-L** [1] - 246:10

**G1** [1] - 220:2

**gap** [3] - 235:18, 236:17, 237:22

**garage** [3] - 13:12, 13:18, 15:19

**garment** [1] - 135:13

**gas** [2] - 89:3, 92:7

**gathered** [1] - 226:11

**GAUL** [1] - 246:13

**Gaul** [18] - 126:12, 245:24, 246:10, 246:17, 246:19, 258:10, 258:16, 260:8, 263:19, 267:2, 268:22, 269:8, 270:23, 272:12, 272:18, 279:6, 279:13, 280:11

**gauze** [2] - 52:20, 52:21

**gears** [1] - 111:9

**general** [10] - 11:6, 46:22, 47:5, 47:16, 49:2, 142:3, 151:5, 206:16, 224:4, 227:3

**General** [4] - 75:17, 80:7, 81:2, 81:4

**generally** [16] - 9:21, 12:1, 28:7, 51:10, 53:20, 54:21, 61:23, 64:6, 65:9, 110:5, 163:14, 249:25, 251:11, 251:12, 256:7, 256:11

**generate** [1] - 113:13

**generated** [1] - 256:15

**generates** [1] - 111:12

**gentleman** [1] - 192:23

**gentlemen** [12] - 7:22, 68:25, 97:25, 106:22, 125:14, 131:2, 138:2, 140:20, 194:18, 201:8, 231:7, 279:18

**given** [12] - 4:6, 6:17, 126:22, 132:10, 136:19, 137:2, 149:4, 154:17, 180:15, 216:18, 217:14, 256:1

**Glade** [2] - 76:2, 76:9

**glare** [1] - 99:23

**glass** [1] - 206:25

**glasses** [1] - 52:3

**glove** [27] - 24:8, 24:15, 37:4, 38:8, 44:17, 45:7, 45:10, 45:23, 46:1, 46:18, 48:7, 48:8, 48:9, 59:9, 59:10, 104:22, 105:1, 105:4, 105:17, 269:18, 269:20, 269:22, 278:14, 278:18, 279:6, 279:8

**gloves** [20] - 52:4, 53:2, 53:9, 57:12, 57:23, 58:13, 58:14, 58:25,

59:2_, 59:15_, 59:17_, 59:19_, 60:5_, 60:15_, 220:8_, 220:12_, 250:10_, 250:20_, 273:11

**go-between** [1]_ - 111:24

**God** [5]_ - 8:6_, 107:20_, 131:13_, 195:6_, 246:5

**good-faith** [1]_ - 127:2

**Goodrich** [2]_ - 280:15_, 280:18

**Google** [2]_ - 191:10_, 191:11

**GoPro** [1]_ - 64:12

**GoPro-type** [1]_ - 64:12

**Government** [142]_ - 15:6_, 16:17_, 17:5_, 17:25_, 19:12_, 20:23_, 21:14_, 22:25_, 23:21_, 24:23_, 25:23_, 26:12_, 27:8_, 28:1_, 28:25_, 29:4 _, 29:9_, 30:2_, 30:18_, 31:2_, 32:11_, 32:17_, 33:13_, 33:21_, 34:14_, 35:18_, 36:12_, 36:19_, 37:11_, 37:15_, 37:19_, 37:20, 37:25_, 38:6_, 38:13_, 39:8_, 39:20_, 40:7_, 40:18_, 41:5_, 41:13_, 41:15_, 42:3_, 42:23_, 43:14_, 44:7_, 44:21_, 45:15_, 47:12_, 48:20_, 49:11_, 49:12_, 49:18_, 50:11_, 50:16_, 51:8_, 51:17_, 51:24_, 53:13_, 54:9_, 54:25_, 55:17_, 56:12_, 56:16_, 56:23_, 57:5_, 57:19_, 58:3_, 58:18_, 59:24_, 60:20_, 61:12_, 62:5_, 63:21_, 65:5_, 65:19_, 66:19_, 67:7_, 67:25_, 68:15_, 70:7_, 71:9_, 71:14_, 71:21_, 72:5_, 72:24_, 73:16_, 74:6_, 74:25_, 75:21_, 76:16_, 77:10_, 78:23_, 79:19_, 79:24_, 81:7_, 82:2_, 82:12_, 83:19_, 84:7_, 85:17_, 87:4_, 87:25_, 90:7_, 91:9_, 92:11_, 94:18_, 95:13_, 99:5_, 105:22_, 106:11_, 106:16 _, 107:2_, 139:5_, 150:9_, 155:1_, 165:12, 166:12, 166:14_, 166:21_, 168:13 _, 170:5_, 172:19_, 173:19_, 175:19_, 177:4_,

177:16_, 177:22_, 180:23 _, 181:4_, 181:9_, 182:23 _, 184:17_, 186:25_, 187:9_, 187:15_, 188:4_, 188:8_, 189:20_, 227:22_, 269:2, 277:16

**government** [25]_ - 3:20 _, 6:16_, 7:9_, 7:24_, 25:21_, 29:20_, 33:13_, 37:10_, 46:7_, 63:3_, 64:19_, 83:19_, 100:9_, 100:10_, 100:20_, 103:3_, 109:24_, 110:6_, 165:1_, 165:16_, 183:1_, 194:20_, 245:23_, 267:18_, 273:9

**government's** [1]_ - 129:16

**Government's** [28]_ - 3:23_, 4:2_, 4:7_, 16:5_, 36:15_, 36:17_, 37:23_, 59:12_, 79:22_, 99:13_, 103:23_, 106:14_, 115:8_, 115:15_, 116:11_, 117:12 _, 117:16_, 117:21_, 118:10_, 118:20_, 119:3_, 119:10_, 122:2_, 122:15_, 139:11_, 146:24_, 277:11

**grab** [1]_ - 148:11

**grabbing** [2]_ - 172:8

**grade** [2]_ - 252:19_, 265:2

**gradually** [1]_ - 171:22

**graduate** [1]_ - 247:9

**graduation** [1]_ - 196:11

**grand** [1]_ - 6:11

**granted** [40]_ - 22:18_, 42:4_, 44:9_, 45:16_, 47:13_, 48:21_, 53:14_, 54:11_, 55:1_, 56:14_, 56:24_, 57:7_, 57:20_, 59:5_, 59:25_, 62:7_, 63:4 _, 63:25_, 64:20_, 65:6_, 65:21_, 66:21_, 67:9_, 68:16_, 73:1_, 84:9_, 85:18_, 88:1_, 94:20_, 98:10_, 106:18_, 122:3_, 129:8_, 181:5_, 182:24_, 183:2_, 187:13_, 187:17_, 227:25_, 231:6

**grave** [1]_ - 108:25

**grease** [2]_ - 198:8_, 201:22

**Great** [1]_ - 38:21

**great** [2]_ - 103:9_, 190:18

**greater** [1]_ - 186:21

**green** [5]_ - 29:24_, 54:23

_, 231:20_, 232:2_, 232:3

**greenish** [1]_ - 185:10

**Gregor** [5]_ - 126:13_, 252:9_, 252:10_, 280:12_, 280:13

**grind** [2]_ - 159:3_, 159:9

**grinding** [19]_ - 159:3_, 159:8, 159:11_, 159:13_, 167:19_, 168:2_, 169:22_, 172:7_, 172:12_, 172:16_, 173:1_, 176:5_, 176:17_, 176:22_, 178:1_, 178:11_, 178:15

**grip** [4]_ - 262:1_, 262:18_, 262:20_, 267:12

**ground** [2]_ - 161:6_, 177:20

**grounded** [1]_ - 163:2

**grounds** [1]_ - 193:8

**group** [6]_ - 120:19_, 120:22_, 121:8_, 121:17_, 121:18_, 122:17

**grown** [1]_ - 180:4

**guard** [7]_ - 144:12_, 144:19_, 145:1_, 161:22_, 163:1_, 175:23_, 262:13

**guess** [9]_ - 78:12_, 96:15 _, 105:7_, 192:8_, 192:21 _, 192:23_, 203:18_, 223:25_, 280:17

**guide** [9]_ - 209:7_, 251:15_, 251:16_, 251:17 _, 251:21_, 252:3_, 266:7 _, 267:15_, 268:5

**Gun** [1]_ - 38:21

**gun** [38]_ - 38:25_, 135:12 _, 135:25_, 136:4_, 136:5 _, 145:8_, 148:3_, 150:25 _, 151:3_, 151:5_, 151:6_, 151:8_, 151:22_, 152:6_, 152:11_, 152:16_, 153:10 _, 153:11_, 155:6_, 155:17_, 155:19_, 156:9_, 158:21_, 163:5_, 182:18_, 192:23_, 192:25_, 193:1_, 193:20_, 217:6_, 222:7_, 223:8_, 223:14_, 224:4_, 224:18_, 245:6_, 245:12_, 278:22

**gun's** [1]_ - 128:7

**guns** [6]_ - 153:7_, 193:6_, 193:12_, 193:13_, 193:15 _, 193:17

**gunshot** [6]_ - 135:6_, 135:9_, 135:10_, 135:11_, 135:16_, 135:17

**guys** [2]_ - 143:9_, 186:9

**GX1** [5]_ - 220:2_, 220:19 _, 240:6_, 244:5_, 258:6

**GX1127** [2]_ - 99:3_, 99:10

**GX1132** [1]_ - 100:3

**GX1143** [4]_ - 230:2_, 230:13_, 230:20_, 230:22

**GX187A** [1]_ - 266:22

**GX188A** [2]_ - 263:22_, 275:17

**GX200-72** [1]_ - 103:2

**GX30** [8]_ - 222:15_, 222:16_, 222:22_, 225:5_, 260:3_, 260:10_, 260:24_, 261:4

**GX322B** [1]_ - 100:10

**GX343** [1]_ - 98:17

**GX912A** [4]_ - 226:19_, 226:25_, 227:18_, 228:5

**GX923** [1]_ - 103:21

**GX948A** [2]_ - 273:14_, 273:16

## H

**hair** [8]_ - 112:21_, 114:2_, 120:19_, 121:17_, 121:23 _, 122:17_, 123:10_, 124:17

**hairs** [1]_ - 121:6

**hand** [23]_ - 39:24_, 82:17 _, 82:21_, 83:1_, 107:17_, 114:16_, 114:20_, 131:10 _, 140:21_, 168:9_, 198:4 _, 205:25_, 212:21_, 217:9_, 235:21_, 236:23_, 237:2_, 246:2_, 256:1_, 276:21

**hand-to-hand** [3]_ - 217:9_, 256:1_, 276:21

**handed** [5]_ - 3:19_, 59:12_, 214:21_, 267:18_, 270:24

**handgun** [1]_ - 186:14

**handheld** [1]_ - 140:14

**handle** [4]_ - 16:11_, 113:4_, 144:8_, 265:3

**handled** [8]_ - 150:15_, 198:9_, 206:5_, 206:9_, 207:21_, 207:25_, 208:1

**handling** [1]_ - 163:5

**handmade** [1]_ - 189:16

**hands** [3]_ - 71:22_, 135:14_, 205:21

**handwriting** [10] - 27:23_, 28:16_, 29:18_, 32:15_, 32:23_, 32:25_, 34:24_, 35:7_, 35:13_, 259:6

**handwritten** [11]_ - 28:9_, 29:15_, 29:21_, 30:7_, 33:2_, 50:5_, 70:2_, 70:13_, 71:25_, 85:14_, 85:15

**handy** [1]_ - 32:4

**hanging** [1]_ - 100:23

**happy** [2]_ - 16:14_, 165:21

**Harbor** [3]_ - 64:25_, 65:10_, 66:24

**hard** [7]_ - 46:13_, 47:23_, 74:10_, 103:16_, 162:19_, 178:9

**harder** [3]_ - 134:2_, 172:25_, 239:21

**Hardy** [1]_ - 59:15

**Hawaii** [4]_ - 23:5_, 27:17_, 35:4_, 35:6

**head** [4]_ - 83:16_, 84:21_, 106:20_, 257:7

**Head** [2]_ - 141:10_, 260:21

**heading** [1]_ - 169:14

**heads** [1]_ - 61:5

**headstamp** [3]_ - 184:9_, 184:25_, 187:5

**hear** [3]_ - 69:19_, 108:3_, 140:20

**heard** [4]_ - 9:17_, 140:15_, 152:25_, 186:15

**hearing** [2]_ - 130:11_, 277:18

**heated** [1]_ - 209:18

**held** [1]_ - 123:16

**hello** [1]_ - 244:25

**help** [12]_ - 8:6_, 60:8_, 107:20_, 131:13_, 195:6_, 198:25_, 209:7_, 224:25_, 231:9_, 235:12_, 238:7_, 246:5

**helpful** [4]_ - 88:8_, 100:20_, 105:7_, 138:3

**helping** [1]_ - 133:9

**highlight** [6]_ - 91:19_, 174:3_, 177:9_, 209:23_, 237:24_, 239:22

**highly** [1]_ - 169:1

**highway** [1]_ - 88:6

**Highway** [6]_ - 88:7_, 88:24_, 90:18_, 91:16_, 92:20_, 93:14

**history** [4]_ - 142:4_, 150:22_, 156:25_, 157:10

**hit** [3]_ - 152:8_, 164:2_, 190:9

**hits** [2]_ - 135:23_, 154:6

**HKY4343** [1]_ - 87:13

**hold** [35]_ - 23:9_, 25:17_, 27:19_, 29:16_, 35:11_, 37:1_, 39:12_, 41:23_, 44:22_, 45:9_, 46:3_, 54:1_, 54:22_, 55:9_, 56:7_, 62:2_, 62:14_, 63:10_, 63:15_, 64:5_, 68:2_, 73:6_, 73:11_, 84:17_, 85:1_, 87:11_, 95:23_, 120:2_, 146:24_, 162:16_, 164:4_, 181:16_, 187:24_, 193:7_, 277:25

**holding** [4]_ - 123:16_, 162:1_, 223:2_, 273:23

**holds** [4]_ - 143:16_, 144:1_, 146:20_, 174:10

**hole** [4]_ - 147:19_, 152:5_, 159:23_, 190:9

**holes** [1]_ - 190:8

**Home** [1]_ - 28:8

**honestly** [1]_ - 128:6

**Honor** [199]_ - 3:8_, 3:16_, 3:23_, 4:8_, 4:15_, 5:3_, 7:4_, 7:15_, 7:25_, 8:15_, 15:5_, 16:7_, 17:4_, 19:11_, 20:22_, 21:14_, 22:17_, 22:24_, 23:20_, 25:22_, 26:12_, 27:7_, 28:22_, 30:5_, 31:4_, 32:3_, 32:10_, 33:16_, 34:11_, 34:13_, 35:17_, 36:12_, 37:18_, 38:12_, 40:6_, 40:17_, 41:4_, 41:14_, 42:2_, 42:23_, 44:5_, 44:20_, 45:14_, 46:6_, 47:11_, 48:19_, 49:10_, 53:2_, 53:12_, 54:9_, 54:24_, 55:16_, 56:13_, 56:22_, 57:17_, 57:18_, 59:4_, 60:19_, 61:11_, 62:4_, 63:2_, 63:20_, 64:18_, 65:4_, 65:18_, 66:17_, 66:18_, 67:6_, 67:20_, 68:14_, 68:22_, 69:22_, 70:6_, 71:16_, 72:5_, 72:23_, 73:15_, 75:1_, 75:21_, 76:15_, 76:17_, 77:9_, 78:22_, 79:18_, 81:7_, 82:11_, 83:18_, 84:6_, 85:16_, 87:3_, 87:24_, 90:6_, 91:9_, 94:17_, 95:12_, 96:6_, 97:4_, 101:19_, 102:23_, 103:10_, 103:19_, 105:12_, 105:21_, 106:10_, 107:9_, 107:14_, 108:5_, 115:9_, 117:13_, 117:17_, 118:21_, 119:19_, 122:1_, 123:2_, 123:3_, 125:10_, 125:13_, 126:9_, 126:19_, 129:3_, 130:7_, 130:23_, 131:5_, 131:21_, 137:19_, 138:10_, 139:3_, 139:16_, 141:2_, 141:5_, 146:2_, 146:23_, 149:11_, 149:20_, 161:24_, 162:7_, 164:18_, 165:20_, 166:2_, 166:6_, 166:19_, 172:18_, 177:15_, 180:22_, 180:25_, 181:1_, 181:3_, 182:22_, 182:25_, 187:12_, 187:14_, 188:3_, 190:10_, 193:3_, 194:8_, 194:15_, 194:20_, 194:22_, 194:25, 195:15_, 201:1_, 215:7_, 219:25_, 220:11_, 220:22_, 222:15_, 226:18_, 226:22_, 227:17_, 227:24_, 228:1_, 230:12_, 231:4_, 238:17_, 241:23_, 242:2_, 242:22_, 244:14_, 245:19_, 245:23_, 258:5_, 258:8_, 259:18_, 259:23_, 262:16_, 263:14_, 266:12_, 266:21_, 268:18_, 268:25_, 270:14_, 272:6_, 277:20_, 278:13_, 279:3_, 279:17_, 280:13_, 280:22_, 280:25

**Honor's** [7]_ - 215:10_, 221:17_, 222:9_, 222:13_, 230:12_, 241:19_, 258:10

**honors** [1]_ - 200:14

**hood** [5]_ - 179:23_, 250:11_, 250:13_, 250:24_, 251:1

**hope** [2]_ - 7:22_, 131:1

**hopefully** [2]_ - 126:1_, 173:2

**Hornady** [1]_ - 188:16

**horseshoe** [2]_ - 228:16_, 228:19

**host** [1]_ - 142:15

**hostile** [1]_ - 208:8

**Hot** [1]_ - 78:11

**hour** [3]_ - 31:16_, 125:16_, 273:21

**hours** [3]_ - 115:4_, 199:4

**house** [1]_ - 211:1

**hub** [2]_ - 112:15_, 125:3

**human** [2]_ - 264:10_, 264:13

**humid** [2]_ - 208:3_, 208:9

**hurt** [1]_ - 113:1

**hygiene** [1]_ - 51:22

**I**

**I1-2** [1]_ - 120:10

**idea** [3]_ - 236:24_, 239:7_, 279:24

**identical** [5]_ - 202:20_, 202:21_, 202:23_, 202:24_, 203:6

**identification** [24]_ - 22:12_, 24:18_, 156:10_, 180:14_, 201:3_, 205:8_, 213:17_, 213:18_, 213:19_, 214:5_, 214:8_, 214:9_, 214:11_, 215:5_, 216:7_, 229:3_, 230:3_, 233:9_, 241:12_, 241:21_, 244:4_, 244:8_, 270:24_, 271:3

**identifications** [4]_ - 198:12_, 208:21_, 215:3_, 216:6

**identified** [5]_ - 117:8_, 181:9_, 203:6_, 240:22_, 244:1

**identifier** [1]_ - 116:5

**identifiers** [1]_ - 115:23

**identify** [19]_ - 16:8_, 19:20_, 21:10_, 78:3_, 141:12_, 156:2_, 161:13_, 161:15_, 162:1_, 174:25_, 175:12_, 175:14_, 179:13_, 198:25_, 208:11_, 229:19_, 229:21_, 230:14_, 271:11

**identifying** [4]_ - 36:4_, 60:16_, 134:14_, 134:16

**if..** [1]_ - 59:18

**ignites** [1]_ - 135:24

**ll** [1]_ - 142:5

**illegible** [1]_ - 70:14

**illustration** [1]_ - 173:14

**illustrative** [1] - 231:7

**image** [67] - 16:18, 26:4, 26:15, 26:18, 29:3, 30:9, 30:21, 33:14, 33:18, 38:5, 39:19, 40:21, 41:6, 42:3, 43:20, 46:7, 47:12, 49:12, 49:14, 49:24, 65:19, 65:23, 66:20, 66:24, 70:21, 70:23, 71:20, 73:16, 73:19, 75:1, 77:13, 79:4, 79:10, 79:13, 80:11, 80:14, 87:25, 94:2, 94:4, 107:3, 167:6, 167:7, 167:8, 168:17, 169:1, 171:12, 177:21, 184:23, 188:11, 210:15, 211:22, 214:22, 225:12, 225:22, 226:10, 227:6, 227:8, 227:12, 228:17, 231:17, 231:22, 232:1, 232:3, 232:24

**Image** [1] - 70:8

**images** [12] - 16:4, 51:6, 52:11, 98:6, 153:6, 165:5, 165:7, 167:5, 174:14, 208:22, 224:23, 232:9

**imaginary** [5] - 4:21, 5:20, 5:24, 6:2, 6:8

**imagine** [1] - 153:9

**imaging** [4] - 211:4, 211:21, 225:23, 243:20

**immediate** [1] - 225:14

**immediately** [1] - 225:15

**impact** [9] - 7:1, 206:7, 206:11, 207:8, 208:4, 208:10, 208:12, 219:17, 223:15

**impacts** [1] - 232:25

**imparted** [1] - 134:11

**impeding** [2] - 172:9, 178:12

**implements** [1] - 146:12

**important** [4] - 7:9, 152:15, 160:3, 180:16

**importantly** [1] - 167:3

**impossibility** [4] - 127:15, 129:12, 129:21, 130:18

**impression** [5] - 189:10, 189:11, 198:9,

205:23, 206:5

**impressions** [1] - 242:14

**improper** [1] - 129:12

**in-house** [1] - 211:1

**inappropriate** [1] - 127:14

**incident** [3] - 12:15, 216:12, 216:14

**include** [6] - 197:19, 217:5, 257:13, 257:16, 274:10, 276:16

**included** [3] - 6:12, 197:14, 258:1

**includes** [3] - 26:6, 125:20, 198:14

**including** [6] - 57:10, 143:18, 190:3, 248:13, 250:9, 279:22

**inclusive** [2] - 156:5, 156:9

**inconclusive** [3] - 213:17, 213:25, 215:6

**incubation** [1] - 273:21

**indeed** [2] - 7:11, 158:14

**indicate** [9] - 89:25, 118:12, 212:5, 223:22, 229:9, 229:14, 239:3, 261:23, 265:15

**indicated** [14] - 120:1, 211:19, 215:7, 224:14, 224:24, 225:2, 227:11, 228:7, 231:24, 236:3, 237:7, 240:2, 240:3, 240:7

**indicates** [4] - 228:11, 228:17, 228:20, 255:11

**indicating** [53] - 19:21, 20:12, 21:6, 26:10, 42:16, 45:4, 60:13, 60:17, 66:13, 74:1, 78:16, 83:1, 88:10, 89:4, 90:17, 90:20, 92:2, 93:13, 104:13, 143:17, 144:1, 144:25, 145:19, 147:18, 147:20, 147:22, 162:18, 162:23, 162:25, 168:9, 168:19, 169:9, 170:14, 170:20, 171:7, 173:25, 174:22, 186:8, 212:3, 212:4, 226:12, 226:15, 228:6, 228:11, 228:13, 228:16, 228:19, 229:11, 229:13, 237:10,

237:13, 274:10

**indicating)** [72] - 18:7, 26:8, 28:19, 35:15, 47:24, 48:3, 50:1, 50:2, 50:3, 50:4, 50:9, 58:14, 59:9, 59:16, 68:5, 74:2, 75:10, 75:15, 76:13, 77:19, 77:23, 78:5, 78:8, 80:20, 85:4, 86:5, 88:11, 89:9, 89:23, 91:3, 91:7, 91:20, 91:23, 94:1, 94:11, 107:6, 119:12, 143:25, 144:8, 144:13, 144:19, 147:19, 150:5, 154:25, 168:5, 168:21, 169:10, 169:18, 169:19, 170:25, 174:18, 174:19, 174:20, 175:9, 176:24, 178:18, 181:12, 183:15, 183:16, 183:22, 188:12, 188:24, 224:1, 235:15, 236:4, 236:9, 237:17, 237:25, 239:23, 240:1, 262:1

**indication** [2] - 171:24, 242:18

**individual** [12] - 91:25, 94:9, 116:3, 117:25, 121:10, 121:16, 126:20, 159:1, 180:10, 204:18, 205:5, 206:4

**individual's** [1] - 233:15

**individually** [2] - 183:13, 252:19

**individuals** [12] - 110:3, 112:4, 114:25, 143:12, 198:24, 199:1, 202:19, 203:1, 204:7, 213:4, 213:6, 248:1

**Industries** [1] - 141:23

**infantry** [3] - 142:9, 142:19, 145:18

**infantrymen** [1] - 142:24

**influences** [1] - 202:13

**info** [1] - 39:1

**information** [26] - 6:6, 125:22, 151:15, 152:16, 153:10, 157:13, 157:14, 158:21, 160:4, 160:8, 179:9, 180:18, 180:19, 204:24, 205:14, 212:10, 212:13, 212:25, 213:14, 214:17,

226:12, 229:9, 233:16, 233:24, 242:13, 252:22

**Information** [1] - 153:6

**ingest** [1] - 213:5

**inherent** [1] - 209:12

**inherit** [1] - 202:12

**inhibits** [1] - 172:16

**initial** [15] - 17:20, 109:2, 109:3, 114:1, 118:1, 121:11, 121:21, 204:17, 218:6, 218:12, 218:24, 219:14, 223:11, 225:19, 237:15

**initials** [7] - 139:24, 181:12, 221:10, 242:19, 259:6, 259:7, 275:5

**inner** [1] - 184:3

**inquire** [1] - 108:5

**insert** [1] - 254:10

**inserted** [3] - 147:20, 155:4, 185:10

**inside** [38] - 11:25, 16:25, 20:16, 22:1, 24:8, 37:4, 44:17, 45:6, 45:10, 45:23, 47:3, 48:7, 52:6, 58:24, 81:25, 99:25, 100:1, 104:22, 105:1, 105:4, 115:14, 134:11, 135:21, 135:24, 137:4, 140:2, 153:24, 180:3, 180:4, 182:10, 253:20, 258:13, 259:11, 263:22, 265:10, 267:12, 269:24, 274:18

**insights** [1] - 129:14

**inspect** [2] - 150:24, 151:12

**inspected** [4] - 74:14, 122:19, 161:5, 190:3

**inspecting** [1] - 161:19

**inspection** [7] - 49:4, 90:25, 153:19, 160:23, 163:9, 187:8, 187:22

**instance** [5] - 121:25, 214:5, 223:17, 249:3, 251:20

**instances** [4] - 16:8, 16:10, 127:20, 157:24

**Institutes** [1] - 136:14

**instruct** [1] - 279:21

**instruction** [1] - 201:9

**instructions** [1] -

125:19

**instruments** [2]_ - 250:11_, 250:12

**insurance** [1]_ - 83:13

**intact** [1]_ - 154:8

**intake** [3]_ - 109:1_, 114:1_, 217:23

**Integrated** [1]_ - 153:5

**intend** [2]_ - 7:11_, 149:13

**intended** [4]_ - 6:18_, 146:5_, 186:21_, 249:11

**intention** [1]_ - 130:4

**intentional** [1]_ - 182:17

**interaction** [1]_ - 279:25

**interest** [4]_ - 121:5_, 166:8_, 252:20_, 252:21

**interesting** [1]_ - 278:12

**interfere** [1]_ - 163:21

**interior** [4]_ - 11:15_, 26:5_, 258:17_, 259:8

**internal** [2]_ - 111:25_, 112:8

**interrupt** [1]_ - 279:19

**introduced** [2]_ - 27:8_, 278:10

**invalid** [1]_ - 130:18

**inventory** [5]_ - 11:7_, 97:14_, 97:15_, 109:3_, 118:2

**inventorying** [2]_ - 111:14_, 121:18

**inverted** [2]_ - 232:1_, 233:1

**Investigation** [2]_ - 8:23_, 195:23

**investigation** [6]_ - 125:20_, 157:15_, 241:17_, 251:14_, 257:11_, 279:23

**investigations** [1]_ - 249:20

**investigative** [2]_ - 180:20_, 196:10

**invite** [1]_ - 272:11

**involve** [1]_ - 128:4

**involved** [7]_ - 112:4_, 114:24_, 115:1_, 153:11_, 189:25_, 254:23_, 258:1

**involvement** [2]_ - 12:12_, 114:12

**involving** [1]_ - 216:13

**ion** [1]_ - 64:8

**iron** [1]_ - 60:3

**irregular** [1]_ - 189:14

**Island** [7]_ - 89:6_, 90:21_, 91:15_, 92:6_, 92:19_, 93:13_, 94:23

**isolating** [1]_ - 167:7

**issue** [6]_ - 6:21_, 83:3_, 127:22_, 128:16_, 128:19_, 218:2

**issued** [13]_ - 6:11_, 23:5_, 25:11_, 27:17_, 35:4_, 40:23_, 42:1_, 81:4_, 82:19_, 85:2_, 87:12_, 107:8_, 130:10

**issues** [4]_ - 4:13_, 69:10_, 126:18_, 280:20

**IT** [2]_ - 69:11_, 69:16

**item** [242]_ - 12:5_, 20:2_, 20:7_, 20:8, 22:23_, 23:2_, 24:7_, 24:10_, 25:2_, 25:8_, 26:7_, 26:9_, 27:12_, 27:14_, 28:3_, 28:5_, 29:7_, 29:10_, 29:12_, 29:14, 31:7_, 32:4_, 32:20_, 32:21_, 33:15_, 34:12_, 34:18_, 34:22_, 34:24_, 35:7_, 35:18_, 35:22_, 35:23_, 35:25_, 36:3_, 36:7_, 36:21_, 37:14_, 38:5_, 38:16_, 38:18_, 39:2_, 39:10_, 39:12_, 40:10_, 40:11_, 40:23_, 41:17_, 41:19_, 44:11_, 44:13_, 45:3_, 45:5_, 45:18_, 45:20_, 53:6_, 53:16_, 54:13_, 54:14, 55:3_, 55:14_, 55:23_, 55:24_, 58:6_, 58:22_, 59:11, 61:20_, 61:21_, 61:23_, 62:9_, 62:10_, 64:2_, 64:3_, 64:22_, 64:23_, 65:8_, 65:9_, 65:19_, 67:11_, 67:12_, 67:14_, 71:1_, 71:2, 71:19_, 71:21_, 72:7_, 72:10_, 72:11_, 72:17_, 72:20_, 73:2_, 73:4_, 78:19_, 79:2_, 80:22_, 84:8_, 84:11_, 84:12_, 85:20_, 85:22_, 87:7_, 87:8_, 88:3_, 91:1_, 95:1_, 95:17_, 95:18_, 100:1_, 102:10_, 102:11_, 102:22_, 102:24_, 103:12_, 103:20_, 109:4_, 113:22_, 115:12_, 115:23_, 116:1_, 116:5_, 116:10_, 116:18_, 116:21_, 117:23_, 117:24_, 118:2,

118:23_, 119:8_, 119:11_, 119:12_, 119:15_, 120:9_, 120:11_, 120:17_, 122:25_, 124:11_, 139:13_, 139:15_, 139:16_, 139:19_, 139:23_, 140:1_, 140:5_, 141:15_, 149:24_, 151:12_, 151:15_, 181:7_, 181:10_, 181:13_, 187:19_, 187:20_, 187:22_, 188:7_, 189:20_, 194:23_, 198:9_, 198:10_, 201:21_, 205:24_, 206:5_, 206:8_, 206:9_, 206:13_, 206:22_, 206:24_, 206:25_, 207:1_, 207:12_, 207:13_, 207:21_, 207:24_, 209:3_, 209:6_, 209:7_, 209:9_, 209:10_, 209:14_, 209:15_, 210:1_, 210:7_, 210:8_, 211:2_, 211:3_, 211:19_, 218:22_, 218:24_, 219:7_, 219:19_, 220:15_, 221:9_, 221:14_, 221:15_, 223:11_, 224:12_, 224:15_, 224:19_, 225:11_, 225:20_, 228:11_, 228:12_, 230:4_, 231:19_, 240:25_, 241:20_, 242:19_, 242:21_, 245:14_, 250:18_, 251:10_, 251:15_, 251:23_, 252:18_, 253:10_, 254:8_, 255:20_, 258:9_, 260:15_, 263:12_, 263:18_, 263:22_, 263:23_, 265:8_, 265:9_, 265:12_, 265:14_, 266:3_, 267:17_, 268:22_, 269:7_, 269:16_, 270:5_, 270:10_, 273:12_, 274:1_, 274:3_, 274:11_, 274:16_, 279:8

**Item** [31]_ - 20:4_, 20:6_, 46:11_, 47:23_, 115:25_, 116:2_, 116:6_, 116:7_, 116:9_, 116:10_, 116:16_, 116:19_, 116:24_, 116:25_, 117:10_, 118:6_, 119:4_, 119:13_, 120:10_, 221:15_, 229:14_, 234:15_, 240:22_, 243:21_, 260:14_, 263:24_, 265:9_, 271:9_, 271:10_, 271:12_, 271:13

**itemize** [2]_ - 114:5_, 116:21

**itemized** [2]_ - 113:22_, 120:12

**items** [145]_ - 4:12_, 7:13_, 11:19_, 11:22_, 11:23_, 13:22_, 16:9_, 16:25_,

19:22_, 19:24_, 20:9_, 22:3_, 22:5_, 23:9_, 24:12_, 26:18_, 26:24_, 28:24_, 49:5_, 49:8_, 49:10_, 49:15_, 49:16_, 49:21_, 49:22_, 50:14_, 50:20_, 50:22_, 50:23_, 51:1_, 51:7_, 51:13_, 51:20_, 52:5_, 52:24_, 53:8_, 57:9_, 57:22_, 60:9_, 60:13_, 61:9_, 63:6_, 63:7_, 68:23_, 72:4_, 73:8_, 73:19_, 74:3_, 78:9_, 81:18_, 96:15_, 96:16_, 96:17_, 96:23_, 97:14_, 97:15_, 97:24_, 105:1_, 109:11_, 112:10_, 112:12_, 114:5_, 115:14_, 115:18_, 115:21_, 116:17_, 123:16_, 130:19_, 138:21_, 138:23_, 141:19_, 165:21_, 167:11_, 183:4_, 183:6_, 183:8_, 183:23_, 184:11_, 197:15_, 198:13_, 198:14_, 202:4_, 206:20_, 206:21_, 207:19_, 208:16_, 208:17_, 208:22_, 209:16_, 211:7_, 217:5_, 218:21_, 219:8_, 222:2_, 222:4_, 244:15_, 247:22_, 249:19_, 249:23_, 250:1_, 251:15_, 251:17_, 251:20_, 251:21_, 252:12_, 254:3_, 255:5_, 255:23_, 257:10_, 257:14_, 257:21_, 257:24_, 257:25_, 258:1_, 261:4_, 266:7_, 266:17_, 266:19_, 266:22_, 267:14_, 268:4_, 268:14_, 268:19_, 269:9_, 270:14_, 270:22_, 270:25_, 271:1_, 271:5_, 271:7_, 273:17_, 275:8_, 275:13_, 276:18_, 277:25_, 278:8_, 279:10

**Items** [3]_ - 115:22_, 115:23_, 116:15

**itself** [18]_ - 74:21_, 81:13_, 86:3_, 109:20_, 123:12_, 155:9_, 191:21_, 204:22_, 214:18_, 224:3_, 231:9_, 247:25_, 254:8_, 259:12_, 261:6_, 264:23_, 265:19_, 268:13

J

**jacket** [7]_ - 185:15_, 185:20_, 185:21_, 186:3_,

186:4, 186:6

**jackets** [3] - 97:12, 97:17, 98:5

**James** [1] - 3:10

**January** [1] - 25:16

**jeans** [3] - 56:2, 56:9, 56:17

**Jencks** [1] - 5:21

**Jennifer** [1] - 3:10

**Jerry** [1] - 126:15

**job** [13] - 108:14, 111:13, 132:14, 134:13, 135:7, 196:24, 208:15, 213:7, 247:11, 248:4, 248:8, 254:21, 256:8

**jobs** [1] - 248:2

**John** [2] - 3:8, 43:9

**joined** [3] - 133:11, 196:12, 197:8

**joining** [1] - 196:13

**joint** [2] - 203:25, 204:14

**Jose** [1] - 10:20

**judge** [4] - 9:6, 14:1, 195:13, 270:4

**Judge** [21] - 3:12, 7:17, 7:19, 201:11, 216:3, 220:4, 220:15, 222:12, 222:18, 230:18, 242:4, 244:20, 246:12, 259:21, 260:6, 266:24, 270:20, 272:13, 272:16, 276:23, 279:12

**July** [1] - 38:23

**jumped** [1] - 29:7

**JUROR** [6] - 34:3, 88:14, 88:16, 88:18, 93:4, 260:19

**juror** [4] - 34:7, 34:8, 38:3, 260:18

**jurors** [13] - 7:16, 33:24, 34:2, 84:19, 122:4, 122:24, 125:20, 130:22, 143:19, 162:8, 228:4, 260:20, 279:22

**JURORS** [5] - 84:21, 106:20, 106:23, 141:10, 260:21

**jury** [192] - 6:11, 7:20, 8:1, 9:17, 9:18, 14:16, 15:6, 15:14, 16:3, 17:4, 18:17, 19:3, 19:12, 19:21, 21:23, 23:8, 23:10, 25:17, 26:11, 27:19, 28:10,

28:17, 28:21, 29:16, 31:8, 32:5, 32:11, 32:12, 33:1, 35:11, 37:1, 38:2, 39:12, 39:18, 40:17, 40:25, 41:5, 41:23, 43:6, 43:25, 44:22, 45:9, 46:3, 47:10, 47:22, 49:9, 49:25, 51:5, 52:8, 53:20, 54:1, 54:5, 54:22, 55:9, 56:7, 57:25, 58:8, 58:11, 59:8, 59:13, 60:16, 61:24, 62:2, 62:13, 63:10, 63:12, 63:17, 64:5, 66:23, 68:2, 68:3, 68:7, 69:4, 69:5, 69:8, 69:13, 69:23, 71:8, 71:13, 71:14, 72:3, 73:6, 73:11, 73:15, 75:7, 77:9, 79:9, 80:11, 80:18, 80:24, 84:17, 85:1, 87:10, 88:13, 90:6, 92:17, 93:2, 93:7, 93:23, 94:19, 95:23, 106:17, 106:19, 115:21, 119:6, 119:25, 122:2, 126:2, 126:3, 130:25, 131:22, 134:20, 136:10, 139:6, 140:5, 141:7, 141:9, 142:2, 143:11, 146:8, 146:14, 146:16, 146:25, 147:16, 148:22, 153:3, 154:17, 159:8, 160:3, 161:14, 162:16, 166:20, 166:21, 166:23, 173:3, 174:4, 174:16, 176:13, 178:15, 187:25, 189:23, 196:7, 197:11, 198:2, 198:21, 201:17, 209:2, 212:17, 215:13, 215:16, 215:21, 215:23, 217:2, 218:17, 221:3, 222:25, 223:22, 227:18, 227:23, 229:6, 230:15, 231:5, 231:15, 232:16, 235:8, 237:8, 239:6, 241:15, 242:10, 250:5, 252:16, 254:16, 258:22, 260:3, 260:13, 261:21, 263:21, 263:24, 264:25, 265:12, 267:5, 267:22, 269:16, 271:24, 271:25, 272:9, 272:10, 273:6, 274:8, 280:7, 280:8

**jury's** [3] - 28:20, 28:22, 34:11

**K**

**Kara** [3] - 126:12, 252:9, 280:12

**Kate** [1] - 10:17

**Kathleen** [1] - 33:6

**Kathryn** [1] - 10:18

**keep** [4] - 114:5, 116:22, 147:9, 199:3

**keeping** [1] - 139:8

**keeps** [1] - 112:18

**kept** [5] - 14:7, 14:9, 173:15, 213:1, 253:1

**kid** [1] - 191:10

**kind** [37] - 9:20, 14:21, 18:22, 47:2, 51:6, 58:13, 63:13, 108:25, 110:5, 111:15, 111:17, 111:20, 111:23, 112:2, 112:5, 112:11, 112:15, 112:16, 112:22, 113:8, 142:25, 143:9, 148:24, 153:22, 174:17, 178:12, 182:9, 189:11, 201:14, 225:16, 228:19, 229:21, 235:18, 236:22, 240:1, 248:4, 248:10

**kindly** [1] - 140:25

**kinds** [1] - 159:25

**knife** [1] - 218:22

**knowing** [1] - 111:21

**knowledge** [2] - 138:3, 217:16

**known** [68] - 155:20, 197:3, 197:22, 198:5, 204:15, 206:21, 212:12, 212:14, 212:16, 212:18, 212:19, 212:22, 213:1, 213:4, 213:10, 213:15, 213:21, 213:22, 213:24, 214:1, 214:2, 214:13, 214:23, 230:6, 234:7, 234:8, 234:14, 234:16, 234:19, 234:20, 234:23, 234:24, 234:25, 235:1, 235:16, 236:1, 237:3, 237:11, 238:3, 238:11, 238:24, 239:2, 239:5, 239:17, 239:21, 240:8, 240:23, 240:24, 241:11,

242:12, 243:2, 243:19, 243:22, 249:6, 249:9, 249:10, 249:11, 249:17, 253:14, 253:16, 253:20, 253:22, 254:5, 256:5, 257:16

**Korea** [1] - 142:15

**Kristin** [1] - 243:13

**Kristy** [2] - 3:16, 130:7

**L**

**Lab** [6] - 269:14, 275:17, 275:20, 275:23, 276:1, 279:8

**lab** [45] - 109:4, 109:10, 109:20, 110:2, 118:1, 118:4, 119:12, 119:17, 119:25, 120:7, 134:24, 149:24, 149:25, 191:14, 199:11, 200:5, 208:14, 210:23, 211:12, 214:8, 216:16, 221:12, 221:14, 244:6, 246:24, 247:3, 247:11, 247:25, 248:1, 249:2, 249:22, 250:7, 250:9, 257:3, 257:6, 257:10, 259:2, 263:25, 265:9, 266:19, 267:19, 268:23, 269:10, 274:10

**lab's** [2] - 113:8, 122:10

**labeled** [2] - 253:13, 263:8

**LaBelle** [1] - 38:22

**labels** [1] - 221:9

**laboratory** [59] - 108:13, 108:16, 108:19, 108:22, 109:1, 109:8, 109:12, 109:16, 110:6, 110:8, 111:16, 111:23, 112:16, 112:19, 113:22, 114:7, 114:23, 115:16, 115:18, 115:24, 116:20, 117:24, 118:7, 119:11, 120:8, 120:12, 120:16, 122:13, 124:17, 126:10, 126:12, 126:13, 132:4, 132:6, 139:22, 139:23, 152:2, 181:11, 183:9, 199:14, 200:7, 200:9, 200:12, 206:20, 217:15, 217:20, 218:1, 218:16, 221:7, 221:9, 234:24, 242:19, 243:22, 246:20, 246:21,

259:7_, 263:23_, 271:3_, 271:14

**lacking** [1]_ - 213:25

**lacquer** [1]_ - 180:2

**ladies** [12]_ - 7:21_, 68:25_, 97:25_, 106:21_, 125:14_, 131:2_, 138:2_, 140:20_, 194:18_, 201:8_, 231:7_, 279:18

**laid** [1]_ - 184:24

**Lake** [2]_ - 85:25_, 86:6

**large** [5]_ - 68:20_, 173:6_, 203:3_, 257:20_, 263:21

**largely** [1]_ - 250:4

**larger** [2]_ - 142:8_, 267:2

**laser** [2]_ - 219:15_, 223:12

**laser-only** [1]_ - 219:15

**last** [22]_ - 6:11_, 8:10_, 14:8_, 14:13_, 34:8_, 107:23_, 108:1_, 131:16_, 131:19_, 148:14_, 148:21_, 170:3_, 175:12_, 180:17_, 180:18_, 192:13_, 195:9_, 195:12_, 236:18_, 238:14_, 246:8_, 279:16

**latent** [121]_ - 9:23_, 110:21_, 112:24_, 120:22_, 121:6_, 121:10_, 121:15_, 121:18_, 122:20_, 124:18_, 196:13_, 196:20_, 197:2_, 197:15_, 197:22_, 197:23_, 198:3_, 198:15_, 198:16_, 200:10_, 201:3_, 201:15_, 201:17_, 201:20_, 201:23_, 202:4_, 203:19_, 205:11_, 205:17_, 205:18_, 205:23_, 206:3_, 206:8_, 206:16_, 206:18_, 206:23_, 206:24_, 207:6_, 207:8_, 207:10_, 207:12_, 207:17_, 207:19_, 207:22_, 207:23_, 208:1_, 208:4_, 208:7_, 208:11_, 208:13_, 208:15_, 208:18_, 208:23_, 208:24_, 209:5_, 209:19_, 209:23_, 210:1_, 210:4_, 210:7_, 210:8_, 210:10_, 210:11_, 210:17_, 210:18_, 210:21_, 210:22_, 210:24_, 211:3_, 211:15_, 211:17_, 211:20_, 211:22_, 211:24_, 212:1_, 212:9_, 212:12_, 212:15_, 213:10_,

213:14_, 213:20_, 213:21_, 213:24_, 214:1_, 214:13_, 214:22_, 218:9_, 223:18_, 223:20_, 223:24_, 224:5_, 224:10_, 224:13_, 224:23_, 225:23_, 225:25_, 227:8_, 227:15_, 228:6_, 229:3_, 229:14_, 229:19_, 231:18_, 231:24_, 232:8_, 233:10_, 235:14_, 236:6_, 237:24_, 238:11_, 238:22_, 238:23_, 239:2_, 239:4_, 239:17_, 240:5_, 240:8_, 240:21

**Latent** [1]_ - 196:3

**latents** [2]_ - 121:20

**latest** [1]_ - 199:3

**law** [15]_ - 109:9_, 109:13_, 109:18_, 111:24_, 113:19_, 127:3_, 130:17_, 137:7_, 156:22_, 157:2_, 157:7_, 157:12_, 198:18_, 198:25_, 249:19

**lawful** [1]_ - 158:22

**lawyer** [1]_ - 9:7

**lawyers** [1]_ - 280:1

**lay** [5]_ - 81:17_, 81:18_, 173:8_, 201:14

**layout** [2]_ - 109:23_, 205:3

**lead** [7]_ - 157:14_, 180:19_, 180:20_, 185:20_, 185:23_, 207:5_, 255:18

**leader** [9]_ - 9:16_, 10:1_, 10:2_, 10:19_, 12:14_, 14:14_, 14:16_, 14:17_, 132:13

**leading** [8]_ - 70:16_, 145:23_, 158:5_, 170:16_, 182:6_, 266:5_, 271:22_, 272:4

**leaking** [1]_ - 72:14

**leaping** [1]_ - 127:9

**learn** [1]_ - 151:15

**learned** [3]_ - 197:14_, 197:16_, 197:17

**least** [12]_ - 11:3_, 51:12_, 70:13_, 71:24_, 112:19_, 120:16_, 122:10_, 124:2_, 163:19_, 165:11_, 255:7_, 256:7

**leave** [2]_ - 134:4_, 206:16

**leaves** [3]_ - 135:25_, 136:1

**leaving** [2]_ - 198:12_, 207:5

**lectures** [1]_ - 197:14

**LED** [1]_ - 66:12

**left** [49]_ - 18:6_, 19:21_, 46:13_, 52:15_, 58:3_, 77:1_, 77:14_, 77:16_, 82:17_, 82:21_, 89:24_, 92:21_, 93:15_, 98:24_, 135:13_, 167:20_, 168:9_, 168:18_, 169:14_, 194:23_, 197:7_, 206:4_, 206:8_, 206:19_, 206:23_, 207:1_, 207:8_, 207:10_, 207:11_, 207:13_, 207:14_, 208:8_, 209:19_, 212:21_, 231:17_, 232:19_, 233:25_, 235:14_, 235:19_, 235:21_, 236:23_, 237:2_, 237:17_, 237:19_, 239:25_, 240:5_, 240:23

**left-hand** [6]_ - 82:17_, 82:21_, 168:9_, 235:21_, 236:23_, 237:2

**legal** [2]_ - 4:12_, 9:9

**legally** [2]_ - 128:16_, 129:12

**legible** [1]_ - 71:7

**lesser** [1]_ - 186:22

**letter** [5]_ - 31:9_, 175:1_, 175:9_, 175:10_, 175:12

**letters** [3]_ - 31:13_, 166:3_, 192:8

**level** [2]_ - 132:14_, 132:15

**Level** [3]_ - 205:4_, 205:5_, 205:6

**levels** [5]_ - 205:2_, 205:10_, 205:12_, 212:2_, 229:2

**lever** [1]_ - 147:25

**leverage** [1]_ - 144:9

**license** [22]_ - 15:22_, 16:2_, 22:14_, 23:5_, 23:12_, 23:15_, 24:7_, 26:21_, 37:6_, 81:25_, 82:2_, 82:7_, 83:23_, 84:15_, 85:3_, 86:2_, 86:3_, 87:1_, 87:12_, 87:13_, 87:19_, 213:7

**life** [2]_ - 198:7_, 203:15

**lift** [2]_ - 210:19_, 210:21

**lifted** [1]_ - 9:24

**lifting** [2]_ - 210:17_, 210:19

**lifts** [1]_ - 211:6

**light** [6]_ - 209:11_, 209:21_, 219:16_, 223:13_, 251:2

**lighter** [1]_ - 144:3

**lighter-colored** [1]_ - 144:3

**lights** [2]_ - 113:1_, 219:18

**likelihood** [1]_ - 208:10

**likely** [2]_ - 129:11_, 202:19

**limited** [2]_ - 129:9_, 179:9

**line** [12]_ - 130:16_, 144:25_, 229:10_, 231:20_, 232:2_, 232:3_, 232:5_, 236:10_, 236:11_, 236:18_, 237:8_, 237:18

**lines** [10]_ - 28:20_, 172:13_, 178:13_, 178:17_, 228:14_, 229:8_, 229:25_, 236:22_, 237:4_, 237:13

**link** [3]_ - 68:5_, 68:11_, 102:9

**liquid** [3]_ - 72:15_, 255:14_, 273:23

**list** [5]_ - 97:12_, 166:16_, 192:10_, 258:1_, 277:6

**listed** [7]_ - 43:8_, 92:21_, 92:22_, 93:17_, 94:10_, 268:4_, 277:4

**lite** [1]_ - 9:21

**litigant** [1]_ - 127:2

**litigated** [1]_ - 128:19

**litigation** [2]_ - 4:4_, 128:13

**live** [3]_ - 129:8_, 129:17_, 147:13

**live-fire** [2]_ - 129:8_, 129:17

**lived** [2]_ - 47:1_, 51:1

**living** [1]_ - 108:11

**Llanes** [4]_ - 126:15_, 280:16_, 280:17

**loaded** [5]_ - 145:7_, 155:4_, 155:9_, 181:25_, 182:10

**loading** [2]_ - 148:22_, 148:24

**loads** [2]_ - 148:17_, 148:25

local [1] - 109:19

locate [2] - 114:4, 223:18

located [19] - 14:20, 24:8, 76:2, 80:7, 88:10, 91:16, 104:22, 110:22, 114:6, 144:18, 205:9, 210:4, 223:24, 224:9, 224:10, 232:21, 233:23, 237:2, 238:4

locater [1] - 75:11

location [7] - 76:8, 88:5, 88:6, 92:4, 233:4, 237:6, 238:12

locations [4] - 81:3, 92:14, 93:11, 158:4

locks [1] - 147:20

lodged [1] - 151:1

log [1] - 11:19

logo [2] - 179:14, 185:2

LONG [1] - 3:12

look [78] - 17:12, 18:6, 25:14, 25:18, 27:20, 28:19, 32:5, 43:21, 49:22, 67:2, 75:20, 77:16, 78:2, 82:21, 83:1, 88:5, 89:24, 102:24, 104:25, 105:8, 112:3, 120:20, 120:23, 121:5, 121:6, 121:11, 121:12, 121:19, 121:20, 150:25, 151:8, 155:20, 161:10, 169:4, 169:8, 171:21, 175:17, 183:5, 186:8, 189:15, 204:12, 204:18, 204:21, 209:4, 209:9, 209:12, 212:13, 220:7, 220:10, 220:18, 220:23, 221:20, 221:22, 222:20, 229:18, 232:10, 232:11, 232:12, 236:1, 237:3, 238:3, 239:7, 241:14, 242:6, 242:25, 249:3, 249:5, 258:12, 258:16, 258:19, 259:8, 260:8, 262:5, 267:17, 274:3

looked [23] - 46:25, 61:6, 79:14, 86:22, 86:24, 93:18, 99:10, 100:4, 171:9, 180:4, 202:19, 202:20, 213:13, 223:14, 226:11, 227:15, 231:24, 238:22, 241:15, 258:20, 260:15, 261:1, 261:3

looking [38] - 90:24, 92:24, 99:15, 110:23, 111:1, 132:17, 135:11, 136:3, 142:5, 142:7, 143:23, 158:17, 160:24, 175:22, 189:12, 204:1, 204:12, 204:17, 205:12, 208:20, 209:4, 212:2, 213:9, 227:1, 228:4, 228:5, 228:17, 228:18, 232:18, 233:3, 233:7, 235:8, 238:10, 238:11, 242:11, 260:10, 262:2

looks [17] - 23:12, 28:14, 29:22, 33:5, 35:5, 49:1, 94:3, 99:15, 102:13, 102:14, 102:15, 115:16, 135:22, 189:16, 204:20, 223:8

Looks [1] - 78:13

loop [1] - 204:15

loss [1] - 112:23

Loureiro [1] - 10:20

lower [2] - 76:24, 89:1

Luce [34] - 3:10, 15:8, 25:6, 25:21, 33:12, 34:20, 37:9, 39:20, 43:13, 43:18, 50:11, 66:7, 80:3, 103:23, 164:25, 165:3, 166:20, 167:15, 169:24, 170:5, 170:11, 172:18, 173:19, 174:14, 177:4, 178:7, 184:17, 186:25, 188:3, 189:18, 229:16, 230:19, 232:13, 260:2

luck [1] - 260:20

lug [1] - 145:14

lunch [8] - 125:15, 125:25, 126:5, 126:18, 128:10, 128:18, 128:23, 131:2

lyse [1] - 254:18

## M

ma'am [18] - 100:14, 107:21, 107:25, 108:2, 108:4, 114:12, 120:4, 140:18, 195:1, 197:21, 198:11, 200:18, 215:14, 220:6, 221:22, 231:15, 233:7, 245:20

machine [2] - 255:8, 273:24

machinery [1] - 276:8

machines [3] - 254:23, 255:2, 255:5

Madam [1] - 230:20

madras [2] - 55:7, 57:10

magazine [31] - 139:8, 146:20, 146:24, 147:10, 147:11, 147:12, 147:14, 147:16, 147:20, 148:2, 148:9, 148:17, 150:9, 150:12, 154:24, 155:4, 155:5, 174:10, 181:14, 181:16, 181:18, 181:25, 182:5, 182:11, 182:14, 182:15, 182:16, 182:18, 183:24

Magnaflux [13] - 171:1, 171:23, 172:7, 172:23, 173:15, 173:16, 173:17, 173:25, 174:3, 177:9, 178:6, 178:10, 178:12

magnet [3] - 170:20, 170:21

magnetic [3] - 163:22, 172:8, 172:14

magnets [2] - 163:20, 163:21

magnified [1] - 169:1

main [2] - 111:11, 143:13

maintain [2] - 114:6, 280:1

majority [1] - 110:7

Mama [1] - 78:11

management [4] - 108:21, 108:23, 108:24, 217:22

managing [1] - 111:15

manhandling [1] - 124:3

Mankato [1] - 247:8

manner [4] - 127:9, 158:7, 159:6, 254:6

manners [1] - 208:20

manually [1] - 197:6

manufactured [2] - 121:3, 184:14

manufacturer [7] - 157:21, 158:1, 179:14, 184:10, 185:2, 188:16

manufacturers [1] -

157:22

manufacturing [1] - 142:17

Marathon [6] - 89:3, 90:22, 91:15, 92:6, 92:22, 93:16

March [1] - 67:4

Maria [1] - 3:9

mark [12] - 20:2, 49:6, 134:4, 166:16, 169:9, 169:22, 170:23, 172:13, 202:10, 229:23, 232:22, 237:8

marked [24] - 138:23, 212:13, 213:14, 220:19, 222:22, 226:19, 226:25, 230:1, 230:22, 232:24, 233:6, 236:9, 238:9, 241:20, 259:2, 260:4, 260:9, 265:8, 266:22, 267:3, 267:18, 268:23, 270:15, 270:23

marker [2] - 48:5, 48:6

Market [6] - 89:6, 90:22, 91:15, 92:6, 92:19, 93:13

Market/Marathon/ Dos [1] - 94:24

marking [7] - 224:2, 239:10, 243:4, 271:15, 271:20, 273:9, 273:14

markings [12] - 214:22, 214:23, 221:6, 227:13, 231:20, 236:22, 271:4, 274:6, 274:8, 274:10, 274:24

marks [15] - 18:21, 56:2, 159:4, 167:21, 168:5, 168:23, 176:17, 176:23, 178:2, 178:11, 178:15, 179:16, 189:12, 198:13, 203:21

maroon [2] - 264:1, 264:5

Martin [1] - 13:15

Mary [1] - 166:4

mask [2] - 61:25, 250:9

masks [2] - 52:20

massive [1] - 202:25

master's [1] - 133:20

match [1] - 157:12

matches [1] - 99:16

material [7] - 62:23, 135:15, 160:16, 170:25

_, 171:1_, 274:18

**matter** [6]_ - 7:12_, 114:15_, 124:25_, 129:18 _, 138:5_, 257:4

**mattress** [2]_ - 47:3_, 49:1

**McDonald's** [5]_ - 75:5_, 75:8_, 77:14_, 77:17_, 77:24

**mean** [26]_ - 4:25_, 77:6_, 101:8_, 102:11_, 102:23_, 110:16_, 124:10_, 128:7_, 128:8_, 134:7_, 138:5_, 158:11_, 192:9_, 193:24_, 198:2_, 201:17_, 203:11_, 206:22_, 211:18_, 212:17 _, 223:10_, 247:16_, 249:16_, 250:17_, 273:19

**meaning** [5]_ - 17:22_, 121:12_, 219:15_, 235:2_, 237:25

**means** [4]_ - 148:7_, 185:21_, 213:18_, 264:14

**measure** [1]_ - 181:17

**mechanism's** [1]_ - 153:23

**Medellín** [3]_ - 31:18_, 31:19

**Medetis** [2]_ - 3:10_, 126:7

**MEDETIS** [1]_ - 3:12

**Medetis-Long** [2]_ - 3:10_, 126:7

**MEDETIS-LONG** [1]_ - 3:12

**meet** [1]_ - 204:20

**member** [6]_ - 136:11_, 136:13_, 136:14_, 199:7_, 199:10_, 248:11

**members** [47]_ - 8:1_, 14:23_, 15:14_, 23:8_, 63:17_, 69:22, 131:22_, 143:11_, 166:23_, 196:7_, 197:11_, 198:2_, 198:20_, 201:17_, 209:2_, 212:17_, 216:16_, 217:2_, 218:17_, 221:3_, 222:25_, 223:22_, 229:6_, 231:15_, 232:16_, 235:8_, 242:10_, 248:16_, 248:18_, 249:2_, 250:5_, 252:16_, 254:16_, 256:24 _, 258:22_, 259:11_, 260:13_, 261:21_, 263:21 _, 263:24_, 264:25_, 265:12_, 267:5_, 267:22_, 269:16_, 273:6_, 274:8

**memorialized** [1]_ - 129:19

**menacing** [1]_ - 140:16

**mentioned** [24]_ - 31:23 _, 54:3_, 81:24_, 105:15_, 110:16_, 120:15_, 132:20 _, 156:1_, 175:18_, 179:12_, 188:17_, 206:14 _, 207:4_, 208:14_, 211:17_, 229:20_, 238:21 _, 241:4_, 250:3_, 250:24 _, 252:24_, 254:15_, 261:12_, 262:4

**mere** [1]_ - 129:14

**messages** [1]_ - 4:1

**messy** [1]_ - 46:23

**metal** [29]_ - 60:3_, 68:4_, 68:9_, 102:9_, 116:4_, 159:7_, 159:13_, 159:18_, 163:22_, 163:25_, 164:2_, 164:3_, 164:12_, 164:13_, 171:2_, 171:4_, 172:15_, 172:25_, 173:10_, 179:22 _, 179:23_, 179:25_, 185:15_, 185:20_, 185:21 _, 186:3_, 186:4_, 268:12

**method** [2]_ - 163:19_, 253:21

**methodology** [3]_ - 176:14_, 176:15_, 178:5

**methods** [4]_ - 163:23_, 176:21_, 177:24_, 256:9

**Mexican** [3]_ - 92:23_, 93:17_, 94:24

**Mexico** [1]_ - 31:20

**Miami** [7]_ - 9:2_, 9:21_, 13:10_, 14:9_, 71:3_, 216:13

**microliters** [1]_ - 255:15

**microphone** [4]_ - 108:3 _, 140:12_, 140:22_, 143:20

**microphones** [1]_ - 140:14

**microscope** [1]_ - 168:17

**middle** [6]_ - 43:5_, 92:24 _, 125:16_, 233:25_, 240:23_, 241:13

**might** [33]_ - 6:8_, 6:19_, 101:3_, 101:13_, 101:18_, 112:6_, 138:3_, 149:18_, 157:3_, 157:25_, 162:19_, 171:24_, 185:23_, 186:12 _, 186:20_, 193:2_,

201:23_, 204:20_, 206:7_, 207:14_, 207:21_, 207:25 _, 208:1_, 209:13_, 215:9 _, 218:18_, 218:20_, 218:23_, 249:23_, 251:13 _, 278:14

**Military** [3]_ - 75:9_, 77:22 _, 78:4

**military** [5]_ - 142:18_, 142:21_, 143:1_, 145:22_, 213:6

**military-type** [1]_ - 142:21

**military-wise** [1]_ - 143:1

**MILITELLO** [2]_ - 3:16_, 6:10

**Militello** [2]_ - 3:17_, 6:7

**million** [1]_ - 213:4

**mind** [6]_ - 45:10_, 99:18_, 162:5_, 190:19_, 220:22_, 280:2

**mindful** [1]_ - 127:17

**mineral** [1]_ - 171:2

**mini** [1]_ - 66:12

**minimizes** [1]_ - 218:15

**minimum** [1]_ - 250:13

**Minnesota** [1]_ - 247:7

**minus** [2]_ - 170:10_, 231:20

**minute** [3]_ - 33:24_, 122:25_, 148:18

**minutes** [11]_ - 31:16_, 66:15_, 69:1_, 125:17_, 126:1_, 250:14_, 251:1_, 259:23_, 271:23_, 272:2_, 279:16

**mirror** [1]_ - 21:8

**Miss** [1]_ - 36:21

**missing** [4]_ - 128:9_, 146:19_, 188:22

**misspoke** [1]_ - 63:24

**mobile** [1]_ - 140:21

**model** [1]_ - 12:25

**moisten** [1]_ - 252:18

**moistened** [1]_ - 265:2

**moisture** [2]_ - 208:3_, 209:19

**moment** [23]_ - 11:24_, 32:6_, 34:7_, 38:6_, 57:17 _, 68:24_, 70:16_, 99:11_, 100:11_, 103:22_, 115:13 _, 163:13_, 164:21_,

166:16_, 180:25_, 183:5_, 183:12_, 193:7_, 199:17_, 203:18_, 231:21_, 235:6_, 260:17

**momentarily** [4]_ - 69:18_, 202:5_, 229:16_, 234:12

**moments** [3]_ - 77:25_, 78:20_, 147:4

**monitor** [1]_ - 118:12

**monitors** [1]_ - 260:18

**month** [1]_ - 248:24

**months** [3]_ - 4:3_, 23:17 _, 97:2

**moot** [1]_ - 197:17

**morning** [24]_ - 3:2_, 3:8 _, 3:10_, 3:11_, 3:12_, 3:13_, 3:15_, 3:16_, 3:18 _, 6:17_, 7:21_, 7:25_, 8:20_, 8:21_, 26:25_, 36:4 _, 66:16_, 69:1_, 107:16_, 108:11_, 108:12_, 123:9_, 280:19

**Mosin** [1]_ - 142:8

**Mosin-Nagant** [1]_ - 142:8

**most** [16]_ - 109:24_, 110:9_, 112:20_, 120:16_, 120:24_, 122:11_, 124:2_, 159:3_, 167:2_, 180:17_, 202:19_, 205:5_, 208:19_, 210:24_, 218:21_, 241:4

**mostly** [2]_ - 51:12_, 196:24

**motion** [3]_ - 5:21_, 128:13_, 129:8

**move** [22]_ - 36:12_, 37:18 _, 69:25_, 79:18_, 106:10 _, 111:18_, 113:9_, 113:10_, 144:25_, 165:20 _, 205:14_, 205:17_, 208:24_, 212:11_, 213:15 _, 215:8_, 229:12_, 233:12_, 236:9_, 237:15_, 237:17_, 251:11

**moved** [8]_ - 33:3_, 50:7_, 144:24_, 169:17_, 226:16 _, 240:20_, 276:21_, 276:23

**moves** [1]_ - 67:21

**moving** [8]_ - 115:6_, 169:6_, 173:15_, 186:23_, 233:13_, 236:11_, 245:13 _, 250:18

**MR** [564]_ - 3:8_, 3:14_, 3:23_, 4:8_, 4:15_, 4:18_,

5:3_, 5:7_, 5:14_, 5:19_, 5:23_, 6:3_, 7:4_, 7:15_, 7:25, 8:15_, 8:19_, 15:5, 15:10_, 15:14, 15:15_, 16:5_, 16:14, 16:16_, 17:4, 17:8_, 17:24, 18:2_, 19:11, 19:14_, 20:22, 21:1_, 21:14, 21:17_, 22:17_, 22:19, 22:22_, 22:24, 23:1_, 23:20_, 23:24, 24:1_, 24:22, 25:1_, 25:5, 25:7_, 25:21, 26:1_, 26:11, 26:14_, 27:7, 27:11_, 28:22, 29:2_, 30:1, 30:3_, 30:5_, 30:8, 30:18, 30:20_, 31:4, 31:6_, 32:3_, 32:8_, 32:10, 32:13_, 32:17, 32:19_, 33:12_, 33:17_, 34:1_, 34:11, 34:17_, 34:19, 34:21_, 35:17, 35:21_, 36:12, 36:16, 36:20_, 37:9, 37:13_, 37:18_, 37:22_, 38:1, 38:4_, 38:12, 38:15_, 39:18, 39:22_, 40:6, 40:9_, 40:17, 40:20_, 41:4, 41:8_, 41:14, 41:16_, 42:2, 42:5_, 42:23, 43:1_, 43:13_, 43:17, 43:19_, 44:5, 44:10_, 44:20_, 44:24_, 45:2_, 45:14, 45:17_, 46:6, 46:9_, 47:10, 47:14_, 48:19_, 48:22_, 49:9, 49:13_, 49:18, 49:20_, 50:11, 50:13_, 50:16, 50:18_, 51:5, 51:9_, 51:17, 51:19_, 51:24, 52:1_, 53:2, 53:5_, 53:12, 53:15_, 54:8, 54:12, 55:2_, 55:16_, 55:19_, 55:21_, 55:22_, 56:13, 56:15_, 56:22, 57:1_, 57:5, 57:8_, 57:17, 57:21_, 58:7_, 58:20, 58:21_, 59:4_, 59:7_, 59:23, 60:1_, 60:19, 60:22_, 61:11_, 61:15_, 61:17_, 61:19_, 62:4, 62:8_, 63:2_, 63:5_, 63:20_, 63:23, 64:1_, 64:18, 64:21_, 65:4, 65:7_, 65:18, 65:22_, 66:6, 66:8_, 66:17, 66:22_, 67:6, 67:10_, 67:20_, 67:23, 68:1_, 68:14, 68:17_, 68:22_, 69:22, 69:24_, 70:6, 70:10_, 70:17, 70:18_, 71:16, 71:18_, 72:5, 72:9_, 72:23_, 73:2, 73:3_, 73:15, 73:18_, 74:25, 75:2_, 75:21, 75:24_, 76:15_, 76:20, 76:21_,

77:9, 77:12_, 78:22, 79:1_, 79:18_, 79:21, 80:1_, 80:3, 80:5_, 80:10_, 80:14, 80:16_, 81:7, 81:10_, 82:11, 82:14_, 83:18, 83:22_, 84:6, 84:10_, 84:19_, 84:22_, 85:16, 85:19_, 87:3, 87:6_, 87:24, 88:2_, 88:13_, 88:20, 88:21_, 90:6, 90:9_, 91:9, 91:12_, 92:10, 92:13_, 93:5_, 93:6, 93:9_, 94:17, 94:21_, 95:12_, 95:16, 96:6_, 96:9_, 96:11_, 97:4_, 97:6, 98:4_, 98:12_, 98:15_, 98:17, 98:21_, 99:3_, 99:5_, 99:10, 99:14_, 100:3, 100:6_, 100:9_, 100:14_, 100:16_, 100:18, 100:22_, 101:19_, 101:21_, 101:22, 101:24_, 102:23_, 103:2_, 103:5_, 103:8, 103:14_, 103:19, 103:25_, 105:9_, 105:12, 105:14_, 105:21, 105:24_, 106:10_, 106:13_, 106:17_, 106:19_, 107:1_, 107:9_, 107:14_, 108:5_, 108:10_, 114:11_, 115:9_, 115:11_, 117:13_, 117:16_, 117:19_, 118:17_, 118:18_, 118:21, 118:23_, 118:25_, 119:2_, 119:19_, 119:22_, 119:24_, 120:3_, 122:1_, 122:8_, 123:2_, 123:5_, 123:7_, 124:21, 125:2_, 125:6_, 125:8_, 125:10_, 126:9_, 126:19_, 127:7_, 127:25_, 128:6_, 129:3_, 130:7_, 130:13_, 130:21_, 131:5_, 131:21, 132:1_, 137:19_, 137:24_, 138:10, 138:11_, 139:3_, 139:12_, 139:15, 139:18_, 140:8, 140:24_, 141:5_, 141:11, 141:14_, 143:21_, 144:2, 145:25_, 146:2_, 146:3_, 146:23_, 147:4_, 147:6, 147:8_, 149:11_, 149:15, 149:22_, 157:6, 158:6_, 161:24_, 162:4_, 162:7_, 162:14_, 164:18_, 164:25, 165:4_, 165:20_, 166:2_, 166:6_, 166:8_, 166:19, 167:1_, 167:15, 167:17_, 168:13, 168:14_, 169:4_, 169:5_, 169:12, 169:13_, 169:24_, 170:1_, 170:5, 170:7_, 170:11, 170:13_, 170:17_, 172:5_, 172:18, 172:20_,

173:19_, 173:21_, 174:13, 174:15_, 175:19_, 175:21_, 177:4, 177:6_, 177:15, 177:17_, 178:7, 178:8_, 180:22_, 180:25_, 181:3, 181:6, 182:7_, 182:22_, 182:25_, 183:3_, 184:17, 184:22_, 186:25, 187:2_, 187:12_, 187:14, 187:18_, 188:3, 188:6_, 189:18, 189:22_, 190:10_, 190:13_, 190:15_, 193:3, 193:5_, 193:11_, 193:15_, 193:18_, 194:3_, 194:6_, 194:8_, 194:10_, 194:15_, 194:20_, 194:25, 195:13, 195:15_, 195:19_, 201:1_, 201:6_, 201:11_, 201:12_, 215:7_, 216:3_, 216:4_, 219:25, 220:4_, 220:5_, 220:11_, 220:15_, 220:17_, 221:2_, 221:17, 221:18_, 222:9_, 222:12_, 222:18_, 222:19_, 225:5, 225:7_, 226:18_, 226:22_, 226:23_, 227:17_, 227:20_, 227:23_, 228:1_, 228:2_, 229:15_, 229:17_, 230:12_, 230:18_, 230:21_, 231:4_, 231:14_, 232:13_, 232:15_, 238:17_, 238:20_, 241:2, 241:3_, 241:19_, 241:23_, 242:2_, 242:4_, 242:5_, 242:22_, 242:24_, 244:14_, 244:18_, 244:20_, 244:23_, 245:16_, 245:19_, 245:23_, 246:12_, 246:16_, 258:5_, 258:8_, 258:15_, 259:18_, 259:21_, 259:23_, 259:25_, 260:6_, 260:7_, 260:23_, 262:16_, 262:17_, 263:14_, 263:17_, 266:6_, 266:12_, 266:15_, 266:16_, 266:21_, 266:24_, 267:1_, 268:18_, 268:21_, 268:25_, 269:2_, 269:5_, 269:6_, 270:4, 270:7_, 270:10_, 270:13_, 270:18_, 270:20_, 270:21_, 272:6_, 272:13_, 272:16_, 272:17_, 273:12_, 273:15_, 276:23, 277:2_, 277:5_, 277:8_, 277:13_, 277:20_, 277:22_, 278:13_, 278:17_, 278:25_, 279:3_, 279:5_, 279:12_, 279:17_, 280:13_, 280:17_, 280:22_, 280:25_, 281:4

**MS** [3]_ - 3:12_, 3:16_, 6:10
**multicolored** [1]_ - 102:4
**multiple** [11]_ - 18:11_, 18:15_, 58:13_, 75:19_, 98:11_, 110:3_, 149:4_, 149:5_, 179:4_, 197:18_, 202:22
**multitude** [1]_ - 167:21
**must** [5]_ - 128:20_, 138:6_, 138:7_, 280:1_, 280:3
**mustard** [1]_ - 53:21
**muzzle** [8]_ - 135:12_, 135:25_, 136:2_, 145:10_, 145:12_, 150:25_, 151:8_, 262:14

N

**Nagant** [1]_ - 142:8
**name** [31]_ - 8:10_, 27:4_, 31:11_, 43:8_, 71:25_, 82:22_, 89:4_, 92:3_, 107:23_, 107:25_, 108:1_, 122:13_, 131:16_, 131:18_, 131:19_, 195:9_, 195:12_, 217:11_, 217:12_, 217:13_, 233:15_, 234:2_, 240:24_, 242:14_, 243:10_, 243:12_, 243:13_, 243:17_, 246:8_, 252:8
**namely** [1]_ - 247:17
**names** [2]_ - 92:15_, 192:10
**Nancy** [1]_ - 166:4
**National** [1]_ - 153:5
**natural** [1]_ - 264:3
**nature** [8]_ - 16:13_, 18:13_, 68:4_, 113:2_, 117:3_, 206:15_, 207:2_, 262:21
**Navy** [2]_ - 56:5_, 56:6
**near** [2]_ - 76:9_, 224:7
**necessarily** [1]_ - 158:24
**necessary** [4]_ - 7:8_, 145:2_, 164:14_, 226:3
**need** [29]_ - 4:13_, 6:19_, 9:24_, 12:16_, 33:3_, 49:8_, 53:7_, 54:19_, 57:14_, 58:15_, 88:13_, 101:3_, 101:8_, 101:13_, 105:8_, 121:22_, 122:13_, 127:25_, 130:15_, 140:6_, 143:20_, 149:19_, 159:10

_, 159:21_, 176:16_, 201:24_, 214:24_, 236:19

**needed** [4]_ - 6:4_, 9:23_, 101:2_, 101:12

**needing** [1]_ - 97:8

**negative** [1]_ - 264:14

**Network** [2]_ - 136:13_, 153:6

**nevertheless** [1]_ - 16:12

**new** [9]_ - 102:10_, 102:11_, 102:12_, 102:21_, 102:22_, 132:14_, 132:15_, 193:13_, 215:9

**next** [36]_ - 7:24_, 24:13_, 44:6_, 69:25_, 87:19_, 98:3_, 107:13_, 114:9_, 126:1_, 126:7_, 126:9_, 126:19_, 129:2_, 130:19_, 131:4_, 144:18_, 147:17_, 148:11_, 151:18_, 156:14_, 172:19_, 172:21_, 193:10_, 194:17_, 205:5_, 210:5_, 214:12_, 232:9_, 234:1_, 234:14_, 237:16_, 239:1_, 241:8_, 245:22_, 279:15_, 280:12

**NIBIN** [7]_ - 152:25_, 153:4_, 153:5_, 156:1_, 156:5_, 156:11

**nice** [7]_ - 7:22_, 107:7_, 154:10_, 189:11_, 189:12_, 281:2_, 281:4

**night** [3]_ - 91:7_, 91:23_, 94:15

**nights** [9]_ - 89:22_, 91:7_, 91:22_, 93:22_, 94:14_, 94:15_, 94:25_, 95:3_, 95:7

**Nissan** [16]_ - 13:1_, 15:18_, 16:20_, 17:10_, 23:6_, 37:4_, 40:15_, 44:18_, 45:7_, 45:24_, 51:14_, 53:23_, 55:6_, 55:11_, 56:3_, 87:16

**non** [2]_ - 140:16_, 206:21

**non-menacing** [1]_ - 140:16

**non-porous** [1]_ - 206:21

**none** [1]_ - 231:19

**nonporous** [3]_ - 206:25_, 207:24_, 209:15

**Norinco** [3]_ - 141:22_, 191:10

**norm** [1]_ - 17:19

**normal** [6]_ - 115:3_, 120:24_, 150:17_, 150:19_, 264:2_, 264:3

**normally** [1]_ - 266:4

**North** [7]_ - 82:20_, 83:8_, 87:12_, 92:20_, 93:14_, 141:22_, 142:15

**north** [4]_ - 88:6_, 88:24_, 90:18_, 91:16

**nose** [2]_ - 185:22_, 186:9

**note** [13]_ - 16:12_, 29:4_, 30:7_, 30:21_, 31:9_, 70:19_, 71:1_, 97:1_, 97:7_, 97:9_, 223:11_, 225:2_, 240:11

**noted** [3]_ - 129:24_, 130:8_, 232:8

**notes** [12]_ - 28:9_, 29:15_, 50:5_, 70:2_, 70:13_, 70:21_, 85:15_, 133:1_, 165:6_, 219:13_, 249:5_, 265:20

**nothing** [10]_ - 7:4_, 8:6_, 20:16_, 103:19_, 107:20_, 131:13_, 182:11_, 195:6_, 246:5_, 280:22

**noticing** [1]_ - 34:4

**notified** [2]_ - 12:14_, 121:18

**Number** [16]_ - 3:5_, 30:6_, 40:22_, 41:5_, 46:11_, 116:10_, 181:9_, 221:7_, 263:25_, 268:23_, 269:14_, 275:18_, 275:21_, 275:24_, 276:2_, 279:8

**number** [183]_ - 12:4_, 19:21_, 20:2_, 20:9_, 21:10_, 21:19_, 22:11_, 24:6_, 24:15_, 31:12_, 38:24_, 40:23_, 42:7_, 42:8_, 43:10_, 48:5_, 48:7_, 61:14_, 63:22_, 65:14_, 71:11_, 74:9_, 75:16_, 85:3_, 85:5_, 87:13_, 96:2_, 97:19_, 97:21_, 98:16_, 99:8_, 107:8_, 109:4_, 119:11_, 119:12_, 119:13_, 119:15_, 120:1_, 120:6_, 120:7_, 120:8_, 120:9_, 127:20_, 134:21_, 134:23_, 134:25_, 139:23_, 156:15_, 156:16_, 156:18_, 156:22_, 156:23_, 157:1_, 157:2_, 157:7_, 157:9_, 157:16_, 157:25_, 158:3_, 158:7_, 158:14_,

158:23_, 159:1_, 159:7_, 159:9_, 159:23_, 160:5_, 160:6_, 160:8_, 160:10_, 160:11_, 161:3_, 161:4_, 161:7_, 161:11_, 161:13_, 161:15_, 161:17_, 161:20_, 161:22_, 162:15_, 162:18_, 162:24_, 163:4_, 163:6_, 163:21_, 163:23_, 164:1_, 164:3_, 164:6_, 164:15_, 165:13_, 167:7_, 167:9_, 167:10_, 168:6_, 169:7_, 169:8_, 170:3_, 170:23_, 171:4_, 171:5_, 171:6_, 171:7_, 171:13_, 171:15_, 171:16_, 171:17_, 171:21_, 171:23_, 172:10_, 172:15_, 172:16_, 172:24_, 173:2_, 174:3_, 174:17_, 174:25_, 175:3_, 175:7_, 175:15_, 175:24_, 176:4_, 176:7_, 176:11_, 176:20_, 177:1_, 177:9_, 177:12_, 177:13_, 177:19_, 177:25_, 178:4_, 178:13_, 178:18_, 178:20_, 178:22_, 178:23_, 178:24_, 179:3_, 179:7_, 180:2_, 180:16_, 180:20_, 181:11_, 192:22_, 194:12_, 221:9_, 221:10_, 221:12_, 221:14_, 221:15_, 228:12_, 242:19_, 243:5_, 257:3_, 257:6_, 257:20_, 257:24_, 259:2_, 259:7_, 265:9_, 267:19_, 269:8_, 269:10_, 269:12_, 271:17_, 274:11_, 279:8

**number's** [1]_ - 159:22

**numbered** [3]_ - 115:18_, 116:16_, 119:17

**numbering** [1]_ - 119:14

**numbers** [29]_ - 21:24_, 29:25_, 31:13_, 39:4_, 80:19_, 115:24_, 126:21_, 134:14_, 134:17_, 137:16_, 138:24_, 156:19_, 157:19_, 159:20_, 159:22_, 159:25_, 160:23_, 160:24_, 161:17_, 161:19_, 162:2_, 162:10_, 163:10_, 163:16_, 170:15_, 175:8_, 192:13_, 228:14_, 270:17

**Numbers** [1]_ - 115:17

**nuts** [1]_ - 209:1

**O**

**oath** [3]_ - 69:17_, 216:1_, 272:14

**object** [6]_ - 134:2_, 206:4_, 208:6_, 208:7_, 208:11_, 219:5

**objection** [36]_ - 36:14_, 36:18_, 37:20_, 37:22_, 37:24_, 67:22_, 67:23_, 67:24_, 79:20_, 79:21_, 79:23_, 97:4_, 101:19_, 106:12_, 106:13_, 106:15_, 137:21_, 137:25_, 165:24_, 166:7_, 166:9_, 166:11_, 166:18_, 193:3_, 201:4_, 201:6_, 227:19_, 227:20_, 227:21_, 277:1_, 277:5_, 277:8_, 277:11_, 277:13_, 277:15_, 278:16

**obliterate** [4]_ - 159:1_, 164:5_, 176:20_, 177:25

**obliterated** [19]_ - 126:21_, 134:17_, 134:21_, 134:24_, 135:2_, 137:16_, 156:16_, 157:8_, 157:17_, 158:14_, 161:8_, 163:10_, 163:16_, 169:11_, 169:18_, 170:15_, 176:8_, 176:9_, 179:3

**obliterating** [1]_ - 158:23

**obliteration** [6]_ - 163:6_, 163:7_, 164:6_, 168:18_, 178:19_, 179:13

**observation** [2]_ - 248:13_, 248:17

**observations** [5]_ - 21:7_, 46:24_, 176:19_, 189:4_, 199:24

**observe** [3]_ - 161:3_, 177:24_, 206:18

**observed** [6]_ - 14:22_, 30:12_, 106:6_, 243:12_, 248:16_, 248:18

**observed-by** [1]_ - 243:12

**obstruction** [2]_ - 6:14_, 151:1

**obstructions** [1]_ - 151:10

**obtain** [4]_ - 179:10_, 194:11_, 261:19_, 269:23

**obtained** [11]_ - 13:25_, 57:3_, 61:10_, 73:8_, 75:3_

_, 133:16_, 225:18_, 242:17_, 243:8_, 243:11_, 271:20

**obviously** [8]_ - 6:20_, 11:10_, 16:11_, 48:17_, 96:25_, 124:14_, 140:16_, 141:8

**occasions** [2]_ - 200:23_, 256:16

**occur** [1]_ - 168:22

**occurred** [1]_ - 216:12

**October** [1]_ - 85:4

**offense** [1]_ - 128:16

**offenses** [1]_ - 5:12

**offer** [1]_ - 129:20

**office** [6]_ - 6:20_, 9:2_, 13:10_, 71:3_, 216:13_, 256:12

**Officer** [2]_ - 130:22_, 272:9

**OFFICER** [2]_ - 7:19_, 130:23

**official** [1]_ - 108:14

**officials** [1]_ - 137:7

**often** [3]_ - 159:3_, 185:6_, 190:2

**oftentimes** [1]_ - 134:23

**ogive** [1]_ - 186:11

**Ohio** [2]_ - 85:2_, 87:19

**oil** [2]_ - 171:2_, 198:8

**oils** [2]_ - 201:22_, 207:10

**old** [3]_ - 102:12_, 102:20

**Old** [2]_ - 56:5_, 56:6

**olive** [1]_ - 54:23

**on-screen** [1]_ - 243:20

**on-site** [2]_ - 199:19_, 199:24

**on-the-job** [1]_ - 196:24

**once** [22]_ - 11:20_, 14:4_, 14:24_, 20:3_, 102:24_, 103:15_, 108:25_, 109:10_, 123:14_, 147:16_, 205:22_, 210:14_, 212:23_, 213:9_, 219:1_, 224:10_, 254:5_, 254:14_, 255:19_, 276:19_, 276:20

**one** [154]_ - 10:2_, 11:14_, 12:24_, 20:11_, 21:9_, 28:8_, 33:3_, 34:2_, 39:14_, 39:16_, 41:21_, 44:15_, 44:17_, 47:20_, 48:6_, 48:16_, 50:1_, 50:2_, 50:3_, 50:5_, 50:6_, 55:14_,

56:11_, 57:17_, 58:4_, 58:5_, 58:11_, 58:15_, 59:16_, 62:24_, 70:13_, 70:16_, 70:21_, 74:1_, 75:3_, 76:23_, 77:14_, 85:12_, 85:13_, 87:1_, 88:22_, 90:10_, 90:11_, 91:18_, 93:1_, 98:13_, 98:22_, 99:11_, 99:16_, 100:11_, 100:20_, 101:3_, 101:9_, 101:11_, 101:13_, 103:15_, 103:20_, 103:22_, 104:6_, 104:7_, 111:5_, 111:6_, 111:11_, 114:21_, 118:12_, 122:17_, 124:7_, 127:22_, 135:11_, 135:13_, 141:18_, 142:9_, 145:9_, 148:7_, 148:8_, 148:10_, 148:14_, 148:21_, 155:10_, 155:13_, 155:15_, 155:17_, 155:19_, 157:19_, 157:22_, 159:19_, 159:24_, 160:12_, 161:17_, 161:20_, 166:16_, 166:23_, 169:9_, 169:10_, 169:18_, 169:19_, 171:7_, 172:3_, 172:6_, 172:10_, 174:22_, 178:1_, 180:25_, 183:14_, 183:15_, 183:18_, 183:21_, 184:20_, 189:2_, 193:7_, 194:8_, 194:23_, 205:9_, 206:14_, 213:1_, 213:16_, 217:5_, 217:7_, 221:4_, 224:20_, 235:5_, 236:9_, 237:15_, 237:16_, 237:17_, 237:23_, 239:1_, 239:19_, 249:11_, 259:13_, 260:17_, 265:18_, 266:7_, 267:7_, 267:14_, 267:23_, 268:4_, 269:9_, 269:18_, 270:10_, 271:7_, 271:11_, 276:7_, 276:13_, 279:3

**ones** [3]_ - 136:14_, 232:24_, 239:24

**open** [15]_ - 11:14_, 20:15_, 58:20_, 58:23_, 59:6_, 115:13_, 140:4_, 144:8_, 144:10_, 147:23_, 185:22_, 221:19_, 254:18_, 258:11_, 280:2

**opening** [2]_ - 155:5_, 185:22

**operability** [5]_ - 128:14_, 129:9_, 129:10_, 129:17_, 152:1

**operations** [3]_ - 110:22_, 197:22_, 249:1

**Operations** [1]_ - 196:3

**operator** [1]_ - 147:25

**opinion** [10]_ - 138:5_, 138:6_, 138:8_, 161:7_, 176:7_, 179:2_, 182:17_, 190:6_, 191:24_, 280:3

**opponent** [1]_ - 145:21

**opportunity** [6]_ - 22:4_, 23:8_, 71:14_, 129:4_, 138:21_, 218:15

**opposed** [3]_ - 186:12_, 186:14_, 253:15

**or..** [1]_ - 104:19

**oral** [1]_ - 197:18

**Oran** [4]_ - 4:19_, 6:11_, 6:18_, 33:5

**orange** [3]_ - 68:19_, 223:3_, 265:14

**Orbic** [1]_ - 44:14

**Order** [1]_ - 3:1

**order** [19]_ - 49:7_, 58:1_, 105:2_, 111:16_, 113:10_, 129:10_, 129:19_, 129:23_, 130:8_, 130:17_, 144:8_, 144:24_, 146:18_, 147:17_, 149:4_, 165:22_, 229:20_, 268:16

**ordered** [1]_ - 125:25

**orders** [2]_ - 129:5_, 130:9

**organization** [2]_ - 136:11_, 199:10

**organizations** [1]_ - 199:7

**organized** [2]_ - 46:23_, 46:25

**orientation** [2]_ - 212:8_, 226:14

**original** [10]_ - 104:15_, 104:17_, 157:25_, 175:25_, 177:11_, 184:2_, 191:3_, 207:22_, 231:22_, 232:3

**originally** [11]_ - 109:5_, 115:25_, 116:17_, 117:24_, 121:3_, 132:12_, 135:1_, 167:12_, 176:4_, 178:20

**origins** [1]_ - 142:2

**ounces** [1]_ - 78:18

**ourselves** [1]_ - 48:5

**outfits** [3]_ - 101:3_, 101:13

**outlay** [1]_ - 7:10

**outline** [4]_ - 111:18_, 112:12_, 113:8_, 171:5

**outside** [13]_ - 18:15_, 83:11_, 84:23_, 87:17_, 102:2_, 124:9_, 137:4_, 192:3_, 198:17_, 199:12_, 243:4_, 258:12_, 258:16

**outstanding** [1]_ - 200:16

**overall** [8]_ - 49:16_, 74:9_, 179:19_, 187:6_, 204:13_, 204:17_, 205:4

**overlapping** [4]_ - 218:22_, 218:23_, 224:7_, 228:25

**overnight** [9]_ - 86:10_, 87:22_, 89:20_, 91:6_, 91:14_, 91:22_, 93:21_, 93:22_, 94:24

**overpenetration** [3]_ - 186:15_, 186:20_, 186:22

**overruled** [4]_ - 97:5_, 101:20_, 101:23_, 124:22

**oversee** [1]_ - 10:16

**overview** [1]_ - 126:6

**own** [9]_ - 90:25_, 110:12_, 160:12_, 178:13_, 183:14_, 214:14_, 214:24_, 224:25_, 250:19

**owners** [1]_ - 192:10

**P**

**p.m** [19]_ - 31:19_, 31:21_, 89:17_, 91:19_, 95:2_, 126:3_, 128:25_, 130:25_, 215:16_, 215:19_, 215:23_, 271:25_, 272:7_, 272:10_, 280:8_, 281:5

**P1** [1]_ - 229:13

**pack** [2]_ - 101:17_, 101:25

**package** [12]_ - 265:18_, 267:2_, 272:23_, 273:1_, 273:2_, 273:8_, 273:9_, 273:10_, 273:14_, 274:25_, 275:3_, 275:7

**packaged** [2]_ - 183:11_, 225:20

**packages** [5]_ - 272:19_, 272:21_, 272:24_, 273:4_, 273:7

**packaging** [2]_ - 109:4_,

271:2

**pads** [2] - 52:20, 52:21

**page** [21] - 167:5, 231:5, 231:13, 231:16, 232:13, 232:17, 233:19, 234:22, 235:7, 235:9, 235:11, 235:23, 236:23, 237:2, 238:14, 238:18, 239:1, 239:10, 240:4, 240:5

**paid** [2] - 89:25, 91:25

**paint** [6] - 18:13, 18:20, 18:22, 29:24, 60:8, 229:23

**pair** [5] - 55:5, 56:2, 56:17, 59:16, 113:24

**pairs** [1] - 58:13

**Palm** [7] - 75:9, 77:4, 77:6, 77:22, 78:4, 86:9, 216:14

**palm** [3] - 110:23, 212:8, 226:14

**palms** [1] - 198:4

**pancake** [1] - 154:7

**pants** [5] - 97:13, 97:20, 98:23, 98:24, 113:24

**paper** [15] - 12:2, 27:23, 29:15, 29:18, 32:14, 32:23, 33:2, 52:13, 81:17, 100:12, 116:8, 206:23, 206:24, 211:2, 269:8

**paperwork** [2] - 5:23, 6:1

**parent** [6] - 116:1, 116:6, 116:9, 116:10, 116:21, 119:15

**parents** [1] - 202:12

**Parking** [1] - 96:1

**parking** [18] - 14:9, 33:11, 85:8, 85:25, 86:1, 86:11, 87:22, 89:20, 91:6, 91:14, 91:22, 93:21, 93:22, 94:14, 94:25, 95:9, 95:10, 95:21

**parse** [1] - 112:17

**part** [39] - 30:9, 33:8, 33:14, 80:4, 102:14, 108:21, 116:18, 122:22, 129:8, 134:13, 135:6, 144:3, 144:6, 152:16, 158:17, 162:24, 174:4, 175:18, 178:19, 185:4, 186:1, 188:17,

197:2, 198:22, 199:2, 200:5, 202:1, 208:14, 217:20, 218:4, 254:20, 255:24, 257:9, 257:10, 257:23, 261:19, 265:18

**partial** [12] - 157:24, 157:25, 161:10, 161:13, 161:15, 161:17, 161:22, 167:9, 176:20, 177:1, 177:12, 178:24

**partially** [2] - 20:15, 180:2

**participate** [3] - 10:14, 10:24, 12:6

**participated** [1] - 11:4

**particular** [32] - 58:1, 71:2, 111:8, 114:22, 115:1, 117:4, 117:6, 117:8, 120:17, 121:10, 121:16, 121:25, 127:5, 128:15, 150:2, 150:23, 154:19, 216:11, 219:11, 221:14, 223:17, 234:22, 252:5, 254:24, 256:20, 257:20, 261:18, 263:10, 270:10, 271:7, 274:1, 274:25

**parties** [2] - 125:23, 279:25

**parties'** [1] - 129:19

**partner** [1] - 109:9

**partners** [2] - 109:13, 109:18

**parts** [6] - 140:10, 141:12, 143:22, 161:14, 245:8, 262:6

**pass** [3] - 32:12, 95:9, 122:24

**passed** [1] - 219:5

**passenger** [3] - 42:9, 48:1, 53:23

**passenger's** [4] - 21:2, 21:3, 24:9, 47:16

**passport** [5] - 25:11, 25:15, 26:7, 26:15

**past** [1] - 65:16

**path** [1] - 204:18

**patina** [3] - 162:19, 162:21, 163:14

**pattern** [5] - 204:15, 212:7, 226:13, 262:23, 263:3

**pattern-type** [1] - 226:13

**patterns** [1] - 203:17

**Patterson** [2] - 126:13, 280:14

**pay** [1] - 94:9

**payment** [3] - 90:2, 92:1, 94:10

**peaks** [1] - 172:8

**peanuts** [1] - 78:11

**peel** [1] - 164:6

**peeling** [2] - 163:25, 173:10

**peer** [1] - 249:3

**peer-review** [1] - 249:3

**penetrate** [2] - 186:20, 186:24

**penetration** [2] - 186:4, 186:24

**pens** [1] - 26:21

**people** [8] - 102:9, 114:24, 185:7, 193:6, 193:17, 203:7, 204:3, 211:11

**per** [1] - 152:23

**perceived** [1] - 257:16

**percent** [2] - 193:24, 194:1

**perfect** [1] - 99:20

**perfectly** [2] - 102:16, 102:18

**perform** [30] - 10:11, 10:22, 109:2, 110:20, 124:12, 127:8, 153:13, 154:18, 154:20, 247:13, 248:12, 255:9, 265:1, 266:9, 267:8, 268:1, 269:19, 271:8, 273:3, 273:24, 275:11, 275:12, 275:15, 275:17, 275:20, 275:23, 276:1, 276:4, 279:7

**performance** [1] - 164:15

**performed** [9] - 114:19, 248:19, 263:11, 273:7, 273:18, 273:19, 275:9, 275:10, 276:16

**performing** [2] - 112:25, 273:21

**perhaps** [2] - 6:7, 88:17

**period** [3] - 96:21, 142:5, 273:21

**permanent** [4] - 158:4, 158:9, 158:11, 203:16

**permissible** [3] -

126:24, 140:9, 162:8

**permission** [70] - 22:17, 22:19, 32:5, 33:13, 39:19, 42:2, 43:14, 44:5, 44:7, 45:14, 46:6, 47:11, 48:19, 51:6, 53:12, 54:9, 54:24, 55:16, 56:13, 56:22, 57:5, 57:18, 59:4, 59:23, 60:19, 61:11, 62:4, 63:2, 63:20, 64:18, 65:4, 65:18, 67:6, 68:14, 72:24, 76:15, 84:6, 85:16, 87:24, 94:17, 106:17, 122:2, 139:4, 140:4, 140:8, 146:23, 161:25, 164:22, 181:3, 182:22, 182:25, 187:12, 187:14, 195:13, 219:25, 220:11, 221:17, 222:10, 222:13, 227:17, 230:13, 241:19, 242:22, 244:16, 258:5, 258:10, 263:14, 268:18, 268:25, 270:4

**permit** [3] - 95:11, 95:21, 96:1

**persist** [1] - 203:14

**persistence** [2] - 203:9, 203:11

**persistent** [2] - 203:14, 203:18

**person** [13] - 89:25, 121:4, 138:3, 203:23, 214:17, 234:22, 234:23, 235:5, 243:11, 243:18, 244:2, 249:11, 254:15

**personal** [4] - 51:22, 200:13, 207:5, 250:8

**personally** [2] - 193:17, 271:1

**personnel** [4] - 110:6, 110:20, 120:12, 122:19

**perspective** [4] - 42:11, 48:13, 49:21, 50:14

**pertained** [1] - 97:7

**phase** [1] - 240:21

**phenomenon** [1] - 232:6

**phone** [28] - 29:25, 31:12, 38:24, 39:4, 39:24, 39:25, 40:14, 40:24, 41:11, 41:25, 42:1, 42:8, 42:16, 42:20, 43:10, 44:6,

44:14_, 45:6_, 45:23_, 46:12_, 47:25_, 48:2_, 48:5_, 48:7_, 48:15_, 48:16_, 71:11

**phones** [9]_ - 39:14_, 41:21_, 44:15_, 45:8_, 45:25_, 46:16_, 47:19_, 48:8_, 48:9

**phonetic** [1]_ - 114:2

**photo** [19]_ - 17:10_, 20:5_, 21:19_, 39:25_, 42:14_, 48:24_, 49:16_, 85:13_, 98:13_, 98:22_, 99:23_, 101:1_, 104:10_, 104:11_, 104:12_, 104:15_, 104:23_, 170:10

**photograph** [39]_ - 17:13_, 23:22_, 24:2_, 24:4_, 24:5_, 29:1_, 32:4_, 37:14_, 39:23_, 43:2_, 46:10_, 49:23_, 56:11_, 57:2_, 70:11_, 79:14_, 81:16_, 82:15_, 104:8_, 105:16_, 105:19_, 105:25_, 119:9_, 170:19_, 210:13_, 210:14_, 222:15_, 223:1_, 225:8_, 225:9_, 225:17_, 227:4_, 227:8_, 228:22_, 229:1_, 230:3_, 235:22_, 260:9_, 262:5

**photographed** [2]_ - 11:25_, 12:2

**photographer** [4]_ - 224:13_, 224:23_, 225:11_, 225:18

**photographers** [1]_ - 211:14

**photographic** [1]_ - 227:8

**photographs** [24]_ - 11:12_, 11:13_, 11:15_, 11:20_, 11:21_, 16:9_, 22:3_, 22:7_, 26:23_, 47:5_, 47:7_, 54:4_, 74:12_, 74:22_, 86:17_, 86:20_, 164:20_, 165:9_, 188:7_, 211:9_, 211:12_, 230:6_, 239:12

**photography** [17]_ - 210:9_, 210:11_, 210:23_, 211:1_, 211:4_, 211:12_, 211:14_, 211:15_, 211:21_, 224:12_, 224:17_, 224:19_, 224:21_, 224:22_, 225:1_, 228:7_, 231:25

**photos** [12]_ - 20:5_, 53:24_, 86:23_, 98:9_, 98:10_, 98:11_, 104:17_,

104:25_, 105:2_, 105:3_, 105:4_, 105:5

**Photoshop** [2]_ - 212:4_, 229:23

**physical** [23]_ - 22:2_, 22:4_, 29:4_, 33:25_, 38:5_, 60:16_, 61:9_, 68:23_, 71:1_, 72:7_, 74:9_, 74:21_, 78:19_, 84:8_, 85:13_, 92:15_, 110:9_, 119:1_, 122:16_, 151:12_, 192:22_, 196:2

**physically** [2]_ - 122:14_, 149:1

**picks** [3]_ - 24:14_, 52:7_, 80:23

**picture** [21]_ - 15:16_, 30:4_, 47:15_, 47:18_, 48:10_, 51:7_, 51:10_, 52:2_, 60:2_, 68:18_, 99:15_, 104:1_, 104:2_, 104:3_, 167:16_, 170:12_, 172:2_, 184:25_, 210:10_, 210:11_, 262:7

**pictures** [12]_ - 49:10_, 52:23_, 57:12_, 72:20_, 74:19_, 104:6_, 165:6_, 165:15_, 170:8_, 173:12_, 225:3_, 225:11

**piece** [20]_ - 12:2_, 29:15_, 29:18_, 32:23_, 33:2_, 66:3_, 66:12_, 102:9_, 102:15_, 102:21_, 117:9_, 146:19_, 206:23_, 211:2_, 216:24_, 217:2_, 223:3

**pieces** [7]_ - 27:23_, 32:14_, 71:5_, 116:4_, 116:8_, 138:12_, 218:3

**pillow** [1]_ - 29:23

**pin** [3]_ - 135:23_, 189:10

**pinged** [1]_ - 153:10

**pink** [3]_ - 228:14_, 229:8_, 229:10

**pipe** [2]_ - 29:22_, 30:25

**PKU** [6]_ - 31:13_, 71:12_, 85:3_, 85:6_, 85:10_, 86:2

**Placard** [1]_ - 40:22

**placard** [6]_ - 12:3_, 24:5_, 42:7_, 46:11_, 107:6_, 107:7

**placards** [2]_ - 19:22_, 20:1

**place** [7]_ - 11:23_, 11:25_, 104:9_, 147:21_, 157:19_, 199:20_, 252:21

**placed** [10]_ - 12:1_, 104:10_, 184:1_, 209:17_, 220:19_, 220:20_, 230:23_, 255:5_, 256:2_, 263:8

**places** [3]_ - 18:15_, 118:13_, 179:4

**placing** [1]_ - 273:24

**plain** [1]_ - 14:23

**plainly** [1]_ - 127:21

**plan** [12]_ - 111:9_, 111:11_, 111:17_, 112:11_, 113:8_, 113:21_, 114:13_, 126:8_, 127:23_, 182:19_, 218:5_, 218:14

**planes** [1]_ - 212:22

**plans** [1]_ - 112:24

**plastic** [11]_ - 51:13_, 58:4_, 58:18_, 62:15_, 62:17_, 81:3_, 116:8_, 183:14_, 222:6_, 223:3_, 223:4

**plate** [17]_ - 15:22_, 16:2_, 82:3_, 82:5_, 83:7_, 83:10_, 83:23_, 84:15_, 84:24_, 85:2_, 85:3_, 86:2_, 86:4_, 87:2_, 87:12_, 87:13_, 87:19

**plates** [3]_ - 26:21_, 81:25_, 82:7

**play** [1]_ - 185:17

**pleasant** [1]_ - 280:5

**pleasure** [2]_ - 68:24_, 215:10

**pliers** [2]_ - 52:4_, 60:4

**plugged** [1]_ - 40:24

**pocket** [3]_ - 42:10_, 42:13_, 48:1

**pockets** [1]_ - 113:25

**point** [35]_ - 19:3_, 28:25_, 35:13_, 111:23_, 121:22_, 140:16_, 143:9_, 147:2_, 147:25_, 148:3_, 151:4_, 157:10_, 160:9_, 162:9_, 175:2_, 175:4_, 175:5_, 180:22_, 213:12_, 215:8_, 216:23_, 225:6_, 225:16_, 225:19_, 234:11_, 236:5_, 237:10_, 238:6_, 240:15_, 240:16_, 257:2_, 259:19_, 274:19_, 276:24

**pointed** [2]_ - 156:21_, 177:19

**pointing** [6]_ - 235:19_, 235:21_, 235:22_, 236:3_, 237:16_, 237:19

**points** [9]_ - 214:6_, 229:19_, 229:21_, 230:3_, 233:6_, 233:9_, 237:9_, 238:23_, 252:10

**Police** [7]_ - 196:14_, 196:16_, 196:19_, 197:1_, 197:7_, 199:9_, 200:19

**policies** [1]_ - 111:22

**policy** [4]_ - 122:10_, 152:22_, 152:23_, 152:24

**polish** [1]_ - 172:13

**polished** [2]_ - 172:11_, 177:8

**polishing** [3]_ - 172:1_, 176:18_, 178:5

**poncho** [2]_ - 29:24_, 61:25

**poor** [1]_ - 176:5

**popped** [1]_ - 192:10

**popping** [1]_ - 238:23

**pores** [1]_ - 204:23

**porous** [5]_ - 206:20_, 206:21_, 206:22_, 207:19_, 209:14

**portion** [31]_ - 88:12_, 90:18_, 143:15_, 143:16_, 144:20_, 147:18_, 147:22_, 156:21_, 161:21_, 163:2_, 168:19_, 173:8_, 174:10_, 175:24_, 176:10_, 177:13_, 178:23_, 178:25_, 185:10_, 185:22_, 185:24_, 186:10_, 188:23_, 189:8_, 212:24_, 225:19_, 235:21_, 236:7_, 236:23_, 237:2

**portions** [2]_ - 123:15_, 198:5

**position** [7]_ - 132:8_, 144:21_, 144:24_, 185:1_, 196:4_, 212:8_, 228:21

**positioning** [1]_ - 141:7

**positions** [1]_ - 196:12

**possession** [3]_ - 217:8_, 266:4_, 274:19

**possibility** [2]_ - 103:20_, 129:14

**possible** [14]_ - 6:14_, 69:11_, 97:3_, 97:7_, 102:23_, 121:6_, 157:16_, 175:6_, 175:10_, 192:10_, 192:24_, 192:25_, 193:21_, 233:9

**possibly** [2]_ - 6:5_,

115:6

**Post** [1]_ - 225:2

**Post-It** [1]_ - 225:2

**posting** [2]_ - 125:21_, 279:24

**postmortem** [1]_ - 198:23

**potential** [12]_ - 6:24_, 113:2_, 121:4_, 208:23_, 223:19_, 223:24_, 224:10 _, 247:18_, 247:23_, 249:23_, 254:19_, 273:23

**potentially** [6]_ - 12:15_, 18:12_, 121:2_, 121:14_, 160:19_, 247:22

**powder** [7]_ - 135:21_, 135:24_, 136:1_, 136:4_, 152:11_, 210:20

**practical** [1]_ - 248:13

**practice** [1]_ - 116:20

**pre** [3]_ - 16:10_, 16:13_, 22:25

**pre-admitted** [3]_ - 16:10_, 16:13_, 22:25

**precaution** [1]_ - 53:11

**precisely** [2]_ - 167:23_, 175:1

**precision** [2]_ - 129:5_, 224:2

**premise** [1]_ - 142:23

**premised** [1]_ - 129:12

**prepare** [1]_ - 128:17

**preparing** [1]_ - 182:1

**presence** [5]_ - 208:4_, 208:12_, 247:18_, 264:10 _, 264:15

**present** [11]_ - 6:4_, 13:14_, 86:14_, 120:25_, 121:13_, 123:13_, 123:15 _, 209:13_, 226:13_, 236:2_, 272:8

**presentations** [1]_ - 136:19

**presented** [4]_ - 154:24_, 251:10_, 252:13_, 280:4

**presenting** [1]_ - 242:25

**preservation** [1]_ - 211:16

**preserve** [14]_ - 20:16_, 20:20_, 112:22_, 114:3_, 124:16_, 210:8_, 210:21_, 210:24_, 218:10_, 218:12 _, 218:19_, 219:14_, 268:16

**preserved** [2]_ - 244:5

**preserving** [1]_ - 210:17

**pretend** [2]_ - 148:8_, 148:16

**pretty** [2]_ - 90:10_, 179:22

**pretzels** [1]_ - 78:13

**prevent** [4]_ - 144:22_, 250:16_, 251:9_, 253:7

**prevents** [1]_ - 251:2

**preview** [1]_ - 154:17

**previewed** [1]_ - 156:17

**previous** [8]_ - 49:23_, 101:1_, 231:19_, 238:9_, 239:14_, 241:25_, 243:23

**previously** [13]_ - 3:24_, 4:2_, 4:5_, 71:13_, 83:20 _, 115:7_, 117:12_, 118:19_, 120:1_, 120:15_, 128:20_, 200:20_, 222:14

**primarily** [2]_ - 137:14_, 142:14

**primary** [2]_ - 132:17_, 186:4

**primer** [5]_ - 135:22_, 136:2_, 136:3_, 188:23_, 189:8

**principal** [1]_ - 136:14

**principle** [1]_ - 129:24

**print** [129]_ - 97:24_, 110:21_, 112:25_, 120:22 _, 121:10_, 121:15_, 196:14_, 197:22_, 201:20 _, 205:12_, 205:13_, 205:23_, 206:8_, 206:23_, 206:24_, 207:1_, 207:13_, 207:20_, 207:22_, 207:25 _, 208:1_, 208:5_, 209:19 _, 210:7_, 210:9_, 210:10 _, 210:12_, 210:15_, 210:17_, 210:18_, 210:21 _, 210:22_, 210:24_, 211:15_, 211:20_, 211:22 _, 212:1_, 212:7_, 212:9_, 212:12_, 212:14_, 212:16 _, 212:18_, 212:19_, 213:10_, 213:14_, 213:15 _, 213:20_, 213:21_, 213:22_, 213:24_, 214:1_, 214:13_, 214:22_, 214:23 _, 218:9_, 223:20_, 223:24_, 224:5_, 224:13_, 224:23_, 225:23_, 225:25 _, 226:11_, 226:14_, 227:11_, 228:6_, 229:12_, 229:14_, 230:7_, 231:18_,

231:24_, 232:8_, 232:20_, 233:5_, 233:6_, 233:11_, 233:20_, 233:23_, 234:19 _, 235:1_, 235:2_, 235:3_, 235:14_, 236:1_, 236:5_, 236:6_, 237:3_, 237:7_, 237:24_, 238:3_, 238:11_, 238:23_, 238:24_, 239:2_, 239:4_, 239:5_, 239:17_, 240:8_, 240:22_, 240:23_, 241:11_, 241:16_, 243:15 _, 243:19_, 243:21_, 243:22_, 244:1_, 244:4_, 244:7

**Print** [1]_ - 196:3

**printed** [3]_ - 28:11_, 28:13_, 35:2

**printing** [1]_ - 98:1

**prints** [40]_ - 9:23_, 110:23_, 121:7_, 121:13_, 124:18_, 197:15_, 198:15 _, 198:16_, 198:23_, 200:10_, 201:23_, 202:4_, 203:12_, 207:22_, 207:23 _, 208:13_, 208:18_, 208:23_, 208:24_, 209:10 _, 209:13_, 209:20_, 209:23_, 211:3_, 213:1_, 214:2_, 234:15_, 234:16_, 234:21_, 234:23_, 234:24 _, 241:12_, 242:16_, 242:20_, 243:2_, 243:11_, 243:18

**priority** [2]_ - 115:2_, 115:3

**prison** [2]_ - 4:20_, 5:5

**pristine** [2]_ - 154:10_, 253:1

**probative** [3]_ - 117:2_, 117:8_, 264:19

**problem** [2]_ - 128:6_, 171:14

**problems** [1]_ - 193:11

**procedure** [5]_ - 99:6_, 214:9_, 216:7_, 224:9_, 233:8

**procedures** [3]_ - 150:19_, 199:20_, 200:2

**proceed** [11]_ - 17:7_, 20:24_, 26:13_, 61:16_, 122:5_, 138:9_, 222:15_, 230:17_, 233:19_, 238:14 _, 270:19

**proceeding** [1]_ - 126:24

**proceedings** [1]_ - 281:5

**process** [105]_ - 11:10_, 113:7_, 113:14_, 113:23_, 117:8_, 124:1_, 124:17_, 160:10_, 160:14_, 163:15 _, 165:13_, 172:21_, 173:13_, 173:23_, 179:20 _, 179:21_, 180:6_, 180:16_, 194:12_, 197:14 _, 200:1_, 208:17_, 209:3 _, 209:15_, 209:16_, 209:22_, 213:9_, 213:11_, 214:8_, 214:18_, 215:4_, 216:18_, 217:4_, 219:18_, 223:9_, 223:10_, 223:19_, 225:1_, 225:13_, 225:17_, 226:2_, 227:10_, 227:12_, 227:13_, 228:15_, 229:7_, 229:12_, 229:18_, 230:9_, 231:23_, 235:13_, 238:8_, 238:21_, 239:8_, 240:9_, 241:10_, 244:6_, 248:24_, 250:7_, 250:8_, 252:15_, 252:25_, 253:14_, 254:14 _, 254:18_, 254:24_, 255:2_, 255:4_, 255:7_, 255:11_, 255:20_, 255:24 _, 256:4_, 259:15_, 261:16_, 261:19_, 261:24 _, 263:7_, 263:10_, 265:1 _, 265:4_, 266:9_, 267:8_, 268:1_, 268:11_, 268:15_, 269:19_, 269:25_, 270:1_, 271:5_, 271:8_, 273:18_, 273:19_, 273:20_, 274:14 _, 275:15_, 275:17_, 275:23_, 276:1_, 276:4_, 276:19_, 276:20_, 279:8_, 279:10

**processed** [4]_ - 207:23 _, 211:19_, 223:8_, 254:6

**processes** [3]_ - 178:3_, 210:20_, 218:16

**processing** [19]_ - 197:16_, 198:14_, 201:24 _, 202:3_, 207:15_, 209:7 _, 211:8_, 218:10_, 218:25_, 219:14_, 219:20 _, 225:20_, 228:12_, 245:15_, 251:15_, 251:17 _, 256:2_, 256:3_, 276:22

**processors** [1]_ - 112:25

**produce** [2]_ - 249:5_, 251:13

**produced** [3]_ - 142:11_, 168:11_, 241:16

**producing** [1]_ - 142:16

**product** [1]_ - 113:17

**production** [1]_ - 247:3

**professional** [4] - 136:8, 136:11, 199:7, 199:10
**proffer** [1] - 201:2
**proficiency** [1] - 248:14
**profile** [1] - 188:11
**profiles** [1] - 256:15
**program** [2] - 197:13, 248:13
**projected** [1] - 128:3
**promised** [1] - 7:23
**promotion** [1] - 132:20
**proof** [1] - 83:13
**proper** [1] - 159:21
**properly** [2] - 108:3, 150:24
**property** [2] - 243:6, 243:9
**prosecutor** [1] - 10:8
**protect** [4] - 20:18, 180:1, 211:2, 219:10
**protected** [1] - 207:20
**protective** [2] - 250:9, 254:11
**protects** [2] - 152:8, 250:22
**protocol** [2] - 11:8, 152:19
**protocols** [1] - 150:17
**protruding** [1] - 144:3
**provide** [9] - 32:5, 99:8, 113:19, 121:11, 160:7, 180:20, 218:25, 253:20, 275:12
**provided** [11] - 4:3, 4:5, 101:20, 137:6, 205:3, 214:13, 214:20, 233:15, 233:24, 234:23, 277:7
**publication** [1] - 227:18
**publish** [65] - 15:5, 15:9, 16:5, 17:25, 19:11, 20:22, 21:14, 25:22, 26:11, 33:12, 37:9, 37:10, 38:2, 40:17, 41:4, 42:2, 42:23, 43:14, 46:7, 47:12, 48:19, 51:17, 51:24, 56:13, 56:22, 57:5, 59:24, 60:20, 63:21, 65:18, 66:18, 68:14, 70:6, 73:15, 75:21, 76:15, 76:19, 77:9, 78:22, 80:11, 81:7,

82:11, 87:24, 88:13, 90:6, 91:9, 92:10, 93:6, 94:17, 105:21, 106:17, 117:16, 164:19, 164:22, 164:25, 166:20, 166:21, 184:17, 222:14, 226:18, 227:23, 231:4, 231:13, 260:5, 260:17
**published** [4] - 37:12, 54:4, 71:13, 136:16
**pull** [29] - 28:25, 30:1, 30:2, 37:9, 50:11, 51:7, 56:11, 83:19, 99:8, 103:20, 144:9, 147:25, 148:5, 148:7, 148:9, 148:13, 148:17, 148:18, 151:2, 169:12, 172:19, 173:19, 175:19, 177:15, 184:20, 185:23, 186:25, 211:22, 225:22
**pulled** [3] - 155:5, 233:21, 269:9
**pulling** [2] - 149:5, 149:6
**pulls** [1] - 267:12
**purchase** [2] - 65:1, 66:2
**purchased** [9] - 78:10, 80:22, 91:5, 91:21, 101:17, 101:22, 101:25, 102:21, 121:4
**purchases** [1] - 81:3
**purchasing** [1] - 156:24
**purple** [6] - 236:9, 236:11, 236:22, 237:4, 237:12, 237:17
**purport** [1] - 192:23
**purpose** [10] - 17:17, 146:5, 156:18, 158:22, 186:4, 186:24, 210:13, 250:15, 250:25, 251:7
**purposes** [7] - 116:22, 129:5, 142:18, 230:15, 234:13, 256:17, 264:9
**pursuant** [3] - 15:17, 201:1, 230:13
**pursue** [1] - 233:9
**purview** [1] - 102:2
**put** [32] - 17:19, 29:8, 47:2, 57:23, 81:17, 135:21, 147:16, 148:11, 149:1, 149:14, 149:16, 151:23, 153:25, 155:6, 155:10,

157:22, 157:25, 158:3, 158:8, 159:23, 172:14, 182:10, 182:14, 189:20, 190:8, 190:9, 199:20, 210:21, 229:8, 230:6, 253:10
**puts** [1] - 148:2
**putting** [1] - 179:25

### Q

**Q-tip** [1] - 261:13
**qualification** [3] - 137:22, 201:4, 248:14
**qualified** [7] - 133:3, 135:11, 137:6, 138:1, 200:20, 200:23, 201:7
**qualify** [1] - 248:19
**quality** [1] - 249:4
**Quantico** [17] - 108:13, 108:16, 108:17, 108:18, 108:20, 109:12, 110:8, 114:23, 118:4, 124:10, 126:10, 126:11, 126:13, 126:14, 132:4, 149:24, 183:9
**quantification** [1] - 256:5
**quantify** [1] - 256:9
**quantity** [1] - 68:20
**questioned** [10] - 249:13, 249:15, 249:16, 249:18, 250:1, 254:3, 254:7, 257:13
**questioning** [3] - 6:24, 123:1, 126:22
**questions** [30] - 4:13, 34:7, 96:6, 105:9, 107:9, 127:6, 127:20, 127:23, 128:4, 130:5, 130:12, 141:11, 149:18, 190:10, 190:19, 194:15, 199:25, 201:13, 216:8, 244:14, 245:1, 252:24, 271:22, 272:20, 273:17, 276:25, 277:18, 278:15, 278:25, 279:12
**quick** [2] - 9:18, 245:1
**quickly** [2] - 115:6, 194:22
**quite** [5] - 97:19, 136:23, 177:8, 186:23, 190:2
**quote** [2] - 129:19, 234:20

### R

**rack** [1] - 19:17
**rain** [1] - 20:17
**raining** [1] - 208:9
**rains** [1] - 208:4
**raise** [6] - 107:17, 126:18, 131:10, 140:21, 246:2, 280:21
**raised** [2] - 128:19, 198:5
**range** [4] - 140:12, 192:1, 192:4, 192:7
**rapidly** [1] - 152:8
**rather** [5] - 58:22, 203:19, 212:16, 254:9, 271:15
**razor** [1] - 51:23
**reach** [5] - 42:17, 185:12, 240:16, 243:24, 264:12
**reached** [2] - 214:5, 240:19
**reaching** [1] - 42:12
**read** [16] - 21:23, 28:21, 31:1, 31:8, 31:17, 66:11, 71:8, 74:10, 75:7, 77:6, 80:17, 84:23, 95:23, 120:4, 165:21, 201:9
**readily** [2] - 158:12, 201:24
**reading** [1] - 168:18
**reads** [2] - 10:4, 50:6
**ready** [5] - 38:1, 130:22, 145:1, 148:3, 148:12
**reagent** [3] - 252:19, 261:15, 265:2
**real** [1] - 104:16
**realizing** [1] - 114:17
**really** [5] - 80:19, 113:1, 128:7, 143:8, 171:18
**reapproach** [1] - 149:11
**rear** [1] - 146:11
**reason** [6] - 120:23, 145:5, 151:25, 153:13, 156:25, 191:18
**reasons** [2] - 203:1, 213:6
**receipt** [37] - 43:2, 43:20, 65:10, 65:11,

65:23_, 66:24_, 67:3_, 74:21_, 75:5_, 76:1_, 76:11_, 76:23_, 77:16_, 77:25_, 78:2_, 78:10_, 79:15_, 80:6_, 85:25_, 86:3_, 89:4_, 89:7_, 89:25_, 90:16_, 90:25_, 91:14_, 91:17_, 91:24_, 92:4_, 92:6_, 92:15_, 93:12_, 93:21_, 93:24_, 94:23_, 95:10_, 109:2

**receipts** [24]_ - 42:19_, 49:25_, 65:1_, 65:14_, 74:8_, 74:9_, 74:11_, 74:14_, 74:20_, 75:3_, 75:16_, 75:19_, 77:13_, 79:4_, 85:5_, 85:7_, 85:8_, 86:11_, 86:13_, 86:17_, 86:21_, 86:24_, 87:23_, 93:18

**receive** [23]_ - 4:10_, 11:17_, 109:17_, 113:24_, 114:4_, 124:11_, 150:4_, 150:9_, 155:18_, 196:23_, 197:8_, 206:20_, 208:22_, 209:6_, 209:8_, 216:24_, 218:3_, 218:5_, 219:2_, 248:10_, 248:12_, 249:19_, 250:12

**received** [43]_ - 12:17_, 36:19, 37:25_, 67:25_, 79:24_, 106:16_, 108:25_, 109:5_, 112:14_, 114:16_, 116:18_, 117:24_, 117:25_, 118:4_, 118:7_, 121:17_, 136:24_, 139:22_, 149:24_, 150:6_, 151:8, 166:13_, 166:15_, 167:12_, 183:10_, 184:3_, 197:12_, 197:13_, 200:14_, 200:15_, 217:5_, 221:3_, 222:3_, 223:6_, 227:22_, 241:9_, 243:2_, 243:19_, 247:7_, 248:7_, 274:20, 277:16

**receiver** [24]_ - 143:8_, 143:14_, 143:15_, 143:17_, 143:25_, 156:21_, 157:22_, 157:23_, 158:4_, 158:10_, 161:1_, 161:7_, 161:21_, 162:16_, 163:4_, 167:7_, 167:16_, 169:7_, 170:10_, 174:5_, 174:6_, 174:7_, 179:16

**receives** [1]_ - 250:13

**receiving** [1]_ - 111:13

**recent** [1]_ - 83:4

**recently** [3]_ - 71:2_,

132:10_, 132:14

**recess** [8]_ - 69:7_, 125:16_, 128:23_, 128:25_, 215:17_, 215:19_, 272:1_, 272:7

**rechargeable** [1]_ - 64:8

**reciprocate** [2]_ - 182:13_, 182:14

**recognize** [40]_ - 23:2_, 24:2_, 25:8_, 27:14_, 28:5_, 29:12_, 32:21_, 34:22_, 35:23_, 38:18_, 40:11_, 41:19_, 45:5_, 45:20_, 53:18_, 54:14_, 55:24_, 61:21_, 64:3_, 67:12_, 70:11_, 79:2_, 85:22_, 87:8_, 95:18_, 117:20_, 117:23_, 220:20_, 222:23_, 227:1_, 227:4_, 242:8_, 260:10_, 263:19_, 267:3_, 267:19_, 270:25_, 271:1_, 271:2_, 271:3

**recollection** [1]_ - 128:12

**record** [17]_ - 3:6_, 3:20_, 8:11_, 16:7_, 32:10_, 92:17_, 107:24_, 118:25_, 131:17_, 139:3_, 141:5_, 181:8_, 195:10_, 229:21_, 233:17_, 246:9

**recorded** [1]_ - 240:23

**recording** [1]_ - 212:20

**records** [1]_ - 213:4

**recover** [6]_ - 16:25_, 81:18_, 81:19_, 81:24_, 159:24_, 174:23

**recovered** [34]_ - 25:12_, 26:7_, 30:7_, 30:15_, 40:14_, 43:3_, 44:15_, 44:17_, 45:6_, 45:23_, 47:20_, 47:25_, 48:2_, 53:22_, 55:5_, 55:11_, 56:3_, 56:17_, 60:11_, 62:18_, 62:22_, 63:7_, 64:23_, 66:25_, 67:18_, 72:19_, 73:20_, 75:5_, 81:14_, 84:15_, 95:21_, 96:17_, 97:10_, 99:1

**recovering** [1]_ - 163:15

**recovery** [3]_ - 10:15_, 10:25_, 165:13

**red** [5]_ - 64:25_, 101:17_, 102:6_, 170:19_, 267:25

**reddish** [1]_ - 264:5

**redirect** [5]_ - 105:11_, 125:9_, 194:7_, 245:18_,

279:2

**REDIRECT** [3]_ - 105:13_, 194:9_, 279:4

**reduce** [2]_ - 172:13_, 180:3

**Redweld** [1]_ - 115:13

**reenter** [1]_ - 215:21

**refer** [6]_ - 115:25_, 121:12_, 186:18_, 205:2_, 217:24_, 251:17

**reference** [10]_ - 16:13_, 34:12_, 50:9_, 76:13_, 77:19_, 107:4_, 133:24_, 163:13_, 168:3_, 186:16

**referenced** [1]_ - 272:23

**references** [2]_ - 31:20_, 90:21

**referred** [3]_ - 233:21_, 259:2_, 279:6

**referring** [5]_ - 6:8_, 85:14_, 142:21_, 178:16_, 262:9

**reflect** [11]_ - 26:24_, 29:3_, 43:2_, 73:19_, 74:23_, 79:4_, 79:13_, 167:11_, 175:25_, 234:2_, 243:7

**reflected** [1]_ - 90:25

**reflects** [2]_ - 79:15_, 105:16

**refrain** [1]_ - 130:13

**refrigerator** [2]_ - 256:3_, 276:22

**refuting** [1]_ - 129:16

**regard** [18]_ - 137:16_, 174:8_, 198:21_, 200:9_, 200:13_, 207:4_, 222:15_, 243:4_, 259:16_, 267:2_, 268:14_, 270:14_, 270:23_, 273:17_, 275:8_, 276:5_, 276:18_, 279:6

**regarding** [5]_ - 6:24_, 125:19_, 127:24_, 128:4_, 130:5

**regards** [1]_ - 156:11

**region** [2]_ - 265:3_, 267:12

**regions** [1]_ - 268:12

**registration** [6]_ - 82:8_, 82:15_, 83:4_, 83:10_, 84:3_, 85:4

**regular** [1]_ - 199:19

**regularly** [2]_ - 248:14_, 253:24

**rejected** [1]_ - 129:10

**relate** [5]_ - 5:12_, 5:14_, 5:21_, 115:24_, 146:4

**related** [10]_ - 6:15_, 6:24_, 60:9_, 126:14_, 128:11_, 129:24_, 130:6_, 136:16_, 136:19_, 199:8

**relates** [1]_ - 173:12

**relating** [4]_ - 42:20_, 65:1_, 81:3_, 137:9

**relation** [2]_ - 5:7_, 233:5

**relationship** [2]_ - 237:6_, 238:13

**relevant** [5]_ - 7:14_, 126:24_, 128:8_, 128:16_, 129:21

**relied** [1]_ - 129:13

**reloaded** [1]_ - 191:21

**rely** [1]_ - 138:8

**remain** [5]_ - 69:17_, 131:9_, 195:2_, 216:1_, 272:14

**remaining** [1]_ - 58:18

**remains** [2]_ - 172:16_, 188:2

**remember** [7]_ - 37:3_, 70:1_, 77:24_, 97:21_, 97:23_, 170:20_, 188:20

**remembering** [1]_ - 37:5

**remind** [3]_ - 14:16_, 174:4_, 189:23

**removable** [1]_ - 158:12

**removal** [2]_ - 121:24_, 123:22

**remove** [12]_ - 11:18_, 49:5_, 53:7_, 53:25_, 120:24_, 121:14_, 124:14_, 140:5_, 140:25_, 159:7_, 159:13_, 254:18

**removed** [33]_ - 36:8_, 49:8_, 50:20_, 51:14_, 58:4_, 61:3_, 104:18_, 104:24_, 105:2_, 116:2_, 116:3_, 116:5_, 116:8_, 116:17_, 116:19_, 116:20_, 116:25_, 117:7_, 119:4_, 122:14_, 123:10_, 123:11_, 123:12_, 123:14_, 123:17_, 123:19_, 123:25_, 158:15_, 183:21_, 219:2_, 245:5_, 261:10

**removing** [1]_ - 121:15

**render** [4]_ - 201:25_, 202:1_, 207:15_, 214:1

**rendered** [1]₋ - 139:7
**Renee** [1]₋ - 3:17
**Rent** [1]₋ - 28:8
**Rent-a-Home** [1]₋ - 28:8
**reorient** [1]₋ - 48:4
**repeat** [2]₋ - 155:8₋, 181:23
**repeated** [1]₋ - 191:18
**rephrase** [5]₋ - 145:24₋, 157:5₋, 158:5₋, 193:11₋, 262:15
**replace** [2]₋ - 4:10₋, 142:8
**reporting** [1]₋ - 117:3
**repository** [1]₋ - 153:6
**represent** [5]₋ - 6:20₋, 74:20₋, 86:23₋, 237:18₋, 239:16
**representation** [1]₋ - 239:13
**representative** [2]₋ - 236:12₋, 239:6
**represented** [1]₋ - 239:3
**representing** [1]₋ - 237:11
**request** [13]₋ - 4:21₋, 108:12₋, 108:15, 111:12₋, 111:14₋, 111:20₋, 114:14₋, 130:5₋, 156:15₋, 187:14₋, 217:9₋, 217:11₋, 218:13
**requested** [1]₋ - 214:3
**requesting** [2]₋ - 5:24₋, 6:2
**require** [7]₋ - 9:22₋, 110:3₋, 129:25₋, 149:19₋, 182:2₋, 207:15₋, 209:21
**required** [7]₋ - 130:1₋, 157:1₋, 157:21₋, 158:3₋, 182:18₋, 199:4₋, 234:25
**requirements** [1]₋ - 156:19
**requires** [1]₋ - 110:2
**research** [2]₋ - 125:21₋, 279:23
**researchers** [1]₋ - 202:19
**researching** [2]₋ - 4:18₋, 4:21
**resembles** [1]₋ - 68:11
**reserves** [1]₋ - 9:6
**reset** [1]₋ - 88:17

**residue** [9]₋ - 135:6₋, 135:9₋, 135:10₋, 135:11₋, 135:13₋, 135:16₋, 135:17₋, 136:2₋, 136:3
**respects** [1]₋ - 150:15
**Response** [4]₋ - 9:15₋, 9:19₋, 12:14₋, 13:11
**response** [2]₋ - 33:4₋, 117:25
**responsibilities** [2]₋ - 9:11₋, 10:1
**responsibility** [3]₋ - 132:11₋, 133:2₋, 192:15
**responsible** [7]₋ - 10:9₋, 17:11₋, 108:24₋, 109:1₋, 109:7₋, 111:13₋, 111:20
**rest** [2]₋ - 188:18₋, 188:25
**restate** [1]₋ - 128:11
**restaurant** [2]₋ - 77:20₋, 92:5
**Restaurant** [3]₋ - 92:23₋, 93:17₋, 94:24
**restoration** [12]₋ - 156:16₋, 159:15₋, 160:13₋, 163:24₋, 172:21₋, 172:25₋, 173:13₋, 173:15₋, 178:6₋, 179:21₋, 180:16₋, 194:12
**restore** [11]₋ - 134:25₋, 160:5₋, 160:6₋, 160:10₋, 160:11₋, 163:10₋, 173:8₋, 176:10₋, 176:25₋, 178:3₋, 179:6
**restored** [2]₋ - 175:16₋, 180:2
**result** [4]₋ - 175:14₋, 179:9₋, 239:15₋, 264:14
**results** [5]₋ - 117:3₋, 117:8₋, 122:22₋, 276:7
**resume** [8]₋ - 7:22₋, 34:8₋, 69:6₋, 69:21₋, 122:25₋, 131:2₋, 201:10₋, 216:2
**resurfaced** [1]₋ - 129:18
**retained** [1]₋ - 113:18
**retention** [6]₋ - 210:15₋, 211:5₋, 211:21₋, 225:12₋, 225:23₋, 243:20
**retrieve** [7]₋ - 38:14₋, 102:24₋, 119:19₋, 180:23₋, 182:22₋, 244:17₋, 266:12
**retrieved** [1]₋ - 234:7
**retrieving** [1]₋ - 118:25
**return** [8]₋ - 29:20₋, 31:2₋

₋, 69:14₋, 70:1₋, 147:3₋, 149:10₋, 175:3₋, 215:25
**returned** [4]₋ - 219:19₋, 219:20₋, 221:11₋, 225:21
**reverse** [4]₋ - 231:17₋, 232:1₋, 232:9₋, 232:25
**review** [11]₋ - 22:4₋, 22:7₋, 23:9₋, 34:8₋, 122:5₋, 129:5₋, 138:17₋, 138:21₋, 199:25₋, 230:10₋, 249:3
**reviewed** [12]₋ - 15:1₋, 15:2₋, 36:4₋, 65:15₋, 78:20₋, 85:11₋, 85:12₋, 86:20₋, 94:4₋, 138:23₋, 230:1₋, 249:2
**reviewing** [2]₋ - 33:25₋, 114:15
**reviews** [1]₋ - 199:18
**revisit** [2]₋ - 7:12₋, 130:3
**revolver** [1]₋ - 188:15
**revolver-type** [1]₋ - 188:15
**rewards** [1]₋ - 200:14
**Richmond** [1]₋ - 133:19
**rid** [2]₋ - 173:1₋, 176:16
**ridge** [68]₋ - 196:20₋, 197:3₋, 198:5₋, 199:6₋, 201:3₋, 201:18₋, 202:6₋, 202:9₋, 202:11₋, 202:14₋, 202:18₋, 203:12₋, 203:13₋, 203:20₋, 203:21₋, 203:24₋, 204:5₋, 204:10₋, 204:13₋, 204:17₋, 204:18₋, 204:22₋, 204:23₋, 205:4₋, 205:6₋, 205:22₋, 206:1₋, 206:12₋, 212:4₋, 212:5₋, 226:12₋, 226:16₋, 229:25₋, 232:20₋, 232:22₋, 232:25₋, 233:2₋, 233:3₋, 233:4₋, 235:16₋, 236:2₋, 236:7₋, 236:8₋, 236:10₋, 236:11₋, 236:12₋, 236:13₋, 237:5₋, 237:13₋, 237:15₋, 237:16₋, 237:18₋, 237:19₋, 237:22₋, 237:23₋, 237:25₋, 238:4₋, 238:9₋, 238:12₋, 239:3₋, 239:24
**ridges** [36]₋ - 198:6₋, 198:7₋, 198:9₋, 198:12₋, 201:21₋, 201:23₋, 203:20₋, 204:1₋, 204:3₋, 204:14₋, 204:18₋, 204:20₋, 205:17₋, 205:19₋, 205:21₋, 206:7₋, 206:11₋, 207:11₋, 207:13₋, 229:25₋, 232:3₋, 232:4₋, 232:5₋,

232:10₋, 232:11₋, 235:16₋, 235:17₋, 235:18₋, 236:4₋, 236:16₋, 237:12₋, 237:15₋, 237:21₋, 238:1₋, 238:2₋, 238:5
**rifle** [98]₋ - 116:13₋, 116:14₋, 116:18₋, 116:19₋, 117:1₋, 117:7₋, 118:9₋, 118:13₋, 119:5₋, 119:9₋, 123:17₋, 127:13₋, 129:15₋, 130:6₋, 130:9₋, 139:8₋, 140:10₋, 141:7₋, 141:23₋, 141:25₋, 142:3₋, 142:7₋, 142:9₋, 142:25₋, 143:2₋, 143:13₋, 144:11₋, 144:14₋, 145:10₋, 145:17₋, 145:18₋, 146:6₋, 146:9₋, 146:15₋, 147:11₋, 147:17₋, 148:7₋, 148:23₋, 149:10₋, 149:25₋, 150:2₋, 150:12₋, 150:16₋, 153:18₋, 154:19₋, 154:20₋, 158:8₋, 158:23₋, 159:2₋, 159:9₋, 160:20₋, 160:22₋, 160:24₋, 161:11₋, 161:14₋, 162:1₋, 165:12₋, 167:12₋, 168:6₋, 168:16₋, 168:20₋, 174:4₋, 174:9₋, 175:15₋, 175:18₋, 179:3₋, 179:10₋, 179:14₋, 179:21₋, 180:7₋, 180:9₋, 181:14₋, 182:9₋, 191:10₋, 191:14₋, 192:1₋, 192:11₋, 194:13₋, 217:6₋, 217:8₋, 219:11₋, 222:1₋, 223:2₋, 245:3₋, 245:8₋, 258:2₋, 259:13₋, 259:14₋, 259:16₋, 260:14₋, 260:24₋, 260:25₋, 261:3₋, 261:6₋, 262:2₋, 262:6₋, 263:7₋, 275:15
**rifles** [3]₋ - 142:4₋, 154:9₋, 191:2
**right-hand** [1]₋ - 83:1
**righty** [1]₋ - 194:3
**rise** [5]₋ - 69:4₋, 126:2₋, 215:13₋, 271:24₋, 280:7
**risk** [1]₋ - 186:22
**roasted** [1]₋ - 78:11
**robustness** [1]₋ - 143:6
**rod** [2]₋ - 68:4₋, 68:9
**rods** [1]₋ - 60:3
**role** [5]₋ - 9:19₋, 12:9₋, 132:15₋, 248:12₋, 255:20
**roles** [3]₋ - 10:3₋, 10:12₋, 15:1
**roll** [1]₋ - 52:13

**rolled** [1]_ - 5:9
**rolling** [1]_ - 241:7
**roof** [2]_ - 19:16_, 19:19
**room** [3]_ - 69:18_, 152:3_, 225:4
**Rose** [2]_ - 10:17_, 10:18
**rotating** [3]_ - 99:18_, 216:17_, 256:25
**rough** [1]_ - 179:22
**roughly** [1]_ - 240:2
**round** [4]_ - 113:3_, 154:21_, 181:24_, 186:13
**rounds** [3]_ - 147:13_, 149:4_, 181:15
**route** [3]_ - 112:8_, 112:19_, 124:2
**routes** [1]_ - 114:7
**Routh** [52]_ - 3:5_, 3:13_, 3:14_, 3:15_, 5:6_, 5:17_, 6:8_, 6:11_, 6:13_, 6:18_, 6:22_, 7:2_, 7:5_, 7:14_, 13:8_, 23:6_, 25:11_, 27:18_, 35:5_, 36:5_, 36:14_, 37:20_, 67:22_, 79:20_, 82:23_, 98:2_, 98:16_, 98:19_, 99:4_, 100:12_, 103:4_, 103:7_, 106:12_, 127:23_, 129:7_, 130:4_, 137:21_, 165:24_, 166:7_, 201:5_, 227:19_, 234:3_, 234:22_, 240:24_, 242:15_, 243:8_, 243:17_, 244:21_, 277:1_, 277:10_, 277:19_, 280:24
**ROUTH** [76]_ - 3:14_, 4:18_, 5:3_, 5:7_, 5:14_, 5:19_, 5:23_, 6:3_, 7:15_, 36:16_, 37:22_, 67:23_, 79:21_, 96:9_, 96:11_, 97:6, 98:4_, 98:12_, 98:15_, 98:17_, 98:21_, 99:3_, 99:5_, 99:10, 99:14_, 100:3, 100:6_, 100:9_, 100:14_, 100:16_, 100:18, 100:22_, 101:22, 101:24_, 102:23_, 103:2_, 103:5_, 103:8, 103:14_, 103:19, 103:25_, 105:9_, 106:13_, 123:5_, 123:7, 125:2_, 125:6_, 125:8_, 127:25_, 128:6_, 130:7_, 130:13_, 137:24_, 166:8_, 190:13_, 190:15, 193:5_, 193:11_, 193:15_, 193:18_, 194:3_, 194:6_, 201:6_, 227:20_, 244:23_, 245:16_, 277:2_, 277:5_, 277:8_, 277:13_, 277:20_,

277:22_, 278:13_, 278:17_, 278:25_, 280:25
**routine** [1]_ - 115:3
**routines** [1]_ - 251:15
**routing** [1]_ - 109:7
**rugged** [1]_ - 143:2
**Rule** [2]_ - 201:2_, 230:13
**ruled** [1]_ - 127:21
**ruling** [3]_ - 97:4_, 127:15_, 130:16
**rulings** [6]_ - 126:23_, 127:4_, 127:16_, 127:19_, 128:11_, 128:20
**run** [2]_ - 153:21_, 262:12
**running** [2]_ - 115:2_, 178:17
**runs** [1]_ - 148:20
**Russian** [2]_ - 142:7_, 185:14
**Russian-designed** [1]_ - 142:7
**Russian-made** [1]_ - 185:14
**rust** [4]_ - 176:6_, 176:17_, 180:1_, 180:4
**rusting** [2]_ - 179:23_, 180:3
**Ryan** [13]_ - 3:5_, 3:14_, 13:8_, 23:6_, 25:11_, 27:17_, 35:5_, 36:5_, 234:3_, 234:22_, 240:24_, 242:15_, 243:17

### S

**S-M-I-T-H** [1]_ - 131:19
**S-T-E-W-A-R-T** [1]_ - 195:12
**safe** [4]_ - 98:5_, 98:7_, 139:7_, 144:20
**safely** [1]_ - 152:6
**safes** [1]_ - 110:3
**safety** [12]_ - 144:14_, 144:17, 144:18, 144:23_, 145:5_, 145:7_, 148:4_, 148:5_, 150:19_, 150:22_, 151:3
**sales** [2]_ - 157:10_, 160:9
**Sam** [1]_ - 166:4
**sample** [18]_ - 155:15_, 155:17, 155:20_, 238:7_, 239:6_, 249:7_, 249:9_, 249:10_, 249:11_, 252:22

_, 253:15_, 253:22_, 254:5_, 269:23_, 273:21_, 274:20
**samples** [22]_ - 155:18_, 247:22_, 247:24_, 249:13_, 249:16_, 249:17_, 249:18_, 250:1_, 250:19_, 251:13_, 254:7_, 255:8_, 256:1_, 256:10_, 256:16_, 257:13_, 257:17_, 273:22_, 273:24_, 276:20
**Samsung** [1]_ - 40:14
**sandpapering** [1]_ - 171:25
**sanitize** [1]_ - 250:16
**Sara** [2]_ - 33:5_, 82:23
**sat** [2]_ - 224:12_, 225:4
**Sausage** [2]_ - 73:10_, 78:11
**Sausages** [1]_ - 73:22
**save** [1]_ - 124:3
**saw** [17]_ - 13:9_, 13:17_, 53:24_, 77:25_, 82:2_, 90:16_, 100:25_, 104:10_, 119:9_, 121:18_, 150:2_, 171:12_, 176:4_, 224:5_, 229:9_, 231:18_, 240:24
**scan** [2]_ - 211:2_, 211:3
**scanned** [2]_ - 243:19_, 252:23
**scarring** [1]_ - 203:16
**scenario** [2]_ - 112:3_, 114:16
**scene** [7]_ - 10:3_, 11:10_, 111:5_, 153:8_, 265:16_, 278:19
**scenes** [1]_ - 9:24
**scheduled** [1]_ - 38:23
**Science** [1]_ - 136:13
**science** [10]_ - 110:14_, 110:15_, 133:9_, 133:19_, 133:20_, 193:24_, 194:1_, 196:9_, 196:10_, 247:7
**sciences** [1]_ - 132:17
**scientific** [3]_ - 110:11_, 138:2_, 200:17
**scientifically** [1]_ - 112:7
**scientist** [4]_ - 122:16_, 132:14_, 132:16_, 196:2
**scientists** [4]_ - 110:8_, 110:9_, 111:25_, 112:9
**scope** [34]_ - 118:6_, 119:4_, 119:8_, 122:14_,

122:23_, 123:10_, 123:11_, 123:12_, 123:16_, 123:17_, 123:19_, 123:22_, 123:25_, 124:9_, 124:14_, 150:6_, 193:4_, 193:8_, 222:5_, 222:7_, 223:3_, 223:23_, 224:3_, 224:5_, 224:8_, 224:16_, 245:2_, 245:5_, 245:6_, 261:3_, 261:7_, 261:10_, 278:22
**Scott** [1]_ - 126:13
**scratches** [1]_ - 169:20
**screen** [21]_ - 15:11_, 18:7_, 19:4_, 25:5_, 34:19_, 43:17_, 71:20_, 93:5_, 167:24_, 169:15_, 169:25_, 171:10_, 175:20_, 210:16_, 222:20_, 223:21_, 226:25_, 230:23_, 243:20_, 260:8_, 261:22
**screens** [2]_ - 38:3_, 106:21
**screwdriver** [3]_ - 60:4_, 134:2_, 134:3
**scroll** [3]_ - 98:20_, 165:3
**se** [1]_ - 152:23
**sealed** [4]_ - 141:2_, 221:10_, 253:3_, 253:5
**search** [69]_ - 9:24_, 10:5_, 10:10_, 10:11_, 10:24_, 11:7_, 11:9_, 11:18_, 11:21_, 12:6_, 12:17_, 12:18_, 13:25_, 14:14_, 14:18_, 14:21_, 14:24_, 14:25_, 15:2_, 15:3_, 15:17_, 16:23_, 17:11_, 21:9_, 21:22_, 22:1_, 23:7_, 23:17_, 25:13_, 26:25_, 27:24_, 35:25_, 36:9_, 39:5_, 42:20_, 49:4_, 49:7_, 50:21_, 51:15_, 55:11_, 56:4_, 59:20_, 62:10_, 63:7_, 64:3_, 64:24_, 65:2_, 67:18_, 70:24_, 72:18_, 73:8_, 74:12_, 74:23_, 75:4_, 79:11_, 79:12_, 81:15_, 82:8_, 84:4_, 84:16_, 85:22_, 86:10_, 86:18_, 86:24_, 90:12_, 95:22_, 97:10_, 106:7_, 233:16
**searched** [3]_ - 12:16_, 15:17_, 16:21
**searches** [9]_ - 9:22_, 11:3_, 11:5_, 13:22_, 14:1_, 14:3_, 15:20_, 156:1_, 156:2

**searching** [1] - 10:5

**seat** [16] - 3:2, 26:19, 30:11, 30:12, 39:16, 40:3, 40:4, 42:9, 42:15, 48:1, 48:11, 48:15, 69:14, 87:15, 87:18, 280:9

**seated** [11] - 7:21, 8:8, 107:22, 126:4, 129:1, 131:1, 131:15, 195:8, 215:24, 246:7, 272:11

**seats** [2] - 30:15, 47:2

**second** [7] - 69:10, 110:14, 155:8, 155:10, 167:8, 191:21, 235:20

**secondary** [2] - 113:12, 113:16

**seconds** [1] - 91:19

**section** [2] - 11:15, 270:11

**secure** [5] - 13:12, 14:9, 109:21, 265:5, 270:1

**secured** [1] - 141:3

**securely** [2] - 149:16, 245:3

**security** [1] - 109:25

**SECURITY** [2] - 7:19, 130:23

**see** [216] - 15:11, 15:22, 17:12, 17:13, 18:7, 18:20, 19:2, 19:15, 19:21, 20:5, 20:11, 20:15, 21:24, 23:11, 24:4, 24:5, 24:8, 26:2, 26:18, 26:20, 26:21, 26:24, 30:18, 30:25, 40:21, 40:22, 40:23, 42:6, 42:7, 42:10, 43:23, 44:22, 46:11, 46:12, 46:13, 46:14, 47:7, 47:18, 47:20, 47:23, 48:10, 48:17, 48:23, 48:25, 49:24, 50:3, 50:5, 51:11, 51:22, 52:2, 52:3, 52:4, 52:6, 52:13, 52:20, 54:1, 54:17, 54:18, 54:22, 55:9, 56:16, 57:9, 60:3, 60:4, 60:15, 63:17, 66:1, 66:2, 68:10, 68:18, 68:19, 72:14, 73:12, 75:11, 76:11, 76:22, 76:24, 77:2, 77:13, 78:9, 78:11, 78:14, 80:14, 80:19, 82:21, 84:17, 84:19, 88:22, 89:1,

89:10, 89:14, 89:20, 90:15, 90:17, 90:21, 91:21, 92:3, 92:5, 92:14, 93:11, 94:2, 94:8, 100:23, 100:25, 103:3, 104:1, 104:25, 105:3, 107:2, 107:7, 111:4, 118:9, 119:12, 120:20, 120:21, 121:1, 121:9, 121:13, 126:6, 128:6, 128:21, 130:15, 139:24, 141:9, 145:10, 151:10, 153:11, 159:3, 159:6, 161:1, 161:10, 162:19, 164:3, 167:5, 167:8, 167:19, 167:20, 167:22, 168:15, 169:24, 170:2, 170:5, 170:14, 170:18, 171:4, 171:6, 171:7, 171:8, 172:2, 173:12, 173:25, 176:23, 177:7, 177:8, 177:21, 178:7, 178:10, 178:11, 178:13, 180:3, 184:1, 184:24, 185:23, 186:10, 187:5, 188:10, 188:11, 189:10, 190:18, 209:9, 212:4, 212:6, 212:14, 213:21, 221:10, 223:1, 223:2, 228:14, 228:16, 228:21, 230:23, 232:10, 232:19, 232:25, 234:25, 236:1, 236:8, 236:15, 237:3, 237:5, 237:20, 238:3, 238:11, 239:12, 239:18, 239:21, 242:18, 242:20, 255:16, 258:25, 260:13, 260:24, 261:12, 262:5, 265:9, 269:10, 274:9, 278:15

**see..** [1] - 58:14

**seeing** [22] - 15:16, 16:19, 21:18, 26:4, 26:5, 30:4, 39:23, 39:24, 46:10, 47:15, 49:14, 51:10, 52:11, 60:2, 167:18, 167:25, 170:8, 173:22, 174:16, 177:18, 184:23, 187:3

**seized** [9] - 13:15, 17:21, 34:25, 35:25, 51:7, 51:20, 60:10, 67:14, 72:17

**select** [1] - 154:2

**selecting** [1] - 252:15

**selection** [3] - 251:12, 252:11, 252:12

**self** [7] - 135:19, 146:21, 148:22, 148:24, 148:25, 185:7, 188:21

**self-contained** [2] - 146:21, 185:7

**self-containing** [1] - 188:21

**self-loading** [2] - 148:22, 148:24

**self-loads** [1] - 148:25

**self-unit** [1] - 135:19

**semen** [1] - 111:1

**semiautomated** [1] - 273:25

**semiautomatic** [16] - 148:7, 148:13, 148:15, 148:24, 153:25, 188:14, 190:20, 190:23, 190:24, 191:2, 191:4, 191:6, 191:11, 191:12, 191:13, 192:6

**semiporous** [1] - 206:21

**send** [1] - 210:10

**senior** [5] - 12:14, 132:14, 132:15, 248:16, 248:17

**senior-level** [2] - 132:14, 132:15

**sensitive** [1] - 135:23

**sent** [4] - 168:24, 223:11, 253:12, 263:9

**sentence** [4] - 4:20, 5:5, 5:9, 5:11

**separate** [6] - 5:11, 139:8, 150:13, 150:14, 183:18, 273:22

**separated** [4] - 183:23, 188:18, 188:25, 245:9

**separately** [5] - 11:19, 49:6, 251:5, 251:6, 251:8

**September** [28] - 12:13, 12:17, 12:19, 14:11, 14:19, 23:7, 25:12, 25:15, 27:1, 76:12, 93:1, 93:25, 94:7, 94:12, 95:2, 95:4, 95:8, 96:4, 193:1, 216:11, 216:23, 221:25, 223:7, 227:15, 241:5, 256:21, 261:7, 274:15

**sequence** [6] - 105:3, 209:7, 218:10, 218:25, 219:14, 225:20

**serial** [85] - 126:21, 134:14, 134:16, 134:21, 134:22, 137:16, 156:15, 156:16, 156:18, 156:19, 156:22, 156:23, 157:1, 157:2, 157:7, 157:9, 157:16, 157:19, 157:24, 158:3, 158:7, 158:14, 158:23, 159:1, 159:9, 159:19, 159:25, 160:5, 160:6, 160:8, 160:10, 160:11, 160:23, 160:24, 161:3, 161:4, 161:11, 161:13, 161:15, 161:17, 161:20, 162:2, 162:10, 162:15, 162:18, 162:23, 162:24, 163:4, 163:6, 163:10, 163:16, 165:13, 167:7, 167:9, 168:6, 169:7, 169:8, 170:3, 170:15, 175:7, 175:15, 175:24, 176:4, 176:7, 176:11, 176:20, 177:1, 177:12, 177:13, 177:25, 178:22, 178:23, 178:24, 179:3, 179:6, 180:1, 180:15, 180:20, 192:22, 194:12

**series** [6] - 13:22, 164:19, 173:4, 175:10, 183:13, 230:5

**serological** [1] - 264:9

**serology** [7] - 111:1, 247:13, 247:15, 247:16, 248:5, 250:4, 264:17

**serve** [1] - 9:15

**serving** [2] - 5:4, 5:11

**set** [11] - 4:16, 61:2, 130:21, 154:4, 154:9, 165:11, 202:11, 203:13, 204:8, 204:10, 220:12

**setting** [1] - 210:23

**seven** [4] - 4:19, 5:5, 5:9, 23:17

**seven-year** [3] - 4:19, 5:5, 5:9

**several** [7] - 101:12, 110:18, 111:7, 123:15, 198:24, 241:8

**shadow** [2] - 200:2, 200:3

**shakes** [1] - 106:20

**shall** [2] - 129:20, 279:23

**shape** [1] - 224:7

**shapes** [2] - 204:23, 205:7

**share** [2] - 202:21

**shavings** [1] - 171:2

**sheet** [1] - 112:12

**sheets** [1] - 51:11

**shell** [2] - 104:4, 278:5

**shift** [1] - 216:10

**shifts** [1] - 115:5

**shiny** [1] - 167:20

**SHIPLEY** [355] - 3:8, 7:4, 7:25, 8:15, 8:19, 15:5, 15:10, 15:14, 15:15, 16:5, 16:14, 16:16, 17:4, 17:8, 17:24, 18:2, 19:11, 19:14, 20:22, 21:1, 21:14, 21:17, 22:17, 22:19, 22:22, 22:24, 23:1, 23:20, 23:24, 24:1, 24:22, 25:1, 25:5, 25:7, 25:21, 26:1, 26:11, 26:14, 27:7, 27:11, 28:22, 29:2, 30:1, 30:3, 30:5, 30:8, 30:18, 30:20, 31:4, 31:6, 32:3, 32:8, 32:10, 32:13, 32:17, 32:19, 33:12, 33:17, 34:1, 34:11, 34:17, 34:19, 34:21, 35:17, 35:21, 36:12, 36:20, 37:9, 37:13, 37:18, 38:1, 38:4, 38:12, 38:15, 39:18, 39:22, 40:6, 40:9, 40:17, 40:20, 41:4, 41:8, 41:14, 41:16, 42:2, 42:5, 42:23, 43:1, 43:13, 43:17, 43:19, 44:5, 44:10, 44:20, 44:24, 45:2, 45:14, 45:17, 46:6, 46:9, 47:10, 47:14, 48:19, 48:22, 49:9, 49:13, 49:18, 49:20, 50:11, 50:13, 50:16, 50:18, 51:5, 51:9, 51:17, 51:19, 51:24, 52:1, 53:2, 53:5, 53:12, 53:15, 54:8, 54:12, 55:2, 55:16, 55:19, 55:21, 55:22, 56:13, 56:15, 56:22, 57:1, 57:5, 57:8, 57:17, 57:21, 58:7, 58:20, 58:21, 59:4, 59:7, 59:23, 60:1, 60:19, 60:22, 61:11, 61:15, 61:17, 61:19, 62:4, 62:8, 63:2, 63:5, 63:20, 63:23,

64:1, 64:18, 64:21, 65:4, 65:7, 65:18, 65:22, 66:6, 66:8, 66:17, 66:22, 67:6, 67:10, 67:20, 68:1, 68:14, 68:17, 68:22, 69:22, 69:24, 70:6, 70:10, 70:17, 70:18, 71:16, 71:18, 72:5, 72:9, 72:23, 73:2, 73:3, 73:15, 73:18, 74:25, 75:2, 75:21, 75:24, 76:15, 76:20, 76:21, 77:9, 77:12, 78:22, 79:1, 79:18, 80:1, 80:3, 80:5, 80:10, 80:14, 80:16, 81:7, 81:10, 82:11, 82:14, 83:18, 83:22, 84:6, 84:10, 84:19, 84:22, 85:16, 85:19, 87:3, 87:6, 87:24, 88:2, 88:13, 88:20, 88:21, 90:6, 90:9, 91:9, 91:12, 92:10, 92:13, 93:6, 93:9, 94:17, 94:21, 95:12, 95:16, 96:6, 97:4, 101:19, 101:21, 105:12, 105:14, 105:21, 105:24, 106:10, 106:17, 106:19, 107:1, 107:9, 126:9, 126:19, 127:7, 129:3, 130:21, 131:5, 131:21, 132:1, 137:19, 138:10, 138:11, 139:3, 139:12, 139:15, 139:18, 140:8, 140:24, 141:5, 141:11, 141:14, 143:21, 144:2, 145:25, 146:2, 146:3, 146:23, 147:4, 147:6, 147:8, 149:11, 149:15, 149:22, 157:6, 158:6, 161:24, 162:4, 162:7, 162:14, 164:18, 164:25, 165:4, 165:20, 166:2, 166:6, 166:19, 167:1, 167:15, 167:17, 168:13, 168:14, 169:4, 169:5, 169:12, 169:13, 169:24, 170:1, 170:5, 170:7, 170:11, 170:13, 170:17, 172:5, 172:18, 172:20, 173:19, 173:21, 174:13, 174:15, 175:19, 175:21, 177:4, 177:6, 177:15, 177:17, 178:7, 178:8, 180:22, 180:25, 181:3, 181:6, 182:7, 182:22, 182:25, 183:3, 184:17, 184:22, 186:25, 187:2, 187:12, 187:14, 187:18, 188:3, 188:6, 189:18, 189:22,

190:10, 193:3, 194:8, 194:10, 194:15, 280:13, 280:17, 280:22, 281:4

**Shipley** [6] - 3:8, 7:3, 126:18, 128:19, 143:20, 166:1

**shirt** [3] - 54:17, 97:20, 101:11

**shirts** [12] - 56:19, 57:2, 97:12, 97:19, 98:10, 98:11, 98:23, 98:25, 100:7, 100:8, 100:23, 100:25

**shock** [1] - 135:22

**shoes** [3] - 97:13, 97:21

**shoot** [3] - 146:13, 151:24, 182:1

**shooting** [1] - 153:12

**shoots** [3] - 128:14, 128:15, 136:2

**short** [5] - 33:10, 57:10, 237:23, 237:25, 239:23

**shorts** [4] - 55:5, 55:7, 97:20, 98:25

**shot** [2] - 43:20, 104:3

**shoulder** [1] - 267:13

**show** [54] - 15:19, 16:3, 17:4, 17:24, 20:1, 22:2, 23:20, 28:10, 28:17, 32:15, 38:25, 39:18, 47:10, 49:9, 50:16, 51:5, 55:14, 57:16, 57:25, 58:8, 58:11, 59:8, 59:14, 61:9, 66:23, 73:21, 83:17, 86:13, 87:2, 89:8, 98:12, 99:3, 103:8, 105:4, 115:7, 117:11, 118:19, 119:6, 119:25, 139:10, 149:19, 162:16, 165:11, 165:12, 165:15, 165:22, 178:15, 192:25, 193:20, 220:6, 239:20, 240:25, 242:21

**showing** [20] - 16:9, 16:17, 22:7, 22:24, 32:11, 32:17, 66:24, 72:20, 74:19, 93:8, 106:21, 115:20, 179:15, 181:8, 222:21, 222:23, 226:24, 230:22, 239:14, 263:19

**shown** [7] - 78:10,

83:20, 92:1, 173:23, 226:24, 230:14, 234:21

**Shows** [1] - 38:22

**shows** [3] - 90:2, 98:22, 112:12

**sic** [1] - 61:12

**side** [50] - 17:10, 20:12, 21:2, 21:3, 21:8, 24:9, 26:5, 26:6, 26:19, 26:21, 28:8, 28:11, 28:17, 29:23, 31:14, 33:1, 33:3, 33:7, 40:3, 40:4, 42:9, 47:17, 48:1, 48:12, 53:23, 82:21, 83:1, 114:23, 145:11, 168:9, 184:25, 212:11, 233:18, 236:16, 237:21, 238:1, 238:2, 238:5, 239:12, 239:18, 240:4, 240:5, 269:9, 280:21

**side-by-side** [3] - 212:11, 233:18, 239:12

**side-view** [1] - 21:8

**sidebar** [1] - 5:8

**sides** [5] - 29:18, 32:24, 32:25, 145:11, 239:20

**sight** [4] - 145:14, 146:10, 146:11

**sights** [1] - 146:8

**sign** [1] - 17:20

**significance** [3] - 34:4, 181:22, 181:24

**significant** [1] - 120:10

**signifies** [1] - 116:24

**Sihvola** [1] - 3:17

**silver** [4] - 170:24, 174:2, 188:23, 189:8

**similar** [7] - 10:22, 18:14, 68:4, 91:14, 211:4, 224:20, 239:10

**similarities** [2] - 204:2, 204:5

**simple** [1] - 262:15

**simply** [3] - 162:9, 209:9, 254:10

**simulate** [1] - 147:16

**simulating** [1] - 146:16

**simultaneous** [1] - 242:14

**single** [6] - 215:4, 215:5, 244:7

**site** [2] - 199:19, 199:24

**sitting** [1] - 42:15

**situation** [6] - 4:24, 5:15, 145:19, 148:25, 189:2, 232:7

**situations** [1] - 158:18

**six** [9] - 23:17, 39:6, 39:7, 91:6, 91:22, 93:22, 94:15, 98:10

**size** [3] - 66:13, 78:19, 154:11

**skin** [8] - 198:5, 202:9, 202:14, 202:18, 205:21, 206:1, 206:12

**skip** [1] - 184:16

**skipped** [2] - 238:18, 238:25

**SKS** [12] - 116:13, 141:23, 141:25, 142:3, 160:24, 161:16, 181:14, 182:2, 191:2, 191:10, 193:19

**slammed** [1] - 134:3

**slated** [1] - 112:12

**sleeping** [1] - 47:3

**slide** [5] - 157:23, 234:1, 235:12, 238:10, 239:14

**slightly** [1] - 207:20

**slow** [2] - 152:8, 154:5

**small** [2] - 159:15, 238:7

**smaller** [9] - 140:10, 142:9, 262:11, 262:12, 271:13, 272:23, 272:24, 273:2, 273:8

**SMITH** [1] - 131:23

**Smith** [47] - 126:10, 126:20, 127:7, 127:23, 128:4, 129:2, 131:6, 131:8, 131:19, 132:2, 137:20, 138:12, 139:19, 140:25, 141:6, 141:12, 141:15, 143:10, 143:18, 143:22, 146:22, 147:9, 149:9, 149:16, 162:1, 162:5, 162:8, 162:15, 165:5, 167:2, 167:18, 167:24, 169:6, 170:18, 172:22, 173:22, 175:22, 179:2, 181:8, 183:5, 184:23, 187:20, 189:20, 189:23, 194:11, 194:16, 280:11

**smooth** [3] - 172:14, 189:11, 206:10

**smudged** [1] - 207:17

**sneakers** [4] - 53:21, 53:22, 54:3, 97:23

**snip** [2] - 253:10, 254:10

**so..** [1] - 5:15

**softer** [1] - 134:5

**sold** [4] - 134:22, 156:24, 192:23, 193:17

**soldier** [1] - 146:6

**soldiers** [1] - 145:20

**solely** [1] - 128:13

**solemnly** [5] - 8:4, 107:18, 131:11, 195:4, 246:3

**solution** [6] - 193:23, 250:11, 250:12, 254:19, 273:20, 273:23

**someone** [10] - 51:2, 101:2, 101:12, 101:17, 101:22, 135:14, 159:3, 191:7, 192:19, 245:10

**sometimes** [9] - 10:7, 110:2, 154:6, 209:20, 211:10, 229:24, 231:8, 260:1

**somewhat** [1] - 90:11

**somewhere** [2] - 217:15, 223:25

**son** [4] - 4:19, 5:17, 5:25, 7:7

**soon** [1] - 69:11

**sorry** [40] - 12:20, 12:22, 28:12, 33:5, 33:10, 40:4, 48:2, 49:12, 55:19, 57:15, 63:16, 63:23, 68:5, 68:6, 78:4, 79:8, 80:10, 81:8, 85:2, 85:9, 86:1, 88:6, 89:12, 93:4, 93:15, 96:14, 99:18, 102:19, 106:3, 114:10, 181:22, 184:19, 238:17, 238:18, 242:23, 273:12, 275:10, 277:25

**sort** [11] - 17:12, 24:12, 55:7, 110:8, 159:11, 167:25, 171:23, 218:18, 226:4, 253:1, 262:3

**source** [4] - 209:11, 209:21, 213:23, 223:13

**sources** [1] - 209:11

**South** [12] - 75:9, 76:9, 77:22, 78:4, 80:7, 80:20, 88:7, 88:25,

90:18, 91:16, 92:20, 93:14

**Southern** [1] - 193:1

**Southwest** [1] - 76:2

**Soviet** [2] - 142:7, 142:24

**space** [1] - 13:13

**Spanish** [1] - 4:2

**spatial** [3] - 233:5, 237:6, 238:13

**speaking** [4] - 110:5, 170:15, 250:6, 251:12

**spear** [1] - 145:21

**Special** [1] - 8:2

**special** [1] - 138:4

**specialized** [5] - 110:20, 134:9, 136:24, 138:3, 198:4

**specialties** [1] - 111:7

**specialty** [1] - 158:17

**specific** [6] - 108:19, 110:20, 117:2, 199:6, 233:15, 248:24

**specifically** [8] - 14:17, 66:2, 137:15, 181:17, 210:18, 210:19, 211:15, 256:11

**specifics** [1] - 251:11

**speculation** [1] - 101:21

**speculative** [1] - 129:13

**spell** [5] - 8:11, 107:23, 131:16, 195:9, 246:8

**spelled** [1] - 131:19

**spinning** [1] - 159:12

**splits** [2] - 237:14

**spoken** [1] - 46:1

**spoon** [1] - 51:23

**spray** [3] - 18:12, 18:20, 18:22

**sprayed** [1] - 180:2

**spring** [1] - 144:7

**squad** [1] - 9:14

**square** [2] - 241:13, 241:15

**staff** [2] - 248:16, 248:18

**stage** [8] - 4:4, 172:1, 172:21, 173:23, 226:8, 226:9, 226:17

**stages** [2] - 165:13, 244:6

**stain** [1] - 209:22

**stamp** [2] - 164:2

**stamped** [3] - 105:5, 163:1, 175:24

**stand** [17] - 69:15, 119:1, 131:8, 140:6, 149:12, 149:20, 161:25, 162:1, 162:6, 162:9, 162:11, 162:12, 195:2, 215:25, 220:22, 222:10, 241:23

**standard** [5] - 11:8, 28:13, 28:14, 152:19, 212:19

**standards** [1] - 199:21

**standby** [1] - 3:17

**standing** [5] - 22:19, 130:8, 131:9, 195:2, 245:25

**stands** [6] - 140:11, 141:22, 152:3, 153:5, 189:9, 199:17

**start** [27] - 4:14, 14:24, 22:10, 28:1, 39:8, 49:11, 58:2, 58:5, 74:25, 81:24, 82:17, 112:20, 115:22, 125:15, 143:14, 159:6, 160:23, 162:15, 163:10, 163:18, 174:17, 177:22, 211:22, 212:1, 235:15, 237:21, 280:2

**started** [9] - 12:12, 26:25, 34:10, 130:19, 132:6, 132:24, 142:16, 178:5, 226:1

**starting** [6] - 3:7, 142:6, 169:8, 171:6, 212:20, 235:13

**starts** [1] - 112:16

**State** [2] - 246:8, 247:8

**state** [17] - 3:6, 8:10, 16:1, 23:5, 82:17, 82:19, 84:1, 84:2, 84:3, 107:23, 109:18, 121:3, 131:16, 138:5, 195:9, 253:1

**states** [1] - 39:1

**States** [14] - 3:4, 3:7, 3:9, 4:14, 4:15, 6:24, 8:2, 25:11, 37:18, 67:21, 107:14, 131:5, 156:20, 280:22

**stating** [2] - 115:24, 242:20

**station** [2]_ - 89:3_, 250:16

**stay** [3]_ - 7:10_, 154:8_, 245:25

**stayed** [1]_ - 245:14

**steel** [7]_ - 143:8_, 143:17 _, 163:20_, 164:13_, 173:10_, 174:1_, 176:14

**step** [6]_ - 88:22_, 141:6_, 206:14_, 210:5_, 214:8_, 214:12

**Stephanie** [4]_ - 126:11_, 194:21_, 195:11_, 280:11

**STEPHANIE** [2]_ - 195:12, 195:16

**steps** [3]_ - 151:16_, 168:7_, 256:4

**sterile** [2]_ - 252:18_, 265:2

**Stewart** [15]_ - 126:11_, 194:21_, 195:11_, 195:20 _, 195:22_, 201:2_, 201:13_, 216:5_, 220:18_, 222:20_, 225:8_, 226:24_, 228:3_, 232:16_, 280:11

**STEWART** [1]_ - 195:16

**stick** [1]_ - 171:16

**sticker** [2]_ - 18:14_, 259:7

**stickers** [5]_ - 18:11_, 18:18_, 18:19_, 18:25_, 19:7

**still** [19]_ - 25:15_, 72:15_, 88:15_, 88:17_, 90:20_, 123:17_, 129:2_, 130:4_, 130:12_, 162:6_, 164:3_, 164:4_, 172:16_, 174:2_, 176:23_, 178:13_, 180:19 _, 233:2_, 280:12

**stock** [3]_ - 147:19_, 170:10_, 262:12

**stop** [4]_ - 125:15_, 146:22 _, 235:20_, 272:4

**stopped** [1]_ - 13:15

**storage** [1]_ - 19:17

**store** [3]_ - 62:25_, 80:7_, 102:22

**stored** [1]_ - 13:12

**stores** [3]_ - 75:17_, 75:18 _, 81:1

**straight** [5]_ - 102:16_, 102:18_, 103:17_, 171:16 _, 178:1

**straighten** [1]_ - 103:16

**straps** [3]_ - 60:4_, 60:12 _, 267:13

**streaming** [2]_ - 69:16_, 69:18

**Street** [1]_ - 76:2

**stretch** [1]_ - 63:14

**strictly** [1]_ - 129:9

**strike** [1]_ - 97:25

**strip** [1]_ - 182:13

**strong** [1]_ - 113:1

**structure** [1]_ - 175:7

**studied** [1]_ - 190:1

**studies** [1]_ - 202:22

**studying** [1]_ - 189:24

**style** [1]_ - 55:7

**sub** [5]_ - 113:22_, 114:5_, 116:18_, 116:21_, 120:12

**sub-item** [1]_ - 116:18

**sub-itemize** [2]_ - 114:5 _, 116:21

**sub-itemized** [2]_ - 113:22_, 120:12

**subject** [4]_ - 6:18_, 124:25_, 207:17_, 218:20

**subjected** [2]_ - 215:3_, 215:6

**submission** [1]_ - 234:14

**submissions** [2]_ - 111:16_, 241:9

**submit** [1]_ - 244:6

**submits** [2]_ - 109:11_, 109:16

**submitted** [14]_ - 112:4_, 134:23_, 187:4_, 208:16_, 210:2_, 211:6_, 211:7_, 216:24_, 217:3_, 234:14_, 234:24_, 235:4_, 244:8_, 257:21

**subpoena** [3]_ - 6:3_, 6:11_, 6:12

**subset** [1]_ - 117:2

**substance** [5]_ - 28:24_, 69:2_, 206:11_, 215:14_, 272:2

**substantial** [1]_ - 204:2

**substantially** [5]_ - 36:7 _, 67:17_, 118:3_, 203:3_, 274:13

**substrate** [2]_ - 134:5_, 273:22

**success** [1]_ - 172:23

**successful** [4]_ - 163:24 _, 192:12_, 210:1_, 210:4

**successfully** [1]_ - 176:25

**sufficient** [2]_ - 213:20_, 213:23

**suggest** [1]_ - 135:16

**suggested** [2]_ - 6:3_, 127:10

**suit** [1]_ - 140:15

**suitable** [5]_ - 153:18_, 153:20_, 208:24_, 229:12 _, 233:12

**suited** [3]_ - 112:6_, 124:13_, 124:24

**summarize** [2]_ - 136:10 _, 179:2

**summary** [3]_ - 9:18_, 134:20_, 149:7

**sunglasses** [1]_ - 52:3

**Sunny** [4]_ - 72:12_, 78:13_, 78:15_, 78:16

**SunnyD** [2]_ - 51:11_, 72:12

**super** [1]_ - 208:3

**super-humid** [1]_ - 208:3

**superglue** [17]_ - 26:20_, 209:16_, 209:17_, 209:18 _, 209:20_, 209:22_, 209:24_, 219:17_, 223:14 _, 223:15_, 223:19_, 224:9_, 227:10_, 227:12_, 228:13_, 231:23

**supervise** [1]_ - 224:25

**supervised** [1]_ - 16:23

**supervisor** [1]_ - 10:12

**supports** [1]_ - 174:7

**supposed** [4]_ - 158:7_, 158:9_, 171:21_, 218:6

**surface** [10]_ - 121:13_, 172:14_, 179:25_, 189:15 _, 206:4_, 206:8_, 207:1_, 207:9_, 207:25_, 218:18

**surface-type** [1]_ - 218:18

**surfaces** [4]_ - 180:13_, 206:15_, 206:17_, 269:24

**susceptible** [1]_ - 112:22

**sustained** [1]_ - 193:8

**swab** [30]_ - 173:6_, 173:7 _, 252:18_, 252:20_,

252:21_, 252:24_, 252:25 _, 253:1_, 253:5_, 253:10 _, 253:17_, 253:19_, 253:20_, 253:22_, 254:5_, 254:8_, 254:9_, 254:10_, 254:12_, 261:18_, 263:8_, 263:10_, 265:2_, 265:3_, 267:11_, 269:22_, 273:22

**swabbed** [5]_ - 261:22_, 261:24_, 262:21_, 262:22 _, 267:12

**swabbing** [5]_ - 252:20_, 261:13_, 261:25_, 262:11 _, 263:5

**swabs** [2]_ - 135:15_, 263:6

**swear** [5]_ - 8:4_, 107:18_, 131:11_, 195:4_, 246:3

**sweat** [3]_ - 198:8_, 201:22_, 207:10

**swift** [1]_ - 122:4

**switch** [1]_ - 144:23

**switched** [1]_ - 80:12

**sworn** [8] - 8:17_, 108:8_, 131:9_, 131:24_, 195:2_, 195:17_, 246:1_, 246:14

**system** [10]_ - 119:14_, 210:15_, 211:5_, 211:21_, 225:12_, 225:23_, 234:25 _, 235:1_, 243:20_, 252:23

T

**table** [2]_ - 139:9_, 206:25

**tablecloth** [2]_ - 62:16_, 62:22

**tablecloths** [1]_ - 62:24

**tag** [6]_ - 85:5_, 228:11_, 243:6_, 243:9_, 269:9_, 269:10

**tall** [1]_ - 152:3

**tampering** [1]_ - 6:15

**tank** [2]_ - 152:3_, 154:6

**tape** [43]_ - 17:14_, 17:17_, 17:19_, 29:24_, 52:4_, 115:23_, 116:3_, 116:19_, 116:25_, 117:6_, 117:9_, 118:9_, 118:13_, 120:17_, 120:20_, 121:4_, 121:6_, 121:8_, 121:14_, 121:15_, 121:24_, 122:18_, 122:20 _, 122:21_, 123:11_, 123:12_, 123:14_, 123:17 _, 123:19_, 210:20_,

217:6_, 218:21_, 218:23_, 219:1_, 222:2_, 222:5_, 223:2_, 223:20_, 223:23_, 224:3_, 224:7_, 228:25_, 240:22

**taped** [1]_ - 222:6

**target** [5]_ - 135:12_, 146:13_, 186:20_, 190:7_, 190:9

**task** [1]_ - 157:16

**Team** [4]_ - 9:15_, 9:19_, 12:14_, 13:11

**team** [11]_ - 9:15_, 10:1_, 10:2_, 10:4_, 10:19_, 12:14_, 14:14_, 14:16_, 14:17_, 14:25_, 108:19

**technical** [2]_ - 132:13_, 138:2

**technician** [2]_ - 114:4_, 132:25

**technique** [3]_ - 171:25_, 210:17_, 228:12

**techniques** [4]_ - 197:16 _, 201:25_, 202:3_, 207:15

**teeth** [1]_ - 266:1

**telephones** [2]_ - 39:5_, 39:6

**ten** [20]_ - 96:16_, 126:1_, 148:9_, 148:16_, 214:23_, 230:7_, 233:20_, 233:23_, 235:2_, 235:3_, 241:16_, 243:15_, 243:21_, 244:1_, 271:23_, 272:2

**ten-print** [14]_ - 214:23_, 230:7_, 233:20_, 233:23_, 235:2_, 235:3_, 241:16_, 243:15_, 243:21_, 244:1

**tender** [2]_ - 123:3_, 137:19

**Tendering** [50] - 22:23_, 25:2_, 27:12_, 28:3_, 29:10, 31:7_, 32:20_, 34:18_, 35:22_, 38:16_, 39:10_, 40:10_, 41:17_, 44:11_, 45:3_, 45:18_, 53:6_, 53:16_, 54:13, 55:3 _, 55:23_, 57:22_, 59:11, 61:20_, 62:9_, 63:6_, 64:2 _, 64:22_, 65:8_, 67:11_, 71:19_, 72:10_, 73:4_, 84:11_, 85:20_, 87:7_, 95:17_, 103:12_, 115:12_, 118:23_, 139:15_, 181:7_, 183:4_, 187:19_, 220:15_, 258:9_, 263:18_, 269:7_,

270:22_, 273:12

**tension** [1]_ - 144:7

**term** [12]_ - 110:16_, 148:21_, 153:1_, 185:15_, 186:15_, 203:9_, 203:11_, 211:17_, 212:16_, 249:6_, 249:13_, 249:15

**terminology** [1]_ - 226:4

**terms** [11]_ - 11:6_, 126:6 _, 134:7_, 150:15_, 202:5 _, 206:16_, 224:2_, 227:3 _, 227:7_, 247:12_, 247:25

**test** [35]_ - 113:5_, 124:10 _, 126:22_, 129:9_, 129:17_, 151:20_, 151:24 _, 152:6_, 152:15_, 152:19_, 153:10_, 153:14 _, 153:16_, 153:18_, 153:20_, 154:2_, 154:12_, 154:18_, 154:20_, 154:23 _, 155:21_, 264:9_, 264:14_, 264:16_, 265:21 _, 265:23_, 266:17_, 266:19_, 268:7_, 268:8_, 276:16_, 278:3_, 278:5_, 278:8

**test-fire** [7]_ - 113:5_, 126:22_, 151:24_, 152:6_, 153:10_, 154:23_, 155:21

**test-firing** [2]_ - 152:15_, 153:18

**tested** [4]_ - 191:14_, 252:12_, 278:1_, 278:19

**testified** [7] - 8:17, 108:8, 131:24_, 137:8_, 137:15, 195:17, 246:14

**testifying** [1]_ - 70:2

**testimony** [14] - 8:5_, 17:16_, 37:5_, 69:3_, 81:24_, 85:11_, 107:18_, 131:11_, 138:7_, 149:3, 195:5_, 215:15_, 246:3_, 272:3

**testing** [25]_ - 111:4_, 113:17_, 123:21_, 124:7_, 124:15_, 124:19_, 127:24 _, 128:5_, 129:8_, 130:6_, 151:18_, 152:1_, 152:23_, 153:25_, 156:13_, 179:19 _, 179:21_, 180:6_, 202:16_, 209:25_, 218:5_, 247:17_, 248:14_, 248:19 _, 266:4

**tests** [4]_ - 129:10_, 140:1 _, 197:19_, 276:14

**text** [3]_ - 4:1_, 33:4_, 33:8

**textured** [6]_ - 206:10_, 261:25_, 262:4_, 262:9_, 265:24_, 265:25

**THE** [338]_ - 3:2_, 3:11_, 3:13_, 3:15_, 3:18_, 4:6_, 4:9_, 4:16_, 4:25_, 5:4_, 5:10_, 5:16_, 5:20_, 6:2_, 6:7_, 6:23_, 7:5_, 7:16_, 7:18_, 7:21_, 8:3_, 8:7_, 8:9_, 8:12, 8:14_, 15:9_, 16:12_, 16:15_, 17:7_, 19:13_, 20:24_, 21:16_, 22:18_, 22:21_, 23:23_, 24:24_, 25:24_, 26:13_, 27:10_, 30:6_, 31:5_, 32:7 _, 32:9_, 33:24_, 34:2_, 34:6_, 34:16_, 35:20_, 36:14_, 36:17_, 37:20_, 37:23_, 38:3_, 39:21_, 40:8_, 40:19_, 41:7_, 42:4 _, 42:25_, 43:16_, 44:9_, 44:23_, 45:1_, 45:16_, 46:8_, 47:13_, 48:21_, 53:4_, 53:14_, 54:11_, 55:1_, 55:18_, 55:20_, 56:14_, 56:24_, 57:7_, 57:20_, 59:5_, 59:6_, 59:25_, 60:21_, 61:14_, 61:16_, 61:18_, 62:7_, 63:4_, 63:22_, 63:25_, 64:20_, 65:6_, 65:21_, 66:15_, 66:21_, 67:9_, 67:22_, 67:24_, 68:16_, 68:25_, 69:6_, 69:8_, 69:14_, 70:9_, 70:16_, 71:17_, 72:8_, 73:1_, 73:17_, 75:23_, 76:19_, 77:11_, 78:25_, 79:20_, 79:22_, 80:13_, 81:9_, 82:13_, 84:9_, 85:18_, 87:5_, 88:1_, 88:15_, 88:17_, 88:19_, 90:8_, 91:11_, 92:12_, 93:8_, 94:20_, 95:15_, 96:8_, 97:5_, 97:25_, 98:14_, 98:16_, 98:18_, 99:4_, 99:6_, 99:11_, 100:5_, 100:11_, 100:15_, 100:17 _, 100:19_, 101:20_, 101:23_, 103:1_, 103:3_, 103:6_, 103:11_, 103:13_, 103:22_, 105:11_, 105:23 _, 106:12_, 106:14_, 106:18_, 106:21_, 106:24 _, 107:10_, 107:16_, 107:21_, 107:25_, 108:2_, 108:4, 108:6_, 114:9_, 114:10_, 115:10_, 117:15 _, 117:18_, 118:22_, 118:24_, 119:21_, 119:23

_, 120:2_, 122:3_, 122:24 _, 123:4_, 124:22_, 124:24_, 125:7_, 125:9_, 125:11_, 125:13_, 125:14 _, 126:4_, 126:17_, 127:5 _, 127:22_, 128:3_, 128:10_, 129:1_, 129:4_, 130:11_, 130:15_, 130:22 _, 130:24_, 131:1_, 131:7 _, 131:14_, 131:18_, 131:20_, 137:21_, 137:25 _, 139:10_, 139:14_, 140:6_, 140:13_, 140:18_, 140:19_, 141:2_, 141:4_, 141:10_, 141:13_, 143:20 _, 143:24_, 145:23_, 147:1, 147:5_, 147:7_, 149:13_, 149:21_, 157:5_, 158:5_, 162:3_, 162:11_, 162:13_, 164:24_, 165:24 _, 166:3_, 166:7_, 166:10 _, 166:16_, 169:25_, 170:16_, 172:6_, 180:24_, 181:2_, 181:5_, 182:6_, 182:24_, 183:2_, 187:13_, 187:17_, 188:5_, 190:12_, 193:7_, 193:13_, 193:16_, 193:17_, 194:5_, 194:7_, 194:16_, 194:24_, 195:1_, 195:7_, 195:11, 195:14_, 201:4_, 201:7_, 215:11_, 215:17_, 215:20_, 215:24 _, 220:3_, 220:14_, 220:16_, 220:22_, 220:24 _, 220:25_, 222:11_, 222:17_, 226:21_, 227:19 _, 227:21_, 227:25_, 230:17_, 231:6_, 238:16_, 241:22_, 242:1_, 242:3_, 244:17_, 244:19_, 244:21 _, 245:17_, 245:18_, 245:20_, 245:21_, 245:22 _, 245:25_, 246:6_, 246:10_, 246:11_, 258:7_, 258:14_, 259:20_, 259:22 _, 259:24_, 260:5_, 260:17_, 260:20_, 260:22 _, 262:15_, 263:16_, 266:5_, 266:14_, 266:23_, 268:20_, 269:1_, 269:4_, 270:6_, 270:8_, 270:12_, 270:17_, 270:19_, 271:22 _, 272:1_, 272:8_, 272:11 _, 272:14_, 273:11_, 273:13_, 277:1_, 277:4_, 277:6_, 277:10_, 277:14_, 277:18_, 278:15_, 279:1_, 279:13_, 279:18_, 280:9_, 280:16_, 280:20_, 280:24 _, 281:1

themselves [2] - 146:7, 202:6

theoretically [1] - 193:19

theory [1] - 129:12

therefore [1] - 71:7

thermal [1] - 263:23

thermal-type [1] - 263:23

think.. [1] - 58:5

thinking [3] - 105:25, 171:12, 182:17

third [1] - 92:3

thorough [1] - 49:7

three [12] - 45:25, 46:3, 48:4, 51:6, 92:14, 93:11, 98:7, 173:4, 204:15, 205:9, 213:16

threw [1] - 162:21

throughout [10] - 109:8, 111:19, 113:13, 113:22, 113:23, 161:18, 203:15, 218:1, 232:19, 238:22

throwaway [2] - 62:15, 62:24

throwing [1] - 174:2

thrown [1] - 239:9

thumb [1] - 212:20

thumbs [1] - 212:23

tie [10] - 60:4, 60:12, 62:1, 99:16, 265:14, 265:21, 265:23, 265:24, 266:1, 266:10

tie-down [2] - 60:4, 60:12

tied [3] - 5:15, 245:12

ties [6] - 97:12, 97:17, 97:19, 98:7, 141:1, 251:25

tightly [1] - 164:4

Tijuana [1] - 78:11

time-stamped [1] - 105:5

tip [6] - 145:10, 172:12, 228:17, 239:19, 261:13

tire [1] - 60:3

title [3] - 108:14, 132:10, 256:8

today [13] - 7:23, 12:19, 12:21, 22:4, 65:15, 74:15, 85:11, 86:15,

99:17, 126:11, 134:19, 280:10, 281:2

together [4] - 87:21, 212:24, 230:6, 245:14

toilet [1] - 52:13

tomorrow [6] - 5:19, 6:6, 7:6, 7:12, 280:6, 281:2

tomorrow's [1] - 280:12

took [22] - 20:14, 121:20, 122:17, 133:1, 134:3, 153:10, 155:10, 161:18, 164:20, 165:6, 168:16, 170:9, 170:21, 188:7, 224:12, 224:15, 224:18, 224:23, 225:11, 225:13, 225:22, 278:22

tool [9] - 134:1, 134:3, 134:5, 134:6, 134:9, 229:20, 229:23, 229:24

toolmark [8] - 126:21, 132:9, 132:18, 132:21, 132:25, 133:3, 134:4, 134:5

Toolmarks [1] - 136:12

toolmarks [14] - 111:3, 113:3, 132:12, 132:24, 133:9, 133:23, 133:24, 134:10, 152:9, 167:19, 168:2, 168:4, 168:23, 180:13

tools [3] - 26:22, 59:20, 60:9

top [35] - 19:16, 19:17, 38:7, 47:3, 71:10, 80:4, 83:16, 88:5, 89:5, 90:17, 92:19, 98:20, 119:9, 121:1, 135:20, 145:11, 167:5, 167:6, 167:16, 169:21, 170:10, 170:12, 170:20, 171:3, 182:13, 184:24, 185:2, 185:4, 185:9, 185:19, 185:25, 212:24, 221:19, 242:13, 257:6

topic [4] - 69:25, 105:15, 127:14, 128:12

topics [1] - 127:16

torn [2] - 56:2, 71:5

totality [1] - 174:18

touch [1] - 118:12

touched [1] - 179:18

tourniquet [4] - 35:10, 35:14, 97:1, 97:8

tourniquets [1] - 97:2

towards [3] - 141:8, 173:24, 262:14

towel [1] - 20:12

trace [12] - 112:21, 114:2, 120:19, 121:8, 121:16, 121:23, 122:16, 157:3, 157:9, 179:10, 217:24, 229:24

traced [2] - 229:10, 230:2

tracing [3] - 229:10, 236:10, 239:25

track [3] - 114:6, 116:22, 252:23

tracks [1] - 156:24

trade [1] - 193:6

traded [5] - 193:2, 193:12, 193:14, 193:15, 193:19

Trail [3] - 75:9, 77:22, 78:4

trained [4] - 137:5, 196:20, 211:11, 211:15

trainee [1] - 133:2

training [25] - 18:18, 68:8, 135:7, 137:5, 137:6, 138:4, 159:1, 181:20, 196:23, 196:24, 197:8, 197:12, 197:13, 197:20, 202:7, 202:15, 208:6, 248:7, 248:10, 248:12, 248:13, 248:17, 248:20, 264:17

trainings [3] - 136:24, 137:2, 198:17

transaction [1] - 92:25

transfer [2] - 201:21, 206:12

transferred [8] - 121:19, 121:20, 198:10, 201:21, 205:23, 205:24, 206:6, 217:9

transition [1] - 68:23

translation [3] - 3:25, 4:3, 4:4

transportation [1] - 7:10

transported [1] - 17:18

transporting [1] - 7:7

Tree [6] - 75:17, 76:23, 77:15, 78:2, 81:2, 81:5

trends [1] - 199:3

trial [1] - 7:23

tried [1] - 180:7

tries [1] - 159:3

trigger [18] - 144:11, 144:12, 144:19, 144:22, 145:1, 148:7, 148:9, 148:13, 148:18, 149:5, 151:2, 161:22, 163:1, 175:23, 262:13, 262:19, 262:20

truck [1] - 85:2

true [1] - 65:14

TrueFit [1] - 59:10

truly [2] - 151:23, 153:25

trunk [1] - 48:25

truth [16] - 8:5, 8:6, 107:19, 107:20, 131:12, 131:13, 166:8, 195:5, 195:6, 246:4, 246:5

try [18] - 76:16, 114:1, 119:25, 134:25, 146:12, 160:10, 163:10, 163:20, 163:22, 164:5, 171:20, 174:3, 174:25, 178:3, 184:4, 186:9, 210:8, 212:7

trying [16] - 102:20, 120:25, 124:16, 154:7, 158:21, 159:7, 159:24, 161:19, 164:4, 171:5, 171:22, 172:13, 173:1, 180:19, 186:19, 202:4

tube [6] - 252:22, 253:13, 263:8, 265:5, 274:20

tubes [4] - 113:15, 255:10, 273:21

tucked [1] - 26:20

Tula [4] - 184:15, 185:14, 187:6

turn [3] - 33:7, 143:18, 143:21

twice [2] - 97:2, 155:24

twins [4] - 202:20, 202:21, 202:23, 202:24

two [58] - 4:22, 26:21, 31:24, 45:8, 48:9, 59:15, 66:3, 66:12, 71:24, 73:10, 74:3, 77:13, 78:16, 85:12, 85:15, 88:10, 89:1, 98:5, 101:17, 101:25, 104:6, 104:25, 110:13, 122:25, 135:10, 136:3, 136:14, 144:1, 146:10, 146:12, 155:14, 167:5,

174:14_, 196:18_, 202:24_, 203:7_, 204:19_, 212:23_, 215:2_, 235:15_, 235:19_, 235:22_, 236:4_, 237:11_, 237:14_, 237:21_, 238:1_, 238:2_, 238:4_, 248:25_, 262:3_, 270:24_, 271:10_, 272:19_, 272:24_, 273:4_, 273:6

**two-pack** [2]_ - 101:17_, 101:25

**two-piece** [2]_ - 66:3_, 66:12

**type** [22]_ - 18:14_, 27:3_, 64:12_, 74:11_, 137:5_, 141:24_, 142:21_, 142:23_, 154:14_, 164:12_, 184:4_, 185:12_, 186:21_, 188:15_, 190:21_, 209:6_, 212:7_, 218:18_, 226:13_, 233:4_, 238:12_, 263:23

**typed** [1]_ - 28:8

**types** [7]_ - 56:19_, 135:10_, 154:9_, 161:19_, 204:15_, 206:17_, 218:19

**typical** [3]_ - 51:2_, 197:4_, 251:16

**typically** [12]_ - 109:11_, 189:10_, 189:11_, 201:24_, 206:20_, 206:22_, 208:22_, 211:6_, 212:25_, 214:2_, 218:21_, 219:7

### U

**U.S** [8]_ - 26:7_, 88:6_, 88:24_, 90:18_, 91:16_, 92:20_, 93:14

**Ukraine** [3]_ - 97:2_, 97:8

**ultimate** [1]_ - 193:23

**ultimately** [3]_ - 7:1_, 109:9_, 112:23

**ultraviolet** [3]_ - 219:16_, 250:13_, 251:2

**umbrella** [1]_ - 60:7

**unable** [2]_ - 97:24_, 175:16

**unaware** [1]_ - 278:21

**unburned** [2]_ - 136:1_, 136:4

**uncommon** [3]_ - 218:3_, 232:6_, 251:25

**under** [9]_ - 26:20_, 39:16_, 48:15_, 69:17_, 75:12_, 144:7_, 216:1_, 250:25_,

272:14

**undergo** [2]_ - 199:12_, 214:10

**underlying** [1]_ - 130:2

**underneath** [12]_ - 31:13_, 40:3_, 40:4_, 48:16_, 50:2_, 71:10_, 71:12_, 87:15_, 87:18_, 121:1_, 212:21

**underside** [1]_ - 121:5

**unexposed** [1]_ - 121:2

**unidentified** [1]_ - 6:25

**Union** [2]_ - 142:7_, 142:24

**unique** [3]_ - 202:8_, 202:9_, 203:20

**uniqueness** [2]_ - 202:17_, 202:18

**Unit** [10]_ - 110:25_, 113:14_, 196:3_, 219:6_, 219:12_, 246:22_, 246:24_, 247:12_, 248:11_, 256:25

**unit** [40]_ - 108:21_, 108:23_, 108:24_, 110:22_, 111:6_, 111:8_, 112:25_, 113:12_, 117:25_, 122:17_, 132:23_, 132:24_, 133:9_, 133:23_, 135:19_, 146:21_, 185:7_, 188:21_, 196:4_, 196:6_, 197:22_, 200:10_, 210:11_, 211:14_, 217:23_, 217:24_, 218:6_, 218:9_, 218:14_, 218:16_, 219:4_, 219:6_, 224:12_, 224:17_, 224:19_, 224:21_, 224:22_, 228:7_, 231:25_, 245:8

**United** [14]_ - 3:4_, 3:7_, 3:9_, 4:14_, 4:15_, 6:24_, 8:2_, 25:11_, 37:18_, 67:21_, 107:14_, 131:5_, 156:20_, 280:22

**units** [11]_ - 110:19_, 111:22_, 112:17_, 112:21_, 114:20_, 218:9_, 218:25_, 219:20_, 225:21_, 245:7

**University** [3]_ - 133:18_, 196:10_, 247:8

**unknown** [5]_ - 129:22_, 199:1_, 253:15_, 253:16_, 254:6

**unless** [3]_ - 3:3_, 128:20_, 130:19

**unlikely** [1]_ - 191:7

**unopened** [1]_ - 73:9

**unprecedented** [1]_ - 129:11

**unsolved** [1]_ - 153:12

**unusual** [1]_ - 189:9

**up** [100]_ - 4:23_, 13:15_, 18:3_, 18:20_, 23:10_, 25:17_, 25:21_, 26:15_, 27:19_, 28:10_, 28:25_, 29:16_, 30:1_, 30:2_, 35:11_, 37:1_, 37:9_, 38:7_, 39:12_, 41:23_, 44:22_, 45:9_, 46:3_, 50:11_, 51:7_, 54:1_, 54:8_, 54:22_, 55:9_, 56:7_, 56:11_, 62:2_, 62:14_, 63:10_, 63:15_, 64:5_, 68:2_, 73:6_, 73:11_, 83:19_, 84:17_, 85:1_, 87:11_, 88:19_, 89:4_, 94:4_, 95:23_, 103:21_, 106:21_, 120:2_, 139:5_, 140:6_, 144:10_, 144:19_, 145:11_, 146:24_, 149:17_, 162:1_, 162:16_, 164:6_, 166:23_, 169:12_, 172:19_, 173:19_, 175:19_, 176:16_, 177:4_, 177:15_, 184:20_, 186:25_, 187:24_, 192:15_, 194:23_, 195:1_, 199:20_, 209:18_, 209:21_, 211:22_, 219:18_, 220:22_, 221:11_, 224:20_, 225:22_, 226:10_, 228:17_, 228:22_, 231:18_, 235:22_, 236:9_, 236:11_, 236:14_, 236:15_, 237:15_, 237:17_, 237:20_, 238:23_, 242:13_, 244:10_, 270:9_, 277:25

**updated** [4]_ - 3:19_, 3:21_, 4:7_, 4:10

**upfront** [1]_ - 180:19

**upload** [1]_ - 211:4

**uploaded** [1]_ - 225:12

**upper** [2]_ - 77:1_, 98:23

**upright** [3]_ - 212:8_, 228:20_, 228:21

**upside** [3]_ - 228:18_, 228:20_, 229:13

**useful** [1]_ - 251:14

**user** [1]_ - 182:3

**utensil** [1]_ - 60:7

**utensils** [1]_ - 51:23

**utero** [1]_ - 203:13

**uterus** [1]_ - 202:10

**utility** [2]_ - 58:14_, 60:5

**utilize** [3]_ - 202:3_, 209:7_, 209:11

**utilizing** [2]_ - 197:15_, 212:3

**UV** [5]_ - 113:1_, 219:18_, 223:15_, 250:24_, 250:25

### V

**vaccine** [1]_ - 247:3

**valid** [1]_ - 25:15

**valleys** [1]_ - 172:8

**Vans** [1]_ - 53:21

**vapors** [1]_ - 209:18

**variety** [4]_ - 197:16_, 202:3_, 203:1_, 213:6

**various** [5]_ - 165:12_, 165:24_, 200:20_, 231:10_, 255:5

**varying** [1]_ - 241:10

**vehicle** [101]_ - 10:24_, 11:4_, 11:6_, 11:7_, 11:11_, 11:13_, 11:16_, 11:18_, 11:22_, 11:25_, 12:6_, 12:16_, 12:18_, 12:25_, 13:5_, 13:9_, 13:12_, 13:14_, 13:17_, 13:23_, 14:4_, 14:7_, 14:20_, 15:17_, 16:4_, 16:22_, 16:23_, 16:25_, 17:17_, 17:18_, 17:21_, 17:22_, 18:11_, 19:9_, 19:16_, 19:17_, 19:25_, 20:7_, 20:14_, 20:17_, 21:6_, 21:20_, 22:12_, 24:9_, 24:19_, 30:15_, 37:3_, 38:9_, 46:23_, 47:4_, 47:6_, 47:8_, 48:24_, 49:3_, 49:5_, 49:7_, 49:8_, 49:15_, 51:1_, 51:3_, 51:21_, 52:12_, 56:9_, 56:17_, 57:3_, 59:20_, 60:10_, 60:11_, 61:10_, 62:18_, 66:25_, 67:18_, 68:20_, 70:3_, 70:22_, 72:19_, 72:21_, 74:8_, 75:4_, 75:6_, 81:13_, 81:14_, 83:5_, 83:7_, 83:11_, 83:13_, 84:4_, 84:16_, 87:14_, 95:22_, 96:17_, 97:10_, 97:13_, 97:15_, 98:5_, 98:8_, 99:1_, 99:25_, 102:5

**verification** [10]_ - 214:12_, 214:17_, 214:19

_, 214:21_, 215:4_, 215:6_, 226:3_, 226:6_, 244:9_, 244:11

**verifications** [1]_ - 214:16

**verified** [1]_ - 130:7

**verify** [1]_ - 235:5

**verifying** [1]_ - 129:16

**version** [1]_ - 100:13

**versus** [1]_ - 164:13

**vessel** [2]_ - 183:14

**vicinity** [1]_ - 224:4

**videotape** [4]_ - 191:14_, 191:16_, 191:17_, 191:19

**Vienna** [2]_ - 73:9_, 73:22

**view** [10]_ - 14:23_, 18:3_, 21:3_, 21:8_, 41:9, 122:6_, 228:22_, 274:16_, 274:17_, 274:18

**viewed** [1]_ - 71:2

**VIN** [3]_ - 21:10_, 21:19_, 22:11

**violation** [1]_ - 127:21

**violent** [1]_ - 9:13

**Virginia** [9]_ - 108:18_, 132:4_, 133:8_, 133:18_, 133:19_, 133:21_, 196:10_, 196:11_, 196:15

**visible** [10]_ - 56:2_, 163:3_, 163:5_, 168:7_, 201:24_, 201:25_, 202:1_, 207:14_, 207:16_, 209:20

**visual** [8]_ - 90:25_, 121:21_, 153:19_, 163:9_, 209:8_, 219:15_, 223:12_, 255:9

**visualize** [4]_ - 163:23_, 171:23_, 209:21_, 210:15

**visually** [5]_ - 151:12_, 161:13_, 161:15_, 164:3_, 223:15

**Volario** [1]_ - 32:1

**volume** [5]_ - 255:11_, 255:12_, 255:13_, 255:14

**volumes** [1]_ - 276:13

### W

**wait** [2]_ - 34:7_, 69:15

**waiting** [2]_ - 14:21_, 69:17

**walk** [4]_ - 107:16_, 195:1_, 228:4_, 239:11

**walked** [1]_ - 182:9

**War** [1]_ - 142:5

**warrant** [8]_ - 10:5_, 12:17_, 14:21_, 14:24_, 14:25_, 15:2_, 15:18_, 25:13

**warrants** [1]_ - 13:25

**water** [7]_ - 57:14_, 152:3_, 152:5_, 152:8_, 154:6_, 252:19_, 265:2

**wavelengths** [1]_ - 209:12

**ways** [2]_ - 28:19_, 158:25

**weapon** [24]_ - 123:24_, 140:25_, 141:12_, 142:11_, 142:18_, 142:19_, 142:21_, 143:22_, 144:24_, 145:3_, 145:5_, 145:22_, 146:4_, 149:4_, 155:22_, 160:15_, 188:14_, 220:13_, 223:17_, 259:18_, 261:16_, 261:23_, 261:25_, 262:13

**wear** [1]_ - 220:8

**wearing** [1]_ - 250:20

**weather** [1]_ - 20:17

**weekend** [3]_ - 4:12_, 7:22_, 38:22

**weeks** [1]_ - 101:12

**welcome** [1]_ - 245:17

**Wesley** [2]_ - 3:5_, 242:15

**West** [9]_ - 75:9_, 77:4_, 77:6_, 77:22_, 78:4_, 86:9_, 196:10_, 196:11_, 216:14

**west** [1]_ - 77:2

**whatsoever** [2]_ - 125:22_, 240:13

**wheel** [2]_ - 159:11_, 159:13

**whereas** [1]_ - 206:24

**whirl** [1]_ - 204:16

**white** [8]_ - 24:12_, 94:3_, 100:8_, 169:20_, 232:4_, 232:5_, 264:1_, 264:4

**whited** [1]_ - 167:25

**whited-out** [1]_ - 167:25

**whole** [15]_ - 8:6, 107:19_, 116:21_, 117:2, 131:12_, 142:23_, 156:25_, 162:24_, 189:15_, 195:6_, 200:8_, 224:19_, 236:19_, 245:14, 246:4

**whoops** [1]_ - 236:14

**wide** [1]_ - 152:4

**Wilson** [4]_ - 31:12_, 71:10_, 71:11_, 71:25

**window** [3]_ - 20:13_, 20:15_, 100:24

**windshield** [1]_ - 21:20

**wipe** [1]_ - 250:12

**wiped** [1]_ - 135:4

**wise** [1]_ - 143:1

**wish** [5]_ - 103:1, 122:6_, 128:17_, 130:12_, 280:5

**witness** [121]_ - 5:2_, 5:18_, 7:2_, 7:24_, 15:6_, 16:9_, 17:5_, 17:24_, 20:23_, 22:20_, 22:24_, 23:21_, 24:22_, 25:22_, 27:7_, 28:23_, 29:9_, 32:17_, 34:12_, 35:18_, 37:10_, 37:12_, 38:12_, 40:6_, 41:14_, 44:6_, 44:20_, 45:15_, 53:13_, 54:25_, 55:17_, 57:18_, 61:12_, 62:5_, 63:3_, 64:19_, 65:5_, 66:18_, 67:7_, 69:9_, 69:15_, 70:7_, 72:6_, 72:24_, 78:23_, 83:20_, 84:7_, 85:17_, 92:10_, 95:13_, 103:6_, 105:22_, 107:13_, 115:9_, 118:21_, 119:1_, 123:3_, 125:15_, 126:9_, 126:12_, 126:16_, 126:19_, 129:2_, 130:19_, 131:4_, 131:8_, 137:9_, 137:22_, 137:25_, 139:4_, 139:5_, 139:10_, 139:12_, 140:9_, 140:11_, 140:20_, 143:21_, 147:3_, 149:11_, 149:12_, 149:13_, 149:19_, 161:25_, 162:6_, 162:12_, 164:19_, 164:20_, 164:23_, 165:1_, 165:23_, 181:4_, 183:1_, 187:15_, 194:17_, 195:2_, 201:5_, 201:7_, 201:8_, 215:21_, 215:25_, 220:1_, 226:19_, 230:14_, 230:19_, 241:25_, 244:15_, 245:22_, 258:6_, 259:22_, 260:3_, 263:15_, 266:13_, 266:22_, 272:4_, 272:11_, 276:25_, 277:19_, 279:15_, 279:20_, 280:12

**WITNESS** [36]_ - 8:7_, 8:9_, 8:12_, 30:6_, 44:23_, 45:1_, 59:6_, 103:13_, 107:21_, 107:25_, 108:4_, 114:10_, 118:24_, 124:24

_, 125:13_, 131:14_, 131:18_, 140:18_, 141:2_, 143:24_, 162:13_, 169:25_, 172:6_, 193:17_, 194:5_, 195:7_, 195:11_, 220:16_, 220:22_, 220:25_, 245:17_, 245:21_, 246:6_, 246:10_, 273:11_, 273:13

**witness's** [2]_ - 138:6_, 138:7

**witnesses** [6]_ - 125:23_, 126:6_, 126:8_, 131:3_, 280:1_, 280:10

**womb** [3]_ - 202:12_, 202:14_, 202:22

**wondering** [1]_ - 34:3

**word** [6]_ - 29:22_, 77:2_, 135:2_, 169:20_, 191:20_, 191:23

**words** [1]_ - 75:11

**workbench** [1]_ - 250:11

**works** [2]_ - 159:13_, 218:14

**workstation** [1]_ - 250:10

**World** [1]_ - 142:5

**worn** [1]_ - 74:10

**worst** [1]_ - 172:6

**Worth** [2]_ - 85:25_, 86:6

**wrapped** [5]_ - 120:21_, 121:9_, 183:14_, 185:21_, 252:19

**wrapping** [1]_ - 270:9

**write** [1]_ - 252:22

**wrongly** [1]_ - 185:7

**wrote** [2]_ - 120:15_, 181:11

### X

**Xterra** [46]_ - 13:1_, 14:18_, 15:18_, 15:22_, 16:20_, 17:11_, 18:15_, 21:3_, 23:6_, 26:24_, 30:9_, 34:25_, 36:1_, 36:3_, 36:8_, 37:4_, 39:2_, 39:15_, 40:15_, 41:21_, 43:3_, 44:16_, 44:18_, 45:7_, 45:24_, 49:6_, 50:20_, 51:14_, 53:23_, 55:6_, 55:12_, 56:3_, 60:25_, 61:3_, 63:8_, 67:15_, 68:18_, 72:17_, 72:20_, 73:20_, 79:5_, 81:25_,

82:3, 83:24, 87:16, 87:17

## Y

**year** [11] - 4:19, 5:5, 5:9, 6:11, 12:24, 14:8, 14:13, 65:16, 96:16, 199:6, 247:9

**years** [9] - 8:25, 96:16, 195:25, 196:5, 196:6, 196:18, 246:25, 253:25

**yellow** [3] - 19:22, 20:1, 52:3

**yourself** [6] - 17:1, 94:4, 137:2, 138:7, 199:3, 211:9

**yourselves** [1] - 23:9

**yup** [2] - 60:11, 106:1

## Z

**zip** [10] - 62:1, 141:1, 251:25, 265:14, 265:21, 265:23, 265:24, 265:25, 266:1, 266:9

**Ziploc** [2] - 52:14, 61:25

**zipper** [1] - 267:12

**zoom** [9] - 43:18, 66:6, 80:3, 98:19, 167:15, 170:11, 172:5, 174:13

**zoomed** [7] - 26:15, 30:21, 32:3, 33:14, 33:18, 37:14, 65:23

**zoomed-in** [7] - 26:15, 30:21, 32:3, 33:14, 33:18, 37:14, 65:23