UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 24-cr-80116-AMC-1

UNITED STATES OF AMERICA,                    Fort Pierce, Florida

                    Plaintiff,              September 16, 2025

          vs.                                8:49 a.m. - 5:14 p.m.

RYAN WESLEY ROUTH,

                    Defendant.              Pages 1 to 333
_____
                 TRANSCRIPT OF JURY TRIAL - DAY 7
             BEFORE THE HONORABLE AILEEN M. CANNON
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
                          UNITED STATES ATTORNEY'S OFFICE
                          JOHN SHIPLEY, ESQ.
                          MARIA MEDETIS-LONG, ESQ.
                          CHRISTOPHER BROWNE, ESQ.
                          JENNIFER LUCE, ESQ.
                          99 NE 4th Street
                          Miami, Florida 33132

                          U.S. DEPARTMENT OF JUSTICE
                          JAMES M. DONNELLY, ESQ.
                          950 Pennsylvania Avenue, NW
                          Washington, DC 20530

FOR THE DEFENDANT:
                          RYAN WESLEY ROUTH, PRO SE

AS STANDBY COUNSEL:
                          FEDERAL PUBLIC DEFENDER'S OFFICE
                          KRISTY MILITELLO, ESQ.
                          RENEE SIHVOLA, ESQ.
                          250 S. Australian Avenue
                          Suite 400
                          West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:
                          LAURA E. MELTON, RMR, CRR, FPR
                          Official Court Reporter to the
                          Honorable Aileen M. Cannon
                          United States District Court
                          Fort Pierce, Florida

E X A M I N A T I O N S

Witness/Proceedings                                          Page

SCOTT PATTERSON
        DIRECT EXAMINATION BY MR. SHIPLEY                       6
        CROSS-EXAMINATION BY MR. ROUTH                         26
KARA GREGOR
        DIRECT EXAMINATION BY MR. DONNELLY                     31
        CROSS-EXAMINATION BY MR. ROUTH                         75
JERRY LLANES
        DIRECT EXAMINATION BY MR. BROWNE                       77
        CROSS-EXAMINATION BY MR. ROUTH                        163
SPECIAL AGENT CHRISTOPHER GOODRICH
        DIRECT EXAMINATION BY MR. SHIPLEY                     165
        CROSS-EXAMINATION BY MR. ROUTH                        278

E X H I B I T S

GOVERNMENT ADMITTED EXHIBITS

Exhibit                                                      Page

12-19, 22, 115, 119, 120, 125, 127, 128, 135.........  116
20, 106, 200-8, 319, 405A through D..................  148
21..................................................  111
141, 142, 149, 156, 161, 200-4, 200-7...............  116
163A and 163B.......................................   21
200-107, 318, 412, 415, 428, 516, 519, 600-4........  118
200-12, 200-107.....................................  116
200-13..............................................  117
406, 407, 517, 518, 600-26, and 906.................  148
514 and 515.........................................  144
600-103, 600-124, 600-132, 600-135, 600-136.........  118
600-130.............................................  162
600-137, 600-138, 600-139...........................  118
600-140, 600-142, 600-148, 600-149, 600-156.........  118
600-17, 600-18, 600-21, 600-23A through G...........  118
600-24A through L, 600-35, 600-43, 600-47, 600-53....  118
600-58, 600-60, 600-61, 600-89, 600-97..............  118
600-6, 600-9 600-12, 600-14.........................  118
702.................................................   92
709, 710, 904, 905..................................  118

DEFENDANT ADMITTED EXHIBITS
Exhibit                                                      Page
                            NONE

(Call to the Order of the Court.)

THE COURT:  Please be seated.  Let's call the case.

COURTROOM DEPUTY:  Calling case United States of America v. Ryan Wesley Routh.  Case Number 24-cr-80116-Cannon.

Counsel, please state your appearances for the record, starting with the United States.

MR. SHIPLEY:  Good morning, Your Honor.  John Shipley, Christopher Browne, Maria Medetis-Long, James Donnelly, and Jennifer Luce for the United States.  Good morning.

THE COURT:  Good morning to all of you.

MS. MEDETIS-LONG:  Good morning.

MR. ROUTH:  Good morning.  Ryan Routh for the defense.

THE COURT:  Good morning, Mr. Routh.

MS. MILITELLO:  Good morning, Your Honor. Kristy Militello and Renee Sihvola, standby counsel.

THE COURT:  Good morning to both of you.

Okay.  Any issues to raise before we get started today, Mr. Shipley?

MR. SHIPLEY:  Not from the United States, Your Honor. We're going to make one switch.  We are going to call Special Agent Patterson first.  He should be a fairly brief witness, about 20 minutes or so.  He is on the list.  We were going to have him second.  We are going to call him first so he can get back on the road.

THE COURT:  Okay.  All right.  Any legal issues to

raise, Mr. Routh?

MR. ROUTH:  I'm not sure of any updates on my son, but as far as I'm concerned, we are going to exclude my son.  So...

THE COURT:  Okay.  Are you certain that you are abandoning any effort to call your son as a witness in this case?

MR. ROUTH:  Yes, yes.  It's just -- it's, you know, not worth the headache and --

THE COURT:  I don't need to know your internal deliberations.  I just need to know --

MR. ROUTH:  Okay.  Well, that's it.  That's all --

THE COURT:  -- are you --

MR. ROUTH:  So that's it.

THE COURT:  Please try not to interrupt.  Are you certain, Mr. Routh, that you do not wish to call your son as a witness in this case?

MR. ROUTH:  I'm certain.

THE COURT:  Okay.  And so you're withdrawing that request, which would mean that I would then go and inform the marshals accordingly and your son would be transported back to where he was originally, which means you would then not be able to change your mind later on in the trial.  Do you understand and accept that?

MR. ROUTH:  Yes.  Fully.  Yes, I fully understand.

THE COURT:  Okay.  All right, then.  I have been

informed that our jurors are present.  So unless there are other items to address, we will call them in.

Is your agent prepared?

MR. SHIPLEY:  I can make sure he is ready to go.

THE COURT:  Okay.  I will give you a minute to do that.

MR. ROUTH:  I did have one other item as far as --

THE COURT:  Okay.  All right.  What other issues, legal issues do you wish to raise?

MR. ROUTH:  Thank you for your response on the jail -- jail situation.  You know, I don't have hot water and can't take a shower either, nor do I have a law library.  So I just wanted to note that for the record.  You know, I don't complain about much but, you know, I will not shower for a month and I don't have a law library, but I'm not even mentioning that.  So, you know...

THE COURT:  All right.  As I indicated in that order, whatever internal grievances you have with respect to your conditions of pretrial detention should be raised through the proper administrative channels, not piecemeal as you have grown accustomed to doing in this proceeding.  Do you understand?

MR. ROUTH:  Nothing further.

THE COURT:  Okay.  All right.  Let's call your agent in, please.  And let's summon the jurors.

COURT SECURITY OFFICER:  Yes, Your Honor.

(The jury entered the courtroom at 8:53 a.m.)

THE COURT:  Please have a seat.

All right.  Government, please call your next witness.

MR. SHIPLEY:  Thank you, Your Honor.  Good morning.

Good morning, members of the jury.  The United States calls Special Agent Austin Scott Patterson.

THE COURT:  All right.  Good morning, Agent Patterson.

And good morning to you, ladies and gentlemen.  Thank you for your prompt arrival.  We will resume trial today.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  Scott Patterson.  S-C-O-T-T, P-A-T-T-E-R-S-O-N.

MR. SHIPLEY:  May I proceed?

THE COURT:  Yes.

MR. SHIPLEY:  Okay.

SCOTT PATTERSON,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q.    Okay.  Good morning, Agent Patterson.

A.    Good morning.

Q.    Okay.  Who do you work for?

A.    The Federal Bureau of Investigation.

Q.    And how long have you worked for the FBI?

A.    23 years.

Q.    Okay.  What is your current title?

A.    I am director of ballistic research.

Q.    Okay.  And where are you based?

A.    Huntsville, Alabama.

Q.    Okay.  Are you also a special agent with the FBI?

A.    I am.

Q.    And are you a supervisor as well?

A.    I am.

Q.    Okay.  Can you tell us about what the Ballistics Research Facility does with the FBI.

A.    We are the FBI's weapons, ammunition, and armor test facility.  And there is a clear distinction that needs to be made between what we do and what the FBI lab at Quantico does. We test guns to be used operationally by our personnel and enforcement actions.  And so does the gun function?  Does the ammunition work?  What are the effects of the ammunition on whatever target it is we're working towards?

And then the armor piece is huge.  We do soft body armor that policemen wear every day to make sure that it will catch

projectiles.  We do hard armor plates that will catch rifle projectiles.  And we will test a variety of other things such as glass for federal buildings to make sure that it's ballistically sound.  We will do armor and a whole host of other -- cars, security booths, things like that.

Q.    So fair to say your focus, as you mentioned, unlike the lab in Quantico, is primarily the law enforcement side of equipment?

A.    It is, absolutely, yeah, to be operationally effective both in defending our personnel from getting hurt, as well as being effective offensively.

Q.    Okay.  And do you also sometimes test objects of evidence in a case?

A.    We do.

Q.    Okay.  Can you tell the jury, what is ballistics?

A.    It's the study of, really, projectiles in motion for us. But it -- for the FBI's purposes, it's weapons, ammunition, armor.  So we want to understand:  What does a cartridge do inside of a gun?  What does a bullet do as it travels through the air?  And then, what does a projectile do when it hits whatever the intended target was?

We have to study all three of those areas.

Q.    Okay.  Before we talk about your work in this case, could you tell the jury a little bit about your background.  Did you go to college?

A.    I did.  I went to the University of Missouri, got a degree there.  I got a degree after college.  And then, many years later, I got a master's degree in national security resource strategy.

Q.    Okay.  Was that from the National Defense University?

A.    It is.

Q.    Okay.  What did you do after college?

A.    I worked as a deputy sheriff for a very short period of time, and then I was a Missouri State trooper for five years before joining the FBI.

Q.    Okay.  And do you -- with your work with the FBI now, do you have other responsibilities outside of the Ballistics Research Facility?

A.    I do not.

Q.    Okay.  In the past, have you had different responsibilities?

A.    I have.

Q.    Okay.  Have those included experience with sniper teams?

A.    Yes.  I was a FBI observer sniper, both at the Albuquerque SWAT team level and then at a larger team at the Washington field office for the FBI.

Q.    In the course of your FBI career, have you spent time overseas in battle zones?

A.    I have almost a year total between two deployments to Afghanistan.

Q.   Okay.   Now let's talk about your training specifically in ballistics.   Have you had specialized training in this field?

A.   I have.

Q.   Okay.   Can you describe that for the jury.

A.   In 2010, when I joined the Ballistic Research Facility, there was a gentleman there, my predecessor, who had been the head of research for approximately the last 15 years.   I did a -- what was really best described as a two-year apprenticeship, so a two-year training program to understand how to utilize all the instrumentation and set up the experiments the proper way.

Q.   Okay.   Have you continued to receive specialized training in ballistics?

A.   I have.   So we will visit vendors who manufacture the weapons, vendors who manufacture the ammunition, as well as the armor pieces to understand how they make it.   And oftentimes, we will make some recommendations on how to improve FBI products as we go to that.

We are also part of a number of technical boards that are nationally recognized.   So the Sporting Arms Ammunition Manufacturing Institute, referred to as SAAMI, it's the national body that gives recommended guidelines for cartridges, for guns.   We are part of that group.   We are also -- assist the National Institute of Justice out of DOJ, which is a body armor test standard entity.   We work with them on, kind of,

test standards and how we do those things.

Q.    Okay.  At this point in your career, do you also give trainings yourself?

A.    I have.  Yeah.  As the head of ballistic research of the FBI, I have been literally all over the word to train law enforcement and certain select military groups on ballistics. I have -- I don't know how many times I have done that, but it's been to thousands of different people.

Q.    Okay.  As part of your work at the Ballistics Research Facility, do you ever conduct ballistics research testing?

A.    Absolutely.

Q.    Okay.  And specifically, ballistics resistance testing?

A.    We do.

Q.    Okay.  Could you tell the jury, what is ballistics resistance generally?

A.    So certainly in a case of -- and I will use armored plates in the sense that the FBI wears armored plates for operational activities.  We will have a variety of different cartridges out of different guns, really different calibers.  And we want to know whether or not we can catch those projectiles or deflect them if they're shot at our personnel.  And we -- we will take those shots.  I probably personally have been a part of literally hundreds of formal test shots on armor.

Q.    And what are you trying to learn in these test shots?

A.    What the risk is to our personnel.  Can we stop the

projectile?  Do we need to make a change if a new projectile comes to market and we have to protect our personnel from that?  And on the other side of it, if others are going to wear armor, what kind of projectiles can we design to get through that?

Q.   Okay.  How many times have you performed this kind of ballistics resistance testing in your career?

A.   Hundreds.  I don't really truly know the number over 16 years.

Q.   Okay.  Have you ever testified as an expert in ballistics resistance?

A.   I have.

Q.   And in ballistics generally?

A.   Yes.

Q.   Okay.  Many times?

A.   Three that -- four that come to mind.

Q.   Okay.

MR. SHIPLEY:  Your Honor, at this time I would tender the witness as an expert in ballistics resistance and the testing of armor.

THE COURT:  Any objection to that qualification?

MR. ROUTH:  No objection.

THE COURT:  The witness is so qualified in the field of ballistics resistance and testing of armor.

MR. SHIPLEY:  Okay.  May I proceed?

THE COURT:  Yes.

BY MR. SHIPLEY:

Q.   Okay.  All right.  Were you asked to examine any piece of evidence in this case?

A.   Yes, sir.

Q.   Okay.  Did you conduct examinations on it?

A.   Yes, sir, I did.

Q.   Okay.  And did you make findings from your testing?

A.   I did make findings.

Q.   Before coming to court, did you review those findings?

A.   I did.

Q.   And did you also review the item that you evaluated?

A.   Yes.

Q.   Okay.  With a court exhibit number?

A.   Yes.

Q.   Okay.

     MR. SHIPLEY:  Your Honor, permission to approach the witness with what is in evidence as Government Exhibit 187B?

     THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

     Agent Patterson, do you recognize that item?

A.   I do.

Q.   Okay.  When you evaluated it, was it inside that plastic bag?

A.   It -- I received it in a plastic bag, but when we tested

it, we took it out.

Q.   Okay.  Would you mind, do you -- would you mind taking that out of the plastic bag, and do you want gloves to do that?

A.   I'm okay without gloves on this.

Q.   Okay.  Would you hold that Item 187B up for the jury, please.

A.   (Complies.)

Q.   Okay.  Can you generally --

MR. SHIPLEY:  Can everybody in the jury see it?  We have seen it before, I think.

BY MR. SHIPLEY:

Q.   Can you generally describe what that item is?

A.   So it's roughly a square.  It's 12 by 13 and 3/4 inches wide.  It weighs 14.39 pounds, so just over 14 pounds, so it's pretty heavy.  And it's -- we take measurements at the four corners and the center, but generally it's .31 inches thick.  So it's a third of an inch thick.

Q.   Okay.  Let me ask you -- we will talk about your testing in a moment, but on the front of that item, are there some what appear to be sort of white colorings?

A.   There are.  There are going to be four that you can see.  One is going to look different than the other three.  So there is one below, there is one top left, one top right, and then there is this one (indicating) that is a brighter color than the other two.  That's where two projectiles from our

test-firing hit substantially the same spot.

Q.   Okay.  Other than those discolorations, and I think a lab number on there as well, is that in substantially the same condition as when you first received it and when you tested it?

A.   It is.

Q.   Okay.  All right.  Let me show you one other item, if you put that down.

MR. SHIPLEY:  Your Honor, permission to approach the witness with Government Exhibit 188B, in evidence?

THE COURT:  Granted.

BY MR. SHIPLEY:

Q.   (Tendering item.)

Agent Patterson, you've seen that item before as well; correct?

A.   I have, yes.

Q.   Okay.  Does that appear similar to the Item 187B, the larger plate you held up?

A.   It does.

Q.   Okay.  Did you perform any separate testing of this item, this smaller 188B?

A.   No, sir.

Q.   Okay.  But are they essentially similar in their purpose?

A.   They do look very similar except for size.

Q.   Okay.  What would you call these things?

A.   We refer to them as metal plates.  They're steel plates of

some alloy probably.

Q.   Have you ever heard the term "armor plates"?

A.   Yes.

Q.   Is that a term you would use for these items?

A.   Yes.

Q.   Okay.  All right.  Let me ask you about the testing.  You can put 1- --

            MR. SHIPLEY:  Your Honor, may I retrieve 188B?

            THE COURT:  Yes.

BY MR. SHIPLEY:

Q.   One more question.

     Is that a heavy item, Agent Patterson?

A.   They are both heavy.

Q.   Okay.  Okay.  Let's focus on Government Exhibit 187B.  And, again, could you hold that up for the jury, if you're comfortable doing that while we talk about it?

     What is it made of?

A.   I would say steel.  Feels like a steel plate.

Q.   Okay.  How heavy is it?

A.   It's very heavy.  It's a little over 14 pounds.

Q.   Okay.  Did you actually weigh it?

A.   Yes.  14.39.

Q.   Okay.  Ever seen an item like this before?

A.   We have.

Q.   Okay.  In your experience, is this an item that could be

obtained commercially, or is this a specialized type of armor?

A.    No.   When we buy plates for testing, we can order it and it looks substantially the same as what this one looks.

Q.    Okay.   In your experience and training, where could somebody get an item like that?

A.    Any metal supply store.   If you had a welding supply store that offered metals, you could buy it there and just ask for them to cut to whatever size you want it cut to.

Q.    Okay.   Did you measure the dimensions of this item?

A.    I did.

Q.    Okay.   And what are those?

A.    It's 12 inches tall and 13.75 wide.

Q.    Okay.   And I think it's clear enough, but how would you describe the shape of that item?

A.    Relatively square.

Q.    Okay.   Now, let me ask you:   Does the FBI have anything like this as armor for ballistics resistance?

A.    We do.   We issue steel plates to all of our personnel as part of the armor packages they get.   It's shaped a little different and it's sized differently, so somebody my size would get a larger plate than somebody who is much smaller to fit inside their body armor.   But our plates are different in this in that they're also thinner, they're not as thick.   This is .31.   Our plates are only .25, so ours are a quarter of an inch thick.

Q.   So can you -- first of all, can you hold the item up for the jury with a side view so they can see the thickness.

A.   (Complies.)

Q.   And can you tell the jury again how the thickness of that item compares to standard FBI body armor.

A.   Yeah, this is noticeably thicker than ours.

Q.   Okay.  All right.  How and where did you first receive this item for your testing?

A.   I received it from the FBI's Firearms and Toolmarks Unit at the FBI lab from Quantico.  It was sent to us in Alabama.

Q.   Okay.  What were you asked to do with it?

A.   To fire a very specific handgun and ammunition type against it to determine what, if anything, would happen when those bullets struck the plate.

Q.   Okay.  Were you told what type of weapon to use in that test?

A.   I was.  It was specified that it had to be a Glock 19 9mm pistol.

Q.   Did you have an understanding as to why that specific type of weapon?

A.   I did.  I was told that it was present at the scene the day of the event.

Q.   Okay.  Is that a type of weapon, in your experience, commonly used by law enforcement?

A.   It is the principal firearm certainly of the FBI, and it is

the most widely produced Glock handgun Glock has.  It is all over the country in law enforcement.

Q.   Okay.  Were you also told what type of ammunition to use?

A.   I was.

Q.   Okay.  And what was that?

A.   Speer is the company that makes it.  Gold Dot is the -- for better -- for lack of a better term, it's the product name of it.  Gold Dot hollow point.  And then it's a 124-grain hollow-point projectile.  But it's important to know that it has a notation that it's a "+P," which means it's higher pressure, which means the bullet comes out faster.

Q.   Okay.  Is that also an item commonly used by law enforcement?

A.   Absolutely.

Q.   Okay.  So both -- is it fair to say both the pistol you used, the Glock, and also the ammunition are common to law enforcement?

A.   Absolutely.

Q.   Is that something that's widely known?

A.   Yes.

Q.   Okay.  All right.  Is this a type of exam that you conduct routinely --

A.   Not --

Q.   -- this type of -- on this type of item?

A.   On metal plates, yes, we do that routinely.

Q.   Okay.   In your experience, how common is it to test the resistance of an item like that to pistol fire?

A.   It's rare.

Q.   Why is that?

A.   It is essentially impossible for us with any pistol round that we have in our facility -- and we have roughly 1.1 million rounds of ammo in our building -- to penetrate a plate of this size with a pistol bullet.

Q.   You went ahead with that test anyway; correct?

A.   We did.

Q.   Okay.   Let me take a look at some photos from that.   Did you take photographs during your testing process?

A.   Yes, sir.

Q.   Okay.   And have you reviewed those photographs before you came to court today?

A.   I have.

Q.   Okay.

MR. SHIPLEY:   Your Honor, if we could publish, just to the witness because it's not yet in evidence, Government Exhibit 163A and 163B.

THE COURT:   You may.

BY MR. SHIPLEY:

Q.   Do you recognize those photographs, Agent?

A.   I do.

Q.   Okay.   And are those the photographs you took in the course

of your testing?

A.   They are.

Q.   Okay.  Do they fairly and accurately represent the results and the process of your testing?

A.   They do.

Q.   Okay.

MR. SHIPLEY:  Your Honor, I would move Government Exhibits 163A and B into evidence, please.

THE COURT:  Any objection?

MR. ROUTH:  No objection.

THE COURT:  Those two exhibits are admitted without objection.

(Government Exhibits 163A and 163B were received in evidence.)

MR. SHIPLEY:  Permission to publish 163A to the jury?

THE COURT:  Granted.

MR. SHIPLEY:  And if the Court could do that.

Do the members of the jury have it?

JURORS:  Yes.

BY MR. SHIPLEY:

Q.   Okay.  All right.  What are we seeing in this image, Special Agent Patterson, and can you tell us about how you actually did this resistance test?

A.   In general, this is inside of our enclosed 50-meter test bay where I would say 90-plus percent of all of our armor

testing takes place.  And what you are seeing is the forward edge right there -- I don't know if that is showing up.  But this is the leading edge right here of the plate (indicating).  And then as you're looking at it from the side, when we shot at it, the bullets would have come in this direction to impact the plate from right to left.

Q.   Okay.

A.   And what's important in this picture is you're seeing inclinometers that tell you that the plate is perfectly vertical.  When we test armor, it is important that it is perfectly vertical.  If we start to angle the armor at all, it gives the armor a better chance of defeating the bullet.  The best chance for us to get through armor is if I have it straight up and down and hit it straight on.

Q.   Okay.  So is it fair to say that if a plate like this were positioned sort of at angle, would it be more effective or less effective in resisting bullet fire?

A.   Oh, it's more effective at any angle.

Q.   Is it fair to say -- if I'm understanding your testimony, when you did this test, why do you have the plate vertical?

A.   To give the projectiles the best chance of penetrating.

Q.   Okay.  All right.  So what do you do?

A.   So we set up the plate in this configuration you see on your screen.  And then obviously, the devices will be taken off, and it's just the plate which I think you will see in the

subsequent picture.  We then have a gun that we have to set off at exactly 10 feet.  That's the standard distance we do all of our armor testing.  At that point, we make sure that the gun barrel is level.  We put a level on it, and we have it stationary in one point.  We will then load the control rounds and fire a series of those into the plate, one at a time. After every shot, we walk forward to make sure that we haven't suffered any penetrations.

Q.    You mentioned that the standard distance for doing this is 10 feet?

A.    Yes.

Q.    Okay.  In this instance, would it have made any different -- any difference if you had done the test at, for example, 5 feet?

A.    In this instance, it doesn't.  And this is important to understand.  We will tell you what the velocity is.  And the velocity of these projectiles coming out of our test handgun were 1,240 feet per second.  For a pistol bullet, that's really pretty fast.  Understanding that, whenever we fire it and I tell you it's 1,240, sometimes it's going to be 1,220, and sometimes it's going to be 1,250.  There is natural variance in there.  It will stay within a range, but there is natural variance.  But the average of this is 1,240.  I tell you that because whether you are at 5 feet or 10 feet, in this case, the results are going to be the same.

Q.   Okay.

MR. SHIPLEY:  Ms. Luce, can we publish Government Exhibit 163B, now, please.  Okay.  Let me clear the screen.  Excuse me.

BY MR. SHIPLEY:

Q.   Okay.  What are we seeing in this image?

A.   This is this front plate, front face of the plate right here (indicating) that the jury is seeing.  And then that is exactly what it would look like when we're standing, facing the plate, firing each one of the test shots.

Q.   Okay.  And are those sort of white -- white spots?

A.   Again, and I will mark them -- so there is a bullet hole there (indicating).  There is a bullet hole there (indicating).  There is one here, and then there are two impacting substantially in the same spot there (indicating).

Q.   Okay.  Now, you used the word "hole."  What kind of impact, if any, did your shots actually have on this plate?

A.   Right.  We -- we essentially scratched it; that's all we did to it.

Q.   Okay.  Can you hold that up again for the jury, and make sure the jurors on this end can see as well as best they can.

A.   (Indicating.)

Yeah.  And using "hole" is not the right term.  It's a circle impact from the bullet, and that's how they always look on metal.

Q.   Okay.

MR. SHIPLEY:  And, Your Honor, if you would just remind the jury, they will have an opportunity to see this item and review.  I don't want to pass it around now because of its weight.

THE COURT:  The jury is aware of that.  Thank you.

MR. SHIPLEY:  Thank you.

BY MR. SHIPLEY:

Q.   Okay.  Would it have made -- how many shots did you fire?

A.   Five.

Q.   Okay.  Would it have made a difference in the outcome of your examination if you had fired more than five times?

A.   We could have shot thousands of those rounds at this plate, and I'm never going to penetrate it.

Q.   Okay.  Do you have an opinion as to whether this plate would have been -- was impenetrable to the shots that you fired?

A.   It is impenetrable to the shots I fired.

Q.   Okay.  And in summary, do you have an opinion as to whether the plate you examined would have deflected fire from a service weapon of the kind used by law enforcement?

A.   In every case where the bullet hit the plate, it's going to deflect the bullet.

MR. SHIPLEY:  No further questions, Your Honor.  Thank you.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. ROUTH:

Q. Good morning. Thanks for traveling here.

A. Yeah.

Q. So sorry to take your time. So I guess you just looked at the plates. You didn't look at the SKS gun?

A. I did not, no, sir.

Q. They didn't send you the gun? Okay.

So in general, since you're a ballistics expert, the further a target is away that you're trying to shoot at, the less accurate it would be, I would assume?

MR. SHIPLEY: Objection to scope. And prior rulings, Your Honor.

THE COURT: Sustained.

Next question.

BY MR. ROUTH:

Q. An item far away is harder to hit than something that is very close?

THE COURT: Sustained.

BY MR. ROUTH:

Q. With a gun?

THE COURT: Mr. Routh, sustained.

Please abide by the Court's prior orders, switch gears, and ask a different question.

BY MR. ROUTH:

Q.   So that's not a permissible question?

THE COURT:   Correct.

MR. ROUTH:   Okay.

BY MR. ROUTH:

Q.   Do you by chance know the range of an S -- of a AK-47, how far it will shoot the 7.62x39?

A.   In general, yes, I do.

Q.   Okay.   Can you answer that?

A.   Thousands of feet.

Q.   Thousands of feet.   Thousands?   So just, just thousands?

A.   Yeah, I think --

Q.   Or just a thousand?

A.   If you want, for us, we would talk about how far it could go and the most ideal launch angle.   It's -- you're looking at somewhere probably on the order of 2 1/2 to 3,000 yards.

Q.   For a 7.62 bullet --

A.   Yes.

Q.   -- by 39?

A.   Yes.

Q.   Okay.   Okay.   What was that again?   How much?

A.   2 1/2 thou- -- 2 1/2 to 3,000 yards would be the max range of one of those, given there is some variables in there.   But that roughly will get you --

Q.   Okay.

A.    -- a good number.

Q.    All right.  Right on.  Okay.  Okay.

You don't know by chance if the Norinco SKS is a semiautomatic rifle or fully automatic or manual or?

A.    I don't know anything about this rifle, sir.

Q.    Okay.  With a -- with an AK-47, what type of scope would be attached to an AK-47?

MR. SHIPLEY:  Objection, Your Honor, to scope of the testimony.

THE COURT:  Mr. Routh, your questions need to stay within the scope of the questions asked on direct examination, and you are exceeding that clearly, now, multiple times.  So if you're unable to comply with that rule of evidence, then we will just have to cease the cross-examination.

Do you have any additional questions that actually stay within the scope of direct examination?

MR. ROUTH:  The gentleman stated he was a ballistics expert.  I mean, did he not say that he was a -- a ballistics expert?  As far as ballistics being a gun that fires bullets, are you not an expert on ballistics?

THE COURT:  Sir, the witness's qualification does not trump the rule of evidence which I already said requires cross-examination to stay within the bounds of direct examination.  That's a Federal rule of evidence that you have indicated you are going to comply with, along with all the

rules of evidence.  So do you have any additional questions?

BY MR. ROUTH:

Q.   Are the plates the exact same thickness?

A.   I did not measure the second plate, sir; I only had access to this one.

Q.   Okay.

A.   They appear substantially the same, though.

Q.   Okay.  All right.  I guess I'm not allowed any further questions.  So thank you.

THE COURT:  To be clear, Mr. Routh, you are allowed permissible questions that comply with the Federal Rules of Evidence, and this is your opportunity to do that.  But I see you are concluding your opportunity.

So, with that, any redirect?

MR. SHIPLEY:  No, Your Honor.  Thank you.

THE COURT:  Thank you, Agent.

THE WITNESS:  Ma'am, may I clarify one answer?

THE COURT:  You may, sir.

THE WITNESS:  So when I said 2 1/2 to 3, I think I said yards; it's actually miles.  I was doing some math.  So that bullet at the right angle, which is about 33 degrees launch, could go 2 1/2 to 3 miles.

THE COURT:  All right.  Thank you.

Any additional questioning following that clarification?

MR. SHIPLEY:  No.  Thank you very much, Agent.

THE COURT:  All right.  Thank you, Agent.  You may be excused.

MR. SHIPLEY:  Your Honor, may I approach to retrieve the item?

THE COURT:  Yes.  Thank you.

All right.  Please call your next witness.

MR. DONNELLY:  Yes, Your Honor.  The government calls Kara Gregor.

THE COURT:  Thank you.  Please invite Ms. Gregor into the courtroom.

Good morning.  Please stay standing for a brief moment.

COURTROOM DEPUTY:  Please raise your right hand.  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  My name is Kara Gregor.  My first name is spelled K-A-R-A, and my last name is spelled G-R-E-G-O-R.

MR. DONNELLY:  May I question the witness, Your Honor?

THE COURT:  Yes, you may.

KARA GREGOR,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DONNELLY:

Q.    Good morning, ma'am.  How are you?

A.    Good morning.

Q.    Ma'am, by whom are you employed?

A.    I am employed by the FBI Laboratory located in Quantico, Virginia.

Q.    And what do you do for the FBI Laboratory?

A.    I am a forensic examiner in the DNA Casework Unit.

Q.    And how long have you been a forensic examiner with the DNA Casework Unit?

A.    Since April of 2016, so for approximately 9 1/2 years.

Q.    And can you tell the members of the jury, briefly, what your daily duties are as a forensic examiner with the DNA Casework Unit.

A.    Yes.  As a forensic examiner, it is my job to manage a case when it comes to the unit.  And I will use the information or incoming paperwork to decide what items I'm going to test in a case, and then I will direct a team of biologists to perform those examinations or tests in the laboratory.  And then once their lab work is completed, I review the results of the biologists' work to see if any additional testing is needed. And then I will interpret the results and write my conclusions in a report and then sometimes testify to that report in court.

Q.   And do you also deal with serology as part of your daily duties?

A.   I do.  And serology is the detection and identification of bodily fluids on items of evidence.

Q.   Ma'am, before you came to the FBI laboratory, can you give the members of the jury some idea about what your educational background was.

A.   Yes.  I have a bachelor of science degree in biochemistry and molecular biology with a minor in chemistry from the University of Massachusetts.

Q.   And after you graduated from the University of Massachusetts, did you get jobs in the field that's similar to this one?

A.   Yes.

Q.   And can you tell the members of the jury what jobs you've held pre -- prior to your job duties at the FBI.

A.   So prior to working at the FBI laboratory, I worked very briefly at Bode Cellmark Forensics, which is located in Lorton, Virginia, as a DNA analyst in the DNA unit there, where I was being trained in DNA extractions.

     And then prior to that job, I worked at the Massachusetts State Police Crime Laboratory for approximately six years, and I had job duties in two units there.  One was the DNA unit, and one was the Crime Scene Response Unit.

     In the DNA unit, my job was similar to what I do now as a

forensic examiner in the FBI laboratory, but I also performed the lab work at the Massachusetts State Police Crime Laboratory like a biologist does at the FBI laboratory.  And so in the Crime Scene Response Unit, what I did there is I would respond to crime scenes and collect evidence and bring it back to the laboratory to be processed.

Q.   Did you receive any training, classroom-type training, when you were at the Massachusetts State Police in the field of DNA analysis?

A.   Yes.  So when I was at the Massachusetts State Police Crime Laboratory, I attended a 17-week training course at the Northeast Regional Institute at SUNY Albany, or the State University of New York in Albany, and I was being trained in DNA analysis methods.  And then I went back to the laboratory at the Massachusetts -- Massachusetts State Police Crime Laboratory to learn the specific protocols in which they performed DNA casework.  And that was part of my training program as for the Massachusetts State Police Crime Laboratory.

Q.   And in the six years that you spent with the Massachusetts State Police, did you also attend outside programs and workshops in the field of DNA?

A.   Yes.  While I was employed there, I attended lectures and trainings in the field of forensic DNA.

Q.   Were you a member of any professional organizations when you were at the Massachusetts State Police?

A.    I was.  I was a member of an organization of the Northeast Regional Forensic -- or sorry -- the Northeast Regional Association of Forensic Scientists.

Q.    And when you began at the FBI, did you receive any training from the FBI in the field of DNA analysis or serology?

A.    Yes.  So at the FBI laboratory, my training program was very extensive, and that lasted approximately two years.  And what I did was I took written practical and oral examinations in the fields of serology, DNA analysis and interpretation, population genetics, and statistics.

I also participated in moot court exercises and performed casework under a qualified forensic examiner.  And then at the end of the training program, I took a final exam, which is called a competency test.  And this is to show that I could perform casework independently.

Q.    Do you still stay current with the latest trends in the field of DNA and serology?

A.    Yes, I do.

Q.    And how do you do that?

A.    I am required to continue continuing education in the field of forensic DNA analysis by having eight hours of continuing education every year.

Q.    Do you work with any outside law enforcement agencies, that is, agencies outside of the FBI, to talk with them about their procedures and their DNA analysis?

A.   Yes.   Outside of the FBI, we work with state and local partners.

Q.   And with regard to the lab itself, are there quality control procedures that are in place at the DNA lab -- or the DNA Casework Unit at the FBI lab?

A.   There are.  We have a very extensive quality assurance program to include SOPs, which are standard operating procedures, and these are written protocols that the forensic examiners and biologists must follow.  It's similar to a cookbook recipe that has step-by-step instructions.

We also have PPE, or personal protective equipment, that the biologists must wear to protect themselves as to not contaminate the evidence.

We have two reviews that each case file undergoes once a forensic examiner completes a case or writes up a report, and those two reviews are called a technical review and an administrative review.

A technical review is where another forensic examiner must ensure that they perform their own independent analysis and see if they come to the same conclusions as the original forensic examiner.  And then the second review is an administrative where another individual will look at the report to ensure that there is no spelling or grammatical errors in a case.

We also have controls that we use throughout our DNA testing process to ensure that there is no contamination, and

that -- and to ensure that everything is working properly.

We also have validations in place to ensure that all of the operating procedures that we have in place have been tested and sure to work correctly in the laboratory.

And these are just a few examples in which the FBI laboratory has in place to make sure that the results are reliable.

Q.   And is the FBI laboratory, and specifically the DNA Casework Unit, accredited by any outside group?

A.   Yes.  The FBI laboratory is accredited by ANAB, or A-N-A-B, and that stands for the American National Standards Institute, National Accreditation Board.

Q.   And as part of that accreditation process, do people from ANAB come into the lab to observe the procedures that are in place in the laboratory?

A.   Yes.

Q.   And so are they looking at the people that are performing the work, the biologists and the examiners, as well as the procedures that are in place?

A.   Yes.  To ensure that we are following the proper procedures and protocols, sometimes they will sit with an examiner to see how to -- how they perform their day-to-day duties.

Q.   And have you ever been qualified as an expert to testify in either state or federal court on prior occasions?

A.   Yes.  I have testified previously 49 times, 48 times in

forensic serology and/or DNA analysis, and 1 time for crime scene investigation.

MR. DONNELLY: Your Honor, at this time, pursuant to Rule 702, I would proffer this witness as an expert in the field of forensic serology and DNA analysis.

THE COURT: Any objection, Mr. Routh?

MR. ROUTH: No objection.

THE COURT: The witness is qualified in that field.

MR. DONNELLY: Thank you very much.

BY MR. DONNELLY:

Q. Ma'am, we've talked a little bit about DNA. First, and just very quickly, I think, because it's been mentioned previously, but can you give a little bit more about what serology actually is.

A. Yes. So serology, again, is the detection and identification of bodily fluids on items of evidence. So, for example, at the FBI laboratory, the two bodily fluids that we test for are blood and/or semen.

Q. And are -- why are those -- why are the bodily fluids important in the DNA Casework Unit?

A. So it would be important to do serology on items of evidence that are, say -- or, say, come in for a crime scene, so if we have a huge comforter, well, we're looking for any potential stains that we want to take forward for DNA testing. So we may test those stains for blood and/or semen.

Q.   And why is it important to get those -- is the actual -- the fluid itself important for a DNA examination?

A.   Yes.  Because the blood and/or semen contain the cells that would have the DNA inside.

Q.   And then moving on to DNA.  Can you describe for the members of the jury just briefly what exactly is DNA.

A.   So DNA stands for deoxyribonucleic acid, and it is a person's genetic blueprint.  It contains all the information for things you can see, such as whether a person has blond hair or brown hair, whether a person has blue eyes or brown eyes, or whether a person is tall or short.

And each person receives half of their DNA from their mother and half of their DNA from their father.  And each person is going to have a unique DNA profile, with the exception of identical twins, because identical twins will have the same DNA profile.

Q.   Can you -- do people -- even though there is only the shared DNA between identical twins, do various people have similar DNA?  Like would my DNA be similar to, for instance, your DNA?

A.   Yes.  So our DNA would share approximately 99 percent, so -- each individual shares about 99 percent between the person sitting next to you, but there is less than 1 percent of the DNA that differs from individual to individual.  And that's the part of the DNA that we look at for DNA testing.

Q.   And are those differences, those slight differences between people, enough to allow you to draw any scientific conclusions?

A.   Yes.

Q.   And how do you do that?  What are the conclusions that you can draw from those differences?

A.   Well, first let me describe what the differences are that I'm looking at.  So what I'm looking at, essentially, are called STRs, and that stands for short tandem repeats.  And these are piece -- or short pieces of DNA that are repeated over and over again.

So you can think of them as like boxcars on a train.  So, for example, if one train had 6 boxcars, that means it's repeated 6 times.  If it's another train that has 12 boxcars, then that is repeated 12 times.  So I'm looking at those numbers and, say, if a person had a type of 6/12, well, that would be expressing what their genotype is at a location.

Q.   And would you look at those -- the genotypes at those locations, can you distinguish between one person's DNA and another person's DNA based on differences in those genotypes?

A.   Yes.

Q.   And can you describe a little bit for the members of the jury how it is that the DNA testing process starts at the DNA Casework Unit in the lab?

A.   So at the FBI laboratory, in our unit, we have five pro- -- or steps for DNA testing.  The first step of the process is

called collection.  And this is where we take a swabbing or a cutting from an item of evidence and we put it into a tube.

The second step of the process is called extraction.  And this is where we add chemicals to that tube that contains the evidence to break open the cells and release the DNA inside.

After that, the third step of the process is called quantitation.  And this is where we're trying to estimate how much human and/or male DNA we have in our sample.

The fourth step of the process is called amplification.  And this is where we are making millions and millions of copies of those short pieces of DNA or those STRs that differ from individual to individual.

And then the last step of the process is called separation and detection.  And this is where we put the DNA on an instrument and it separates the DNA by its size, and based on the length of those repeated sequences, it is assigned a number, and then those numbers make up the DNA profile.

Q.   Now, we heard from one of the biologists yesterday a little bit about the collection and the extraction process.  But are the quantification, the amplification, and the other steps in the process, are they done largely by machines and do they generate results through those machines?

THE COURT:  Leading.

BY MR. DONNELLY:

Q.   Are those process -- are those later steps performed --

THE COURT:  How?  How are those later steps performed?

BY MR. DONNELLY:

Q.   How are those later steps performed?

A.   So we use a semiautomated process.  The biologists are hands-on, but they're putting the samples onto an instrument to perform those specific processes.  And then the instruments are generating those results.

Q.   Just to go back one step.  Before there is actual, like, testing of anything, are you the -- I think you mentioned a little bit about bodily fluids.  Can you tell the members of the jury what other types of cells would contain DNA.

A.   So some examples would be semen, blood, saliva, skin cells, hair, bones.

Q.   And are you familiar with the term "a known sample"?

A.   I am.

Q.   What is a known sample?

A.   So a known sample is a sample that is collected from an individual so we know what your DNA profile is, and we use that for comparison.

Q.   And are you familiar with what a buccal swab is?

A.   Yes.

Q.   And can you tell the members of the jury what a buccal swab is.

A.   So a buccal swab is an example of a type of known DNA sample that can be collected, and it's essentially a cheek

swab.  So you can think of it as, like, taking a Q-tip and rubbing the inside of one's cheek to get a buccal sample from an individual.

Q.    And is that an example of a known sample?

A.    Yes.

Q.    And as far as questioned samples, are you familiar with the term "questioned samples"?

A.    Yes.

Q.    Can you describe for the members of the jury what a questioned sample is.

A.    So "questioned samples" is a term we use for the items of evidence or an evidence DNA profile.  So it's what we're comparing the known DNA profiles to, because we don't know what DNA profile is, so it's an unknown DNA profile or a questioned sample.

Q.    Are you familiar with the term "mixture"?

A.    Yes.

Q.    And what is a mixture, and how does it relate to the work that you do at the DNA Casework Unit?

A.    So as part of my job as a forensic examiner, when I am interpreting DNA profiles, the number of contributors that are contributing to a DNA profile could be one person, which is single source.  But if it's more than one individual, then that is a mixture.  And we interpret DNA profiles up to four people.

Q.    As part of your routine duties, and based upon your

training, education, and experience, is it common to get mixtures when you are doing an examination of DNA?

A. It is.

Q. Can you still do a full DNA analysis and be able to make identifications, even with mixtures?

A. Yes.

Q. Are you able to get statistical analyses done for mixtures?

A. Yes. If it's a mixture that is two, three, or four individuals.

Q. And is this a scientifically -- or is this a method that is regularly accepted within the scientific community?

A. It is.

Q. With regard to your role with the forensic casework unit with the DNA Casework Unit, I would like to just ask you preliminarily, are you familiar with all of the steps in that process that you laid out for us, before, beginning with collection and running on down the list?

A. I am.

Q. And why is it that you're familiar with all of those steps?

A. Because I was extensively trained in those steps.

Q. And are you -- are there decisions made by you and other examiners about items that are to be tested or not tested at the DNA Casework Unit?

A. Yes. That is part of my job duties as a forensic examiner, is to decide what items I'm going to test in a case based upon

the incoming paperwork.

Q.   Are all items of evidence equally capable of being tested for DNA?

A.   Somewhat.  There are some samples or items that may not be accepted in the DNA Casework Unit.

Q.   For instance, do you test cartridge casings?

A.   No.  So those are not accepted by the DNA Casework Unit.

Q.   And why are they not accepted by the DNA Casework Unit?

A.   They're more suitable for latent prints because of their smooth areas on cartridge case- -- cartridge casings, as opposed to having textured areas in which the DNA casework or DNA in which we concentrate our exams on.

Q.   And in any given case, is every piece of evidence that's collected by FBI casework -- case agents submitted for DNA analysis?

A.   It can be.  But there can be other items that are specifically submitted for other disciplines within the FBI lab.

Q.   And do you and other examiners make decisions about what items are to be tested or not tested based on your training, your education, and your experience?

A.   Yes.

Q.   When you become involved in -- in the examination, do you check to make sure that the information that you're getting from the steps that you described, before, beginning with

collection, do you check to make sure that that work was done accurately?

A.   I do.

Q.   And why do you do that?

A.   To ensure that everything was performed correctly and that the notes are correctly -- or are done by the biologist.

Q.   And specifically with regard to the case that you're here for today, did you do that in this particular case?

A.   I did.

Q.   How is it that you go about checking the information that you've received to make sure that it was -- or that it appears to be -- to be the result of accurate testing?

A.   So there are notes that the biologists take for each step of the DNA process, from collection to the last step.  And those notes are called case notes.  And those case notes are reviewed by me as when I'm writing my report.

Q.   And when you receive all of the information at the end of that -- that process, beginning with collection and running all the way through, what is it that you actually do with that information?

A.   I use that information to ensure that the proper items in which I wanted tested were tested.  And I ensure that the controls that were run throughout the DNA testing process was to ensure that no contamination occurred throughout that process.  And then I'm also interpreting the data to make my

Case 9:24-cr-80116-AMC   Document 331   Entered on FLSD Docket 09/29/2025   Page 46 of 333

conclusions in a case.

Q.   And when you are making your conclusions, what types of conclusions are you reaching in any particular case?

A.   So there are two main conclusions that I can -- can occur. And then one of those is called an inclusion, and this is where a person of interest could be a possible contributor to the DNA evidence profile.  And then there can be an exclusion which is where a person of interest could not have been a contributor to the DNA evidence profile.

Q.   And how is it -- what do you use to base the inclusion versus exclusion determination?  How do you make that conclusion -- make that determination?

A.   So I perform that comparison by taking a known DNA sample from an individual and looking at each location or DNA types that a person has and comparing those numbers to the DNA types in a questioned sample or unknown or evidence sample and seeing if those numbers are the same or if they are different.

Q.   And based upon the examination that is -- that is done and the process that's performed by the DNA Casework Unit, does the FBI use software to generate what's known as a likelihood ratio calculation?

A.   Yes.  So we use a software program called STRmix, or S-T-R mix, and this is used to generate a statistic to give weight to the evidence.

Q.   And the weight that you give to the evidence and that

statistic, does it also allow you to assign a verbal scale for the level of support for inclusion for a particular item of evidence?

A.    Yes.  But let me back up.  So let me explain first what a likelihood ratio is.  So a likelihood ratio is comparing the probability of the evidence under two opposing scenarios.  So, for example, if one of those scenarios is if a person of interest is a contributor to the DNA evidence profile versus the second scenario which is if someone unknown and unrelated is a contributor to the DNA evidence profile.

And then, to answer your question now about the verbal scale, that is something that we use in addition to the likelihood ratio.  So the likelihood ratio is a number, and we have a verbal scale to explain what that number is.  So it's giving context to the results in a case.

Q.    And what is the verbal scale?  What are the -- what are the scales that you use for your level of inclusion?

A.    So for our level of inclusion, if the likelihood ratio number is 2 or greater, then that is support for an inclusion. But we have a range of inclusion, from limited support for inclusion, all the way to the higher end which is very strong support for inclusion.

Q.    And what would it take for you to be able to assign something "very strong support" for inclusion?

A.    So when the likelihood ratio is greater than or equal to

1 million, then that is very strong support for inclusion.

Q.    Is the STRmix software that you described before, is that a software that's regularly used in the scientific community across the country?

A.    It is.

Q.    And are the analyses that are produced by STRmix regularly accepted within the scientific community?

A.    Yes.

Q.    And now just -- we're going to get into a little bit more about this particular case.

Do you -- as part of your duties, did you become aware in September of 2024 that there was a case coming your way that -- that was of some particular interest?

A.    Yes.

Q.    And were you assigned to investigate that particular case or do the DNA forensic casework unit [sic] for that particular case?

A.    I was.

Q.    And was there a lab number assigned to that case?

A.    There was.

Q.    And do you recall that lab number?

A.    It is 2024-02020.

Q.    And did it involve an individual by the name of Ryan Routh?

A.    It did.

Q.    Did you become aware as to whether or not there was a

buccal swab that was generated in this case from Ryan Routh?

A.    Yes.  The Item 220 was a buccal sample from Ryan Routh.

Q.    And is that buccal sample another example of what you would -- what you called before, a known sample?

A.    Yes.

Q.    And do you know if a profile, a DNA profile, was generated from that buccal swab?

A.    Yes, a DNA profile was generated from the buccal sample from Routh.

Q.    And was that DNA profile entered into that STRmix software that you mentioned before?

A.    Yes.  As part of my analysis, I did use that in the STRmix software.

Q.    And in addition to that buccal swab, that known sample, did you receive other items from the FBI that -- where there was a request for an examination?

A.    Yes.

Q.    And did you examine those other items?

A.    I did, and there was approximately 58 items that were tested in the DNA Casework Unit.

Q.    And when you say that they were examined by the DNA Casework Unit, were you working with a team of biologists?

A.    Yes.

Q.    And were various biologists assigned to different items of evidence?

A.    They were.

Q.    And were DNA profiles suitable for comparison generated from each one of the items that was submitted?

A.    No.  So only half of the evidence were suitable for comparison.  So 29 of the 58 were suitable for comparison.

Q.    And were all of the suitable profiles that were generated entered into that STRmix software for comparison purposes?

A.    They were.

Q.    And did you do anything to check them before they were entered into the STRmix?

A.    Yes.  So I did my comparison first by taking the known DNA profile and comparing it to the evidence DNA profiles to see if I could visually exclude that individual from any of the questioned samples.  And then if I could not visually exclude that individual, then I would take the questioned sample and the known sample and run it through that STRmix software program to calculate a statistic.

Q.    Did you visually exclude the known sample from further process -- or the questioned sample in any of those instances from further processing?

A.    In some questioned samples that were submitted, there were a couple of exclusions in which I was able to exclude Routh from.

Q.    And on the ones that were actually submitted into STRmix, did STRmix actually generate an analysis for those items?

A.   Yes.

Q.   And based on that, did you reach conclusions on several of the items that had been entered and submitted for -- into your possession for examination by the FBI?

A.   Yes.

Q.   And, again, when we were talking about the statistical analysis, is that the likelihood ratio that we discussed before?

A.   Yes.  So the statistical calculation that STRmix calculates is a likelihood ratio, which I explained previously.

Q.   And were the results of this process also subject to the peer review that you discussed earlier?

A.   Yes.

Q.   Okay.  Now, getting a little bit further into this case in particular, did you review the process that was used by various lab members for each of the items that was actually then entered into STRmix?

A.   Yes.

Q.   And did you check that to make sure that it appeared that the process had worked correctly for each one of those items?

A.   Yes.

Q.   Did that include swabs that were taken by a biologist by the name of Curtis Gaul?

A.   Yes, it did.

Q.   And did you check that process throughout for accuracy?

A.   Yes.

Q.   And did you generate a report and generate a conclusion for many of the items that were submitted into evidence in this case?

A.   Yes.

MR. DONNELLY:  Your Honor, for illustrative purposes, again, under Rule 107, I would ask to show first the witness what has been marked as GX913.

THE COURT:  Are you intending to publish to the jury?

MR. DONNELLY:  Eventually, once she takes a look at it, yes, Your Honor, just to make sure that she recognizes what it is.

THE COURT:  All right.  Let's take a brief break.  It's 9:48.

All rise for the jury.

(The jury exited the courtroom at 9:51 a.m.)

THE COURT:  Please have a seat.

Ma'am, you may be excused from the courtroom, and we will call you back.  Do not discuss, please, the substance of your testimony with anyone over the break.  Thank you.

All right.  Mr. Donnelly, can I please see a copy of whatever illustrative aid you wish to use with this witness.

MR. DONNELLY:  Yes, Your Honor.  May I hand it to your deputy?

THE COURT:  Yes.

All right.  Thank you.  Okay.  So this is marked as Government's 913.  What portions of this do you wish to use?

MR. DONNELLY:  Your Honor, it would be page 1, and then the following sections that show the charts that are generated by the computer analysis that follow.

THE COURT:  So are you intending to go through each and every one of these pages?  There appear to be --

MR. DONNELLY:  I believe we would be able to stop at about the halfway mark.  I think they are actually just a different view of the same data that begins about halfway through, Your Honor.

THE COURT:  Okay.  All right.

Mr. Routh, this is Government's 913.  Do you have any objection to use of this document for demonstrative purposes only?

MR. ROUTH:  No objection.

THE COURT:  Okay.  All right.  I will now return this to the government.

We will take a ten-minute break and then resume at 10:00.  Thank you.

(A recess was taken from 9:53 a.m. to 10:06 a.m.)

THE COURT:  Please have a seat.  Everybody is present.

I'm not sure where our court security officer is, but if we could please call the jury in and get the witness ready to resume.

(The jury entered the courtroom at 10:07 a.m.)

THE COURT:  Please have a seat.

All right.  Ms. Gregor, if you could please make your way back to the witness stand.

And you remain under oath, ma'am.  Thank you.

Please continue.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Ms. Gregor, before we get into the chart that we discussed before, you mentioned earlier that you had excluded Mr. Routh as a contributor to certain pieces of questioned evidence.  Is that -- did I recall that correctly?

A.   Yes.

Q.   And the fact that somebody was excluded as a contributor, does that necessarily mean that they didn't touch or possess the item from which that DNA was taken?

A.   Correct.  It just means that the DNA results when I compared the known sample to the questioned item, the DNA types did not match or the numbers were different, so I could exclude that individual.  So that means they could not have been a contributor to the DNA evidence profile.

Q.   With regard to --

MR. DONNELLY:  If we could please publish, just for the witness at this point, what was marked as Government Exhibit 913, please.

THE COURT:  You may.

MR. DONNELLY:  Thank you, Your Honor.

BY MR. DONNELLY:

Q.   Ms. Gregor, do you see on the screen in front of you a document that has been marked as GX913?

A.   I do.

Q.   And do you recognize that -- that document?

A.   Yes.

Q.   Have you had a chance to review that document in anticipation of your testimony here today?

A.   Yes.

Q.   And can you describe for the members of the jury what that document essentially is.

A.   So what I'm looking at is the known DNA profile submitted from Ryan Routh.  It was the buccal sample.  And it's his DNA profile.

The top is Item 220, and that's the item number assigned by the FBI laboratory.

Q.   And -- sorry.  But -- before you go any further.  There are additional pages to this particular document; is that correct?  To the document that you're looking at, GX913?

A.   Yes.

Q.   And are they charts that you -- that were prepared in -- as part of your examination of the evidence in this case?

A.   Yes.

Q.   Okay.

MR. DONNELLY:  Your Honor, with permission, if we could publish for the jury now what is GX913 for illustrative purposes only.

THE COURT:  All right.  Mr. Routh, any objection to use of this exhibit as an illustrative or demonstrative aid?

MR. ROUTH:  No objection.

THE COURT:  Okay.  Ladies and gentlemen, as I said yesterday, demonstrative or illustrative aids are there to help you follow along a witness's testimony, and can be helpful in this context as well.  But they aren't to be considered evidence in and of themselves.  And so this exhibit that you're about to see won't be part of the exhibits that are ultimately given to you during deliberations.

So, with that, you may publish this report.

MR. DONNELLY:  Thank you, Judge.

BY MR. DONNELLY:

Q.   Okay.  Ms. Gregor, you began to describe what you're looking at on page 1 of this -- of GX913.  Can you describe for the members of the jury what they're looking at.

A.   Yes.  So this is Item 220.  It's the buccal sample from Ryan Routh.  This is his DNA profile that was generated.  It is a single-source DNA profile, and it has the sex-determining factors of a male.

And so I am looking at a total of 24 locations; so, for

example, one of those locations is D3, and then VWA, and then D16, and so forth as you work your way down.  And then the numbers or DNA profile are the 15, 18 at D3; the 15, 16 at VWA; and so forth.

Q.   And so if I could just circle -- the area that I just circled, are those the locations of DNA that you're -- or that you're looking at in your examination of the DNA profile?

THE COURT:  Leading.

BY MR. DONNELLY:

Q.   What are those numbers and letters?

A.   So those are the 24 locations that I look at.  21 of those locations are the ones that differ from individual to individual.  And then three of those locations I look at to determine the sex typing of the profile, meaning whether the profile is from a male individual or a female individual.

Q.   And then the item that I'm circling now (indicating) to the right there, what are those numbers?  What do they represent?

A.   So that is the DNA profile from Routh.  So at each location, there is going to be two numbers or one number, depending on if you are sharing the same DNA type from your mother and then your father, because remember when I said you receive half of your information from your mother and half of your information from your father?  Well, for example, at D3 there -- or sorry -- VWA, there is a 15, 16.  So that 15, 16, one of those would be from your mother, and one of those types

would be from your father.

Q.   And a little bit further down there, the area that I just circled, do you see AMEL?

A.   Yes.

Q.   And what does that represent?

A.   So that is short for amelogenin, and that's one of the sex-determining regions.  So I look there to see if there is an XY.  If there is a Y, that means it's from a male individual. If it's an XX, then it would be from a female.

Q.   And if we could go to page 2, please.

Can you describe for the members of the jury what they're seeing here on page 2.

A.   So this is a visual representation of Item 1, Collection 1, which is -- the original item was a rifle.  And Item 1, Collection 1 was a swabbing from the textured areas of the grip and foregrip of the rifle.

And so this is the DNA profile where there are five locations that I'm looking at, and then those peaks that are called -- which are similar to heart peaks on a monitor, those are the short tandem repeats, or STRs, that are repeated over and over again.  So that 15 means that there is 15 repeats that are repeated over and over again.

And I look at all of the numbers in a questioned sample, and when I am doing my interpretation, I look back at the known DNA sample that was submitted, or that profile, and I perform a

comparison between the numbers.

Q.   And just to draw your attention to the area that I'm circling (indicating) on the top there, in those squares, can you -- or those rectangles, can you describe for the members of the jury what is depicted in those rectangles.

A.   Yes.  So those are locations that I look at.  So again, those 24 locations.  So D3, VWA, D16, CSF, and TPOX.  The technical term for a location is called "loci," and that's what I'm looking at.

Q.   And do those correspond to the left column on the first page that we were looking at before?

A.   It does.

Q.   And then you mentioned also some of the numbers.  I'm going to ask you to look at the circled area down on the bottom there.  And can you describe for the members of the jury what it is that is depicted in that circled area (indicating).

A.   So in the circled area at D3, there are three DNA types.  So there is a 15, a 16, and an 18 peak that are being called.

Q.   And then I'm going to circle a second area.  Can you describe for the members of the jury what you see there.

A.   So at the second location, VWA, there are two DNA types, a 15 peak and a 16 peak.

Q.   Okay.

         MR. DONNELLY:  And, Ms. Luce, if we could just go back to page 1 for a moment.

BY MR. DONNELLY:

Q.   And, Ms. Gregor, I'm going to draw your attention to the area that I have just circled right there (indicating).  How does the area that I have circled there relate to the page that we just looked at?

A.   So this is the known DNA profile, and I'm looking here at the same locations, D3 and VWA.  So at D3 for the known DNA profile from Routh, he has a 15, 18 at that location.  And then for VWA, he has a 15, 16, at that location.  And then I compared those numbers back to the questioned sample from the original page we were just looking at.

Q.   And when you -- do you do that same examination for each one of the 24 loci that you described -- the 24 different locations that are listed here on page 1?

A.   Yes.

Q.   And do you compare the numbers that are in the second column here on page 1 with the numbers that are generated on the following pages with the charts?

A.   I do.  And I look at the numbers and compare them for all of the locations.

Q.   And in this particular case, when you looked at those numbers, were you able to determine whether or not Ryan Routh was a potential contributor to the DNA on the rifle in this case?

A.   Yes.

Q.   Okay.  And if we could just go to page -- page 2 again.

Ms. Gregor, can you just walk us through again the rest of page 1 here and what we're looking at.

A.   So, for example, here I'm looking at D3.  The DNA types are 15, 16, and 18.  The original page, Routh had a 15, 18 at D3. So I'm looking to see if those numbers fit within this DNA-questioned profile and do they match.  And I do that for each location for the whole DNA profile to see if I can include an individual or exclude an individual.

Q.   And based upon your examination of page 2 here, was -- were all the numbers here, did they keep the possibility that Ryan Routh was a contributor to the DNA profile obtained from the rifle?

A.   Yes.

Q.   And if we could go to page 3.  Same series of questions, if we could, with page 3.  What do -- what do these numbers and what do these boxes represent?

A.   So the first box is Y-InDel, and that's a sex-determining region to see -- if there is a peak present, then that means it's from a male individual.  Then the next box is an amelogenin, and this is also a sex-determining location to determine whether the profile is from a male or a female individual, and also can be a mixture of both.  And then the next locations across the board or the top is D8, D21, D18, and DYS391.  The D8, D21, and D18 are those autosomal or STRs that

differ from individual. And then DYS391 is a sex-determining marker to determine whether a profile is from a male individual. And if there is a peak present, then it would be from a male individual.

Q. And with regard to everything -- except for the last one that you mentioned, the DY, with regard to the other four columns of information there, how did they compare to the known profile on page 1?

A. So when I'm looking at the known DNA profile from Routh, I'm looking at the same locations and looking at the numbers from that known DNA profile and seeing if they match or included to the numbers here, present in the questioned sample.

Q. And based upon your examination using this data, was Ryan Routh still included as a potential contributor?

A. Yes.

Q. And if we could move to the next page, please, page 4.

Same questions with regard to this page. Ms. Gregor, can you describe for the members of the jury what they're looking at here.

A. So this is the same sample, but I'm looking at an additional four more locations (indicating) called D2, D19, THO1, and FGA.

Q. And did you examine the profiles and the numbers for the profile on the bottom of the page here as well?

A. Yes.

Q. And did you compare them to the profile on page 1?

A. Yes. The profile from Routh.

Q. And was he still included as a potential contributor to the source of the DNA from the rifle?

A. Yes.

Q. And if we could go to the last page.

And I'm going to ask you, again, to examine this page and tell the members of the jury what they're looking at here.

A. So, again, there are additional locations that I look at for my comparison when I'm comparing the questioned sample back to the known DNA sample. And those locations are here (indicating) at the top, where it's D22, D5, D13, D7, and SE33.

Q. And for the results that appear on the page here, did you compare them to the known profile that's described on page 1?

A. Yes.

Q. And based upon your analysis, what did you find?

A. That they were still included.

MR. DONNELLY: And I believe I said this was the last page. I stand corrected. I believe there is one more page. If we could go to the last page now.

BY MR. DONNELLY:

Q. Can you describe for the members of the jury, just paying attention, I think, to the top page -- top part of the page here, can you describe for the members of the jury what they're looking at here.

A.   So, again, there are four additional locations that I'm looking at, and I'm circling them in red.  It's D10, D1, D12, and D2.  And I look at the DNA types at each of those locations and compare it back to the known DNA profile from Routh (indicating).

Q.   And, again, based upon your analysis of this page, did you -- it's -- was he still included as a potential contributor?

A.   Yes.

Q.   On this page and throughout this document, do you see the lab number that was assigned to the rifle in this particular case?

A.   Yes.  It was 2024-02020.

Q.   And for the rifle itself, do you see the number that corresponds to the rifle?

A.   Yes.  So the rifle itself was Item 1, but we took a swabbing from the textured areas of the grip and the foregrip, and so that item number is Item 1, Collection 1, which is parentheses 1.

Q.   And I'm going to ask you to look at the circled area up there (indicating).  Okay.  I might have covered it.  Is that the number up there?

A.   Yes, that is the lab number.

Q.   Okay.

         MR. DONNELLY:  Ms. Luce, we can take it down at this

point.

BY MR. DONNELLY:

Q.   Did you develop profiles and charts similar to the one we just examined for a number -- for all of the other items from which DNA was collected and extracted?

A.   Yes.  For the items of which we did the five-step DNA testing process, DNA profiles were generated for those items.

Q.   Okay.  And now going back, specifically, with regard to the rifle, which was Lab Number 11, were you able to reach any conclusions based upon the examination and the -- the examination that you just described as to whether or not the source of the DNA on that -- was it a single source or were there multiple sources?

A.   Well, first, it was a DNA profile that was from a male individual.  And it was a mixture of three individuals.

Q.   With regard to the three individuals, is that what's known as a mixture?

A.   Yes.

Q.   And is that what we described earlier in your testimony?

A.   Yes.

Q.   With regard to the rifle, was there a likelihood ratio that was calculated for this particular item, for the rifle?

A.   Yes.

Q.   And what was the likelihood ratio that was calculated for this item?

A.   So the DNA results from Item 1, Collection 1, which was the swabbing from the textured areas of the grip and the foregrip of the rifle, are 250 septillion times more likely if Routh and two unknown unrelated individuals are contributors than if three unknown unrelated people are contributors.  And this provides very strong support for inclusion of Mr. Routh.

Q.   And is very strong support for inclusion the highest level of verbal -- the verbal status that you give in a particular case?

A.   That is our highest level -- level for support for inclusion.

Q.   And just for context, what's the minimum level for very strong support for inclusion?

A.   So the minimum level or the lower end of our verbal scale for an inclusion is called limited support for inclusion.

Q.   For very strong support, though, what is the minimum likelihood ratio that you would use?

A.   So the minimum likelihood ratio number would have to be greater than or equal to 1 million to be very strong support for inclusion.

Q.   And in this case, we have 250 septillion?

A.   Yes.  The likelihood ratio is 250 septillion.

Q.   And just for context, 250 million, how many zeros are in 250 million?

A.   Well, the likelihood ratio here in this case was 250

septillion. So that's 2-5, followed by 25 zeros.

Q. And for -- for 250 million, how many zeros would be in 250 million?

A. So for 250 million, there would be 2-5, followed by seven zeros.

Q. With regard to the rifle -- well, moving along.

Did you also become -- did you also examine Item Number 5 in the lab numbers?

A. Yes. Item 5 was a bag.

Q. And can you -- the bag that you described as Item Number 5, did you go through the same process with regard to bag number that was given Lab Number 5?

A. So for Item 5, the five-step process for DNA testing was processed on this item.

Q. And did you go through the same process, as you described earlier, with regard to the rifle?

A. Yes.

Q. And did you go through the same process that you used with regard to -- with the example that we used in Government Exhibit 913?

A. Yes.

Q. And for the bag which was given Lab Number 5, were you able to reach any conclusions with regard to the bag which is number 5?

A. Yes. So Item 5 was a bag. And a swabbing from the handles

was collected for DNA testing, and that was Item 5, Collection 1, or parentheses 1.  And male DNA was obtained from this item, and I interpreted the DNA profile as originating from one individual.  I then compared Routh's DNA profile to this item, and the DNA results are 160 octillion times more likely if Routh is a contributor than if an unknown unrelated individual is a contributor.  And this provides very strong support for inclusion of Mr. Routh.

Q.   And with regard to this Bag Number 5, were you aware as to whether or not there was also serology performed by one of your biologists on that bag?

A.   Yes.

Q.   And why was that done?

A.   There were red-brown stains that were shown on this bag. And so those red-brown stains were tested for the presence of blood.  However, blood was not detected on this item.

Q.   Moving along to what the lab refers to as Item Number 8, are you familiar with Item Number 8 in the lab submissions?

A.   Yes.  Item 8 is a zip tie.

Q.   And was the zip tie related to the bag in number 5 in some way?

A.   It was.

Q.   And was that also examined by you after the process was completed for collection, extraction, and so forth?

A.   Yes.

Q.   And did you, based upon the -- well, I should ask, did you go through the same compare -- examination process that you described before with regard to the rifle and that reddish-brown bag?

A.   Yes.

Q.   And were you able to make any conclusions based upon your examination of the information from the zip tie?

A.   Yes.

Q.   Can you tell the members of the jury what those conclusions were?

A.   So, again, Item 8 was a zip tie.  And we took a swabbing from the textured areas of the zip tie as Item 8, Collection 1, or parentheses 1.  I interpreted the DNA profile as being from a male individual, and it was one individual that was contributing DNA to this DNA profile.  I then compared Routh's DNA profile to this item, and the DNA results from Item 8, Collection 1, which is, again, the swabbing from the textured areas of the zip tie, are 160 octillion times more likely if Routh is a contributor than if an unknown unrelated individual is a contributor.  And this provides very strong support for inclusion of Mr. Routh.

Q.   I'm going to move along to Lab Number 11.  Are you familiar with Lab Number 11, the item contained in Lab Number 11?

A.   So, yes.  Item Number 11 was a backpack.

Q.   And the backpack that you described, did it go through the

same process as you have described with the rifle and with the reddish-brown backpack and the zip ties?

A.   Yes.

Q.   And did you do the same examination, and did you reach any conclusions?

A.   Yes, I did.

Q.   And can you tell the members of the jury what those conclusions were from the backpack.

A.   So Item 11, again, was a backpack.  And we took a swabbing from the zipper pulls of the backpack, the inside shoulder straps, and the top strap of the backpack as Item 11, Collection 1, or parentheses 1.  And I interpreted that DNA profile as having no conclusion regarding sex-typing results. So I'm not able to say whether that backpack is from a male individual or a female individual because it was inconclusive.

But I did compare Mr. Routh's DNA profile to that item because it was still a single source, or one person was contributing DNA to that backpack.  And when I compared Routh's DNA profile to that item, the DNA results from Item 11, parentheses 1, again, which is the swabbing from the zipper pulls, the inside shoulder straps, and the top strap of the backpack, are 210 times more likely if Routh is a contributor than if an unknown unrelated individual is a contributor.  And this provides moderate support for inclusion of Mr. Routh.

Q.   Now, was there another item submitted to your laboratory

that was related to that blue backpack?

A.    Yes.  There was another item, and it was Item 14, which was a bungee cord.

Q.    And was the bungee cord also subject to the same examination beginning with collection and running all the way through?

A.    It was.

Q.    And did you have a chance to examine -- to examine the results of the testing on the bungee cord, Item Number 14?

A.    Yes.

Q.    And did you reach any conclusions based upon your examination of that data?

A.    Yes.

Q.    And can you tell the members of the jury what it is that you concluded based on your examination of that data.

A.    So, again, Item 14 was a bungee cord.  And we took a swabbing from the ends of that bungee cord, including the metal coils at both ends.  And that was Item 14, Collection 1, or parentheses 1.  I interpreted that DNA profile as being from a male individual, and I interpreted it as originating from one individual.

I then compared Routh's DNA profile to that item, and the DNA results from Item 14, parentheses 1, which is, again, the swabbing from the ends of the bungee cord, including the metal coils, are 810 septillion times more likely if Routh is a

contributor than if an unknown, unrelated individual is a contributor.  And this provides very strong support for inclusion of Mr. Routh.

Q.    And one more item, if I could ask you about one more item, and that would be Lab Number 61.  Are you familiar with what was submitted, Lab Number 61?

A.    Yes.  So Item 61 was a right glove.

Q.    And was that put through the same process as you have described earlier for the rifle and the bags and the other items?

A.    Yes.

Q.    And did you also do an examination of the data that was generated from a result of that testing?

A.    Yes.

Q.    And were you able to reach any conclusions?

A.    Yes.

Q.    And what conclusions did you reach with regard to the glove which was Item Number 61?

A.    So, again, Item 61 was a right glove from a Nissan Xterra. And we performed a swabbing, or a collection or swabbing from the inside of that glove or a wear of swabbing to see who potentially could be wearing this item.  And that was Item 61, parentheses 1, or Collection 1.  And I interpreted that DNA profile as originating from a male individual, and one individual was contributing DNA to that item.

I then compared Routh's DNA profile to that item, and the DNA results from Item 61, parentheses 1, which again is a swabbing or a wear of swabbing of the right glove, are 160 octillion times more likely if Routh is a contributor than if an unknown, unrelated individual is a contributor.  And this provides very strong support for inclusion of Mr. Routh.

MR. DONNELLY:  Your Honor, with your permission, if I could approach the witness with several items of evidence that have been marked already in evidence as Government Exhibit -- this one is 187A?

THE COURT:  Yes, you may.

BY MR. DONNELLY:

Q.   (Tendering items.)

Ma'am, have you had a chance to look at what's contained within 187A?

A.   So this is Item 11, which is the backpack (indicating).  This is Item 16, which are keys (indicating).  And this is Item 14, which is a bungee cord (indicating).

Q.   If you could just put them back -- are those the same -- sorry.  Are those the same items that we were just referring to earlier during the questioning about the DNA profiles that were developed from Item Number 11 and 14?

A.   So only the bungee cord was tested for DNA and the backpack which was tested for DNA.  Not this item which was Item 16.

Q.   Okay.

MR. DONNELLY:  Your Honor, with your permission, if I could take that back?

THE COURT:  Yes.

MR. DONNELLY:  Thank you.

And, Your Honor, if I could approach with what's been already marked into evidence as Government Exhibit 188A?

THE COURT:  Yes.

MR. DONNELLY:  Thank you.

BY MR. DONNELLY:

Q.   (Tendering item.)

And, ma'am, have you had a chance to take a look at the 187 -- or 188A exhibit that I have shown you?

A.   Yes.

Q.   And do you see Lab Item Number 5 that you described before, which is the bag?

A.   Yes.  And this bag is Item Number 5 and which was tested for DNA (indicating).

Q.   And do you also see Item Number 8, which is a zip tie?

A.   Yes.  Item 8 was this orange zip tie that was tested for DNA.

MR. DONNELLY:  With Your Honor's permission, if I could -- thank you.

Thank you, Judge.  I have no further questions.

THE COURT:  Very well.  Any cross-examination, Mr. Routh?

MR. ROUTH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good morning.  Thanks for coming out.

A.   Good morning.

Q.   Sorry to take your time.

The -- just a couple of questions.  You said you don't test bullet casings.  Did you test, by chance, a Colt .45 bullet casing?

A.   No.

Q.   So you -- you never test bullet casings?

A.   No.

Q.   Okay.  In this case, did you test a golf tee for DNA?

A.   No.

Q.   We have a little green piece of a fence part.  Did you test that for DNA?

A.   No.

Q.   Okay.  We have a blue flashlight also.  Did you test the blue flashlight for DNA?

A.   No.

Q.   How about a Sunny Delight drink bottle?  Did you test that for DNA?

A.   I don't believe so, but I can't recall.

Q.   Okay.  It's a good size -- (indicating)?  You don't remember?

A.    I don't remember.

MR. ROUTH:  Okay.  All right.  Thank you for your time.

THE WITNESS:  Thank you.

THE COURT:  Redirect?

MR. DONNELLY:  No, thank you, Your Honor.

THE COURT:  Thank you very much.  You may be excused.

All right.  Please call your next witness.

And, ladies and gentlemen, for your planning, I plan to break today around noon for lunch.

MR. BROWNE:  Your Honor, the United States calls Jerry Llanes.

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning, Judge.  How are you?

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

THE WITNESS:  Thank you.

COURTROOM DEPUTY:  State your first and last name, and please spell it for the record.

THE WITNESS:  My name is Jerry Llanes.  First name is J-E-R-R-Y.  Last name is L-L-A-N-E-S.

JERRY LLANES,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWNE:

Q.   May I inquire, Your Honor?

A.   Yes.

Q.   Good morning, Mr. Llanes.

A.   Good morning.

Q.   Tell us where you work, sir.

A.   I work at the FBI for the Miami division.

Q.   And what are your duties and responsibilities at the FBI?

A.   At the FBI, I work for a team called CART.  That -- that stands for Computer Analysis Response Team.  And I am a digital forensic examiner on that squad.  And my responsibilities are to preserve, capture, and analyze any digital forensic data.

Q.   Can you define the term "digital forensic data" for the jury?

A.   Sure.  That's -- digital forensic data is anything that we can take from any -- any device that can have storage on it and be able to capture that data, preserve it, make -- verify its integrity, and then be able to process it and put it in a format that is understandable for most people to look at and be able to make an analysis from.

Q.   Give us some everyday examples of a digital storage device of the type you just described.

A.   That could vary from anything to cell phones, USB flash

drives, hard drives in laptops, devices inside your vehicles, like, you know, all the cars now have like the fancy computers and stuff inside.  So anything that can really retain storage on it, we're capable of in some way or another capturing that data.

Q.    In your career at the FBI's CART team, approximately how many digital devices have you forensically examined?

A.    I have probably processed in the last -- since I have been with them, about six years, I probably processed well over 200 devices with the FBI.

Q.    Can you walk us through the CART team standard procedures for preserving and extracting digital evidence from a device?

A.    Sure.

As soon as we get a device, there is two things that are required before we even analyze a device.  Those two things are a service request, which is a formal request from the squad that we're trying to help with an investigation.  That is a formal request from them asking us to provide services to them.

The second is legal authority.  The legal authority can come in one or two shapes:  a search warrant or a consent form. The reason that those are important is because the search warrant is, is the FBI allowed to look at that specific device, phone, whatever.  And it also -- we want to make sure that we have the correct devices.  Nowadays, people have various phones with them, various devices, things like that, and that -- that

search warrant also details exactly what it is we're going to -- we're going to be looking at to the exclusion of all others.

After that, we take the device, we make sure it's preserved.  We want to cut all communications if there -- if it is a device that is able to communicate, such as a cell phone.  After that, we make sure that it's -- it's preserved.  And then we will run it through a battery of tests and see if we can essentially capture that image, capture -- capture -- an image is essentially a snapshot of the data that's on that device.

We will make sure that we are looking at the device, capturing that image, and then once we can verify that the image is -- its integrity is -- is validated, then that's when we will begin to analyze the data.  And then based on the data that we analyze is what we will be able to produce in reports and things like that.

Q.   Let's talk about the analysis step.  What kinds of tools does the FBI's CART team use to analyze digital devices?

A.   So we have a couple of pieces of software and hardware that we use to analyze digital devices.  We have something called Cellebrite Premium.  That is one of our cell phone extraction tools.  We also have something called the Magnet -- Magnet GrayKey, which is another cell phone extraction device both for Android and Apple phones, as I'm sure people have one or the other.

Those tools are -- they are vetted by the FBI and approved and bought by the FBI for us to use.  And they are pretty much industry-standard devices that are used across the entire law enforcement enterprise to be able to do extractions from these phones.

Q.   You talked about the step after the analysis --

A.   Uh-huh.

Q.   -- involves generating reports.  Do you remember that?

A.   Yes.

Q.   Talk about how reports are generated.

A.   So after -- after we get an extraction from a cell phone, and that extraction is validated, what we will do is we will then run that extraction through a -- what's called Physical Analyzer.  And that analyzer will give us pretty much a heads-up display of everything that is on the phone, and then we can do our analysis in that way.

Once we're done with our analysis and we want to look at specifically -- we want to hand off a report to, say, you know, an attorney, the investigative agent, an analyst of some sort, we will generate reports for that, and that software itself generates that report for us.

That software does take all the information on the phone and parses it out in what I like to call "buckets."  So an example is like all the images on your phone, it will put them in a small bucket that is for images.  If you have text

messages, it will put them in a bucket for text messages.

So when you are looking at the software, it's very intuitive to look at, and it shows you everything that -- right up front as to what you're looking at.  Makes it easier for the examiner to analyze and makes it easier for investigators to look at that data.

Q.   And the capabilities you just described --

A.   Yes.

Q.   -- those are the software -- which software's capabilities are you describing?

A.   The software capability I'm describing is the Cellebrite software Physical Analyzer.

Q.   And speaking of Cellebrite, can you tell the jury, what is an artifact in the context of the Cellebrite software?

A.   An artifact is anything that has been identified in the software, and it is its own item.  So if you have a photograph, let's say, of a dog, that is an artifact.  That is one file that was recognized on that -- on that device itself, and it's considered an artifact inside the report.

Q.   Can you give just two more examples of artifacts that may be found within a Cellebrite report.

A.   So you can find anything such as:  Text messages; you can find images; you can find notes; you can find search history; you can find presentations; you can find bookmarks to different -- to different websites and things of that nature.

So there is -- there is a lot of things that you can find on some of the cell phones, because, pretty much, cell phones nowadays are the -- what you would expect me to say, is a small computer in your pocket.

Q.   Did there come a time when you used the Cellebrite software to analyze digital devices in the investigation of this case?

A.   Yes.

Q.   Okay.  Do you recall when you first learned that you were going to be responsible for analyzing digital evidence in this case?

A.   Repeat that for me, sir.  I didn't hear you well.

Q.   Do you remember when you first learned that you were going to be involved in this investigation?

A.   Yes.

Q.   When was that?

A.   That was -- that was when I was -- I don't remember the specific date, but I was called in -- I was called in for the Evidence Response Team, and they had us come in with another coworker, and I was given the chain of custody for these specific devices.

Q.   Where did you report to?

A.   I reported to the -- to the FBI building, the main building for the Miami division.

Q.   And does the CART team have a separate space within the FBI's main building?

A.   Yes.  So I went -- I went down to the ERT area, which is the Evidence Response Team's area.  I took the chain of custody from the special agent that was on the ERT team, and then we transferred that evidence into the CART forensic lab that we have.  And that lab is exclusively for the processing and analyzing of computer digital data.

Q.   Is the CART team's forensic lab considered a secure facility?

A.   Yes.  That facility is secured.  It only has badge access.  There are only two groups of people that can be in that facility.  One is security for, you know, for physical security reasons, and anyone who is a forensic examiner.  Anybody else has to get clearance to go into that area.

Q.   I'm going to show you a couple of items of physical evidence that have already been admitted, beginning with Government's Exhibit 300.

        MR. BROWNE:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MR. BROWNE:

Q.   (Tendering items.)

     Mr. Llanes, do you recognize Government's Exhibit 300?

A.   Yes, I do.

Q.   And how do you recognize it?

A.   Standard procedure makes us label each device with a unique number which we call the QMM number.  Q stands for

questionable, and MM is just the Miami division.  And that label is on there with my initials.

Q.   We're not going to do this for each one --

A.   Okay.

Q.   -- but just for Government's Exhibit 300, can you hold the exhibit up and show the members of the jury where that label is affixed to the exhibit.

A.   Okay.  So on this one, specifically, right here, here is the label (indicating).  I put the case number on it.  We have a B number which identifies this as a -- it's a unique identifier.  I put on here, "no PIN," because there wasn't a PIN on the device.  And then I put that QMM number which has my initials off to the right.

Q.   All right.  You can set that down.

A.   Okay.

Q.   And can you just tell us in general, what type of device is Government's Exhibit 300.

A.   Exhibit 300 is an Android phone from, I believe it's -- this was the -- yes, this was the -- the -- I believe it was called Blu.

Q.   Blu is the brand?

A.   The brand, yes, or the model of the phone, yes.

Q.   Okay.  And that's spelled for the record, B-L-U?

A.   B-L-U; it was just B-L-U.

Q.   All right.  Did you forensically examine that device?

A.   Yes.

Q.   And how did you examine it?

A.   On this specific device, I made sure that it was preserved. We usually put it in just airplane mode to make sure that communication is cut off, remove any SIM cards if there are any.  Then we put it through a battery of tests to see if it's supported.  We have a matrix that will show us what specific phones are supported or not.  In this case, this phone was supported on the Cellebrite Premium device hardware that we have.  And then I got an extraction from that.  After I got an extraction from that and validated that its integrity was -- was -- fit to standard, I then put it through Cellebrite, which makes, also, the same piece of software, and put it through Physical Analyzer.  And then at that point, once that data was parsed, then the output was -- was submitted to a report.  And that report, it was given to the appropriate officials.

Q.   All right.  I am now going to show you Government's Exhibit 301.  Your Honor, may I approach?

        THE COURT:  Yes.

        MR. BROWNE:  Government's Exhibit 301 is in evidence.

BY MR. BROWNE:

Q.   (Tendering item.)

     Mr. Llanes, do you recognize Government's Exhibit 301?

A.   I do, yes.

Q.   And how do you recognize it?

A.   I recognize it by another label that I have placed on it that has my initials on it.

Q.   Did you forensically examine that phone?

A.   Yes, I did.

Q.   And did you examine it more or less in the same way that you just described, using Cellebrite?

A.   Yes.

Q.   I'm now going to show you Government's Exhibit 302.

        MR. BROWNE:  May I approach, Your Honor?

        THE COURT:  Yes.  Is 302 in evidence?

        MR. BROWNE:  It is, Your Honor.

        THE COURT:  Thank you.

BY MR. BROWNE:

Q.   (Tendering item.)

        Mr. Llanes, what is Government's Exhibit 302?

A.   Government's Exhibit 302 is an AT&T; I believe it was called a Calypso 2 phone.

Q.   And did you forensically examine that phone?

A.   I did as well, yes.

Q.   How do you know?

A.   I have my label on here, and I have seen various exhibits derived from this, from my original report.

Q.   I'm now going to show you Government's Exhibits 303 and 304, both of which are in evidence.

A.    Okay.

Q.    (Tendering items.)

Mr. Llanes, do you recognize Government's Exhibits 303 and 304?

A.    Yes, I do.

Q.    And how do you recognize those?

A.    I recognize both because they, of course, have my label on them.  And these specific phones were looked at and a battery of tests were done against them.

Q.    Okay.  You mentioned a battery of tests, but you didn't mention forensically analyze.  Is there a reason why?

A.    Yes, for these specific phones, these phones were not provisioned.  What that means is that when you buy a phone -- I'm sure everybody has seen it, whether it's an Apple phone or an Android phone.  When you first get that phone, you will go through some sort of setup process where it says, "Hello, set up your phone," things like that.  That's the state that these phones were in.  And because those phones were in that state, they don't exactly have an initialized file system on them.  A file system is what the phone uses to obviously maintain your files.  If that doesn't exist, then that -- it makes it very difficult for us to extract that from the phones.  But that's usually a very good indicator that there is no user-generated data on there.

Q.    Is there another term for a phone that has, in layman's

terms, not yet been set up?

A. Yeah. It's -- it's -- it's typically in its factory default setting, if I were to give it a term.

Q. I'm now going to show you Government's Exhibit 305.

MR. BROWNE: This is in evidence, Your Honor. May I approach?

THE COURT: Yes. You can have standing authority to approach for any admitted exhibits.

MR. BROWNE: Thank you, Your Honor.

BY MR. BROWNE:

Q. (Tendering item.)

Okay. Mr. Llanes, do you recognize 305?

A. I do.

Q. And is it fair to say that that phone is a bit different than the other phones that are on the witness stand right now?

A. Yes.

Q. How so?

A. This phone is in the flip-phone style. It does not have one of the more modern operating systems like Android or iPhone. So this phone is -- the procedure for this phone is a little bit different.

Q. Can you describe the procedure and how it was different from the extraction process that you previously described.

A. So this specific phone, when we did a battery of tests, we looked to see if there was some capable software to be able to

extract this phone.  Unfortunately, for this phone, because of -- it's a little bit dated, as you can tell by its mechanism and, you know, it being a flip phone, that specific phone did not have software support.  The last resort that our forensic lab uses to preserve evidence is to take photographs with an approved camera to be able to, you know, provide that as images of what was on the phone.

So in this specific case for this phone, we went through the various screens on the phone, manually, and took photographs of them.  And then that is put into a specific report, and then presented like any other report to any other investigator.

Q.   Mr. Llanes, I'm going to ask you to arrange the items, Government's Exhibits 300 through 305, from left to right in front of you.

A.   Okay.

Q.   Starting with 300 on the left so we can try to keep them straight as we talk about them.

A.   Absolutely, yes.

Q.   Okay.

A.   Okay.  (Complies.)

Q.   All right.  Mr. Llanes, I want to go back to Government's Exhibit 300.

A.   Okay.

Q.   Remind the jury, again, what kind of phone this is.

A.   This was the phone that has the model number Blu. It's -- this was an Android phone, and this phone did not have any security feature on it to get -- be able to get into the phone.

Q.   When you say it's an Android phone, what do you mean by that?

A.   Android is the operating system that is developed by Google, and it's one of the more prominent operating systems for phones that is widely available in the world.

In the U.S. the Apple iOS file system is the more prominent one, but across the world, Android is the more recognized OS for all phones and on the market.  There are a couple other variations, but the more prominent ones are iOS for Apple and Android for Android phones.  But Android is just the operating system for the phone, kind of like Windows is for a Windows machine.

Q.   And we're going to refer to these by their exhibit number which is on the yellow sticker.

A.   Okay.

Q.   But for purposes of this exhibit, Government's Exhibit 300, what is the 1B number associated with Government's Exhibit 300?

A.   The 1B number for 300 is 1B17.

Q.   Great.  All right.  I'm going to show you on your monitor only, with the Court's permission, Government's Exhibit 702, which is not in evidence.

MR. BROWNE:  Your Honor, would it be possible to project this to the witness monitor only?

THE COURT:  Yes.

MR. BROWNE:  Ms. Luce, can you let me know when we have Government's Exhibit 702 on the screen.

THE WITNESS:  Okay.

BY MR. BROWNE:

Q.   Mr. Llanes, can you tell us first what kind of document we're looking at in Government's 702?

A.   This is a Cellebrite extraction report that has been derived from my original report.

Q.   And do you recognize this particular Cellebrite extraction report?

A.   Yes, I do.

Q.   How do you recognize it?

A.   I recognize it because some of the information in the Summary section at the top of this document was specifically filled out by me.

Q.   And does this report show digital evidence that you extracted from Government's Exhibit 300?

A.   Yes, it does.

Q.   And how do you know that you yourself performed the extraction on Government's Exhibit 300?

A.   There are some details here in the device information on this -- on this specific report as it correlates to the device

that I imaged.  One of those is the --

Q.   You don't have to read from the exhibit, sir.  I'm sorry to cut you off.

A.   Okay.

MR. BROWNE:  At this time, Your Honor, I'd ask that Government's Exhibit 702 be admitted into evidence.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  Government's 702 will be admitted without objection.

MR. BROWNE:  Permission to publish?

THE COURT:  Granted.

(Government Exhibit 702 was received in evidence.)

MR. BROWNE:  Can you folks see that?

A JUROR:   (Nods head.)

BY MR. BROWNE:

Q.   All right, Mr. Llanes.  I want to start at the very top --

A.   Okay.

Q.   -- in the table labeled "Summary."  Can you just run through each row, and tell us what each piece of data is in the Summary field.

A.   Okay.  So the first section is just the version for that specific version of the software.  The next one is when I reported -- when I created the report.  The following date is the time zone setting, specifically UTC, which is Universal

Time Code.  That is the time code that is used across the board to be able to generate some of these reports.

Q.  I'm going to stop you there --

A.  Sure.

Q.  -- because we're going to see this term "UTC" quite a bit in the Cellebrite reports; correct?

A.  Yes (nods head).

Q.  Can you explain to the jury what Universal Time Code is and how it differs from, for example, Eastern Standard Time.

A.  So Universal Time Code, as you -- UTC is Universal Time Code, and it's typically used as a -- essentially a time code that we use to make all devices be on one specific time format. This is specifically in the technology world; I'm sure other sciences use Universal Time Code as well.

How it differs from our time code is that there is an offset, so it's -- in having been a system administrator, a lot of, like, big servers and stuff like that, they keep them on Universal Time Code so they can all be on the same exact time frame so they don't have to play with issues like daylight savings and things like that.  That is typically what UTC is used for.

The reason that we use it here is to have a universal time for everything.  If we then need to use it to find out the local time, we will just do the calculation and find out the local time, and in this case it would be minus 4.

Q.   Can you explain in a little bit more detail why that minus 4 is important and why it's reflected on Government's Exhibit 702?

A.   The reason that it's reflected here is because the phone's -- the phone's -- the phone's time code was specifically minus 4.  So it comes out on the report.  The reason that -- the reason that it's important in the report is because you have to use that offset on UTC.

Q.   So if you subtract four --

A.   Yes.

Q.   -- hours from the UTC time --

A.   Yes, you will get the local time.

Q.   And in this case, the local time?

A.   The local time would be 11:00 a.m.?  I want to say 11:00, 11:56 a.m.?

Q.   Are you reading the extraction end date time, or are you reading the report creation time?

A.   No, I'm reading the report creation time.

Q.   Okay.  So --

A.   For the extraction time, that would be -- that would be 11 -- 11:55 p.m.  Or 11:55 a.m. for the extraction start time.

Q.   Okay.  So it's the time minus 4?

A.   Yes.

Q.   The time that's reflected on the report minus 4?

A.   Yes.

Q.   All right.  Keep going in the Summary field.  After UTC value, there is an examiner name.  What is that?

A.   Yes.  MM CART is the designator that we use for -- MM is for the Miami division.  CART is the squad that I'm on.  And JR are just my initials.

Q.   And the location?

A.   Location is Miramar, Florida.  The case number is the unique case number that we use in this case.

Evidence number is the 1B17, which is specific to that item and only that item.  CART is the department that we work for.

And FBI is the -- just the organization.  And that's all hand-typed in by me and not the software.

Q.   Okay.  And now let's go to the Source Extraction field. Can you explain what the significance is of the extraction start and the extraction end.

A.   Specifically for this device, the extraction start time is when I -- when the actual extraction started, when the system was able to gain file system access, meaning that it was able to get into the phone and be able to start copying the data off.  That's what the start -- start time is for.

And then the end time is when it completed that task.  That doesn't mean -- that doesn't -- these times right here does not mean that I was finished with the phone entirely; it just meant that I was able to grab the data for start time and grab the data with its end time.

And you will notice here that it isn't a lot of time between those two times that -- that's because there wasn't a significant amount of data on the phone.

Q.   All right.  So the distinction between the extraction times and the report creation time is what?

A.   The distinction is -- is that the extraction date was the day that I did the extraction.  The report date is the date that a report was created from that extraction.

Q.   Now, I want to take you to, again, in the Source Extraction field, the row that says "Selected Manufacturer."  What is that?

A.   Selected manufacturer says Blu.  And that is just the manufacturer of the phone.

Q.   All right.  And the extraction type.  Can you explain what that means?

A.   So extraction type, specifically it says there Android because it's an Android phone -- file system.  What that means is I was able to get an extraction that consisted of the entire file system.  There are a couple of different types of extractions, but specifically for this one means that I was able to grab every single file that was on that phone.

Q.   Now, there is a number of fields in the Device Information section, but I want to point your attention to first IMEI 1 and IMEI 2.

A.   Okay.

Q.    What are those numbers?

A.    So those numbers, IMEI stands for International Mobile Equipment Identifier.  And that is just a number that is used by the manufacturer.  Every device has a unique number associated with it.  And they use that number to track the device on the network as it moves about in the network.

That specific -- these specific numbers, you will notice that they are exactly the same.  A lot of phones have two slots for IMEIs, but sometimes they will have the two slots but use the same exact number.  But that number is unique to that phone and no other phone.

Q.    And you previously talked about OS, or operating system.

A.    Yes.

Q.    What can you tell about the operating system for Government's Exhibit 300?

A.    The operating system was using Android 12.

Q.    And, finally, I want to direct your attention to the row labeled "MSISDN."  What is that?

A.    MSISDN is Mobile Station International Subscriber Directory Number.  And it's a very fancy name for -- it amounts to your phone number.

Q.    And, in fact, the phone number for Government's Exhibit 300 is what?

A.    Here it says 1-728-206-1801.

Q.    So 728 is the area code?

A.   Yes.

Q.   Got it.  All right.  I want to turn now to page 2 of Government's Exhibit 702.

Tell us what we're looking at here.

A.   So here what we're looking at is -- is based on the context category -- on the Contents category, we're looking at 13 user accounts and 4 wireless network account -- or 4 wireless networks that this specific device connected to.

Q.   Let's start with the user accounts.  You said there are 13 of them, 10 of which are displayed on this page; correct?

A.   Yes.

Q.   All right.  Let's start first with row number 1.  What is the user account identified in that row?

A.   On row number 1?

Q.   Yes.

A.   On row number 1, it just has a source that the account that it was using was the account -- the account that was logged into the phone for something called Google Duo.  Google Duo is like a translation piece of software.  That comes -- it usually comes prepackaged with the phone.

Q.   Translation between two different languages?

A.   Yes.

Q.   Okay.  And what about row number 2?

A.   Row Number 2 is a username for Facebook, and it's one of the accounts that interacted with this phone at some point.

Q.   Okay.  And when you say "the account interacted with the phone," what do you mean by that?

A.   So when you log into -- I'm not talking about a -- when you log in -- let's say, if you logged into your Facebook. That -- that's not what I'm talking about here.  This is an interaction with the operating system of the phone.  So if you went into your phone, you can look at your phone, and there is an Accounts section in there.  If you put your account in there, then other aspects of the phone will open up to you if you have a valid account.

     For this specific entry here, this is a Facebook account that was parsed out by the software saying that a Facebook account was entered into this phone.

Q.   And how does Facebook, if you know, generate usernames?

A.   Usually usernames are generated -- they have their own internal ID that they use, and it's usually like a long number, but the username is typically a derivative of the email address that is used.

Q.   So in row 3, we see a long string of numbers?

A.   Yes.

Q.   Is that typical of the usernames that are generated by Facebook?

A.   By Facebook, yes.

Q.   Okay.  And next in row 4, what is that?

A.   Row 4, this is a username that was used to -- to make use

of the Google calendar.  The username here, do you want me to read it out?

Q.   Yes.  Please read it out slowly so the court reporter can take down all the numbers.

A.   The username here is iamanidiot200010001@gmail.com.

Q.   And what does this report tell you about the interaction between that username and Government's Exhibit 300?

A.   That this -- this specific account is the Google account that was used for this Android device.  Android is made by Google, and typically users will use a Google account to interact with the services that Google provides.  It doesn't have to be a Google account, but in this instance it is.

Q.   All right.  I want to skip all the way down to row 10.

A.   Okay.

Q.   And I want you to explain to the jury, what is the artifact documented in row 10 of Government's Exhibit 702?

A.   This is another entry for some of the Google services that are packaged in with Android.  In this case it's the digital well-being app on the phone.  And since the account with that email address was entered into the phone, that is the account that interacted with the -- that -- that app there, the digital well-being app is what interacted with the phone, with the iamanidiot@gmail.com address.

Q.   And what is the account name -- excuse me -- associated with the iamanidiot@gmail.com email address?

A.   The account name just says John Smith.

MR. BROWNE:  Can we go to the next page of Government's Exhibit 702, please.

BY MR. BROWNE:

Q.   All right.  I now want to zoom in to the cell next to row 11.  Can you tell us what kinds of data are in row 11?

A.   So for row 11, we have the -- the username itself which we have been speaking about.  We have the account name, which is John Smith.  We have a password.  The reason that it looks like that is because when the software parses out passwords, this is what is considered an encrypted password.

An encrypted password is a password that is essentially -- essentially, like, censored so that it has encryption on it so that that data's scrambled, and so that is the way it looks to us.  If this password was not encrypted, it would be in clear text.  We would be able to read the password in plain English, whatever that password might be.

As for the source, these are the accounts that I was talking about earlier, how these accounts are on the phone.  This is not like an account that you have that, like, if you log into, like, a web page.  These are accounts that are actually on the phone themselves.

Q.   And turning now to row 13.

MR. BROWNE:  If we could zoom out, Ms. Luce, and then zoom back in to just cell 13.

BY MR. BROWNE:

Q.   What does this tell you about which accounts were on this phone?

A.   This account here is for a Facebook account.  You can see the Facebook ID that is generated internally at Facebook, and you have an account name of Ryan Routh.  And then --

Q.   I'm sorry.

A.   Uh-huh.

Q.   Let me ask you, what type of account, specifically, is loaded onto this device, Government's Exhibit 300?

A.   Specifically, this is an account that is -- that is used with -- I want to say it -- let me see.  It's with Exhibit 301, because I see the phone number at the bottom which is the IMSI for Exhibit 301.

Q.   Not to confuse things.

A.   Uh-huh.

Q.   Let's go back to page 1 of this particular Cellebrite report 702.  So, to be clear, this Cellebrite report is for Government's Exhibit 300; correct?

A.   Yes.

Q.   Okay.

     MR. BROWNE:  So going back to row 13, Ms. Luce, on page 3, and if we can just zoom into the field that says "phone" at the very bottom.

///

BY MR. BROWNE:

Q. So you're saying that that phone number --

A. Yes.

Q. -- does not connect to Government's Exhibit 300?

A. No. That is the phone number that is associated with -- with the Facebook account.

Q. Okay. And it's also associated, I believe you testified, with another phone in this case?

A. Yes.

Q. Which phone is that?

A. That is Exhibit 301.

Q. Okay. So can you read the phone number that is associated with this Facebook account into the record, please.

A. Yes. 1-808-464-8342.

Q. Do you happen to know where that area code geo-locates to?

A. I believe that is Hawaii.

Q. And we previously looked at the phone number assigned to Government's Exhibit 300?

A. Yes.

Q. And do you recall what the area code for that was?

A. I believe it was 726.

Q. Okay.

MR. BROWNE: Can we go back to page 1, please, and could we go to the MSISDN field.

THE WITNESS: Sorry. 728.

BY MR. BROWNE:

Q.   You were close.

All right.  Let's go back to, one last time, row 13 on page 3.  And, again, the account named associated with the Facebook account on Government's Exhibit 300 is what?

A.   Say that again, sir.

Q.   The account name --

A.   Okay.

Q.   -- associated with the Facebook account --

A.   Okay.

Q.   -- on Government's Exhibit 300 is what?

A.   Is Ryan Routh.

Q.   And the user ID, I believe you already said --

A.   Yes.

Q.   -- that's the number that's generated by whom?

A.   By Facebook themselves.

Q.   All right.  Let's go to the next page.  Can you tell us what we're looking at here in the field titled "wireless networks."

A.   Yes.  These are any -- any time that your phone connects to a wireless network, it is cataloged inside the phone.  And this phone specifically connected to these four wireless networks.

Q.   Can you read the names of the four wireless networks to which this phone connected.

A.   Yes.  The first one is Dos Amigos; two is Corvo; three is

Starbucks Wi-Fi; and number four is McDonald's free Wi-Fi.

Q.   All right.

MR. BROWNE:  I would like to turn now, Ms. Luce, to Government's Exhibit 1119, which was previously admitted.

Permission to publish?

THE COURT:  Granted.

BY MR. BROWNE:

Q.   Okay.  Mr. Llanes, what are we looking at here in Government's Exhibit 1119?

A.   I believe we are looking at a TracFone subscriber information.

Q.   And which phone number does this subscriber information pertain to?

A.   In the first block there, it shows the phone number for Exhibit 300.

Q.   Okay.  And that is the phone number beginning with 728, for the record?

A.   That is correct.

Q.   Okay.  What else can you tell about the user of Government's Exhibit 300 based on this subscriber record from TracFone?

A.   I can tell from the -- from the IMEI is the -- also the IMEI of Exhibit 300.  And, also, that the equipment name is the model of the phone as well.

Q.   And that is the Blu products that you spoke about

previously?

A.   Yes, the very last block at the end.

Q.   And if we were to go back to the Cellebrite report that you generated --

A.   Yes.

Q.   -- and look at the IMEI --

A.   Yes.

Q.   -- it's going to be the same one that is documented in TracFone's records that they maintain; correct?

A.   That is correct.

Q.   Okay.  But is there a name on here, a person's name?

A.   I do not see a name.

     MR. BROWNE:  Go to the next page, Ms. Luce.

BY MR. BROWNE:

Q.   Do you see anything under profile address?

A.   I do not see anything, no.

Q.   Or profile first name or profile last name?

A.   No.

Q.   Okay.  Is that typical in your experience of how TracFone, in particular, maintains subscriber records?

A.   Typically -- typically, you would be required to register your phone with a name.  I -- I'm -- I'm going to think that -- that TracFone doesn't -- doesn't follow that completely.  But if you have carriers like AT&T and some of the other various carriers, they will require a name.  Specifically, for phones

like this, you know, they can be phones where they're, you know, pay-as-you-go-type phones, and in those cases, they might be more lenient on -- on having the registration of a name or address or whatnot.

Q.   And these pay-as-you-go-type plans, are they also referred to, sometimes, as prepaid plans?

A.   Yes.

Q.   All right.  I want to turn back now to Government's Exhibit 702 briefly.

        MR. BROWNE:  If we could go to the second page, please.

BY MR. BROWNE:

Q.   Turning your attention, again, to the email account in row 4, beginning with the words, "iamanidiot."  Do you see that?

A.   I do.

Q.   Okay.  And it has a bunch of numbers after the word "idiot"?

A.   Yes.

Q.   Okay.  I'm showing you, now, Government's Exhibit 1121.

        MR. BROWNE:  Let me confirm, Your Honor, if that's already been admitted.

        THE COURT:  It has been.

        MR. BROWNE:  That is in evidence.  Thank you, Your Honor.  Permission to publish 1121?

        THE COURT:  Granted.

BY MR. BROWNE:

Q.   Okay.  Mr. Llanes, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is a Google -- Google subscriber information.

Q.   And looking at the account name, what is that?

A.   The account name here is showing as just John Smith.

Q.   Okay.  And what email address is associated with that particular account?

A.   We have the iamanidiot@gmail.com.

Q.   Okay.  That's the same email address that we just saw in an artifact from Government's Exhibit 300?

A.   That is correct.

Q.   And it says here under the Services category, there are a number of items there.  Can you just briefly explain what those terms mean and how they apply to Government's Exhibit 300.

A.   So -- so some of the services that are listed on there, these are the services that are in use with that account.  So, like, Gmail, the web and app history, the calendar, logging into the Android phone itself, making use of the YouTube.  Those are all services that are provided by Google where the subscriber information on this page interacted with those Google services.

Q.   Okay.  And is there evidence on Government's Exhibit 300 that that phone interacted with some of the same Google

services?

A.   Let's see here.  Yes.

Q.   Okay.  I want to point your attention now to the table at the very bottom of the page, where it says, "IP activity."  Do you see that?

A.   Yes.

Q.   What is IP activity?

A.   IP activity is anything -- where internet traffic is -- has an address and that you interact with a remote source on the internet.

Q.   Okay.  And what does IP stand for?

A.   IP stands for Internet Protocol.

Q.   Is there any evidence that you have come across in your analysis that this IP address was used to connect to the internet from any of the devices that you examined?

A.   Yes.

Q.   Okay.  What evidence is that?

A.   Exhibit 300.

Q.   Okay.  So there is a connection between the IP address listed here, 174.618.3.4, and Government's Exhibit 300?

A.   Yes.

Q.   And what connection have you discovered during your investigation?

A.   This -- this specific address went to -- or this specific device went to a URL, which is universal resource locator,

which is a fancy name for an address -- went to a website called guns.com.

Q.   All right.  I want to show you now what has not yet been admitted as Government's Exhibit -- that's been marked as Government's 21.

MR. BROWNE:  Your Honor, could we publish that to the witness only?

THE COURT:  Yes.

BY MR. BROWNE:

Q.   All right.  Mr. Llanes, do you recognize on your screen Government's Exhibit 21?

A.   I do.

Q.   What is it?

A.   This is a Cellebrite extraction report that was derived from my report that shows -- that shows -- that shows all the details of Exhibit 300.  Can I see the second page?

Q.   Yes.

MR. BROWNE:  Ms. Luce.

THE WITNESS:  So this is specific to web history of -- of that device.

MR. BROWNE:  Thank you, sir.

At this time, I would ask that Government's Exhibit 21 be moved into evidence, Your Honor.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Government's 21 will be admitted without objection.

(Government Exhibit 21 was received in evidence.)

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  Ms. Luce, could we go to page 2, please, and could we zoom into the URL field.

Can everybody see?

BY MR. BROWNE:

Q.   Mr. Llanes, you previously described a URL, or a fancy term for a website.

A.   Uh-huh.

Q.   Can you explain what we're looking at here.

A.   What you are looking at here in the web history is this specific device pulled up this web page.  So for the title, that's just the title that is given to the page by the creators of the page.  And the URL is the actual address of that web page.

Q.   Do you mind reading the title into the record, please, of the website listed here?

A.   Sure.  It says "Gear Review," and it says "UTG site tool for AK/SKS-style rifles," and then it says "guns.com."

Q.   And you previously indicated that there was a connection --

A.   Yes.

Q.   -- between Government's Exhibit 300 and guns.com; correct?

A.    Yes.

Q.    And what was that connection?

A.    That connection was -- is that, based on the IP address, that that IP address had made a query or an access to this specific website.

Q.    And according to the Cellebrite report that is Government's Exhibit 21, when did that phone access this website?

A.    It was last visited on 9/13/2024.

MR. BROWNE:  Your Honor, I have a number of paper exhibits that I would like to bring up to the witness stand.  I can read them out now with the Court's permission?

THE COURT:  Okay.

MR. BROWNE:  They are, Your Honor, Government's Exhibits 12 through 19, sequential; Government Exhibit 22; Government Exhibit 115; Government Exhibit 119; Government Exhibit 120; Government Exhibit 125; Government Exhibits 127 through 128, sequential; Government Exhibit 135; Government Exhibit 141; Government Exhibit 142; Government Exhibit 149; Government Exhibit 156; Government Exhibit 161; Government Exhibit 200-4; Government Exhibit 200-7; Government Exhibit 200-12; Government Exhibit 200-13; Government Exhibit 200-107; Government Exhibit 318; Government Exhibit 412; Government Exhibit 415; Government Exhibit 428; Government Exhibit 516; Government Exhibit 519; Government Exhibit 600-4; Government Exhibit 600-6; Government

Exhibit 600-9; Government Exhibit 600-12; Government Exhibit 600-14; Government Exhibit 600-17; Government Exhibit 600-18; Government Exhibit 600-21; Government Exhibit 600-23A through 23G, sequential; Government Exhibit 600-24A through 24L, sequential.

THE COURT:  Okay.  I think that's enough for this long segment, unless you're about finished.

MR. BROWNE:  No.  Your Honor, I have several more.  I will get those physical exhibits in an attempt to move them in now.

THE COURT:  Okay.  All right.  I jotted down everything you mentioned, ending with 600-24A through L.

BY MR. BROWNE:

Q.   (Tendering items.)

Mr. Llanes, please take a look at those exhibits, and take your time, and let me know when you are done reviewing them by looking up.

A.   Okay.

Q.   All right.  Mr. Llanes, describe the evidence that you just reviewed, in general.

A.   These are printouts of Cellebrite extraction reports that were derived from my reports that were given to investigators.

Q.   And is every single one of the Cellebrite reports you just reviewed derived from the extractions that you yourself performed?

A.   That is correct.

MR. BROWNE:  Your Honor, at this time I would ask to admit the previously noted exhibits into evidence.

THE COURT:  Mr. Routh, do you need more time to review each of these to determine whether you have any objection?

MR. ROUTH:  I will be generous.  No objection.

THE COURT:  All right, ladies and gentlemen.  We're going to take a five-minute break so Mr. Routh can have additional time to review this lengthy segment, and then we will resume.

All rise for the jury.

(The jury exited the courtroom at 11:39 a.m.)

THE COURT:  All right.  Thank you, sir, you may be excused for the break.  Please don't talk about your testimony and substance with anyone.

THE WITNESS:  Yes, Your Honor.

THE COURT:  I will see you momentarily.

Mr. Routh, do you need me to read back -- everybody may be seated.

Do you need me to read back to you any of the numbers so that you can determine whether you have an objection over the break?

MR. ROUTH:  No.  I have all of the numbers.

THE COURT:  You have?  Okay.  Very well.  We are in a brief five-minute break, and then if you maintain your

no-objection posture, then I will go ahead and admit those so we can move along.  Thank you.

MR. BROWNE:  Your Honor, if I may?  I'm so sorry.

THE COURT:  Yes.

MR. BROWNE:  There are additional exhibits that we are going to introduce in the same fashion.  In order to avoid wasting the jury's time, I can propose those at the end of the break, and we can discuss whether or not there is any objection to those additional exhibits that I was going to read off.

THE COURT:  Okay.  Well, then, why don't we -- why don't you announce those additional exhibits now and then, Mr. Routh, you can take a look at all of these together.

MR. BROWNE:  I will do that, Your Honor.

THE COURT:  The last one I had was 600-24A through L.

MR. BROWNE:  Okay.  The next exhibit from GX300 will be Government's Exhibit 119.

THE COURT:  I had 119 in your prior batch.

MR. BROWNE:  Perfect.  My apologies.

In that case, it's -- the next one would be 600-35, 600-43, 600-47, 600-53, 600-58, 600-60, 600-61, 600-89, 600-97, 600-103, 600-124, 600-132, 600-135, 600-136, 600-137, 600-138, 600-139, 600-140.  And I have ten more.  600-142, 600-148, 600-149, 600-156, 708, 709, 710, 904, and 905.

THE COURT:  Did you hear all of those exhibits, Mr. Routh?

MR. ROUTH:  Yes, Your Honor.

THE COURT:  Okay.  Then we will take a break so you can review, and we will address these exhibits when we get back. Thank you.

(A recess was taken from 11:42 a.m. to 11:49 a.m.)

THE COURT:  Thank you.  You may all be seated.

Mr. Routh, have you had an opportunity to decide whether you object to admission of any of those numerous exhibits?

MR. ROUTH:  They're all satisfactory.

THE COURT:  Okay.  So you're raising no objection; is that correct?

MR. ROUTH:  No objection.

THE COURT:  All right.  Then all of the exhibits referenced by Mr. Browne, both in the presence of the jury before we broke, plus the additional exhibits, will be admitted without any defense objection.

(Government Exhibits 12-19, 22, 115, 119, 120, 125, 127, 128, 135 were received in evidence.)

(Government Exhibits 141, 142, 149, 156, 161, 200-4, 200-7 were received in evidence.)

(Government Exhibits 200-12, 200-107 were received in evidence.)

THE COURT:  I will quickly repeat the numbers. Mr. Browne, please let me know if I miss any.

MR. BROWNE:  Yes, Your Honor.

THE COURT:  12 through 19 sequential.  22, 115, 119, 120, 125, 127, 128, 135, 141, 142, 149, 156, 161, 200-4, 200-7, 200-12, 200-107.

MR. BROWNE:  Your Honor, I apologize.  I had 200-13.

THE COURT:  Mr. Routh, did you have 200-13 in your list?

MR. ROUTH:  Yes, Your Honor.

THE COURT:  Okay.  Do you have any objection to that exhibit, sir?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  200-13 will be admitted as well.

(Government Exhibit 200-13 was received in evidence.)

THE COURT:  We continue.  200-107, 318, 412, 415, 428, 516, 519, 600-4, 600-6, 600-9, 600-12, 600-14, 600-17, 600-18, 600-21, 600-23A through G, 600-24A through L, 600-35, 600-43, 600-47, 600-53, 600-58, 600-60, 600-61, 600-89, 600-97, 600-103, 600-124, 600-132, 600-135, 600-136, 600-137, 600-138, 600-139, 600-140, 600-142, 600-148, 600-149, 600-156. 600 -- excuse me, 708, which I show as already admitted at calendar call.  Is that correct, Mr. Browne?

MR. BROWNE:  708 or 709, Your Honor?

THE COURT:  708.

MR. BROWNE:  It was, Your Honor.

THE COURT:  Okay.  708 was already admitted.  Then we

have 709 admitted today.  710.  Also 904 and 905.

And is that the end of the list, Mr. Browne?

MR. BROWNE:  It is.

(Government Exhibits 200-107, 318, 412, 415, 428, 516, 519, 600-4 were received in evidence.)

(Government Exhibits 600-6, 600-9 600-12, 600-14 were received in evidence.)

(Government Exhibits 600-17, 600-18, 600-21, 600-23A through G were received in evidence.)

(Government Exhibits 600-24A through L, 600-35, 600-43, 600-47, 600-53 were received in evidence.)

(Government Exhibits 600-58, 600-60, 600-61, 600-89, 600-97 were received in evidence.)

(Government Exhibits 600-103, 600-124, 600-132, 600-135, 600-136 were received in evidence.)

(Government Exhibits 600-137, 600-138, 600-139 were received in evidence.)

(Government Exhibits 600-140, 600-142, 600-148, 600-149, 600-156 were received in evidence.)

(Government Exhibits 709, 710, 904, 905 were received in evidence.)

MR. BROWNE:  And just for planning purposes, Your Honor, that is from one device.  I have a much smaller number, I believe, it's only four items, from the next phone, and then two items from the subsequent phone.

THE COURT:  Okay.  But as far as pre-lunch examination, are you going to get past these various exhibits with this witness before lunch?

MR. BROWNE:  No, ma'am.  And, in fact, I'm only going to publish two of those exhibits with this particular witness.  So it should be fast, and I can stop if the Court would like, before going into the exhibits off of the next phone with this witness.

THE COURT:  Yes.  For now, we're just going to handle that segment.

Let's call the jurors in, Officer.  Thank you.

MR. BROWNE:  Can I go back to the lectern, Your Honor?

THE COURT:  Yes.

And please invite the witness back into the courtroom.

You can return to the witness stand, please.

(The jury entered the courtroom at 11:55 a.m.)

THE COURT:  Thank you.  Please have a seat, everybody.

Sir, you remain under oath.

Ladies and gentlemen, the various exhibits that were referenced earlier, along with the series of additional exhibits, were admitted without objection.

So you may proceed, Mr. Browne.

MR. BROWNE:  Thank you, Your Honor.

Ms. Luce, could you please pull up what has now been admitted as Government's Exhibit 135.

Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  Could we go to the second page of that exhibit, please, Ms. Luce.

BY MR. BROWNE:

Q.   All right, Mr. Llanes.  What is Government's Exhibit 135?

A.   This is a Cellebrite extraction report derived from my original report that details a web history.

Q.   Okay.  And what type of web history does this exhibit detail?

A.   These are various searches for items and stuff on the website Craigslist specific to Miami.

Q.   All right.  And how many artifacts are listed on this particular Cellebrite report?

A.   14.

Q.   Okay.  And why are there 14 different artifacts when it appears that the person using this phone only went to one website?

A.   So when -- when you go to a website, at the address bar, depending on how you interact with a web page is what your URL might be.  A good example that I will give you.  If you go to, like, something like that Google Maps or something like that, once you search your initial address and you go to that specific location, if you were to manipulate the page in any way, then you'll have a different address at the top.

So different elements of a web page will essentially change the URL at the top, the address at the top of the page.  That's why you have so many artifacts in here for that specific page, because there were different -- different ways to sort the page, different items, did you sort it by date?  Did you sort it by, you know, seller?  Things of that nature.

So any interaction with the page would essentially change the address at the top.  And that's why we have these 14 artifacts, even though it's for one specific page.

Q.   And the user of Government's Exhibit 300 would have accessed each one of these different artifacts online?

A.   Yes.

Q.   All right.  I want to turn your attention just to row number 9.  What is the title of that artifact?

A.   Number 9 says:  "General for sales," in quotes "'guns,' near West Palm Beach, Florida-Craigslist."

Q.   And what does the URL to the right of that title entry in row 9 tell us?

A.   It tells us that it came from -- it came from the Craigslist website, specific to Miami, in the -- in the area of West Palm Beach.  And the query, which is just another name for the search, was for "guns."

MR. BROWNE:  And could we go to the next page of this, Ms. Luce, which should contain two entries.  At the very top.  Can we just zoom in on Rows 3 and 4.

BY MR. BROWNE:

Q.   And what were those two queries for, Mr. Llanes?

A.   Guns.

Q.   All right.

MR. BROWNE:  Next, if we could pull up Government's Exhibit 17, which was just admitted into evidence.

Permission to publish, Your Honor?

THE COURT:  Granted.

BY MR. BROWNE:

Q.   All right.  What are we looking at here, Mr. Llanes?

A.   We are looking at another Cellebrite extraction report that originally came from my report.  And this is specific to -- can I see the -- can I see the second page, because that's where the artifacts are?

This is a specific image.

Q.   And which phone was this image on?

A.   I believe this was --

MR. BROWNE:  Go back to the first page, Ms. Luce.

THE WITNESS:  Yeah.  I believe this was from Exhibit 300.  Yes.

BY MR. BROWNE:

Q.   Okay.  Now, if we could go to the very last page.  What is this?

A.   It appears to be a rifle.

Q.   Okay.  And is this image, was it stored on Government's

Exhibit 300?

A.   Yes.

MR. BROWNE:   And can we zoom in on the shoes, Ms. Luce. Can we zoom back out and go back to page 2.

BY MR. BROWNE:

Q.   Mr. Llanes, what else can you tell us about the manner in which this particular image was stored on Government's Exhibit 300?

A.   So in the path which is just the location of where the file is at, we see -- we see a very long, verbose line of information there.  But what this tells us is that in the Google apps -- in the Google apps that comes with the phone, specifically, the phone's app, this photo was stored in the cache for that -- for that -- for that application.

Cache is nothing more than a temporary storage for files. So when you search for things on websites and stuff like that, you may not save that picture, but the phone is saving it for you because it needs a way to store that data to then be able to show it to you.  This specific image was stored in the cache of that specific application on this specific phone.

Q.   All right.  And I want to turn your attention now to Government's Exhibit 14, which is in evidence.

MR. BROWNE:   Permission to publish, Your Honor?

THE COURT:   Granted.

///

BY MR. BROWNE:

Q.   Okay.  What is on the screen here, Mr. Llanes?

A.   This is a Cellebrite extraction report derived from my report of an item on Exhibit 300.

Q.   Okay.  And if we could turn to page 2 and to page 3, what types of artifacts are reflected on this exhibit, Government's Exhibit 14?

A.   These were four artifacts, and they were four images.

MR. BROWNE:  Ms. Luce, could you go to the last page of Government's Exhibit 14, please.

BY MR. BROWNE:

Q.   What does that appear to be, Mr. Llanes?

A.   It appears to be a rifle.

MR. BROWNE:  And can we zoom in on the shoes, please.

Your Honor, at this time, my plan was to proceed to Government's Exhibit 301, which is the next phone in the sequence.  I have a number of exhibits to introduce from that phone.  I can proceed, Your Honor, or we can take a break.

THE COURT:  All right.  Ladies and gentlemen, we're going to go just a little bit longer.

So continue, please.

MR. BROWNE:  Thank you, Your Honor.

BY MR. BROWNE:

Q.   Mr. Llanes, I want to turn back to Government's Exhibit 301.  Do you have that in front of you?

A.    Yes.

Q.    Can you remind the jury what that is.

A.    This is an Android phone.  This was a Samsung A32.  It was labeled as, I believe, 1B1, and it was an Android phone that had the -- the area code with 808, which was the Hawaii number.

Q.    Thank you, sir.

A.    Yes.

        MR. BROWNE:  And I would ask, Ms. Luce, if we could put up Government's Exhibit 600-30, which is in evidence.

        Permission to publish, Your Honor?

        THE COURT:  Granted.

        MR. BROWNE:  Can everybody see?

BY MR. BROWNE:

Q.    All right.  Mr. Llanes, what are we looking at here?

A.    This is a Cellebrite extraction report derived from my report for Exhibit 301.

Q.    All right.  And if we could zoom in, Ms. Luce, on the device information table which is the next table down in the field, I -- Mr. Llanes, help me out.  Where do I find the mobile identification number?  Is it under MSISDN?

A.    No.  Can you see what I just typed, what I just scribbled on there?

Q.    Thank you very much.

A.    Yeah.  That is the -- the unique number, the -- essentially, the telephone number for this phone.

Q.   Thank you, sir.  And, again, could you read into the record the phone number associated with Government's Exhibit 301.

A.   Yes.  Area code 808-464-8342.

Q.   And do you recall where you've seen that number before?

A.   Yes.

Q.   Where was that?

A.   That was on Exhibit 301.

MR. BROWNE:  And can we turn back to Government's Exhibit 702 for a moment, Ms. Luce, on page 3.

That exhibit is in evidence, Your Honor.

THE COURT:  Yes, you may.

MR. BROWNE:  If we could zoom in, Ms. Luce, on row 13.

BY MR. BROWNE:

Q.   At the very bottom of the row, Mr. Llanes, do you see what number is there?

A.   Yes.

Q.   And is that phone number associated with a Facebook account?

A.   Yes.

Q.   Is that the phone number we just looked at which is the number assigned to 301?

A.   That is correct.

MR. BROWNE:  And if we could zoom out, Ms. Luce.

BY MR. BROWNE:

Q.   Which Facebook account is that number associated with?

A.   For the account name, it says, "Ryan Routh."

Q.   All right.

MR. BROWNE:  Returning now to Government's Exhibit 600-30 in evidence.  It we could turn to the fourth page of the Cellebrite report.

BY MR. BROWNE:

Q.   Mr. Llanes, what are we looking at here?

A.   We are looking at a screenshot of the various tabs that are stored for a browser.

Q.   All right.  Let's break that down.  What are tabs?

A.   So tabs can be any of the web pages that you have visited, and then you don't close the web page, so it's just stored as a tab.  So you can visit it, go back to it at any point if you wanted to.

Q.   All right.  Let's go one by one, zooming in first on the tab in the upper left-hand corner.

A.   The tab at the upper left-hand corner is -- it doesn't show a web page, but it looks -- it appears to be weather.com.

Q.   Okay.

MR. BROWNE:  And if we could zoom in, Ms. Luce, on the tab in the upper right-hand corner of Government's Exhibit 600-30.

BY MR. BROWNE:

Q.   What does that look like to you, Mr. Llanes?

A.   It looks like a photograph, like a satellite image from

weather.com.

Q.   Okay.

A.   And it -- it shows -- it shows like an area with trees and grass.

Q.   Okay.

MR. BROWNE:  If we could zoom back out, Ms. Luce, and let's focus now on that middle row.

THE WITNESS:  Okay.

BY MR. BROWNE:

Q.   What do those tabs show, Mr. Llanes?

A.   The two tabs, I believe, are for Instagram.  The first one is someone's profile picture.  And on the right-hand side, you have the various messages from specific users.  Also, the user of the account is at the top; that reads, "Ryan Routh campbox."

Q.   Thank you.

MR. BROWNE:  Ms. Luce, can we go zoom back out, and go to the last tab reflected in Government's Exhibit 600-30.

BY MR. BROWNE:

Q.   What does that appear to be, Mr. Llanes?

A.   This used to -- this appears to be from weather.com, and it looks like satellite imagery of what I assume is an airport.

Q.   Okay.

A.   Airplanes at an airport.

Q.   Does that appear to be a live feed from that satellite?

A.   Yes, it does.

MR. BROWNE: And zooming back out, Ms. Luce, and back in to the picture in the upper right-hand corner.

BY MR. BROWNE:

Q. Does that also appear to be a live feed of that satellite image?

A. Yes.

Q. Okay.

MR. BROWNE: I want to turn back to page 2 of Government's Exhibit 600-30, Ms. Luce.

BY MR. BROWNE:

Q. Can you tell us what types of information you can discern about this particular picture based on what's on the screen in front of us.

A. So looking at the path which -- which I explained was where the phone stores this photograph, this photograph was at one point -- it appeared to be a screenshot, but then was trashed.

So if we look at the path, we will see that it's on the Android system, but one of the directories is dot trash, and that is a specific directory for maintaining photos in the trash bin.

Q. And how does a photo or a file end up in the trash bin?

A. Typically, usually it's in the trash because of user interaction. That means that the user will actually take that file and delete it. That doesn't mean it's deleted, but it's sitting in the trash folder. And typically, Android -- unless

the trash is cleared by the user, typically, Android, after 30 days, will get rid of that file.

MR. BROWNE:  I would like to turn now to Government's Exhibit 1118, which is in evidence.

THE COURT:  You may.

MR. BROWNE:  May I publish, Your Honor?

THE COURT:  Yes.

BY MR. BROWNE:

Q.   What kind of document is this, sir?

A.   This is what appears to be T-Mobile subscriber information.

Q.   All right.  And I want to turn your attention to the third row, where it lists the MSISDN number.  Do you see that?

A.   I do.

Q.   And what is the number there?

A.   The number there is 808-464-8342.

Q.   And is that the number associated with Government's Exhibit 301?

A.   That is correct.

Q.   And what is the MSISDN name associated with that telephone number?

A.   It says here, "Ryan Routh."

Q.   I'm now going to show you one, two, three, four paper exhibits which are not yet in evidence.  They are Government's Exhibit 118, Government's Exhibit 600-194, Government Exhibit 600-195, and Government Exhibit 1300.

THE COURT:  You may proceed to show the witness these four exhibits.

BY MR. BROWNE:

Q.   (Tendering items.)

As before, Mr. Llanes, please review those carefully, and look up when you are done.

A.   Okay.

Q.   All right.  Mr. Llanes, do you recognize those exhibits?

A.   I do.

Q.   How do you recognize them, sir?

A.   I recognize them because they are Cellebrite extraction reports that were derived from my reports.

Q.   And in particular, from which device were these Cellebrite reports derived?

A.   These were derived from Exhibit 301.  For Exhibit 118, same here.  Same here.  Yes.  These are all text messages from Exhibit 301.

MR. BROWNE:  Your Honor, at this time, I would ask that Government's Exhibits 118, 600-194, 600-195, and 1300 be admitted into evidence.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  Those four exhibits will be admitted without objection.  That's 118, 600-194, 600-195.

I have a question, Mr. Browne.  The exhibit list ends

the series 600-193.

MR. BROWNE:  Just a moment.

Your Honor, it's possible that this was from the revised exhibit list that we handed up on the first day of trial.

THE COURT:  Okay.  All right.  Well, then, this is a nice place to stop to ensure that everybody is on the same page.  And the food, I think, is probably here already.

So, ladies and gentlemen, enjoy your lunch.  Please make sure you don't discuss this case with anyone or let anyone discuss it with you.  You should conduct no investigation or research or posting about this case in any way.  And maintain zero contact with any of the attorneys, parties, or witnesses in the case.  We will take one hour today, until 1:10.

All rise for the jury.

(The jury exited the courtroom at 12:13 p.m.)

THE COURT:  All right.  Sir, thank you.  We will see you after lunch.  No discussion, like I said, regarding your testimony.

Everybody else may be seated.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  I do see these exhibits on the revised witness list.  Is this filed as an -- as a docket entry, Mr. Browne?

MR. BROWNE:  Not yet, Your Honor.

THE COURT:  Okay.  But this was the revised list provided to Mr. Routh on Monday the 8th?

MR. BROWNE:  Yes, ma'am.

THE COURT:  Okay.  Mr. Routh, do you see those exhibit numbers on your revised witness list?  We're discussing 600-194 and 600-195.

MR. ROUTH:  I do not have it on the list that I have in my hand, no.

THE COURT:  All right.  Ms. Militello, do you have a copy of the revised exhibit list that contains some additional exhibits?

And just to confirm, Mr. Browne, 600-194 and 600-195, were they provided in discovery?

MR. BROWNE:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROUTH:  Yes, we have it.

THE COURT:  Okay.  All right.  And to confirm, you have no objection, sir, to those four exhibits, 118, 600-194, 600-195, and 1300?

MR. ROUTH:  No objection.

THE COURT:  Okay.  All right.  Then I have already admitted those.  They remain admitted.

Anything further before we break for lunch, Mr. Browne?

MR. BROWNE:  No, Your Honor, thank you.

THE COURT:  Mr. Routh.

MR. ROUTH:  No objections.  No problems.

THE COURT:  Anything to raise before lunch?

Legal issues, Mr. Routh?

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Then enjoy your lunch.  We will resume at 1:10.  Thank you.

(A recess was taken from 12:16 p.m. to 1:18 p.m.)

THE COURT:  Please be seated.

Okay.  Anything to address before we continue with the last witness?

MR. BROWNE:  No, Your Honor.  Mr. Llanes is ready.  Should we have him take the stand?

THE COURT:  Yes, please.

Anything from Mr. Routh.

MR. ROUTH:  No, Your Honor.

THE COURT:  Okay.  Let's invite the jurors in, please.

COURT SECURITY OFFICER:  Yes, Your Honor.

(The jury entered the courtroom at 1:19 p.m.)

THE COURT:  Please have a seat.  Sir, you remain under oath.

Before we broke, the Court admitted four exhibits: 118, 600-194, 600-195, and 1300.  These were on the government's revised exhibit list, and those were admitted without objection.

You may continue.

MR. BROWNE:  Thank you, Your Honor.

BY MR. BROWNE:

Q.   All right, Mr. Llanes.  When we left off, I showed you four items from Government's Exhibit 301.  Do you remember that?

A.   Yes, I do.

Q.   Okay.  And remind the members of the jury, which is Government's Exhibit 301.

A.   Exhibit 301 is -- it is an Android phone, and it's -- it's -- its model is A32, Samsung A32.

Q.   And did you previously identify the phone number associated with Government's Exhibit 301?

A.   Yes, I have.

Q.   Okay.  And can you just give us a reminder of what that is?

A.   I believe it was the phone that was with the area code 808, which is -- resides out of Hawaii.

Q.   All right.  I want to show you now what has just been admitted as Government's Exhibit 118.

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

BY MR. BROWNE:

Q.   All right.  Mr. Llanes, can you tell us what we're looking at here in Government's Exhibit 118?

A.   We are looking at a text message originating from Exhibit 301 to a person listed as -- I'm not sure how to pronounce it, but the -- the later portion of the name says

"Chinese hero to fight."

Q.   And who is identified as the owner of Device 301?

A.   The -- the phone number with area code 808, which is Exhibit 301.

Q.   And what is the name associated with that phone number?

A.   Ryan Routh.

Q.   Okay.  And do you see what appears after the "at" symbol immediately after the phone number?

A.   Yes.

Q.   What is that?

A.   It's whatsapp.net.

Q.   And what does that tell you about the text message that we are looking at in Government's Exhibit 118?

A.   This -- the text message originates natively inside of the WhatsApp application.

Q.   Okay.  And what is the WhatsApp application, for the members of the jury that may not be familiar with that?

A.   A WhatsApp application is an application for sending encrypted messages between two parties or a group of people. It's kind of like -- like your regular text messaging from AT&T or whatever subscriber but this one is specific to WhatsApp.

The important thing about this application is that the messages are encrypted end to end, encrypted meaning that only the person that sends it and the person that receives it can see it.

Q.   And on what date was the text message that we're looking at sent?

A.   It was sent on 2/3/2024.

Q.   All right.  And what does that text message say?

A.   The text message says:  "I know it is very difficult.  I think our President Kennedy was killed from someone buried in the hill facing his caravan in Dallas, Texas.  It must be something like this, an underground buried space that cannot be seen or detected.  It is certainly not an easy task.  If I can help, just let me know what to do."

Q.   And again, Mr. Llanes, who sent that text message?

A.   This message was sent from the 808 area code, which is Exhibit 301.

Q.   All right.  I'm now going to turn to what was just admitted as Government's Exhibit 600-194.

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  All right.  And if we could zoom in into the Participants field, please, Ms. Luce.

BY MR. BROWNE:

Q.   All right.  Who are the participants in Government's Exhibit 600-194?

A.   They are listed as Ryan International Volunteer Center, and the other participant is just simply labeled "Ben."

MR. BROWNE:  Okay.  And if we could zoom back out.

BY MR. BROWNE:

Q.   Is this also a text message, Mr. Llanes?

A.   Yes, it is.

Q.   All right.  And beginning with the green bubble, do you see in the upper right-hand corner, what is the difference between the green bubble and the blue bubble that appears in the lower left-hand segment of Government's Exhibit 600-194?

A.   The green bubble, the message is coming from Exhibit 301 to the person that is named Ben, versus the other way which is the opposite.  In the blue -- in the blue text message, we have Ben sending the message to Exhibit 301.

Q.   Okay.  So the sender is using 301, that's going to be in green.

A.   Yes.

Q.   And is that the way that Cellebrite typically presents text messages when there are two participants?

A.   Yes.

Q.   All right.  Beginning with the message sent by the user of Government's Exhibit 301, what does that message say?

A.   The message says:  "What do you think of Trump?"

Q.   And what is the response, according to Government's Exhibit 600-194?

A.   The response is:  "Not a fan."

     MR. BROWNE:  Next page, please.

///

BY MR. BROWNE:

Q.   And what does the user of Government's Exhibit 301 say in response?

A.   "I hate him.  Retarded."

Q.   What is the reply?

A.   "Pretty much."

Q.   And what does the user of Government's Exhibit 301 say next?

A.   "Yes.  Shan't get elected again."

Q.   Turning now to what was just admitted as Government's Exhibit 600-195.

MR.  BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

BY MR.  BROWNE:

Q.   Mr. Llanes, is this the same type of exhibit?

A.   No.  This is back to a message being in WhatsApp.

Q.   And what's the difference?

A.   The difference here is this message is coming from Exhibit 301 to another -- another user called "Captain Talk Recruiting."

Q.   Okay.  But the previous exhibit we just looked at, that was a traditional text message?

A.   Yes.  That was an SMS message, which is a simple message service.  Those are the native messages that are, you know, by your carrier.  These are -- this one that we're looking at here

is a WhatsApp message.

Q.   Are those native messages commonly referred to as text messages?

A.   Yes.  Yes, they are.

Q.   All right.  And, again, who are the participants in this particular WhatsApp messaging exchange?

A.   One is labelled as "Ryan Routh," and the other one is named as "Captain Talk Recruiting."

MR. BROWNE:  And, Ms. Luce, if we could zoom out.

BY MR. BROWNE:

Q.   Mr. Llanes, please read what the user named Ryan Routh texts in the upper right-hand corner of Government's Exhibit 600-195.

A.   It states:  "I think Trump will be a big problem for Ukraine."

Q.   And is the response?

A.   The response is:  "Yeah, Trump seems to cause chaos.  Not what the world needs right now."

Q.   And in reply, what does the user of Government's Exhibit 301 say?

A.   "For sure.  What an idiot."

MR. BROWNE:  If we could zoom out.  Next page.

BY MR. BROWNE:

Q.   And does the user of Government's Exhibit 301 send an additional text message in this exchange?

A.    Yes.

Q.    Can you please read it for the jury.

A.    "He needs to go away.  He canceled the JCPOA for Iran. What a fucking idiot.  I hate him."

Q.    Finally, I'm showing you what has been previously admitted as Government's Exhibit 408.

        MR.  BROWNE:  Permission to publish, Your Honor?

        THE COURT:  Granted.

BY MR.  BROWNE:

Q.    Mr. Llanes, what device is this from?

A.    This is from Exhibit 301.

        MR.  BROWNE:  And if we could go to page 2.

BY MR.  BROWNE:

Q.    What types of artifacts are we looking at in Government's Exhibit 408?

A.    These are two artifacts that were retrieved that the user injected words into Google Translate.

Q.    And what words did the user of Government's Exhibit 301 inject into Google Translate, according to this Cellebrite report?

A.    Would you like me to read it in Spanish?

Q.    You can read it in English, sir.

A.    Okay.

Q.    Just the English part for now.

A.    Okay.  "I will call as soon as I know, so you will have

plenty of time."

Q.   Okay.  And with the Court's permission, Your Honor, Mr. Llanes, are you a Spanish speaker?

A.   I am.

Q.   Are you able to read the search results beginning with the word "Te"?

A.   Yes.

Q.   Okay.

MR. BROWNE:  Your Honor, would that be okay if the witness read that portion of the Google Translate result?

THE COURT:  No.  All translations will be done in English.

MR. BROWNE:  Understood.

BY MR. BROWNE:

Q.   Mr. Llanes, can you read the second artifact in row 2. And, again, is that language that would have been injected by the user of this phone?

A.   "You are awesome.  Thanks so much.  Maybe tomorrow or maybe Monday if I can.  Are you far from Mexico City?"

Q.   I would like to show you now Government's Exhibit 514.

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  I'm sorry.  Can we take that off the screen, please.  Just a moment.

My apologies, Your Honor.

BY MR. BROWNE:

Q.   Mr. Llanes, going back to the physical exhibits in front of you.

A.   Okay.

Q.   Can you please hold up Government's Exhibit 305, which is in evidence.

A.   Yes.  (Complies.)

Q.   All right.  And remind the jury, what is that?

A.   This is a flip phone.  It's a TLC flip phone that was seized along with all of the other items.

Q.   And I believe you told the jury previously that the process for forensically analyzing this phone was a little bit different.  Can you remind us how?

A.   Yes.  So after we did our battery of tests for this specific phone, there wasn't any software that we would be able to use to extract the data from this.  So as -- essentially our last resort is we document everything and we take photographs of the screens.  We manually flip through the screens and photograph them and submit those in the report.

Q.   Did you personally review the photographs that were taken of the screen of Government's Exhibit 305?

A.   No, I did not.

Q.   Okay.  Were you involved in reviewing that phone and projecting those images onto photographs?

A.   Yes.

Q.   Okay.

MR. BROWNE:  Your Honor, at this time I would ask that the following exhibits be projected on the witness monitor only, beginning with Government's Exhibit 514.

THE COURT:  Yes, you can show the witness these exhibits.  Please give us the numbers.

MR. BROWNE:  514 and 515, Your Honor.

THE COURT:  Witness only, please.

BY MR. BROWNE:

Q.   Mr. Llanes, can you see Government's Exhibit 514 and 515?

A.   Yes.

Q.   Are those consistent with the photographs that were taken of the screen of Government's Exhibit 305?

A.   Yes.

Q.   Okay.  And were those, in fact, taken from Government's Exhibit 305?

A.   Yes.

MR. BROWNE:  Your Honor, at this time I would ask that Government's Exhibits 514 and 515 be admitted into evidence.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  514 and 515 will be admitted without objection.

(Government Exhibits 514 and 515 were received in evidence.)

MR. BROWNE:  Permission to publish Government's Exhibit 514, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  Are you able to see that?

THE JURY:  (Head nods.)

BY MR. BROWNE:

Q.   Okay.  Mr. Llanes, what are we looking at in Government's Exhibit 514?

A.   We are looking at a registration of the phone into service. Essentially, a prepaid phone, and activating that phone, that service.

Q.   Is this like an automatically generated text message?

A.   It's an automatically generated text message from the carrier once you set up that account.  It's essentially telling you, your phone, this is your phone number and when your next payment is due.

Q.   Okay.  And according to this automatically generated text message, what is the phone number associated with Government's Exhibit 305?

A.   The phone number is 336-335-9543.

Q.   And where is this text message coming from?

A.   This text message is coming from TracFone.

Q.   And do you recall -- I'm sorry, sir.  Go ahead.

A.   It's coming -- it's coming from the provider, TracFone.

Q.   Do you recall describing for the jury pay-as-you-go type of

plans?

A.    Yes.

Q.    And based on your experience reviewing devices, does TracFone provide that type of pay-as-you-go service?

A.    Yes.

Q.    Okay.  And can you read, beginning with the words, "Welcome to TracFone," this text message into the record.

A.    "Welcome to TracFone.  We are so happy you are with us.  Your phone number is 336-335-9543.  And your next payment is due on April 19, 2024.  Finish setting up your account with my account app.  Visit this URL, at...to get started."

Q.    All right.  And in your experience, is that text message consistent with a pay-as-you-go or prepaid type of phone service?

A.    Yes.

Q.    I want to move now to Government's Exhibit 515, which was just admitted into evidence.  Okay.  And what are we looking at here, sir?

A.    We are looking at another text message.

Q.    And where did that text message come from?

A.    That text message came from 336-337-9339.

Q.    And specifically, the text message that is represented in Government's Exhibit 515, which of the physical items of evidence was that taken from?

A.    That was taken from Exhibit 305.

Q.   Okay.  And can you read the text message at the top of Government's Exhibit 515.

A.   "We came from P-A-J-M beach to see her brother," space "Florida."

Q.   All right.  Returning one last time to the physical devices on the witness stand, can you locate Government's Exhibit 302, please.

A.   Yes.  (Complies.)

Q.   And again, sir, did you personally perform an extraction of that device?

A.   Yes, I did.

Q.   And remind the jury, what kind of device is that?

A.   This is an AT&T Calypso 2 Android phone.

        MR. BROWNE:  Your Honor, at this time I would ask permission to approach the witness with Government's Exhibits 20, 106, 200-8, 319, 405A through 405D, 406 through 407, 516 -- excuse me -- 517 through 518, 600-26, and 906.  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. BROWNE:

Q.   (Tendering items.)

A.   Thank you.

Q.   Mr. Llanes, as before, please review each of those items carefully and look up when you are done.

A.   Okay.

Q.   Mr. Llanes, do you recognize those exhibits?

A.   I do.

Q.   How do you recognize them, sir?

A.   I recognize they have the -- the Cellebrite extraction report that was derived from my original report.

Q.   And these Cellebrite extractions that I just handed you were derived from your extraction of which device?

A.   These here were extracted from Exhibit 30 -- 302.

MR. BROWNE:  Your Honor, at this time I would ask that the exhibits I just identified be admitted into evidence?

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  Okay.  The following exhibits are admitted without objection:  20, 106, 200-8, 319, 405A through D, 406, 407, 517, 518, 600-26, and 906.

(Government Exhibits 20, 106, 200-8, 319, 405A through D were received in evidence.)

(Government Exhibits 406, 407, 517, 518, 600-26, and 906 were received in evidence.)

THE COURT:  You may publish.

MR. BROWNE:  Thank you, Your Honor.

BY MR. BROWNE:

Q.   I would like to begin at the end with Government's Exhibit 906.  Okay.  Mr. Llanes, what are we looking at here?

A.   We are looking at a -- we are looking at a Cellebrite

extraction report that's derived from my original report from Exhibit 302.

Q. And are you able to determine the phone number associated with Government's Exhibit 302 from page 1 of this exhibit?

A. Yes.

Q. What is that phone number, sir?

A. The phone number is 1-743-251-7269.

Q. All right. I want to show you now what's been previously admitted as Government's Exhibit 1117.

MR. BROWNE: Permission to publish, Your Honor?

THE COURT: Yes.

BY MR. BROWNE:

Q. Mr. Llanes, what is this?

A. This is the wireless subscriber information from AT&T.

Q. And for which phone is this subscriber information generated?

A. This is for Exhibit 302.

Q. Okay. And what is the call number according to the AT&T subscriber record you just identified?

A. 743-251-7269.

Q. Is that the same number you just read off the Cellebrite report?

A. That is.

Q. All right. And what is the financial liable party, according to this AT&T subscriber record?

A.   The financial -- oh, it says under contact name, "John White."

Q.   And according to the user information field --

A.   Okay.

Q.   -- what is the username?

A.   The username?  They're both listed as John White.

Q.   And what is the service start date according to the subscriber record?

A.   8/4/2024.

Q.   And what type of payment is indicated on the subscriber record?

A.   It says payment type is prepaid.

Q.   What is the email address associated with the user according to the subscriber record?

A.   It says "no@aol.com."

Q.   And going back to the financial liable party field, do you see the home phone number that was provided by the financial liable party, according to this record?

A.   Yes.

Q.   Does that appear to be a real phone number?

A.   I would say it is not.

Q.   What about the work phone number provided by the user or the subscriber of Government's Exhibit 302; is that a real phone number?

A.   I would also say that is not a real number.

Q.   Okay.

MR.  BROWNE:  I'm going to go back, then, to Government's Exhibit 906.  Turning to page 2 of that exhibit, Ms. Luce, please.

BY MR.  BROWNE:

Q.   What type of artifact is reflected in the Cellebrite report at Government's Exhibit 906?

A.   The artifact is an image.

Q.   Okay.  And what, if anything, can you tell us about that image based on the file path?

A.   The file path is located in these snapshots of the -- of the phone.

Q.   And if we could go to the next page and look at the image itself.  What is that, Mr. Llanes?

A.   This is essentially a landing page for a new setup of setting up your phone with an account.

Q.   And what does it say at the top right under the Google icon?

A.   It says, "Hi, Ryan."

MR.  BROWNE:  Turning now to what was previously admitted as Government's Exhibit 518.

Permission to publish, Your Honor?

THE COURT:  Granted.

BY MR.  BROWNE:

Q.   What is this, Mr. Llanes?

A.   This is a Cellebrite extraction report derived from my original report as it relates to Exhibit 302.

Q.   Okay.  If you look down at the MSISDN row.

MR. BROWNE:  If we could zoom in on that, Ms. Luce.

BY MR. BROWNE:

Q.   Do you see that there are two numbers listed there as MSISDN?

A.   Yes.

Q.   How do you explain that?

A.   A cell phone can have a variety of ways to have phone numbers, so you can have a SIM card that has a phone number attributed to it.  Some cell phones will have two SIM cards. Now the newer technology is something called an eSIM, which replaces a physical SIM card.  It's now just essentially a piece of software inside your phone, and they just attribute a phone number to that eSIM.  So there is a couple mechanisms to have various phone numbers.

Q.   Is it fair to say that you can switch your phone number as easily as just switching a SIM card?

A.   That is correct.

MR. BROWNE:  If we could turn to the next page of this exhibit, Ms. Luce, Government's Exhibit 518.  And the next page.

BY MR. BROWNE:

Q.   What is this item, Mr. Llanes?

A.   This appears to be a text message.

Q.   Okay.  And this is the traditional SMS type of text message that you previously described?

A.   Yes.  Text message, yes.

Q.   All right.  And just describe in general what this text message says.

A.   This text message is a message that you get once you establish your account with AT&T, and they send that kind of pre-generated text message back to you.  And that's what the -- the received messages, the blue -- the blue bubble states.

Q.   And according to the date on the received message in the blue bubble, when was this prepaid account established?

A.   On 3/30/2024.

        MR.  BROWNE:  I ask that we turn now to Government's Exhibit 600-26, which is in evidence.

        Permission to publish, Your Honor?

        THE COURT:  Granted.

BY MR.  BROWNE:

Q.   What are we looking at here, Mr. Llanes?

A.   We are looking at a Cellebrite extraction report derived from my original report for Exhibit 302.

Q.   That's the AT&T phone?

A.   That is the AT&T phone, yes.

        MR.  BROWNE:  If we could turn to the next page.

BY MR. BROWNE:

Q.    What type of artifact is this?

A.    This artifact is an image.

Q.    And what, if anything, can you tell the jury about this image based, again, on the file path?

A.    The file path, this was an image that was in the trash.

        MR. BROWNE:  If we could proceed to the image itself.

        Turning now to Government's Exhibit 517, which is in evidence.  Permission to publish, Your Honor?

        THE COURT:  Granted.

        MR. BROWNE:  If we could go to the second page, please.

BY MR. BROWNE:

Q.    What type of artifact is this, Mr. Llanes?

A.    This artifact is network usages for Exhibit 302.

Q.    Okay.  And what is a network usage in the context of a Cellebrite report?

A.    Network usage is just the -- how much -- how many -- how much amount of data you've used either sending data or receiving data.

Q.    Okay.  And in this network usage table in the second column, do you see where it says "SSID"?

A.    Yes.

Q.    What is that?

A.    An SSID is essentially the name for a wireless network. You probably have a wireless network at your home.  Let's say

if you went to McDonald's, their SSID would be "McDonald's free Wi-Fi."  That's the name of it.  That is what an SSID is.  It's just the name that is broadcast on the Wi-Fi.

Q.   And according to this artifact, what is the name of the wireless network to which this device connected?

A.   "AT&T Royal Palm."

Q.   And what is the date according to this artifact?

A.   3/28/2024.

Q.   And, again, this particular artifact was recovered from which of the physical phones in front of you?

A.   This was recovered from Exhibit 302.  The AT&T Calypso 2 phone.

MR.  BROWNE:  I would like to turn now to Government's Exhibits 405A through D, which are in evidence.

Permission to publish?

THE COURT:  Granted.

MR.  BROWNE:  If we could turn to the second page.

BY MR.  BROWNE:

Q.   Mr. Llanes, what types of artifacts are these?

A.   These -- these artifacts are four images.

Q.   And what, if anything, can you tell about the first three images from their respective file paths?

A.   That they were located in the trash.

MR.  BROWNE:  If we could turn to the next page, please, Ms. Luce.

BY MR. BROWNE:

Q.   What about the fourth artifact at the very top of Government's Exhibit 405A?

A.   This was also located in the trash.

Q.   And where were these artifacts recovered from, Mr. Llanes?

A.   These were -- these were recovered from Exhibit 302.

MR. BROWNE:   And if we could proceed to the images themselves, Ms. Luce.

BY MR. BROWNE:

Q.   I'm showing you now, Mr. Llanes, Government's Exhibit 405A. What is this?

A.   This seems to be a picture that was taken with another device of -- it looks like some -- some flight searches between Miami, MIA, and Mexico.

Q.   And what makes you say that this was a picture taken with another device?

A.   I can see -- I can see a little bit of the background.  But I can see the outer frame of the phone.  And I also see some, like -- I can see some -- because of the way that the camera interacts with another LCD screen, I can see some of the, like, refraction from the light, so I can tell that this is a capture device taking a picture of this specific phone.

Q.   Okay.  You mentioned that -- the way the screen interacts with another LCD screen?

A.   Yes.

Q.   What do you mean by that?

A.   On essentially your screen, liquid crystal display, that's a screen on your phone.  When you use your camera, you can sometimes pick up -- like, you will see the lines in the center of the screen there.  And that's just the artifact that's produced when it goes to capture that image.  That's usually a dead giveaway of a screenshot that you take natively versus taking a picture with another device of a device.  And, of course, the outer border is usually a dead giveaway that that's a picture that we took of another device.

Q.   Is it possible for an LCD screen to reflect an image back to the user of the second device?

A.   Yes.

MR.  BROWNE:  Okay.  I want to turn back to 600-26, please, on the third page.

BY MR.  BROWNE:

Q.   Is that what's happening here?

A.   That is what is happening there, yes.

Q.   Can you describe what you see in the reflection?

A.   I can see someone holding a silver phone.

Q.   And is that the process you just described?

A.   Yes.

MR.  BROWNE:  Turning back to Government's Exhibit 405B, which is in evidence.  Permission to publish?

THE COURT:  Granted.

BY MR. BROWNE:

Q.   What is this, sir?

A.   This is, again, a picture of -- taken with another device of searches from MIA to MEX of flights.

Q.   Do you see a distinctive pattern in the background of the second phone in this image?

A.   It looks like it might be on a blanket or a shirt of some sort.

Q.   Can we go to the next page, please.

A.   Okay.

Q.   And, again, what does this Government's Exhibit 405C appear to show?

A.   Someone holding a phone, and then they took a picture of that phone with some other capturing device.

Q.   And the flights listed --

A.   Yes.

Q.   -- in the lower half --

A.   Uh-huh.

Q.   -- if you could tell us, based on your review of the exhibit, what flights are those?

A.   These appear to be from Miami to Bogotá.

Q.   And the second leg in the lower fourth of Government's Exhibit 405 -- excuse me -- 405C?

A.   It would be from Bogotá to Mexico.

         MR. BROWNE:  And we can go to the last page, please,

Ms. Luce.

BY MR. BROWNE:

Q.   What's this?

A.   Another -- another picture taken with a device of various other flights from Miami to Mexico.

Q.   Two more exhibits, Mr. Llanes.  I would like to turn to Government's Exhibit 319, which is in evidence.

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

MR. BROWNE:  If you could turn to the second page.

BY MR. BROWNE:

Q.   What type of artifact is this?

A.   This artifact is an image.

Q.   Okay.  And what phone did this image come from?

A.   This came from Exhibit 302.

Q.   Okay.  And what, if anything, can you tell us about this image based on the file path?

A.   This image was found in the trash.

MR. BROWNE:  And if we could turn to the image itself on page 3, Ms. Luce.

BY MR. BROWNE:

Q.   Mr. Llanes, what does this image appear to show?

A.   It appears to show a license plate.

Q.   And can you read for the members of the jury the license plate number depicted in this image.

A.    97E EED.

Q.    And which state issued this license plate?

A.    Florida.

Q.    Finally, Mr. Llanes, I want to show you what's been previously admitted as Government's Exhibit 20.

MR. BROWNE:  Permission to publish, Your Honor?

THE COURT:  Granted.

BY MR. BROWNE:

Q.    Mr. Llanes, what type of artifact is this, according to page 2 of GX20?

A.    This artifact is an image.

Q.    And what, if anything, can you tell us about this image (indicating) according to the file path?

A.    It was also found in the trash.

Q.    Does it appear that this image was, in fact, recorded or photographed using Government's Exhibit 302?

A.    Yes.

Q.    How do you know that?

A.    Off to the right in the third column, we have what's called "metadata."  Metadata is essentially when you take a photograph with a device that supports embedding metadata.  You will get things like the model number, what time it was captured, the resolution of that image.  You could sometimes get geographic data or like geo coordinates if you enable that.

So a lot of modern phones or modern smartphones, they will

be able to embed that metadata on there.  And in this specific image, that is the metadata of Exhibit 302.

Q.   The metadata in that third column is consistent with the device itself, in other words?

A.   Yes.

MR. BROWNE:  And if we could proceed to the image itself, Ms. Luce, on page 3 of Government's Exhibit 20.  And if we could zoom in on that black item in the upper third of the image.

BY MR. BROWNE:

Q.   Mr. Llanes, what does that look like to you?

A.   It appears to be a rifle tied to a tree.

MR. BROWNE:  Just a moment, Your Honor.

My apologies, Your Honor.  One additional exhibit.  If we could project it to the witness only.  Government's Exhibit 600-130.

BY MR. BROWNE:

Q.   Mr. Llanes, can you see what's on the screen which has been previously marked but not admitted as Government's Exhibit 600-130?

A.   Yes.

Q.   And what type of artifact is this?

A.   Can --

MR. BROWNE:  Can you go to page 2.

THE WITNESS:  The artifact for this is web history.

BY MR. BROWNE:

Q.   Okay.  And where did this artifact come from?

A.   This artifact came from, I believe, Exhibit 300.

Q.   And is this artifact derived for the extraction that you personally performed of Government's Exhibit 300?

A.   Yes.

     MR. BROWNE:  Your Honor, at this time I would ask that Government's Exhibit 600-130 be moved into evidence.

     THE COURT:  Any objection, Mr. Routh?

     MR. ROUTH:  No objection.

     THE COURT:  600-130 will be admitted without objection.

     (Government Exhibit 600-130 was received in evidence.)

     MR. BROWNE:  Permission to publish, Your Honor?

     THE COURT:  Granted.

BY MR. BROWNE:

Q.   Mr. Llanes, what type of artifact is this?

A.   This is a web history artifact.

Q.   And according to the title, what website did the user of Government's Exhibit 300 visit?

A.   The website is listed as pennlive.com, and the title reads: "Fox News makes tickets available for Trump's town hall in Harrisburg Wednesday," pennlive.com.

     MR. BROWNE:  Nothing further for this witness, Your Honor.  May I retrieve the physical exhibits?

     THE COURT:  Yes, you may.

Okay.  Any cross-examination, Mr. Routh?

MR. ROUTH:  Just one question.

THE COURT:  Okay.  Let's just allow Mr. Browne to collect his items.

MR. BROWNE:  Thank you, Your Honor.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Thank you for your time.  Sorry to take your day.  Just a quick curiosity as to -- how did you unlock the phone, 301?

A.   301 went through a battery of tests where we initially tried to get support for the phone.  After that, that -- that battery of tests that we did was not successful, then we have an in-house application that the FBI develops that we then put it through a process of extracting the phone and then decrypting the PIN off of that.  And once that PIN was deciphered, we were able to put -- we were able to take that PIN, unlock the phone, and continue the rest of the extraction.

Q.   Okay.  Okay.  So it took a little bit of work to break the password?

A.   It took plenty of work.

Q.   All right.

A.   Yeah.

Q.   Sounds good.

A.   Yes.  A very good question.

MR. ROUTH:  All right.  Thank you so much.

THE WITNESS:  You are welcome.

THE COURT:  Any redirect?

MR. BROWNE:  No, Your Honor.

THE COURT:  Okay.  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  We will proceed now to the next witness.

MR. SHIPLEY:  Thank you, Your Honor.  The United States calls FBI Special Agent Adam Goodrich.

THE COURT:  Good afternoon, sir.  Please walk over here.  You will be sworn in now.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please be seated.

State your first and last name, and please spell it for the record.

THE WITNESS:  First name is Christopher.  Goodrich, G-O-O-D-R-I-C-H.

MR. SHIPLEY:  May I proceed, Your Honor?

THE COURT:  Yes.

SPECIAL AGENT CHRISTOPHER GOODRICH,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHIPLEY:

Q.   Okay.  Before we go any further, Agent Goodrich, do you also go by "Adam"?

A.   I do.

Q.   Okay.  Good afternoon.

MR. SHIPLEY:  Good afternoon, members of the jury.

BY MR. SHIPLEY:

Q.   What do you do for a living, Agent Goodrich?

A.   I'm a Special Agent with the FBI.

Q.   Okay.  And what unit are you currently assigned to?

A.   I'm currently assigned to the Cellular Analysis Survey Team or CAST unit.

Q.   And where are you based geographically in the United States?

A.   In Miami.

Q.   Okay.  Is travel an important part of your job, as well, to other locations?

A.   Yes, sir.

Q.   And how long have you been with the FBI?

A.   Just under ten years.

Q.   Okay.  Let me talk about your career before the FBI.

Did you go to college?

A.   I did.  I received a bachelor's from Metropolitan State

College in Denver, and then a master's in public administration from the University of Colorado.

Q.   Okay.  After college, where did you go to work?

A.   I went to work at the Norfolk Police Department in Norfolk, Virginia.  I was a police officer for just under ten years.  Yeah.

Q.   What kind of things did you do with the police department?

A.   So patrol.  I was on the Public Housing Unit.  I was a supervisor.  Worked on K-9.  That was my last assignment.  Kind of enjoyed that a little bit, so...

Q.   And when did you start with the FBI?

A.   June 2016.

Q.   Okay.  And did you do any more studying or academic work before that, or is that when you got your master's?

A.   That's -- I got my masters while I was in the police department --

Q.   Okay.

A.   -- so...

Q.   And what did you do first with the FBI when you joined?

A.   When I joined?  You go to Quantico for six months.  And then after that, I was assigned to Miami, to the Violent Crimes Against Children squad.  I did that for approximately three years.  After that, I was sent to the Violent Crime squad.  I did that for three years.  And then I have been on the CAST unit for three or four years.

Q.   Okay.  What is the -- what is the CAST unit?  We're going to be talking about it a lot today, but can you give the jury an overview now.

A.   So the CAST unit is composed of about 80 agents, give or take, that are specially trained in historic cell site analysis.  And for the laymen, tracking phones in real time and historically so we can tell where the phone is or where the phone was.

Q.   Is that an assignment that you wanted at the time?

A.   Yes.  I did.  It was -- to me, it was very important.  People are attached to their phones.  You can derive a lot of evidence from there.  It's very useful and helpful in most investigations, so -- and also, I would be lying if I didn't tell you my -- my father was one of the original members of the CAST unit.  So he basically started the CAST unit.

Q.   Okay.  All right.  In that assignment, did you receive training in cell phone technology and location tracking?

A.   I did.  So my training started -- I believe in 2018 I took my first CAST basic course.  It's a three-day course -- well, it was three days then.  It's two days now.  You're basically -- you're provided phone records.  You're taught about phone records.  You do a limited amount of analysis.  You learn about which -- you know, how phones work and the phone carriers.

After that, you get through that, you go to an advanced

course.  That's a much longer course.  It's a week long.  It's a deeper dive into the intricacies of each network.  We're actually tested.  They provide us cases.  You're tested at the end of that.  If you get through that, then you go on to what's called our FTX, our Field Training Exercise.  That's a three-day course.  You work one-on-one with an instructor.  They give you a case, whether it be a homicide case, a missing person, a missing child.  Either you can put an X on a map and say, "go here, find the phone," or you can't.  If you can't, then they put you out of the program.

Get through that, then you go to a month-long certification process.  It's broken into two, two-week sessions.  The first week is basically a semester's worth of radiofrequency theory.  We test every day.  At the end, you take a final.

If you get through that week, you go to the second week.  The second week is, they actually bring in network engineers from the big three telephone carriers.  They provide us how their network works.  They also bring in legal compliance people, so -- that actually maintain the records that we look at that we use.  They provide presentation.

After that week, you go into what's basically the last two weeks, and that's kind of our final exam.  They give you a case to work from start to finish.  We actually go out and measure radio -- radiofrequency.  I do a drive test.

At the end of that, we conclude with presenting in court.

So -- and instead of a jury, you have a jury of cell site experts, other CAST agents.  And then the defense attorney is a CAST agent, and your prosecutor is actual a prosecutor.  Get through that, then you can be a CAST agent.  So...

Q.   Have you continued to receive trainings even after you were proved as a CAST agent?

A.   Yes, sir.  We have an annual recertification.  It happens typically the last week of February every year.  It's -- give or take, I have seen it go from three to five days.  That happens every year.  I certified last in this past February.

We also have ongoing training.  Typically, every month we get case-related presentations, et cetera.  And we also have a weekly where we keep up with any type of intricacies that are changing within cellular networks.

Q.   Okay.  Are you at the point in your career where you actually give these trainings yourself?

A.   I do.  I've provided trainings to FBI agents, local law enforcement, and international partners.  So...

Q.   Okay.  You mentioned earlier you were a CAST national asset.  What does that mean?

A.   So I said there were 80 agents nationwide, so -- that do CAST work.  The majority of them do it in a part-time capacity. There is anywhere from 12 to 18 of us that do it full-time.  I do it full-time.  So...

Q.   Okay.  And does that mean you respond to investigations or

potentially testify across the country?

A.   Yes, sir.

Q.   Okay.  And you mentioned -- how many individuals like you are there in the FBI CAST team who do this work full-time?

A.   So, give or take, retirements, we're anywhere from 15 to 18, 20, I believe, that do full-time CAST work.

Q.   Okay.  Just a couple more questions about your background.

Have you received any certifications relating to CAST analysis?

A.   Well, I am a certified CAST agent.  I believe that's the only certification we get, so...

Q.   Okay.  Have you ever testified as an expert witness in a courtroom like this relating to CAST data?

A.   I have.  I believe today is my 41st time.

Q.   Okay.  Throughout the country?

A.   Yes.  Yes, sir.  I even testified just on Friday in the Virgin Islands.

Q.   Okay.

MR. BROWNE:  Your Honor, at this time I would tender the witness as an expert in cell phone location analysis.

THE COURT:  Any objection, Mr. Routh?

MR. ROUTH:  No objection.

THE COURT:  All right.  The witness is so qualified in that field, cell phone location analysis.

MR. SHIPLEY:  Thank you, Your Honor.

BY MR. SHIPLEY:

Q. And just so everybody is clear, Agent Goodrich, sometimes, I will refer to CAST or you refer to CAST. CAST stands for what exactly?

A. Cellular Analysis Survey Team.

Q. Okay. All right. So let's talk about what you actually do as part of this team, and let's start with some basics about cell phones. How does a cell phone work, in a way that we all can understand here?

A. Okay. So as you guys leave the building today, you're going to turn your cell phones on. Your cell phone is going to scan the radiofrequency environment, and it's going to look for -- it's going to do what is called stacking and racking. It's going to look for the cell phone tower and site of the tower that is providing the best signal. When you press send, it's going to connect to the tower, and your going to be able to place a phone call. From there, that is documented in the call detail records. It's a record that's kept in a normal course of business by our -- by the phone company. It's going to give you -- we call it a CDR. It's going to give you some basic information.

Q. Let me stop you there. Let's do this in smaller pieces, if only for my benefit.

A. Okay. Yup.

Q. Cell phone tower. What's a cell phone tower? Is there one

that you have seen around here, for example?

A.    Yeah.   I believe there is one to the west of this building. So a cell phone tower, we don't have -- our phones are not connected by wire, right?  Our phones communicate to this tower by way of radiofrequency.  From there, it is connected to the other side, it's connected to the network, and you're able to place calls and find people with cell phones across the nation and have communication with them.  So...

Q.    Okay.  And let me ask you, what is a cellular network?

A.    So it's just a group of towers that provide coverage and coverage areas by way of radiofrequency to the user.

Q.    Probably familiar to most of us, but what are some of the companies that operate cell towers and cell networks?

A.    So right now in America, we have three major carriers.  We have T-Mobile, AT&T, and Verizon.

Q.    Okay.  Do they operate independently of each other?

A.    Yes, they do.

Q.    Okay.  What does that mean?  Do they have their own separate networks, or how does that happen?

A.    Yes, they generally have their own separate networks. However, they will share space sometimes.  So they will -- let's say AT&T has a cell phone tower, and they placed it up here in downtown Fort Pierce.  They don't want to -- you know, Verizon doesn't want to come through and have to build a tower, that's expensive for them, so they will lease out or rent space

from the other network and vice versa.  And sometimes these towers that -- are erected by independent entities that lease it out to all three.  So it is very common to see Verizon, AT&T, T-Mobile on the same tower.

Q.   Okay.  Do these providers maintain lists and records about where their towers are located?

A.   They do.  These are multibillion-dollar companies.  They want to know where these -- where their equipment is.  One cell phone tower I have heard can range to about $300,000 worth of equipment.  So they want to know where that is and if it needs servicing, they need to know exactly where it is, so they keep what's called a cell tower list.  It's very simple.  They have the name of the tower, latitude, longitude, and the orientation of the antenna that is on that tower.  So at its most simplest form.

Q.   Okay.  So how does a cell phone engage with a cell tower? How does that actually work?

A.   Through radiofrequency.

Q.   Okay.  Now, does a cell phone always select the geographically closest tower, or how does a cell phone pick which tower to connect with of the many?

A.   Like we said, your phone gets on it.  It is -- it's scanning the environment, the radiofrequency environment.  It determines what -- which cell tower and site of the tower, which element on that tower is providing the best signal.

From there, that can be the closest tower.  Typically in most cases, it's the closest tower.  However, there are terrain issues that can cause that to change.  So radiofrequency doesn't like -- can't go through dirt.  So if a tower is on the other side of a mountain, physically the closest tower would be on the other side of that mountain, but if there is one, you know, a couple of miles away that has the best line of sight, that's the tower that the phone is going to connect to.  So...

Q.    Is another factor that might impact which tower a cell phone connects to, buildings, for example, does this play out differently in highly urban areas unlike in the countryside or in an open area?

A.    Yes, sir.  You can't see -- you know, if there is a -- a large building in your way, and on the other side -- you're on the other side of the building and you have direct line of sight to a sector that is clear of obstruction, your phone could, and most likely will, connect to the tower with the best line of sight.

Q.    Okay.  Are some towers more powerful than others, and is that a consideration also?

A.    Yes, some towers are more powerful.  It all depends.  It's network derived.  So how they design their network is on them.  Most -- they're not all equal, if you will.  So if you have a -- for instance, if you have ever traveled across Alligator

Alley, there may be -- they may put one tower up in Alligator Alley like every so often and blast that signal as far as it can go.

But in a highly dense urban area, you're going to have towers pretty close to each other, one, because there is a density and they can't just blast that frequency out.  So...

Q.   Okay.  One more question about the towers.  Can they have overlapping coverage?

A.   Yes.

Q.   What does that mean?

A.   They are designed to have overlapping coverage.  That's because when we get on a phone call, and if they didn't have overlapping coverage, you would just walk from one cell, or one coverage area to another, and it would drop; right?  So they have to have this overlapping feature so that when you go from cell to cell to cell, your phone calls don't drop.  If your phone call drops, you're going to move to AT&T, Verizon, you're going to move to a different carrier.  So...  They pretty much design -- or they do design this overlap.

Q.   Okay.  Do cell phone providers keep records of which towers their phones hit on?

A.   Yes, sir.  That's -- they do this on what's called call detail records.

Q.   Okay.  And are these one of the types of records that you use in your work?

A.   Yes, sir.

Q.   Let's tell the jury a little bit about some of those records.  Call data records or call detail records, what are those?

A.   So call detail records are just like you -- you are used to seeing them.  They're like old paper bills.  It's essentially an Excel spreadsheet that says, hey, at this time, this date, phone number, this phone called this phone on this -- on a -- on a tower and on this side of the tower.  So...

Q.   And do they show what tower a call or a data session is connecting to?

A.   Yes, sir.

Q.   Okay.  Let me ask you -- I introduced a new concept.  We've talked about making cell phone calls.  What's a data session, and how does that play into this?

A.   So when you make a phone call, that's going to be -- a phone or -- a phone call or text message in typical -- that's going to be what they identify in the call detail record.  Now, if you use WhatsApp or you're on the internet, or you're answering emails or Instagram, that's going to be housed on the data session side.  So these are -- they basically bundle up that data, they enter into a -- a data session with the network, and that's what gets logged in a data session or a data report.  So...

Q.   So do these call data records show phone calls?

A.   They don't.  So all we get is, hey, at this date, this time, you entered into a data session.  Depending on the carrier, you will see bytes up, bytes down, so how much information is going up and how much is coming down from the network.  But you won't see phone calls or text messages if they're using WhatsApp or Telegram or anything like that.

Q.   Okay.  Will these records that you receive distinguish between, say, a phone call or a voicemail or different types of cell phone activity?

A.   Yes, they distinguish themselves from phone calls or text messages.

Q.   Okay.  And can you determine the approximate location of a cell phone at a given time using these call data records?

A.   Yes, sir.  So these call detail records, data records, we can provide a general or approximate location.  So this is very broad.  I don't want you guys to get confused and think that this -- I can pinpoint on a map that this phone was specifically in this courtroom or on this block.  I'm going to highlight very broad locations.

     This is not Google -- like everybody is used to pulling their phone out, hitting Google, seeing that little blue dot and saying, all right, I'm right here.  This is not that.  This is very broad-based.  I'm going to be able to tell you that the phone was not in Greensboro, the phone was not in Hawaii.  The phone was utilizing a tower to the south of Trump International

Golf Course.  Right?  So...

Q.    Okay.  And is this called "historical cell site analysis"?

A.    Yes, sir.

Q.    Okay.  And the information about where the cell phone towers are, does the FBI have that information?

A.    Yes, sir.

Q.    And where do you obtain that from?

A.    We obtain that from the carriers.

Q.    Okay.  And the actual call detail records, how does the FBI obtain those?

A.    Through a search warrant.

Q.    Okay.  So this is -- is this information that is just available for the FBI to take and use without a search warrant?

A.    No, sir.

Q.    Okay.

A.    No.

Q.    And in this case, the information that you have analyzed, these records, were they obtained through search warrants obtained from a federal judge?

A.    Yes, sir.

Q.    Okay.  How long do providers keep these type of records? And does it vary?

A.    So it varies.  And it varies on what dataset you have. With T-Mobile, call detail records are maintained, so that's just calls and text messages, that's maintained for two years.

With AT&T, it's three to five years.  So more on the three side.  With Verizon, it's just a year.  So...

Q.   Okay.  And are you able with these kinds of records to determine where a phone was located at every moment of the day, 24/7?

A.   I am not.  So we are very hamstrung on locating the device.  The device -- we have to have a data point.  So it has to be provided from the phone carrier.  So there has to be a phone call, a text message, a data session, entry before -- that I can plot.  So...

Q.   Is it fair to say that the phone has to be in use?

A.   Yes, sir.

Q.   Okay.  In order to generate these type of records?

A.   Yes, sir.

Q.   Okay.  And you touched on this a moment ago, but it's important.  Do these records give us an exact precise location of where a phone is in use at any given moment, or approximate?

A.   It's very approximate.

Q.   Okay.  Let me ask you about another source of information.  Are you familiar with what are called "timing advance records"?

A.   Yes, sir.

Q.   Okay.  Now, what are those?

A.   Those are -- it's an engineering set of records.  It's kept by the phone companies to optimize their network.  It is a reading from the tower to the phone and from the phone back to

the tower.  So radiofrequency travels at the speed of light, or near the speed of light.  It's a fixed speed.  So from that, they can determine a distance.

So basically timing advance provides me the location of the tower, the side of the tower that's being utilized, and then the distance from that tower and gives us a buffer.  So...

Q.   Let me ask you a couple more things about that.  Why do cell phone providers do this?  Why do they send out these kind of timing advance signals?

A.   So it's to optimize your phone.  Your phone has to be provided basically a time slot of when your phone is available to use resources on the network.  So -- and it's very -- it's down to the microsecond, if you will.  It's basically almost like cars getting on the interstate.  So it's saying, hey, you, your phone can use resources at this precise millisecond.  And so on.

They also use it and keep it and maintain it because engineers can look at it and determine holes in their network.  So...

Q.   Okay.  So this is -- these records, fair to say, are kept and maintained and created by the phone companies to maintain their networks, make sure their networks are working?

A.   Yes, sir.  To optimize, or make better, their networks.

Q.   Okay.  Are these also the type of records that you would obtain from providers pursuant to search warrants?

A.   Yes, sir.  When they're available.  Now, we spoke of retention periods.  You spoke of that a little --

Q.   I was going to ask you that specifically.  How do these records differ from those historical cell site records in terms of how long they're kept, how easily investigators can access them from providers?

A.   So these are really short-lived.  Verizon is 7 days, T-Mobile is 30 days, and AT&T is 13 months.  So...

Q.   Okay.  What is the advantage of the timing advance records to an investigator, to an analyst like you?  What do those records allow you to do that maybe the historical records do not?

A.   So with -- we spoke of call detail records and data session records.  The phone has to be operating, like I have to get a phone call, I have to have a text message.  Data sessions, they -- they happen, depending on the carrier, every 15 minutes or every hour.

But with timing advance, they're continual.  So it's -- there is no rhyme or reason on how much data I could get with an hour.  Sometimes you can get five or six entry points in a minute.  But it's not user based.  So it's the network reaching out to the phone and the phone reaching back.  So, with that, we see a lot more data.

Q.   Okay.  Do these timing advance records depend on which tower is geographically closest to the phone?

A.   It doesn't.  So that is another aspect.  In the call detail record, you place a phone call, you are utilizing the best signal, which we have said is typically the closest tower.  Not always, but typically the closest tower that's providing the best signal.

With timing advance, it doesn't have -- it just has to be a useable signal.  So the best signal, the closest tower that doesn't factor into timing advanced.  So you could have a couple towers away, that tower talking to the phone and the phone talking back.  It just has to be a useable signal.

Q.   Okay.  And what do these records, these timing advance records, allow you to do in terms of identifying more precisely where a phone might be in use at any particular moment?

A.   So it gives me a band, and sometimes occasionally the precision gets a little better.  I'm not going to say it's not -- broadly speaking here, you can have simultaneous hits sometimes, and adjoining towers can make what's called an X -- or they will intersect and you can say the phone without question is within that point of intersection.

I have used it numerous times.  If your child goes missing today, that's what I'm going to use to find or locate your child.

I have used it to find phones in fugitives.  Homicide cases.  I found deceased bodies using this stuff.  My unit uses it daily to find and locate people.

Q.    Is this kind of data capable of putting a phone within a very precise geographic distance?

A.    So it's more precise than just call detail records could provide.

Q.    Okay.  And is it fair -- what would you estimate that distance to be in terms of a mile or parts of a mile, how far?

A.    It's hard to explain it without -- until we see it.  We will explain it a little bit later when we actually look at some of my maps, but there is going to be what I call "the hot dog."

So we have the base of the tower.  We will have a sector, so it will look like a pie wedge, and then there is going to be what I call "the hot dog," and that's the distance from the tower.  So I would expect to find the phone anywhere on that hot dog.  That hot dog is typically 78 meters wide.  It can -- the phone can be just under it, just over it, depending -- depending, you know.  So I'm typically used to seeing it within 200 meters of that band.  So...

Q.    Okay.  And we've talked about how long providers keep those kind of records, and you used those records in this case as well?

A.    Yes, sir.

Q.    Okay.  Were you asked to analyze call detail records and timing advance records in connection with this case?

A.    I was.

Q.   Okay.  And who asked you to do that?

A.   The -- the FBI, the case agent.

Q.   That's fine.  We don't need the --

A.   My boss, yeah.

Q.   Okay.  And what kind of information are you -- is that the customary way a project comes to you?

A.   Yes, sir.

Q.   Okay.  What kind of information are you ordinarily given when you start this type of investigation?

A.   Typically, just phone records, time, date, and location of crimes.  Sometimes, like we will see in this, I will be provided other data points such as LPRs, or license plate readers, locations, and time/date of license plate readers.

So it's -- typically, it's very depending on the case what I receive.

Q.   Okay.  Are you expected to know everything about an investigation or a case in order to do your project?

A.   No, sir.  And typically, I don't know.  I don't know everything about the case.

Q.   Okay.

A.   So...

Q.   Is it fair to say you're not familiar with every aspect of this investigation?

A.   No, sir.

Q.   Okay.  All right.  Let me give you a couple of phone

numbers that we've heard about in the evidence.  Did you conduct an analysis for the telephone number 808-464-8342?

A.    Yes, sir.

Q.    Okay.  Is that a T-Mobile phone?

A.    Yes, sir.

Q.    Okay.  And is that a number that you know to be associated with a phone already in evidence as Government Exhibit 301?

A.    Yes, sir.

Q.    Did you also conduct an analysis for the phone number 743-251-7269?

A.    Yes, sir.

Q.    And is that an AT&T phone?

A.    Yes, sir.

Q.    And is that the number associated with a phone in evidence in this case already as Government Exhibit 302?

A.    Yes, sir.

Q.    Okay.  And finally, did you conduct an analysis for the number 728-206-1801?

A.    Yes, sir.

Q.    Who is the provider for that number?

A.    Verizon.

Q.    And is that a number that you know to be associated with the phone admitted here as Government Exhibit 300?

A.    Yes, sir.

Q.    Okay.  And the FBI -- did the FBI obtain all those records

pursuant to search warrants?

A.   Yes, sir.

Q.   Okay.  And are those records -- before coming to court, have you had an opportunity to review the format that these records were presented here in this trial?

A.   Yes, sir.

Q.   Okay.  And are those records contained in what has been already been admitted into evidence as Government Exhibits 1114 for the Verizon phone, 1115 for the T-Mobile phone, and 1116 for the AT&T phone?

A.   Yes, sir.

     MR. SHIPLEY:  And, Your Honor, for the record, those items are all already in evidence, and I believe they were on that thumb drive that was provided earlier.

     THE COURT:  Okay.  Ladies and gentlemen, some of the exhibits are going to be viewable, if you wish, on a thumb drive.  I will go over those logistical details later.

     You may proceed, Counsel.

     MR. SHIPLEY:  Thank you, Your Honor.

BY MR. SHIPLEY:

Q.   And did you have an understanding whether these phones and these phone numbers were associated with the defendant?

A.   Yes, sir.

Q.   Okay.  Now, are you aware from the case agents whether there were any other phone numbers associated with the

defendant?

A.   Yes, sir.

Q.   Well, let me ask you a precise.  Are these the three numbers that you conducted analysis on?

A.   Yes, sir.

Q.   Okay.  So you -- do you have any information as to whether the defendant was or was not using other phones or other numbers as well?

A.   I don't.

Q.   And that -- is that information part of the data we're going to be looking at here this afternoon?

A.   Yes, sir.

Q.   Okay.  By the way, have you ever used your analysis to eliminate an individual from an investigation?

A.   Yes, sir.  I have used it numerous times to eliminate people as suspects.  Also, my -- my unit -- I have never personally done this, but my unit has used analysis to actually remove people from jail, so -- or prison.

Q.   All right.  Now, in this case, did you generate a report with your findings?

A.   I did.

Q.   Okay.  And is that a PowerPoint-style exhibit?

A.   Yes, sir.

Q.   Okay.

          MR. SHIPLEY:  At this time, Your Honor, I would like to

publish to the witness and to the jury first page of Government Exhibit 714, already admitted into evidence.

THE COURT:  One moment.  You may publish.

MR. SHIPLEY:  Okay.  And, Your Honor, obviously guided by the Court's pleasure, I'm now going to start going through the PowerPoint slides with the witness.  I don't know whether -- when the Court wanted to take its break.  I'm happy to proceed, but it might be a moment to do that.

THE COURT:  All right.  Keep going.

MR. SHIPLEY:  Certainly.

BY MR. SHIPLEY:

Q.   Okay.  What do we see?

MR. SHIPLEY:  Members of the jury, do you see this image on your screens?

A JUROR:   (Nods head.)

BY MR. SHIPLEY:

Q.   What do we -- what is this?

A.   So this is just the introductory slide.  It indicates which phone -- phone numbers I did the analysis on, followed by the carrier they're on, and their evidence number.

Q.   Okay.

MR. SHIPLEY:  Okay.  Ms. Luce, can we go to the next page.

BY MR. SHIPLEY:

Q.   Okay.  This introductory page, is this a standard part of

your report?

A.   Yes, sir.  It's just basically a little background.  Who received the phone number from, the phone numbers.  Also a little bit of our methodology.  That we take call detail records, we compare them with known cell site locations.  From that, we can draw on a map and place a broad approximate location of where that phone is.

Q.   Okay.  Let me just highlight a couple of things for the jury.  In paragraph 2, with methodology (indicating), could you read and discuss this portion of the -- of what you wrote.

A.   Yes.  So used in conjunction with CDRs, timing advance, and the list of cell site locations, the location will be used to illustrate an approximate location of where the cell phones interact with the network.

Q.   Okay.  And let me look down the bottom where we see conclusions.  And you write there, "The analysis may not describe or depict all events listed in the call detail records."  What are you talking about?

A.   So there are a lot of records here.  If I remember right, there are over 20,000 records.  If I illustrated every single point there, we would be here well until Christmas, I believe.  So it would take forever to get through that.  So I have to summarize and point what the general trend of the phone is during a specific time.  There are some points where I'm giving you the exact data, time, and point, but there are other slides

that are summary slides that I'm condensing what is going on into a summary of what is going on.

Q.   Okay.  And how do you make decisions about what information you put in a slideshow like this or what information you might summarize?

A.   So it's really what the case dictates.  So if I'm being told, hey, we want to show when was the phone in the general approximate location of the Trump International Golf course. I'm going to summarize that.  We're using timing advance bands. And like we said, I'm getting one or two or three hits a minute.  That would add up if they're there for an extended period of time.

So for this one, I would take something -- like, I would narrow it down just to the cell sites that are the closest, and then I will summarize giving you how many events there are from a time and point or from a -- you know, from one time to another time, and summarize it.  And we'll -- I will highlight that as we go on to the maps.

Q.   Okay.

THE COURT:  Mr. Shipley, quick question.  The location data that is reflected in Government's 714, is that Government's 1114, 1115, and 1116?

MR. SHIPLEY:  Yes, Your Honor.  Those will be the underlying cell phone provider records.  There will be some other information in this slideshow that also has been admitted

in evidence, and I will talk about those in a few moments.

THE COURT:  Okay.

MR. SHIPLEY:  May I proceed?

THE COURT:  Yes.

MR. SHIPLEY:  Okay.  All right.  Can we go to the next slide, Ms. Luce.  Okay.

BY MR. SHIPLEY:

Q.   What are we seeing on this slide, and how do we make this -- make this understandable?

A.   So to the left are just two stock photos of typical micro -- or macro cell phone towers.  So these are your standard three-sided cell phone towers that -- if you don't know what you're looking at there, then you will notice them when you leave here today.  So they're just -- they're not from this case.  They're just stock photos.

On the right, the one that's displayed into three different unique sectors, that's a top-down view of a cell phone tower.  Cell phone towers are typically three sided, divided into three sectors.  They're azimuths.  And the direction that the antenna is pointing, it's network dependent.  And so, there is no rhyme or reason.  It's not every sector 1 is facing north; every sector 2 is facing southeast.  That -- it's very dependent.

There are also other types of towers.  There is what's called an omnidirectional tower.  So that one just propagates out 360 degrees.  There are six-sided towers.  Sometimes there

is just an element in a dead site that has -- just on a building corner, there could be an antenna just used to provide or patch a hole in their network.

Q.   Why don't we go to the next slide.  I think we will see this illustrated even more clearly.  So if you look at the image to the left, the wedge or the pie-shape, what are we seeing there?

A.   So this is that tower, and then we have the pie wedge. Now, that's what I'm going to display on a map.

So when the cell phone companies, they give us -- like I said, they give us the location of the tower, and they give us the azimuth or the centerline that that element or that antenna is facing.  From there, I go 60 degrees one way, 60 degrees the other to make that 120-degree pie wedge that will display on a map.  So the image to the right, that's how it's going to look when we start looking at some of these maps.

So this phone, you can see there is a green -- there is another green dot up here (indicating).  That's an adjoining tower.  So when we look at this, the cell phones are saying that the phone connected to the tower, when it placed a call or text message from this side of the tower, facing this direction (indicating), and I would expect to find the phone anywhere in this general vicinity here (indicating).

So if we can clear that up for me?

Q.   Yes.

A.   There is one thing I have to tell you here.  So this little shaded area down here (indicating), that's just so your eye can fixate on which direction that the element is facing or the antenna is facing.  That's not a coverage area.  That's not us trying to say like, hey, the phone needs to be in this shaded area.  The phone could be anywhere in this general area here (indicating).  And why that is is because I would expect to find the phone about 70 percent into that adjoining tower.  Because we spoke of that overlap.  So that phone -- that coverage area would be where I would look for that phone.  So...

Q.   So if we just -- if we use the image on the right, which is -- this is just a sample image; correct?

A.   Yes, sir.

Q.   Okay.  What's -- what's the physical area, or can you estimate the physical area that's covered by that pie wedge sort of inside of your circle that you've drawn?

A.   And I apologize.  I can't really estimate the -- the area within there.

Q.   Are we talking -- are we talking miles, or do you have to do that by a scale?

A.   Yeah, there would be a scale.  I can't tell how far in or out that is, but that appears to be multiple city blocks.  So I would estimate it at maybe a half a mile there.

Q.   Okay.

A.   So...

Q.   We don't have a scale on this image; correct?

A.   We don't.  But in every other slide there is a scale.  So if you ever have questions or you are wondering how far something is, at the bottom of every one of my maps is a scale.

Q.   Okay.  All right.  And before we start getting into the images you created, the information from this case --

MR. SHIPLEY:  Could we go forward to the next slide.  And clear the screen.

BY MR. SHIPLEY:

Q.   Okay.  We've talked about the difference between historical records and timing advance records.  How can the jury use this slide to better understand that?

A.   So these are timing advance records.  They look similar to the previous slide in that they just have -- we have the location of the tower, we have the sector that's being utilized by the tower, and now we have this distance here (indicating).  So -- and that's provided in the hot dog.  When we see these maps, we will -- I would expect to find the phone within that hot dog boundary there (indicating).

Also, it's -- I would say that you could find it about one band -- one to two bands on the inside and one to two bands on the outside.  So...

Q.   Just so we're all clear, could you circle -- or let me do this.  Let me clear the screen.

Circle the hot -- looking at that illustrative image on the right, circle the hot dog area where you would expect the phone to be, based on your testimony.

A.   So I would -- the data is -- that is being provided to me from T-Mobile is this band here (indicating) that we see highlighted in red.  Just from my knowledge and working phones and locating phones off these records, it's -- I would say it would be -- I would use this as my indicator of where that phone may be (indicating).

Q.   And you mentioned this to the jury earlier.  How long do providers keep these records, and how often are you able to have access to these kind of records with this kind of precision?

A.   So it varies on the carrier.  Verizon is 7 days, AT&T is 13 months, and T-Mobile is 30 days.

Q.   Okay.

MR. SHIPLEY:  Okay.  Can we go to the next slide, Ms. Luce.

A.   So when we see the -- when we see the pie wedge or the timing advance entries, you can also see -- next to it is what I call "the call box."  In that call box, there is certain information.  So highlighted in black there, that is the tower number.

Then we're going to see the timestamp, and that's in local time.  We're going to see what type of activity, so outgoing

voice call or incoming voice call or incoming SMS.  You're going to see the orientation, so that is the degrees off the tower.  So -- or the azimuth that is being provided from the phone carrier, and then you're going to see the other call in the -- the other party in the call.

So from here, you can say that there is an outgoing call to phone number 5501.

Q.   Okay.  Just a question.  Where we see timestamp local time, this is -- what is that referring to?

A.   So records come in UTC from most of the carriers, so you have to do a time conversion.  So...

Q.   Okay.  But is it fair to say that the times we will be seeing on this slideshow, these are local times here in South Florida, or whatever the location is?

A.   Yes, sir.

Q.   Okay.  And one other question.  Where it says "other party to call SMS," does that apply when there is a phone call or when there is a data session when we see that entry?

A.   When there is a phone call.

Q.   Okay.

A.   Or a text message.

Q.   Okay.

MR. SHIPLEY:  Can we go to the next slide, Ms. Luce.

BY MR. SHIPLEY:

Q.   Okay.  Agent, I'm going to now start taking you through

some of the slides based on the evidence in this case.  Why don't you give the jury a broad overview of how to look at these kind of slides.  And we will use this one as an example.

First, up at the top, what does it say?  Could you read that for the jury?

A.   It says:  "Cellular activations for phone number 728-206-1801 on March 28, 2024, at 3:09 p.m."

Q.   Okay.  And that phone number, 1801, that is Government Exhibit 300?

A.   Yes, sir.

Q.   Okay.  What are we looking at here, and what should the jury be inspecting on this image?

A.   So at 301 -- or, I apologize, 309, there was a data session initiated, started utilizing this tower located here (indicating).

Q.   Could you circle that area so the jury may --

A.   Yeah.

Q.   Okay.  Perfect.

A.   So utilizing a tower facing south.  I would expect to find that phone anywhere in the general vicinity that I have circled.

Q.   Let's go through -- on the top right, we see a legend. Let's go through a couple of those entries.

Do you see the legend entry for the Trump International Golf Club southeast corner?

A.    Yes, sir.

Q.    And can you circle where that is depicted on this map.

A.    (Complies.)

And every map I'm going to provide, generally there is a -- there is a legend.  It's color coordinated with the indicator.  It's color coordinated, so Trump International Golf Club is red.

Also, you're going to see numerous red dots.  You see these red dots, you know, throughout this presentation.  Those are unused Verizon towers/their network.  So all these other red towers are the towers that weren't used by the phone.  The one with the pie wedge, that was the tower that was used by the phone.

Q.    Okay.  One more question on the legend.  We see some numbers.  Under Trump International Golf Club, what are those?

A.    That was the latitude, longitude of the area.  That was utilized as the nest, I imagine, by the subject in this case.  So...

Q.    Where did you get that information?

A.    I got that from the case agent.

Q.    Okay.  Let me ask you a couple other things about this slide.  If we go back to the area around the (indicating) cell phone tower there, you see, for example, a blue or purple entry Calypso Bay Waterpark.

Where are these maps coming from, and do those entries have

any significance in our analysis?

A.    So we used Google Maps.  We've -- we can't indicate what is on the map.  So you're going to see throughout this stuff a lot of things that do not have any bearing on the case at all. Calypso Bay Waterpark.  You know, the -- over here, you have the Norton Museum.  So these things have no bearing.  It's just Google Maps in the background.

Q.    Okay.  And in general, is your approach, where there is a location of significance, will that be shown on the legend?

A.    Yes, sir, with a -- with an indicator that color coordinates with the legend.

Q.    Okay.  Okay.  And so if you don't mind, one more time, just take the jury through the information in that box and what that tells us.

A.    So at 3:09 --

Q.    I'm going to clear the screen, Agent, first.

A.    So on March 28, 2024, at 3:09:17 p.m., that phone number ending in 1801 utilized this tower (indicating) located right here.

Q.    And it says "data."  What does that mean?

A.    It was a data session.

Q.    And remind the jury.  A data session could be what?

A.    It's any -- any activity over a phone that's not a -- utilizing phone resources or text messages.  So it could be any internet usage, WhatsApp, anything that your -- Google Maps,

anything where your phone is basically using the internet. So...

Q.   I guess this is a good moment for me to ask you:  What's the difference between these cellular networks and cell phone communications we're talking about and Wi-Fi?

A.   Wi-Fi is radiofrequency that's used to access the internet. Cellular is different in that capacity.

Q.   Okay.  Do the records that you obtained from these cell phone providers, are they of Wi-Fi connections, or are they of cell phone usage?

A.   Cell phone.

Q.   Okay.  So is it fair to say that an individual might use a phone with a Wi-Fi connection, if they did, would that be captured in the data we're talking about?

A.   It would not.

Q.   Okay.  Last question.  Down here (indicating), what do we see the black writing there, the 1,000 meters, 2,000 feet?

A.   That's our legend, so -- or I apologize.  That's our scale.

Q.   Okay.

A.   Sorry.

Q.   We talked earlier when I was showing you the -- the illustration map about figuring out distances.  How would you use that information, that scale, to figure out roughly the distance of that pie slice?

A.   You can eyeball it.  So you can kind of guess -- like you

see there, approximately an inch on my screen is roughly a thousand meters.  So you can scale it out from there.

Q.   Okay.  And it's fair to say, that would give the jury, give us an idea of the geographic area within which that phone would have been used?

A.   Yes, sir.

Q.   Okay.  And does that scale appear on each of the slides we're going to be talking about that show the maps as well?

A.   Yes, sir.

Q.   Okay.

THE COURT:  We will go until 3:00 and then take our break.

MR. SHIPLEY:  That's fine, Your Honor.

Okay.  Okay.  Can we go to the next slide, please, Ms. Luce.

BY MR. SHIPLEY:

Q.   Okay.  All right.  First of all, again, could you start out by -- what's the information on the top of that slide, focusing on the date and the time in particular?

A.   So it's cellular activations for phone number ending in 1801 on March 28, 2024, at 3:19 p.m.

Q.   Okay.  And if I'm remembering, the prior slide had us at 3:09 p.m., so is this the same date?

A.   Yes, sir.

Q.   Okay.  A couple of different things here.  First, let's

start with the legend in the upper right.  Let me start with the ones we have talked about.

Where you see the red dots, remind the jury, what are the red dots?

A.   The red dots are the unused Verizon towers.

Q.   Okay.  And do we see an entry for a Verizon tower where there was a connection?

A.   Yes, sir.

Q.   And could you circle that for the jury?

A.   It's located right here (indicating).

Q.   Okay.  And one more time.  We won't go through this in each instance.  What's the information in that box?  What does that tell us?

A.   So at 3:19:54 p.m., phone number 1801 initiated a data session utilizing that tower.

Q.   Okay.  And do we see the scale of distance right below that?

A.   Yes, sir.

Q.   Okay.  All right.  We see something new here.  And if we go back up to the legend on the right (indicating) -- let me clear where I just put my mark over it.  LP- -- LPR.  What is that?

A.   License plate reader.

Q.   Okay.  And what is a license plate reader?

A.   So it's a -- it's a device that captures your license plate and associates a location and a timestamp and date of where

that -- where that device captured the image of your license plate.

Q.    Okay.  Let me ask you before we start talking in more depth about this:  Did you use these license plate reader records in preparing your analysis?

A.    I did.  I was -- I conducted my analysis.  The LPRs were provided to me later at some point.  And, yeah, I used them as part of my analysis.  So...

Q.    Do you commonly use these type of LPR records in doing this analysis?

A.    Yes, sir.  It helps associating a person with a vehicle, or a phone with a vehicle and, inevitably, a person.

Q.    Okay.  Are you generally familiar with how license plate readers work?  I know this is not your specialty, but could you describe that for the jury, please.

A.    Generally, they will -- they can be third party.  They can be from law enforcement.  They're placed in locations of interest, and they are capturing license plates as they go by.  They associate a tag number with it.  And you have a location, a time and date for the interaction --

Q.    Okay.

A.    -- and a picture.  And most times, they -- they keep and maintain the picture.

So in this instance, we see this is an image from that LPR transaction.

Q.   Okay.  And, again, where did you -- who did you receive these records from?

A.   From the case team.

Q.   Okay.  And did you have an understanding of whether these records were related to the defendant's vehicle?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  For your record -- for the record, Your Honor, and for the members of the jury, the Court has previously admitted these license plate reader records.  They are in Government Exhibit 715 for license plate 97E EED.

THE COURT:  Yes.  715 was admitted without objection.

MR. SHIPLEY:  Government Exhibit 716; those are Motorola LPR data records for 97E EED.

THE COURT:  Same.

MR. SHIPLEY:  Government Exhibit 717 and 718 are Motorola records for the license plate KDL8415.

THE COURT:  That's correct.

MR. SHIPLEY:  And Government Exhibit 719, Motorola LPR data records for plate PKU 3131.

THE COURT:  All right.  719 was also admitted without objection.

MR. SHIPLEY:  Okay.

THE COURT:  Please continue.

MR. SHIPLEY:  Thank you.

BY MR. SHIPLEY:

Q.   Okay.  So let's take a closer look, then, at this -- at this image.  What we see, we see the yellow marker from the legend.  What is that telling us?

A.   That's the location of the LPR.  So...

Q.   Is that where the camera image would have been snapped?

A.   Yes, sir.

Q.   Okay.

        MR. SHIPLEY:  And if we could look more closely at this picture.  Ms. Luce, is there a way to zoom in so we can see more clearly the image of the vehicle and the license plate?  Okay.

BY MR. SHIPLEY:

Q.   What do we see here?

A.   It's an image of a Nissan bearing plate KDL8415 on --

Q.   Can you circle where the license plate, the close-up of the license plate is.

A.   (Complies.)

Q.   Okay.  And "vehicle spotted," what is that information?

A.   It is March 28, 2024, at 4:17:11 p.m.

        MR. SHIPLEY:  Okay.  Ms. Luce, can you zoom back out.

BY MR. SHIPLEY:

Q.   So how does this -- how do you use license plate reader data along with your analysis of the cell phone location records?  And you can talk specifically about this slide.

How do these two -- two things line up, the vehicle image and the pie -- pie wedge?

A.   So this one is at -- the cell phone was utilizing the tower at 3:19:54 p.m.  We also have a LPR at 4:17:11.  So that is almost an hour later.  This is generally saying that the vehicle is in -- on or about Southern Boulevard, and the phone is in West Palm.  So it's basically essentially saying that phone is in West Palm, and the vehicle is on Southern Boulevard.

Q.   Southern Boulevard is a road we're going to talk about a number of times that we go through these slides.  Can you just draw a line along it and tell the jury what number road that is for those who may not know it.

A.   Southern Boulevard.  Sometimes you will probably hear me call it "98" because that's what it's on -- that's how it is listed on the map when you zoom out.

Q.   And is that one of the main east/west arteries in Palm Beach County?

A.   Yes, sir.

Q.   Okay.

          MR. SHIPLEY:  Okay.  Can we do the next slide, Ms. Luce.

BY MR. SHIPLEY:

Q.   Okay.  We've now gone to March 29th.  Is that the next day?

A.   Yes, sir.

Q.   And what's the timestamp on there?

A.   So we have the phone utilizing -- on March 29th, utilizing this tower located here (indicating), at 3:10:42.  And at 2:44, we have an LPR license plate reader hit at 2:44:13.

Q.   Okay.  Is that 3:10 a.m. local Palm Beach County time?

A.   Yes, ma'am -- sir.  Sorry.

Q.   And same thing on the LPR.  Is that local time?

A.   Yes, sir.

Q.   Okay.  So if I'm understanding that correctly, we have the vehicle on the -- we have the phone hitting the cell tower at 3:10, and we also have the vehicle being spotted at 2:44?

A.   Yes, sir.

Q.   Okay. All right.

        MR. SHIPLEY:  Can we do the next slide.  Okay.

        THE WITNESS:  We have cellular activations for phone number ending in 1801 on March 29, 2024, between 2:42 p.m. and 2:43 p.m.

BY MR. SHIPLEY:

Q.   Let me just stop you there, Agent.  So we don't go back and forth, always, between the slides.  This is -- if I could orient you.  Previous slide showed us at 3 -- I'm sorry -- 3:10 in the morning, on March 29th.  And we're now on the afternoon of March 29th, between 2:42 and 2:43; is that correct?

A.   Yes, sir.

Q.   All right.  What are we seeing here?

A.   So we have -- we have phone number ending in 1801 utilizing a tower at 2:42 here (indicating), and at 2:43 here (indicating), and then the LPR at 3:01 here.

Q.   Okay.  Do you have an opinion as to whether the slides we've been looking at show that both this phone, which is Government Exhibit 300, and this vehicle were in Palm Beach County on the date and times reflected here?

A.   Yes, sir.

Q.   Okay.

     MR. SHIPLEY:  Could we go to the next slide.

BY MR. SHIPLEY:

Q.   Okay.  All right.  I think this is the first time we've seen what you spoke of earlier as a summary slide.  Could you remind the jury, what's the difference between this slide and the summary format you use?

A.   So I'm summarizing here, mostly because we have 78 events down here (indicating).  And I'm summarizing that it utilized 78 events between March 28th and April 4th on this tower right here (indicating).  And then we have an incoming call at 2:42 and at 2:43 here (indicating).  It's the general usage of that phone.  So...

Q.   And this is for the period March 28th to April 4th of 2024?

A.   Yes, sir.

Q.   Okay.  And based on this slide, do you have an opinion as to whether this phone was being used in this area of Palm Beach

County during that period, March 28th to April 4th?

A.    Yes, sir.

Q.    Okay.  And was it?

A.    It was being -- the phone was utilizing towers in this vicinity during those -- during that time period.

          MR.  SHIPLEY:  Can we go to the next slide, Ms. Luce.

BY MR.  SHIPLEY:

Q.    Okay.  Let me direct -- do we see the Trump International Golf Club corner depicted on this image?

A.    We do, at the center of the page in the red (indicating) indicator that I just circled.

Q.    Okay.  And let me start on the top.  This shows cellular activations for the phone number corresponding to Government Exhibit 300.  At what time and on which date, what date?

A.    On April 1, 2024, between 11:20 p.m. and 11:21 p.m.

Q.    Is it fair to say this slide is one of the slides -- one of the instances that was captured in that summary that we just saw?

A.    Yes, sir.

Q.    Okay.  So this is sort of a pullout of one of those items?

A.    Yes, sir.

Q.    Okay.  And tell the jury what we're seeing here.

A.    The phone is utilizing a tower to the south of Trump International Golf Club.  It would be my opinion that this tower would service the Trump International Golf Club.

Q.   And what time was this -- these two data sessions happening?

A.   At 11:20:22 p.m. and 11:21:06 p.m.

I should say that this phone could be found anywhere within this general area here (indicating).  So...

Q.   And that's based on the scale that we have at the bottom of the screen?

A.   No.  It's based on my opinion of just looking at the surrounding network.  If I was looking for this phone, and I -- this was the only dataset that I had, that general area is where I would be -- where I would look for the phone.

Q.   Okay.

A.   So...

Q.   Is that something that you and other law enforcement partners do, take this kind of information to actually track where a phone might be physically?

A.   Yes, sir.

Q.   Okay.

THE COURT:  Are you done with this page, Mr. Shipley?

MR. SHIPLEY:  I am, Your Honor.

THE COURT:  Okay.  Then, ladies and gentlemen, we will take our break now.  This will be 20 minutes, until 3:20.

All rise for the jury.

And, sir, please don't talk about your testimony over the break.  Thank you.

(The jury exited the courtroom at 3:03 p.m.)

THE COURT:  Thank you, sir.  You may be excused.

We will be in recess until 3:20.  Thank you.

(A recess was taken from 3:03 p.m. to 3:26 p.m.)

THE COURT:  You may all be seated.  Let's call in the jury.

And your witness as well, please.

MR. SHIPLEY:  May I remain here, Your Honor?

THE COURT:  Yes.

(The jury entered the courtroom at 3:27 p.m.)

THE COURT:  Thank you.  You may all have a seat.

You remain under oath, sir.

Please continue.

MR. SHIPLEY:  Thank you, Your Honor, members of the jury.

Ms. Luce, just to pick up where we left off, can you pull up the slide page 12, please, the slide we had up when we left.

BY MR. SHIPLEY:

Q.   Okay.  And Agent, just to summarize again where we left off, what are the two -- the two landmarks on this slide, what are -- what do they show?

A.   That phone number ending in 1801 utilized a cell phone tower to the south of Trump International Golf Club at -- on April 1, 2024, at or between 11:20 and 11:21.

Q.   Okay.

          MR. SHIPLEY:  All right.  Can we go to the next slide, please.

BY MR. SHIPLEY:

Q.   Okay.  What are we seeing?  So we're now on -- if I'm remembering right, Agent, we saw earlier a summary slide between March 28th and April 4th; correct?

A.   Yes, sir.

Q.   Okay.  And the slide we just saw was a snapshot from within that time period?

A.   Yes, sir.

Q.   Okay.  And is this slideshow we're now onto April 5th?

A.   Yes, sir.  So...

Q.   Okay.  And what are the timestamps on this?

A.   So on April 5th, between 2:05 a.m. and 2:09 a.m., at 2:05, the phone utilized the tower down here (indicating) towards the south.  And then at 2:09, he utilized the tower further north.

Q.   Okay.  And just so the jury can orient itself, does Palm Beach County appear on this map or Palm Beach or West Palm Beach?

A.   Yes, sir.  I believe this is Jupiter, Juno Beach, Juno Ridge.  So we have Juno Ridge here, Juno Beach here (indicating) and Jupiter -- or Jupiter right there (indicating).

Q.   Okay.  West Palm Beach, would that be off the bottom of

this map?

A.   Yes, sir.

Q.   Okay.  Does -- do you have an opinion, based on the information we see on this slide, as to whether that phone was moving north in this period?

A.   Yes, sir.

Q.   And is that -- the location of those two towers, does that roughly track along I-95?

A.   Yes, sir.

Q.   Okay.

     MR.  SHIPLEY:  Okay.  All right.  Could we do the next slide, Ms. Luce.

BY MR.  SHIPLEY:

Q.   Okay.  Here, have we gone ahead about six hours?

A.   We have.  So this is April 5, 2024, at 8:05 a.m.  He is utilizing a tower here (indicating) in the -- at 8:05 a.m., utilizing this tower here.  This is in the general vicinity of the Georgia-Florida line.

Q.   Okay.  So we got the Florida-Georgia line down there?

A.   Yes, sir.  Along the I-95 corridor.

Q.   Okay.  Is this consistent with the phone still heading north on April 5th?

A.   Yes, sir.

Q.   Okay.  All right.

     MR.  SHIPLEY:  Ms. Luce, next slide, please.

BY MR. SHIPLEY:

Q. And does this slide move us forward another six hours, roughly?

A. Yes, sir.

Q. Still on April 5th?

A. On April 5th at 2:05:00 p.m., utilizing a cell phone tower here (indicating) that is to the west of the Georgia-South Carolina line here (indicating).  Along the I-95 corridor.

Q. Okay.  And again --

THE COURT:  Mr. Shipley, does this exhibit have page numbers?

MR. SHIPLEY:  It does, Your Honor.  This would be page number 15, I believe.

THE COURT:  Okay.  Please reference the page numbers when you are flipping through the slides.

MR. SHIPLEY:  I would be happy to do that, Your Honor. There are a couple of instances where I'm going to jump to different page numbers, so it won't be strictly in order.  I will be happy to do that, though.

BY MR. SHIPLEY:

Q. Okay.  All right.  So is this slide consistent with the two previous slides showing the phone moving north along the I-95 corridor?

A. Yes, sir.

Q.   Okay.  All right.  Now, do we have any data for this particular phone, this is the Government Exhibit 300, 1801, for April 5th -- the rest of April 5th or April 6th?

A.   We do not.

Q.   Okay.

MR. SHIPLEY:  Can we do the next slide, Ms. Luce?

This will be page 16, Your Honor.

THE COURT:  Of 714?

MR. SHIPLEY:  Yes.

THE COURT:  Government Exhibit 714?  Okay.

MR. SHIPLEY:  Yes.

THE COURT:  Thank you.

MR. SHIPLEY:  I understand.  For the record, I will make sure I do that so we have that for record purposes.

BY MR. SHIPLEY:

Q.   Okay.  What are we seeing here?

A.   Cellular activations for phone number 1801 on April 7, 2024, at 10:09 a.m.  The phone is utilizing a tower in the vicinity of the Atlanta International Airport.

Q.   Okay.  Now, you mentioned a moment ago you didn't have any data for this phone for the balance of April 5th or April 6th.

A.   Correct.

Q.   Is this the next data point that you had for that phone?

A.   Yes, sir.

Q.   Okay.  And that's the Atlanta airport; correct?

A.   Yes, sir.

Q.   Okay.  Let me ask you something.  During this time period, we've -- your analysis has focused on three phones.  We've talked about 1801 phone, which is Verizon.  Did you have any data for this time period, late March, early April of 2024, for the T-Mobile phone, that's the phone number ending in 8342, Government Exhibit 301?

A.   I did.

Q.   And what did that data show you?

A.   It was mostly inbound traffic that was going -- being sent to voicemail.  And it was geo-locating to the Greater Greensboro, North Carolina location.

Q.   Okay.  Did you have any data showing that phone, the Government Exhibit 301, in Palm Beach County or South Florida at all?

A.   I did not.

Q.   Did it remain -- all the data that you reviewed, where did it have the phone?

A.   In North Carolina.  In the -- around the Greater Greensboro area.

Q.   Okay.  And just so we're clear, the third phone in your analysis, the AT&T phone, Government Exhibit 302, ending in 7269, did you have any data for that phone in this time period, late March, early April?

A.   No, sir.

Q.   Okay.

MR. SHIPLEY:  All right.  Next slide, please.

BY MR. SHIPLEY:

Q.   This is page 17 -- this is later, or depending on the time zone, this is also on April 7th?

A.   Yes, sir.

Q.   And where do -- where do we see this phone, based on the information you have collected here?

A.   On April 7th at 1:28 p.m., the phone was in the general vicinity of the Honolulu International Airport in Hawaii.

Q.   Okay.  And is that consistent -- having looked at the previous slide, is that consistent with that phone having traveled basically by plane from Atlanta to Honolulu?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Okay.  Next slide, please.

BY MR. SHIPLEY:

Q.   All right.  Now we're going to transition to a different time period, different phone number.  So could you read the jury the information on the top.  This is page 18.

A.   So this is cellular activations for phone number 808-464-8342 on July 28, 2024, at 2:40 p.m.  As we see here, the phone is utilizing a tower here in the Greater Greensboro area (indicating), at -- on July 28th at 2:40 p.m.

Q.   Okay.  And is -- just for the record, this is -- this phone

number ending in 8342, this is the T-Mobile phone associated with Government Exhibit 301; correct?

A.  Yes, sir.

Q.  Okay.  And I don't think it actually says "Greensboro" anywhere on here.  How do you know this is the Greensboro, North Carolina, area?

A.  (Indicating.)  Well, it says "Greensboro urban loop" right there.  Also, I made the map; I remember where it was.  If you zoom out a little bit, Greensboro would be on there.

Q.  Okay.

A.  And I know I-40 to run the intersection of North Carolina.

Q.  Okay.  We've seen a shift now, by the way, in the dots showing the tower location to green.  Why is that?

A.  So the T-Mobile phone, I will color coordinate with the color green.  So when you see a green phone number, that's the T-Mobile phone in this presentation.  And so I color coordinated the T-Mobile cell phone towers as green.

MR. SHIPLEY:  Okay.  All right.  Ms. Luce, next slide, please.

BY MR. SHIPLEY:

Q.  This is page 19.  And can you tell the jury what we are seeing here?

A.  So this is summary cellular activations for phone number ending in 8342.  And the new AT&T phone number 743-251-7269 on August 14, 2024.  So this is a little different.  This is a

summary slide.  All these red dots are towers that were used during this time period by both -- by both the green T-Mobile phone, 8342, and the AT&T phone, 7269.

It's basically just showing travel from Greensboro on August 14th at approximately 8:19 a.m. to the Florida border at 3:25 p.m.  And then to West Palm on -- at 8:15 p.m.

Q.   And so we're tracking this -- these two phone numbers.  The green phone number, that's Government Exhibit 301, the T-Mobile?

A.   Yes, sir.

Q.   And this 743-251-7269, is that an AT&T phone?

A.   Yes, sir.

Q.   Government Exhibit 302?

A.   Yes, sir.  And during this time -- during this time period, these two phones were -- in my opinion, were traveling together.

Q.   I was going to ask you.  We're going to see a number of slides ahead where we see data for both of these phones.  In general, what is that reflecting?

A.   That the phones were together.

Q.   Okay.  All right.  So we go from Greensboro, North Carolina, at 8:19 in the morning, and basically pretty much a straight shot down to West Palm Beach that evening on August 14th?

A.   Yes, sir.

Q.   Okay.  Do you have any idea what that distance is?

A.   I apologize.  I don't.  Sorry.

Q.   If we looked at the scale down at the bottom below the entry for West Palm Beach and you sort of extracted back, is that approximately 800, 900 miles?

A.   Yes, sir.  I would say.

Q.   Okay.  Okay.  So this box here (indicating), this tells us what specifically about where these phones were by 8:15 p.m. on August 14th?

A.   8:15, the phones were in the general vicinity of West Palm.  So... or in West Palm.

        MR. SHIPLEY:  Okay.  Okay.  Next slide, please.

BY MR. SHIPLEY:

Q.   All right.  Now, the slide that we just saw --

        MR. SHIPLEY:  This is page 20, for the record.

BY MR. SHIPLEY:

Q.   Page 19 had us -- had the -- the phone -- those two phones arriving at 8:15 p.m. in West Palm Beach; correct?

A.   Yes, sir.

Q.   Okay.  What is the time entry on the top of this slide on page 20?

A.   So this is the next day in the very early morning hours of 2:25 p.m.  I have phone number --

Q.   2:25 a.m. or p.m.?

A.   I'm sorry.  A.m.  2:25 a.m.  I have phone number ending in

8342 in the general vicinity utilizing a tower to the south of the Trump International.  That's, once again, indicated with the red indicator there (indicating) at 2:55.  Connected to a tower just to the south here (indicating).

Q.   Okay.  So it's fair to say, based on this slide, page 20, with what we just saw on page 19, that within no more than six hours, this phone had moved -- gotten to West Palm Beach and went, at 2:25 in the morning, to the edge of the golf course?

A.   Yes, sir.

Q.   And roughly what area, based on the scale you have at the bottom and your training and experience, what is the area that phone would have been within based on that pie wedge?

A.   Like I said, with this stuff, it's very general.  It's broad-based with this type of record, so I would expect that phone to be anywhere in this general vicinity (indicating) here.  Including Southern Boulevard.

Q.   Okay.  And just so we're clear again, that icon, that corresponds to specific coordinates?

A.   Yes, sir.

Q.   What kind of coordinates are they?

A.   Latitude, longitude coordinates that were provided to me from the case team.

Q.   Okay.  All right.  So this is August 15th at 2:25 in the morning.

          MR.  SHIPLEY:  Can we go to the next slide, please.

BY MR. SHIPLEY:

Q.   This is page 21.

Okay.  What time are we looking at -- what date and time are we looking at here?

A.   So we have activations for the AT&T phone number ending in 7269 on August 16, 2024, between 4:30 a.m. and 4:54 a.m.  So this is a data session.  AT&T provides data sessions just like the other carriers; however, AT&T differs a little bit in that they will give us what's called handovers.  So when you get on a phone call, and I drive from here to Miami tonight, hopefully, I get to -- my AT&T phone will indicate which towers I use during that data session.

So I start a data session right here at 4:30 (indicating). This phone was traveling, in my opinion, from east to west, utilizing handoff towers here at 4:45 a.m. and here at 4:54 a.m.  So these are very good at showing travel, if you will.

Now, a handover is a little different than the beginning of a start of a data session.  So at the start, your phone is selecting off that best signal principle.  With handovers, it's network derived, so the network is moving that phone along the way.  It just has to be a useable signal, okay?

So these handoff -- handovers can be looked upon a little differently in that -- that area, that broad area that we were speaking of, gets a little bit larger.  All right?  So...

Q.   And we also have some -- an LPR image here as well; correct?

A.   Yes, sir.  So we have an LPR here at the yellow indicator, towards the left side of the page, at 4:52:54 a.m. on August 16, 2024.

        MR.  SHIPLEY:  Ms. Luce, it's pretty dark in the image we have on the small -- is there a way to zoom in on the license plate image?

BY MR.  SHIPLEY:

Q.   And, Agent, can you appear -- can you see --

        MR.  SHIPLEY:  Ms. Luce, can we zoom in a little more on that?  I'm not sure that makes it better.

BY MR.  SHIPLEY:

Q.   Can you make out any of the numbers and letters on that?

A.   I can -- I think the last numbers are --

Q.   Let me clear the screen.  Hang on one second, Agent.
     There you go.

A.   I know the first letter is P, and the last four are 3131.

Q.   Okay.  Thank you.

        MR.  SHIPLEY:  Can you zoom back out.

BY MR.  SHIPLEY:

Q.   And is the location of that LPR image consistent with what you testified earlier about the phone appearing to be moving east to west?

A.   Yes.  So if we have -- we have a handover here at 4:45.  We

have an LPR at the yellow indicator at 4:52.  And then we have a tower usage here at 4:54 a.m., showing travel from east to west along the Southern Boulevard corridor.

Q.   In general, throughout your examination of the data, were the LPR images and the LPR data you received consistent with the information that you received from the cell phone providers?

A.   Yes, sir.

Q.   In the way that we see on this slide?

A.   Yes, sir.  Some even better.  Eventually we're going to get to a timing advance that is very close to the LPR intersections.

Q.   Okay.  Last question on this slide.  What -- just so we orient ourselves.  The first tower hit, that's over here (indicating)?

A.   Yes, sir.

Q.   The first -- I'm sorry -- the first in time reflected on this slide?

A.   Yes, sir.  And that is located right here (indicating). And that's at 4:30.

Q.   4:30 a.m.?

A.   a.m., yes, sir.

Q.   Okay.  And could you circle the southeast corner of the golf course.

A.   It is right here (indicating) with this red indicator.

Q.   Okay.

MR. SHIPLEY:  All right.  Ms. Luce, can we do the next slide, please.  This will be page 22.

BY MR. SHIPLEY:

Q.   And now we are on August 16th.  We've gone from the previous slide which shows roughly 4:30 to 5:00 in the morning. We're now looking at -- are we looking at between 12:30 -- roughly around 12:30 in the afternoon that same day?

A.   Right.  Yes, sir.  So we have activity for the AT&T phone and the T-Mobile phone on August 16, 2024, between 12:32 and 12:38 p.m.

We have the AT&T phone utilizing a tower right here (indicating) towards the 20-mile bend at 12:32.  Then we have an LPR at 12:37, right here (indicating) with the yellow indicator.  And then we have 12:38, right here (indicating). So...

Q.   And in general, based on your having prepared these maps, does this show the vehicle moving -- well, could be moving east or west -- let me rephrase the question -- in the western part of Palm Beach County?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  And, Ms. Luce, maybe we can zoom in.  Do we have a clearer view in this slide of the license plate on that Xterra?

BY MR. SHIPLEY:

Q.   Can you read that any more than you could before, Agent?

A.   It's a little obstructed.  But I see P.  It appears to be a U.  And then 3131.

MR. SHIPLEY:  Can we go to the next slide, Ms. Luce.

BY MR. SHIPLEY:

Q.   Okay.  And does this slide depict about 45 minutes after that?

A.   Yes, sir.

Q.   After the -- sorry.  Let me correct myself and do the page numbers so we're tracking it.

MR. SHIPLEY:  Your Honor, this is page 23 in the order of the slides.

BY MR. SHIPLEY:

Q.   And the slide we were just looking at was Slide 22, and that had us at approximately 12:30; correct?

A.   Yes, sir.

Q.   Okay.  What are we seeing on this slide, then, same day, August 16th?

A.   So we have the AT&T phone and the T-Mobile phone on August 16, 2024, between 1:38 p.m. and 2:15 p.m.

At 1:38, the T-Mobile phone is utilizing that tower (indicating) right here to the west of the golf course.  And the AT&T phone is utilizing the same tower, different orientation, at 1:47 to the west of the golf course.

And then we have, at 2:15, the AT&T phone is utilizing the tower to the east of the golf course.

It's my opinion that those towers would provide service to the golf course amongst other areas in that general vicinity.

Q.  Okay.

MR. SHIPLEY:  And Ms. Luce, can we go back.

BY MR. SHIPLEY:

Q.  So, like, if we could just highlight up here.  This is August 16th between 1:30 and 2:15 in the afternoon; correct?

A.  Yes, sir.

MR. SHIPLEY:  Ms. Luce, could we go back two slides to page 21.

BY MR. SHIPLEY:

Q.  Okay.  And read again.  What's the time entry?  Is that the same date?

A.  Yes, sir.  August 16th, between 4:30 a.m. and 4:54 a.m.

MR. SHIPLEY:  So if we can go back to Slide -- ahead to Slide 23.

BY MR. SHIPLEY:

Q.  Essentially, 12 hours later, the phone is back -- do you have an opinion as to whether the phone is back in that same vicinity of the golf course?

A.  Yes, sir.

Q.  Is that 12 hours later on the same day, August 16th?

A.  Yes, sir.

Q.   And if we remember, what day did the phones arrive in West Palm Beach?

A.   I believe on the 15th.

Q.   Could it be the evening of August 14th?

A.   14th, yes.  And then in the vicinity of the Trump International on the 15th, around 2:00 a.m.

Q.   Correct.

        MR. SHIPLEY:  Okay.  Next slide, please.

BY MR. SHIPLEY:

Q.   All right.  Now, we -- on this slide, do we start still on August 16th at 11:35 p.m.?

A.   Yes, sir.  August 16th at 11:35 p.m., and to August 17th at 12:32 a.m.

Q.   Okay.

A.   At 11:35 p.m., the phone started a data session (indicating) down here towards the South Bay.  Now, this is a new indicator here.  This dark blue indicator is --

Q.   Let me stop you there.  What's at that location, and what's reflected on the legend?

A.   So that is the Marathon Gas station or truck stop located at 850 U.S. 27 Highway in South Bay, Florida.

Q.   Is that Lake Okeechobee up here (indicating)?

A.   Yes, sir.

Q.   Okay.  All right.  What does this -- if you could carry on, what does this slide tell us about the movement of this phone?

A.    So at 11:35:27 p.m., a data session was initiated here to the east of the Marathon Gas station (indicating).  We then have handovers here at 12:02, 12:12, further east (indicating).  And then we -- getting into the vicinity of the Trump International Golf Club at or around 12:32 p.m.

Q.    Is that 12:32 a.m.?

A.    a.m., sorry.  I apologize.

Q.    It's hard to keep track.

A.    Yes.

Q.    So just for the record, is that 12:32 a.m. on August 17th?

A.    Yes, sir.

Q.    And does that appear to be the endpoint, at least on this slide, of a trip from South Bay over to the eastern edge of Palm Beach County that started earlier on the 16th?

A.    Yes.

      And, once again, we have an LPR here at 12:09 a.m., that is between a handover at 12:02 and 12:12.  So...

Q.    And does that appear to be the same license plate that we've seen in the other LPR images from August 2024 so far?

A.    Yes, sir.

Q.    Okay.  And we see a new icon on the legend here (indicating).  What is -- what's that location?

A.    That's Mar-a-Lago, located at 1100 South Ocean Boulevard, Palm Beach, Florida.

Q.    Okay.  And what is -- what is Mar-a-Lago, or do you know

who lives there?

A.   I do.   Our President; that's his residence.

Q.   Okay.

     MR. SHIPLEY:   Next slide, Ms. Luce.   This will be page 25.

BY MR. SHIPLEY:

Q.   Okay.   So now we're on -- we're still on the 17th.   And what does the time frame reflected on the top of the slide say?

A.   It's summary cellular activations for the AT&T phone 7269, and the T-Mobile phone ending in 8342, on August 17, 2024, between 12:35 a.m. and 1:38 a.m.

Q.   Okay.   Now, we see a lot of green cell phone tower dots on here, but could you circle for the jury, what are the primary areas of emphasis where there were actual cell phone data that you've reflected.

A.   Yes, sir.   So we have the T-Mobile phone here (indicating) to the south of the Trump International Golf course.   And then we have the AT&T phone located here at 12:35, here (indicating) at 1:12 a.m., and here -- down here at 12:57 (indicating).

Q.   Okay.   Does that necessarily reflect -- let me ask the question this way.   Does that mean that the phone was moving between all of these locations?   What does -- the significance of the fact that we have similar time frames but the phone hitting on multiple towers?

A.   So it -- he was there from -- he was in the vicinity of the

Trump International, also other locations between this time period of 12:35 a.m. and 1:38 a.m. So they're -- AT&T and T-Mobile are on different networks, like we spoke, so -- or like I told you earlier, they have different tower locations. So their -- they can be on different -- when they utilize a tower within the same period, and they're utilizing different towers, it's going to look different. So...

Q. Okay.

MR. SHIPLEY: And focusing -- if I could clear the screen. Focusing on the T-Mobile phone, Government Exhibit 301.

BY MR. SHIPLEY:

Q. Would that have encompassed the -- would that have included the Trump International Golf Club?

A. Yes, sir.

Q. That pie, the pie wedge?

A. Yes, sir.

Q. Okay. Could you circle that.

A. Yeah. I would expect to find the phone during that time period, around here (indicating). This AT&T network is different. They use -- utilize different towers. I would expect to find the phone in this general vicinity (indicating), this one here -- this is an outlier down here at the bottom. I -- I utilized a drive test equipment to basically look where the radiofrequency was for that tower. This tower does

actually provide radiofrequency to that location.  So...

Q.   That location being the vicinity of the golf course?

A.   To the vicinity of the golf course, yes, sir.

Q.   Okay.

A.   And numerous areas around here (indicating).  So...

Q.   And if could you remind the jury, what's the time frame of all of this activity?

A.   12:35 a.m. to 1:38 a.m.

Q.   Okay.

MR. SHIPLEY:  Ms. Luce, can we go to the next slide, which is Slide 26.

BY MR. SHIPLEY:

Q.   All right.  Are we now on the late morning of August 17th?

A.   Yes, sir.

Q.   And what's the -- what's the time reflected here?

A.   So August 17, 2024, between 11:48 a.m. and 11:58 a.m., we have a data session starting on a tower near the 20-mile bend at 11:48 here (indicating).  Then we have an LPR again at 11:56 a.m. here with the yellow indicator at the center of the page.  And then we have a handover or handoff here at 11:58.  So this is showing travel from west to east.

Q.   Okay.  So this is -- this shows the vehicle and the phones moving from what?  South Bay would be to the west on this image; correct?

A.   Yes, sir.

Q.   To the left-hand side?

A.   Yes, sir.

Q.   And the Trump International Golf Club would be to the east, to the right-hand side; correct?

A.   Yes, sir.

Q.   And does the vehicle appear to be moving in that direction?

A.   Yes, sir.

Q.   Okay.  And this is approximately -- this is less than 12 hours after the activity we just spoke about on the prior slide?

A.   Yes, sir.

Q.   Okay.

     MR. SHIPLEY:  I guess, can we pull that back up, Ms. Luce, rather than...

BY MR. SHIPLEY:

Q.   Okay.  Just for clarity.  Again, what's the time frame of this activity on August 17th?

A.   12:35 a.m. and 1:38 a.m.

     MR. SHIPLEY:  This is page 25.  Could we go back to page 26, please.

BY MR. SHIPLEY:

Q.   And what's the time we're looking at here?

A.   11:48 a.m. and 11:58 a.m.

Q.   And which direction is that vehicle heading then?

A.   In my opinion, it's going from west to east.

Q.    Okay.

        MR. SHIPLEY:  All right.  Next slide, please.

BY MR. SHIPLEY:

Q.    Okay.  This is now -- this is page 27.

      We're now August 18th, between 1:19 in the morning and 2:19 in the morning; is that correct?

A.    Yes, sir.

Q.    And what are we seeing on this slide?

A.    So we have the AT&T phone and the T-Mobile phone on August 18, 2024, between 1:19 a.m. and 2:19 a.m. utilizing the T-Mobile phone at 2:04 and 2:05, utilized this tower right here (indicating) to the south of the Trump International.  And at 1:19 a.m., we have the AT&T phone to the west, and at 2:19, we have the AT&T phone to the south.

      It's my opinion that all those sites would provide coverage to the golf course and the Trump International -- Golf Club, sorry.

Q.    Have we now seen this activity in the early morning hours for a series of nights in a row?

A.    Yes, sir.

Q.    Okay.

        MR. SHIPLEY:  All right.  Could we go to the next slide, please, Ms. Luce.  This will be page 28.

BY MR. SHIPLEY:

Q.    And, Agent, what are we seeing -- this is now August 18th

at 11:55 in the morning.

A.   So we have a data session start at the -- for the AT&T phone on August 18th at 11:55 a.m., utilized the tower here on Southern Boulevard (indicating).  We also have an LPR.  I apologize.  We have an LPR at 11:55, and we have cellular activity at 11:55.  Sorry.

Q.   Do you have an opinion as to whether that is consistent with the vehicle moving from west to east?

A.   I can't really -- at this one, I can't really determine if it's going east -- west to east, east to west.  All I know is that the tower that he connected to is to the east.  So it connected at 11:55 a.m., and we have an LPR at 11:54 a.m.

MR. SHIPLEY:  Okay.  Let's go to the next slide, which is page 29, please.

BY MR. SHIPLEY:

Q.   All right.  So we're still on August 18th, and what time are we at now?

A.   So this is the AT&T phone on August 18th, between 11 -- or I apologize.  1:35 p.m. and 2:08 p.m. at 1:40 -- 1:35 utilizing a tower to the east of the Trump International, and at 2:08 to the south (indicating) of Trump International.

Q.   Based on the information reflected in this slide, do you have an opinion as to whether the phone was in the vicinity and -- of -- including the golf course at that time?

A.   Yes, sir.  It's my opinion that those two sites would

provide coverage to the Trump International.

MR. SHIPLEY:  And, Your Honor -- Ms. Luce, could we go back to Slide 27, please.

BY MR. SHIPLEY:

Q.   Just want, again, to get the timing and the dates correct. What is the date and time on this activity by the golf course?

A.   So this is August 18th, between 1:19 a.m. and 2:19 a.m.

MR. SHIPLEY:  Let's go two ahead to Slide 29, please.

BY MR. SHIPLEY:

Q.   Same date?

A.   Yes, sir.  August 18th, between 1:35 p.m. and 2:08 p.m.

Q.   Same area around the golf course?

A.   Yes, sir.

MR. SHIPLEY:  Okay.  Ms. Luce, can we go to Slide 30, please.

BY MR. SHIPLEY:

Q.   Okay. All right.  Now, are we seeing something different on this slide?  Are we seeing something for the first time?

A.   Yes, sir.  So we're seeing timing advance, so we spoke of it earlier.  This is giving me that third variable of distance from the tower.  So I'm displaying a 78-meter band.  You see this band here (indicating) across -- I'm circling here (indicating).  I would expect to find the phone anywhere along that band, give or take, one or two bands on each side of it.

So what we have here is we have at 1:47 the phone connected

to this tower (indicating), located here on this sector.  And then we have a distance of 4.08 miles to the centerline.  And then we indicate that the hot dog goes to the length of the sector.  That's why we have that hot dog shape.

So I would expect to find the phone anywhere along that arc.

Q.   And how wide is that arc, based on the scale you have at the bottom and your experience?

Can I clear the screen just so we can -- they can see the --

A.   Yes.

Q.   -- that black arc?

A.   The depth of the arc is 78 meters.  The width of this arc, I apologize, I don't -- it's been a while since I --

Q.   I think "depth" is what I meant to ask -- is a better word.

A.   Okay.

Q.   And is it -- is that information that precise?

A.   Yes.  This is the stuff we use routinely.  We've -- I have located just -- I have located a body in the Everglades using this stuff in the middle of basically nowhere in the middle of a field, located a deceased body.  I have used it to find children, fugitives.  Phones that have been broken in the middle of a street.  This stuff is very good.

And, like I said earlier, if your loved ones go missing, this is the stuff that I'm going to get from the phone company

to hopefully find and locate them.

Q. Okay. And is this -- so this is now August 19, 2024. Is this just about the first time you had the timing advance location data?

A. Yes, sir. So, like I said, there is a 30-day retention period for this. So we went back 30 days. This was the first day that I received timing advance records. So...

Q. Okay. So are we going to start to see timing advance arcs on the slides going forward?

A. Yes, sir. So we get more precise and we get more records.

So, like I said, it's not uncommon to get five to ten hits within a minute of time from timing advance records. So...

Q. And two quick questions about the LPR data. If we look at the picture, does that appear to be that same PU 3131 license plate?

A. Yes, sir.

Q. And as we have talked about earlier, is this license plate reader image generally consistent with what the cell phone data is telling you?

A. Yes, sir.

Q. Okay.

MR. SHIPLEY: All right. Next slide, please. Slide 31.

BY MR. SHIPLEY:

Q. Okay. We see a lot of arcs here. Can you -- first, let's

orient ourselves.  What's the date and time here?

A.   So this is August 19th, between 2020 -- I'm sorry.
August 19, 2024, between 2:19 a.m. and 3:03 a.m.

Q.   Okay.

A.   So this is a summary slide.  For these, I had to limit it
down.  If not, we would have -- we could see for certain, like,
that this site would also provide arcs through.  This site
could also arc the area.  So I limited it down to the three
main towers that were used outside of the golf course.

So, in my opinion, it was these three sites located here,
here, and here (indicating).  So during that time, those sites
provided 15 events here between 2:19 and 3:03; 13 events for
this one right here (indicating); and 5 events for this site
here.

Q.   What is the significance -- some of the -- if we look at
the arcs, some are shaded darker than others.  What is the
significance of that?

A.   So there is just multiple -- if it's really light, there
were one to two hits over that -- in that arc, like this one
right here (indicating).  So there is most likely just one hit.
When you see the dark, there is two or more, so -- hits in
there.

Q.   Is it fair to say when we see the darker shades of green --
and will we continue to see images like this as we go through
the slideshow?

A.    Yes, sir.

Q.    Does that mean more or less activity?

A.    It means more.  And "more," by two, three, four.  I couldn't indicate how many are in there, just basically I have two colors there, light green and dark green.

Q.    And could you remind the jury, the depth on each of these arcs is about what physical distance?

A.    78 meters.

Q.    Okay.  And do these images -- does this include the Trump International Golf Club?

A.    Yes, sir.

Q.    Okay.

      MR. SHIPLEY:  Okay, Ms. Luce, the next slide.  This is Slide 32.

BY MR. SHIPLEY:

Q.    All right.  And what are we seeing here?  What's the date and time, first of all?

A.    So on the previous slide, we had the T-Mobile phone.  Now we have the AT&T phone for this similar time period.

      So at 2:37 a.m. on August 19th, he -- the AT&T phone utilized this tower, which would provide coverage to the Trump International Golf Course.

Q.    Is this consistent -- do you have an opinion as to whether what this demonstrates about the two phones generally being in the same area?

A.    That they were together, yes, sir --

Q.    Okay.

A.    -- generally speaking.

        MR. SHIPLEY:  Ms. Luce, can we go to the next slide, please.  That will be page 33.

BY MR. SHIPLEY:

Q.    Okay.  So we were -- so now we're back.  Are we still on August 19th?

A.    Yes, sir.  So we're on August 19th, between 1:57 p.m. and 2:34 p.m.  We are utilizing --

Q.    Can I just stop you there.

      So is this about 12 hours of all the activity we saw on the previous slide?

A.    Yes, sir.

Q.    Okay.  Let me do this.

        MR. SHIPLEY:  Can we go back to 31, Ms. Luce?

BY MR. SHIPLEY:

Q.    I don't want to speak for the -- what's the time frame -- what's the date and time we're seeing there of all of that activity?

A.    2:19 a.m. to 3:03 a.m.

Q.    On what date?

A.    On August 19th.

Q.    All right.

        MR. SHIPLEY:  And then can we go two slides to page 33.

THE WITNESS: We have August 19th between 1:57 p.m. and 2:34 p.m.

BY MR. SHIPLEY:

Q. Okay. Same day, about 12 hours later?

A. Yes, sir.

Q. Okay. And what opinions can you draw from the information reflected on this slide?

A. The phone was in the general vicinity of the Trump International Golf Course.

Q. Were there multiple -- if we look at this box (indicating) here, was there just a singular event or they're multiple events?

A. There were multiple events. 58 events, to be precise. And then we had 6 events with this one (indicating), and 13 here (indicating). So...

MR. SHIPLEY: Okay. Ms. Luce, the next slide, please.

BY MR. SHIPLEY:

Q. And what does this slide show us? Same time frame?

A. Yes, sir. So we have the same time frame, August 19th, 2024, between 1:58 and 2:27 p.m.

Q. Based on this, do you have an opinion, again, as to whether the phones were generally together in this time period?

A. The AT&T phone was in the general vicinity of the Trump International Golf Course, and so was the T-Mobile phone during that time period.

MR. SHIPLEY: Okay. Next slide, Ms. Luce, page 35.

BY MR. SHIPLEY:

Q. Okay. We've now gone ahead two days to August 21st; correct?

A. Yes, sir. So we have the T-Mobile phone --

Q. Before we do that. What time frame are we looking at here?

A. On August 21st, 2024, between 1:58 a.m. and 4:16 a.m.

Q. Okay. And what opinions can we draw -- do you draw from this information and this data?

A. That the phone was in the general vicinity of the Trump International Golf Course.

Q. And specifically, what is this (indicating) location that I'm highlighting?

A. So that's the Trump International southeast corner located at the red indicator right there.

I will say that this is very broad, so we -- the phone -- I would expect that phone to be anywhere in this general vicinity (indicating), including the Trump International.

MR. SHIPLEY: Next slide, Ms. Luce. This is page 36.

BY MR. SHIPLEY:

Q. All right. Is this a sort of snapshot moment of the summary slide that you just showed?

A. Yes, sir. So --

Q. Could you describe this for the jury, please.

A. Yes. So we have the T-Mobile phone on August 21, 2024,

between 2:26 a.m. and 2:36 a.m.  We are utilizing a tower to the southwest of the golf course (indicating) at 2:26 a.m. here.  And then at 2:31, we're here (indicating).  And then at 2:36, we are here in the general vicinity of Mar-a-Lago.

Q.   Okay.  Would you just highlight or draw a box around where Mar-a-Lago is.

A.   Mar-a-Lago is right here (indicating).  It's the dark red indicator to the right side of the page.

Q.   Was that the residence -- is the -- was the residence of then-Candidate Trump, still is the residence?

A.   Yes, sir.

Q.   Okay.  And what's the time again on this?

A.   It is from 2:26 a.m. to 2:36 a.m.

Q.   Okay.  Is it fair to say that most of that arc in the vicinity of Mar-a-Lago is over open water; correct?

A.   Right.  Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Okay.  Next slide, please.

THE WITNESS:  So we have a similar situation happening here with the AT&T --

MR. SHIPLEY:  It's page 37, Your Honor.

THE WITNESS:  So we start a data session.  The data session is down here at 2:06.  We have a handover here to the east -- I apologize -- to the west of the Trump International Golf course at 2:23.  And then at 2:37, we are utilizing a

tower here (indicating) towards Mar-a-Lago.

BY MR. SHIPLEY:

Q.   Do you have an opinion as to how that lines up with the T-Mobile phone we just saw in the previous slide?

A.   It lines up.

Q.   Is that generally -- I won't keep asking the question.  Is that generally the case throughout the entirety of your analysis, the jury will be seeing those phones were moving with each other?

A.   They were.  There was a few days where the AT&T phone was left in the general vicinity of the golf course and the T-Mobile phone was absent from it.  But they were united towards -- I think it's in the presentation.  So...

Q.   Okay.  All right.

MR. SHIPLEY:  Ms. Luce, can we go to page 38.

BY MR. SHIPLEY:

Q.   Okay.  And is this basic -- is this -- what are we seeing here?  This is the same night, August 21st, a little later in time, still early morning?

A.   Yes, sir.  So August 21st, between 3:06 a.m. and 4:06 a.m., in the general vicinity of the golf course.

Q.   Okay.  Has the phone essentially moved away from Mar-a-Lago, back towards the golf course?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Okay.  Next slide, please.  Page 39.

THE WITNESS:  So this is what I was referring to earlier.  So we have the AT&T phone from August 21, 2024, at 4:43 a.m. to August 28, 2024, at 10:46 a.m.  Utilizing this single tower (indicating) here, we have 351 events, one incoming SMS, no phone activity.  The phone was on in that general vicinity.

BY MR. SHIPLEY:

Q.  Okay.  Now, is this the one instance you mentioned a moment ago where there is some different movement between the two phones?

A.  Yes, sir.

Q.  Okay.  So this slide -- is it fair to say this slide shows the AT&T phone for a week essentially hitting at that same location?

A.  Yes, sir.

Q.  Okay.

MR. SHIPLEY:  Let's go to the next slide, which is page 40.

BY MR. SHIPLEY:

Q.  Okay.  And let's start walking through this.  Now we're talking about the T-Mobile phone, Government Exhibit 301; correct?

A.  Yes, sir.

Q.  Okay.

A.   So we have the T-Mobile phone on August 21, 2024, between 10:14 a.m. and 10:59 a.m., in the general vicinity of the Trump International Golf course.

Q.   Okay.

MR. SHIPLEY:  Can we then go to the next slide, Ms. Luce, page 41.

BY MR. SHIPLEY:

Q.   So now are we a day ahead?

A.   Yes, sir.  So --

Q.   What's the time frame here again?

A.   August 22, 2024, between 4:56 a.m. and 5:35 a.m.  The phone again is in the general vicinity of the golf course.

MR. SHIPLEY:  Can we go to Slide 42, please.

BY MR. SHIPLEY:

Q.   Okay.  Now we're on August 22nd, same day, and is this about four hours later?

A.   Yes, sir.  So --

Q.   That's showing continued activity in that area?

A.   Yes, sir.  Between August 22nd -- or on August 22nd, between 8:14 a.m. and 8:34 a.m., in the general vicinity of the golf course.

Q.   Okay.

MR. SHIPLEY:  All right.  Can we go to Slide 43, please.

BY MR. SHIPLEY:

Q.   Okay.  And are we moving ahead four days here to August 26th?

A.   Yes, sir.  So the T-Mobile phone on August 26th between 3:40 p.m. and 3:53 p.m., in the general vicinity of the golf course.

Q.   Okay.

MR. SHIPLEY:  Next slide, please.  44.

THE WITNESS:  Yes, sir.  We have August 28, 2024, between 9:12 a.m. and 8:43 p.m., in the general vicinity of the golf course.

BY MR. SHIPLEY:

Q.   Okay.  And you mentioned earlier, this is a summary slide?

A.   Yes, sir.

Q.   How many -- looking at the two boxes, are there a significant number of events going on (indicating)?

A.   Yeah.  We had 660 events here (indicating), utilizing that tower.  We had 447, this tower here (indicating) and 44 events located right here (indicating).

Q.   Okay.  And this is a 12-hour stretch, August 28th, between 9:12 a.m. and 8:43 p.m.?

A.   Yes, sir.

Q.   All right.

MR. SHIPLEY:  Next slide, please.  45.

BY MR. SHIPLEY:

Q.   Okay.  What do we see now on this slide?  We see two phone

numbers reflected here now again.

A.   So this is where the phones, the AT&T phone and the T-Mobile phone, they become reacquired, if you will.  So they're back together.  We see this at -- happen on August 29, 2024, at approximately 9:24 and 9:25 a.m.  So...

Q.   Okay.

MR. SHIPLEY:  All right.  Next slide, please.  46.

BY MR. SHIPLEY:

Q.   Okay.  What opinions are reflected on this slide about the T-Mobile phone and its usage between 9:26 and 9:52 a.m. on August 29th?

A.   So we have the T-Mobile phone on those dates, 9 -- on August 29, 2024, between 9:26 a.m. and 9:52 a.m., in the vicinity of the Trump International Golf Club.

Q.   All right.

MR. SHIPLEY:  Let's move ahead two days to the next slide, page 47.

BY MR. SHIPLEY:

Q.   What date are we looking at?  What are the times?  And what is your opinion reflected on this slide?

A.   So we have August 31, 2024, between 5:07 a.m. and 6:37 a.m., in the general vicinity of the Trump International Golf course.

Q.   And if we go to the next slide, page 48, what does that tell us about the AT&T phone in that same time period roughly?

A.     So the AT&T phone is in the vicinity of the Trump International Golf course on August 31, 2024, between 5:41 a.m. and 6:41 a.m.

Q.     Okay.

MR. SHIPLEY:  All right.  Let's move to the next slide and the next day, which is September 1, 2024.

BY MR. SHIPLEY:

Q.     And can you tell the jury, what's the time frame reflected on this summary slide.

A.     T-Mobile phone on September 1st, between 9:32 a.m. and 2:07 p.m., in the general vicinity of the Trump International Golf course.

Q.     And if I could just draw your attention -- again, why is this a summary slide?

A.     Just because there are multiple towers that could be used at this time frame and were used during this time frame that were providing T-Mobile timing advance records that intersect the golf course.  I didn't -- if I put them all up there, it would look like somebody -- it already looks like, to me, that spaghetti was thrown up on the -- but it would really look like that if I put every call or every timing advance.

So I limited it down to the three towers that were most important to this investigation, the closest ones that were providing coverage to that area.

Q.     And there are a significant number of events depicted on

this slide?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  All right.  And very quickly, next slide, 50.

BY MR. SHIPLEY:

Q.   Is that generally consistent with the information we saw in the previous slide and the pattern of the phones being in the same area?

A.   Yes, sir.  We have cellular activations on for the AT&T phone on September 1st between 9:30 and 2:18 as well.

Q.   Okay.

MR. SHIPLEY:  Next slide, 51, please.

BY MR. SHIPLEY:

Q.   What do we see on this slide?

A.   All right.  So we have the T-Mobile phone and the AT&T phone on September 1st, between 12:29 p.m. and 12:30 p.m.  We also have a LPR hit at 12:29:56.  So as we see here, we have timing advance events here at 12:29:53 and 12:30:13.  We also have the AT&T utilizing -- or the AT&T phone utilizing a tower at 12:30, all in the general vicinity of that LPR hit.

Q.   Okay.

A.   So...

Q.   And just so the jury is following along, the -- the timing advance data that we're getting from T-Mobile, which shapes --

can you just circle one of those shapes -- is that the hot dog shape?

A.   Yes.  So we have the hot dog here at 12:29:53, right here (indicating.)  And then at 12:30:13, we are here (indicating). And we happen to have the LPR at 12:29:56 (indicating).  So...

Q.   And is that timing advance data putting the phone even more precisely in a location?

A.   Yes, sir.

Q.   Okay.  All right.

    MR. SHIPLEY:  Okay.  Let's go to the next slide, 52.

BY MR. SHIPLEY:

Q.   We're still on September 1st.  A couple of hours -- so hour or so later, two hours later.  Let me clear the screen.

    Just generally, can you tell the jury what we're seeing on this slide.

A.   Yes, sir.  We have the T-Mobile phone and the AT&T phone on September 1, 2024, between 2:18 p.m. and 2:44 p.m.  At 2:44, we have the T-Mobile phone utilizing this tower (indicating), from this distance here.  That distance appears to intersect with the LPR at -- that was at 2:44:36, so 10 seconds prior to.

    We also have a data session that starts at 2:18 here, and we have handovers at 2:31, 2:36, and 2:44 here (indicating).

    So, in my opinion, the phone was traveling from -- from east to west, along the -- Southern Boulevard.

Q.   Let me ask you just more precisely.  The LPR image shows

the vehicle spotted at 12:44:36; correct?

A.   Yes, sir.

Q.   And then the timing advance arc, the green hot dog, if I'm circling it correctly, what time is that?

A.   10 seconds later at 2:44:46.

Q.   So do you have an opinion as to how that timing advance information matches up with the LPR data?

A.   It's pretty good.  It's pretty --

Q.   Almost exact?

A.   Yes, sir.

Q.   Okay.

        MR. SHIPLEY:  Next slide, 53, please.

BY MR. SHIPLEY:

Q.   Okay.  We're now on September 2nd, the next day.  What time are we looking at here?

A.   We have September 2, 2024, between 4:29 a.m. and 8:05 p.m., in the general vicinity of the Trump International Golf Club.

Q.   Fair to say that all of this activity is during a 16-hour period on that day, September 2nd?

A.   Yes, sir.  And you can see, like, right here, we have 1,297 events.  So...

Q.   Is that a lot of activity?

A.   It is.

Q.   And, again, would you circle for the jury where is the southeast corner of the golf course?

A.    Located right here (indicating).

Q.    Okay.

        MR. SHIPLEY:  All right.  Next slide, please.

BY MR. SHIPLEY:

Q.    What does this tell us about the AT&T phone in that time frame between --

A.    So --

Q.    -- 4:30, roughly, and 7:30 p.m.?

A.    It pairs up well with the T-Mobile phone, the AT&T phone, on September 2nd, 2024, between 4:30 a.m. and 7:30 p.m., is in the general vicinity of the Trump International Golf Club.

Q.    Okay.  Let me skip ahead, then, to a couple of days later to September 7, 2024.

        MR. SHIPLEY:  So if we could go to the next slide, please, which I think is 55.

BY MR. SHIPLEY:

Q.    Okay.  What's the time reflected on here?

A.    So we have September 7, 2024, at 10:23 a.m.  The phone is utilizing this tower here (indicating), located here.  And we have a distance along this hot dog right here.  We also have a LPR located at the Palm Beach International Airport at 10:19:32 a.m.

Q.    Okay.  Just for reference, we don't see it labeled on here, but do you see the golf course area reflected on this map?

A.    Yes, sir.  It's --

Q.   Where is it roughly?

A.   It's roughly down here (indicating).

Q.   Sort of the bottom of the -- of the hot dog?

A.   Yes, sir.

Q.   And the LPR hit is -- where did you mention that is?

A.   It's located right here with this yellow indicator.

Q.   Is that adjacent to -- sorry.  I don't want to talk over you.

A.   No worries.

Q.   Is that adjacent to Palm Beach International Airport?

A.   Yes, sir.

MR. SHIPLEY:  Okay.

Okay.  Next slide, please, 56.

BY MR. SHIPLEY:

Q.   Okay.

A.   We are at the T-Mobile phone on September 7th, 2024, at 11:01 a.m.  It's utilizing this tower right here (indicating) at 11:01:07, along this timing advance band here.  That seems very close to the LPR hit that we have at 11:01:14 a.m.

Q.   If you will assume with me the previous slide shows the activity at 10:23 a.m., this shows 11:01 a.m.  Do you have an opinion, based on those two slides, about whether the vehicle was in the vicinity of specifically the Palm Beach International Airport?

A.   Yes, sir.  The vehicle was hit on LPR at 11:01:14 a.m., and

we see cellular activity that was in that general vicinity.

Q.   And where -- just so we're clear, where is the airport on this map?

A.   It's south of that LPR hit.  So (indicating) here is the airport down here.

Q.   Is that --

A.   Yeah.

Q.   Okay.  All right.

MR. SHIPLEY:  Next slide, please.

BY MR. SHIPLEY:

Q.   Are we talking the same date, September 7th?

A.   Yes, sir.  So we have September 7th between 11:08 a.m. and 11:15 a.m. in the general vicinity of the Trump International Golf Club.

Q.   Is this time frame shortly after the times we have just seen next to the airport?

A.   Yes, sir.

MR. SHIPLEY:  Okay.  Next slide, please.

BY MR. SHIPLEY:

Q.   Page 58.

So -- we've gone ahead a day to September 8th; correct?

A.   Yes, sir.

Q.   Okay.  And what's the time frame reflected on this summary slide?

A.   We have September 8, 2024, between 2:26 a.m. and 6:28 p.m.,

in the general vicinity of the Trump International Golf Club.

Q.   Is that roughly a 16-hour span on Sunday, September 8th?

A.   Yes, sir.

Q.   Okay.  And is there a lot of activity we're seeing on this slide?

A.   Yes, sir.  We're seeing 500 -- I'm sorry, 405 events on this tower, 606 on this tower (indicating), and 53 here.

Q.   And do you have an opinion, based on that, whether during this 16-hour period, the defendant or the -- correction -- the phone was in the vicinity of the Trump International Golf Course?

A.   Yes, sir.

Q.   Throughout that time period?

A.   Yes, sir.

Q.   Okay.

          MR. SHIPLEY:  Next slide.

          THE WITNESS:  We're also seeing cellular activations for the AT&T phone on September 8, 2024, between 2:46 a.m. and 5:58 p.m. in the general vicinity of the Trump International Golf Club.

BY MR. SHIPLEY:

Q.   And is this slide consistent for the AT&T phone with the prior slide about the T-Mobile phone?

A.   Yes, sir.

Q.   Okay.  All right.  This is September 8th, 2:46 to 5:58 p.m.

MR. SHIPLEY:  Can we go to the next slide, which will be page 60.

BY MR. SHIPLEY:

Q.   What date is this?

A.   So we have September 9, 2024.

Q.   Is that the next day?

A.   The next day.  September 9, 2024, between 3:43 a.m. and 4:59 p.m., in the general vicinity of the Trump International Golf Club.

Q.   And here again, that is about 13 hours on September 9th?

A.   Yes, sir.

Q.   And are we seeing a lot of activity?

A.   Yes, sir.  We see 876 events here (indicating) on this tower, 30 here (indicating), and 213 here (indicating).

Q.   Okay.  So is that similar to the volume of activity we saw on September 8th, the day before?

A.   Similar, yes, sir.

MR. SHIPLEY:  Okay.  Go to the next slide, 61, please.

THE WITNESS:  All right.  We have cellular activations for the AT&T phone --

BY MR. SHIPLEY:

Q.   Let me clear this.  Excuse me.

A.   -- on the same day.

Q.   Go ahead.

A.   On the same day, between the same time period roughly,

between 4:31 a.m. and 4:31 p.m., in the general vicinity of the Trump International Golf Club.

MR. SHIPLEY:  Okay.  Can we go to Slide 62, please.

BY MR. SHIPLEY:

Q.    September 11th, that is two days later?

A.    Yes, sir.  So...

Q.    What are we seeing here?

A.    We have September 11, 2024, between 3:31 a.m. and 6:31 a.m. And, once again, the phone was in the general vicinity of the Trump International Golf Club.

Q.    Okay.  All right.  Let me skip ahead a couple.  Let me go to page -- the full pages will be in evidence and/or already are in evidence.  But for our discussion today, let me skip ahead to page 66, please.

Okay.  So we've moved ahead now to September 14th; is that correct?

A.    Yes, sir.

Q.    All right.  What are we seeing on this slide?

A.    So September 14th at 11:54 a.m., we have the cell phone utilizing a tower here (indicating) to the east of the LPR located in the center of your page.

This phone would -- I would expect to find this phone anywhere along this big green hot dog here at 11:54:36.  So the LPR is at 11:54:48.  It's pretty close to that band.  So...

Q.    Okay.  And just --

MR. SHIPLEY: Okay. We can zoom in on the image.

BY MR. SHIPLEY:

Q. What's the license plate that we see now on the Xterra?

A. 97E EED.

Q. Is that a different license plate than we saw on some of the earlier slides?

A. Yes, sir.

Q. Okay. And just one question. Where we have the LPR image, South Bay is not marked on the legend here, but is that roughly where South Bay is?

A. Yes, sir.

Q. Under that image?

A. Yes, sir.

MR. SHIPLEY: Okay. Next slide, please. 67.

BY MR. SHIPLEY:

Q. Okay. Now are we on September 15th?

A. We are.

Q. And what's the time frame here?

A. So we have the T-Mobile phone on September 15th, between 12:00 a.m. and 1:15 a.m. So...

Q. Take us through what this slide tells us.

A. Yes. We have the phone at 12:00 a.m. located in the vicinity of the Marathon gas station, right here (indicating). And then at 12:52, we're located utilizing this tower here, but along this here (indicating). And then at 1:00 a.m., we're

utilizing this tower here (indicating) along this arc.  And then at 1:07, we're on this arc right here.  And at 1:15, we're along this arc (indicating).

To me, in my opinion, having looked at numerous amounts of timing advance data, this indicates travel from the Marathon gas station to east, to the east, and I believe the next slide will show how it goes to the golf course.

Q.   Okay.  And just again, could you tell the jury:  What time are we looking at here?

A.   Between 12:0- -- sorry.  12:00 a.m. and 1:15 a.m.

Q.   Okay.  Let's -- let me clear the screen first.

MR. SHIPLEY:  Okay.  And can we go to the next slide, please, which will be 68.

BY MR. SHIPLEY:

Q.   Okay.  What are we -- do we have an LPR image shown here?

A.   We do.  We have cellular activity along this arc here at 12:51 a.m., and we have -- or 12:51:31 a.m., and we have LPR at 12:51:20.

Q.   Okay.  So what is your opinion as to how that LPR image lines up, again with what the cell data is telling us?

A.   So it's pretty close.  So...

Q.   Okay.

MR. SHIPLEY:  Next slide, 69.

THE WITNESS:  Here we have AT&T timing advance data, which we haven't seen to this point.  AT&T collects their

differently.  We don't get as much from AT&T that we get from T-Mobile phones.  So but they do collect it.  This was provided at 12:50:38, utilizing a tower here (indicating) in the center, and it's an omnidirectional tower, so there is no sector.  So you can expect to find the phone anywhere along this circle here (indicating) from that -- from that event.  So...

BY MR. SHIPLEY:

Q.   Okay.  And based on the slides we've just seen, what does that tell you about the two phones?  Were they moving together?

A.   They are moving together, yes, sir.

MR. SHIPLEY:  Okay.  Next slide, please.  Page 70.

BY MR. SHIPLEY:

Q.   Okay.  What time are we looking at here?

A.   So we have September 15th at 1:21 a.m.  We have the phone utilizing a tower that's providing this arc here (indicating) at 1:21:37.  And at 1:21:44, we're here (indicating) at this LPR event.

So, again, they're lining up as this phone is traveling from west to east towards the Trump International.

Q.   Okay.  And if we just take a look at the license plate again.  Remind the jury:  What is that license plate?

A.   97E EED.

MR. SHIPLEY:  Next slide, please.

THE WITNESS:  All right.  Here we have --

MR. SHIPLEY:  This is page 71, for the record.

A.   Here we have the AT&T phone on September 15, 2024, between 12:42 a.m. and 1:24 a.m.

We have a data session starting right here at 12:42 (indicating), and we have a handover event at 1:19:04 here (indicating), and another handover event at 1:24:24 here.  And we have a LPR here at 1:21:44.

So basically we have a handover here (indicating) at 1:19, we have an LPR here at 1:21:44, and another handover here at 1:24:24.  That indicates to me that it was travel from east to west, and the phone and the vehicle, they are marrying up together.  So...

BY MR. SHIPLEY:

Q.   Okay.

MR. SHIPLEY:  All right.  Next slide, please, 72.

BY MR. SHIPLEY:

Q.   And let me just summarize this.  Is it fair to say this is consistent with the testimony you just gave about this phone moving as well?

A.   Yes, sir.

Q.   The T-Mobile phone moving with the AT&T phone?

A.   Yes, sir.

Q.   Okay.

MR. SHIPLEY:  Next slide, please.  73.

BY MR. SHIPLEY:

Q.   Okay.  Are we getting closer to the area of the Trump

International Golf course now?

A.   Yes, sir.

Q.   What time is this?

A.   So we have September 15, 2024, at 1:52 a.m., utilizing this tower here (indicating).  Here is -- on the phone -- I would expect to find it in the vicinity of this hot dog here at 1:52:56 (indicating).  We also have a LPR here at 1:53:56 here (indicating).

Q.   Is that another example of the LPR data confirming the phone data, and the other way also?

A.   Yes, sir.

Q.   Okay.

        MR. SHIPLEY:  All right.  Next slide, please.

BY MR. SHIPLEY:

Q.   Okay.  All right.  Is this a summary slide?

A.   Yes, sir.  So...

Q.   What does this tell us about the activity of the T-Mobile phone between 1:52 a.m. and 1:59 a.m., on September 15th?

A.   So the phone travels south on Military, in my opinion, to Summit Boulevard at 1:56:08, and then over towards the southeast corner of the Trump International Golf Club at 1:59:20 a.m.

Q.   Okay.  And at that time, 1:59:20, would the phone have been within that hot dog shape there?

A.   Yes, sir.

MR. SHIPLEY:  Next slide, please.  It should be 75.

BY MR. SHIPLEY:

Q.   I'm going to show you these next slides in sequence, and show the jury, and then ask you a couple of questions about them.  So very briefly, what are we seeing here?

A.   So this is the T-Mobile phone on September 15, 2024, between 2:39 a.m. and 2:41 a.m.  Like -- like we have said, the phone is utilizing this tower (indicating), this timing advance arc here, and here at 2:41 and 2:39 a.m. (indicating).

Q.   Okay.  Now take a close look at this slide.

MR. SHIPLEY:  And then if we could go to the next slide, please.  76.

BY MR. SHIPLEY:

Q.   So tell us both what this slide shows by itself, and also whether you were able to draw any conclusions about how this phone was moving in that time frame.

A.   So, yes.  Right here.  So this is what we talked about, those near simultaneous hits.  So at 2:50:25 a.m., right here, we're on this arc.  And then at 2:50:27 a.m., we're on this arc.  Those intersect within two seconds.  We're over here, most likely on Gun -- Gun Club Road, in this general vicinity here (indicating).  So the phone was -- in earlier slides, was on Summit Boulevard.  Now it's up over here on Gun Club.

In my opinion, having looked at the totality of the data, I believe the subject was driving around the vicinity of the golf

course.

Q.    And if we look at the next slide, which will be 77, is that consistent with your opinion?

A.    Yes.  Yes, sir.  So it could have been, like, there -- there are roads, and I believe there is a jail over in this general vicinity.  There -- it's on this intersection here.  So at 3:20:46 --

Q.    Can you circle what are you referring to.

A.    Yup.  So at 3:20:46, along this (indicating), right, then at 3:20:47, we're along here (indicating).  Now, where those points intersect is right here (indicating).  So that's over top of parts of the golf course.  The parking lot over in that general vicinity, over there.  But, in my opinion, the phone was traveling by way of car during that period.

Q.    Okay.  So we're at 3:20 a.m.  Let's go -- let's go to the next slide, which will be 78.  What do we see here?

A.    So this is the totality of the records that we received between -- on September 15th between 3:36 a.m. and 12:57 p.m., utilizing -- there were 797 events utilizing all of these bands right here (indicating).  So in the general vicinity of the Trump International Golf Club southeast corner located in that red indicator right here (indicating).

Q.    Now, when you say that's the totality, the information, what do you mean?

A.    So that's including this 3:36 a.m. to 12:57 p.m.  I believe

later we're going to see ones at 4:06 a.m., where it -- that this general -- like, all these bands are a little wider.  They're going to shorten up a little bit closer to the location of the red indicator.  So --

MR. SHIPLEY:  Why don't we --

THE WITNESS:  -- if you want to fast forward a little.

MR. SHIPLEY:  No.  Why don't we go to -- why don't we go to that slide.  That will be the next one, and that will be page 79.

BY MR. SHIPLEY:

Q.   Okay.

A.   So you see what I'm saying?  Like, we went -- 3:36, that's all of the records.  Then at 4:06 -- I started from 4:06 to 12:56, and this is much tighter in here (indicating), if you will, right there.  So -- indicating to me it's getting more -- I'm able to narrow it down a little bit further where I believe the phone would be or where I would look for that phone if these were the records I had received.  So -- and that would definitely include the Trump International Golf Club southeast corner, right there with the red indicator in the center of the page.

Q.   In this time frame between whether you use 3:30 or 4:06 a.m., did you receive any information that this cell phone was hitting on any other towers?

A.   No, sir.

Q.   Just stationary?

A.   Yes, sir.

Q.   And tell the jury again.  Those bands are about how -- what is the depth of those bands?

A.   They're 78 meters.  I would say, like, we're looking at a 200-meter buffer that I would give in that time period, so -- and just kind of maybe a little bit outside of the ring here to here (indicating).  So I would say that phone -- that's where I would look for that phone.  If that was the data that I received and I'm trying to find that phone or the person attached to that phone, that is the area that I would look for that phone.

Q.   And to reiterate, do you have any data showing that this phone hit on any other towers either on this page or anywhere else in that time frame?

A.   No, sir.

     MR.  SHIPLEY:  Let's go to the next page, page 80.  Let me clear the screen.

BY MR.  SHIPLEY:

Q.   All right.  Now, we've -- at the back end of that time frame, we're at 12:57 p.m., on September 15th.  What do we see on this slide?

A.   So this is the last timing advanced entry that we have. The phone appeared to go off the network at 12:57:23 p.m.

Q.   Okay.  And that band, again, that roughly 78-meter stretch,

that's the area -- is that the area where the phone would have been?

A.   Yes, sir.

MR. SHIPLEY:  Next slide, please.

BY MR. SHIPLEY:

Q.   Now, this slide is talking about that other phone, the 743 AT&T phone.  Can you just summarize what this tells us about where that phone was during this same overnight time period on September 15th.

A.   Yes, sir.  So these were all the towers that were being utilized by the phone during -- on September 15, 2024, between 1:42 a.m. and 1:42 p.m.

MR. SHIPLEY:  Okay.  Next slide, please.  82.

BY MR. SHIPLEY:

Q.   What do we see here?

A.   So we have activations for the AT&T phone on September 15, 2024, between 12:42 p.m. and 1:28 p.m.  So we had a -- right here at 12:42, the AT&T phone utilized a tower in that direction.  And then we had a handoff here (indicating) at 1 -- 1:14.  And then, at 1:28, we're utilizing a handoff that's facing that direction (indicating).  So I know it's a little hard to see there, but...

Q.   Are those handover -- based on those handovers, do you have an opinion about whether the phone by this point was moving?

A.   Yes.  So, sometime at 1:14 -- between 1:14 and 1:28, that

phone, in my opinion, would have possibly moved south -- southeast.

Q.   Okay.  And just to reiterate, you're not -- you have not been -- have you been involved in all aspects of this investigation?

A.   No, sir.

Q.   Okay.  So you don't know offhand the time of any encounter between the defendant and the Secret Service agent?

A.   No, sir.  No.

Q.   Okay.

MR. SHIPLEY:  All right.  Next slide, 83.

BY MR. SHIPLEY:

Q.   Okay.  Can you summarize what we see here about the movement of the AT&T phone between 1:42 p.m. and 2:09 p.m.

A.   So we started a data session here at 1:42:40 (indicating); then 1:42:54 here (indicating); 1:48 here (indicating); 1:56 here (indicating); 2:02 here (indicating); and 2:09 in the vicinity of the traffic stop.

The traffic stop occurred at 2:09:30, and we have -- 2:09:27, we have a handover event in the general vicinity of the traffic stop.

Q.   And do you have an understanding as to what happened at that traffic stop?

A.   Yes.  Mr. Routh was taken into custody.

Q.   Okay.

MR. SHIPLEY: Can we go to the next slide, 84, please.

BY MR. SHIPLEY:

Q. And what does this tell us?

A. So we just have a series of signaling events -- a data session starts and signaling events. So we have a signaling event here (indicating) or timing advance event without the band; it's just the tower. And then we also have -- we have this at 2:06 (indicating); 2:09 here (indicating). We have another one at -- we have one at 2:09:38, 2:09:53. We have a data session start at 2:10:48, and a signaling of a timing advance event at 2:22:10 p.m.

Q. Okay. And is this in Martin County, Florida?

A. Yes, sir.

Q. Okay.

MR. SHIPLEY: Let me skip 85 and go to 86, in the interest of time.

BY MR. SHIPLEY:

Q. Okay. Do we see now the T-Mobile phone, the green logo back? So what do you -- what conclusion do you draw from the reappearance of this phone?

A. So the phone, I said, went off the network. When it comes back up on the network, at 1 -- we see the first tower at -- I believe at 1:56:23 p.m. We also have a LPR at 1:51:53.

So the data event is further north. And travel from south to north, that would be -- that's what I would expect to see.

Q.   Okay.  What are the ways a phone could go sort of suddenly off a network?

A.   It can be broken, damaged, destroyed.  It could be turned off.  It could be placed on airplane mode.  So --

Q.   Could it run out of power?

A.   It could run out of power, yes, sir.

Q.   And when a phone -- if a phone is then charged up sometime later and comes back on, would it then be in a position to connect to cell towers?

A.   Yes, sir.

Q.   Okay.

        MR. SHIPLEY:  Okay.  Let's look at slide 88, please.

BY MR. SHIPLEY:

Q.   Okay.  So what we've talked about so far have been snapshots of moments in time; correct?

A.   Yes, sir.

Q.   Okay.  The next few slides are going to tell us something different.  What are we going to see on these slides?

A.   So we're going to see which towers were most frequently used during the period of him -- of the phone being in Palm Beach.

     So between August 14, 2024, to September 15, 2024, this phone, the T-Mobile phone, utilized this tower here in South Bay that I -- in my opinion, would provide coverage to the Marathon Gas station/truck stop.  And it had 21,232 cellular

communications during that period.  So this is its most frequently used tower.  In my line of work, that's -- that's typically your home tower.  That's where you live.  That's where you are residing.  That's also a good spot to go -- if you have an address and you have cellular activity like this, that's where I would expect to find the phone during nighttime hours or, you know, whenever you're there.  So...

Q.   Okay.  Of course, have we seen evidence in the slideshow so far of the phone being in the vicinity of the golf course in the nighttime hours?

A.   Yes, sir.

        MR. SHIPLEY:  Okay.  Can we go to the next slide which will be 89.

BY MR. SHIPLEY:

Q.   And what does this show us?

A.   This is the second most frequently used tower.  So and -- for the T-Mobile phone on August 14, 2024, and September 15, 2024, at 57 -- or 5,728 cellular transactions.

    This, too, also would provide coverage to the Marathon Gas or -- yeah, Marathon Gas and truck stop.

Q.   That's the blue icon?

A.   Yes, sir.

Q.   Okay.

        MR. SHIPLEY:  Let's go to the next slide.  Slide 90.

BY MR. SHIPLEY:

Q.   What does this tell us?

A.   This is the third most frequently used tower for the T-Mobile phone between August 14th and September 15th, 2024. This phone is located to the west of the Trump International Golf Club.   There were 3,484 cellular transactions on that tower alone.

Q.   So other than the -- the cellular events reflected on the two previous slides out by South Bay, this was the location of the most activity with that phone?

A.   Yes, sir.

Q.   Okay.   And this is the T-Mobile phone, Government Exhibit 301?

A.   Yes, sir.

          MR. SHIPLEY:   Okay.   And can we do Slide 91, please, now.

BY MR. SHIPLEY:

Q.   What do we see here in summary form?

A.   All right.   So this is summary activations for the T-Mobile phone between August 19, 2024, and September 15, 2024.   I narrowed it down just to those bands that were being utilized right here on your screen and associated times that that phone was on those bands.   So -- and that's this box here (indicating) in summary form.

     If you like, I could read it for the record.

Q.   Yes.   Do we see a number of those times in the wee small

hours of the morning?

A.   Yes, sir.

Q.   Can you read down those time frames, please, for the jury where this phone was used in the vicinity of that location on the southeast corner of the golf course.

A.   Yes, sir.  So we have August 19th at 2:22 a.m., and again at 2:01 p.m.

August 20th at 1:42 a.m. through 2:53 a.m.

We have August 21st from 2:01 a.m. to 2:27 a.m.; again at 3:10 a.m. to 4:14 a.m.; and again at 10:18 a.m.

On August 22nd from 5:00 a.m. to 5:35 a.m.

On August 23rd at 4:35 a.m.

August 24th at 5:06 a.m.

August 26th at 1:50 p.m.

August 28th from 9:17 a.m. to 9:22 a.m.  And again, at 8:34 p.m. to 8:40 p.m.

On August 29th from 9:38 a.m. to 9:47 a.m.

August 31st from 5:10 a.m. to 6:37 a.m., and again at 8:57 a.m.

On September 1st from 9:35 a.m. to 2:03 p.m.

On September 2nd at 4:33 a.m.

On September 4th from 12:29 a.m. to 1:55 a.m.

On September 7th at 11:09 a.m.

On September 8th from 2:32 a.m. to 2:35 a.m.

On September 9th from 3:48 a.m. to 3:49 a.m.

On September 15th from 1:59 a.m. to 2:03 a.m.; and then again at 4:06 a.m. to 12:57 a.m.

Q.   And am I right, Agent, that August 19th is the first date that we have this timing advance data; correct?

A.   Yes, sir.

Q.   Do you recall from early in this slideshow where there -- whether there was evidence that this phone was in that same vicinity on the night of the 15th of August, the 16th of August, the 17th of August, and the 18th of August as well?

A.   Yes, sir.  And I must say that this is just the times that he is hitting these specific bands that are displayed on your map.  This is not incorporating all the other data that we went through already, the summary slides.

This is just when he is in the vicinity of what's been referred to me as the nest and the southeast corner located in the red here (indicating).

Q.   This is -- is this telling us just the data relating to this one tower closest to that one location?

A.   Correct.

Q.   And have you seen and did you summarize over the course of your testimony a number of other instances where the phones -- where both phones would have been around other parts of the golf course as well?

A.   Yes, sir.

MR. SHIPLEY:  Okay.  One moment, Your Honor.

BY MR. SHIPLEY:

Q.   Just one clarification on the slide in case we're following along.  On the 9:15 entry where it says 4:06 a.m. --

THE COURT:  What page?

MR. SHIPLEY:  Oh, I'm sorry.  We are on page 91, the slide that's still up on the screen.

BY MR. SHIPLEY:

Q.   Where it says 4:06:00 a.m., should that be 12:57 p.m.?  Let me circle it for you.

A.   Yes, sir.  I apologize.

Q.   Okay.  So to correct, is that 4:06 a.m. to 4:57 p.m. on September 15th?

A.   Yes, sir.  Until the phone goes off at 12:57 p.m.

MR. SHIPLEY:  Thank you.

Thank you, Your Honor.  No further questions.

THE COURT:  Okay.  Ladies and gentlemen, we're going to take just a very brief five-minute break for the restroom, and then we will continue.

Please don't discuss the substance of your testimony, sir.

All rise for the jury.

(The jury exited the courtroom at 4:57 p.m.)

THE COURT:  Thank you.  Please return in five minutes.

(A recess was taken from 4:57 p.m. to 5:03 p.m.)

THE COURT:  Let's call in the jurors, please.

(The jury entered the courtroom at 5:03 p.m.)

THE COURT:  Please have a seat.  You remain under oath, sir.

Any cross-examination?

MR. ROUTH:  Just a couple of questions.

CROSS-EXAMINATION

BY MR. ROUTH:

Q.   Good afternoon.  How are you?

A.   I'm all right.

Q.   Right on.  We will try to get you out of here so you can get to Miami.

The -- so what you're saying is that 120-degree angle, just so I understand what is going on, if you -- somebody is missing or lost their phone or whatever and it's in that -- in that cone of 120 degrees, and you have to, I guess, get a search party to search that area and try to find that body or that phone or whatever?

A.   Yes.  In -- well, like a very primitive form, yeah.  We would look for other addresses associated with the individual, lots of methods to try to derive a location within that cone, yes, sir.

Q.   But that's the general area where you have to -- you have to -- they could be in that -- in that cone pretty much anywhere?

A.   Yes, it's very broad speaking.

I said that a few times, but I just want to make sure you guys understand that fully.  It's very broad-based.  I'm not pinpointing any specific location.  It could be anywhere within that area when we just have the cone.  When we have the timing advance bands, it's a little more precise.

Q.   Right, right, right.

A.   So...

Q.   Sounds good.

So when we're looking at that entire block where we -- all of the activity, you know -- so if we have got a wonderful dance club on the corner of Summit Boulevard and Military Trail there at Neptune and Mercury Streets, is it not possible that someone could have been at that dance club for all these late nights and danced -- dancing (indicating)?

A.   Yes, sir.  It could be possible that you were at the dance club, but it's also possible to be at the golf course.  So...

Q.   Right.

A.   -- like I said.

Q.   So it's kind of -- kind of rough.

A.   Yes, sir.

Q.   I noticed there is another dance facility (indicating) on Congress Avenue at Ohio Street.  So that covers another area. That is another --

A.   I'm not familiar with the dance clubs in that area, but I will take you for your word, yes, sir.

Q.   I will take you sometime.  So...

But, again, and there's hundreds -- hundreds, if not a thousand houses there on Kirk Road that -- you know, to visit people and hang out and do all sorts of things and --

A.   Yes, sir.

Q.   So, I mean, as far as pinpointing where someone could have gone or been or spent all their time, it's kind of hard to -- hard to -- hard to say, I would guess.

A.   I would say that the phone could have been anywhere at those locations, including the Trump International Golf Course.

Q.   Right, right, right.  All right.  Sounds great.

MR. ROUTH:  Thanks for your help.  That's all I have.

THE WITNESS:  Thank you, sir.

MR. ROUTH:  Thank you, Your Honor.

THE COURT:  Any redirect?

MR. SHIPLEY:  No.

THE COURT:  All right.  Thank you very much, Agent. You may be excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right, ladies and gentlemen, we are going to break for the evening.  It is 5:06 approximately.  We will resume again as usual at 9:00 a.m., our normal time.

Again, I will remind you not to engage in any discussion regarding this case with anyone, including your fellow jurors.

Do not research, post, communicate, look up, or do anything related to this case on the internet or elsewhere.

Have no contact with the attorneys, parties, and witnesses in the case.  And, of course, maintain an open mind until all the evidence has been presented.

Again, the only evidence that can be considered in this courtroom, in this case is the evidence presented in the official proceedings in the courtroom and the law as I present it to you.

So with those remarks, I wish you all a pleasant evening.  We will resume tomorrow, as I said, at 9:00.

All rise for the jury.

(The jury exited the courtroom at 5:08 p.m.)

THE COURT:  Thank you.  Please have a seat.

Just a couple of items before we close.

To confirm, Mr. Routh, you are withdrawing your request for a Rule 17(b) subpoena as relates to your son; is that correct?

MR. ROUTH:  That's correct, Your Honor.

THE COURT:  Okay.  All right.  You understand that once this decision is made, as you're telling me, you won't be able to bring him back?  I just want to make sure you understand the consequences of this decision.

MR. ROUTH:  Fully understand.

THE COURT:  Okay.  All right.  Well, then that

concludes that discussion.

Any other evidentiary or legal issues to raise before we close, Mr. Shipley or Mr. Browne?

MR. BROWNE:  Your Honor, this is more of a logistical issue.  I wanted to make the Court aware that we anticipate towards the end of tomorrow we will have two witnesses who are both Spanish speakers.  We have contracted two interpreters to work with them for purposes of facilitating -- facilitating their testimony.  And I don't know if the Court wants to take it up now, but they will be present in court tomorrow just to kind of observe things.

Does the Court have a practice in terms of where the interpreters would sit for live witness testimony?

THE COURT:  Typically the certified translators sit over there (indicating), and they're equipped with the headphones, and we proceed that way.  But if you have another alternative or some other issue with that arrangement, I'm happy to hear you out.

MR. BROWNE:  I spoke to the two interpreters, and they can provide, of course, more information.  But apparently these are not court-hired interpreters; these are hired by the government in this case.  And it's their practice to actually sit next to the witness in the witness box and translate both the question to the witness and then the response, obviously, for the record.

So I don't know if the Court would be okay with that, that they would be sitting -- there are two, and they basically take turns doing the interpretation, but my understanding is that they would sit next to the witness as the testimony is happening.

THE COURT:  Okay.  And what day is this for?

MR.  BROWNE:  This will likely be tomorrow in the late afternoon.  However, we have one, two, three, four, five -- six witnesses that will come before those two gentlemen testify.

THE COURT:  Okay.  I will give this some thought as far as the formatting for the translation and revisit it in the morning tomorrow.

Let's see.  As far as those six witnesses that you anticipate, can you list those out, please.

MR.  BROWNE:  Yes, Your Honor.  They would be Pat Lantry, Aaron Thompson, Ronnie Oxendine, Matthew Perry, Garett Foo, Laura Haller, and Samuel and Lazaro Plata.

THE COURT:  Okay.  All right.  Other than that, does the government still tentatively think it will be close to resting at some point on Thursday?

MR.  BROWNE:  We are thinking more towards Friday now, Your Honor; again, just based on the duration of some of the testimony.  But we do think there is an outside chance that we would be close to wrapping up by the end of Thursday, but we think Friday is much more likely.

THE COURT:  Okay.  All right, then.  Any other witness updates from the defense, Ms. Militello, regarding Mr. McClay or any other issues, just for planning purposes?

MS. MILITELLO:  No, Your Honor.  I believe everyone will be available on Friday.  And just to remind the Court, I will be out tomorrow for the procedure.

THE COURT:  Yes.  Thank you.  All the best to you.  Ms. Sihvola will be here.

Okay.  All right.  Now, as far as the charge conference, I did want to indicate that I anticipate having at least an initial charge conference Thursday, which may require breaking a little bit early on Thursday, with the jury at least, around 4:45 or 5:00.  So please plan accordingly for that.

Mr. Routh, you should come prepared to present your argument on your jury instruction request, which we touched upon briefly in the past based on your submission.

Okay.  That is all I have for this evening.  Please arrive tomorrow at 8:45 for our brief morning session.  And unless there is anything else, we will be in recess.

Mr. Routh, anything further?

MR. ROUTH:  I think we have discussed earlier about going over my exhibits at some point in time, but...

THE COURT:  Okay.  That is a fair point.  Okay.  Well, then, we may be able to squeeze that in during the charge

conference on Thursday.  So be prepared for that discussion Thursday.  And if more time is necessary, then I will fit that in during Friday's session, either in a break or during an extended lunch.  So thank you.  Have a good evening.  We will resume tomorrow.

(These proceedings concluded at 5:14 p.m.)

C E R T I F I C A T E


I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled matter.


DATE:   09-16-2025          /s/Laura Melton
                            LAURA E. MELTON, RMR, CRR, FPR
                            Official Court Reporter
                            United States District Court
                            Southern District of Florida
                            Fort Pierce, Florida

**$**

**$300,000** [1]_ - 173:9

**'**

**'guns** [1]_ - 121:15

**1**

**1** [52]_ - 16:7_, 37:1_, 38:23_, 48:1_, 53:3_, 56:19_, 58:13_, 58:14_, 58:15_, 59:25_, 60:14_, 60:17_, 61:3_, 62:8_, 63:1_, 63:14_, 64:16_, 64:18_, 64:19_, 66:1_, 66:19_, 68:2_, 69:12_, 69:13_, 69:17_, 70:12_, 70:20_, 71:18_, 71:19_, 71:23_, 72:23_, 73:2_, 96:23_, 98:12_, 98:14_, 98:16_, 102:17_, 103:23_, 149:4_, 191:21_, 209:15_, 211:25_, 250:6_, 252:17_, 269:20_, 271:22
**1,000** [1]_ - 200:17
**1,220** [1]_ - 23:20
**1,240** [3]_ - 23:18_, 23:20_, 23:23
**1,250** [1]_ - 23:21
**1,297** [1]_ - 253:20
**1-728-206-1801** [1]_ - 97:24
**1-743-251-7269** [1]_ - 149:7
**1-808-464-8342** [1]_ - 103:14
**1.1** [1]_ - 20:6
**1/2** [6]_ - 27:16_, 27:22_, 29:19_, 29:22_, 31:13
**10** [8]_ - 23:2_, 23:10_, 23:24_, 98:10_, 100:13_, 100:16_, 252:20_, 253:5
**106** [3]_ - 147:16_, 148:14_, 148:16
**107** [1]_ - 52:7
**10:00** [1]_ - 53:20
**10:06** [1]_ - 53:21
**10:07** [1]_ - 54:1
**10:09** [1]_ - 215:18
**10:14** [1]_ - 247:2
**10:18** [1]_ - 275:10

**10:19:32** [1]_ - 254:22
**10:23** [2]_ - 254:18_, 255:21
**10:46** [1]_ - 246:4
**10:59** [1]_ - 247:2
**11** [16]_ - 65:9_, 69:22_, 69:23_, 69:24_, 70:9_, 70:11_, 70:19_, 73:16_, 73:22_, 94:21_, 101:6_, 101:7_, 235:18_, 259:8
**1100** [1]_ - 229:23
**1114** [2]_ - 186:8_, 190:22
**1115** [2]_ - 186:9_, 190:22
**1116** [2]_ - 186:9_, 190:22
**1117** [1]_ - 149:9
**1118** [1]_ - 130:4
**1119** [2]_ - 105:4_, 105:9
**1121** [2]_ - 107:19_, 107:24
**115** [3]_ - 112:15_, 116:18_, 117:2
**118** [9]_ - 130:24_, 131:15_, 131:19_, 131:24_, 133:18_, 134:22_, 135:17_, 135:22_, 136:13
**119** [5]_ - 112:15_, 115:16_, 115:17_, 116:18_, 117:2
**11:00** [2]_ - 94:14
**11:01** [2]_ - 255:17_, 255:21
**11:01:07** [1]_ - 255:18
**11:01:14** [2]_ - 255:19_, 255:25
**11:08** [1]_ - 256:12
**11:09** [1]_ - 275:23
**11:15** [1]_ - 256:13
**11:20** [2]_ - 209:15_, 211:25
**11:20:22** [1]_ - 210:3
**11:21** [2]_ - 209:15_, 211:25
**11:21:06** [1]_ - 210:3
**11:35** [3]_ - 228:11_, 228:12_, 228:15
**11:35:27** [1]_ - 229:1
**11:39** [1]_ - 114:12
**11:42** [1]_ - 116:5
**11:48** [3]_ - 232:16_, 232:18_, 233:23
**11:49** [1]_ - 116:5

**11:54** [2]_ - 235:12_, 259:19
**11:54:36** [1]_ - 259:23
**11:54:48** [1]_ - 259:24
**11:55** [8]_ - 94:21_, 119:16_, 235:1_, 235:3_, 235:5_, 235:6_, 235:12
**11:56** [2]_ - 94:15_, 232:19
**11:58** [3]_ - 232:16_, 232:20_, 233:23
**11th** [1]_ - 259:5
**12** [14]_ - 14:13_, 17:12_, 39:13_, 39:14_, 97:16_, 112:14_, 117:2_, 169:23_, 211:17_, 227:20_, 227:24_, 233:9_, 241:12_, 242:4
**12-19** [1]_ - 116:18
**12-hour** [1]_ - 248:19
**120** [4]_ - 112:16_, 116:18_, 117:3_, 278:15
**120-degree** [2]_ - 192:14_, 278:12
**124-grain** [1]_ - 19:8
**125** [3]_ - 112:16_, 116:18_, 117:3
**127** [3]_ - 112:16_, 116:18_, 117:3
**128** [3]_ - 112:17, 116:19_, 117:3
**12:0** [1]_ - 261:10
**12:00** [3]_ - 260:20_, 260:22_, 261:10
**12:02** [2]_ - 229:3_, 229:17
**12:09** [1]_ - 229:16
**12:12** [2]_ - 229:3_, 229:17
**12:13** [1]_ - 132:16
**12:16** [1]_ - 134:7
**12:29** [2]_ - 251:17_, 275:22
**12:29:53** [2]_ - 251:19_, 252:3
**12:29:56** [2]_ - 251:18_, 252:5
**12:30** [5]_ - 225:7_, 225:8_, 226:16_, 251:17_, 251:21
**12:30:13** [2]_ - 251:19_, 252:4
**12:32** [6]_ - 225:10_, 225:13_, 228:13_, 229:5_, 229:6_, 229:10
**12:35** [5]_ - 230:11_,

230:18_, 231:2_, 232:8_, 233:18
**12:37** [1]_ - 225:14
**12:38** [2]_ - 225:11_, 225:15
**12:42** [4]_ - 263:2_, 263:3_, 269:17_, 269:18
**12:44:36** [1]_ - 253:1
**12:50:38** [1]_ - 262:3
**12:51** [1]_ - 261:17
**12:51:20** [1]_ - 261:18
**12:51:31** [1]_ - 261:17
**12:52** [1]_ - 260:24
**12:56** [1]_ - 267:14
**12:57** [7]_ - 230:19_, 266:18_, 266:25_, 268:21_, 276:2_, 277:8_, 277:13
**12:57:23** [1]_ - 268:24
**13** [13]_ - 14:13_, 98:6_, 98:9_, 101:23_, 101:25_, 102:22_, 104:3_, 126:12_, 181:8_, 195:15_, 239:12_, 242:14_, 258:10
**13.75** [1]_ - 17:12
**1300** [4]_ - 130:25_, 131:19_, 133:19_, 134:22
**135** [5]_ - 112:17, 116:19_, 117:3_, 119:25_, 120:6
**14** [18]_ - 14:14_, 16:20_, 71:2_, 71:9_, 71:16_, 71:18_, 71:23_, 73:18_, 73:22_, 120:15_, 120:16_, 121:8_, 123:22_, 124:7_, 124:10_, 218:25_, 272:22_, 273:17
**14.39** [2]_ - 14:14_, 16:22
**141** [3]_ - 112:18, 116:20_, 117:3
**142** [3]_ - 112:18, 116:20_, 117:3
**149** [3]_ - 112:18, 116:20_, 117:3
**14th** [8]_ - 219:5_, 219:24_, 220:9_, 228:4_, 228:5_, 259:15_, 259:19_, 274:3
**15** [25]_ - 10:7_, 57:3_, 57:24_, 58:21_, 59:18_, 59:22_, 60:8_, 60:9_, 61:5_, 170:5_, 181:16_, 214:14_, 239:12_, 263:1_, 264:4_, 265:6_, 269:11_, 269:17_, 272:22_, 273:18_, 274:19
**156** [3]_ - 112:19, 116:20_,

117:3

**15th** [14]_ - 221:23_, 228:3_, 228:6_, 260:16_, 260:19_, 262:14_, 264:18_, 266:18_, 268:21_, 269:9_, 274:3_, 276:1_, 276:8_, 277:12

**16** [15]_ - 12:8_, 57:3_, 57:24_, 59:18_, 59:22_, 60:9_, 61:5_, 73:17_, 73:24_, 215:7_, 222:6_, 223:5_, 225:10_, 226:21

**16-hour** [3]_ - 253:18_, 257:2_, 257:9

**160** [3]_ - 68:5_, 69:18_, 73:4

**161** [3]_ - 112:19, 116:20_, 117:3

**163A** [4]_ - 20:20_, 21:8_, 21:13_, 21:15

**163B** [3]_ - 20:20_, 21:13_, 24:3

**16th** [9]_ - 225:5_, 226:19_, 227:9_, 227:16_, 227:24_, 228:11_, 228:12_, 229:14_, 276:8

**17** [4]_ - 122:6_, 217:4_, 230:10_, 232:16

**17(b** [1]_ - 281:17

**17-week** [1]_ - 33:11

**174.618.3.4** [1]_ - 109:20

**17th** [6]_ - 228:12_, 229:10_, 230:7_, 232:13_, 233:17_, 276:9

**18** [9]_ - 57:3_, 59:18_, 60:8_, 61:5_, 169:23_, 170:6_, 217:20_, 234:10

**1801** [10]_ - 197:8_, 199:18_, 201:21_, 202:14_, 207:16_, 208:1_, 211:23_, 215:2_, 215:17_, 216:4

**187** [1]_ - 74:12

**187A** [2]_ - 73:10_, 73:15

**187B** [4]_ - 13:17_, 14:5_, 15:16_, 16:14

**188A** [2]_ - 74:6_, 74:12

**188B** [3]_ - 15:9_, 15:20_, 16:8

**18th** [8]_ - 234:5_, 234:25_, 235:3_, 235:16_, 235:18_, 236:7_, 236:11_, 276:9

**19** [10]_ - 18:17_, 112:14_, 117:2_, 146:10_, 218:21_, 220:17_, 221:6_, 238:2_, 239:3_, 274:19

**19th** [9]_ - 239:2_, 240:20_, 241:8_, 241:9_, 241:23_, 242:1_, 242:19_, 275:6_, 276:3

**1:00** [1]_ - 260:25

**1:07** [1]_ - 261:2

**1:10** [2]_ - 132:14_, 134:6

**1:12** [1]_ - 230:19

**1:14** [3]_ - 269:20_, 269:25

**1:15** [3]_ - 260:20_, 261:2_, 261:10

**1:18** [1]_ - 134:7

**1:19** [6]_ - 134:18_, 234:5_, 234:10_, 234:13_, 236:7_, 263:7

**1:19:04** [1]_ - 263:4

**1:21** [1]_ - 262:14

**1:21:37** [1]_ - 262:16

**1:21:44** [3]_ - 262:16_, 263:6_, 263:8

**1:24** [1]_ - 263:2

**1:24:24** [2]_ - 263:5_, 263:9

**1:28** [4]_ - 217:9_, 269:17_, 269:20_, 269:25

**1:30** [1]_ - 227:9

**1:35** [3]_ - 235:19_, 236:11

**1:38** [6]_ - 226:21_, 226:22_, 230:11_, 231:2_, 232:8_, 233:18

**1:40** [1]_ - 235:19

**1:42** [4]_ - 269:12_, 270:14_, 275:8

**1:42:40** [1]_ - 270:15

**1:42:54** [1]_ - 270:16

**1:47** [2]_ - 226:25_, 236:25

**1:48** [1]_ - 270:16

**1:50** [1]_ - 275:14

**1:51:53** [1]_ - 271:23

**1:52** [2]_ - 264:4_, 264:18

**1:52:56** [1]_ - 264:7

**1:53:56** [1]_ - 264:7

**1:55** [1]_ - 275:22

**1:56** [1]_ - 270:16

**1:56:08** [1]_ - 264:20

**1:56:23** [1]_ - 271:23

**1:57** [2]_ - 241:9_, 242:1

**1:58** [2]_ - 242:20_, 243:7

**1:59** [2]_ - 264:18_, 276:1

**1:59:20** [2]_ - 264:22_, 264:23

**1B** [2]_ - 90:21_, 90:22

**1B1** [1]_ - 125:4

**1B17** [2]_ - 90:22_, 95:9

**1st** [5]_ - 250:10_, 251:11_, 251:17_, 252:12_, 275:20

---

2

---

**2** [29]_ - 27:16_, 27:22_, 29:19_, 29:22_, 47:19_, 58:10_, 58:12_, 61:1_, 61:10_, 86:18_, 96:24_, 98:2_, 98:23_, 98:24_, 111:6_, 123:4_, 124:5_, 129:8_, 141:12_, 142:15_, 147:13_, 151:3_, 155:11_, 160:10_, 161:24_, 189:9_, 191:22_, 253:16

**2,000** [1]_ - 200:17

**2-5** [2]_ - 67:1_, 67:4

**2/3/2024** [1]_ - 137:3

**20** [11]_ - 3:22_, 147:16_, 148:14_, 148:16_, 160:5_, 161:7_, 170:6_, 210:22_, 220:15_, 220:21_, 221:5

**20,000** [1]_ - 189:20

**20-mile** [2]_ - 225:13_, 232:17

**200** [2]_ - 78:9_, 183:18

**200-107** [5]_ - 112:22_, 116:22_, 117:4_, 117:14_, 118:4

**200-12** [3]_ - 112:21_, 116:22_, 117:4

**200-13** [5]_ - 112:21_, 117:5_, 117:6_, 117:12_, 117:13

**200-4** [3]_ - 112:20_, 116:20_, 117:3

**200-7** [3]_ - 112:20_, 116:21_, 117:3

**200-8** [3]_ - 147:16_, 148:14_, 148:16

**200-meter** [1]_ - 268:6

**2010** [1]_ - 10:5

**2016** [2]_ - 31:13_, 166:12

**2018** [1]_ - 167:18

**2020** [1]_ - 239:2

**2024** [61]_ - 48:12_, 146:10_, 197:7_, 199:17_, 201:21_, 205:20_, 207:16_, 208:22_, 209:15_, 211:25_, 213:15_, 215:18_, 216:5_, 217:22_, 218:25_, 222:6_, 223:5_, 225:10_, 226:21_, 229:19_, 230:10_, 232:16_, 234:10_, 238:2_, 239:3_, 242:20_, 243:7_, 243:25_, 246:3_, 246:4_, 247:1_, 247:11_, 248:8_, 249:5_, 249:13_, 249:21_, 250:2_, 250:6_, 252:17_, 253:16_, 254:10_, 254:13_, 254:18_, 255:16_, 256:25_, 257:18_, 258:5_, 258:7_, 259:8_, 263:1_, 264:4_, 265:6_, 269:11_, 269:17_, 272:22_, 273:17_, 273:18_, 274:3_, 274:19

**2024-02020** [2]_ - 48:22_, 64:13

**20th** [1]_ - 275:8

**21** [12]_ - 57:11_, 110:5_, 110:11_, 110:22_, 111:1_, 111:3_, 112:7_, 222:2_, 227:12_, 243:25_, 246:3_, 247:1

**21,232** [1]_ - 272:25

**210** [1]_ - 70:22

**213** [1]_ - 258:14

**21st** [5]_ - 243:3_, 243:7_, 245:18_, 245:20_, 275:9

**22** [6]_ - 112:14_, 116:18_, 117:2_, 225:3_, 226:15_, 247:11

**220** [3]_ - 49:2_, 55:17_, 56:21

**22nd** [4]_ - 247:15_, 247:19_, 275:11

**23** [3]_ - 7:6_, 226:12_, 227:18

**23G** [1]_ - 113:4

**23rd** [1]_ - 275:12

**24** [5]_ - 56:25_, 57:11_, 59:7_, 60:13

**24-cr-80116-Cannon** [1]_ - 3:4

**24/7** [1]_ - 179:5

**24L** [1]_ - 113:5

**24th** [1]_ - 275:13

**25** [4]_ - 17:24_, 67:1_, 230:5_, 233:19

**250** [9]_ - 66:3_, 66:21_, 66:22_, 66:23_, 66:24_,

66:25_, 67:2_, 67:3_, 67:4
**26** [2]_ - 232:11_, 233:20
**26th** [3]_ - 248:2_, 248:3_, 275:14
**27** [3]_ - 228:21_, 234:4_, 236:3
**28** [8]_ - 197:7_, 199:17_, 201:21_, 205:20_, 217:22_, 234:23_, 246:4_, 248:8
**28th** [7]_ - 208:18_, 208:22_, 209:1_, 212:7_, 217:24_, 248:19_, 275:15
**29** [6]_ - 50:5_, 207:16_, 235:14_, 236:8_, 249:5_, 249:13
**29th** [6]_ - 206:24_, 207:2_, 207:22_, 207:23_, 249:11_, 275:17
**2:00** [1]_ - 228:6
**2:01** [2]_ - 275:7_, 275:9
**2:02** [1]_ - 270:17
**2:03** [2]_ - 275:20_, 276:1
**2:04** [1]_ - 234:11
**2:05** [3]_ - 212:15_, 234:11
**2:05:00** [1]_ - 214:6
**2:06** [2]_ - 244:23_, 271:8
**2:07** [1]_ - 250:11
**2:08** [3]_ - 235:19_, 235:20_, 236:11
**2:09** [5]_ - 212:15_, 212:17_, 270:14_, 270:17_, 271:8
**2:09:27** [1]_ - 270:20
**2:09:30** [1]_ - 270:19
**2:09:38** [1]_ - 271:9
**2:09:53** [1]_ - 271:9
**2:10:48** [1]_ - 271:10
**2:15** [3]_ - 226:21_, 227:1_, 227:9
**2:18** [3]_ - 251:11_, 252:17_, 252:21
**2:19** [7]_ - 234:5_, 234:10_, 234:13_, 236:7_, 239:3_, 239:12_, 241:21
**2:22** [1]_ - 275:6
**2:22:10** [1]_ - 271:11
**2:23** [1]_ - 244:25
**2:25** [5]_ - 220:23_, 220:24_, 220:25_, 221:8_, 221:23
**2:26** [4]_ - 244:1_, 244:2_, 244:13_, 256:25

**2:27** [2]_ - 242:20_, 275:9
**2:31** [2]_ - 244:3_, 252:22
**2:32** [1]_ - 275:24
**2:34** [2]_ - 241:10_, 242:2
**2:35** [1]_ - 275:24
**2:36** [4]_ - 244:1_, 244:4_, 244:13_, 252:22
**2:37** [2]_ - 240:20_, 244:25
**2:39** [2]_ - 265:7_, 265:9
**2:40** [2]_ - 217:22_, 217:24
**2:41** [2]_ - 265:7_, 265:9
**2:42** [4]_ - 207:16_, 207:23_, 208:2_, 208:19
**2:43** [4]_ - 207:17_, 207:23_, 208:2_, 208:20
**2:44** [5]_ - 207:3_, 207:11_, 252:17_, 252:22
**2:44:13** [1]_ - 207:4
**2:44:36** [1]_ - 252:20
**2:44:46** [1]_ - 253:5
**2:46** [2]_ - 257:18_, 257:25
**2:50:25** [1]_ - 265:18
**2:50:27** [1]_ - 265:19
**2:53** [1]_ - 275:8
**2:55** [1]_ - 221:3
**2nd** [4]_ - 253:14_, 253:19_, 254:10_, 275:21

### 3

**3** [13]_ - 29:19_, 29:22_, 61:15_, 61:16_, 99:19_, 102:23_, 104:4_, 121:25_, 124:5_, 126:9_, 159:20_, 161:7_, 207:21
**3,000** [2]_ - 27:16_, 27:22
**3,484** [1]_ - 274:5
**3/28/2024** [1]_ - 155:8
**3/30/2024** [1]_ - 153:14
**3/4** [1]_ - 14:13
**30** [7]_ - 130:2_, 148:8_, 181:8_, 195:15_, 236:14_, 238:6_, 258:14
**30-day** [1]_ - 238:5
**300** [45]_ - 83:16_, 83:21_, 84:5_, 84:17_, 84:18_, 89:14_, 89:17_, 89:23_, 90:20_, 90:21_, 90:22_, 91:20_, 91:23_, 97:15_, 97:22_, 100:7_, 102:10_, 102:19_, 103:4_, 103:18_,

104:5_, 104:11_, 105:15_, 105:20_, 105:23_, 108:12_, 108:16_, 108:24_, 109:18_, 109:20_, 110:16_, 111:25_, 121:10_, 122:20_, 123:1_, 123:8_, 124:4_, 162:3_, 162:5_, 162:19_, 185:23_, 197:9_, 208:6_, 209:14_, 215:2
**301** [45]_ - 85:19_, 85:21_, 85:24_, 102:12_, 102:14_, 103:11_, 124:16_, 124:25_, 125:16_, 126:2_, 126:7_, 126:21_, 130:17_, 131:15_, 131:17_, 135:4_, 135:7_, 135:8_, 135:11_, 135:24_, 136:2_, 136:4_, 137:13_, 138:8_, 138:11_, 138:12_, 138:19_, 139:2_, 139:7_, 139:19_, 140:20_, 140:24_, 141:11_, 141:18_, 163:10_, 163:11_, 185:7_, 197:13_, 216:7_, 216:14_, 218:2_, 219:8, 231:11_, 246:22_, 274:12
**302** [21]_ - 86:9_, 86:11_, 86:16_, 86:17_, 147:6_, 148:8_, 149:2_, 149:4_, 149:17_, 150:23_, 152:2_, 153:22_, 154:14_, 155:11_, 156:6_, 159:15_, 160:16_, 161:2_, 185:15_, 216:22_, 219:13
**303** [2]_ - 86:24_, 87:3
**304** [2]_ - 86:25_, 87:4
**305** [9]_ - 88:4_, 88:12_, 89:14_, 143:5_, 143:21_, 144:13_, 144:16_, 145:19_, 146:25
**309** [1]_ - 197:13
**31** [6]_ - 14:16_, 17:24_, 238:23_, 241:16_, 249:21_, 250:2
**3131** [4]_ - 204:20_, 223:18_, 226:4_, 238:14
**318** [3]_ - 112:22_, 117:14, 118:4
**319** [4]_ - 147:16_, 148:14_, 148:16_, 159:7
**31st** [1]_ - 275:18
**32** [1]_ - 240:14
**33** [3]_ - 29:21_, 241:5_, 241:25
**336-335-9543** [2]_ - 145:20_, 146:9
**336-337-9339** [1]_ -

146:21
**35** [1]_ - 243:1
**351** [1]_ - 246:5
**36** [1]_ - 243:19
**360** [1]_ - 191:25
**37** [1]_ - 244:21
**38** [1]_ - 245:15
**39** [2]_ - 27:19_, 246:1
**3:00** [1]_ - 201:11
**3:01** [1]_ - 208:3
**3:03** [5]_ - 211:1_, 211:4_, 239:3_, 239:12_, 241:21
**3:06** [1]_ - 245:20
**3:09** [3]_ - 197:7_, 199:15_, 201:23
**3:09:17** [1]_ - 199:17
**3:10** [4]_ - 207:5_, 207:11_, 207:21_, 275:10
**3:10:42** [1]_ - 207:3
**3:19** [1]_ - 201:21
**3:19:54** [2]_ - 202:14_, 206:4
**3:20** [3]_ - 210:22_, 211:3_, 266:15
**3:20:46** [2]_ - 266:7_, 266:9
**3:20:47** [1]_ - 266:10
**3:25** [1]_ - 219:6
**3:26** [1]_ - 211:4
**3:27** [1]_ - 211:10
**3:30** [1]_ - 267:22
**3:31** [1]_ - 259:8
**3:36** [3]_ - 266:18_, 266:25_, 267:12
**3:40** [1]_ - 248:4
**3:43** [1]_ - 258:7
**3:48** [1]_ - 275:25
**3:49** [1]_ - 275:25
**3:53** [1]_ - 248:4

### 4

**4** [12]_ - 62:16_, 93:25_, 94:2_, 94:6_, 94:22_, 94:24_, 98:7_, 99:24_, 99:25_, 107:13_, 121:25
**4.08** [1]_ - 237:2
**40** [1]_ - 246:19
**405** [2]_ - 158:23_, 257:6
**405A** [6]_ - 147:16_,

148:14_, 148:16_, 155:14_, 156:3_, 156:10

**405B** [1]_ - 157:23

**405C** [2]_ - 158:11_, 158:23

**405D** [1]_ - 147:16

**406** [3]_ - 147:16_, 148:14, 148:18

**407** [3]_ - 147:17_, 148:15, 148:18

**408** [2]_ - 141:6_, 141:15

**41** [1]_ - 247:6

**412** [3]_ - 112:23_, 117:14, 118:4

**415** [3]_ - 112:23_, 117:14, 118:4

**41st** [1]_ - 170:14

**42** [1]_ - 247:13

**428** [3]_ - 112:23_, 117:14, 118:4

**43** [1]_ - 247:23

**44** [2]_ - 248:7_, 248:17

**447** [1]_ - 248:17

**45** [3]_ - 75:8_, 226:7_, 248:23

**46** [1]_ - 249:7

**47** [1]_ - 249:17

**48** [2]_ - 36:25_, 249:24

**49** [1]_ - 36:25

**4:06** [8]_ - 245:20_, 267:1_, 267:13_, 267:23_, 276:2_, 277:3_, 277:11

**4:06:00** [1]_ - 277:8

**4:14** [1]_ - 275:10

**4:16** [1]_ - 243:7

**4:17:11** [2]_ - 205:20_, 206:4

**4:29** [1]_ - 253:16

**4:30** [8]_ - 222:6_, 222:13_, 224:20_, 224:21_, 225:6_, 227:16_, 254:8_, 254:10

**4:31** [2]_ - 259:1

**4:33** [1]_ - 275:21

**4:35** [1]_ - 275:12

**4:43** [1]_ - 246:4

**4:45** [3]_ - 222:15_, 223:25_, 284:13

**4:52** [1]_ - 224:1

**4:52:54** [1]_ - 223:4

**4:54** [4]_ - 222:6_, 222:16

_, 224:2_, 227:16

**4:56** [1]_ - 247:11

**4:57** [3]_ - 277:11_, 277:22_, 277:24

**4:59** [1]_ - 258:8

**4th** [5]_ - 208:18_, 208:22_, 209:1_, 212:7_, 275:22

---

*5*

**5** [17]_ - 23:14_, 23:24_, 67:7_, 67:9_, 67:10_, 67:12_, 67:13_, 67:22_, 67:24_, 67:25_, 68:1_, 68:9_, 68:20_, 74:14_, 74:16_, 213:15_, 239:13

**5,728** [1]_ - 273:18

**50** [1]_ - 251:5

**50-meter** [1]_ - 21:24

**500** [1]_ - 257:6

**51** [1]_ - 251:13

**514** [9]_ - 142:20_, 144:4_, 144:7_, 144:10_, 144:19_, 144:22_, 144:24_, 145:2_, 145:8

**515** [8]_ - 144:7_, 144:10_, 144:19_, 144:22_, 144:24_, 146:16_, 146:23_, 147:2

**516** [4]_ - 112:24_, 117:15, 118:4_, 147:17

**517** [4]_ - 147:17_, 148:15, 148:18_, 154:8

**518** [5]_ - 147:17_, 148:15, 148:18_, 151:21_, 152:22

**519** [3]_ - 112:24_, 117:15, 118:5

**52** [1]_ - 252:10

**53** [2]_ - 253:12_, 257:7

**55** [1]_ - 254:15

**5501** [1]_ - 196:7

**56** [1]_ - 255:13

**57** [1]_ - 273:18

**58** [4]_ - 49:19_, 50:5_, 242:13_, 256:20

**5:00** [3]_ - 225:6_, 275:11_, 284:13

**5:03** [2]_ - 277:24_, 278:1

**5:06** [2]_ - 275:13_, 280:21

**5:07** [1]_ - 249:21

**5:08** [1]_ - 281:13

**5:10** [1]_ - 275:18

**5:14** [1]_ - 285:6

**5:35** [2]_ - 247:11_, 275:11

**5:41** [1]_ - 250:2

**5:58** [2]_ - 257:19_, 257:25

**5th** [8]_ - 212:12_, 212:15_, 213:22_, 214:5_, 214:6_, 215:3_, 215:21

---

*6*

**6** [3]_ - 39:12_, 39:13_, 242:14

**6/12** [1]_ - 39:15

**60** [3]_ - 192:13_, 258:2

**600** [1]_ - 117:20

**600-103** [3]_ - 115:21_, 117:18, 118:14

**600-12** [3]_ - 113:1_, 117:15, 118:6

**600-124** [3]_ - 115:21_, 117:18, 118:14

**600-130** [5]_ - 161:16_, 161:20_, 162:8_, 162:11_, 162:12

**600-132** [3]_ - 115:21_, 117:18, 118:14

**600-135** [3]_ - 115:21_, 117:18, 118:14

**600-136** [3]_ - 115:21_, 117:18, 118:15

**600-137** [3]_ - 115:21_, 117:18, 118:16

**600-138** [3]_ - 115:21_, 117:18, 118:16

**600-139** [3]_ - 115:22_, 117:19, 118:16

**600-14** [3]_ - 113:2_, 117:15, 118:6

**600-140** [3]_ - 115:22_, 117:19, 118:18

**600-142** [3]_ - 115:22_, 117:19, 118:18

**600-148** [3]_ - 115:22_, 117:19, 118:18

**600-149** [3]_ - 115:23_, 117:19, 118:18

**600-156** [3]_ - 115:23_, 117:19, 118:19

**600-17** [3]_ - 113:2_, 117:15, 118:8

**600-18** [3]_ - 113:3_, 117:15, 118:8

**600-193** [1]_ - 132:1

**600-194** [11]_ - 130:24_, 131:19_, 131:24_, 133:5_, 133:12, 133:18, 134:22_, 137:15, 137:22_, 138:7_, 138:22

**600-195** [9]_ - 130:25_, 131:19_, 131:24_, 133:6_, 133:12, 133:19, 134:22_, 139:11_, 140:13

**600-21** [3]_ - 113:3_, 117:16, 118:8

**600-23A** [3]_ - 113:4_, 117:16, 118:8

**600-24A** [5]_ - 113:5_, 113:12_, 115:14_, 117:16, 118:10

**600-26** [5]_ - 147:17_, 148:15, 148:18_, 153:16_, 157:14

**600-30** [5]_ - 125:9_, 127:4_, 127:22_, 128:17_, 129:9

**600-35** [3]_ - 115:19_, 117:16, 118:10

**600-4** [3]_ - 112:25_, 117:15, 118:5

**600-43** [3]_ - 115:20_, 117:16, 118:10

**600-47** [3]_ - 115:20_, 117:17, 118:11

**600-53** [3]_ - 115:20_, 117:17, 118:11

**600-58** [3]_ - 115:20_, 117:17, 118:12

**600-6** [3]_ - 112:25_, 117:15, 118:6

**600-60** [3]_ - 115:20_, 117:17, 118:12

**600-61** [3]_ - 115:20_, 117:17, 118:12

**600-89** [3]_ - 115:20_, 117:17, 118:12

**600-9** [3]_ - 113:1_, 117:15, 118:6

**600-97** [3]_ - 115:20_, 117:17, 118:13

**606** [1]_ - 257:7

**61** [8]_ - 72:5_, 72:6_, 72:7_, 72:18_, 72:19_, 72:22_, 73:2_, 258:18

**62** [1]_ - 259:3

**66** [1]_ - 259:14

**660** [1]_ - 248:16

**67** [1]_ - 260:14
**68** [1]_ - 261:13
**69** [1]_ - 261:23
**6:28** [1]_ - 256:25
**6:31** [1]_ - 259:8
**6:37** [2]_ - 249:22_, 275:18
**6:41** [1]_ - 250:3
**6th** [2]_ - 215:3_, 215:21

### 7

**7** [5]_ - 181:7_, 195:14_, 215:17, 254:13, 254:18
**7.62** [1]_ - 27:17
**7.62x39** [1]_ - 27:7
**70** [2]_ - 193:8_, 262:11
**702** [14]_ - 37:4_, 90:24_, 91:5_, 91:9_, 92:6_, 92:9_, 92:13_, 94:3_, 98:3_, 100:16_, 101:3_, 102:18_, 107:9_, 126:9
**708** [5]_ - 115:23_, 117:20_, 117:22_, 117:23_, 117:25
**709** [4]_ - 115:23_, 117:22_, 118:1, 118:20
**71** [1]_ - 262:25
**710** [3]_ - 115:23_, 118:1, 118:20
**714** [4]_ - 188:2_, 190:21_, 215:8_, 215:10
**715** [2]_ - 204:11_, 204:12
**716** [1]_ - 204:13
**717** [1]_ - 204:16
**718** [1]_ - 204:16
**719** [2]_ - 204:19_, 204:21
**72** [1]_ - 263:14
**726** [1]_ - 103:21
**7269** [4]_ - 216:23_, 219:3_, 222:6_, 230:9
**728** [3]_ - 97:25_, 103:25_, 105:16
**728-206-1801** [2]_ - 185:18_, 197:7
**73** [1]_ - 263:23
**743** [1]_ - 269:6
**743-251-7269** [4]_ - 149:20_, 185:10, 218:24_, 219:11
**75** [1]_ - 265:1
**76** [1]_ - 265:12

**77** [1]_ - 266:2
**78** [7]_ - 183:15_, 208:16_, 208:18_, 237:13_, 240:8_, 266:16_, 268:5
**78-meter** [2]_ - 236:21_, 268:25
**79** [1]_ - 267:9
**797** [1]_ - 266:19
**7:30** [2]_ - 254:8_, 254:10
**7th** [6]_ - 217:5_, 217:9_, 255:16_, 256:11_, 256:12_, 275:23

### 8

**8** [10]_ - 68:17_, 68:18_, 68:19_, 69:11_, 69:12_, 69:16_, 74:18_, 74:19_, 256:25_, 257:18
**8/4/2024** [1]_ - 150:9
**80** [3]_ - 167:4_, 169:21_, 268:17
**800** [1]_ - 220:5
**808** [4]_ - 125:5_, 135:14_, 136:3_, 137:12
**808-464-8342** [4]_ - 126:3_, 130:15_, 185:2_, 217:22
**810** [1]_ - 71:25
**82** [1]_ - 269:13
**83** [1]_ - 270:11
**8342** [6]_ - 216:6_, 218:1_, 218:24_, 219:3_, 221:1_, 230:10
**84** [1]_ - 271:1
**85** [1]_ - 271:15
**850** [1]_ - 228:21
**86** [1]_ - 271:15
**876** [1]_ - 258:13
**88** [1]_ - 272:12
**89** [1]_ - 273:13
**8:05** [3]_ - 213:15_, 213:16_, 253:16
**8:14** [1]_ - 247:20
**8:15** [4]_ - 219:6_, 220:8_, 220:10, 220:18
**8:19** [2]_ - 219:5_, 219:22
**8:34** [2]_ - 247:20_, 275:16
**8:40** [1]_ - 275:16
**8:43** [2]_ - 248:9_, 248:20
**8:45** [1]_ - 284:19

**8:53** [1]_ - 5:25
**8:57** [1]_ - 275:19
**8th** [6]_ - 133:2_, 256:21_, 257:2_, 257:25_, 258:16_, 275:24

### 9

**9** [7]_ - 31:13_, 121:14_, 121:15_, 121:18_, 249:12_, 258:5_, 258:7
**9/13/2024** [1]_ - 112:8
**90** [1]_ - 273:24
**90-plus** [1]_ - 21:25
**900** [1]_ - 220:5
**904** [3]_ - 115:23_, 118:1, 118:20
**905** [3]_ - 115:23_, 118:1, 118:20
**906** [6]_ - 147:18_, 148:15, 148:18_, 148:24_, 151:3_, 151:7
**91** [2]_ - 274:14_, 277:5
**913** [4]_ - 53:2_, 53:13_, 54:25_, 67:20
**97E** [5]_ - 160:1_, 204:11_, 204:14_, 260:4_, 262:22
**98** [1]_ - 206:15
**99** [2]_ - 38:21_, 38:22
**9:00** [2]_ - 280:22_, 281:11
**9:12** [2]_ - 248:9_, 248:20
**9:15** [1]_ - 277:3
**9:17** [1]_ - 275:15
**9:22** [1]_ - 275:15
**9:24** [1]_ - 249:5
**9:25** [1]_ - 249:5
**9:26** [2]_ - 249:10_, 249:13
**9:30** [1]_ - 251:11
**9:32** [1]_ - 250:10
**9:35** [1]_ - 275:20
**9:38** [1]_ - 275:17
**9:47** [1]_ - 275:17
**9:48** [1]_ - 52:14
**9:51** [1]_ - 52:16
**9:52** [2]_ - 249:10_, 249:13
**9:53** [1]_ - 53:21
**9mm** [1]_ - 18:17
**9th** [2]_ - 258:10_, 275:25

### A

**a.m** [172]_ - 5:25_, 52:16_, 53:21_, 54:1_, 94:14_, 94:15_, 94:21_, 114:12_, 116:5_, 119:16_, 207:5_, 212:15_, 213:15_, 213:16_, 215:18_, 219:5_, 220:24_, 220:25_, 222:6_, 222:15_, 222:16_, 223:4_, 224:2_, 224:21_, 224:22_, 227:16_, 228:6_, 228:13_, 229:6_, 229:7_, 229:10_, 229:16_, 230:11_, 230:19_, 231:2_, 232:8_, 232:16_, 232:19_, 233:18_, 233:23_, 234:10_, 234:13_, 235:3_, 235:12_, 236:7_, 239:3_, 240:20_, 241:21_, 243:7_, 244:1_, 244:2_, 244:13_, 245:20_, 246:4_, 247:2_, 247:11_, 247:20_, 248:9_, 248:20_, 249:5_, 249:10_, 249:13_, 249:21_, 249:22_, 250:2_, 250:3_, 250:10_, 253:16_, 254:10_, 254:18_, 254:22_, 255:17_, 255:19_, 255:21_, 255:25_, 256:12_, 256:13_, 256:25_, 257:18_, 258:7_, 259:1_, 259:8_, 259:19_, 260:20_, 260:22_, 260:25_, 261:10_, 261:17_, 262:14_, 263:2_, 264:4_, 264:18_, 264:22_, 265:7_, 265:9_, 265:18_, 265:19_, 266:15_, 266:18_, 266:25_, 267:1_, 267:23_, 269:12_, 275:6_, 275:8_, 275:9_, 275:10_, 275:11_, 275:12_, 275:13_, 275:15_, 275:17_, 275:18_, 275:19_, 275:20_, 275:21_, 275:22_, 275:23_, 275:24_, 275:25_, 276:1_, 276:2_, 277:3_, 277:8_, 277:11_, 280:22
**A.m** [1]_ - 220:25
**A32** [3]_ - 125:3_, 135:9
**Aaron** [1]_ - 283:16
**abandoning** [1]_ - 4:5
**abide** [1]_ - 26:24
**able** [46]_ - 4:21_, 43:4_, 43:7_, 47:23_, 50:22_, 53:8_, 60:22_, 65:9_, 67:22_, 69:6_, 70:14_, 72:15_, 77:19_, 77:20_,

77:22_, 79:6_, 79:15_, 80:4_, 88:25_, 89:6_, 90:3_, 93:2_, 95:18_, 95:19_, 95:24_, 96:18_, 96:21_, 101:16_, 123:18_, 142:5_, 143:15_, 145:4_, 149:3_, 161:1_, 163:17_, 171:16_, 172:6_, 177:23_, 179:3_, 195:11_, 265:15_, 267:16_, 281:21_, 284:25

**absent** [1]_ - 245:12

**absolutely** [5]_ - 8:9_, 11:11_, 19:14_, 19:18_, 89:19

**academic** [1]_ - 166:13

**accept** [1]_ - 4:23

**accepted** [5]_ - 43:11_, 44:5_, 44:7_, 44:8_, 48:7

**access** [8]_ - 29:4_, 83:9_, 95:18_, 112:4_, 112:7_, 181:5_, 195:12_, 200:6

**accessed** [1]_ - 121:11

**according** [16]_ - 112:6_, 138:21_, 141:19_, 145:17_, 149:18_, 149:25_, 150:3_, 150:7_, 150:14_, 150:18_, 153:12_, 155:4_, 155:7_, 160:9_, 160:13_, 162:18

**accordingly** [2]_ - 4:20_, 284:13

**account** [46]_ - 98:7_, 98:13_, 98:16_, 98:17_, 99:1_, 99:8_, 99:10_, 99:11_, 99:13_, 100:8_, 100:10_, 100:12_, 100:19_, 100:20_, 100:24_, 101:1_, 101:8_, 101:20_, 102:4_, 102:6_, 102:9_, 102:11_, 103:6_, 103:13_, 104:4_, 104:5_, 104:7_, 104:9_, 107:12_, 108:6_, 108:7_, 108:9_, 108:18_, 126:18_, 126:25_, 127:1_, 128:14_, 145:14_, 146:10_, 146:11_, 151:16_, 153:8_, 153:13

**accounts** [8]_ - 98:7_, 98:9_, 98:25_, 99:8_, 101:18_, 101:19_, 101:21_, 102:2

**Accreditation** [1]_ - 36:12

**accreditation** [1]_ - 36:13

**accredited** [2]_ - 36:9_, 36:10

**accuracy** [1]_ - 51:25

**accurate** [2]_ - 26:12_, 45:12

**accurately** [2]_ - 21:3_, 45:2

**accustomed** [1]_ - 5:20

**acid** [1]_ - 38:7

**actions** [1]_ - 7:21

**activating** [1]_ - 145:10

**activations** [14]_ - 197:6_, 201:20_, 207:15_, 209:13_, 215:17_, 217:21_, 218:23_, 222:5_, 230:9_, 251:10_, 257:17_, 258:19_, 269:16_, 274:18

**activities** [1]_ - 11:18

**activity** [30]_ - 109:4_, 109:7_, 109:8_, 177:9_, 195:25_, 199:23_, 225:9_, 232:7_, 233:9_, 233:17_, 234:18_, 235:6_, 236:6_, 240:2_, 241:12_, 241:20_, 246:6_, 247:18_, 253:18_, 253:22_, 255:21_, 256:1_, 257:4_, 258:12_, 258:15_, 261:16_, 264:17_, 273:5_, 274:9_, 279:10

**actual** [7]_ - 38:1_, 41:8_, 95:17_, 111:17_, 169:3_, 178:9_, 230:14

**Adam** [2]_ - 164:10_, 165:5

**add** [2]_ - 40:4_, 190:11

**addition** [2]_ - 47:12_, 49:14

**additional** [17]_ - 28:15_, 29:1_, 29:24_, 31:23_, 55:20_, 62:21_, 63:9_, 64:1_, 114:9_, 115:5_, 115:9_, 115:11_, 116:16_, 119:20_, 133:10_, 140:25_, 161:14

**address** [26]_ - 5:2_, 99:17_, 100:20_, 100:23_, 100:25_, 106:15_, 107:4_, 108:8_, 108:11_, 109:9_, 109:14_, 109:19_, 109:24_, 110:1_, 111:17_, 112:3_, 112:4_, 116:3_, 120:19_, 120:23_, 120:25_, 121:2_, 121:8_, 134:9_, 150:13_, 273:5

**addresses** [1]_ - 278:19

**adjacent** [2]_ - 255:7_, 255:10

**adjoining** [3]_ - 182:17_, 192:18_, 193:8

**administration** [1]_ - 166:1

**administrative** [3]_ - 5:19_, 35:17_, 35:21

**administrator** [1]_ - 93:16

**admission** [1]_ - 116:8

**admit** [2]_ - 114:3_, 115:1

**admitted** [44]_ - 21:11_, 83:15_, 88:8_, 92:6_, 92:9_, 105:4_, 107:21_, 110:4_, 111:1_, 116:16_, 117:12_, 117:20_, 117:25_, 118:1_, 119:21_, 119:25_, 122:6_, 131:20_, 131:23_, 133:22_, 134:21_, 134:23_, 135:17_, 137:14_, 139:10_, 141:5_, 144:19_, 144:22_, 146:17_, 148:10_, 148:13_, 149:9_, 151:21_, 160:5_, 161:19_, 162:11_, 185:23_, 186:8_, 188:2_, 190:25_, 204:10_, 204:12_, 204:21

**advance** [35]_ - 179:20_, 180:4_, 180:9_, 181:9_, 181:18_, 181:24_, 182:6_, 182:11_, 183:24_, 189:11_, 190:9_, 194:12_, 194:14_, 195:20_, 224:11_, 236:19_, 238:3_, 238:7_, 238:8_, 238:12_, 250:17_, 250:21_, 251:19_, 251:25_, 252:6_, 253:3_, 253:6_, 255:18_, 261:5_, 261:24_, 265:8_, 271:6_, 271:11_, 276:4_, 279:5

**advanced** [3]_ - 167:25_, 182:8_, 268:23

**advantage** [1]_ - 181:9

**affirm** [4]_ - 6:10, 30:14_, 76:15_, 164:14

**affixed** [1]_ - 84:7

**Afghanistan** [1]_ - 9:25

**afternoon** [9]_ - 164:11_, 165:7_, 165:8_, 187:11_, 207:22_, 225:8_, 227:9_, 278:8_, 283:8

**agencies** [2]_ - 34:23_, 34:24

**Agent** [27]_ - 3:21_, 6:5_, 6:6_, 7:1_, 13:21_, 15:13_, 16:12_, 20:23_, 21:22_,

29:16_, 30:1_, 30:2_, 164:10_, 165:4_, 165:10_, 165:11_, 171:2_, 199:16_, 207:19_, 211:20_, 212:6_, 223:10_, 223:16_, 226:2_, 234:25_, 276:3_, 280:17

**agent** [13]_ - 5:3_, 5:22_, 7:11_, 80:19_, 83:3_, 169:3_, 169:4_, 169:6_, 170:10_, 184:2_, 196:25_, 198:20_, 270:8

**AGENT** [1]_ - 164:25

**agents** [6]_ - 44:14_, 167:4_, 169:2_, 169:17_, 169:21_, 186:24

**ago** [3]_ - 179:15_, 215:20_, 246:10

**ahead** [17]_ - 20:9_, 115:1_, 145:23_, 213:14_, 219:18_, 227:17_, 236:8_, 243:3_, 247:8_, 248:1_, 249:16_, 254:12_, 256:21_, 258:24_, 259:11_, 259:14_, 259:15

**aid** [2]_ - 52:22_, 56:6

**aids** [1]_ - 56:9

**air** [1]_ - 8:20

**airplane** [2]_ - 85:4_, 272:4

**airplanes** [1]_ - 128:23

**Airport** [3]_ - 254:21_, 255:10_, 255:24

**airport** [8]_ - 128:21_, 128:23_, 215:19_, 215:25_, 217:10_, 256:2_, 256:5_, 256:16

**AK-47** [3]_ - 27:6_, 28:6_, 28:7

**AK/SKS** [1]_ - 111:22

**AK/SKS-style** [1]_ - 111:22

**Alabama** [2]_ - 7:10_, 18:10

**Albany** [2]_ - 33:12_, 33:13

**Albuquerque** [1]_ - 9:19

**Alley** [2]_ - 175:1_, 175:2

**Alligator** [2]_ - 174:25_, 175:1

**allow** [5]_ - 39:2_, 47:1_, 163:3_, 181:11_, 182:12

**allowed** [3]_ - 29:8_, 29:10_, 78:22

**alloy** [1]_ - 16:1

almost [4]– - 9:24–, 180:13–, 206:5–, 253:9

alone [1]– - 274:6

alternative [1]– - 282:17

AMEL [1]– - 58:3

amelogenin [2]– - 58:6–, 61:21

America [2]– - 3:4–, 172:14

American [1]– - 36:11

Amigos [1]– - 104:25

ammo [1]– - 20:7

ammunition [8]– - 7:17–, 7:22–, 8:17–, 10:15–, 18:12–, 19:3–, 19:16

Ammunition [1]– - 10:20

amount [3]– - 96:3–, 154:18–, 167:22

amounts [2]– - 97:20–, 261:4

amplification [2]– - 40:9–, 40:20

ANAB [3]– - 36:10–, 36:14

analyses [2]– - 43:7–, 48:6

Analysis [3]– - 77:12–, 165:13–, 171:5

analysis [46]– - 33:9–, 33:14–, 34:5–, 34:9–, 34:21–, 34:25–, 35:19–, 37:1–, 37:5–, 43:4–, 44:15–, 49:12–, 50:25–, 51:7–, 53:5–, 63:16–, 64:6–, 77:22–, 79:17–, 80:6–, 80:16–, 80:17–, 109:14–, 167:6–, 167:22–, 170:9–, 170:20–, 170:24–, 178:2–, 185:2–, 185:9–, 185:17–, 187:4–, 187:13–, 187:17–, 188:19–, 189:16–, 199:1–, 203:5–, 203:6–, 203:8–, 203:10–, 205:24–, 216:3–, 216:22–, 245:8

analyst [3]– - 32:19–, 80:19–, 181:10

analyze [10]– - 77:14–, 78:15–, 79:14–, 79:15–, 79:18–, 79:20–, 81:5–, 82:6–, 87:11–, 183:23

analyzed [1]– - 178:17

Analyzer [3]– - 80:14–, 81:12–, 85:14

analyzer [1]– - 80:14

analyzing [3]– - 82:9–,

83:6–, 143:12

Android [25]– - 79:24–, 84:18–, 87:15–, 88:19–, 90:2–, 90:5–, 90:7–, 90:11–, 90:14–, 96:16–, 96:17–, 97:16–, 100:9–, 100:18–, 108:20–, 125:3–, 125:4–, 129:18–, 129:25–, 130:1–, 135:8–, 147:13

angle [6]– - 22:11–, 22:16–, 22:18–, 27:15–, 29:21–, 278:12

announce [1]– - 115:11

annual [1]– - 169:7

answer [3]– - 27:9–, 29:17–, 47:11

answering [1]– - 176:20

antenna [5]– - 173:14–, 191:19–, 192:2–, 192:12–, 193:4

anticipate [3]– - 282:5–, 283:14–, 284:10

anticipation [1]– - 55:10

anyway [1]– - 20:9

apologies [3]– - 115:18–, 142:25–, 161:14

apologize [11]– - 117:5–, 193:18–, 197:13–, 200:18–, 220:2–, 229:7–, 235:5–, 235:19–, 237:14–, 244:24–, 277:10

app [6]– - 100:19–, 100:21–, 100:22–, 108:19–, 123:13–, 146:11

appear [21]– - 14:20–, 15:16–, 29:7–, 53:7–, 63:13–, 124:12–, 128:19–, 128:24–, 129:4–, 150:20–, 158:11–, 158:21–, 159:22–, 160:15–, 201:7–, 212:19–, 223:10–, 229:12–, 229:18–, 233:6–, 238:14

appearances [1]– - 3:5

appeared [3]– - 51:19–, 129:16–, 268:24

appearing [1]– - 223:23

Apple [4]– - 79:24–, 87:14–, 90:10–, 90:13

application [8]– - 123:14–, 123:20–, 136:15–, 136:16–, 136:18–, 136:22–, 163:14

apply [2]– - 108:16–, 196:17

apprenticeship [1]– - 10:9

approach [13]– - 13:16–, 15:8–, 30:4–, 73:8–, 74:5–, 83:17–, 85:19–, 86:10–, 88:6–, 88:8–, 147:15–, 147:18–, 199:8

appropriate [1]– - 85:16

approved [2]– - 80:1–, 89:6

approximate [7]– - 177:12–, 177:15–, 179:17–, 179:18–, 189:6–, 189:13–, 190:8

apps [2]– - 123:12

April [24]– - 31:13–, 146:10–, 208:18–, 208:22–, 209:1–, 209:15–, 211:25–, 212:7–, 212:12–, 212:15–, 213:15–, 213:22–, 214:5–, 214:6–, 215:3–, 215:17–, 215:21–, 216:5–, 216:24–, 217:5–, 217:9

arc [17]– - 237:6–, 237:7–, 237:12–, 237:13–, 239:8–, 239:19–, 244:14–, 253:3–, 261:1–, 261:2–, 261:3–, 261:16–, 262:15–, 265:9–, 265:19–, 265:20

arcs [5]– - 238:8–, 238:25–, 239:7–, 239:16–, 240:7

area [65]– - 57:5–, 58:2–, 59:2–, 59:14–, 59:16–, 59:17–, 59:19–, 60:3–, 60:4–, 64:20–, 83:1–, 83:2–, 83:13–, 97:25–, 103:15–, 103:20–, 121:20–, 125:5–, 126:3–, 128:3–, 135:14–, 136:3–, 137:12–, 174:13–, 175:4–, 175:14–, 193:2–, 193:4–, 193:6–, 193:10–, 193:15–, 193:16–, 193:18–, 195:2–, 197:16–, 198:16–, 198:22–, 201:4–, 208:25–, 210:5–, 210:10–, 216:20–, 217:24–, 218:6–, 221:10–, 221:11–, 222:24–, 236:12–, 239:8–, 240:25–, 247:18–, 250:24–, 251:9–, 254:24–, 263:25–, 268:11–, 269:1–, 278:16–, 278:22–, 279:4–, 279:22–, 279:24

areas [13]– - 8:22–, 44:10–, 44:11–, 58:15–, 64:17–, 66:2–, 69:12–, 69:18–, 172:11–, 174:12–, 227:4–,

230:14–, 232:5

argument [1]– - 284:16

armor [24]– - 7:17–, 7:24–, 8:1–, 8:4–, 8:18–, 10:16–, 10:25–, 11:23–, 12:3–, 12:19–, 12:23–, 16:2–, 17:1–, 17:17–, 17:19–, 17:22–, 18:5–, 21:25–, 22:10–, 22:11–, 22:12–, 22:13–, 23:3

armored [2]– - 11:16–, 11:17

Arms [1]– - 10:20

arrange [1]– - 89:13

arrangement [1]– - 282:17

arrival [1]– - 6:8

arrive [2]– - 228:1–, 284:19

arriving [1]– - 220:18

arteries [1]– - 206:17

artifact [30]– - 81:14–, 81:15–, 81:17–, 81:19–, 100:15–, 108:12–, 121:14–, 142:15–, 151:6–, 151:8–, 154:2–, 154:3–, 154:13–, 154:14–, 155:4–, 155:7–, 155:9–, 156:2–, 157:5–, 159:12–, 159:13–, 160:9–, 160:11–, 161:22–, 161:25–, 162:2–, 162:3–, 162:4–, 162:16–, 162:17

artifacts [14]– - 81:20–, 120:13–, 120:16–, 121:3–, 121:9–, 121:11–, 122:14–, 124:6–, 124:8–, 141:14–, 141:16–, 155:19–, 155:20–, 156:5

aspect [2]– - 182:1–, 184:22

aspects [2]– - 99:9–, 270:4

asset [1]– - 169:20

assign [2]– - 47:1–, 47:23

assigned [11]– - 40:16–, 48:15–, 48:19–, 49:24–, 55:17–, 64:11–, 103:17–, 126:21–, 165:12–, 165:13–, 166:21

assignment [3]– - 166:9–, 167:9–, 167:16

assist [1]– - 10:23

associate [1]– - 203:19

associated [27]– - 90:21–, 97:5–, 100:24–, 103:5–,

103:7_, 103:12_, 104:4_, 104:9_, 108:8_, 126:2_, 126:17_, 126:25_, 130:16_, 130:19_, 135:10_, 136:5_, 145:18_, 149:3_, 150:13_, 185:6_, 185:14_, 185:22_, 186:22_, 186:25_, 218:1_, 274:21_, 278:19

**associates** [1]_ - 202:25

**associating** [1]_ - 203:11

**association** [1]_ - 34:3

**assume** [3]_ - 26:12_, 128:21_, 255:20

**assurance** [1]_ - 35:6

**AT&T** [72]_ - 86:17_, 106:24_, 136:20_, 147:13_, 149:14_, 149:18_, 149:25_, 153:8_, 153:23_, 153:24_, 155:6_, 155:11_, 172:15_, 172:22_, 173:4_, 175:17_, 179:1_, 181:8_, 185:12_, 186:10_, 195:14_, 216:22_, 218:24_, 219:3_, 219:11_, 222:5_, 222:7_, 222:8_, 222:11_, 225:9_, 225:12_, 226:20_, 226:24_, 227:1_, 230:9_, 230:18_, 231:2_, 231:20_, 234:9_, 234:13_, 234:14_, 235:2_, 235:18_, 240:19_, 240:20_, 242:23_, 244:20_, 245:10_, 246:3_, 246:14_, 249:2_, 249:25_, 250:1_, 251:10_, 251:16_, 251:20_, 252:16_, 254:5_, 254:9_, 257:18_, 257:22_, 258:20_, 261:24_, 261:25_, 262:1_, 263:1_, 263:20_, 269:7_, 269:16_, 269:18_, 270:14

**at...to** [1]_ - 146:11

**Atlanta** [3]_ - 215:19_, 215:25_, 217:13

**attached** [3]_ - 28:7_, 167:11_, 268:11

**attempt** [1]_ - 113:9

**attend** [1]_ - 33:20

**attended** [2]_ - 33:11_, 33:22

**attention** [11]_ - 59:2_, 60:2_, 63:23_, 96:23_, 97:17_, 107:12_, 109:3_, 121:13_, 123:21_, 130:11_, 250:13

**attorney** [2]_ - 80:19_,

169:2

**attorneys** [2]_ - 132:13_, 281:3

**attribute** [1]_ - 152:15

**attributed** [1]_ - 152:12

**August** [81]_ - 218:25_, 219:5_, 219:24_, 220:9_, 221:23_, 222:6_, 223:5_, 225:5_, 225:10_, 226:19_, 226:21_, 227:9_, 227:16_, 227:24_, 228:4_, 228:11_, 228:12_, 229:10_, 229:19_, 230:10_, 232:13_, 232:16_, 233:17_, 234:5_, 234:10_, 234:25_, 235:3_, 235:16_, 235:18_, 236:7_, 236:11_, 238:2_, 239:2_, 239:3_, 240:20_, 241:8_, 241:9_, 241:23_, 242:1_, 242:19_, 243:3_, 243:7_, 243:25_, 245:18_, 245:20_, 246:3_, 246:4_, 247:1_, 247:11_, 247:15_, 247:19_, 248:2_, 248:3_, 248:8_, 248:19_, 249:5_, 249:11_, 249:13_, 249:21_, 250:2_, 272:22_, 273:17_, 274:3_, 274:19_, 275:6_, 275:8_, 275:9_, 275:11_, 275:12_, 275:13_, 275:14_, 275:15_, 275:17_, 275:18_, 276:3_, 276:8_, 276:9

**Austin** [1]_ - 6:5

**authority** [3]_ - 78:19_, 88:7

**automatic** [1]_ - 28:4

**automatically** [3]_ - 145:12_, 145:13_, 145:17

**autosomal** [1]_ - 61:25

**available** [6]_ - 90:9_, 162:21_, 178:13_, 180:11_, 181:1_, 284:5

**Avenue** [1]_ - 279:22

**average** [1]_ - 23:23

**avoid** [1]_ - 115:6

**aware** [6]_ - 25:6_, 48:11_, 48:25_, 68:9_, 186:24_, 282:5

**awesome** [1]_ - 142:18

**azimuth** [2]_ - 192:12_, 196:3

**azimuths** [1]_ - 191:19

### B

**B-L-U** [1]_ - 84:24

**bachelor** [1]_ - 32:8

**bachelor's** [1]_ - 165:25

**background** [7]_ - 8:24_, 32:7_, 156:17_, 158:5_, 170:7_, 189:2_, 199:7

**backpack** [13]_ - 69:24_, 69:25_, 70:2_, 70:8_, 70:9_, 70:10_, 70:11_, 70:14_, 70:18_, 70:22_, 71:1_, 73:16_, 73:23

**badge** [1]_ - 83:9

**bag** [15]_ - 13:24_, 13:25_, 14:3_, 67:9_, 67:10_, 67:11_, 67:22_, 67:23_, 67:25_, 68:11_, 68:14_, 68:20_, 69:4_, 74:15_, 74:16

**Bag** [1]_ - 68:9

**bags** [1]_ - 72:9

**balance** [1]_ - 215:21

**ballistic** [2]_ - 7:8_, 11:4

**Ballistic** [1]_ - 10:5

**ballistically** [1]_ - 8:4

**ballistics** [18]_ - 8:15_, 10:2_, 10:13_, 11:6_, 11:10_, 11:12_, 11:14_, 12:6_, 12:9_, 12:12_, 12:18_, 12:23_, 17:17_, 26:10_, 28:17_, 28:18_, 28:19_, 28:20

**Ballistics** [3]_ - 7:15_, 9:12_, 11:9

**band** [11]_ - 182:14_, 183:18_, 194:22_, 195:5_, 236:21_, 236:22_, 236:24_, 255:18_, 259:24_, 268:25_, 271:7

**bands** [12]_ - 190:9_, 194:22_, 236:24_, 266:19_, 267:2_, 268:3_, 268:4_, 274:20_, 274:22_, 276:11_, 279:5

**bar** [1]_ - 120:19

**barrel** [1]_ - 23:4

**base** [2]_ - 46:10_, 183:11

**based** [52]_ - 7:9_, 39:19_, 40:15_, 42:25_, 43:25_, 44:20_, 46:18_, 51:2_, 61:10_, 62:13_, 63:16_, 64:6_, 65:10_, 69:1_, 69:6_, 71:11_, 71:15_, 79:14_,

98:5_, 105:20_, 112:3_, 129:12_, 146:3_, 151:10_, 154:5_, 158:19_, 159:17_, 165:15_, 177:23_, 181:21_, 195:3_, 197:1_, 208:24_, 210:6_, 210:8_, 213:3_, 217:7_, 221:5_, 221:10_, 221:12_, 221:14_, 225:17_, 235:22_, 237:7_, 242:21_, 255:22_, 257:8_, 262:8_, 269:23_, 279:2_, 283:22_, 284:17

**basic** [3]_ - 167:19_, 171:21_, 245:17

**basics** [1]_ - 171:7

**batch** [1]_ - 115:17

**battery** [8]_ - 79:8_, 85:6_, 87:8_, 87:10_, 88:24_, 143:14_, 163:11_, 163:13

**battle** [1]_ - 9:23

**bay** [2]_ - 21:25_, 198:24

**Bay** [9]_ - 199:5_, 228:16_, 228:21_, 229:13_, 232:23_, 260:9_, 260:10_, 272:24_, 274:8

**beach** [1]_ - 147:3

**Beach** [25]_ - 121:16_, 121:21_, 206:18_, 207:5_, 208:6_, 208:25_, 212:19_, 212:20_, 212:21_, 212:22_, 212:25_, 216:14_, 219:23_, 220:4_, 220:18_, 221:7_, 225:20_, 228:2_, 229:14_, 229:24_, 254:21_, 255:10_, 255:23_, 272:21

**bearing** [3]_ - 199:4_, 199:6_, 205:15

**become** [5]_ - 44:23_, 48:11_, 48:25_, 67:7_, 249:3

**began** [2]_ - 34:4_, 56:18

**begin** [2]_ - 79:14_, 148:23

**beginning** [13]_ - 43:16_, 44:25_, 45:18_, 71:5_, 83:15_, 105:16_, 107:13_, 138:4_, 138:18_, 142:5_, 144:4_, 146:6_, 222:18

**begins** [1]_ - 53:10

**below** [3]_ - 14:23_, 202:16_, 220:3

**ben** [2]_ - 137:24_, 138:9

**Ben** [1]_ - 138:10

**bend** [2]_ - 225:13_,

232:17

**benefit** [1]_ - 171:23

**best** [13]_ - 10:8_, 22:13_, 22:21_, 24:21_, 171:15_, 173:25_, 174:7_, 174:18_, 182:2_, 182:5_, 182:7_, 222:20_, 284:7

**better** [9]_ - 19:7_, 22:12_, 180:23_, 182:15_, 194:13_, 223:12_, 224:10_, 237:15

**between** [95]_ - 7:19_, 9:24_, 38:18_, 38:22_, 39:1_, 39:18_, 59:1_, 96:2_, 96:4_, 98:21_, 100:7_, 109:19_, 111:25_, 136:19_, 138:5_, 156:13_, 177:8_, 194:11_, 200:4_, 207:16_, 207:20_, 207:23_, 208:14_, 208:18_, 209:15_, 211:25_, 212:7_, 212:15_, 222:6_, 225:7_, 225:10_, 226:21_, 227:9_, 227:16_, 229:17_, 230:11_, 230:22_, 231:1_, 232:16_, 234:5_, 234:10_, 235:18_, 236:7_, 236:11_, 239:2_, 239:3_, 239:12_, 241:9_, 242:1_, 242:20_, 243:7_, 244:1_, 245:20_, 246:10_, 247:1_, 247:11_, 247:19_, 247:20_, 248:3_, 248:9_, 248:19_, 249:10_, 249:13_, 249:21_, 250:2_, 250:10_, 251:11_, 251:17_, 252:17_, 253:16_, 254:6_, 254:10_, 256:12_, 256:25_, 257:18_, 258:7_, 258:25_, 259:1_, 259:8_, 260:19_, 261:10_, 263:1_, 264:18_, 265:7_, 266:18_, 267:22_, 269:11_, 269:17_, 269:25_, 270:8_, 270:14_, 272:22_, 274:3_, 274:19

**big** [4]_ - 93:17_, 140:14_, 168:17_, 259:23

**bills** [1]_ - 176:6

**bin** [2]_ - 129:20_, 129:21

**biochemistry** [1]_ - 32:8

**biologist** [3]_ - 33:3_, 45:6_, 51:22

**biologists** [10]_ - 31:20_, 35:9_, 35:12_, 36:18_, 40:18_, 41:4_, 45:13_, 49:22_, 49:24_, 68:11

**biologists'** [1]_ - 31:23

**biology** [1]_ - 32:9

**bit** [29]_ - 8:24_, 37:11_, 37:13_, 39:21_, 40:19_, 41:10_, 48:9_, 51:14_, 58:2_, 88:14_, 88:21_, 89:2_, 93:5_, 94:1_, 124:20_, 143:12_, 156:17_, 163:19_, 166:10_, 176:2_, 183:8_, 189:4_, 218:9_, 222:8_, 222:25_, 267:3_, 267:16_, 268:7_, 284:12

**black** [4]_ - 161:8_, 195:22_, 200:17_, 237:12

**blanket** [1]_ - 158:7

**blast** [2]_ - 175:2_, 175:6

**block** [4]_ - 105:14_, 106:2_, 177:18_, 279:9

**blocks** [1]_ - 193:23

**blond** [1]_ - 38:9

**blood** [6]_ - 37:18_, 37:25_, 38:3_, 41:12_, 68:16

**Blu** [5]_ - 84:20_, 84:21_, 90:1_, 96:12_, 105:25

**BLU** [2]_ - 84:23_, 84:24

**blue** [14]_ - 38:10_, 71:1_, 75:18_, 75:19_, 138:6_, 138:10_, 153:10_, 153:13_, 177:21_, 198:23_, 228:17_, 273:21

**blueprint** [1]_ - 38:8

**board** [2]_ - 61:24_, 93:1

**Board** [1]_ - 36:12

**boards** [1]_ - 10:19

**Bode** [1]_ - 32:18

**bodies** [1]_ - 182:24

**bodily** [5]_ - 32:4_, 37:16_, 37:17_, 37:19_, 41:10

**body** [8]_ - 7:24_, 10:22_, 10:24_, 17:22_, 18:5_, 237:19_, 237:21_, 278:16

**Bogotá** [2]_ - 158:21_, 158:24

**bones** [1]_ - 41:13

**bookmarks** [1]_ - 81:24

**booths** [1]_ - 8:5

**border** [2]_ - 157:9_, 219:5

**boss** [1]_ - 184:4

**bottle** [1]_ - 75:21

**bottom** [15]_ - 59:14_, 62:24_, 102:13_, 102:24_, 109:4_, 126:14_, 189:15_,

194:5_, 210:6_, 212:25_, 220:3_, 221:11_, 231:23_, 237:8_, 255:3

**bought** [1]_ - 80:2

**Boulevard** [12]_ - 206:6_, 206:9_, 206:10_, 206:14_, 221:16_, 224:3_, 229:23_, 235:4_, 252:24_, 264:20_, 265:23_, 279:11

**boundary** [1]_ - 194:20

**bounds** [1]_ - 28:23

**box** [11]_ - 61:18_, 61:20_, 195:21_, 199:13_, 202:12_, 220:7_, 242:10_, 244:5_, 274:22_, 282:23

**boxcars** [3]_ - 39:11_, 39:12_, 39:13

**boxes** [2]_ - 61:17_, 248:14

**brand** [2]_ - 84:21_, 84:22

**break** [22]_ - 40:5_, 52:13_, 52:20_, 53:19_, 76:9_, 114:8_, 114:14_, 114:22_, 114:25_, 115:8_, 116:2_, 124:18_, 127:10_, 133:23_, 163:19_, 188:7_, 201:12_, 210:22_, 210:25_, 285:3

**breaking** [1]_ - 284:12

**brief** [6]_ - 3:21_, 30:12_, 52:13_, 114:25_, 277:17_, 284:19

**briefly** [7]_ - 31:14_, 32:18_, 38:6_, 107:9_, 108:15_, 265:5_, 284:17

**brighter** [1]_ - 14:24

**bring** [5]_ - 33:5_, 112:10_, 168:16_, 168:18_, 281:22

**broad** [10]_ - 177:16_, 177:19_, 177:23_, 189:6_, 197:2_, 221:14_, 222:24_, 243:16_, 278:25_, 279:2

**broad-based** [3]_ - 177:23_, 221:14_, 279:2

**broadcast** [1]_ - 155:3

**broadly** [1]_ - 182:16

**broke** [2]_ - 116:16_, 134:21

**broken** [3]_ - 168:12_, 237:22_, 272:3

**brother** [1]_ - 147:3

**brown** [6]_ - 38:10_, 68:14

_, 68:15_, 69:4_, 70:2

**BROWNE** [204]_ - 76:10_, 77:3_, 83:17_, 83:19_, 85:21_, 85:22_, 86:10_, 86:12_, 86:14_, 88:5_, 88:9_, 88:10_, 91:1_, 91:4_, 91:7_, 92:5_, 92:11_, 92:14_, 92:16_, 101:2, 101:4_, 101:24_, 102:1_, 102:22_, 103:1_, 103:23_, 104:1_, 105:3_, 105:7_, 106:13_, 106:14_, 107:10_, 107:11_, 107:20_, 107:23_, 108:1_, 110:6_, 110:9_, 110:18_, 110:21_, 111:4_, 111:6_, 111:9_, 112:9_, 112:13_, 113:8_, 113:13_, 114:2_, 115:3_, 115:5_, 115:13_, 115:15_, 115:18_, 117:1_, 117:5_, 117:22_, 117:24_, 118:3_, 118:22_, 119:4_, 119:12_, 119:23_, 120:3_, 120:5_, 121:23_, 122:1_, 122:5_, 122:9_, 122:18_, 122:21_, 123:3_, 123:5_, 123:23_, 124:1_, 124:9_, 124:11_, 124:14_, 124:22_, 124:23_, 125:8_, 125:12_, 125:13_, 126:8_, 126:12, 126:13_, 126:23_, 126:24_, 127:3, 127:6_, 127:20, 127:23_, 128:6_, 128:9_, 128:16, 128:18_, 129:1, 129:3_, 129:8, 129:10_, 130:3_, 130:6_, 130:8_, 131:3_, 131:18_, 132:2_, 132:25_, 133:3_, 133:14_, 133:24_, 134:11_, 135:1_, 135:2_, 135:18_, 135:20_, 137:16_, 137:18, 137:20_, 137:25_, 138:1_, 138:24_, 139:1_, 139:12_, 139:14_, 140:9, 140:10_, 140:22_, 140:23_, 141:7_, 141:9_, 141:12, 141:13_, 142:9_, 142:13_, 142:14_, 142:21_, 142:23_, 143:1_, 144:2_, 144:7_, 144:9_, 144:18_, 145:1_, 145:4_, 145:6_, 147:14_, 147:20_, 148:9_, 148:21_, 148:22_, 149:10_, 149:12_, 151:2_, 151:5_, 151:20_, 151:24_, 152:4, 152:5_, 152:21_, 152:24_, 153:15_, 153:19_, 153:25_, 154:1_, 154:7_, 154:11_, 154:12_, 155:13_, 155:17_, 155:18_, 155:24_, 156:1_, 156:7_,

156:9_, 157:14_, 157:16_, 157:23_, 158:1_, 158:25_, 159:2_, 159:8_, 159:10_, 159:11_, 159:19_, 159:21_, 160:6_, 160:8_, 161:6_, 161:10_, 161:13_, 161:17_, 161:24_, 162:1_, 162:7_, 162:13_, 162:15_, 162:23_, 163:5_, 164:4_, 170:19_, 282:4_, 282:19_, 283:7_, 283:15_, 283:21

**Browne** [12]_ - 3:8_, 116:15_, 116:25_, 117:21_, 118:2_, 119:22_, 131:25_, 132:24_, 133:12_, 133:23_, 163:3_, 282:3

**browser** [1]_ - 127:9

**bubble** [6]_ - 138:4_, 138:6_, 138:8_, 153:10_, 153:13

**buccal** [12]_ - 41:20_, 41:22_, 41:24_, 42:2_, 49:1_, 49:2_, 49:3_, 49:7_, 49:8_, 49:14_, 55:15_, 56:21

**bucket** [2]_ - 80:25_, 81:1

**buckets** [1]_ - 80:23

**buffer** [2]_ - 180:6_, 268:6

**build** [1]_ - 172:24

**building** [9]_ - 20:7_, 82:22_, 82:25_, 171:10_, 172:2_, 174:15_, 174:16_, 192:2

**buildings** [2]_ - 8:3_, 174:11

**bullet** [16]_ - 8:19_, 19:11_, 20:8_, 22:12_, 22:17_, 23:18_, 24:12_, 24:13_, 24:24_, 25:22_, 25:23_, 27:17_, 29:21_, 75:8_, 75:11

**bullets** [3]_ - 18:14_, 22:5_, 28:19

**bunch** [1]_ - 107:16

**bundle** [1]_ - 176:21

**bungee** [8]_ - 71:3_, 71:4_, 71:9_, 71:16_, 71:17_, 71:24_, 73:18_, 73:23

**Bureau** [1]_ - 7:4

**buried** [2]_ - 137:6_, 137:8

**business** [1]_ - 171:19

**but..** [2]_ - 269:22_, 284:23

**buy** [3]_ - 17:2_, 17:7_, 87:13

**BY** [215] - 6:25, 13:1, 13:19, 14:11, 15:11, 16:10, 20:22_, 21:20, 24:5, 25:8_, 26:3, 26:17, 26:21, 27:1_, 27:5, 29:2_, 31:3_, 37:10_, 40:24_, 41:2_, 54:8_, 55:3_, 56:17_, 57:9_, 60:1, 63:21_, 65:2_, 73:12_, 74:9_, 75:3_, 77:3_, 83:19_, 85:22_, 86:14_, 88:10_, 91:7_, 92:16, 101:4_, 102:1_, 103:1_, 104:1_, 105:7_, 106:14_, 107:11_, 108:1_, 110:9_, 111:9_, 113:13_, 120:5, 122:1_, 122:9_, 122:21_, 123:5_, 124:1_, 124:11_, 124:23_, 125:13, 126:13, 126:24, 127:6, 127:23_, 128:9, 128:18, 129:3, 129:10_, 130:8_, 131:3_, 135:2_, 135:20, 137:20, 138:1_, 139:1_, 139:14, 140:10_, 140:23_, 141:9, 141:13_, 142:14, 143:1_, 144:9_, 145:6_, 147:20, 148:22_, 149:12_, 151:5_, 151:24, 152:5_, 152:24_, 153:19, 154:1_, 154:12_, 155:18_, 156:1_, 156:9_, 157:16_, 158:1_, 159:2_, 159:11_, 159:21_, 160:8_, 161:10_, 161:17_, 162:1_, 162:15_, 163:8_, 165:3, 165:9, 171:1, 186:20, 188:11_, 188:16_, 188:24, 191:7, 194:10_, 196:24, 201:16, 205:1, 205:13_, 205:22, 206:23_, 207:18_, 208:11, 209:7_, 211:19, 212:4, 213:13_, 214:1, 214:21, 215:15, 217:3, 217:17, 218:20, 220:13, 220:16, 222:1, 223:9, 223:13_, 223:21, 225:4, 226:1_, 226:6, 226:14, 227:7, 227:13, 227:19, 228:9, 230:6, 231:12, 232:12, 233:15, 233:21, 234:3, 234:24, 235:15, 236:4, 236:9, 236:16, 238:24, 240:15, 241:6_, 241:17_, 242:3_, 242:17, 243:2, 243:20_, 245:2, 245:16_, 246:8, 246:20_, 247:7, 247:14, 247:25_, 248:11, 248:24, 249:8, 249:18, 250:7, 251:6, 251:14, 252:11, 253:13, 254:4, 254:16, 255:14, 256:10, 256:19_, 257:21, 258:3_, 258:21, 259:4, 260:2, 260:15_, 261:14_, 262:7, 262:12_, 263:12, 263:15, 263:24_, 264:14, 265:2, 265:13, 267:10, 268:19, 269:5, 269:14_, 270:12, 271:2, 271:17, 272:13_, 273:14, 273:25, 274:16, 277:1, 277:7_, 278:7

**bytes** [2]_ - 177:3

## C

**cache** [3]_ - 123:14_, 123:15_, 123:19

**calculate** [1]_ - 50:17

**calculated** [2]_ - 65:22_, 65:24

**calculates** [1]_ - 51:9

**calculation** [3]_ - 46:21_, 51:9_, 93:24

**calendar** [3]_ - 100:1_, 108:19_, 117:21

**calibers** [1]_ - 11:19

**Calypso** [5]_ - 86:18_, 147:13_, 155:11_, 198:24_, 199:5

**camera** [4]_ - 89:6_, 156:19_, 157:3_, 205:6

**campbox** [1]_ - 128:14

**canceled** [1]_ - 141:3

**Candidate** [1]_ - 244:10

**cannot** [1]_ - 137:8

**capabilities** [2]_ - 81:7_, 81:9

**capability** [1]_ - 81:11

**capable** [4]_ - 44:2_, 78:4_, 88:25_, 183:1

**capacity** [2]_ - 169:22_, 200:7

**Captain** [2]_ - 139:19_, 140:8

**capture** [7]_ - 77:14_, 77:19_, 79:9_, 156:21_, 157:6

**captured** [4]_ - 160:22_, 200:14_, 203:1_, 209:17

**captures** [1]_ - 202:24

**capturing** [4]_ - 78:4_, 79:12_, 158:14_, 203:18

**car** [1]_ - 266:14

**caravan** [1]_ - 137:7

**card** [3]_ - 152:11_, 152:14_, 152:19

**cards** [2]_ - 85:5_, 152:12

**career** [6]_ - 9:22_, 11:2_, 12:6_, 78:6_, 165:23_, 169:15

**carefully** [2]_ - 131:5_, 147:24

**Carolina** [6]_ - 214:8_, 216:12_, 216:19_, 218:6_, 218:11_, 219:22

**carrier** [9]_ - 139:25_, 145:14_, 175:18_, 177:3_, 179:8_, 181:16_, 188:20_, 195:14_, 196:4

**carriers** [8]_ - 106:24_, 106:25_, 167:24_, 168:17_, 172:14_, 178:8_, 196:10_, 222:8

**carry** [1]_ - 228:24

**cars** [3]_ - 8:5_, 78:2_, 180:14

**CART** [10]_ - 77:11_, 78:6_, 78:11_, 79:18_, 82:24_, 83:4_, 83:7_, 95:3_, 95:4_, 95:10

**cartridge** [4]_ - 8:18_, 44:6_, 44:10

**cartridges** [2]_ - 10:22_, 11:18

**case** [88]_ - 3:2_, 3:3_, 4:6_, 4:16_, 8:13_, 8:23_, 11:16_, 13:3_, 23:24_, 25:22_, 31:17_, 31:20_, 35:14_, 35:15_, 35:23_, 43:25_, 44:10_, 44:13_, 44:14_, 45:7_, 45:8_, 45:15_, 46:1_, 46:3_, 47:15_, 48:10_, 48:12_, 48:15_, 48:17_, 48:19_, 49:1_, 51:14_, 52:4_, 55:24_, 60:21_, 60:24_, 64:12_, 66:9_, 66:21_, 66:25_, 75:13_, 82:6_, 82:10_, 84:9_, 85:8_, 89:8_, 93:25_, 94:13_, 95:7_, 95:8_, 100:18_, 103:8_, 115:19_, 132:10_, 132:12_, 132:14_, 168:7_, 168:22_, 169:12_, 178:17_, 183:20_, 183:24_, 184:2_, 184:14_, 184:17_, 184:19_, 185:15_, 186:24_, 187:19_, 190:6_, 191:15_, 194:7_, 197:1_, 198:17_, 198:20_, 199:4_,

204:3_, 221:22_, 245:7_, 277:2_, 280:24_, 281:2_, 281:4_, 281:7_, 282:22

**Case** [1]_ - 3:4

**case-related** [1]_ - 169:12

**cases** [4]_ - 107:2_, 168:3 _, 174:2_, 182:24

**Casework** [16]_ - 31:10_, 31:12_, 31:16_, 35:5_, 36:9_, 37:20_, 39:23_, 42:19_, 43:14_, 43:23_, 44:5_, 44:7_, 44:8_, 46:19 _, 49:20_, 49:22

**casework** [7]_ - 33:17_, 34:12_, 34:15_, 43:13_, 44:11_, 44:14_, 48:16

**casing** [1]_ - 75:9

**casings** [4]_ - 44:6_, 44:10_, 75:8_, 75:11

**CAST** [21]_ - 165:14_, 166:24_, 167:1_, 167:4_, 167:15_, 167:19_, 169:2_, 169:3_, 169:4_, 169:6_, 169:19_, 169:22_, 170:4_, 170:6_, 170:8_, 170:10_, 170:13_, 171:3

**cataloged** [1]_ - 104:21

**catch** [3]_ - 7:25_, 8:1_, 11:20

**category** [3]_ - 98:6_, 108:14

**CDR** [1]_ - 171:20

**CDRs** [1]_ - 189:11

**cease** [1]_ - 28:14

**cell** [78]_ - 77:25_, 79:6_, 79:21_, 79:23_, 80:11_, 82:2_, 101:5_, 101:25_, 152:10_, 152:12_, 167:5_, 167:17_, 169:1_, 170:20_, 170:24_, 171:8_, 171:11_, 171:14_, 171:25_, 172:3_, 172:7_, 172:13_, 172:22_, 173:8_, 173:12_, 173:16_, 173:19_, 173:20_, 173:24 _, 174:10_, 175:13_, 175:16_, 175:20_, 176:14 _, 177:9_, 177:13_, 178:2 _, 178:4_, 180:8_, 181:4_, 189:5_, 189:12_, 189:13_, 190:14_, 190:24_, 191:11 _, 191:12_, 191:17_, 191:18_, 192:10_, 192:19 _, 198:22_, 200:4_, 200:8 _, 200:10_, 200:11_, 205:24_, 206:3_, 207:10_,

211:23_, 214:6_, 218:17_, 224:6_, 230:12_, 230:14_, 238:18_, 259:19_, 261:20 _, 267:23_, 272:9

**Cellebrite** [37]_ - 79:21_, 81:11_, 81:13_, 81:14_, 81:21_, 82:5_, 85:9_, 85:13_, 86:7_, 91:10_, 91:12_, 93:6_, 102:17_, 102:18_, 106:3_, 110:14_, 112:6_, 113:21_, 113:23_, 120:7_, 120:14_, 122:11_, 124:3_, 125:15_, 127:5_, 131:11_, 131:13_, 138:15 _, 141:19_, 148:4_, 148:6 _, 148:25_, 149:21_, 151:6_, 152:1_, 153:21_, 154:16

**Cellmark** [1]_ - 32:18

**cells** [4]_ - 38:3_, 40:5_, 41:11_, 41:12

**cellular** [24]_ - 169:14_, 171:5_, 172:9_, 197:6_, 200:4_, 200:7_, 201:20_, 207:15_, 209:12_, 215:17 _, 217:21_, 218:23_, 230:9_, 235:5_, 251:10_, 256:1_, 257:17_, 258:19_, 261:16_, 272:25_, 273:5_, 273:18_, 274:5_, 274:7

**Cellular** [1]_ - 165:13

**censored** [1]_ - 101:13

**center** [8]_ - 14:16_, 137:23_, 157:4_, 209:10_, 232:19_, 259:21_, 262:3_, 267:20

**centerline** [2]_ - 192:12_, 237:2

**certain** [7]_ - 4:4_, 4:15_, 4:17_, 11:6_, 54:11_, 195:21_, 239:6

**certainly** [4]_ - 11:16_, 18:25_, 137:9_, 188:10

**certification** [2]_ - 168:11_, 170:11

**certifications** [1]_ - 170:8

**certified** [3]_ - 169:10_, 170:10_, 282:14

**cetera** [1]_ - 169:12

**chain** [2]_ - 82:19_, 83:2

**chance** [11]_ - 22:12_, 22:13_, 22:21_, 27:6_, 28:3_, 55:9_, 71:8_, 73:14 _, 74:11_, 75:8_, 283:23

**change** [5]_ - 4:22_, 12:1

_, 121:1_, 121:7_, 174:3

**changing** [1]_ - 169:14

**channels** [1]_ - 5:19

**chaos** [1]_ - 140:17

**charge** [3]_ - 284:9_, 284:11_, 284:25

**charged** [1]_ - 272:7

**chart** [1]_ - 54:9

**charts** [4]_ - 53:4_, 55:23 _, 60:18_, 65:3

**check** [5]_ - 44:24_, 45:1_, 50:9_, 51:19_, 51:25

**checking** [1]_ - 45:10

**cheek** [2]_ - 41:25_, 42:2

**chemicals** [1]_ - 40:4

**chemistry** [1]_ - 32:9

**child** [3]_ - 168:8_, 182:20 _, 182:22

**Children** [1]_ - 166:22

**children** [1]_ - 237:22

**Chinese** [1]_ - 136:1

**Christmas** [1]_ - 189:21

**Christopher** [2]_ - 3:8_, 164:21

**CHRISTOPHER** [1]_ - 164:25

**circle** [19]_ - 24:24_, 57:5 _, 59:19_, 193:17_, 194:24_, 195:1_, 195:2_, 197:16_, 198:2_, 202:9_, 205:16_, 224:23_, 230:13 _, 231:18_, 252:1_, 253:24_, 262:5_, 266:8_, 277:9

**circled** [10]_ - 57:6_, 58:3 _, 59:14_, 59:16_, 59:17_, 60:3_, 60:4_, 64:20_, 197:21_, 209:11

**circling** [5]_ - 57:16_, 59:3_, 64:2_, 236:22_, 253:4

**City** [1]_ - 142:19

**city** [1]_ - 193:23

**clarification** [2]_ - 29:25 _, 277:2

**clarify** [1]_ - 29:17

**clarity** [1]_ - 233:16

**classroom** [1]_ - 33:7

**classroom-type** [1]_ - 33:7

**clear** [24]_ - 7:18_, 17:13_, 24:3_, 29:10_, 101:16_,

102:18_, 171:2_, 174:17_, 192:24_, 194:9_, 194:24_, 194:25_, 199:16_, 202:20 _, 216:21_, 221:17_, 223:16_, 231:9_, 237:9_, 252:13_, 256:2_, 258:22_, 261:11_, 268:18

**clearance** [1]_ - 83:13

**cleared** [1]_ - 130:1

**clearer** [1]_ - 225:24

**clearly** [3]_ - 28:12_, 192:5_, 205:11

**close** [14]_ - 26:19_, 104:2 _, 127:12_, 175:5_, 205:16_, 224:11_, 255:19 _, 259:24_, 261:21_, 265:10_, 281:15_, 282:3_, 283:19_, 283:24

**close-up** [1]_ - 205:16

**closely** [1]_ - 205:9

**closer** [3]_ - 205:2_, 263:25_, 267:3

**closest** [11]_ - 173:20_, 174:1_, 174:2_, 174:5_, 181:25_, 182:3_, 182:4_, 182:7_, 190:14_, 250:23_, 276:18

**club** [4]_ - 234:16_, 279:11 _, 279:13_, 279:16

**Club** [26]_ - 197:25_, 198:7 _, 198:15_, 209:9_, 209:24_, 209:25_, 211:24 _, 229:5_, 231:14_, 233:3 _, 240:10_, 249:14_, 253:17_, 254:11_, 256:14 _, 257:1_, 257:20_, 258:9_, 259:2_, 259:10_, 264:21_, 265:21_, 265:23_, 266:21 _, 267:19_, 274:5

**clubs** [1]_ - 279:24

**Code** [6]_ - 93:1_, 93:8_, 93:10_, 93:11_, 93:14_, 93:18

**code** [12]_ - 93:1_, 93:11_, 93:15_, 94:5_, 97:25_, 103:15_, 103:20_, 125:5_, 126:3_, 135:14_, 136:3_, 137:12

**coils** [2]_ - 71:18_, 71:25

**collect** [3]_ - 33:5_, 163:4 _, 262:2

**collected** [6]_ - 41:17_, 41:25_, 44:14_, 65:5_, 68:1_, 217:8

**Collection** [6]_ - 64:18_, 66:1_, 68:1_, 69:12_,

69:17_, 70:12

**collection** [13]_ - 40:1_, 40:19_, 43:17_, 45:1_, 45:14_, 45:18_, 58:13_, 58:15_, 68:24_, 71:5_, 71:18_, 72:20_, 72:23

**collects** [1]_ - 261:25

**College** [1]_ - 166:1

**college** [5]_ - 8:25_, 9:2_, 9:7_, 165:24_, 166:3

**color** [7]_ - 14:24_, 198:5_, 198:6_, 199:10_, 218:14_, 218:15_, 218:16

**Colorado** [1]_ - 166:2

**colorings** [1]_ - 14:20

**colors** [1]_ - 240:5

**Colt** [1]_ - 75:8

**column** [5]_ - 59:10_, 60:17_, 154:21_, 160:19_, 161:3

**columns** [1]_ - 62:7

**comfortable** [1]_ - 16:16

**comforter** [1]_ - 37:23

**coming** [13]_ - 13:9_, 23:17_, 48:12_, 75:4_, 138:8_, 139:18_, 145:21_, 145:22_, 145:24_, 177:4_, 186:3_, 198:25

**commercially** [1]_ - 17:1

**common** [4]_ - 19:16_, 20:1_, 43:1_, 173:3

**commonly** [4]_ - 18:24_, 19:12_, 140:2_, 203:9

**communicate** [3]_ - 79:6_, 172:4_, 281:1

**communication** [2]_ - 85:5_, 172:8

**communications** [3]_ - 79:5_, 200:5_, 273:1

**community** [3]_ - 43:11_, 48:3_, 48:7

**companies** [5]_ - 172:13_, 173:7_, 179:24_, 180:21_, 192:10

**company** [3]_ - 19:6_, 171:19_, 237:25

**compare** [9]_ - 60:16_, 60:19_, 62:7_, 63:1_, 63:14_, 64:4_, 69:2_, 70:16_, 189:5

**compared** [7]_ - 54:18_, 60:10_, 68:4_, 69:15_, 70:18_, 71:22_, 73:1

**compares** [1]_ - 18:5

**comparing** [5]_ - 42:13_, 46:15_, 47:5_, 50:12_, 63:10

**comparison** [9]_ - 41:19_, 46:13_, 50:2_, 50:5_, 50:7_, 50:11_, 59:1_, 63:10

**competency** [1]_ - 34:14

**complain** [1]_ - 5:13

**completed** [3]_ - 31:22_, 68:24_, 95:21

**completely** [1]_ - 106:23

**completes** [1]_ - 35:15

**compliance** [1]_ - 168:18

**Complies** [6]_ - 14:7_, 18:3_, 89:21_, 143:7_, 147:8_, 205:18

**complies** [1]_ - 198:3

**comply** [3]_ - 28:13_, 28:25_, 29:11

**composed** [1]_ - 167:4

**Computer** [1]_ - 77:12

**computer** [3]_ - 53:5_, 82:4_, 83:6

**computers** [1]_ - 78:2

**concentrate** [1]_ - 44:12

**concept** [1]_ - 176:13

**concerned** [1]_ - 4:3

**conclude** [1]_ - 168:25

**concluded** [2]_ - 71:15_, 285:6

**concludes** [1]_ - 282:1

**concluding** [1]_ - 29:13

**conclusion** [4]_ - 46:12_, 52:2_, 70:13_, 271:19

**conclusions** [20]_ - 31:24_, 35:20_, 39:2_, 39:4_, 46:1_, 46:2_, 46:3_, 46:4_, 51:2_, 65:10_, 67:23_, 69:6_, 69:9_, 70:5_, 70:8_, 71:11_, 72:15_, 72:17_, 189:16_, 265:15

**condensing** [1]_ - 190:1

**condition** [1]_ - 15:4

**conditions** [1]_ - 5:18

**conduct** [7]_ - 11:10_, 13:5_, 19:21_, 132:11_, 185:2_, 185:9_, 185:17

**conducted** [2]_ - 187:4_, 203:6

**cone** [4]_ - 278:15_, 278:20_, 278:23_, 279:4

**conference** [3]_ - 284:10_, 284:11_, 285:1

**configuration** [1]_ - 22:23

**confirm** [4]_ - 107:20_, 133:12_, 133:17_, 281:16

**confirming** [1]_ - 264:9

**confuse** [1]_ - 102:15

**confused** [1]_ - 177:16

**Congress** [1]_ - 279:22

**conjunction** [1]_ - 189:11

**connect** [7]_ - 103:4_, 109:14_, 171:16_, 173:21_, 174:8_, 174:18_, 272:9

**connected** [12]_ - 98:8_, 104:22_, 104:24_, 155:5_, 172:4_, 172:5_, 172:6_, 192:20_, 221:3_, 235:11_, 235:12_, 236:25

**connecting** [1]_ - 176:11

**connection** [8]_ - 109:19_, 109:22_, 111:23_, 112:2_, 112:3_, 183:24_, 200:13_, 202:7

**connections** [1]_ - 200:9

**connects** [2]_ - 104:20_, 174:11

**consent** [1]_ - 78:20

**consequences** [1]_ - 281:23

**consideration** [1]_ - 174:21

**considered** [5]_ - 56:11_, 81:19_, 83:7_, 101:11_, 281:6

**consisted** [1]_ - 96:18

**consistent** [16]_ - 144:12_, 146:13_, 161:3_, 213:21_, 214:22_, 217:11_, 217:12_, 223:22_, 224:5_, 235:7_, 238:18_, 240:23_, 251:7_, 257:22_, 263:17_, 266:3

**contact** [3]_ - 132:13_, 150:1_, 281:3

**contain** [3]_ - 38:3_, 41:11_, 121:24

**contained** [3]_ - 69:23_, 73:14_, 186:7

**contains** [3]_ - 38:8_,

40:4_, 133:10

**contaminate** [1]_ - 35:13

**contamination** [2]_ - 35:25_, 45:24

**contents** [1]_ - 98:6

**context** [7]_ - 47:15_, 56:11_, 66:12_, 66:23_, 81:14_, 98:5_, 154:15

**continual** [1]_ - 181:18

**continue** [11]_ - 34:20_, 54:6_, 117:14_, 124:21_, 134:9_, 134:25_, 163:18_, 204:24_, 211:13_, 239:24_, 277:18

**continued** [3]_ - 10:12_, 169:5_, 247:18

**continuing** [2]_ - 34:20_, 34:21

**contracted** [1]_ - 282:7

**contributing** [4]_ - 42:22_, 69:15_, 70:18_, 72:25

**contributor** [22]_ - 46:6_, 46:8_, 47:8_, 47:10_, 54:11_, 54:14_, 54:21_, 60:23_, 61:12_, 62:14_, 63:3_, 64:8_, 68:6_, 68:7_, 69:19_, 69:20_, 70:22_, 70:23_, 72:1_, 72:2_, 73:4_, 73:5

**contributors** [3]_ - 42:21_, 66:4_, 66:5

**control** [2]_ - 23:5_, 35:4

**controls** [2]_ - 35:24_, 45:23

**conversion** [1]_ - 196:11

**cookbook** [1]_ - 35:10

**coordinate** [1]_ - 218:14

**coordinated** [3]_ - 198:5_, 198:6_, 218:17

**coordinates** [5]_ - 160:24_, 199:11_, 221:18_, 221:20_, 221:21

**copies** [1]_ - 40:10

**copy** [2]_ - 52:21_, 133:10

**copying** [1]_ - 95:19

**cord** [8]_ - 71:3_, 71:4_, 71:9_, 71:16_, 71:17_, 71:24_, 73:18_, 73:23

**corner** [18]_ - 127:16_, 127:17_, 127:21_, 129:2_, 138:5_, 140:12_, 192:2_, 197:25_, 209:9_, 224:23_, 243:14_, 253:25_, 264:21

_, 266:21_, 267:20_, 275:5_, 276:15_, 279:11

**corners** [1]_ - 14:16

**correct** [50]_ - 15:14_, 20:9_, 27:3_, 54:17_, 55:20_, 78:24_, 93:6_, 98:10_, 102:19_, 105:18_, 106:9_, 106:10_, 108:13_, 111:25_, 114:1_, 116:12_, 117:21_, 126:22_, 130:18_, 152:20_, 193:13_, 194:2_, 204:18_, 207:23_, 212:7_, 215:22_, 215:25_, 218:2_, 220:18_, 223:2_, 226:10_, 226:16_, 227:9_, 228:7_, 232:24_, 233:4_, 234:6_, 236:5_, 243:4_, 244:15_, 246:23_, 253:1_, 256:21_, 259:16_, 272:15_, 276:4_, 276:19_, 277:11_, 281:18_, 281:19

**corrected** [1]_ - 63:19

**correction** [1]_ - 257:9

**correctly** [7]_ - 36:4_, 45:5_, 45:6_, 51:20_, 54:12_, 207:9_, 253:4

**correlates** [1]_ - 91:25

**correspond** [1]_ - 59:10

**corresponding** [1]_ - 209:13

**corresponds** [2]_ - 64:15_, 221:18

**corridor** [4]_ - 213:20_, 214:9_, 214:24_, 224:3

**Corvo** [1]_ - 104:25

**Counsel** [2]_ - 3:5_, 186:18

**counsel** [1]_ - 3:15

**country** [4]_ - 19:2_, 48:4_, 170:1_, 170:15

**countryside** [1]_ - 174:12

**County** [9]_ - 206:18_, 207:5_, 208:7_, 209:1_, 212:19_, 216:14_, 225:20_, 229:14_, 271:12

**couple** [23]_ - 50:22_, 75:7_, 79:19_, 83:14_, 90:12_, 96:19_, 152:16_, 170:7_, 174:7_, 180:7_, 182:9_, 184:25_, 189:8_, 197:23_, 198:21_, 201:25_, 214:18_, 252:12_, 254:12_, 259:11_, 265:4_, 278:5_, 281:15

**Course** [7]_ - 178:1_,

240:22_, 242:9_, 242:24_, 243:11_, 257:11_, 280:10

**course** [55]_ - 9:22_, 20:25_, 33:11_, 87:7_, 157:9_, 167:19_, 168:1_, 168:6_, 171:19_, 190:8_, 221:8_, 224:24_, 226:23_, 226:25_, 227:2_, 227:4_, 227:22_, 230:17_, 232:2_, 232:3_, 234:16_, 235:24_, 236:6_, 236:12_, 239:9_, 244:2_, 244:25_, 245:11_, 245:21_, 245:23_, 247:3_, 247:12_, 247:21_, 248:5_, 248:10, 249:23_, 250:2_, 250:12_, 250:18_, 253:25_, 254:24_, 261:7_, 264:1_, 266:1_, 266:12_, 273:8_, 273:9_, 275:5_, 276:20_, 276:23_, 279:16_, 281:4_, 282:20

**court** [13]_ - 13:9_, 13:13_, 20:15_, 31:25_, 34:11_, 36:24_, 53:23_, 100:3_, 119:6_, 168:25_, 186:3_, 282:10_, 282:21

**Court** [10]_ - 3:1_, 21:17_, 134:21_, 188:7_, 204:9_, 282:5_, 282:9_, 282:12_, 283:1_, 284:5

**COURT** [219]_ - 3:2_, 3:10_, 3:13_, 3:16_, 3:25_, 4:4_, 4:9_, 4:12_, 4:14_, 4:18_, 4:25_, 5:5_, 5:7_, 5:16_, 5:22_, 5:24_, 6:1_, 6:6, 6:20_, 12:20_, 12:22_, 12:25_, 13:18_, 15:10_, 16:9_, 20:21_, 21:9_, 21:11_, 21:16_, 25:6_, 26:1_, 26:15_, 26:20_, 26:23_, 27:3_, 28:10_, 28:21_, 29:10_, 29:16_, 29:18_, 29:23_, 30:2_, 30:6_, 30:10_, 30:24_, 37:6_, 37:8_, 40:23_, 41:1_, 52:9_, 52:13_, 52:17_, 52:25_, 53:6_, 53:12_, 53:17_, 53:22_, 54:2_, 55:1_, 56:5_, 56:8_, 57:8_, 73:11_, 74:3_, 74:7_, 74:24_, 76:4_, 76:6_, 76:12_, 83:18_, 85:20_, 86:11_, 86:13_, 88:7_, 91:3_, 92:7_, 92:9_, 92:12_, 105:6_, 107:22_, 107:25_, 110:8_, 110:24_, 111:1_, 111:5_, 112:12_, 113:6_, 113:11_, 114:4_, 114:7_, 114:13_, 114:17_, 114:24_, 115:4_, 115:10_,

115:14_, 115:17_, 115:24_, 116:2_, 116:6_, 116:11_, 116:14_, 116:24_, 117:2_, 117:6_, 117:9_, 117:12_, 117:14_, 117:23_, 117:25_, 119:1_, 119:9_, 119:13_, 119:17_, 120:2_, 122:8_, 123:24_, 124:19_, 125:11_, 126:11_, 130:5_, 130:7_, 131:1_, 131:21_, 131:23_, 132:6_, 132:17_, 132:22_, 133:1_, 133:4_, 133:9_, 133:15_, 133:17_, 133:21_, 133:25_, 134:2_, 134:5_, 134:8_, 134:13_, 134:16_, 134:17_, 134:19_, 135:19_, 137:17_, 139:13_, 141:8_, 142:11_, 142:22_, 144:5_, 144:8_, 144:20_, 144:22_, 145:3_, 147:19_, 148:11_, 148:13_, 148:20_, 149:11_, 151:23_, 153:18_, 154:10_, 155:16_, 157:25_, 159:9_, 160:7_, 162:9_, 162:11_, 162:14_, 162:25_, 163:3_, 163:6_, 164:3_, 164:5_, 164:7_, 164:11_, 164:24_, 170:21_, 170:23_, 186:15_, 188:3_, 188:9_, 190:20_, 191:2_, 191:4_, 201:11_, 204:12_, 204:15_, 204:18_, 204:21_, 204:24_, 210:19_, 210:21_, 211:2_, 211:5_, 211:9_, 211:11_, 214:11_, 214:15_, 215:8_, 215:10_, 215:12_, 277:4_, 277:16_, 277:23_, 277:25_, 278:2_, 280:15_, 280:17_, 280:20_, 281:14_, 281:20_, 281:25_, 282:14_, 283:6_, 283:10_, 283:18_, 284:1_, 284:7_, 284:24

**Court's** [5]_ - 26:24_, 90:24_, 112:11_, 142:2_, 188:5

**court-hired** [1]_ - 282:21

**COURTROOM** [10]_ - 3:3_, 6:9_, 6:14_, 30:13_, 30:18_, 76:14_, 76:19_, 76:21_, 164:13_, 164:18

**courtroom** [19]_ - 5:25_, 30:11_, 52:16_, 52:18_, 54:1_, 114:12_, 119:14_, 119:16_, 132:16_, 134:18_, 170:13_, 177:18_, 211:1_, 211:10_, 277:22_, 278:1_, 281:7_, 281:8_, 281:13

**coverage** [14]_ - 172:10_, 172:11_, 175:8_, 175:11_, 175:13_, 175:14_, 193:4_, 193:10_, 234:15_, 236:1_, 240:21_, 250:24_, 272:24_, 273:19

**covered** [2]_ - 64:21_, 193:16

**covers** [1]_ - 279:22

**coworker** [1]_ - 82:19

**Craigslist** [3]_ - 120:12_, 121:16_, 121:20

**created** [4]_ - 92:24_, 96:8_, 180:21_, 194:7

**creation** [3]_ - 94:17_, 94:18_, 96:5

**creators** [1]_ - 111:16

**Crime** [6]_ - 32:22_, 33:2_, 33:10_, 33:15_, 33:18_, 166:23

**crime** [5]_ - 32:24_, 33:4_, 33:5_, 37:1_, 37:22

**crimes** [1]_ - 184:11

**Crimes** [1]_ - 166:21

**cross** [6]_ - 26:1_, 28:14_, 28:23_, 74:24_, 163:1_, 278:4

**CROSS** [4]_ - 26:2_, 75:2_, 163:7_, 278:6

**cross-examination** [6]_ - 26:1_, 28:14_, 28:23_, 74:24_, 163:1_, 278:4

**CROSS-EXAMINATION** [4]_ - 26:2_, 75:2_, 163:7_, 278:6

**crystal** [1]_ - 157:2

**CSF** [1]_ - 59:7

**curiosity** [1]_ - 163:10

**current** [2]_ - 7:7_, 34:16

**Curtis** [1]_ - 51:23

**custody** [3]_ - 82:19_, 83:2_, 270:24

**customary** [1]_ - 184:6

**cut** [5]_ - 17:8_, 79:5_, 85:5_, 92:3

**cutting** [1]_ - 40:2

**D**

**D1** [1]_ - 64:2

**D10** [1]_ - 64:2

**D12** [1] - 64:2
**D13** [1] - 63:12
**D16** [2] - 57:2, 59:7
**D18** [2] - 61:24, 61:25
**D19** [1] - 62:21
**D2** [2] - 62:21, 64:3
**D21** [2] - 61:24, 61:25
**D22** [1] - 63:12
**D3** [9] - 57:1, 57:3, 57:23, 59:7, 59:17, 60:7, 61:4, 61:5
**D5** [1] - 63:12
**D7** [1] - 63:12
**D8** [2] - 61:24, 61:25
**daily** [3] - 31:15, 32:1, 182:25
**Dallas** [1] - 137:7
**damaged** [1] - 272:3
**dance** [5] - 279:11, 279:13, 279:15, 279:21, 279:24
**danced** [1] - 279:14
**dancing** [1] - 279:14
**dark** [5] - 223:6, 228:17, 239:21, 240:5, 244:7
**darker** [2] - 239:16, 239:23
**data** [113] - 45:25, 53:10, 62:13, 71:12, 71:15, 72:12, 77:14, 77:15, 77:17, 77:19, 78:5, 79:10, 79:14, 81:6, 83:6, 85:15, 87:24, 92:20, 95:19, 95:24, 95:25, 96:3, 101:6, 123:18, 143:16, 154:18, 154:19, 160:24, 170:13, 176:3, 176:10, 176:14, 176:21, 176:22, 176:23, 176:24, 176:25, 177:2, 177:13, 177:14, 179:7, 179:9, 181:13, 181:15, 181:19, 181:23, 183:1, 184:12, 187:10, 189:25, 190:21, 195:4, 196:18, 197:13, 199:20, 199:21, 199:22, 200:14, 202:14, 204:14, 204:20, 205:24, 210:1, 215:1, 215:21, 215:23, 216:5, 216:9, 216:13, 216:17, 216:23, 219:18, 222:7, 222:12, 222:13, 222:19,

224:4, 224:5, 228:15, 229:1, 230:14, 232:17, 235:2, 238:4, 238:13, 238:18, 243:9, 244:22, 251:25, 252:6, 252:21, 253:7, 261:5, 261:20, 261:24, 263:3, 264:9, 264:10, 265:24, 268:9, 268:13, 270:15, 271:4, 271:10, 271:24, 276:4, 276:12, 276:17
**data's** [1] - 101:14
**dataset** [2] - 178:23, 210:10
**date** [33] - 82:17, 92:24, 94:16, 96:6, 96:7, 121:5, 137:1, 150:7, 153:12, 155:7, 176:7, 177:1, 184:10, 201:19, 201:23, 202:25, 203:20, 208:7, 209:14, 222:3, 227:15, 236:6, 236:10, 239:1, 240:16, 241:19, 241:22, 249:19, 256:11, 258:4, 276:3
**dated** [1] - 89:2
**dates** [2] - 236:5, 249:12
**day-to-day** [1] - 36:22
**daylight** [1] - 93:19
**days** [15] - 130:2, 167:20, 169:9, 181:7, 181:8, 195:14, 195:15, 238:6, 243:3, 245:10, 248:1, 249:16, 254:12, 259:5
**dead** [3] - 157:7, 157:9, 192:1
**deal** [1] - 32:1
**deceased** [2] - 182:24, 237:21
**decide** [3] - 31:19, 43:25, 116:7
**deciphered** [1] - 163:17
**decision** [2] - 281:21, 281:23
**decisions** [3] - 43:21, 44:19, 190:3
**decrypting** [1] - 163:16
**deeper** [1] - 168:2
**default** [1] - 88:3
**defeating** [1] - 22:12
**defendant** [5] - 186:22, 187:1, 187:7, 257:9, 270:8
**defendant's** [1] - 204:5

**defending** [1] - 8:10
**defense** [4] - 3:12, 116:17, 169:2, 284:2
**Defense** [1] - 9:5
**define** [1] - 77:15
**definitely** [1] - 267:19
**deflect** [2] - 11:20, 25:23
**deflected** [1] - 25:20
**degree** [4] - 9:1, 9:2, 9:3, 32:8
**degrees** [6] - 29:21, 191:25, 192:13, 196:2, 278:15
**delete** [1] - 129:24
**deleted** [1] - 129:24
**deliberations** [2] - 4:10, 56:14
**Delight** [1] - 75:21
**demonstrates** [1] - 240:24
**demonstrative** [3] - 53:14, 56:6, 56:9
**dense** [1] - 175:4
**density** [1] - 175:6
**Denver** [1] - 166:1
**deoxyribonucleic** [1] - 38:7
**department** [3] - 95:10, 166:7, 166:16
**Department** [1] - 166:4
**dependent** [2] - 191:20, 191:22
**depict** [2] - 189:17, 226:7
**depicted** [6] - 59:5, 59:16, 159:25, 198:2, 209:9, 250:25
**deployments** [1] - 9:24
**depth** [5] - 203:3, 237:13, 237:15, 240:6, 268:4
**DEPUTY** [10] - 3:3, 6:9, 6:14, 30:13, 30:18, 76:14, 76:19, 76:21, 164:13, 164:18
**deputy** [2] - 9:8, 52:24
**derivative** [1] - 99:17
**derive** [2] - 167:11, 278:20
**derived** [19] - 86:23, 91:11, 110:14, 113:22,

113:24, 120:7, 124:3, 125:15, 131:12, 131:14, 131:15, 148:5, 148:7, 149:1, 152:1, 153:21, 162:4, 174:23, 222:21
**describe** [24] - 10:4, 14:12, 17:14, 38:5, 39:6, 39:21, 42:9, 55:12, 56:18, 56:19, 58:11, 59:4, 59:15, 59:20, 62:18, 63:22, 63:24, 88:22, 113:19, 153:5, 157:19, 189:17, 203:15, 243:24
**described** [21] - 10:8, 44:25, 48:2, 60:13, 63:14, 65:11, 65:19, 67:10, 67:15, 69:3, 69:25, 70:1, 72:9, 74:14, 77:24, 81:7, 86:7, 88:23, 111:10, 153:3, 157:21
**describing** [3] - 81:10, 81:11, 145:25
**design** [4] - 12:4, 174:23, 175:19
**designator** [1] - 95:3
**designed** [1] - 175:11
**destroyed** [1] - 272:3
**detail** [16] - 94:1, 120:10, 171:18, 175:23, 176:3, 176:5, 176:18, 177:14, 178:9, 178:24, 181:13, 182:1, 183:3, 183:23, 189:4, 189:17
**details** [5] - 79:1, 91:24, 110:16, 120:8, 186:17
**detected** [2] - 68:16, 137:9
**detection** [3] - 32:3, 37:15, 40:14
**detention** [1] - 5:18
**determination** [2] - 46:11, 46:12
**determine** [13] - 18:13, 57:14, 60:22, 61:22, 62:2, 114:5, 114:21, 149:3, 177:12, 179:4, 180:3, 180:18, 235:9
**determines** [1] - 173:24
**determining** [5] - 56:23, 58:7, 61:18, 61:21, 62:1
**develop** [1] - 65:3

**developed** [2]_ - 73:22_, 90:7

**develops** [1]_ - 163:14

**device** [55]_ - 77:18_, 77:23_, 78:12_, 78:14_, 78:15_, 78:22_, 79:4_, 79:6_, 79:10_, 79:11_, 79:23_, 81:18_, 83:24_, 84:12_, 84:16_, 84:25_, 85:3_, 85:9_, 91:24_, 91:25_, 95:16_, 96:22_, 97:4_, 97:6_, 98:8_, 100:9_, 102:10_, 109:25_, 110:20_, 111:15_, 118:23_, 125:18_, 131:13_, 136:2_, 141:10_, 147:10_, 147:12_, 148:7_, 155:5_, 156:13_, 156:16_, 156:22_, 157:8_, 157:10_, 157:12_, 158:3_, 158:14_, 159:4_, 160:21_, 161:4_, 179:6_, 179:7_, 202:24_, 203:1

**devices** [15]_ - 22:24_, 78:1_, 78:7_, 78:10_, 78:24_, 78:25_, 79:18_, 79:20_, 80:3_, 82:6_, 82:20_, 93:12_, 109:15_, 146:3_, 147:5

**dictates** [1]_ - 190:6

**differ** [4]_ - 40:11_, 57:12_, 62:1_, 181:4

**difference** [8]_ - 23:13_, 25:11_, 138:5_, 139:17_, 139:18_, 194:11_, 200:4_, 208:14

**differences** [5]_ - 39:1_, 39:5_, 39:6_, 39:19

**different** [52]_ - 9:15_, 11:8_, 11:18_, 11:19_, 14:22_, 17:20_, 17:22_, 23:13_, 26:25_, 46:17_, 49:24_, 53:10_, 54:19_, 60:13_, 81:25_, 88:14_, 88:21_, 88:22_, 96:19_, 98:21_, 120:16_, 120:25_, 121:1_, 121:4_, 121:5_, 121:11_, 143:13_, 175:18_, 177:8_, 191:16_, 200:7_, 201:25_, 214:19_, 217:18_, 217:19_, 218:25_, 222:18_, 226:24_, 231:3_, 231:4_, 231:5_, 231:6_, 231:7_, 231:21_, 236:17_, 246:10_, 260:5_, 272:18

**differently** [4]_ - 17:20_, 174:12_, 222:24_, 262:1

**differs** [4]_ - 38:24_, 93:9_, 93:15_, 222:8

**difficult** [2]_ - 87:22_, 137:5

**digital** [15]_ - 77:12_, 77:14_, 77:15_, 77:17_, 77:23_, 78:7_, 78:12_, 79:18_, 79:20_, 82:6_, 82:9_, 83:6_, 91:19_, 100:18_, 100:21

**dimensions** [1]_ - 17:9

**direct** [7]_ - 28:11_, 28:16_, 28:23_, 31:20_, 97:17_, 174:16_, 209:8

**DIRECT** [4]_ - 6:24_, 31:2_, 77:2_, 165:2

**direction** [8]_ - 22:5_, 191:19_, 192:21_, 193:3_, 233:6_, 233:24_, 269:19_, 269:21

**director** [1]_ - 7:8

**directories** [1]_ - 129:18

**Directory** [1]_ - 97:19

**directory** [1]_ - 129:19

**dirt** [1]_ - 174:4

**discern** [1]_ - 129:11

**disciplines** [1]_ - 44:17

**discolorations** [1]_ - 15:2

**discovered** [1]_ - 109:22

**discovery** [1]_ - 133:13

**discuss** [6]_ - 52:19_, 115:8_, 132:10_, 132:11_, 189:10_, 277:19

**discussed** [4]_ - 51:7_, 51:12_, 54:9_, 284:22

**discussing** [1]_ - 133:5

**discussion** [5]_ - 132:18_, 259:13_, 280:24_, 282:1_, 285:1

**display** [4]_ - 80:15_, 157:2_, 192:9_, 192:14

**displayed** [3]_ - 98:10_, 191:16_, 276:11

**displaying** [1]_ - 236:21

**distance** [17]_ - 23:2_, 23:9_, 180:3_, 180:6_, 183:2_, 183:6_, 183:13_, 194:17_, 200:24_, 202:16_, 220:1_, 236:20_, 237:2_, 240:7_, 252:19_, 254:20

**distances** [1]_ - 200:22

**distinction** [3]_ - 7:18_, 96:4_, 96:6

**distinctive** [1]_ - 158:5

**distinguish** [3]_ - 39:18_, 177:7_, 177:10

**dive** [1]_ - 168:2

**divided** [1]_ - 191:18

**division** [4]_ - 77:9_, 82:23_, 84:1_, 95:4

**DNA** [165]_ - 31:10_, 31:11_, 31:15_, 32:19_, 32:20_, 32:23_, 32:25_, 33:8_, 33:14_, 33:17_, 33:21_, 33:23_, 34:5_, 34:9_, 34:17_, 34:21_, 34:25_, 35:4_, 35:5_, 35:24_, 36:8_, 37:1_, 37:5_, 37:11_, 37:20_, 37:24_, 38:2_, 38:4_, 38:5_, 38:6_, 38:7_, 38:12_, 38:13_, 38:14_, 38:16_, 38:18_, 38:19_, 38:20_, 38:21_, 38:24_, 38:25_, 39:9_, 39:18_, 39:19_, 39:22_, 39:25_, 40:5_, 40:8_, 40:11_, 40:14_, 40:15_, 40:17_, 41:11_, 41:18_, 41:24_, 42:12_, 42:13_, 42:14_, 42:19_, 42:21_, 42:22_, 42:24_, 43:2_, 43:4_, 43:14_, 43:23_, 44:3_, 44:5_, 44:7_, 44:8_, 44:11_, 44:12_, 44:14_, 45:14_, 45:23_, 46:6_, 46:9_, 46:13_, 46:14_, 46:15_, 46:19_, 47:8_, 47:10_, 48:16_, 49:6_, 49:8_, 49:10_, 49:20_, 49:21_, 50:2_, 50:11_, 50:12_, 54:16_, 54:17_, 54:18_, 54:21_, 55:14_, 55:15_, 56:22_, 56:23_, 57:3_, 57:6_, 57:7_, 57:18_, 57:20_, 58:17_, 58:25_, 59:17_, 59:21_, 60:6_, 60:7_, 60:23_, 61:4_, 61:7_, 61:8_, 61:12_, 62:9_, 62:11_, 63:4_, 63:11_, 64:3_, 64:4_, 65:5_, 65:6_, 65:7_, 65:12_, 65:14_, 66:1_, 67:13_, 68:1_, 68:2_, 68:3_, 68:4_, 68:5_, 69:13_, 69:15_, 69:16_, 70:12_, 70:16_, 70:18_, 70:19_, 71:19_, 71:22_, 71:23_, 72:23_, 72:25_, 73:1_, 73:2_, 73:21_, 73:23_, 73:24_, 74:17_, 74:20_, 75:13_, 75:16_, 75:19_, 75:22

**DNA-questioned** [1]_ - 61:7

**docket** [1]_ - 132:24

**document** [13]_ - 53:14_, 55:5_, 55:7_, 55:9_, 55:13_, 55:20_, 55:21_, 64:10_, 91:8_, 91:17_, 108:2_, 130:9_, 143:17

**documented** [3]_ - 100:16_, 106:8_, 171:17

**dog** [18]_ - 81:17_, 183:10_, 183:13_, 183:15_, 194:18_, 194:20_, 195:2_, 237:3_, 237:4_, 252:1_, 252:3_, 253:3_, 254:20_, 255:3_, 259:23_, 264:6_, 264:24

**DOJ** [1]_ - 10:24

**dollar** [1]_ - 173:7

**done** [16]_ - 11:7_, 23:13_, 40:21_, 43:7_, 45:1_, 45:6_, 46:18_, 68:13_, 80:17_, 87:9_, 113:16_, 131:6_, 142:11_, 147:24_, 187:17_, 210:19

**Donnelly** [2]_ - 3:8_, 52:21

**DONNELLY** [36]_ - 30:8_, 30:23_, 31:3_, 37:3_, 37:9_, 37:10_, 40:24_, 41:2_, 52:6_, 52:10_, 52:23_, 53:3_, 53:8_, 54:7_, 54:8_, 54:23_, 55:2_, 55:3_, 56:2_, 56:16_, 56:17_, 57:9_, 59:24_, 60:1_, 63:18_, 63:21_, 64:25_, 65:2_, 73:7_, 73:12_, 74:1_, 74:4_, 74:8_, 74:9_, 74:21_, 76:5

**Dos** [1]_ - 104:25

**dot** [3]_ - 129:18_, 177:21_, 192:18

**Dot** [2]_ - 19:6_, 19:8

**dots** [8]_ - 198:8_, 198:9_, 202:3_, 202:4_, 202:5_, 218:12_, 219:1_, 230:12

**down** [40]_ - 15:7_, 22:14_, 43:17_, 57:2_, 58:2_, 59:14_, 64:25_, 83:1_, 84:14_, 100:4_, 100:13_, 113:11_, 125:18_, 127:10_, 152:3_, 177:3_, 177:4_, 180:13_, 189:15_, 190:14_, 191:17_, 193:2_, 200:16_, 208:17_, 212:16

_, 213:19_, 219:23_, 220:3_, 228:16_, 230:19_, 231:23_, 239:6_, 239:8_, 244:23_, 250:22_, 255:2_, 256:5_, 267:16_, 274:20_, 275:3

**downtown** [1]_ - 172:23

**draw** [13]_ - 39:2_, 39:5_, 59:2_, 60:2_, 189:6_, 206:12_, 242:6_, 243:8_, 244:5_, 250:13_, 265:15_, 271:19

**drawn** [1]_ - 193:17

**drink** [1]_ - 75:21

**drive** [5]_ - 168:24_, 186:14_, 186:17_, 222:10_, 231:24

**drives** [2]_ - 78:1

**driving** [1]_ - 265:25

**drop** [2]_ - 175:14_, 175:16

**drops** [1]_ - 175:17

**due** [2]_ - 145:16_, 146:10

**Duo** [2]_ - 98:18

**duration** [1]_ - 283:22

**during** [28]_ - 20:12_, 56:14_, 73:21_, 109:22_, 189:24_, 209:1_, 209:5_, 216:2_, 219:2_, 219:14_, 222:12_, 231:19_, 239:11_, 242:24_, 250:16_, 253:18_, 257:8_, 266:14_, 269:8_, 269:11_, 272:20_, 273:1_, 273:6_, 284:25_, 285:3

**duties** [9]_ - 31:15_, 32:2_, 32:16_, 32:23_, 36:22_, 42:25_, 43:24_, 48:11_, 77:10

**DY** [1]_ - 62:6

**DYS391** [2]_ - 61:25_, 62:1

E

**early** [7]_ - 216:5_, 216:24_, 220:22_, 234:18_, 245:19_, 276:6_, 284:12

**easier** [2]_ - 81:4_, 81:5

**easily** [2]_ - 152:19_, 181:5

**east** [23]_ - 222:14_, 223:24_, 224:2_, 225:18_, 227:2_, 229:2_, 229:3_,

232:21_, 233:3_, 233:25_, 235:8_, 235:10_, 235:11_, 235:20_, 244:24_, 252:24_, 259:20_, 261:6_, 262:19_, 263:9

**east/west** [1]_ - 206:17

**eastern** [1]_ - 229:13

**Eastern** [1]_ - 93:9

**easy** [1]_ - 137:9

**edge** [4]_ - 22:2_, 22:3_, 221:8_, 229:13

**education** [4]_ - 34:20_, 34:22_, 43:1_, 44:21

**educational** [1]_ - 32:6

**EED** [5]_ - 160:1_, 204:11_, 204:14_, 260:4_, 262:22

**effective** [5]_ - 8:9_, 8:11_, 22:16_, 22:17_, 22:18

**effects** [1]_ - 7:22

**effort** [1]_ - 4:5

**eight** [1]_ - 34:21

**either** [6]_ - 5:11_, 36:24_, 154:18_, 168:8_, 268:14_, 285:3

**elected** [1]_ - 139:9

**element** [4]_ - 173:25_, 192:1_, 192:12_, 193:3

**elements** [1]_ - 121:1

**eliminate** [2]_ - 187:14_, 187:15

**elsewhere** [1]_ - 281:2

**email** [7]_ - 99:17_, 100:20_, 100:25_, 107:12_, 108:8_, 108:11_, 150:13

**emails** [1]_ - 176:20

**embed** [1]_ - 161:1

**embedding** [1]_ - 160:21

**emphasis** [1]_ - 230:14

**employed** [3]_ - 31:6_, 31:7_, 33:22

**enable** [1]_ - 160:24

**enclosed** [1]_ - 21:24

**encompassed** [1]_ - 231:13

**encounter** [1]_ - 270:7

**encrypted** [6]_ - 101:11_, 101:12_, 101:15_, 136:19_, 136:23

**encryption** [1]_ - 101:14

**end** [22]_ - 24:21_, 34:13_, 45:17_, 47:21_, 66:14_,

94:16_, 95:15_, 95:21_, 95:25_, 106:2_, 115:7_, 118:2_, 129:21_, 136:23_, 148:23_, 168:4_, 168:14_, 168:25_, 268:20_, 282:6_, 283:24

**ending** [13]_ - 113:12_, 199:18_, 201:20_, 207:16_, 208:1_, 211:23_, 216:6_, 216:22_, 218:1_, 218:24_, 220:25_, 222:5_, 230:10

**endpoint** [1]_ - 229:12

**ends** [4]_ - 71:17_, 71:18_, 71:24_, 131:25

**enforcement** [13]_ - 7:21_, 8:7_, 11:6_, 18:24_, 19:2_, 19:13_, 19:17_, 25:21_, 34:23_, 80:4_, 169:18_, 203:17_, 210:14

**engage** [2]_ - 173:16_, 280:23

**engineering** [1]_ - 179:23

**engineers** [2]_ - 168:16_, 180:18

**English** [4]_ - 101:17_, 141:22_, 141:24_, 142:12

**enjoy** [2]_ - 132:9_, 134:5

**enjoyed** [1]_ - 166:10

**ensure** [11]_ - 35:19_, 35:22_, 35:25_, 36:1_, 36:2_, 36:20_, 45:5_, 45:21_, 45:22_, 45:24_, 132:7

**enter** [1]_ - 176:22

**entered** [14]_ - 5:25_, 49:10_, 50:7_, 50:10_, 51:3_, 51:17_, 54:1_, 99:13_, 100:20_, 119:16_, 134:18_, 177:2_, 211:10_, 278:1

**enterprise** [1]_ - 80:4

**entire** [3]_ - 80:3_, 96:18_, 279:9

**entirely** [1]_ - 95:23

**entirety** [1]_ - 245:7

**entities** [1]_ - 173:2

**entity** [1]_ - 10:25

**entries** [4]_ - 121:24_, 195:20_, 197:23_, 198:25

**entry** [15]_ - 99:11_, 100:17_, 121:17_, 132:24_, 179:9_, 181:20_, 196:18_, 197:24_, 198:23_,

_, 202:6_, 220:4_, 220:20_, 227:14_, 268:23_, 277:3

**environment** [3]_ - 171:12_, 173:23

**equal** [3]_ - 47:25_, 66:19_, 174:24

**equally** [1]_ - 44:2

**equipment** [7]_ - 8:8_, 35:11_, 97:3_, 105:23_, 173:8_, 173:10_, 231:24

**equipped** [1]_ - 282:15

**erected** [1]_ - 173:2

**errors** [1]_ - 35:23

**ERT** [2]_ - 83:1_, 83:3

**eSIM** [2]_ - 152:13_, 152:16

**essentially** [27]_ - 15:22_, 20:5_, 24:18_, 39:7_, 41:25_, 55:13_, 79:9_, 79:10_, 93:11_, 101:13_, 121:1_, 121:7_, 125:25_, 143:16_, 145:10_, 145:14_, 151:15_, 152:14_, 154:24_, 157:2_, 160:20_, 176:6_, 206:7_, 227:20_, 245:22_, 246:14

**establish** [1]_ - 153:8

**established** [1]_ - 153:13

**estimate** [5]_ - 40:7_, 183:5_, 193:16_, 193:18_, 193:24

**et** [1]_ - 169:12

**evaluated** [2]_ - 13:11_, 13:23

**evening** [6]_ - 219:23_, 228:4_, 280:21_, 281:11_, 284:18_, 285:4

**event** [11]_ - 18:22_, 242:11_, 262:6_, 262:17_, 263:4_, 263:5_, 270:20_, 271:6_, 271:11_, 271:24

**events** [24]_ - 189:17_, 190:15_, 208:16_, 208:18_, 239:12_, 239:13_, 242:12_, 242:13_, 242:14_, 246:5_, 248:15_, 248:16_, 248:17_, 250:25_, 251:19_, 253:21_, 257:6_, 258:13_, 266:19_, 271:4_, 271:5_, 274:7

**eventually** [2]_ - 52:10_, 224:10

**Everglades** [1]_ - 237:19

**everyday** [1]_ - 77:23

**Evidence** [3]_ - 29:12_, 82:18_, 83:2

**evidence** [117]_ - 8:12_, 13:3_, 13:17_, 15:9_, 20:19_, 21:8_, 21:14_, 28:13_, 28:22_, 28:24_, 29:1_, 32:4_, 33:5_, 35:13_, 37:16_, 37:22_, 40:2_, 40:5_, 42:12_, 44:2_, 44:13_, 46:7_, 46:9_, 46:16_, 46:24_, 46:25_, 47:3_, 47:6_, 47:8_, 47:10_, 49:25_, 50:4_, 50:12_, 52:3_, 54:11_, 54:21_, 55:24_, 56:12_, 73:8_, 73:9_, 74:6_, 78:12_, 82:9_, 83:4_, 83:15_, 85:21_, 86:11_, 86:25_, 88:5_, 89:5_, 90:25_, 91:19_, 92:6_, 92:13_, 95:9_, 107:23_, 108:24_, 109:13_, 109:17_, 110:23_, 111:3_, 113:19_, 114:3, 116:19, 116:21_, 116:23, 117:13, 118:5, 118:7, 118:9, 118:11, 118:13, 118:15, 118:17, 118:19, 118:21_, 122:6_, 123:22_, 125:9_, 126:10_, 127:4_, 130:4_, 130:23_, 131:20_, 143:6_, 144:19_, 144:25_, 146:17_, 146:24_, 148:10, 148:17_, 148:19_, 153:16_, 154:9_, 155:14_, 157:24_, 159:7_, 162:8_, 162:12_, 167:12_, 185:1_, 185:7_, 185:14_, 186:8_, 186:13_, 188:2_, 188:20_, 191:1_, 197:1_, 259:12_, 259:13_, 273:8_, 276:7_, 281:5_, 281:6_, 281:7

**evidentiary** [1]_ - 282:2

**exact** [6]_ - 29:3_, 93:18_, 97:10_, 179:16_, 189:25_, 253:9

**exactly** [8]_ - 23:2_, 24:9_, 38:6_, 79:1_, 87:19_, 97:8_, 171:4_, 173:11

**exam** [3]_ - 19:21_, 34:13_, 168:22

**EXAMINATION** [8]_ - 6:24_, 26:2_, 31:2_, 75:2_, 77:2_, 163:7_, 165:2_, 278:6

**examination** [32]_ - 25:12_, 26:1_, 28:11_, 28:14_, 28:16_, 28:23_,

28:24_, 38:2_, 43:2_, 44:23_, 46:18_, 49:16_, 51:4_, 55:24_, 57:7_, 60:12_, 61:10_, 62:13_, 65:10_, 65:11_, 69:2_, 69:7_, 70:4_, 71:5_, 71:12_, 71:15_, 72:12_, 74:24_, 119:1_, 163:1_, 224:4_, 278:4

**examinations** [3]_ - 13:5_, 31:21_, 34:8

**examine** [12]_ - 13:2_, 49:18_, 62:23_, 63:7_, 67:7_, 71:8_, 84:25_, 85:2_, 86:4_, 86:6_, 86:19

**examined** [6]_ - 25:20_, 49:21_, 65:4_, 68:23_, 78:7_, 109:15

**examiner** [16]_ - 31:10_, 31:11_, 31:15_, 31:17_, 33:1_, 34:12_, 35:15_, 35:18_, 35:21_, 36:21_, 42:20_, 43:24_, 77:13_, 81:5_, 83:12_, 95:2

**examiners** [4]_ - 35:9_, 36:18_, 43:22_, 44:19

**example** [19]_ - 23:14_, 37:17_, 39:12_, 41:24_, 42:4_, 47:7_, 49:3_, 57:1_, 57:23_, 61:4_, 67:19_, 80:24_, 93:9_, 120:21_, 172:1_, 174:11_, 197:3_, 198:23_, 264:9

**examples** [4]_ - 36:5_, 41:12_, 77:23_, 81:20

**exams** [1]_ - 44:12

**exceeding** [1]_ - 28:12

**Excel** [1]_ - 176:7

**except** [2]_ - 15:23_, 62:5

**exception** [1]_ - 38:15

**exchange** [2]_ - 140:6_, 140:25

**exclude** [7]_ - 4:3_, 50:13_, 50:14_, 50:18_, 50:22_, 54:19_, 61:9

**excluded** [2]_ - 54:10_, 54:14

**exclusion** [3]_ - 46:7_, 46:11_, 79:2

**exclusions** [1]_ - 50:22

**exclusively** [1]_ - 83:5

**excuse** [6]_ - 24:4_, 100:24_, 117:20_, 147:17_, 158:23_, 258:22

**excused** [6]_ - 30:3_,

52:18_, 76:6_, 114:14_, 211:2_, 280:18

**Exercise** [1]_ - 168:5

**exercises** [1]_ - 34:11

**exhibit** [29]_ - 13:13_, 56:6_, 56:12_, 74:12_, 84:6_, 84:7_, 90:17_, 90:20_, 92:2_, 115:15_, 117:10_, 120:4_, 120:9_, 124:6_, 126:10_, 131:25_, 132:4_, 133:4_, 133:10_, 134:23_, 139:15_, 139:21_, 149:4_, 151:3_, 152:22_, 158:20_, 161:14_, 187:22_, 214:11

**Exhibit** [231]_ - 13:17_, 15:9_, 16:14_, 20:20_, 24:3_, 54:25_, 67:20_, 73:10_, 74:6_, 83:16_, 83:21_, 84:5_, 84:17_, 84:18_, 85:19_, 85:21_, 85:24_, 86:9_, 86:16_, 86:17_, 88:4_, 89:23_, 90:20_, 90:21_, 90:24_, 91:5_, 91:20_, 91:23_, 92:6_, 92:13_, 94:3_, 97:15_, 97:22_, 98:3_, 100:7_, 100:16_, 101:3_, 102:10_, 102:12_, 102:14_, 102:19_, 103:4_, 103:11_, 103:18_, 104:5_, 104:11_, 105:4_, 105:9_, 105:15_, 105:20_, 105:23_, 107:9_, 107:19_, 108:12_, 108:16_, 108:24_, 109:18_, 109:20_, 110:4_, 110:11_, 110:16_, 110:22_, 111:3_, 111:25_, 112:7_, 112:14_, 112:15_, 112:16_, 112:17_, 112:18_, 112:19_, 112:20_, 112:21_, 112:22_, 112:23_, 112:24_, 112:25_, 113:1_, 113:2_, 113:3_, 113:4_, 113:5_, 115:16, 117:13_, 119:25_, 120:6_, 121:10_, 122:6_, 122:20_, 123:1_, 123:8_, 123:22_, 124:4_, 124:7_, 124:10_, 124:16_, 124:25_, 125:9_, 125:16_, 126:2_, 126:7_, 126:9_, 127:4_, 127:22_, 128:17_, 129:9_, 130:4_, 130:17_, 130:24_, 130:25_, 131:15_, 131:17_, 135:4_, 135:7_, 135:8_, 135:11_, 135:17_, 135:22_, 135:24_, 136:4_, 136:13_, 137:13_, 137:15_, 137:22_, 138:7_, 138:8_

_, 138:11_, 138:19_, 138:22_, 139:2_, 139:7_, 139:11_, 139:19_, 140:13_, 140:20_, 140:24_, 141:6_, 141:11_, 141:15_, 141:18_, 142:20_, 143:5_, 143:21_, 144:4_, 144:10_, 144:13_, 144:16_, 145:2_, 145:8_, 145:19_, 146:16_, 146:23_, 146:25_, 147:2_, 147:6_, 148:8_, 148:24_, 149:2_, 149:4_, 149:9_, 149:17_, 150:23_, 151:3_, 151:7_, 151:21_, 152:2_, 152:22_, 153:16_, 153:22_, 154:8_, 154:14_, 155:11_, 156:3_, 156:6_, 156:10_, 157:23_, 158:11_, 158:23_, 159:7_, 159:15_, 160:5_, 160:16_, 161:2_, 161:7_, 161:16_, 161:20_, 162:3_, 162:5_, 162:8_, 162:12_, 162:19_, 185:7_, 185:15_, 185:23_, 188:2_, 197:9_, 204:11_, 204:13_, 204:16_, 204:19_, 208:6_, 209:14_, 215:2_, 215:10_, 216:7_, 216:14_, 216:22_, 218:2_, 219:8_, 219:13, 231:11_, 246:22_, 274:12

**Exhibits** [27]_ - 21:8_, 21:13_, 86:24_, 87:3_, 89:14_, 112:14_, 112:16_, 116:18, 116:20, 116:22, 118:4, 118:6, 118:8, 118:10, 118:12, 118:14, 118:16, 118:18, 118:20_, 131:19_, 144:19_, 144:24_, 147:16_, 148:16, 148:18_, 155:14_, 186:8

**exhibits** [40]_ - 21:11_, 56:13_, 86:22_, 88:8_, 112:10_, 113:9_, 113:15_, 114:3_, 115:5_, 115:9_, 115:11_, 115:24_, 116:3_, 116:9_, 116:14_, 116:16_, 119:2_, 119:5_, 119:7_, 119:19_, 119:21_, 124:17_, 130:23_, 131:2_, 131:8_, 131:23_, 132:22_, 133:11_, 133:18_, 134:21_, 143:2_, 144:3_, 144:6_, 148:1_, 148:10_, 148:13_, 159:6_, 162:24_, 186:16_, 284:23

**exist** [1]_ - 87:21

**exited** [6]_ - 52:16_, 114:12_, 132:16_, 211:1_, 277:22_, 281:13

**expect** [18]_ - 82:3_, 183:14_, 192:22_, 193:7_, 194:19_, 195:2_, 197:19_, 221:14_, 231:19_, 231:22 _, 236:23_, 237:5_, 243:17_, 259:22_, 262:5_, 264:6_, 271:25_, 273:6

**expected** [1]_ - 184:16

**expensive** [1]_ - 172:25

**experience** [12]_ - 9:18_, 16:25_, 17:4_, 18:23_, 20:1_, 43:1_, 44:21_, 106:19_, 146:3_, 146:12_, 221:11_, 237:8

**experiments** [1]_ - 10:11

**expert** [10]_ - 12:9_, 12:18 _, 26:10_, 28:18_, 28:19_, 28:20_, 36:23_, 37:4_, 170:12_, 170:20

**experts** [1]_ - 169:2

**explain** [12]_ - 47:4_, 47:14_, 93:8_, 94:1_, 95:14_, 96:14_, 100:15_, 108:15_, 111:13_, 152:9_, 183:7_, 183:8

**explained** [2]_ - 51:10_, 129:14

**expressing** [1]_ - 39:16

**extended** [2]_ - 190:11_, 285:4

**extensive** [2]_ - 34:7_, 35:6

**extensively** [1]_ - 43:20

**extract** [3]_ - 87:22_, 89:1 _, 143:16

**extracted** [4]_ - 65:5_, 91:20_, 148:8_, 220:4

**extracting** [2]_ - 78:12_, 163:15

**extraction** [45]_ - 40:3_, 40:19_, 68:24_, 79:21_, 79:23_, 80:11_, 80:12_, 80:13_, 85:10_, 85:11_, 88:23_, 91:10_, 91:12_, 91:23_, 94:16_, 94:20_, 94:21_, 95:13_, 95:14_, 95:15_, 95:16_, 95:17_, 96:4_, 96:6_, 96:7_, 96:8 _, 96:9_, 96:14_, 96:16_, 96:18_, 110:14_, 113:21_, 120:7_, 122:11_, 124:3_, 125:15_, 131:11_, 147:9_, 148:4_, 148:7_, 149:1_, 152:1_, 153:21_, 162:4_, 163:18

**extractions** [5]_ - 32:20 _, 80:4_, 96:20_, 113:24_, 148:6

**eye** [1]_ - 193:2

**eyeball** [1]_ - 200:25

**eyes** [2]_ - 38:10

F

**face** [1]_ - 24:7

**Facebook** [17]_ - 98:24_, 99:4_, 99:11_, 99:12_, 99:14_, 99:22_, 99:23_, 102:4_, 102:5_, 103:6_, 103:13_, 104:5_, 104:9_, 104:16_, 126:17_, 126:25

**facilitating** [2]_ - 282:8

**Facility** [4]_ - 7:16_, 9:13 _, 10:5_, 11:10

**facility** [6]_ - 7:18_, 20:6_, 83:8_, 83:9_, 83:11_, 279:21

**facing** [10]_ - 24:9_, 137:7 _, 191:21_, 191:22_, 192:13_, 192:21_, 193:3_, 193:4_, 197:19_, 269:21

**fact** [6]_ - 54:14_, 97:22_, 119:4_, 144:15_, 160:15_, 230:23

**factor** [2]_ - 174:10_, 182:8

**factors** [1]_ - 56:24

**factory** [1]_ - 88:2

**fair** [21]_ - 8:6_, 19:15_, 22:15_, 22:19_, 88:14_, 152:18_, 179:11_, 180:20 _, 183:5_, 184:22_, 196:12_, 200:12_, 201:3_, 209:16_, 221:5_, 239:23_, 244:14_, 246:13_, 253:18 _, 263:16_, 284:24

**fairly** [2]_ - 3:21_, 21:3

**familiar** [15]_ - 41:14_, 41:20_, 42:6_, 42:16_, 43:15_, 43:19_, 68:18_, 69:22_, 72:5_, 136:17_, 172:12_, 179:20_, 184:22 _, 203:13_, 279:24

**fan** [1]_ - 138:23

**fancy** [4]_ - 78:2_, 97:20_, 110:1_, 111:10

**far** [20]_ - 4:3_, 5:6_, 26:18 _, 27:7_, 27:14_, 28:19_, 42:6_, 119:1_, 142:19_,

175:2_, 183:6_, 193:22_, 194:4_, 229:19_, 272:14_, 273:9_, 280:6_, 283:10_, 283:13_, 284:9

**fashion** [1]_ - 115:6

**fast** [3]_ - 23:19_, 119:6_, 267:6

**faster** [1]_ - 19:11

**father** [5]_ - 38:13_, 57:21 _, 57:23_, 58:1_, 167:14

**FBI** [64]_ - 7:5_, 7:11_, 7:16 _, 7:19_, 9:10_, 9:11_, 9:19_, 9:21_, 9:22_, 10:17 _, 11:5_, 11:17_, 17:16_, 18:5_, 18:10_, 18:25_, 31:7_, 31:9_, 32:5_, 32:16 _, 32:17_, 33:1_, 33:3_, 34:4_, 34:5_, 34:6_, 34:24 _, 35:1_, 35:5_, 36:5_, 36:8_, 36:10_, 37:17_, 39:24_, 44:14_, 44:17_, 46:20_, 49:15_, 51:4_, 55:18_, 77:9_, 77:10_, 77:11_, 78:10_, 78:22_, 80:1_, 80:2_, 82:22_, 95:11_, 163:14_, 164:10_, 165:11_, 165:21_, 165:23 _, 166:11_, 166:19_, 169:17_, 170:4_, 178:5_, 178:9_, 178:13_, 184:2_, 185:25

**FBI's** [6]_ - 7:17_, 8:17_, 18:9_, 78:6_, 79:18_, 82:25

**feature** [2]_ - 90:3_, 175:15

**February** [2]_ - 169:8_, 169:10

**Federal** [3]_ - 7:4_, 28:24 _, 29:11

**federal** [3]_ - 8:3_, 36:24_, 178:19

**feed** [2]_ - 128:24_, 129:4

**feet** [9]_ - 23:2_, 23:10_, 23:14_, 23:18_, 23:24_, 27:10_, 27:11_, 200:17

**fellow** [1]_ - 280:25

**female** [4]_ - 57:15_, 58:9 _, 61:22_, 70:15

**fence** [1]_ - 75:15

**few** [5]_ - 36:5_, 191:1_, 245:10_, 272:17_, 279:1

**FGA** [1]_ - 62:22

**Fi** [8]_ - 105:1_, 155:2_, 155:3_, 200:5_, 200:6_, 200:9_, 200:13

**Field** [1]_ - 168:5

**field** [26]_ - 9:21_, 10:2_, 12:22_, 32:12_, 33:8_, 33:21_, 33:23_, 34:5_, 34:17_, 34:20_, 37:5_, 37:8_, 92:21_, 95:1_, 95:13_, 96:10_, 102:23_, 103:24_, 104:18_, 111:7_, 125:19_, 137:19_, 150:3_, 150:16_, 170:24_, 237:21

**fields** [2]_ - 34:9_, 96:22

**fight** [1]_ - 136:1

**figure** [1]_ - 200:23

**figuring** [1]_ - 200:22

**file** [20]_ - 35:14_, 81:17_, 87:19_, 87:20_, 90:10_, 95:18_, 96:17_, 96:19_, 96:21_, 123:9_, 129:21_, 129:24_, 130:2_, 151:10_, 151:11_, 154:5_, 154:6_, 155:22_, 159:17_, 160:13

**filed** [1]_ - 132:23

**files** [2]_ - 87:21_, 123:15

**filled** [1]_ - 91:18

**final** [3]_ - 34:13_, 168:14 _, 168:22

**finally** [4]_ - 97:17_, 141:5 _, 160:4_, 185:17

**financial** [4]_ - 149:24_, 150:1_, 150:16_, 150:17

**findings** [4]_ - 13:7_, 13:8 _, 13:9_, 187:20

**fine** [2]_ - 184:3_, 201:13

**finish** [2]_ - 146:10_, 168:23

**finished** [2]_ - 95:23_, 113:7

**fire** [7]_ - 18:12_, 20:2_, 22:17_, 23:6_, 23:19_, 25:9_, 25:20

**firearm** [1]_ - 18:25

**Firearms** [1]_ - 18:9

**fired** [3]_ - 25:12_, 25:17_, 25:18

**fires** [1]_ - 28:19

**firing** [2]_ - 15:1_, 24:10

**first** [57]_ - 3:21_, 3:23_, 6:15_, 15:4_, 18:1_, 18:7 _, 30:19_, 30:21_, 37:11_, 39:6_, 39:25_, 47:4_, 50:11_, 52:7_, 59:10_, 61:18_, 65:14_, 76:21_, 76:23_, 82:8_, 82:12_, 87:15_, 91:8_, 92:22_,

96:23_, 98:12_, 104:25_, 105:14_, 106:17_, 122:18_, 127:15_, 128:11_, 132:4_, 155:21_, 164:19_, 164:21_, 166:19_, 167:19_, 168:12_, 188:1_, 197:4_, 199:16_, 201:17_, 201:25_, 208:12_, 223:18_, 224:14_, 224:17_, 236:18_, 238:3_, 238:6_, 238:25_, 240:17_, 261:11_, 271:22_, 276:3

**fit** [4]_ - 17:21_, 61:6_, 85:12_, 285:2

**five** [16]_ - 9:9_, 25:10_, 25:12_, 39:24_, 58:17_, 65:6_, 67:13_, 114:8_, 114:25_, 169:9_, 179:1_, 181:20_, 238:11_, 277:17_, 277:23_, 283:8

**five-minute** [3]_ - 114:8_, 114:25_, 277:17

**five-step** [2]_ - 65:6_, 67:13

**fixate** [1]_ - 193:3

**fixed** [1]_ - 180:2

**flash** [1]_ - 77:25

**flashlight** [2]_ - 75:18_, 75:19

**flight** [1]_ - 156:13

**flights** [4]_ - 158:4_, 158:15, 158:20, 159:5

**flip** [5]_ - 88:18_, 89:3_, 143:9_, 143:18

**flip-phone** [1]_ - 88:18

**flipping** [1]_ - 214:16

**Florida** [12]_ - 95:7_, 121:16, 147:4_, 160:3_, 196:14, 213:18, 213:19_, 216:14, 219:5_, 228:21, 229:24, 271:12

**Florida-Craigslist** [1]_ - 121:16

**Florida-Georgia** [1]_ - 213:19

**fluid** [1]_ - 38:2

**fluids** [5]_ - 32:4_, 37:16_, 37:17_, 37:19_, 41:10

**focus** [3]_ - 8:6_, 16:14_, 128:7

**focused** [1]_ - 216:3

**focusing** [3]_ - 201:18_, 231:9_, 231:10

**folder** [1]_ - 129:25

**folks** [1]_ - 92:14

**follow** [4]_ - 35:9_, 53:5_, 56:10_, 106:23

**followed** [3]_ - 67:1_, 67:4_, 188:19

**following** [9]_ - 29:24_, 36:20_, 53:4_, 60:18_, 92:24_, 144:3_, 148:13_, 251:24_, 277:2

**follows** [4]_ - 6:23, 31:1, 77:1, 165:1

**Foo** [1]_ - 283:17

**food** [1]_ - 132:8

**foregrip** [3]_ - 58:16_, 64:17_, 66:2

**forensic** [28]_ - 31:10_, 31:11_, 31:15_, 31:17_, 33:1_, 33:23_, 34:2_, 34:3_, 34:12_, 34:21_, 35:8_, 35:15_, 35:18_, 35:20_, 37:1_, 37:5_, 42:20_, 43:13_, 43:24_, 48:16_, 77:13_, 77:14_, 77:15_, 77:17_, 83:4_, 83:7_, 83:12_, 89:4

**forensically** [6]_ - 78:7_, 84:25_, 86:4_, 86:19_, 87:11_, 143:12

**Forensics** [1]_ - 32:18

**forever** [1]_ - 189:22

**form** [5]_ - 78:20_, 173:15_, 274:17_, 274:23_, 278:18

**formal** [3]_ - 11:23_, 78:16_, 78:18

**format** [4]_ - 77:21_, 93:12_, 186:4_, 208:15

**formatting** [1]_ - 283:11

**Fort** [1]_ - 172:23

**forth** [4]_ - 57:2_, 57:4_, 68:24_, 207:20

**forward** [7]_ - 22:1_, 23:7_, 37:24_, 194:8_, 214:2_, 238:9_, 267:6

**four** [28]_ - 12:15_, 14:15_, 14:21_, 42:24_, 43:8_, 62:6_, 62:21_, 64:1_, 94:9_, 104:22_, 104:23_, 105:1_, 118:24_, 124:8_, 130:22_, 131:2_, 131:23_, 133:18_, 134:21_, 135:3_, 155:20_, 166:25_, 223:18_, 240:3_, 247:16_, 248:1_, 283:8

**fourth** [4]_ - 40:9_, 127:4_

_, 156:2_, 158:22

**Fox** [1]_ - 162:21

**frame** [21]_ - 93:19_, 156:18_, 230:8_, 232:6_, 233:16_, 241:19_, 242:18_, 242:19_, 243:6_, 247:10_, 250:8_, 250:16_, 254:6_, 256:15_, 256:23_, 260:18_, 265:16_, 267:22_, 268:15_, 268:21

**frames** [2]_ - 230:23_, 275:3

**free** [2]_ - 105:1_, 155:1

**frequency** [1]_ - 175:6

**frequently** [4]_ - 272:19_, 273:2_, 273:16_, 274:2

**Friday** [4]_ - 170:16_, 283:21_, 283:25_, 284:5

**Friday's** [1]_ - 285:3

**front** [10]_ - 14:19_, 24:7_, 55:4_, 81:4_, 89:15_, 124:25_, 129:13_, 143:2_, 155:10

**FTX** [1]_ - 168:5

**fucking** [1]_ - 141:4

**fugitives** [2]_ - 182:23_, 237:22

**full** [6]_ - 43:4_, 169:23_, 169:24_, 170:4_, 170:6_, 259:12

**full-time** [4]_ - 169:23_, 169:24_, 170:4_, 170:6

**fully** [5]_ - 4:24_, 28:4_, 279:2_, 281:24

**function** [1]_ - 7:21

## G

**G-O-O-D-R-I-C-H** [1]_ - 164:22

**G-R-E-G-O-R** [1]_ - 30:22

**gain** [1]_ - 95:18

**Garett** [1]_ - 283:16

**Gas** [5]_ - 228:20_, 229:2_, 272:25_, 273:19_, 273:20

**gas** [2]_ - 260:23_, 261:6

**Gaul** [1]_ - 51:23

**gear** [1]_ - 111:21

**gears** [1]_ - 26:24

**general** [60]_ - 21:24_, 26:10_, 27:8_, 84:16_, 113:20_, 121:15_, 153:5_,

177:15_, 189:23_, 190:7_, 192:23_, 193:6_, 197:20_, 199:8_, 208:20_, 210:5_, 210:10_, 213:17_, 217:9_, 219:19_, 220:10_, 221:1_, 221:13_, 221:15_, 224:4_, 225:17_, 227:4_, 231:22_, 242:8_, 242:23_, 243:10_, 243:17_, 244:4_, 245:11_, 245:21_, 246:7_, 247:2_, 247:12_, 247:20_, 248:4_, 248:9_, 249:22_, 250:11_, 251:21_, 253:17_, 254:11_, 256:1_, 256:13_, 257:1_, 257:19_, 258:8_, 259:1_, 259:9_, 265:21_, 266:6_, 266:13_, 266:20_, 267:2_, 270:20_, 278:22

**generally** [18]_ - 11:15_, 12:12_, 14:8_, 14:12_, 14:16_, 172:20_, 198:4_, 203:13_, 203:16_, 206:5_, 238:18_, 240:24_, 241:3_, 242:22_, 245:6_, 245:7_, 251:7_, 252:14

**generate** [11]_ - 40:22_, 46:20_, 46:23_, 50:25_, 52:2_, 80:20_, 93:2_, 99:14_, 179:13_, 187:19

**generated** [22]_ - 49:1_, 49:6_, 49:8_, 50:2_, 50:6_, 53:4_, 56:22_, 60:17_, 65:7_, 72:13_, 80:10_, 87:23_, 99:15_, 99:21_, 102:5_, 104:15_, 106:4_, 145:12_, 145:13_, 145:17_, 149:16_, 153:9

**generates** [1]_ - 80:21

**generating** [2]_ - 41:7_, 80:8

**generous** [1]_ - 114:6

**genetic** [1]_ - 38:8

**genetics** [1]_ - 34:10

**genotype** [1]_ - 39:16

**genotypes** [2]_ - 39:17_, 39:19

**gentleman** [2]_ - 10:6_, 28:17

**gentlemen** [12]_ - 6:7_, 56:8_, 76:8_, 114:7_, 119:19_, 124:19_, 132:9_, 186:15_, 210:21_, 277:16_, 280:20_, 283:9

**geo** [3]_ - 103:15_, 160:24_, 216:11

**geo-locates** [1]_ - 103:15

**geo-locating** [1]_ - 216:11

**geographic** [3]_ - 160:23_, 183:2_, 201:4

**geographically** [3]_ - 165:15_, 173:20_, 181:25

**Georgia** [3]_ - 213:18_, 213:19_, 214:8

**Georgia-Florida** [1]_ - 213:18

**Georgia-South** [1]_ - 214:8

**giveaway** [2]_ - 157:7_, 157:9

**given** [12]_ - 27:23_, 44:13_, 56:14_, 67:12_, 67:22_, 82:19_, 85:16_, 111:16_, 113:22_, 177:13_, 179:17_, 184:8

**glass** [1]_ - 8:3

**Glock** [4]_ - 18:17_, 19:1_, 19:16

**glove** [5]_ - 72:7_, 72:17_, 72:19_, 72:21_, 73:3

**gloves** [2]_ - 14:3_, 14:4

**Gmail** [1]_ - 108:19

**God** [4]_ - 6:12_, 30:16_, 76:17_, 164:16

**Gold** [2]_ - 19:6_, 19:8

**golf** [34]_ - 75:13_, 221:8_, 224:24_, 226:23_, 226:25_, 227:2_, 227:4_, 227:22_, 232:2_, 232:3_, 234:16_, 235:24_, 236:6_, 236:12_, 239:9_, 244:2_, 245:11_, 245:21_, 245:23_, 247:12_, 247:21_, 248:4_, 248:10_, 250:18_, 253:25_, 254:24_, 261:7_, 265:25_, 266:12_, 273:9_, 275:5_, 276:23_, 279:16

**Golf** [39]_ - 178:1_, 190:8_, 197:25_, 198:6_, 198:15_, 209:9_, 209:24_, 209:25_, 211:24_, 229:5_, 230:17_, 231:14_, 233:3_, 240:10_, 240:22_, 242:9_, 242:24_, 243:11_, 244:25_, 247:3_, 249:14, 249:23_, 250:2_, 250:12_, 253:17_, 254:11_, 256:14_, 257:1_, 257:10, 257:20_, 258:9_, 259:2_, 259:10_, 264:1_, 264:21_, 266:21_, 267:19_, 274:5_, 280:10

**Goodrich** [5]_ - 164:10_,

164:21_, 165:4_, 165:10_, 171:2

**GOODRICH** [1]_ - 164:25

**Google** [27]_ - 90:8_, 98:18_, 100:1_, 100:8_, 100:10_, 100:11_, 100:12_, 100:17_, 108:5_, 108:21_, 108:23_, 108:25_, 120:22_, 123:12_, 141:17_, 141:19_, 142:10_, 151:17_, 177:20_, 177:21_, 199:2_, 199:7_, 199:25

**Government** [88]_ - 13:17_, 15:9_, 16:14_, 20:19_, 21:7_, 21:13_, 24:2_, 54:24_, 67:19_, 73:9_, 74:6_, 92:13_, 111:3_, 112:14_, 112:15_, 112:16_, 112:17_, 112:18_, 112:19_, 112:20_, 112:21_, 112:22_, 112:23_, 112:24_, 112:25_, 113:1_, 113:2_, 113:3_, 113:4_, 116:18, 116:20, 116:22, 117:13, 118:4, 118:6, 118:8, 118:10, 118:12, 118:14, 118:16, 118:18, 118:20, 130:24_, 130:25_, 144:24_, 148:16, 148:18_, 162:12_, 185:7_, 185:15_, 185:23_, 186:8_, 188:1_, 197:8_, 204:11_, 204:13_, 204:16_, 204:19_, 208:6_, 209:13_, 215:2_, 215:10_, 216:7_, 216:14_, 216:22_, 218:2_, 219:8_, 219:13_, 231:10_, 246:22_, 274:11

**government** [5]_ - 6:2_, 30:8_, 53:18_, 282:22_, 283:19

**government's** [1]_ - 134:23

**Government's** [143]_ - 53:2_, 53:13_, 83:16_, 83:21_, 84:5_, 84:17_, 85:18_, 85:21_, 85:24_, 86:9_, 86:16_, 86:17_, 86:24_, 87:3_, 88:4_, 89:14_, 89:22_, 90:20_, 90:21_, 90:24_, 91:5_, 91:9_, 91:20_, 91:23_, 92:6_, 92:9_, 94:2_, 97:15_, 97:22_, 98:3_, 100:7_, 100:16_, 101:2_, 102:10_, 102:19_, 103:4_, 103:18_, 104:5_, 104:11_, 105:4_,

105:9_, 105:20_, 107:8_, 107:19_, 108:12_, 108:16_, 108:24_, 109:20_, 110:4_, 110:5_, 110:11_, 110:22_, 111:1_, 111:25_, 112:6_, 112:13_, 115:16_, 119:25_, 120:6_, 121:10_, 122:5_, 122:25_, 123:7_, 123:22_, 124:6_, 124:10_, 124:16_, 124:24_, 125:9_, 126:2_, 126:8_, 127:3_, 127:21_, 128:17_, 129:9_, 130:3_, 130:16_, 130:23_, 130:24_, 131:19_, 135:4_, 135:7_, 135:11_, 135:17_, 135:22_, 136:13_, 137:15_, 137:21_, 138:7_, 138:19_, 138:21_, 139:2_, 139:7_, 139:10_, 140:12_, 140:19_, 140:24_, 141:6_, 141:14_, 141:18_, 142:20_, 143:5_, 143:21_, 144:4_, 144:10_, 144:13_, 144:15_, 144:19_, 145:1_, 145:7_, 145:18_, 146:16_, 146:23_, 147:2_, 147:6_, 147:15_, 148:23_, 149:4_, 149:9_, 150:23_, 151:3_, 151:7_, 151:21_, 152:22_, 153:15_, 154:8_, 155:13_, 156:3_, 156:10_, 157:23_, 158:11_, 158:22_, 159:7_, 160:5_, 160:16_, 161:7_, 161:15_, 161:19_, 162:5_, 162:8_, 162:19_, 190:21_, 190:22

**grab** [3]_ - 95:24_, 96:21

**graduated** [1]_ - 32:11

**grammatical** [1]_ - 35:23

**granted** [25]_ - 13:18_, 15:10_, 21:16_, 92:12_, 105:6_, 107:25_, 111:5_, 120:2_, 122:8_, 123:24_, 125:11_, 135:19_, 137:17_, 139:13_, 141:8_, 142:22_, 145:3_, 151:23_, 153:18_, 154:10_, 155:16_, 157:25_, 159:9_, 160:7_, 162:14

**grass** [1]_ - 128:4

**GrayKey** [1]_ - 79:23

**great** [2]_ - 90:23_, 280:11

**greater** [3]_ - 47:19_, 47:25_, 66:19

**Greater** [3]_ - 216:11_, 216:19_, 217:23

**green** [20]_ - 75:15_,

138:4_, 138:6_, 138:8_, 138:13_, 192:17_, 192:18_, 218:13_, 218:15_, 218:17_, 219:2_, 219:8_, 230:12_, 239:23_, 240:5_, 253:3_, 259:23_, 271:18

**Greensboro** [10]_ - 177:24_, 216:12_, 216:19_, 217:23_, 218:4_, 218:5_, 218:7_, 218:9_, 219:4_, 219:21

**Gregor** [10]_ - 30:9_, 30:10_, 30:21_, 54:3_, 54:9_, 55:4_, 56:18_, 60:2_, 61:2_, 62:17

**GREGOR** [1]_ - 30:25

**grievances** [1]_ - 5:17

**grip** [3]_ - 58:15_, 64:17_, 66:2

**group** [4]_ - 10:23_, 36:9_, 136:19_, 172:10

**groups** [2]_ - 11:6_, 83:10

**grown** [1]_ - 5:19

**guess** [7]_ - 26:6_, 29:8_, 200:3_, 200:25_, 233:13_, 278:15_, 280:8

**guided** [1]_ - 188:4

**guidelines** [1]_ - 10:22

**Gun** [3]_ - 265:21_, 265:23

**gun** [8]_ - 7:21_, 8:19_, 23:1_, 23:3_, 26:7_, 26:9_, 26:22_, 28:19

**guns** [5]_ - 7:20_, 10:23_, 11:19_, 121:22_, 122:3

**guns.com** [3]_ - 110:2_, 111:22_, 111:25

**guys** [3]_ - 171:10_, 177:16_, 279:2

**GX20** [1]_ - 160:10

**GX300** [1]_ - 115:15

**GX913** [5]_ - 52:8_, 55:5_, 55:21_, 56:3_, 56:19

### H

**hair** [3]_ - 38:9_, 38:10_, 41:13

**half** [7]_ - 38:12_, 38:13_, 50:4_, 57:22_, 158:17_, 193:24

**halfway** [2]_ - 53:9_, 53:10

**hall** [1]_ - 162:21

**Haller** [1]_ - 283:17

**hamstrung** [1]_ - 179:6

**hand** [18]_ - 6:9_, 30:13_, 52:23_, 76:14_, 80:18_, 95:12_, 127:16_, 127:17_, 127:21_, 128:12_, 129:2_, 133:8_, 138:5_, 138:7_, 140:12_, 164:13_, 233:1_, 233:4

**hand-typed** [1]_ - 95:12

**handed** [2]_ - 132:4_, 148:6

**handgun** [3]_ - 18:12_, 19:1_, 23:17

**handle** [1]_ - 119:9

**handles** [1]_ - 67:25

**handoff** [5]_ - 222:15_, 222:23_, 232:20_, 269:19_, 269:20

**handover** [11]_ - 222:18_, 223:25_, 229:17_, 232:20_, 244:23_, 263:4_, 263:5_, 263:7_, 263:8_, 269:23_, 270:20

**handovers** [6]_ - 222:9_, 222:20_, 222:23_, 229:3_, 252:22_, 269:23

**hands** [1]_ - 41:5

**hands-on** [1]_ - 41:5

**hang** [2]_ - 223:16_, 280:4

**happy** [5]_ - 146:8_, 188:7_, 214:17_, 214:20_, 282:18

**hard** [8]_ - 8:1_, 78:1_, 183:7_, 229:8_, 269:22_, 280:7_, 280:8

**harder** [1]_ - 26:18

**hardware** [2]_ - 79:19_, 85:9

**Harrisburg** [1]_ - 162:22

**hate** [2]_ - 139:4_, 141:4

**Hawaii** [5]_ - 103:16_, 125:5_, 135:15_, 177:24_, 217:10

**head** [4]_ - 10:7_, 11:4_, 92:15_, 188:15

**Head** [1]_ - 145:5

**head)** [1]_ - 93:7

**headache** [1]_ - 4:8

**heading** [2]_ - 213:21_, 233:24

**headphones** [1]_ - 282:16

**heads** [1]_ - 80:15

**heads-up** [1]_ - 80:15

**hear** [4]_ - 82:11_, 115:24_, 206:14_, 282:18

**heard** [4]_ - 16:2_, 40:18_, 173:9_, 185:1

**heart** [1]_ - 58:19

**heavy** [5]_ - 14:15_, 16:12_, 16:13_, 16:19_, 16:20

**held** [2]_ - 15:17_, 32:16

**Hello** [1]_ - 87:16

**help** [9]_ - 6:12_, 30:16_, 56:9_, 76:17_, 78:17_, 125:19_, 137:10_, 164:16_, 280:12

**helpful** [2]_ - 56:10_, 167:12

**helps** [1]_ - 203:11

**hero** [1]_ - 136:1

**Hi** [1]_ - 151:19

**higher** [2]_ - 19:10_, 47:21

**highest** [2]_ - 66:7_, 66:10

**highlight** [5]_ - 177:19_, 189:8_, 190:17_, 227:8_, 244:5

**highlighted** [2]_ - 195:6_, 195:22

**highlighting** [1]_ - 243:13

**highly** [2]_ - 174:12_, 175:4

**Highway** [1]_ - 228:21

**hill** [1]_ - 137:7

**hired** [2]_ - 282:21

**historic** [1]_ - 167:5

**historical** [4]_ - 178:2_, 181:4_, 181:11_, 194:11

**historically** [1]_ - 167:7

**history** [8]_ - 81:23_, 108:19_, 110:19_, 111:14_, 120:8_, 120:9_, 161:25_, 162:17

**hit** [15]_ - 15:1_, 22:14_, 25:22_, 26:18_, 175:21_, 207:4_, 224:14_, 239:20_, 251:18_, 251:21_, 255:5_, 255:19_, 255:25_, 256:4_, 268:14

**hits** [7]_ - 8:20_, 182:16_, 190:10_, 238:11_, 239:19_, 239:21_, 265:18

**hitting** [6]_ - 177:21_, 207:10_, 230:24_, 246:14_, 267:24_, 276:11

**hold** [6]_ - 14:5_, 16:15_, 18:1_, 24:20_, 84:5_, 143:5

**holding** [2]_ - 157:20_, 158:13

**hole** [5]_ - 24:12_, 24:13_, 24:16_, 24:23_, 192:3

**holes** [1]_ - 180:18

**hollow** [2]_ - 19:8_, 19:9

**hollow-point** [1]_ - 19:9

**home** [3]_ - 150:17_, 154:25_, 273:3

**homicide** [2]_ - 168:7_, 182:23

**Honolulu** [2]_ - 217:10_, 217:13

**Honor** [143]_ - 3:7_, 3:14_, 3:19_, 5:24_, 6:3_, 12:17_, 13:16_, 15:8_, 16:8_, 20:18_, 21:7_, 25:2_, 25:24_, 26:14_, 28:8_, 29:15_, 30:4_, 30:8_, 30:23_, 37:3_, 52:6_, 52:11_, 52:23_, 53:3_, 53:11_, 55:2_, 56:2_, 73:7_, 74:1_, 74:5_, 75:1_, 76:5_, 76:10_, 77:4_, 83:17_, 85:19_, 86:10_, 86:12_, 88:5_, 88:9_, 91:1_, 92:5_, 107:20_, 107:24_, 110:6_, 110:23_, 111:4_, 112:9_, 112:13_, 113:8_, 114:2_, 114:16_, 115:3_, 115:13_, 116:1_, 117:1_, 117:5_, 117:8_, 117:11_, 117:22_, 117:24_, 118:23_, 119:12_, 119:23_, 120:1_, 122:7_, 123:23_, 124:15_, 124:18_, 124:22_, 125:10_, 126:10_, 130:6_, 131:18_, 132:3_, 132:21_, 132:25_, 133:14_, 133:24_, 134:4_, 134:11_, 134:15_, 134:17_, 135:1_, 135:18_, 137:16_, 139:12_, 141:7_, 142:2_, 142:9_, 142:21_, 142:25_, 144:2_, 144:7_, 144:18_, 145:2_, 147:14_, 147:18_, 148:9_, 148:21_, 149:10_, 151:22_, 153:17_, 154:9_, 159:8_, 160:6_, 161:13_, 161:14_, 162:7_, 162:13_, 162:24_, 163:5_, 164:4_, 164:6_, 164:9,

164:23_, 170:19_, 170:25_, 186:12_, 186:19_, 187:25_, 188:4_, 190:23_, 201:13_, 204:9_, 210:20_, 211:8_, 211:14_, 214:13_, 214:17_, 215:7_, 226:12_, 236:2_, 244:21_, 276:25_, 277:15_, 280:14_, 280:19_, 281:19_, 282:4_, 283:15_, 283:22_, 284:4

**Honor's** [1]_ - 74:21

**hopefully** [2]_ - 222:11_, 238:1

**host** [1]_ - 8:4

**hot** [19]_ - 5:10_, 183:9_, 183:13_, 183:15_, 194:18_, 194:20_, 195:1_, 195:2_, 237:3_, 237:4_, 252:1_, 252:3_, 253:3_, 254:20_, 255:3_, 259:23_, 264:6_, 264:24

**hour** [5]_ - 132:14_, 181:17_, 181:20_, 206:5_, 252:12

**hours** [19]_ - 34:21_, 94:11_, 213:14_, 214:2_, 220:22_, 221:7_, 227:20_, 227:24_, 233:9_, 234:18_, 241:12_, 242:4_, 247:16_, 252:12_, 252:13_, 258:10_, 273:7_, 273:10_, 275:1

**house** [1]_ - 163:14

**housed** [1]_ - 176:20

**houses** [1]_ - 280:3

**Housing** [1]_ - 166:8

**huge** [2]_ - 7:24_, 37:23

**human** [1]_ - 40:8

**hundreds** [4]_ - 11:23_, 12:7_, 280:2

**Huntsville** [1]_ - 7:10

**hurt** [1]_ - 8:10

I

**I-40** [1]_ - 218:11

**I-95** [4]_ - 213:8_, 213:20_, 214:8_, 214:23

**iamanidiot** [1]_ - 107:13

**iamanidiot 200010001@gmail. com** [1]_ - 100:5

**iamanidiot@gmail. com** [3]_ - 100:23_,

100:25_, 108:10

**icon** [4]_ - 151:18_, 221:17_, 229:21_, 273:21

**ID** [3]_ - 99:16_, 102:5_, 104:13

**idea** [3]_ - 32:6_, 201:4_, 220:1

**ideal** [1]_ - 27:15

**identical** [3]_ - 38:15_, 38:18

**identification** [3]_ - 32:3_, 37:16_, 125:20

**identifications** [1]_ - 43:5

**identified** [5]_ - 81:15_, 98:13_, 136:2_, 148:10_, 149:19

**identifier** [2]_ - 84:11_, 97:3

**identifies** [1]_ - 84:10

**identify** [2]_ - 135:10_, 176:18

**identifying** [1]_ - 182:12

**idiot** [3]_ - 107:17_, 140:21_, 141:4

**illustrate** [1]_ - 189:13

**illustrated** [2]_ - 189:20_, 192:5

**illustration** [1]_ - 200:22

**illustrative** [6]_ - 52:6_, 52:22_, 56:3_, 56:6_, 56:9_, 195:1

**image** [65]_ - 21:21_, 24:6_, 79:9_, 79:12_, 79:13_, 122:15_, 122:16_, 122:25_, 123:7_, 123:19_, 127:25_, 129:5_, 151:8_, 151:10_, 151:13_, 154:3_, 154:5_, 154:6_, 154:7_, 157:6_, 157:11_, 158:6_, 159:13_, 159:14_, 159:17_, 159:18_, 159:19_, 159:22_, 159:25_, 160:11_, 160:12_, 160:15_, 160:23_, 161:2_, 161:6_, 161:9_, 188:14_, 192:6_, 192:15_, 193:12_, 193:13_, 194:2_, 195:1_, 197:12_, 203:1_, 203:24_, 205:3_, 205:6_, 205:11_, 205:15_, 206:1_, 209:9_, 223:1_, 223:6_, 223:8_, 223:22_, 232:24_, 238:18_, 252:25_, 260:1_, 260:8_, 260:12_, 261:15_, 261:19

**imaged** [1]_ - 92:1

**imagery** [1]_ - 128:21

**images** [14]_ - 80:24_, 80:25_, 81:23_, 89:6_, 124:8_, 143:24_, 155:20_, 155:22_, 156:7_, 194:7_, 224:5_, 229:19_, 239:24_, 240:9

**imagine** [1]_ - 198:17

**IMEI** [6]_ - 96:23_, 96:24_, 97:2_, 105:22_, 105:23_, 106:6

**IMEIs** [1]_ - 97:9

**immediately** [1]_ - 136:8

**impact** [4]_ - 22:5_, 24:16_, 24:24_, 174:10

**impacting** [1]_ - 24:14

**impenetrable** [2]_ - 25:16_, 25:18

**important** [16]_ - 19:9_, 22:8_, 22:10_, 23:15_, 37:20_, 37:21_, 38:1_, 38:2_, 78:21_, 94:2_, 94:7_, 136:22_, 165:18_, 167:10_, 179:16_, 250:23

**impossible** [1]_ - 20:5

**improve** [1]_ - 10:17

**IMSI** [1]_ - 102:13

**in-house** [1]_ - 163:14

**inbound** [1]_ - 216:10

**inch** [3]_ - 14:17_, 17:24_, 201:1

**inches** [3]_ - 14:13_, 14:16_, 17:12

**inclinometers** [1]_ - 22:9

**include** [5]_ - 35:7_, 51:22_, 61:8_, 240:9_, 267:19

**included** [7]_ - 9:18_, 62:12_, 62:14_, 63:3_, 63:17_, 64:7_, 231:13

**including** [8]_ - 71:17_, 71:24_, 221:16_, 235:24_, 243:18_, 266:25_, 280:10_, 280:24

**inclusion** [23]_ - 46:5_, 46:10_, 47:2_, 47:17_, 47:18_, 47:19_, 47:20_, 47:21_, 47:22_, 47:24_, 48:1_, 66:6_, 66:7_, 66:11_, 66:13_, 66:15_, 66:20_, 68:8_, 69:21_, 70:24_, 72:3_, 73:6

**incoming** [6]_ - 31:19_, 44:1_, 196:1_, 208:19_, 246:6

**inconclusive** [1]_ - 70:15

**incorporating** [1]_ - 276:12

**InDel** [1]_ - 61:18

**independent** [2]_ - 35:19_, 173:2

**independently** [2]_ - 34:15_, 172:16

**indicate** [5]_ - 199:2_, 222:11_, 237:3_, 240:4_, 284:10

**indicated** [5]_ - 5:16_, 28:25_, 111:23_, 150:10_, 221:2

**indicates** [3]_ - 188:18_, 261:5_, 263:9

**indicating** [88]_ - 14:24_, 24:8_, 24:22_, 57:16_, 59:3_, 62:21_, 63:12_, 75:24_, 160:13_, 189:9_, 192:22_, 193:2_, 195:5_, 198:22_, 199:18_, 200:16_, 202:20_, 207:3_, 208:2_, 208:3_, 209:10_, 212:16_, 212:23_, 213:16_, 214:7_, 217:24_, 218:7_, 220:7_, 221:3_, 221:15_, 224:15_, 224:25_, 225:13_, 225:14_, 226:23_, 228:16_, 228:22_, 230:16_, 230:18_, 231:22_, 234:12_, 235:21_, 236:22_, 237:1_, 239:13_, 242:10_, 242:14_, 243:12_, 243:18_, 244:2_, 245:1_, 246:5_, 248:15_, 248:16_, 248:17_, 252:4_, 252:18_, 254:19_, 255:17_, 256:4_, 257:7_, 258:13_, 258:14_, 259:20_, 261:1_, 262:3_, 262:6_, 262:15_, 262:16_, 263:4_, 263:5_, 263:7_, 265:8_, 266:9_, 267:14_, 267:15_, 269:19_, 270:15_, 270:16_, 270:17_, 271:6_, 271:8_, 274:23_, 279:14_, 279:21_, 282:15

**indicating)** [68]_ - 22:3_, 24:13_, 24:15_, 59:16_, 60:3_, 64:5_, 64:21_, 73:16_, 73:17_, 73:18_, 74:17_, 84:9_, 192:18_, 192:23_, 193:7_, 194:17_,

194:20_, 195:9_, 197:15_, 202:10_, 208:17_, 208:19_, 208:20_, 210:5_, 212:24_, 214:8_, 221:4_, 222:13_, 224:19_, 225:15_, 229:2_, 229:3_, 229:22_, 230:19_, 231:20_, 232:5_, 232:18_, 235:4_, 236:23_, 239:11_, 239:20_, 242:15_, 244:3_, 244:7_, 248:18_, 252:4_, 252:5_, 252:22_, 254:1_, 255:2_, 258:14_, 260:23_, 260:25_, 261:3_, 264:5_, 264:7_, 264:8_, 265:9_, 265:22_, 266:10_, 266:11_, 266:20_, 266:22_, 268:8_, 269:21_, 271:8_, 276:16

**indicator** [19]_ - 87:23_, 195:8_, 198:6_, 199:10_, 209:11_, 221:3_, 223:3_, 224:1_, 224:25_, 225:15_, 228:17_, 232:19_, 243:15_, 244:8_, 255:6_, 266:22_, 267:4_, 267:20

**individual** [44]_ - 35:22_, 38:22_, 38:24_, 40:12_, 41:18_, 42:3_, 42:23_, 46:14_, 48:23_, 50:13_, 50:15_, 54:20_, 57:12_, 57:13_, 57:15_, 58:8_, 61:9_, 61:20_, 61:23_, 62:1_, 62:3_, 62:4_, 65:15_, 68:4_, 68:6_, 69:14_, 69:19_, 70:15_, 70:23_, 71:20_, 71:21_, 72:1_, 72:24_, 72:25_, 73:5_, 187:14_, 200:12_, 278:19

**individuals** [5]_ - 43:9_, 65:15_, 65:16_, 66:4_, 170:3

**industry** [1]_ - 80:3

**industry-standard** [1]_ - 80:3

**inevitably** [1]_ - 203:12

**inform** [1]_ - 4:19

**information** [62]_ - 31:18_, 38:8_, 44:24_, 45:10_, 45:17_, 45:20_, 45:21_, 57:22_, 57:23_, 62:7_, 69:7_, 80:22_, 91:16_, 91:24_, 96:22_, 105:11_, 105:12_, 108:5_, 108:22_, 123:11_, 125:18_, 129:11_, 130:10_, 149:14_, 149:15_, 150:3_, 171:21_, 177:4_, 178:4_, 178:5_,

178:12_, 178:17_, 179:19_, 184:5_, 184:8_, 187:6_, 187:10_, 190:3_, 190:4_, 190:25_, 194:7_, 195:22_, 198:19_, 199:13_, 200:23_, 201:18_, 202:12_, 205:19_, 210:15_, 213:4_, 217:8_, 217:20_, 224:6_, 235:22_, 237:17_, 242:6_, 243:9_, 251:7_, 253:7_, 266:23_, 267:23_, 282:20

**informed** [1]_ - 5:1

**initial** [2]_ - 120:23_, 284:11

**initialized** [1]_ - 87:19

**initials** [4]_ - 84:2_, 84:13_, 86:3_, 95:5

**initiated** [3]_ - 197:14_, 202:14_, 229:1

**inject** [1]_ - 141:19

**injected** [2]_ - 141:17_, 142:16

**inquire** [1]_ - 77:4

**inside** [18]_ - 8:19_, 13:23_, 17:22_, 21:24_, 38:4_, 40:5_, 42:2_, 70:10_, 70:21_, 72:21_, 78:1_, 78:3_, 81:19_, 104:21_, 136:14_, 152:15_, 193:17_, 194:22

**inspecting** [1]_ - 197:12

**Instagram** [2]_ - 128:11_, 176:20

**instance** [9]_ - 23:12_, 23:15_, 38:19_, 44:6_, 100:12_, 174:25_, 202:12_, 203:24_, 246:9

**instances** [4]_ - 50:19_, 209:17_, 214:18_, 276:21

**instead** [1]_ - 169:1

**Institute** [3]_ - 10:21_, 10:24_, 36:11

**institute** [1]_ - 33:12

**instruction** [1]_ - 284:16

**instructions** [1]_ - 35:10

**instructor** [1]_ - 168:6

**instrument** [2]_ - 40:15_, 41:5

**instrumentation** [1]_ - 10:10

**instruments** [1]_ - 41:6

**integrity** [3]_ - 77:20_, 79:13_, 85:11

**intended** [1] - 8:21

**intending** [2]_ - 52:9_, 53:6

**interact** [4]_ - 100:11_, 109:9_, 120:20_, 189:14

**interacted** [6]_ - 98:25_, 99:1_, 100:21_, 100:22_, 108:22_, 108:25

**interaction** [5]_ - 99:6_, 100:6_, 121:7_, 129:23_, 203:20

**interacts** [2]_ - 156:20_, 156:23

**interest** [6]_ - 46:6_, 46:8_, 47:8_, 48:13_, 203:18_, 271:16

**internal** [3]_ - 4:9_, 5:17_, 99:16

**internally** [1]_ - 102:5

**international** [5]_ - 97:2_, 137:23_, 169:18_, 215:19_, 217:10

**International** [54]_ - 97:19_, 177:25_, 190:8_, 197:24_, 198:6_, 198:15_, 209:8_, 209:24_, 209:25_, 211:24_, 221:2_, 228:6_, 229:5_, 230:17_, 231:1_, 231:14_, 233:3_, 234:12_, 234:16_, 235:20_, 235:21_, 236:1_, 240:10_, 240:22_, 242:9_, 242:24_, 243:11_, 243:14_, 243:18_, 244:24_, 247:3_, 249:14_, 249:22_, 250:2_, 250:11_, 253:17_, 254:11_, 254:21_, 255:10_, 255:24_, 256:13_, 257:1_, 257:10_, 257:19_, 258:8_, 259:2_, 259:10_, 262:19_, 264:1_, 264:21_, 266:21_, 267:19_, 274:4_, 280:10

**internet** [8]_ - 109:8_, 109:10_, 109:15_, 176:19_, 199:25_, 200:1_, 200:6_, 281:2

**Internet** [1]_ - 109:12

**interpret** [2]_ - 31:24_, 42:24

**interpretation** [3]_ - 34:9_, 58:24_, 283:3

**interpreted** [6]_ - 68:3_, 69:13_, 70:12_, 71:19_, 71:20_, 72:23

**interpreters** [4]_ - 282:7_, 282:13_, 282:19_, 282:21

**interpreting** [2]_ - 42:21_, 45:25

**interrupt** [1]_ - 4:14

**intersect** [5]_ - 182:18_, 250:17_, 252:19_, 265:20_, 266:11

**intersection** [3]_ - 182:19_, 218:11_, 266:6

**intersections** [1]_ - 224:12

**interstate** [1]_ - 180:14

**intricacies** [2]_ - 168:2_, 169:13

**introduce** [2]_ - 115:6_, 124:17

**introduced** [1]_ - 176:13

**introductory** [2]_ - 188:18_, 188:25

**intuitive** [1]_ - 81:3

**investigate** [1]_ - 48:15

**investigation** [12]_ - 37:2_, 78:17_, 82:6_, 82:13_, 109:23_, 132:11_, 184:9_, 184:17_, 184:23_, 187:14_, 250:23_, 270:5

**Investigation** [1]_ - 7:4

**investigations** [2]_ - 167:13_, 169:25

**investigative** [1]_ - 80:19

**investigator** [2]_ - 89:12_, 181:10

**investigators** [3]_ - 81:5_, 113:22_, 181:5

**invite** [3]_ - 30:10_, 119:14_, 134:16

**involve** [1]_ - 48:23

**involved** [4]_ - 44:23_, 82:13_, 143:23_, 270:4

**involves** [1]_ - 80:8

**iOS** [2]_ - 90:10_, 90:13

**IP** [9]_ - 109:4_, 109:7_, 109:8_, 109:11_, 109:12_, 109:14_, 109:19_, 112:3_, 112:4

**iPhone** [1]_ - 88:20

**Iran** [1]_ - 141:3

**Islands** [1]_ - 170:17

**issue** [3]_ - 17:18_, 282:5_, 282:17

**issued** [1]_ - 160:2

**issues** [9]_ - 3:17_, 3:25_, 5:7_, 5:8_, 93:19_, 134:3_, 174:3_, 282:2_, 284:3

**item** [62]_ - 5:6_, 13:11_, 13:20_, 13:21_, 14:12_, 14:19_, 15:6_, 15:12_, 15:13_, 15:19_, 16:12_, 16:23_, 16:25_, 17:5_, 17:9_, 17:14_, 18:1_, 18:5_, 18:8_, 19:12_, 19:24_, 20:2_, 25:3_, 26:18_, 30:5_, 40:2_, 47:2_, 54:16_, 54:18_, 55:17_, 57:16_, 58:14_, 64:18_, 65:22_, 65:25_, 67:14_, 68:2_, 68:4_, 68:16_, 69:16_, 69:23_, 70:16_, 70:19_, 70:25_, 71:2_, 71:22_, 72:4_, 72:22_, 72:25_, 73:1_, 73:24_, 74:10_, 81:16_, 85:23_, 86:15_, 88:11_, 95:9_, 95:10_, 124:4_, 152:25_, 161:8

**Item** [45]_ - 14:5_, 15:16_, 49:2_, 55:17_, 56:21_, 58:13_, 58:14_, 64:16_, 64:18_, 66:1_, 67:7_, 67:9_, 67:10_, 67:13_, 67:25_, 68:1_, 68:17_, 68:18_, 68:19_, 69:11_, 69:12_, 69:16_, 69:24_, 70:9_, 70:11_, 70:19_, 71:2_, 71:9_, 71:16_, 71:18_, 71:23_, 72:7_, 72:18_, 72:19_, 72:22_, 73:2_, 73:16_, 73:17_, 73:18_, 73:22_, 73:24_, 74:14_, 74:16_, 74:18_, 74:19

**items** [51]_ - 5:2_, 16:4_, 31:19_, 32:4_, 37:16_, 37:21_, 42:11_, 43:22_, 43:25_, 44:2_, 44:4_, 44:16_, 44:20_, 45:21_, 49:15_, 49:18_, 49:19_, 49:24_, 50:3_, 50:25_, 51:3_, 51:16_, 51:20_, 52:3_, 65:4_, 65:6_, 65:7_, 72:10_, 73:8_, 73:13_, 73:20_, 83:14_, 83:20_, 87:2_, 89:13_, 108:15_, 113:14_, 118:24_, 118:25_, 120:11_, 121:5_, 131:4_, 135:4_, 143:10_, 146:23_, 147:21_, 147:23_, 163:4_, 186:13_, 209:20_, 281:15

**itself** [15]_ - 35:3_, 38:2_, 64:14_, 64:16_, 80:20_, 81:18_, 101:7_, 108:20_, 151:14_, 154:7_, 159:19_, 161:4_, 161:7_, 212:18_,

265:14

**J**

**J-E-R-R-Y** [1] - 76:24
**jail** [4] - 5:10, 187:18, 266:5
**James** [1] - 3:8
**JCPOA** [1] - 141:3
**Jennifer** [1] - 3:9
**Jerry** [2] - 76:10, 76:23
**JERRY** [1] - 76:25
**job** [8] - 31:17, 32:16, 32:21, 32:23, 32:25, 42:20, 43:24, 165:18
**jobs** [2] - 32:12, 32:15
**John** [6] - 3:7, 101:1, 101:9, 108:7, 150:2, 150:6
**joined** [3] - 10:5, 166:19, 166:20
**joining** [1] - 9:10
**jotted** [1] - 113:11
**JR** [1] - 95:4
**Judge** [3] - 54:7, 56:16, 74:23
**judge** [2] - 76:13, 178:19
**July** [2] - 217:22, 217:24
**jump** [1] - 214:18
**June** [1] - 166:12
**Juno** [4] - 212:21, 212:22
**Jupiter** [3] - 212:21, 212:23
**JUROR** [2] - 92:15, 188:15
**jurors** [7] - 5:1, 5:23, 24:21, 119:11, 134:16, 277:25, 280:25
**JURORS** [1] - 21:19
**jury** [120] - 5:25, 6:4, 8:15, 8:24, 10:4, 11:14, 14:5, 14:9, 16:15, 18:2, 18:4, 21:15, 21:18, 24:8, 24:20, 25:3, 25:6, 31:14, 32:6, 32:15, 38:6, 39:22, 41:11, 41:22, 42:9, 52:9, 52:15, 52:16, 53:24, 54:1, 55:12, 56:3, 56:20, 58:11, 59:5, 59:15, 59:20,

62:18, 63:8, 63:22, 63:24, 69:9, 70:7, 71:14, 77:16, 81:13, 84:6, 89:25, 93:8, 100:15, 114:11, 114:12, 116:15, 119:16, 125:2, 132:15, 132:16, 134:18, 135:6, 136:17, 141:2, 143:8, 143:11, 145:25, 147:12, 154:4, 159:24, 165:8, 167:2, 169:1, 176:2, 188:1, 188:13, 189:9, 194:12, 195:10, 197:2, 197:5, 197:12, 197:16, 199:13, 199:22, 201:3, 202:3, 202:9, 203:15, 204:9, 206:12, 208:14, 209:22, 210:23, 211:1, 211:6, 211:10, 211:15, 212:18, 217:20, 218:21, 230:13, 232:6, 240:6, 243:24, 245:8, 250:8, 251:24, 252:14, 253:24, 261:8, 262:21, 265:4, 268:3, 275:3, 277:21, 277:22, 278:1, 281:12, 281:13, 284:12, 284:16
**JURY** [1] - 145:5
**jury's** [1] - 115:7
**Justice** [1] - 10:24

**K**

**K-9** [1] - 166:9
**Kara** [2] - 30:9, 30:21
**KARA** [2] - 30:22, 30:25
**KDL8415** [2] - 204:17, 205:15
**keep** [15] - 61:11, 89:17, 93:17, 95:1, 169:13, 173:11, 175:20, 178:21, 180:17, 183:19, 188:9, 195:11, 203:22, 229:8, 245:6
**Kennedy** [1] - 137:6
**kept** [4] - 171:18, 179:23, 180:20, 181:5
**keys** [1] - 73:17
**killed** [1] - 137:6
**kind** [31] - 10:25, 12:4, 12:5, 24:16, 25:21, 89:25, 90:15, 91:8, 130:9, 136:20, 147:12, 153:8, 166:7, 166:9,

168:22, 180:8, 183:1, 183:20, 184:5, 184:8, 195:12, 197:3, 200:25, 210:15, 221:20, 268:7, 279:19, 280:7, 282:11
**kinds** [3] - 79:17, 101:6, 179:3
**Kirk** [1] - 280:3
**know..** [1] - 5:15
**knowledge** [1] - 195:6
**known** [27] - 19:19, 41:14, 41:16, 41:17, 41:24, 42:4, 42:13, 46:13, 46:20, 49:4, 49:14, 50:11, 50:16, 50:18, 54:18, 55:14, 58:24, 60:6, 60:7, 62:7, 62:9, 62:11, 63:11, 63:14, 64:4, 65:16, 189:5
**Kristy** [1] - 3:15

**L**

**L-L-A-N-E-S** [1] - 76:24
**Lab** [7] - 65:9, 67:12, 67:22, 69:22, 69:23, 74:14
**lab** [26] - 7:19, 8:6, 15:2, 18:10, 31:22, 33:2, 35:3, 35:4, 35:5, 36:14, 39:23, 44:18, 48:19, 48:21, 51:16, 64:11, 64:23, 67:8, 68:17, 68:18, 72:5, 72:6, 83:4, 83:5, 83:7, 89:5
**label** [7] - 83:24, 84:2, 84:6, 84:9, 86:2, 86:22, 87:7
**labeled** [5] - 92:19, 97:18, 125:4, 137:24, 254:23
**labelled** [1] - 140:7
**Laboratory** [7] - 31:7, 31:9, 32:22, 33:2, 33:11, 33:16, 33:18
**laboratory** [17] - 31:21, 32:5, 32:17, 33:1, 33:3, 33:6, 33:14, 34:6, 36:4, 36:6, 36:8, 36:10, 36:15, 37:17, 39:24, 55:18, 70:25
**lack** [1] - 19:7
**ladies** [11] - 6:7, 56:8, 76:8, 114:7, 119:19,

124:19, 132:9, 186:15, 210:21, 277:16, 280:20
**Lago** [8] - 229:23, 229:25, 244:4, 244:6, 244:7, 244:15, 245:1, 245:23
**laid** [1] - 43:16
**Lake** [1] - 228:22
**landing** [1] - 151:15
**landmarks** [1] - 211:21
**language** [1] - 142:16
**languages** [1] - 98:21
**Lantry** [1] - 283:16
**laptops** [1] - 78:1
**large** [1] - 174:15
**largely** [1] - 40:21
**larger** [4] - 9:20, 15:17, 17:21, 222:25
**last** [36] - 6:15, 10:7, 30:19, 30:22, 40:13, 45:14, 62:5, 63:6, 63:18, 63:20, 76:21, 76:24, 78:8, 89:4, 104:3, 106:2, 106:17, 112:8, 115:14, 122:22, 124:9, 128:17, 134:10, 143:17, 147:5, 158:25, 164:19, 166:9, 168:21, 169:8, 169:10, 200:16, 223:15, 223:18, 224:13, 268:23
**lasted** [1] - 34:7
**late** [5] - 216:5, 216:24, 232:13, 279:13, 283:7
**latent** [1] - 44:9
**latest** [1] - 34:16
**latitude** [3] - 173:13, 198:16, 221:21
**launch** [2] - 27:15, 29:21
**Laura** [1] - 283:17
**law** [15] - 5:11, 5:14, 8:7, 11:5, 18:24, 19:2, 19:12, 19:16, 25:21, 34:23, 80:3, 169:17, 203:17, 210:14, 281:8
**layman's** [1] - 87:25
**laymen** [1] - 167:6
**Lazaro** [1] - 283:17
**LCD** [3] - 156:20, 156:24, 157:11
**leading** [3] - 22:3, 40:23, 57:8

**learn** [3] - 11:24, 33:16, 167:23
**learned** [2] - 82:8, 82:12
**lease** [2] - 172:25, 173:2
**least** [3] - 229:12, 284:11, 284:13
**leave** [2] - 171:10, 191:14
**lectern** [1] - 119:12
**lectures** [1] - 33:22
**left** [17] - 14:23, 22:6, 59:10, 89:14, 89:17, 127:16, 127:17, 135:3, 138:7, 191:10, 192:6, 211:16, 211:18, 211:20, 223:4, 233:1, 245:11
**left-hand** [4] - 127:16, 127:17, 138:7, 233:1
**leg** [1] - 158:22
**legal** [7] - 3:25, 5:7, 78:19, 134:3, 168:18, 282:2
**legend** [13] - 197:22, 197:24, 198:5, 198:14, 199:9, 199:11, 200:18, 202:1, 202:20, 205:4, 228:19, 229:21, 260:9
**length** [2] - 40:16, 237:3
**lengthy** [1] - 114:9
**lenient** [1] - 107:3
**less** [6] - 22:16, 26:12, 38:23, 86:6, 233:8, 240:2
**letter** [1] - 223:18
**letters** [2] - 57:10, 223:14
**level** [11] - 9:20, 23:4, 47:2, 47:17, 47:18, 66:7, 66:10, 66:12, 66:14
**liable** [3] - 149:24, 150:16, 150:18
**library** [2] - 5:11, 5:14
**license** [29] - 159:23, 159:24, 160:2, 184:12, 184:13, 202:22, 202:23, 202:24, 203:1, 203:4, 203:13, 203:18, 204:10, 204:11, 204:17, 205:11, 205:16, 205:17, 205:23, 207:4, 223:8, 225:24, 229:18, 238:14, 238:17, 260:3,

260:5, 262:20, 262:21
**light** [5] - 156:21, 180:1, 180:2, 239:18, 240:5
**likelihood** [15] - 46:20, 47:5, 47:13, 47:18, 47:25, 51:7, 51:10, 65:21, 65:24, 66:17, 66:18, 66:22, 66:25
**likely** [11] - 66:3, 68:5, 69:18, 70:22, 71:25, 73:4, 174:18, 239:20, 265:21, 283:7, 283:25
**limit** [1] - 239:5
**limited** [5] - 47:20, 66:15, 167:22, 239:8, 250:22
**line** [10] - 123:10, 174:7, 174:16, 174:19, 206:1, 206:12, 213:18, 213:19, 214:8, 273:2
**lines** [4] - 157:4, 245:3, 245:5, 261:20
**lining** [1] - 262:18
**liquid** [1] - 157:2
**list** [15] - 3:22, 43:17, 117:7, 118:2, 131:25, 132:4, 132:23, 133:1, 133:5, 133:7, 133:10, 134:23, 173:12, 189:12, 283:14
**listed** [13] - 60:14, 108:17, 109:20, 111:20, 120:13, 135:24, 137:23, 150:6, 152:6, 158:15, 162:20, 189:17, 206:16
**lists** [2] - 130:12, 173:5
**literally** [2] - 11:5, 11:23
**live** [4] - 128:24, 129:4, 273:3, 282:13
**lived** [1] - 181:7
**lives** [1] - 230:1
**living** [1] - 165:10
**Llanes** [66] - 76:11, 76:23, 77:6, 83:21, 85:24, 86:16, 87:3, 88:12, 89:13, 89:22, 91:8, 92:17, 105:8, 108:2, 110:10, 111:10, 113:15, 113:19, 120:6, 122:2, 122:10, 123:6, 124:2, 124:12, 124:24, 125:14, 125:19, 126:14, 127:7, 127:24, 128:10, 128:19, 131:5,

131:8, 134:11, 135:3, 135:21, 137:11, 138:2, 139:15, 140:11, 141:10, 142:3, 142:15, 143:2, 144:10, 145:7, 147:23, 148:1, 148:24, 149:13, 151:14, 151:25, 152:25, 153:20, 154:13, 155:19, 156:5, 156:10, 159:6, 159:22, 160:4, 160:9, 161:11, 161:18, 162:16
**LLANES** [1] - 76:25
**load** [1] - 23:5
**loaded** [1] - 102:10
**local** [12] - 35:1, 93:24, 93:25, 94:12, 94:13, 94:14, 169:17, 195:24, 196:8, 196:13, 207:5, 207:7
**locate** [4] - 147:6, 182:21, 182:25, 238:1
**located** [32] - 31:7, 32:18, 151:11, 155:23, 156:4, 173:6, 179:4, 197:14, 199:18, 202:10, 207:3, 224:19, 228:20, 229:23, 230:18, 237:1, 237:19, 237:21, 239:10, 243:14, 248:18, 254:1, 254:19, 254:21, 255:6, 259:21, 260:22, 260:24, 266:21, 274:4, 276:15
**locates** [1] - 103:15
**locating** [3] - 179:6, 195:7, 216:11
**location** [52] - 39:16, 46:14, 57:19, 59:8, 59:21, 60:8, 60:9, 61:8, 61:21, 95:6, 95:7, 120:24, 123:9, 167:17, 170:20, 170:24, 177:12, 177:15, 179:16, 180:4, 184:10, 189:7, 189:12, 189:13, 190:8, 190:20, 192:11, 194:16, 196:14, 199:9, 202:25, 203:19, 205:5, 205:24, 213:7, 216:12, 218:13, 223:22, 228:18, 229:22, 232:1, 232:2, 238:4, 243:12, 246:15, 252:7, 267:4, 274:8, 275:4, 276:18, 278:20, 279:3
**locations** [30] - 39:18,

56:25, 57:1, 57:6, 57:11, 57:12, 57:13, 58:18, 59:6, 59:7, 60:7, 60:14, 60:20, 61:24, 62:10, 62:21, 63:9, 63:11, 64:1, 64:3, 165:19, 177:19, 184:13, 189:5, 189:12, 203:17, 230:22, 231:1, 231:4, 280:10
**locator** [1] - 109:25
**loci** [2] - 59:8, 60:13
**log** [3] - 99:3, 99:4, 101:21
**logged** [3] - 98:17, 99:4, 176:23
**logging** [1] - 108:19
**logistical** [2] - 186:17, 282:4
**logo** [1] - 271:18
**LONG** [1] - 3:11
**longitude** [3] - 173:13, 198:16, 221:21
**look** [71] - 14:22, 15:23, 20:11, 24:9, 24:24, 26:7, 35:22, 38:25, 39:17, 52:10, 57:11, 57:13, 58:7, 58:23, 58:24, 59:6, 59:14, 60:19, 63:9, 64:3, 64:20, 73:14, 74:11, 77:21, 78:22, 80:17, 81:3, 81:6, 99:7, 106:6, 113:15, 115:12, 127:24, 129:17, 131:6, 147:24, 151:13, 152:3, 161:11, 168:19, 171:12, 171:14, 180:18, 183:8, 183:12, 189:15, 192:5, 192:15, 192:19, 193:10, 194:14, 197:2, 205:2, 205:9, 210:11, 231:7, 231:24, 238:13, 239:15, 242:10, 250:19, 250:20, 262:20, 265:10, 266:2, 267:17, 268:9, 268:11, 272:12, 278:19, 281:1
**looked** [13] - 26:6, 60:5, 60:21, 87:8, 88:25, 103:17, 126:20, 139:21, 217:11, 220:3, 222:23, 261:4, 265:24
**looking** [88] - 22:4, 27:15, 36:17, 37:23, 39:7, 39:14, 46:14, 55:14, 55:21, 56:19,

56:20_, 56:25_, 57:7_, 58:18_, 59:9_, 59:11_, 60:6_, 60:11_, 61:3_, 61:4_, 61:6_, 62:9_, 62:10_, 62:18_, 62:20_, 63:8_, 63:25_, 64:2_, 79:2_, 79:11_, 81:2_, 81:4_, 91:9_, 98:4_, 98:5_, 98:6_, 104:18_, 105:8_, 105:10_, 108:6_, 111:13_, 111:14_, 113:17_, 122:10_, 122:11_, 125:14_, 127:7_, 127:8_, 129:14_, 135:21_, 135:23_, 136:13_, 137:1_, 139:25_, 141:14_, 145:7_, 145:9_, 146:17_, 146:19_, 148:24_, 148:25_, 153:20_, 153:21_, 187:11_, 191:13_, 192:16_, 195:1_, 197:11_, 208:5_, 210:8_, 210:9_, 222:3_, 222:4_, 225:7_, 226:15_, 233:22_, 243:6_, 248:14_, 249:19_, 253:15_, 261:9_, 262:13_, 268:5_, 279:9

**looks** [10]_ - 17:3_, 101:9_, 101:15_, 127:18_, 127:25_, 128:21_, 156:13_, 158:7_, 250:19

**loop** [1]_ - 218:7

**Lorton** [1]_ - 32:18

**lost** [1]_ - 278:14

**loved** [1]_ - 237:24

**lower** [4]_ - 66:14_, 138:6_, 158:17_, 158:22

**LP** [1]_ - 202:21

**LPR** [48]_ - 202:21_, 203:9_, 203:24_, 204:14_, 204:19_, 205:5_, 206:4_, 207:4_, 207:7_, 208:3_, 223:1_, 223:3_, 223:22_, 224:1_, 224:5_, 224:11_, 225:14_, 229:16_, 229:19_, 232:18_, 235:4_, 235:5_, 235:12_, 238:13_, 251:18_, 251:21_, 252:5_, 252:20_, 252:25_, 253:7_, 254:21_, 255:5_, 255:19_, 255:25_, 256:4_, 259:20_, 259:24_, 260:8_, 261:15_, 261:17_, 261:19_, 262:17_, 263:6_, 263:8_, 264:7_, 264:9_, 271:23

**LPRs** [2]_ - 184:12_, 203:6

**Luce** [72]_ - 3:9_, 24:2_, 59:24_, 64:25_, 91:4_, 101:24_, 102:22_, 105:3_, 106:13_, 110:18_, 111:6_,

119:24_, 120:4_, 121:24_, 122:18_, 123:3_, 124:9_, 125:8_, 125:17_, 126:9_, 126:12_, 126:23_, 127:20_, 128:6_, 128:16_, 129:1_, 129:9_, 137:19_, 140:9_, 151:4_, 152:4_, 152:22_, 155:25_, 156:8_, 159:1_, 159:20_, 161:7_, 188:22_, 191:6_, 195:18_, 196:23_, 201:15_, 205:10_, 205:21_, 206:22_, 209:6_, 211:16_, 213:12_, 213:25_, 215:6_, 218:18_, 223:6_, 223:11_, 225:2_, 225:23_, 226:5_, 227:6_, 227:11_, 230:4_, 232:10_, 233:14_, 234:23_, 236:2_, 236:14_, 240:13_, 241:4_, 241:16_, 242:16_, 243:1_, 243:19_, 245:15_, 247:6

**lunch** [9]_ - 76:9_, 119:1_, 119:3_, 132:9_, 132:18_, 133:23_, 134:2_, 134:5_, 285:4

**lying** [1]_ - 167:13

## M

**ma'am** [13]_ - 6:13_, 29:17_, 31:4_, 31:6_, 32:5_, 37:11_, 52:18_, 54:5_, 73:14_, 74:11_, 119:4_, 133:3_, 207:6

**machine** [1]_ - 90:16

**machines** [2]_ - 40:21_, 40:22

**macro** [1]_ - 191:11

**magnet** [1]_ - 79:22

**Magnet** [1]_ - 79:22

**main** [5]_ - 46:4_, 82:22_, 82:25_, 206:17_, 239:9

**maintain** [10]_ - 87:20_, 106:9_, 114:25_, 132:12_, 168:19_, 173:5_, 180:17_, 180:21_, 203:23_, 281:4

**maintained** [3]_ - 178:24_, 178:25_, 180:21

**maintaining** [1]_ - 129:19

**maintains** [1]_ - 106:20

**major** [1]_ - 172:14

**majority** [1]_ - 169:22

**male** [14]_ - 40:8_, 56:24_, 57:15_, 58:8_, 61:20_,

61:22_, 62:2_, 62:4_, 65:14_, 68:2_, 69:14_, 70:14_, 71:20_, 72:24

**manage** [1]_ - 31:17

**manipulate** [1]_ - 120:24

**manner** [1]_ - 123:6

**manual** [1]_ - 28:4

**manually** [2]_ - 89:9_, 143:18

**manufacture** [2]_ - 10:14_, 10:15

**manufacturer** [4]_ - 96:10_, 96:12_, 96:13_, 97:4

**Manufacturing** [1]_ - 10:21

**map** [16]_ - 168:8_, 177:17_, 189:6_, 192:9_, 192:15_, 198:2_, 198:4_, 199:3_, 200:22_, 206:16_, 212:19_, 213:1_, 218:8_, 254:24_, 256:3_, 276:12

**Maps** [4]_ - 120:22_, 199:2_, 199:7_, 199:25

**maps** [8]_ - 183:9_, 190:18_, 192:16_, 194:5_, 194:19_, 198:25_, 201:8_, 225:17

**Mar** [8]_ - 229:23_, 229:25_, 244:4_, 244:6_, 244:7_, 244:15_, 245:1_, 245:23

**Mar-a-Lago** [8]_ - 229:23_, 229:25_, 244:4_, 244:6_, 244:7_, 244:15_, 245:1_, 245:23

**Marathon** [7]_ - 228:20_, 229:2_, 260:23_, 261:5_, 272:25_, 273:19_, 273:20

**March** [15]_ - 197:7_, 199:17_, 201:21_, 205:20_, 206:24_, 207:2_, 207:16_, 207:22_, 207:23_, 208:18_, 208:22_, 209:1_, 212:7_, 216:5_, 216:24

**Maria** [1]_ - 3:8

**mark** [3]_ - 24:12_, 53:9_, 202:21

**marked** [9]_ - 52:8_, 53:1_, 54:24_, 55:5_, 73:9_, 74:6_, 110:4_, 161:19_, 260:9

**marker** [2]_ - 62:2_, 205:3

**market** [2]_ - 12:2_, 90:12

**marrying** [1]_ - 263:10

**marshals** [1]_ - 4:20

**Martin** [1]_ - 271:12

**Massachusetts** [11]_ - 32:10_, 32:12_, 32:21_, 33:2_, 33:8_, 33:10_, 33:15_, 33:18_, 33:19_, 33:25

**master's** [3]_ - 9:3_, 166:1_, 166:14

**masters** [1]_ - 166:15

**match** [3]_ - 54:19_, 61:7_, 62:11

**matches** [1]_ - 253:7

**math** [1]_ - 29:20

**matrix** [1]_ - 85:7

**Matthew** [1]_ - 283:16

**max** [1]_ - 27:22

**McClay** [1]_ - 284:2

**McDonald's** [3]_ - 105:1_, 155:1

**mean** [19]_ - 4:19_, 28:18_, 54:15_, 90:5_, 95:22_, 95:23_, 99:2_, 108:16_, 129:24_, 157:1_, 169:20_, 169:25_, 172:18_, 175:10_, 199:20_, 230:21_, 240:2_, 266:24_, 280:6

**meaning** [3]_ - 57:14_, 95:18_, 136:23

**means** [15]_ - 4:21_, 19:10_, 19:11_, 39:12_, 54:17_, 54:20_, 58:8_, 58:21_, 61:19_, 87:13_, 96:15_, 96:17_, 96:20_, 129:23_, 240:3

**meant** [2]_ - 95:23_, 237:15

**measure** [3]_ - 17:9_, 29:4_, 168:23

**measurements** [1]_ - 14:15

**mechanism** [1]_ - 89:2

**mechanisms** [1]_ - 152:16

**Medetis** [1]_ - 3:8

**MEDETIS** [1]_ - 3:11

**Medetis-Long** [1]_ - 3:8

**MEDETIS-LONG** [1]_ - 3:11

**member** [2]_ - 33:24_, 34:1

**members** [33]_ - 6:4_, 21:18_, 31:14_, 32:6_,

32:15_, 38:6_, 39:21_, 41:10_, 41:22_, 42:9_, 51:16_, 55:12_, 56:20_, 58:11_, 59:4_, 59:15_, 59:20_, 62:18_, 63:8_, 63:22_, 63:24_, 69:9_, 70:7_, 71:14_, 84:6_, 135:6_, 136:17_, 159:24_, 165:8_, 167:14_, 188:13_, 204:9_, 211:14

**mention** [2]_ - 87:11_, 255:5

**mentioned** [17]_ - 8:6_, 23:9_, 37:12_, 41:9_, 49:11_, 54:10_, 59:13_, 62:6_, 87:10_, 113:12_, 156:23_, 169:19_, 170:3_, 195:10_, 215:20_, 246:9_, 248:12

**mentioning** [1]_ - 5:15

**mercury** [1]_ - 279:12

**message** [47]_ - 135:23_, 136:12_, 136:14_, 137:1_, 137:4_, 137:5_, 137:11_, 137:12_, 138:2_, 138:8_, 138:10_, 138:11_, 138:18_, 138:19_, 138:20_, 139:16_, 139:18_, 139:22_, 139:23_, 140:1_, 140:25_, 145:12_, 145:13_, 145:18_, 145:21_, 145:22_, 146:7_, 146:12_, 146:19_, 146:20_, 146:21_, 146:22_, 147:1_, 153:1_, 153:2_, 153:4_, 153:6_, 153:7_, 153:9_, 153:12_, 176:17_, 179:9_, 181:15_, 192:21_, 196:21

**messages** [16]_ - 81:1_, 81:22_, 128:13_, 131:16_, 136:19_, 136:23_, 138:16_, 139:24_, 140:2_, 140:3_, 153:10_, 177:5_, 177:11_, 178:25_, 199:24

**messaging** [2]_ - 136:20_, 140:6

**metadata** [6]_ - 160:20_, 160:21_, 161:1_, 161:2_, 161:3

**metal** [6]_ - 15:25_, 17:6_, 19:25_, 24:25_, 71:17_, 71:24

**metals** [1]_ - 17:7

**meters** [7]_ - 183:15_, 183:18_, 200:17_, 201:2_, 237:13_, 240:8_, 268:5

**method** [1]_ - 43:10

**methodology** [2]_ - 189:4_, 189:9

**methods** [2]_ - 33:14_, 278:20

**Metropolitan** [1]_ - 165:25

**MEX** [1]_ - 158:4

**Mexico** [4]_ - 142:19_, 156:14_, 158:24_, 159:5

**MIA** [2]_ - 156:14_, 158:4

**Miami** [13]_ - 77:9_, 82:23_, 84:1_, 95:4_, 120:12_, 121:20_, 156:14_, 158:21_, 159:5_, 165:17_, 166:21_, 222:10_, 278:11

**micro** [1]_ - 191:11

**microsecond** [1]_ - 180:13

**middle** [4]_ - 128:7_, 237:20_, 237:23

**might** [11]_ - 64:21_, 101:17_, 107:3_, 120:21_, 158:7_, 174:10_, 182:13_, 188:8_, 190:4_, 200:12_, 210:16

**mile** [3]_ - 183:6_, 193:24

**miles** [6]_ - 29:20_, 29:22_, 174:7_, 193:20_, 220:5_, 237:2

**Military** [2]_ - 264:19_, 279:11

**military** [1]_ - 11:6

**MILITELLO** [2]_ - 3:14_, 284:4

**Militello** [3]_ - 3:15_, 133:9_, 284:2

**million** [8]_ - 20:6_, 48:1_, 66:19_, 66:23_, 66:24_, 67:2_, 67:3_, 67:4

**millions** [2]_ - 40:10

**millisecond** [1]_ - 180:15

**mind** [7]_ - 4:22_, 12:15_, 14:2_, 111:19_, 199:12_, 281:4

**minimum** [4]_ - 66:12_, 66:14_, 66:16_, 66:18

**minor** [1]_ - 32:9

**minus** [5]_ - 93:25_, 94:1_, 94:6_, 94:22_, 94:24

**minute** [8]_ - 5:5_, 53:19_, 114:8_, 114:25_, 181:21_, 190:11_, 238:12_, 277:17

**minutes** [5]_ - 3:22_, 181:16_, 210:22_, 226:7_, 277:23

**Miramar** [1]_ - 95:7

**miss** [1]_ - 116:25

**missing** [5]_ - 168:7_, 168:8_, 182:20_, 237:24_, 278:13

**Missouri** [2]_ - 9:1_, 9:9

**mix** [1]_ - 46:23

**mixture** [7]_ - 42:16_, 42:18_, 42:24_, 43:8_, 61:23_, 65:15_, 65:17

**mixtures** [3]_ - 43:2_, 43:5_, 43:7

**MM** [3]_ - 84:1_, 95:3

**mobile** [2]_ - 97:2_, 125:20

**Mobile** [58]_ - 97:19_, 130:10_, 172:15_, 173:4_, 178:24_, 181:8_, 185:4_, 186:9_, 195:5_, 195:15_, 216:6_, 218:1_, 218:14_, 218:16_, 218:17_, 219:2_, 219:9_, 225:10_, 226:20_, 226:22_, 230:10_, 230:16_, 231:3_, 231:10_, 234:9_, 234:11_, 240:18_, 242:24_, 243:5_, 243:25_, 245:4_, 245:12_, 246:22_, 247:1_, 248:3_, 249:3_, 249:10_, 249:12_, 250:10_, 250:17_, 251:16_, 251:25_, 252:16_, 252:18_, 254:9_, 255:16_, 257:23_, 260:19_, 262:2_, 263:20_, 264:17_, 265:6_, 271:18_, 272:23_, 273:17_, 274:3_, 274:11_, 274:18

**mode** [2]_ - 85:4_, 272:4

**model** [5]_ - 84:22_, 90:1_, 105:24_, 135:9_, 160:22

**moderate** [1]_ - 70:24

**modern** [3]_ - 88:19_, 160:25

**molecular** [1]_ - 32:9

**moment** [18]_ - 14:19_, 30:12_, 59:25_, 126:9_, 132:2_, 142:24_, 161:13_, 179:4_, 179:15_, 179:17_, 182:13_, 188:3_, 188:8_, 200:3_, 215:20_, 243:21_, 246:9_, 276:25

**momentarily** [1]_ -

114:17

**moments** [2]_ - 191:1_, 272:15

**Monday** [2]_ - 133:2_, 142:19

**monitor** [4]_ - 58:19_, 90:23_, 91:2_, 144:3

**month** [3]_ - 5:14_, 168:11_, 169:11

**month-long** [1]_ - 168:11

**months** [3]_ - 166:20_, 181:8_, 195:15

**moot** [1]_ - 34:11

**morning** [39]_ - 3:7_, 3:9_, 3:10_, 3:11_, 3:12_, 3:13_, 3:14_, 3:16_, 6:3_, 6:4_, 6:6_, 6:7_, 7:1_, 7:2_, 26:4_, 30:12_, 31:4_, 31:5_, 75:4_, 75:5_, 76:12_, 76:13_, 77:6_, 77:7_, 207:22_, 219:22_, 220:22_, 221:8_, 221:24_, 225:6_, 232:13_, 234:5_, 234:6_, 234:18_, 235:1_, 245:19_, 275:1_, 283:12_, 284:19

**most** [20]_ - 19:1_, 27:15_, 77:21_, 167:12_, 172:12_, 173:14_, 174:2_, 174:18_, 174:24_, 196:10_, 203:22_, 239:20_, 244:14_, 250:22_, 265:21_, 272:19_, 273:1_, 273:16_, 274:2_, 274:9

**mostly** [2]_ - 208:16_, 216:10

**mother** [4]_ - 38:13_, 57:21_, 57:22_, 57:25

**motion** [1]_ - 8:16

**Motorola** [3]_ - 204:14_, 204:17_, 204:19

**mountain** [2]_ - 174:5_, 174:6

**move** [11]_ - 21:7_, 62:16_, 69:22_, 113:9_, 115:2_, 146:16_, 175:17_, 175:18_, 214:2_, 249:16_, 250:5

**moved** [6]_ - 110:23_, 162:8_, 221:7_, 245:22_, 259:15_, 270:1

**movement** [3]_ - 228:25_, 246:10_, 270:14

**moves** [1]_ - 97:6

**moving** [21]_ - 38:5_, 67:6_

_, 68:17_, 213:5_, 214:23_, 222:21_, 223:23_, 225:18_, 230:21_, 232:23_, 233:6_, 235:8_, 245:8_, 248:1_, 262:9_, 262:10_, 263:18_, 263:20_, 265:16_, 269:24

**MR** [572]_ - 3:7_, 3:12_, 3:19_, 4:2_, 4:7, 4:11_, 4:13_, 4:17_, 4:24_, 5:4_, 5:6_, 5:9_, 5:21_, 6:3, 6:19, 6:21, 6:25_, 12:17_, 12:21_, 12:24_, 13:1_, 13:16, 13:19_, 14:9, 14:11_, 15:8, 15:11_, 16:8, 16:10_, 20:18, 20:22_, 21:7_, 21:10_, 21:15_, 21:17_, 21:20_, 24:2, 24:5_, 25:2_, 25:7, 25:8_, 25:24_, 26:3_, 26:13, 26:17, 26:21, 27:1_, 27:4_, 27:5_, 28:8_, 28:17, 29:2_, 29:15_, 30:1_, 30:4_, 30:8_, 30:23_, 31:3_, 37:3_, 37:7_, 37:9_, 37:10_, 40:24_, 41:2_, 52:6_, 52:10_, 52:23_, 53:3_, 53:8_, 53:16_, 54:7_, 54:8_, 54:23_, 55:2_, 55:3_, 56:2_, 56:7_, 56:16_, 56:17_, 57:9_, 59:24_, 60:1_, 63:18, 63:21_, 64:25_, 65:2_, 73:7_, 73:12_, 74:1_, 74:4_, 74:8_, 74:9_, 74:21_, 75:1_, 75:3_, 76:2_, 76:5_, 76:10_, 77:3_, 83:17_, 83:19_, 85:21_, 85:22_, 86:10_, 86:12_, 86:14_, 88:5_, 88:9_, 88:10_, 91:1_, 91:4_, 91:7_, 92:5_, 92:8_, 92:11_, 92:14_, 92:16_, 101:2, 101:4_, 101:24_, 102:1_, 102:22_, 103:1_, 103:23_, 104:1_, 105:3_, 105:7_, 106:13_, 106:14_, 107:10_, 107:11_, 107:20_, 107:23_, 108:1_, 110:6_, 110:9_, 110:18_, 110:21_, 110:25_, 111:4_, 111:6_, 111:9_, 112:9_, 112:13_, 113:8_, 113:13_, 114:2_, 114:6_, 114:23_, 115:3_, 115:5_, 115:13_, 115:15_, 115:18_, 116:1_, 116:10_, 116:13_, 117:1_, 117:5_, 117:8_, 117:11_, 117:22_, 117:24_, 118:3_, 118:22_, 119:4_, 119:12_, 119:23_, 120:3_, 120:5_,

121:23, 122:1_, 122:5_, 122:9_, 122:18_, 122:21_, 123:3_, 123:5_, 123:23_, 124:1_, 124:9_, 124:11_, 124:14_, 124:22_, 124:23_, 125:8_, 125:12_, 125:13_, 126:8, 126:12, 126:13_, 126:23, 126:24_, 127:3, 127:6_, 127:20, 127:23_, 128:6_, 128:9_, 128:16, 128:18_, 129:1, 129:3_, 129:8, 129:10_, 130:3_, 130:6_, 130:8_, 131:3_, 131:18_, 131:22_, 132:2_, 132:25_, 133:3_, 133:7_, 133:14_, 133:16_, 133:20_, 133:24_, 134:1_, 134:4_, 134:11_, 134:15_, 135:1_, 135:2_, 135:18_, 135:20_, 137:16_, 137:18, 137:20_, 137:25, 138:1_, 138:24_, 139:1_, 139:12_, 139:14_, 140:9, 140:10_, 140:22_, 140:23_, 141:7_, 141:9_, 141:12, 141:13_, 142:9_, 142:13_, 142:14_, 142:21_, 142:23, 143:1_, 144:2_, 144:7_, 144:9_, 144:18_, 144:21_, 145:1_, 145:4_, 145:6_, 147:14_, 147:20_, 148:9_, 148:12_, 148:21_, 148:22_, 149:10_, 149:12_, 151:2_, 151:5_, 151:20_, 151:24_, 152:4, 152:5_, 152:21_, 152:24_, 153:15_, 153:19_, 153:25, 154:1_, 154:7_, 154:11_, 154:12_, 155:13_, 155:17_, 155:18_, 155:24_, 156:1_, 156:7_, 156:9_, 157:14_, 157:16_, 157:23_, 158:1_, 158:25_, 159:2_, 159:8_, 159:10_, 159:11_, 159:19_, 159:21_, 160:6_, 160:8_, 161:6_, 161:10_, 161:13_, 161:17_, 161:24_, 162:1_, 162:7_, 162:10_, 162:13_, 162:15_, 162:23_, 163:2_, 163:5_, 163:8_, 164:1_, 164:4, 164:9, 164:23, 165:3_, 165:8, 165:9_, 170:19_, 170:22_, 170:25, 171:1_, 186:12_, 186:19, 186:20_, 187:25_, 188:4_, 188:10, 188:11_, 188:13_, 188:16_, 188:22_, 188:24_, 190:23_, 191:3_, 191:5, 191:7_, 194:8, 194:10_, 195:17_, 196:23_, 196:24_, 201:13, 201:16_, 204:8

_, 204:13_, 204:16_, 204:19_, 204:23_, 204:25, 205:1_, 205:9, 205:13_, 205:21_, 205:22_, 206:21, 206:23_, 207:14_, 207:18_, 208:10_, 208:11_, 209:6, 209:7_, 210:20_, 211:8_, 211:14_, 211:19_, 212:2, 212:4_, 213:11, 213:13_, 213:25_, 214:1_, 214:13_, 214:17, 214:21_, 215:6_, 215:9_, 215:11_, 215:13, 215:15_, 217:2, 217:3_, 217:16, 217:17_, 218:18, 218:20_, 220:12, 220:13_, 220:15, 220:16_, 221:25, 222:1_, 223:6, 223:9_, 223:11, 223:13_, 223:20_, 223:21_, 225:2, 225:4_, 225:23, 226:1_, 226:5_, 226:6_, 226:12, 226:14_, 227:6, 227:7_, 227:11, 227:13_, 227:17, 227:19_, 228:8, 228:9_, 230:4, 230:6_, 231:9, 231:12_, 232:10, 232:12_, 233:13, 233:15_, 233:19, 233:21_, 234:2, 234:3_, 234:22, 234:24_, 235:13, 235:15_, 236:2, 236:4_, 236:8, 236:9_, 236:14, 236:16_, 238:22, 238:24_, 240:13, 240:15_, 241:4, 241:6_, 241:16_, 241:17_, 241:25_, 242:3, 242:16_, 242:17_, 243:1, 243:2_, 243:19, 243:20_, 244:18_, 244:21_, 245:2_, 245:15, 245:16_, 246:1_, 246:8_, 246:18, 246:20_, 247:5_, 247:7_, 247:13, 247:14_, 247:23, 247:25_, 248:7_, 248:11_, 248:23, 248:24_, 249:7, 249:8_, 249:16, 249:18_, 250:5, 250:7_, 251:4, 251:6_, 251:13, 251:14_, 252:10, 252:11_, 253:12, 253:13_, 254:3, 254:4_, 254:14, 254:16_, 255:12, 255:14_, 256:9, 256:10_, 256:18, 256:19_, 257:16_, 257:21_, 258:1, 258:3_, 258:18_, 258:21_, 259:3, 259:4_, 260:1, 260:2_, 260:14, 260:15_, 261:12_, 261:14_, 261:23_, 262:7_, 262:11, 262:12_, 262:23_, 262:25_, 263:12_, 263:14, 263:15_, 263:23_, 263:24_, 264:13_, 264:14_, 265:1, 265:2_,

265:11, 265:13, 267:5_, 267:7, 267:10_, 268:17, 268:19_, 269:4, 269:5_, 269:13, 269:14_, 270:11_, 270:12, 271:1, 271:2_, 271:15, 271:17_, 272:12, 272:13_, 273:12_, 273:14_, 273:24, 273:25_, 274:14, 274:16_, 276:25, 277:1_, 277:5, 277:7_, 277:14_, 278:5_, 278:7_, 280:12, 280:14_, 280:16_, 281:19_, 281:24_, 282:4_, 282:19_, 283:7_, 283:15_, 283:21_, 284:22

**MS** [3]_ - 3:11_, 3:14_, 284:4

**MSISDN** [8]_ - 97:18_, 97:19_, 103:24_, 125:20_, 130:12_, 130:19_, 152:3_, 152:7

**multibillion** [1]_ - 173:7

**multibillion-dollar** [1]_ - 173:7

**multiple** [9]_ - 28:12_, 65:13_, 193:23_, 230:24_, 239:18_, 242:10_, 242:11_, 242:13_, 250:15

**museum** [1]_ - 199:6

**must** [5]_ - 35:9_, 35:12_, 35:18_, 137:7_, 276:10

N

**name** [44]_ - 6:15_, 19:7_, 30:19_, 30:21_, 30:22_, 48:23_, 51:23_, 76:21_, 76:23_, 76:24_, 95:2_, 97:20_, 100:24_, 101:1_, 101:8_, 102:6_, 104:7_, 105:23_, 106:11_, 106:12_, 106:17_, 106:22_, 106:25_, 107:4_, 108:6_, 108:7_, 110:1_, 121:21_, 127:1_, 130:19_, 135:25_, 136:5_, 150:1_, 154:24_, 155:2_, 155:3_, 155:4_, 164:19_, 164:21_, 173:13

**named** [4]_ - 104:4_, 138:9_, 140:7_, 140:11

**names** [1]_ - 104:23

**narrow** [2]_ - 190:14_, 267:16

**narrowed** [1]_ - 274:20

**nation** [1]_ - 172:7

**national** [3]_ - 9:3_, 10:22

_, 169:19

**National** [4]_ - 9:5_, 10:24_, 36:11_, 36:12

**nationally** [1]_ - 10:20

**nationwide** [1]_ - 169:21

**native** [2]_ - 139:24_, 140:2

**natively** [2]_ - 136:14_, 157:7

**natural** [2]_ - 23:21_, 23:22

**nature** [2]_ - 81:25_, 121:6

**near** [4]_ - 121:16_, 180:2_, 232:17_, 265:18

**necessarily** [2]_ - 54:15_, 230:20

**necessary** [1]_ - 285:2

**need** [10]_ - 4:9_, 4:10_, 12:1_, 28:10_, 93:23_, 114:4_, 114:18_, 114:20_, 173:11_, 184:3

**needed** [1]_ - 31:23

**needs** [6]_ - 7:18_, 123:18_, 140:18_, 141:3_, 173:10_, 193:5

**Neptune** [1]_ - 279:12

**nest** [2]_ - 198:17_, 276:15

**network** [37]_ - 97:6_, 98:7_, 104:21_, 154:14_, 154:15_, 154:17_, 154:20_, 154:24_, 154:25_, 155:5_, 168:2_, 168:16_, 168:18_, 172:6_, 172:9_, 173:1_, 174:23_, 176:23_, 177:5_, 179:24_, 180:12_, 180:18_, 181:21_, 189:14_, 191:20_, 192:3_, 198:10_, 210:9_, 222:21_, 231:20_, 268:24_, 271:21_, 271:22_, 272:2

**networks** [13]_ - 98:8_, 104:19_, 104:22_, 104:23_, 169:14_, 172:13_, 172:19_, 172:20_, 180:22_, 180:23_, 200:4_, 231:3

**never** [3]_ - 25:14_, 75:11_, 187:16

**new** [7]_ - 12:1_, 151:15_, 176:13_, 202:19_, 218:24_, 228:17_, 229:21

**New** [1]_ - 33:13

**newer** [1]_ - 152:13

**News** [1]_ - 162:21

**next** [124]_ - 6:2_, 26:16_, 30:7_, 38:23_, 61:20_, 61:24_, 62:16_, 76:7_, 92:23_, 99:24_, 101:2_, 101:5_, 104:17_, 106:13_, 115:15_, 115:19_, 118:24_, 119:7_, 121:23_, 122:5_, 124:16_, 125:18_, 138:24_, 139:8_, 140:22_, 145:15_, 146:9_, 151:13_, 152:21_, 152:22_, 153:25_, 155:24_, 158:9_, 164:7_, 188:22_, 191:5_, 192:4_, 194:8_, 195:17_, 195:20_, 196:23_, 201:14_, 206:21_, 206:24_, 207:14_, 208:10_, 209:6_, 212:2_, 213:11_, 213:25_, 215:6_, 215:23_, 217:2_, 217:16_, 218:18_, 220:12_, 220:22_, 221:25_, 225:2_, 226:5_, 228:8_, 230:4_, 232:10_, 234:2_, 234:22_, 235:13_, 238:22_, 240:13_, 241:4_, 242:16_, 243:1_, 243:19_, 244:18_, 246:1_, 246:18_, 247:5_, 248:7_, 248:23_, 249:7_, 249:16_, 249:24_, 250:5_, 250:6_, 251:4_, 251:13_, 252:10_, 253:12_, 253:14_, 254:3_, 254:14_, 255:13_, 256:9_, 256:16_, 256:18_, 257:16_, 258:1_, 258:6_, 258:7_, 258:18_, 260:14_, 261:6_, 261:12_, 261:23_, 262:11_, 262:23_, 263:14_, 263:23_, 264:13_, 265:1_, 265:3_, 265:11_, 266:2_, 266:16_, 267:8_, 268:17_, 269:4_, 269:13_, 270:11_, 271:1_, 272:17_, 273:12_, 273:24_, 282:23_, 283:4

**nice** [1]_ - 132:7

**night** [2]_ - 245:18_, 276:8

**nights** [2]_ - 234:19_, 279:14

**nighttime** [2]_ - 273:6_, 273:10

**Nissan** [2]_ - 72:19_, 205:15

**no-objection** [1]_ - 115:1

**no@aol.com** [1]_ - 150:15

**noon** [1]_ - 76:9

**Norfolk** [2]_ - 166:4

**Norinco** [1]_ - 28:3

**normal** [2]_ - 171:18_, 280:22

**north** [7]_ - 191:21_, 212:17_, 213:5_, 213:22_, 214:23_, 271:24_, 271:25

**North** [5]_ - 216:12_, 216:19_, 218:6_, 218:11_, 219:22

**northeast** [3]_ - 33:12_, 34:1_, 34:2

**Norton** [1]_ - 199:6

**notation** [1]_ - 19:10

**note** [1]_ - 5:12

**noted** [1]_ - 114:3

**notes** [6]_ - 45:6_, 45:13_, 45:15_, 81:23

**nothing** [7]_ - 5:21_, 6:12_, 30:15_, 76:17_, 123:15_, 162:23_, 164:16

**notice** [3]_ - 96:1_, 97:7_, 191:13

**noticeably** [1]_ - 18:6

**noticed** [1]_ - 279:21

**nowadays** [2]_ - 78:24_, 82:3

**nowhere** [1]_ - 237:20

**Number** [21]_ - 3:4_, 65:9_, 67:7_, 67:10_, 67:12_, 67:22_, 68:9_, 68:17_, 68:18_, 69:22_, 69:23_, 69:24_, 71:9_, 72:18_, 73:22_, 74:14_, 74:16_, 74:18_, 97:20_, 98:24

**number** [148]_ - 10:19_, 12:7_, 13:13_, 15:3_, 28:1_, 40:17_, 42:21_, 47:13_, 47:14_, 47:19_, 48:19_, 48:21_, 55:17_, 57:19_, 64:11_, 64:14_, 64:18_, 64:22_, 64:23_, 65:4_, 66:18_, 67:12_, 67:24_, 68:20_, 72:5_, 72:6_, 83:25_, 84:9_, 84:10_, 84:12_, 90:1_, 90:17_, 90:21_, 90:22_, 95:7_, 95:8_, 95:9_, 96:22_, 97:3_, 97:4_, 97:5_, 97:10_, 97:21_, 97:22_, 98:12_, 98:14_, 98:16_, 98:23_, 99:16_, 102:13_, 103:2_, 103:5_, 103:12_, 103:17_, 104:15_, 105:1_, 105:12_, 105:14_, 105:16_, 108:15_, 112:9_, 118:24_, 121:14_, 121:15_, 124:17_

_, 125:5_, 125:20_, 125:24_, 125:25_, 126:2_, 126:4_, 126:15_, 126:17_, 126:20_, 126:21_, 126:25_, 130:12_, 130:14_, 130:15_, 130:16_, 130:20_, 135:10_, 136:3_, 136:5_, 136:8_, 145:15_, 145:18_, 145:20_, 146:9_, 149:3_, 149:6_, 149:7_, 149:18_, 149:21_, 150:17_, 150:20_, 150:22_, 150:24_, 150:25_, 152:11_, 152:16_, 152:18_, 159:25_, 160:22_, 176:8_, 185:2_, 185:6_, 185:9_, 185:14_, 185:18_, 185:20_, 185:22_, 188:20_, 189:3_, 195:23_, 196:7_, 197:6_, 197:8_, 199:17_, 201:20_, 202:14_, 203:19_, 206:11_, 206:12_, 207:16_, 208:1_, 209:13_, 211:23_, 214:14_, 215:17_, 216:6_, 217:19_, 217:21_, 218:1_, 218:15_, 218:23_, 218:24_, 219:8_, 219:17_, 220:23_, 220:25_, 222:5_, 248:15_, 250:25_, 274:25_, 276:21

**numbers** [54]_ - 39:15_, 40:17_, 46:15_, 46:17_, 54:19_, 57:3_, 57:10_, 57:17_, 57:19_, 58:23_, 59:1_, 59:13_, 60:10_, 60:16_, 60:17_, 60:19_, 60:22_, 61:6_, 61:11_, 61:16_, 62:10_, 62:12_, 62:23_, 67:8_, 97:1_, 97:2_, 97:7_, 99:19_, 100:4_, 107:16_, 114:20_, 114:23_, 116:24_, 133:5_, 144:6_, 152:6_, 152:11_, 152:17_, 185:1_, 186:22_, 186:25_, 187:4_, 187:8_, 188:19_, 189:3_, 198:15_, 214:12_, 214:15_, 214:19_, 219:7_, 223:14_, 223:15_, 226:11_, 249:1

**numerous** [6]_ - 116:8_, 182:20_, 187:15_, 198:8_, 232:5_, 261:4

**O**

**oath** [5]_ - 54:5_, 119:18_, 134:20_, 211:12_, 278:2

**object** [1]_ - 116:8

**objection** [48]_ - 12:20_,

12:21_, 21:9_, 21:10_, 21:12_, 26:13_, 28:8_, 37:6_, 37:7_, 53:14_, 53:16_, 56:5_, 56:7_, 92:7_, 92:8_, 92:10_, 110:24_, 110:25_, 111:2_, 114:5_, 114:6_, 114:21_, 115:1_, 115:8_, 116:11_, 116:13_, 116:17_, 117:9_, 119:21_, 131:21_, 131:22_, 131:24_, 133:18_, 133:20_, 134:24_, 144:20_, 144:21_, 144:23_, 148:11_, 148:12_, 148:14_, 162:9_, 162:10_, 162:11_, 170:21_, 170:22_, 204:12_, 204:22

**objections** [1]_ - 134:1

**objects** [1]_ - 8:12

**observe** [2]_ - 36:14_, 282:11

**observer** [1]_ - 9:19

**obstructed** [1]_ - 226:3

**obstruction** [1]_ - 174:17

**obtain** [5]_ - 178:7_, 178:8_, 178:10_, 180:25_, 185:25

**obtained** [6]_ - 17:1_, 61:12_, 68:2_, 178:18_, 178:19_, 200:8

**obviously** [4]_ - 22:24_, 87:20_, 188:4_, 282:24

**occasionally** [1]_ - 182:14

**occasions** [1]_ - 36:24

**occur** [1]_ - 46:4

**occurred** [2]_ - 45:24_, 270:19

**Ocean** [1]_ - 229:23

**octillion** [3]_ - 68:5_, 69:18_, 73:4

**offensively** [1]_ - 8:11

**offered** [1]_ - 17:7

**offhand** [1]_ - 270:7

**office** [1]_ - 9:21

**OFFICER** [2]_ - 5:24_, 134:17

**officer** [2]_ - 53:23_, 166:5

**Officer** [1]_ - 119:11

**official** [1]_ - 281:8

**officials** [1]_ - 85:17

**offset** [2]_ - 93:16_, 94:8

**often** [2]_ - 175:2_, 195:11

**oftentimes** [1]_ - 10:16

**Ohio** [1]_ - 279:22

**Okeechobee** [1]_ - 228:22

**old** [1]_ - 176:6

**omnidirectional** [2]_ - 191:24_, 262:4

**once** [14]_ - 31:21_, 35:14_, 52:10_, 79:12_, 80:17_, 85:14_, 120:23_, 145:14_, 153:7_, 163:16_, 221:2_, 229:16_, 259:9_, 281:20

**one** [145]_ - 3:20_, 5:6_, 14:22_, 14:23_, 14:24_, 15:6_, 16:11_, 17:3_, 23:5_, 23:6_, 24:10_, 24:14_, 27:23_, 29:5_, 29:17_, 32:13_, 32:23_, 32:24_, 39:12_, 39:18_, 40:18_, 41:8_, 42:22_, 42:23_, 46:5_, 47:7_, 50:3_, 51:20_, 53:7_, 57:1_, 57:19_, 57:25_, 58:6_, 60:13_, 62:5_, 63:19_, 65:3_, 68:3_, 68:10_, 69:14_, 70:17_, 71:20_, 72:4_, 72:24_, 73:10_, 78:20_, 79:21_, 79:24_, 81:17_, 83:11_, 84:3_, 84:8_, 88:19_, 90:8_, 90:11_, 92:1_, 92:23_, 93:12_, 96:20_, 98:24_, 104:3_, 104:25_, 106:8_, 113:23_, 115:14_, 115:19_, 118:23_, 120:17_, 121:9_, 121:11_, 127:15_, 128:11_, 129:15_, 129:18_, 130:22_, 132:14_, 136:21_, 139:25_, 140:7_, 147:5_, 161:14_, 163:2_, 167:14_, 168:6_, 171:25_, 172:2_, 173:8_, 174:6_, 175:1_, 175:5_, 175:7_, 175:13_, 175:24_, 188:3_, 190:10_, 190:13_, 190:16_, 191:16_, 191:24_, 192:13_, 193:1_, 194:5_, 194:21_, 194:22_, 196:16_, 197:3_, 198:11_, 198:14_, 199:12_, 202:11_, 206:3_, 206:17_, 209:16_, 209:20_, 223:16_, 231:23_, 235:9_, 236:24_, 239:13_, 239:19_, 239:20_, 242:14_, 246:5_, 246:9_, 252:1_, 260:8_, 267:8_, 271:9_, 276:18_, 276:25_, 277:2_,

283:8

**one's** [1]_ - 42:2

**one-on-one** [1]_ - 168:6

**ones** [7]_ - 50:24_, 57:12_, 90:13_, 202:2_, 237:24_, 250:23_, 267:1

**ongoing** [1]_ - 169:11

**online** [1]_ - 121:11

**open** [5]_ - 40:5_, 99:9_, 174:13_, 244:15_, 281:4

**operate** [2]_ - 172:13_, 172:16

**operating** [11]_ - 35:7_, 36:3_, 88:19_, 90:7_, 90:8_, 90:14_, 97:12_, 97:14_, 97:16_, 99:6_, 181:14

**operational** [1]_ - 11:17

**operationally** [2]_ - 7:20_, 8:9

**opinion** [34]_ - 25:15_, 25:19_, 208:4_, 208:24_, 209:24_, 210:8_, 213:3_, 219:15_, 222:14_, 227:3_, 227:21_, 233:25_, 234:15_, 235:7_, 235:23_, 235:25_, 239:10_, 240:23_, 242:21_, 245:3_, 249:20_, 252:23_, 253:6_, 255:22_, 257:8_, 261:4_, 261:19_, 264:19_, 265:24_, 266:3_, 266:13_, 269:24_, 270:1_, 272:24

**opinions** [3]_ - 242:6_, 243:8_, 249:9

**opportunity** [5]_ - 25:3_, 29:12_, 29:13_, 116:7_, 186:4

**opposed** [1]_ - 44:11

**opposing** [1]_ - 47:6

**opposite** [1]_ - 138:10

**optimize** [3]_ - 179:24_, 180:10_, 180:23

**oral** [1]_ - 34:8

**orange** [1]_ - 74:19

**order** [8]_ - 5:16_, 17:2_, 27:16_, 115:6_, 179:13_, 184:17_, 214:19_, 226:12

**Order** [1]_ - 3:1

**orders** [1]_ - 26:24

**ordinarily** [1]_ - 184:8

**organization** [2]_ - 34:1_, 95:11

**organizations** [1]_ - 33:24

**orient** [4]_ - 207:21_, 212:18_, 224:14_, 239:1

**orientation** [3]_ - 173:13_, 196:2_, 226:25

**original** [12]_ - 35:20_, 58:14_, 60:11_, 61:5_, 86:23_, 91:11_, 120:8_, 148:5_, 149:1_, 152:2_, 153:22_, 167:14

**originally** [2]_ - 4:21_, 122:12

**originates** [1]_ - 136:14

**originating** [4]_ - 68:3_, 71:20_, 72:24_, 135:23

**OS** [2]_ - 90:11_, 97:12

**ourselves** [2]_ - 224:14_, 239:1

**outcome** [1]_ - 25:11

**outer** [2]_ - 156:18_, 157:9

**outgoing** [2]_ - 195:25_, 196:6

**outlier** [1]_ - 231:23

**output** [1]_ - 85:15

**outside** [10]_ - 9:12_, 33:20_, 34:23_, 34:24_, 35:1_, 36:9_, 194:23_, 239:9_, 268:7_, 283:23

**overlap** [2]_ - 175:19_, 193:9

**overlapping** [4]_ - 175:8_, 175:11_, 175:13_, 175:15

**overnight** [1]_ - 269:8

**overseas** [1]_ - 9:23

**overview** [2]_ - 167:3_, 197:2

**own** [5]_ - 35:19_, 81:16_, 99:15_, 172:18_, 172:20

**owner** [1]_ - 136:2

**Oxendine** [1]_ - 283:16

P

**P-A-T-T-E-R-S-O-N** [1]_ - 6:18

**p.m** [91]_ - 94:21_, 132:16_, 134:7_, 134:18_, 197:7_, 199:17_, 201:21_, 201:23_, 202:14_, 205:20_, 206:4_, 207:16_, 207:17_, 209:15_, 210:3_, 211:1_, 211:4_, 211:10_, 214:6_, 217:9_, 217:22_,

217:24_, 219:6_, 220:8_, 220:18_, 220:23_, 220:24 _, 225:11_, 226:21_, 228:11_, 228:12_, 228:15 _, 229:1_, 229:5_, 235:19 _, 236:11_, 241:9_, 241:10_, 242:1_, 242:2_, 242:20_, 248:4_, 248:9_, 248:20_, 250:11_, 251:17 _, 252:17_, 253:16_, 254:8_, 254:10_, 256:25_, 257:19_, 257:25_, 258:8_, 259:1_, 266:18_, 266:25_, 268:21_, 268:24_, 269:12 _, 269:17_, 270:14_, 271:11_, 271:23_, 275:7_, 275:14_, 275:16_, 275:20 _, 277:8_, 277:11_, 277:13_, 277:22_, 277:24 _, 278:1_, 281:13_, 285:6

**packaged** [1]_ - 100:18

**packages** [1]_ - 17:19

**page** [155]_ - 53:3_, 56:19 _, 58:10_, 58:12_, 59:11_, 59:25_, 60:4_, 60:11_, 60:14_, 60:17_, 61:1_, 61:3_, 61:5_, 61:10_, 61:15_, 61:16_, 62:8_, 62:16_, 62:17_, 62:24_, 63:1_, 63:6_, 63:7_, 63:13 _, 63:14_, 63:19_, 63:20_, 63:23_, 64:6_, 64:10_, 98:2_, 98:10_, 101:2_, 101:21_, 102:17_, 102:23 _, 103:23_, 104:4_, 104:17_, 106:13_, 107:10 _, 108:22_, 109:4_, 110:16_, 111:6_, 111:15_, 111:16_, 111:17_, 111:18 _, 120:3_, 120:20_, 120:24_, 121:1_, 121:2_, 121:3_, 121:5_, 121:7_, 121:9_, 121:23_, 122:13_, 122:18_, 122:22_, 123:4_, 124:5_, 124:9_, 126:9_, 127:5_, 127:12_, 127:18_, 129:8_, 132:8_, 138:24_, 140:22_, 141:12_, 149:4_, 151:3_, 151:13_, 151:15_, 152:21_, 152:23_, 153:25 _, 154:11_, 155:17_, 155:24_, 157:15_, 158:9_, 158:25_, 159:10_, 159:20 _, 160:10_, 161:7_, 161:24_, 188:1_, 188:23_, 188:25_, 209:10_, 210:19 _, 211:17_, 214:11_, 214:13_, 214:15_, 214:19 _, 215:7_, 217:4_, 217:20 _, 218:21_, 220:15_,

220:17_, 220:21_, 221:5_, 221:6_, 222:2_, 223:4_, 225:3_, 226:10_, 226:12_, 227:12_, 230:5_, 232:20_, 233:19_, 233:20_, 234:4_, 234:23_, 235:14_, 241:5_, 241:25_, 243:1_, 243:19_, 244:8_, 244:21_, 245:15_, 246:1_, 246:18_, 247:6_, 249:17_, 249:24_, 256:20 _, 258:2_, 259:12_, 259:14_, 259:21_, 262:11 _, 262:25_, 267:9_, 267:21_, 268:14_, 268:17 _, 277:4_, 277:5

**pages** [5]_ - 53:7_, 55:20 _, 60:18_, 127:11_, 259:12

**pairs** [1]_ - 254:9

**PAJM** [1]_ - 147:3

**Palm** [29]_ - 121:16_, 121:21_, 155:6_, 206:7_, 206:8_, 206:17_, 207:5_, 208:6_, 208:25_, 212:18_, 212:19_, 212:25_, 216:14 _, 219:6_, 219:23_, 220:4 _, 220:10_, 220:11_, 220:18_, 221:7_, 225:20_, 228:2_, 229:14_, 229:24_, 254:21_, 255:10_, 255:23 _, 272:20

**paper** [3]_ - 112:9_, 130:22_, 176:6

**paperwork** [2]_ - 31:19_, 44:1

**paragraph** [1]_ - 189:9

**parentheses** [9]_ - 64:19_, 68:2_, 69:13_, 70:12_, 70:20_, 71:19_, 71:23_, 72:23_, 73:2

**parking** [1]_ - 266:12

**parsed** [2]_ - 85:15_, 99:12

**parses** [2]_ - 80:23_, 101:10

**part** [26]_ - 10:19_, 10:23_, 11:9_, 11:22_, 17:19_, 32:1_, 33:17_, 36:13_, 38:25_, 42:20_, 42:25_, 43:24_, 48:11_, 49:12_, 55:24_, 56:13_, 63:23_, 75:15_, 141:24_, 165:18_, 169:22_, 171:7_, 187:10_, 188:25_, 203:8_, 225:19

**part-time** [1]_ - 169:22

**participant** [1]_ - 137:24

**participants** [4]_ - 137:19_, 137:21_, 138:16 _, 140:5

**participated** [1]_ - 34:11

**particular** [27]_ - 45:8_, 46:3_, 47:2_, 48:10_, 48:13_, 48:15_, 48:16_, 51:15_, 55:20_, 60:21_, 64:11_, 65:22_, 66:8_, 91:12_, 102:17_, 106:20_, 108:9_, 119:5_, 120:14_, 123:7_, 129:12_, 131:13_, 140:6_, 155:9_, 182:13_, 201:19_, 215:2

**parties** [3]_ - 132:13_, 136:19_, 281:3

**partners** [3]_ - 35:2_, 169:18_, 210:15

**parts** [3]_ - 183:6_, 266:12 _, 276:22

**party** [7]_ - 149:24_, 150:16_, 150:18_, 196:5_, 196:16_, 203:16_, 278:16

**pass** [1]_ - 25:4

**password** [8]_ - 101:9_, 101:11_, 101:12_, 101:15 _, 101:16_, 101:17_, 163:20

**passwords** [1]_ - 101:10

**past** [4]_ - 9:15_, 119:2_, 169:10_, 284:17

**Pat** [1]_ - 283:15

**patch** [1]_ - 192:3

**path** [9]_ - 123:9_, 129:14 _, 129:17_, 151:10_, 151:11_, 154:5_, 154:6_, 159:17_, 160:13

**paths** [1]_ - 155:22

**patrol** [1]_ - 166:8

**pattern** [2]_ - 158:5_, 251:8

**Patterson** [9]_ - 3:21_, 6:5_, 6:6_, 6:17_, 7:1_, 13:21_, 15:13_, 16:12_, 21:22

**PATTERSON** [1] - 6:22

**pay** [5]_ - 107:2_, 107:5_, 145:25_, 146:4_, 146:13

**pay-as-you-go** [3]_ - 145:25_, 146:4_, 146:13

**pay-as-you-go-type** [2]_ - 107:2_, 107:5

**paying** [1]_ - 63:22

**payment** [4]_ - 145:16_,

146:9_, 150:10_, 150:12

**peak** [5]_ - 59:18_, 59:22_, 61:19_, 62:3

**peaks** [2]_ - 58:18_, 58:19

**peer** [1]_ - 51:12

**penetrate** [2]_ - 20:7_, 25:14

**penetrating** [1]_ - 22:21

**penetrations** [1]_ - 23:8

**pennlive.com** [2]_ - 162:20_, 162:22

**people** [20]_ - 11:8_, 36:13_, 36:17_, 38:17_, 38:18_, 39:2_, 42:24_, 66:5_, 77:21_, 78:24_, 79:24_, 83:10_, 136:19_, 167:11_, 168:19_, 172:7_, 182:25_, 187:16_, 187:18 _, 280:4

**per** [1]_ - 23:18

**percent** [5]_ - 21:25_, 38:21_, 38:22_, 38:23_, 193:8

**perfect** [2]_ - 115:18_, 197:18

**perfectly** [2]_ - 22:9_, 22:11

**perform** [9]_ - 15:19_, 31:20_, 34:15_, 35:19_, 36:22_, 41:6_, 46:13_, 58:25_, 147:9

**performed** [14]_ - 12:5_, 33:1_, 33:17_, 34:11_, 40:25_, 41:1_, 41:3_, 45:5 _, 46:19_, 68:10_, 72:20_, 91:22_, 113:25_, 162:5

**performing** [1]_ - 36:17

**period** [30]_ - 9:8_, 190:12 _, 208:22_, 209:1_, 209:5 _, 212:10_, 213:5_, 216:2 _, 216:5_, 216:23_, 217:19_, 219:2_, 219:14_, 231:2_, 231:6_, 231:20_, 238:6_, 240:19_, 242:22_, 242:25_, 249:25_, 253:19 _, 257:9_, 257:13_, 258:25_, 266:14_, 268:6_, 269:8_, 272:20_, 273:1

**periods** [1]_ - 181:2

**permissible** [2]_ - 27:2_, 29:11

**permission** [34]_ - 13:16 _, 15:8_, 21:15_, 56:2_, 73:7_, 74:1_, 74:21_, 90:24_, 92:11_, 105:5_,

107:24_, 111:4_, 112:11_, 120:1_, 122:7_, 123:23_, 125:10_, 135:18_, 137:16_, 139:12_, 141:7_, 142:2_, 142:21_, 145:1_, 147:15_, 149:10_, 151:22_, 153:17_, 154:9_, 155:15_, 157:24_, 159:8_, 160:6_, 162:13

**Perry** [1]_ - 283:16

**person** [22]_ - 38:9_, 38:10_, 38:11_, 38:12_, 38:14_, 38:23_, 39:15_, 42:22_, 46:6_, 46:8_, 46:15_, 47:7_, 70:17_, 120:17_, 135:24_, 136:24_, 138:9_, 168:8_, 203:11_, 203:12_, 268:10

**person's** [4]_ - 38:8_, 39:18_, 39:19_, 106:11

**personal** [1]_ - 35:11

**personally** [5]_ - 11:22_, 143:20_, 147:9_, 162:5_, 187:17

**personnel** [6]_ - 7:20_, 8:10_, 11:21_, 11:25_, 12:2_, 17:18

**pertain** [1]_ - 105:13

**phone** [518]_ - 78:23_, 79:6_, 79:21_, 79:23_, 80:11_, 80:15_, 80:22_, 80:24_, 84:18_, 84:22_, 85:8_, 86:4_, 86:18_, 86:19_, 87:13_, 87:14_, 87:15_, 87:17_, 87:20_, 87:25_, 88:14_, 88:18_, 88:20_, 88:24_, 89:1_, 89:3_, 89:7_, 89:8_, 89:9_, 89:25_, 90:1_, 90:2_, 90:4_, 90:5_, 90:15_, 95:19_, 95:23_, 96:3_, 96:13_, 96:17_, 96:21_, 97:10_, 97:11_, 97:21_, 97:22_, 98:18_, 98:20_, 98:25_, 99:2_, 99:6_, 99:7_, 99:9_, 99:13_, 100:19_, 100:20_, 100:22_, 101:19_, 101:22_, 102:3_, 102:13_, 102:24_, 103:2_, 103:5_, 103:8_, 103:10_, 103:12_, 103:17_, 104:20_, 104:21_, 104:22_, 104:24_, 105:12_, 105:14_, 105:16_, 105:24_, 106:22_, 108:20_, 108:25_, 112:7_, 118:24_, 118:25_, 119:7_, 120:17_, 122:16_, 123:12_, 123:17

_, 123:20_, 124:16_, 124:18_, 125:3_, 125:4_, 125:25_, 126:2_, 126:17_, 126:20_, 129:15_, 135:8_, 135:10_, 135:14_, 136:3_, 136:5_, 136:8_, 142:17_, 143:9_, 143:12_, 143:15_, 143:23_, 145:9_, 145:10_, 145:15_, 145:18_, 145:20_, 146:9_, 146:13_, 147:13_, 149:3_, 149:6_, 149:7_, 149:15_, 150:17_, 150:20_, 150:22_, 150:24_, 151:12_, 151:16_, 152:10_, 152:11_, 152:15_, 152:16_, 152:17_, 152:18_, 153:23_, 153:24_, 155:12_, 156:18_, 156:22_, 157:3_, 157:20_, 158:6_, 158:13_, 158:14_, 159:14_, 163:10_, 163:12_, 163:15_, 163:18_, 167:7_, 167:8_, 167:17_, 167:21_, 167:22_, 167:23_, 168:9_, 170:20_, 170:24_, 171:8_, 171:11_, 171:14_, 171:17_, 171:19_, 171:25_, 172:3_, 172:22_, 173:9_, 173:16_, 173:19_, 173:20_, 173:22_, 174:8_, 174:11_, 174:17_, 175:12_, 175:16_, 175:17_, 175:20_, 176:8_, 176:14_, 176:16_, 176:17_, 176:25_, 177:5_, 177:8_, 177:9_, 177:10_, 177:13_, 177:17_, 177:21_, 177:24_, 177:25_, 178:4_, 179:4_, 179:8_, 179:11_, 179:17_, 179:24_, 179:25_, 180:8_, 180:10_, 180:11_, 180:15_, 180:21_, 181:14_, 181:15_, 181:22_, 181:25_, 182:2_, 182:9_, 182:10_, 182:13_, 182:18_, 183:1_, 183:14_, 183:16_, 184:10_, 184:25_, 185:4_, 185:7_, 185:9_, 185:12_, 185:14_, 185:23_, 186:9_, 186:10_, 186:22_, 186:25_, 188:19_, 189:3_, 189:7_, 189:23_, 190:7_, 190:24_, 191:11_, 191:12_, 191:17_, 191:18_, 192:10_, 192:17_, 192:20_, 192:22_, 193:5_, 193:6_, 193:8_, 193:9_, 193:10_, 194:19_, 195:2_, 195:9_, 196:4_, 196:7_, 196:17_, 196:19_, 197:6_, 197:8

_, 197:20_, 198:11_, 198:13_, 198:23_, 199:17_, 199:23_, 199:24_, 200:1_, 200:4_, 200:9_, 200:10_, 200:11_, 200:13_, 201:4_, 201:20_, 202:14_, 203:12_, 205:24_, 206:3_, 206:6_, 206:8_, 207:2_, 207:10_, 207:15_, 208:1_, 208:5_, 208:21_, 208:25_, 209:4_, 209:13_, 209:23_, 210:4_, 210:9_, 210:11_, 210:16_, 211:23_, 212:16_, 213:4_, 213:21_, 214:6_, 214:23_, 215:2_, 215:17_, 215:18_, 215:21_, 215:23_, 216:4_, 216:6_, 216:13_, 216:18_, 216:21_, 216:22_, 216:23_, 217:7_, 217:9_, 217:12_, 217:19_, 217:21_, 217:23_, 217:25_, 218:1_, 218:14_, 218:15_, 218:16_, 218:17_, 218:23_, 218:24_, 219:3_, 219:7_, 219:8_, 219:11_, 220:17_, 220:23_, 220:25_, 221:7_, 221:12_, 221:15_, 222:5_, 222:10_, 222:11_, 222:14_, 222:19_, 222:21_, 223:23_, 224:6_, 225:9_, 225:10_, 225:12_, 226:20_, 226:22_, 226:24_, 227:1_, 227:20_, 227:21_, 228:15_, 228:25_, 230:9_, 230:10_, 230:12_, 230:14_, 230:16_, 230:18_, 230:21_, 230:23_, 231:10_, 231:19_, 231:22_, 234:9_, 234:11_, 234:13_, 234:14_, 235:3_, 235:18_, 235:23_, 236:23_, 236:25_, 237:5_, 237:25_, 238:18_, 240:18_, 240:19_, 240:20_, 242:8_, 242:23_, 242:24_, 243:5_, 243:10_, 243:16_, 243:17_, 243:25_, 245:4_, 245:10_, 245:12_, 245:22_, 246:3_, 246:6_, 246:14_, 246:22_, 247:1_, 247:11_, 248:3_, 248:25_, 249:2_, 249:3_, 249:10_, 249:12_, 249:25_, 250:1_, 250:10_, 251:11_, 251:16_, 251:17_, 251:20_, 252:6_, 252:16_, 252:18_, 252:23_, 254:5_, 254:9_, 254:18_, 255:16_, 257:10_, 257:18_, 257:22_, 257:23_, 258:20_, 259:9_,

259:19_, 259:22_, 260:19_, 260:22_, 262:5_, 262:14_, 262:18_, 263:1_, 263:10_, 263:17_, 263:20_, 264:5_, 264:10_, 264:18_, 264:19_, 264:23_, 265:6_, 265:8_, 265:16_, 265:22_, 266:13_, 267:17_, 267:23_, 268:8_, 268:9_, 268:10_, 268:11_, 268:12_, 268:14_, 268:24_, 269:1_, 269:6_, 269:7_, 269:8_, 269:11_, 269:16_, 269:18_, 269:24_, 270:1_, 270:14_, 271:18_, 271:20_, 271:21_, 272:1_, 272:7_, 272:20_, 272:23_, 273:6_, 273:9_, 273:17_, 274:3_, 274:4_, 274:9_, 274:11_, 274:19_, 274:21_, 275:4_, 276:7_, 277:13_, 278:14_, 278:17_, 280:9

**phone's** [4]_ - 94:5_, 123:13

**phones** [60]_ - 77:25_, 78:24_, 79:24_, 80:5_, 82:2_, 85:8_, 87:8_, 87:12_, 87:18_, 87:22_, 88:15_, 90:9_, 90:12_, 90:14_, 97:8_, 106:25_, 107:1_, 107:2_, 152:12_, 155:10_, 160:25_, 167:6_, 167:11_, 167:23_, 171:8_, 171:11_, 172:3_, 172:4_, 172:7_, 175:21_, 182:23_, 186:21_, 187:7_, 189:13_, 192:19_, 195:6_, 195:7_, 216:3_, 219:15_, 219:18_, 219:20_, 220:8_, 220:10_, 220:17_, 228:1_, 232:22_, 237:22_, 240:24_, 242:22_, 245:8_, 246:11_, 249:2_, 251:8_, 262:2_, 262:9_, 276:21_, 276:22

**photo** [2]_ - 123:13_, 129:21

**photograph** [6]_ - 81:16_, 127:25_, 129:15_, 143:19_, 160:20

**photographed** [1]_ - 160:16

**photographs** [10]_ - 20:12_, 20:14_, 20:23_, 20:25_, 89:5_, 89:10_, 143:17_, 143:20_, 143:24_, 144:12

**photos** [4]_ - 20:11_, 129:19_, 191:10_, 191:15

**Physical** [3]_ - 80:13_, 81:12_, 85:14
**physical** [12]_ - 83:11_, 83:14_, 113:9_, 143:2_, 146:23_, 147:5_, 152:14_, 155:10_, 162:24_, 193:15_, 193:16_, 240:7
**physically** [2]_ - 174:5_, 210:16
**pick** [3]_ - 157:4_, 173:20_, 211:16
**picture** [18]_ - 22:8_, 23:1_, 123:17_, 128:12_, 129:2_, 129:12_, 156:12_, 156:15_, 156:22_, 157:8_, 157:10_, 158:3_, 158:13_, 159:4_, 203:22_, 203:23_, 205:10_, 238:14
**pie** [13]_ - 183:12_, 192:6_, 192:8_, 192:14_, 193:16_, 195:19_, 198:12_, 200:24_, 206:2_, 221:12_, 231:16
**pie-shape** [1]_ - 192:6
**piece** [9]_ - 7:24_, 13:2_, 39:9_, 44:13_, 75:15_, 85:13_, 92:20_, 98:19_, 152:15
**piecemeal** [1]_ - 5:19
**pieces** [6]_ - 10:16_, 39:9_, 40:11_, 54:11_, 79:19_, 171:22
**Pierce** [1]_ - 172:23
**PIN** [5]_ - 84:11_, 84:12_, 163:16_, 163:18
**pinpoint** [1]_ - 177:17
**pinpointing** [2]_ - 279:3_, 280:6
**pistol** [6]_ - 18:18_, 19:15_, 20:2_, 20:5_, 20:8_, 23:18
**PKU** [1]_ - 204:20
**place** [12]_ - 22:1_, 35:4_, 36:2_, 36:3_, 36:6_, 36:15_, 36:19_, 132:7_, 171:17_, 172:7_, 182:2_, 189:6
**placed** [5]_ - 86:2_, 172:22_, 192:20_, 203:17_, 272:4
**plain** [1]_ - 101:17
**plan** [3]_ - 76:8_, 124:15_, 284:13
**plane** [1]_ - 217:13
**planning** [3]_ - 76:8_,

118:22_, 284:3
**plans** [3]_ - 107:5_, 107:6_, 146:1
**plastic** [3]_ - 13:23_, 13:25_, 14:3
**Plata** [1]_ - 283:17
**plate** [52]_ - 15:17_, 16:18_, 17:21_, 18:14_, 20:7_, 22:3_, 22:6_, 22:9_, 22:15_, 22:20_, 22:23_, 22:25_, 23:6_, 24:7_, 24:10_, 24:17_, 25:13_, 25:15_, 25:20_, 25:22_, 29:4_, 159:23_, 159:25_, 160:2_, 184:12_, 184:13_, 202:22_, 202:23_, 202:24_, 203:2_, 203:4_, 203:13_, 204:10_, 204:11_, 204:17_, 204:20_, 205:11_, 205:15_, 205:16_, 205:17_, 205:23_, 207:4_, 223:8_, 225:24_, 229:18_, 238:15_, 238:17_, 260:3_, 260:5_, 262:20_, 262:21
**plates** [14]_ - 8:1_, 11:16_, 11:17_, 15:25_, 16:2_, 17:2_, 17:18_, 17:22_, 17:24_, 19:25_, 26:7_, 29:3_, 203:18
**play** [3]_ - 93:19_, 174:11_, 176:15
**pleasant** [1]_ - 281:10
**pleasure** [1]_ - 188:5
**plenty** [2]_ - 142:1_, 163:21
**plot** [1]_ - 179:10
**plus** [1]_ - 116:16
**pocket** [1]_ - 82:4
**point** [27]_ - 11:2_, 19:8_, 19:9_, 23:3_, 23:5_, 54:24_, 65:1_, 85:14_, 96:23_, 98:25_, 109:3_, 127:13_, 129:16_, 169:15_, 179:7_, 182:19_, 189:21_, 189:23_, 189:25_, 190:16_, 203:7_, 215:23_, 261:25_, 269:24_, 283:20_, 284:23_, 284:24
**pointing** [1]_ - 191:20
**points** [4]_ - 181:20_, 184:12_, 189:24_, 266:11
**police** [3]_ - 166:5_, 166:7_, 166:15
**Police** [9]_ - 32:22_, 33:2_, 33:8_, 33:10_, 33:15_, 33:18_, 33:20_, 33:25_,

166:4
**policemen** [1]_ - 7:25
**population** [1]_ - 34:10
**portion** [3]_ - 135:25_, 142:10_, 189:10
**portions** [1]_ - 53:2
**position** [1]_ - 272:8
**positioned** [1]_ - 22:16
**possess** [1]_ - 54:15
**possession** [1]_ - 51:4
**possibility** [1]_ - 61:11
**possible** [7]_ - 46:6_, 91:1_, 132:3_, 157:11_, 279:12_, 279:15_, 279:16
**possibly** [1]_ - 270:1
**post** [1]_ - 281:1
**posting** [1]_ - 132:12
**posture** [1]_ - 115:1
**potential** [5]_ - 37:24_, 60:23_, 62:14_, 63:3_, 64:7
**potentially** [2]_ - 72:22_, 170:1
**pounds** [3]_ - 14:14_, 16:20
**power** [2]_ - 272:5_, 272:6
**powerful** [2]_ - 174:20_, 174:22
**PowerPoint** [2]_ - 187:22_, 188:6
**PowerPoint-style** [1]_ - 187:22
**PPE** [1]_ - 35:11
**practical** [1]_ - 34:8
**practice** [2]_ - 282:12_, 282:22
**pre** [3]_ - 32:16_, 119:1_, 153:9
**pre-generated** [1]_ - 153:9
**pre-lunch** [1]_ - 119:1
**precise** [9]_ - 179:16_, 180:15_, 183:2_, 183:3_, 187:3_, 237:17_, 238:10_, 242:13_, 279:5
**precisely** [3]_ - 182:12_, 252:7_, 252:25
**precision** [2]_ - 182:15_, 195:13
**predecessor** [1]_ - 10:6
**preliminarily** [1]_ - 43:15

**Premium** [2]_ - 79:21_, 85:9
**prepackaged** [1]_ - 98:20
**prepaid** [5]_ - 107:6_, 145:10_, 146:13_, 150:12_, 153:13
**prepared** [5]_ - 5:3_, 55:23_, 225:17_, 284:15_, 285:1
**preparing** [1]_ - 203:5
**presence** [2]_ - 68:15_, 116:15
**present** [9]_ - 5:1_, 18:21_, 53:22_, 61:19_, 62:3_, 62:12_, 281:8_, 282:10_, 284:15
**presentation** [4]_ - 168:20_, 198:9_, 218:16_, 245:13
**presentations** [2]_ - 81:24_, 169:12
**presented** [4]_ - 89:11_, 186:5_, 281:5_, 281:7
**presenting** [1]_ - 168:25
**presents** [1]_ - 138:15
**preserve** [3]_ - 77:14_, 77:19_, 89:5
**preserved** [3]_ - 79:5_, 79:7_, 85:3
**preserving** [1]_ - 78:12
**President** [2]_ - 137:6_, 230:2
**press** [1]_ - 171:15
**pressure** [1]_ - 19:11
**pretrial** [1]_ - 5:18
**pretty** [15]_ - 14:15_, 23:19_, 80:2_, 80:14_, 82:2_, 139:6_, 175:5_, 175:18_, 219:22_, 223:6_, 253:8_, 259:24_, 261:21_, 278:23
**previous** [12]_ - 139:21_, 194:15_, 207:21_, 214:23_, 217:12_, 225:6_, 240:18_, 241:13_, 245:4_, 251:8_, 255:20_, 274:8
**previously** [20]_ - 36:25_, 37:13_, 51:10_, 88:23_, 97:12_, 103:17_, 105:4_, 106:1_, 111:10_, 111:23_, 114:3_, 135:10_, 141:5_, 143:11_, 149:8_, 151:20_, 153:3_, 160:5_, 161:19_,

204:10

**primarily** [1] - 8:7

**primary** [1] - 230:13

**primitive** [1] - 278:18

**principal** [1] - 18:25

**principle** [1] - 222:20

**printouts** [1] - 113:21

**prints** [1] - 44:9

**prison** [1] - 187:18

**pro** [1] - 39:24

**probability** [1] - 47:6

**problem** [1] - 140:14

**problems** [1] - 134:1

**procedure** [4] - 83:24, 88:20, 88:22, 284:6

**procedures** [8] - 34:25, 35:4, 35:8, 36:3, 36:14, 36:19, 36:20, 78:11

**proceed** [15] - 6:19, 12:24, 119:22, 124:15, 124:18, 131:1, 154:7, 156:7, 161:6, 164:7, 164:23, 186:18, 188:8, 191:3, 282:16

**proceeding** [1] - 5:20

**proceedings** [2] - 281:8, 285:6

**process** [41] - 20:12, 21:4, 35:25, 36:13, 39:22, 39:25, 40:3, 40:6, 40:9, 40:13, 40:19, 40:21, 40:25, 41:4, 43:16, 45:14, 45:18, 45:23, 45:25, 46:19, 50:19, 51:11, 51:15, 51:20, 51:25, 65:7, 67:11, 67:13, 67:15, 67:18, 68:23, 69:2, 70:1, 72:8, 77:20, 87:16, 88:23, 143:11, 157:21, 163:15, 168:12

**processed** [4] - 33:6, 67:14, 78:8, 78:9

**processes** [1] - 41:6

**processing** [2] - 50:20, 83:5

**produce** [1] - 79:15

**produced** [3] - 19:1, 48:6, 157:6

**product** [1] - 19:7

**products** [2] - 10:18, 105:25

**professional** [1] - 33:24

**proffer** [1] - 37:4

**profile** [61] - 38:14, 38:16, 40:17, 41:18, 42:12, 42:14, 42:22, 46:7, 46:9, 47:8, 47:10, 49:6, 49:8, 49:10, 50:12, 54:21, 55:14, 55:16, 56:22, 56:23, 57:3, 57:7, 57:14, 57:15, 57:18, 58:17, 58:25, 60:6, 60:8, 61:7, 61:8, 61:12, 61:22, 62:2, 62:8, 62:9, 62:11, 62:24, 63:1, 63:2, 63:14, 64:4, 65:14, 68:3, 68:4, 69:13, 69:15, 69:16, 70:13, 70:16, 70:19, 71:19, 71:22, 72:24, 73:1, 106:15, 106:17, 128:12

**profiles** [10] - 42:13, 42:21, 42:24, 50:2, 50:6, 50:12, 62:23, 65:3, 65:7, 73:21

**program** [8] - 10:9, 33:18, 34:6, 34:13, 35:7, 46:22, 50:17, 168:10

**programs** [1] - 33:20

**project** [4] - 91:2, 161:15, 184:6, 184:17

**projected** [1] - 144:3

**projectile** [4] - 8:20, 12:1, 19:9

**projectiles** [8] - 8:1, 8:2, 8:16, 11:20, 12:4, 14:25, 22:21, 23:17

**projecting** [1] - 143:24

**prominent** [3] - 90:8, 90:10, 90:13

**prompt** [1] - 6:8

**pronounce** [1] - 135:25

**propagates** [1] - 191:24

**proper** [4] - 5:19, 10:11, 36:20, 45:21

**properly** [1] - 36:1

**propose** [1] - 115:7

**prosecutor** [2] - 169:3

**protect** [2] - 12:2, 35:12

**protective** [1] - 35:11

**Protocol** [1] - 109:12

**protocols** [3] - 33:16,

35:8, 36:21

**proved** [1] - 169:6

**provide** [20] - 78:18, 89:6, 146:4, 168:3, 168:17, 168:20, 172:10, 177:15, 183:4, 192:2, 198:4, 227:3, 232:1, 234:15, 236:1, 239:7, 240:21, 272:24, 273:19, 282:20

**provided** [18] - 108:21, 133:2, 133:13, 150:17, 150:22, 167:21, 169:17, 179:8, 180:11, 184:12, 186:14, 194:18, 195:4, 196:3, 203:7, 221:21, 239:12, 262:2

**provider** [3] - 145:24, 185:20, 190:24

**providers** [10] - 173:5, 175:20, 178:21, 180:8, 180:25, 181:6, 183:19, 195:11, 200:9, 224:7

**provides** [9] - 66:6, 68:7, 69:20, 70:24, 72:2, 73:6, 100:11, 180:4, 222:7

**providing** [6] - 171:15, 173:25, 182:4, 250:17, 250:24, 262:15

**provisioned** [1] - 87:13

**PU** [1] - 238:14

**public** [1] - 166:1

**Public** [1] - 166:8

**publish** [36] - 20:18, 21:15, 24:2, 52:9, 54:23, 56:3, 56:15, 92:11, 105:5, 107:24, 110:6, 111:4, 119:5, 120:1, 122:7, 123:23, 125:10, 130:6, 135:18, 137:16, 139:12, 141:7, 142:21, 145:1, 148:20, 149:10, 151:22, 153:17, 154:9, 155:15, 157:24, 159:8, 160:6, 162:13, 188:1, 188:3

**pull** [4] - 119:24, 122:5, 211:17, 233:13

**pulled** [1] - 111:15

**pulling** [1] - 177:20

**pullout** [1] - 209:20

**pulls** [2] - 70:10, 70:21

**purple** [1] - 198:23

**purpose** [1] - 15:22

**purposes** [10] - 8:17, 50:7, 52:6, 53:14, 56:4, 90:20, 118:22, 215:14, 282:8, 284:3

**pursuant** [3] - 37:3, 180:25, 186:1

**put** [29] - 15:7, 16:7, 23:4, 40:2, 40:14, 72:8, 73:19, 77:20, 80:24, 81:1, 84:9, 84:11, 84:12, 85:4, 85:6, 85:12, 85:14, 89:10, 99:8, 125:8, 163:14, 163:17, 168:8, 168:10, 175:1, 190:4, 202:21, 250:18, 250:21

**putting** [3] - 41:5, 183:1, 252:6

## Q

**Q-tip** [1] - 42:1

**QMM** [2] - 83:25, 84:12

**qualification** [2] - 12:20, 28:21

**qualified** [5] - 12:22, 34:12, 36:23, 37:8, 170:23

**quality** [2] - 35:3, 35:6

**Quantico** [5] - 7:19, 8:7, 18:10, 31:7, 166:20

**quantification** [1] - 40:20

**quantitation** [1] - 40:7

**quarter** [1] - 17:24

**queries** [1] - 122:2

**query** [2] - 112:4, 121:21

**questionable** [1] - 84:1

**questioned** [17] - 42:6, 42:7, 42:10, 42:11, 42:14, 46:16, 50:14, 50:15, 50:19, 50:21, 54:11, 54:18, 58:23, 60:10, 61:7, 62:12, 63:10

**questioning** [2] - 29:24, 73:21

**questions** [17] - 25:24, 28:10, 28:11, 28:15, 29:1, 29:9, 29:11, 61:15, 62:17, 74:23, 75:7, 170:7, 194:4, 238:13, 265:4, 277:15, 278:5

**R**

**quick** [3] – 163:10, 190:20, 238:13
**quickly** [3] – 37:12, 116:24, 251:4
**quite** [1] – 93:5
**quotes** [1] – 121:15

**racking** [1] – 171:13
**radio** [1] – 168:24
**radiofrequency** [12] – 168:13, 168:24, 171:12, 172:5, 172:11, 173:18, 173:23, 174:3, 180:1, 200:6, 231:25, 232:1
**raise** [9] – 3:17, 4:1, 5:8, 6:9, 30:13, 76:14, 134:2, 164:13, 282:2
**raised** [1] – 5:18
**raising** [1] – 116:11
**range** [5] – 23:22, 27:6, 27:22, 47:20, 173:9
**rare** [1] – 20:3
**rather** [1] – 233:14
**ratio** [15] – 46:20, 47:5, 47:13, 47:18, 47:25, 51:7, 51:10, 65:21, 65:24, 66:17, 66:18, 66:22, 66:25
**reach** [7] – 51:2, 65:9, 67:23, 70:4, 71:11, 72:15, 72:17
**reaching** [3] – 46:3, 181:21, 181:22
**reacquired** [1] – 249:3
**read** [29] – 92:2, 100:2, 100:3, 101:16, 103:12, 104:23, 112:11, 114:18, 114:20, 115:9, 126:1, 140:11, 141:2, 141:21, 141:22, 142:5, 142:10, 142:15, 146:6, 147:1, 149:21, 159:24, 189:10, 197:4, 217:19, 226:2, 227:14, 274:24, 275:3
**reader** [7] – 202:22, 202:23, 203:4, 204:10, 205:23, 207:4, 238:18
**readers** [3] – 184:13, 203:14
**reading** [5] – 94:16,

94:17, 94:18, 111:19, 179:25
**reads** [2] – 128:14, 162:20
**ready** [3] – 5:4, 53:24, 134:11
**real** [4] – 150:20, 150:23, 150:25, 167:6
**really** [13] – 8:16, 10:8, 11:19, 12:7, 23:18, 78:3, 181:7, 190:6, 193:18, 235:9, 239:18, 250:20
**reappearance** [1] – 271:20
**reason** [9] – 78:21, 87:11, 93:22, 94:4, 94:7, 101:9, 181:19, 191:21
**reasons** [1] – 83:12
**receive** [13] – 10:12, 18:7, 33:7, 34:4, 45:17, 49:15, 57:22, 167:16, 169:5, 177:7, 184:15, 204:1, 267:23
**received** [35] – 13:25, 15:4, 18:9, 21:13, 45:11, 92:13, 111:3, 116:19, 116:21, 116:22, 117:13, 118:5, 118:7, 118:9, 118:11, 118:13, 118:15, 118:17, 118:19, 118:20, 144:24, 148:17, 148:19, 153:10, 153:12, 162:12, 165:25, 170:8, 189:3, 224:5, 224:6, 238:7, 266:17, 267:18, 268:10
**receives** [2] – 38:12, 136:24
**receiving** [1] – 154:19
**recertification** [1] – 169:7
**recess** [7] – 53:21, 116:5, 134:7, 211:3, 211:4, 277:24, 284:20
**recipe** [1] – 35:10
**recognize** [23] – 13:21, 20:23, 55:7, 83:21, 83:23, 85:24, 86:1, 86:2, 87:3, 87:6, 87:7, 88:12, 91:12, 91:15, 91:16, 108:2, 110:10, 131:8, 131:10, 131:11, 148:1, 148:3, 148:4
**recognized** [3] – 10:20,

81:18, 90:11
**recognizes** [1] – 52:11
**recommendations** [1] – 10:17
**recommended** [1] – 10:22
**record** [34] – 3:5, 5:12, 6:16, 30:20, 76:22, 84:23, 103:13, 105:17, 105:20, 111:19, 126:1, 146:7, 149:19, 149:25, 150:8, 150:11, 150:14, 150:18, 164:20, 171:18, 176:18, 182:2, 186:12, 204:8, 215:13, 215:14, 217:25, 220:15, 221:14, 229:10, 262:25, 274:24, 282:25
**recorded** [1] – 160:15
**records** [79] – 106:9, 106:20, 167:21, 167:22, 168:19, 171:18, 173:5, 175:20, 175:23, 175:24, 176:3, 176:5, 176:25, 177:7, 177:13, 177:14, 178:9, 178:18, 178:21, 178:24, 179:3, 179:13, 179:16, 179:20, 179:23, 180:20, 180:24, 181:4, 181:9, 181:11, 181:13, 181:14, 181:24, 182:11, 182:12, 183:3, 183:20, 183:23, 183:24, 184:10, 185:25, 186:3, 186:5, 186:7, 189:5, 189:18, 189:19, 189:20, 190:24, 194:12, 194:14, 195:7, 195:11, 195:12, 196:10, 200:8, 203:4, 203:9, 204:2, 204:5, 204:10, 204:14, 204:17, 204:20, 205:25, 238:7, 238:10, 238:12, 250:17, 266:17, 267:13, 267:18
**recovered** [4] – 155:9, 155:11, 156:5, 156:6
**Recruiting** [2] – 139:20, 140:8
**rectangles** [2] – 59:4, 59:5
**red** [21] – 64:2, 68:14, 68:15, 195:6, 198:7, 198:8, 198:9, 198:10, 202:3, 202:4, 202:5, 209:10, 219:1, 221:3, 224:25, 243:15, 244:7,

266:22, 267:4, 267:20, 276:16
**red-brown** [2] – 68:14, 68:15
**reddish** [2] – 69:4, 70:2
**reddish-brown** [2] – 69:4, 70:2
**redirect** [4] – 29:14, 76:4, 164:3, 280:15
**refer** [4] – 15:25, 90:17, 171:3
**reference** [2] – 214:15, 254:23
**referenced** [2] – 116:15, 119:20
**referred** [4] – 10:21, 107:5, 140:2, 276:15
**referring** [4] – 73:20, 196:9, 246:2, 266:8
**refers** [1] – 68:17
**reflect** [2] – 157:11, 230:20
**reflected** [23] – 94:2, 94:4, 94:24, 124:6, 128:17, 151:6, 190:21, 208:7, 224:17, 228:19, 230:8, 230:15, 232:15, 235:22, 242:7, 249:1, 249:9, 249:20, 250:8, 254:17, 254:24, 256:23, 274:7
**reflecting** [1] – 219:19
**reflection** [1] – 157:19
**refraction** [1] – 156:21
**regard** [18] – 35:3, 43:13, 45:7, 54:22, 62:5, 62:6, 62:17, 65:8, 65:16, 65:21, 67:6, 67:11, 67:16, 67:19, 67:23, 68:9, 69:3, 72:17
**regarding** [4] – 70:13, 132:18, 280:24, 284:2
**region** [1] – 61:19
**regional** [3] – 33:12, 34:2
**regions** [1] – 58:7
**register** [1] – 106:21
**registration** [2] – 107:3, 145:9
**regular** [1] – 136:20
**regularly** [3] – 43:11, 48:3, 48:6
**reiterate** [2] – 268:13,

270:3

**relate** [2]_ - 42:18_, 60:4

**related** [5]_ - 68:20_, 71:1_, 169:12_, 204:5_, 281:2

**relates** [2]_ - 152:2_, 281:17

**relating** [3]_ - 170:8_, 170:13_, 276:17

**relatively** [1]_ - 17:15

**release** [1]_ - 40:5

**reliable** [1]_ - 36:7

**remain** [8]_ - 54:5_, 119:18_, 133:22_, 134:19_, 211:8_, 211:12_, 216:17_, 278:2

**remarks** [1]_ - 281:10

**remember** [10]_ - 57:21_, 75:25_, 76:1_, 80:8_, 82:12_, 82:16_, 135:4_, 189:19_, 218:8_, 228:1

**remembering** [2]_ - 201:22_, 212:6

**remind** [15]_ - 25:2_, 89:25_, 125:2_, 135:6_, 143:8_, 143:13_, 147:12_, 199:22_, 202:3_, 208:14_, 232:6_, 240:6_, 262:21_, 280:23_, 284:5

**reminder** [1]_ - 135:13

**remote** [1]_ - 109:9

**remove** [2]_ - 85:5_, 187:18

**Renee** [1]_ - 3:15

**rent** [1]_ - 172:25

**repeat** [2]_ - 82:11_, 116:24

**repeated** [6]_ - 39:9_, 39:13_, 39:14_, 40:16_, 58:20_, 58:22

**repeats** [3]_ - 39:8_, 58:20_, 58:21

**rephrase** [1]_ - 225:19

**replaces** [1]_ - 152:14

**reply** [2]_ - 139:5_, 140:19

**report** [64]_ - 31:25_, 35:15_, 35:22_, 45:16_, 52:2_, 56:15_, 80:18_, 80:21_, 81:19_, 81:21_, 82:21_, 85:16_, 86:23_, 89:11_, 91:10_, 91:11_, 91:13_, 91:19_, 91:25_, 92:24_, 94:6_, 94:7_, 94:17_, 94:18_, 94:24_, 96:5_, 96:7_, 96:8_, 100:6

_, 102:18_, 106:3_, 110:14_, 110:15_, 112:6_, 120:7_, 120:8_, 120:14_, 122:11_, 122:12_, 124:3_, 124:4_, 125:15_, 125:16_, 127:5_, 141:20_, 143:19_, 148:5_, 149:1_, 149:22_, 151:6_, 152:1_, 152:2_, 153:21_, 153:22_, 154:16_, 176:24_, 187:19_, 189:1

**reported** [2]_ - 82:22_, 92:24

**reporter** [1]_ - 100:3

**reports** [12]_ - 79:15_, 80:8_, 80:10_, 80:20_, 93:2_, 93:6_, 113:21_, 113:22_, 113:23_, 131:12_, 131:14

**represent** [4]_ - 21:3_, 57:17_, 58:5_, 61:17

**representation** [1]_ - 58:13

**represented** [1]_ - 146:22

**request** [7]_ - 4:19_, 49:16_, 78:16_, 78:18_, 281:16_, 284:16

**require** [2]_ - 106:25_, 284:11

**required** [3]_ - 34:20_, 78:15_, 106:21

**requires** [1]_ - 28:22

**research** [6]_ - 7:8_, 10:7_, 11:4_, 11:10_, 132:12_, 281:1

**Research** [4]_ - 7:15_, 9:13_, 10:5_, 11:9

**residence** [4]_ - 230:2_, 244:9_, 244:10

**resides** [1]_ - 135:15

**residing** [1]_ - 273:4

**resistance** [9]_ - 11:12_, 11:15_, 12:6_, 12:10_, 12:18_, 12:23_, 17:17_, 20:2_, 21:23

**resisting** [1]_ - 22:17

**resolution** [1]_ - 160:23

**resort** [2]_ - 89:4_, 143:17

**resource** [2]_ - 9:3_, 109:25

**resources** [3]_ - 180:12_, 180:15_, 199:24

**respect** [1]_ - 5:17

**respective** [1]_ - 155:22

**respond** [2]_ - 33:4_, 169:25

**response** [9]_ - 5:9_, 32:24_, 33:4_, 138:21_, 138:23_, 139:3_, 140:16_, 140:17_, 282:24

**Response** [3]_ - 77:12_, 82:18_, 83:2

**responsibilities** [4]_ - 9:12_, 9:16_, 77:10_, 77:13

**responsible** [1]_ - 82:9

**rest** [3]_ - 61:2_, 163:18_, 215:3

**resting** [1]_ - 283:20

**restroom** [1]_ - 277:17

**result** [3]_ - 45:12_, 72:13_, 142:10

**results** [20]_ - 21:3_, 23:25_, 31:22_, 31:24_, 36:6_, 40:22_, 41:7_, 47:15_, 51:11_, 54:17_, 63:13_, 66:1_, 68:5_, 69:16_, 70:13_, 70:19_, 71:9_, 71:23_, 73:2_, 142:5

**resume** [8]_ - 6:8_, 53:19_, 53:25_, 114:10_, 134:6_, 280:22_, 281:11_, 285:5

**retain** [1]_ - 78:3

**retarded** [1]_ - 139:4

**retention** [2]_ - 181:2_, 238:5

**retirements** [1]_ - 170:5

**retrieve** [3]_ - 16:8_, 30:4_, 162:24

**retrieved** [1]_ - 141:16

**return** [3]_ - 53:17_, 119:15_, 277:23

**returning** [2]_ - 127:3_, 147:5

**review** [20]_ - 13:9_, 13:11_, 25:4_, 31:22_, 35:16_, 35:17_, 35:18_, 35:21_, 51:12_, 51:15_, 55:9_, 111:21_, 114:4_, 114:9_, 116:3_, 131:5_, 143:20_, 147:23_, 158:19_, 186:4

**reviewed** [5]_ - 20:14_, 45:16_, 113:20_, 113:24_, 216:17

**reviewing** [3]_ - 113:16_,

143:23_, 146:3

**reviews** [2]_ - 35:14_, 35:16

**revised** [6]_ - 132:4_, 132:23_, 133:1_, 133:5_, 133:10_, 134:23

**revisit** [1]_ - 283:11

**rhyme** [2]_ - 181:19_, 191:20

**rid** [1]_ - 130:2

**Ridge** [2]_ - 212:22

**rifle** [24]_ - 8:1_, 28:4_, 28:5_, 58:14_, 58:16_, 60:23_, 61:13_, 63:4_, 64:11_, 64:14_, 64:15_, 64:16_, 65:9_, 65:21_, 65:22_, 66:3_, 67:6_, 67:16_, 69:3_, 70:1_, 72:9_, 122:24_, 124:13_, 161:12

**rifles** [1]_ - 111:22

**right-hand** [6]_ - 127:21_, 128:12_, 129:2_, 138:5_, 140:12_, 233:4

**ring** [1]_ - 268:7

**rise** [6]_ - 52:15_, 114:11_, 132:15_, 210:23_, 277:21_, 281:12

**risk** [1]_ - 11:25

**Road** [1]_ - 265:21

**road** [4]_ - 3:24_, 206:10_, 206:12_, 280:3

**roads** [1]_ - 266:5

**role** [1]_ - 43:13

**Ronnie** [1]_ - 283:16

**rough** [1]_ - 279:19

**roughly** [18]_ - 14:13_, 20:6_, 27:24_, 200:23_, 201:1_, 213:8_, 214:3_, 221:10_, 225:6_, 225:8_, 249:25_, 254:8_, 255:1_, 255:2_, 257:2_, 258:25_, 260:9_, 268:25

**round** [1]_ - 20:5

**rounds** [3]_ - 20:7_, 23:5_, 25:13

**Routh** [73]_ - 3:4_, 3:12_, 3:13_, 4:1_, 4:15_, 26:23_, 28:10_, 29:10_, 37:6_, 48:23_, 49:1_, 49:2_, 49:9_, 50:22_, 53:13_, 54:10_, 55:15_, 56:5_, 56:22_, 57:18_, 60:8_, 60:22_, 61:5_, 61:12_, 62:9_,

62:14_, 63:2_, 64:4_, 66:3_, 66:6_, 68:6_, 68:8_, 69:19_, 69:21_, 70:22_, 70:24_, 71:25_, 72:3_, 73:4_, 73:6_, 74:25_, 92:7_, 102:6_, 104:12_, 110:24_, 114:4_, 114:8_, 114:18_, 115:12_, 115:25_, 116:7_, 117:6_, 127:1_, 128:14_, 130:21_, 131:21_, 133:2_, 133:4_, 133:25_, 134:3_, 134:14_, 136:6_, 140:7_, 140:11_, 144:20_, 148:11_, 162:9_, 163:1_, 170:21_, 270:24_, 281:16_, 284:15_, 284:21

**ROUTH** [56]_ - 3:12_, 4:2_, 4:7, 4:11_, 4:13_, 4:17_, 4:24_, 5:6_, 5:9_, 5:21_, 12:21_, 21:10_, 26:3, 26:17, 26:21, 27:1_, 27:4_, 27:5_, 28:17, 29:2_, 37:7_, 53:16_, 56:7_, 75:1_, 75:3_, 76:2_, 92:8_, 110:25_, 114:6_, 114:23_, 116:1_, 116:10_, 116:13_, 117:8_, 117:11_, 131:22_, 133:7_, 133:16_, 133:20_, 134:1_, 134:4_, 134:15_, 144:21_, 148:12_, 162:10_, 163:2_, 163:8_, 164:1_, 170:22_, 278:5_, 278:7_, 280:12_, 280:14_, 281:19_, 281:24_, 284:22

**Routh's** [6]_ - 68:4_, 69:15_, 70:16_, 70:18_, 71:22_, 73:1

**routine** [1]_ - 42:25

**routinely** [3]_ - 19:22_, 19:25_, 237:18

**row** [30]_ - 92:20_, 96:10_, 97:17_, 98:12_, 98:13_, 98:14_, 98:16_, 98:23_, 98:24_, 99:19_, 99:24_, 99:25_, 100:13_, 100:16_, 101:6_, 101:7_, 101:23_, 102:22_, 104:3_, 107:13_, 121:13_, 121:18_, 126:12_, 126:14_, 128:7_, 130:12_, 142:15_, 152:3_, 234:19

**rows** [1]_ - 121:25

**Royal** [1]_ - 155:6

**rubbing** [1]_ - 42:2

**rule** [3]_ - 28:13_, 28:22_, 28:24

**Rule** [3]_ - 37:4_, 52:7_, 281:17

**rules** [1]_ - 29:1

**Rules** [1]_ - 29:11

**rulings** [1]_ - 26:13

**run** [8]_ - 45:23_, 50:16_, 79:8_, 80:13_, 92:19_, 218:11_, 272:5_, 272:6

**running** [3]_ - 43:17_, 45:18_, 71:5

**Ryan** [20]_ - 3:4_, 3:12_, 48:23_, 49:1_, 49:2_, 55:15_, 56:22_, 60:22_, 61:12_, 62:14_, 102:6_, 104:12_, 127:1_, 128:14_, 130:21_, 136:6_, 137:23_, 140:7_, 140:11_, 151:19

## S

**SAAMI** [1]_ - 10:21

**sales** [1]_ - 121:15

**saliva** [1]_ - 41:12

**sample** [33]_ - 40:8_, 41:14_, 41:16_, 41:17_, 41:25_, 42:2_, 42:4_, 42:10_, 42:15_, 46:13_, 46:16_, 49:2_, 49:3_, 49:4_, 49:8_, 49:14_, 50:15_, 50:16_, 50:18_, 50:19_, 54:18_, 55:15_, 56:21_, 58:23_, 58:25_, 60:10_, 62:12_, 62:20_, 63:10_, 63:11_, 193:13

**samples** [7]_ - 41:5_, 42:6_, 42:7_, 42:11_, 44:4_, 50:14_, 50:21

**Samsung** [2]_ - 125:3_, 135:9

**Samuel** [1]_ - 283:17

**satellite** [4]_ - 127:25_, 128:21_, 128:24_, 129:4

**satisfactory** [1]_ - 116:10

**save** [1]_ - 123:17

**saving** [1]_ - 123:17

**savings** [1]_ - 93:20

**saw** [11]_ - 108:11_, 209:18_, 212:6_, 212:9_, 220:14_, 221:6_, 241:12_, 245:4_, 251:7_, 258:15_, 260:5

**scale** [19]_ - 47:1_, 47:12_, 47:14_, 47:16_, 66:14_, 193:21_, 193:22_, 194:2_, 194:3_, 194:5_, 200:18_,

200:23_, 201:2_, 201:7_, 202:16_, 210:6_, 220:3_, 221:10_, 237:7

**scales** [1]_ - 47:17

**scan** [1]_ - 171:12

**scanning** [1]_ - 173:23

**scenario** [1]_ - 47:9

**scenarios** [2]_ - 47:6_, 47:7

**Scene** [1]_ - 33:4

**scene** [4]_ - 18:21_, 32:24_, 37:2_, 37:22

**scenes** [1]_ - 33:5

**science** [1]_ - 32:8

**sciences** [1]_ - 93:14

**scientific** [4]_ - 39:2_, 43:11_, 48:3_, 48:7

**scientifically** [1]_ - 43:10

**scientists** [1]_ - 34:3

**scope** [5]_ - 26:13_, 28:6_, 28:8_, 28:11_, 28:16

**Scott** [2]_ - 6:5_, 6:17

**SCOTT** [2]_ - 6:17, 6:22

**scrambled** [1]_ - 101:14

**scratched** [1]_ - 24:18

**screen** [31]_ - 22:24_, 24:3_, 55:4_, 91:5_, 110:10_, 124:2_, 129:12_, 142:24_, 143:21_, 144:13_, 156:20_, 156:23_, 156:24_, 157:2_, 157:3_, 157:5_, 157:11_, 161:18_, 194:9_, 194:25_, 199:16_, 201:1_, 210:7_, 223:16_, 231:10_, 237:9_, 252:13_, 261:11_, 268:18_, 274:21_, 277:6

**screens** [4]_ - 89:9_, 143:18_, 188:14

**screenshot** [3]_ - 127:8_, 129:16_, 157:7

**scribbled** [1]_ - 125:21

**SE33** [1]_ - 63:12

**search** [15]_ - 78:20_, 78:21_, 79:1_, 81:23_, 120:23_, 121:22_, 123:16_, 142:5_, 178:11_, 178:13_, 178:18_, 180:25_, 186:1_, 278:15_, 278:16

**searches** [3]_ - 120:11_, 156:13_, 158:4

**seat** [9]_ - 6:1_, 52:17_, 53:22_, 54:2_, 119:17_, 134:19_, 211:11_, 278:2_, 281:14

**seated** [10]_ - 3:2_, 6:14_, 30:18_, 76:19_, 114:19_, 116:6_, 132:20_, 134:8_, 164:18_, 211:5

**second** [26]_ - 3:23_, 23:18_, 29:4_, 35:21_, 40:3_, 47:9_, 59:19_, 59:21_, 60:16_, 78:19_, 107:10_, 110:16_, 120:3_, 122:13_, 142:15_, 154:11_, 154:20_, 155:17_, 157:12_, 158:6_, 158:22_, 159:10_, 168:15_, 168:16_, 223:16_, 273:16

**seconds** [3]_ - 252:20_, 253:5_, 265:20

**Secret** [1]_ - 270:8

**section** [4]_ - 91:17_, 92:22_, 96:23_, 99:8

**sections** [1]_ - 53:4

**sector** [8]_ - 174:17_, 183:11_, 191:21_, 191:22_, 194:16_, 237:1_, 237:4_, 262:4

**sectors** [2]_ - 191:17_, 191:19

**secure** [1]_ - 83:7

**secured** [1]_ - 83:9

**security** [6]_ - 8:5_, 9:3_, 53:23_, 83:11_, 90:3

**SECURITY** [2]_ - 5:24_, 134:17

**see** [164]_ - 14:9_, 14:21_, 18:2_, 22:23_, 22:25_, 24:21_, 25:3_, 29:12_, 31:23_, 35:19_, 36:21_, 38:9_, 50:12_, 52:21_, 55:4_, 56:13_, 58:3_, 58:7_, 59:20_, 61:6_, 61:8_, 61:19_, 64:10_, 64:14_, 72:21_, 74:14_, 74:18_, 79:8_, 85:6_, 88:25_, 92:14_, 93:5_, 99:19_, 102:4_, 102:12_, 102:13_, 106:12_, 106:15_, 106:16_, 107:13_, 109:2_, 109:5_, 110:16_, 111:8_, 114:17_, 122:13_, 123:10_, 125:12_, 125:21_, 126:14_, 129:17_, 130:12_, 132:17_, 132:22_, 133:4_, 136:7_, 136:25_, 138:4_, 144:10_, 145:4_,

147:3_, 150:17_, 152:6_, 154:21_, 156:17_, 156:18_, 156:19_, 156:20_, 157:4_, 157:19_, 157:20_, 158:5_, 161:18_, 173:3_, 174:14_, 177:3_, 177:5_, 181:23_, 183:7_, 184:11_, 188:12_, 188:13_, 189:15_, 192:4_, 192:17_, 194:18_, 195:5_, 195:19_, 195:20_, 195:24_, 195:25_, 196:2_, 196:4_, 196:8_, 196:18_, 197:22_, 197:24_, 198:8_, 198:14_, 198:23_, 199:3_, 200:17_, 201:1_, 202:3_, 202:6_, 202:16_, 202:19_, 203:24_, 205:3_, 205:10_, 205:14_, 209:8_, 213:4_, 217:7_, 217:22_, 218:15_, 219:17_, 219:18_, 223:10_, 224:9_, 226:3_, 229:21_, 230:12_, 236:21_, 237:9_, 238:8_, 238:25_, 239:6_, 239:21_, 239:23_, 239:24_, 248:25_, 249:4_, 251:15_, 251:18_, 253:20_, 254:23_, 254:24_, 256:1_, 258:13_, 260:3_, 266:16_, 267:1_, 267:12_, 268:21_, 269:15_, 269:22_, 270:13_, 271:18_, 271:22_, 271:25_, 272:18_, 272:19_, 274:17_, 274:25_, 283:13

**seeing** [37]_ - 21:21_, 22:1_, 22:8_, 24:6_, 24:8_, 46:16_, 58:12_, 62:11_, 176:6_, 177:21_, 183:18_, 191:8_, 192:7_, 196:13_, 207:25_, 209:22_, 212:5_, 215:16_, 218:22_, 226:18_, 234:8_, 234:25_, 236:17_, 236:18_, 236:19_, 240:16_, 241:19_, 245:8_, 245:17_, 252:14_, 257:4_, 257:6_, 257:17_, 258:12_, 259:7_, 259:18_, 265:5

**segment** [4]_ - 113:7_, 114:9_, 119:10_, 138:7

**seized** [1]_ - 143:10

**select** [2]_ - 11:6_, 173:19

**selected** [2]_ - 96:10_, 96:12

**selecting** [1]_ - 222:20

**seller** [1]_ - 121:6

**semen** [4]_ - 37:18_,

37:25_, 38:3_, 41:12

**semester's** [1]_ - 168:13

**semiautomated** [1]_ - 41:4

**semiautomatic** [1]_ - 28:4

**send** [5]_ - 26:9_, 140:24_, 153:8_, 171:15_, 180:8

**sender** [1]_ - 138:12

**sending** [3]_ - 136:18_, 138:11_, 154:18

**sends** [1]_ - 136:24

**sense** [1]_ - 11:17

**sent** [8]_ - 18:10_, 137:2_, 137:3_, 137:11_, 137:12_, 138:18_, 166:23_, 216:10

**separate** [4]_ - 15:19_, 82:24_, 172:19_, 172:20

**separates** [1]_ - 40:15

**separation** [1]_ - 40:13

**September** [53]_ - 48:12_, 250:6_, 250:10_, 251:11_, 251:17_, 252:12_, 252:17_, 253:14_, 253:16_, 253:19_, 254:10_, 254:13_, 254:18_, 255:16_, 256:11_, 256:12_, 256:21_, 256:25_, 257:2_, 257:18_, 257:25_, 258:5_, 258:7_, 258:10_, 258:16_, 259:5_, 259:8_, 259:15_, 259:19_, 260:16_, 260:19_, 262:14_, 263:1_, 264:4_, 264:18_, 265:6_, 266:18_, 268:21_, 269:9_, 269:11_, 269:17_, 272:22_, 273:18_, 274:3_, 274:19_, 275:20_, 275:21_, 275:22_, 275:23_, 275:24_, 275:25_, 276:1_, 277:12

**septillion** [5]_ - 66:3_, 66:21_, 66:22_, 67:1_, 71:25

**sequence** [2]_ - 124:17_, 265:3

**sequences** [1]_ - 40:16

**sequential** [5]_ - 112:14_, 112:17_, 113:4_, 113:5_, 117:2

**series** [6]_ - 23:6_, 61:15_, 119:20_, 132:1_, 234:19_, 271:4

**serology** [11]_ - 32:1_, 32:3_, 34:5_, 34:9_, 34:17_

_, 37:1_, 37:5_, 37:14_, 37:15_, 37:21_, 68:10

**servers** [1]_ - 93:17

**service** [10]_ - 25:20_, 78:16_, 139:24_, 145:9_, 145:11_, 146:4_, 146:14_, 150:7_, 209:25_, 227:3

**Service** [1]_ - 270:8

**services** [8]_ - 78:18_, 100:11_, 100:17_, 108:17_, 108:18_, 108:21_, 108:23_, 109:1

**Services** [1]_ - 108:14

**servicing** [1]_ - 173:11

**session** [30]_ - 176:10_, 176:14_, 176:21_, 176:22_, 176:23_, 177:2_, 179:9_, 181:13_, 196:18_, 197:13_, 199:21_, 199:22_, 202:15_, 222:7_, 222:12_, 222:13_, 222:19_, 228:15_, 229:1_, 232:17_, 235:2_, 244:22_, 244:23_, 252:21_, 263:3_, 270:15_, 271:5_, 271:10_, 284:19_, 285:3

**sessions** [4]_ - 168:12_, 181:15_, 210:1_, 222:7

**set** [8]_ - 10:10_, 22:23_, 23:1_, 84:14_, 87:16_, 88:1_, 145:14_, 179:23

**setting** [4]_ - 88:3_, 92:25_, 146:10_, 151:16

**setup** [2]_ - 87:16_, 151:15

**seven** [1]_ - 67:4

**several** [3]_ - 51:2_, 73:8_, 113:8

**sex** [7]_ - 56:23_, 57:14_, 58:7_, 61:18_, 61:21_, 62:1_, 70:13

**sex-determining** [5]_ - 56:23_, 58:7_, 61:18_, 61:21_, 62:1

**sex-typing** [1]_ - 70:13

**shaded** [3]_ - 193:2_, 193:5_, 239:16

**shades** [1]_ - 239:23

**shan't** [1]_ - 139:9

**shape** [5]_ - 17:14_, 192:6_, 237:4_, 252:2_, 264:24

**shaped** [1]_ - 17:19

**shapes** [3]_ - 78:20_, 251:25_, 252:1

**share** [2]_ - 38:21_, 172:21

**shared** [1]_ - 38:18

**shares** [1]_ - 38:22

**sharing** [1]_ - 57:20

**sheriff** [1]_ - 9:8

**shift** [1]_ - 218:12

**SHIPLEY** [276]_ - 3:7_, 3:19_, 5:4_, 6:3, 6:19, 6:21, 6:25, 12:17_, 12:24, 13:1_, 13:16, 13:19_, 14:9, 14:11_, 15:8, 15:11_, 16:8, 16:10_, 20:18, 20:22_, 21:7_, 21:15_, 21:17_, 21:20_, 24:2, 24:5_, 25:2_, 25:7, 25:8_, 25:24_, 26:13_, 28:8_, 29:15_, 30:1_, 30:4_, 164:9, 164:23, 165:3_, 165:8, 165:9_, 170:25, 171:1_, 186:12_, 186:19, 186:20_, 187:25_, 188:4_, 188:10, 188:11_, 188:13_, 188:16_, 188:22_, 188:24_, 190:23_, 191:3_, 191:5, 191:7_, 194:8, 194:10_, 195:17_, 196:23_, 196:24_, 201:13, 201:16_, 204:8_, 204:13_, 204:16_, 204:19_, 204:23_, 204:25, 205:1_, 205:9, 205:13_, 205:21_, 205:22_, 206:21, 206:23_, 207:14_, 207:18_, 208:10_, 208:11_, 209:6, 209:7_, 210:20_, 211:8_, 211:14_, 211:19_, 212:2, 212:4_, 213:11, 213:13_, 213:25_, 214:1_, 214:13_, 214:17, 214:21_, 215:6_, 215:9_, 215:11_, 215:13, 215:15_, 217:2, 217:3_, 217:16, 217:17_, 218:18, 218:20_, 220:12, 220:13_, 220:15, 220:16_, 221:25, 222:1_, 223:6, 223:9_, 223:11, 223:13_, 223:20_, 223:21_, 225:2, 225:4_, 225:23, 226:1_, 226:5_, 226:6_, 226:12, 226:14_, 227:6, 227:7_, 227:11, 227:13_, 227:17, 227:19_, 228:8, 228:9_, 230:4, 230:6_, 231:9, 231:12_, 232:10, 232:12_, 233:13, 233:15_, 233:19, 233:21_, 234:2, 234:3_, 234:22, 234:24_, 235:13, 235:15_, 236:2, 236:4_, 236:8, 236:9_, 236:14,

236:16_, 238:22, 238:24_, 240:13, 240:15_, 241:4, 241:6_, 241:16_, 241:17_, 241:25_, 242:3_, 242:16_, 242:17_, 243:1, 243:2_, 243:19, 243:20_, 244:18_, 244:21_, 245:2_, 245:15, 245:16_, 246:1_, 246:8_, 246:18, 246:20_, 247:5_, 247:7_, 247:13, 247:14_, 247:23, 247:25_, 248:7_, 248:11, 248:23, 248:24_, 249:7, 249:8_, 249:16, 249:18_, 250:5, 250:7_, 251:4, 251:6_, 251:13, 251:14_, 252:10, 252:11_, 253:12, 253:13_, 254:3, 254:4, 254:14, 254:16_, 255:12, 255:14_, 256:9, 256:10, 256:18, 256:19_, 257:16_, 257:21_, 258:1, 258:3_, 258:18_, 258:21_, 259:3, 259:4_, 260:1, 260:2_, 260:14, 260:15_, 261:12_, 261:14_, 261:23 _, 262:7_, 262:11, 262:12 _, 262:23_, 262:25_, 263:12, 263:14, 263:15_, 263:23, 263:24_, 264:13_, 264:14_, 265:1, 265:2_, 265:11, 265:13, 267:5_, 267:7, 267:10_, 268:17, 268:19_, 269:4, 269:5_, 269:13, 269:14_, 270:11_, 270:12_, 271:1, 271:2_, 271:15, 271:17_, 272:12, 272:13_, 273:12, 273:14 _, 273:24, 273:25_, 274:14, 274:16_, 276:25, 277:1_, 277:5, 277:7_, 277:14_, 280:16

**Shipley** [6]_ - 3:7_, 3:18_, 190:20_, 210:19_, 214:11 _, 282:3

**shirt** [1]_ - 158:7

**shoes** [2]_ - 123:3_, 124:14

**shoot** [2]_ - 26:11_, 27:7

**short** [8]_ - 9:8_, 38:11_, 39:8_, 39:9_, 40:11_, 58:6 _, 58:20_, 181:7

**short-lived** [1]_ - 181:7

**shorten** [1]_ - 267:3

**shortly** [1]_ - 256:15

**shot** [5]_ - 11:21_, 22:4_, 23:7_, 25:13_, 219:23

**shots** [8]_ - 11:22_, 11:23 _, 11:24_, 24:10_, 24:17_,

25:9_, 25:16_, 25:18

**shoulder** [2]_ - 70:10_, 70:21

**show** [41]_ - 15:6_, 34:14 _, 52:7_, 53:4_, 83:14_, 84:6_, 85:7_, 85:18_, 86:9 _, 86:24_, 88:4_, 90:23_, 91:19_, 110:3_, 117:20_, 123:19, 127:17_, 128:10 _, 130:22_, 131:1_, 135:16, 142:20_, 144:5_, 149:8_, 158:12_, 159:22_, 159:23_, 160:4_, 176:10_, 176:25_, 190:7_, 201:8_, 208:5_, 211:22_, 216:9_, 225:18_, 242:18_, 261:7_, 265:3_, 265:4_, 273:15

**showed** [3]_ - 135:3_, 207:21_, 243:22

**shower** [2]_ - 5:11_, 5:13

**showing** [15]_ - 22:2_, 107:19_, 108:7_, 141:5_, 156:10_, 200:21_, 214:23 _, 216:13_, 218:13_, 219:4_, 222:16_, 224:2_, 232:21_, 247:18_, 268:13

**shown** [4]_ - 68:14_, 74:12_, 199:9_, 261:15

**shows** [15]_ - 81:3_, 105:14_, 110:15_, 128:3_, 209:12_, 225:6_, 232:22_, 246:13_, 252:25_, 255:20 _, 255:21_, 265:14

**sic** [1]_ - 48:16

**side** [20]_ - 8:7_, 12:3_, 18:2_, 22:4_, 128:12_, 172:6_, 174:5_, 174:6_, 174:15_, 174:16_, 176:9_, 176:21_, 179:2_, 180:5_, 192:21_, 223:4_, 233:1_, 233:4_, 236:24_, 244:8

**sided** [3]_ - 191:12_, 191:18_, 191:25

**sight** [3]_ - 174:8_, 174:17 _, 174:19

**signal** [10]_ - 171:15_, 173:25_, 175:2_, 182:3_, 182:5_, 182:7_, 182:10_, 222:20_, 222:22

**signaling** [4]_ - 271:4_, 271:5_, 271:10

**signals** [1]_ - 180:9

**significance** [6]_ - 95:14 _, 199:1_, 199:9_, 230:22 _, 239:15_, 239:17

**significant** [3]_ - 96:3_,

248:15_, 250:25

**Sihvola** [2]_ - 3:15_, 284:8

**silver** [1]_ - 157:20

**SIM** [5]_ - 85:5_, 152:11_, 152:12_, 152:14_, 152:19

**similar** [16]_ - 15:16_, 15:22_, 15:23_, 32:12_, 32:25_, 35:9_, 38:19_, 58:19_, 65:3_, 194:14_, 230:23_, 240:19_, 244:19 _, 258:15_, 258:17

**simple** [2]_ - 139:23_, 173:12

**simplest** [1]_ - 173:14

**simply** [1]_ - 137:24

**simultaneous** [2]_ - 182:16_, 265:18

**single** [8]_ - 42:23_, 56:23 _, 65:12_, 70:17_, 96:21_, 113:23_, 189:20_, 246:5

**single-source** [1]_ - 56:23

**singular** [1]_ - 242:11

**sit** [5]_ - 36:21_, 282:13_, 282:14_, 282:23_, 283:4

**site** [13]_ - 111:21_, 167:5 _, 169:1_, 171:14_, 173:24_, 178:2_, 181:4_, 189:5_, 189:12_, 192:1_, 239:7_, 239:13

**sites** [5]_ - 190:14_, 234:15_, 235:25_, 239:10 _, 239:11

**sitting** [3]_ - 38:23_, 129:25_, 283:2

**situation** [2]_ - 5:10_, 244:19

**six** [11]_ - 32:22_, 33:19_, 78:9_, 166:20_, 181:20_, 191:25_, 213:14_, 214:2_, 221:6_, 283:8_, 283:13

**six-sided** [1]_ - 191:25

**size** [6]_ - 15:23_, 17:8_, 17:20_, 20:8_, 40:15_, 75:24

**sized** [1]_ - 17:20

**skin** [1]_ - 41:12

**skip** [5]_ - 100:13_, 254:12 _, 259:11_, 259:13_, 271:15

**SKS** [2]_ - 26:7_, 28:3

**slice** [1]_ - 200:24

**slide** [166]_ - 188:18_,

191:6_, 191:8_, 192:4_, 194:3_, 194:8_, 194:13_, 194:15_, 195:17_, 196:23 _, 198:22_, 201:14_, 201:18_, 201:22_, 205:25 _, 206:21_, 207:14_, 207:21_, 208:10_, 208:13 _, 208:14_, 208:24_, 209:6_, 209:16_, 211:17_, 211:21_, 212:2_, 212:6_, 212:9_, 213:4_, 213:12_, 213:25_, 214:2_, 214:22_, 215:6_, 217:2_, 217:12_, 217:16_, 218:18_, 219:1_, 220:12_, 220:14_, 220:20 _, 221:5_, 221:25_, 224:9 _, 224:13_, 224:18_, 225:3_, 225:6_, 225:24_, 226:5_, 226:7_, 226:15_, 226:18_, 227:17_, 227:18 _, 228:8_, 228:10_, 228:25_, 229:13_, 230:4_, 230:8_, 232:10_, 232:11_, 233:10_, 234:2_, 234:8_, 234:23_, 235:13_, 235:22 _, 236:3_, 236:8_, 236:14 _, 236:18_, 238:22_, 239:5_, 240:13_, 240:14_, 240:18_, 241:4_, 241:13_, 242:7_, 242:16_, 242:18_, 243:1_, 243:19_, 243:22_, 244:18_, 245:4_, 246:1_, 246:13_, 246:18_, 247:5_, 247:13_, 247:23_, 248:7_, 248:12_, 248:23_, 248:25 _, 249:7_, 249:9_, 249:17 _, 249:20_, 249:24_, 250:5_, 250:9_, 250:14_, 251:1_, 251:4_, 251:8_, 251:13_, 251:15_, 252:10 _, 252:15_, 253:12_, 254:3_, 254:14_, 255:13_, 255:20_, 256:9_, 256:18_, 256:24_, 257:5_, 257:16_, 257:22_, 257:23_, 258:1_, 258:18_, 259:3_, 259:18_, 260:14_, 260:21_, 261:6_, 261:12_, 261:23_, 262:11 _, 262:23_, 263:14_, 263:23_, 264:13_, 264:15 _, 265:1_, 265:10_, 265:12_, 265:14_, 266:2_, 266:16_, 267:8_, 268:22_, 269:4_, 269:6_, 269:13_, 270:11_, 271:1_, 272:12_, 273:12_, 273:24_, 274:14 _, 277:2_, 277:6

**slides** [26]_ - 188:6_, 189:25_, 190:1_, 197:1_, 197:3_, 201:7_, 206:11_,

207:20_, 208:4_, 209:16_, 214:16_, 214:23_, 219:18_, 226:13_, 227:11_, 238:9_, 241:25_, 255:22_, 260:6_, 262:8_, 265:3_, 265:22_, 272:17_, 272:18_, 274:8_, 276:13

**slideshow** [7]_ - 190:4_, 190:25, 196:13, 212:12_, 239:25, 273:8_, 276:6

**slight** [1]_ - 39:1

**slot** [1]_ - 180:11

**slots** [2]_ - 97:8_, 97:9

**slowly** [1]_ - 100:3

**small** [4]_ - 80:25_, 82:3_, 223:7_, 274:25

**smaller** [4]_ - 15:20_, 17:21_, 118:23_, 171:22

**smartphones** [1]_ - 160:25

**Smith** [3]_ - 101:1_, 101:9_, 108:7

**smooth** [1]_ - 44:10

**SMS** [5]_ - 139:23_, 153:2_, 196:1_, 196:17_, 246:6

**snapped** [1]_ - 205:6

**snapshot** [3]_ - 79:10_, 212:9_, 243:21

**snapshots** [2]_ - 151:11_, 272:15

**sniper** [2]_ - 9:18_, 9:19

**so..** [59]_ - 4:3_, 166:10_, 166:18_, 169:4_, 169:18_, 169:24_, 170:11_, 172:8_, 174:9_, 175:6_, 175:18_, 176:9_, 176:24_, 178:1_, 179:2_, 179:10_, 180:6_, 180:19_, 181:8_, 183:18_, 184:21_, 193:11_, 194:1_, 194:23_, 196:11_, 198:18_, 200:2_, 203:8_, 205:5_, 208:21_, 210:5_, 210:13_, 212:13_, 220:11_, 222:25_, 225:16_, 229:17_, 231:7_, 232:1_, 232:5_, 238:7_, 238:12_, 242:15_, 245:13_, 249:5_, 251:23_, 252:5_, 253:21_, 259:6_, 259:24_, 260:20_, 261:21_, 262:6_, 263:11_, 264:16_, 273:7, 279:7_, 279:16_, 280:1

**soft** [1]_ - 7:24

**software** [28]_ - 46:20_, 46:22_, 48:2_, 48:3_, 49:10_, 49:13_, 50:7_,

50:16_, 79:19_, 80:20_, 80:22_, 81:2_, 81:9_, 81:11_, 81:12_, 81:14_, 81:16_, 82:5_, 85:13_, 88:25_, 89:4_, 92:23_, 95:12_, 98:19_, 99:12_, 101:10_, 143:15_, 152:15

**software's** [1]_ - 81:9

**solemnly** [4]_ - 6:10, 30:14, 76:15, 164:14

**someone** [6]_ - 47:9_, 137:6_, 157:20_, 158:13_, 279:13_, 280:6

**sometime** [3]_ - 269:25_, 272:7_, 280:1

**sometimes** [18]_ - 8:12_, 23:20, 23:21, 31:25_, 36:21, 97:9_, 107:6_, 157:4_, 160:23_, 171:2_, 172:21_, 173:1_, 181:20_, 182:14_, 182:17_, 184:11_, 191:25_, 206:14

**somewhat** [1]_ - 44:4

**somewhere** [1]_ - 27:16

**son** [6]_ - 4:2_, 4:3_, 4:5_, 4:15_, 4:20_, 281:17

**soon** [2]_ - 78:14_, 141:25

**SOPs** [1]_ - 35:7

**sorry** [28]_ - 26:6_, 34:2_, 55:19_, 57:24_, 73:20_, 75:6_, 92:2_, 102:7_, 103:25_, 115:3_, 142:23_, 145:23_, 163:9_, 200:20_, 207:6_, 207:21_, 220:2_, 220:25_, 224:17_, 226:10_, 229:7_, 234:17_, 235:6_, 239:2_, 255:7_, 257:6_, 261:10_, 277:5

**sort** [15]_ - 14:20_, 22:16_, 24:11_, 80:19_, 87:16_, 121:4_, 121:5_, 158:8_, 193:17_, 209:20_, 220:4_, 243:21_, 255:3_, 272:1

**sorts** [1]_ - 280:4

**sound** [1]_ - 8:4

**sounds** [3]_ - 163:24_, 279:8_, 280:11

**source** [12]_ - 42:23_, 56:23_, 63:4_, 65:12_, 70:17_, 95:13_, 96:9_, 98:16_, 101:18_, 109:9_, 179:19

**sources** [1]_ - 65:13

**South** [12]_ - 196:13_, 214:8_, 216:14_, 228:16_, 228:21_, 229:13_, 229:23

_, 232:23_, 260:9_, 260:10_, 272:23_, 274:8

**south** [15]_ - 177:25_, 197:19_, 209:23_, 211:24_, 212:17_, 221:1_, 221:4_, 230:17_, 234:12_, 234:14_, 235:21_, 256:4_, 264:19_, 270:2_, 271:24

**southeast** [11]_ - 191:22_, 197:25_, 224:23_, 243:14_, 253:25_, 264:21_, 266:21_, 267:19_, 270:2_, 275:5_, 276:15

**Southern** [8]_ - 206:6_, 206:8_, 206:10_, 206:14_, 221:16_, 224:3_, 235:4_, 252:24

**southwest** [1]_ - 244:2

**space** [5]_ - 82:24_, 137:8_, 147:4_, 172:21_, 172:25

**spaghetti** [1]_ - 250:20

**span** [1]_ - 257:2

**Spanish** [3]_ - 141:21_, 142:3_, 282:7

**speaker** [1]_ - 142:3

**speakers** [1]_ - 282:7

**speaking** [6]_ - 81:13_, 101:8_, 182:16_, 222:25_, 241:3_, 278:25

**SPECIAL** [1]_ - 164:25

**special** [2]_ - 7:11_, 83:3

**Special** [5]_ - 3:20_, 6:5_, 21:22_, 164:10_, 165:11

**specialized** [3]_ - 10:2_, 10:12_, 17:1

**specially** [1]_ - 167:5

**specialty** [1]_ - 203:14

**specific** [49]_ - 18:12_, 18:19_, 33:16_, 41:6_, 78:22_, 82:17_, 82:20_, 85:3_, 85:7_, 87:8_, 87:12_, 88:24_, 89:3_, 89:8_, 89:10_, 91:25_, 92:23_, 93:12_, 95:9_, 97:7_, 98:8_, 99:11_, 100:8_, 109:24_, 110:19_, 111:15_, 112:5_, 120:12_, 120:24_, 121:3_, 121:9_, 121:20_, 122:12_, 122:15_, 123:19_, 123:20_, 128:13_, 129:19_, 136:21_, 143:15_, 156:22_, 161:1_, 189:24_, 221:18_, 276:11_, 279:3

**specifically** [27]_ - 10:1_, 11:12_, 36:8_, 44:17_, 45:7_, 65:8_, 80:18_, 84:8_, 91:17_, 92:25_, 93:13_, 94:6_, 95:16_, 96:16_, 96:20_, 102:9_, 102:11_, 104:22_, 106:25_, 123:13_, 146:22_, 177:18_, 181:3_, 205:25_, 220:8_, 243:12_, 255:23

**specified** [1]_ - 18:17

**speed** [3]_ - 180:1_, 180:2

**Speer** [1]_ - 19:6

**spell** [4]_ - 6:15_, 30:19_, 76:22_, 164:19

**spelled** [3]_ - 30:22_, 84:23

**spelling** [1]_ - 35:23

**spent** [3]_ - 9:22_, 33:19_, 280:7

**Sporting** [1]_ - 10:20

**spot** [3]_ - 15:1_, 24:15_, 273:4

**spots** [1]_ - 24:11

**spotted** [3]_ - 205:19_, 207:11_, 253:1

**spreadsheet** [1]_ - 176:7

**squad** [5]_ - 77:13_, 78:16_, 95:4_, 166:22_, 166:23

**square** [2]_ - 14:13_, 17:15

**squares** [1]_ - 59:3

**squeeze** [1]_ - 284:25

**SSID** [4]_ - 154:21_, 154:24_, 155:1_, 155:2

**stacking** [1]_ - 171:13

**stains** [4]_ - 37:24_, 37:25_, 68:14_, 68:15

**stand** [8]_ - 54:4_, 63:19_, 88:15_, 109:11_, 112:10_, 119:15_, 134:12_, 147:6

**Standard** [1]_ - 93:9

**standard** [11]_ - 10:25_, 18:5_, 23:2_, 23:9_, 35:7_, 78:11_, 80:3_, 83:24_, 85:12_, 188:25_, 191:12

**Standards** [1]_ - 36:11

**standards** [1]_ - 11:1

**standby** [1]_ - 3:15

**standing** [3]_ - 24:9_, 30:12_, 88:7

**stands** [8]_ - 36:11_, 38:7

327

_, 39:8_, 77:12_, 83:25_, 97:2_, 109:12_, 171:3

**Starbucks** [1]_ - 105:1

**start** [34]_ - 22:11_, 92:17 _, 94:21_, 95:15_, 95:16_, 95:19_, 95:20_, 95:24_, 98:9_, 98:12_, 150:7_, 166:11_, 168:23_, 171:7_, 184:9_, 188:5_, 192:16_, 194:6_, 196:25_, 201:17_, 202:1_, 203:3_, 209:12_, 222:13_, 222:19_, 228:10 _, 235:2_, 238:8_, 244:22 _, 246:21_, 271:10

**started** [10]_ - 3:17_, 95:17_, 146:11_, 167:15_, 167:18_, 197:14_, 228:15 _, 229:14_, 267:13_, 270:15

**starting** [4]_ - 3:6_, 89:17 _, 232:17_, 263:3

**starts** [3]_ - 39:22_, 252:21_, 271:5

**State** [11]_ - 9:9_, 32:22_, 33:2_, 33:8_, 33:10_, 33:12_, 33:15_, 33:18_, 33:20_, 33:25_, 165:25

**state** [10]_ - 3:5_, 6:15_, 30:19_, 35:1_, 36:24_, 76:21_, 87:17_, 87:18_, 160:2_, 164:19

**states** [2]_ - 140:14_, 153:11

**States** [8]_ - 3:3_, 3:6_, 3:9_, 3:19_, 6:4_, 76:10_, 164:9_, 165:16

**station** [4]_ - 228:20_, 229:2_, 260:23_, 261:6

**Station** [1]_ - 97:19

**station/truck** [1]_ - 272:25

**stationary** [2]_ - 23:5_, 268:1

**statistic** [3]_ - 46:23_, 47:1_, 50:17

**statistical** [3]_ - 43:7_, 51:6_, 51:9

**statistics** [1]_ - 34:10

**status** [1]_ - 66:8

**stay** [6]_ - 23:22_, 28:10_, 28:15_, 28:23_, 30:12_, 34:16

**steel** [4]_ - 15:25_, 16:18_, 17:18

**step** [14]_ - 35:10_, 39:25_,

40:3_, 40:6_, 40:9_, 40:13 _, 41:8_, 45:13_, 45:14_, 65:6_, 67:13_, 79:17_, 80:6

**step-by-step** [1]_ - 35:10

**steps** [9]_ - 39:25_, 40:20 _, 40:25_, 41:1_, 41:3_, 43:15_, 43:19_, 43:20_, 44:25

**sticker** [1]_ - 90:18

**still** [18]_ - 34:16_, 43:4_, 62:14_, 63:3_, 63:17_, 64:7_, 70:17_, 213:21_, 214:5_, 228:10_, 230:7_, 235:16_, 241:7_, 244:10_, 245:19_, 252:12_, 277:6_, 283:19

**stock** [2]_ - 191:10_, 191:15

**stop** [16]_ - 11:25_, 53:8_, 93:3_, 119:6_, 132:7_, 171:22_, 207:19_, 228:18 _, 228:20_, 241:11_, 270:18_, 270:19_, 270:21 _, 270:23_, 272:25_, 273:20

**storage** [4]_ - 77:18_, 77:23_, 78:3_, 123:15

**store** [3]_ - 17:6_, 123:18

**stored** [6]_ - 122:25_, 123:7_, 123:13_, 123:19_, 127:9_, 127:12

**stores** [1]_ - 129:15

**STR** [1]_ - 46:23

**straight** [4]_ - 22:14_, 89:18_, 219:23

**strap** [2]_ - 70:11_, 70:21

**straps** [2]_ - 70:11_, 70:21

**strategy** [1]_ - 9:4

**street** [2]_ - 237:23_, 279:22

**streets** [1]_ - 279:12

**stretch** [2]_ - 248:19_, 268:25

**strictly** [1]_ - 214:19

**string** [1]_ - 99:19

**STRmix** [12]_ - 46:22_, 48:2_, 48:6_, 49:10_, 49:12_, 50:7_, 50:10_, 50:16_, 50:24_, 50:25_, 51:9_, 51:17

**strong** [12]_ - 47:21_, 47:24_, 48:1_, 66:6_, 66:7_

_, 66:13_, 66:16_, 66:19_, 68:7_, 69:20_, 72:2_, 73:6

**STRs** [4]_ - 39:8_, 40:11_, 58:20_, 61:25

**struck** [1]_ - 18:14

**study** [2]_ - 8:16_, 8:22

**studying** [1]_ - 166:13

**stuff** [11]_ - 78:3_, 93:17_, 120:11_, 123:16_, 182:24 _, 199:3_, 221:13_, 237:18_, 237:20_, 237:23 _, 237:25

**style** [3]_ - 88:18_, 111:22 _, 187:22

**subject** [4]_ - 51:11_, 71:4_, 198:17_, 265:25

**submission** [1]_ - 284:17

**submissions** [1]_ - 68:18

**submit** [1]_ - 143:19

**submitted** [12]_ - 44:14_, 44:17_, 50:3_, 50:21_, 50:24_, 51:3_, 52:3_, 55:14_, 58:25_, 70:25_, 72:6_, 85:15

**subpoena** [1]_ - 281:17

**Subscriber** [1]_ - 97:19

**subscriber** [16]_ - 105:10_, 105:12_, 105:20 _, 106:20_, 108:5_, 108:22_, 130:10_, 136:21 _, 149:14_, 149:15_, 149:19_, 149:25_, 150:8_, 150:10_, 150:14_, 150:23

**subsequent** [2]_ - 23:1_, 118:25

**substance** [3]_ - 52:19_, 114:15_, 277:19

**substantially** [5]_ - 15:1 _, 15:3_, 17:3_, 24:15_, 29:7

**subtract** [1]_ - 94:9

**successful** [1]_ - 163:13

**suddenly** [1]_ - 272:1

**suffered** [1]_ - 23:8

**suitable** [5]_ - 44:9_, 50:2 _, 50:4_, 50:5_, 50:6

**summarize** [10]_ - 189:23_, 190:5_, 190:9_, 190:15_, 190:17_, 211:20 _, 263:16_, 269:7_, 270:13_, 276:20

**summarizing** [2]_ -

208:16_, 208:17

**summary** [25]_ - 25:19_, 91:17_, 92:19_, 92:21_, 95:1_, 190:1_, 190:2_, 208:13_, 208:15_, 209:17 _, 212:6_, 218:23_, 219:1 _, 230:9_, 239:5_, 243:22 _, 248:12_, 250:9_, 250:14_, 256:23_, 264:15 _, 274:17_, 274:18_, 274:23_, 276:13

**Summit** [3]_ - 264:20_, 265:23_, 279:11

**summon** [1]_ - 5:23

**Sunday** [1]_ - 257:2

**Sunny** [1]_ - 75:21

**SUNY** [1]_ - 33:12

**supervisor** [2]_ - 7:13_, 166:9

**supply** [2]_ - 17:6

**support** [20]_ - 47:2_, 47:19_, 47:20_, 47:22_, 47:24_, 48:1_, 66:6_, 66:7 _, 66:10_, 66:13_, 66:15_, 66:16_, 66:19_, 68:7_, 69:20_, 70:24_, 72:2_, 73:6_, 89:4_, 163:12

**supported** [3]_ - 85:7_, 85:8_, 85:9

**supports** [1]_ - 160:21

**surrounding** [1]_ - 210:9

**Survey** [2]_ - 165:13_, 171:5

**suspects** [1]_ - 187:16

**sustained** [3]_ - 26:15_, 26:20_, 26:23

**swab** [7]_ - 41:20_, 41:22 _, 41:24_, 42:1_, 49:1_, 49:7_, 49:14

**swabbing** [16]_ - 40:1_, 58:15_, 64:17_, 66:2_, 67:25_, 69:11_, 69:17_, 70:9_, 70:20_, 71:17_, 71:24_, 72:20_, 72:21_, 73:3

**swabs** [1]_ - 51:22

**SWAT** [1]_ - 9:20

**swear** [4]_ - 6:10, 30:14_, 76:15_, 164:14

**switch** [3]_ - 3:20_, 26:24 _, 152:18

**switching** [1]_ - 152:19

**sworn** [5]_ - 6:23, 31:1,

77:1_, 164:12, 165:1
**symbol** [1]_ - 136:7
**system** [15]_ - 87:19_, 87:20_, 90:7_, 90:10_, 90:15_, 93:16_, 95:17_, 95:18_, 96:17_, 96:19_, 97:12_, 97:14_, 97:16_, 99:6_, 129:18
**systems** [2]_ - 88:19_, 90:8

T

**T-Mobile** [57]_ - 130:10_, 172:15_, 173:4_, 178:24_, 181:8_, 185:4_, 186:9_, 195:5_, 195:15_, 216:6_, 218:1_, 218:14_, 218:16_, 218:17_, 219:2_, 219:9_, 225:10_, 226:20_, 226:22 _, 230:10_, 230:16_, 231:3_, 231:10_, 234:9_, 234:11_, 240:18_, 242:24 _, 243:5_, 243:25_, 245:4 _, 245:12_, 246:22_, 247:1_, 248:3_, 249:3_, 249:10_, 249:12_, 250:10 _, 250:17_, 251:16_, 251:25_, 252:16_, 252:18 _, 254:9_, 255:16_, 257:23_, 260:19_, 262:2_, 263:20_, 264:17_, 265:6_, 271:18_, 272:23_, 273:17 _, 274:3_, 274:11_, 274:18
**tab** [5]_ - 127:13_, 127:16_, 127:17_, 127:21_, 128:17
**table** [5]_ - 92:19_, 109:3_, 125:18_, 154:20
**tabs** [5]_ - 127:8_, 127:10 _, 127:11_, 128:10_, 128:11
**tag** [1]_ - 203:19
**tall** [2]_ - 17:12_, 38:11
**tandem** [2]_ - 39:8_, 58:20
**target** [3]_ - 7:23, 8:21_, 26:11
**task** [2]_ - 95:21_, 137:9
**taught** [1]_ - 167:21
**Team** [4]_ - 77:12_, 82:18 _, 165:13_, 171:5
**team** [14]_ - 9:20_, 31:20_, 49:22_, 77:11_, 78:6_, 78:11_, 79:18_, 82:24_, 83:3_, 170:4_, 171:7_,

204:3_, 221:22
**Team's** [1]_ - 83:2
**team's** [1]_ - 83:7
**teams** [1]_ - 9:18
**technical** [4]_ - 10:19_, 35:16_, 35:18_, 59:8
**technology** [3]_ - 93:13 _, 152:13_, 167:17
**tee** [1]_ - 75:13
**telegram** [1]_ - 177:6
**telephone** [4]_ - 125:25_, 130:19_, 168:17_, 185:2
**temporary** [1]_ - 123:15
**ten** [5]_ - 53:19_, 115:22_, 165:22_, 166:5_, 238:11
**ten-minute** [1]_ - 53:19
**tender** [2]_ - 12:17_, 170:19
**Tendering** [12]_ - 13:20_, 15:12_, 73:13_, 74:10_, 83:20_, 85:23_, 86:15_, 87:2_, 88:11_, 113:14_, 131:4_, 147:21
**tentatively** [1]_ - 283:19
**term** [14]_ - 16:2_, 16:4_, 19:7_, 24:23_, 41:14_, 42:7_, 42:11_, 42:16_, 59:8_, 77:15_, 87:25_, 88:3_, 93:5_, 111:10
**terms** [6]_ - 88:1_, 108:16 _, 181:4_, 182:12_, 183:6 _, 282:12
**terrain** [1]_ - 174:2
**test** [35]_ - 7:17_, 7:20_, 8:2_, 8:12_, 10:25_, 11:1 _, 11:23_, 11:24_, 15:1_, 18:16_, 20:1_, 20:9_, 21:23_, 21:24_, 22:10_, 22:20_, 23:13_, 23:17_, 24:10_, 31:19_, 34:14_, 37:18_, 37:25_, 43:25_, 44:6_, 75:7_, 75:8_, 75:11 _, 75:13_, 75:15_, 75:18_, 75:21_, 168:14_, 168:24_, 231:24
**test-firing** [1]_ - 15:1
**tested** [18]_ - 13:25_, 15:4 _, 36:3_, 43:22_, 44:2_, 44:20_, 45:22_, 49:20_, 68:15_, 73:23_, 73:24_, 74:16_, 74:19_, 168:3
**testified** [10]_ - 6:23_, 12:9, 31:1_, 36:25, 77:1_, 103:7, 165:1_, 170:12_, 170:16_, 223:23

**testify** [4]_ - 31:25_, 36:23 _, 170:1_, 283:9
**testimony** [21]_ - 6:10_, 22:19_, 28:9, 30:14_, 52:20_, 55:10_, 56:10_, 65:19_, 76:15_, 114:14_, 132:19_, 164:14_, 195:3_, 210:24_, 263:17_, 276:21 _, 277:19_, 282:9_, 282:13_, 283:4_, 283:23
**testing** [30]_ - 11:10_, 11:12_, 12:6_, 12:19_, 12:23_, 13:7_, 14:18_, 15:19_, 16:6_, 17:2_, 18:8 _, 20:12_, 21:1_, 21:4_, 22:1_, 23:3_, 31:23_, 35:25_, 37:24_, 38:25_, 39:22_, 39:25_, 41:9_, 45:12_, 45:23_, 65:7_, 67:13_, 68:1_, 71:9_, 72:13
**tests** [9]_ - 31:21_, 79:8_, 85:6_, 87:9_, 87:10_, 88:24_, 143:14_, 163:11_, 163:13
**Texas** [1]_ - 137:7
**text** [46]_ - 80:25_, 81:1_, 81:22_, 101:16_, 131:16_, 135:23_, 136:12_, 136:14 _, 136:20_, 137:1_, 137:4 _, 137:5_, 137:11_, 138:2 _, 138:10_, 138:15_, 139:22_, 140:2_, 140:25_, 145:12_, 145:13_, 145:17 _, 145:21_, 145:22_, 146:7_, 146:12_, 146:19_, 146:20_, 146:21_, 146:22 _, 147:1_, 153:1_, 153:2_, 153:4_, 153:5_, 153:7_, 153:9_, 176:17_, 177:5_, 177:10_, 178:25_, 179:9_, 181:15_, 192:21_, 196:21 _, 199:24
**texts** [1]_ - 140:12
**textured** [6]_ - 44:11_, 58:15_, 64:17_, 66:2_, 69:12_, 69:17
**than..** [1]_ - 233:14
**THE** [254]_ - 3:2_, 3:10_, 3:13_, 3:16_, 3:25_, 4:4_, 4:9_, 4:12_, 4:14_, 4:18_, 4:25_, 5:5_, 5:7_, 5:16_, 5:22_, 6:1_, 6:6_, 6:13_, 6:17, 6:20_, 12:20_, 12:22 _, 12:25_, 13:18_, 15:10_, 16:9_, 20:21_, 21:9_, 21:11_, 21:16_, 25:6_, 26:1_, 26:15_, 26:20_,

26:23_, 27:3_, 28:10_, 28:21_, 29:10_, 29:16_, 29:17_, 29:18_, 29:19_, 29:23_, 30:2_, 30:6_, 30:10_, 30:17_, 30:21_, 30:24_, 37:6_, 37:8_, 40:23_, 41:1_, 52:9_, 52:13_, 52:17_, 52:25_, 53:6_, 53:12_, 53:17_, 53:22_, 54:2_, 55:1_, 56:5 _, 56:8_, 57:8_, 73:11_, 74:3_, 74:7_, 74:24_, 76:3 _, 76:4_, 76:6_, 76:12_, 76:13_, 76:18_, 76:20_, 76:23_, 83:18_, 85:20_, 86:11_, 86:13_, 88:7_, 91:3_, 91:6_, 92:7_, 92:9 _, 92:12_, 103:25_, 105:6 _, 107:22_, 107:25_, 110:8_, 110:19_, 110:24_, 111:1_, 111:5_, 112:12_, 113:6_, 113:11_, 114:4_, 114:7_, 114:13_, 114:16_, 114:17_, 114:24_, 115:4_, 115:10_, 115:14_, 115:17 _, 115:24_, 116:2_, 116:6 _, 116:11_, 116:14_, 116:24_, 117:2_, 117:6_, 117:9_, 117:12_, 117:14_, 117:23_, 117:25_, 119:1_, 119:9_, 119:13_, 119:17_, 120:2_, 122:8_, 122:19_, 123:24_, 124:19_, 125:11 _, 126:11_, 128:8_, 130:5 _, 130:7_, 131:1_, 131:21 _, 131:23_, 132:6_, 132:17_, 132:21_, 132:22 _, 133:1_, 133:4_, 133:9_, 133:15_, 133:17_, 133:21 _, 133:25_, 134:2_, 134:5 _, 134:8_, 134:13_, 134:16_, 134:19_, 135:19 _, 137:17_, 139:13_, 141:8_, 142:11_, 142:22_, 144:5_, 144:8_, 144:20_, 144:22_, 145:3_, 145:5_, 147:19_, 148:11_, 148:13 _, 148:20_, 149:11_, 151:23_, 153:18_, 154:10 _, 155:16_, 157:25_, 159:9_, 160:7_, 161:25_, 162:9_, 162:11_, 162:14_, 162:25_, 163:3_, 163:6_, 164:2_, 164:3_, 164:5_, 164:6_, 164:7_, 164:11_, 164:17_, 164:21_, 164:24 _, 170:21_, 170:23_, 186:15_, 188:3_, 188:9_, 190:20_, 191:2_, 191:4_, 201:11_, 204:12_, 204:15 _, 204:18_, 204:21_,

204:24_, 207:15_, 210:19_, 210:21_, 211:2_, 211:5_, 211:9_, 211:11_, 214:11_, 214:15_, 215:8_, 215:10_, 215:12_, 242:1_, 244:19_, 244:22_, 246:2_, 248:8_, 257:17_, 258:19_, 261:24_, 262:24_, 267:6_, 277:4_, 277:16_, 277:23_, 277:25_, 278:2_, 280:13_, 280:15_, 280:17_, 280:19_, 280:20_, 281:14_, 281:20_, 281:25_, 282:14_, 283:6_, 283:10_, 283:18_, 284:1_, 284:7_, 284:24

**theirs** [1]_ - 261:25

**themselves** [6]_ - 35:12_, 56:12_, 101:22_, 104:16_, 156:8_, 177:10

**then-Candidate** [1]_ - 244:10

**theory** [1]_ - 168:13

**thick** [4]_ - 14:16_, 14:17_, 17:23_, 17:25

**thicker** [1]_ - 18:6

**thickness** [3]_ - 18:2_, 18:4_, 29:3

**thinking** [1]_ - 283:21

**thinner** [1]_ - 17:23

**third** [11]_ - 14:17_, 40:6_, 130:11_, 157:15_, 160:19_, 161:3_, 161:8_, 203:16_, 216:21_, 236:20_, 274:2

**THO1** [1]_ - 62:22

**Thompson** [1]_ - 283:16

**thou** [1]_ - 27:22

**thousand** [3]_ - 27:13_, 201:2_, 280:3

**thousands** [6]_ - 11:8_, 25:13_, 27:10_, 27:11

**three** [36]_ - 8:22_, 12:15_, 14:22_, 43:8_, 57:13_, 59:17_, 65:15_, 65:16_, 66:5_, 104:25_, 130:22_, 155:21_, 166:22_, 166:24_, 166:25_, 167:19_, 167:20_, 168:6_, 168:17_, 169:9_, 172:14_, 173:3_, 179:1_, 187:3_, 190:10_, 191:12_, 191:16_, 191:18_, 216:3_, 239:8_, 239:10_, 240:3_, 250:22_, 283:8

**three-day** [2]_ - 167:19_, 168:6

**three-sided** [1]_ - 191:12

**throughout** [11]_ - 35:24_, 45:23_, 45:24_, 51:25_, 64:10_, 170:15_, 198:9_, 199:3_, 224:4_, 245:7_, 257:13

**thrown** [1]_ - 250:20

**thumb** [2]_ - 186:14_, 186:16

**Thursday** [6]_ - 283:20_, 283:24_, 284:11_, 284:12_, 285:1_, 285:2

**tickets** [1]_ - 162:21

**tie** [8]_ - 68:19_, 68:20_, 69:7_, 69:11_, 69:12_, 69:18_, 74:18_, 74:19

**tied** [1]_ - 161:12

**ties** [1]_ - 70:2

**tighter** [1]_ - 267:14

**time/date** [1]_ - 184:13

**timestamp** [4]_ - 195:24_, 196:8_, 202:25_, 207:1

**timestamps** [1]_ - 212:14

**timing** [38]_ - 179:20_, 180:4_, 180:9_, 181:9_, 181:18_, 181:24_, 182:6_, 182:8_, 182:11_, 183:24_, 189:11_, 190:9_, 194:12_, 194:14_, 195:20_, 224:11_, 236:5_, 236:19_, 238:3_, 238:7_, 238:8_, 238:12_, 250:17_, 250:21_, 251:19_, 251:24_, 252:6_, 253:3_, 253:6_, 255:18_, 261:5_, 261:24_, 265:8_, 268:23_, 271:6_, 271:10_, 276:4_, 279:4

**tip** [1]_ - 42:1

**title** [8]_ - 7:7_, 111:15_, 111:16_, 111:19_, 121:14_, 121:17_, 162:18_, 162:20

**titled** [1]_ - 104:18

**TLC** [1]_ - 143:9

**today** [14]_ - 3:17_, 6:8_, 20:15_, 45:8_, 55:10_, 76:9_, 118:1_, 132:14_, 167:2_, 170:14_, 171:10_, 182:21_, 191:14_, 259:13

**together** [9]_ - 115:12_, 219:16_, 219:20_, 241:1_, 242:22_, 249:4_, 262:9_, 262:10_, 263:11

**tomorrow** [9]_ - 142:18_,

281:11_, 282:6_, 282:10_, 283:7_, 283:12_, 284:6_, 284:19_, 285:5

**tonight** [1]_ - 222:10

**took** [15]_ - 14:1_, 20:25_, 34:8_, 34:13_, 64:16_, 69:11_, 70:9_, 71:16_, 83:2_, 89:9_, 157:10_, 158:13_, 163:19_, 163:21_, 167:18

**tool** [1]_ - 111:21

**Toolmarks** [1]_ - 18:9

**tools** [3]_ - 79:17_, 79:22_, 80:1

**top** [30]_ - 14:23_, 55:17_, 59:3_, 61:24_, 63:12_, 63:23_, 70:11_, 70:21_, 91:17_, 92:17_, 120:25_, 121:2_, 121:8_, 121:24_, 128:14_, 147:1_, 151:17_, 156:2_, 191:17_, 197:4_, 197:22_, 201:18_, 209:12_, 217:20_, 220:20_, 230:8_, 266:12

**top-down** [1]_ - 191:17

**total** [2]_ - 9:24_, 56:25

**totality** [3]_ - 265:24_, 266:17_, 266:23

**touch** [1]_ - 54:15

**touched** [2]_ - 179:15_, 284:16

**towards** [12]_ - 7:23_, 212:16_, 223:4_, 225:13_, 228:16_, 245:1_, 245:13_, 245:23_, 262:19_, 264:20_, 282:6_, 283:21

**tower** [130]_ - 171:14_, 171:15_, 171:16_, 171:25_, 172:3_, 172:4_, 172:22_, 172:24_, 173:4_, 173:9_, 173:12_, 173:13_, 173:14_, 173:16_, 173:20_, 173:21_, 173:24_, 173:25_, 174:1_, 174:2_, 174:4_, 174:5_, 174:8_, 174:10_, 174:18_, 175:1_, 176:9_, 176:10_, 177:25_, 179:25_, 180:1_, 180:5_, 180:6_, 181:25_, 182:3_, 182:4_, 182:7_, 182:9_, 183:11_, 183:14_, 191:17_, 191:24_, 192:8_, 192:11_, 192:19_, 192:20_, 192:21_, 193:8_, 194:16_, 194:17_, 195:22_, 196:3_, 197:14_, 197:19_, 198:12_, 198:23_,

_, 199:18_, 202:6_, 202:15_, 206:3_, 207:3_, 207:10_, 208:2_, 208:18_, 209:23_, 209:25_, 211:24_, 212:16_, 212:17_, 213:16_, 213:17_, 214:6_, 215:18_, 217:23_, 218:13_, 221:1_, 221:4_, 224:2_, 224:14_, 225:12_, 226:22_, 226:24_, 227:2_, 230:12_, 231:4_, 231:6_, 231:25_, 232:17_, 234:11_, 235:3_, 235:11_, 235:20_, 236:21_, 237:1_, 240:21_, 244:1_, 245:1_, 246:5_, 248:17_, 251:20_, 252:18_, 254:19_, 255:17_, 257:7_, 258:14_, 259:20_, 260:24_, 261:1_, 262:3_, 262:4_, 262:15_, 264:5_, 265:8_, 269:18_, 271:7_, 271:22_, 272:23_, 273:2_, 273:3_, 273:16_, 274:2_, 274:6_, 276:18

**towers** [38]_ - 172:10_, 172:13_, 173:2_, 173:6_, 174:20_, 174:22_, 175:5_, 175:7_, 175:20_, 178:5_, 182:9_, 182:17_, 191:11_, 191:12_, 191:18_, 191:23_, 191:25_, 198:11_, 202:5_, 209:4_, 213:7_, 218:17_, 219:1_, 222:11_, 222:15_, 227:3_, 230:24_, 231:7_, 231:21_, 239:9_, 250:15_, 250:22_, 267:24_, 268:14_, 269:10_, 272:9_, 272:19

**towers/their** [1]_ - 198:10

**town** [1]_ - 162:21

**TPOX** [1]_ - 59:7

**TracFone** [9]_ - 105:10_, 105:21_, 106:19_, 106:23_, 145:22_, 145:24_, 146:4_, 146:7_, 146:8

**TracFone's** [1]_ - 106:9

**track** [4]_ - 97:5_, 210:15_, 213:8_, 229:8

**tracking** [4]_ - 167:6_, 167:17_, 219:7_, 226:11

**traditional** [2]_ - 139:22_, 153:2

**traffic** [6]_ - 109:8_, 216:10_, 270:18_, 270:19_, 270:21_, 270:23

**Trail** [1]_ - 279:11

**train** [4]_ - 11:5_, 39:11_, 39:12_, 39:13

**trained** [4]_ - 32:20_, 33:13_, 43:20_, 167:5

**training** [18]_ - 10:1_, 10:2_, 10:9_, 10:12_, 17:4_, 33:7_, 33:11_, 33:17_, 34:4_, 34:6_, 34:13_, 43:1_, 44:20_, 167:17_, 167:18_, 169:11_, 221:11

**Training** [1]_ - 168:5

**trainings** [5]_ - 11:3_, 33:23_, 169:5_, 169:16_, 169:17

**transaction** [1]_ - 203:25

**transactions** [2]_ - 273:18_, 274:5

**transferred** [1]_ - 83:4

**transition** [1]_ - 217:18

**translate** [4]_ - 141:17_, 141:19_, 142:10_, 282:23

**translation** [3]_ - 98:19_, 98:21_, 283:11

**translations** [1]_ - 142:11

**translators** [1]_ - 282:14

**transported** [1]_ - 4:20

**trash** [11]_ - 129:18_, 129:20_, 129:21_, 129:22_, 129:25_, 130:1_, 154:6_, 155:23_, 156:4_, 159:18_, 160:14

**trashed** [1]_ - 129:16

**travel** [8]_ - 165:18_, 219:4_, 222:16_, 224:2_, 232:21_, 261:5_, 263:9_, 271:24

**traveled** [2]_ - 174:25_, 217:13

**traveling** [6]_ - 26:4_, 219:15_, 222:14_, 252:23_, 262:18_, 266:14

**travels** [3]_ - 8:19_, 180:1_, 264:19

**tree** [1]_ - 161:12

**trees** [1]_ - 128:3

**trend** [1]_ - 189:23

**trends** [1]_ - 34:16

**trial** [4]_ - 4:22_, 6:8_, 132:5_, 186:5

**tried** [1]_ - 163:12

**trip** [1]_ - 229:13

**trooper** [1]_ - 9:9

**truck** [2]_ - 228:20_, 273:20

**truly** [1]_ - 12:7

**trump** [1]_ - 28:22

**Trump** [54]_ - 138:20_, 140:14_, 140:17_, 177:25_, 190:8_, 197:24_, 198:6_, 198:15_, 209:8_, 209:23_, 209:25_, 211:24_, 221:2_, 228:5_, 229:4_, 230:17_, 231:1_, 231:14_, 233:3_, 234:12_, 234:16_, 235:20_, 235:21_, 236:1_, 240:9_, 240:21_, 242:8_, 242:23_, 243:10_, 243:14_, 243:18_, 244:10_, 244:24_, 247:2_, 249:14_, 249:22_, 250:1_, 250:11_, 253:17_, 254:11_, 256:13_, 257:1_, 257:10_, 257:19_, 258:8_, 259:2_, 259:10_, 262:19_, 263:25_, 264:21_, 266:21_, 267:19_, 274:4_, 280:10

**Trump's** [1]_ - 162:21

**truth** [12] - 6:11_, 6:12_, 30:15_, 30:16, 76:16_, 76:17, 164:15_, 164:16

**try** [5]_ - 4:14_, 89:17_, 278:10_, 278:16_, 278:20

**trying** [6]_ - 11:24_, 26:11_, 40:7_, 78:17_, 193:5_, 268:10

**tube** [2]_ - 40:2_, 40:4

**turn** [24]_ - 98:2_, 105:3_, 107:8_, 121:13_, 123:21_, 124:5_, 124:24_, 126:8_, 127:4_, 129:8_, 130:3_, 130:11_, 137:14_, 152:21_, 153:15_, 153:25_, 155:13_, 155:17_, 155:24_, 157:14_, 159:6_, 159:10_, 159:19_, 171:11

**turned** [1]_ - 272:3

**turning** [7]_ - 101:23_, 107:12_, 139:10_, 151:3_, 151:20_, 154:8_, 157:23

**turns** [1]_ - 283:3

**twins** [3]_ - 38:15_, 38:18

**two** [87]_ - 9:24_, 10:8_, 10:9_, 14:25_, 21:11_, 24:14_, 32:23_, 34:7_, 35:14_, 35:16_, 37:17_, 43:8_, 46:4_, 47:6_, 57:19_, 59:21_, 66:4_, 78:14_, 78:15_, 78:20_, 81:20_,

83:10_, 96:2_, 97:8_, 97:9_, 98:21_, 104:25_, 118:25_, 119:5_, 121:24_, 122:2_, 128:11_, 130:22_, 136:19_, 138:16_, 141:16_, 152:6_, 152:12_, 159:6_, 167:20_, 168:12_, 168:21_, 178:25_, 190:10_, 191:10_, 194:22_, 206:1_, 210:1_, 211:21_, 213:7_, 214:22_, 219:7_, 219:15_, 220:17_, 227:11_, 235:25_, 236:8_, 236:24_, 238:13_, 239:19_, 239:21_, 240:3_, 240:5_, 240:24_, 241:25_, 243:3_, 246:10_, 248:14_, 248:25_, 249:16_, 252:13_, 255:22_, 259:5_, 262:9_, 265:20_, 274:8_, 282:6_, 282:7_, 282:19_, 283:2_, 283:8_, 283:9

**two-week** [1]_ - 168:12

**two-year** [2]_ - 10:8_, 10:9

**type** [44]_ - 17:1_, 18:12_, 18:15_, 18:19_, 18:23_, 19:3_, 19:21_, 19:24_, 28:6_, 33:7_, 39:15_, 41:24_, 57:20_, 77:24_, 84:16_, 96:14_, 96:16_, 102:9_, 107:2_, 107:5_, 120:9_, 139:15_, 145:25_, 146:4_, 146:13_, 150:10_, 150:12_, 151:6_, 153:2_, 154:2_, 154:13_, 159:12_, 160:9_, 161:22_, 162:16_, 169:13_, 178:21_, 179:13_, 180:24_, 184:9_, 195:25_, 203:9_, 221:14

**typed** [2]_ - 95:12_, 125:21

**types** [18]_ - 41:11_, 46:2_, 46:14_, 46:15_, 54:18_, 57:25_, 59:17_, 59:21_, 61:4_, 64:3_, 96:19_, 124:6_, 129:11_, 141:14_, 155:19_, 175:24_, 177:8_, 191:23

**typical** [4]_ - 99:21_, 106:19_, 176:17_, 191:10

**typically** [24]_ - 88:2_, 93:11_, 93:20_, 99:17_, 100:10_, 106:21_, 129:22_, 129:25_, 130:1_, 138:15_, 169:8_, 169:11_, 174:1_, 182:3_, 182:4_, 183:15_, 183:17_, 184:10_, 184:14_, 184:18_,

191:18_, 273:3_, 282:14

**typing** [2]_ - 57:14_, 70:13

### U

**U.S** [2]_ - 90:10_, 228:21

**Ukraine** [1]_ - 140:15

**ultimately** [1]_ - 56:13

**unable** [1]_ - 28:13

**uncommon** [1]_ - 238:11

**under** [18]_ - 34:12_, 47:6_, 52:7_, 54:5_, 106:15_, 108:14_, 119:18_, 125:20_, 134:19_, 150:1_, 151:17_, 165:22_, 166:5_, 183:16_, 198:15_, 211:12_, 260:12_, 278:2

**undergoes** [1]_ - 35:14

**underground** [1]_ - 137:8

**underlying** [1]_ - 190:24

**understandable** [2]_ - 77:21_, 191:9

**understood** [1]_ - 142:13

**unfortunately** [1]_ - 89:1

**unique** [8]_ - 38:14_, 83:24_, 84:10_, 95:8_, 97:4_, 97:10_, 125:24_, 191:17

**unit** [19]_ - 31:18_, 32:19_, 32:23_, 32:24_, 32:25_, 33:4_, 39:24_, 43:13_, 48:16_, 165:12_, 165:14_, 166:25_, 167:1_, 167:4_, 167:15_, 182:24_, 187:16_, 187:17

**Unit** [18]_ - 18:9_, 31:10_, 31:12_, 31:16_, 35:5_, 36:9_, 37:20_, 39:23_, 42:19_, 43:14_, 43:23_, 44:5_, 44:7_, 44:8_, 46:19_, 49:20_, 49:22_, 166:8

**united** [1]_ - 245:12

**United** [8]_ - 3:3_, 3:6_, 3:9_, 3:19_, 6:4_, 76:10_, 164:9_, 165:16

**units** [1]_ - 32:23

**Universal** [6]_ - 92:25_, 93:8_, 93:10_, 93:14_, 93:18

**universal** [2]_ - 93:22_, 109:25

**University** [6] - 9:1, 9:5, 32:10, 32:11, 33:13, 166:2

**unknown** [10] - 42:14, 46:16, 47:9, 66:4, 66:5, 68:6, 69:19, 70:23, 72:1, 73:5

**unless** [4] - 5:1, 113:7, 129:25, 284:20

**unlike** [2] - 8:6, 174:12

**unlock** [2] - 163:10, 163:18

**unrelated** [8] - 47:9, 66:4, 66:5, 68:6, 69:19, 70:23, 72:1, 73:5

**unused** [2] - 198:10, 202:5

**up** [72] - 10:10, 14:5, 15:17, 16:15, 18:1, 22:2, 22:14, 22:23, 24:20, 35:15, 40:17, 42:24, 47:4, 64:20, 64:22, 80:15, 81:4, 84:6, 87:17, 88:1, 99:9, 111:15, 112:10, 113:17, 119:24, 122:5, 125:9, 129:21, 131:6, 132:4, 143:5, 145:14, 146:10, 147:24, 151:16, 157:4, 169:13, 172:22, 175:1, 176:21, 177:3, 177:4, 190:11, 192:18, 192:24, 197:4, 202:20, 205:16, 206:1, 211:16, 211:17, 227:8, 228:22, 233:13, 245:3, 245:5, 250:18, 250:20, 253:7, 254:9, 261:20, 262:18, 263:10, 265:23, 267:3, 271:22, 272:7, 277:6, 281:1, 282:10, 283:24

**updates** [2] - 4:2, 284:2

**upper** [8] - 127:16, 127:17, 127:21, 129:2, 138:5, 140:12, 161:8, 202:1

**urban** [3] - 174:12, 175:4, 218:7

**URL** [8] - 109:25, 111:7, 111:10, 111:17, 120:20, 121:2, 121:17, 146:11

**usage** [8] - 154:15, 154:17, 154:20, 199:25, 200:10, 208:20, 224:2, 249:10

**usages** [1] - 154:14

**USB** [1] - 77:25

**useable** [3] - 182:7, 182:10, 222:22

**useful** [1] - 167:12

**user** [28] - 87:23, 98:6, 98:9, 98:13, 104:13, 105:19, 121:10, 128:13, 129:22, 129:23, 130:1, 138:18, 139:2, 139:7, 139:19, 140:11, 140:19, 140:24, 141:16, 141:18, 142:17, 150:3, 150:13, 150:22, 157:12, 162:18, 172:11, 181:21

**user-generated** [1] - 87:23

**username** [9] - 98:24, 99:17, 99:25, 100:1, 100:5, 100:7, 101:7, 150:5, 150:6

**usernames** [3] - 99:14, 99:15, 99:21

**users** [2] - 100:10, 128:13

**uses** [3] - 87:20, 89:5, 182:24

**usual** [1] - 280:22

**UTC** [8] - 92:25, 93:5, 93:10, 93:20, 94:8, 94:11, 95:1, 196:10

**UTG** [1] - 111:21

**utilize** [3] - 10:10, 231:5, 231:21

**utilized** [16] - 180:5, 194:16, 198:17, 199:18, 208:17, 211:23, 212:16, 212:17, 231:24, 234:11, 235:3, 240:21, 269:11, 269:18, 272:23, 274:20

**Utilizing** [1] - 246:4

**utilizing** [45] - 177:25, 182:2, 197:14, 197:19, 199:24, 202:15, 206:3, 207:2, 208:1, 209:4, 209:23, 213:16, 213:17, 214:6, 215:18, 217:23, 221:1, 222:15, 225:12, 226:22, 226:24, 227:1, 231:6, 234:10, 235:19, 241:10, 244:1, 244:25, 248:16, 251:20, 252:18, 254:19, 255:17, 259:20,

260:24, 261:1, 262:3, 262:15, 264:4, 265:8, 266:19, 269:20

V

**valid** [1] - 99:10

**validated** [3] - 79:13, 80:12, 85:11

**validations** [1] - 36:2

**value** [1] - 95:2

**variable** [1] - 236:20

**variables** [1] - 27:23

**variance** [2] - 23:21, 23:23

**variations** [1] - 90:13

**varies** [3] - 178:23, 195:14

**variety** [3] - 8:2, 11:18, 152:10

**various** [15] - 38:18, 49:24, 51:15, 78:24, 78:25, 86:22, 89:9, 106:24, 119:2, 119:19, 120:11, 127:8, 128:13, 152:17, 159:4

**vary** [2] - 77:25, 178:22

**vehicle** [20] - 203:11, 203:12, 204:5, 205:11, 205:19, 206:1, 206:6, 206:8, 207:10, 207:11, 208:6, 225:18, 232:22, 233:6, 233:24, 235:8, 253:1, 255:22, 255:25, 263:10

**vehicles** [1] - 78:1

**velocity** [2] - 23:16, 23:17

**vendors** [2] - 10:14, 10:15

**verbal** [7] - 47:1, 47:11, 47:14, 47:16, 66:8, 66:14

**verbose** [1] - 123:10

**verify** [2] - 77:19, 79:12

**Verizon** [13] - 172:15, 172:24, 173:3, 175:17, 179:2, 181:7, 185:21, 186:9, 195:14, 198:10, 202:5, 202:6, 216:4

**versa** [1] - 173:1

**version** [2] - 92:22, 92:23

**versus** [4] - 46:11, 47:8, 138:9, 157:7

**vertical** [3] - 22:10, 22:11, 22:20

**vetted** [1] - 80:1

**vice** [1] - 173:1

**vicinity** [61] - 192:23, 197:20, 209:5, 213:17, 215:19, 217:10, 220:10, 221:1, 221:15, 227:4, 227:22, 228:5, 229:4, 230:25, 231:22, 232:2, 232:3, 235:23, 242:8, 242:23, 243:10, 243:17, 244:4, 244:15, 245:11, 245:21, 246:7, 247:2, 247:12, 247:20, 248:4, 248:9, 249:14, 249:22, 250:1, 250:11, 251:21, 253:17, 254:11, 255:23, 256:1, 256:13, 257:1, 257:10, 257:19, 258:8, 259:1, 259:9, 260:23, 264:6, 265:21, 265:25, 266:6, 266:13, 266:20, 270:18, 270:20, 273:9, 275:4, 276:8, 276:14

**view** [4] - 18:2, 53:10, 191:17, 225:24

**viewable** [1] - 186:16

**Violent** [2] - 166:21, 166:23

**Virgin** [1] - 170:17

**Virginia** [3] - 31:8, 32:19, 166:5

**visit** [5] - 10:14, 127:13, 146:11, 162:19, 280:3

**visited** [2] - 112:8, 127:11

**visual** [1] - 58:13

**visually** [3] - 50:13, 50:14, 50:18

**voice** [2] - 196:1

**voicemail** [2] - 177:8, 216:11

**volume** [1] - 258:15

**volunteer** [1] - 137:23

**VWA** [7] - 57:1, 57:3, 57:24, 59:7, 59:21, 60:7, 60:9

### W

**walk** [5]‗ - 23:7‗, 61:2‗, 78:11‗, 164:11‗, 175:13
**walking** [1]‗ - 246:21
**wants** [1]‗ - 282:9
**warrant** [5]‗ - 78:20‗, 78:22‗, 79:1‗, 178:11‗, 178:13
**warrants** [3]‗ - 178:18‗, 180:25‗, 186:1
**Washington** [1]‗ - 9:20
**wasting** [1]‗ - 115:7
**water** [2]‗ - 5:10‗, 244:15
**Waterpark** [2]‗ - 198:24‗, 199:5
**ways** [3]‗ - 121:4‗, 152:10‗, 272:1
**weapon** [4]‗ - 18:15‗, 18:20‗, 18:23‗, 25:21
**weapons** [3]‗ - 7:17‗, 8:17‗, 10:15
**wear** [5]‗ - 7:25‗, 12:3‗, 35:12‗, 72:21‗, 73:3
**wearing** [1]‗ - 72:22
**wears** [1]‗ - 11:17
**weather.com** [3]‗ - 127:18‗, 128:1‗, 128:20
**web** [15]‗ - 101:21‗, 108:19‗, 110:19‗, 111:14‗, 111:15‗, 111:17‗, 120:8‗, 120:9‗, 120:20‗, 121:1‗, 127:11‗, 127:12‗, 127:18‗, 161:25‗, 162:17
**website** [11]‗ - 110:1‗, 111:11‗, 111:20‗, 112:5‗, 112:7‗, 120:12‗, 120:18‗, 120:19‗, 121:20‗, 162:18‗, 162:20
**websites** [2]‗ - 81:25‗, 123:16
**wedge** [10]‗ - 183:12‗, 192:6‗, 192:8‗, 192:14‗, 193:16‗, 195:19‗, 198:12‗, 206:2‗, 221:12‗, 231:16
**Wednesday** [1]‗ - 162:22
**wee** [1]‗ - 274:25
**week** [9]‗ - 168:1‗, 168:12‗, 168:13‗, 168:15‗, 168:16‗, 168:21‗, 169:8‗, 246:14

**weekly** [1]‗ - 169:13
**weeks** [1]‗ - 168:22
**weigh** [1]‗ - 16:21
**weighs** [1]‗ - 14:14
**weight** [3]‗ - 25:5‗, 46:24‗, 46:25
**Welcome** [1]‗ - 146:6
**welcome** [2]‗ - 146:8‗, 164:2
**welding** [1]‗ - 17:6
**well-being** [2]‗ - 100:19‗, 100:22
**Wesley** [1]‗ - 3:4
**West** [14]‗ - 121:16‗, 121:21‗, 206:7‗, 206:8‗, 212:19‗, 212:25‗, 219:6‗, 219:23‗, 220:4‗, 220:10‗, 220:11‗, 220:18‗, 221:7‗, 228:1
**west** [20]‗ - 172:2‗, 214:7‗, 222:14‗, 223:24‗, 224:3‗, 225:19‗, 226:23‗, 226:25‗, 232:21‗, 232:23‗, 233:25‗, 234:13‗, 235:8‗, 235:10‗, 244:24‗, 252:24‗, 262:19‗, 263:10‗, 274:4
**western** [1]‗ - 225:19
**whatnot** [1]‗ - 107:4
**WhatsApp** [10]‗ - 136:15‗, 136:16‗, 136:18‗, 136:21‗, 139:16‗, 140:1‗, 140:6‗, 176:19‗, 177:6‗, 199:25
**whatsapp.net** [1]‗ - 136:11
**white** [3]‗ - 14:20‗, 24:11
**White** [2]‗ - 150:2‗, 150:6
**whole** [6]‗ - 6:11‗, 8:4, 30:15‗, 61:8, 76:16, 164:15
**Wi** [8]‗ - 105:1‗, 155:2‗, 155:3‗, 200:5‗, 200:6‗, 200:9‗, 200:13
**Wi-Fi** [8]‗ - 105:1‗, 155:2‗, 155:3‗, 200:5‗, 200:6‗, 200:9‗, 200:13
**wide** [4]‗ - 14:14‗, 17:12‗, 183:15‗, 237:7
**widely** [3]‗ - 19:1‗, 19:19‗, 90:9
**wider** [1]‗ - 267:3
**width** [1]‗ - 237:13

**Windows** [2]‗ - 90:15
**wire** [1]‗ - 172:4
**wireless** [10]‗ - 98:7‗, 104:18‗, 104:21‗, 104:22‗, 104:23‗, 149:14‗, 154:24‗, 154:25‗, 155:5
**wish** [6]‗ - 4:15‗, 5:8‗, 52:22‗, 53:2‗, 186:16‗, 281:10
**withdrawing** [2]‗ - 4:18‗, 281:16
**witness** [54]‗ - 3:21‗, 4:5‗, 4:16‗, 6:2‗, 12:18‗, 12:22‗, 13:17‗, 15:9‗, 20:19‗, 30:7‗, 30:23‗, 37:4‗, 37:8‗, 52:7‗, 52:22‗, 53:24‗, 54:4‗, 54:24‗, 73:8‗, 76:7‗, 88:15‗, 91:2‗, 110:7‗, 112:10‗, 119:3‗, 119:5‗, 119:8‗, 119:14‗, 119:15‗, 131:1‗, 132:23‗, 133:5‗, 134:10‗, 142:10‗, 144:3‗, 144:5‗, 144:8‗, 147:6‗, 147:15‗, 161:15‗, 162:23‗, 164:8‗, 170:12‗, 170:20‗, 170:23‗, 188:1‗, 188:6‗, 211:7‗, 282:13‗, 282:23‗, 282:24‗, 283:4‗, 284:1
**WITNESS** [36]‗ - 6:13‗, 6:17‗, 29:17‗, 29:19‗, 30:17‗, 30:21‗, 76:3‗, 76:13‗, 76:18‗, 76:20‗, 76:23‗, 91:6‗, 103:25‗, 110:19‗, 114:16‗, 122:19‗, 128:8‗, 132:21‗, 161:25‗, 164:2‗, 164:6‗, 164:17‗, 164:21‗, 207:15‗, 242:1‗, 244:19‗, 244:22‗, 246:2‗, 248:8‗, 257:17‗, 258:19‗, 261:24‗, 262:24‗, 267:6‗, 280:13‗, 280:19
**witness's** [2]‗ - 28:21‗, 56:10
**witnesses** [5]‗ - 132:13‗, 281:4‗, 282:6‗, 283:9‗, 283:13
**wonderful** [1]‗ - 279:10
**wondering** [1]‗ - 194:4
**word** [6]‗ - 11:5‗, 24:16‗, 107:16‗, 142:6‗, 237:15‗, 279:25
**words** [5]‗ - 107:13‗, 141:17‗, 141:18‗, 146:6‗, 161:4
**works** [1]‗ - 168:18

**workshops** [1]‗ - 33:21
**world** [4]‗ - 90:9‗, 90:11‗, 93:13‗, 140:18
**worries** [1]‗ - 255:9
**worth** [3]‗ - 4:8‗, 168:13‗, 173:9
**wrapping** [1]‗ - 283:24
**write** [2]‗ - 31:24‗, 189:16
**writes** [1]‗ - 35:15
**writing** [2]‗ - 45:16‗, 200:17
**written** [2]‗ - 34:8‗, 35:8
**wrote** [1]‗ - 189:10

### X

**Xterra** [3]‗ - 72:19‗, 225:25‗, 260:3
**XX** [1]‗ - 58:9
**XY** [1]‗ - 58:8

### Y

**Y-InDel** [1]‗ - 61:18
**yards** [3]‗ - 27:16‗, 27:22‗, 29:20
**year** [7]‗ - 9:24‗, 10:8‗, 10:9‗, 34:22‗, 169:8‗, 169:10‗, 179:2
**years** [17]‗ - 7:6‗, 9:2‗, 9:9‗, 10:7‗, 12:8‗, 31:13‗, 32:22‗, 33:19‗, 34:7‗, 78:9‗, 165:22‗, 166:5‗, 166:23‗, 166:24‗, 166:25‗, 178:25‗, 179:1
**yellow** [7]‗ - 90:18‗, 205:3‗, 223:3‗, 224:1‗, 225:14‗, 232:19‗, 255:6
**yesterday** [2]‗ - 40:18‗, 56:9
**York** [1]‗ - 33:13
**yourself** [4]‗ - 11:3‗, 91:22‗, 113:24‗, 169:16
**YouTube** [1]‗ - 108:20
**yup** [2]‗ - 171:24‗, 266:9

### Z

**zero** [1]‗ - 132:13
**zeros** [4]‗ - 66:23‗, 67:1‗, 67:2‗, 67:5

**zip** [9] - 68:19, 68:20, 69:7, 69:11, 69:12, 69:18, 70:2, 74:18, 74:19

**zipper** [2] - 70:10, 70:20

**zone** [2] - 92:25, 217:5

**zones** [1] - 9:23

**zoom** [30] - 101:5, 101:24, 101:25, 102:23, 111:7, 121:25, 123:3, 123:4, 124:14, 125:17, 126:12, 126:23, 127:20, 128:6, 128:16, 137:18, 137:25, 140:9, 140:22, 152:4, 161:8, 205:10, 205:21, 206:16, 218:9, 223:7, 223:11, 223:20, 225:23, 260:1

**zooming** [2] - 127:15, 129:1