**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-80116-CR-CANNON/McCabe**

**UNITED STATES OF AMERICA**

**vs.**

**RYAN WESLEY ROUTH,**

      **Defendant.**
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, through undersigned counsel, respectfully files this Memorandum to aid the Court in its upcoming sentencing of the Defendant, Ryan Routh. The Presentence Investigation Report (PSI) proposes a sentence of life imprisonment for Routh's assassination attempt on President Donald J. Trump; the United States agrees, and urges the Court to follow that recommendation. Routh's crimes undeniably warrant a life sentence—he took steps over the course of months to assassinate a major Presidential candidate, demonstrated the will to kill anybody in the way, and has since expressed neither regret nor remorse to his victims. His arguments for a downward variance from life imprisonment [ECF No. 380] are wholly meritless.

The Constitution affords citizens many peaceful avenues to oppose or express strong dissent about a Presidential candidate—murder is not one of them.

## Background

On September 23, 2025, after a two-and-a-half week trial, a Fort Pierce federal jury convicted the Defendant of five crimes relating to his calculated scheme to assassinate President Donald J. Trump at a time when President Trump was a major Presidential candidate [ECF No.

1

318].   The Defendant plotted painstakingly to kill President Trump, and took significant steps toward making that happen, culminating on September 15, 2024 at the Trump International Golf Club in West Palm Beach, when he sat in a sniper hide that he had carefully constructed, chambered a round in the military-grade SKS rifle that he possessed illegally, and pointed it toward President Trump and his protective detail.   Routh was only thwarted in his assassination attempt by a Secret Service agent who noticed and disrupted Routh before Routh could fire a shot.

The jury convicted Routh of all five crimes charged in the Indictment.   Count 1 charged the attempted assassination of a major Presidential candidate, contrary to 18 U.S.C. §351(c). Count 2 charged Routh with knowingly possessing and brandishing a firearm in furtherance of that assassination attempt, contrary to 18 U.S.C. §924(c)(1)(A)(ii).   Count 3 charged that Routh intentionally assaulted a federal officer (Secret Service agent Robert Fercano), with the intent to inflict deadly injury and using a dangerous weapon, in violation of 18 U.S.C. §111(a)(1) and (b). Count 4 alleged that Routh, a convicted felon, knowingly and unlawfully possessed a firearm, contrary to 18 U.S.C. §922(g)(1). Count 5 alleged that Routh knowingly possessed a firearm with an obliterated serial number, contrary to 18 U.S.C. §922(k).

The Defendant was represented by counsel during most of the pre-trial process, but elected to represent himself at trial with the assistance of his former appointed attorneys acting as standby counsel.   [*See* ECF Nos. 208, 210–211] (cataloguing Defendant's repeated and unequivocal decision to represent himself)].   With and without counsel, Routh made "calculated attempts to make a mockery of this proceeding" [ECF No. 364:5].   Moments after publication of the verdict—with some jurors still in the courtroom—the Defendant conspicuously attempted to harm himself by puncturing his neck with a pen [*see* ECF No. 336:120–122].

This Court subsequently appointed counsel to represent Routh at sentencing [ECF No. 364].   The Court's Order came after Routh advised in a *pro se* letter, among other things:   (1) "I felt ordinary citizens should decide; just a quarter of an inch further back and we all would not have to deal with all of this mess forwards"; (2) "I hate our dictator missed the trial, can my appeal

2

be heard in 30 years when he is gone"; (3) "[p]erhaps now that I am found guilty, it might make it easier to trade my life for another[ …]; and (4) "[m]y life is done"  [ECF No. 359:1:1-2].  The Court also directed the parties to file any sentencing memoranda and variance requests by January 16, 2026, in anticipation of the sentencing hearing on February 4, 2026 [*id.*].

### <u>Summary of Facts</u>

Having presided over this case from its start, the Court knows well the facts giving rise to Routh's convictions.  Cravenly, in cold blood, Routh attempted to kill President Trump, putting at risk of death also a brave Secret Service agent and potentially anyone in the line of fire.  There is no question about Routh's guilt on all five charges; the Court denied Routh's motion for judgment of acquittal during trial, and no such motion was filed thereafter.

The PSI's Offense Conduct section lays out in detail the evidence presented by the United States during trial; we need not repeat all that information here.  Each of the charges was linked by Routh's plan to kill President Trump, and his preparation for executing it.  As the prosecution proved at trial, Routh wanted to deny the American people even the option of voting for then-candidate Trump in the November 2024 Presidential election, seeking to alter violently this country's future [*see, e.g.*, PSI ¶¶5, 42 (summarizing Routh's own words confessing his intent)].

Routh's criminal acts at the golf course were not impromptu; he had been planning to assassinate the President for months, at least. The United States proved that in late March 2024, Routh traveled from North Carolina to the West Palm Beach area to pursue President Trump, and immediately upon returning to North Carolina, provided Lazaro Plata the box containing ammunition, destructive-device components, and the "Dear World" letter making clear that he wanted President Trump dead.  Then, in July 2024, after the unsuccessful attempt by another prospective assassin, Thomas Crooks, on President Trump's life in Butler, Pennsylvania, Routh re-committed himself to accomplishing what Crooks failed to complete.

After flying from Hawaii, Routh unlawfully purchased in early August in North Carolina the military-grade SKS rifle that he ultimately possessed on September 15.  On August 14, he

returned to West Palm Beach, driving all day and night in a car with a stolen Ohio license plate. Once in South Florida, Routh camped out at a truck stop while tracking the President's whereabouts and researching weaponry and assassination tactics.  Using a burner phone (one of 10 phones attributed to him), Routh researched, among other things, President Trump's campaign movements, patterns of life, the golf club, President Trump's airplane, firearms and ammunition, escape routes, local hospitals, police forensic techniques, and items he would need as a sniper.

On September 15 itself, Routh set up his sniper hide in the predawn hours, in preparation for President Trump playing golf that day.  He parked his car, now bearing a stolen Florida tag, across the street from a hidden area near the 6th hole.  After being discovered by Agent Fercano shortly before President Trump would have come into close range of the sniper hide, Routh fled the scene, abandoning the rifle and seeking to escape undetected.  Evidence at trial established that while Routh's primary target was then-candidate Trump, he deliberately put others at risk of death too, by (1) moving the rifle in Agent Fercano's direction once the pair made eye contact on the fence line; (2) using Russian-made ammunition that risked over-penetration and hitting additional people nearby; and (3) fleeing the scene recklessly on busy public roadways.[1]  Far from accepting responsibility for his actions, Routh insisted upon trial, and to this day remains totally unrepentant.

### The PSI and Sentencing Procedures in this Case

As noted above, the PSI states that Routh's advisory Guidelines range is life imprisonment [PSI ¶178].  We agree, and so does the Defendant [ECF No. 380:4 ("the defendant [is] in a sentencing range of life")].  There is no dispute that Routh's Guidelines range is life.

The PSI reaches its recommendation by starting Routh at Offense Level 33 [PSI ¶59], then adding six levels because Routh targeted an official victim [PSI ¶61, citing USSG §3A1.2].  The PSI also adds the terrorism enhancement in USSG §3A1.4 [PSI ¶62], which applies to any offense

---

[1]    *See* for (1) PSI ¶37, for (2) Trial Tr. 9/15/25:185-86; and for (3) PSI ¶38.

conduct (whether conforming to popular definitions of "terrorism" or not) that involved a violation of specified statutes such as 18 U.S.C. §351 and was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  The terrorism enhancement adds 12 levels to Routh's offense and puts him automatically in Criminal History category VI instead of I where he would be otherwise given that none of his many prior convictions accrue any Criminal History points [PSI ¶178].  As explained by the PSI, the overall analysis yields an advisory Guidelines sentence of life imprisonment [*id.*].

In addition to the Sentencing Guidelines, this Court must examine the factors in 18 U.S.C. §3553(a).  That statute provides that courts, in imposing a reasonable sentence, must consider, among other things:  (1) the applicable guidelines range; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect of the law, and to provide just punishment for the offense; (5) the need for adequate deterrence; (6) the protection of the public; and (7) the need to avoid unwarranted sentencing disparities.  *See* 18 U.S.C. §3553(a).  Explicit recitation of how the defendant's sentence comports with each of these factors is not required; the sentencing court instead simply must acknowledge that it has considered the defendant's arguments in light of the statutory sentencing factors, and has worked that analysis into the ultimate sentence.  *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).  A sentencing court "is permitted to attach great weight to one factor over others" and that the "decision about how much weight to assign a particular sentencing factor [is] committed to the sound discretion of the district court."  *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015).

On January 15, 2026, the Defendant filed an "Objection to P.S.R. and request for a sentencing variance" [ECF No. 380].  The pleading states that Routh objects to all of the facts in

the Offense Conduct section, but he does not provide any evidence of his own to refute a single line in that section (the entirety of the Offense Conduct section is from the Government's trial evidence). Routh's pleading states that he does <u>not</u> object to the PSI's ultimate recommendation that his advisory Guidelines range is life imprisonment [*id.*:4], although he disputes being placed in Criminal History category VI.[2] Finally, Routh asks that the Court vary downward to impose a total sentence of 27 years rather than life imprisonment [*id.*:5].

## <u>Argument</u>

This Court should follow the PSI's recommendation and explicitly impose life imprisonment, nothing less: such a sentence comports with the advisory Guidelines range, is reasonable, and is, in truth, demanded by the statutory sentencing factors under §3553. The Eleventh Circuit has stressed that "we ordinarily expect a sentence within the Guidelines range to be reasonable." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008); *see also United States v. Boone*, 97 F.4th 1331, 1342 (11th Cir. 2024) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable.") (alterations adopted) (quotation marks omitted); *United States v. Coglianese*, 34 F.4th 1002, 1009 (11th Cir. 2022) (same); *United States v. Perkins*, 787 F.3d 1329, 1342 (11th Cir.

---

2    Routh's objection to the underlying Guidelines analysis is difficult to understand, especially in light of his concession that, no matter what, the advisory punishment is life imprisonment. Although Routh's PSI objections are a day late [*compare* ECF No. 29:5], the Government will respond to them anyway in a separate pleading within seven days [*see id.*]. The terrorism enhancement plainly applies here, and that automatically puts Routh in Criminal History category VI regardless of his number of criminal history points. *See* USSG §3A1.4.

Although this Court's order on sentencing procedures [ECF No. 29] allows us time and the vehicle of a separate pleading to respond to Routh's variance arguments, those arguments are cursory at best, so we will address them in this pleading [see *infra*:16-20] rather than filing an additional, separate response.

2015) (same); *United States v. Muho*, 978 F.3d 1212, 1227 (11th Cir. 2020) ("Sentences that fall within the Guidelines range … are generally reasonable.").

Below we address the §3553 factors most relevant to the Court's decision here,[3] and explain why all of them support a life sentence for Routh:

### §3553 Factor:  The Nature and Circumstances of the Offense

Routh's crimes of conviction reflect careful plotting, extensive premeditation, and a cowardly disregard for human life.  Routh planned for months to assassinate then-candidate Trump.  He explored many options for doing so, ranging from Stinger missiles to rocket-propelled grenades to .50 caliber weapons, before settling on the SKS sniper rifle he possessed on September 15, 2024.  Routh acquired the ammunition for that rifle, as well as a scope and other components that he hoped would aid the rifle's effectiveness.  Routh traveled across the country, concealing his movements by using burner phones, fake or stolen license plates, multiple aliases, and deceptive messages to family members.  On September 15, he loaded 20 rounds into the rifle's magazine, racked one round into the chamber, and aimed the barrel through an opening in the golf club's chain-link fence for a clear shot at President Trump as he played golf that day.  Routh spent hours camped out in his sniper hide, with the gun shielded by armored plates, waiting for his moment to kill.  Thanks only to Agent Fercano, that moment never came.

Routh's attempt to assassinate then-candidate Trump is surely the most serious of his

---

[3]     Other factors identified in §3553 are either irrelevant to Routh's punishment or do not justify any leniency, so we will not address them at length.  Even if restitution is ordered, Routh on this record has no more or less ability to pay it out of custody than in custody.  We are not aware of any pertinent policy statement of the Sentencing Commission suggesting lenient punishment for an assassination attempt.  And we are not aware of any unique health, vocational, or education requirements for Routh that might favor a shorter time in rather than out of BOP custody.

convictions, but the jury also convicted Routh of other significant crimes related to this attempt: brandishing a deadly weapon in furtherance of a crime of violence; threatening Special Agent Fercano with a dangerous weapon; possessing a firearm and ammunition as a convicted felon, and possessing a firearm with an obliterated serial number.   The trial record showed that Routh committed multiple uncharged crimes too during this scheme – ranging from the theft of license plates, to the use of aliases, to possessing other types of ammunition and destructive devices despite being a convicted felon, to making false statements.   Ultimately, however, it is the heinous nature of this assassination attempt – his selfish, violent decision to prevent the American voters from electing President Trump by killing him first – that warrants severe criminal punishment.

### §3553 Factor:  The History and Characteristics of the Defendant

Nothing about Routh's personal history or characteristics supports a downward variance from the life sentence proposed by the Guidelines.

The trial record shows that the Defendant, for all his protestations of peacefulness, is a dangerous man, at least when it comes to individuals who stand in his way.   Routh was convicted in 2002 for possessing a weapon of mass death and destruction; specifically, a "binary explosive device with a detonation cord and a blasting cap" [PSI ¶109].  By definition, this item had to be a "weapon," not some item for benign purpose.  *See* N.C. Stat. 14.288.8(b).

The Defendant kept guns and ammunition close at hand even after becoming a convicted felon.  At trial, the Government proved that Routh possessed, while a convicted felon, six rounds of .50 caliber ammunition (April 6, 2024, Greensboro, NC, in the storage container delivered to Lazaro Plata), and a Hornady Colt. 45 cartridge casing (September 15, 2024, Palm Beach and Martin County, FL, in his Xterra) [*see* Trial Tr.:9/12/25:165, 9/15/25:189].   The Defendant also

boasted, in a 2022 WhatsApp message, that "I ow[n]ed an ak47 in [N]orth Carolina and a tech 9 and a bunch of guns . . ." [GX 1300; Trial Tr. 9/19/25:26].  Routh lived in North Carolina as recently as 2018.

Trial evidence further showed Routh's comfort with engaging in, and soliciting, deadly violence – exactly as he did in the "Dear World" letter.  According to Samuel Plata, the Defendant once purposefully ran over, with a vehicle, an employee who tried to speak to the Defendant about unpaid wages, and then sped off [Trial Tr. 9/17/25:203].  According to Ronnie Oxendine, the man who sold Routh the SKS rifle used in Routh's crimes of conviction, Routh threatened other people [*id*.:109].  The jury also saw Routh's June 2025 "song lyrics" calling for violence against President Trump in the most profane ways, proclaiming :  "Lay some bullets down … bullets fly round and round Don't be some pussy now when killing some wussy Go on get busy – eat them bullets." [PSI ¶44].

The violence that Routh attempted to direct toward President Trump and others in this scheme was not an aberration.  The PSI does not identify the substantial non-trial evidence in this record showing Routh's pattern of attempted violence or threats toward those who displease him – be they employees seeking their wages, people of different races or religions, or public figures unaligned with his world view.  The Court need not rely upon this additional evidence to follow the advisory Guidelines and impose a life sentence, but even a few examples confirm that Ryan Routh is far from a peaceful, non-violent man:

- On June 20, 2025, the Defendant, while incarcerated, authored a letter to the International Criminal Court "from Ryan Wesley Routh, alleged trump gunman," in which he identified himself as an anti-Semite and said, among other things:  "I do hope Iran has that nuke ready; I do not want to deal with Jews stealing Arab land that is not theirs for the next 1000 years – please remove those religious nuts … we

should be delivering truck loads of guns daily so they all can fight.  I do hope Iran sends all of their ground troops."

- In the early 2000s, according to a witness who testified at trial on other topics (Samuel Plata) and as reflected in FBI 302s, Routh routinely traveled with an Uzi-type firearm.  Routh showed the gun to Samuel Plata and said he "was not going to go down easy for law enforcement."

- During 2023-24, Routh exchanged WhatsApp messages online with a user "Zhu Xiance hero to fight."  Routh believed that Zhu was in China or Taiwan, and thought these messages were encrypted but still at various times urged Zhu to delete them. In those messages, extracted by the FBI from his devices after arrest, Routh called for the assassination of several world leaders, as well as neighbors who offended him.  Indeed, on September 1, 2024, Routh wrote "there is one rich Chinese man that lives near me …once you get out we can systematically assassinate each and every one of them for their connection to crimes … come and help me kill them."[4]

Simply put, any effort by Routh to portray himself as a peaceful man for whom this assassination attempt was an aberration is unconvincing.

**§3553 Factor:  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect of the law, and to provide just punishment for the offense**

Imposing a life sentence is vital to reinforce the seriousness of Routh's crimes, especially his assassination attempt.  As described in the legislative history of §3553(a):  "This purpose— essentially the 'just deserts' concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense."  *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (quoting S. Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59).

---

[4]     These incidents were referenced in pre-trial proceedings [*see* ECF No. 122] and provided to the Probation Officer.  The Government is prepared to introduce evidence about them at sentencing if needed – but again, the Court need not in our view go outside the trial record or PSI at all to impose the Guidelines' recommended sentence of life imprisonment.

A life sentence in this case would not only promote respect for the vitally serious laws that Routh broke, it would also protect the democratic process, and emphasize the importance of elections in that process.  Individuals cannot believe that deadly violence is an acceptable means of ensuring that a particular candidate is not elected.  It is essential that this Court, based upon the facts of the case before it, send a message that seeking to assassinate a Presidential candidate will result in the most severe punishment.

**§3553 Factor:  The Need for Adequate Deterrence**

This factor has two components, both advanced by a life sentence here.

One goal of sentencing must be "specific deterrence" – in other words, preventing the defendant from seeking to engage in misconduct in the future.  As discussed above, Routh's life demonstrates little respect for the law, at least when he sees someone standing in the way of what he wants.  Routh's vast criminal history, while generally non-violent before the instant offenses, is far too extensive to downplay.  It includes at least 36 convictions, 19 additional arrests, and a slew of probation violations and criminal citations, spanning decades   [PSI ¶¶ 80-140].  This chronicle of lawlessness involves many repeat offenses illustrating further how Routh has no real concern for the law.  These crimes mirror Routh's disregard for the law in non-criminal ways, evidenced by his lengthy trail of unpaid civil judgments amounting to hundreds of thousands of dollars [PSI ¶¶ 173-75], and the ease with which, during this offense, he lied to everyone around him – friends, family, merchants, and law enforcement [*e.g.*, PSI ¶¶ 25-29].  There is no persuasive evidence in this record that Routh, if given less than a life sentence, would suddenly become the law-abiding citizen he never has been.

Moreover, the facts of this assassination plot, including Routh's knowledge of and willingness to use a sniper rifle for cold-blooded murder, reinforce why he would be a profound public danger if released.

So-called "general" deterrence has equal or maybe greater significance here.  Indeed, "general deterrence ... is one of the key purposes of sentencing."  *Pugh*, 515 F.3d at 1194 (cleaned up).  There is a powerful need to deter others from thinking that political violence can be attempted without life-altering criminal consequences. "The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others."  *United States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) (*en banc*).  Democracy dies when individuals who fear the outcome of an election resort to violence –in this instance, the attempted cold-blooded assassination of now-President Trump.

### §3553 Factor:  The Protection of the Public

There can be no better protection for the public than incarcerating Routh for his remaining life.  Routh is demonstrably a threat to members of the public – at least those members of the public who may displease him, or get in his way.  This case demonstrates the lengths to which Routh would go to eliminate President Trump, a man Routh disliked in the most violent, crude respects.  But as discussed in the "history and characteristics" section above, the record shows other examples of Routh using or threatening violence against people he dislikes.

Routh routinely called for violence against political leaders whose viewpoints he did not share.  He also made threats to individuals in his own sphere of life, ranging from employees who he did not want to pay to members of different religions to neighbors he found racially offensive. Routh has been convicted of violent crimes of public endangerment (possessing a weapon of mass

death and destruction) and at least four non-violent crimes of individual harm (possessing stolen property). Further incontestable evidence of Routh's dangerousness abounds – as Lazaro Plata described it during trial, Routh deliberately, in April 2024, left multiple rounds of .50 caliber ammunition and homemade firing mechanisms right beneath Lazaro's house in North Carolina without telling him what those items were and instead actually misleading him into thinking they were merely "some books" [Trial tr.:9/17/25:214].

Routh is also a threat to the public collectively.  He attempted to prevent the American people from exercising their right to elect the President of their choosing, by killing one of the two major candidates in the 2024 Presidential election.  His conduct jeopardized the democratic process as well as multiple human lives:  President Trump and Special Agent Fercano, at minimum.  Routh's decision to flee the scene put others at risk – if not for Tommy McGee, who took the extraordinary step of following Routh's vehicle after Routh fled recklessly from the golf course (Trial Tr. 9/11/25:133), Routh might to this day be unpunished for his crimes.   Despite knowing that he could not possess any kind of weapon or ammunition at all, Routh hatched a plan to acquire in an illegal transaction a sniper rifle, and then, in a separate illegal transaction, the 7.62 x 39 mm ammunition to kill people with it.  His dangerousness is undoubtable.

### §3553 Factor:  The need to avoid unwarranted sentencing disparities

Sentencing Routh to life imprisonment would not create any unwarranted sentencing disparity with similarly-situated defendants.  Fortunately for the prospective victims and the democratic process, prosecutions of individuals for attempting to assassinate a President or major Presidential candidate are uncommon.  We are not aware of an instance where a defendant has been convicted of and then sentenced for violating §351(c) regarding a major Presidential

candidate.  In *United States v. Duran*, 884 F. Supp. 566, 94-00447-PLF (D.D.C. 1994), *aff'd*, 96 F.3d 1495 (D.C. Cir. 1996), however, a defendant convicted of violating §1751(c) for attempting to kill then-President Clinton received 360 months' imprisonment on that count (plus additional punishments on other charges bringing his total imprisonment to 480 months).[5]  *Duran* is the closest analogous case, and certainly does not support any argument of unwarranted disparity in sentencing Routh to life for his similar attempt on now-President Trump's life.

Other cases support our requested punishment.  Jared Loughner in 2012 received life imprisonment under his guilty plea to violating §351(c) for attempting to assassinate Congresswoman Gabby Giffords, although he pled guilty additionally to multiple other crimes including the murder of federal employees.  *See* https://www.justice.gov/archives/opa/pr/jared-lee-loughner-pleads-guilty-federal-charges-tucson-shooting.  Sirhan Sirhan received the death penalty (later reduced to life imprisonment) in the late 1960s on state murder charges for assassinating then-presidential candidate and United States Senator Bobby Kennedy.  *See Sirhan v. Galaza*, 761 F. Supp. 2d 1073 (C.D. Cal. Jan. 5, 2015) (denying post-conviction relief).  Laurence Layton in the 1980s received 180 months' imprisonment after trial for conspiring to kill Congressman Leo Ryan in the 1978 Jonestown massacre in violation of §351(d).  Layton was not charged with attempting to kill the Congressman, unlike Routh.  He was convicted of aiding and abetting the killing, however, and for that crime he received life imprisonment.  *See United States v. Layton*, 855 F.2d 1388, 1398 (9th Cir. 1988).[6]

---

[5]      Duran received an additional 120 months running consecutively for violating §924(c) in connection with the assassination attempt.  Duran was also convicted of four §111(b) charges and of being a felon in possession. *United States v. Duran,* 2025 WL 1094221 (D.D.C. Apr. 11, 2025).

[6]      Three men were convicted in 1954 after trial for shooting members of Congress as part of

Recently, a district judge in the District of Maryland imposed a substantially below-Guidelines 97-month sentence on Nicholas Roske, who pled guilty to violating §351(c) by attempting to assassinate Supreme Court Justice Brett Kavanaugh in 2022.  Roske, who pled guilty, had no criminal history, and, in the judge's view, abandoned the crime by voluntarily ceasing the plot and turning himself in.  *See* https://www.politico.com/news/2025/10/03/kavanaugh-assassin-sentencing-00593998. The differences between Routh and Roske are obvious, which presumably is why Routh does not even cite that case.  Routh only fled his sniper hide after Special Agent Fercano confronted him, and never turned himself into law enforcement until he was caught trying to escape.  Routh unlike Roske also has a significant criminal history, and, of course, went to trial rather than admit guilt, refusing to concede even that he was at the golf course on September 15.  *See United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (no unwarranted disparity caused by treating more favorably defendants who plead guilty).

Roske's sentence in any event is mistaken, and does not provide a persuasive example for this Court to follow in sentencing Routh even if the circumstances were more similar.  *See* https://www.justice.gov/ag/media/1414626/dl?inline (Government's sentencing memorandum in *Roske*, explaining why, notwithstanding his guilty plea, Roske deserved no less than his Guidelines-recommended term of 30 years to life).[7]  Particularly after considering the important factual distinctions between Routh's and Roske's conduct, sentencing Routh in accordance with

---

a Puerto Rican nationalist protest.  They each received 75-year sentences, and although §351 did not exist at that time, the primary charges were similar to some in this case – assault with intent to kill, and assault with a deadly weapon.  *See Lebron v. United States*, 229 F.2d 16 (D.C. Cir. 1956).

[7]      The United States has appealed the below-guidelines sentence for Roske as procedurally and substantively unreasonable.  *See United States v. Roske*, No. 25-4598 (4th Cir. 2025).

his correctly-calculated Guidelines range would not create any unwarranted sentencing disparity discouraged by §3553. *See also United States v. Mirasol*, 2025 WL 1742059, at *2 (11th Cir. June 24, 2025) (observing that a "well-founded claim of disparity assumes that apples are being compared to apples," especially because a court that "correctly calculates and carefully reviews the Guidelines range necessarily gives significant weight and consideration to the need to avoid unwarranted disparities" (cleaned up)).

### Defense arguments for leniency

The PSI states that "[t]he probation officer has not identified any factors that may warrant a sentence outside of the advisory guideline system" [PSI ¶190].   We concur.   No downward variance would be reasonable.  Routh remains unrepentant for his crimes, never apologized for the lives he put at risk (on the contrary, during trial, he called Agent Fercano "absurd and, frankly, childish" [Trial Tr. 9/19:286-87]), and his life demonstrates near-total disregard for law.

Routh first contends that "nothing happened" [ECF No. 380:4].  This argument is as false today as it was when the Government addressed it explicitly during trial [*see, e.g.*, Trial Tr. 9/23/25:91-94].   Routh's conduct put multiple people at risk of death, deeply affected Agent Fercano (a former Marine not easily shaken), disrupted the life of Tommy McGee, and impacted countless others through his reckless flight.  "Nothing happened," in the sense of no one actually being murdered, was due only to Agent Fercano's bravery, wits, and training.   Even this unsuccessful assassination attempt had the potential to embolden others to commit politically-motivated violence.  That the drafters of §351 and of the Guidelines both contemplated the same punishment for an unsuccessful assassination as for a successful one makes that point evident.

Routh next insists that he should have no criminal history points and this alleged fact supports leniency.  His logic ignores the impact of the terrorism enhancement on his Criminal History calculation, automatically putting him in Category VI.  As discussed above, however, whatever the Guidelines' treatment of his record, the notion that Routh's criminal history supports leniency at sentencing is untenable.  If anything, his lifetime of criminality supports an *upward* variance in his criminal history score if such a thing were necessary and possible in this case.

Routh's supposed past "good acts" likewise pale in comparison to the calculated, cold-blooded dangerousness of his conduct in this case.  Small acts of kindness and decency over a lifetime are laudable, but they cannot be cited to excuse in any measure the attempted murder of a human being over political disagreements (let alone the potential slaughter, intentional or not, of anyone such as Agent Fercano in the literal cross-fire of his plan).[8]  Routh himself acknowledged to Probation that, whatever the challenges of his youth, they are not a reason for excusing his criminal conduct in this case as a 59-year-old adult. [PSI ¶147 (quoting Routh as saying that "no one should blame his childhood for what he became")].[9]

Routh's motive for his crimes was unconscionable – preventing the American people from electing the candidate of their choice for President.  Routh's gloss on his crimes has always been that anything he may have done was justified by events in Ukraine or American domestic politics.

---

[8]     The Court largely excluded evidence of Routh's "good acts" during trial, as required by the Rules of Evidence, which meant it has thus far been unnecessary to debate whether all of these acts actually occurred, or how "good" or impactful they actually were (ranging from Routh's alleged recruitment of soldiers in Ukraine to crafting Halloween decorations in North Carolina). The reality is that none of these past acts – even taking all of them at face value – mitigates attempted murder, let alone justifies a downward variance.

[9]     Routh does not share his sister's view of their upbringing.  Routh told Probation that he had a "fairly good childhood."  [PSI ¶145].

But there is no justification whatsoever in this country for attempting to murder a Presidential candidate during an election, or forcibly assaulting a Secret Service agent, or soliciting the assassination of a public figure with whom you disagree.

Routh's supposed mental health issues likewise do not mitigate the seriousness of his offenses, or diminish the imperative of life imprisonment to protect the public from him, to ensure adequate deterrence, and to promote respect for the law.  As the PSI notes, Routh's former counsel retained a private psychiatrist, Dr. Heather Holmes, after Routh's arrest to evaluate Routh for competency and a potential insanity defense [PSI ¶157].  Dr. Holmes' report ultimately acknowledged that Routh had no basis to claim incompetence, insanity, or diminished capacity, but did propose that Routh suffers from two disorders.  Neither diagnosis is corroborated by Routh's prior medical or psychiatric records, to our knowledge, and Routh himself disclaimed any mental impairment in his conversations with Dr. Holmes and in pretrial proceedings before this Court, including during the *Faretta* inquiries into his desire to represent himself at trial.

We do not agree that Dr. Holmes' report, based upon limited post-arrest interviews and unsupported by any testing or by pre-existing documentation of the alleged mental health conditions, provides a reliable basis for a downward variance, or calls into question any aspect of this proceeding.  But even crediting Dr. Holmes's report fully and taking her diagnoses at face value,[10] the disorders she proposes for Routh do not, on this record, support leniency.

---

[10]     The defense, not the Court or the United States, hired Dr. Holmes, a frequent consultant for criminal defendants.  *See, e.g.*, *United States v. Saingerard*, 621 F.3d 1341 (11th Cir. 2010); *United States v. Brown*, 2025 WL 2429021, at *1 (S.D. Fla. Apr. 25, 2025) ("Dr. Heather Holmes, … , testified that he was likely suffering from bipolar disorder and in a manic state when he committed the offenses"); *United States v. Davis*, 2011 WL 6965662, at *5 (S.D. Fla. Sept. 30, 2011) & 2012 WL 41929 (S.D. Fla. Jan. 9, 2012); https://www.cbsnews.com/news/esteban-santiago-pleads-guilty-in-deadly-fort-lauderdale-florida-airport-shooting/.

Narcissistic Personality Disorder is fairly commonplace, for example, and provides little basis for soft punishment.  Indeed, in *Brinkley v. Houk*, 831 F.3d 356 (6th Cir. 2016), the Sixth Circuit rejected the defendant's argument that his trial counsel was ineffective for failing to present at his murder trial evidence of his Narcissistic Personality Disorder.  As the court explained:

> Brinkley characterizes this condition as a "severe psychiatric condition" that "would have helped explain the criminal activity [*i.e.*, Smith's murder] and humanized [Brinkley] for the jury." Pet'r Br. at 80-81. But here, as in another recent case, Brinkley "seriously misunderstands the nature of [this] diagnosis." *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014).  "Personality disorders are not psychoses[,]" and "people with personality disorders are present in all walks of life." *Id.* … That Brinkley is a narcissist, therefore, does not "explain" his brutal murder of Shantae Smith; and it was counsel's prerogative to conclude that Brinkley's narcissism would not make him more sympathetic to a jury. (Quite the contrary, if common experience is any guide.).

*Id.* at 364.  We have identified no instance where a defendant's claimed Narcissistic Personality Disorder supported a more lenient sentence than otherwise compelled by the §3553 factors.  Such a diagnosis, even if credited, has less significance for Routh, who concededly was competent for trial, and understood at the time of his crimes the distinction between right and wrong and knew what he was doing.  Routh's careful planning, deliberate scheming, and counter-detection efforts during the assassination plot demonstrate his willful decision-making – as does the jury's ultimate verdict that Routh intentionally aimed to kill President Trump and to assault Agent Fercano.

Similarly, a Bipolar II diagnosis does not compel a lenient sentence.  Far more severe bipolar disorders than Routh's may not offset egregious criminal conduct.  *See United States v. Pacheco Colon*, 2025 WL 302684, at *5-6 (11th Cir. Jan. 27, 2025) (affirming upward variance for carjacking defendant despite his bipolar disorder); *see also United States v. Markham*, 418 F. App'x 730, 732 (10th Cir. 2011) (affirming denial of downward variance to defendant who presented at sentencing expert testimony about his bipolar disorder but failed to show how the

condition related to his crime).  Significantly, the district court in *Duran*, discussed above, imposed a virtual life sentence on President Clinton's attempted assassin despite the defendant having full-blown paranoid schizophrenia to such a degree that the court allowed him to present an insanity defense at trial.  96 F.3d at 1502.  Routh in any event makes no effort to explain how his supposed conditions relate to his crimes of conviction or excuse his past or present criminal conduct.

Finally, Routh suggests that the Court should "allow defendant to experience freedom again as opposed to dying in prison" [ECF No. 380:5].  Why?  Absolutely nothing about the Defendant's criminal activity in this case, or his past criminal activity (which, despite its frequency, was punished with relatively little jail time), justifies going below his Guidelines range.

In summary, none of Routh's arguments for a variance comes close to providing reasonable grounds to deviate from the Guidelines or impose a term of imprisonment shorter than life. Although district courts must say they have considered each of the §3553(a) factors, they need not "explicitly address," let alone credit, "all of the mitigating evidence."  *United States v. Al-Jaberi*, 97 F.4th 1310, 1330 (11th Cir. 2024) (quotation omitted).  A downward variance on this record would unreasonably minimize the danger Routh's conduct posed to human life and to democracy.

## <u>Conclusion</u>

For all the foregoing reasons, the Court should adopt the PSI and sentence Routh to life imprisonment on Count 1.  The Court should follow the PSI's other recommendations about the remaining counts and on topics such as supervised release.  Finally, in imposing a life sentence on Count 1, the Court should make the required finding under *United States v. Keene*, 470 F.3d 1347, 1350 (11th Cir. 2006), that it would impose such a sentence regardless of any Guidelines error.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:    /s/ John Shipley
John Charlton Shipley
Florida Bar No. 69670
Christopher B. Browne
Florida Bar No. 91337
Maria K. Medetis Long
Florida Bar No. 1012329
Assistant United States Attorneys

U.S. Attorney's Office
Southern District of Florida
99 Northeast 4th Street, 8th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9111
E-mail: John.Shipley@usdoj.gov

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL FOR THE
NATIONAL SECURITY DIVISION

By:    /s/ James Donnelly
James Donnelly, Trial Attorney
Court ID No. A5503278
Department of Justice, National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-0849

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16, 2026, I filed the foregoing response with the Clerk of Court using CM/ECF.

/s/ John C. Shipley
Assistant United States Attorney